## CASE NO. 21-2051

———————————

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

———————————

**JUSTIN ADKINS; JUSTIN BLAKE; EDWIN GLOWACKI; ERIC
JORDAN; KEVIN PALMER; DENNIS SARGENT; TRAVIS
THORNSBERRY; MICHAEL WILLIAMS; JOHN BAKER; JAMES
BLAIN; DEVERY BROWN; JAMES DEAL; JONATHAN JEFFERS;
ROBERT MOSTELLER; MICHAEL L. POTTER; MICHAEL D. POTTER;
JESSEE WALLACE; TIMOTHY WITT; JOHN BILLS; MICHAEL
CLARK; RANDALL CRAYCRAFT; JOHN FRASURE; SAMMY MADDIX;
JAMES STINNETT; TODD THAYER; MICHAEL CAMPBELL; TONY
ABDON; THE ESTATE OF CHAD LITTLE; BRANDON ADKINS;
JACQUELINE MARSHALL; HOMER MAYNARD; SCOTT MORRISON;
JEREMY NAPIER; SHAWN PATTERSON; MATTHEW WOODS; JOHN
CARPENTER; QUINCY CHRISTIAN; GREGORY HAMM;
ETHAN MULLINS; MICHAEL OWENS; JONATHAN ROWE; DANNY
STEWART; LLOYD WILLIAMS; DAVID MANIS; JOSHUA FERGUSON;
ERIC SPEAKS; DONALD STEPHENS; JASON BARKER; CHAD DOWDY;
JERRY FLOCKER; GROVER KELLEY; CHRISTOPHER CLAY
STILTNER; DENNIS HUTCHINSON; JOSHUA HALL; ZACH POTTER;
DEANNA LANHAM; SAMUEL PRESTON; BOBBY AKERS; GERALD
BARBER,**

**Plaintiffs – Appellants**

**v.**

**CSX TRANSPORTATION, INCORPORATED; CRAIG S. HELIGMAN,
M.D.; GUS THOELE; CURT SHOGREN; MILTON STORM; DELANDO
JONES; TOM DEANGELO; SHAWN LUSK; ELIZABETH CREEDON;
KENNETH RAY EMERSON**

**Defendants – Appellees**

---

**Appeal from the United States District Court
for the Southern District of West Virginia**

---

**JOINT APPENDIX
VOLUME 3 OF 6**

---

Jeff R. Dingwall
EIGHT & SAND
750 West Fir Street, Suite 602
San Diego, CA 92101
Tel: (619) 796-3464
Fax: (619) 717-8762
jeff@eightandsandlaw.com

Gregory G. Paul
PAUL LAW OFFICES
100 First Avenue, Suite 1010
Pittsburgh, PA 15222
Tel: (412) 417-5862
Fax: (888) 822-9421
gregpaul@morgan-paul.com

**ATTORNEYS FOR APPELLANTS**

Brian D. Schmalzbach
MCGUIRE WOODS
800 East Canal Street
Richmond, VA 23219
P: 804−775−7873
E:bschmalzbach@mcguirewoods.com

Samuel Lewis Tarry , Jr.
MCGUIRE WOODS
800 East Canal Street
Richmond, VA 23219
P: 804−775−7873
E:starry@mcguirewoods.com

Davis M. Walsh
MCGUIRE WOODS
800 East Canal Street
Richmond, VA 23219
P: 804−775−7873
E: dwalsh@mcguirewoods.com

Kathryn M. Barber
MCGUIRE WOODS
800 East Canal Street
Richmond, VA 23219
P: 804−775−7873
E:kbarber@mcguirewoods.com

Melissa Foster Bird

NELSON MULLINS RILEY &
SCARBOROUGH
P. O. Box 1856
Huntington, WV 25719
P: 304-526-3500
E:melissa.fosterbird@nelsonmullins.com

**ATTORNEYS FOR APPELLEES**

## TABLE OF CONTENTS
## APPENDIX VOLUME 3 OF 6

| ECF # | Description | Page # |
|-------|-------------|--------|
| 382-1 | Deposition of Craig S. Heligman 4/28/21 (Vol. I) | 949 |
|       | Deposition of Craig S. Heligman 4/28/21 (Vol. II) | 1205 |
| 382-3 | Deposition (30(b)(6)) of Jolanda Johnson 5/5/21 | 1260 |
| 402-1 | Plaintiff Chad Little's Responses to Defendants' Interrogatories | 1335 |
| 402-2 | Defendants' Wage Information Demonstrative Exhibit | 1347 |
| 402-3 | Report of Plaintiffs' Expert Economist Jeff Opp | 1350 |
| 402-4 | Email Correspondence re: Damages | 1356 |
| 408 | Minute Order of Case Management Conference 6/14/21 | 1364 |
|     | Transcript of Case Management Conference 6/14/21 | 1365 |
| 411-1 | Deposition of August Thoele 6/17/21 | 1387 |
| 412-1 | Deposition of Dr. Shannon Johnson, D.C. 5/20/21 | 1396 |
| 412-2 | Deposition of Dr. Daniel Carey, D.C. 5/27/21 | 1412 |
| 413-1 | Deposition of Dr. Shannon Johnson, D.C. 5/20/21 | 1419 |
| 413-2 | Deposition of Craig S. Heligman 4/28/21 | 1440 |
| 413-3 | Deposition (30(b)(6)) of Penny Dreher 5/4/21 | 1460 |
| 413-4 | Deposition (30(b)(6)) of Macon Jones 5/17/21 | 1471 |
| 413-5 | Defendants' Exhibit re: Plaintiffs' Medical Treatment | 1493 |
| 415-1 | Defendants' Letters to Plaintiffs re: No Longer Accepting Documentation from Drs. Johnson and Carey | 1497 |
| 415-2 | Deposition of Craig S. Heligman 4/28/21 | 1498 |

| 415-3 | Deposition (30(b)(6)) of Penny Dreher 5/4/21 | 1518 |
| 415-4 | Deposition (30(b)(6)) of Macon Jones 5/17/21 | 1529 |

1              IN THE UNITED STATES DISTRICT COURT FOR THE

2                  SOUTHERN DISTRICT OF WEST VIRGINIA

3                            AT HUNTINGTON

4

5       _____
                                        )
6       JUSTIN ADKINS, et al.,          )
                                        )
7                    Plaintiffs,        )
                                        ) Case No.
8              -vs                      ) 3:18-CV-00321
                                        )
9       CSX CORPORATION, et al.,        )
                                        )
10                   Defendants.        )
                                        )
11

12

13

14

15         VIDEOTAPED DEPOSITION OF CRAIG HELIGMAN, M.D.

16                   VOLUME I PAGES 1 - 313

17                      CONDUCTED REMOTELY

18                  WEDNESDAY, APRIL 28, 2021

19

20

21

22      REPORTED BY:  LAURA L. MAES, CSR NO. 9836

23

24

25

                                                                    1

Craig Heligman, M.D.                                        April 28, 2021

1              IN THE UNITED STATES DISTRICT COURT FOR THE

2                 SOUTHERN DISTRICT OF WEST VIRGINIA

3                          AT HUNTINGTON

4

5    _____
                                     )
6    JUSTIN ADKINS, et al.,          )
                                     )
7               Plaintiffs,          )
                                     ) Case No.
8            -vs                     ) 3:18-CV-00321
                                     )
9    CSX CORPORATION, et al.,        )
                                     )
10              Defendants.          )
                                     )
11

12

13

14   VIDEOTAPED DEPOSITION OF CRAIG HELIGMAN, M.D., VOLUME

15   I, conducted remotely by Laura L. Maes, CSR No. 9836,

16   on behalf of the Plaintiffs, commencing at the hour

17   of 7:03 a.m. on Wednesday, April 28, 2021.

18

19

20

21

22

23

24

25

                                                              2

Craig Heligman, M.D.                                                    April 28, 2021

```
 1    APPEARANCES:  (VIA ZOOM)


 2
      For the Plaintiffs:
 3
          EIGHT & SAND
 4        BY:  JEFF R. DINGWALL, (Pro Hac Vice)
          550 West B Street, Fourth Floor
 5        San Diego, California 92101
          619.796.3464
 6        jeff@eightandsandlaw.com


 7
      For the Plaintiffs:
 8
          GARELLA LAW, P.C.
 9        BY:  C. KIEL GARELLA, ESQ. (Pro Hac Vice)
          409 East Boulevard
10        Charlotte, North Carolina 28303
          980.321.7934
11        kiel@gljustice.com


12


13    For the Plaintiffs:

14        MORGAN & PAUL, PLLC
          BY:  GREGORY G. PAUL, ESQ.
15        100 First Avenue, Suite 1010
          Pittsburgh, Pennsylvania 15222
16        844.374.7200
          gregpaul@morganpaul.com

17

18    For the Plaintiffs:

19        UNDERWOOD LAW OFFICE, INC.
          BY:  JOHN PATRICK L. STEPHENS, ESQ.
20        923 Third Avenue
          Huntington, West Virginia 25701
21        304.486.3350

22

23

24

25
```

3

USCA4    951

Craig Heligman, M.D.                                                April 28, 2021

```
 1    For the Defendants:

 2         NELSON, MULLINS, RILEY & SCARBOROUGH, LLP
           BY:  MELISSA FOSTER BIRD, ESQ.
 3         949 Third Avenue, Suite 200
           Huntington, West Virginia 25701
 4         304.526.3500
           melissa.fosterbird@nelsonmullins.com
 5

 6

 7    Also present:

 8         KYLE LOSKAMP, VIDEOGRAPHER

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

Craig Heligman, M.D.                                                    April 28, 2021

1                              I N D E X

2

3        WITNESS

4          CRAIG HELIGMAN, M.D.

5

6        EXAMINATION                                            PAGE

7          MR. DINGWALL                                           7

8          MR. PAUL                                             187

9                           E X H I B I T S

10                                                              PAGE

11         Exhibit 1    Second Amended Notice of               10
                        Deposition of Craig S. Heligman
12
           Exhibit 2    Three Letters to William Fergus        62
13                      with attachments

14         Exhibit 3    9/20/2017 Letter from Dr.              95
                        Heligman
15
           Exhibit 4    ACA Choosing Wisely Document          110
16

17         Exhibit 5    9/23/2017 Letter from Dr.             122
                        Heligman
18
           Exhibit 6    E-mail with Attachments -            126
19                      CSXT(Adkins)022527-556

20         Exhibit 7    Certification of Ongoing              241
                        Illness or Injury Forms
21                      (CONFIDENTIAL)

22

23

24

25

                                                                       5

Craig Heligman, M.D.                                                   April 28, 2021

```
 1                    WEDNESDAY, APRIL 28, 2021

 2                         7:03 A.M.

 3

 4           THE VIDEOGRAPHER:   Here begins the          07:01

 5   videotaped deposition of Craig Heligman, Media 1,    07:01

 6   Volume I, in the matter of Adkins versus CSX in the  07:01

 7   United States District Court in the Southern         07:01

 8   District of West Virginia at Huntington.  The case   07:01

 9   number today is 3:18-cv-00321.                       07:01

10           Today's date is April 28th, 2021.  The time  07:01

11   on the monitor is 7:03 a.m.  Your video operator     07:01

12   today is Kyle Loskamp, representing Network          07:01

13   Deposition Services Incorporated, located at 1800    07:01

14   Century Park East, Suite 150, Los Angeles,           07:01

15   California.  The phone number is (310) 557-3400.     07:01

16           Our court reporter today is Laura Maes.      07:02

17   Today's deposition is taken on behalf of the         07:02

18   plaintiff and taken via Zoom Videoconference.        07:02

19           Will counsel please introduce yourselves    07:02

20   and state whom you represent?                        07:02

21           MR. DINGWALL:  Jeff Dingwall for the         07:02

22   plaintiffs.                                          07:02

23           MR. PAUL:  Greg Paul as well.                07:02

24           MS. FOSTER BIRD:  Sorry, Greg.               07:02

25           Melissa Foster Bird, I represent CSX,        07:02
```

6

Craig Heligman, M.D.                                                    April 28, 2021

| 1 | Dr. Heligman, and the other defendants in this | 07:02 |
| 2 | action. | 07:02 |
| 3 | THE VIDEOGRAPHER:  Thank you very much. | 07:02 |
| 4 | Will the court reporter please swear in the | 07:02 |
| 5 | witness? | 07:02 |
| 6 | THE REPORTER:  Mr. Dingwall -- | 07:02 |
| 7 | MR. DINGWALL:  Oh, I'm sorry.  Yes, I guess | 07:02 |
| 8 | we need to enter into a stipulation that the court | 07:02 |
| 9 | reporter, who is a Maryland court reporter, is | 07:02 |
| 10 | agreeable to all parties to administer the oath to | 07:02 |
| 11 | this witness. | 07:02 |
| 12 | MS. FOSTER BIRD:  We so stipulate. | 07:02 |
| 13 | MR. DINGWALL:  Thank you. | 07:02 |
| 14 | | 07:02 |
| 15 | Whereupon, CRAIG HELIGMAN, M.D., | |
| 16 | being first duly sworn or affirmed to testify to the | |
| 17 | truth, the whole truth, and nothing but the truth, | |
| 18 | via Zoom, was examined and testified as follows: | |
| 19 | | 07:02 |
| 20 | EXAMINATION | 07:02 |
| 21 | BY MR. DINGWALL: | 07:02 |
| 22 | Q.   Good morning, Dr. Heligman. | 07:03 |
| 23 | A.   Good morning. | 07:03 |
| 24 | Q.   Am I saying your name right? | 07:03 |
| 25 | A.   Yes, it's Heligman. | 07:03 |

7

Craig Heligman, M.D.                                                April 28, 2021

```
 1        Q.   Okay.  Great.  Thank you very much.        07:03

 2             I'm Jeff Dingwall, one of the attorneys for 07:03

 3   the plaintiffs in this case.  I want to see if we    07:03

 4   can agree on a few rules at the outset.             07:03

 5             Will you tell me if you don't understand a 07:03

 6   question that I ask?                                 07:03

 7        A.   Yes, I will.                               07:03

 8        Q.   Okay.  Will you tell me if you find a      07:03

 9   question confusing?                                  07:03

10        A.   Yes.                                       07:03

11        Q.   Will you tell me if I have assumed a fact  07:03

12   incorrectly in one of my questions?                 07:03

13        A.   Yes.                                       07:03

14        Q.   Will you tell me if you don't know the     07:03

15   answer to a question?                                07:03

16        A.   Yes.                                       07:03

17        Q.   And do you think you need to be reminded of 07:03

18   any of these rules?                                 07:03

19        A.   No.                                        07:03

20        Q.   All right.  Very good.                     07:03

21             I'm going to start off by entering an      07:03

22   exhibit -- just so we can all use eDepoze because I  07:04

23   know we're all excited about it.  And if you can let 07:04

24   me know when you get that, Dr. Heligman.            07:04

25        A.   Okay.  I have it.  It's just showing up    07:04
```

8

Craig Heligman, M.D.                                          April 28, 2021

| 1 | now. | 07:04 |
|---|------|-------|
| 2 | Q.   All right.  And this is just a copy of the | 07:04 |
| 3 | deposition notice that we served for today's | 07:04 |
| 4 | deposition. | 07:04 |
| 5 | Have you seen this document before? | 07:04 |
| 6 | A.   Yes, I have. | 07:04 |
| 7 | Q.   Okay.  And you're appearing pursuant to | 07:04 |
| 8 | this notice; is that right? | 07:04 |
| 9 | A.   That's correct. | 07:04 |
| 10 | MS. FOSTER BIRD:  You know, I'm just going | 07:04 |
| 11 | to go on record.  Actually, I don't think that was | 07:04 |
| 12 | ever served.  For any of the witnesses, we did not | 07:04 |
| 13 | get deposition notices.  We have no objection to the | 07:04 |
| 14 | noticed deposition and it going forward.  If it says | 07:04 |
| 15 | anything more than it's just a notice, it was not | 07:04 |
| 16 | served. | 07:04 |
| 17 | MR. DINGWALL:  All right.  Well, we can | 07:04 |
| 18 | always fix that. | 07:04 |
| 19 | MS. FOSTER BIRD:  I'm not complaining.  I'm | 07:04 |
| 20 | just saying if it has anything else in it, I did not | 07:04 |
| 21 | see it. | 07:05 |
| 22 | MR. DINGWALL:  But did you get a copy of it | 07:05 |
| 23 | there, Melissa? | 07:05 |
| 24 | MS. FOSTER BIRD:  I did.  Let me -- yeah, | 07:05 |
| 25 | if that's it -- if it's just the one-page unsigned | 07:05 |

9

Craig Heligman, M.D.                                          April 28, 2021

```
 1    notice of deposition, that's fine.                    07:05
 2            MR. DINGWALL:  It's three pages.  There's a   07:05
 3    second page where the -- on the signature...         07:05
 4            MS. FOSTER BIRD:  Okay.                       07:05
 5            MR. DINGWALL:  And then there's a proof of    07:05
 6    service.  So, anyway, as long as you don't find      07:05
 7    anything objectionable on there, we can go forward.  07:05
 8            MS. FOSTER BIRD:  We can go forward.          07:05
 9    BY MR. DINGWALL:                                      07:05
10        Q.   Okay.  Dr. Heligman, in 2017, you testified 07:05
11    in the formal investigations of each of the          07:05
12    plaintiffs in this case; is that right?              07:05
13        A.   Yes, it is.                                  07:05
14            (Exhibit 1 was marked for identification and
15    attached to the transcript.)                         07:05
16    BY MR. DINGWALL:                                      07:05
17        Q.   Okay.  And the testimony you provided in    07:05
18    those formal investigations was in your capacity as  07:05
19    the Chief Medical Officer at CSX; is that right?     07:05
20        A.   Yes.                                         07:05
21        Q.   Were you physically present for each of     07:05
22    those formal investigations?                         07:05
23        A.   I was physically present for most of them,  07:06
24    but not all of them.                                 07:06
25        Q.   Okay.  To the extent that you were not      07:06
```

                                                                  10

USCA4    958

Craig Heligman, M.D.                                                April 28, 2021

| | | |
|---|---|---|
| 1 | physically present, how did you testify in those | 07:06 |
| 2 | investigations? | 07:06 |
| 3 | A.   That was by telephone. | 07:06 |
| 4 | Q.   Okay.  For the investigations in which you | 07:06 |
| 5 | were physically present, where did they take place? | 07:06 |
| 6 | A.   It was at our offices in Huntington, West | 07:06 |
| 7 | Virginia. | 07:06 |
| 8 | Q.   And for the investigations in which you | 07:06 |
| 9 | participated by phone, where were you physically | 07:06 |
| 10 | present? | 07:06 |
| 11 | A.   In one case, I was in Omaha at a vendor | 07:06 |
| 12 | visit, and at the -- I believe there was only two | 07:06 |
| 13 | that I did by phone, if I remember correctly.  The | 07:06 |
| 14 | other one would have been at my office here in | 07:06 |
| 15 | Jacksonville. | 07:06 |
| 16 | Q.   Okay.  Do you remember specifically which | 07:06 |
| 17 | investigations you participated in by phone? | 07:06 |
| 18 | A.   I do not. | 07:06 |
| 19 | Q.   Okay.  But as to all of the investigations | 07:06 |
| 20 | in which you testified, you were present either by | 07:06 |
| 21 | phone or in person when the Charge Letters were read | 07:06 |
| 22 | into the record; is that right? | 07:07 |
| 23 | A.   Yes, that's correct. | 07:07 |
| 24 | Q.   Okay.  And you were also copied on each and | 07:07 |
| 25 | every one of the Charge Letters for the plaintiffs | 07:07 |

                                                                        11

```
 1   in this case; is that right?                        07:07

 2        A.   No, I was not actually given a copy of each  07:07

 3   of the Charge Letters.                               07:07

 4        Q.   Okay.  So if a Charge Letter for any of the  07:07

 5   plaintiffs in this case had a CC at the bottom of it  07:07

 6   with your name on it, is it your testimony that you  07:07

 7   did not receive that?                                07:07

 8        A.   I would have seen many of them, but I don't  07:07

 9   believe I received all of them, no.  I don't keep a  07:07

10   file of Charge Letters.  They're held in a different  07:07

11   location in our system.                              07:07

12        Q.   Okay.  Would you agree that you were copied  07:07

13   on the Charge Letters for the plaintiffs in this    07:07

14   case?                                                07:07

15        A.   If my name was listed as a CC, then yes.   07:07

16        Q.   Okay.  And how would you have obtained --   07:07

17   I'm sorry -- how would you have received those      07:07

18   Charge Letters?                                      07:07

19        A.   It would have either been through an e-mail  07:08

20   that I was CC'd on or it would have been during the  07:08

21   time I would have reviewed the case in our          07:08

22   administrative database where those letters are     07:08

23   housed.                                              07:08

24        Q.   Okay.  And did you participate in drafting  07:08

25   the language in the Charge Letters?                  07:08
```

                                                          12

Craig Heligman, M.D.                                                April 28, 2021

```
 1        A.    No.                                      07:08

 2        Q.    Did you have an opportunity to review the    07:08

 3   Charge Letters before they were sent?                07:08

 4        A.    No.                                      07:08

 5        Q.    Have you reviewed the Charge Letters at any  07:08

 6   point up till now?                                 07:08

 7        A.    I may have looked at some of them or even   07:08

 8   all of them, but I -- I don't remember that part.   07:08

 9        Q.    You heard them read into the record in each  07:08

10   of the investigations in which you testified;       07:08

11   correct?                                           07:08

12        A.    Yes.                                     07:08

13        Q.    And if there was anything incorrect about   07:08

14   the language that you heard read into the record    07:08

15   from the Charge Letter, you would have corrected    07:08

16   that; right?                                        07:08

17        A.    I didn't write the Charge Letters, so it   07:09

18   wouldn't have been my place to make any corrections.  07:09

19        Q.    But if there was anything that you had     07:09

20   specific knowledge of with regard to the Charge     07:09

21   Letters and you heard it read incorrectly, you would  07:09

22   have made a correction; right?                      07:09

23        A.    Again, I didn't write the Charge Letters.  07:09

24   That was not my position in the proceedings.  So,   07:09

25   no, if -- I wouldn't have known if it was correct or  07:09
```

13

Craig Heligman, M.D.                                          April 28, 2021

```
 1    incorrect.  There's -- Labor Relations and our        07:09

 2    Charging Officers would be the ones responsible for   07:09

 3    assuring the accuracy of those charges.               07:09

 4        Q.   Have you reviewed any of the Charge Letters  07:09

 5    in preparation for your testimony today?              07:09

 6        A.   I believe I reviewed a couple of them.       07:09

 7    They're very similar, so I didn't see reason to       07:09

 8    review all of them.                                   07:09

 9        Q.   Would you agree that generally the Charge    07:09

10    Letters for the plaintiffs in this case state that    07:10

11    the investigations -- I'm sorry -- the purpose of     07:10

12    the investigations was to determine the facts and     07:10

13    place responsibility, if any, in connection with an   07:10

14    incident that occurred in the vicinity of Russell,    07:10

15    Kentucky with information received from the CSXT       07:10

16    Chief Medical Officer on July 14th, 2017?             07:10

17        A.   That sounds correct.                         07:10

18        Q.   Okay.  And the Chief Medical Officer that    07:10

19    the Charge Letters referred to was you; is that       07:10

20    right?                                                07:10

21        A.   Yes, that is correct.                        07:10

22        Q.   So the basis for the Charge Letters,         07:10

23    according to the language that we just agreed upon,   07:10

24    was that you provided information on July 14th,        07:10

25    2017; correct?                                        07:10
```

                                                                    14

Craig Heligman, M.D.                                                    April 28, 2021

```
 1        A.    Yes.                                    07:10

 2        Q.    Okay.  And what information did you provide  07:10

 3   on July 14th, 2017?                                07:11

 4        A.    I presented a collection of COII documents  07:11

 5   or the certification of injury and illness         07:11

 6   documents, from two specific chiropractic providers  07:11

 7   in the Greater Huntington area.                    07:11

 8        Q.    And who did you provide that information  07:11

 9   to?                                                07:11

10        A.    It was originally presented to our Law  07:11

11   Department, and then it was presented to the Labor  07:11

12   Relations team.                                    07:11

13        Q.    In what format did you provide that    07:11

14   documentation to the Law Department?               07:11

15        A.    I had presented it either directly in a  07:11

16   hard copy or by e-mail.  I don't remember precisely  07:11

17   which one it was.                                  07:11

18        Q.    Have you searched your e-mail at any time  07:11

19   up to the present to look for that?                07:11

20        A.    Our e-mails are purged on a regular basis  07:12

21   and they don't go back that far.  Any e-mails that  07:12

22   were written would be provided through the discovery  07:12

23   process.                                           07:12

24        Q.    So any e-mails from that time period are no  07:12

25   longer in existence; is that your testimony?       07:12
```

Craig Heligman, M.D.                                                    April 28, 2021

```
 1       A.   No, sir.  What I'm saying is I can't do the    07:12
 2   search.  My e-mail box is purged, I believe, after     07:12
 3   18 months, and so anything that far back -- you        07:12
 4   know, we're talking five years ago -- would not be     07:12
 5   available to me in my e-mail box.                       07:12
 6            What I'm saying is that we have a team that    07:12
 7   is able to search the stored documents, the stored     07:12
 8   e-mails that are -- and they work through the Law      07:12
 9   Department for purposes of providing discovery as --    07:12
10   you know, if any cases do come up.  So I don't have    07:13
11   access to that research tool.  I can only look in my   07:13
12   own e-mail box.                                         07:13
13       Q.   Okay.  During the course of this case, have    07:13
14   any e-mails been provided to you from that time        07:13
15   period?                                                 07:13
16       A.   Yes.                                           07:13
17       Q.   And which -- who provided those e-mails to     07:13
18   you?                                                    07:13
19       A.   They were presented by Ms. Foster Bird.        07:13
20       Q.   Okay.  And do you know if those e-mails        07:13
21   have been produced in this case?                        07:13
22       A.   To my knowledge, they have been.               07:13
23       Q.   Do you recall the contents of those            07:13
24   e-mails?                                                07:13
25       A.   The -- I don't recall the specific content    07:13
```

                                                                  16

Craig Heligman, M.D.                                            April 28, 2021

```
 1    of each one of them.  If there's one you'd like me    07:13
 2    to look at, I'm happy to do so.                        07:13
 3        Q.   Going back to the Charge Letter, it states   07:13
 4    that information received from the Chief Medical       07:13
 5    Officer on July 14th, 2017, quote:                     07:13
 6              "That you were dishonest and                 07:14
 7               attempted to defraud the                    07:14
 8               company and/or benefits                     07:14
 9               providers when you, as well as              07:14
10               more than 50 other craft                    07:14
11               employees, submitted                        07:14
12               potentially fraudulent                      07:14
13               documentation."                             07:14
14         Is that right?                                    07:14
15        A.   I believe that's generally the language.     07:14
16    If you have a copy for me to look at, I'm happy to     07:14
17    confirm it.                                            07:14
18        Q.   Okay.  Was it your opinion as of July 14th,  07:14
19    2017, that the plaintiffs in this case were            07:14
20    dishonest?                                             07:14
21        A.   It was my opinion at the time that there     07:14
22    was some potential for that, yes, but did I know,      07:14
23    no.                                                    07:14
24        Q.   Okay.  Was it your opinion as of July 14th,  07:14
25    2017, that the plaintiffs in this case attempted to    07:14
```

17

Craig Heligman, M.D.                                                April 28, 2021

```
 1   defraud the company?                              07:14

 2       A.   I'm sorry.  Could you restate that one more   07:15

 3   time?                                             07:15

 4       Q.   Yes.                                     07:15

 5            Was it your opinion as July 14th, 2017,  07:15

 6   that the plaintiffs in this case had attempted to  07:15

 7   defraud the company?                              07:15

 8       A.   No, it was my opinion that there was that  07:15

 9   possibility.  It was the responsibility of the   07:15

10   investigation and hearing process to determine what  07:15

11   the facts were in the case and make a decision upon  07:15

12   completion of those investigations.              07:15

13       Q.   Was it your opinion as of July 14th, 2017,  07:15

14   that the plaintiffs in this case attempted to    07:15

15   defraud benefits providers?                      07:15

16       A.   Again, I thought there was potential for  07:15

17   that.  However, it was the responsibility, following  07:15

18   the process and procedures of the investigation and  07:15

19   hearing, for others to make the determination as to  07:15

20   the guilt or innocence according to the charges.  07:15

21       Q.   And was it your opinion as of July 14th,  07:15

22   2017, that the plaintiffs in this case submitted  07:16

23   potentially fraudulent documentation?            07:16

24       A.   I feel that it was potentially that way.  07:16

25   The documents themselves I don't believe were     07:16
```

                                                          18

Craig Heligman, M.D.                                                    April 28, 2021

```
 1   actually fraudulent.  I believe some of the        07:16

 2   information presented in those documents could have 07:16

 3   led us down that pathway.                           07:16

 4       Q.   What specific information in the documents 07:16

 5   could have led us down the pathway of fraudulent    07:16

 6   documentation?                                      07:16

 7       A.   We had somewhere around 70 individuals from 07:16

 8   two different chiropractic providers.  The          07:16

 9   information on each and every one of those forms was 07:16

10   very similar.  The time period in which the         07:16

11   providers were approving or certifying absence time 07:17

12   or disability periods were pretty much the same.    07:17

13         And so the consistency of a large number of   07:17

14   cases or the information on these forms for these   07:17

15   individual cases that were presented really within a 07:17

16   very short time period was the concern.  And it was  07:17

17   the pattern of information at the time that we       07:17

18   received it that was concerning, not necessarily    07:17

19   what was on any -- any one document.                07:17

20       Q.   Okay.  Other than -- I'm sorry.  And I'll  07:17

21   back up for a second.                               07:17

22         You stated that the information that you      07:17

23   provided on July 14th, 2017, was a collection of    07:17

24   Certificate of Ongoing Illness or Injury documents; 07:17

25   is that right?                                       07:17
```

19

Craig Heligman, M.D.                                                    April 28, 2021

```
1        A.    Yes.                                        07:17

2        Q.    And you provided those documents to the Law  07:17

3   Department and to the Labor Relations team; is that   07:17

4   right?                                                07:18

5        A.    I first provided it to the Law Department,  07:18

6   and then I believe it was transferred over to Labor   07:18

7   Relations.                                            07:18

8        Q.    What caused you to provide that information 07:18

9   to the Law Department?                                07:18

10        A.    At that time period, we had received -- I  07:18

11   think it was 20 or 21 of those forms all in the same  07:18

12   day, and that was very unusual.  We actually receive  07:18

13   quite a large number of documents every day of the   07:18

14   week, and to have 20 or more forms provided from one  07:18

15   practitioner or one geographical area in one day,     07:18

16   that's pretty unusual.  In fact, I've never           07:18

17   experienced that at CSX or prior to my work at CSX.   07:18

18        Q.    And so was it the number of forms that you 07:18

19   received that caused you to contact the Law           07:18

20   Department?                                           07:18

21        A.    Not the number, but the combination of     07:19

22   factors -- the large number, the location, and        07:19

23   specifically to limited to two practitioners.  So     07:19

24   it's that combination of common practitioners,        07:19

25   common date or common time period, and common         07:19
```

                                                                           20

Craig Heligman, M.D.                                          April 28, 2021

```
 1   documents that we received all at once.  Very, very    07:19
 2   unusual set of circumstances.                          07:19
 3          As time progressed from that first              07:19
 4   collection, I asked our team to continue to collect    07:19
 5   them to see if there was any additional pattern, and   07:19
 6   when we started receiving a large number of them       07:19
 7   over the next few weeks is when I presented that to    07:19
 8   the Law Department and asked their opinion if there    07:19
 9   was anything we needed to do further with this         07:19
10   information.                                           07:19
11      Q.   What was your first -- when was your first     07:19
12   contact with the Law Department regarding these COII   07:19
13   forms?                                                 07:20
14      A.   I actually don't recall a specific date.       07:20
15   It would have been towards the end of June of 2017.    07:20
16      Q.   And is there any way for you to determine      07:20
17   when your first contact was with the Law Department?   07:20
18      A.   No.                                            07:20
19      Q.   There's -- you have no way of tracking         07:20
20   whether you sent an e-mail or sent these documents     07:20
21   in hard copy to the Law Department?                    07:20
22      A.   You would have to check with our               07:20
23   document -- the records-keeping department.  They      07:20
24   would be able to track that down.  As I said, I        07:20
25   don't remember if it was something I carried to the    07:20
```

                                                                    21

Craig Heligman, M.D.                                                    April 28, 2021

```
 1   Law Department.  That's probably the more likely        07:20
 2   scenario, but I wouldn't rule out having sent them      07:20
 3   by e-mail.                                              07:20
 4        Q.   Who specifically in the Law Department did    07:20
 5   you contact?                                            07:20
 6        A.   I contacted our employment attorney.          07:20
 7        Q.   And who is that?                              07:20
 8        A.   Michael Burns.                                07:20
 9        Q.   Did you receive any guidance from             07:20
10   Mr. Burns?                                              07:21
11        MS. FOSTER BIRD:  I'm going to object here         07:21
12   to attorney/client privilege for any conversations     07:21
13   that were held between Dr. Heligman and Mr. Burns,      07:21
14   including any legal advice or recommendations that      07:21
15   were given.                                             07:21
16   BY MR. DINGWALL:                                        07:21
17        Q.   And I don't want to know the substance of     07:21
18   any conversations you had with Mr. Burns.  I'm just     07:21
19   asking whether he provided you with any guidance.       07:21
20        MS. FOSTER BIRD:  That's what -- beyond a          07:21
21   "Yes" or a "No" answer, I would object.                 07:21
22        THE WITNESS:  He did provide guidance.             07:21
23   BY MR. DINGWALL:                                        07:21
24        Q.   And at some point, I believe, you stated      07:21
25   that the matter was referred from the Law Department    07:21
```

22

Craig Heligman, M.D.                                                    April 28, 2021

| | | |
|---|---|---|
| 1 | to the Labor Relations team; is that right? | 07:21 |
| 2 | A.    That's my recollection, yes. | 07:21 |
| 3 | Q.    And do you know when that occurred? | 07:21 |
| 4 | A.    I do not know the specific date. | 07:21 |
| 5 | Q.    How did you become aware that the matter | 07:22 |
| 6 | was referred from the Law Department to the Labor | 07:22 |
| 7 | Relations team? | 07:22 |
| 8 | A.    When someone from Labor Relations contacted | 07:22 |
| 9 | me to request additional information. | 07:22 |
| 10 | Q.    And who was it on the Labor Relations team | 07:22 |
| 11 | that contacted you? | 07:22 |
| 12 | A.    I think it was Penny Dreher that was the | 07:22 |
| 13 | first person that contacted me.  She was the | 07:22 |
| 14 | individual that was managing the administration | 07:22 |
| 15 | process for all these cases. | 07:22 |
| 16 | Q.    Do you know Ms. Dreher's title, or at the | 07:22 |
| 17 | time did you know her title? | 07:22 |
| 18 | A.    I don't recall, no. | 07:22 |
| 19 | Q.    Do you recall when she first contacted you? | 07:22 |
| 20 | A.    No, I do not. | 07:22 |
| 21 | Q.    Is that something you could find out? | 07:22 |
| 22 | A.    I don't know.  Again, I don't have ability | 07:22 |
| 23 | to look in my e-mails that long ago.  I guess I | 07:23 |
| 24 | could ask Ms. Dreher if she remembers, but that's | 07:23 |
| 25 | the only way I could do it. | 07:23 |

23

Craig Heligman, M.D.                                                April 28, 2021

```
 1        Q.   Do you know if she contacted you by phone    07:23
 2   or by e-mail or in person?                             07:23
 3        A.   It would either have been by e-mail or       07:23
 4   telephone.  It was not in person for the first         07:23
 5   contact.                                               07:23
 6        Q.   In your handling of these cases involving    07:23
 7   the COII forms in 2017, did you keep any records of    07:23
 8   your communications with either the Law Department     07:23
 9   or the Labor Relations team?                           07:23
10        A.   No.                                          07:23
11        Q.   Is that your practice generally not to keep  07:23
12   records of communications regarding potentially        07:23
13   fraudulent activity?                                   07:23
14        A.   We have retention rules on our e-mails, and  07:23
15   there was no reason for me to retain any e-mails.      07:23
16   We don't record our phone calls.  We don't record      07:24
17   chat.  So it's my practice not to retain any of them   07:24
18   unless I'm made aware of a legal reason to do so.      07:24
19             And then as I stated previously, it's        07:24
20   our -- we have a department that goes back and does     07:24
21   the review on all the retained e-mails.  I don't do    07:24
22   that, and I don't have access to that information so   07:24
23   far or so long ago.                                    07:24
24        Q.   At any point from June 2017 to the present,  07:24
25   have you ever been advised to retain documents or      07:24
```

                                                                        24

Craig Heligman, M.D.                                                    April 28, 2021

```
 1    e-mails or any communications regarding the          07:24

 2    plaintiffs in this matter?                           07:24

 3          MS. FOSTER BIRD:  I'm going to object to       07:24

 4    the extent that any recommendations came from legal  07:24

 5    counsel inside or outside CSX.  So I'm going to       07:24

 6    object to that question if -- if it is with regard   07:24

 7    to legal counsel.                                    07:24

 8    BY MR. DINGWALL:                                     07:24

 9       Q.   Do you have an answer, Dr. Heligman?         07:25

10       A.   I -- I will follow my attorney's advice.    07:25

11          MS. FOSTER BIRD:  So I've objected to that     07:25

12    question because it calls for -- I think we -- it    07:25

13    calls for attorney/client privilege information.     07:25

14          MR. DINGWALL:  So whether Dr. Heligman was     07:25

15    advised to retain any documents regarding the        07:25

16    plaintiffs in this matter is attorney/client         07:25

17    privilege?                                           07:25

18          MS. FOSTER BIRD:  Yes.                         07:25

19          MR. DINGWALL:  And you can provide a           07:25

20    privilege log to that extent?                        07:25

21          MS. FOSTER BIRD:  For all of the              07:25

22    conversations, probably not.  That's not the basis   07:25

23    for a privilege log.                                 07:25

24          MR. DINGWALL:  Well, if you're asserting       07:25

25    privilege, I think it's proper.                      07:25
```

                                                                    25

Craig Heligman, M.D.                                            April 28, 2021

```
 1   BY MR. DINGWALL:                              07:25

 2       Q.   Dr. Heligman, I think you stated that you    07:25

 3   received COII documents for approximately 70   07:26

 4   individuals; is that right?                    07:26

 5       A.   For this group of individuals, yes.   07:26

 6       Q.   Okay.  And all 70 of those individuals  07:26

 7   treated with either Dr. Shannon Johnson or     07:26

 8   Dr. Daniel Carey; is that right?               07:26

 9       A.   Yes, sir.                             07:26

10       Q.   Okay.  How many of those 70 individuals  07:26

11   were ultimately terminated?                    07:26

12       A.   I don't remember.  A large majority, but I  07:26

13   don't remember the precise number.             07:26

14       Q.   And do you know if investigations were held  07:26

15   for all 70 individuals?                        07:26

16       A.   To my knowledge, yes.                 07:26

17       Q.   And did you testify in the investigations  07:26

18   for all 70 individuals?                        07:26

19       A.   To the best of my recollection, yes.  07:26

20       Q.   Have you testified in any legal proceedings  07:26

21   stemming from the 70 individuals and the submission  07:26

22   of their COII forms?                           07:26

23       A.   I believe I've been deposed on one case so  07:27

24   far.                                          07:27

25       Q.   And which case is that?               07:27
```

                                                                    26

Craig Heligman, M.D.                                                    April 28, 2021

```
 1        A.    I believe it was Adonis Ginn.          07:27

 2        Q.    Other than that case and this case, are you  07:27

 3   aware of any other legal cases that you'll be      07:27

 4   testifying in?                                     07:27

 5        A.    Not to my knowledge.  These are the only  07:27

 6   ones I recall at this point.                       07:27

 7        Q.    Okay.  In your communications with -- is it  07:27

 8   Penny Dreher?  Am I saying that right?            07:27

 9        A.    Yes.                                     07:27

10        Q.    Okay.  In your communications with her, did  07:27

11   she provide you any guidance with regard to the   07:27

12   submission of the COII forms?                      07:27

13        A.    No.                                      07:27

14        Q.    What was the substance of your          07:27

15   communications with her?                           07:27

16        A.    It was mostly process.  She would have been  07:27

17   responsible for making arrangements to identify the  07:28

18   Charging Officer, the Hearing Officer, making      07:28

19   arrangements for locations, perhaps, of where we   07:28

20   would be doing the hearings.  But it was purely    07:28

21   administrative.                                    07:28

22        Q.    When was the determination made to conduct  07:28

23   the formal investigations with regard to the       07:28

24   plaintiffs in this case?                           07:28

25        A.    I don't remember the precise date.  The  07:28
```

                                                                          27

Craig Heligman, M.D.                                                April 28, 2021

```
 1   Collective Bargaining Agreements have rules that      07:28
 2   stipulate what the time frames are for our ability    07:28
 3   to charge individuals under the Collective            07:28
 4   Bargaining Agreement.                                 07:28
 5       Q.   Whose decision was it to conduct the formal  07:28
 6   investigations at to the plaintiffs in this matter?   07:28
 7       A.   I don't know if there was one individual.    07:28
 8   I believe it was a decision in combination with our   07:28
 9   legal team and our Labor Relations team.  I don't     07:28
10   really know who, if any one person, made the          07:29
11   decision.                                             07:29
12       Q.   Other than Michael Burns in the Law          07:29
13   Department and Penny Dreher in Labor Relations, did   07:29
14   you personally discuss this matter with anybody else  07:29
15   in the company?                                       07:29
16       MS. FOSTER BIRD:  I'll object to the extent       07:29
17   it involves discussions with anyone in the Law        07:29
18   Department.  Other than that, go ahead.               07:29
19       THE WITNESS:  I know I would have discussed        07:29
20   the -- some of the issues with my medical team, with  07:29
21   perhaps individual in our risk management team,       07:29
22   perhaps additional individuals for Labor Relations,   07:29
23   or our field administration team.  They would have    07:29
24   all been involved in the process, and so it wouldn't  07:29
25   surprise me if I held conversations with any or all   07:29
```

28

USCA4    976

Craig Heligman, M.D.                                              April 28, 2021

| | | |
|---|---|---|
| 1 | of them. | 07:30 |
| 2 | BY MR. DINGWALL: | 07:30 |
| 3 | Q.   And did you keep any documentation | 07:30 |
| 4 | regarding communications with any of the individuals | 07:30 |
| 5 | or teams that you just mentioned? | 07:30 |
| 6 | A.   No. | 07:30 |
| 7 | Q.   Do you typically keep appointments on a | 07:30 |
| 8 | calendar system? | 07:30 |
| 9 | A.   Typically, yes, I do. | 07:30 |
| 10 | Q.   And would you have calendar appointments | 07:30 |
| 11 | with the individuals that you just talked about | 07:30 |
| 12 | regarding this matter? | 07:30 |
| 13 | A.   Not necessarily.  My calendar is primarily | 07:30 |
| 14 | used for specific team meetings or one-on-one | 07:30 |
| 15 | discussions where it's specific to we want to meet | 07:30 |
| 16 | at this point in time about this particular subject. | 07:30 |
| 17 | But frequently I will communicate by telephone or by | 07:30 |
| 18 | e-mail or face to face with individuals without | 07:30 |
| 19 | having a specific appointment on the calendar. | 07:30 |
| 20 | Q.   Have you gone back at any time and looked | 07:31 |
| 21 | to see if you kept or had appointments on your | 07:31 |
| 22 | calendar with anybody involving the matter that | 07:31 |
| 23 | we're here for today? | 07:31 |
| 24 | A.   No. | 07:31 |
| 25 | Q.   Is that something that you could do? | 07:31 |

29

USCA4     977

Craig Heligman, M.D.                                                April 28, 2021

```
1        A.   No.  Again, that data is --          07:31

2        Q.   Why not?                             07:31

3        A.   -- that data is purged consistent with our   07:31

4   records retention process for our e-mail.     07:31

5        Q.   And so is that something that would have to   07:31

6   be obtained through another department?       07:31

7        A.   Yes.  I don't know if they're able to look   07:31

8   at our calendars from that period of time or not.   07:31

9        Q.   How far back does your calendar go?  07:31

10       A.   I believe it's 18 months is the standard   07:31

11  records retention.                            07:31

12       Q.   What system do you use for calendaring?   07:31

13       A.   We use the Microsoft Outlook program.   07:31

14       Q.   And what system do you use for e-mail?   07:32

15       A.   Also Outlook.                        07:32

16       Q.   And is the e-mail retention policy    07:32

17  18 months as well?                            07:32

18       A.   I believe that is correct, yes.      07:32

19       Q.   And are you able to search your e-mail or   07:32

20  your calendar at least for the past 18 months?   07:32

21       A.   I could do that.                     07:32

22       Q.   Okay.  Other than the COII forms for the   07:32

23  plaintiffs in this case, did you provide any other   07:32

24  information either to Labor Relations or to the Law   07:32

25  Department?                                    07:32
```

                                                                    30

Craig Heligman, M.D.                                              April 28, 2021

```
 1        A.   I think that was the basis -- that was the     07:32
 2   only information I presented at that point in time.      07:32
 3   There were some letters I had written and               07:32
 4   attachments to those letters that I would have also     07:32
 5   shared with them.                                       07:32
 6        Q.   Did anybody within the company, from          07:33
 7   June 2017 through the dates of the investigations of    07:33
 8   the plaintiffs in this matter, ask you to go back       07:33
 9   and collect more information?                           07:33
10        MS. FOSTER BIRD:  I'm going to object to           07:33
11   the extent that request, if there was one, came from    07:33
12   legal counsel.  So if it came from legal counsel,       07:33
13   that is privileged and please do not answer.            07:33
14        THE WITNESS:  Could you restate the                07:33
15   question for me, please?                                07:33
16   BY MR. DINGWALL:                                        07:33
17        Q.   Did anybody in the company, from June of      07:33
18   2017 through the dates of the formal investigations     07:33
19   of the plaintiffs in this case, ask you to go back      07:33
20   and obtain more information?                            07:33
21        A.   The answer is no, but I'm not sure what       07:33
22   "more information" really means.                        07:33
23        Q.   What was the basis for you answering no?      07:34
24        A.   Because I don't recall anybody asking me to   07:34
25   gather more information.  I did my own review of the    07:34
```

                                                                  31

```
 1   cases.  I did my own review of the medical records   07:34
 2   that we held on those individuals.  But nobody asked  07:34
 3   me to do that.                                        07:34
 4       Q.   Are you saying that you reviewed medical    07:34
 5   documentation outside of the COIIs for any of the    07:34
 6   plaintiffs in this case?                             07:34
 7       A.   We have employee health records and we have 07:34
 8   a case management system, and so we will frequently  07:34
 9   have information concerning those subject matters --  07:34
10   or that subject matter for our employees.  And what  07:34
11   I was curious about was whether or not we had any    07:34
12   additional information in our files with regards to   07:34
13   the COII or the cases that the COIIs represented for  07:34
14   those individuals.                                   07:35
15       Q.   What is the document system you use for     07:35
16   medical records for employees?                       07:35
17       A.   We use an Oracle database.  It's ECM.  I    07:35
18   don't know what those initials stand for, but it's a 07:35
19   document imaging folder system for retention of      07:35
20   digital documents.                                   07:35
21       Q.   And would that system contain all medical   07:35
22   records that have been submitted to the company for  07:35
23   all employees?                                       07:35
24       A.   It would have been for any documents that   07:35
25   we received from employees or other sources that     07:35
```

32

Craig Heligman, M.D.                                                      April 28, 2021

```
 1    should be in the employee's health record.  We also    07:35
 2    have a section for their EAP and drug testing           07:35
 3    information.  That would be considered part of the      07:35
 4    employee health record.                                 07:36
 5          We also have a case management system where       07:36
 6    we will document when we received documents, for        07:36
 7    example, or what we do with the information or when     07:36
 8    we receive phone calls from individuals.  And so we     07:36
 9    have that as a separate system.  It's not part of       07:36
10    that digital document retention program.                07:36
11    Q.    Prior to the investigations that were held        07:36
12    for the plaintiffs in this matter, did you search       07:36
13    that medical document retention system for documents    07:36
14    regarding the plaintiffs?                               07:36
15    A.    Yes, I did.                                        07:36
16    Q.    And what specifically did you look for?           07:36
17    A.    I was looking for information with regards        07:36
18    to was this the first time we had an issue of this      07:36
19    nature with the employee, was there additional          07:36
20    information with regards to either the medical issue    07:36
21    or the providers.  I was interested in finding out,     07:36
22    again, if we had any additional information that        07:37
23    would help clarify the situation.                       07:37
24          And although we had some information where        07:37
25    some of the individuals had already submitted prior     07:37
```

33

Craig Heligman, M.D.                                                    April 28, 2021

```
 1   COIIs for the same condition from the same        07:37
 2   practitioners, there really wasn't any specific   07:37
 3   pattern of who did or did not submit prior         07:37
 4   information.                                        07:37
 5         These documents get submitted as part of    07:37
 6   the notification process in many cases, or it could 07:37
 7   be that they were off work for a period of time and 07:37
 8   had to submit medical information in order to be   07:37
 9   cleared to come back to work.  So I was just trying 07:37
10   to, again, understand more about the individual    07:37
11   cases.                                              07:37
12         Q.   If a COII form is submitted on behalf of an 07:37
13   employee, how does it arrive at CSX?               07:37
14         A.   Most commonly by fax.  On the other hand, 07:37
15   we do accept them by e-mail, which is becoming more 07:37
16   common.                                             07:38
17         Q.   And are those typically submitted by    07:38
18   medical providers?                                  07:38
19         A.   It's a mix of coming directly from medical 07:38
20   providers and from the employees themselves.  For  07:38
21   our physical exams, they would be submitted from our 07:38
22   vendor, not from the employee or the practitioners 07:38
23   themselves.                                         07:38
24         Q.   And is it an acceptable practice at CSX for 07:38
25   a medical provider to submit a COII form on behalf 07:38
```

34

Craig Heligman, M.D.                                                April 28, 2021

| | | |
|---|---|---|
| 1 | of a patient? | 07:38 |
| 2 | A.    Yes, it happens frequently. | 07:38 |
| 3 | Q.    Is there any requirement that an employee | 07:38 |
| 4 | submit a COII form following medical treatment? | 07:38 |
| 5 | A.    The COII is a tool that we use to assist | 07:38 |
| 6 | with the employee being able to meet their | 07:38 |
| 7 | responsibility of communicating with the company | 07:38 |
| 8 | under their Collective Bargaining Agreement.  In | 07:38 |
| 9 | other words, each of the agreements have a | 07:39 |
| 10 | requirement for the employee to notify the company | 07:39 |
| 11 | periodically if they're going to be off for medical | 07:39 |
| 12 | reasons.  We offer the COII as a means for the | 07:39 |
| 13 | employee to do that. | 07:39 |
| 14 |      However, if the employee submits medical | 07:39 |
| 15 | documents that have the same information that allows | 07:39 |
| 16 | us to understand why they're off for medical | 07:39 |
| 17 | reasons, we accept letters from doctors, we will | 07:39 |
| 18 | accept the actual medical records, but the most | 07:39 |
| 19 | common way it's done is the employee will submit the | 07:39 |
| 20 | COII or ask their physician to submit it on their | 07:39 |
| 21 | behalf. | 07:39 |
| 22 | Q.    How would an employee know what information | 07:39 |
| 23 | would need to be submitted to the company in order | 07:39 |
| 24 | to take time off for a medical condition? | 07:39 |
| 25 | A.    They don't have to submit any medical | 07:39 |

35

| | | |
|---|---|---|
| 1 | information in order to take the time off.  They do | 07:39 |
| 2 | have a responsibility under their Collective | 07:39 |
| 3 | Bargaining Agreement to notify the employer, CSX in | 07:39 |
| 4 | this case, as to what their status is, whether | 07:40 |
| 5 | they're able to return to work or not and what's the | 07:40 |
| 6 | reason for them to continue to be off. | 07:40 |
| 7 | So if it's a medical one, they'll provide | 07:40 |
| 8 | that medical information on the COII.  So they're | 07:40 |
| 9 | not asking permission to be off work.  They're | 07:40 |
| 10 | simply keeping us up to date on their status with | 07:40 |
| 11 | regards to their ability to work. | 07:40 |
| 12 | Q.   And that requirement comes from the | 07:40 |
| 13 | Collective Bargaining Agreement? | 07:40 |
| 14 | A.   It's part of the Collective Bargaining | 07:40 |
| 15 | Agreement, and then for those that -- it's primarily | 07:40 |
| 16 | the Collective Bargaining Agreement.  I think for | 07:40 |
| 17 | some management people, it is a policy that's on the | 07:40 |
| 18 | Gateway. | 07:40 |
| 19 | Q.   But as far as agreement employees, those | 07:40 |
| 20 | that would fall under a Collective Bargaining | 07:40 |
| 21 | Agreement, the requirement to notify the company of | 07:40 |
| 22 | their medical condition is a creature of the | 07:41 |
| 23 | Collective Bargaining Agreement; is that right? | 07:41 |
| 24 | A.   Yes, that's correct. | 07:41 |
| 25 | Q.   Okay.  So there is no policy or procedure | 07:41 |

36

USCA4      984

Craig Heligman, M.D.                                                        April 28, 2021

```
 1    from CSX that requires agreement employees to       07:41
 2    provide notice of their medical condition to the    07:41
 3    company?                                             07:41
 4        A.   Not prior to -- or not prior to them        07:41
 5    leaving for medical reasons.  To my knowledge, they  07:41
 6    will have a mark-off system.  Each group has their   07:41
 7    own process in who they should notify when they need 07:41
 8    to mark off work for a medical reason.               07:41
 9          We primarily monitor the incoming              07:41
10    information with regards to the periodic             07:41
11    notification, as we're required to do under the      07:41
12    Collective Bargaining Agreement, and when they're    07:41
13    ready to return to work, we'll review their case at  07:42
14    that point in time.                                  07:42
15        Q.   And is it fair to say, then, that as long   07:42
16    as an agreement employee keeps the company apprised  07:42
17    of his or her medical condition and availability for 07:42
18    work, there would be no issue as far as discipline?  07:42
19        A.   Not -- not to my knowledge, no.             07:42
20        Q.   How did you determine that the plaintiffs   07:42
21    in this case were dishonest?                         07:42
22        A.   I didn't determine they were dishonest.  I  07:42
23    advised the individuals we already spoke about that  07:43
24    I thought there was a pattern of behavior based on   07:43
25    the submission of the COIIs in this geographical     07:43
```

                                                                              37

Craig Heligman, M.D.                                          April 28, 2021

```
 1    region from the same two practitioners.  It was for      07:43

 2    others to determine whether or not the employee was      07:43

 3    dishonest.                                               07:43

 4         Q.   How did you determine that the plaintiffs      07:43

 5    in this case attempted to defraud the company?           07:43

 6         A.   I didn't make that determination.  Again, I    07:43

 7    identified a pattern and said -- had suggested that      07:43

 8    this was a possible issue that should be addressed.      07:43

 9    But it was up to other individuals to make that          07:43

10    determination as to whether that, you know, they         07:43

11    were doing anything inappropriate.                       07:43

12         Q.   And in the context of the plaintiffs in        07:43

13    this case and specifically the charges that led to       07:44

14    their formal investigation, what did it mean that        07:44

15    they were dishonest?                                     07:44

16         A.   I'm not sure I understand the question.        07:44

17         Q.   If we back up a little bit to the language     07:44

18    we discussed in the Charge Letter, it said that the      07:44

19    investigations were for the purpose of determining       07:44

20    the facts and placing the responsibility in              07:44

21    connection with information received from you on         07:44

22    July 14, 2017, that the employee was dishonest.          07:44

23         A.   Okay.                                          07:44

24         Q.   So in what ways were the plaintiffs in this    07:44

25    case dishonest that led to the charges being sent        07:44
```

38

Craig Heligman, M.D.                                                              April 28, 2021

```
 1   out?                                               07:44

 2        A.    I believe it was because of the concern  07:45

 3   that they were misrepresenting their status, and    07:45

 4   that would constitute potential dishonesty.         07:45

 5        Q.    Okay.  And what specifically did you deem 07:45

 6   to be dishonest?                                    07:45

 7        A.    Again, I didn't determine that they were 07:45

 8   dishonest.  We -- I identified that there was a     07:45

 9   large number of COIIs received in a very short      07:45

10   period of time in the same geographical area from   07:45

11   the same two practitioners.  So for my purposes, I  07:45

12   felt that this was a pattern that could represent   07:45

13   either dishonesty or fraud or other reasons why     07:45

14   individuals would do this.                          07:45

15        But it certainly wasn't a medical reason.      07:45

16   I could not explain this on a medical basis, and,   07:45

17   therefore, I delivered this information to other    07:45

18   individuals to determine whether or not it was a    07:45

19   potential violation of company policy, Collective   07:46

20   Bargaining Agreement, and subject to disciplinary   07:46

21   action.                                             07:46

22        Q.    Your involvement in the investigations of 07:46

23   the plaintiffs in this case had nothing to do with  07:46

24   your medical opinion?                               07:46

25        A.    It had to do with the -- again, the pattern 07:46
```

39

```
 1   of documentation.  If the information had been, say,   07:46
 2   a large number of people that had provided             07:46
 3   misinformation potentially on an expense form and it   07:46
 4   was very similar and we received the same documents    07:46
 5   in a short period of time, those documents would not   07:46
 6   have come to me.                                       07:46
 7        The fact that there was medical information       07:46
 8   on those documents meant that it was up to me.  I      07:46
 9   was recipient for that information.  But it was,       07:46
10   again, the pattern, not the specifics of the medical   07:46
11   information that was on there other than to state it   07:46
12   was very similar across the cases.  I think that       07:47
13   with myself as a physician, I would be able to see     07:47
14   that pattern where perhaps others would not.           07:47
15   Q.   So your position as a physician made you          07:47
16   uniquely qualified to identify a pattern of            07:47
17   employees receiving treatment from two providers?      07:47
18   A.   I think it allowed me to interpret the            07:47
19   medical information on those forms and to reach some   07:47
20   conclusion as to what it meant.                        07:47
21   Q.   And what conclusions did you reach about          07:47
22   what it meant?                                         07:47
23   A.   To me it appeared to mean that we had two         07:47
24   providers in this one small area and we were           07:47
25   receiving very much identical statements on each and   07:47
```

                                                                    40

Craig Heligman, M.D.                                            April 28, 2021

```
 1    every one of the COIIs from these two practitioners.    07:47
 2           We don't see this on -- we just haven't          07:48
 3    seen this ever.  In my career, I've never seen it.      07:48
 4    And so it's an unusual set of circumstances to see      07:48
 5    every single document say two months off work for a     07:48
 6    nonspecific soft tissue, musculoskeletal-type           07:48
 7    complaint in a very small geographical area.            07:48
 8           So I reviewed it.  I thought I don't know         07:48
 9    why we're seeing this, and I took the information to     07:48
10    other individuals in hopes that they could help me      07:48
11    understand why I could potentially be seeing this       07:48
12    pattern and to determine whether or not it meant        07:48
13    anything from a policy, procedure, or disciplinary      07:48
14    perspective.                                            07:48
15       Q.   Is it fair to assume that as the Chief          07:48
16    Medical Officer, you don't review every COII form       07:48
17    that comes in?                                          07:48
18       A.   I don't review every single COII form.  We      07:48
19    have a team of nurses that would be responsible for     07:49
20    viewing those first.  If they had any questions         07:49
21    about the information on the COIIs, they would then     07:49
22    consult me.                                             07:49
23       Q.   How did the COII forms of the plaintiffs in     07:49
24    this case come to your attention?                       07:49
25       A.   One of our nurses had been -- was the first     07:49
```

41

```
 1    person to actually see this pattern.  Again, I think    07:49
 2    we received 20 or 21 forms from these two providers     07:49
 3    in the same day or within two or three days, and it     07:49
 4    was -- again, it was so unusual that she brought it     07:49
 5    to my attention and said, "What -- what should I do,    07:49
 6    if anything?"                                           07:49
 7        Q.   And what nurse was that?                       07:49
 8        A.   Kelly Crouch.                                  07:49
 9        Q.   And what did you advise Ms. Crouch?            07:49
10        A.   I asked her to continue to monitor it and     07:49
11    to see what other forms -- if there was a continuing    07:49
12    pattern or not.                                         07:49
13        Q.   How long -- well, when did Ms. Crouch first    07:50
14    bring this to your attention?                           07:50
15        A.   I don't remember the exact date.  It was      07:50
16    towards the middle of June 2017.                        07:50
17        Q.   You would agree that the Collective           07:50
18    Bargaining Agreement requires disciplinary events to    07:50
19    occur in a certain period of time; right?              07:50
20        A.   Yes.                                           07:50
21        Q.   Okay.  And so you would agree that it would    07:50
22    be important to keep track of dates upon which this     07:50
23    potentially disciplinary conduct comes to your         07:50
24    attention; right?                                       07:50
25        A.   No.                                            07:50
```

42

Craig Heligman, M.D.                                                April 28, 2021

```
 1        Q.   Well, you would agree that if disciplinary    07:50
 2    action isn't taken within a certain amount of time,    07:50
 3    as set forth in the Collective Bargaining Agreement,   07:50
 4    it could be overturned or improper; correct?           07:50
 5        A.   Yes.                                           07:50
 6        Q.   Okay.  And so how are you sure that those      07:50
 7    timelines were met based upon when you learned of       07:51
 8    this potential conduct?                                 07:51
 9        A.   That's the responsibility of our Labor         07:51
10    Relations team and our labor attorney, employment       07:51
11    attorneys to make sure that we adhere to the            07:51
12    provisions in the Collective Bargaining Agreement.      07:51
13        Q.   And what information did you provide to         07:51
14    those individuals to set -- or to establish the         07:51
15    timeline in which discipline needed to occur?           07:51
16        A.   When we had a sufficient number of             07:51
17    documents to suggest that we actually did have an       07:51
18    issue present in that area.                             07:51
19        Q.   And what did you determine to be the           07:51
20    sufficient number of documents?                         07:51
21        A.   I had no set number in mind.  We watched       07:51
22    the process for a couple, three weeks or so, and we     07:51
23    just continued to collect the information.  When we     07:52
24    had a significant volume over that time period is       07:52
25    when I approached our Law Department and ultimately     07:52
```

                                                                    43

Craig Heligman, M.D.                                      April 28, 2021

```
 1   Labor Relations, and they determined the appropriate      07:52

 2   timeline for the disciplinary process.                    07:52

 3       Q.    And what was that timeline based upon?          07:52

 4       A.    Again, you would have to ask other             07:52

 5   individuals.  I did not establish the timeline and I      07:52

 6   am not responsible for making those determinations.       07:52

 7       Q.    And so you'd have kept no records about any     07:52

 8   of the timing of these documents coming in or             07:52

 9   communications you had with anybody regarding them?       07:52

10       A.    No.                                             07:52

11       Q.    Okay.  The Charge Letter also stated that       07:52

12   the plaintiffs in this case, quote:                       07:53

13            "Attempted to defraud the                        07:53

14             company."                                       07:53

15            Is that right?                                   07:53

16       A.    Yes.                                            07:53

17       Q.    And what does it mean to attempt to defraud     07:53

18   the company with regard to these plaintiffs?              07:53

19       A.    Well, I think that's more of a legal            07:53

20   definition, and I defer to others to actually define      07:53

21   it for you.  My understanding is that they were           07:53

22   attempting to receive some sort of gain for               07:53

23   inappropriate reasons.                                    07:53

24       Q.    You testified in each of the investigations     07:53

25   for the plaintiffs; right?                                07:53
```

44

```
 1        A.    Yes.                                      07:53

 2        Q.    And in so doing, you stated that you had  07:53

 3   direct information about the information that was in 07:53

 4   the Charge Letters; correct?                         07:53

 5        A.    Yes.                                       07:53

 6        Q.    And so if you were unable to understand or 07:53

 7   define what it meant to attempt to defraud the      07:53

 8   company, you would have said so in the              07:53

 9   investigation; correct?                             07:54

10        A.    I would have made that statement, but,   07:54

11   again, my understanding of fraud is that it is      07:54

12   something that has to be determined by other        07:54

13   individuals.  I was merely presenting the           07:54

14   information, and the determination of whether it met 07:54

15   the threshold for the definition of fraud was not   07:54

16   mine to make.  It was for others to make that       07:54

17   determination.                                      07:54

18           So when I'm defining fraud, I'm using a     07:54

19   layman's understanding of the word, not the legal   07:54

20   definition.                                         07:54

21        Q.    Well, the charges state that the basis for 07:54

22   the charge is information that you provided on       07:54

23   July 14th that, quote:                              07:54

24           "You were dishonest" -- meaning             07:54

25             the employee was dishonest --            07:54
```

45

| 1 | "and attempted to defraud the | 07:54 |
| 2 | company and/or benefits | 07:54 |
| 3 | providers." | 07:54 |
| 4 | Correct? | 07:54 |
| 5 | A.   Yes. | 07:54 |
| 6 | Q.   So did you provide information that the | 07:54 |
| 7 | employees attempted to defraud the company? | 07:55 |
| 8 | A.   The information I presented was the | 07:55 |
| 9 | collection of COIIs and the concern that this | 07:55 |
| 10 | represented a pattern that could suggest something | 07:55 |
| 11 | else was happening in our environment that required | 07:55 |
| 12 | investigation. | 07:55 |
| 13 | Q.   Wouldn't that be a more appropriate basis | 07:55 |
| 14 | for an investigation rather than an accusation of | 07:55 |
| 15 | fraud? | 07:55 |
| 16 | A.   You would have to refer -- or I would defer | 07:55 |
| 17 | to others to follow the proper process for | 07:55 |
| 18 | scheduling and holding investigations under the | 07:55 |
| 19 | Collective Bargaining Agreement.  That's not my | 07:55 |
| 20 | area. | 07:55 |
| 21 | If our Labor Relations team, our field | 07:55 |
| 22 | administration team wrote the Charge Letter and it | 07:55 |
| 23 | was done in accordance with the requirements of the | 07:55 |
| 24 | labor agreement, again, that is not my area of | 07:55 |
| 25 | expertise.  I did not write the Charge Letter. | 07:55 |

46

Craig Heligman, M.D.                                                    April 28, 2021

```
 1        Q.   And then, similarly, what does it mean with    07:56

 2   regard to these plaintiffs that they attempted to       07:56

 3   defraud benefits providers?                             07:56

 4        A.   The concern was that, as it came to be        07:56

 5   identified afterwards, there were other issues going    07:56

 6   on in that local area with regards to potential for     07:56

 7   furloughs and for other things related to the           07:56

 8   various Collective Bargaining Agreement that would      07:56

 9   affect our employees.                                   07:56

10             So in our labor agreements, if someone is     07:56

11   furloughed, they will have a defined period of when     07:56

12   benefits will be continued.  If there are other         07:56

13   reasons for them to make changes under the labor        07:56

14   agreement, there would be other provisions similar      07:56

15   to that.  However, if the individual is off for         07:57

16   medical reasons, then those benefits could be           07:57

17   extended for up to two years.                           07:57

18             So the potential there was for an             07:57

19   inappropriate presentation for the purposes of          07:57

20   gaining their benefits under potentially fraudulent     07:57

21   circumstances, and that was the actual issue for        07:57

22   these investigations.                                   07:57

23        Q.   If an employee was terminated, what impact    07:57

24   would that have on their benefits?                      07:57

25        A.   If they are terminated, my understanding is   07:57
```

47

Craig Heligman, M.D.                                    April 28, 2021

```
 1    their benefits are discontinued, but I'm not the     07:57
 2    expert in that area.  I would defer to, again, our   07:57
 3    Labor Relations and our legal team for that.         07:57
 4         Q.   How did you come to know that if an        07:57
 5    employee was off on medical, their benefits would    07:57
 6    extend for two years?                                07:57
 7         A.   We deal with people that are off work for  07:58
 8    medical reasons pretty much every day, and so we do  07:58
 9    have an understanding of that part of the Collective 07:58
10    Bargaining Agreement.                                07:58
11         Q.   Do you know what the cost to the company is 07:58
12    to provide benefits to an employee for two years?    07:58
13         A.   I don't know the specific cost.  The       07:58
14    cumulative cost for this group of individuals was    07:58
15    calculated and it was approximately $16,000 per      07:58
16    individual or over a million dollars for the group,  07:58
17    and that was a statement that was made in each of    07:58
18    the investigations.                                  07:58
19         Q.   And how was that calculation made?         07:58
20         A.   It was provided to me by other individuals 07:58
21    that made that calculation.                          07:58
22         Q.   Who provided that to you?                  07:58
23         A.   I actually don't remember.                 07:59
24         Q.   How do you know that it's accurate?        07:59
25         A.   Because it would have come from either our 07:59
```

                                                              48

Craig Heligman, M.D.                                                    April 28, 2021

```
 1   Law Department, our field administrative Labor    07:59
 2   Relations or benefits teams that would be able to  07:59
 3   calculate that information.  I'm not responsible for  07:59
 4   paying the premium.  We would have to have received  07:59
 5   that from another part of the company.            07:59
 6        Q.   And over what period of time were those  07:59
 7   dollar amounts calculated?                        07:59
 8        A.   It would have been for the two-year period  07:59
 9   of concern should someone be off work for medical  07:59
10   reasons.                                           07:59
11        Q.   Okay.  So it's your understanding that the  07:59
12   calculation of $16,000 per individual was the cost  07:59
13   of ensuring one employee for the period of         07:59
14   two years?                                         07:59
15        A.   That's generally my understanding, yes.  07:59
16        Q.   Okay.  And is it your understanding that  07:59
17   because the plaintiffs in this case were terminated,  08:00
18   that those benefits were not paid to them?         08:00
19        A.   That is my understanding, yes.           08:00
20        Q.   Okay.  And do you know what the cost of   08:00
21   benefits are for an employee who is furloughed?    08:00
22        A.   Again, the calculation for the monthly    08:00
23   benefits is dependent upon what those benefits are  08:00
24   under the agreement, and I don't know that answer.  08:00
25        Q.   Okay.  Was that information provided to you  08:00
```

49

```
 1    prior to you testifying in the formal            08:00

 2    investigations?                                  08:00

 3        A.   That was not a calculation that was      08:00

 4    presented to me.  However, the -- I believe it was a  08:00

 5    four-month period -- I think it was a four-month  08:00

 6    period for those people that were entering into   08:00

 7    those furlough situations.                        08:00

 8            I don't know for those that were not      08:00

 9    furloughed, what they may have been able to receive.  08:00

10    I just know that for the two-year period, if they're  08:01

11    off for medical reasons, that their benefits --  08:01

12    their health benefits specifically would be      08:01

13    continued for two years.                          08:01

14        Q.   And which specific benefits providers did  08:01

15    the plaintiffs in this case attempt to defraud?  08:01

16        A.   It wasn't specifically the benefits      08:01

17    providers.  It was the company.  The company pays  08:01

18    the premium for the benefits.                     08:01

19        Q.   Okay.  So the language in the Charge Letter  08:01

20    that the plaintiffs in this case attempted to    08:01

21    defraud benefits providers is not accurate?      08:01

22        A.   The company provides the benefits.  If it  08:01

23    weren't for their employment, these benefits would  08:01

24    not have been offered.                            08:01

25        Q.   You sent letters to, among other people,  08:01
```

                                                              50

Craig Heligman, M.D.                                                    April 28, 2021

```
 1    the Office of Inspector General for the Railroad        08:02
 2    Retirement Board; correct?                              08:02
 3         A.   Yes.                                          08:02
 4         Q.   Okay.  And the Railroad Retirement Board is   08:02
 5    a benefits provider to these plaintiffs; right?         08:02
 6         A.   Yes.                                          08:02
 7         Q.   And you also copied that letter to Aetna;     08:02
 8    is that right?                                          08:02
 9         A.   Yes.                                          08:02
10         Q.   And is Aetna a benefits provider of these     08:02
11    plaintiffs?                                             08:02
12         A.   Aetna is one of the three health care         08:02
13    insurance companies that provide health insurance       08:02
14    for craft employees under the national agreement.       08:02
15         Q.   So they would be a benefits provider;         08:02
16    correct?                                                08:02
17         A.   Yes.                                          08:02
18         Q.   And the same for Highmark Blue Cross Blue     08:02
19    Shield?                                                 08:02
20         A.   Yes.                                          08:02
21         Q.   And also United Healthcare?                   08:02
22         A.   Yes.                                          08:02
23         Q.   And those were all benefits providers that    08:02
24    you copied on your letter to the Railroad Retirement    08:02
25    Board; correct?                                         08:02
```

51

USCA4    999

Craig Heligman, M.D.                                                    April 28, 2021

```
 1        A.    Correct.                                      08:02

 2              MR. DINGWALL:  Okay.  We've been going for    08:02

 3     about an hour.                                         08:02

 4              Do you want to take, say, a five-minute       08:03

 5     break?                                                 08:03

 6              MS. FOSTER BIRD:  Yeah, let's stick with      08:03

 7     the five minutes if we can.  Yeah, that's great.      08:03

 8     Thank you.                                             08:03

 9              MR. DINGWALL:  Sounds good.                   08:03

10              THE VIDEOGRAPHER:  Off the record at          08:03

11     8:03 a.m.                                              08:03

12              (Recess taken.)                               08:08

13              THE VIDEOGRAPHER:  We are back on the         08:09

14     record at 8:09 a.m.                                    08:09

15     BY MR. DINGWALL:                                       08:09

16        Q.    Dr. Heligman -- sorry.  Dr. Heligman, do     08:09

17     you understand that each of the plaintiffs in this    08:09

18     case were terminated from employment following the    08:09

19     formal investigations in which you testified?         08:09

20        A.    There were a few that were not, but most of  08:09

21     them, yes.                                             08:09

22        Q.    And I'm specifically referring to the        08:09

23     plaintiffs in this case.                              08:09

24              So do you understand that they were all      08:09

25     terminated?                                            08:09
```

52

```
 1        A.    Yes.                                    08:09

 2        Q.    Okay.  And do you understand that each of  08:09

 3   the plaintiffs in this case were fired because it   08:09

 4   was -- they were found to have violated CSX         08:09

 5   Operating Rule 104.2(a)?                            08:09

 6        A.    Yes.                                     08:09

 7        Q.    Okay.  And also that they were found to  08:09

 8   have violated the Code of Ethics policy?            08:09

 9        A.    Correct.                                 08:09

10        Q.    Okay.  And is it your understanding that 08:09

11   CSX Operating Rule 104.2(a) states, quote:          08:10

12             "Employee behavior must be               08:10

13              respectful and courteous.               08:10

14              Employees must not be any of            08:10

15              the following..."                       08:10

16        And then letter (a) is "dishonest"?           08:10

17        A.    Yes.                                     08:10

18        Q.    Okay.  And is it your understanding that 08:10

19   the specific portion of the ethics policy that the  08:10

20   plaintiffs in this case were found to have been     08:10

21   violated is with regard to fraud?                   08:10

22             THE WITNESS:  Mr. Dingwall, can I ask you 08:10

23   to hold for a second?  There's noise outside my room 08:10

24   and I need to ask them to be quiet.                 08:10

25             MR. DINGWALL:  Sure.  Let's go -- let's go 08:10
```

                                                              53

```
 1   off the record for a second.                      08:10

 2            THE VIDEOGRAPHER:  Off the record at 8:10 08:10

 3   a.m.                                              08:10

 4            (Recess taken.)                          08:10

 5            THE VIDEOGRAPHER:  Back on the record at 08:11

 6   8:11 a.m.                                         08:11

 7   BY MR. DINGWALL:                                  08:11

 8       Q.   All right.  Dr. Heligman, right before we 08:11

 9   took a little break there, I asked you if it was  08:11

10   your understanding that the portion of the ethics 08:11

11   policy that the plaintiffs in this case were found 08:11

12   to be in violation of refers to fraud?            08:11

13       A.   I believe that's correct, yes.          08:11

14       Q.   Okay.  What about the plaintiffs in this -- 08:11

15   well, I'm sorry.  Let me start over.              08:11

16            How were the employees in this case       08:11

17   dishonest under Rule 104.2(a)?                    08:11

18       A.   Again, the issue of dishonesty was the   08:11

19   determination of those individuals that determined 08:11

20   the outcome of the hearing and their discipline.  08:12

21   The -- my understanding is dishonesty was in that 08:12

22   they potentially presented information that misled 08:12

23   or was inappropriate at that moment in time.      08:12

24       Q.   So were the employees actually dishonest or 08:12

25   were they potentially dishonest?                  08:12
```

                                                                    54

```
 1        A.   When I presented the information, it was to     08:12
 2   present the potential and whether or not it should        08:12
 3   be investigated.  The Charge Letter was a state --        08:12
 4   was a statement made that they were.                      08:12
 5             Again, the manner in which the Charge            08:12
 6   Letter is written is subject to interpretation by         08:12
 7   our field administration and Labor Relations team.        08:12
 8   They have to be written in such a manner in order to      08:13
 9   initiate the investigation and the hearing process.       08:13
10   They're being charged with this.  They're not being       08:13
11   found guilty at the time the Charge Letter is sent        08:13
12   out.  That is the purpose of the investigation and        08:13
13   the hearing.                                              08:13
14        Q.   You would agree that it would not be            08:13
15   appropriate to conduct formal investigations of          08:13
16   employees without a belief that they were actually        08:13
17   in violation of things with which they're charged;        08:13
18   right?                                                    08:13
19        A.   Yes.                                            08:13
20        Q.   Okay.  And that belief came from you;           08:13
21   correct?                                                  08:13
22        A.   No.                                             08:13
23        Q.   Who was of the belief that the plaintiffs       08:13
24   in this case were in violation and needed to be           08:13
25   investigated?                                             08:13
```

                                                                    55

Craig Heligman, M.D.                                          April 28, 2021

```
 1        A.    It would have been the drafters of the      08:13
 2   Charge Letter and ultimately the Charging Officer.     08:14
 3        Q.    The drafters of the Charge Letter and the   08:14
 4   Charging Officer were operating on information that    08:14
 5   was provided by you; correct?                          08:14
 6        A.    Yes.                                         08:14
 7        Q.    Okay.  Are you aware of anyone else that    08:14
 8   provided information that formed the basis of the      08:14
 9   Charge Letter and the formal investigation?            08:14
10        A.    Not to my knowledge.                        08:14
11        Q.    Okay.  Are you aware of anyone else besides 08:14
12   yourself that provided substantive testimony in the    08:14
13   formal investigations of the plaintiffs in this        08:14
14   matter?                                                08:14
15        A.    Not to my knowledge.                        08:14
16        Q.    And how did the plaintiffs in this case     08:14
17   violate the ethics policy?                             08:14
18        A.    Again, that was the charge.  It was the     08:14
19   response of the -- of other individuals to write the   08:14
20   Charge Letter, make the charges.  I was presented at   08:15
21   the investigations as a witness.  The information      08:15
22   that led to that Charge Letter being written was       08:15
23   because I presented the information to those           08:15
24   individuals.                                           08:15
25             It was my concern that there was a           08:15
```

                                                                   56

Craig Heligman, M.D.                                    April 28, 2021

```
 1    potential for dishonesty and potential for fraud.  I     08:15
 2    was not aware of why that may have been an issue,        08:15
 3    but it was a pattern amongst all of these employees      08:15
 4    that was suspect.  It wasn't an individual issue.        08:15
 5    It was simply a pattern of documentation, given the      08:15
 6    two practitioners in that geographical area, that        08:15
 7    was highly unusual.                                      08:15
 8            Whether or not it actually represented           08:15
 9    fraud or dishonesty was whether -- was the decision      08:15
10    of the individuals that reviewed the information I       08:15
11    provided and the results of the testimony at the --     08:15
12    collected at the time of the hearing, including my       08:15
13    own and those of the employees and any witnesses         08:16
14    that the employees chose to bring to the hearing.        08:16
15            There's likely other documents that may          08:16
16    have been reviewed outside of that that I was            08:16
17    unaware of, but the Charge Letter was written on the     08:16
18    basis of the information I presented.  Whether or        08:16
19    not it represented dishonesty or fraudulent behavior     08:16
20    on the part of the individual employee was not my        08:16
21    decision to make.                                        08:16
22        Q.  Are you aware of anybody at the company          08:16
23    besides yourself with a medical background that          08:16
24    reviewed the investigation transcripts of the           08:16
25    plaintiffs in this matter?                               08:16
```

57

Craig Heligman, M.D.                                            April 28, 2021

```
 1        A.   I'm the only physician and was the only      08:16

 2   physician at that time at this company.               08:16

 3        Q.   Okay.  Are you aware of anyone from outside  08:16

 4   of the company that reviewed the transcripts of the   08:16

 5   formal investigations of the plaintiffs in this       08:17

 6   matter?                                               08:17

 7        A.   I don't know.                               08:17

 8        Q.   Did you personally seek information from     08:17

 9   anybody outside of the company regarding the charges  08:17

10   or your testimony in the formal investigations?       08:17

11        A.   No.                                         08:17

12        Q.   Was it your understanding that the          08:17

13   potential outcome of the formal investigations of     08:17

14   the plaintiffs in this matter would be dismissal?     08:17

15        A.   Yes.                                         08:17

16        Q.   And was it your understanding that the      08:17

17   company was going to rely on the testimony that you   08:17

18   provided in those investigations?                     08:17

19        A.   They would be relying on my testimony and   08:17

20   the testimony of the employees and the testimony      08:17

21   given of the Charging Officer and the                 08:17

22   decision-making that was conducted following          08:17

23   completion of the investigative hearings.  It was     08:17

24   not solely based upon my opinions or documents.       08:18

25        Q.   You intended for the company to rely on     08:18
```

58

| | | |
|---|---|---|
| 1 | your testimony; right? | 08:18 |
| 2 | A.   No, sir. | 08:18 |
| 3 | Q.   You did not expect the company to lend any | 08:18 |
| 4 | credibility to your testimony? | 08:18 |
| 5 | A.   That's not what I said. | 08:18 |
| 6 | Q.   Okay.  So you expected, at least in part, | 08:18 |
| 7 | for the company to rely on the testimony that you | 08:18 |
| 8 | provided? | 08:18 |
| 9 | A.   I expected them to look at the information | 08:18 |
| 10 | I presented and make a determination as to what the | 08:18 |
| 11 | next action should be. | 08:18 |
| 12 | Q.   You understood that if the plaintiffs in | 08:18 |
| 13 | this case were fired following the formal | 08:18 |
| 14 | investigations, that they would lose their benefits; | 08:18 |
| 15 | correct? | 08:18 |
| 16 | A.   That was my understanding, yes. | 08:18 |
| 17 | Q.   And you voluntarily testified in each of | 08:18 |
| 18 | the formal investigations of the plaintiffs in this | 08:18 |
| 19 | matter; right? | 08:19 |
| 20 | A.   I was asked to provide that testimony and | 08:19 |
| 21 | be a witness on behalf of the company. | 08:19 |
| 22 | Q.   And who asked you to provide that | 08:19 |
| 23 | testimony? | 08:19 |
| 24 | A.   That would have been undoubtedly the team | 08:19 |
| 25 | from Labor Relations and our field administration | 08:19 |

59

| | | |
|---|---|---|
| 1 | team. | 08:19 |
| 2 | Q. And how was that communicated to you? | 08:19 |
| 3 | A. Either verbally or by e-mail. As you | 08:19 |
| 4 | pointed out, I was the person that collected the | 08:19 |
| 5 | information and presented it to those other | 08:19 |
| 6 | individuals, and that was the collection of | 08:19 |
| 7 | information that initiated the decision-making on -- | 08:19 |
| 8 | on their end. | 08:19 |
| 9 | Q. Did you discuss the substance of the | 08:19 |
| 10 | testimony you were going to provide in the formal | 08:19 |
| 11 | investigations with anyone in the company? | 08:19 |
| 12 | MS. FOSTER BIRD: I'm sorry. I was on | 08:19 |
| 13 | mute. I'm going to object to the extent that that | 08:19 |
| 14 | is anyone in the Law Department or in the Legal | 08:20 |
| 15 | Department. Otherwise, you can answer. | 08:20 |
| 16 | THE WITNESS: The decision was made by a | 08:20 |
| 17 | group of individuals coming to a conclusion. I | 08:20 |
| 18 | can't, again, state who made the decision. I spoke | 08:20 |
| 19 | with many people. No one told me what to say in the | 08:20 |
| 20 | course of my testimony at those hearings. | 08:20 |
| 21 | BY MR. DINGWALL: | 08:20 |
| 22 | Q. Did anybody in the company provide you with | 08:20 |
| 23 | guidance as to how to testify in the formal | 08:20 |
| 24 | investigations? | 08:20 |
| 25 | MS. FOSTER BIRD: Again, same objection. | 08:20 |

60

Craig Heligman, M.D.                                                    April 28, 2021

```
 1            THE WITNESS:  The only thing that was      08:20
 2    provided to me was a statement that I could read at 08:20
 3    each of the individual hearings to make sure that   08:20
 4    the information presented was represented           08:20
 5    accurately.                                         08:20
 6            And so the statement about the language in  08:20
 7    the charge with the ethics information or the       08:21
 8    language for that, the rule information, and the    08:21
 9    calculation made on the total benefits that were at 08:21
10    issue, that was a written statement that was        08:21
11    provided so I could consistently provide that       08:21
12    information.                                         08:21
13            Otherwise, my instructions were to          08:21
14    basically answer the questions truthfully.          08:21
15    BY MR. DINGWALL:                                    08:21
16        Q.   Who provided that statement to you?        08:21
17            MS. FOSTER BIRD:  Objection to the extent   08:21
18    it was somebody in the Law Department, if it was.   08:21
19            THE WITNESS:  I don't know who the          08:21
20    actual -- I don't know who gave the final approval  08:21
21    to use that statement.                              08:21
22    BY MR. DINGWALL:                                    08:21
23        Q.   How was the statement provided to you?     08:21
24        A.   It was -- it was handed to me, if I        08:21
25    remember correctly.                                 08:21
```

                                                              61

USCA4    1009

| | | |
|---|---|---|
| 1 | Q.   And you don't recall who handed it to you? | 08:21 |
| 2 | A.   It could have been one of our attorneys. | 08:22 |
| 3 | Q.   And did you carry that statement with you | 08:22 |
| 4 | to each of the investigations? | 08:22 |
| 5 | A.   Yes. | 08:22 |
| 6 | Q.   And did you carry it in hard copy? | 08:22 |
| 7 | A.   Yes. | 08:22 |
| 8 | Q.   Did you provide it as an exhibit to any of | 08:22 |
| 9 | the investigations? | 08:22 |
| 10 | A.   No. | 08:22 |
| 11 | Q.   Did you read it verbatim in each of the | 08:22 |
| 12 | investigations? | 08:22 |
| 13 | A.   Yes. | 08:22 |
| 14 | Q.   I'll introduce another exhibit.  This will | 08:22 |
| 15 | be Exhibit 2.  Let me know when you have it. | 08:22 |
| 16 | (Exhibit 2 was marked for identification and | |
| 17 | attached to the transcript.) | 08:23 |
| 18 | THE WITNESS:  Yes, I have it. | 08:23 |
| 19 | BY MR. DINGWALL: | 08:23 |
| 20 | Q.   All right.  And this is a 13-page document, | 08:23 |
| 21 | so you should be able to page over using the arrows | 08:23 |
| 22 | on your screen there. | 08:23 |
| 23 | A.   Yes, I can. | 08:23 |
| 24 | Q.   Okay.  And if you need to take a moment to | 08:23 |
| 25 | look through all 13 pages, that's just fine, but the | 08:23 |

62

Craig Heligman, M.D.                                        April 28, 2021

```
 1   first page is a letter dated July 14th, 2017, and    08:23
 2   it's on your letterhead to a Mr. William Fergus; is   08:23
 3   that right?                                           08:23
 4        A.   Yes, that's correct.                        08:23
 5        Q.   Okay.  And there's an attachment, and then  08:23
 6   there's another letter on Page 5 that's dated         08:23
 7   July 21, 2017, again, on your letterhead to a         08:23
 8   Mr. William Fergus; is that right?                    08:23
 9        A.   Yes.                                         08:24
10        Q.   And then on Page 7 of this exhibit is a     08:24
11   July 28, 2017 letter on your letterhead to            08:24
12   Mr. William Fergus as well; is that right?            08:24
13        A.   Yes, that's correct.                        08:24
14        Q.   All right.  And we talked about this a      08:24
15   little bit ago, but this is a letter that you sent    08:24
16   to the U.S. Railroad Retirement Board Office of       08:24
17   Inspector General; is that right?                     08:24
18        A.   Yes, sir, it is.                            08:24
19        Q.   Okay.  And in that letter, you stated that  08:24
20   you had suspicions in the past about the providers    08:24
21   removing your employees from work inappropriately;    08:24
22   is that right?                                        08:24
23        A.   Yes, that's correct.                        08:24
24        Q.   And the providers that you're referring to  08:24
25   in this letter were Dr. Johnson and Dr. Carey; is     08:24
```

63

USCA4    1011

Craig Heligman, M.D.                                                April 28, 2021

```
 1   that right?                                08:24

 2        A.   Yes, that's correct.             08:24

 3        Q.   What suspicions in the past did you have?  08:24

 4        A.   These individuals were -- many of our  08:25

 5   employees saw these individuals over time.  I don't  08:25

 6   remember the full length of time for either one of  08:25

 7   them.                                      08:25

 8            I know Dr. Johnson had been a practitioner  08:25

 9   in the area for a very long time.  My predecessor  08:25

10   had mentioned Dr. Johnson being a provider in that  08:25

11   area, so he was well aware of him for the duration  08:25

12   of his time here, and so Dr. Johnson was a known  08:25

13   entity.  Many of our employees saw him.  We received  08:25

14   many COIIs and other documents from Dr. Johnson  08:25

15   specifically, fewer from Dr. Carey.  And so we were  08:25

16   aware of both of the individuals.          08:25

17            The information that was presented was  08:25

18   provided consistent with how we received information  08:25

19   from other practitioners.  It would be submitted on  08:25

20   behalf of employees.  We knew that they were  08:26

21   practitioners in the area that our employees  08:26

22   preferred.  That wasn't a problem for us.  So we  08:26

23   just had a volume of information from both  08:26

24   practitioners.                             08:26

25            The difficulty was that, anecdotally, it  08:26
```

64

1    seemed to occur consistent with times when there may    08:26

2    have been reduced work and individuals were    08:26

3    furloughed for a short time.  Potentially it was for    08:26

4    work injuries, but the timing of -- so the kind of    08:26

5    things that Dr. Johnson and Dr. Carey were endorsing    08:26

6    were the same things that we saw in 2017, just not    08:26

7    in the same volume and not all at the same time.    08:26

8         So it was really -- there was no -- there    08:26

9    was consistency with how we received information.    08:26

10   Was this person potentially extending time off?    08:26

11   Well, not anymore, or less than perhaps other    08:26

12   providers and other employees have in the past from    08:27

13   time to time.    08:27

14        So we had concerns, but there wasn't    08:27

15   anything that we could say was clearly concerning    08:27

16   that we needed to look into it further.    08:27

17        Q.   Did you ever document those concerns?    08:27

18        A.   No, sir.    08:27

19        Q.   Did you ever contact Dr. Carey or    08:27

20   Dr. Johnson to discuss your concerns with them?    08:27

21        A.   I attempted to contact Dr. Johnson on one    08:27

22   occasion.    08:27

23        Q.   And when was that?    08:27

24        A.   It was either -- it was earlier in 2017, or    08:27

25   it could have been 2016.  I don't remember the exact    08:27

65

Craig Heligman, M.D.                                                    April 28, 2021

```
 1   date.                                               08:27

 2        Q.   And was it prior to you sending this letter  08:27

 3   to Mr. Fergus on July 14th, 2017?                  08:27

 4        A.   My recollection had nothing to do with this  08:27

 5   incident that we're discussing today.             08:27

 6        Q.   Okay.  And did you, in fact, talk to     08:27

 7   Dr. Johnson?                                       08:27

 8        A.   No.                                       08:28

 9        Q.   Did you ever send a letter or an e-mail to  08:28

10   Dr. Johnson letting him know that you'd like to    08:28

11   speak with him?                                    08:28

12        A.   No.                                       08:28

13        Q.   And what about Dr. Carey?                 08:28

14        A.   No.                                       08:28

15        Q.   Did you ever contact any of the employees  08:28

16   prior to July of 2017 who treated with Dr. Carey or  08:28

17   Dr. Johnson to let them know you had concerns?     08:28

18        A.   No.                                       08:28

19        Q.   So your -- the suspicions that you refer to  08:28

20   in this letter to Mr. Fergus on July 14th, 2017,  08:28

21   were anecdotal; is that right?                     08:28

22        A.   Yes, that's correct.                      08:28

23        Q.   Okay.  And you also refer in this letter to  08:28

24   patterns that were clearly fraudulent; is that     08:28

25   right?                                             08:29
```

66

Craig Heligman, M.D.                                                     April 28, 2021

```
 1        A.    I said we were not able to identify          08:29

 2   patterns that were clearly fraudulent.                  08:29

 3        Q.    So in making that statement, was it -- were  08:29

 4   you communicating to Mr. Fergus that you now            08:29

 5   believed you did have a pattern that was clearly        08:29

 6   fraudulent?                                             08:29

 7        A.    I was, again, identifying that there was a   08:29

 8   pattern that was of concern that had the potential      08:29

 9   for fraudulent behavior, and I was asking -- I was      08:29

10   notifying Mr. Fergus to make the determination as to    08:29

11   whether or not it meant -- or it met their              08:29

12   definition of fraudulent behavior for the purposes      08:29

13   of administering the RRB benefits.                      08:29

14        Q.    And you understood that you sending this     08:29

15   letter to Mr. Fergus had the potential of causing       08:29

16   the Railroad Retirement Board to deny benefits to       08:30

17   the employees in question; right?                       08:30

18        A.    There was that potential, yes.               08:30

19        Q.    Okay.  And you understood that when you      08:30

20   sent this letter?                                       08:30

21        A.    Yes, I did.                                  08:30

22        Q.    And you wrote this letter in -- and          08:30

23   provided your professional medical opinions;            08:30

24   correct?                                                08:30

25        A.    I provided my opinions.                      08:30
```

                                                                         67

Craig Heligman, M.D.                                                    April 28, 2021

```
 1        Q.    Your professional medical opinion; correct?    08:30
 2        A.    The medical opinion was -- as I stated         08:30
 3   there, in my professional medical opinion -- that         08:30
 4   the providers continued to keep employees off work        08:30
 5   for much longer than is medically appropriate.  That      08:30
 6   was my medical opinion.                                   08:30
 7        Q.    Okay.  What was the basis for your medical      08:30
 8   opinion that you provided to Mr. Fergus?                  08:30
 9        A.    The time period in which the employees had     08:30
10   remained off work for relatively minor                    08:30
11   musculoskeletal conditions.  I've been a practicing       08:30
12   physician for over 30 years now, and they also            08:31
13   exceeded the general guidelines from the major            08:31
14   references that discuss expectations for disability,      08:31
15   periods of times for various medical conditions.          08:31
16           In this case, the time periods were               08:31
17   significantly in excess of what my clinical               08:31
18   experience was as well as the medical references          08:31
19   that are published.                                       08:31
20        Q.    You conclude your letter to Mr. Fergus on      08:31
21   Page 2 of Exhibit 2 by, quote, saying:                    08:31
22             "I strongly urge you to fully                   08:31
23                investigate all of these cases               08:31
24                for potential conspiracy to                  08:31
25                defraud RRB sickness and                     08:31
```

                                                                68

USCA4    1016

Craig Heligman, M.D.                                                      April 28, 2021

```
 1                    disability benefit programs by        08:31
 2                    our employees and their               08:31
 3                    chiropractors."                        08:31
 4              Is that right?                                08:31
 5         A.    Yes, that's correct.                        08:31
 6         Q.    Okay.  And what is the basis for your claim 08:31
 7     that there was a conspiracy with regard to the       08:32
 8     plaintiffs in this case?                              08:32
 9         A.    There was a large volume of individuals all 08:32
10     from the same geographical area all seeing the same  08:32
11     two practitioners.  That was the basis.              08:32
12         Q.    Okay.  Did you have any information that    08:32
13     led you to believe that these employees had all      08:32
14     gotten together and decided that they were going to  08:32
15     do this?                                              08:32
16         A.    I do not know what those employees did on  08:32
17     their own time.                                       08:32
18         Q.    Do you have -- did you have any information 08:32
19     that led you to believe that the doctors, Dr. Carey  08:32
20     and Dr. Johnson, got together and decided that they  08:32
21     were going to attempt to defraud benefit providers?  08:32
22         A.    I do not know what either provider's       08:32
23     intentions were.                                      08:32
24         Q.    Did you have any information that Dr. Carey 08:32
25     or Dr. Johnson got together with these employees     08:32
```

69

USCA4    1017

Craig Heligman, M.D.                                                    April 28, 2021

```
 1   specifically and decided that they were going to      08:32
 2   attempt to defraud benefits providers?                 08:33
 3       A.   I have no knowledge as to what discussions    08:33
 4   took place between the practitioners and their         08:33
 5   patients.                                               08:33
 6       Q.   And so when you sent this letter on           08:33
 7   July 14th, 2017, to Mr. Fergus, you had no evidence    08:33
 8   whatsoever that there was any fraud committed by       08:33
 9   anybody; correct?                                       08:33
10       A.   Again, I was identifying a pattern that we    08:33
11   saw, and I was urging Mr. Fergus to investigate        08:33
12   that.  The context is that there had already been a    08:33
13   major issue with another railroad where there was      08:33
14   identification of fraud for similar reasons.           08:33
15           Also I -- pardon me?                           08:33
16       Q.   Go ahead.                                      08:33
17       A.   Also I had just completed my responsibility   08:33
18   as the designated industry representative to the       08:33
19   Disability Advisory Committee for the RRB, so          08:33
20   these -- this information was fresh in my memory.      08:34
21           I was aware of the RRB and what they did       08:34
22   and what their responsibilities were.  I also knew     08:34
23   that they had investigated the prior issues from the   08:34
24   other railroad, and so I urged them to, again,         08:34
25   consider this in our case and to investigate it.       08:34
```

Craig Heligman, M.D.                                                April 28, 2021

```
 1              My urging was to investigate it, not to      08:34
 2    make any decisions on their behalf.                    08:34
 3        Q.   What other railroad was investigated by the   08:34
 4    RRB?                                                    08:34
 5        A.   The Long Island Railroad.                      08:34
 6        Q.   And when was that?                             08:34
 7        A.   I want to -- I don't remember the exact       08:34
 8    dates.  I want to say it was somewhere in the 2008     08:34
 9    time period.  It was -- there are many articles in     08:34
10    the lay press that discusses it.  I'd have to pull     08:34
11    those out and look at the exact dates for you if you   08:35
12    need me to.                                            08:35
13        Q.   This July 14th letter that you sent to        08:35
14    Mr. Fergus has an attachment, which is a spreadsheet   08:35
15    essentially, containing a number of employees who      08:35
16    you believed submitted potentially fraudulent          08:35
17    documentation from Dr. Carey and Dr. Johnson; is       08:35
18    that right?                                            08:35
19        A.   Yes.                                           08:35
20        Q.   Okay.  And it was your desire that the RRB    08:35
21    would investigate those individual employees that      08:35
22    you listed in that spreadsheet; correct?               08:35
23        A.   I left up to Mr. Fergus to determine how to   08:35
24    conduct his investigation.                             08:35
25        Q.   But you strongly urged him to fully           08:35
```

                                                                    71

Craig Heligman, M.D.                                                    April 28, 2021

```
 1    investigate them; correct?                      08:35

 2         A.   I strongly urged him to investigate the    08:35

 3    individuals listed and what that meant for the RRB.  08:35

 4         Q.   And you sent this letter to the RRB but    08:35

 5    also copied, as we discussed earlier, Aetna,    08:35

 6    Highmark Blue Cross Blue Shield, and United    08:36

 7    Healthcare; correct?                            08:36

 8         A.   Yes.  And I also copied the Ohio State    08:36

 9    Chiropractic Board and the -- excuse me -- Kentucky    08:36

10    Board of Chiropractic Examiners.                08:36

11         Q.   And was it your hope, in copying those    08:36

12    entities, that they would also investigate these    08:36

13    employees and chiropractors?                    08:36

14         A.   It was my intent that all of these parties    08:36

15    should investigate and make determinations for    08:36

16    themselves as to what to do with the information.    08:36

17         Q.   And you understood, in sending this letter    08:36

18    to Aetna, Highmark, and United Healthcare, that it    08:36

19    had the potential to cause these employees to lose    08:36

20    benefits from those providers; correct?    08:36

21         A.   I knew that it had the potential, yes.    08:36

22         Q.   And you knew that in sending this letter to    08:36

23    the Ohio State Chiropractic Board and the Kentucky    08:36

24    Board of Chiropractic Examiners, that it had the    08:37

25    potential to cause either disciplinary or licensing    08:37
```

                                                                           72

```
 1      issues for Dr. Carey and Dr. Johnson; correct?    08:37

 2          A.    That is the purpose for the boards, so yes.  08:37

 3          Q.    Okay.  Did Mr. Fergus ever respond to your  08:37

 4      letter?                                           08:37

 5          A.    He did respond and he acknowledged the  08:37

 6      acceptance of the -- the receipt of the information.  08:37

 7          Q.    Beyond that communication, did you receive  08:37

 8      any other communication from the Railroad Retirement  08:37

 9      Board with regard to this matter?                 08:37

10          A.    Over time since then I was advised that it  08:37

11      was sent to an investigations team.  I believe    08:37

12      they're out of Philadelphia.  I don't know what the  08:37

13      outcome was of the RRB investigation.             08:37

14          Q.    Okay.  You've never been notified that the  08:37

15      RRB found any wrongdoing; is that right?          08:37

16          A.    No, I was never notified of any outcome.  08:38

17          Q.    Okay.  And were you ever notified by Aetna  08:38

18      that they found any wrongdoing?                   08:38

19          A.    No.                                      08:38

20          Q.    Were you ever notified by Highmark Blue    08:38

21      Cross Blue Shield that they found any wrongdoing?  08:38

22          A.    No.                                      08:38

23          Q.    Were you ever notified by United Healthcare  08:38

24      that they found any wrongdoing?                   08:38

25          A.    No.                                      08:38
```

73

Craig Heligman, M.D.                                                    April 28, 2021

```
 1        Q.   And are you aware that the Ohio and        08:38
 2   Kentucky Chiropractic Boards dismissed the          08:38
 3   complaints that you made against Dr. Johnson and    08:38
 4   Dr. Carey?                                          08:38
 5        A.   I received a letter from one of them, but I 08:38
 6   understand that neither board had any reason to take 08:38
 7   any action.                                         08:38
 8        Q.   Are you aware of any independent entity or 08:38
 9   organization that has found any wrongdoing with     08:38
10   regard to the plaintiffs in this matter or          08:39
11   Dr. Johnson and Dr. Carey?                          08:39
12        A.   No.                                       08:39
13        Q.   What was the volume of COII forms that CSX 08:39
14   received in 2017?                                   08:39
15        A.   The total volume?                         08:39
16        Q.   Yes.                                      08:39
17        A.   I don't know.  Hundreds, potentially      08:39
18   thousands.                                          08:39
19        Q.   Okay.  Is there any way to look that      08:39
20   information up?                                      08:39
21        A.   No, not without hand-counting every fax   08:39
22   that we received and identifying what that fax was. 08:39
23        Q.   Did you attempt to do that at any time in 08:39
24   2017?                                               08:39
25        A.   No.                                       08:39
```

74

USCA4    1022

Craig Heligman, M.D.                                              April 28, 2021

```
 1        Q.   What was the volume of COII forms that CSX    08:40
 2   received from the Tri-State area in 2017?              08:40
 3        A.   I don't know.                                08:40
 4        Q.   And when I say "Tri-State area," I'm          08:40
 5   referring to Kentucky, Ohio, and West Virginia.        08:40
 6             Can we agree on that?                         08:40
 7        A.   Yes.                                          08:40
 8        Q.   Okay.  And is your answer still the same?     08:40
 9        A.   Yes.                                          08:40
10        Q.   Okay.  How many CSX employees are there --    08:40
11   I'm sorry.  Let me back up.                             08:40
12             How many CSX agreement employees are there    08:40
13   in the Tri-State area?                                  08:40
14        A.   I don't know.                                08:40
15        Q.   How many CSX employees were there in the      08:40
16   Tri-State area in 2017?                                 08:40
17        A.   I don't know.                                08:40
18        Q.   How many CSX employees in the Tri-State       08:40
19   area treated with any kind of medical professional      08:40
20   in 2017?                                                08:41
21        A.   I don't know.                                08:41
22        Q.   What percentage of the CSX workforce in the   08:41
23   Tri-State area submitted COII forms in 2017?            08:41
24        A.   I don't know that either.                    08:41
25        Q.   How was it that you determined that the       08:41
```

                                                              75

1    volume of COII forms that you received in 2017 was    08:41

2    any different than you had received at any other    08:41

3    point in time?    08:41

4        A.    Oh, at that point in time, I think we had    08:41

5    approximately 21,000 employees scattered across the    08:41

6    eastern United States.  For us to receive the kind    08:41

7    of volume we did at that point in time from a single    08:41

8    or a couple of practitioners in that very short    08:41

9    period of time, we just never had seen that before.    08:41

10   Usually we get one or two.  We may get one from a    08:41

11   practitioner and never see that practitioner again.    08:42

12        So for me to actually be aware and come to    08:42

13   recognize the name of any treating provider is    08:42

14   pretty rare.  There's a handful that I can tell you    08:42

15   I probably would recognize their names and have some    08:42

16   understanding of -- of estimating the volume of    08:42

17   cases.  But the reality is there are so many    08:42

18   practitioners and so many employees that there's no    08:42

19   pattern that could be identified.    08:42

20        This was the only time that we saw so many    08:42

21   documents in a short time from a very limited number    08:42

22   of practitioners.  It's just never happened.  We had    08:42

23   never identified this pattern at any other time with    08:42

24   me being at CSX and, to my knowledge, in any time    08:42

25   that we had this process established at CSX.  In    08:43

Craig Heligman, M.D.                                      April 28, 2021

```
 1    fact, in my career, I'd never seen this happen        08:43

 2    before.                                               08:43

 3        Q.   How do you know that you had -- it had       08:43

 4    never happened before?                                08:43

 5        A.   Again, in my capacity as a Chief Medical     08:43

 6    Officer or in my capacity in other organizations      08:43

 7    where I had previously worked doing the similar kind  08:43

 8    of work, you have an understanding of the workforce,  08:43

 9    you have an understanding of the spread, but you      08:43

10    don't necessarily take issue with any one provider    08:43

11    or any one geographical area.                         08:43

12            There's just so much that comes across that   08:43

13    there's no pattern to it.  We can't state, with any   08:43

14    high degree of confidence, that this one              08:43

15    practitioner saw employees in a geographical area     08:43

16    like this.                                            08:44

17            This was unique.  The first -- the first      08:44

18    time we saw it when we had 20 or so forms come in on  08:44

19    the exact same day -- and looking at the dates, I     08:44

20    think at one point I calculated on the dates of the   08:44

21    last visit that Dr. Johnson had at least a day when   08:44

22    all he saw were CSX employees at this moment in       08:44

23    time.                                                 08:44

24            I had never come across that before.  My      08:44

25    team had never come across that before.  This was an  08:44
```

                                                              77

Craig Heligman, M.D.                                    April 28, 2021

```
 1   extremely unique set of circumstances.            08:44

 2       Q.   Given that there is no requirement that an  08:44

 3   employee submit a COII form, it's possible, isn't  08:44

 4   it, that CSX employees could be treating with the  08:44

 5   same treater all the time and you would not know?  08:44

 6       A.   That is correct.  Employees may seek      08:44

 7   treatment from any practitioner they desire, and if  08:44

 8   they see a practitioner and they don't make us aware  08:45

 9   of it, I would have no way of knowing.             08:45

10       Q.   So you don't actually know if there was a  08:45

11   pattern other than in this particular instance COII  08:45

12   forms were submitted; correct?                     08:45

13       A.   I can only make comments on the information  08:45

14   that we do receive, not on the information we don't  08:45

15   receive.                                           08:45

16       Q.   And you made the comment that there was a  08:45

17   day that Dr. Johnson only saw CSX employees; is that  08:45

18   right?                                             08:45

19       A.   No, sir.                                  08:45

20            What I said was that when I looked at the  08:45

21   date -- last date of service on the -- that was     08:45

22   provided on the forms, there are large enough people  08:45

23   that were seen on that date where, in my estimation,  08:45

24   assuming an average time for an appointment that we  08:45

25   generally go by for physicians and the number of    08:45
```

78

USCA4    1026

Craig Heligman, M.D.                                                April 28, 2021

```
 1   hours in a given day that is a standard workday for    08:45
 2   a provider, my conclusion was it's likely that this    08:46
 3   group of employees -- or Dr. Johnson had only seen     08:46
 4   CSX employees on that particular day.                  08:46
 5          I'm not saying he did or didn't.  I'm just       08:46
 6   saying, based on my knowledge about standards of       08:46
 7   practice in a clinic, it seemed odd that you would     08:46
 8   only see employees from one employer on any one day.   08:46
 9   It can happen, particularly if you have a small town   08:46
10   where there's a limited group of practitioners and,    08:46
11   say, you have an employer that has a relationship      08:46
12   with a practitioner in the town and they want all      08:46
13   their employees seen for a particular exam.  That      08:46
14   happens with some level of frequency.                  08:46
15          But in this case, that wasn't the scenario.     08:46
16   It just seemed unusual for a practitioner when there   08:46
17   are many chiropractic providers in that Tri-State      08:46
18   area -- and I don't know the full number.  I just      08:47
19   know what we see -- but there are a large enough        08:47
20   number of chiropractic practitioners in that area to   08:47
21   make the statement that this was unusual.              08:47
22          Why would so many employees seek care from      08:47
23   Dr. Johnson on the same day?  I don't have an answer   08:47
24   for that.  I'm just saying it piqued my curiosity      08:47
25   and I wanted to try to figure out why this situation   08:47
```

79

Craig Heligman, M.D.                                         April 28, 2021

```
 1   was occurring.                                     08:47

 2        Q.   You would agree that it would be important  08:47

 3   to answer that question prior to terminating the   08:47

 4   employment of this many employees; right?          08:47

 5        A.   That was the purpose of the investigation.  08:47

 6        Q.   And what was learned in the investigation  08:47

 7   that gave you an answer to that question?          08:47

 8        A.   Clearly the decision-makers that reviewed  08:47

 9   the testimony, that reviewed the transcripts,      08:47

10   reviewed whatever other information they had at hand  08:47

11   thought they had enough information to make a       08:48

12   determination that, in fact, the employees were    08:48

13   guilty of those charges.                           08:48

14        Q.   Are you aware of anybody else that -- are  08:48

15   you aware of anybody at CSX that ever contacted    08:48

16   Dr. Johnson or Dr. Carey regarding the plaintiffs in  08:48

17   this case?                                         08:48

18        A.   I have no knowledge of that.             08:48

19        Q.   And are you aware of anyone in the company  08:48

20   that contacted the plaintiffs in this case prior to  08:48

21   the formal investigations to ask them to provide   08:48

22   additional information regarding their treatment?  08:48

23        A.   I have no knowledge of that.             08:48

24        Q.   And so while you wanted an answer to the  08:48

25   question of why these employees were treating with  08:48
```

80

| | | |
|---|---|---|
| 1 | these two particular providers, you made no effort | 08:48 |
| 2 | to find that out; is that right? | 08:48 |
| 3 | A.   The issue was of the pattern.  The | 08:48 |
| 4 | requirement of the employee is to provide the | 08:48 |
| 5 | information necessary in -- under the Collective | 08:49 |
| 6 | Bargaining Agreement.  This pattern of documents | 08:49 |
| 7 | that we received was unusual.  The issue wasn't the | 08:49 |
| 8 | medical information on the documents, per se.  The | 08:49 |
| 9 | issue was the volume of forms we received. | 08:49 |
| 10 | As I used as an analogy earlier, if the -- | 08:49 |
| 11 | if the group that managed our expense accounts and | 08:49 |
| 12 | reviewed those reports saw a similar volume of a | 08:49 |
| 13 | similar nature from a limited group of employees in | 08:49 |
| 14 | a limited geographical area, they wouldn't be | 08:49 |
| 15 | calling the vendors where the money was spent and | 08:49 |
| 16 | ask them why this happened. | 08:49 |
| 17 | They would, however, potentially take it to | 08:49 |
| 18 | someone internally to the company to inquire whether | 08:49 |
| 19 | or not we should investigate this further.  And | 08:49 |
| 20 | that's what I did. | 08:49 |
| 21 | Q.   You would agree that all of the plaintiffs | 08:49 |
| 22 | in this case complied with the requirements of the | 08:50 |
| 23 | Collective Bargaining Agreement with regard to the | 08:50 |
| 24 | documentation that they needed to provide; correct? | 08:50 |
| 25 | A.   Yes. | 08:50 |

81

Craig Heligman, M.D.                                                    April 28, 2021

```
 1        Q.   At some point, you heard about an         08:50

 2   announcement -- well, actually, let me step back for 08:50

 3   a second.                                            08:50

 4            How many chiropractors are there -- well,  08:50

 5   let me step back.                                    08:50

 6            How many chiropractors were there in 2017  08:50

 7   in the Tri-State area?                               08:50

 8            MS. FOSTER BIRD:  May I -- before we go any 08:50

 9   further, let me qualify this Tri-State thing.        08:50

10            Are you saying all of Kentucky, all of     08:50

11   Ohio, all of West Virginia?  Is that what you're     08:50

12   calling the Tri-State, or are you geographically     08:50

13   limiting it?                                         08:50

14            MR. DINGWALL:  I'm calling it all three of 08:50

15   those areas.                                         08:50

16            MS. FOSTER BIRD:  All three -- all three   08:50

17   whole states?                                        08:50

18            MR. DINGWALL:  All three whole states.     08:50

19            MS. FOSTER BIRD:  Okay.                     08:50

20            Go ahead.  I'm sorry.                       08:50

21            THE WITNESS:  That's okay.                  08:50

22            I have no idea -- as I stated before, I    08:50

23   have no idea what the total number of chiropractic   08:50

24   professionals are in the Tri-State area that were    08:51

25   discussed.                                           08:51
```

                                                                     82

Craig Heligman, M.D.                                          April 28, 2021

```
 1   BY MR. DINGWALL:                               08:51

 2       Q.   Do you have any knowledge of how many  08:51

 3   chiropractors there were within a 25-mile radius of  08:51

 4   Huntington, West Virginia in 2017?             08:51

 5       A.   I have no idea.                        08:51

 6       Q.   How about a 50-mile radius?           08:51

 7       A.   I have no idea.                        08:51

 8       Q.   Do you know if there were any other   08:51

 9   chiropractors in 2017 in that area besides Dr. Carey  08:51

10   and Dr. Johnson?                               08:51

11       A.   Yes.                                   08:51

12       Q.   And who were they?                    08:51

13       A.   I don't recall their names.  We receive  08:51

14   forms from multiple chiropractors in that      08:51

15   geographical area besides Dr. Carey and Dr. Johnson.  08:51

16   I don't recall.                                08:51

17       Q.   So you do have -- so you do have an idea of  08:51

18   how many chiropractors there were in the area at the  08:51

19   time?                                          08:51

20       A.   No, sir, I don't.  In order to do that, I  08:51

21   would need to go through the licensing and their  08:51

22   addresses and do a count.                      08:51

23           So I don't know.  If you'd like to consult  08:51

24   the state licensing boards, I'm sure they can  08:51

25   provide that count for you, but I'm not able to.  08:52
```

                                                            83

Craig Heligman, M.D.                                                April 28, 2021

```
 1   All I can tell you is that we have seen documents    08:52
 2   from several other chiropractic professionals in     08:52
 3   that area, but we have never seen the large volume    08:52
 4   of documents from those professionals as we had with  08:52
 5   Dr. Carey and Dr. Johnson.                            08:52
 6        Q.   You would agree that in order to make a     08:52
 7   determination as to the propriety of these two        08:52
 8   providers treating this many employees, it would be   08:52
 9   incumbent upon you to determine how many other        08:52
10   providers there were?                                 08:52
11        A.   No, sir, it's not.                          08:52
12        Q.   Okay.  And you would also agree that in     08:52
13   determining whether these chiropractors were          08:52
14   properly treating these employees, it would be        08:52
15   incumbent to reach out to other chiropractors in the  08:52
16   area?                                                 08:52
17        A.   No, sir, it is not necessary for that.      08:53
18        Q.   Okay.  Now, at some point in June or July   08:53
19   of 2017, you learned about an announcement of the     08:53
20   reduction of forces in or around the Huntington,      08:53
21   West Virginia area; is that right?                    08:53
22        A.   Yes, sir.                                   08:53
23        Q.   Okay.  And when did you learn about the     08:53
24   announcement of the reduction in forces?              08:53
25        A.   It was sometime following the receipt of    08:53
```

84

USCA4   1032

Craig Heligman, M.D.                                                   April 28, 2021

```
 1     the initial batch of documents.                    08:53

 2         Q.   And when you say "initial batch of        08:53

 3     documents," you're referring to the COII forms?    08:53

 4         A.   Yes, sir.                                  08:53

 5         Q.   And you don't know when you actually first 08:53

 6     received that initial batch?                        08:53

 7         A.   Again, I don't recall the dates.  I'm sure 08:53

 8     if you have them in front of you, we can look and   08:53

 9     see, but I don't recall the exact dates.            08:53

10         Q.   And you have no way of figuring out that   08:53

11     information?                                         08:53

12         A.   Not without looking at the documents.      08:53

13         Q.   Okay.  And what did you learn about the    08:53

14     announcement of the reduction in forces?            08:54

15         A.   Just that.  I was made aware that there    08:54

16     were furloughs that were going to take place in that 08:54

17     area and it affected several different crafts.       08:54

18     There may have been some other agreements that were  08:54

19     going to be exercised.  That part wasn't discussed   08:54

20     with me.  I was just told about the idea that there  08:54

21     were going to be furloughs in that area and they had 08:54

22     a list of individuals to be named that was based on  08:54

23     their seniority.                                     08:54

24         Q.   How did you learn about the announcement of 08:54

25     the reduction in forces?                             08:54
```

Craig Heligman, M.D.                                             April 28, 2021

```
 1       A.   I believe that actually came from a person    08:54
 2   in Labor Relations, and I don't recall who actually    08:54
 3   told me.                                                08:54
 4       Q.   How was it communicated to you?               08:54
 5       A.   Verbally.                                      08:54
 6       Q.   And were there any e-mail communications      08:55
 7   that you were aware of about the potential -- or        08:55
 8   about the force reductions?                             08:55
 9       A.   I don't recall.                                08:55
10       Q.   Do you know why that information was           08:55
11   communicated to you?                                    08:55
12       A.   You would have to ask others as to why, but   08:55
13   my understanding was it coincided with me presenting    08:55
14   the COII information to our legal and Labor             08:55
15   Relations groups, and they, in turn, told me that      08:55
16   this was taking place.  And the assumption was there   08:55
17   was some -- some level of connection between the       08:55
18   two -- two of them.                                     08:55
19       Q.   Okay.  How often in your career have you      08:55
20   been notified about force reductions?                   08:55
21       A.   Never.  This was the first.                    08:55
22       Q.   And how, if at all, did you consider that     08:55
23   information about the force reductions with regard      08:56
24   to the COII forms that you received?                    08:56
25       A.   It had the potential to explain some of the   08:56
```

86

1   behavior.                                        08:56

2       Q.   How so?                                 08:56

3       A.   As we discussed earlier, their benefits --   08:56

4   if they were off work for medical reasons, then   08:56

5   their benefits would be extended longer than what   08:56

6   they would have otherwise received in the course of   08:56

7   being furloughed.                                08:56

8       Q.   Did you cross-reference those individuals   08:56

9   who were set to be furloughed with those individuals   08:56

10  who submitted COII forms from Dr. Johnson and    08:56

11  Dr. Carey?                                       08:56

12      A.   I did not, but I believe our Labor      08:56

13  Relations and field administration teams did that   08:56

14  correlation.                                     08:56

15      Q.   Okay.  The conditions noted on the COII   08:56

16  forms by Dr. Johnson and Dr. Carey were all      08:57

17  relatively minor musculoskeletal conditions; right?   08:57

18      A.   Yes, sir.                               08:57

19      Q.   And that was what you understood based on   08:57

20  your review of those COII forms; right?          08:57

21      A.   Yes, that's correct.                    08:57

22      Q.   Okay.  And as a general matter, you don't   08:57

23  consider relatively minor musculoskeletal conditions   08:57

24  to be abnormal, do you?                          08:57

25      A.   No, sir.                                08:57

87

Craig Heligman, M.D.                                                    April 28, 2021

1       Q.   It's probably safe to say that a              08:57

2   significant portion of the population has some         08:57

3   relatively minor musculoskeletal condition; right?     08:57

4       A.   The medical literature would support nearly   08:57

5   a hundred percent of the adult population would        08:57

6   experience minor musculoskeletal conditions.          08:57

7       Q.   Okay.  And given that, you certainly         08:57

8   wouldn't find it abnormal for a railroad worker to    08:57

9   have a relatively minor musculoskeletal condition;    08:57

10  right?                                                08:58

11      A.   That's correct.                              08:58

12      Q.   Okay.  The opinions you offered in the       08:58

13  formal investigations of the plaintiffs in this case  08:58

14  were your medical opinions; is that right?            08:58

15      A.   They're opinions that I made as -- in my     08:58

16  position of the Chief Medical Officer, so, yes,       08:58

17  there were some medical opinions.  But I am also an   08:58

18  employee of the organization with administrative      08:58

19  responsibility, so I was also making comments with    08:58

20  reference to my administrative role within the        08:58

21  organization.                                         08:58

22      Q.   The testimony that you provided in the       08:58

23  formal investigation included your opinions as to     08:58

24  the propriety of the treatment that was provided by   08:58

25  Dr. Johnson and Dr. Carey to the plaintiffs; right?   08:58

                                                              88

Craig Heligman, M.D.                                    April 28, 2021

```
 1        A.    I did make comments with regard to my      08:58

 2   observations as to the diagnoses listed and the       08:58

 3   length of time that both Dr. Carey and Dr. Johnson    08:58

 4   were listing on the forms.                            08:59

 5        Q.    Okay.  And those opinions that you offered 08:59

 6   in the formal investigations were based on diagnoses  08:59

 7   you made; correct?                                    08:59

 8        A.    No, sir.  They were based on the diagnoses 08:59

 9   listed by the treating providers.                     08:59

10        Q.    But it was your opinion that the course of 08:59

11   treatment pursued by Dr. Johnson and Dr. Carey was    08:59

12   not appropriate given the diagnoses; is that right?   08:59

13        A.    No.                                        08:59

14        Q.    No, it's not right or, no, that was not    08:59

15   your testimony?                                       08:59

16        A.    No, your statements were incorrect.        08:59

17        Q.    Okay.  So it was not your opinion in your  08:59

18   testimony in the formal investigations that the --    08:59

19   Dr. Carey and Dr. Johnson were providing              08:59

20   inappropriate treatment?                              08:59

21        A.    No.  Based on what was listed on the COIIs 08:59

22   and then in some of the -- in some of the             08:59

23   investigations, the employees had provided some       09:00

24   additional records.  There was no indication that     09:00

25   the treatment itself was inappropriate from the       09:00
```

                                                              89

```
 1   standpoint of a chiropractic professional providing    09:00

 2   chiropractic care.                                      09:00

 3       Q.   So you were not of the opinion that the        09:00

 4   care that Dr. Johnson and Dr. Carey provided to the     09:00

 5   plaintiffs in this case was below the standard of       09:00

 6   care for a chiropractor, are you?                        09:00

 7       A.   No, I didn't make that statement.  There       09:00

 8   were -- there were other statements I did make --       09:00

 9   excuse me -- did make that appeared that the length     09:00

10   of treatment being provided was more than one would     09:00

11   expect for the diagnoses listed.  And in some of the    09:00

12   cases, there was a document that I did present as       09:00

13   a -- as an exhibit that identified that the length     09:00

14   of time may have been excessive for needing to be      09:01

15   off work or for length of recovery.                     09:01

16       Q.   So you don't dispute the diagnoses that        09:01

17   were made by Dr. Johnson and Dr. Carey with regard      09:01

18   to the plaintiffs in this case; is that right?          09:01

19       A.   That's correct.                                09:01

20       Q.   Okay.  But it is your opinion that the         09:01

21   treatment was not appropriate; right?                   09:01

22       A.   That's not what I said.  What I'm saying is    09:01

23   that the duration of the treatment being delivered      09:01

24   and the duration of the recommendations of reduced      09:01

25   and absent -- and not performance of various            09:01
```

90

Craig Heligman, M.D.                                    April 28, 2021

```
 1    activities was -- excuse me.  Let me start over.        09:01
 2            It wasn't the treatment itself.  It was the     09:01
 3    length of time that treatment was delivered and it      09:01
 4    was the length of time that the providers were          09:01
 5    recommending that the person avoid work activities      09:01
 6    that was at issue.  That did not meet standards of      09:02
 7    those kinds of recommendations if you compare it to     09:02
 8    what is recommended by the medical literature and       09:02
 9    what is identified in the two references that are       09:02
10    commonly cited for determining lengths of               09:02
11    disability.                                             09:02
12        Q.   So you don't take issue with the diagnoses;    09:02
13    correct?                                                09:02
14        A.   Correct.                                       09:02
15        Q.   And you don't take issue with the actual       09:02
16    treatment that was being provided; correct?             09:02
17        A.   Correct.                                       09:02
18        Q.   But you did take issue with the length of      09:02
19    the treatment; is that right?                           09:02
20        A.   To some degree, yes.                           09:02
21        Q.   Okay.  And it was the length of treatment      09:02
22    that you felt created a pattern that lends itself       09:02
23    towards potential fraud?                                09:02
24        A.   No.                                            09:02
25        Q.   Okay.  Help me out.                            09:02
```

                                                                91

Craig Heligman, M.D.                                                April 28, 2021

```
 1         A.    Sure.  Happy to do that.              09:03

 2         Q.    All right.  So what specifically was it   09:03

 3    about the treatment that these employees were     09:03

 4    getting from Dr. Carey and Dr. Johnson that you felt  09:03

 5    lended itself towards allegations of fraud?       09:03

 6         A.    There's a fairly large body of literature  09:03

 7    that looks at the doctor/patient relationship.    09:03

 8    Amongst those it's clear that health care         09:03

 9    professionals will misrepresent information to    09:03

10    various agencies to assist their patients to receive  09:03

11    benefits.  That's in the literature.             09:03

12         So that's a concern, knowing that           09:03

13    information, also knowing the duration of time that  09:03

14    the practitioner said they should not be at work was  09:03

15    in excess of what the medical literature and the  09:04

16    disability duration references would recommend.   09:04

17    People being off work that long is not healthy, and  09:04

18    they should have recovered with acceptable lengths  09:04

19    of treatment.                                    09:04

20         So while I don't believe that the treatment  09:04

21    given was incorrect or the fact of being -- or even  09:04

22    the professional that's delivering the treatment.  09:04

23    It was the fact that the health professional and the  09:04

24    patients were continuing to be off work for lengths  09:04

25    of time that didn't match with the diagnoses being  09:04
```

                                                           92

Craig Heligman, M.D.                                                April 28, 2021

| | | |
|---|---|---|
| 1 | provided. | 09:04 |
| 2 | Now, what the intent was behind that I'm | 09:04 |
| 3 | unclear.  But the pattern of behavior over this 70 | 09:04 |
| 4 | or so employees, when all we had was a COII from two | 09:04 |
| 5 | specific chiropractic professionals in a small | 09:04 |
| 6 | geographical area, was still highly unusual. | 09:05 |
| 7 | Q.   Was the testimony that you provided in the | 09:05 |
| 8 | formal investigations of the plaintiffs in this case | 09:05 |
| 9 | made to a reasonable degree of medical certainty? | 09:05 |
| 10 | A.   That's a legal definition, and so my answer | 09:05 |
| 11 | is this is based upon my professional experience as | 09:05 |
| 12 | a provider, my review of the medical literature, and | 09:05 |
| 13 | awareness of the disability duration guidelines and | 09:05 |
| 14 | the nature of appropriate treatment for the | 09:05 |
| 15 | conditions listed. | 09:05 |
| 16 | Q.   You would agree that it would not be | 09:05 |
| 17 | appropriate to opine on the course of treatment for | 09:05 |
| 18 | a patient without physically examining them; | 09:05 |
| 19 | correct? | 09:05 |
| 20 | A.   The -- the issue is that I'm not here to | 09:05 |
| 21 | interfere with the doctor/patient relationship.  We | 09:06 |
| 22 | don't do that.  It would be inappropriate to do so. | 09:06 |
| 23 | But I also am not here to make a selection of | 09:06 |
| 24 | providers for the employees.  They choose to do what | 09:06 |
| 25 | they choose to do and they work with their health | 09:06 |

93

Craig Heligman, M.D.                                              April 28, 2021

```
1   care provider.  That is the doctor/patient        09:06

2   relationship.                                      09:06

3         My observation was that for this set of      09:06

4   individuals, the duration of time off being        09:06

5   recommended by the practitioners was different from 09:06

6   the standard of care being recommended in the      09:06

7   medical literature and the length of time off was  09:06

8   not consistent with standards being recommended by 09:06

9   the disability duration guidelines that have been  09:06

10  published.                                         09:06

11     Q.   So you agree that it was inappropriate to  09:06

12  send letters to Dr. Johnson and Dr. Carey to let   09:06

13  them know that CSX would no longer take medical    09:06

14  documentation from them on behalf of employees;    09:06

15  correct?                                           09:07

16     A.   But that's not what we did.                09:07

17     Q.   You did not send a letter to Dr. Johnson   09:07

18  and Dr. Carey letting them know that you would not 09:07

19  accept documentation from them any longer?         09:07

20     A.   It was documentation specific to CSX forms, 09:07

21  so we would not accept COIIs or return-to-work     09:07

22  information from those practitioners.  We did not  09:07

23  advise them that the employees were unable to see  09:07

24  them.  We did not advise them that we wouldn't     09:07

25  receive medical information or medical records.    09:07
```

94

1       It was strictly an issue of we no longer        09:07

2   were able to accept forms that were completed by      09:07

3   them for the purposes of determining ongoing absence  09:07

4   for medical reasons and return to work.              09:07

5       Q.   Well, you did send letters to the           09:07

6   plaintiffs in this matter stating that the CSX        09:07

7   Medical Department is no longer accepting any         09:07

8   medical documentation completed by Shannon Johnson    09:08

9   or Daniel Carey; is that right?                       09:08

10      A.   Do you have a copy of that letter I can      09:08

11  look at?  The -- I don't remember the exact           09:08

12  language.  However, the intent was specific to the    09:08

13  medical forms.  That's the documentation we were      09:08

14  referencing.                                          09:08

15      Thank you.                                        09:08

16      Q.   So I just sent you over what we've marked    09:08

17  as Exhibit 3.  Let me know when you have that.        09:08

18      (Exhibit 3 was marked for identification and

19  attached to the transcript.)                          09:08

20      THE WITNESS:  I do have it.                       09:08

21  BY MR. DINGWALL:                                      09:08

22      Q.   Okay.  And this is a letter dated            09:08

23  September 20th, 2017, on your letterhead, to an S.M.  09:08

24  Morrison; is that right?                              09:08

25      A.   Yes, sir.                                    09:08

95

Craig Heligman, M.D.                                                April 28, 2021

| | | |
|---|---|---|
| 1 | Q.   All right.  And Mr. Morrison is one of the | 09:08 |
| 2 | plaintiffs in this case. | 09:08 |
| 3 | And this letter is signed by you; correct? | 09:08 |
| 4 | A.   Yes, that's correct. | 09:08 |
| 5 | Q.   And you would agree that in the second | 09:08 |
| 6 | sentence of this letter, it states: | 09:08 |
| 7 | "The purpose of this | 09:08 |
| 8 | correspondence is to advise | 09:08 |
| 9 | you that the CSX Medical | 09:08 |
| 10 | Department is no longer | 09:08 |
| 11 | accepting any medical | 09:09 |
| 12 | documentation completed by | 09:09 |
| 13 | Shannon Johnson, D.C., or | 09:09 |
| 14 | Daniel Carey, II, D.C." | 09:09 |
| 15 | Correct? | 09:09 |
| 16 | A.   Yes, that's correct. | 09:09 |
| 17 | Q.   Okay.  And that would be an interference | 09:09 |
| 18 | with the doctor/patient relationship. | 09:09 |
| 19 | You agree; right? | 09:09 |
| 20 | A.   No, I don't agree with that at all.  If you | 09:09 |
| 21 | look at the second sentence -- or the sentence right | 09:09 |
| 22 | after that: | 09:09 |
| 23 | "If you continue to have a need | 09:09 |
| 24 | to be off [..] work for a | 09:09 |
| 25 | medical reason or wish to | 09:09 |

96

Craig Heligman, M.D.                                                April 28, 2021

```
 1                    return to work from a medical      09:09
 2                    leave, please provide              09:09
 3                    sufficient updated medical         09:09
 4                    documentation from your            09:09
 5                    primary care or treating           09:09
 6                    physician, other than the two      09:09
 7                    referenced above, within           09:09
 8                    30 days [of] the date of this      09:09
 9                    letter."                           09:09
10         So what we were referring to was simply the   09:09
11    COII or documentation that would reflect the       09:09
12    information requested on the COII and similarly on  09:09
13    our attending physician return-to-work statement.  09:09
14         So this was only to address the CSX           09:09
15    management of the absence of the employee under the 09:09
16    Collective Bargaining Agreement or under company   09:10
17    policy.  There was nothing that would prevent the  09:10
18    employee from continuing to seek care from either  09:10
19    practitioner.                                      09:10
20       Q.   It's just that they couldn't use that care 09:10
21    as a basis to justify their time off from work;    09:10
22    correct?                                           09:10
23       A.   They could not use those practitioners to  09:10
24    validate the reason -- the medical reasons for their 09:10
25    absence.                                           09:10
```

97

```
 1        Q.   Okay.                                    09:10

 2        A.   Again, this is an administrative task.  It   09:10

 3   is not a treatment issue.                         09:10

 4        Q.   You are not a licensed chiropractor; is   09:10

 5   that right?                                        09:10

 6        A.   That is correct.                         09:10

 7        Q.   You are not an orthopedist?              09:10

 8        A.   Again, correct.                          09:10

 9        Q.   You are not a neurologist?               09:10

10        A.   That is also correct.                    09:10

11        Q.   You are not licensed to practice in West   09:10

12   Virginia?                                          09:10

13        A.   Correct.                                 09:10

14        Q.   You're not licensed to practice in       09:10

15   Kentucky?                                          09:11

16        A.   Correct.                                 09:11

17        Q.   You're not licensed to practice in Ohio?  09:11

18        A.   Yes, that's correct.                     09:11

19        Q.   Okay.  Have you ever had an active medical   09:11

20   practice?                                          09:11

21        A.   Yes.                                     09:11

22        Q.   When was the last time you had a practice   09:11

23   in which you personally examined patients and made   09:11

24   diagnoses?                                         09:11

25        A.   It was just prior to me taking a position   09:11
```

                                                                     98

| | | |
|---|---|---|
| 1 | at CSX. | 09:11 |
| 2 | Q.   And when was that? | 09:11 |
| 3 | A.   2012. | 09:11 |
| 4 | Q.   Okay.  And what was the nature of your | 09:11 |
| 5 | practice? | 09:11 |
| 6 | A.   It was a broad occupational medicine | 09:11 |
| 7 | practice.  I saw patients myself.  I also consulted | 09:11 |
| 8 | for various organizations.  I received referrals | 09:11 |
| 9 | from insurance companies, from attorneys to review | 09:11 |
| 10 | documents or to examine patients.  So it was a | 09:11 |
| 11 | fairly broad practice both in legal administrative, | 09:11 |
| 12 | direct patient care. | 09:11 |
| 13 | Q.   When you were in practice and you had a | 09:12 |
| 14 | patient that had a condition that was outside of | 09:12 |
| 15 | your expertise, did you refer that patient out to a | 09:12 |
| 16 | different provider? | 09:12 |
| 17 | A.   I did. | 09:12 |
| 18 | Q.   And you believe that's the proper thing to | 09:12 |
| 19 | do; correct? | 09:12 |
| 20 | A.   Yes. | 09:12 |
| 21 | Q.   Okay.  And did you ever refer patients to | 09:12 |
| 22 | chiropractors? | 09:12 |
| 23 | A.   Yes. | 09:12 |
| 24 | Q.   And when you made those referrals to | 09:12 |
| 25 | chiropractors, were they for musculoskeletal | 09:12 |

99

1    conditions?                                              09:12

2        A.    Yes.                                            09:12

3        Q.    And that was because you felt that it was      09:12

4    outside of your area of specialty to treat them; is      09:12

5    that right?                                              09:12

6        A.    No.                                            09:12

7        Q.    Was it because you felt that it was you        09:12

8    were unable to provide the course of treatment that      09:12

9    those patients needed?                                   09:12

10       A.    No, it was primarily because the individual    09:12

11   had a preference for manual manipulation or other        09:12

12   chiropractic care as opposed to a physical              09:13

13   therapist, who may not be able to deliver that kind      09:13

14   of service.  I don't -- I'm not trained in manual       09:13

15   manipulation, and if a patient had a preference for     09:13

16   that, they would need to see an osteopathic             09:13

17   professional or a chiropractic professional.            09:13

18       Q.    And your job at -- as this Chief Medical       09:13

19   Officer at CSX is to essentially determine the          09:13

20   fitness for duty of the individuals based on the        09:13

21   medical information that you receive from other         09:13

22   providers; is that right?                               09:13

23       A.    Yes, that's correct.                           09:13

24       Q.    Okay.  And that's because you don't           09:13

25   personally examine any employees; right?                09:13

                                                         100

```
 1        A.    That's correct.                          09:13

 2        Q.    And that's because you don't have the    09:13

 3   training to necessarily evaluate all conditions that 09:13

 4   an employee might suffer; is that right?            09:13

 5        A.    That's not correct.                      09:14

 6        Q.    Okay.  Well, if you -- you are not       09:14

 7   qualified to render an opinion regarding            09:14

 8   psychological treatment of an employee; right?      09:14

 9        A.    I can render an opinion, yes.            09:14

10        Q.    Okay.  And that's something that is within 09:14

11   your specialty?                                     09:14

12        A.    Yes.                                     09:14

13        Q.    Okay.  And so if you received an opinion  09:14

14   from a mental health provider for an employee, you  09:14

15   could evaluate as to whether that recommendation was 09:14

16   proper or not?                                      09:14

17        A.    I can make a recommendation with regards to 09:14

18   fitness for duty based on the information provided  09:14

19   by those other professionals.  I can also render an 09:14

20   opinion as to what the information means as         09:14

21   delivered by these professionals.                   09:14

22              Would I hold myself out as a mental health 09:14

23   professional to deliver treatment?  No.  But I do   09:15

24   have knowledge of certain standards as it applies to 09:15

25   the ability to determine fitness for duty across a  09:15
```

                                                            101

Craig Heligman, M.D.                                      April 28, 2021

```
 1   broad range of medical conditions.  It's not limited   09:15
 2   to musculoskeletal conditions.                         09:15
 3       Q.   But you certainly wouldn't tell a mental      09:15
 4   health provider that was treating a CSX employee       09:15
 5   that they needed to conduct their treatment in a       09:15
 6   certain way, would you?                                09:15
 7       A.   No, I would not.                              09:15
 8       Q.   Okay.  And the same would be true, for        09:15
 9   example, if you received documentation from a          09:15
10   cardiologist?                                          09:15
11       A.   Correct.  I would not tell those              09:15
12   individuals how to deliver treatment to their          09:15
13   patients.                                              09:15
14       Q.   Okay.  That's because you're not a            09:15
15   specialist in those areas; right?                      09:15
16       A.   I'm not a specialist in those areas.  Those   09:15
17   are not the -- that's not the patient population       09:15
18   that I would see as a clinician.                       09:15
19       Q.   Are you a member of any professional          09:16
20   organizations?                                         09:16
21       A.   Yes.                                          09:16
22       Q.   Which ones?                                   09:16
23       A.   American College of Occupational &            09:16
24   Environmental Medicine, the American Medical           09:16
25   Association, and the International Academy of          09:16
```

                                                              102

Craig Heligman, M.D.                                                April 28, 2021

| | | |
|---|---|---|
| 1 | Independent Medical Evaluators. | 09:16 |
| 2 | Q.   Do any of those entities of which you're a | 09:16 |
| 3 | member provide ongoing training to its members? | 09:16 |
| 4 | A.   All three do. | 09:16 |
| 5 | Q.   And as a licensed doctor, are you required | 09:16 |
| 6 | to obtain regular continuing education credits? | 09:16 |
| 7 | A.   Yes. | 09:16 |
| 8 | Q.   And what are the requirements for you to do | 09:16 |
| 9 | so? | 09:16 |
| 10 | A.   It depends upon the state of licensure. | 09:16 |
| 11 | Each state has its own requirements. | 09:16 |
| 12 | Q.   You are licensed in Florida; is that right? | 09:16 |
| 13 | A.   Yes. | 09:16 |
| 14 | Q.   Okay.  And where else? | 09:16 |
| 15 | A.   Currently I hold an active license in | 09:17 |
| 16 | Missouri and an inactive license in Kansas. | 09:17 |
| 17 | Q.   Do the organizations that you belong to | 09:17 |
| 18 | provide any guidance on the diagnosis and treatment | 09:17 |
| 19 | of musculoskeletal injuries? | 09:17 |
| 20 | A.   Yes. | 09:17 |
| 21 | Q.   Did you consult any of that guidance prior | 09:17 |
| 22 | to testifying in the formal investigations of the | 09:17 |
| 23 | plaintiffs in this case? | 09:17 |
| 24 | A.   I used my collective knowledge from my | 09:17 |
| 25 | experience as a clinician as well as the information | 09:17 |

103

| | | |
|---|---|---|
| 1 | from educational courses, references I've read, and | 09:17 |
| 2 | the medical literature that I have read.  It wasn't | 09:17 |
| 3 | specific to any organization or any specific | 09:17 |
| 4 | reference. | 09:17 |
| 5 | Q.   And I believe that you entered into the | 09:17 |
| 6 | investigation -- I'm sorry.  Let me start over. | 09:17 |
| 7 | I believe that during the course of your | 09:17 |
| 8 | testimony in the formal investigations, you entered | 09:18 |
| 9 | exhibits of documents that you relied upon in | 09:18 |
| 10 | forming your opinion as to the propriety of the | 09:18 |
| 11 | length of treatment that the plaintiffs were | 09:18 |
| 12 | receiving; correct? | 09:18 |
| 13 | A.   No, I don't believe that's correct. | 09:18 |
| 14 | Q.   Okay.  You didn't offer any exhibits in -- | 09:18 |
| 15 | as part of your testimony in the formal | 09:18 |
| 16 | investigations? | 09:18 |
| 17 | A.   No, you specified to length of treatment. | 09:18 |
| 18 | I don't -- if there was anything on length of | 09:18 |
| 19 | treatment, it was the Choosing Wisely two-page | 09:18 |
| 20 | document that I presented.  And I don't have it in | 09:18 |
| 21 | front of me, so if you have that, I'd be happy to | 09:18 |
| 22 | review it and discuss whatever information is in | 09:18 |
| 23 | there. | 09:18 |
| 24 | Q.   Where did you obtain the Choosing Wisely | 09:18 |
| 25 | document? | 09:18 |

104

Craig Heligman, M.D.                                                                          April 28, 2021

```
 1        A.    It's a published document.  I don't        09:18

 2   remember the publication date for that.               09:18

 3            The -- the Academy -- I believe it's of      09:18

 4   Internal Medicine had started a Choosing Wisely       09:18

 5   series.  It wasn't focused on specific chiropractic   09:19

 6   care.  This document happened to be a document        09:19

 7   prepared in conjunction with the chiropractic         09:19

 8   societies -- or the professional chiropractic         09:19

 9   societies, but they also look at appropriateness for  09:19

10   other cardiac tests, for other laboratory tests.  It  09:19

11   covers a fairly broad spectrum of medical practice.   09:19

12        Q.    Was the information in that document        09:19

13   peer-reviewed?                                         09:19

14        A.    To the best of my knowledge, yes.           09:19

15        Q.    And by what entity or entities was it       09:19

16   peer-reviewed?                                         09:19

17        A.    Again, you'd have to look on the document.  09:19

18   It states...                                           09:19

19        Q.    Was that something that was important for   09:19

20   you to determine before offering it as an exhibit in   09:19

21   the investigations?                                    09:19

22        A.    What was important?                         09:19

23        Q.    Determining whether that document was       09:19

24   peer-reviewed.                                         09:20

25        A.    Yes.  In the course of providing           09:20
```

Craig Heligman, M.D.                                              April 28, 2021

```
 1    information and reviewing medical information, it is    09:20
 2    important for it to be peer-reviewed.                   09:20
 3        Q.   Prior to testifying in the formal             09:20
 4    investigations, did you consult with any other         09:20
 5    medical profession -- professionals?                   09:20
 6        A.   No.                                            09:20
 7        Q.   Do the -- well, is there any reason why you   09:20
 8    could not have consulted, prior to testifying in the   09:20
 9    formal investigation, with any independent licensed    09:20
10    chiropractors?                                          09:20
11        A.   So let me restate the question so I           09:20
12    understand.  Was there anything that would prevent     09:20
13    me from consulting other health care professionals?    09:21
14             Is that -- is that your question in           09:21
15    specific to chiropractic professionals?                09:21
16        Q.   Yes.                                           09:21
17        A.   No, there's nothing that would prevent me     09:21
18    from consulting other professionals.                   09:21
19        Q.   And you chose not to do so, though; is that   09:21
20    right?                                                  09:21
21        A.   Yes, that's correct.                           09:21
22        Q.   Okay.  But you would agree that the best      09:21
23    way to determine the propriety of the care that was    09:21
24    being provided by Dr. Johnson and Dr. Carey to the     09:21
25    plaintiffs in this case would be to consult other      09:21
```

Craig Heligman, M.D.                                    April 28, 2021

```
 1    professionals in that field?                    09:21

 2        A.   No.                                    09:21

 3        Q.   Okay.  Is there any reason why you could   09:21

 4    not have consulted with an independent orthopedist   09:21

 5    prior to testifying in the formal investigations?   09:21

 6        A.   Is there any reason that would prevent me?   09:21

 7    No.                                              09:21

 8        Q.   Is there any reason that you couldn't have   09:21

 9    consulted with independent neurologists with regard   09:21

10    to the treatment that the plaintiffs were receiving?   09:21

11        A.   There's nothing that would prevent me from   09:22

12    doing so.                                        09:22

13        Q.   And there's nothing that prevented you from   09:22

14    simply asking the employees who had submitted these   09:22

15    COIIs to go get another opinion, is there?       09:22

16        A.   Yes.                                    09:22

17        Q.   And what is that?                       09:22

18        A.   We don't send individuals out for       09:22

19    evaluations except for certain circumstances.    09:22

20        Q.   And those certain circumstances are what?   09:22

21        A.   There's a provision in the Collective   09:22

22    Bargaining Agreement that's called a three-doctor   09:22

23    panel.  Under those circumstances, we would be   09:22

24    required to send individuals out for further     09:22

25    evaluation.                                      09:22
```

                                                          107

1           There's -- there's not a strong reason to          09:22

2    send anyone out for a second opinion with regards to      09:22

3    determining things that I am required to determine        09:23

4    as part of my job.  If I have the knowledge to            09:23

5    determine fitness for duty on these individuals, I        09:23

6    do so.  We don't get second opinions or independent       09:23

7    medical examinations just for the sole purpose of         09:23

8    having them.                                              09:23

9        Q.   Well, in this case, it wouldn't be for the       09:23

10   sole purpose of just having them.  It would be for        09:23

11   the purpose of determining whether a significant          09:23

12   number of employees committed fraud or not; right?        09:23

13       A.   No.  No, that wouldn't be a reason for           09:23

14   doing a referral for another opinion.                     09:23

15       Q.   So the ongoing employment of 50-plus             09:23

16   individuals was not a sufficient basis to collect         09:23

17   more information in which to make a determination?        09:23

18       A.   No, it wasn't a medical issue.                   09:23

19       Q.   So whether the employees at issue were           09:24

20   treating for a sufficient period of time was not a        09:24

21   medical issue?                                            09:24

22       A.   No.  The issue of answering the question as      09:24

23   to were these employees dishonest or were they            09:24

24   acting fraudulently, that's not a medical                 09:24

25   determination.                                            09:24

                                                                    108

Craig Heligman, M.D.                                                    April 28, 2021

```
 1        Q.   Well, that determination was made based on    09:24
 2   the course of treatment they were seeking; correct?     09:24
 3        A.   No.                                            09:24
 4        Q.   So what was the basis for determining          09:24
 5   whether they were being dishonest or being               09:24
 6   fraudulent?                                               09:24
 7        A.   It was the number of cases we received,        09:24
 8   number of documents received from two specific           09:24
 9   practitioners in a small geographical area all at        09:24
10   the same time, that in following which, we -- or         09:24
11   following which, I was told that there are business      09:24
12   issues going on in that area for reduction in force      09:25
13   furloughs -- other changes that may motivate an          09:25
14   individual to present information at that moment in       09:25
15   time.                                                    09:25
16        The diagnosis, the treatment, the duration          09:25
17   of care wasn't the issue.  It was the issue of           09:25
18   whether or not the volume of cases that we saw at        09:25
19   that time had reason for being sent in.                  09:25
20        As I said before, if we had similar                 09:25
21   situations with submission of expense reports,           09:25
22   similar submission of payroll submissions that the       09:25
23   respective departments felt were out of -- out of        09:25
24   the ordinary for their specific areas of interest,       09:25
25   they would present that to the same group I did to       09:25
```

                                                                    109

```
 1    look at whether or not it should be investigated.    09:25
 2            This wasn't a medical issue.  This was a     09:26
 3    behavioral issue at that moment in time.             09:26
 4       Q.   I'm going to send over what I've marked as   09:26
 5    Exhibit 4, and let me know when you have it.         09:26
 6            (Exhibit 4 was marked for identification and
 7    attached to the transcript.)                         09:26
 8            THE WITNESS:  Yes, I have it.                 09:26
 9    BY MR. DINGWALL:                                      09:26
10       Q.   And this is a three-page document, and it's  09:26
11    entitled "Choosing Wisely"; is that right?           09:26
12       A.   Yes, that's correct.                         09:26
13       Q.   And this is a document that you submitted    09:26
14    as an exhibit in the formal investigation of the     09:26
15    plaintiffs in this case; is that right?              09:26
16       A.   Yes.  Not all of them, but some of them.     09:26
17       Q.   And you relied upon this document as a       09:26
18    basis for your -- I'm sorry.  You relied upon this   09:26
19    document as at least one of the bases for your       09:26
20    opinions offered in your testimony; is that right?   09:26
21       A.   Yes.                                         09:26
22       Q.   Okay.  Other than this document, was there   09:26
23    any other medical literature that you relied upon in 09:27
24    testifying in the formal investigations?             09:27
25       A.   Again, there's several documents that I've   09:27
```

                                                                  110

1    used in the past that -- during my collective          09:27

2    experience and education.  This was the one that was    09:27

3    fairly appropriate for the set of circumstances and     09:27

4    would be a reasonable reference for the discussion      09:27

5    about chiropractic care.                                09:27

6         There are other guidelines.  There's the          09:27

7    MDGuidelines that can discuss this.  The                09:27

8    Occupational -- let's see -- Occupational               09:27

9    Disability -- it's, I believe, the ODA.  I'm trying     09:27

10   to remember the exact language.  There's also a         09:27

11   treatment guidelines referenced by the American         09:27

12   College of Occupational Environmental Medicine          09:27

13   that's been published that discuss the treatment of     09:28

14   musculoskeletal conditions.                             09:28

15        So this was a nice summary, but it                 09:28

16   certainly wasn't the only document that I would have    09:28

17   used to form an opinion.                                09:28

18   Q.   Will you agree that in a circumstance where        09:28

19   the jobs and livelihoods of 50-plus individuals were    09:28

20   on the line, the best information was the -- well,      09:28

21   let me start over.                                      09:28

22        You would agree that in a circumstance             09:28

23   where there were 50-plus employees with their jobs      09:28

24   and livelihoods on the line, you would only want to     09:28

25   use the best documentation and support for your         09:28

                                                             111

Craig Heligman, M.D.                                                April 28, 2021

```
 1   opinions; right?                              09:28

 2       A.   I'm not sure I really understand the  09:28

 3   question.                                     09:28

 4       Q.   Well, you were testifying in the formal  09:28

 5   investigations of 50-plus employees; correct?  09:28

 6       A.   Yes, that's correct.                 09:28

 7       Q.   And you knew that the outcome of those  09:28

 8   formal investigations was potentially termination of  09:28

 9   all of the employees; right?                  09:29

10       A.   Yes, that's correct.                 09:29

11       Q.   And in testifying, you would want to take  09:29

12   great care that you provided only the best    09:29

13   information upon which the decision-makers would  09:29

14   make a decision on their employment; right?   09:29

15       A.   I wanted to present information that was  09:29

16   sufficient to assist with the decision-making.  It  09:29

17   is not a listing of every peer-reviewed article that  09:29

18   potentially addresses this.  There are hundreds of  09:29

19   thousands of articles in the medical literature that  09:29

20   are peer-reviewed that address musculoskeletal  09:29

21   conditions.  There's no way to present all that  09:29

22   information in the course of a hearing for these  09:29

23   investigations.                               09:29

24            I selected the one document that I thought  09:29

25   was representative -- or most representative of the  09:29
```

112

USCA4    1060

Craig Heligman, M.D.                                                April 28, 2021

```
 1    information being discussed.  However, the          09:29

 2    investigation itself was an administrative process,  09:29

 3    not a medical review process.                        09:29

 4          So this was ancillary to the actual            09:30

 5    proceedings of the investigation and the ultimate    09:30

 6    decision-making with regards to the employee's       09:30

 7    decision to -- or the decision that led to the       09:30

 8    termination of these employees.                      09:30

 9       Q.   So of the hundreds and thousands of          09:30

10    documents that exist out there that you could have   09:30

11    referred to, the Choosing Wisely document was the    09:30

12    one that you felt most appropriate for the           09:30

13    circumstances?                                       09:30

14       A.   Yes, for the lay medical population, this    09:30

15    was a very good resource.  That was the intention    09:30

16    for this document.                                   09:30

17       Q.   And you're not suggesting that this          09:30

18    document was a substitute for the opinions and       09:30

19    treatment of Dr. Johnson and Dr. Carey, are you?     09:30

20       A.   No, I was using this to reflect what a       09:30

21    reliable provider organization was establishing as a 09:30

22    reasonable standard.                                 09:31

23       Q.   Okay.  So you're suggesting that this        09:31

24    Choosing Wisely document is the reasonable standard  09:31

25    to which Dr. Johnson and Dr. Carey should be held?   09:31
```

                                                            113

Craig Heligman, M.D.                                        April 28, 2021

```
 1        A.    I think it is a reasonable standard for the    09:31
 2   discussion that we were having.  Whether or not you       09:31
 3   should hold a specific provider to a specific             09:31
 4   standard is a different issue.                            09:31
 5        Q.    Well, what standard should Dr. Carey and       09:31
 6   Dr. Johnson be held to?                                   09:31
 7        A.    They should be held to the standard that       09:31
 8   their licensing agency allows them or that -- that        09:31
 9   they have.  They should meet the licensing               09:31
10   requirements of their state boards.  They should        09:31
11   meet the educational requirements that allows them       09:31
12   to graduate from their training program.  Again,         09:31
13   whatever's required of them for the purposes of           09:31
14   holding themselves out as a licensed chiropractic        09:31
15   provider is what they should be held to.                 09:32
16        This document was simply a summary document         09:32
17   for laypeople to discuss these issues with their         09:32
18   providers.  It was not meant to be a standard of         09:32
19   care that each and every professional should be held     09:32
20   to.                                                       09:32
21        Again, this is the American Board of the            09:32
22   Internal Medicine Foundation along with the American     09:32
23   Chiropractic Association that was published for the      09:32
24   purpose of educating a lay population, a patient         09:32
25   population.  And the intent was look at these            09:32
```

                                                               114

Craig Heligman, M.D.                                                April 28, 2021

```
 1    issues; discuss them with your provider.              09:32

 2              Now, for each individual case, for each     09:32

 3    individual interaction between a provider of health   09:32

 4    care services and their patient, these may not        09:32

 5    always apply.  And, therefore, you do have to rely    09:32

 6    on your training, your education, your knowledge,     09:32

 7    your experience, and the literature that you've read  09:32

 8    to determine what the best course of action is when   09:33

 9    you're treating a patient.                            09:33

10              This is a population-driven document that   09:33

11    was designed for educating a non-medical population.  09:33

12         Q.   And so the purpose of you presenting this   09:33

13    document in the formal investigation was to educate   09:33

14    the plaintiffs in this case?                          09:33

15         A.   Yes, to a large degree.                     09:33

16         Q.   Okay.  And so in educating them, you would  09:33

17    want to give them an opportunity to absorb that       09:33

18    education and then put it into practice; correct?     09:33

19         A.   That was not the intent of the hearing.     09:33

20         Q.   Okay.  So it was a little late, then, to    09:33

21    offer education, wasn't it?                           09:33

22         A.   No, sir.  Again, this was merely a          09:33

23    reflection of what a reliable organization or group   09:33

24    of organizations felt where there were issues that    09:33

25    both a patient and their treating provider should be  09:34
```

                                                                    115

```
 1     discussing in the course of their interactions.      09:34

 2              Whether or not it actually took place,       09:34

 3     whether or not the patient researches a -- their      09:34

 4     medical conditions or relies simply on the           09:34

 5     professional opinion of the practitioner is really   09:34

 6     none of my business.  Each patient is responsible    09:34

 7     for their own health and their health care.  They're 09:34

 8     responsible for choosing the professionals that they 09:34

 9     feel they need to see when they have a need for      09:34

10     health care.                                         09:34

11              It's the responsibility for the health care 09:34

12     professionals to deliver the health care to their    09:34

13     patient to the best of their abilities and, if       09:34

14     necessary, refer individuals on for care by          09:34

15     professionals that also may need to be involved.     09:34

16        Q.   And you --                                   09:34

17        A.   That, again, was not the intent of this      09:34

18     investigation.                                       09:34

19        Q.   The intent of the investigation was for you  09:34

20     to second-guess the health care decisions made by    09:34

21     the employees and their health care providers;       09:35

22     correct?                                             09:35

23        A.   No, sir.                                     09:35

24              MS. FOSTER BIRD:  Objection.  Objection.    09:35

25     That was argumentative and not necessary commentary. 09:35
```

116

Craig Heligman, M.D.                                                          April 28, 2021

```
 1              THE WITNESS:  But, no, it was not the       09:35

 2   intent of the investigation.                          09:35

 3   BY MR. DINGWALL:                                       09:35

 4      Q.   So in the Choosing Wisely document -- which   09:35

 5   you stated was for educational purposes to the        09:35

 6   employees; right?                                      09:35

 7      A.   It was for educational purposes for those     09:35

 8   present at the investigation, not just for the        09:35

 9   employees but also for anyone else that may review    09:35

10   the investigation documents, the exhibits, and for    09:35

11   those present at the investigation.                   09:35

12      Q.   So if we look, for example, at No. 4 of       09:35

13   this document, it says:                               09:35

14              "Do not provide long-term pain             09:35

15               management without a                      09:35

16               psychosocial screening or                09:35

17               assessment."                              09:35

18           Is that right?                                09:35

19      A.   Yes, that's correct.                          09:35

20      Q.   Okay.  And it's your opinion that this        09:35

21   document and that statement contained in No. 4 was    09:36

22   for the purpose of educating a lay employee?          09:36

23      A.   Yes.                                          09:36

24      Q.   Okay.  And so you would expect the            09:36

25   plaintiffs in this case to discuss not providing      09:36
```

                                                                     117

```
 1   long-term pain management without a psychosocial      09:36
 2   screening or assessment with their medical            09:36
 3   providers?                                            09:36
 4      A.   Again, the publication's for the purposes     09:36
 5   of educating both the patient as well as the          09:36
 6   practitioner, but the standard -- excuse me -- the    09:36
 7   individual interactions between the provider and the  09:36
 8   patient is between the two of those individuals.      09:36
 9          This is merely a discussion of what would      09:36
10   be a general practice under the circumstances,        09:36
11   whether it is a description of information that the    09:36
12   health care professional should review for their own  09:36
13   practice purposes or for the education of the         09:37
14   patients.                                             09:37
15          But, and specific to No. 4, it is highly       09:37
16   appropriate for a practitioner to take into account   09:37
17   the psychosocial factors involved in pain             09:37
18   management.  There's absolutely no question that's    09:37
19   an appropriate action to take, and that is true not   09:37
20   just of chiropractic providers, but all health care   09:37
21   professionals.                                        09:37
22      Q.   And you have evidence that Dr. Carey and      09:37
23   Dr. Johnson did not take those into consideration?    09:37
24      A.   I have no evidence of that whatsoever.  I     09:37
25   don't know what -- I have no evidence they did or     09:37
```

                                                                    118

```
 1    did not do that, I should say.                  09:37

 2        Q.   Okay.  And, again, you would -- with regard  09:37

 3    to No. 3 of this document, you would expect the  09:37

 4    statement --                                     09:37

 5              "Avoid protracted use of              09:37

 6                 passive or palliative physical     09:37

 7                 therapeutic modalities for low     09:37

 8                 back pain disorders unless         09:38

 9                 they support the goal(s) of an     09:38

10                 active treatment plan."            09:38

11            -- as something that would be educational  09:38

12    for a lay employee?                             09:38

13        A.   For both a lay population as well as the  09:38

14    treating providers.                             09:38

15        Q.   So that's a topic you would expect the  09:38

16    plaintiffs in this case to have discussed with  09:38

17    Dr. Johnson and Dr. Carey?                      09:38

18        A.   Again, the interaction between a health  09:38

19    care provider and their patient is between the two  09:38

20    of them.                                        09:38

21        Q.   Okay.  And if you look at the very bottom  09:38

22    of this document on Page 1, you would agree that it  09:38

23    says, quote:                                    09:38

24              "The items -- these items are         09:38

25                 provided solely for                09:38
```

119

Craig Heligman, M.D.                                                    April 28, 2021

```
 1                   informational purposes and are      09:38
 2                   not intended as a substitute         09:38
 3                   for consultation with a              09:38
 4                   medical professional."               09:38
 5           Is that right?                               09:38
 6      A.   Yes.  It also goes on to state:              09:38
 7                   "Patients with any specific          09:38
 8                   questions about the items on         09:39
 9                   this list or their individual        09:39
10                   situation should consult their       09:39
11                   physician."                          09:39
12      Q.   Correct.                                      09:39
13           And so you're not offering this as any sort 09:39
14      of substitute for the decisions of the plaintiffs in 09:39
15      this case as to how they made their medical       09:39
16      determinations; is that right?                    09:39
17      A.   That is correct.                              09:39
18      Q.   And you're not offering this document as a   09:39
19      substitute for the diagnoses or treatment plans of 09:39
20      Dr. Johnson and Dr. Carey with regard to the      09:39
21      plaintiffs; correct?                               09:39
22      A.   Yes, that's correct also.                     09:39
23           MR. DINGWALL:  Why don't we take another     09:39
24      break?  Call it five minutes.                      09:39
25           Is that good for everyone?                    09:39
```

                                                              120

USCA4    1068

```
 1              MS. FOSTER BIRD:  Can we have more like --    09:39
 2              Dr. Heligman, do you need to eat?  Would      09:39
 3   you like to have a little longer than five?             09:39
 4              THE WITNESS:  It would be nice to go grab a   09:39
 5   bite.                                                    09:39
 6              MS. FOSTER BIRD:  Yes.                        09:39
 7              MR. DINGWALL:  Well, I was going to say we    09:39
 8   might be a little premature on a lunch break, and       09:39
 9   I'm not even a hundred percent sure that we're going    09:39
10   to need one.  But how would we do it?                   09:39
11              Like, a ten-minute one now, and if it looks  09:40
12   like we're going to go real long, we can take a         09:40
13   lunch?                                                  09:40
14              THE WITNESS:  Well, it's 12:40 p.m. my time  09:40
15   zone.                                                   09:40
16              MR. DINGWALL:  All right.  Well, let's        09:40
17   take -- let's take ten and we'll come back and then     09:40
18   we can make the call on that.                           09:40
19              MS. FOSTER BIRD:  Okay.                       09:40
20              THE VIDEOGRAPHER:  Off the record at          09:40
21   9:40 a.m.                                                09:40
22              (Recess taken.)                               09:49
23              THE VIDEOGRAPHER:  We are back on the         09:53
24   record at 9:53 a.m.                                      09:53
25
```

                                                            121

Craig Heligman, M.D.                                    April 28, 2021

```
 1   BY MR. DINGWALL:                              09:53

 2       Q.   All right.  Dr. Heligman, I'm sending over   09:53

 3   another exhibit that we've marked as No. 5.   09:53

 4       A.   Okay.                                09:53

 5       Q.   It's just a one-page document.       09:53

 6            Do you have that there?              09:54

 7            (Exhibit 5 was marked for identification and

 8   attached to the transcript.)                  09:54

 9            THE WITNESS:  Yes, I do.             09:54

10   BY MR. DINGWALL:                              09:54

11       Q.   All right.  And this is an August 23rd,   09:54

12   2017 letter, on your letterhead again, to     09:54

13   Dr. Shannon Johnson; is that right?           09:54

14       A.   Yes.                                 09:54

15       Q.   And the letter states:              09:54

16                "The purpose of this            09:54

17                 correspondence is to advise    09:54

18                 you that CSX will no longer     09:54

19                 accept any medical             09:54

20                 documentation completed by      09:54

21                 your office on behalf of any    09:54

22                 CSX employee."                 09:54

23            Is that right?                       09:54

24       A.   Yes.                                 09:54

25       Q.   Okay.  And you would agree with me that it   09:54
```

                                                        122

Craig Heligman, M.D.                                                      April 28, 2021

```
 1    would be, again, inappropriate to interfere with the    09:54
 2    relationship between a CSX employee and his or her       09:54
 3    chosen medical provider; correct?                        09:54
 4         A.    Yes, I would agree that we would not want     09:54
 5    to interfere in the doctor/patient relationship.         09:54
 6         Q.    But you would agree that you telling a        09:54
 7    medical provider that you will not accept any            09:54
 8    medical documentation from them any longer would be      09:54
 9    an interference with that relationship; right?           09:55
10         A.    No, that's not correct.                       09:55
11         Q.    Okay.  And so if a CSX employee treated       09:55
12    with Dr. Johnson following you sending this letter       09:55
13    to him and then provided documentation to CSX, you       09:55
14    would not accept that; right?                            09:55
15         A.    We would not accept that for the             09:55
16    decision-making for fitness for duty or validating a    09:55
17    medical-related absence.  We would not accept it for    09:55
18    administrative use, but we would be happy to review     09:55
19    it.  This is, again, identifying that we would not      09:55
20    use it for administrative reasons.                       09:55
21         Q.    And you would agree that that's something    09:55
22    that could potentially dissuade an employee from        09:55
23    treating with a provider if the company was refusing    09:55
24    to accept documentation from that provider?             09:55
25         A.    I can't speak for any one patient, but, no,  09:55
```

123

USCA4    1071

Craig Heligman, M.D.                                    April 28, 2021

```
 1   I don't think it would dissuade anyone from seeking    09:56

 2   medical care from a provider they trust and feel is    09:56

 3   giving them quality medical care.                      09:56

 4       Q.   Even if the company had already notified      09:56

 5   the federal government and several other benefits      09:56

 6   providers of suspected fraud based on treatment with   09:56

 7   that employee?                                         09:56

 8       A.   Again, that's the decision-making by the      09:56

 9   individual patient.  The patient may select            09:56

10   whichever practitioner or provider they would feel     09:56

11   comfortable seeing.  People seek out-of-network        09:56

12   benefits or -- excuse me -- out-of-network providers   09:56

13   and they're willing to pay more for that.  They're     09:56

14   willing to pay for medical services that are not       09:56

15   reimbursable under their health insurance plan.        09:56

16            So, no, I don't think this would dissuade     09:56

17   anyone from seeking medical services from              09:56

18   Dr. Johnson if they felt that Dr. Johnson was the      09:56

19   best practitioner for them.                            09:56

20       Q.   And what impact did this letter that you      09:56

21   sent to Dr. Johnson have on an employee's ability to   09:56

22   obtain benefits for treatment with Dr. Johnson?        09:57

23       A.   None whatsoever.                              09:57

24       Q.   Okay.  And so what was the basis, then, of    09:57

25   you sending this letter to Dr. Johnson?                09:57
```

                                                              124

```
 1        A.   To advise Dr. Johnson that we would not        09:57

 2   accept documentation from him on behalf of a patient     09:57

 3   who is an employee of CSX.  And that did not prevent     09:57

 4   Dr. Johnson from continuing to treat those              09:57

 5   individuals; only reflected that we would not accept    09:57

 6   the documentation from him for administrative           09:57

 7   purposes.                                               09:57

 8        Q.   So at any time did you communicate to         09:57

 9   Dr. Johnson that "While we won't accept any medical      09:57

10   documentation from you, we will still make sure that    09:57

11   benefits are paid for treatment that you provide"?      09:57

12        A.   That's not my responsibility.  It's           09:57

13   Dr. Johnson's responsibility to determine whether or    09:57

14   not he meets the requirements for being in network      09:57

15   or out of network with any health insurance company.    09:58

16        Q.   And at any time did you communicate to any    09:58

17   CSX employees that while you would not accept           09:58

18   documentation from Dr. Johnson, they were still free    09:58

19   to treat with him and you would still -- and their      09:58

20   treatment would still be covered by benefits?           09:58

21        A.   Again, it's up to the patient to determine    09:58

22   who's in their network, out of network, what they       09:58

23   want to pay for, what they want their insurance         09:58

24   company to pay for.  There's no need for me to send     09:58

25   any notification to any employee on that -- on that     09:58
```

```
 1    basis.                                              09:58

 2              MR. DINGWALL:  Object as nonresponsive.    09:58

 3    BY MR. DINGWALL:                                     09:58

 4        Q.   Did you communicate in any way to any CSX   09:58

 5    employees that, while you would not accept           09:58

 6    documentation from Dr. Johnson, they were still free 09:58

 7    to treat with him?                                   09:58

 8        A.   No, there was no reason to do that.         09:58

 9        Q.   Okay.  And did you communicate to any CSX   09:58

10    employees that, while you would not accept           09:58

11    documentation from Dr. Johnson, any treatment with   09:58

12    him would still be covered by their benefits?        09:59

13        A.   Again, that's not my responsibility, so no. 09:59

14        Q.   Okay.  I'll introduce what we've marked as  09:59

15    Exhibit 6.  Let me know when you have this.          09:59

16        A.   I have it.                                  09:59

17             (Exhibit 6 was marked for identification and

18    attached to the transcript.)                         09:59

19    BY MR. DINGWALL:                                     09:59

20        Q.   Okay.  This is a 30-page document.  First   09:59

21    page is CSXT(Adkins)022527.                          09:59

22             And do you recognize the first page of this 09:59

23    document, Dr. Heligman?                              09:59

24        A.   Yes, this is an e-mail from myself to Jason 09:59

25    Peak.                                                09:59
```

                                                          126

Craig Heligman, M.D.                                                April 28, 2021

```
 1        Q.   Okay.  And who is Jason Peak?            09:59

 2        A.   Jason Peak was the Director of Risk      10:00

 3   Management at the time this e-mail was sent.       10:00

 4        Q.   And why did you send this e-mail to Jason 10:00

 5   Peak?                                              10:00

 6        A.   Our Risk Management Department are -- is 10:00

 7   the group that manages our claims, whether it's for 10:00

 8   on-duty injuries or freight claims or other -- other 10:00

 9   kinds of claims made against the company.          10:00

10        My primary interaction with Jason would be    10:00

11   for on-duty injury or illness claims against the   10:00

12   company, and so the intent here was just to bring  10:00

13   him into the loop on what was happening at that    10:00

14   moment in time with this group of individuals and  10:00

15   allow him to review his records to determine if    10:00

16   there was any issues that would be affected or that 10:00

17   would affect his -- his circumstances or his       10:00

18   decision-making.                                   10:00

19        Q.   And were there any issues that affected his 10:00

20   decision-making that he communicated to you?       10:01

21        A.   Not that I recall, no.                   10:01

22        Q.   And did you make a determination as to   10:01

23   whether any of the plaintiffs in this lawsuit had  10:01

24   work-related injuries?                             10:01

25        A.   No, all of the documents that were       10:01
```

127

```
 1    presented to us were for non-work-related injuries.    10:01
 2        Q.   And how did you determine that the injuries    10:01
 3    were non-work-related?                                 10:01
 4        A.   It was a -- made as a statement on those      10:01
 5    forms.  Most of the individuals said they fell at      10:01
 6    home or fell outside.  They -- they did not advise     10:01
 7    us that it was a work issue.                           10:01
 8            If there had been a work injury, then the      10:01
 9    employee was responsible for reporting it to           10:01
10    management and to completing the PI-1A form, which     10:01
11    is their report of injury, and then also to provide    10:01
12    a -- if treatment was sought, to provide               10:01
13    documentation with regard to that treatment.           10:01
14            So to my knowledge and to -- the purpose       10:02
15    here for referring this to Jason Peak was to confirm   10:02
16    that these were not work-related events or that had    10:02
17    been reported as work-related events.                  10:02
18        Q.   And it looks like there's a number of         10:02
19    attachments to this e-mail that you sent to Mr. Peak   10:02
20    on July 6th; is that right?                            10:02
21        A.   Yes.                                          10:02
22        Q.   Okay.  One is a medical notes batch; is       10:02
23    that right?                                            10:02
24            Or I guess there's -- there's -- one,          10:02
25    two -- three medical notes batches; is that right?     10:02
```

```
 1        A.    Let me see what -- I think there's more    10:02

 2   than three.  Let me see -- one, two, three, four,     10:02

 3   five -- looks like six attachments in this case.      10:03

 4        Q.    Right.                                      10:03

 5             And three of them are entitled "Medical      10:03

 6   Notes Batch"; is that right?                           10:03

 7        A.    Yes.                                         10:03

 8        Q.    And then two of them are entitled "Shannon  10:03

 9   Johnson Patient List"; right?                           10:03

10        A.    Yes.                                          10:03

11        Q.    And then one is entitled "Fraud Review       10:03

12   Tracking"; is that right?                                10:03

13        A.    Yes.                                           10:03

14        Q.    Okay.  In the -- in the body of this e-mail  10:03

15   to Mr. Peak, you state that:                             10:03

16             "We had HR look them up and see                10:03

17              if there was a correlation                    10:03

18              with furlough dates, but there                10:03

19              wasn't."                                       10:03

20             Is that right?                                  10:03

21        A.    Yes, that's correct.                           10:03

22        Q.    Okay.  And is that statement made that you     10:03

23   looked up to see if the COII notes -- I'm sorry.         10:03

24   Let me start over.                                        10:03

25             Was it your intention in communicating that   10:03
```

                                                                     129

USCA4    1077

Craig Heligman, M.D.                                                April 28, 2021

```
 1    to Mr. Peak that you looked up to see if there was a    10:03
 2    correlation between the COII notes that were            10:04
 3    submitted and the furlough dates?                       10:04
 4        A.    Partially that, but also just the fact that   10:04
 5    we didn't know who was or wasn't on a furlough list.    10:04
 6    And so we asked HR to do some comparisons for us to     10:04
 7    see what was -- you know, who was on which list and     10:04
 8    just advising that we couldn't find a specific          10:04
 9    correlation amongst the larger group.  In other         10:04
10    words, all of them were not on a furlough list.         10:04
11        Q.    Okay.                                         10:04
12        A.    They may have been involved in other things   10:04
13    that were coming up, but they weren't actively on a     10:04
14    furlough list at that point in time.                    10:04
15        Q.    And so with regard to that lack of            10:04
16    correlation with the furlough list, that bit of         10:04
17    information would not support a finding of fraud;       10:04
18    correct?                                                10:04
19        A.    It wouldn't support or refute the             10:04
20    allegation.  It's the one piece of information on       10:04
21    which we would, you know, make that determination.      10:05
22        Q.    Can you tell me, within this document that    10:05
23    we've marked as Exhibit 6, if all of the attachments   10:05
24    that are noted in that e-mail header are part of        10:05
25    this document?                                          10:05
```

                                                                    130

Craig Heligman, M.D.                                                    April 28, 2021

```
 1        A.   Well, it's probably been five years since I    10:05

 2   saw this.  And then it looks like there is also this     10:05

 3   letter -- excuse me -- this e-mail from Penny            10:05

 4   Dreher, and so I can't say for sure if that was part     10:05

 5   of the attachment or not.                                10:06

 6        Q.   Okay.  Well, let's, I guess, go back to        10:06

 7   Page 1 and up to the header of that e-mail again.        10:06

 8        A.   Okay.                                          10:06

 9        Q.   Are the -- is the document entitled            10:06

10   "20170623 Medical Notes Batch" a document that you       10:06

11   would have created?                                      10:06

12        A.   Yes, that looks like one I would have          10:06

13   created.                                                 10:06

14        Q.   Okay.  And what is that document?              10:06

15        A.   Basically it's a listing of the                10:06

16   information.  If you look on Page 2, this is a           10:06

17   listing that says "Fax SR Administrator."  This is       10:06

18   from our fax mailbox.                                    10:06

19             And so actually the nurse mentioned in --      10:07

20   in that e-mail, Pam Kessler, would have actually         10:07

21   been the person to pull this information out.  I         10:07

22   can't tell if that's the attachment labeled "Medical     10:07

23   Notes Batch."                                            10:07

24             If you go further in -- if I can get to it.    10:07

25   If you go to Page 10, that would be the list that I      10:07
```

131

USCA4    1079

| | | |
|---|---|---|
| 1 | would have prepared. | 10:07 |
| 2 | Q.   Okay.  So Page 10 going into -- | 10:07 |
| 3 | A.   Right.  Page -- | 10:07 |
| 4 | Q.   -- I guess -- so 10 going into 16? | 10:07 |
| 5 | A.   Right.  Through -- through Page 15 would | 10:07 |
| 6 | have been the spreadsheet I created -- or | 10:08 |
| 7 | spreadsheets.  And then on Page 18, it's formatted a | 10:08 |
| 8 | little bit differently, but that would also be the | 10:08 |
| 9 | same spreadsheet that I would have created. | 10:08 |
| 10 | Q.   Okay.  And this is essentially the | 10:08 |
| 11 | spreadsheet that you sent to the RRB; is that right? | 10:08 |
| 12 | A.   Yes, that's correct. | 10:08 |
| 13 | Q.   Okay.  So how do we know what the "20170623 | 10:08 |
| 14 | Medical Notes Batch" is? | 10:08 |
| 15 | A.   We probably wouldn't specifically know | 10:08 |
| 16 | because it's not labeled on here and it's a | 10:08 |
| 17 | five-year-old e-mail.  After five years, I have to | 10:08 |
| 18 | admit my memory for specific e-mails isn't perfect. | 10:09 |
| 19 | Q.   Did you save that "20170623 Medical Notes | 10:09 |
| 20 | Batch" anywhere? | 10:09 |
| 21 | A.   I'd have to do a search to see if it's in | 10:09 |
| 22 | my files still. | 10:09 |
| 23 | Q.   Is there any reason it wouldn't be? | 10:09 |
| 24 | A.   If it was not named the same way.  If it | 10:09 |
| 25 | was named for the purpose of sending it to Mr. Peak, | 10:09 |

132

Craig Heligman, M.D.                                         April 28, 2021

```
 1    then it may not be identified that way.           10:09

 2         Q.   Do you have a naming convention for      10:09

 3    documents that you keep?                           10:09

 4         A.   No, not really.                          10:09

 5         Q.   Well, you could probably search fairly   10:09

 6    easily for a document by this name; right?         10:09

 7         A.   Yes.                                      10:09

 8         Q.   Okay.  And then the "20170629 Medical Notes  10:09

 9    Batch," again, how would we know if that's present 10:09

10    in this document or not?                           10:10

11         A.   Same issue.  It's not specifically labeled  10:10

12    that I can see on these documents, and the way it's  10:10

13    printed out is not the easiest to read.            10:10

14         Q.   Okay.  And, again, the same for the      10:10

15    "20170622 Medical Notes Batch"?                    10:10

16         A.   Yes, that's correct.                     10:10

17         Q.   And then there's two attachments that say  10:10

18    "Shannon Johnson Patient List."                    10:10

19         A.   Mm-hmm.                                  10:10

20         Q.   But, again, I don't see anything within  10:10

21    this document that is identified as a "Shannon     10:10

22    Johnson Patient List."                             10:10

23         Do you?                                       10:10

24         A.   In all likelihood, again, it's not labeled.  10:10

25    But Page 2, 3, and I'm going on through -- through  10:10
```

                                                                  133

1   Page 9 were likely the attachments that would have      10:11

2   been labeled that.  If you look at Page 6, it has       10:11

3   "Carey Chiropractic" at the top.  And let me find       10:11

4   the other one.  And then Page 2 at the top -- oh,       10:11

5   also says "Carey Chiropractic."  Let me see.  Let me    10:11

6   run through the rest of the attachments.                10:11

7        No, I -- I would not be able to                    10:11

8   specifically correlate these pages with a specific      10:11

9   document title.  My belief is that it's referencing     10:12

10  the pages that are showing "Fax SR Administrator."      10:12

11     Q.   Okay.  But there's nothing within this          10:12

12  document that's identified as "Shannon Johnson          10:12

13  Patient List"; right?                                   10:12

14     A.   Not that I can -- not that I can see.           10:12

15     Q.   Okay.  On the document that is entitled         10:12

16  "Carey Chiropractic," which is Page 2 -- I think        10:12

17  it's 2 through 9.                                       10:12

18        Does that look right?                             10:12

19     A.   Right.  That is correct, yes.                   10:12

20        May I go back just one step, please?              10:12

21     Q.   Sure.                                           10:13

22     A.   Starting on Page 10, this is the                10:13

23  spreadsheet I would have prepared.  You can see that    10:13

24  both Dr. Johnson and Dr. Carey are identified as to     10:13

25  the employees' names on -- on those lines.  I don't     10:13

                                                            134

Craig Heligman, M.D.                                              April 28, 2021

```
 1   know if this is the name -- or the document name    10:13

 2   that is listed in the attachment, but it does show  10:13

 3   Dr. Johnson on here as well as Dr. Carey.           10:13

 4       Q.   Okay.  So going back to the Pages 2 through 10:13

 5   8 and, I guess, starting on Page 2 --               10:13

 6       A.   Yes.                                        10:13

 7       Q.   -- is it your understanding that these --  10:13

 8   that this document reflects medical documentation   10:13

 9   sent from Carey Chiropractic to the CSX Medical     10:13

10   Department?                                          10:13

11       A.   Yes, this is the fax mailbox.  As you can  10:13

12   see by the "Fax SR Administrator," that's how it's  10:14

13   labeled.  And so these documents would have been    10:14

14   identified as documents we received to this fax     10:14

15   mailbox and, since it's listed as Dr. -- or Carey   10:14

16   Chiropractic, received from that clinic.            10:14

17       Q.   Now, it looks like there's a number of     10:14

18   employees who had information sent from Carey        10:14

19   Chiropractic that are redacted.                      10:14

20            Do you see that?                            10:14

21       A.   There's a lot of lines that are redacted.  10:14

22       Q.   Do you know if those names are redacted    10:14

23   because they are individuals who are not a part of  10:14

24   this lawsuit?                                        10:14

25       A.   I do not know.                             10:14
```

                                                                135

```
 1        Q.   Okay.  If there were individuals during       10:14

 2   this time frame, as reflected on Page 2 through 8 in    10:15

 3   this exhibit, who were submitting COIIs from Carey      10:15

 4   Chiropractic, would you expect that they would have     10:15

 5   been subject to the same formal investigation that      10:15

 6   the plaintiffs in this case were?                       10:15

 7        A.   I wouldn't know.  I don't know what these     10:15

 8   documents are.                                          10:15

 9        Q.   Well, if we look at, for example, the fifth   10:15

10   and sixth entries on Page 2, they're in green.          10:15

11        A.   Yes.                                          10:15

12        Q.   And they both say "COII" as "Subject";        10:15

13   correct?                                                10:15

14        A.   Correct.                                      10:15

15        Q.   And the dates are 3/17 and 5/17 of 2017;      10:15

16   right?                                                  10:15

17        A.   Correct.                                      10:15

18        Q.   And that would have been within the time      10:15

19   frame that you were investigating the plaintiffs in     10:15

20   this case; correct?                                     10:15

21        A.   No, our -- our investigation or receipt of    10:15

22   documents that were of concern did not happen until     10:16

23   June.                                                   10:16

24        Q.   Okay.  So if anybody treated prior to         10:16

25   June of 2017, you were not considering them as part     10:16
```

USCA4    1084

```
 1   of the investigation into potential fraud?        10:16

 2        A.   No.  What I'm saying is that our        10:16

 3   investigation was triggered by the number of      10:16

 4   documents we saw in the middle of June, not by this  10:16

 5   list.  This was a look-back just to see what we had  10:16

 6   potentially received in the past similar to what I  10:16

 7   mentioned I looked at before, the older medical    10:16

 8   records in their -- each of the person's medical   10:16

 9   files.                                             10:16

10           So, again, I don't know the names here and  10:16

11   not all of them are labeled specifically.  So this  10:16

12   is merely a list, and I'm only assuming that they   10:16

13   are records that were received from Dr. Carey's    10:17

14   office because that's the heading on this list.  But  10:17

15   this was the fax mailbox, and I don't look at this  10:17

16   mailbox.  So the nurses manage the information flow  10:17

17   from this mailbox.                                 10:17

18        Q.   If you look at the first entry that's in  10:17

19   black on Page 2, do you see that?  Its "Subject" is  10:17

20   "Jonathan Rowe."                                   10:17

21        A.   Page -- okay.                            10:17

22        Q.   Still on --                              10:17

23        A.   I see that.  Mm-hmm.                     10:17

24        Q.   Okay.  And Jonathan Rowe is a plaintiff in  10:17

25   this lawsuit.                                      10:17
```

USCA4   1085

| | | |
|---|---|---|
| 1 | You understand that; right? | 10:17 |
| 2 | A.   Yes. | 10:17 |
| 3 | Q.   And do you see the date on that entry as | 10:17 |
| 4 | 9/9 of 2016? | 10:17 |
| 5 | A.   Yes, I do. | 10:17 |
| 6 | Q.   Okay.  And do you know why Mr. Rowe would | 10:17 |
| 7 | have been considered part of this investigation if | 10:18 |
| 8 | his documentation was well prior to the June 2017 | 10:18 |
| 9 | time frame you referenced? | 10:18 |
| 10 | A.   He must have submitted a COII in the time | 10:18 |
| 11 | frame that we had reviewed.  So it was from, say, | 10:18 |
| 12 | the middle of June of 2017 through approximately | 10:18 |
| 13 | July of the same year.  Again, I'd have to go back | 10:18 |
| 14 | and look at the full list of documents to determine | 10:18 |
| 15 | which form Mr. Rowe had submitted at that time. | 10:18 |
| 16 | Q.   But certainly you would have taken into | 10:18 |
| 17 | consideration the fact that Mr. Rowe had been | 10:18 |
| 18 | treating for almost a year prior to the time frame | 10:18 |
| 19 | that you were concerned with; correct? | 10:18 |
| 20 | A.   Yes.  Ultimately, we would have considered | 10:18 |
| 21 | the fact that some of these individuals had been | 10:18 |
| 22 | under treatment with both Dr. Carey and Dr. Shannon | 10:18 |
| 23 | for a number of months, if not years, prior to this | 10:18 |
| 24 | time period. | 10:19 |
| 25 | Q.   And that's something that would mitigate | 10:19 |

138

Craig Heligman, M.D.                                                April 28, 2021

| 1 | against fraudulent activity; correct? | 10:19 |
| 2 | A.   Not necessarily. | 10:19 |
| 3 | Q.   So if you found that an employee had | 10:19 |
| 4 | treated with Dr. Carey or Dr. Johnson for a period | 10:19 |
| 5 | of time earlier than June of 2017 and who also was | 10:19 |
| 6 | not subject to the furlough, you would agree that | 10:19 |
| 7 | there would be no rational basis to deem that they | 10:19 |
| 8 | were committing fraud; right? | 10:19 |
| 9 | A.   No, I wouldn't agree with that statement. | 10:19 |
| 10 | Q.   Is that because Melissa shook her head when | 10:19 |
| 11 | you -- when I asked you that question? | 10:19 |
| 12 | A.   No.  I'd be happy to explain my rationale | 10:19 |
| 13 | if you'd like. | 10:19 |
| 14 | Q.   Please do. | 10:19 |
| 15 | A.   Sure. | 10:19 |
| 16 | So a person may choose a practitioner or | 10:20 |
| 17 | may report to their practitioner that they're unable | 10:20 |
| 18 | to work for any number of reasons.  One, it could | 10:20 |
| 19 | absolutely be the God's honest truth.  They really | 10:20 |
| 20 | can't do it. | 10:20 |
| 21 | If it's a prolonged period of time when | 10:20 |
| 22 | there are other circumstances -- you know, furlough | 10:20 |
| 23 | is only one -- they may have a life set of | 10:20 |
| 24 | circumstances where they need to continue benefits | 10:20 |
| 25 | but they need to provide child care at home because | 10:20 |

139

```
 1   there is no one else there to do it for them.  None    10:20

 2   of these are medical excuses for why they would tell   10:20

 3   their provider why they feel pain.                     10:20

 4           And so there are a number of reasons why       10:20

 5   one would want to continue their benefits but not      10:20

 6   work.  Furlough is only one of them.  That is why --   10:20

 7   if we go back to our Choosing Wisely document, that    10:20

 8   is why you're supposed to do a psychological and       10:21

 9   social review of the circumstances, to make sure       10:21

10   that you're actually treating a medical problem and    10:21

11   not a psychosocial issue.                              10:21

12       Q.   And did you make a determination whether      10:21

13   any of the employees that are the plaintiffs in this   10:21

14   case were treating for an improper person --           10:21

15   purpose?                                               10:21

16       A.   I did not have sufficient information to      10:21

17   make individualized assessments of any of the          10:21

18   employees.                                             10:21

19       Q.   Okay.  But you, yourself, did not make any    10:21

20   kind of a psychosocial assessment?                     10:21

21       A.   No.  Again, I wasn't the treating            10:21

22   professional in this case.                             10:21

23       Q.   Correct.                                      10:21

24           And so the best thing to do is to defer to     10:21

25   them; correct?                                         10:21
```

                                                                    140

```
 1        A.    No.  What I'm deferring to the provider is     10:21
 2   they're responsible for their own doctor/patient          10:21
 3   relationship.  It is between the patient and the          10:21
 4   doctor.  I was neither in this set of circumstances.      10:21
 5   I was the Chief Medical Officer for CSX, and I had        10:21
 6   my own responsibilities.                                  10:22
 7        Q.    Which was to the company; correct?             10:22
 8        A.    No, it was to identify when I felt that --     10:22
 9   well, No. 1, the primary reason is fitness for duty,      10:22
10   and that's for safety reasons.  If someone is unfit       10:22
11   to work and they've presented a safety hazard, we        10:22
12   wouldn't want them to be at work.  On the other          10:22
13   hand, if they're able to be medically clear, we          10:22
14   would welcome back -- welcome them back at any time      10:22
15   with open arms.                                           10:22
16        My administrative function is to be                  10:22
17   cognizant of these factors that people have in their     10:22
18   lives and to recognize that the potential exists for     10:22
19   employees individually or collectively to not            10:22
20   necessarily share the full set of information with       10:22
21   us.  It's also for me to recognize that providers,       10:22
22   as I said, also have a predilection to helping their     10:22
23   employ -- their patients seek whatever it is that        10:22
24   the patient is seeking.  Usually it's a benefits         10:23
25   issue.                                                    10:23
```

141

Craig Heligman, M.D.                                              April 28, 2021

1              So understanding the dynamics of the          10:23

2     situation, we go back to the concept that my          10:23

3     responsibility was to identify things or              10:23

4     abnormalities in my practice, in my responsibility    10:23

5     as the Chief Medical Officer, and present them to      10:23

6     the organization.  I have an equal responsibility to   10:23

7     the employee to make sure that I'm making good        10:23

8     decisions on their behalf when it comes to fitness    10:23

9     for duty.                                              10:23

10        Q.   As of today, do you have any evidence that    10:23

11    any of the plaintiffs in this case defrauded any       10:23

12    benefits providers?                                    10:23

13        A.   Again, I don't have the results of the RRB    10:23

14    investigation.  The issue wasn't necessarily the      10:23

15    benefit providers.  In this set of circumstances, it  10:23

16    was potential -- potential dishonesty and fraud       10:23

17    against the company that pays for the benefits.        10:24

18             MR. DINGWALL:  I'll object as               10:24

19    nonresponsive.                                         10:24

20    BY MR. DINGWALL:                                       10:24

21        Q.   Do you today have any evidence that any of    10:24

22    the plaintiffs involved in this case defrauded any     10:24

23    benefits providers?                                    10:24

24        A.   Not for the benefit providers, no.           10:24

25        Q.   Do you have any evidence today that any of    10:24

                                                              142

USCA4    1090

Craig Heligman, M.D.                                          April 28, 2021

```
 1    the plaintiffs in this case defrauded the company?    10:24

 2         A.    The decision was made by the individuals    10:24

 3    reviewing the investigative information, the hearing   10:24

 4    transcripts and exhibits -- it was determined that     10:24

 5    the individuals that were dismissed did -- in fact,    10:24

 6    were guilty of the charges rendered, which is fraud    10:24

 7    and dishonesty.                                         10:24

 8         Q.    And I'm going to go back and ask you the     10:24

 9    question again.                                         10:24

10         Do you have any evidence today that any of        10:24

11    the plaintiffs in this case defrauded the company?    10:24

12         A.    It's not my decision.  So do I have          10:25

13    evidence?  I don't know what the individuals that      10:25

14    made those decisions based it upon.  I was             10:25

15    presenting information.  I did not make a decision.    10:25

16    So do I have all of the evidence that the              10:25

17    decision-makers had?  I don't know.                     10:25

18         Q.    So you do not have any evidence that anyone  10:25

19    committed any fraud in this case; is that right?       10:25

20         A.    I don't have an opinion.                     10:25

21         Q.    So you don't have any evidence on which to   10:25

22    base an opinion; correct?                               10:25

23         A.    I don't have the full set of documents that  10:25

24    the decision-makers had or the rationale they used     10:25

25    to make their decisions.  So I don't have the          10:25
```

                                                              143

Craig Heligman, M.D.                                                    April 28, 2021

```
 1   necessary information to answer your question.  I    10:25
 2   don't have a full set of documentation to be able to 10:25
 3   make the decision, nor was I the one responsible for 10:25
 4   making it.                                           10:25
 5        Q.   And do you have any evidence today that any 10:25
 6   of the plaintiffs in this case were dishonest?       10:25
 7        A.   Again, it was not my responsibility to make 10:26
 8   the decision on whether or not they were guilty of   10:26
 9   the charges.  That was a different part of the       10:26
10   organization with a different group of individuals.  10:26
11        I was not privy to all of the                   10:26
12   decision-making and the factors that went into that  10:26
13   decision-making, so I don't have an opinion and I    10:26
14   don't -- did not make the decision with regards to   10:26
15   the guilt or innocence of any of these employees.    10:26
16        Q.   Understood.  And I'm going to -- I'm going  10:26
17   to ask the question again because I think that was   10:26
18   nonresponsive.                                       10:26
19        Do you, as you sit here today, have any         10:26
20   evidence that any of the plaintiffs in this case     10:26
21   were dishonest?                                      10:26
22        A.   All I have is the documentation that we've 10:26
23   already discussed.  Whether it is proof of the guilt 10:26
24   or innocence of the individual is subject to someone 10:26
25   else's determination.                                10:26
```

Craig Heligman, M.D.                                                    April 28, 2021

```
 1        Q.   And so you have not formed an opinion on      10:26

 2   that -- on whether any of the plaintiffs in this       10:26

 3   case were dishonest?                                   10:27

 4        A.   It was not my responsibility to make that    10:27

 5   determination.                                         10:27

 6        Q.   But have you formed an opinion?              10:27

 7        A.   Again, it's not an opinion that I should     10:27

 8   have to make.  I wasn't responsible for the            10:27

 9   procedures, whether or not they met or did not meet    10:27

10   the criteria under the Collective Bargaining           10:27

11   Agreement.  I merely presented the information.  I     10:27

12   have no opinion on this issue.                         10:27

13        Q.   You have no opinion whatsoever as to         10:27

14   whether any of the 50-plus individuals that were       10:27

15   fired deserved to be fired?                            10:27

16        A.   Again, it was a business decision based      10:27

17   upon other decision-makers looking at the facts and    10:27

18   evidence.  All I can say is that all of these -- or    10:27

19   most of them went up to the Public Law Board and       10:27

20   were upheld.  I think maybe two to four cases were     10:27

21   overturned at the Public Law Board, and those cases    10:27

22   apparently were based upon information that was not    10:27

23   available to me.                                       10:27

24             So the answer to your question is I don't    10:28

25   have an opinion because it was not one for me to       10:28
```

                                                                    145

Craig Heligman, M.D.                                          April 28, 2021

```
 1   make.  And all I can state is that the Public Law    10:28

 2   Board, who reviewed all the information, for the      10:28

 3   most part, found in favor of the company, not in      10:28

 4   favor of the employees, so they upheld the            10:28

 5   terminations.                                         10:28

 6           MR. DINGWALL:  Okay.  Why don't we take a    10:28

 7   lunch break?                                          10:28

 8           THE WITNESS:  Okay.  How long?               10:28

 9           MS. FOSTER BIRD:  30 minutes tops.           10:28

10           MR. DINGWALL:  Well, let's go off the        10:28

11   record.                                               10:28

12           THE VIDEOGRAPHER:  Off the record at 10:28   10:28

13   a.m.                                                  10:28

14           (Recess taken.)                              11:15

15           THE VIDEOGRAPHER:  We are back on the        11:15

16   record at 11:15 a.m.                                  11:15

17   BY MR. DINGWALL:                                      11:15

18       Q.   All right.  Dr. Heligman, did you have a    11:15

19   nice break?                                           11:16

20       A.   Oh, I managed to get something to eat.      11:16

21       Q.   Good deal.                                  11:16

22           We had briefly talked about Exhibit No. 2,   11:16

23   which is the series of letters that you sent to       11:16

24   Mr. Fergus at the Railroad Retirement Board, and I    11:16

25   want to ask you a couple questions about those        11:16
```

146

Craig Heligman, M.D.                                              April 28, 2021

| 1 | again. | 11:16 |
| 2 | A.    Okay. | 11:16 |
| 3 | Q.    If you need to pull them up, go ahead. | 11:16 |
| 4 | A.    Here we go.  Exhibit 2, you said? | 11:16 |
| 5 | Q.    Yes. | 11:16 |
| 6 | A.    Okay.  I have it up. | 11:16 |
| 7 | Q.    All right.  Did anyone besides yourself | 11:16 |
| 8 | have input on the contents of this letter that you | 11:16 |
| 9 | sent to Mr. Fergus on July 14th, 2017? | 11:16 |
| 10 | MS. FOSTER BIRD:  I'll object to the extent | 11:16 |
| 11 | that he discussed this with anybody from the Legal | 11:16 |
| 12 | Department or any of the lawyers for CSX. | 11:16 |
| 13 | Otherwise, you can answer. | 11:16 |
| 14 | THE WITNESS:  In the law -- excuse me.  I | 11:16 |
| 15 | actually don't remember.  I -- I don't think I did. | 11:16 |
| 16 | BY MR. DINGWALL: | 11:17 |
| 17 | Q.    Okay.  And when you say you don't think you | 11:17 |
| 18 | did, you mean you didn't have any input from anybody | 11:17 |
| 19 | else in drafting this letter? | 11:17 |
| 20 | A.    No, I drafted this letter myself.  Others | 11:17 |
| 21 | may have reviewed it, but it's my letter. | 11:17 |
| 22 | Q.    Okay.  And that was my next question. | 11:17 |
| 23 | Did anybody else review it before it was | 11:17 |
| 24 | sent to the Railroad Retirement Board? | 11:17 |
| 25 | MS. FOSTER BIRD:  Same objection. | 11:17 |

147

Craig Heligman, M.D.                                                April 28, 2021

```
 1              THE WITNESS:  We may have -- or excuse me    11:17
 2    -- I should say I may have.  I don't remember who it   11:17
 3    may have been, though.                                 11:17
 4    BY MR. DINGWALL:                                        11:17
 5        Q.   Okay.  Would there be any records showing     11:17
 6    that you had e-mailed it to anybody else for review?   11:17
 7        A.   I don't know.                                 11:17
 8        Q.   Was this a letter that you composed on your   11:17
 9    computer?                                              11:17
10        A.   On my work computer, yes.                     11:17
11        Q.   And was it saved on your work computer?       11:17
12        A.   Yes.                                          11:17
13        Q.   Okay.  And so to the extent that it           11:17
14    was e-mailed to anybody, that could be found either    11:18
15    through a search of your own e-mail or through the     11:18
16    archives; is that right?                               11:18
17        A.   It would have to be through the archives.     11:18
18        Q.   Okay.  And is the same true for the           11:18
19    July 21, 2017 e-mail -- or sorry -- letter that you    11:18
20    sent to Mr. Fergus?                                    11:18
21              MS. FOSTER BIRD:  I'll just have a           11:18
22    continuing objection to these.  If they were          11:18
23    reviewed or had input from somebody from the Law      11:18
24    Department, I would expect that to be privileged.     11:18
25    Otherwise, go ahead.                                   11:18
```

                                                                    148

Craig Heligman, M.D.                                                    April 28, 2021

```
 1              THE WITNESS:  The subsequent two letters I    11:18

 2   sent were not reviewed by anyone else.                   11:18

 3   BY MR. DINGWALL:                                         11:18

 4       Q.   Okay.  And that's the July 21, 2017 letter     11:18

 5   and the -- let's see -- July 28, 2017 letter?            11:18

 6       A.   Yes, that's correct.                            11:18

 7       Q.   Okay.  And the purpose of those last two        11:18

 8   letters, the July 21 and July 28, were simply to         11:18

 9   provide the Railroad Retirement Board with an update     11:19

10   of some additional employees; is that right?            11:19

11       A.   Yes, that's correct.                            11:19

12       Q.   But you were still requesting that              11:19

13   Mr. Fergus fully investigate the chiropractors and       11:19

14   the employees that you had listed in your                11:19

15   attachments; is that right?                              11:19

16       A.   Yes, that's correct.                            11:19

17            And I should actually clarify something.        11:19

18   This is to the Inspector General's office, and so        11:19

19   this is -- the Inspector General has oversight of        11:19

20   the RRB.  It's not necessarily to the RRB itself.        11:19

21       Q.   Understood, but thank you for that              11:19

22   clarification.                                           11:19

23            And did you decide to write these letters       11:19

24   of your own volition?                                    11:19

25       A.   Yes.                                            11:19
```

149

Craig Heligman, M.D.                                                April 28, 2021

```
 1        Q.   Okay.  Were you consulted on the decision    11:19
 2   to discipline any of the employees following the       11:20
 3   formal investigations that were conducted?             11:20
 4        A.   No.                                           11:20
 5        Q.   Did you have any communication with any of    11:20
 6   the charging managers prior to the formal              11:20
 7   investigations that you testified in?                  11:20
 8        A.   No.                                           11:20
 9        Q.   Did you send any documents to any of the      11:20
10   charging managers prior to the formal investigations   11:20
11   that you testified in?                                 11:20
12        A.   No.                                           11:20
13        Q.   Did you have any communications with any of   11:20
14   the individuals involved in the formal                 11:20
15   investigations in between the formal investigation     11:20
16   and the time that the employees were terminated?       11:20
17        A.   No.                                           11:20
18        Q.   Prior to your testimony in the formal         11:21
19   investigations of the plaintiffs in this case, had     11:21
20   you ever testified in a formal investigation before?   11:21
21        A.   Yes.                                          11:21
22        Q.   On how many occasions?                        11:21
23        A.   Very few.  Three or four times, perhaps.      11:21
24        Q.   And do you remember the circumstances of      11:21
25   those occasions?                                       11:21
```

```
 1        A.   They were related to positive testing in    11:21

 2    our drug and alcohol program.                         11:21

 3        Q.   Okay.  Is CSX a member of the American       11:21

 4    Association of Railroads?                              11:21

 5        A.   Yes.                                          11:21

 6        Q.   And that's AAR -- well, if I refer to it as  11:21

 7    "AAR," will you understand that I'm talking about     11:21

 8    the American Association of Railroads?                11:21

 9        A.   Yes, I will.                                 11:22

10        Q.   Okay.  And that's an industry group; is      11:22

11    that correct?                                         11:22

12        A.   Yes, that is correct.                        11:22

13        Q.   Does the AAR, to your knowledge, provide     11:22

14    any guidance to its railroad members regarding       11:22

15    cumulative trauma disorders?                          11:22

16        A.   I have not been -- received, I should say.   11:22

17    I have not received any information from the A --     11:22

18    from the AAR to -- on that subject, no.               11:22

19        Q.   Okay.  Are you aware of any guidance         11:22

20    provided by the AAR on ergonomics?                    11:22

21        A.   No.                                          11:22

22        Q.   Okay.  So in your time at CSX, you have      11:22

23    never seen any guidance or documentation from the    11:22

24    AAR regarding cumulative trauma disorders?            11:22

25        A.   That's correct.  I have not seen any.        11:22
```

                                                                    151

Craig Heligman, M.D.                                                April 28, 2021

```
 1         Q.   Okay.  And the same that you've never seen    11:22
 2   any guidance from the AAR regarding ergonomics; is       11:22
 3   that right?                                              11:22
 4         A.   That's correct.                               11:23
 5         Q.   Okay.  Other than guidance from the AAR,      11:23
 6   are you aware of any documentation or guidance at        11:23
 7   CSX regarding ergonomics for its employees?             11:23
 8         A.   The ergonomics programs are -- or have been   11:23
 9   managed by our Industrial Hygiene Group and Bart         11:23
10   Edgar, also, in the past, other individuals that are    11:23
11   no longer at the company.                               11:23
12         Q.   You said Bart -- what was the last name?      11:23
13         A.   Edgar, E-d-g-a-r.                             11:23
14         Q.   And who was Bart Edgar?                       11:23
15         A.   He is currently the manager in our drug and  11:23
16   alcohol testing program.                                11:23
17         Q.   Okay.  Is the -- is the ergonomics program   11:24
18   that is administered by the Industrial Hygiene Group    11:24
19   shared with the Medical Department?                     11:24
20         A.   Information is shared with us, yes, as       11:24
21   needed.                                                 11:24
22         Q.   Okay.  Did you consult with the Industrial   11:24
23   Hygiene Group regarding its ergonomics program at       11:24
24   any time prior to your testimony in the formal          11:24
25   investigations of the plaintiffs in this case?          11:24
```

152

1        A.   I speak with those individuals on a regular      11:24

2   basis.  Sometimes it's on ergonomics if that's the        11:24

3   topic of concern, but I spoke with -- I didn't speak      11:24

4   with anybody about ergonomics as it pertains to           11:24

5   this -- the reason we're here today.                      11:24

6        Q.   Okay.  What does the ergonomics program at      11:24

7   CSX consist of?                                           11:24

8        A.   Again, I'd have to defer to our IH team.        11:24

9        Q.   Do you have access to documents regarding       11:25

10   the ergonomics program at CSX?                            11:25

11        A.   I have access if I need to, yes.               11:25

12        Q.   And how would you access those documents?      11:25

13        A.   I'd probably go over to Mr. Bullock's          11:25

14   office and ask him where they are.                        11:25

15        Q.   And who's Mr. Bullock?                         11:25

16        A.   Billy Bullock is -- or was at that time --     11:25

17   the Director of Industrial Hygiene.  About a year         11:25

18   ago he changed roles, but he is still involved in         11:25

19   the Industrial Hygiene Group.                             11:25

20        Q.   Are the documents regarding the ergonomics     11:25

21   program at CSX accessible via computer?                   11:25

22        A.   Yes, all our programs should be accessible     11:25

23   on the -- on Gateway.                                     11:25

24        Q.   So if you needed to look something up          11:25

25   regarding the ergonomics program, you could do so        11:25

153

USCA4   1101

| | | |
|---|---|---|
| 1 | from your computer? | 11:26 |
| 2 | A.   For the most part, yes. | 11:26 |
| 3 | Q.   What is your understanding of the purpose | 11:26 |
| 4 | of the ergonomics program at CSX? | 11:26 |
| 5 | A.   It's considered a safety program, | 11:26 |
| 6 | preventative in nature. | 11:26 |
| 7 | Q.   In what way is it preventative in nature? | 11:26 |
| 8 | A.   Ergonomics has to do with the interaction | 11:26 |
| 9 | between the worker and the work or the workstation. | 11:26 |
| 10 | And so the understanding is if you position the | 11:26 |
| 11 | workstation and the work to be done correctly as it | 11:26 |
| 12 | -- as it's compared to where the workers are, then | 11:26 |
| 13 | you'll have a potential for a reduction in | 11:26 |
| 14 | complaints of typically musculoskeletal symptoms, | 11:26 |
| 15 | but there could be other issues. | 11:26 |
| 16 | Q.   Is it your understanding that certain jobs | 11:26 |
| 17 | at CSX are more likely to result in musculoskeletal | 11:27 |
| 18 | injuries than others? | 11:27 |
| 19 | A.   To my knowledge, we don't have any jobs at | 11:27 |
| 20 | CSX where there's a concern for cumulative trauma. | 11:27 |
| 21 | And that -- that term is actually quite outdated. | 11:27 |
| 22 | Q.   What term would you use? | 11:27 |
| 23 | A.   The current research on that suggests that | 11:27 |
| 24 | it's just not cumulative and it's not trauma. | 11:27 |
| 25 | There's not necessarily a specific term for it. | 11:27 |

154

1    Q.   Is it your position that repetitive stress    11:27

2   does not cause musculoskeletal injuries in railroad    11:27

3   workers?                                                11:27

4    A.   What I'm saying is that that's a much          11:28

5   larger discussion.  So the concept of repetitive or    11:28

6   cumulative trauma actually has, by and large, been     11:28

7   debunked.                                               11:28

8    Q.   And how has it been debunked?                  11:28

9    A.   It -- the concept of simple repetition of     11:28

10   movement of the body through space doesn't cause       11:28

11   injury.                                                11:28

12    Q.   And what is the basis for your -- for that   11:28

13   statement?                                             11:28

14    A.   Because the research that I've been made     11:28

15   aware of and have viewed myself looks at issues        11:28

16   beyond repetition.  You're looking at not just         11:28

17   repetition, but force, duration, position,             11:28

18   temperature, vibration.                                11:28

19        There are multiple factors that go into the    11:28

20   potential for these workplace-type -- potentially      11:28

21   workplace-type exposures that could potentially        11:28

22   cause the onset of musculoskeletal complaints.         11:29

23   Whether or not it constitutes the definition of an     11:29

24   injury is unlikely.  The reporting of these kinds of   11:29

25   cases, if you will, under OSHA is as an occupational   11:29

155

Craig Heligman, M.D.                                                      April 28, 2021

```
 1    illness, not as an occupational injury.              11:29

 2        Q.   What's the distinction between an           11:29

 3    occupational illness and an occupational injury?     11:29

 4        A.   Typically an occupational injury is more of 11:29

 5    an acute-type event.  There's a point in time where  11:29

 6    an event takes place and an injury occurs.           11:29

 7             Occupational illness is something that may   11:29

 8    have been an event that over time an illness has     11:29

 9    developed potentially due to an exposure in the      11:29

10    workplace.  A common one would be noise exposure,    11:29

11    another one being the potential for a toxicological  11:29

12    exposure or -- or skin or inhalation exposures to    11:30

13    chemicals.                                           11:30

14        Q.   And would a musculoskeletal disorder fall   11:30

15    underneath an occupational illness?                  11:30

16        A.   That's how it's to be reported.             11:30

17        Q.   Okay.  So the musculoskeletal disorders     11:30

18    that were reported on the COIIs for the plaintiffs   11:30

19    in this matter could be considered occupational      11:30

20    illnesses?                                           11:30

21        A.   I don't see how.                            11:30

22        Q.   And why not?                                11:30

23        A.   My recollection, without looking at them    11:30

24    once again, is that these were all single-event      11:30

25    acute events that occurred outside of the workplace. 11:30
```

                                                                      156

```
 1   So I don't see -- how can you consider it an        11:30

 2   occupational illness?                                11:30

 3       Q.   You would agree that if someone had treated 11:30

 4   for a period of time for a musculoskeletal issue and 11:31

 5   it just happened to have been part of their COII     11:31

 6   that you received in June or July of 2017, that      11:31

 7   doesn't necessarily mean it was an acute injury;     11:31

 8   right?                                               11:31

 9       A.   I wouldn't agree with that at all, no.      11:31

10       Q.   Okay.  And you would agree that just        11:31

11   because a symptom manifested itself outside of work  11:31

12   does not mean that it's not a work-related injury;   11:31

13   right?                                               11:31

14       A.   What you're talking about is the subjective 11:31

15   experience of a symptom or a pain complaint.         11:31

16   Doesn't rule it -- rule in or rule out when that     11:31

17   event may have occurred to induce that pain.         11:31

18       Q.   And so an employee who has subjective       11:31

19   symptoms that they believe are work-related have a   11:31

20   valid claim; is that right?                          11:32

21       A.   A valid claim?  No, not necessarily.        11:32

22       Q.   So if an employee has a subjective pain     11:32

23   that they're experiencing, you would discount that?  11:32

24       A.   That's not what I said.                     11:32

25            Just as you are claiming that a pain        11:32
```

                                                            157

```
 1   experienced at home had the potential for having its    11:32
 2   onset or instigating factor at work, pain              11:32
 3   experienced at work can have its instigating factor    11:32
 4   that occurred at home.  You can't make a causal        11:32
 5   relationship simply on the basis of the fact that      11:32
 6   someone has reported musculoskeletal pain.             11:32
 7       Q.   Right.  And so you have no basis to           11:32
 8   determine, one way or the other, whether the           11:32
 9   symptoms that were reported by the plaintiffs on       11:32
10   their COII forms were causally related to something    11:33
11   that occurred at home versus at work; right?           11:33
12       A.   No, most of them actually said this           11:33
13   occurred outside of work.                              11:33
14       Q.   You would agree that a manifestation of a     11:33
15   symptom is not necessarily causally related to where   11:33
16   it occurred; right?                                    11:33
17       A.   The manifestation of symptoms are a           11:33
18   totally separate issue as to a causation evaluation.   11:33
19   There -- you have to do more than just say someone     11:33
20   has pain or a symptom to make a statement about        11:33
21   causation.                                             11:33
22            On the basis of what I reviewed for this      11:33
23   group of cases, these were all reported as events      11:33
24   that occurred off the job.  And had they occurred on   11:33
25   the job, it would be their responsibility to report    11:33
```

                                                                   158

Craig Heligman, M.D.                                      April 28, 2021

```
 1    it as such and complete the PI-1A or the first       11:33

 2    report of injury and manage that through the on-duty 11:34

 3    injury process.                                      11:34

 4          None of them have done that.  And so the       11:34

 5    information that is available to us -- or to me at    11:34

 6    the time -- was these occurred at home, not at work. 11:34

 7       Q.   Well, you would agree for those that         11:34

 8    submitted COIIs in 2017, they were terminated;       11:34

 9    right?                                               11:34

10       A.   The individuals that were found guilty of    11:34

11    the charges were terminated.  Yes, that's correct.   11:34

12       Q.   So they would not have had an opportunity    11:34

13    to report a work-related injury or complete the CSX  11:34

14    forms; is that right?                                11:34

15       A.   No, that's not correct.  These events        11:34

16    occurred --                                          11:34

17       Q.   So after --                                  11:34

18       A.   Pardon me?                                   11:34

19       Q.   Go ahead.                                    11:34

20       A.   The charges occurred after the reported      11:34

21    medical condition.  They had plenty of time to       11:34

22    report it.                                           11:34

23       Q.   And so if the symptoms manifested            11:34

24    themselves outside of work, there's nothing to       11:34

25    prevent an employee from reporting that as a         11:35
```

159

| | | |
|---|---|---|
| 1 | work-related injury; right? | 11:35 |
| 2 |     A.    They would have to -- they could report it. | 11:35 |
| 3 | They would also have to identify the onset date and | 11:35 |
| 4 | the circumstances around the onset of why they | 11:35 |
| 5 | believe it's a work-related event.  But, yes, they | 11:35 |
| 6 | could report it if they had a symptom outside of | 11:35 |
| 7 | work.  If they felt it was work-related, they could | 11:35 |
| 8 | report that. | 11:35 |
| 9 |     Q.    And what if they don't know if it's | 11:35 |
| 10 | work-related or not? | 11:35 |
| 11 |     A.    Then it probably isn't. | 11:35 |
| 12 |     Q.    And what makes you say that? | 11:35 |
| 13 |     A.    Because I think most people are smart | 11:35 |
| 14 | enough to figure that out.  If they say "I fell at | 11:35 |
| 15 | home," they fell at home.  If they fell at work, | 11:35 |
| 16 | they fell at work.  I think people are not going to | 11:35 |
| 17 | mix those two events up. | 11:35 |
| 18 |     Q.    Well, you don't contend that people | 11:35 |
| 19 | suddenly get a new body when they leave work and go | 11:35 |
| 20 | home, do you? | 11:36 |
| 21 |     A.    No, of course not. | 11:36 |
| 22 |     Q.    Okay.  So if someone leaves work without | 11:36 |
| 23 | any manifestation of any symptoms, goes home and, | 11:36 |
| 24 | say, lifts up their child and suddenly blows out | 11:36 |
| 25 | their back, can you rule out that that was not | 11:36 |

160

| | | |
|---|---|---|
| 1 | work-related? | 11:36 |
| 2 | A.   Yes. | 11:36 |
| 3 | Q.   How? | 11:36 |
| 4 | A.   You would use the standards for causation | 11:36 |
| 5 | analysis.  There's a publication by NIOSH that was | 11:36 |
| 6 | reiterated in the American College of Occupational & | 11:36 |
| 7 | Environmental Medicine guidelines to the evaluation | 11:36 |
| 8 | of musculoskeletal injuries.  You would have to look | 11:36 |
| 9 | at the plausibility issues, the Bradford Hill | 11:36 |
| 10 | criteria, the literature in the area, as well as | 11:36 |
| 11 | looking at the statements from the -- individual | 11:36 |
| 12 | statements from the provider or the health care | 11:36 |
| 13 | provider of the medical records. | 11:36 |
| 14 | But, quite honestly, if someone goes home | 11:36 |
| 15 | and lifts up their child and hurts their back, they | 11:37 |
| 16 | hurt their back lifting up their child. | 11:37 |
| 17 | Q.   So you can say that unequivocally without | 11:37 |
| 18 | doing all of the things you just said needed to be | 11:37 |
| 19 | done to determine causation? | 11:37 |
| 20 | A.   Again, it's quite unusual for someone to | 11:37 |
| 21 | leave work with absolutely no musculoskeletal | 11:37 |
| 22 | symptoms and have a sudden onset of a | 11:37 |
| 23 | musculoskeletal symptom lifting something at home | 11:37 |
| 24 | and claiming it's work-related. | 11:37 |
| 25 | So based on your hypothetical situation, I | 11:37 |

161

Craig Heligman, M.D.                                                    April 28, 2021

1    would say, with a hundred percent degree of           11:37

2    certainty, that if you had no symptoms at work, went   11:37

3    home, lifted your child, experienced back pain, your   11:37

4    back pain was caused by that -- lifting that child     11:37

5    at home, not at work.                                  11:37

6        Q.    Okay.  And so, conversely, you would not     11:37

7    ever dispute a claim of a work-related injury if an    11:37

8    employee left home with no symptoms, went to work,     11:37

9    picked up a hammer, and blew out their back; is that   11:37

10   right?                                                 11:37

11       A.    Again, you're looking at a different         11:37

12   factor.  So a hammer typically doesn't weigh as much   11:38

13   as most children, but the issue as you look at each    11:38

14   incident based upon these facts that are present at    11:38

15   the time, if they lifted an object at work and had     11:38

16   an acute onset of low back pain, then we would say     11:38

17   that the two are likely related.                       11:38

18            The expectation is that the person would      11:38

19   complete our injury form and would then secure         11:38

20   treatment for that if they felt it was necessary.      11:38

21   But experiencing pain doesn't necessarily mean that    11:38

22   it was a severe injury either.                         11:38

23       Q.    Well, does it have to be a severe injury to  11:38

24   be work-related?                                       11:38

25       A.    No, it does not.                             11:38

                                                                        162

Craig Heligman, M.D.                                                          April 28, 2021

```
 1         Q.   Okay.  And so there's really no way to        11:38
 2    differentiate without going through that whole          11:38
 3    causation analysis, is there, as to whether             11:38
 4    something was work-related or not?                       11:38
 5         A.   Based on the examples we gave, yes, I can     11:38
 6    make that determination because I can go through        11:38
 7    that process in my own head.  It's a common event.      11:39
 8    I'm -- certainly recognize the causation analysis       11:39
 9    process, and I think these are fairly simple            11:39
10    examples.  If you'd like to discuss a more complex      11:39
11    one, it would take more time to do.                      11:39
12         Q.   Well, the body's pretty complex, you would    11:39
13    agree; right?                                            11:39
14         A.   Yes, I would.                                  11:39
15         Q.   Especially the spine; correct?                 11:39
16         A.   Not necessarily more complex than anything    11:39
17    else in the body.                                        11:39
18         Q.   Okay.  So it's less complex than an elbow?    11:39
19         A.   Again, I would say the complexity of the      11:39
20    body is not necessarily the issue when you do a         11:39
21    causation analysis.  The body is a complex issue.       11:39
22    You know, there's many things that go into it.          11:39
23    There's a lot of reasons for having low back pain       11:39
24    that have nothing to do with the                         11:39
25    musculoskeletal-type complaints.                         11:39
```

163

1    So I think you have to say that each and    11:39

2    every body system, organ system, body part has its    11:40

3    own complexities.  And so it's a fairly generic    11:40

4    statement saying one area's more complex than the    11:40

5    other.  I just don't think that's the case.  You    11:40

6    have to look at a person holistically.    11:40

7    Q.    Right.    11:40

8    And so without looking holistically at the    11:40

9    plaintiffs in this case and without doing a full    11:40

10   causation analysis, you cannot offer an opinion, one    11:40

11   way or the other, as to whether their injuries were    11:40

12   work-related or not; correct?    11:40

13   A.    I can base a decision on work-relatedness    11:40

14   based on the information provided at that time.  And    11:40

15   in all these cases, these incidents were reported as    11:40

16   occurring off duty.  Had the employee decided it was    11:40

17   work-related, they would have had reporting    11:40

18   mechanisms for that and they could have so stated on    11:40

19   the COII as well.    11:40

20   The fact of the matter is this is a very    11:41

21   simple issue.  It's not a complex issue at all.  The    11:41

22   question is:  If it occurred at work, why didn't    11:41

23   they report it?  They reported these issues as being    11:41

24   -- occurring at home, off work.  There's no reason    11:41

25   to go into more detail than that on my part.    11:41

164

Craig Heligman, M.D.                                             April 28, 2021

 1              They had plenty of opportunities to make a      11:41

 2       statement that the medical issues were work-related     11:41

 3       both during the investigation and when they sought      11:41

 4       medical care, or they could have also reported that     11:41

 5       incident as occurring at work at any point in time.     11:41

 6       The fact is they stated that it all occurred at         11:41

 7       home, off the job.  I have no reason to disagree        11:41

 8       with it.                                                11:41

 9          Q.    And so you recognize the distinction           11:41

10       between the onset of a symptom and the causation of     11:41

11       that symptom; correct?                                  11:41

12          A.    Yes.                                           11:41

13          Q.    Okay.  And so it's your opinion that as        11:41

14       long as the onset of the symptom occurs outside of      11:42

15       the work, it's a non-work-related injury?              11:42

16          A.    Not what I said.                               11:42

17          Q.    Well, help me understand.                      11:42

18          A.    What this person stated on their forms, the    11:42

19       provider reported it was an off-duty event.  The        11:42

20       employee reported it was an off-duty event.  A slip     11:42

21       and fall at home is a slip and fall at home.  You       11:42

22       can't translate that to a work-related incident.        11:42

23              So I think these cases are fairly               11:42

24       cut-and-dried.  Not a single person reported an         11:42

25       on-duty injury or illness in this particular case.      11:42

                                                                   165

Craig Heligman, M.D.                                                April 28, 2021

```
 1        Q.   Well, again, I think you may be making --    11:42
 2   or not making a distinction between the onset and      11:42
 3   the causation.  If someone slips and falls at home,    11:42
 4   that would be the onset of a symptom, but the actual   11:42
 5   injury itself, the causation could be many different   11:42
 6   factors; correct?                                      11:43
 7        A.   Not in my opinion.  I think if you slip and  11:43
 8   fall and you say you hurt your knee, you slipped and   11:43
 9   fell and you hurt your knee.  I'm not sure what        11:43
10   causal factor you think would be in play other than    11:43
11   that.                                                  11:43
12        Q.   Well, let's say a worker has a minor knee    11:43
13   sprain -- or they think it's a knee sprain -- at       11:43
14   work, some kind of pain in their knee at work, and     11:43
15   they don't think much of it and they go home and       11:43
16   they slip and fall, and then it's found out they       11:43
17   have a torn meniscus.                                  11:43
18             Can you separate the -- the symptomology --  11:43
19   or the causation at work versus the causation at       11:43
20   home?                                                  11:43
21        A.   Yes.  In all likelihood, the slip and fall  11:43
22   had the greater force and, if they fell in a certain   11:43
23   fashion, was the likely cause of that meniscal         11:43
24   injury.  The -- again, it's a matter of diagnosis      11:43
25   and the objective evidence presented at the time       11:44
```

                                                                166

```
 1    they're evaluated.                              11:44

 2            If they said "I felt pain at work" and you   11:44

 3    don't know why, it could have been also a       11:44

 4    degenerative knee or preexisting meniscal injury  11:44

 5    that created the pain at work before they had the  11:44

 6    knee sprain.                                    11:44

 7            So in most cases, meniscal tears are     11:44

 8    degenerative in nature and not traumatic.  So in all  11:44

 9    likelihood, the patient could have had the meniscal  11:44

10    tear present before work, experienced pain at work,  11:44

11    and fell after they left work.  So then you are now  11:44

12    complicating the, quote-unquote, "causation     11:44

13    analysis" in its entirety.                      11:44

14       Q.   And those are all things that you need to  11:44

15    consider before you can state definitively as to  11:44

16    whether something is work-related or            11:44

17    non-work-related; correct?                      11:44

18       A.   Again, you base the determination of work  11:44

19    causation on an analysis of the information that's  11:44

20    made available to you at the time the analysis is  11:44

21    done.  In this case, the employees had stated to  11:44

22    their provider and it was reiterated by the provider  11:45

23    that these events were things that took place off  11:45

24    work.  I have no reason to question it.  There's  11:45

25    no --                                           11:45
```

```
 1        Q.   But you're questioning --              11:45

 2        A.   There's no contradictory information in  11:45

 3   this case.  Not one person has made a statement that 11:45

 4   their musculoskeletal pain was work-related or that  11:45

 5   they even thought it was.  So no causation analysis  11:45

 6   was really necessary.  It was a simple statement     11:45

 7   that the employee made this all occurred off work.   11:45

 8        Q.   Well, if you don't question how -- the    11:45

 9   basis for the employees stating how they were        11:45

10   injured on their COII forms, why would you question  11:45

11   that they were submitting those forms at all?        11:45

12        A.   I'm not sure I follow.                     11:45

13        Q.   Well, the -- the basis of the formal       11:45

14   investigations against these plaintiffs in this case 11:45

15   was that they submitted COII forms in a manner that  11:45

16   was potentially fraudulent; right?                   11:46

17        A.   No.  Again, let me restate this for you.   11:46

18             The reason that this became a concern is   11:46

19   because we had a large number of documents submitted 11:46

20   from the same two providers in a very small -- a     11:46

21   very short time frame in a specific local area.      11:46

22             It had nothing to do with the content of   11:46

23   those COIIs.  It had to do with the volume, the      11:46

24   timing, and the location.  It didn't matter what was 11:46

25   on the medical documentation.  There's no question   11:46
```

168

Craig Heligman, M.D.                                          April 28, 2021

```
 1    of work-relatedness.  Nobody asked us to address      11:46

 2    that, and so it was not addressed.  To do so now      11:46

 3    doesn't make any sense to me.                         11:46

 4         Q.   Okay.  And I appreciate you saying that.    11:46

 5             So the entire basis for the formal           11:46

 6    investigations of the plaintiffs in this case was     11:46

 7    the volume, the timing, and the location of the       11:46

 8    COIIs; is that right?                                 11:47

 9         A.   Right.  It was a collection of a            11:47

10    significant number of documents coming from the same  11:47

11    practitioners in one area.                            11:47

12         Q.   Okay.  And there's no other basis for the   11:47

13    formal investigation that you're aware of; is that    11:47

14    right?                                                11:47

15         A.   That was the basis for the information that 11:47

16    I had that I presented to other officials in the      11:47

17    organization, who decided that this was of            11:47

18    significance that it should be investigated further.  11:47

19         Q.   Okay.  And just so we're clear, when you    11:47

20    say "volume," you're talking about the number of      11:47

21    COIIs that actually came in to your office; is that   11:47

22    right?                                                11:47

23         A.   Yes, that's correct.                        11:47

24         Q.   And when you say "timing," you're talking   11:47

25    about the period of time over which those COII forms  11:47
```

169

| | | |
|---|---|---|
| 1 | came in; correct? | 11:47 |
| 2 | A.   Yes, that's correct. | 11:47 |
| 3 | Q.   And when you say "location," you're talking | 11:47 |
| 4 | about the fact that the COII forms came in from two | 11:47 |
| 5 | providers; is that right? | 11:47 |
| 6 | A.   Right, location being where those providers | 11:47 |
| 7 | and employees were located.  And then the fourth one | 11:47 |
| 8 | was the specific two providers. | 11:47 |
| 9 | Q.   Okay.  So the location is the fact that the | 11:47 |
| 10 | COIIs were submitted by employees in a certain | 11:47 |
| 11 | geographic area; is that right? | 11:47 |
| 12 | A.   Yes. | 11:47 |
| 13 | Q.   Okay.  And then the fact that all of those | 11:47 |
| 14 | COIIs came in from one of two providers; is that | 11:47 |
| 15 | right? | 11:47 |
| 16 | A.   Right. | 11:47 |
| 17 | Q.   Okay.  And with regard to timing, what was | 11:47 |
| 18 | the specific time frame that you considered to be | 11:47 |
| 19 | relevant to the investigation of the plaintiffs in | 11:47 |
| 20 | this case? | 11:47 |
| 21 | A.   From the time that we initially started | 11:47 |
| 22 | recognizing the volume that we received and the time | 11:47 |
| 23 | that we collected that information and presented it | 11:47 |
| 24 | to other people within the organization to determine | 11:47 |
| 25 | what next steps should be. | 11:49 |

170

Craig Heligman, M.D.                                              April 28, 2021

```
 1        Q.   Okay.  And what specifically were those     11:49
 2   dates?                                                11:49
 3        A.   I don't recall when I specifically may have 11:49
 4   spoken with those individuals, either individually    11:49
 5   or collectively, but the date this letter went out    11:49
 6   to Mr. Fergus was taken as the date where we had      11:49
 7   sufficient information to charge individuals for the  11:49
 8   potential of dishonesty and fraud.                    11:49
 9        Q.   Sticking with the timing issue, was the     11:49
10   focus of the investigation based upon the timing      11:49
11   that the COIIs were received in your office or based  11:50
12   upon the time that the plaintiffs received            11:50
13   treatment?                                            11:50
14        A.   It was based upon the time at which we felt 11:50
15   there was a sufficient recognizable pattern.          11:50
16        Q.   Okay.  But was the pattern based upon the   11:50
17   time that the COIIs were received in your office?     11:50
18        A.   It was based on a time when we thought we   11:50
19   had sufficient numbers to say this is a pattern of    11:50
20   behavior, that it wasn't just a single day or a       11:50
21   one-off event.  It was that we had collected          11:50
22   sufficient documentation to say this is a pattern of  11:50
23   behavior that was demonstrated by a large number of   11:50
24   individuals over a relatively short period of time,   11:50
25   located in that jurisdiction by these -- by these     11:50
```

171

USCA4   1119

```
 1   two providers.                                    11:50

 2          When we reached the conclusion that a      11:50

 3   pattern of that nature was present is when the    11:51

 4   decision was made to submit these letters to the RRB  11:51

 5   and other recipients and to charge the individuals.   11:51

 6       Q.   I'm just trying to understand what exactly  11:51

 7   constituted the pattern that formed your -- the   11:51

 8   basis for your moving forward with this           11:51

 9   investigation.                                    11:51

10       A.   I wasn't the one that made the decision to  11:51

11   move forward with the investigation.  I was the one  11:51

12   that collected the forms and presented them to other  11:51

13   parts of the organization and asked for their     11:51

14   opinion with regard to what next steps should be  11:51

15   taken.                                            11:51

16       Q.   You would agree that there's a distinction  11:51

17   to be made between an employee who had been treating  11:51

18   for, let's say, a year with either Dr. Johnson and  11:51

19   Dr. Carey and happened to submit a COII in June of  11:51

20   2017 versus someone who just went one time and then  11:51

21   submitted a COII in June of 2017; right?          11:52

22       A.   I think there's a difference in the      11:52

23   treatment issues potentially.  If there's a       11:52

24   difference in the analysis and some individuals who  11:52

25   had been seeing Dr. Carey or Dr. Johnson for longer  11:52
```

172

Craig Heligman, M.D.                                                April 28, 2021

```
 1    periods of time than just a single event and we        11:52

 2    received those documents in the same time frame,       11:52

 3    there may or may not have been a relationship, but     11:52

 4    that was for the investigation to determine.           11:52

 5         Q.   But you were the one who ultimately          11:52

 6    identified the pattern of these documents being        11:52

 7    submitted to your office; right?                       11:52

 8         A.   Yes.                                          11:52

 9         Q.   And you were the one who brought that to      11:52

10    the Law Department and the Labor Relations             11:52

11    Department; right?                                     11:52

12         A.   Yes.                                          11:52

13         Q.   So ultimately it was your decision as to     11:52

14    what the pattern was; correct?                         11:52

15         A.   Ultimately what I did was I identified that  11:52

16    we had collected a large number of COII documents      11:53

17    over a short period of time from the same local area   11:53

18    from two practitioners.  That was an unusual           11:53

19    situation.                                             11:53

20              And, therefore, when it looked like we had   11:53

21    60 or 70 cases that came to light within three or      11:53

22    four weeks, that was significant enough, in my         11:53

23    opinion, to take it to others to determine whether     11:53

24    or not further review of the circumstances should be   11:53

25    made.                                                  11:53
```

Craig Heligman, M.D.                                              April 28, 2021

```
 1        Q.   So, again, that was based entirely upon the    11:53
 2   date on which your office received the COII forms;       11:53
 3   right?                                                    11:53
 4        A.   No, that's not true.  It is based upon when    11:53
 5   we had sufficient numbers that I felt it was a           11:53
 6   significant pattern that was really irrefutable that     11:53
 7   we had not seen in any other way, shape, or form         11:54
 8   throughout my experience at CSX.                          11:54
 9             There was 60 -- we have never received 60      11:54
10   or 70 COIIs or any other medical forms or set of         11:54
11   medical documents from that large number of a group      11:54
12   from a -- from one or two providers in a local area.     11:54
13   It was a very unique set of circumstances.               11:54
14             There was a large volume relative to our       11:54
15   daily experience.  And when you reach the number of      11:54
16   60 to 70 individuals, then I thought it was              11:54
17   appropriate to present that to other individuals in      11:54
18   the organization and let them decide if any further      11:54
19   action should be taken.                                   11:54
20        Q.   You had to make a determination at some        11:54
21   point as to what the cutoff was at -- regarding the      11:54
22   timing of the COIIs and referring it to Labor           11:54
23   Relations and the Law Department; right?                 11:54
24        A.   It was my decision as to when I brought it     11:54
25   to their attention, yes.                                  11:55
```

                                                                      174

Craig Heligman, M.D.                                              April 28, 2021

```
 1        Q.   Okay.  But it was also your decision as to      11:55
 2   how far back to include COIIs that had been               11:55
 3   submitted; right?                                         11:55
 4        A.   We started from the date that we received       11:55
 5   those 20 or so documents all in the same day.  We         11:55
 6   did a retrospective review of their cases after           11:55
 7   that.                                                      11:55
 8        Q.   Okay.  And when you conducted the               11:55
 9   retrospective analysis, what did that include?            11:55
10        A.   Again, we were trying to determine if there     11:55
11   was any other time when we saw the same kind of           11:55
12   pattern, and we could not identify one.                   11:55
13             We recognized that our employees in this        11:55
14   group of individuals, several of them -- I don't          11:55
15   remember how many -- had seen one or -- one or the        11:55
16   other of these practitioners previously, whether it       11:55
17   was an ongoing event every couple months or on a          11:55
18   more continuous basis or a less frequent basis or         11:56
19   for different reasons that could have been the case.      11:56
20             But the actual issue was the pattern wasn't     11:56
21   even beginning to start until the first time we saw       11:56
22   these 20 or so cases show up all on the same day.         11:56
23        Q.   So was your retrospective analysis limited      11:56
24   to whether you had seen similar patterns of COII          11:56
25   forms being submitted to your office?                     11:56
```

                                                               175

1       A.   What we are looking for is any information       11:56

2    for these two practitioners.  We don't have the       11:56

3    capacity to do an ongoing evaluation of volume from   11:56

4    different professionals.  We don't have the          11:56

5    staffing.  We don't have the data management         11:56

6    capacity.                                            11:56

7       Q.   So was it essentially tribal knowledge as     11:56

8    to whether this is something that had ever happened   11:56

9    before?                                              11:56

10      A.   All I can tell you is that in the times I     11:56

11   had worked for CSX, it was never brought to my       11:56

12   attention.                                           11:56

13      Q.   Which doesn't mean it didn't happen; right?  11:57

14      A.   I don't know.  Again, it was never brought   11:57

15   to my attention.  It was never brought to my         11:57

16   predecessor's attention.  So all I can tell you is   11:57

17   what I experienced.                                  11:57

18      Q.   What predecessors did you speak with?        11:57

19      A.   My prior boss was Dr. Thomas Neilson.        11:57

20      Q.   And when did you speak with him?             11:57

21      A.   I did not speak with him about this case.    11:57

22   All I'm saying is that in my experience with him for 11:57

23   three years -- and I knew Dr. Neilson actually       11:57

24   before I started working at CSX -- in our day-to-day 11:57

25   discussions, there was no evidence that we were      11:57

                                                              176

```
 1    seeing the kind of pattern that we now experience in    11:57
 2    2017.                                                   11:57
 3            Again, yes -- is it anecdotal?  Perhaps.        11:57
 4    But usually it's very unusual for a Chief Medical       11:57
 5    Officer to recognize, without any doubts, the names     11:58
 6    and locations of various providers in, you know, 20,    11:58
 7    21, 22 states.  It doesn't -- doesn't happen very       11:58
 8    often.  There's a handful of names I could              11:58
 9    potentially think of where me might recognize the       11:58
10    names when they come in.                                11:58
11        Q.   During the investigations that you             11:58
12    testified in, did you become aware that medical         11:58
13    records had been shared with a number of different      11:58
14    employees?                                              11:58
15        A.   No, I don't recall any medical records         11:58
16    being shared with any other employees.                  11:58
17        Q.   Are you aware, in any of the investigations    11:58
18    that you testified in, that COII forms for all of       11:58
19    the charged employees were shared with all of the       11:59
20    charged employees?                                      11:59
21        A.   Yes, the COIIs were shared on the basis of     11:59
22    how we were conducting the investigations.              11:59
23        Q.   And you recognize that the COII forms          11:59
24    contained personal and private information of the       11:59
25    individuals; correct?                                   11:59
```

                                                                        177

```
 1        A.    There were names, dates of births, the form    11:59

 2   request, the employee ID, and last four of their        11:59

 3   Social Security Number.                                  11:59

 4        Q.    In some instances, those COIIs contained      11:59

 5   the entire Social Security Number; is that right?        11:59

 6        A.    In some cases, that was correct, yes.         11:59

 7        Q.    And that information was distributed among     11:59

 8   all of the charged employees; right?                     11:59

 9        A.    No.  The individuals were grouped by craft    11:59

10   and union affiliation, so not every person received      11:59

11   every single -- or I should say the investigations       12:00

12   were grouped.  The COIIs were exhibits at all of the     12:00

13   investigations.                                          12:00

14            When we discovered that there was               12:00

15   information that was of concern to employees in our      12:00

16   initial group of individuals that went through the      12:00

17   investigation process, we went -- went ahead and         12:00

18   then had that information redacted and advised those     12:00

19   individuals that may have received it that they          12:00

20   should not distribute it any further.                    12:00

21        Q.    And not only was that information shared       12:00

22   among the charged employees, it was also shared          12:00

23   among union representatives who attended the formal      12:00

24   investigations; right?                                   12:00

25        A.    The union representatives were there as       12:00
```

178

Craig Heligman, M.D.                                                                April 28, 2021

```
 1    part of their responsibility under the Collective      12:00
 2    Bargaining Agreement.  But, yes, they would have       12:01
 3    received all the exhibits, just as the employees       12:01
 4    would have.                                            12:01
 5        Q.   And it was also shared among CSX management   12:01
 6    personnel who were present at the investigations;      12:01
 7    right?                                                 12:01
 8        A.   The -- yes, it would have been shared with    12:01
 9    the individuals who had a need to see the exhibits.    12:01
10    I honestly don't recall if the Charging Officer had    12:01
11    a reason to view them, but certainly the Hearing       12:01
12    Officer did.                                           12:01
13        Q.   And you would agree that Social Security      12:01
14    Numbers are private, confidential information;         12:01
15    correct?                                               12:01
16        A.   Yes, they're private information.            12:01
17        Q.   And you would agree that medical diagnoses    12:01
18    and medical conditions are private personal           12:01
19    information; right?                                    12:01
20        A.   It's considered personal information for     12:01
21    the interests of the doctor/patient relationship,      12:01
22    yes.                                                   12:01
23        Q.   And you would agree that that is not         12:01
24    information that should be shared publically;          12:01
25    correct?                                               12:01
```

                                                                                        179

USCA4    1127

1        A.    It has an issue of whether or not there was    12:02

2    a need to know.  So when there is a need to know the    12:02

3    information, then, yes, it may be shared.    12:02

4        Q.    Well, the charged employees did not have a    12:02

5    need to know everybody else's medical condition;    12:02

6    right?    12:02

7        A.    In the manner in which the investigations    12:02

8    were conducted, then, yes, they would have had a    12:02

9    need to see the exhibits.  And so this was done in    12:02

10   accordance with the requirements of the    12:02

11   investigation process.    12:02

12       Q.    There was no requirement that employees be    12:02

13   investigated together, is there?    12:02

14       A.    That's outside the scope of my -- my    12:02

15   responsibilities.  I didn't make any determination    12:02

16   along how the investigations were to be conducted.    12:02

17       Q.    Well, you introduced the exhibits, did you    12:02

18   not?    12:02

19       A.    Yes.    12:02

20       Q.    Okay.  So you had a decision to make as to    12:02

21   whether to disclose that private information amongst    12:02

22   all of the individuals in the investigation; right?    12:03

23       A.    As part of the investigation process, it    12:03

24   was -- I had presented those as exhibits in the    12:03

25   course of the investigation process; therefore,    12:03

180

Craig Heligman, M.D.                                        April 28, 2021

```
 1    those present had a need to know.              12:03
 2         Q.   Nobody in the investigation needed to know  12:03
 3    the individual Social Security Numbers, did they?  12:03
 4         A.   We don't ask for those Social Security  12:03
 5    Numbers on those forms.  If there was a potential  12:03
 6    oversight on the part of the employee and they added  12:03
 7    their entire Social Security Number and we    12:03
 8    identified that, we fixed the problem and, again,  12:03
 9    advised the employees not to share that information  12:03
10    beyond the scope of the investigation.        12:03
11         Q.   As the individual introducing those  12:03
12    exhibits in the investigation, though, it was  12:03
13    incumbent upon you to make sure that you were not  12:03
14    disclosing private information; correct?      12:03
15         A.   It's my responsibility to present the  12:03
16    exhibits, not to confirm that the employee did or  12:04
17    did not fill out those forms accurately.      12:04
18         Q.   Okay.  So you're blaming the employee for  12:04
19    putting their Social Security Number on a form but  12:04
20    take no responsibility for disclosing that    12:04
21    information; is that right?                    12:04
22         A.   What I'm saying is --               12:04
23         MS. FOSTER BIRD:  I'm going to object.  I'm  12:04
24    going to object.  That was a misstatement of his  12:04
25    testimony.  You can ask a question, but you cannot  12:04
```

                                                        181

Craig Heligman, M.D.                                                April 28, 2021

```
 1   restate something he supposedly said and then      12:04

 2   misstate it, which is what you did.                12:04

 3         MR. DINGWALL:  Well, Dr. Heligman told me     12:04

 4   at the outset he would let me know if he didn't    12:04

 5   understand my question or if I did -- said something 12:04

 6   wrong, and I'm sure he's capable of doing so.      12:04

 7         MS. FOSTER BIRD:  I have the right to make    12:04

 8   an objection.  I've made it.  Thank you.           12:04

 9   BY MR. DINGWALL:                                   12:04

10      Q.   You can go ahead and answer, Dr. Heligman. 12:04

11      A.   You'll have to ask the question again.     12:04

12      Q.   So is it your position that the employees  12:04

13   are to blame for the disclosure of their Social    12:04

14   Security Numbers because they included their Social 12:04

15   Security Numbers on the COII form?                 12:04

16      A.   What I'm saying is we never requested it,  12:04

17   that when we presented the documents that were     12:05

18   needed for the purposes of the investigation, we did 12:05

19   so.                                                12:05

20         One of the employees identified -- or it     12:05

21   could be one of the union officials that identified 12:05

22   that the Social Security Numbers were on those     12:05

23   forms.  We then proceeded to redact them for the -- 12:05

24   for the rest of the investigations.  There was no  12:05

25   mal-intent in that and there was no specific issue 12:05
```

                                                              182

```
 1   beyond that.                                    12:05

 2        Q.   But you take responsibility for your role   12:05

 3   in introducing those documents without first making   12:05

 4   sure that the confidential information was redacted   12:05

 5   or otherwise not shared; right?                 12:05

 6        A.   Well, again, the documents were delivered   12:05

 7   as a need to know.  So the information that the   12:05

 8   individuals that were charged during the        12:05

 9   investigation process had those -- had a right to   12:05

10   those exhibits.  Those exhibits were distributed.   12:05

11        At a later date, it was identified by      12:05

12   either an employee or a group of employees or one of   12:05

13   the union officials that said this was an oversight.   12:06

14   They would like to have -- they were concerned about   12:06

15   it.  We said we understand.  We corrected the   12:06

16   problem.  We advised the employees that had already   12:06

17   received the unredacted documents to not disclose   12:06

18   the information any further.                     12:06

19        Q.   What was the need-to-know basis for    12:06

20   employees in an investigation -- well, let me start   12:06

21   over.                                           12:06

22        The formal investigations involved multiple   12:06

23   charged employees; correct?                     12:06

24        A.   Yes.                                  12:06

25        Q.   So in some cases, there might have been   12:06
```

183

| | | |
|---|---|---|
| 1 | two, three, or four employees charged in the same | 12:06 |
| 2 | investigation; right? | 12:06 |
| 3 | A.   The -- the number varied, but, yes, there | 12:06 |
| 4 | were multiple employees at each of the | 12:06 |
| 5 | investigations. | 12:06 |
| 6 | Q.   And in those investigations in which you | 12:06 |
| 7 | testified, you introduced documents, including the | 12:06 |
| 8 | COII forms; correct? | 12:07 |
| 9 | A.   That's correct. | 12:07 |
| 10 | Q.   And you introduced the COII forms of | 12:07 |
| 11 | everybody that was involved in the investigation; | 12:07 |
| 12 | correct? | 12:07 |
| 13 | A.   That's because we had to demonstrate that | 12:07 |
| 14 | there was a patten present.  Without multiple | 12:07 |
| 15 | documents, then you can't present a pattern. | 12:07 |
| 16 | Q.   And so there was no way for you to present | 12:07 |
| 17 | a pattern without disclosing Social Security | 12:07 |
| 18 | Numbers? | 12:07 |
| 19 | A.   There was no way to present the pattern | 12:07 |
| 20 | without presenting the COII documents of all the | 12:07 |
| 21 | individuals involved. | 12:07 |
| 22 | Q.   But you certainly could have redacted the | 12:07 |
| 23 | Social Security Numbers; correct? | 12:07 |
| 24 | A.   We certainly could have redacted the Social | 12:07 |
| 25 | Security Numbers, and we did so when we identified | 12:07 |

184

Craig Heligman, M.D.                                                    April 28, 2021

```
 1   the issue.  But there was no intent of thinking that    12:07
 2   this was something that was of concern until the        12:07
 3   employees had identified it and said that they were     12:07
 4   concerned.  We resolved that issue.                     12:08
 5        Q.   Well, as a medical professional and the       12:08
 6   Chief Medical Officer of a major corporation, that's    12:08
 7   something you should have known beforehand; right?      12:08
 8        A.   It's an issue that we did not recognize at    12:08
 9   the time.  We fixed it, and we went forward.            12:08
10        Q.   So you gave yourself the benefit of the       12:08
11   doubt; right?                                           12:08
12        A.   We recognized the problem.  We fixed it.      12:08
13   We moved on.                                            12:08
14        Q.   How did you fix it?                           12:08
15        A.   The information was redacted.  The            12:08
16   employees were each individually sent a -- I believe    12:08
17   they were sent a letter and told verbally not to        12:08
18   share the information beyond the scope of the           12:08
19   investigation itself.                                   12:08
20        Q.   You can't un-ring the bell, though; right?    12:08
21        A.   Again, we recognized the problem.  We fixed   12:08
22   it.  We moved on.                                       12:08
23        Q.   So I think what I'm hearing you say is you    12:09
24   recognized the problem, you fixed it, and you moved     12:09
25   on; right?                                              12:09
```

185

Craig Heligman, M.D.                                              April 28, 2021

```
 1        A.    I'm pretty sure that's what I said, yes.    12:09

 2        Q.    Okay.  Dr. Heligman, what is your          12:09

 3   educational background?                               12:09

 4        A.    How far back would you like me to go?      12:09

 5        Q.    Undergraduate, please.                     12:09

 6        A.    University of Missouri, I received a B.A.  12:09

 7   in Biology.  I then went to medical school at         12:09

 8   St. Louis University.  I received my M.D.  I went      12:09

 9   into internship at the Naval Hospital Pensacola in    12:09

10   Pensacola, Florida.  Then I -- during that time       12:09

11   period, I applied for and received my medical         12:09

12   license from the State of Missouri.                   12:09

13        I did five years on active duty in the           12:09

14   Navy, did my residency at Methodist Hospital in       12:09

15   Indianapolis in the specialty of occupational         12:10

16   medicine.  During that time period, I also received  12:10

17   a Master's -- a Master's in Health at Purdue and      12:10

18   completed my residency.                               12:10

19        I applied for board certification at the         12:10

20   earliest opportunity and, again, passed the test,     12:10

21   received my official notice of board                  12:10

22   certification -- I believe it was January of 1996.   12:10

23   I've also participated in ongoing continuing medical 12:10

24   education throughout the course of my career in       12:10

25   excess of what is required by any licensing state     12:10
```

                                                                     186

Craig Heligman, M.D.                                    April 28, 2021

| | | |
|---|---|---|
| 1 | that I held a license in. | 12:10 |
| 2 | Q.   And your board certification is in | 12:10 |
| 3 | occupational medicine? | 12:10 |
| 4 | A.   That's correct. | 12:10 |
| 5 | Q.   Okay. | 12:10 |
| 6 | MR. DINGWALL:  Well, we've been going for | 12:10 |
| 7 | just about an hour again.  Let's take a five-minute | 12:11 |
| 8 | break. | 12:11 |
| 9 | THE WITNESS:  Okay. | 12:11 |
| 10 | THE VIDEOGRAPHER:  Off the record at | 12:11 |
| 11 | 12:11 p.m. | 12:11 |
| 12 | (Recess taken.) | 12:27 |
| 13 | THE VIDEOGRAPHER:  We are back on the | 12:30 |
| 14 | record at 12:30 p.m. | 12:30 |
| 15 | | 12:30 |
| 16 | EXAMINATION | 12:30 |
| 17 | BY MR. PAUL: | 12:30 |
| 18 | Q.   Good afternoon, Dr. Heligman.  My name is | 12:30 |
| 19 | Greg Paul, and we are going to continue with your | 12:30 |
| 20 | deposition today, looking at some documents, | 12:30 |
| 21 | following up on Mr. Dingwall's questions today. | 12:30 |
| 22 | Sound good? | 12:30 |
| 23 | A.   I'm at your disposal. | 12:30 |
| 24 | Q.   All right.  Thank you. | 12:30 |
| 25 | Just before we look at those, I just want | 12:30 |

187

Craig Heligman, M.D.                                                      April 28, 2021

1    to ask you a few questions on the background of the      12:30

2    Certificate of Ongoing Illness form.                      12:30

3         Is that a document that was generated by             12:30

4    the Medical Department at CSX?                             12:30

5    A.   Mr. Paul, you're echoing on my end.                  12:30

6    Q.   Okay.  Am I echoing now?                             12:30

7    A.   No, it's fine.                                       12:30

8    Q.   Okay.  Let me know -- let me know if that            12:30

9    happens again.                                            12:30

10        So you didn't hear my question or it was             12:30

11   just difficult to hear because of an echo?                12:30

12   A.   It was difficult, but you asked if the COII          12:31

13   was a form that was created by the Medical                12:31

14   Department?                                               12:31

15   Q.   That's correct.                                      12:31

16   A.   The answer is yes.                                   12:31

17   Q.   Okay.  And approximately -- well, has the            12:31

18   COII form been in existence since you came to CSX as      12:31

19   Associate --                                              12:31

20   A.   Yes.                                                 12:31

21   Q.   -- Medical Director?                                 12:31

22   A.   Yes.                                                 12:31

23   Q.   Okay.  Have there -- have there been                 12:31

24   different forms or versions of it over the years          12:31

25   that you've been there?                                   12:31

                                                               188

Craig Heligman, M.D.                                          April 28, 2021

```
 1        A.    Yes.                                    12:31

 2        Q.    Okay.  Approximately how many versions have  12:31

 3   there been since you came aboard?                 12:31

 4        A.    I think we've updated it one or two times  12:31

 5   since I've been here.  We've received COIIs       12:31

 6   completed that actually date back to about three  12:31

 7   CMOs ago, so it's been updated a few times over the  12:31

 8   years.                                            12:31

 9        Q.    Okay.  And just, if you could, explain what  12:31

10   the purpose is of the Certificate of Ongoing Illness  12:31

11   or Injury.                                        12:31

12        A.    Certainly.                             12:31

13             When an employee is off work for medical  12:31

14   reasons, they have an obligation under their      12:32

15   Collective Bargaining Agreement to keep the employer  12:32

16   informed as to their status and when they're ready  12:32

17   to return to work or -- or if they're not ready to  12:32

18   return to work.                                   12:32

19             The COII is intended as a tool for the  12:32

20   employee to have their provider let us know whether  12:32

21   or not they're able to return to work or not and to  12:32

22   give us some background on the medical issues so we  12:32

23   can ascertain, with some level of expectation, when  12:32

24   we think they might be able to come back.         12:32

25        Q.    And is the COII used for both work-related  12:32
```

189

```
 1   and non-work-related absences?                    12:32

 2       A.   Yes.                                      12:32

 3       Q.   Okay.  And is there an appropriate period 12:32

 4   of time that requires -- excuse me -- appropriate  12:32

 5   period of time of an absence that requires the use 12:32

 6   of a Certificate of Ongoing Illness?               12:32

 7       A.   It depends on the Collective Bargaining   12:32

 8   Agreement, but, generally speaking, it's every     12:32

 9   45 days or so.  We are willing to accept medical   12:33

10   records or other statements from the treating      12:33

11   physician as long as it provides us with similar   12:33

12   information.                                        12:33

13       Q.   Okay.  Yeah, I think you testified earlier 12:33

14   today about that fact.  And I appreciate the       12:33

15   45 days.                                            12:33

16          My question was a little bit different, but 12:33

17   while we're on the 45 days, does that mean that if 12:33

18   an employee is going to be off work for longer than 12:33

19   45 days, they have to resubmit an updated COII form? 12:33

20       A.   That's correct.                            12:33

21       Q.   Okay.  The question that I meant to ask -- 12:33

22   and perhaps I didn't ask it well -- is if an       12:33

23   employee is, say, off for three days, do they have 12:33

24   to submit a COII, or is there a defined period of  12:33

25   time that requires the use of that form?           12:33
```

                                                              190

```
 1        A.   I understand.                              12:33

 2             No, the COII form is the -- again, the     12:33

 3   periodic notification to the employer.  If an        12:33

 4   individual is off work for minor medical issues that 12:33

 5   are less than seven days, then we use what's called  12:34

 6   our doctor's note process.  The information          12:34

 7   requested isn't as -- as much, and really it's used  12:34

 8   to administer the attendance points system.          12:34

 9             Individuals who are away from work for      12:34

10   whatever reason may be -- may have points assigned   12:34

11   to their attendance record.  And at a certain level  12:34

12   when there's so many cumulative points, they may     12:34

13   receive a disciplinary letter or some sort of        12:34

14   intervention like that.  The medical part of that is 12:34

15   in the Collective Bargaining Agreements, and each    12:34

16   one is a little bit different.                        12:34

17             If an employee is away for an emergent or   12:34

18   significantly urgent medical problem, then those     12:34

19   points can be waived, and so the employee would send 12:34

20   us a note from the provider outlining what the issue 12:34

21   was.  We would say whether it meets the definition   12:34

22   in the agreement or not, and then it would be        12:34

23   determined if points would be waived for that        12:35

24   particular event.                                    12:35

25             For absences that are longer than          12:35
```

191

1    seven days, for a person to return to work, we have        12:35

2    what we call an MD-3 form.  That's our attending            12:35

3    physician statement.  So if there's a serious              12:35

4    medical concern that is less than seven days, a            12:35

5    surgery, or a medical-related absence of seven days        12:35

6    or longer, we ask that the employee complete an MD-3        12:35

7    form before they come back to work.  And we would do       12:35

8    our fitness-for-duty review at that point in time.         12:35

9          So for short duration, minor medical issues          12:35

10   potentially, or a notification of a short-term             12:35

11   emergency need for services, we use our doctor's           12:35

12   note process.  Serious medical issues and longer           12:35

13   than seven-day absences for return-to-work purposes,       12:35

14   it's the MD-3 form.  And for ongoing absence of a          12:35

15   longer period of time, then we use a COII for the          12:36

16   periodic update of the information.                         12:36

17      Q.   Okay.  And I know -- I think you mentioned         12:36

18   earlier that typically these forms have been faxed         12:36

19   into the Medical Department; is that correct?              12:36

20      A.   Faxed or e-mailed.  We just don't see a lot        12:36

21   of hand-carried anymore.                                    12:36

22      Q.   Okay.  Or first-class mail, is that true,         12:36

23   too?                                                        12:36

24      A.   First-class mail, yes.                             12:36

25      Q.   Okay.  So typically e-mail and fax.               12:36

                                                                192

Craig Heligman, M.D.                                                    April 28, 2021

```
 1              And is it correct to say that they do come      12:36
 2    to the Medical Department in Jacksonville?               12:36
 3         A.   Yes, we have several fax lines that the        12:36
 4    nurses monitor so they can manage the incoming           12:36
 5    information.                                              12:36
 6         Q.   Okay.  And is this a fax line in the           12:36
 7    Medical Department that goes right to, like, an          12:36
 8    e-mail or electronic format as opposed to the old       12:36
 9    school-type?                                             12:36
10         A.   Yes, it's a digital fax, so it comes to a     12:36
11    specified mailbox.                                       12:36
12         Q.   And -- and right now we're just talking        12:36
13    general process, but whose job responsibility by        12:36
14    title is responsible for reviewing those forms when     12:36
15    they come into the Medical Department?                   12:37
16         A.   We have three nurses, and although they        12:37
17    have their individual responsibilities, they can        12:37
18    potentially review any of the fax boxes to keep the     12:37
19    information flowing.                                     12:37
20              So we have one that is focused on the          12:37
21    return to work for off-duty medical issues, one of      12:37
22    the nurses will be doing the doctors' notes as part     12:37
23    of their primary job responsibilities, and the third   12:37
24    nurse's primary responsibility would be related to      12:37
25    the on-duty medical issues.                              12:37
```
                                                                          193

Craig Heligman, M.D.                                    April 28, 2021

1        Q.    Okay.  And back in 2017, do you remember        12:37

2    which nurse was responsible for reviewing the COIIs       12:37

3    that came in?                                             12:37

4        A.    Kelly Crouch.                                   12:37

5        Q.    Okay.  And I guess -- well, I can ask her,      12:37

6    but just -- I guess your her supervisor; right?          12:37

7        A.    I was at that time.  I'm not today.            12:37

8        Q.    Okay.  Did she have any job                     12:37

9    responsibilities to review the completeness of those     12:37

10   forms as they come in?                                    12:38

11       A.    Yes.  They come in with various levels of       12:38

12   completeness.  As long as there's sufficient              12:38

13   information for us to understand what the issues          12:38

14   are, we don't really get hung up too much about           12:38

15   dotting the I's and crossing the T's in every single     12:38

16   case.                                                     12:38

17       Q.    In the event that someone like Kelly or         12:38

18   yourself deemed a COII insufficient, what's the          12:38

19   process for making it compliant?                          12:38

20       A.    Typically it's either a phone call,             12:38

21   potentially a letter that goes back to the employee      12:38

22   with a new form.  Typically we accept the COIIs as       12:38

23   they come in.  Usually there's sufficient                 12:38

24   information.                                              12:38

25       Q.    Okay.  But it sounds like if there's any       12:38

                                                          194

Craig Heligman, M.D.                                 April 28, 2021

1   question about completeness or other accurateness of     12:38

2   the COII, it's the nurse that would reach out to the     12:38

3   employee to -- to fix it or to get additional     12:39

4   information?     12:39

5      A.   Yes, that's typically part of their     12:39

6   responsibility.     12:39

7      Q.   Okay.   And we're obviously going to look at     12:39

8   some of these.   I know you've seen a lot of them.     12:39

9       But is it accurate to say that the employee     12:39

10   fills part of those out, and then the doctor's     12:39

11   office or whatever health care provider's office     12:39

12   fills out other parts of it?     12:39

13      A.   Right.   The expectation is that the     12:39

14   employee completes the demographics section at the     12:39

15   top, and then the medical office or provider would     12:39

16   complete the rest of it.     12:39

17      Q.   Okay.   Has it ever been the policy or     12:39

18   practice there at CSX at the Medical Department to     12:39

19   reach out to the health care provider for any     12:39

20   additional information that's necessary?     12:39

21      A.   Yes, we do that from time to time.     12:39

22      Q.   Okay.   So it's accurate to say it's an     12:39

23   option to both contact the employee or the health     12:39

24   care provider if there's any questions about the     12:39

25   COII?     12:39

195

1      A.   Right.                                      12:39

2      Q.   Okay.  And I understand your testimony      12:39

3  today that you reviewed the COIIs for the plaintiffs  12:39

4  in this case, and you've explained the reasons why.   12:40

5       But my question is:  Outside of this case,       12:40

6  is it accurate to say that it's not part of your job  12:40

7  responsibilities to review the COIIs?  Or is that     12:40

8  not true?                                             12:40

9      A.   It depends on the circumstances.  Most of   12:40

10  the documentation is handled by the nurses.  They     12:40

11  understand the, you know, policies, practices,        12:40

12  expectations on the medical side.  They can handle    12:40

13  most of this information without my intervention.     12:40

14       When there are questions, that's when they      12:40

15  bring me into it.  And it could be a COII, could be   12:40

16  an MD-3, could be almost any number of things         12:40

17  regarding medical issues that occur throughout the    12:40

18  company.                                              12:40

19      Q.   What are some -- what are the circumstances  12:40

20  that you would get involved in reviewing an incoming  12:40

21  COII?                                                 12:40

22      A.   Well, if it's perhaps incomplete in the     12:40

23  nurse's mind and they want to know -- if we need to   12:40

24  get additional information, they may ask about that.  12:41

25  But we also review them not just in realtime, but     12:41

                                                        196

```
 1    there may be issues for cases that are ongoing.  And    12:41
 2    I'm trying to get acquainted with the facts of the      12:41
 3    case, and I'll go through the medical file and our      12:41
 4    case management notes and review the COIIs at that      12:41
 5    time.                                                   12:41
 6         Q.   Okay.  Do you have any job                    12:41
 7    responsibilities -- and right now this is at any        12:41
 8    time that you've been with CSX, so if it's changed,     12:41
 9    just let me know and we'll narrow it down.              12:41
10          Have you ever had any job responsibilities        12:41
11    with respect to the administration of the Family        12:41
12    Medical Leave Act or FMLA?                              12:41
13         A.   No, I do not administer that.                 12:41
14         Q.   Okay.  And if I use a word other than         12:41
15    "administer," do you or does anyone in the Medical      12:41
16    Department have any job responsibilities with           12:41
17    respect to any aspect of the FMLA?                      12:41
18         A.   Oh, we have some responsibilities.  It        12:42
19    depends upon the group that administers that program    12:42
20    to determine whether or not they have a question        12:42
21    about the medical information, and they will send       12:42
22    that information to the nurse or to myself.             12:42
23          Just a quick example, an individual               12:42
24    submitted an FMLA form that has a recommendation for    12:42
25    restricted activity at work.  That would be             12:42
```

197

Craig Heligman, M.D.                                        April 28, 2021

```
 1    forwarded to our department for review to determine    12:42
 2    if there's any need to look into an accommodation      12:42
 3    issue.                                                 12:42
 4            Frequently there's a medication issue that     12:42
 5    may come up and they would like us to opine on that    12:42
 6    for safety reasons.  We also ask that they send us a   12:42
 7    notification if individuals are off work under FMLA    12:42
 8    for drug and alcohol treatment.  We do have a fairly   12:42
 9    robust program in that area, so we'd want to know      12:42
10    about those cases and get them into our EAP team.      12:42
11            In cases where there's a question of           12:43
12    whether or not the usage pattern of FMLA was           12:43
13    potentially questionable, then the FMLA office may     12:43
14    also send those to me and take a review of the         12:43
15    information provided.                                  12:43
16            Those are the broad strokes of what we do      12:43
17    with FMLA.                                             12:43
18        Q.   Okay.  And is that currently or is that       12:43
19    historically the case?                                 12:43
20        A.   Both.                                         12:43
21        Q.   Okay.  Because I know at some point CSX       12:43
22    switched over to using Kepro; is that correct?         12:43
23        A.   Yes.  And I don't actually know the name of   12:43
24    the company they had been using before Kepro.          12:43
25        Q.   Okay.  So with respect to your testimony      12:43
```

                                                                   198

| 1 | about your involvement in the FMLA, has that been | 12:43 |
| 2 | the same regardless of whether Kepro was in the | 12:43 |
| 3 | picture with respect to FMLA administration? | 12:43 |
| 4 |     A.   Yes. | 12:43 |
| 5 |     Q.   Okay.  All right.  And I wanted to ask you | 12:43 |
| 6 | if you've had any training while at CSX under the | 12:44 |
| 7 | FMLA? | 12:44 |
| 8 |     A.   No specific -- let's see -- their routine | 12:44 |
| 9 | training that we have to go through on a periodic | 12:44 |
| 10 | basis where they discuss employee responsibilities | 12:44 |
| 11 | and what we need to do for FMLA.  But as far as | 12:44 |
| 12 | formal training beyond that, I've been in practice | 12:44 |
| 13 | since the FMLA came to fruition, and I've had to | 12:44 |
| 14 | manage issues related to FMLA in various capacities | 12:44 |
| 15 | for a long time now. | 12:44 |
| 16 |     Q.   Okay.  Now, I'm not asking you any type of | 12:44 |
| 17 | a legal conclusion on this one, so don't take it | 12:44 |
| 18 | that way. | 12:44 |
| 19 |         When you review -- when you have reviewed | 12:44 |
| 20 | Certificate of Ongoing Illnesses in general, have | 12:44 |
| 21 | you, yourself, or anyone that works under you in the | 12:44 |
| 22 | Medical Department ever considered that to be a | 12:44 |
| 23 | request for leave under the FMLA? | 12:44 |
| 24 |     A.   What happens is when we receive information | 12:45 |
| 25 | that we think it could be something that the | 12:45 |

199

1    employee could request FMLA for, we have an area on      12:45

2    our case management system that can be check-boxed.      12:45

3    And that generates a report that goes to the FMLA        12:45

4    office saying that, you know, they're off work for       12:45

5    medical reasons.  We don't know what they did with       12:45

6    regard to FMLA, possibly could request it.               12:45

7           We don't know their eligibility at that           12:45

8    point.  It's for the FMLA office to decide what to       12:45

9    do with the information we send them after that.         12:45

10      Q.   Okay.  And I appreciate that description,         12:45

11   and by the way that you answered it, I think you         12:45

12   answered my question "Yes," but let me just make         12:45

13   sure that's clear for the record.                        12:45

14          So is your testimony:  The fact that there        12:45

15   is a process in place where a box can get checked in     12:45

16   the database management system that somebody in the      12:45

17   Medical Department thinks could be FMLA-qualifying,      12:45

18   does that mean that that's happened while you've         12:46

19   been at CSX?                                             12:46

20      A.   Oh, yes.  Yes, that was -- we introduced         12:46

21   that as we went into developing our case management      12:46

22   system.                                                  12:46

23      Q.   Okay.  And what's the name of that case          12:46

24   management system again, please?                         12:46

25      A.   Currently the company is called Cority,          12:46

                                                                 200

Craig Heligman, M.D.                                                    April 28, 2021

```
 1   C-o-r-i-t-y.  Previously it was Medgate.          12:46

 2        Q.   Okay.  Do you recall what it was back in   12:46

 3   2017?                                               12:46

 4        A.   It's been Medgate since I first was aware  12:46

 5   of it in probably 1999 or so, I think.             12:46

 6        Q.   Okay.  Okay.  And, again, this is not a    12:46

 7   legal question I'm asking you, but have you had any  12:46

 8   training or do you have any understanding in the way 12:46

 9   that you go about doing your job duties about what   12:46

10   can be a potential FMLA-qualifying leave?           12:46

11        A.   Again, I've had some training in the course 12:46

12   of our routine information distributed here at CSX.  12:47

13   It was mostly on-the-job-type training since I was   12:47

14   already established and working at the time FMLA     12:47

15   came about.  So I've taken some courses in my past   12:47

16   when the FMLA first came out and picked up           12:47

17   additional information under the guidance of various 12:47

18   employment attorneys I've worked with in the past.   12:47

19        Q.   Okay.  With respect to that box that can be 12:47

20   checked, has that been in existence since at least   12:47

21   2017?                                               12:47

22        A.   Yes.                                       12:47

23        Q.   Okay.  Do you recall when that FMLA box,    12:47

24   for lack of a better word, began?                   12:47

25        A.   I want to say we added it when we developed 12:47
```

                                                              201

Craig Heligman, M.D.                                                          April 28, 2021

```
 1    the -- when we purchased the software or purchased    12:47
 2    the system, I think we added it at that time.  And    12:47
 3    it's -- we've tried to consider various               12:47
 4    possibilities and workflows, some successful, not --  12:48
 5    some not so successful, but the FMLA box that we       12:48
 6    added, I believe, came in from the beginning of when   12:48
 7    we started using Medgate or Cority.                    12:48
 8         Q.   Okay.  And when was that again,              12:48
 9    approximately?                                         12:48
10         A.   I want to say 2000- -- hang on.  I want to   12:48
11    say 2014 was about the time we started establishing    12:48
12    ourselves using that program.                          12:48
13         Q.   And I take it it's one of the three nurses   12:48
14    that would check that FMLA box; is that correct?       12:48
15         A.   Or any of the other nurses that were         12:48
16    present prior to -- to when we had these three.        12:48
17         Q.   Of course.                                   12:48
18              Okay.  But when it comes to that FMLA box,   12:48
19    it would be one of the nurses in the CSX Medical       12:48
20    Department who would check it; is that right?          12:48
21         A.   Yes, that's correct.                         12:48
22         Q.   Okay.  Are you aware of any, you know,       12:48
23    guidance or policy or training that -- that has been   12:48
24    provided since 2014 to the present to inform or        12:49
25    educate the nurses as to what may be an                12:49
```

                                                                        202

```
 1   FMLA-qualifying event?                          12:49

 2        A.   Again, outside of the routine requirements  12:49

 3   that all of the employees have to receive for   12:49

 4   general information, I don't know if any of them 12:49

 5   received specific formal training on FMLA itself. 12:49

 6             So, again, it's not something we      12:49

 7   administer.  We have an understanding of it and what 12:49

 8   it means and how it may interact with the cases that 12:49

 9   we have, but they don't have a need to know the ins 12:49

10   and outs of FMLA because it's not really part of 12:49

11   their job.  So I don't recall that we've established 12:49

12   a formal training program for them.             12:49

13        Q.   Okay.  Have any of the nurses ever come to 12:49

14   you for guidance on whether to check that FMLA box; 12:50

15   that is, questions about what could be an       12:50

16   FMLA-qualifying event?                          12:50

17        A.   No.  Most of the time when you receive a 12:50

18   COII, it's 45 days out from the time they've been 12:50

19   off work.  All of those have the potential for being 12:50

20   qualified under FMLA, and so the actual default is 12:50

21   the box is checked, for the most part.          12:50

22        Q.   Oh, okay.                             12:50

23             And that's been the case since 2014 to the 12:50

24   present?                                        12:50

25        A.   Whether or not that default was set at that 12:50
```

                                                           203

Craig Heligman, M.D.                                                    April 28, 2021

```
 1   time, I don't remember.                            12:50

 2        Q.   Okay.  So is it accurate to say that, while  12:50

 3   I understand on the one hand that the nurses don't    12:50

 4   have, like, per se, FMLA administrative duties,       12:50

 5   the -- is it correct to say the purpose of the        12:50

 6   box -- and there's a default on that box for a COII   12:50

 7   form -- then it gets -- that document gets            12:50

 8   electronically sent over to the FMLA department?      12:51

 9        A.   Not the COII.  It generates a report        12:51

10   automatically from the system, and that report then   12:51

11   is automatically forwarded to the FMLA office.        12:51

12        Q.   And is that Jolanda Johnson?  Is that your   12:51

13   understanding?                                        12:51

14        A.   Yes, it was Jolanda Johnson at that time.   12:51

15   Since then she still has some responsibility for      12:51

16   FMLA, but there are other people involved in that as  12:51

17   well.                                                 12:51

18        Q.   Okay.  Do you have any knowledge about      12:51

19   whether that default FMLA box was checked for the     12:51

20   plaintiffs in this case when the COIIs came in in     12:51

21   2017?                                                 12:51

22        A.   I looked at several of them, and all but    12:51

23   one that I looked at, it had already been checked.    12:51

24        Q.   Okay.  So this means that -- just trying to 12:51

25   clarify, when you -- are you testifying that when     12:51
```

204

 1   you looked at the certificate in this case, you also   12:51

 2   checked the database to see whether the box was         12:52

 3   checked?                                                12:52

 4        A.   No, no.  I did this recently and as --        12:52

 5   really as part of the preparation for today's           12:52

 6   activity.  And it looked like -- again, I didn't        12:52

 7   look at all of them, but a large number of them had     12:52

 8   the box checked and one of them did not.                12:52

 9        Q.   Okay.  So just getting it clear here, back    12:52

10   at the time in 2017, is it correct to say that you      12:52

11   did not look into whether the FMLA boxes were           12:52

12   checked for these plaintiffs?                           12:52

13        A.   That is correct.                              12:52

14        Q.   Okay.  Recently, you mean, like, in the       12:52

15   last couple of weeks, you -- in preparation for this    12:52

16   deposition, you went back and looked?                   12:52

17        A.   Yes.                                          12:52

18        Q.   Okay.  And is it your testimony that all      12:52

19   except one of the plaintiffs in this case, the FMLA     12:52

20   default box was checked?                                12:52

21        A.   No, I didn't look at every single one of      12:53

22   the individuals.  I looked at a non-scientific          12:53

23   selection of them.  And one of them was checked --      12:53

24   excuse me -- all of them were checked except for        12:53

25   one.  So while I can't speak to what had occurred in    12:53

                                                        205

Craig Heligman, M.D.                                                    April 28, 2021

| | | |
|---|---|---|
| 1 | 2017, I can tell you that most of the time the box | 12:53 |
| 2 | was checked. | 12:53 |
| 3 | Q.  Okay.  And I apologize if this is | 12:53 |
| 4 | repetitive, but can you just tell me how you went | 12:53 |
| 5 | about checking -- what you did in order to check | 12:53 |
| 6 | that box? | 12:53 |
| 7 | Just what steps did you take? | 12:53 |
| 8 | A.  I went to our case management system, I | 12:53 |
| 9 | opened up the cases that were on this particular | 12:53 |
| 10 | case, and looked at the notes as well as looked at | 12:53 |
| 11 | the data and where that check box -- the check box | 12:53 |
| 12 | that was there.  Just, again, part of the process of | 12:53 |
| 13 | reviewing the information in preparation, and that | 12:53 |
| 14 | FMLA box was present.  It was checked.  It's kind of | 12:54 |
| 15 | right up in front on our initial screen. | 12:54 |
| 16 | And that's about the extent of it. | 12:54 |
| 17 | Q.  Okay.  And is -- that case management | 12:54 |
| 18 | field, if that's the correct term, is that part of a | 12:54 |
| 19 | medical file or a personnel file or something else? | 12:54 |
| 20 | A.  No, it's really just a trigger for us to | 12:54 |
| 21 | say -- again, trying to let the FMLA team know "Do | 12:54 |
| 22 | we need to" -- you know, "If you want to send -- if | 12:54 |
| 23 | you think it's appropriate to send the information | 12:54 |
| 24 | about FMLA to these employees, these cases came in | 12:54 |
| 25 | to us."  That's really the only purpose for that | 12:54 |

206

Craig Heligman, M.D.                                          April 28, 2021

| 1 | box. | 12:54 |
| 2 | Q.  Okay.  And the non-scientific study that | 12:54 |
| 3 | you did -- or not study, but the non-scientific | 12:54 |
| 4 | search, approximately how many people did you bring | 12:54 |
| 5 | up -- | 12:54 |
| 6 | A.  About a -- | 12:54 |
| 7 | Q.  -- of the plaintiffs? | 12:54 |
| 8 | A.  About a dozen. | 12:54 |
| 9 | Q.  And do you remember who they were? | 12:54 |
| 10 | A.  No, unfortunately I don't. | 12:55 |
| 11 | Q.  Okay.  Was it a -- did you just randomly | 12:55 |
| 12 | pick approximately 12 people from the plaintiffs, or | 12:55 |
| 13 | did you just go in alphabetical order or something | 12:55 |
| 14 | else? | 12:55 |
| 15 | A.  No, it was kind of a random selection.  I | 12:55 |
| 16 | wanted to pull up a few of the cases to refresh my | 12:55 |
| 17 | memory in preparation for the deposition. | 12:55 |
| 18 | Q.  Okay.  And do you happen to remember who | 12:55 |
| 19 | the person was that didn't have the box checked? | 12:55 |
| 20 | Did that stand out in your mind at all? | 12:55 |
| 21 | A.  It actually may have been Mr. Ginn'scase | 12:55 |
| 22 | since I'd already been deposed on his case.  I think | 12:55 |
| 23 | that -- | 12:55 |
| 24 | Q.  I see. | 12:55 |
| 25 | A.  I think that was the issue there. | 12:55 |

207

```
 1        Q.   Okay.  So you believe it was Mr. Ginn that   12:55
 2   did not have the box checked?                          12:55
 3        A.   Correct.                                     12:55
 4        Q.   Okay.  Because I was going -- if you're not  12:55
 5   -- are you sure it was Gin?  Because if not, I just    12:55
 6   want to ask you:  What were the circumstances, if      12:56
 7   any, that stood out as that one person being           12:56
 8   different than the other, if that was the case?        12:56
 9        A.   His case was separate from the individuals   12:56
10   that you're representing, and I had already been       12:56
11   deposed on his case.                                   12:56
12        Q.   Got it, okay.                                12:56
13             And if we wanted to look at that box and     12:56
14   that screen, other than referring to it as the case   12:56
15   management system, is there any more specific term     12:56
16   that you're aware of to describe what that screen      12:56
17   is?                                                    12:56
18        A.   It's just the new-case landing screen where  12:56
19   we put the basic information in.                       12:56
20        Q.   Okay.  After that box is checked and it      12:56
21   gets sent over to the FMLA people, do you or anybody   12:56
22   that work under you in the Medical Department have     12:56
23   any further involvement, in general?  I know there     12:56
24   could be a case-by-case exception, but in general.    12:57
25        A.   No, we -- we wouldn't have any further       12:57
```

                                                                        208

| 1 | involvement. | 12:57 |
| 2 | Q.    Okay.  Have you ever had any training under | 12:57 |
| 3 | the Americans with Disabilities Act, Rehabilitation | 12:57 |
| 4 | Act, or any other similar state disability | 12:57 |
| 5 | discrimination law? | 12:57 |
| 6 | A.    Not specific to the states.  I have -- I | 12:57 |
| 7 | have received some training in ADA.  Again, ADA came | 12:57 |
| 8 | to fruition at a time when it was early in my | 12:57 |
| 9 | practice.  So I have a working knowledge that can be | 12:57 |
| 10 | -- I can answer questions, I know what my | 12:57 |
| 11 | responsibilities are, but I'm not the expert. | 12:57 |
| 12 | Q.    Okay.  Are you familiar with the term | 12:57 |
| 13 | "reasonable accommodation"? | 12:57 |
| 14 | A.    Yes. | 12:57 |
| 15 | Q.    Okay.  And, again, not in the legal sense, | 12:57 |
| 16 | but in terms of your job duties or training that | 12:57 |
| 17 | you've received at CSX, what does that mean to you? | 12:57 |
| 18 | A.    It's a phrase used in the Americans with | 12:57 |
| 19 | Disabilities Act. | 12:57 |
| 20 | "Reasonable" is not particularly well | 12:57 |
| 21 | defined, but the simple answer is if an individual | 12:58 |
| 22 | is unable to perform their essential functions and | 12:58 |
| 23 | they would like to be accommodated for the ability | 12:58 |
| 24 | to continue to do their job, it is the employer's | 12:58 |
| 25 | responsibility to determine what reasonable | 12:58 |

209

1    accommodation may be offered to that employee so      12:58

2    that they may continue to perform the essential       12:58

3    functions of their job.                               12:58

4        Q.   And what job duties do you have, if any,     12:58

5    with respect to reasonable accommodations at CSX?     12:58

6        A.   Most of the requests for job accommodation   12:58

7    will come through for my review, and we also have a   12:58

8    vocational -- well, we used to have two full-time      12:58

9    vocational rehab managers.  We currently have a       12:58

10   part-time consultant that handles it.  But it would   12:58

11   first go through either myself or our vocational      12:58

12   rehab specialists, and then we would then proceed to  12:58

13   initiate the process.                                 12:59

14       Q.   Are you familiar with a medical leave of     12:59

15   absence as being a form of a reasonable               12:59

16   accommodation under the disability discrimination     12:59

17   laws?                                                 12:59

18       A.   What I understand that to be is leave as an  12:59

19   accommodation, and, yes, I'm familiar with it.  We    12:59

20   apply that from time to time as an accommodation.     12:59

21   Again, I don't believe it's well defined, but we use  12:59

22   it as an accommodation for some people.               12:59

23       Q.   Okay.  And when it comes to that specific    12:59

24   topic as medical leave of absence as a form of an     12:59

25   accommodation, do you or anyone in the Medical        12:59

                                                                    210

1   Department have job responsibilities with respect to    12:59

2   that?                                                    12:59

3       A.    I'm part of the team that would review        12:59

4   that -- that topic, and if leave as an accommodation    12:59

5   is being recommended by the team, we would advise       12:59

6   the employee of such -- potentially either myself,      12:59

7   one of the nurses, our voc rehab person, or             01:00

8   potentially the manager.                                01:00

9       Q.    And does that team have a name?               01:00

10      A.    No, it's an informal group of individuals     01:00

11  to look at all the information, make sure that we're    01:00

12  doing the interactive process, collecting the           01:00

13  appropriate information, discussing the case with a     01:00

14  manager, reviewing the medical information,             01:00

15  potentially up to and including talking with the        01:00

16  treating provider.                                      01:00

17          And so we, as a group -- and the group may      01:00

18  change depending upon the case, but it's really         01:00

19  trying to look at all angles for the requested          01:00

20  accommodation to determine whether or not the           01:00

21  company is able to grant that accommodation.            01:00

22      Q.    If it doesn't have a name, is it -- would     01:00

23  it be accurate to call it, like, a reasonable           01:00

24  accommodation committee?  Or is it too formal?          01:00

25      A.    It's really too formal.                       01:00

                                                                211

Craig Heligman, M.D.                                                                April 28, 2021

```
 1            You know, some of our accommodations are      01:01
 2   very simple.  It doesn't take a lot of people to       01:01
 3   figure it out, and it doesn't even necessarily take    01:01
 4   us collecting a job accommodation request form.        01:01
 5   Some employees -- in fact, the vast majority of the    01:01
 6   accommodations that we provide, the employee simply    01:01
 7   has to make a request to their manager for something   01:01
 8   simple, and typically it's granted.                    01:01
 9            Again, a simple example may be for someone     01:01
10   with a hearing impairment that wants a visual alarm    01:01
11   or specialized equipment for telephonic purposes.      01:01
12   We'll provide that, and it doesn't even require        01:01
13   anything more formal than the employee asking their    01:01
14   manager and us securing the equipment.                 01:01
15       Q.    So an accommodation can be verbal.  It       01:01
16   doesn't have to require the use of the formal job      01:01
17   accommodation request form?                            01:01
18       A.    That's correct.                              01:01
19       Q.    Okay.  And you mentioned earlier about the   01:01
20   essential functions of the job.                        01:01
21            Do you remember that?                         01:02
22       A.    Yes.                                         01:02
23       Q.    Okay.  How do you go about, assuming you     01:02
24   have, to determine the essential functions of a        01:02
25   person's job?                                          01:02
```

212

Craig Heligman, M.D.                                    April 28, 2021

1        A.   I would rely on information from the          01:02

2   manager, information from the employee, the job         01:02

3   description.  But, by and large, it's someone           01:02

4   outside of myself who would actually have to define     01:02

5   the essential functions as they exist.                  01:02

6        Q.   Okay.  And the job descriptions, are you --   01:02

7   as an occupational medicine and medical director at     01:02

8   CSX, are you familiar with at least all of the job      01:02

9   descriptions of the plaintiffs in this case?            01:02

10       A.   I'm probably familiar with most of them.  I   01:02

11  couldn't recite them for you, but I'm sure I've seen    01:02

12  them.                                                   01:02

13       Q.   Okay.  Have you ever gone on field visits     01:02

14  to see how jobs are performed?                          01:02

15       A.   Yes.                                          01:02

16       Q.   Okay.  And was that, you know, like, part     01:02

17  of your job duties or was that just fun, like, to       01:03

18  see what an engineer does?  Well, let me ask a more     01:03

19  serious question.  But, I mean, is that -- like,        01:03

20  tell me the circumstances of how you actually did       01:03

21  that, went out in the field and saw how work was        01:03

22  performed.                                              01:03

23       A.   Different ways.  Sometimes it's a request     01:03

24  to come out and take a look at something.  That's       01:03

25  pretty unusual.  Most of the time it's -- we're         01:03

                                                                213

Craig Heligman, M.D.                                                April 28, 2021

```
 1    going out to just -- for our own information, to      01:03
 2    look at the job, learn what they do.  We may talk to  01:03
 3    the employees as they do their job.  We may go to     01:03
 4    our training center and actually attempt to do some   01:03
 5    of the work ourselves -- not very well I have to      01:03
 6    say, but we attempt.                                  01:03
 7            Also I've had prior experience with           01:03
 8    providing services to other railroads, so I've been   01:03
 9    to other railroad facilities prior to coming to CSX.  01:03
10    So I don't make those trips too frequently anymore.   01:03
11        Q.   Have you ever been to the Huntington, you    01:04
12    know, mechanical shop or the Russell car shop in      01:04
13    Kentucky?                                             01:04
14        A.   I've been there but not to observe any job   01:04
15    functions.                                            01:04
16        Q.   Okay.  And I forgot to ask you -- before we  01:04
17    move on too quickly -- who else was on that -- I      01:04
18    don't know what to call it other than accommodation   01:04
19    committee that's less formal?                         01:04
20        A.   And it's not necessarily a meeting of all    01:04
21    people at the same time, so it's more of a process.   01:04
22            We would talk to the operating manager for    01:04
23    that individual to find out what the business issues  01:04
24    are.  We would include our employment attorney to     01:04
25    make sure that we're following the rules as we        01:04
```

                                                                   214

| | | |
|---|---|---|
| 1 | should.  We would involve our vocational | 01:04 |
| 2 | rehabilitation consultant or manager if they're -- | 01:04 |
| 3 | of the employee at that time. | 01:04 |
| 4 | We would -- and someone -- it may not be | 01:04 |
| 5 | myself, but someone would communicate directly with | 01:04 |
| 6 | the employee to get some information.  We would, if | 01:05 |
| 7 | needed, get the job accommodation form completed by | 01:05 |
| 8 | the treating provider, and if that wasn't completely | 01:05 |
| 9 | clear, on some occasions, we would contact the | 01:05 |
| 10 | treating provider to gather additional information. | 01:05 |
| 11 | So the operating manager, our employment | 01:05 |
| 12 | attorney, vocational rehabilitation, myself -- those | 01:05 |
| 13 | are the most common participants. | 01:05 |
| 14 | Q.   Okay.  And if I understood you correctly, | 01:05 |
| 15 | it's not a meeting or a telephone call.  It's more | 01:05 |
| 16 | of a process; is that what you said? | 01:05 |
| 17 | A.   Right.  And I -- I forgot to mention we | 01:05 |
| 18 | also involve our HR business partner in that as | 01:05 |
| 19 | well, whoever's responsible for the HR function, to | 01:05 |
| 20 | help us gather the information. | 01:05 |
| 21 | Q.   Now, you mentioned you have some prior | 01:05 |
| 22 | railroad experience? | 01:05 |
| 23 | A.   Yes. | 01:05 |
| 24 | Q.   Okay.  Can you tell me about that, please? | 01:05 |
| 25 | A.   I was invited to be a regional consulting | 01:05 |

215

Craig Heligman, M.D.                                              April 28, 2021

```
 1    physician by the Union Pacific Railroad.  I believe    01:06
 2    that was in 1998.  And that responsibility grew into   01:06
 3    a larger responsibility, and I was consulting for      01:06
 4    them as an assistant medical director.                 01:06
 5           During that time period, I was also invited     01:06
 6    to be the medical consultant for Kansas City           01:06
 7    Southern, which that started in 2004.  And I           01:06
 8    continued to be the medical director, the chief        01:06
 9    medical officer for Kansas City Southern until I       01:06
10    came onboard at CSX.  I stopped working for Union      01:06
11    Pacific -- I want to say it was 2006.                  01:06
12           And so three Class I Railroads, including       01:06
13    CSX, and I was also asked to consult with a short      01:06
14    line, the Rio Grande Pacific.                          01:06
15       Q.   And what time period was the Rio Grande        01:07
16    Pacific?                                               01:07
17       A.   I want to say it was 2006, 2007, perhaps --    01:07
18    maybe later -- until I started with CSX.               01:07
19       Q.   Okay.  Did all of those consulting jobs end    01:07
20    when you came to CSX?                                  01:07
21       A.   Yes, I started CSX as a full-time position.    01:07
22       Q.   That was 2012?                                 01:07
23       A.   January of 2012.                               01:07
24       Q.   Okay.  And I think you were associate          01:07
25    medical director for, what, like, three years and     01:07
```

216

| | | |
|---|---|---|
| 1 | then took over from Dr. Neilson? | 01:07 |
| 2 | A.   Yes, that's correct. | 01:07 |
| 3 | Q.   Okay.  With respect to this consulting for | 01:07 |
| 4 | the other railroads, was that through a private | 01:07 |
| 5 | company or just you as an individual? | 01:07 |
| 6 | Or how did that work? | 01:07 |
| 7 | A.   I put together an LLC and operated under | 01:07 |
| 8 | that. | 01:07 |
| 9 | Q.   Okay.  What was the name of the LLC, | 01:07 |
| 10 | please? | 01:07 |
| 11 | A.   It was Heligman Consultants. | 01:07 |
| 12 | Q.   Okay. | 01:08 |
| 13 | A.   And my career pathway is a little bit | 01:08 |
| 14 | disjointed at times.  I also had an actual | 01:08 |
| 15 | corporation.  And I've also been Heligman Consulting | 01:08 |
| 16 | when I was getting into doing the private consulting | 01:08 |
| 17 | work originally.  I then went to a full-employment | 01:08 |
| 18 | position, closed out that corporation, and then | 01:08 |
| 19 | after I left full employment with, of course, | 01:08 |
| 20 | benefits, I again reopened under an LLC entity to | 01:08 |
| 21 | perform the consulting work. | 01:08 |
| 22 | Q.   Okay.  I know you mentioned earlier today | 01:08 |
| 23 | about the Long Island Railroad fraud case that | 01:08 |
| 24 | the -- I believe the U.S. Attorney's office and the | 01:08 |
| 25 | Railroad Retirement Board investigated. | 01:08 |

| | | |
|---|---|---|
| 1 | That's what you were referring to earlier? | 01:08 |
| 2 | A.    Yes, sir. | 01:08 |
| 3 | Q.    Okay.  And did you have any involvement | 01:08 |
| 4 | with that as a consultant or otherwise? | 01:08 |
| 5 | A.    No, I did not. | 01:08 |
| 6 | Q.    Okay.  My understanding is that that really | 01:08 |
| 7 | had to do with fraudulent -- piling fraudulent | 01:09 |
| 8 | disability benefits with the United States Railroad | 01:09 |
| 9 | Retirement Board, coupled with a fairly generous | 01:09 |
| 10 | pension -- early pension program that the Long | 01:09 |
| 11 | Island Railroaders had. | 01:09 |
| 12 | Does that sound right to you? | 01:09 |
| 13 | Are we talking about the same thing? | 01:09 |
| 14 | A.    Yes, that sounds right. | 01:09 |
| 15 | The other issue that came up was that all | 01:09 |
| 16 | of the employees were directed to two specific | 01:09 |
| 17 | health care providers.  I believe they were | 01:09 |
| 18 | orthopedic surgeons, and I believe they were also -- | 01:09 |
| 19 | they had some legal issues related to that.  I can't | 01:09 |
| 20 | remember what the penalty was, whether there was | 01:09 |
| 21 | fines or jail time or -- or what the outcome of the | 01:09 |
| 22 | lawsuit, but there were two specific orthopedic | 01:09 |
| 23 | surgeons is my recollection. | 01:09 |
| 24 | Q.    Is -- the fact that your recollection is | 01:09 |
| 25 | that there were these two orthopedic surgeons | 01:09 |

218

Craig Heligman, M.D.                                                    April 28, 2021

```
 1   involved in the Long Island Railroad situation, is        01:09

 2   that what made you think about it when the                01:09

 3   plaintiffs in this case were treating with the two        01:10

 4   chiropractors?                                            01:10

 5        A.   That was -- that was one of the issues that     01:10

 6   may have come to mind, yes.                               01:10

 7        Q.   Okay.  Were there any other issues?  I          01:10

 8   mean, other -- let me ask that a little better way.       01:10

 9             Other than the Long Island Railroad             01:10

10   incident that you're familiar with, were you aware        01:10

11   of anything else in terms of fraudulent                   01:10

12   or potentially fraudulent claims at any of these          01:10

13   other railroads that you've worked for?                   01:10

14        A.   No, I've never been involved in that, any       01:10

15   potentially fraudulent claims.  There's always            01:10

16   disagreements about various aspects of on-duty            01:10

17   injuries or other claims against the company, but         01:10

18   none specific related to fraud.                           01:10

19        Q.   I wanted to follow up on the -- I know you      01:11

20   said you hadn't been to Huntington or Russell for         01:11

21   the purpose of looking at jobs.                           01:11

22             Have you ever been to any other facilities      01:11

23   at CSX -- while working at CSX -- for the purpose of      01:11

24   watching how job tasks are performed?  And I'm            01:11

25   really talking about for union employees, agreement       01:11
```

                                                                    219

```
 1   employees.                                          01:11
 2        A.    Because the rest of us are kind of boring,  01:11
 3   actually.                                           01:11
 4        Q.    Agreed.                                  01:11
 5        A.    I've been to the training facility and  01:11
 6   have -- as I mentioned, had watched people learn how  01:11
 7   to do their jobs.  I've made some attempts to drive  01:11
 8   a spike -- failed miserably.  We've -- I've been on  01:11
 9   trips on the locomotive with the individuals.  I    01:11
10   hosted, at that time, the new NTSB medical officers  01:11
11   on a trip on one of our trains.  I've been to some  01:12
12   of the shops, been to yard offices.                 01:12
13          Again, I can't give you specifics.  I just  01:12
14   don't remember all of the events.  I've been to     01:12
15   intermodal yards on a couple different occasions in  01:12
16   a couple different locations.  We have a -- an auto  01:12
17   ramp where the stevedores have to load and unload   01:12
18   the -- the automobiles from the auto racks.         01:12
19          So it's a mixed bag.                         01:12
20        Q.    Okay.  What about at prior railroads, the  01:12
21   same question?                                      01:12
22        A.    Yes, both at Kansas City Southern and at  01:12
23   Union Pacific.  Again, mixed bag of events going on,  01:12
24   tours of various locations for various reasons.     01:12
25   Most of it was for my education, not necessarily to  01:12
```

220

| | | |
|---|---|---|
| 1 | define essential functions. | 01:12 |
| 2 | Q.  Okay.  Fair enough.  Because that's where | 01:12 |
| 3 | the question started, so let me broaden that beyond | 01:13 |
| 4 | the essential functions. | 01:13 |
| 5 | But is it -- I mean, is it accurate to say | 01:13 |
| 6 | that either from field tests or from talking to | 01:13 |
| 7 | managers or from reading job descriptions, that | 01:13 |
| 8 | you're familiar with the job duties of each and | 01:13 |
| 9 | every one of the plaintiffs in this case? | 01:13 |
| 10 | A.  Yes, I believe so. | 01:13 |
| 11 | Q.  Okay.  And just to be complete, have you | 01:13 |
| 12 | ever watched any videos of the job tasks of the | 01:13 |
| 13 | plaintiffs in this case?  Not specifically the | 01:13 |
| 14 | plaintiffs, but the job description or the job | 01:13 |
| 15 | duties, rather. | 01:13 |
| 16 | A.  I can't recall what specific job videos I | 01:13 |
| 17 | may have seen, but I've seen demonstrations of | 01:13 |
| 18 | people performing job tasks for a variety of jobs. | 01:13 |
| 19 | I can't remember which ones they are, and I can't | 01:13 |
| 20 | remember which jobs are associated with which | 01:13 |
| 21 | employees in this case. | 01:13 |
| 22 | Q.  Sure. | 01:13 |
| 23 | Okay.  And we -- I think we've covered the | 01:13 |
| 24 | essential functions or the reasonable accommodation | 01:13 |
| 25 | piece of job duties, so let's just put that bucket | 01:14 |

221

```
 1    over there.                                      01:14

 2            What other purposes have you reviewed the   01:14

 3    job duties of the railroaders, whether at CSX or the   01:14

 4    other railroaders -- other railroads?  Excuse me.   01:14

 5        A.   Well, the most common one these days is we   01:14

 6    have to submit forms to the RRB.  There's a form   01:14

 7    that -- when someone applies for disability benefits   01:14

 8    with the RRB, there's a few forms that are sent to   01:14

 9    our company to complete by the -- whoever in the --   01:14

10    whoever at the company is able to respond to those   01:14

11    forms.                                            01:14

12            One of them is a vocational form, and so as   01:14

13    part of the completion of that form, I attach a job   01:14

14    description on every case.  So I have printed out,   01:14

15    read, reviewed job descriptions on a regular basis   01:14

16    in order to comply with completion of those forms   01:15

17    for the RRB.                                      01:15

18        Q.   Okay.  Is it your understanding that, in   01:15

19    part, that's to assist the RRB in determining     01:15

20    whether someone is entitled to own-occupation     01:15

21    benefits, meaning that they cannot do their railroad   01:15

22    job?                                              01:15

23        A.   Own-occupation or total perm.  It's either   01:15

24    one, I believe, yes.                              01:15

25        Q.   Okay.  So it's for the purpose of assisting   01:15
```

222

Craig Heligman, M.D.                                                April 28, 2021

1    or supplying information to the Railroad Retirement    01:15

2    Board to determine their eligibility for benefits,    01:15

3    that is, whether they can do their railroad job or    01:15

4    not?                                                  01:15

5        A.    Correct.    It's information from the      01:15

6    employer to the RRB so they make -- may make claims   01:15

7    decisions on it.                                      01:15

8        Q.    Okay.    So we've got the reasonable        01:15

9    accommodation piece, the RRB piece.                   01:15

10           Are there any other reasons that you've       01:15

11   educated yourself about the job duties of various     01:15

12   railroaders -- railroad jobs?                         01:15

13       A.    Several years ago -- and please don't ask   01:16

14   me to give you dates because I really don't           01:16

15   remember -- there was a process in place where we     01:16

16   hired a company to go out and actually review the     01:16

17   jobs and update the job descriptions, and I don't     01:16

18   recall the company.                                   01:16

19           The individuals involved in that process     01:16

20   are no longer with the company, so I don't know       01:16

21   where that information is or where or how it was       01:16

22   used.    I just know it was conducted in order to     01:16

23   update job descriptions.    And as part of that, I    01:16

24   reviewed some of the information that was collected    01:16

25   for what the job descriptions were at that point in   01:16

                                                          223

Craig Heligman, M.D.                                      April 28, 2021

```
 1   time.                                              01:16

 2       Q.   Okay.  Do you remember the name of that   01:16

 3   consulting group?                                  01:16

 4       A.   I really don't, no.                       01:16

 5       Q.   Okay.  Is it accurate to say that part    01:16

 6   of -- well, let me -- let me go back.              01:16

 7            Are there any other reasons that we haven't 01:16

 8   talked about so far about why you have studied or  01:16

 9   educated yourself about the job duties of          01:16

10   railroaders?                                       01:17

11       A.   Well, the most important reason to know   01:17

12   what the -- what the employee does in the form of  01:17

13   their job is to do appropriate decision-making on  01:17

14   fitness for duty.  If you don't know what their job 01:17

15   is, then how can you say whether they're fit to    01:17

16   perform it?  And so without any knowledge of their 01:17

17   job, I couldn't really act as the Chief Medical    01:17

18   Officer.                                           01:17

19       Q.   I've been watching Anderson Cooper do     01:17

20   Jeopardy, and he says, every other word, "Well     01:17

21   said," "Well said" or "Well done," "Well done."    01:17

22            Yeah, I can imagine that's probably one of 01:17

23   the biggest; right?  How do you determine fitness  01:17

24   for duty if you don't understand the job?  Got it. 01:17

25            Any others that we haven't talked about so 01:17
```

                                                          224

| | | |
|---|---|---|
| 1 | far? | 01:17 |
| 2 | A.   I don't think so. | 01:17 |
| 3 | Q.   Okay.  Part of occupational medicine | 01:17 |
| 4 | includes preventive medicine; is that right? | 01:17 |
| 5 | A.   The Occupational Medicine Board is under | 01:17 |
| 6 | the -- one of the three divisions of the American | 01:17 |
| 7 | Board of Preventive Medicine. | 01:17 |
| 8 | Q.   Okay.  So that's a "Yes"; right? | 01:17 |
| 9 | A.   Yes. | 01:18 |
| 10 | Q.   Understood.  Yep, got it. | 01:18 |
| 11 | And can you say that board again, American | 01:18 |
| 12 | Preventive Medicine? | 01:18 |
| 13 | A.   The American Board of Preventive Medicine. | 01:18 |
| 14 | There's three divisions.  There's Occupational | 01:18 |
| 15 | Medicine, General Prevention in Public Health, and | 01:18 |
| 16 | Aerospace Medicine. | 01:18 |
| 17 | Q.   Okay.  And is -- is it correct to say that | 01:18 |
| 18 | another reason that you've studied or educated | 01:18 |
| 19 | yourself on job duties of railroaders is to prevent | 01:18 |
| 20 | injuries in the workplace? | 01:18 |
| 21 | A.   Yes, I think that's a fair assessment. | 01:18 |
| 22 | Q.   Okay.  And where does that fall in the | 01:18 |
| 23 | structure of CSX specifically, like, that -- those | 01:18 |
| 24 | job duties of preventing occupational injuries? | 01:18 |
| 25 | A.   It's really a day-to-day concept that we | 01:18 |

225

Craig Heligman, M.D.                                                    April 28, 2021

1    have to understand.  So in the case of an applicant      01:18

2    who desires to work for CSX, I need to learn at          01:18

3    least enough about their medical information to know     01:18

4    if their medical profile would put them at risk if       01:19

5    they were to perform job functions for CSX,              01:19

6    depending upon what the job is.                          01:19

7           It's kind of the opposite of the return to       01:19

8    work following a medical event for fitness for duty.     01:19

9    So it's on return to work and at -- at new hire.         01:19

10          Also part of that is we're responsible for        01:19

11   ongoing surveillance exams for different agencies,       01:19

12   whether it's OSHA, FRA, Motor Carriers.  We have to      01:19

13   manage the medical process and surveillance exams        01:19

14   for those kinds of functions.  And so if someone is      01:19

15   not meeting the medical guidance for those types of      01:19

16   jobs, we -- we would make those determinations, see      01:19

17   if there's a medical ability fit with the ability to     01:19

18   do the job.                                              01:19

19      Q.   Okay.  Does -- while you've been employed         01:19

20   at CSX, are you aware of any -- I just don't know        01:19

21   what to call them -- but, you know, where people are     01:20

22   required to exercise, like, 15 minutes before their      01:20

23   shift to stretch?                                        01:20

24          Does that concept sound familiar?                 01:20

25      A.   Sure.                                             01:20

                                                              226

Craig Heligman, M.D.                                                      April 28, 2021

```
 1            I think we are still doing that.  The      01:20

 2    individuals involved in that program, a lot of them 01:20

 3    have changed jobs or aren't with the company any    01:20

 4    longer.  But we've promoted people to warm up before 01:20

 5    they do greater physical activity that might be      01:20

 6    required of them at work.  So there's a series of    01:20

 7    stretching exercises that are recommended.           01:20

 8            Mr. Edgar, who we talked about on the       01:20

 9    ergonomics side, he was also involved in that        01:20

10    process when he was with the wellness team and       01:20

11    promoted that exercise program also.                 01:20

12        Q.   Is that part of the Risk Management         01:20

13    Department or some other department?                 01:20

14        A.   Some other department.  We had a wellness   01:20

15    team that started in the Medical Department when I   01:20

16    first came to CSX.  It then moved under a different  01:20

17    person's jurisdiction.  It moved again and again and 01:21

18    changed how we do our wellness functions, and so     01:21

19    today we are, again, modifying how we provide        01:21

20    wellness services to our employees.                  01:21

21        Q.   Okay.  And briefly how is that?             01:21

22            What -- what changed?                        01:21

23        A.   The leadership views.  We had a leadership  01:21

24    change in 2017 -- their viewpoint on how it fits     01:21

25    into the business.  The benefits that we may have    01:21
```

227

Craig Heligman, M.D.                                                April 28, 2021

```
 1    gained from doing some of our wellness activities,    01:21

 2    were they effective or not?  Were they something      01:21

 3    that the employees participated in or not?            01:21

 4            We went from a larger number of contracted    01:21

 5    health and wellness professionals, whether they were  01:22

 6    certified trainers or nutritionists that were         01:22

 7    scattered around the system.  As the change in the    01:22

 8    organization occurred, that number of people          01:22

 9    reduced.  And at this point in time, the contract     01:22

10    for those individuals is discontinued at the end      01:22

11    of -- I believe it's May 1st or the end of May.  I    01:22

12    don't remember now.                                   01:22

13            And they're looking at modifying how we do     01:22

14    that.  So I understand we are looking for a wellness  01:22

15    manager to coordinate efforts, which will be mostly   01:22

16    associated with some of our benefits and vendored     01:22

17    activities.                                           01:22

18            So it's -- it has changed and progressed      01:22

19    over the years in many different ways.                01:22

20       Q.    What was the change that you referenced in   01:22

21    2017?                                                 01:22

22       A.    We had a leadership change.  The -- and,     01:22

23    again, I'm not a finance guy either.  But there was   01:22

24    a group of individuals that promoted Mr. Hunter       01:22

25    Harrison to come in as the CEO of CSX.  I think it    01:23
```

228

```
 1   was March of 2017.  Our former CEO then retired and    01:23
 2   our leadership changed to Mr. Harrison, and he         01:23
 3   brought in his leadership team and our top             01:23
 4   leadership changed over the next few years.            01:23
 5       Q.   He wasn't around very long, was he, at CSX?   01:23
 6       A.   Unfortunately, he passed away after --        01:23
 7   really at maybe even six months.                       01:23
 8       Q.   Yeah, it was December of '17.                 01:23
 9       A.   Right.  Six or eight months, I think.         01:23
10       Q.   Okay.  Did -- you had occasion to work with   01:23
11   Mr. Harrison?                                          01:23
12       A.   No, I never had the opportunity to meet       01:23
13   him.                                                   01:23
14       Q.   Okay.  All right.  In the tenure that he      01:23
15   was at CSX, were you aware of any policies that        01:23
16   changed with respect to medical leave or family       01:23
17   medical leave or accommodations at all?               01:24
18       A.   No, nothing really changed in that area.      01:24
19       Q.   Okay.  In the period of time that he was      01:24
20   there, did you notice any changes at all in the way    01:24
21   that you did your job in the Medical Department?       01:24
22       A.   No real change in how I did my job.  Most     01:24
23   recently we had another reorganization and our        01:24
24   medical functions were moved to different managers.    01:24
25   But beyond that, the actual functions remain the      01:24
```

229

Craig Heligman, M.D.                                                    April 28, 2021

```
 1    same.                                              01:24
 2          MR. PAUL:  Okay.  I'm good plowing through,  01:24
 3    but if anybody needs a break, you just tell me.    01:24
 4    BY MR. PAUL:                                        01:24
 5       Q.   But what's -- what's your -- what are your 01:24
 6    thoughts on that?                                  01:24
 7       A.   I'm good right now.                         01:24
 8          THE REPORTER:  I would love one.             01:24
 9          MS. FOSTER BIRD:  The court reporter's the   01:24
10    most important person, Dr. Heligman.  Sorry.       01:24
11          MR. PAUL:  Yeah.                              01:24
12          THE WITNESS:  I understand.                   01:24
13          MR. PAUL:  All right.  We'll go off the      01:24
14    record.  What do you need, five minutes or something 01:24
15    like that or..?                                     01:25
16          THE REPORTER:  Ten.                           01:25
17          MR. PAUL:  Ten?                               01:25
18          Yeah, am I talking too fast?                  01:25
19          THE REPORTER:  You're much better.  Thank    01:25
20    you.                                                01:25
21          THE VIDEOGRAPHER:  Off the record at         01:25
22    1:25 p.m.                                           01:25
23          (Recess taken.)                               01:33
24          THE VIDEOGRAPHER:  We are back on the        01:33
25    record at 1:33 p.m.                                 01:33
```

230

Craig Heligman, M.D.                                    April 28, 2021

```
 1   BY MR. PAUL:                                        01:33

 2       Q.   All right.  Dr. Heligman, we just took a   01:33

 3   short break.  We're back on the record.            01:33

 4            Are you all ready?                         01:33

 5       A.   I'm ready.                                 01:33

 6       Q.   Okay.  Great.                              01:33

 7            Are you familiar with the American         01:33

 8   Association of Railroads?                           01:33

 9       A.   Yes.                                       01:33

10       Q.   Okay.  What is that organization?         01:33

11       A.   It's an industry organization that        01:33

12   represents the interests of the freight rail       01:33

13   industry.                                          01:33

14       Q.   Okay.  And with -- to drill down on that a 01:33

15   little bit with respect to medical issues, does the 01:33

16   AAR -- are they involved with any medical issues?  01:34

17       A.   There is a Chief Medical Officer, a medical 01:34

18   committee under the risk management committee within 01:34

19   the AAR.                                            01:34

20       Q.   Okay.  And were you aware that -- well, let 01:34

21   me ask you:  Are you aware of any studies that     01:34

22   they've performed with respect to repetitive stress 01:34

23   injuries or cumulative trauma diseases?            01:34

24       A.   No.                                        01:34

25       Q.   Okay.  I think you testified earlier that 01:34
```

231

Craig Heligman, M.D.                                                    April 28, 2021

```
 1   the term "cumulative trauma disease," I believe, is      01:34
 2   no longer kind of in?                                    01:34
 3       A.    Right.  Their -- they don't really provide     01:34
 4   a replacement name, but the concept of cumulative or     01:34
 5   repetitive trauma really isn't something that is         01:34
 6   considered supported by most evidence-based              01:34
 7   practices.                                               01:34
 8       Q.    Okay.  Do you know who Mark Badders is?        01:35
 9       A.    Mr. Badders, I believe, was an industrial      01:35
10   hygienist that was a CSX employee some years ago         01:35
11   long before I came on the scene.                         01:35
12       Q.    Okay.  Who's in charge of Industrial           01:35
13   Hygiene in 2017 to the present, if you know?             01:35
14       A.    In 2017, Billy Bullock was the Director of     01:35
15   Industrial Hygiene.  I think a year ago we               01:35
16   transitioned his role, and Brooke Martin is the          01:35
17   current Director of Industrial Hygiene.  Billy is        01:35
18   serving a different function at this point in time.      01:35
19   He's still involved with Industrial Hygiene but          01:35
20   doesn't run the department.                              01:35
21       Q.    Okay.  And with respect to your job duties     01:35
22   from 2017 till now -- actually, strike that.             01:35
23           With respect to your job duties since            01:35
24   you've been at CSX, have you had any job duties with     01:35
25   respect to the prevention of repetitive stress           01:35
```

232

Craig Heligman, M.D.                                                April 28, 2021

```
 1    injuries in the union crafts or jobs?              01:36

 2         A.   I had no direct responsibility.  The     01:36

 3    Industrial Hygiene Group was moved under -- under  01:36

 4    me.  I believe it occurred in 2015 when I assumed  01:36

 5    the role of Chief Medical Officer, or it could have 01:36

 6    been shortly thereafter.                           01:36

 7         Q.   Okay.  Let me make sure I understood that 01:36

 8    correctly.  You're saying around about 2015, the   01:36

 9    Industrial Hygiene Group came under your           01:36

10    supervision?                                       01:36

11         A.   Correct.                                 01:36

12         Q.   Okay.  So what were your job duties with 01:36

13    respect to that more specifically over the         01:36

14    Industrial Hygiene Group?                          01:36

15         A.   Administrative oversight.  Dr. Bullock is 01:36

16    extremely knowledgeable.  There wasn't a lot of    01:36

17    supervision I had to do for him.  He -- he and his 01:36

18    team are responsible for the issues about ergonomics 01:36

19    and exposures, doing the measurements for noise    01:36

20    exposure, potential chemical exposures, air        01:37

21    monitoring, those kinds of things.                 01:37

22         Q.   Okay.  So when it comes to just -- I want 01:37

23    to ask you a more specific question.               01:37

24              Like, the -- assessing the risks of      01:37

25    repetitive injury to a machinist or a carman in    01:37
```

                                                                        233

Craig Heligman, M.D.                                    April 28, 2021

```
 1    Huntington or Russell, did you have any job duties      01:37
 2    with respect to that?                                   01:37
 3         A.    I had no direct involvement in that, no.     01:37
 4         Q.    Okay.  Would it be accurate to say that      01:37
 5    that's the job duties of the Industrial Hygiene          01:37
 6    Department or somebody else?                             01:37
 7         A.    Well, it was a combination of the             01:37
 8    Industrial Hygiene Group to review some of that          01:37
 9    information.  Bart Edgar also was involved.  He has      01:37
10    a Master's in Ergonomics.  He handled much of our       01:37
11    office ergonomics, was a participant on the tool        01:37
12    committee to look at -- that was one of the things      01:37
13    they would look at with acquisition of new tools for    01:37
14    was it -- excuse me -- ergonomically appropriate for    01:37
15    the job.  He helped design some tools in the field      01:37
16    and some carts.                                          01:38
17         So it was a combination of the Industrial           01:38
18    Hygiene team and Mr. Edgar.  He's, again, changed       01:38
19    roles over the years but has always been helpful in     01:38
20    the ergonomics area since that was his formal           01:38
21    education.                                               01:38
22         Q.    Okay.  Great.  Thank you.                     01:38
23         I want to switch topics a little bit.  I            01:38
24    think -- I can't remember if it was in today's          01:38
25    deposition or perhaps in maybe some testimony at the    01:38
```

234

Craig Heligman, M.D.                                          April 28, 2021

```
 1    hearing, but there was reference to a GS something      01:38
 2    or other, but there were three medical plans.          01:38
 3         Is that basically correct?                        01:38
 4    A.    I think you're referencing the National          01:38
 5    Health Plan under the union agreement.                 01:38
 6    Q.    Yeah.                                             01:38
 7    A.    There are -- United Health is the                 01:38
 8    administrator overall, but the employees have a         01:38
 9    choice of three different plans.  And one is            01:38
10    directly managed by United Health, one by Aetna, one   01:38
11    by Blue Cross Blue Shield.                              01:38
12    Q.    Okay.  And is it correct to say that those        01:39
13    are all employer-sponsored health plans?               01:39
14    A.    It's a negotiated issue, but the employer         01:39
15    does pay the insurance premium for the employees.      01:39
16    Q.    Okay.  And that's -- I understand that's          01:39
17    likely, if not certainly, part of the union            01:39
18    agreement, but is it correct to say that those         01:39
19    health plans, those three that you mentioned, are a    01:39
20    part of the employee benefits that CSX provides to     01:39
21    its employees?                                          01:39
22    A.    It's part of the union benefits that were        01:39
23    negotiated.                                             01:39
24    Q.    Okay.  So in other words -- and if I ask          01:39
25    you a question, I'm sure you'll tell me if you don't   01:39
```

235

Craig Heligman, M.D.                                                    April 28, 2021

```
 1    know the answer.  I think that was part of the      01:39

 2    ground rules before.                                01:39

 3          But in other words, like, the union crafts,   01:39

 4    like the plaintiffs in this case, would not have    01:39

 5    those medical benefits or that choice of those three 01:39

 6    medical benefit plans if they were not an employee  01:39

 7    of CSX; is that --                                  01:39

 8        A.    That is correct.                          01:39

 9        Q.    Okay.  So in that sense, the employee     01:39

10    benefits -- that is the health plan that we're      01:40

11    talking about now -- are not through the union.     01:40

12    They're through CSX?                                01:40

13        A.    Again, it's a negotiation with the union  01:40

14    membership.  It's different -- say, with our        01:40

15    management employees, we have an Aetna plan, and our 01:40

16    benefits team under Total Rewards manages that      01:40

17    relationship.                                       01:40

18          Labor Relations and the other railroads,      01:40

19    their Labor Relations teams bring in a negotiator   01:40

20    for some of these issues to actually negotiate at   01:40

21    the very top level between all of the railroads that 01:40

22    are participating in the national plan and all of   01:40

23    the unions that participate in the national plan,   01:40

24    and they negotiate what the plan should be.         01:40

25          So once that negotiation is completed, the    01:40
```

                                                                    236

Craig Heligman, M.D.                                                April 28, 2021

```
 1   employer -- in this case, our CSX employees -- CSX      01:40

 2   pays the premium under that agreement so that the       01:41

 3   union members may have their health benefit.  Again,    01:41

 4   it's completely a negotiated benefit at the very top    01:41

 5   level.                                                  01:41

 6       Q.   Okay.  All right.  Is there anyone that you    01:41

 7   supervise in the Medical Department that has job        01:41

 8   responsibilities with respect to those three health     01:41

 9   plans?                                                  01:41

10       A.   No, none of us has any responsibility with     01:41

11   regards to those health plans.                          01:41

12       Q.   You said it's administered by United           01:41

13   Healthcare, was it?                                     01:41

14       A.   That's correct.  I think that's the primary    01:41

15   third-party administrator for all three health          01:41

16   plans.                                                  01:41

17       Q.   After the plaintiffs in this case were         01:41

18   terminated, did your department -- or do you have       01:41

19   any knowledge about whether COBRA notices were          01:41

20   mailed out, if you know what that is?  And if not, I    01:41

21   can back up a step.                                     01:42

22       A.   No, I know what you mean by COBRA, but, no,    01:42

23   I don't know.                                           01:42

24       Q.   Okay.  That's not something that you're        01:42

25   involved -- you or your department's involved with?     01:42
```

Craig Heligman, M.D.                                              April 28, 2021

```
 1        A.   No, we are not involved in that.  That's    01:42

 2   correct.                                               01:42

 3        Q.   Okay.  And I know earlier you mentioned      01:42

 4   that there was something -- and also in the            01:42

 5   transcripts that we're going to look at later -- the   01:42

 6   $16,000 number stands out as the cost, I believe you   01:42

 7   said, to CSX per employee for 24 months or two years   01:42

 8   of health care benefits?  Is that --                   01:42

 9        A.   That's the number that was given to me,      01:42

10   yes.                                                   01:42

11        Q.   Okay.  And, again, if this isn't your area,  01:42

12   tell me, but that strikes me as a low number, you      01:42

13   know, $16,000 a year, based upon some of the           01:42

14   information I've seen that the railroad pays           01:42

15   premiums.                                              01:42

16        A.   Again, all I can say is that that's the      01:42

17   number that I remember seeing.  If it's different --   01:42

18   if it's different in the testimony I gave at any of    01:42

19   the -- any of the hearings, the information in that    01:43

20   transcript is going to be the most accurate.           01:43

21        Q.   Okay.  Yeah.  No, I'm -- I'm not suggesting  01:43

22   that, and I don't believe it is different.  I'm just   01:43

23   asking how -- where you got that information or how    01:43

24   it was calculated.                                     01:43

25        A.   Someone else calculated the information,     01:43
```

238

Craig Heligman, M.D.                                          April 28, 2021

```
 1   gave me the numbers to use for the purposes of the      01:43

 2   investigation.                                           01:43

 3       Q.    Okay.  And you don't remember who that is?    01:43

 4       A.    I -- I don't.                                  01:43

 5       Q.    Do you remember what department it came       01:43

 6   from?                                                    01:43

 7       A.    Not specifically, no.                          01:43

 8       Q.    Okay.  If you -- and, again, I don't want     01:43

 9   you to guess, but just based upon your knowledge of     01:43

10   how that happened, do you think it was the Labor        01:43

11   Relations Department that provided you that?            01:43

12           MS. FOSTER BIRD:  I'm going to object here.     01:43

13   Just put my objection on the record that if it came     01:43

14   through Legal or it was the Legal Department, that      01:43

15   would be something that would be protected within an    01:43

16   attorney/client or product privilege.  So to the       01:44

17   extent it could have come from Legal, I'll make that    01:44

18   objection.                                               01:44

19           MR. PAUL:  I understand your objection.  I      01:44

20   don't think you said that, though.  But, yeah --        01:44

21   yeah, I'm not --                                         01:44

22           MS. FOSTER BIRD:  Actually, earlier he said     01:44

23   he didn't know if it came from Legal or Labor           01:44

24   Relations.  He's gone through that earlier, and I       01:44

25   was giving you plenty of leeway to talk about that,     01:44
```

                                                                 239

| | | |
|---|---|---|
| 1 | but I do have to put -- | 01:44 |
| 2 | MR. PAUL:  Sure. | 01:44 |
| 3 | MS. FOSTER BIRD:  -- the objection on the | 01:44 |
| 4 | record. | 01:44 |
| 5 | MR. PAUL:  Oh, understood. | 01:44 |
| 6 | BY MR. PAUL: | 01:44 |
| 7 | Q.   Again, without guessing, but if you had to | 01:44 |
| 8 | make an educated opinion about where it came from, | 01:44 |
| 9 | do you think it was Labor Relations or you just | 01:44 |
| 10 | really don't know? | 01:44 |
| 11 | A.   I just don't remember.  It could have been | 01:44 |
| 12 | the Law Department.  It could have been Labor | 01:44 |
| 13 | Relations.  There were a lot of people involved in | 01:44 |
| 14 | discussions around this issue at that time, and I | 01:44 |
| 15 | just don't remember who actually did those | 01:44 |
| 16 | calculations. | 01:44 |
| 17 | Q.   Okay.  But it sounds like, from your | 01:44 |
| 18 | testimony, that those calculations were given to you | 01:44 |
| 19 | specifically for the hearings; is that correct? | 01:45 |
| 20 | A.   Yes. | 01:45 |
| 21 | Q.   Okay.  When did you first become aware of | 01:45 |
| 22 | those figures?  Just, like, a couple days before the | 01:45 |
| 23 | hearings, or was it earlier in the process? | 01:45 |
| 24 | A.   I don't remember the timing.  It was | 01:45 |
| 25 | prior -- certainly prior to the point where I had to | 01:45 |

240

| | | |
|---|---|---|
| 1 | be a witness at the investigation.  It was probably | 01:45 |
| 2 | at least a few days before that first -- first | 01:45 |
| 3 | appearance at a hearing.  But other than that, I | 01:45 |
| 4 | just don't remember the exact timing. | 01:45 |
| 5 |     Q.   All right. | 01:45 |
| 6 |        MR. PAUL:  Jeff, can we take a look at what | 01:45 |
| 7 | we'll mark as Exhibit 7, please? | 01:45 |
| 8 |        (Exhibit 7 was marked for identification and | |
| 9 | attached to the transcript (CONFIDENTIAL). | 02:05 |
| 10 |        MR. DINGWALL:  Should be there. | 01:45 |
| 11 |        MR. PAUL:  All right.  Looks good.  Thank | 01:45 |
| 12 | you. | 01:45 |
| 13 |        THE WITNESS:  Okay.  I have it. | 01:45 |
| 14 | BY MR. PAUL: | 01:45 |
| 15 |     Q.   Dr. Heligman, you have that? | 01:45 |
| 16 |     A.   Yes, sir. | 01:46 |
| 17 |        MR. PAUL:  Melissa? | 01:46 |
| 18 |        MS. FOSTER BIRD:  [Nods head.] | 01:46 |
| 19 | BY MR. PAUL: | 01:46 |
| 20 |     Q.   Okay.  All right.  This is a document that | 01:46 |
| 21 | we're marking as Exhibit 7, and it's a compilation | 01:46 |
| 22 | of Certificate of Ongoing Illness. | 01:46 |
| 23 |        Do you see that? | 01:46 |
| 24 |     A.   I do. | 01:46 |
| 25 |     Q.   Okay.  So I'm just going to go through and | 01:46 |

Craig Heligman, M.D.                                              April 28, 2021

| | | |
|---|---|---|
| 1 | ask you some questions about these.  And I know you | 01:46 |
| 2 | haven't seen them all, and if you need time at any | 01:46 |
| 3 | point to review these documents, just let me know. | 01:46 |
| 4 | But I imagine at this point in your career, you've | 01:46 |
| 5 | seen them a lot, many times. | 01:46 |
| 6 | So just using this first one as an example | 01:46 |
| 7 | for Mr. Adkins, and you can see this one is dated -- | 01:46 |
| 8 | or not dated -- excuse me -- at the top right corner | 01:46 |
| 9 | called "Carrier Exhibit E." | 01:46 |
| 10 | Is it just generally your understanding | 01:46 |
| 11 | that Certificate of Ongoing Illnesses were made an | 01:46 |
| 12 | exhibit at each of the plaintiffs' hearings? | 01:46 |
| 13 | A.   Yes. | 01:46 |
| 14 | Q.   Okay.  So if we were to take, like, a | 01:46 |
| 15 | spectrum of all the times, using one plaintiff as an | 01:47 |
| 16 | example, that you reviewed their Certificate of | 01:47 |
| 17 | Ongoing Illnesses, would it start when -- | 01:47 |
| 18 | Was it Kelly, the nurse? | 01:47 |
| 19 | A.   Yes. | 01:47 |
| 20 | Q.   -- or perhaps one of the other nurses first | 01:47 |
| 21 | brought this to your attention in June of 2017? | 01:47 |
| 22 | A.   Right.  That would have been the first time | 01:47 |
| 23 | I would have looked at this particular group of | 01:47 |
| 24 | COIIs. | 01:47 |
| 25 | Q.   Okay.  And then -- yeah, I don't know if | 01:47 |

242

Craig Heligman, M.D.                                                    April 28, 2021

```
 1   it's easier -- just -- maybe just go right along      01:47

 2   with it.  But when's the next time that you recall    01:47

 3   looking at the Certificate of Ongoing Illnesses for   01:47

 4   these plaintiffs?                                      01:47

 5       A.   I looked at the group of them on and off      01:47

 6   over the next few weeks.  I had to generate my        01:47

 7   spreadsheet to list them all to prepare for the       01:47

 8   outgoing letters, to prepare it for other             01:47

 9   individuals who were going to be reviewing the        01:47

10   information.  So it was kind of an intermittent       01:47

11   activity.                                             01:48

12       Q.   Okay.  And, again, I don't want to be        01:48

13   repetitive of what you said before, but when you --   01:48

14   when Kelly or perhaps one of the other nurses first   01:48

15   came to you in June of 2017, I think you testified    01:48

16   you checked a database that included past medical     01:48

17   records for each of the plaintiffs?                   01:48

18       A.   I did that after we collected a certain      01:48

19   number of these forms.  I don't remember exactly      01:48

20   when in the timing, but we had collected these        01:48

21   forms.  We continued to watch whether more were       01:48

22   coming in or not.                                      01:48

23            And so as I was preparing my list of cases,  01:48

24   I did go through the case management system and the   01:48

25   employee health records to see if there was other     01:48
```

                                                                             243

1   information that was present that was relevant to        01:48

2   the receipt of this COII.                                01:48

3       Q.    Okay.  I believe that the first date of        01:49

4   these is June 20th of 2017, so if we use that date       01:49

5   as an example, do you believe that you reviewed          01:49

6   these other medical records for the plaintiffs in        01:49

7   between June 20th of '17 and when you wrote the          01:49

8   letter to the Railroad Retirement Board, Fergus?         01:49

9       A.    Yes.                                           01:49

10      Q.    Okay.  It would have been in that window?      01:49

11      A.    Yes, sir.                                      01:49

12      Q.    Okay.  At any other time -- so in this         01:49

13  example, after the first letter to the Railroad          01:49

14  Retirement Board -- did you ever review any of the       01:49

15  employees' other medical records again?                  01:49

16      A.    I may have.  I don't remember.  But as we      01:49

17  wrote the first letter, we had the next group of         01:49

18  cases come in, so I would have focused on reviewing      01:49

19  those medical files.  And then the third group,          01:49

20  again, focusing on that group as they came in.           01:49

21  Whether that --                                          01:49

22      Q.    Okay.  Fair enough.  Yeah.                     01:49

23      A.    I couldn't say if I went back and looked at    01:49

24  any of the first set of cases again or not.              01:50

25      Q.    Okay.  No, let's -- let me ask a slightly      01:50

                                                                          244

```
 1   different question -- well, the same question, just    01:50

 2   different time frame.                                   01:50

 3        If we now make the period of time from            01:50

 4   June 20th of '17 to the date of the last or what I     01:50

 5   believe is the third letter to the Railroad            01:50

 6   Retirement Board, Fergus, did you ever review any of   01:50

 7   the plaintiffs' medical records outside of that        01:50

 8   period of time; in other words, after your third       01:50

 9   letter to the Railroad Retirement Board?               01:50

10      A.   Not that I recall with respect to this        01:50

11   case.                                                  01:50

12      Q.   Okay.  Actually, let me clarify that a        01:50

13   little bit just so it's clear.  Some -- in some of     01:50

14   the hearings, there were medical records other than    01:50

15   the COII that were presented in evidence.              01:50

16        Do you recall that?                               01:50

17      A.   Yes, some employees did present additional    01:50

18   information at the hearings, and the information       01:50

19   they presented was not in the medical records or in   01:50

20   the employee health record that I reviewed prior to   01:50

21   the hearing.  That's actually not an uncommon          01:51

22   occurrence.                                            01:51

23        So at the time that the hearing took place,      01:51

24   the employee submitted additional information.  That  01:51

25   additional medical information was not provided to     01:51
```

                                                              245

```
 1   me prior to the time of the investigation.          01:51
 2       Q.   And, I mean, I think I know the answer, but 01:51
 3   why is that?                                         01:51
 4       A.   It's the nature of the process.  The        01:51
 5   investigation is there to allow the employee to      01:51
 6   present their case.  It's an investigative hearing   01:51
 7   to determine whether or not the charge was correct   01:51
 8   or not, and the employee is allowed to be            01:51
 9   represented by a union official, they are allowed to 01:51
10   present new information, and they are allowed to     01:51
11   present witnesses.  And that's just the process.     01:51
12       Q.   Okay.  I was wrong.  I thought you were     01:52
13   going to say because it didn't exist; in other       01:52
14   words, that it's updated medical that               01:52
15   chronologically did not exist at the time that you   01:52
16   reviewed the database back in June of '17.           01:52
17            I mean, that's a possibility, too, right, I 01:52
18   suppose?                                             01:52
19       A.   That's always possible, but the reality is, 01:52
20   quite frankly, when we receive medical information,  01:52
21   we do not always receive medical information timely  01:52
22   to when the actual medical activity occurred.  We    01:52
23   may receive it months, if not years, after the fact. 01:52
24   And it just depends on the circumstances of whatever 01:52
25   the case is as to whether or not we receive it       01:52
```

```
 1   timely or not.                                  01:52

 2       Q.   Okay.  So let me go back to my original  01:52

 3   question so I can try to do a better job at making  01:52

 4   it a little clearer.  For the moment, I want to   01:52

 5   leave out any medical records that were presented at  01:52

 6   the hearing.                                     01:52

 7       A.   Okay.                                   01:53

 8       Q.   Okay.  So just looking at the period of  01:53

 9   time, the question is:  Did you review any       01:53

10   plaintiffs' medical records after that initial   01:53

11   review of the database in June of 2017 other than  01:53

12   what you may have looked at at the hearing?      01:53

13       A.   No, I reviewed the employee health record  01:53

14   for each of these cases, and no additional medical  01:53

15   records were submitted until the hearing.        01:53

16       Q.   Okay.  And what was the reason that you  01:53

17   looked in the database back in June -- I guess    01:53

18   potentially July -- but June or July of '17, what  01:53

19   was the reason that you looked in the database for  01:53

20   other medical records?                           01:53

21       A.   Really to get a familiarity with some of  01:53

22   the medical information we already had for these   01:53

23   employees.  Some employees we had virtually nothing  01:53

24   other than their employment physical.  Some we had  01:53

25   extensive records and COIIs and MD-3s.  Some had  01:54
```

                                                                        247

| | | |
|---|---|---|
| 1 | prior forms that were completed by the two | 01:54 |
| 2 | chiropractic providers, Dr. Carey and Dr. Johnson. | 01:54 |
| 3 | Some did not. | 01:54 |
| 4 | It was a very mixed group and not at all | 01:54 |
| 5 | out of the ordinary for what we do on a daily basis | 01:54 |
| 6 | when we see the employee's health record. | 01:54 |
| 7 | Q.    Okay.  And when you say the "employee | 01:54 |
| 8 | health record," is that, like, the medical file on | 01:54 |
| 9 | that particular employee? | 01:54 |
| 10 | A.    Yes, we collect the medical information and | 01:54 |
| 11 | place it in a digital folder, and the information | 01:54 |
| 12 | that we collect is driven by time of hire, what -- | 01:54 |
| 13 | you know, what exam was done, ongoing exams that may | 01:54 |
| 14 | be done, periodic receipt of COIIs, periodic receipt | 01:54 |
| 15 | of MD-3s.  Many times there'll be medical records | 01:54 |
| 16 | that are attached.  It could be a work injury.  It | 01:55 |
| 17 | could be an off-duty medical issue. | 01:55 |
| 18 | It's really highly variable.  Some of the | 01:55 |
| 19 | Collective Bargaining Agreements don't require the | 01:55 |
| 20 | same periodicity.  For the COIIs, we may not have | 01:55 |
| 21 | any information related to when they were off work | 01:55 |
| 22 | for medical reasons.  Some we have extensive | 01:55 |
| 23 | information.  So it really is a very -- a broad | 01:55 |
| 24 | variety of volume of information that may be in | 01:55 |
| 25 | their employee health record. | 01:55 |

248

Craig Heligman, M.D.                                                    April 28, 2021

```
 1        Q.   Okay.  The point, though, is that you were    01:55
 2   looking at the -- I don't want to say you actually      01:55
 3   reviewed every single document, but the point is did    01:55
 4   you review -- or did you get access to the entire       01:55
 5   medical file for that particular employee, one of       01:55
 6   the plaintiffs?                                         01:55
 7        A.   Yes.                                          01:55
 8        Q.   Okay.  So whether or not, you know -- I       01:55
 9   don't know -- did you go back and look at the           01:55
10   original fitness-for-duty exam upon hire?               01:55
11        A.   In some cases.  You know, when you have a     01:55
12   file that's a thousand pages, you're not probably       01:56
13   going to look at every page.  When you have a file      01:56
14   that has only the application exam, you're probably     01:56
15   just going to look at that.                             01:56
16        Q.   Yeah, understood.                             01:56
17             Was the purpose, though, to see whether the   01:56
18   treatment with the chiropractors was consistent with   01:56
19   the past medical history in the CSX medical file?       01:56
20        A.   Not so much consistency, but just to learn   01:56
21   if they had prior medical issues that we had           01:56
22   addressed.                                              01:56
23        Q.   And why was that important at that time of    01:56
24   June or July of 2017?                                   01:56
25        A.   It was to hopefully understand potentially   01:56
```

                                                                          249

Craig Heligman, M.D.                                                    April 28, 2021

```
 1   why we were receiving this volume of COIIs at that     01:56
 2   moment in time from that location and those two        01:56
 3   practitioners.  It's for my own education              01:56
 4   predominantly.                                         01:56
 5       Q.   Back in 2017, did you have an understanding   01:56
 6   of the approximate age groups of the workforce in      01:56
 7   Huntington or Russell?                                 01:56
 8       A.   No.                                           01:57
 9       Q.   Okay.  All right.  Taking a look at this      01:57
10   first page, and you'll see in the bottom right-hand    01:57
11   corner what are called Bates numbers.  I'm sure        01:57
12   you've come across that.  So if it's easier, I think   01:57
13   we should refer to that 5702 number --                 01:57
14          Do you see that?                                01:57
15       A.   Yes, I do.                                    01:57
16       Q.   -- as opposed to, like, Page 1 of 77.         01:57
17   That's probably a little less clear.                   01:57
18          Does that -- does that work for you?            01:57
19       A.   That works.                                   01:57
20       Q.   Okay.  So this form, up in the top left,      01:57
21   says Revision 9 of 2014; is that correct?              01:57
22       A.   Yes, that's correct.                          01:57
23       Q.   Okay.  And I know you mentioned earlier       01:57
24   that there's maybe been a couple changes to it         01:57
25   during your tenure at CSX; is that right?              01:57
```

250

Craig Heligman, M.D.                                                    April 28, 2021

```
 1        A.    That's correct.  The most recent revision    01:57
 2    was probably 2019.                                      01:57
 3        Q.    Okay.  But before 2019, say -- so from, to    01:57
 4    your knowledge, 2012 to 2018, to leave a little         01:57
 5    cushion, do you believe there was maybe a change or     01:57
 6    two in there?                                           01:58
 7        A.    There could have been.  I -- I don't          01:58
 8    remember the exact dates of when the form was           01:58
 9    revised.                                                01:58
10        Q.    Okay.  And does anything stand -- I           01:58
11    understand that you don't know the specific date,       01:58
12    but does any issue stand out about why the changes      01:58
13    were made that you have knowledge of?                   01:58
14        A.    For the 2019 revision, yes.  We wanted to     01:58
15    add some check boxes and some dates to match more of    01:58
16    how we collect the information on the MD-3s just for    01:58
17    consistency purposes.  That was the basic reason for    01:58
18    the changes.  Also we adjusted some of the              01:58
19    demographics, formatting it to make sure we got all     01:58
20    the information onto one page.                          01:58
21        Q.    Okay.  So in this form, it looks like         01:58
22    there's the top part that the employee fills out or     01:58
23    is expected that the employee would fill out, and       01:58
24    the bottom part is what the doctor fills out.           01:58
25            Is that a fair general statement?              01:58
```

                                                                        251

| | | |
|---|---|---|
| 1 | A. Yes. | 01:58 |
| 2 | Q. Okay. Now, in this form -- this CSX form | 01:58 |
| 3 | is asking for the last four numbers of the Social | 01:59 |
| 4 | Security Number. | 01:59 |
| 5 | Do you see where I read that? | 01:59 |
| 6 | A. I do. | 01:59 |
| 7 | Q. Okay. And it also asks the "Occupation" or | 01:59 |
| 8 | "Craft"; is that correct? | 01:59 |
| 9 | A. Yes. | 01:59 |
| 10 | Q. Okay. And this "F&O," do you know what | 01:59 |
| 11 | that stands for? | 01:59 |
| 12 | A. I believe that's fireman and oiler. | 01:59 |
| 13 | Q. Okay. Do you have -- do you have an | 01:59 |
| 14 | understanding of what that position does? | 01:59 |
| 15 | A. I don't have as full an understanding of | 01:59 |
| 16 | that role as I do some of the other positions. | 01:59 |
| 17 | Q. Okay. Under the "Division/Shop," I guess | 01:59 |
| 18 | that informs you that Mr. Adkins works in the | 01:59 |
| 19 | Huntington Heavy Repair; right? | 01:59 |
| 20 | A. Yes. | 01:59 |
| 21 | Q. And in the Mechanical Department; is that | 01:59 |
| 22 | correct? | 01:59 |
| 23 | A. Yes. | 01:59 |
| 24 | Q. Okay. Now, in this particular form, did | 01:59 |
| 25 | you ever consider looking at the job duties of the | 01:59 |

252

Craig Heligman, M.D.                                      April 28, 2021

```
 1   fireman/oiler, or was that not necessary?          01:59

 2        A.   For this purpose, it wasn't necessary.   02:00

 3        Q.   Okay.  And then in this example -- and I  02:00

 4   think you mentioned earlier that -- I believe your 02:00

 5   testimony was that a majority of the forms indicated 02:00

 6   that the incident leading to this treatment did not 02:00

 7   happen at work or it happened outside of work; is   02:00

 8   that correct?                                       02:00

 9        A.   Yes, that's correct.                      02:00

10        Q.   Okay.  So are you -- I know this seems     02:00

11   obvious, but are you referring to that first part   02:00

12   that the treating health care provider writes in?   02:00

13        In this case, "Picking up tree limbs at        02:00

14   home," is that what you were referring to?          02:00

15        A.   Yes.                                       02:00

16        Q.   Okay.  And did you at any time consider the 02:00

17   fact that a fireman and oiler, which I understand is 02:00

18   a labor position -- but my question is:  Did you     02:00

19   ever consider the job duties in determining whether  02:00

20   this was exclusively -- the treatment; I'm not       02:01

21   talking about the injury -- but the treatment with,  02:01

22   in this case, Dr. Carey was only related to picking  02:01

23   up the tree limbs or also work-related duties?       02:01

24        A.   It was not specified on this form.         02:01

25        Q.   Okay.  So that's one way of answering it,  02:01
```

253

Craig Heligman, M.D.                                    April 28, 2021

```
1    and I appreciate that.                         02:01

2          So this form does not call for the employee   02:01

3    or the health care provider's assessment of whether  02:01

4    it's work-related or non-work-related; is that   02:01

5    correct?                                        02:01

6       A.   Yes, that's correct.                    02:01

7       Q.   Okay.  And I'm sure you're familiar with a  02:01

8    lot of forms for, perhaps, Workers' Comp or other   02:01

9    reasons where there is a box that says, "Is this   02:01

10   work-related or not?"  Right?                    02:01

11      A.   Right.  Health insurance forms may have   02:01

12   that as well.  Every state has a different form that  02:01

13   potentially is sent to the state.               02:01

14      Q.   So I guess if it's not indicated on the   02:02

15   form, I guess my question is:  Did you consider   02:02

16   that, in this case, Mr. Adkins' treatment with   02:02

17   Dr. Carey is both related to the tree limbs at home   02:02

18   and also as a result of his duties as a fireman and   02:02

19   oiler?                                          02:02

20      A.   No, I did not consider that.  I pretty much   02:02

21   accepted this at face value that the reason that   02:02

22   Mr. Adkins was seeing Dr. Carey was because he had   02:02

23   some injury related to picking up tree limbs at   02:02

24   home.                                           02:02

25      Q.   Okay.  And I don't want to go through, you   02:02
```

                                                        254

Craig Heligman, M.D.                                                    April 28, 2021

```
 1    know, all of these terms, but just looking at the      02:02

 2    "Diagnosis and Concurrent Conditions," what does       02:02

 3    that mean to you, just in a nutshell?                   02:02

 4          Like, what is that -- what's your                 02:02

 5    interpretation of what the -- Dr. Carey wrote under     02:02

 6    "Diagnosis and Concurrent Conditions"?                  02:02

 7       A.    Low back pain and leg pain.                    02:02

 8       Q.    Okay.  And are those -- I'm sorry.  I'm        02:02

 9    sorry.  Go ahead.                                       02:02

10       A.    [Inaudible.]                                   02:03

11       Q.    Okay.  Yeah.                                   02:03

12          And then what are those codes next to the         02:03

13    terminology like "Sciatica" and "Lumbar" -- whatever   02:03

14    it says there?                                          02:03

15       A.    Those would be ICD-9 codes.  The ICD-9 code    02:03

16    system was retired and replaced by the ICD-10, which   02:03

17    has a completely different format.                      02:03

18       Q.    These are billing codes for insurance         02:03

19    purposes?                                               02:03

20       A.    They're not billing codes.  They're           02:03

21    diagnostic codes.  It's the International               02:03

22    Classification of Diseases, I think, is what "ICD"      02:03

23    actually stands for.  It's to be used essentially as    02:03

24    a worldwide reference for consistency of labeling       02:03

25    and identifying diagnoses.                              02:03
```

255

Craig Heligman, M.D.                                                April 28, 2021

```
 1        Q.    Okay.  Now, this bottom part, where it says   02:03
 2   "Duration of Care" for Mr. Adkins, states April 21st      02:03
 3   of '17 through June 21st of 2017.                          02:03
 4        Do you see that?                                      02:03
 5        A.    I do.                                           02:03
 6        Q.    Okay.  And so did you give any weight to        02:03
 7   the fact that the duration of the care starting in         02:04
 8   April of 2017 was before any of the plaintiffs were       02:04
 9   made aware of the potential layoffs or job                 02:04
10   abolishment?                                               02:04
11        A.    Restate that for me, if you wouldn't mind.     02:04
12        Q.    Sure.                                           02:04
13        Did you give any weight or consideration to          02:04
14   the fact that, in this case, Mr. Adkins started           02:04
15   treating with Mr. Carey in April of 2017, before          02:04
16   there was any notification of the layoffs or job           02:04
17   abolishments, which I believe was in June of 2017?        02:04
18        A.    Okay.  The answer is no.  We were focused      02:04
19   on the date that we received the document, and the        02:04
20   date that Dr. Carey signed this was 6/21/17, which         02:04
21   is consistent with the volume of documents that we       02:04
22   received June 20th, June 21st.                             02:05
23        But, no, I wasn't really looking at their            02:05
24   start date at that moment in time.                         02:05
25        Q.    Okay.  Now, that's a good point.  Let me --    02:05
```

256

Craig Heligman, M.D.                                        April 28, 2021

```
 1        Q.   Okay.  Now, this bottom part, where it says   02:03
 2   "Duration of Care" for Mr. Adkins, states April 21st    02:03
 3   of '17 through June 21st of 2017.                        02:03
 4        Do you see that?                                    02:03
 5        A.   I do.                                          02:03
 6        Q.   Okay.  And so did you give any weight to       02:03
 7   the fact that the duration of the care starting in       02:04
 8   April of 2017 was before any of the plaintiffs were      02:04
 9   made aware of the potential layoffs or job               02:04
10   abolishment?                                             02:04
11        A.   Restate that for me, if you wouldn't mind.     02:04
12        Q.   Sure.                                          02:04
13        Did you give any weight or consideration to        02:04
14   the fact that, in this case, Mr. Adkins started          02:04
15   treating with Mr. Carey in April of 2017, before         02:04
16   there was any notification of the layoffs or job         02:04
17   abolishments, which I believe was in June of 2017?       02:04
18        A.   Okay.  The answer is no.  We were focused      02:04
19   on the date that we received the document, and the       02:04
20   date that Dr. Carey signed this was 6/21/17, which       02:04
21   is consistent with the volume of documents that we       02:04
22   received June 20th, June 21st.                           02:05
23        But, no, I wasn't really looking at their          02:05
24   start date at that moment in time.                       02:05
25        Q.   Okay.  Now, that's a good point.  Let me --    02:05
```

256

Craig Heligman, M.D.                                              April 28, 2021

```
 1    let me clarify this so we're perfectly clear.  What    02:05
 2    I actually read from was the "Duration of Care,"       02:05
 3    right, starting in April 21st of 2017 through          02:05
 4    June 21st of '17.                                       02:05
 5         Do you see where I read that?                      02:05
 6    A.    Yes.                                              02:05
 7    Q.    "Duration of Care" doesn't mean that             02:05
 8    Mr. Adkins cannot work; correct?                        02:05
 9    A.    That's correct.                                   02:05
10    Q.    Okay.  So I think what's more important to        02:05
11    drill down on is the next question:                     02:05
12              "[From] the most recent episode               02:05
13               of care within the total                     02:05
14               duration of care noted above,                02:05
15               what dates or date range was                 02:05
16               the employee unable to work?"                02:05
17         Do you see where I read that?                      02:05
18    A.    Yes.                                              02:05
19    Q.    Okay.  So similar question, but did you          02:05
20    give any consideration to the fact that Mr. Adkins     02:05
21    has been unable to work, according to Dr. Carey,       02:05
22    dating back to April 2000- -- excuse me --             02:06
23    April 21st of 2017, prior to any notification of       02:06
24    upcoming layoffs?                                       02:06
25    A.    I would have considered it, but, again, I        02:06
```

257

Craig Heligman, M.D.                                              April 28, 2021

```
 1   was more focused on the document timing, when we        02:06
 2   received it.  Since I had no awareness that the         02:06
 3   employee was off work starting in April, I was only     02:06
 4   made aware of that when we received this document in     02:06
 5   June.  And, again, it doesn't state when Mr. Adkins      02:06
 6   was picking up the tree limbs at home.  Maybe he        02:06
 7   went in for treatment a month after the event.  It      02:06
 8   doesn't state.                                          02:06
 9          So although the time frame is helpful in         02:06
10   some respects, it's not necessarily very precise.       02:06
11   And so the focus for me was the receipt of the          02:06
12   documents from that large group of people first on      02:06
13   the June 20th, June 21st time period and then with      02:07
14   the subsequent three, four weeks.                       02:07
15      Q.   Okay.  But when it comes to the issue of        02:07
16   suspected fraud for Mr. Adkins, would you agree that    02:07
17   the fact that he is treating with Dr. Carey in April    02:07
18   of 2017 and unable to work since April of 2017 would    02:07
19   not be suspicious?                                      02:07
20      A.   I honestly don't know how to answer that        02:07
21   question.  I don't know what Dr. Carey or what          02:07
22   Mr. Adkins knew at that point in time.  I can just      02:07
23   respond to what I knew of.                              02:07
24          [Technical interruption.]                        02:07
25          THE WITNESS:  Did we lose him?                   02:07
```

258

```
 1              THE REPORTER:  I think we did.           02:07

 2              MR. PAUL:  Sorry.  I lost you there.  I'm   02:08

 3    not sure why.  I just touched my ear bud and I went  02:08

 4    down.                                             02:08

 5    BY MR. PAUL:                                       02:08

 6       Q.   So -- I'm sorry -- do you remind repeating  02:08

 7    your answer?  Or I can ask the question again.  I  02:08

 8    just didn't hear it.                              02:08

 9       A.    No, I was making a statement that I wasn't  02:08

10    focused on the time period prior to June 20th,     02:08

11    June 21st.  I don't know what Mr. Adkins knew or   02:08

12    didn't know.  I don't know what Dr. Carey did or   02:08

13    didn't know.  It was just a matter of we received  02:08

14    this document in that time frame.                 02:08

15              So the relevance of the period of        02:08

16    treatment, it is what it is.  It's -- I accept that  02:08

17    he was under treatment from 4/21/17 to 6/21/17, and  02:08

18    at this time, it was expected he would be able to  02:08

19    return to work approximately on August 21st of that  02:08

20    year.  That's all I have.  Again, I take this      02:08

21    information for face value.                        02:09

22       Q.   Okay.  So, yeah, there's -- you did not    02:09

23    think, like, that April date was incorrect or have  02:09

24    any reason to believe that that was altered; is that  02:09

25    correct?                                          02:09
```

259

| | | |
|---|---|---|
| 1 | A.    That's correct. | 02:09 |
| 2 | Q.    Okay.  But I guess I'm just having a little | 02:09 |
| 3 | trouble understanding if -- if the reason that you | 02:09 |
| 4 | were suspicious of fraudulent activity was in order | 02:09 |
| 5 | to get out of a layoff or a job abolishment and if | 02:09 |
| 6 | it's true that Mr. Adkins and the other people were | 02:09 |
| 7 | not informed of a job layoff until June of 2017, | 02:09 |
| 8 | would you agree that there's nothing suspicious | 02:09 |
| 9 | about him being off of work in April of 2017 for the | 02:09 |
| 10 | purpose of avoiding a layoff and to extend benefits? | 02:09 |
| 11 | A.    If this was the only form that I saw, the | 02:09 |
| 12 | answer to your question is no, I would find nothing | 02:09 |
| 13 | suspicious about the form or the time period. | 02:09 |
| 14 | Q.    And Mr. Adkins would be in the clear, then, | 02:09 |
| 15 | when it comes to being accused of fraudulent | 02:10 |
| 16 | activity if he was an individual? | 02:10 |
| 17 | A.    Again, if this was the only form I looked | 02:10 |
| 18 | at, you are -- I would say yes to your -- to your | 02:10 |
| 19 | question, but it wasn't.  It was one of 70 or so | 02:10 |
| 20 | cases that came in in a similar time frame. | 02:10 |
| 21 | And so that was the suspicious event, not | 02:10 |
| 22 | that we received a COII from any particular employee | 02:10 |
| 23 | or any particular physician or provider or any | 02:10 |
| 24 | particular location, for that matter.  It was the | 02:10 |
| 25 | entirety of the volume from employees in this | 02:10 |

260

Craig Heligman, M.D.                                        April 28, 2021

```
 1    location from these two specific practitioners.    02:10

 2        Q.   Okay.  So as we go through and look at    02:10

 3    these individual CIOO[sic] forms, is your testimony  02:10

 4    going to be the same, that there was nothing       02:10

 5    suspicious on any one individual CIO[sic] form of   02:10

 6    the plaintiffs?                                     02:10

 7        A.   That would be correct.                     02:10

 8        Q.   Okay.  And I know you testified earlier    02:10

 9    that I think you had called one of the             02:10

10    chiropractors, and I believe it was Dr. Johnson --  02:11

11    or attempted to call him; is that right?           02:11

12        A.   That's correct, but not in association with 02:11

13    this particular issue.                             02:11

14        Q.   Correct.  Okay.  Yeah.                     02:11

15             But it was not Dr. Carey.  It was         02:11

16    Dr. Johnson?                                        02:11

17        A.   That's correct.                            02:11

18        Q.   Okay.  And is it your testimony that you   02:11

19    did not attempt to reach out to Dr. Carey or       02:11

20    Dr. Johnson with respect to any of the plaintiffs in 02:11

21    this case?                                          02:11

22        A.   That is correct.                           02:11

23        Q.   Okay.                                      02:11

24             MS. FOSTER BIRD:  Hey, Greg.  I need five   02:11

25    minutes whenever you get to a good place to stop.   02:11
```
                                                            261

| | | |
|---|---|---|
| 1 | MR. PAUL:  Good as any. | 02:11 |
| 2 | MS. FOSTER BIRD:  All right.  Let's do it. | 02:11 |
| 3 | Let's take five minutes.  Just let me go run to the | 02:11 |
| 4 | restroom. | 02:11 |
| 5 | MR. PAUL:  Of course. | 02:11 |
| 6 | THE VIDEOGRAPHER:  Off the record at | 02:11 |
| 7 | 2:11 p.m. | 02:11 |
| 8 | (Recess taken.) | 02:16 |
| 9 | THE VIDEOGRAPHER:  Back on the record at | 02:16 |
| 10 | 2:16 p.m. | 02:16 |
| 11 | MR. PAUL:  All right.  Great. | 02:16 |
| 12 | BY MR. PAUL: | 02:16 |
| 13 | Q.  If we could look at the next document, | 02:16 |
| 14 | we're just going to go in order.  So it'll be Bates | 02:16 |
| 15 | No. 5776 for Bobby Akers. | 02:16 |
| 16 | Do you have that in front of you? | 02:16 |
| 17 | A.  I do. | 02:16 |
| 18 | Q.  Okay.  Now, this form, at the top left, | 02:16 |
| 19 | appears to say "Revision" -- it looks like April of | 02:16 |
| 20 | 2013 to me, but I can't be sure. | 02:16 |
| 21 | Does that seem right to you? | 02:16 |
| 22 | A.  Yes. | 02:16 |
| 23 | Q.  Okay.  So one thing that stands out as | 02:16 |
| 24 | different to me is that it's requesting the complete | 02:16 |
| 25 | Social Security Number rather than the last four | 02:16 |

                                                        262

Craig Heligman, M.D.                                                    April 28, 2021

```
 1   digits.                                          02:16

 2          Do you see that?                          02:16

 3      A.   I do.  It's blacked out, but I think you 02:17

 4   are correct.                                     02:17

 5      Q.   Okay.  At least that's a different form  02:17

 6   from Mr. Adkins' form that we just looked at a   02:17

 7   moment ago?                                      02:17

 8      A.   Right.  I believe earlier I stated that we 02:17

 9   received many different iterations of this form. 02:17

10   The employees don't always use the most recent form, 02:17

11   which we would prefer they do, but they don't always 02:17

12   do that.                                         02:17

13      Q.   Okay.  Got it.                            02:17

14          Is this -- if you know, how does an       02:17

15   employee have access to these forms?            02:17

16          Is it online or something?                02:17

17      A.   They're located on our Employee Gateway. 02:17

18   Also all employees have access the Gateway.  They 02:17

19   can print it out.  They can ask a supervisor to  02:17

20   print it out for them.  Honestly, some of the older 02:17

21   forms you can Google and find them.  Some of the 02:17

22   union offices have copies of them for distribution. 02:17

23      Q.   Okay.  In this case, Mr. Akers, he's      02:17

24   identifying his position as a "Carman/Painter."  02:17

25          Do you know what the duties of a          02:18
```

263

```
 1   carman/painter are?                              02:18

 2        A.    That one's pretty straightforward.  Carmen  02:18

 3   are the individuals that were to repair the actual  02:18

 4   cars -- the train cars, not the locomotives.  And  02:18

 5   then as a painter, he'd be responsible for also   02:18

 6   doing painting of those -- of that equipment.     02:18

 7        Q.    Okay.  Based upon your knowledge of the  02:18

 8   duties of a carman and painter, would you agree that  02:18

 9   those involve repetitive movements?               02:18

10        A.    No.                                    02:18

11        Q.    Okay.  What -- why do you believe a    02:18

12   carman's duties are not repetitive in nature?     02:18

13        A.    Well, for clarification, you need to define  02:18

14   what you mean by "repetitive."  So if you're looking  02:18

15   at the issue of the alleged repetitive or cumulative  02:18

16   trauma, the literature states that the repetition  02:18

17   cycle -- forgive me.  It's been a long time since  02:19

18   I've looked at this.                              02:19

19        The repetition cycle has to be at least      02:19

20   twice a minute for it to be considered repetitive,  02:19

21   at a minimum, and we don't really have jobs where  02:19

22   these movements occur at a repetition rate or cycle  02:19

23   rate of two times a minute for the duration of an  02:19

24   entire work shift.  It doesn't occur.  Our         02:19

25   individuals will perform a task; they may stop; they  02:19
```

264

USCA4    1213

```
 1    may rest; they may take their required breaks.        02:19

 2            So it doesn't meet the clinical definition    02:19

 3    or the research definition of "repetitive."           02:19

 4       Q.   Okay.  Is it your testimony, then, that all   02:19

 5    of the plaintiffs in this case -- that the job        02:19

 6    duties were not repetitive under that definition of   02:19

 7    two repetitions a minute?                             02:19

 8       A.   That's correct.                               02:19

 9       Q.   Okay.  And your basis of that is -- I'm       02:19

10    sorry.  Did you mention a study or -- or a source?    02:19

11       A.    There is a book published by NIOSH           02:20

12    called -- it's -- the Yellow Book is how we define    02:20

13    it.  There's a couple of other research articles.     02:20

14    And, you know, we're talking about this subject       02:20

15    today, but there are several other articles that      02:20

16    will define the parameters of the use of extremities  02:20

17    for work, repetition being only one item.             02:20

18            You also have to do it over the course of a   02:20

19    duration.  So it is at least half a shift of          02:20

20    continuing to do this -- do this motion.  What are    02:20

21    the forces involved?  Is it high force, low force?    02:20

22    And there's some cutoffs in the research for that     02:20

23    that I don't recall offhand.  There's vibration.      02:20

24    There's also issues of awkward posture.               02:20

25            So when you're doing a forceful,              02:20
```

265

```
 1    quote-unquote, "repetitive activity" in an awkward      02:20
 2    angle for a long duration of time, then you're more     02:21
 3    likely to report musculoskeletal symptoms -- not        02:21
 4    necessarily identify injury, but symptoms.              02:21
 5            For the shorter issues that don't meet          02:21
 6    those -- that level of criteria, then it really         02:21
 7    doesn't even fall under the rubric of cumulative or     02:21
 8    repetitive trauma.  It just doesn't -- it doesn't       02:21
 9    meet the definition.  And our jobs -- typically we      02:21
10    have enough breaks in place.                            02:21
11            Our jobs may have some element of               02:21
12    repetition.  It may have some element of force.  It     02:21
13    may have some element of duration.  But typically we    02:21
14    don't see that combination of factors for a long       02:21
15    period of time on a sustained basis for our jobs.      02:21
16    This is not assembly line, typically.  It's not meat    02:21
17    packing.  So we don't see that kind of job in our       02:21
18    work environment.                                       02:22
19        Q.    Okay.  So just let me clarify two points,     02:22
20    if I may.  One is that definition of two repetitions    02:22
21    a minute comes from the NIOSH Yellow Book.              02:22
22            Did I understand that correctly?                02:22
23        A.    I believe it's stated there, but I don't      02:22
24    recall for sure.  Again, I wasn't fully prepared to     02:22
25    respond to these issues.  But there are other           02:22
```

266

Craig Heligman, M.D.                                                    April 28, 2021

```
 1   research articles that would define it, and I         02:22

 2   believe the cutoff was at least two cycles per        02:22

 3   minute.                                               02:22

 4       Q.   Is the NIOSH Yellow Book something that you  02:22

 5   use in the regular course of your job duties at CSX?  02:22

 6       A.   It's a reference that's available.  It's     02:22

 7   online.  Anyone can look at it.                       02:22

 8       Q.   Okay.                                        02:22

 9       A.   I was actively engaged when they published   02:22

10   it, and there are some good points about it and some  02:22

11   not so good points about it.                          02:22

12       Q.   Okay.  Would you agree that the fact that    02:22

13   if any one of the plaintiffs did not meet the         02:22

14   definition of "repetition," as you've described it,   02:22

15   does not mean that they don't suffer aches and pains  02:22

16   that require the treatment from a chiropractor?       02:23

17       A.   Not every ache and pain requires the         02:23

18   treatment of a chiropractor.  It's really up to the   02:23

19   patient or the person to decide when it's sufficient  02:23

20   to seek medical treatment.                            02:23

21            They also have a choice of seeing someone    02:23

22   that provides chiropractic services.  They can see    02:23

23   an osteopathic provider.  They can see an allopathic  02:23

24   provider.  They can be referred for a physical        02:23

25   therapist.  They can go to a massage therapist.  For  02:23
```

                                                                          267

Craig Heligman, M.D.                                    April 28, 2021

```
 1    nonspecific musculoskeletal complaints, there are a     02:23

 2    whole host of providers that one may choose to see      02:23

 3    and seek care from.                                     02:23

 4        Q.   Right.  And that -- that consideration of      02:23

 5    receiving treatment in any one of the manners that      02:23

 6    you mentioned, including a chiropractor, is separate    02:23

 7    from a determination of whether they meet the           02:23

 8    definition of "repetitive" under NIOSH's               02:23

 9    definition -- "repetition" under NIOSH's definition?    02:23

10        A.   That's correct.  Not every ache and pain       02:23

11    would meet the definition of two cycles per minute      02:24

12    of duration, et cetera.                                 02:24

13        Q.   All right.  Looking at this Certificate of     02:24

14    Ongoing Illness, are you able to identify, based        02:24

15    upon your review of it, whether Mr. Akers was           02:24

16    treating with Dr. Johnson for a work-related,           02:24

17    non-work-related symptoms, or a combination of both?    02:24

18        A.   It's not stated whether it's work-related      02:24

19    or not work-related.  I mean, really this issue has     02:24

20    been addressed.  And I think every one of these         02:24

21    cases were submitted through proper channels for        02:24

22    review by OSHA, and a hundred percent of them, to my    02:24

23    knowledge, were turned back from OSHA saying these      02:24

24    weren't work-related issues.  So --                     02:24

25        Q.   I appreciate your elaboration.  My question    02:24
```

268

```
 1   was a little different, which is:  Just looking at    02:25
 2   this form, which you reviewed back in June of 2017,   02:25
 3   is there anything on this form that informs you        02:25
 4   whether Mr. Akers was treating with Mr. Johnson for   02:25
 5   work-related, non-work-related symptoms, or a         02:25
 6   combination of both?                                  02:25
 7        A.   It does not state.                          02:25
 8        Q.   Okay.  And then if we look at the "Duration 02:25
 9   of Care" and the date range of the employee being     02:25
10   unable to work, do you see where it says -- it looks  02:25
11   like a 9 to me, September, perhaps, 12th of '16       02:25
12   through present, and then it has a date, July 6th of  02:25
13   2017.                                                 02:25
14        Do you see where I read that?                    02:25
15        A.   Yes.                                        02:25
16        Q.   Okay.  And, you know, maybe after we        02:25
17   establish this, we won't have to do it in every one,  02:25
18   but similar to where we looked at Mr. Adkins, if you  02:25
19   were looking at this COII and Mr. Akers as            02:25
20   information as an individual, there's nothing         02:25
21   suspicious about the dates of treatment or the date   02:26
22   he was unable to work; is that correct?               02:26
23        A.   There's nothing suspicious on the form.     02:26
24   The only comment I would make -- we discussed this    02:26
25   earlier -- is this is a fairly prolonged time period  02:26
```

269

Craig Heligman, M.D.                                                           April 28, 2021

```
 1   to be receiving care only from a chiropractic        02:26
 2   provider for these medical conditions.               02:26
 3        Q.    Okay.  Now there's a question about that.  02:26
 4             I believe in one of the hearings, you'd    02:26
 5   testified -- you know, I don't have it right in      02:26
 6   front of me, but we'll get to it tomorrow -- but are 02:26
 7   there -- my question is:  Are there a certain        02:26
 8   standard or range of treatments that most insurance  02:26
 9   companies permit with a chiropractor?                02:26
10             Does that make sense, that question?  I can 02:26
11   try it again if it doesn't.                          02:26
12        A.    Let me take a shot at it.  The insurance  02:26
13   companies are responsible for determining which     02:26
14   practitioners are in their network or out of their  02:26
15   network for reimbursement purposes.  The insurance  02:26
16   companies also would expect a practitioner to work  02:27
17   within the scope of their practice and what is      02:27
18   allowed under their license.                         02:27
19             So in response to the question, the       02:27
20   insurance company would expect a chiropractic       02:27
21   provider to deliver chiropractic care and work      02:27
22   within that scope of their -- work within the scope 02:27
23   of which their license allows them to do so.        02:27
24   There's no expectation that Dr. Johnson would be    02:27
25   performing surgery on these individuals.  It's      02:27
```

                                                                                   270

Craig Heligman, M.D.                                      April 28, 2021

1    highly doubtful that an insurance company would         02:27

2    reimburse Dr. Johnson to perform surgery.               02:27

3         Does that kind of answer the question?             02:27

4         Q.   It -- it does, you know, and I really do      02:27

5    appreciate the thoroughness of that.  And I just        02:27

6    didn't ask my question in a specific enough way, but    02:27

7    that was helpful.                                        02:27

8         The question I was trying to ask was:  Do          02:27

9    insurance companies only approve a certain number of    02:28

10   treatments with a chiropractor in any given period      02:28

11   of time, whether that's a calendar year or 12-month     02:28

12   period?                                                 02:28

13        A.   Most insurance companies do, yes.             02:28

14        Q.   Okay.  And are you familiar with what the     02:28

15   three insurance companies that the railroaders --       02:28

16   that are provided through CSX, do you know what that    02:28

17   range is -- or not range, but a specific number of      02:28

18   treatments that's permitted?                            02:28

19        A.   I don't know the specific number.  I can      02:28

20   tell you that, in my experience, it's generally been    02:28

21   22 visits.  But, again, insurance companies vary.       02:28

22   It depends on how the benefits have been negotiated.    02:28

23        Q.   And that has to do with the payment of the    02:28

24   treatment; correct?                                     02:28

25        A.   Right.  So if the insurance company --        02:28

                                                                 271

```
 1   let's say the individual's maxed out their number of    02:28
 2   visits under their insurance plan.  There's nothing     02:28
 3   that would prevent the patient from continuing to       02:28
 4   see that provider and pay out of pocket.                02:28
 5        Q.   Right.  Exactly.                              02:29
 6             Okay.  And that's -- there's no policy or     02:29
 7   anything at CSX that interferes with an employee who    02:29
 8   wants to get chiropractic treatment in excess of        02:29
 9   what's paid for by one of the three insurance           02:29
10   companies; is that correct?                             02:29
11        A.   That's correct.  We would have no in- -- no   02:29
12   influence on that at all.  The person may seek care     02:29
13   from whatever provider they choose and see them for     02:29
14   as long as they choose.                                 02:29
15        Q.   Okay.  With respect to the two individuals    02:29
16   that we've talked about so far, when you went back      02:29
17   and looked at their medical file back in June or        02:29
18   July of 2017, you did not keep any notes or charts      02:29
19   or anything about whether -- about that at all, did     02:29
20   you?                                                    02:29
21        A.   The only notes I kept would have been in      02:29
22   one of the other exhibits.  There's a column where      02:29
23   I'd entered some notes, talked about perhaps what       02:30
24   the medical issue was or how long they may have been    02:30
25   seeking -- seeing the provider.  That's the extent      02:30
```

                                                                272

Craig Heligman, M.D.                                          April 28, 2021

```
1    of my notes for these cases.                    02:30
2        Q.   Okay.  And that was an exhibit earlier  02:30
3    today that you had -- that was attached to       02:30
4    an e-mail?                                        02:30
5        A.   Yes.                                     02:30
6        Q.   Okay.  Those are the only notes that you 02:30
7    kept?                                             02:30
8        A.   That's correct.                          02:30
9        Q.   Okay.  All right.  If we go to the next  02:30
10   page, please, Bates No. 5755.  This actually looks 02:30
11   like another one for Mr. Akers.  I don't know why 02:30
12   that's in here twice, so we'll go to the next page 02:30
13   for Chad Dowdy, which is Bates No. 5709.          02:30
14       A.   Yes.                                     02:30
15       Q.   This also appears to be a form that -- the 02:30
16   CSX form requests a Social Security Number; is that 02:30
17   correct?                                          02:30
18       A.   Yes.                                     02:30
19       Q.   Now, granted this one appears -- I don't 02:30
20   know at what point it was blacked out or if somebody 02:31
21   attempted to black it out.                        02:31
22           Do you see where it says his craft -- I'm  02:31
23   sorry.  Go ahead.                                 02:31
24       A.   Yeah, I don't know either, but, again, I'll 02:31
25   just point out this is also the 2013 revision.   02:31
```

273

```
 1        Q.   Correct.  Okay.                        02:31
 2             Now, do you have an understanding of what a  02:31
 3   utility worker does?                             02:31
 4        A.   Again, they're -- they would do some -- I'm  02:31
 5   not as familiar with the full spectrum, but they  02:31
 6   don't have a fully defined scope.  They may be --  02:31
 7   they're kind of a -- what am I trying to say? --  02:31
 8   utility player on a baseball team.  They can play  02:31
 9   many positions.                                  02:31
10        Q.   Okay.  And does this form inform you of any  02:31
11   basis for Mr. Dowdy's treatment with Dr. Johnson  02:31
12   that the symptoms that he was experiencing were  02:31
13   work-related, non-work-related, or a combination of  02:31
14   both?                                            02:31
15        A.   Makes no statement.                    02:31
16        Q.   Okay.  Did you -- now, in this case, the  02:32
17   treatment range appears to start on June 19th, and  02:32
18   looks like his estimated return unrestricted work  02:32
19   date is two months later on August 19th of 2017.  02:32
20             Do you see that?                       02:32
21        A.   Yes, I do.                             02:32
22        Q.   Okay.  Do you have any understanding of the  02:32
23   basis for that estimated return-to-work date?  First  02:32
24   based on this form, and then I'll ask you in     02:32
25   general.  But based on this form..?              02:32
```

274

Craig Heligman, M.D.                                              April 28, 2021

```
 1        A.   No, this is a form that's -- again, this      02:32

 2   section is completed by the provider, so you'd have     02:32

 3   to ask Dr. Johnson that question.                       02:32

 4        Q.   Okay.  Do you have an understanding, based    02:32

 5   on your, you know, education and experience as a        02:32

 6   doctor or otherwise, that chiropractic treatment for    02:33

 7   a month or two months -- is that standard?              02:33

 8        A.   I'm going to answer -- if it's okay, answer   02:33

 9   that question two ways.                                 02:33

10        Q.   Sure.                                         02:33

11        A.   If you look at the evidence-based            02:33

12   recommendations for chiropractic care, typically it    02:33

13   is delivered early in injury, for the most part, not   02:33

14   always, but you're looking for improvement in the      02:33

15   symptoms and the medical condition in the first two    02:33

16   to three visits.                                        02:33

17             And there's an expectation that if your      02:33

18   first two or three visits had no impact at all,        02:33

19   meaning seriously zero impact -- there's no evidence   02:33

20   of improvement after the first few visits -- then      02:34

21   the expectation is that further chiropractic care      02:34

22   would not be a benefit.                                 02:34

23             If, however, there is improvement in the     02:34

24   first few visits, then the expectation is, in the      02:34

25   next two to four weeks or six to 12 visits, that you   02:34
```

                                                                      275

| | | |
|---|---|---|
| 1 | would maximize the benefit from chiropractic care. | 02:34 |
| 2 | So that's what the medical literature would say. | 02:34 |
| 3 | Is it standard to see treatment delivered | 02:34 |
| 4 | outside of the scope of that -- that medical | 02:34 |
| 5 | evidence-based protocol?  The answer is yes.  It's | 02:34 |
| 6 | completely standard to see treatment delivered for | 02:34 |
| 7 | far longer than what the medical literature would | 02:34 |
| 8 | suggest is useful. | 02:34 |
| 9 | Q.    Okay.  With respect to the first part of | 02:34 |
| 10 | your answer, were you -- and I'm talking about the | 02:34 |
| 11 | part where you said if there's not improvement | 02:35 |
| 12 | within the first two or three visits; right? | 02:35 |
| 13 | Do you remember that part? | 02:35 |
| 14 | A.    Yes, I do. | 02:35 |
| 15 | Q.    And is that in the context of recovery from | 02:35 |
| 16 | all symptoms or pain management or something else? | 02:35 |
| 17 | A.    Improvement can be somewhat subjective.  So | 02:35 |
| 18 | when you're dealing with primarily subjective | 02:35 |
| 19 | findings, the expectation of improvement would be, | 02:35 |
| 20 | again, reduction in pain symptoms.  Potentially it | 02:35 |
| 21 | could also be an improvement in function. | 02:35 |
| 22 | It doesn't necessarily mean a complete | 02:35 |
| 23 | alleviation of symptoms, but there has to be some | 02:35 |
| 24 | evidence that the person is reporting an improvement | 02:35 |
| 25 | in how they feel and what they're able to do | 02:35 |

276

Craig Heligman, M.D.                                                    April 28, 2021

```
1    following treatment.                              02:35

2        Q.    I mean, I think I understand your answer   02:35

3    there and I appreciate that, but, I mean, have you   02:35

4    heard of people who regularly treat with             02:35

5    chiropractors for pain management on a regular       02:35

6    basis?                                               02:36

7        A.    Yes.                                       02:36

8            So some individuals will choose to go in     02:36

9    and receive manual manipulation once, and they're    02:36

10   fine.  That -- that resolves their symptoms.  If     02:36

11   they have a new episode, they come in.  They may see 02:36

12   the person in the next month, receive the same       02:36

13   treatment, and that's sufficient.  Could be that     02:36

14   they need two or three treatments in that time       02:36

15   period.  It could be one time they experience the    02:36

16   symptom and they need six or eight visits rather     02:36

17   than the one visit.                                  02:36

18            So periodic use of a chiropractic provider  02:36

19   is not what I'm trying to describe.  It's the        02:36

20   ongoing treatment of the chiropractic care three to  02:36

21   four or five times a week for a long duration of     02:36

22   time.  It's not the intermittent onset of new        02:36

23   symptoms.                                            02:36

24       Q.    Is there anything on this particular form  02:37

25   that indicates how often Dr. Johnson intended to     02:37
```

277

Craig Heligman, M.D.                                          April 28, 2021

```
 1   treat Mr. Dowdy?                                      02:37

 2      A.   No.                                           02:37

 3      Q.   Okay.  And that -- would that be important    02:37

 4   information to know?                                  02:37

 5      A.   Not for the purposes of reviewing the COII,   02:37

 6   no.                                                   02:37

 7      Q.   Okay.  All right.  If you turn the page to    02:37

 8   the next one, please, it's Bates No. 5748.            02:37

 9      A.   Yes.                                          02:37

10      Q.   This is for Chad -- Chad Little.              02:37

11           Do you have that in front of you?             02:37

12      A.   I do.                                         02:37

13      Q.   Okay.  And are you familiar with what an      02:37

14   engineer does?                                        02:37

15      A.   Yes, an engineer operates the locomotive.     02:37

16      Q.   Okay.  Now, looking at this form, can you     02:37

17   just tell me what that -- what -- your                02:38

18   interpretation, in summary fashion, of why he was     02:38

19   treating with Dr. Johnson?                            02:38

20      A.   From my understanding of reading this form,   02:38

21   Mr. Little sought care from Dr. Johnson because he    02:38

22   had low back pain.                                    02:38

23      Q.   Okay.  Were you -- do you have any            02:38

24   knowledge or recollection from when you reviewed      02:38

25   Mr. Little's medical file that he had been off for a  02:38
```

278

```
 1    heart condition?                                02:38

 2         A.   No, that I do not recall being in our    02:38

 3    medical record.                                 02:38

 4         Q.   Okay.  If that is accurate -- and I believe  02:38

 5    it is.  Otherwise, I wouldn't ask you about it.  But  02:38

 6    if it is accurate that he had had -- I believe it  02:38

 7    was a heart attack.  It was some type of a heart  02:38

 8    condition -- that he had been off for some time  02:38

 9    prior to this, is that the type of information that  02:38

10    would have been -- should have been in the medical  02:38

11    file at CSX?                                     02:38

12         A.   If an individual is off work for a heart  02:39

13    attack or other cardiac condition, my expectation is  02:39

14    that the COII should be completed by the        02:39

15    cardiologist or the other physician treating the  02:39

16    heart condition, not the chiropractic provider.  02:39

17            In my opinion, the heart attack is a much  02:39

18    more serious medical condition than a nonspecific  02:39

19    low back pain.  And so I cannot answer the question  02:39

20    why the employee would have the expectation for  02:39

21    Dr. Johnson to provide periodic updates for support  02:39

22    of him being off work as opposed to sending     02:39

23    information from his cardiologist or, if he needed  02:39

24    it, a cardiothoracic surgeon.                   02:39

25         Q.   If it's correct that Mr. Little was off for  02:39
```

                                                          279

```
1    a -- you know, a period of time prior to this form      02:39
2    for heart conditions, would he have been required to    02:39
3    submit a Certificate of Ongoing Illness for those       02:39
4    absences greater than 45 days?                           02:39
5        A.   He would be expected to submit the COII,        02:40
6    but it's up to the employee -- let me start over.        02:40
7            We don't know why that employee is off           02:40
8    work.  So if the employee submits a form from the        02:40
9    chiropractor saying "I'm under treatment for low         02:40
10   back pain and that's why I'm off work," we don't         02:40
11   challenge that.  However, one would conclude if          02:40
12   you're off for a heart attack, you're not going to       02:40
13   get your medical documentation to be off work            02:40
14   completed by a chiropractor.                              02:40
15       Q.   But do you have a recollection of whether       02:40
16   any cardiologist or medical doctor submitted any         02:40
17   Certificate of Ongoing Illness for Mr. Little            02:40
18   related to his heart condition?                           02:40
19       A.   No.  To my understanding and my review,         02:40
20   there was no information about his cardiac               02:40
21   condition.  There were several employees that, after    02:40
22   the fact, were identified as having medical             02:40
23   conditions that would completely explain their          02:40
24   absence from work for periods of time.  But it           02:40
25   doesn't explain why they didn't tell us.                 02:40
```

280

1        Q.    Back in 2017, in June or July of 2017, did        02:41

2    you have any knowledge about whether engineers were        02:41

3    subject to any layoffs at all or job abolishments?        02:41

4        A.    I was not aware of any.                           02:41

5        Q.    Okay.  So if it's true that Mr. Little was        02:41

6    never subject to a layoff, then you would have no          02:41

7    reason to find anything on this form suspicious?           02:41

8        A.    It had nothing to do with knowledge about a      02:41

9    layoff.  I just don't find anything suspicious on          02:41

10   this form.                                                 02:41

11       Q.    Okay.  Have you ever been made aware that        02:41

12   Mr. Little shot himself in front of his wife and           02:41

13   child?                                                     02:41

14       A.    No, I don't recall knowing that.                 02:41

15             MS. FOSTER BIRD:  Sorry.  I was going to         02:41

16   object, but go ahead.                                      02:41

17   BY MR. PAUL:                                               02:41

18       Q.    All right.  We'll go to the next page,           02:41

19   please.  This is Bates No. -- looks like --                02:42

20   actually, it looks like the numbers got a little           02:42

21   bigger.  It looks like 14136 for Christopher               02:42

22   Stiltner.                                                  02:42

23             Do you see that?                                 02:42

24       A.    Yes.                                             02:42

25       Q.    Okay.  I think we've already talked about        02:42

                                                                281

| | | |
|---|---|---|
| 1 | the utility workers. | 02:42 |
| 2 | So is your answer the same with respect to | 02:42 |
| 3 | Mr. Stiltner's job duties? | 02:42 |
| 4 | A.   I think our utility workers also may do the | 02:42 |
| 5 | hustling of the locomotives, moving them around if | 02:42 |
| 6 | needed.  Again, that -- but otherwise, yes. | 02:42 |
| 7 | Q.   And it's the information on this top part | 02:42 |
| 8 | of the form that he worked in the Mechanical | 02:42 |
| 9 | Department in Louisville. | 02:42 |
| 10 | Were you aware of any layoffs or job | 02:42 |
| 11 | abolishments in Louisville in 2017? | 02:42 |
| 12 | A.   No. | 02:42 |
| 13 | Q.   And is it correct that -- | 02:42 |
| 14 | MS. FOSTER BIRD:  What page are you on, | 02:42 |
| 15 | Greg? | 02:42 |
| 16 | MR. PAUL:  I'm on Bates No. 14136.  It's | 02:42 |
| 17 | Page 6 of 77. | 02:42 |
| 18 | MS. FOSTER BIRD:  Yeah, I'm not sure -- I'm | 02:42 |
| 19 | going to that.  Hold on.  Let me interrupt for one | 02:43 |
| 20 | second here.  Sorry. | 02:43 |
| 21 | MR. PAUL:  It's all right. | 02:43 |
| 22 | MS. FOSTER BIRD:  Do you see where it says | 02:43 |
| 23 | "Division/Shop" and it says "Louisville"?  I just | 02:43 |
| 24 | want to make -- I just don't want you -- I just want | 02:43 |
| 25 | to be sure that you know it could be the Louisville | 02:43 |

282

| | | |
|---|---|---|
| 1 | division but not the Louisville shop. | 02:43 |
| 2 | MR. PAUL:  Okay.  No, that's fine. | 02:43 |
| 3 | MS. FOSTER BIRD:  I just wanted to say | 02:43 |
| 4 | that.  Okay. | 02:43 |
| 5 | MR. PAUL:  Yeah, that's -- that's fine. | 02:43 |
| 6 | BY MR. PAUL: | 02:43 |
| 7 | Q.   Do you -- Doctor, just on that topic, I | 02:43 |
| 8 | mean, do you know whether there's a Louisville shop | 02:43 |
| 9 | or a Louisville division or both? | 02:43 |
| 10 | Do you have any knowledge about that? | 02:43 |
| 11 | A.   The divisions were changed and how we | 02:43 |
| 12 | organize our -- our railroad changed around that | 02:43 |
| 13 | time, and so I don't know really what divisions were | 02:43 |
| 14 | active at that moment.  The employees are -- had | 02:44 |
| 15 | their seniority in a specific region or a specific | 02:44 |
| 16 | area based upon when they started with the company, | 02:44 |
| 17 | and so that seniority may not be transferable from | 02:44 |
| 18 | location to location. | 02:44 |
| 19 | And -- and as was said, even though they | 02:44 |
| 20 | may say the division was Louisville, their home | 02:44 |
| 21 | residence may not be in Louisville and their work | 02:44 |
| 22 | may not be in Louisville.  It may have just been a | 02:44 |
| 23 | management structure out of Louisville covered this | 02:44 |
| 24 | area.  And in this case, Mr. Stittner's[sic] address | 02:44 |
| 25 | is listed in Ashland, Kentucky. | 02:44 |

283

Craig Heligman, M.D.                                                    April 28, 2021

```
 1       Q.    Okay.  Got it.                             02:44
 2             Well, I forgot what I was going to ask you. 02:45
 3   I'll have to come back to it.                        02:45
 4             Do you recall testifying earlier that when 02:45
 5   you first -- in June of 2017, first reviewed some of 02:45
 6   these forms, that you had someone from Human         02:45
 7   Resource look into which employees were subject to   02:45
 8   layoff?                                              02:45
 9       A.    That's correct.  Our HR team, in           02:45
10   conjunction with Labor Relations, attempted to       02:45
11   identify which of these employees were on a list --  02:45
12   either already on the list or going to be            02:45
13   subjectively placed on a list for furlough.  And I   02:45
14   don't recall specifically which employees those      02:45
15   were.                                                02:45
16       Q.    But did that happen because you requested  02:45
17   it?                                                  02:46
18       A.    It happened because it was part of the     02:46
19   review process.  I didn't ask for that myself.  I    02:46
20   was not aware that furloughs were occurring, and I   02:46
21   wasn't aware of any kind of changes from a Human     02:46
22   Resources or employment perspective for that region. 02:46
23   So it was up to HR and LR to bring that to my        02:46
24   attention.                                           02:46
25       Q.    And do you remember who specifically looked 02:46
```

284

Craig Heligman, M.D.                                          April 28, 2021

```
 1    into that in Human Resources or Labor Relations?    02:46

 2         A.    I don't.                                 02:46

 3         Q.    Okay.  And we can go back and look at that  02:46

 4    exhibit if you want, but my recollection was that  02:46

 5    the Human Resources conclusion was that there was  02:46

 6    not a connection between the two -- that is, the   02:46

 7    layoffs; is that correct?                          02:46

 8         A.    I think the statement I used in that e-mail  02:46

 9    was that they couldn't identify a pattern.  Or we  02:46

10    could go back and look at it and read it again if  02:46

11    you'd like.                                        02:46

12         Q.    Yeah, we can.                            02:47

13         But -- but your recollection is that --       02:47

14    that a pattern could not be identified between the  02:47

15    Certificates of Ongoing Illness that you received in  02:47

16    June or July and the layoffs; is that correct?     02:47

17         A.    Right.  There was not a one-to-one       02:47

18    consistency.  So not everybody that submitted a form  02:47

19    was on a furlough list or a reorganization list, and  02:47

20    there are some people on that list that we had no   02:47

21    COIIs for.  So there wasn't a one-to-one            02:47

22    coordination between the two lists.                02:47

23         Q.    Okay.  Back to this particular exhibit --  02:47

24    well, first of all, do you -- do you need to go back  02:47

25    and look at that exhibit if you want to, or is      02:47
```

285

| | | |
|---|---|---|
| 1 | that -- | 02:47 |
| 2 | A.   Only if you want me to do so. | 02:47 |
| 3 | Q.   Okay.  No, that's all right. | 02:47 |
| 4 | Looking at this form, is it correct to say | 02:47 |
| 5 | that there's no information on here that informs you | 02:47 |
| 6 | whether Mr. Stiltner was treating for symptoms | 02:47 |
| 7 | related to a work-related incident or a | 02:47 |
| 8 | non-work-related incident or a combination of both? | 02:47 |
| 9 | A.   That's correct.  There's nothing on this | 02:48 |
| 10 | form that would say one way or the other. | 02:48 |
| 11 | Q.   And this form, the "Duration of Care" and | 02:48 |
| 12 | it looks like the "unable to work" appear to be the | 02:48 |
| 13 | same, which is May 21st of 2017. | 02:48 |
| 14 | Do you see that? | 02:48 |
| 15 | A.   I do. | 02:48 |
| 16 | Q.   Okay.  And same question, there's -- | 02:48 |
| 17 | there's nothing suspicious about that, in and of | 02:48 |
| 18 | itself, just looking at Mr. Stiltner as an | 02:48 |
| 19 | individual on this form? | 02:48 |
| 20 | A.   That's correct. | 02:48 |
| 21 | Q.   All right.  Go to the next page, please. | 02:48 |
| 22 | Actually, this looks like another one for | 02:48 |
| 23 | Mr. Stiltner.  Let's see.  I think we can skip over | 02:48 |
| 24 | this one. | 02:48 |
| 25 | All right.  The next one is for Casey | 02:48 |

286

| | | |
|---|---|---|
| 1 | Clark, which is Bates No. 12535.  Just let me know | 02:48 |
| 2 | when you're there. | 02:48 |
| 3 | A.   I'm there. | 02:48 |
| 4 | Q.   Okay.  Are you familiar with the duties of | 02:48 |
| 5 | an electrician? | 02:49 |
| 6 | A.   Again, I have a working knowledge.  I can't | 02:49 |
| 7 | give you the specifics of the full list of their | 02:49 |
| 8 | activities. | 02:49 |
| 9 | Q.   Okay.  Is it -- and if you don't know, tell | 02:49 |
| 10 | me -- but is it your understanding that Mr. Clark, | 02:49 |
| 11 | as an electrician, works on locomotives or something | 02:49 |
| 12 | else, or don't you know? | 02:49 |
| 13 | A.   It's my understanding he could work on | 02:49 |
| 14 | locomotives. | 02:49 |
| 15 | Q.   And would that -- I mean, do you have any | 02:49 |
| 16 | knowledge about if that's true that an electrician, | 02:49 |
| 17 | in part, works on locomotives, that they have to | 02:49 |
| 18 | crouch into awkward positions in order to perform | 02:49 |
| 19 | their job duties? | 02:49 |
| 20 | A.   Potentially, yes. | 02:49 |
| 21 | Q.   All right.  In this particular case, it | 02:49 |
| 22 | appears that the duration of care and the inability | 02:50 |
| 23 | to work are the same, starting in June 19th of 2017. | 02:50 |
| 24 | In order to determine whether Mr. Clark had | 02:50 |
| 25 | previously had any impairments related to what he's | 02:50 |

287

1    treating for here, what options did you have to find    02:50

2    out about that?                                          02:50

3         A.   I don't think I understand the question.      02:50

4         Q.   Me either.  Let me try it again.  All          02:50

5    right?                                                   02:50

6              First, let's look at the "Attending            02:50

7    Physician's Statement."  And just in general terms,      02:50

8    what -- what was Mr. Clark treating with Mr. Johnson     02:50

9    for, according to this form?                             02:50

10        A.   Again, without going into the medical          02:50

11   terms, primarily low back pain and lower extremity       02:50

12   pain.                                                    02:50

13        Q.   Okay.  So to try to ask a clearer question,    02:50

14   if it was important to you to find out if Mr. Clark      02:51

15   had treated for those same or similar conditions         02:51

16   prior to June of 2017, what options did you have at      02:51

17   your disposal?                                           02:51

18        A.   Well, first, on review of this form, it        02:51

19   wasn't that important to know, but I would have gone     02:51

20   back through the medical record to see if he had         02:51

21   been treated before and had made us aware of it.         02:51

22        Q.   And I think we covered this in broad terms,    02:51

23   but I believe you testified it also would have been      02:51

24   an option, if you thought it appropriate, to call        02:51

25   Mr. Clark or his health care provider to get more        02:51

                                                       288

Craig Heligman, M.D.                                    April 28, 2021

```
 1  information about this treatment; is that correct?    02:51
 2      A.   If it was appropriate.  But, again, under    02:51
 3  these circumstances, it wasn't necessary.            02:51
 4      Q.   Okay.  And -- and why is that?              02:51
 5      A.   Because, again, as I've already pointed     02:51
 6  out, we don't interfere with the doctor/patient      02:51
 7  relationship.  And so this form is completed merely  02:52
 8  as an administrative function.  It wasn't meant to   02:52
 9  determine appropriateness of care.  It was not meant 02:52
10  to determine whether anybody had been treated before 02:52
11  or subsequent to the receipt of this information.    02:52
12          It was simply an administrative tool to      02:52
13  document what the employee and their health          02:52
14  professional have reported as the medical reason for 02:52
15  their being absent at this moment in time.  It's not 02:52
16  to be used as a causation analysis.  It's not used   02:52
17  to report a workplace injury.  There are completely  02:52
18  separate processes for all of those things.          02:52
19          So it's really not important for us to make  02:52
20  any -- any decisions on this form other than to      02:52
21  accept it for face value.                            02:52
22      Q.   Okay.  And I guess that -- does your answer 02:52
23  right there tie into the fact that if Mr. Clark --   02:52
24  just reviewing this form, there's nothing suspicious 02:53
25  about it as an individual?                           02:53
```

                                                        289

Craig Heligman, M.D.                                            April 28, 2021

```
 1        A.    That's correct.  As an individual, I see      02:53
 2   nothing particularly suspicious about it.                02:53
 3        Q.    Okay.  But I guess at the time that you saw   02:53
 4   this form along with others who treated with             02:53
 5   Dr. Johnson, you had -- I believe you testified          02:53
 6   some -- I don't recall the word you used -- but some     02:53
 7   concerns along the lines that -- of Mr. Johnson          02:53
 8   treating patients in the past prior to June of 2017?     02:53
 9        A.    We had some concerns.  That's correct.  And   02:53
10   honestly it was because of the number of employees       02:53
11   that would see Dr. Johnson spread out over time over     02:53
12   many years.  There was never -- up until June of         02:53
13   2017, there was never this large influx of documents     02:53
14   from Dr. Johnson or Dr. Carey.                           02:53
15        We never disputed that the employee had the         02:53
16   right to see either practitioner.  We never              02:54
17   challenged either practitioner at all.  There were       02:54
18   times when we had asked for medical records from         02:54
19   these practitioners, doing a return-to-work              02:54
20   fitness-for-duty review, but we never interfered         02:54
21   with the doctor/patient relationship.                    02:54
22        This was an administrative function.  The           02:54
23   employee had a responsibility under the Collective       02:54
24   Bargaining Agreement.  We were the administrators of     02:54
25   receipt of that information because it did have          02:54
```

                                                                     290

1    medical information on these forms and it was to be      02:54

2    placed in the medical record.  But, otherwise, it        02:54

3    was purely an administrative function and used           02:54

4    solely for that purpose.                                 02:54

5        Q.   I recall that from one of the hearings --       02:54

6    and if you don't recall, that's fine.  We'll look at     02:54

7    it tomorrow.  But I believe your testimony was that      02:54

8    the concern over Dr. Johnson treating with -- with       02:54

9    someone was, like, ten years ago.                        02:54

10        Does that sound right?                              02:54

11        A.   I think the concern -- I don't remember the    02:55

12    statement.  I'm sure we will look at it.  But           02:55

13    Dr. Johnson had been a practitioner in that area for    02:55

14    a very long time.  We've been present in that area      02:55

15    for a very long time, so it's not surprising to me      02:55

16    that Dr. Johnson would see a large number of our        02:55

17    employees.                                              02:55

18        Q.   Right.                                         02:55

19             What did Dr. Neilson tell you about            02:55

20    Dr. Johnson's treatment of railroad workers             02:55

21    specifically?                                           02:55

22        A.   My recollection is Dr. Neilson just shared     02:55

23    with me that we saw a lot of these COII forms from      02:55

24    Dr. Johnson.  He thought -- again, it was his           02:55

25    impression that Dr. Johnson may have overtreated or     02:55

```
 1    declared that employees should be off work for        02:55
 2    injuries that he was treating for an extended period   02:55
 3    of time.  There was a potential that it corresponded   02:55
 4    to other times when there were furloughs in the        02:56
 5    area.                                                  02:56
 6            But that was the extent of it.  We never        02:56
 7    took any action.  We had no reason to do so.  We       02:56
 8    just had no -- again, there was no documentation       02:56
 9    such as we received in 2017 to say, "Okay.  Now we     02:56
10    really think we do have a problem."  It was            02:56
11    completely an individualized interpretation of the     02:56
12    information.                                            02:56
13        Q.    Okay.  And was it just one conversation you  02:56
14    had with Dr. Neilson about Dr. Johnson?                02:56
15        A.    It was probably not the only conversation    02:56
16    we held about Dr. Johnson over the three years I       02:56
17    worked with Dr. Neilson, but I can't tell you how      02:56
18    often we really spoke about him.  You know, maybe --   02:56
19        Q.    Yeah.                                         02:56
20        A.    -- about once a year.                         02:56
21        Q.    Do you remember the context of the           02:56
22    conversation with Dr. Neilson regarding Dr. Johnson?   02:56
23            In other words, was it specific to one         02:56
24    employee or -- or just an in-general conversation?     02:56
25        A.    It was an in-general conversation.           02:57
```

292

Craig Heligman, M.D.                                                          April 28, 2021

```
 1        Q.   Okay.  All right.  Let's go to the next      02:57
 2   one, please.  Actually, this is another one for       02:57
 3   Casey Clark, so I think we can skip that one, and     02:57
 4   we'll go to Devery Brown, Bates No. 8736.             02:57
 5        A.   Okay.                                        02:57
 6        Q.   Identifies as a boilermaker.                 02:57
 7             Are you familiar with the job tasks of a     02:57
 8   boilermaker?                                           02:57
 9        A.   Again, the -- I have a general               02:57
10   understanding, but the job tasks themselves are not   02:57
11   necessarily a direct reflection of the title.  These  02:57
12   are craft positions that were listed in -- under the  02:57
13   unions, and those jobs changed over time but the      02:57
14   craft title never did.                                02:57
15        Q.   Kind of like -- kind of like -- I'm sorry.  02:57
16   Go ahead.                                              02:57
17        A.   No, I'm sorry.  I was finished.             02:57
18        Q.   Okay.  Kind of like the fireman, when the   02:57
19   trains haven't run on coal for some time?             02:57
20        A.   That's correct.                             02:58
21        Q.   Got it.                                     02:58
22             Is there anything on this form that informs 02:58
23   you whether Mr. Brown's treatment with Dr. Johnson    02:58
24   was work-related, non-work-related, or a combination  02:58
25   of both?                                              02:58
```

                                                                293

Craig Heligman, M.D.                                    April 28, 2021

```
1      A.   No.                                          02:58

2           [Train horn sounds.]                         02:58

3      Q.   That's exciting.  Who's got the train horn?  02:58

4      A.   Good question.  I don't know.                02:58

5      Q.   Okay.                                        02:58

6      A.   There's three or four railroads that run     02:58

7   along this track every now and then.                02:58

8      Q.   Yeah.                                        02:58

9           MS. FOSTER BIRD:  It was a sign from God.    02:58

10          MR. PAUL:  To wrap it up?                    02:58

11          MS. FOSTER BIRD:  To zip it.                 02:58

12          THE WITNESS:  You'd think that the tracks    02:58

13   right outside our door belong to us, but they don't. 02:58

14          MR. PAUL:  Yup.                              02:58

15   BY MR. PAUL:                                        02:58

16     Q.   Okay.  So looking at this form, is it        02:58

17   possible for you to tell whether Mr. Brown was      02:59

18   treating with Mr. Johnson for aches and pains       02:59

19   related to his job duties as a boilermaker or       02:59

20   something else?                                     02:59

21     A.   It's not stated.                             02:59

22     Q.   Okay.  All right.  Go to the next one,       02:59

23   Dennis Hutchinson.  And it appears -- you have that 02:59

24   in front of you?                                    02:59

25     A.   I do.                                        02:59
```

                                                          294

```
 1        Q.   It appears he's a carman.                    02:59

 2             Do you see that?                             02:59

 3        A.   I do.                                        02:59

 4        Q.   Okay.  And I think one of our other          02:59

 5   gentlemen was a carman and a painter, as I recall,    02:59

 6   but either way you're familiar with the job duties    02:59

 7   of a carman; correct?                                 02:59

 8        A.   Yes.                                         02:59

 9        Q.   Okay.  Is there anything on this form that   02:59

10   informs you whether Mr. Hutchinson's treatment with   02:59

11   Mr. Johnson was work-related, non-work-related, or a  02:59

12   combination of both?                                  02:59

13        A.   No, it does not state.                       02:59

14        Q.   Okay.  In this particular form, the          02:59

15   duration of care and the inability to work appears    03:00

16   to date back to March 15th of 2016.                   03:00

17             Do you see that?                             03:00

18        A.   I do.                                        03:00

19        Q.   Okay.  And although it may seem obvious,     03:00

20   that would clearly predate -- if that's accurate,     03:00

21   that would clearly predate any notice of upcoming     03:00

22   layoffs in June of 2017; is that correct?             03:00

23        A.   That would be correct.                       03:00

24        Q.   Okay.  Go to the next one, please.           03:00

25   Actually, we can skip Ms. Lanham for various          03:00
```

| | | |
|---|---|---|
| 1 | reasons.  So we will go to David Manis, Bates No. | 03:00 |
| 2 | 5778. | 03:00 |
| 3 | Do you have that in front of you? | 03:00 |
| 4 | A.   I do. | 03:00 |
| 5 | MS. FOSTER BIRD:  Hey, Greg, I just want to | 03:00 |
| 6 | back up.  Since you skipped Lanham, I didn't know if | 03:00 |
| 7 | you were doing the whole exhibit or not.  I just | 03:00 |
| 8 | want to back up to tell you that Casey Clark, which | 03:00 |
| 9 | was one of the ones that you mentioned before, is | 03:00 |
| 10 | also not a plaintiff here.  So if for some reason | 03:00 |
| 11 | you're skipping the ones in the exhibit, I just want | 03:00 |
| 12 | to make you aware of that. | 03:00 |
| 13 | It was -- the exhibit attached, some of | 03:01 |
| 14 | this was the exhibit attached to the hearing, but | 03:01 |
| 15 | now you're skipping people who are not plaintiffs | 03:01 |
| 16 | and Casey Clark was also not a plaintiff.  So -- | 03:01 |
| 17 | MR. PAUL:  Okay. | 03:01 |
| 18 | [Crosstalking.] | 03:01 |
| 19 | MS. FOSTER BIRD:  -- or what it is, but I'm | 03:01 |
| 20 | just putting that on the record for completeness. | 03:01 |
| 21 | MR. PAUL:  My -- my oversight is what it | 03:01 |
| 22 | is.  All right. | 03:01 |
| 23 | Anything further?  We can get on with | 03:01 |
| 24 | Mr. Manis?  Okay. | 03:01 |
| 25 | | |

296

Craig Heligman, M.D.                                                    April 28, 2021

| | | |
|---|---|---|
| 1 | BY MR. PAUL: | 03:01 |
| 2 | Q.   All right, Dr. Heligman.  Looks like | 03:01 |
| 3 | Mr. Manis is a painter.  We've already talked about | 03:01 |
| 4 | the job duties that you're familiar with as a | 03:01 |
| 5 | painter. | 03:01 |
| 6 | Do you know, I mean, what's involved with | 03:01 |
| 7 | painting, like, a railroad car or a locomotive, you | 03:01 |
| 8 | know, whether it's manual or a spray gun or | 03:01 |
| 9 | something else? | 03:01 |
| 10 | A.   I think it could be a combination depending | 03:01 |
| 11 | upon what the needs are. | 03:01 |
| 12 | Q.   Okay.  Notwithstanding your definition of | 03:01 |
| 13 | "repetition" under NIOSH, but just in general, do | 03:01 |
| 14 | you have any understanding of whether Mr. Manis' | 03:02 |
| 15 | painting duties were repetitive in nature -- not | 03:02 |
| 16 | under the NIOSH definition? | 03:02 |
| 17 | A.   What definition should I use? | 03:02 |
| 18 | Q.   A definition of -- well, that's a -- that's | 03:02 |
| 19 | a fair point.  Let me -- let me back up a minute. | 03:02 |
| 20 | Like, do you have any understanding of what | 03:02 |
| 21 | a painter is required to do in terms of his or her | 03:02 |
| 22 | arms? | 03:02 |
| 23 | A.   Considering I've painted many homes myself, | 03:02 |
| 24 | there is a movement of the arm with a paintbrush, | 03:02 |
| 25 | with the roller, potentially with a paint gun.  But | 03:02 |

297

Craig Heligman, M.D.                                                April 28, 2021

```
 1    specifically to rail operations, if he's hand        03:02
 2    painting versus using a paint room with a paint gun,  03:02
 3    the activities are somewhat different and the use of   03:02
 4    the hand is different.                                03:03
 5        Q.   Is -- a painter like Mr. Manis, you know,    03:03
 6    in a mechanical shop in Huntington, do you have any   03:03
 7    idea of how much they have to lift?                   03:03
 8        A.   I would have to look at the specific job     03:03
 9    description.  But if you look at the mechanical       03:03
10    employees, most of the job descriptions are going to  03:03
11    list either 50 pounds or potentially 100 pounds.  I   03:03
12    think in most mechanical -- I have to look at the     03:03
13    job description again.  It's either considered        03:03
14    medium or heavy work under the definitions provided   03:03
15    by the Dictionary of Occupational Titles.             03:03
16        Q.   Okay.  And what -- as I recall, medium work  03:03
17    goes up to -- what is it -- 25 or 50?                 03:03
18        A.   Medium is up to 50 pounds occasionally.      03:03
19    For heavy work, it's up to 100 pounds.  For very      03:03
20    heavy, it's up to 150 pounds.                         03:03
21        Q.   Okay.  And -- I'm sorry -- you believe that  03:04
22    the painting duties would require somewhere between   03:04
23    medium and heavy?                                     03:04
24        A.   In the mechanical world, it's either going   03:04
25    to be medium or heavy.                                03:04
```

298

Craig Heligman, M.D.                                    April 28, 2021

```
 1        Q.   Okay.  And same question here, this -- this   03:04
 2   CII -- COII form does not provide any information as    03:04
 3   to whether Mr. Manis' treatment with Dr. Johnson is     03:04
 4   work-related, non-work-related, or a combination of     03:04
 5   both; correct?                                          03:04
 6        A.   That's correct.                               03:04
 7             And I'm more than happy to sit here and       03:04
 8   answer questions on all these pages, but I think you    03:04
 9   need to understand that this form itself is not how     03:04
10   we report our on-duty injuries.  There's a process     03:04
11   in place.  And had any of these employees been         03:04
12   seeking care for a work-related injury, it was their    03:04
13   responsibility at the time they thought the incident   03:04
14   occurred to report that to their manager and           03:04
15   complete the PI-1A.                                     03:04
16             We have a regulatory responsibility for      03:05
17   submitting all work-related injuries up to our         03:05
18   reporting agency.  In this case, it's the FRA, and     03:05
19   in other -- in other jurisdictions, it's typically     03:05
20   OSHA.                                                   03:05
21             So if this person had a work-related         03:05
22   injury, this isn't the form they would submit.  They   03:05
23   would submit the PI-1A, and we would move on from      03:05
24   there.  In this set of circumstances, none of these    03:05
25   individuals submitted a PI-1A to designate that they   03:05
```

                                                                  299

Craig Heligman, M.D.                                                    April 28, 2021

```
1    were reporting a work injury.  At no time did they      03:05
2    report to their manager that they were experiencing     03:05
3    what they thought was a work-related injury or          03:05
4    illness.                                                03:05
5           So, again, I'm happy to sit here with you        03:05
6    and go through each and every one of these pages,       03:05
7    but this document, in most cases, is not used -- or     03:05
8    I should say never will be used for reporting           03:05
9    on-duty injury.  And whether or not the employee or     03:05
10   the provider states that it was an off-duty or          03:06
11   on-duty issue, it's not relevant.                       03:06
12      Q.   So a couple questions on that.                  03:06
13           Do you have an understanding of what an FRA     03:06
14   reportable injury is?                                   03:06
15      A.   Yes.                                            03:06
16      Q.   Okay.  What is that?                            03:06
17      A.   An FRA reportable injury has -- it has to       03:06
18   be occurring on the job, in the course of doing         03:06
19   their work, and generally on property.  We have a       03:06
20   reporting officer that actually makes the reporting     03:06
21   determination.  I'm not the expert in that area.        03:06
22   There is a regulation and a guidance manual that        03:06
23   discusses what -- what incidents may be considered      03:06
24   FRA reportable, and I rely on the reporting officer     03:06
25   to make the final determination.                        03:06
```

Craig Heligman, M.D.                                             April 28, 2021

1          All I'm saying is this document is not used    03:06

2     for that purpose.  And so regardless of what the    03:07

3     person may say or write, we don't use it to define  03:07

4     whether or not it's an FRA reportable incident.      03:07

5          Q.   Okay.  Would you agree that it's up to an  03:07

6     employee whether or not to file an injury claim?     03:07

7          A.   It's up to the employee.  In fact, it's the 03:07

8     employee's responsibility to report when they        03:07

9     experience an -- an on-duty injury or if they        03:07

10    believe that they may have injured themselves at     03:07

11    work.  It is their responsibility to report that.    03:07

12         It is the employer's responsibility to then     03:07

13    review that case and, if it meets the FRA            03:07

14    requirements, to report it to the FRA.  But this is  03:07

15    not the format we use for that purpose.              03:07

16         Q.   No, I think you've made that clear, and I  03:07

17    appreciate that.  Let me ask a different question.   03:07

18         So under a hypothetical that an employee --     03:07

19    a railroad employee does not get injured on the      03:07

20    property of the railroad but is seeking treatment    03:08

21    for a combination of symptoms that occurred from     03:08

22    working over many years and also from other          03:08

23    activities such as golfing, tennis, or cutting wood, 03:08

24    a combination of those two is the reason that the    03:08

25    person is seeking treatment.  Okay?                  03:08

                                                           301

Craig Heligman, M.D.                                    April 28, 2021

1           That -- under that hypothetical, would you          03:08

2    agree that the employee is not required to report an       03:08

3    injury because it didn't happen on property?               03:08

4        A.    If the injury did not happen on property,        03:08

5    then, no, they have no obligation to report.  On the       03:08

6    other hand, if they believe that their ongoing             03:08

7    health condition was due to something that they have       03:08

8    participated in at work, then, yes, it would be            03:08

9    their responsibility to report it as soon as they          03:08

10   recognize that that was potentially present.               03:08

11          So, for example, if someone believed that           03:08

12   they developed a respiratory problem and they              03:09

13   decided it was due to an exposure that occurred at         03:09

14   work over time, at some point when they reach that         03:09

15   conclusion, it would be their responsibility to            03:09

16   report it.                                                 03:09

17       Q.    Okay.  Now, you're familiar that                 03:09

18   railroaders do not have -- or at least railroaders         03:09

19   at CSX do not have Workers' Compensation under any         03:09

20   particular state law; is that correct?                     03:09

21       A.    That is correct.                                 03:09

22       Q.    Okay.  And are you familiar that                 03:09

23   railroaders are covered by a federal law called the        03:09

24   Federal Employers' Liability Act?                          03:09

25       A.    Yes.                                             03:09

                                                                   302

Craig Heligman, M.D.                                                    April 28, 2021

```
 1        Q.   Okay.  And without getting into the legal      03:09

 2   particulars of that statute or law, what is your         03:09

 3   understanding of the Federal Employers' Liability        03:09

 4   Act with respect to any training that you've had on      03:09

 5   the railroad or your job duties?                         03:09

 6        A.   It is the law that governs how we manage       03:09

 7   the work injury -- it's how a person may make a          03:09

 8   claim for a work injury.  So making a claim against      03:09

 9   a company for what they believe to be a workplace        03:09

10   exposure, injury, illness, it's a litigation issue.      03:10

11   It's not an FRA reportability issue.                     03:10

12            And so under FELA, there's some things that     03:10

13   you have to prove that you don't -- that were            03:10

14   eliminated by most Worker Compensation laws.             03:10

15   Workers' Compensation is generally believed to be a      03:10

16   no-fault set of -- of laws handled by primarily an       03:10

17   administrative law judge -- or I should say the          03:10

18   final decision-maker is the administrative law           03:10

19   judge.                                                   03:10

20            On FELA, we still have tort.  And, again,       03:10

21   I'm not a lawyer, but still under FELA, there's an       03:10

22   obligation to prove causation and blame and why.         03:10

23   Was it the company?  Was it the employee?  What          03:10

24   roles did those parties have in the course of the        03:10

25   injury or illness that made it related to work?  And     03:10
```

                                                                     303

```
 1   what damages maybe finally are due to the employee?   03:10
 2   But it has very little to do with reportability       03:10
 3   under FRA.                                            03:11
 4          So we're talking about a regulatory            03:11
 5   function of reporting injuries and filing a claim     03:11
 6   against a company for a presumed illness or injury    03:11
 7   that a plaintiff feels was due to their work at the   03:11
 8   railroad.  They're two totally separate issues.       03:11
 9   They seem to overlap in our practices, but they're    03:11
10   really two completely separate issues.  Anyone can    03:11
11   file a claim.                                         03:11
12      Q.   Have you -- with respect to FELA and your     03:11
13   job duty's general knowledge of the railroad, have    03:11
14   you heard the expression or the terminology that an   03:11
15   employer -- railroad employer may be liable for       03:11
16   injuries if they're caused by work, even in the       03:11
17   slightest?                                            03:11
18      A.   Again, I don't know the exact language, but   03:11
19   --                                                    03:11
20          MS. FOSTER BIRD:  Let me object to, first      03:11
21   of all, asking questions about legal propositions;    03:11
22   secondly, the misstatement of the law.                03:11
23   BY MR. PAUL:                                          03:11
24      Q.   You were saying, Dr. Heligman?                03:11
25      A.   There may be issues where work is thought     03:12
```

Craig Heligman, M.D.                                    April 28, 2021

```
 1    to be a contributing factor.  And, again, it's a      03:12
 2    litigation issue that is formally decided through      03:12
 3    the legal process.  It's not a medical issue.          03:12
 4           But these forms, again, are not used to         03:12
 5    determine reporting status under FRA.  It's not used   03:12
 6    for the purpose of --                                  03:12
 7        Q.    Sure.                                        03:12
 8        A.    -- FELA activity.  This is an                03:12
 9    administrative tool used solely for the notification   03:12
10    of the company as to our employees' medical status     03:12
11    and ability to return to work or not.  That's the      03:12
12    only purpose for this form.                            03:12
13        Q.    Okay.  Great.                                03:12
14           Last question on this topic -- and, again,      03:12
15    I'm not asking about any legal issues.  I'm asking     03:12
16    about your experience working on railroads --          03:12
17    primarily CSX, but any railroad.                       03:12
18           Are you familiar with that process of when      03:12
19    someone claims a work-related injury, that a           03:12
20    determination can be made about a percentage that is   03:12
21    work-related and a percentage that's                   03:12
22    non-work-related with respect to that injury?          03:13
23           MS. FOSTER BIRD:  Gosh, I'm going to object     03:13
24    to that question as being kind of a legal question     03:13
25    for which he is not qualified to answer.               03:13
```

305

```
 1   BY MR. PAUL:                                    03:13

 2       Q.   You can answer if you understand it.    03:13

 3       A.   All I know is that there may be a       03:13

 4   contributing factor, but beyond that, I'm not the 03:13

 5   expert.                                          03:13

 6       Q.   Yeah.  Understood.                      03:13

 7            Contributing factor, can you -- I think I 03:13

 8   know what you mean, but can you explain what you  03:13

 9   mean when you use the term "contributing factor"? 03:13

10       A.   All I'm saying is that in the litigation of 03:13

11   the case, if it is determined that work may have  03:13

12   been a part of the reason for the medical issue,  03:13

13   that there is some level of apportionment.        03:13

14            Again, it's -- it's a litigation process. 03:13

15   I'm not an attorney.  I understand, to a degree,  03:13

16   what FELA is and what the elemental differences are 03:13

17   between FELA and Workers' Compensation, but the   03:13

18   claims process, the litigation around a FELA claim 03:14

19   is out of my area of expertise.                   03:14

20       Q.   Okay.  Thank you.                       03:14

21            Just to wrap things up for today, if we  03:14

22   were to go through this exhibit -- and I guess you 03:14

23   would have an opportunity to do that offline if you 03:14

24   chose to, as could counsel, including myself.  If we 03:14

25   were to go through these, and for any form that -- 03:14
```

                                                        306

```
 1    like -- like this one for Mr. Manis that does not     03:14

 2    indicate the source of the treatment, whether it's    03:14

 3    work-related, non-work-related, or a combination of   03:14

 4    the both, your answer would be the same as we've       03:14

 5    talked about so far?                                   03:14

 6         A.   Yes, this form is not used for determining   03:14

 7    work-relatedness.                                      03:14

 8         Q.   Okay.  But I guess -- okay.  I think you've  03:14

 9    answer that question, but let me just make it          03:14

10    perfectly clear.                                       03:14

11         I mean, if -- other examples, if they don't      03:14

12    identify where the injury occurred -- that is, at     03:14

13    work or not at work -- if they're similar to this     03:15

14    form, would you agree that you -- the Certificate of  03:15

15    Ongoing Illness form does not inform you of whether   03:15

16    the treatment with the chiropractor, whether          03:15

17    Dr. Johnson or otherwise, is work-related,            03:15

18    non-work-related, or a combination of both?           03:15

19         A.   Again, it's not used for that purpose.  If  03:15

20    it's not stated on the form, I will -- whatever the   03:15

21    employee and the provider states is what it is.  And  03:15

22    the assumption is that they did not report any        03:15

23    on-duty injuries through the normal process, that     03:15

24    the medical conditions addressed on these forms are   03:15

25    not work-related.  If they were work-related, we      03:15
```

307

Craig Heligman, M.D.                                                    April 28, 2021

```
 1   would have a separate reporting process and we would   03:15
 2   be able to find that information out.                   03:15
 3        In all of these cases, none of them had           03:15
 4   reported an on-duty injury, and, therefore, the        03:15
 5   assumption was always that this was a personal         03:16
 6   medical issue.                                         03:16
 7   Q.   That was your assumption; correct?                03:16
 8   A.   No, it is -- it was actually identified in        03:16
 9   the review process at OSHA.  So when these cases       03:16
10   were submitted for official review through the OSHA    03:16
11   process -- and forgive me for not stating the proper   03:16
12   job -- titles of the officials -- it was found that    03:16
13   there's no basis for saying this was a work-related    03:16
14   issue.                                                 03:16
15   Q.   Right.                                            03:16
16        And is it your understanding, either from        03:16
17   whatever you've reviewed with OSHA or looking at       03:16
18   these forms, that that -- not OSHA's determination,    03:16
19   but your determination and testimony -- that that is  03:16
20   because these injuries did not happen on the           03:16
21   property of CSX?                                       03:16
22   A.   My assumption is in the absence of a              03:16
23   reported injury at work, then the medical conditions  03:16
24   being documented on these forms are not                03:16
25   work-related.                                          03:17
```

308

USCA4    1257

```
 1              MR. PAUL:  All right.  I think we're good     03:17
 2    for today.                                             03:17
 3              MS. FOSTER BIRD:  Before we go off the       03:17
 4    record, I want to address something in this            03:17
 5    document.                                              03:17
 6              I don't know if you've marked it as an       03:17
 7    exhibit, but if you go to Page 33 of this document,    03:17
 8    there is a COII that is inserted in here.  It has no   03:17
 9    carrier exhibit indication at the top, which           03:17
10    indicates it was part of an exhibit to a hearing.      03:17
11    It also has no Bates stamp number at the bottom.  It   03:17
12    is dated in 2018.  It is for a person who I don't      03:17
13    believe is a plaintiff.                                03:17
14              I don't know where this came from, but to    03:17
15    the extent you're admitting this as an exhibit, it's   03:17
16    problematic for a number of reasons, along with some   03:17
17    of those others that had -- you know, are not          03:17
18    plaintiffs.  So...                                     03:17
19              MR. PAUL:  Okay.  We did mark it as an       03:17
20    exhibit.  I believe it's Exhibit 7.  I will take a     03:18
21    look at that, but I think your objection is noted.     03:18
22    And I will look into that and see what the -- why      03:18
23    that's in there.  It may be that, you know, I          03:18
24    consolidated these or had someone consolidate these    03:18
25    so we could use this -- you know, flip through them    03:18
```

                                                            309

Craig Heligman, M.D.                                      April 28, 2021

```
 1    more easily than pulling up an individual one, but    03:18
 2    I'll look into that.                                  03:18
 3            MS. FOSTER BIRD:  Okay.  Thank you.           03:18
 4            MR. PAUL:  All right.  Anything else for      03:18
 5    today?                                                03:18
 6            MS. FOSTER BIRD:  Not from me.                03:18
 7            MR. PAUL:  Okay.  Everybody have a good       03:18
 8    night.  I think we're off the record.                03:18
 9            THE VIDEOGRAPHER:  We're going off the        03:18
10    record at 3:18 p.m.  Thank you very much.            03:18
11            (At 3:18 p.m. the Volume I deposition of      03:18
12             CRAIG HELIGMAN, M.D. was adjourned.)         03:18
13
14
15
16
17
18
19
20
21
22
23
24
25
```

                                                              310

Jolanda Johnson                                                                    May 5, 2021

1         IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN

2                      DISTRICT OF WEST VIRGINIA

3                             AT HUNTINGTON

4

5    JUSTIN ADKINS, et al.,    )
                               )
6         Plaintiffs,          )
                               )
7    vs.                       )Civil Action No. 3:18-cv-00321
                               )
8    CSX CORPORATION, et al., )
                               )
9         Defendants.          )
     _____)

10

11

12

13

14

15

16

17

18

19

20

21

22        REMOTE VIDEOTAPED DEPOSITION OF CSX CORPORATION'S

23   30(b)(6) DESIGNEE, JOLANDA JOHNSON, commencing at

24   10:38 a.m. PST, Wednesday, May 5, 2021, before

25   Elizabeth A. Willis-Lewis, RPR, CSR No. 12155.

                                                              2

Jolanda Johnson                                                                    May 5, 2021

```
 1     APPEARANCES (VIA ZOOM):

 2


 3          FOR THE PLAINTIFFS:

 4          MORGAN & PAUL, PLLC
            BY:  GREGORY G. PAUL, ESQ.
 5          100 First Avenue, Suite 1010
            Pittsburgh, Pennsylvania 15222
 6          844.374.7200
            gregpaul@paullaw.com
 7


 8
            FOR THE DEFENDANTS:
 9
            NELSON MULLINS
10          BY:  MELISSA FOSTER BIRD, ESQ.
            949 Third Avenue, Suite 200
11          Huntington, West Virginia 25701
            681.888.5282
12          melissa.fosterbird@nelsonmullins.com

13


14          ALSO PRESENT:  PATRICK HUGHES, ESQ.

15

16

17

18

19

20

21

22

23

24

25
```

                                                                                         3

Jolanda Johnson                                                              May 5, 2021

1                              INDEX

2

3     WITNESS:  JOLANDA JOHNSON

4

5     EXAMINATION                                        PAGE

6     By Mr. Paul                                          7

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                          4

Jolanda Johnson                                                                                          May 5, 2021

```
 1                   INDEX TO EXHIBITS

 2    NUMBER                                        MARKED

 3    Exhibit 1     Plaintiffs' Amended Notice of
                    30(b)(6) Deposition and Request
 4                  for Production of Documents.          8

 5    Exhibit 2     13-page e-mail string with
                    attachments including an e-mail
 6                  from Jolanda Johnson to Craig
                    Heligman dated Wednesday, July 19,
 7                  2017, 12:41 PM, Bates stamped
                    CSXT(Adkins)022260-CSXT(Adkins)022272.  14
 8
      Exhibit 3     14-page document including a
 9                  document titled, "Frequently Asked
                    Questions About FMLA," Bates stamped
10                  CSXT(Adkins)022198-CSXT(Adkins)022211.  42

11    Exhibit 4     15-page document titled, "CSX
                    Intermodal Terminals, Inc. -
12                  Medical Leaves of Absence Policy,"
                    Bates stamped
13                  CSXT(Adkins)022066-CSXT(Adkins)022080.  65

14

15

16

17

18

19

20

21

22

23

24

25
```

                                                                                    5

1              WEDNESDAY, MAY 5, 2021, 10:38 A.M. PST

2

3              THE VIDEOGRAPHER:  Hello.  We are on the          10:38:21

4    record.  Here begins the remote deposition of Jolanda      10:38:26

5    Johnson in the matter of Adkins versus CSX Corporation.     10:38:30

6    This is presiding in the United States District Court of    10:38:36

7    the Southern District of Virginia at Huntington.  Case      10:38:40

8    number 3:18-cv-00321.                                        10:38:44

9              Today's date is May 5th, 2021, and the time is    10:38:52

10   10:38 a.m. Pacific Standard Time.  The video operator       10:38:55

11   today is Jason Patsalis representing Network Deposition     10:39:01

12   Services located at 1800 Century Park East, Suite 150,      10:39:05

13   in Los Angeles, California.  Phone number 310-557-3400.     10:39:11

14   The court reporter today is Elizabeth Willis.  This is a    10:39:18

15   remote deposition through Zoom videoconferencing.           10:39:24

16             Would counsel present please identify             10:39:27

17   yourselves for the record and who you represent?            10:39:28

18             MR. PAUL:  This is Greg Paul on behalf of the     10:39:31

19   plaintiffs.                                                  10:39:34

20             MR. HUGHES:  Patrick Hughes for the plaintiffs    10:39:38

21   as well.                                                     10:39:40

22             MS. BIRD:  Melissa Foster Bird.  I'm here on      10:39:41

23   behalf of CSX Transportation, the other defendants in       10:39:44

24   this case, and Ms. Johnson, the witness.                    10:39:46

25             THE DEPONENT:  Jolanda Johnson, CSX.              10:39:49

                                                                          6

| | | |
|---|---|---|
| 1 | administer the oath to the witness. | 10:39:54 |
| 2 | | |
| 3 | JOLANDA JOHNSON, | 10:40:10 |
| 4 | having been first duly sworn, testified as | 10:40:10 |
| 5 | follows: | 10:40:10 |
| 6 | | |
| 7 | COURT REPORTER:  Thank you. | 10:40:10 |
| 8 | | |
| 9 | EXAMINATION BY MR. PAUL: | 10:40:11 |
| 10 | Q.   Good afternoon, Ms. Johnson.  My name is Greg | 10:40:11 |
| 11 | Paul.  We've been introduced before.  How are you doing | 10:40:14 |
| 12 | today? | 10:40:17 |
| 13 | A.   Fine. | 10:40:17 |
| 14 | Q.   Great.  We're here today in this deposition | 10:40:18 |
| 15 | you've been designated as a 30(b)(6) deponent under the | 10:40:22 |
| 16 | Federal Rules of Civil Procedure.  Are you familiar with | 10:40:28 |
| 17 | that? | 10:40:30 |
| 18 | A.   Yes. | 10:40:30 |
| 19 | Q.   Okay.  And what is -- what is your | 10:40:30 |
| 20 | understanding of being designated as a 30(b)(6) deponent | 10:40:31 |
| 21 | today? | 10:40:36 |
| 22 | A.   Just to represent the company.  To speak on | 10:40:36 |
| 23 | behalf of the company on certain matters. | 10:40:39 |
| 24 | Q.   Okay.  And those matters are certain topics, is | 10:40:45 |
| 25 | | |

7

7

Jolanda Johnson                                                    May 5, 2021

```
 1    that your understanding, that were outlined in the     10:40:49

 2    Notice of Deposition?                                  10:40:51

 3         A.   Yes.                                         10:40:52

 4         Q.   Okay.  I'd like to mark that as Exhibit 1 and  10:40:52

 5    share my screen.                                       10:40:58

 6              (Exhibit 1 was marked for identification.)   10:40:59

 7    BY MR. PAUL:                                           10:41:04

 8         Q.   Are you able to see what looks like a        10:41:04

 9    deposition?  It says, "In the United States District   10:41:07

10    Court for the Southern District of West Virginia"?     10:41:08

11         A.   Yes.  But could you zoom, make it larger,    10:41:12

12    please?                                                10:41:15

13         Q.   Yeah.  Absolutely.  Is that big enough?      10:41:16

14         A.   Yes.                                         10:41:21

15         Q.   Okay.  This is a nine-page document that starts  10:41:22

16    out with the names of a number of plaintiffs, and then   10:41:28

17    it gets to a number of topics.  And prior to going on   10:41:31

18    the record today, counsel have confirmed but I want to   10:41:34

19    put on the record, is it your understanding that you've   10:41:40

20    been designated to testify today on behalf of the      10:41:43

21    following topics -- and then we'll read them together --  10:41:46

22    topic 3, topic 6, topic 7, and topic 18?               10:41:49

23         A.   Yes.                                         10:42:00

24         Q.   Okay.  So let's get topic 3 into the record.  10:42:00

25    "Defendant's policies, procedures, and practices for   10:42:06
```

8

Jolanda Johnson                                                    May 5, 2021

```
1   returning an employee to work following sickness and    10:42:08

2   accident, short-term and/or long-term disability        10:42:11

3   benefits."                                              10:42:15

4          Do you see where I read that?                    10:42:16

5      A.   Yes.                                             10:42:17

6      Q.   Okay.  Then topic 6, "Defendant's disability    10:42:17

7   leave of absence policies, procedures, and practices    10:42:26

8   with effective dates and amendments for all such        10:42:29

9   policies."                                              10:42:31

10         Do you see where I read that?                    10:42:32

11     A.   Yes.                                             10:42:33

12     Q.   No. 7, "Identify and produce the person or      10:42:34

13  persons most knowledgeable regarding KEPRO's policies   10:42:38

14  and practices for processing requests and approval for  10:42:42

15  FMLA in general and specific to any of the plaintiffs." 10:42:46

16         Do you see where I read that?                    10:42:49

17     A.   Yes.                                             10:42:51

18     Q.   And then jumping to topic 18, "E-mails between  10:42:54

19  Dr. Heligman and Jolanda Johnson during the period of   10:43:02

20  time 2016 to the present."                              10:43:04

21         Do you see where I read that?                    10:43:05

22     A.   Yes.                                             10:43:07

23     Q.   Sorry.  With you I'm going to go in reverse     10:43:13

24  order.  Tell me what your knowledge is of any e-mails   10:43:16

25  between you and Dr. Heligman during the period of 2016  10:43:19
```

9

```
 1    to the present.                                     10:43:23

 2           MS. BIRD:  We're going to object to that topic,  10:43:26

 3    as we've previously stated, with regard to the breadth  10:43:27

 4    and the over -- overbreadth of it.  We are going to   10:43:32

 5    permit her to answer as to the plaintiffs or this -- the  10:43:36

 6    subject matter in this case, but not as to all possible  10:43:41

 7    e-mails between her and Dr. Heligman which would     10:43:45

 8    encompass, first of all, too long a period of time.  10:43:48

 9    Also, a period of time after all of the [technical  10:43:52

10    interference] in this case to her, and it would be  10:43:55

11    invasion of privacy, possibly, for medical information  10:44:00

12    for other employees that are not plaintiffs in this  10:44:02

13    case.  Previously noted objection and you may continue  10:44:06

14    with that objection.                               10:44:10

15           BY MR. PAUL:                                10:44:11

16        Q.   Okay.  Notwithstanding that objection, let me  10:44:11

17    ask you this:  Do you regularly, in the course of your  10:44:14

18    job duties at CSX, e-mail Dr. Heligman?             10:44:17

19        A.   No.                                        10:44:21

20        Q.   Is it fair to characterize that it's rare that  10:44:23

21    you would exchange e-mails with Dr. Heligman?       10:44:31

22        A.   Yes.                                       10:44:36

23        Q.   Outside of the plaintiffs in this case, do you  10:44:41

24    have a recollection of ever e-mailing Dr. Heligman  10:44:44

25    concerning any employee other than the plaintiffs?  10:44:47
```

                                                                    10

Jolanda Johnson                                                    May 5, 2021

```
 1        A.    Yes.                                        10:44:50

 2        Q.    And broadly, without identifying the specific   10:44:53

 3   person, to the extent you recall, what are the topics or   10:44:57

 4   what are the reasons that you've communicated by e-mail    10:45:00

 5   with Dr. Heligman other than related to the plaintiffs     10:45:03

 6   in this case?                                         10:45:05

 7        A.    Going back to 2016?                        10:45:13

 8        Q.    Yes.                                        10:45:15

 9        A.    As it pertains to revocation of short-term  10:45:27

10   disability.                                           10:45:30

11        Q.    Okay.  So short-term disability questions in   10:45:31

12   general or specific to employees?                     10:45:34

13        A.    Specific to an employee, more related to since  10:45:36

14   the employee was in a safety-sensitive job, based on   10:45:43

15   what our vendor had at the time as far as the medical   10:45:48

16   condition.  Working with Dr. Heligman, as well as the   10:45:52

17   employee's supervisor, to get an understanding as far as   10:45:59

18   his job duties to determine if the employee would be    10:46:03

19   medically qualified to be returned to work.           10:46:09

20        Q.    Okay.  And we'll -- I know that's one of the   10:46:12

21   topics, but as a general matter, do you know if any of   10:46:14

22   the plaintiffs in this case were eligible for short-term   10:46:17

23   disability benefits?                                  10:46:20

24        A.    It's possible that a few may have been eligible   10:46:22

25   for supplemental sickness or short-term disability    10:46:34
```

11

Jolanda Johnson                                                    May 5, 2021

```
1    benefits, but I would like to state on record that those    10:46:37

2    benefits for this group or the ones that may have been      10:46:42

3    eligible are not managed by benefits.                       10:46:47

4         Q.   Okay.  Are you aware of any short-term            10:46:52

5    disability benefits that are provided by CSX to any of      10:46:56

6    the plaintiffs in this case?                                10:47:00

7         A.   I wouldn't say provided by CSX, because going     10:47:02

8    back to their benefits are negotiated, but the -- there     10:47:05

9    is, like, a supplemental sickness benefit that's            10:47:11

10   administered by CoreSource for certain training, and        10:47:15

11   then there is a short-term disability benefit for --        10:47:18

12   that's administered by Sun Life, and that's for BLET        10:47:25

13   union employees.                                            10:47:31

14        Q.   And BLET stands for the Brotherhood of            10:47:32

15   Locomotive Engineer and Trainmen?                           10:47:35

16        A.   Yes.                                              10:47:38

17        Q.   So those are the conductors and engineers?       10:47:39

18        A.   Yes.                                              10:47:41

19        Q.   And are those short-term disability benefits     10:47:41

20   for the BLET members -- are those premiums paid for by      10:47:44

21   the company or are they voluntary?                          10:47:48

22        A.   I'm not sure, because it goes back to our        10:47:51

23   department does not administer those benefits.  I'm         10:47:54

24   aware of it, of those benefits.  But just to the extent     10:47:57

25   of, you know, it being supplemental sickness benefits or    10:48:01
```

12

Jolanda Johnson                                May 5, 2021

| | | |
|---|---|---|
| 1 | short-term disability and the vendor. | 10:48:05 |
| 2 | Q. Okay. Different question. Do you recall, | 10:48:10 |
| 3 | either by preparing for this deposition or by your own | 10:48:15 |
| 4 | memory, whether you had any e-mail correspondence with | 10:48:17 |
| 5 | Dr. Heligman concerning the plaintiffs in this case | 10:48:24 |
| 6 | during the period of time 2016 to the present? | 10:48:26 |
| 7 | A. Yes. | 10:48:31 |
| 8 | Q. Okay. And other than the e-mail that we can | 10:48:32 |
| 9 | take a look at here now in July of 2017, were there any | 10:48:35 |
| 10 | other e-mails that you had with Dr. -- to or from | 10:48:40 |
| 11 | Dr. Heligman concerning the plaintiffs? | 10:48:43 |
| 12 | A. No. | 10:48:45 |
| 13 | MR. PAUL: Okay. Can we mark that Notice of | 10:48:53 |
| 14 | Deposition as Exhibit 1 if we already didn't do that? | 10:48:54 |
| 15 | And I'd like to mark this as Exhibit 2, which | 10:48:57 |
| 16 | is an e-mail dated July 19th, 2017. | 10:49:01 |
| 17 | BY MR. PAUL: | 10:49:05 |
| 18 | Q. Are you able to see that? | 10:49:05 |
| 19 | A. Yes. | 10:49:06 |
| 20 | Q. Okay. Is this the e-mail you're referring to? | 10:49:08 |
| 21 | A. Yes. | 10:49:09 |
| 22 | Q. So is it accurate to say this e-mail chain -- | 10:49:11 |
| 23 | and if you need more time to take a look at it, let me | 10:49:19 |
| 24 | know -- is the only e-mail correspondence that you had | 10:49:23 |
| 25 | with Dr. Heligman concerning the plaintiffs? | 10:49:25 |

13

```
 1      A.   Yes.                                      10:49:29

 2           MR. PAUL:  I'd like to mark that as Exhibit 2,  10:49:37

 3      please.                                        10:49:39

 4           (Exhibit 2 was marked for identification.)  10:49:50

 5      BY MR. PAUL:                                    10:49:51

 6      Q.   During the time of that e-mail of July of 2017,  10:49:51

 7      what was your position at CSX?                  10:49:55

 8      A.   July 2017, manager of benefits, FMLA.      10:49:57

 9      Q.   Okay.  And if you need to take a look at that  10:50:07

10      e-mail again, let me know; I'll pull it back up.  But  10:50:09

11      what was your understanding of your role as manager of  10:50:13

12      FMLA in that correspondence with Dr. Heligman?  10:50:17

13      A.   To review the employee's FMLA record to provide  10:50:21

14      information about their leaves, if any.          10:50:32

15      Q.   And it looks like from the times of the     10:50:40

16      e-mail -- let me pull that back up.  It appears that you  10:50:44

17      responded to Dr. Heligman by e-mail at 12:41 p.m. on  10:50:54

18      July 19th, 2017.  Do you see that?              10:50:58

19      A.   Yes.                                        10:51:00

20      Q.   And it looks like, but I want to ask you, the  10:51:01

21      e-mail chain right below that, did you receive an e-mail  10:51:05

22      from Penny Dreher at 11:18 a.m. on July 19, 2017?  10:51:08

23      A.   Yes.                                        10:51:15

24      Q.   So did you perform the work that you were    10:51:16

25      requested by Penny Dreher and submit it to Dr. Heligman  10:51:18
```

14

```
1    in between 11:18 a.m. and 12:41 p.m. on July 19?         10:51:22

2        A.   Yes.                                            10:51:27

3        Q.   And did you ever do anything before or after   10:51:28

4    that period of time on July 19 with respect to any of   10:51:31

5    the plaintiffs in this case?                            10:51:35

6        A.   No.                                             10:51:44

7        Q.   Were you asked by Dr. Heligman, anyone in the  10:51:44

8    medical department, or Penny Dreher to review the       10:51:50

9    eligibility for current or future FMLA coverage for any 10:51:53

10   of the plaintiffs in this case based upon the           10:51:57

11   information that was in the attachment chart that we're  10:51:59

12   looking at right now that starts at Bates No. 22262 all  10:52:03

13   the way through the end of that attachment 22272?        10:52:08

14       A.   No.                                             10:52:13

15       Q.   Being that you weren't asked to consider       10:52:13

16   current or future existing FMLA coverage, did it occur  10:52:20

17   to you to investigate that on your own initiative?      10:52:24

18       A.   No.                                             10:52:27

19       Q.   And why not?                                    10:52:28

20       A.   Because due to the possible fraud,             10:52:31

21   investigation had been launched, and so I provided the  10:52:38

22   information as part of the investigation process.       10:52:45

23       Q.   Is there any reason other than the alleged     10:52:49

24   suspicion of fraud that you did not consider processing 10:52:53

25   FMLA applications for the plaintiffs in this case in the 10:52:56
```

15

1   summer of 2017?                                          10:52:59

2        A.   No.                                            10:53:01

3        Q.   Okay.  That will take us off of topic 18.      10:53:02

4             So if we move to topic 7, are you able to see  10:53:11

5   that topic?                                              10:53:20

6        A.   Yes.                                           10:53:20

7        Q.   Okay.  So if you could, tell us for the record 10:53:21

8   what KEPRO is, and then we'll get to the policies and    10:53:26

9   practices for processing requests and approval for FMLA  10:53:30

10  in general and specific.                                 10:53:33

11            So first, who or what is KEPRO?                10:53:34

12       A.   KEPRO is a third-party vendor that specializes 10:53:38

13  in the administration of FMLA.  They are responsible for 10:53:43

14  handling calls as it relates to FMLA, ranging from       10:53:55

15  answering questions about the FMLA benefits to           10:54:01

16  initiating an FMLA leave request.  Also, they are        10:54:06

17  clinicians or nurses that are responsible for reviewing  10:54:13

18  the medical certification forms and making a decision    10:54:15

19  and pursuant to the FMLA guidelines whether if their     10:54:19

20  leave -- the leave will be approved, denied, or returned 10:54:24

21  to the employee for a cure.  Also, the nurses are        10:54:28

22  responsible for reviewing the employee's FMLA            10:54:33

23  utilization and determining if the employee should be    10:54:38

24  required to recertify.                                   10:54:43

25       Q.   And for how long has KEPRO been involved in any 10:54:45

                                                                16

Jolanda Johnson                                          May 5, 2021

```
1    aspect of CSX's FMLA administration?              10:54:49

2        A.    Since January 2013.                     10:54:53

3        Q.    Okay.  And if you consider the period of time   10:54:55

4    of 2013 to the present, would you describe KEPRO's   10:54:57

5    involvement in the administration of CSX's FMLA as a   10:55:02

6    full handoff or a partial handoff?                10:55:06

7        A.    I would say a partial handoff.          10:55:08

8        Q.    Okay.  And throughout that period of time, 2013   10:55:15

9    to the present, have those -- has that partial handoff   10:55:19

10   changed in any significant manner such that we need to   10:55:24

11   break it down further?                            10:55:27

12       A.    So KEPRO is definitely -- when it comes to just   10:55:29

13   the day-to-day administration, they are totally -- have   10:55:32

14   taken ownership of that.  But as far as the designation   10:55:36

15   process, at one point CSX was responsible -- benefits   10:55:41

16   was responsible for designating leave of FMLA.  In about   10:55:47

17   2019 KEPRO took on ownership of part of that process,   10:55:53

18   specifically as it relates to employee -- management   10:55:59

19   employees, dispatchers, or -- you know, that are        10:56:04

20   approved for short-term disability.  So they manage that   10:56:09

21   process.                                          10:56:12

22           Also, as far as --                        10:56:19

23           COURT REPORTER:  Ma'am, I'm sorry.  I have my   10:56:19

24   children's school calling me.  Could I go off the record   10:56:23

25   for just a moment?                                11:00:13
```

17

```
 1              MR. PAUL:  Yeah, that's fine.              11:00:13
 2              THE VIDEOGRAPHER:  We're going off the     11:00:13
 3   record --                                            11:00:13
 4              COURT REPORTER:  Thank you.  I'm sorry.    11:00:13
 5              THE VIDEOGRAPHER:  We're going off the record.  11:00:13
 6   The time is 10:56.                                   11:00:13
 7              (Off the record.)                         11:00:13
 8              THE VIDEOGRAPHER:  We're back on the record.  11:00:58
 9   The time is 11:01.                                   11:01:18
10              MR. PAUL:  All right.  Great.             11:01:21
11       BY MR. PAUL:                                     11:01:21
12       Q.  Ms. Johnson, we're back on the record after a  11:01:21
13   short break.  We were talking about KEPRO and its role  11:01:25
14   in the administration of CSX's FMLA process, and I    11:01:29
15   believe you had said that over the course of 2013 to the  11:01:35
16   present, one of the primary things that changed with   11:01:38
17   respect to KEPRO and CSX's FMLA process was the        11:01:41
18   designation process; is that correct?                 11:01:46
19       A.  Yes, the designation and I failed to mention  11:01:47
20   the recertification process.                          11:01:50
21       Q.  Okay.  Let's talk about the designation process  11:01:52
22   first.  What does that mean, if you can explain that for  11:01:54
23   the record?                                           11:01:57
24       A.  So if an employee -- and this is specifically  11:01:57
25   employees that the benefits department manages their   11:02:01
```

                                                              18

Jolanda Johnson                                                    May 5, 2021

1    short-term disability, so that will be active management    11:02:07

2    employees, dispatchers.  So once their short-term          11:02:14

3    disability is approved, then KEPRO will designate their    11:02:16

4    time as FMLA.                                              11:02:23

5         Q.    Okay.  So is it accurate to say that the        11:02:24

6    designation process is the official recognition of an      11:02:27

7    employee's leave as qualifying for FMLA leave?             11:02:31

8         A.    Yes, based on short-term disability approval.   11:02:37

9         Q.    Okay.  Can you explain the relationship between 11:02:41

10   that, the short-term disability process and the FMLA's     11:02:45

11   designation process?                                       11:02:49

12        A.    Yes.  So the short-term disability is           11:02:50

13   administered by New York Life Benefits Solutions,          11:02:54

14   formerly Cigna.  So they, you know, receive medical        11:03:00

15   information from the employee's doctor.  They complete      11:03:04

16   the review of that medical documentation, and they make    11:03:07

17   a decision to either approve or deny the request.          11:03:10

18           With the short-term disability process, the        11:03:16

19   medical information that is obtained is over and beyond     11:03:21

20   what is permitted under the FMLA regulations.  So          11:03:25

21   instead of having the employees get two forms completed,   11:03:30

22   we've taken the position that we'll accept the approval    11:03:34

23   of their short-term disability as a means to designate     11:03:39

24   their FMLA or the continuous leave as FMLA.                11:03:43

25        Q.    So does that mean for that category of          11:03:48

                                                                        19

USCA4    1277

Jolanda Johnson                                                    May 5, 2021

```
 1    employees, they do not have to complete an FMLA        11:03:50

 2    certification form because the paperwork involved in the  11:03:53

 3    application for short-term disability suffices?         11:03:57

 4         A.    Yes.                                         11:04:01

 5         Q.    Okay.  And for what class of employees is that  11:04:01

 6    process in place for?                                   11:04:05

 7         A.    Active management employees, and I believe the  11:04:07

 8    dispatchers as well.                                    11:04:11

 9         Q.    Okay.  Do --                                 11:04:13

10               (Simultaneous colloquy.)                     11:04:13

11         A.    -- active management.                        11:04:13

12         Q.    Okay.  And to your knowledge, does that process  11:04:15

13    that we've just talked about, the short-term disability  11:04:18

14    through Cigna or New York Life, apply to any of the     11:04:20

15    plaintiffs in this case?                                11:04:23

16         A.    No.  They're not eligible for benefits with New  11:04:24

17    York Life.                                              11:04:29

18         Q.    Okay.  And in the testimony today, when you  11:04:29

19    referred to that designation process, you know, in     11:04:32

20    between KEPRO and CSX, does that designation process   11:04:36

21    apply to anyone other than that class of employees that  11:04:42

22    we just talked about, either the dispatchers or the    11:04:46

23    management folks?                                       11:04:48

24         A.    Well, the process, generally speaking, it can  11:04:50

25    apply to any employee except union employees.          11:04:54
```

                                                                  20

Jolanda Johnson                                          May 5, 2021

```
 1        Q.   So in 2017, who was responsible for the      11:05:00

 2   designation of the union crafts that include the       11:05:04

 3   plaintiffs?                                             11:05:09

 4        A.   Benefits.                                     11:05:09

 5        Q.   Okay.  So the -- it was -- was it KEPRO or was 11:05:10

 6   it someone in benefits at CSX who was responsible for  11:05:16

 7   designating that leave for the plaintiffs?             11:05:18

 8        A.   Well, I'm just speaking in general.  In 2017, 11:05:21

 9   benefits was -- had ownership of the designation       11:05:25

10   process.                                               11:05:28

11        Q.   Okay.  And at some point in time, did that   11:05:29

12   designation for the union employees change to KEPRO?   11:05:31

13        A.   Just to the extent of what I've shared as far 11:05:36

14   as short-term disability.                              11:05:41

15        Q.   Okay.  But including -- I guess let me ask it 11:05:42

16   this way:  Was there ever a shift in the designation   11:05:45

17   process from CSX to KEPRO with respect to all          11:05:49

18   employees --                                           11:05:55

19        A.   No.                                          11:05:56

20        Q.   -- on the designation topic?                 11:05:56

21        A.   No.                                          11:05:58

22        Q.   Okay.  So today, is CSX still responsible for 11:05:58

23   the designation process for all employees?            11:06:05

24        A.   Yes.                                         11:06:07

25        Q.   I think we've established this but not in this 11:06:07
```

                                                              21

USCA4    1279

```
 1    deposition.  Are you aware -- I'm on topic 7 and the      11:06:25
 2    last part that says, "Specific to any of the             11:06:29
 3    plaintiffs."  I want to ask you, do you have any         11:06:31
 4    knowledge about whether any of the plaintiffs in this    11:06:33
 5    case were considered by CSX or KEPRO for FMLA leave      11:06:36
 6    starting in June of 2017 moving forward?                 11:06:42
 7        A.   No.                                             11:06:45
 8        Q.   So in general -- now I'm on topic 7 in general. 11:06:48
 9    Can you just walk through the process of how -- what the 11:07:00
10    policies and practices are for processing requests and  11:07:05
11    approval for FMLA?                                       11:07:08
12             And let's right now start with union employees. 11:07:11
13    To the extent it may be different, we can talk about     11:07:13
14    that later.                                              11:07:16
15        A.   If a union employee has a need for FMLA leave,  11:07:18
16    they would -- or should contact KEPRO -- it's known as   11:07:23
17    the CSX FMLA Center -- to initiate leave.  A customer    11:07:31
18    service rep will ask the employee a series of questions  11:07:39
19    such as their CSX ID number, the reason for leave and    11:07:44
20    the type of leave.  They would then run the eligibility  11:07:48
21    just to confirm that the employee meets the eligibility  11:07:55
22    requirements, at least 12 months of service with the     11:07:59
23    company and have worked at least 1,250 hours within a    11:08:03
24    12-month period from the start date of leave.            11:08:07
25        Q.   Okay.  Can I stop you there for one moment?     11:08:10
```

                                                                          22

```
 1    What is the CSX FMLA Center?                              11:08:13

 2         A.    KEPRO.                                         11:08:17

 3         Q.    Okay.  They are one and the same?             11:08:18

 4         A.    Yes.                                           11:08:20

 5         Q.    And for how long has that term been in use, the  11:08:20

 6    CSX FMLA Center, referring to KEPRO?                     11:08:24

 7         A.    Since 2013.                                    11:08:26

 8         Q.    Okay.  And to your knowledge, have any of the  11:08:27

 9    union employees, including the plaintiffs in this case,  11:08:34

10    ever been provided any training on the FMLA at CSX?      11:08:36

11         A.    No.                                           11:08:40

12         Q.    To your knowledge, have any of the supervisors,  11:08:45

13    say, in the Huntington, Kentucky or Ohio area ever been  11:08:48

14    provided any training under the FMLA at CSX?             11:08:53

15         A.    Okay.  So let me step back on the union       11:08:53

16    employees.  So to the extent of -- there was a training  11:08:56

17    I believe in 2018, '19.  There was a segment of FMLA     11:09:01

18    information that was provided.  There was other content  11:09:07

19    that was covered in the training, but there was -- I was  11:09:11

20    responsible for providing content in regards to the      11:09:17

21    FMLA.                                                    11:09:20

22         Q.    Okay.  How about prior to 2018 or '19?  Is your  11:09:21

23    answer the same that there was no training?              11:09:28

24         A.    Yes.  No training.                            11:09:30

25         Q.    And that was no training to both union        11:09:31
```

23

1    employees and supervisors?                        11:09:33

2        A.    No to union employees.   Yes to supervisors.    11:09:35

3        Q.    Okay.   What training are you aware of that was    11:09:40

4    provided to supervisors prior to 2018 and '19?    11:09:43

5        A.    In 2 -- so in general with managers, if they    11:09:46

6    have direct reports, I would provide training on an ad    11:09:51

7    hoc basis or as requested.   But in 2016, we actually    11:09:57

8    held training.   And it was not just FMLA, but it    11:10:06

9    included medical.   It included labor relations.   It    11:10:10

10   included, you know, payroll.   And so it was a training    11:10:16

11   session for all people leaders or people that had direct    11:10:24

12   reports who were able to attend in person.    11:10:29

13       Q.    Other than by an employee contacting the CSX    11:10:37

14   FMLA Center, that is KEPRO, what other means can the    11:10:46

15   company process an application for FMLA coverage?    11:10:50

16       A.    An employee, if they mark off FMLA, meaning    11:10:55

17   either mark off FMLA by calling per management or mark    11:11:03

18   off FMLA with a time keeper or their manager, once their    11:11:07

19   work history has been updated with an FMLA absence, that    11:11:13

20   information is transmitted on a file from CSX to QCERA.    11:11:18

21   That information, those absences, are then uploaded into    11:11:27

22   LeaveSource which is the system that is used to    11:11:34

23   administer FMLA.    11:11:37

24       Q.    And just --                              11:11:42

25       A.    And --                                   11:11:42

                                                    24

Jolanda Johnson                                                    May 5, 2021

1      Q.    I'm sorry, go ahead.                          11:11:42

2      A.    Those absences will auto adjudicate if there is  11:11:42

3   an existing leave and the absence is for the FMLA       11:11:47

4   reason, meaning the FMLA mark-off code is for family    11:11:55

5   member or self.  Then if they're -- for example, let's  11:12:03

6   say the employee marks off for self, and there is an    11:12:05

7   FMLA leave for the employee's own serious health        11:12:09

8   condition, if that absence falls within that approval   11:12:13

9   period, then it would auto adjudicate or automatically  11:12:16

10  be assigned to that leave.  Whereas, if the employee    11:12:21

11  marked off for self and there's not an existing leave,  11:12:24

12  or there's a leave maybe for a family member's serious  11:12:28

13  health condition, or the mark-off falls outside of the  11:12:35

14  approval period, then it will go to what's called       11:12:38

15  inbound list.  And KEPRO, or the CSX FMLA Center, is    11:12:43

16  responsible for processing those exceptions.            11:12:48

17        So similar to, like, a phone call, they would     11:12:53

18  go through that same process.  Okay, this mark-off is   11:12:56

19  for the employee's serious health condition so we'll -- 11:13:00

20  they'll initiate a leave for the employee's serious     11:13:05

21  health condition, run the eligibility to establish if   11:13:09

22  they qualify, and then make a decision either to place  11:13:11

23  the employee in a conditional pending status or deny it 11:13:15

24  if they don't meet the eligibility requirements.        11:13:21

25     Q.   Okay.  So it sounds like on this second         11:13:24

                                                                  25

USCA4    1283

```
 1    topic -- the first topic being that an employee can call    11:13:27

 2    the FMLA center; the second being that an employee can       11:13:31

 3    notify crew management of either an existing FMLA            11:13:35

 4    coverage or a new potentially qualifying FMLA                11:13:39

 5    coverage that goes on the inbound list.  Did I get that      11:13:44

 6    right?                                                       11:13:47

 7        A.   Yeah.  So it's crew management, now, because        11:13:47

 8    not all employees call into crew management.  But crew       11:13:50

 9    management, they can mark off -- like, train and engine      11:13:53

10    employees can mark off through Crew Life, which is an        11:13:56

11    application.  Then other union employees, since you were     11:13:59

12    talking about just union employees in general, they may      11:14:05

13    have a time keeper that they call in, you know, to mark      11:14:07

14    off with or a manager.  So there's various ways,             11:14:12

15    depending on the group or where they're located, that       11:14:16

16    will determine their mark-off process.                      11:14:22

17        Q.   Okay.  Is it accurate to say that the second        11:14:25

18    way that an employee can mark off either for existing or     11:14:29

19    a new FMLA is to contact whoever that person is that's       11:14:32

20    responsible for attendance based on their craft and          11:14:37

21    department?                                                  11:14:40

22        A.   Correct.                                            11:14:41

23        Q.   Okay.                                               11:14:41

24        A.   And it will either be a person, and as I've         11:14:41

25    stated, for T & E employees, they actually have an app       11:14:45
```

26

Jolanda Johnson                                            May 5, 2021

1  where, you know -- you know, it's an application that    11:14:49

2  they can use to mark off versus a person.                11:14:56

3      Q.   Okay.  Are there any other apps that you can    11:14:59

4  think of, just so we, you know, complete this topic?     11:15:03

5      A.   No.                                             11:15:07

6      Q.   Do employees like craft employees, like the     11:15:08

7  plaintiffs in this case, do they have access to          11:15:12

8  LeaveSource?                                             11:15:14

9      A.   Yes.                                            11:15:15

10     Q.   Is there any opportunity for an employee to log 11:15:16

11 into LeaveSource and trigger FMLA leave, either existing 11:15:23

12 or new?                                                  11:15:29

13     A.   No.                                             11:15:30

14     Q.   So we've talked about the FMLA center.  We've   11:15:31

15 talked about crew management or apps or other people who 11:15:35

16 are responsible for attendance.  Are there any other     11:15:41

17 ways that an employee can initiate an FMLA application   11:15:46

18 at CSX?                                                  11:15:49

19     A.   I mean, if they send an e-mail to our mailbox,  11:15:57

20 which is leaveadmin@csx.com, or to a member of the       11:16:04

21 benefits team, two things can happen.  We will go ahead  11:16:13

22 and initiate the leave on the employee's behalf, or we   11:16:18

23 may redirect the employee to reach out to the CSX FMLA   11:16:21

24 Center to initiate FMLA.                                 11:16:27

25     Q.   And how long has that mailbox,                  11:16:33

                                                                 27

1    leaveadmin@csx.com, been in place?                        11:16:35

2         A.   It was put in place in 2017 or 2018, but at the   11:16:39

3    time that it was put in place, it -- only certain          11:16:48

4    departments or persons had access to it.  So the craft     11:16:55

5    employees or management employees did not have access to   11:17:01

6    send e-mails to that mailbox.  It was opened up to allow   11:17:03

7    anyone to send an e-mail to that mailbox I believe         11:17:10

8    in 2019.                                                   11:17:13

9         Q.   Okay.  And is it also correct that an employee   11:17:15

10   could initiate an FMLA application process through his     11:17:22

11   or her supervisor?                                         11:17:26

12        A.   Yes.                                             11:17:27

13        Q.   Is it also correct to say that an employee       11:17:27

14   could initiate FMLA or potentially FMLA qualifying         11:17:32

15   absences through the medical department?                   11:17:36

16        A.   So to clarify, let me step back to the manager.  11:17:38

17   So in the event that an employee lets their manager        11:17:44

18   know, "Hey, I need FMLA," two things could happen.  The    11:17:48

19   manager could let them know that, "Hey, you need to        11:17:51

20   contact the CSX FMLA Center," or the manager may send an   11:17:54

21   e-mail to the benefits department, and then we will        11:17:58

22   start that process.  And on occasion, which it doesn't     11:18:01

23   happen very often, but the manager too can call in to      11:18:05

24   the CSX FMLA Center and initiate the FMLA on the           11:18:10

25   employee's behalf.                                         11:18:15

28

Jolanda Johnson                                                    May 5, 2021

```
 1        Q.   Okay.  And is that also correct with respect to    11:18:16

 2   the employee initiating FMLA to the medical department?      11:18:20

 3        A.   So when you say, "initiate FMLA," I would say       11:18:23

 4   no simply because the medical department's role is           11:18:38

 5   dealing with just being off medical in general, so to        11:18:40

 6   that extent.  But to say -- to call in to initiate the       11:18:43

 7   FMLA, that the medical department would refer them to        11:18:49

 8   the CSX FMLA Center.                                         11:18:54

 9        Q.   Okay.  Let me ask a more specific question.         11:18:57

10   Are you aware of any communications in general, by           11:18:59

11   e-mail or otherwise, where the medical department has        11:19:03

12   informed the FMLA department at CSX of an employee's         11:19:06

13   need for FMLA or potentially FMLA qualifying absence?        11:19:11

14        A.   Yes.                                               11:19:16

15        Q.   Okay.  What do you know about that?                11:19:19

16        A.   So the medical department will -- you know, we     11:19:20

17   would receive notification that someone is off -- off        11:19:25

18   due to a medical reason, and so they would provide us        11:19:30

19   notice of that absence.                                      11:19:35

20        Q.   Okay.  And for how long has the medical            11:19:38

21   department notified you or your department at CSX            11:19:40

22   concerning employees' potential FMLA qualifying              11:19:45

23   absences?                                                    11:19:47

24        A.   How long?                                          11:19:48

25        Q.   For how long?                                      11:19:52
```

                                                                        29

| | | |
|---|---|---|
| 1 | A.   I mean -- | 11:19:57 |
| 2 | Q.   As long as you remember? | 11:19:57 |
| 3 | A.   Yes. | 11:19:57 |
| 4 | Q.   Okay. | 11:19:58 |
| 5 | A.   Yes. | 11:19:58 |
| 6 | Q.   Have you -- and I know -- I know you've been | 11:19:59 |
| 7 | with CSX since 1999, but for how long have you been | 11:20:02 |
| 8 | involved in CSX's FMLA policies and practices? | 11:20:05 |
| 9 | A.   Since 2005. | 11:20:08 |
| 10 | Q.   Okay.  So is -- can we say that it's true that | 11:20:10 |
| 11 | at least since 2005 that the medical department has | 11:20:14 |
| 12 | communicated with the FMLA department at CSX concerning | 11:20:18 |
| 13 | an employee's potential FMLA qualifying event? | 11:20:21 |
| 14 | A.   Yes.  But I would like to state this:  It | 11:20:24 |
| 15 | wasn't, keep in mind -- well, not keep in mind.  But | 11:20:31 |
| 16 | even though I'm saying I've been in this space since | 11:20:35 |
| 17 | 2005, it's not like in 2005 to the present that we were | 11:20:38 |
| 18 | made aware of every single employee that has gone out | 11:20:44 |
| 19 | due to a medical reason.  I know that medical had worked | 11:20:47 |
| 20 | to put a system -- a report that they generated for us | 11:20:51 |
| 21 | to identify those employees that were off medical, but | 11:20:58 |
| 22 | there was an issue with the report so we weren't getting | 11:21:06 |
| 23 | the report.  So not sure when it was actually put in | 11:21:09 |
| 24 | place and when it was -- we started experiencing issues | 11:21:15 |
| 25 | with that report, but the intent was to -- for | 11:21:18 |

30

Jolanda Johnson                                                    May 5, 2021

```
 1   visibility so we'll be able to be notified, you know,        11:21:25

 2   when employees go out due to a medical reason.               11:21:28

 3       Q.   I understand you don't remember or recall the       11:21:30

 4   exact time period, so we can come back to that in a          11:21:34

 5   minute.  But for whatever period of time that this was       11:21:36

 6   in place, did you receive weekly reports from the            11:21:39

 7   medical department about employees' potential FMLA           11:21:42

 8   qualifying absences?                                         11:21:46

 9       A.   Based off -- from what I can recall, yes.           11:21:47

10       Q.   Okay.  And do you -- just to be specific to         11:21:50

11   calendar year 2017, do you know if that process was in       11:21:55

12   place that we're talking about?                              11:21:59

13       A.   I don't recall, simply because it goes back         11:22:03

14   to -- I don't recall when it was put in place, but I         11:22:08

15   also don't recall at what point there was an issue with      11:22:12

16   the reporting.                                               11:22:17

17       Q.   Is it working today?                                11:22:18

18       A.   I don't know, simply because I came out of that     11:22:20

19   space for a couple of years.  And so we have a               11:22:26

20   centralized mailbox where all the reports and any            11:22:30

21   inquiries that are -- it's being sent to, and I'm not        11:22:33

22   involved with the day-to-day aspect of the FMLA.             11:22:38

23       Q.   Okay.  Were you involved in the day-to-day          11:22:41

24   aspect before January of 2019?                               11:22:44

25       A.   Yes.                                                11:22:47
```

31

```
 1        Q.   Okay.  So to the best of your memory -- I've       11:22:47

 2   already asked you about 2017, but to the best of your        11:22:52

 3   memory, was this process where the medical department        11:22:54

 4   would send a report to the FMLA department in existence      11:22:57

 5   in 2018 or '19?                                              11:23:00

 6        A.   I don't recall.                                    11:23:03

 7        Q.   And you may have touched on this, but what was     11:23:10

 8   the purpose of having that system in place where the         11:23:13

 9   medical department would communicate with the FMLA          11:23:16

10   department concerning employees' potential eligibility       11:23:18

11   for FMLA leave?                                              11:23:22

12        A.   Well, not a system, a report that we would         11:23:23

13   receive, but just, once again, for us to have visibility     11:23:27

14   as far as the employees who are off on FMLA.  And then       11:23:31

15   at that point, we would conduct a review to determine if     11:23:34

16   the absence would be designated as FMLA.                     11:23:38

17        Q.   Okay.  That was going to be my next question,      11:23:43

18   is what did you do upon receipt of those reports.  And       11:23:45

19   did you or someone in your department make that              11:23:49

20   eligibility assessment, or did that get shifted over to      11:23:51

21   KEPRO?                                                       11:23:54

22        A.   Benefits.                                          11:23:54

23        Q.   Okay.  And then what would happen -- what's the    11:23:56

24   next step after that determination of eligibility?          11:23:59

25        A.   Verify if they -- if the employee had any         11:24:04
```

```
 1    entitlements available.                           11:24:07

 2        Q.   Okay.  Can you explain what you mean by   11:24:08

 3    "entitlements"?                                    11:24:11

 4        A.   Under the FMLA, the employees are allowed up  11:24:12

 5    to 12 work weeks of unpaid job protected leave.  So  11:24:15

 6    looking at in sum the employee's FMLA balance.     11:24:20

 7        Q.   Got it.  And then what would be the next step  11:24:27

 8    in the FMLA process after the eligibility and      11:24:29

 9    entitlement were checked?                          11:24:32

10        A.   The issue of designation.                 11:24:34

11        Q.   And what is that, please?                 11:24:36

12        A.   It's a letter that's sent to the employee  11:24:38

13    advising them that we received information that they're  11:24:41

14    unable to work due to a personal illness or injury, and  11:24:47

15    that pursuant with the FMLA regulations, their     11:24:51

16    continuous time has been designated as FMLA, reminding  11:24:57

17    the employee as far as how much time is allowed under  11:25:00

18    the FMLA.  And then a copy of the CSX FMLA policy is  11:25:06

19    included.                                          11:25:16

20        Q.   Okay.  And at this point in the process that  11:25:16

21    we're discussing right now, did the medical        11:25:20

22    certification form happen or not happen yet?       11:25:22

23        A.   Did not.                                  11:25:25

24        Q.   Okay.  What's the next step after what you just  11:25:27

25    described?                                         11:25:31
```

                                                              33

1    A.   End of the process.                          11:25:32

2    Q.   I'm sorry?                                    11:25:34

3    A.   It's end of the designation process.         11:25:35

4    Q.   Okay.  So what happens next?  Does it go to  11:25:38

5    KEPRO, or do you do something in-house?            11:25:46

6    A.   No, it's all in-house.  So the letter of     11:25:48

7    designation is generated from LeaveSource.  So KEPRO is  11:25:50

8    not involved in the process.                       11:25:55

9    Q.   Okay.  When does the medical certification form  11:25:57

10   come into play that an employee or the employee's health  11:26:01

11   care provider has to complete?                     11:26:04

12   A.   There's no -- we don't request a medical     11:26:06

13   certification form.                                11:26:08

14   Q.   Okay.  For how long has that been the practice?  11:26:09

15   A.   It's always been our practice.               11:26:12

16   Q.   So it's your testimony that CSX has never    11:26:15

17   requested a medical certification form from an employee  11:26:19

18   or his or her health care provider?               11:26:22

19   A.   No, you said -- you were asking about the    11:26:24

20   designation process.                               11:26:28

21   Q.   Okay.  I think we're done with designation,  11:26:28

22   aren't we?                                         11:26:32

23   A.   Yeah, I thought you said what's next.  Like  11:26:32

24   after it's designated, you said what's next?      11:26:35

25   Q.   Okay.  No, that's all right.  Well, just --  11:26:37

34

```
 1              (Simultaneous colloquy.)                 11:26:37

 2      A.    -- process.  So then you said, "Well, what  11:26:37

 3   happens?  There's KEPRO.  Do you send out a medical  11:26:40

 4   certification form?"  So.                           11:26:43

 5      Q.    Okay.  We're just kind of looking at an     11:26:44

 6   overview of the FMLA process as it relates to CSX's, you 11:26:48

 7   know, policies and procedures.                      11:26:52

 8      A.    Okay.                                       11:26:54

 9      Q.    So after this designation process -- well,  11:26:54

10   first, have we talked about everything in the       11:26:57

11   designation process so far?                         11:26:59

12      A.    Yes.                                        11:27:00

13      Q.    Okay.  So what happens next in terms of an  11:27:01

14   overview of the FMLA process, you know, concerning CSX's 11:27:05

15   policies and practices?                             11:27:10

16      A.    Could you clarify?  Because you keep saying, 11:27:12

17   "What happens next?"  And to me, we just wrapped up our 11:27:15

18   discussion about designation.  So what's next, what am I 11:27:20

19   expanding on?                                        11:27:26

20      Q.    Sure.  Okay.  So let me take, like, two or  11:27:27

21   three steps back.  I'm just trying to get kind of a  11:27:30

22   longitudinal picture of when an employee is in need of 11:27:33

23   FMLA leave and what CSX does from that point all the way 11:27:38

24   until the end.                                       11:27:43

25      A.    Okay.  So in the event that an employee     11:27:45
```

                                                                     35

Jolanda Johnson                                                                    May 5, 2021

```
1     initiates leave, then KEPRO will run the eligibility,      11:27:50

2     verify that the employee has entitlements available.  If   11:27:58

3     the employee qualifies, then they're placed in what's      11:28:03

4     called a conditional approval status.  The employee is     11:28:06

5     mailed an employer response packet.  In the employer       11:28:12

6     response packet is a letter of acknowledgment as far as    11:28:19

7     the leave that was initiated.  It provides information     11:28:21

8     about the type of leave, meaning if it's for self or a     11:28:24

9     covered family member; the leave type, if it's             11:28:29

10    intermittent or continuous.                                11:28:33

11         Then there's other information that is provided       11:28:35

12    to the employee as far as expectations, as far as the      11:28:37

13    due date that they're required to provide a medical        11:28:42

14    certification form, the due date of when the medical       11:28:45

15    certification form was to be received, what will happen    11:28:49

16    if the employee fails to provide the certification         11:28:54

17    within the allotted time period.                           11:28:59

18         There's also language in the letter about the         11:29:01

19    purpose of FMLA and what is considered to be FMLA          11:29:10

20    misuse.  A copy of the CSX FMLA leave policy is            11:29:16

21    included, and then also a medical certification form to    11:29:23

22    be completed by the employee.  There's a section to be     11:29:26

23    completed by the employee, and then a section to be        11:29:30

24    completed by the health care physician.                    11:29:33

25    Q.    In calendar year 2017, was KEPRO or CSX              11:29:35
```

36

USCA4    1294

| | | |
|---|---|---|
| 1 | responsible for mailing out that packet that included | 11:29:41 |
| 2 | the medical certification form for an employee and/or | 11:29:44 |
| 3 | his or her health care provider to complete? | 11:29:49 |
| 4 | A.   The packet is initiated by KEPRO, but the | 11:29:52 |
| 5 | packet is mailed out by CSX document processing | 11:29:58 |
| 6 | department. | 11:30:04 |
| 7 | Q.   And where is that department located? | 11:30:04 |
| 8 | A.   Jacksonville, Florida. | 11:30:07 |
| 9 | Q.   Okay.  So there -- is there some kind of | 11:30:10 |
| 10 | communication between KEPRO and that department in | 11:30:12 |
| 11 | Jacksonville that you just mentioned on this topic of | 11:30:15 |
| 12 | sending out the packet that includes the medical | 11:30:18 |
| 13 | certification form? | 11:30:20 |
| 14 | A.   No. | 11:30:22 |
| 15 | Q.   Okay.  How does that -- what's the connection | 11:30:23 |
| 16 | between KEPRO and this packet being sent out of | 11:30:27 |
| 17 | Jacksonville? | 11:30:30 |
| 18 | A.   So LeaveSource is the system that we use to | 11:30:31 |
| 19 | administer the FMLA.  So the FMLA leave requests are | 11:30:35 |
| 20 | initiated in the system.  So if a person qualifies, then | 11:30:40 |
| 21 | the ERP is generated or the employer response packet. | 11:30:45 |
| 22 | If the employee is not eligible, then the request is | 11:30:49 |
| 23 | denied.  So the declination letter will include, you | 11:30:52 |
| 24 | know, the reason for leave and the reason why the leave | 11:30:58 |
| 25 | is denied.  So whatever is generated today will be | 11:31:00 |

37

 1    queued up or those documents will be placed in a queue        11:31:11

 2    the following business day.  And then document services       11:31:16

 3    or processing will go into the system and retrieve all        11:31:22

 4    of the correspondence that are in the queue and then          11:31:26

 5    mail those letters.                                           11:31:32

 6        Q.    Okay.  And you mentioned ERP.  That stands for      11:31:33

 7    employer response packet?                                     11:31:37

 8        A.    Yes.                                                11:31:39

 9        Q.    Okay.  And maybe -- I know you've described         11:31:39

10    some things that have gone out, but just to be clear,         11:31:42

11    what documents are included in the employer response          11:31:45

12    packet?                                                       11:31:47

13        A.    The letter.  And I described all the -- what's      11:31:48

14    covered in the letter.  Copy of --                           11:31:53

15        Q.    The designation letter?  I'm sorry.  Is that        11:31:55

16    the designation letter or something else?                     11:31:59

17        A.    No, it's not a designation letter.  It's a         11:32:01

18    letter that provides information about a leave request.       11:32:04

19    The type of leave, if it's, like, for an employee's own       11:32:06

20    serious health condition; if it's an intermittent versus      11:32:11

21    a continuous leave; when the medical certification is         11:32:14

22    due.  It provides information about the purpose of FMLA       11:32:19

23    and what is considered to be misuse under the FMLA, a         11:32:28

24    copy of the CSX FMLA leave policy, and the medical            11:32:32

25    certification form.                                           11:32:35

                                                                        38

```
 1        Q.    Okay.  And it sounds like that letter that you    11:32:37

 2   described that's part of the employer response packet --    11:32:47

 3   it sounds like that was specific to an employee as          11:32:51

 4   opposed to a form letter; is that correct?                  11:32:55

 5        A.    Partial.  So, yes, part of it is specific to     11:32:57

 6   the employee.  Their name, their ID, the address, the       11:33:05

 7   reason for leave.  But the majority of the letter, it is    11:33:08

 8   standard language.                                          11:33:13

 9        Q.    Okay.  Based on your training and experience at  11:33:16

10   CSX, you know, with FMLA, are you familiar with the         11:33:22

11   topics "General and Specific Notification" as it relates    11:33:25

12   to the FMLA?                                                11:33:29

13        A.    Yes.                                             11:33:31

14        Q.    Okay.  What do those terms mean to you starting  11:33:32

15   with the -- you know, general?                              11:33:35

16        A.    Yeah, so there's -- pursuant with the            11:33:38

17   regulations, there are certain notices that we are          11:33:42

18   required to provide employees.                              11:33:45

19        Q.    And that falls under general or specific?        11:33:52

20        A.    I mean, it depends on what notices we're         11:33:56

21   talking about.  So the -- so, like, for example, the        11:34:09

22   declination.  I mean, we're required to -- if the leave     11:34:17

23   is going to be denied, we're required to provide notice     11:34:20

24   to the employee.  And it has to be -- we just can't         11:34:23

25   say -- send a general, you know, letter saying, "Hey,       11:34:27
```

39

| | | |
|---|---|---|
| 1 | it's denied."  We have to identify why the leave is | 11:34:30 |
| 2 | denied. | 11:34:35 |
| 3 | Q.   Okay.  But is it correct to say that CSX has an | 11:34:35 |
| 4 | obligation to provide specific notification to an | 11:34:39 |
| 5 | employee of their eligibility for FMLA once they're on | 11:34:42 |
| 6 | notice of a potentially FMLA qualifying absence? | 11:34:46 |
| 7 | A.   Repeat that again. | 11:34:52 |
| 8 | Q.   Sure.  Let me -- let me back up a minute.  Let | 11:34:56 |
| 9 | me show you.  Am I still screen sharing?  Yeah, looks | 11:35:01 |
| 10 | like it. | 11:35:05 |
| 11 | A.   Yes. | 11:35:06 |
| 12 | Q.   Okay.  Is it correct to say -- and we can look | 11:35:06 |
| 13 | at these -- that CSX has written policies and, in this | 11:35:09 |
| 14 | case, frequently-asked questions about the FMLA?  Do you | 11:35:14 |
| 15 | see that? | 11:35:18 |
| 16 | A.   Yes. | 11:35:18 |
| 17 | Q.   And without getting into the specifics, | 11:35:18 |
| 18 | although you're welcome to read all of these if you | 11:35:23 |
| 19 | want, this first document appears to be what's called | 11:35:26 |
| 20 | "Frequently-asked questions about FMLA."  Do you see | 11:35:28 |
| 21 | that? | 11:35:31 |
| 22 | A.   Yes. | 11:35:32 |
| 23 | Q.   And then the next page -- well, three pages -- | 11:35:32 |
| 24 | the third page, rather, is what looks to be a "Family | 11:35:37 |
| 25 | and Medical Leave Act, FMLA, Policy, Effective Date | 11:35:41 |

40

Jolanda Johnson                                                          May 5, 2021

| | | |
|---|---|---|
| 1 | January 16th of 2009, Revised March 9th of 2017."  Do | 11:35:44 |
| 2 | you see where I read that? | 11:35:49 |
| 3 | A.   Yes. | 11:35:50 |
| 4 | Q.   Okay.  And is that what this is, CSX's policy | 11:35:50 |
| 5 | on FMLA? | 11:35:54 |
| 6 | A.   Yeah.  It's not just only our policy, but the | 11:35:56 |
| 7 | DOL have what's called rights and responsibilities, and | 11:36:02 |
| 8 | so we incorporated a lot of language that we needed to | 11:36:05 |
| 9 | cover or make sure that the employee was aware of into | 11:36:12 |
| 10 | our policy.  So instead of having a policy as well -- | 11:36:17 |
| 11 | along with the rights and responsibilities, we've | 11:36:19 |
| 12 | incorporated all of that into our policy. | 11:36:21 |
| 13 | Q.   Okay.  Got it.  So is that saying that, yes, | 11:36:25 |
| 14 | this is CSX's policy on FMLA, but it also incorporates | 11:36:30 |
| 15 | some of the Department of Labor regulations on the FMLA? | 11:36:38 |
| 16 | A.   Yes. | 11:36:39 |
| 17 | Q.   All right.  And now, this next document -- and | 11:36:40 |
| 18 | let me know if I need to blow this up.  It's also called | 11:36:49 |
| 19 | "Family and Medical Leave Act, Effective January 16th of | 11:36:53 |
| 20 | 2009"; is that correct? | 11:36:57 |
| 21 | A.   Yes. | 11:36:58 |
| 22 | Q.   So does that date, January 16th of 2009 -- and | 11:36:58 |
| 23 | that's at Bates No. 22205.  Is that the original policy | 11:37:04 |
| 24 | that is referenced in this seemingly newer policy that | 11:37:10 |
| 25 | starts at Bates No. 22201 -- I'm sorry.  That's the | 11:37:15 |

41

1      A.   Scroll back to the other document that you      11:37:24

2   referenced, please.                                     11:37:33

3      Q.   This one?  Um-hum.                               11:37:37

4      A.   Yeah.                                            11:37:37

5           THE VIDEOGRAPHER:  Counsel, really quickly,      11:37:37

6   which exhibit is this?                                  11:37:39

7           MR. PAUL:  I don't think we've marked this yet.  11:37:40

8   I think it will be Exhibit 3.                           11:37:42

9           (Exhibit 3 was marked for identification.)      11:37:45

10          THE DEPONENT:  Could you -- it's --             11:37:52

11   BY MR. PAUL:                                            11:37:52

12      Q.   You want me to go down?                         11:37:52

13      A.   -- showing additional pages.  Yes, let -- I     11:37:54

14   prefer to look at the document in entirety.            11:37:55

15          MS. BIRD:  Whoa, whoa, whoa, whoa, whoa, whoa.   11:37:59

16   You went too far.  Yeah.                                11:38:00

17          MR. PAUL:  Go down?                              11:38:27

18          THE DEPONENT:  Go ahead.                         11:38:27

19          MS. BIRD:  I tried to scroll down myself, and    11:38:27

20   it doesn't work that way.                               11:38:28

21          MR. PAUL:  You need -- you need eDepoze for      11:38:32

22   that.                                                   11:38:34

23          MS. BIRD:  That's right.                         11:38:36

24          THE DEPONENT:  Go ahead.  You can keep going.    11:38:40

25                                                          42

                                                            42

```
 1        BY MR. PAUL:                                    11:38:46

 2        Q.   Still more?                                11:38:46

 3        A.   So yes.  Yeah.  This is -- yes, this is the 11:38:47

 4   policy at that time.                                 11:38:51

 5        Q.   Okay.  So looks like the -- this initial policy 11:38:52

 6   is dated -- effective date January 16th of 2009.  That 11:39:01

 7   starts at Bates No. 22205 and goes all the way to Bates 11:39:06

 8   No. 22208; is that correct?                          11:39:12

 9        A.   Yes.                                       11:39:14

10        Q.   Okay.  And I think my question was, the policy 11:39:15

11   before that, seems like more of a -- more than a     11:39:19

12   coincidence that it also references a January 16th,  11:39:24

13   2009, date at the very beginning, which is Bates     11:39:28

14   No. 22200.  Do you see that?  Let me blow that up a  11:39:35

15   little bit.                                          11:39:38

16        A.   Yes.  But it also -- also referenced a revised 11:39:39

17   date March 9th, 2017.                                11:39:44

18        Q.   Correct.  Right.  So far these two documents 11:39:46

19   that we've looked at, to your knowledge, are those CSX's 11:39:50

20   FMLA written policies?                               11:39:54

21        A.   Yes.                                       11:39:56

22        Q.   Okay.  Are there any others that you're aware 11:39:57

23   of?                                                  11:40:00

24        A.   No.                                        11:40:01

25        Q.   Okay.  So we've got this frequently-asked  11:40:04
```

                                                                        43

1    question form.  It says, "Revised August 12, 2016."  Do    11:40:10

2    you see where I read that?                                  11:40:14

3        A.   Yes.                                               11:40:15

4        Q.   And we've got these two policies that we've        11:40:16

5    talked about.  And then there's one more document at the   11:40:20

6    end, this document that is Bates 22209.  And do you know   11:40:26

7    what that is?                                               11:40:34

8        A.   Yes.  That's the Department of Labor document.    11:40:35

9        Q.   Okay.  So this is something that -- how is this   11:40:43

10   used at CSX if you know?                                    11:40:48

11       A.   Prior to the revision of our policy, we had our   11:40:51

12   policy and then we also posted the rights and              11:40:57

13   responsibilities.  But then eventually, we just took --    11:41:00

14   kind of combed through the Department of Labor's rights    11:41:06

15   and responsibilities, and incorporated a lot of the       11:41:10

16   language or points that had to be covered and just         11:41:14

17   included it in our policy.                                 11:41:18

18       Q.   I'm sorry, can you clarify what you mean when     11:41:24

19   you say the "rights and responsibilities"?  Is that a     11:41:26

20   letter or a document or a reference to some regulation,    11:41:28

21   or all of the above?                                       11:41:31

22       A.   It's the actual FMLA document that you just --    11:41:33

23   you referenced the very last document.  So that --         11:41:38

24       Q.   Yes?                                              11:41:42

25       A.   -- "Employee Rights and Responsibilities," yes.  11:41:42

                                                            44

Jolanda Johnson                                              May 5, 2021

1      Q.   Okay.  This is what you're referring to as the    11:41:45

2  rights --                                                  11:41:47

3      A.   Right.  So that's a Department of Labor           11:41:47

4  document.  And so what we did was -- you know, a lot of    11:41:50

5  it we had already covered in our policy, but just kind     11:41:56

6  of combed through the rights and responsibilities and      11:41:59

7  made sure that it was addressed in the CSX policy.         11:42:02

8      Q.   Does the -- I'm sorry, go ahead.                  11:42:07

9      A.   I was about to say, so instead of them having     11:42:11

10 to read the policy and then the Department of Labor's      11:42:13

11 rights -- Employee's Rights and Responsibilities, now      11:42:16

12 they -- it's all centralized into one document.            11:42:20

13     Q.   Okay.  Does this document we're looking at        11:42:22

14 right here, 22209, okay, where it says, "Employee Rights   11:42:25

15 and Responsibilities," is that connected with this next    11:42:32

16 document that's Bates numbered 22210 or are they           11:42:34

17 separate?                                                  11:42:38

18     A.   It's two separate documents.  Both are the       11:42:38

19 Department of Labor's documents.                           11:42:41

20     Q.   Okay.  But when you say "rights and              11:42:43

21 responsibilities," you're referring to this specific --   11:42:45

22 where it says, "Employee Rights and Responsibilities,"    11:42:47

23 Bates No. 22209?                                           11:42:49

24     A.   Yes.                                              11:42:52

25     Q.   Okay.  And you're saying information in this     11:42:55

                                                                      45

 1    document was incorporated into the policy right here    11:42:57

 2    that starts at 22200?                                   11:43:02

 3        A.   Yes.                                           11:43:04

 4        Q.   Okay.  So either based upon this policy or     11:43:04

 5    CSX's practices, what is CSX required to do once they   11:43:16

 6    are in receipt of information that an employee could    11:43:20

 7    be -- potentially have a qualifying event for FMLA      11:43:23

 8    coverage?                                               11:43:29

 9        A.   Notify the employee about their eligibility if 11:43:29

10    they qualify.                                           11:43:34

11        Q.   Is that the employer response packet, or is    11:43:35

12    that something else?                                    11:43:40

13        A.   Yes.  That would be the employer response      11:43:40

14    packet.                                                 11:43:43

15        Q.   Okay.  And to your knowledge, has --           11:43:43

16        A.   Either that -- let me clarify.  Either that or 11:43:46

17    a declination because just because an employee has a    11:43:49

18    qualifying reason doesn't necessarily mean that they are 11:43:53

19    eligible.  They may not meet the eligibility            11:43:56

20    requirements.  They may have already exhausted their    11:44:02

21    FMLA leave entitlements.                                11:44:06

22        Q.   Got it.                                        11:44:06

23        A.   So if the leave is declined, then we're        11:44:07

24    required to provide notice to the employee.             11:44:10

25        Q.   And that's a function of checking the 1,250    11:44:12

                                                         46

Jolanda Johnson                                                    May 5, 2021

```
 1    hours or having worked for the company for 12 months?    11:44:19

 2         A.    That's one piece of it.  But you can ask      11:44:21

 3    someone, what if they were off -- went out for surgery   11:44:24

 4    in December and was off a total of 12 weeks?  They may    11:44:28

 5    meet the eligibility requirements, but they've already   11:44:33

 6    exhausted their FMLA benefits.  So they would receive a  11:44:35

 7    declination letter letting them know, "Hey, you've       11:44:39

 8    exhausted your FMLA.  You're only entitled to 12 weeks   11:44:43

 9    under the FMLA."                                          11:44:47

10         So they -- you know, so regardless of why the       11:44:49

11    leave is declined, the employee -- we're required by law 11:44:54

12    to advise the employee of the reason for the             11:44:57

13    declination.                                             11:45:00

14         Q.    Okay.  So is that another way of saying that  11:45:01

15    the employee [sic] response packet is only sent out if   11:45:04

16    somebody determines both eligibility and entitlement as  11:45:08

17    you've described them today?                             11:45:12

18         A.    Yeah.  Yes, and is a covered reason.          11:45:13

19         Q.    Okay.  So a decision is made that early whether 11:45:17

20    it's a covered reason?                                   11:45:20

21         A.    Well, when I say "covered reason," so if      11:45:21

22    someone calls in for a cousin, well, a cousin is not a   11:45:24

23    covered -- you know, not considered to be a covered      11:45:28

24    family member.                                           11:45:31

25         Q.    Okay.  Is it -- but is it accurate to say with 11:45:31
```

47

```
 1   respect to determining eligibility and entitlements and    11:45:34

 2   coverage -- that's the third category -- those are --      11:45:37

 3   that's data that's being checked for eligibility and       11:45:42

 4   entitlement and coverage, and not a specific medical       11:45:46

 5   condition; is that correct?                                11:45:49

 6       A.   Correct.                                          11:45:51

 7       Q.   Okay.  So to, like, put it in another way, if     11:45:51

 8   somebody submitted an interest in FMLA leave and you       11:45:57

 9   determined that they hadn't worked for the company for a   11:46:01

10   year, or hadn't previously been employed for 12 months,    11:46:04

11   or they had already used 12 weeks of FMLA coverage, that   11:46:08

12   would be enough information to say, "Hey, we're not        11:46:11

13   going to send an employer response packet because          11:46:14

14   there's no way that you could be covered for this under    11:46:16

15   the FMLA"?                                                 11:46:19

16       A.   Right.  Instead we will send a declination.       11:46:19

17       Q.   Got it.  Okay.  And based on your training and    11:46:24

18   the policies and practices here under the FMLA, is it      11:46:38

19   correct to say that an employee does not have to use the   11:46:42

20   magic words "FMLA" or "Family Medical Leave Act" to        11:46:45

21   trigger protection and potential coverage under the        11:46:48

22   FMLA?                                                      11:46:51

23       A.   Correct.  However, they need to give us enough    11:46:52

24   information to determine that there may be a need for      11:46:58

25   FMLA.                                                      11:47:01
```

48

Jolanda Johnson                                                    May 5, 2021

1      Q.   Okay.  And how do you define that?  I mean,    11:47:01

2   based on your training and experience at CSX, what is    11:47:03

3   enough information for you or the FMLA department to    11:47:06

4   determine whether a condition is potentially FMLA    11:47:09

5   qualifying?    11:47:13

6      A.   I wouldn't say condition, but reason.  So, for    11:47:14

7   example, if someone says, "Hey, you know, I need to be    11:47:19

8   off the next 30 days because I'm having surgery," so    11:47:22

9   even though the employee did not assert their rights    11:47:26

10  under FMLA, it's enough information to -- you know, to    11:47:29

11  put the company on notice that there is a need for FMLA.    11:47:34

12     Q.   And is that based upon, in your example, the    11:47:38

13  date range of one month as being potentially FMLA    11:47:41

14  qualifying?    11:47:45

15     A.   Yes.    11:47:46

16     Q.   And to -- to take it one step --    11:47:47

17          (Simultaneous colloquy.)    11:47:50

18     Q.   I'm sorry, go ahead.    11:47:51

19     A.   I was about to say the duration.  You're going    11:47:52

20  to be off more than three consecutive days due to a    11:47:54

21  medical reason that's going to prevent them from    11:47:57

22  performing, you know, their job.    11:47:59

23     Q.   Okay.  That's -- all right.  That's exactly    11:48:03

24  what I wanted to ask you about.    11:48:05

25          So is it accurate to say that if somebody said,    11:48:06

                                                            49

1    you know -- to use your time frame of one month -- "I        11:48:10

2    need to be off work for one month for vacation," that's      11:48:12

3    not going to trigger an FMLA event, potentially FMLA         11:48:16

4    qualifying absence, correct?                                 11:48:20

5         A.    Correct.                                          11:48:22

6         Q.    But in the example I think you used, if an        11:48:22

7    employee links up that one-month period of time with a       11:48:25

8    medical condition, either for himself, herself, or a         11:48:27

9    family member, that that would put the company on notice     11:48:30

10   of a potential FMLA qualifying absence?                      11:48:33

11        A.    Correct.                                          11:48:36

12        Q.    And then I think you mentioned the third part,    11:48:36

13   that -- in response to the question what -- where that       11:48:40

14   threshold is, you've got a time frame, for example, a        11:48:45

15   month; you've got a medical condition; and then I think      11:48:48

16   you said something along the lines of, "and the              11:48:51

17   inability to work."  Did I understand that correctly?        11:48:53

18        A.    Yes.                                              11:48:56

19        Q.    Okay.  So is it accurate to say that when an      11:48:57

20   employee provides an estimated time away from work,          11:49:01

21   linked with a medical condition, coupled with the            11:49:04

22   inability to perform their work, that that would provide     11:49:07

23   the company sufficient notice to send out the employee       11:49:10

24   [sic] response packet assuming they're eligible for          11:49:16

25   leave?                                                       11:49:19

                                                            50

Jolanda Johnson                                                                    May 5, 2021

1       A.   Yes.  I'm not sure what's going on, but          11:49:19

2   everything has gotten smaller.                            11:49:34

3       Q.   In terms of the screen sharing or you mean the   11:49:35

4   video?                                                    11:49:38

5       A.   Yes, the screen sharing.                         11:49:39

6            MS. BIRD:  It's partially the font on the        11:49:41

7   document, I think.                                        11:49:44

8            THE DEPONENT:  Is that what happened?  Okay.     11:49:45

9   BY MR. PAUL:                                              11:49:55

10      Q.   I mean, if I blow it up, is that better?         11:49:55

11      A.   Yes.                                             11:49:55

12      Q.   All right.  Other than these documents that      11:49:55

13  we've looked at here in Exhibit 3, are you aware of any   11:49:57

14  other written policies for CSX concerning the FMLA?       11:50:00

15      A.   No.                                              11:50:05

16           MS. BIRD:  Hey, Greg, can you qualify -- can     11:50:07

17  you tell us the date -- the Bates stamp range for         11:50:09

18  Exhibit 3?  It looks like there was something after the   11:50:12

19  exhibit you showed her, and I just wanted --              11:50:15

20           MR. PAUL:  Sure.                                 11:50:17

21           MS. BIRD:  -- to make sure that document is      11:50:17

22  attached to exhibit.                                      11:50:19

23           MR. PAUL:  I believe they're consecutive, but    11:50:20

24  let's go through it.  It starts at 22198.                 11:50:21

25           THE VIDEOGRAPHER:  And, Counsel, this is still   11:50:27

                                                                         51

| | | |
|---|---|---|
| 1 | Exhibit 3, correct? | 11:50:29 |
| 2 | MR. PAUL:  Correct.  Yeah, this exhibit goes | 11:50:31 |
| 3 | through 22211.  And -- | 11:50:48 |
| 4 | MS. BIRD:  Can you make that one bigger? | 11:50:53 |
| 5 | Because that was one -- | 11:50:55 |
| 6 | BY MR. PAUL: | 11:50:56 |
| 7 | Q.   Yeah, I didn't ask you about this one yet, but | 11:50:56 |
| 8 | let's blow it up and take a look.  I believe it's tucked | 11:50:58 |
| 9 | in here by mistake. | 11:51:01 |
| 10 | This appears -- this is a document Bates | 11:51:07 |
| 11 | numbered 22211 that -- it has a couple different titles, | 11:51:09 |
| 12 | but the one I see most prominently is "Protection | 11:51:16 |
| 13 | Against Retaliation for Railroad Workers."  And I don't | 11:51:19 |
| 14 | believe this has any direct bearing on the FMLA. | 11:51:22 |
| 15 | MS. BIRD:  So is that going to be part of | 11:51:28 |
| 16 | Exhibit 3 or not? | 11:51:29 |
| 17 | MR. PAUL:  Well, it is just because it is, but | 11:51:30 |
| 18 | it shouldn't be.  So -- but I think the fact that we've | 11:51:33 |
| 19 | referenced it, I'll leave it in. | 11:51:38 |
| 20 | MS. BIRD:  Okay.  We're getting close to | 11:51:41 |
| 21 | needing a break, Greg.  Is this a good time to take five | 11:51:51 |
| 22 | minutes? | 11:51:55 |
| 23 | MR. PAUL:  Yeah, absolutely. | 11:51:55 |
| 24 | MS. BIRD:  Okay. | 11:51:56 |
| 25 | MR. PAUL:  We'll go off the record. | 11:51:56 |

Jolanda Johnson                                                                      May 5, 2021

```
 1          THE VIDEOGRAPHER:  We're going off the record.    11:51:57

 2   The time is 11:51.                                       11:51:59

 3          (Off the record.)                                 11:52:01

 4          THE VIDEOGRAPHER:  We are back on the record.     11:57:37

 5   The time is 11:58.                                       11:58:08

 6      BY MR. PAUL:                                          11:58:11

 7      Q.  All right.  We're back on the record,             11:58:11

 8   Ms. Johnson, after a short break.  We were talking about 11:58:12

 9   topic No. 7.  Let's get that back up on the screen.      11:58:15

10          Are you able to see that okay?                    11:58:21

11      A.  Yeah.                                             11:58:23

12      Q.  Is there any more information, obviously, that    11:58:24

13   we haven't talked about, concerning KEPRO's policies and 11:58:29

14   practices for processing requests and approval for FMLA  11:58:34

15   in general and specific to any of the plaintiffs?        11:58:37

16      A.  No.                                               11:58:41

17      Q.  Okay.  Just for the sake of being complete,       11:58:41

18   we've talked about, I think so far, in the picture of    11:58:51

19   applying for FMLA, and the paperwork and the packets.    11:58:56

20   Is there also a procedure for recertification after an   11:59:00

21   application is initially approved?                       11:59:05

22      A.  Yes.                                              11:59:07

23      Q.  Okay.  Can you tell me what you know about that   11:59:07

24   recertification process?                                 11:59:10

25      A.  Okay.  So in the event -- once the employee is    11:59:12
```

                                                                      53

Jolanda Johnson                                                    May 5, 2021

```
 1    approved, if the employee -- so let me back up.        11:59:18

 2          So the medical certification, the doctor will    11:59:24

 3    provide in most cases an estimate as far as if the     11:59:30

 4    patient will experience episodes or periods of         11:59:34

 5    incapacity.  That estimate is based on the doctor's    11:59:37

 6    knowledge of the condition and/or the patient's medical 11:59:43

 7    history.  So in the event that the employee consistently 11:59:46

 8    exceeds what the medical certification support gives,   11:59:53

 9    the employee may be asked to recertify.                 11:59:59

10       Q.   And is that something that an employer can do,  12:00:04

11    what, every six months or upon information that casts   12:00:10

12    doubt on the validity of the certification?            12:00:13

13       A.   Yes, every six months.  Sooner if they, you    12:00:15

14    know, receive information that casts doubt, yes.       12:00:19

15       Q.   Okay.                                          12:00:22

16       A.   In a situation such as this, if it appears that 12:00:22

17    something has changed.  A good example would be they're 12:00:24

18    approved for intermittent leave for episodes and office 12:00:30

19    visits, and now the employee is off for blocks of period 12:00:33

20    of time, you know, off now on a continuous leave.       12:00:36

21       Q.   Okay.  Going back a little bit, so we're not    12:00:40

22    talking about certification anymore.  Once the company  12:00:44

23    gets the medical information such as that on a medical   12:00:47

24    certification form, and it's incomplete, what are the   12:00:53

25    steps -- what are the next steps for that?             12:00:56
```

54

| 1 | A.   If it's incomplete? | 12:01:00 |
| 2 | Q.   Yeah, incomplete, like the -- | 12:01:01 |
| 3 | A.   So the medical certification -- the clinician | 12:01:04 |
| 4 | or nurse will highlight the areas that are incomplete, | 12:01:08 |
| 5 | and the employee will be given the opportunity to | 12:01:14 |
| 6 | provide a cure.  And so the employee will receive a | 12:01:17 |
| 7 | properly -- will receive the original med cert along | 12:01:25 |
| 8 | with the incomplete letter.  And as stated in the | 12:01:28 |
| 9 | incomplete letter, the doctor is required to initial and | 12:01:33 |
| 10 | date any changes made to the certification, and the | 12:01:37 |
| 11 | employee has 21 days to provide a response. | 12:01:41 |
| 12 | Q.   And does the doctor or the employee -- are they | 12:01:45 |
| 13 | required to use the Department of Labor medical | 12:01:50 |
| 14 | certification form? | 12:01:53 |
| 15 | A.   No. | 12:01:56 |
| 16 | Q.   Are they required to use CSX's medical | 12:01:58 |
| 17 | certification form? | 12:02:02 |
| 18 | A.   Yes.  But I will state that the medical | 12:02:03 |
| 19 | certification form that we have does not ask any | 12:02:06 |
| 20 | questions, anything more than we're allowed to ask. | 12:02:09 |
| 21 | Q.   Okay.  You're -- are you referring to the | 12:02:16 |
| 22 | medical certification form that's part of the employer | 12:02:19 |
| 23 | response packet? | 12:02:22 |
| 24 | A.   Yes. | 12:02:22 |
| 25 | Q.   Okay.  So you just -- I mean, that wasn't my | 12:02:23 |

55

Jolanda Johnson                                                    May 5, 2021

```
 1   question, but you're just offering up that your -- it's    12:02:26

 2   your opinion that what's being requested in that medical   12:02:29

 3   certification form is compliant with the Department of     12:02:32

 4   Labor form?                                                12:02:35

 5        A.   Yes.                                             12:02:36

 6        Q.   Okay.  And in terms of your job duties and       12:02:36

 7   knowledge about this topic, I mean, what is required to    12:02:41

 8   be completed on a medical certification form in order to   12:02:45

 9   be deemed complete?                                        12:02:49

10        A.   I mean, technically, as you know, I mean, the    12:02:52

11   company doesn't have to require a medical certification    12:02:56

12   form.  But, you know, in the event that an employee        12:03:00

13   is -- there is a need, then we do require a medical        12:03:05

14   certification form to be completed.  And so completion     12:03:09

15   would include, you know, if the employee is being seen,    12:03:15

16   at least for a chronic condition, once or twice a year,    12:03:19

17   medical facts, if they're seeking leave for episodes       12:03:24

18   or -- you know, we need to at least know to get an idea    12:03:30

19   as far as an estimate.  If it's for a family member, the   12:03:34

20   type of care that is going to be provided.  And then       12:03:38

21   also for the doctor to sign off on the med cert and        12:03:44

22   provide information like telephone number, address,        12:03:50

23   things of that nature.                                     12:03:53

24        Q.   Okay.  So in the example we used where a         12:03:54

25   medical certification form was incomplete, you've talked   12:03:57
```

56

| | | |
|---|---|---|
| 1 | about what the company can do.  What if the company | 12:04:00 |
| 2 | looks at the medical certification form, says it's | 12:04:06 |
| 3 | complete but has some additional questions in order to | 12:04:09 |
| 4 | determine whether it's FMLA qualifying, what are the | 12:04:12 |
| 5 | next steps there? | 12:04:14 |
| 6 | A.   I mean, if clarification is needed, then the | 12:04:16 |
| 7 | clinician will -- may reach out to the doctor to obtain | 12:04:28 |
| 8 | clarification.  But once again, you know, it's just for | 12:04:33 |
| 9 | the main -- sole purpose for clarification.  If they're | 12:04:38 |
| 10 | not able to make contact, then a letter will be sent to | 12:04:42 |
| 11 | the employee. | 12:04:46 |
| 12 | Q.   In order to seek that clarification? | 12:04:47 |
| 13 | A.   Correct. | 12:04:50 |
| 14 | Q.   Okay.  And is it also an option -- or let me | 12:04:50 |
| 15 | ask you, what are the options that CSX has with respect | 12:04:54 |
| 16 | to obtaining a second opinion in order to determine FMLA | 12:04:57 |
| 17 | qualification? | 12:05:03 |
| 18 | A.   I mean, we have the right to obtain a second | 12:05:04 |
| 19 | opinion if we doubt the validity of the med cert, and | 12:05:08 |
| 20 | this will be on a -- the initial med cert. | 12:05:13 |
| 21 | Q.   Okay.  Right.  As opposed to a recertification? | 12:05:17 |
| 22 | A.   Yes. | 12:05:23 |
| 23 | Q.   Okay.  Got it.  All right.  I'd like to move | 12:05:24 |
| 24 | over to topic 6, "Defendant's disability leave of | 12:05:27 |
| 25 | absence policies, procedures, and practices, with | 12:05:29 |

57

Jolanda Johnson                                                      May 5, 2021

```
 1    effective dates and amendments for all such policies."    12:05:32
 2           Before I show you that exhibit, or at least        12:05:35
 3    what I believe is a responsive exhibit, just as an        12:05:37
 4    overview, if an employee is not eligible for family       12:05:40
 5    medical leave or FMLA, what are other medical             12:05:45
 6    leave-of-absence options for a craft employee -- let's    12:05:52
 7    start there -- or a union employee?                       12:05:56
 8        A.   Let me see the best approach.  Okay.  So for     12:05:58
 9    dispatchers -- okay.  Could you restate your question?    12:06:04
10        Q.   Yeah.  So this is just sort of an overview.      12:06:11
11    We're going to get into some more specifics, but my       12:06:16
12    question was, if an employee is not eligible for FMLA     12:06:19
13    for one reason or the other, perhaps they've already      12:06:23
14    used it or haven't worked there long enough, what are     12:06:27
15    other options to secure a medical leave of absence for a  12:06:30
16    union employee?                                           12:06:32
17        A.   Okay.  So for a union employee -- so for         12:06:33
18    dispatchers, they can -- they can always file for short-  12:06:41
19    term disability with New York Life Benefits Solution.     12:06:45
20           For, I will say, certain train and engine          12:06:50
21    employees, they can file for supplemental sickness        12:06:56
22    benefits with CoreSource or short-term disability with    12:06:59
23    Sun Life.                                                 12:07:05
24           Union employees can always seek for a              12:07:07
25    medical -- a leave of absence.  They can reach out to     12:07:11
```

58

Jolanda Johnson                                              May 5, 2021

```
 1    their union representative to kind of initiate that        12:07:14

 2    process.                                                    12:07:19

 3        Q.   Okay.  No, that was helpful.  I think the first   12:07:19

 4    two you mentioned were with respect to New York Life or     12:07:25

 5    formerly Cigna, and I think you said supplemental          12:07:28

 6    sickness.  Those are -- that's money, right?  Those are    12:07:32

 7    payments?                                                   12:07:35

 8        A.   Yes.  For their pay, yes.                          12:07:35

 9        Q.   Okay.  And so that wasn't quite my question,      12:07:37

10    but I appreciate that.  And maybe they're related.  But     12:07:40

11    my question really went more to that last answer, which     12:07:43

12    is that an employee could contact their union about a       12:07:46

13    medical leave of absence.  Did I understand your           12:07:50

14    testimony to that correctly?                                12:07:54

15        A.   Yes.                                               12:07:56

16        Q.   And the FMLA is unpaid itself, right?            12:07:56

17        A.   Yes.                                               12:07:58

18        Q.   Okay.  So trying to just -- for me to ask a       12:08:00

19    more specific question.  Other than the FMLA and job        12:08:04

20    protections, it sounds like there's the FMLA and that a     12:08:08

21    union employee can ask their union rep; is that right?      12:08:13

22        A.   Yeah, they can go through that process.  And I     12:08:16

23    really -- can't really speak to their type of process.      12:08:19

24    I can speak to what I know.  So, like, for the T & E        12:08:22

25    employees, or train and engine employees, if they were      12:08:28
```

                                                                        59

USCA4    1317

Jolanda Johnson                                           May 5, 2021

```
1    to call in to crew management, or even through crew life   12:08:32

2    mark off sick, then they will be coded as sick.  And       12:08:36

3    then after seven -- being off seven consecutive days,      12:08:42

4    they're placed in a -- at off medical status.  And I       12:08:47

5    know that the availability team has a process that after   12:08:54

6    so many days, they'll conduct outreach to the employee     12:08:59

7    advising them to either provide medical information to     12:09:03

8    the medical department, return to work, or resign.         12:09:08

9    But -- so but in general, the employees, if they're not    12:09:15

10   eligible for FMLA and there's a need to be off, they can   12:09:18

11   certainly request a leave of absence.  They could go       12:09:22

12   through their union, and possibly even submitting          12:09:27

13   information to the medical department in regards to the    12:09:32

14   need to be off medical.                                    12:09:38

15        Q.    Are you familiar -- based upon your job duties  12:09:40

16   or training at CSX, or as a corporate representative,      12:09:43

17   are you familiar with the terminology that a medical       12:09:47

18   leave of absence can be a reasonable accommodation under   12:09:51

19   the Americans with Disabilities Act or similar             12:09:54

20   disability discrimination laws?                            12:09:59

21        A.    I mean, yes.                                    12:10:01

22        Q.    Okay.  And have you heard of that concept as -- 12:10:07

23   medical leave of absence as a reasonable accommodation     12:10:10

24   under disability discrimination laws as part of your job   12:10:14

25   duties training, or as a corporate representative today    12:10:15
```

60

1    for this deposition, or all of the above?                12:10:18

2         A.   Okay.  Repeat your question.                   12:10:22

3         Q.   Sure.  You said that you're familiar with the  12:10:26

4    concept of a medical leave of absence as a reasonable    12:10:28

5    accommodation, correct?                                  12:10:30

6         A.   Yes.                                            12:10:31

7         Q.   And that's a reasonable accommodation under    12:10:33

8    disability discrimination laws like the Americans with   12:10:35

9    Disabilities Act or Rehabilitation Act; is that correct? 12:10:38

10        A.   I responded to the question simply because I've 12:10:41

11   had a case where an employee was not eligible for FMLA.  12:10:46

12   I did work with a medical team and the law department,   12:10:50

13   and I know that there was, I guess you could say, an     12:10:54

14   accommodation for the employee for that period of time.  12:10:59

15   But that's the only case I can think of where I was      12:11:06

16   involved in a situation where the -- there was a medical 12:11:09

17   reason why the employee needs to be off.                 12:11:13

18        Q.   Okay.  And roughly how long ago was that?      12:11:19

19        A.   It's been a few years ago.  Maybe -- I believe 12:11:27

20   it was before 2017.  So maybe '15, '16, around that time 12:11:32

21   frame.                                                   12:11:36

22        Q.   Before that incident where you went to the     12:11:37

23   medical department that you just described, had you ever 12:11:41

24   heard of that concept before at that time, a medical     12:11:43

25   leave of absence as a reasonable accommodation?          12:11:46

                                                              61

 1      A.   No.                                        12:11:48

 2      Q.   Okay.  So --                               12:11:49

 3           MS. BIRD:  Greg, let me just -- since we are on  12:11:51

 4   the 30(b)(6) part of her deposition, we're not talking  12:11:53

 5   about her personal knowledge, and we're not talking  12:11:57

 6   about a topic for which she's been disclosed with regard  12:11:59

 7   to anything having to do with disability discrimination  12:12:03

 8   policies or anything else.  I'll allow you to question  12:12:06

 9   her about this, but she is not here to speak on behalf  12:12:10

10   of the company about medical disability discrimination  12:12:12

11   as you've defined it, as you're asking her.       12:12:18

12           MR. PAUL:  Well, I think she is.  I mean, topic  12:12:21

13   No. 6, which I've read, is "Defendant's disability leave  12:12:24

14   of absence policies, procedures, and practices," which  12:12:25

15   is exactly that.                                   12:12:28

16           MS. BIRD:  I disagree.                     12:12:30

17        BY MR. PAUL:                                  12:12:32

18      Q.   Okay.  In your corporate role -- corporate  12:12:32

19   representative role today on topic 6, "Defendant's  12:12:41

20   disability leave of policies, practices, and      12:12:41

21   procedures," what do you understand that to mean?  12:12:43

22      A.   Our medical leaves of absence policy, which  12:12:47

23   covers a short-term disability and long-term disability.  12:12:54

24      Q.   Do you believe that CSX's disability leave of  12:12:58

25   absence policies, practices, or procedures encompass  12:13:00

                                                        62

Jolanda Johnson                                                    May 5, 2021

```
 1    requests for accommodation in the form of medical leave   12:13:04

 2    of absence?                                               12:13:07

 3         A.   I've never taken it as accommodation.  I take   12:13:10

 4    it as this is a benefit that's provided to employees.     12:13:15

 5    In the event that they're unable to perform their job     12:13:17

 6    due to a personal illness or injury, they have this time  12:13:21

 7    off and depending on their tenure with the company will   12:13:25

 8    determine their salary continuance.                       12:13:32

 9         Q.   Okay.  Leaving aside the salary continuance     12:13:32

10    piece, what is your understanding of CSX's disability     12:13:35

11    leave of absence policies, practices, and procedures      12:13:39

12    outside of the FMLA which we've already talked about?     12:13:42

13         A.   To what extent?                                 12:13:45

14         Q.   Well, what's the process for an employee who's  12:13:49

15    not eligible for FMLA to be considered for a disability   12:13:54

16    leave of absence?                                         12:13:57

17         A.   So with -- under the MLA or the medical leaves  12:13:59

18    of absence policy, it has no bearing if they're eligible  12:14:02

19    for FMLA or not.  So if the employee -- management        12:14:08

20    employee, because that's who's it's for, if they're       12:14:14

21    going to be off work to -- you know, off seven            12:14:17

22    consecutive working days due to a personal illness or     12:14:21

23    injury, then they are to initiate a claim.  And so with   12:14:25

24    that process, once they approve -- or if they are         12:14:32

25    approved for STD, then the STD is designated as FMLA, if  12:14:37
```

                                                                        63

1    they're eligible, so it runs concurrent with the FMLA.    12:14:46

2        Q.   Are there any disability leave of absence    12:14:50

3    policies, practices, or procedures for union employees?    12:14:53

4        A.   There's no policies, no.    12:14:56

5        Q.   Okay.  The example that you mentioned that was    12:15:01

6    a couple of years ago where you went to medical, was    12:15:05

7    that for a union employee or a non-union employee?    12:15:08

8        A.   It was for a union employee.    12:15:10

9        Q.   And so was that example that you mentioned, was    12:15:12

10   that considered part of a reasonable accommodation    12:15:18

11   process?    12:15:21

12       A.   I mean, I -- you know, the employee was    12:15:22

13   concerned about his job.  He had been diagnosed with a    12:15:31

14   condition, had been off for an extended period of time.    12:15:35

15   And so when he returned, he was not eligible for FMLA,    12:15:38

16   and so he kept calling the CSX FMLA Center.  He was    12:15:43

17   instructed to contact his union rep.  But he just    12:15:49

18   continued to call so it was escalated to me, and then    12:15:53

19   that's when I engaged our medical and law department to    12:15:57

20   see if -- what could be done.  And so from that point,    12:16:00

21   the employee actually dealt directly with medical at    12:16:05

22   that point, because it was out of our hands because he    12:16:08

23   didn't qualify for FMLA.    12:16:11

24       Q.   And in that circumstance, was his disability    12:16:12

25   leave of absence approved?    12:16:16

                                                              64

Jolanda Johnson                                                    May 5, 2021

 1        A.   I'm not sure.  I mean, I can't -- because, like    12:16:17

 2   I said, I connected with medical and law, explained to    12:16:22

 3   them what occurred.  And then from that point, medical    12:16:27

 4   took over his case.  So the outcome of it, I don't know.    12:16:31

 5        Q.   Okay.  I'd like to show you what we'll mark as    12:16:35

 6   Exhibit 4, which consists of 15 pages, and I'd like to    12:16:40

 7   just scroll through them first and then ask you some    12:16:44

 8   questions.  But I'd like to just identify the documents    12:16:46

 9   first.  But if you need more time for any reason, let me    12:16:50

10   know.                                                    12:16:53

11        This first document is entitled "Medical Leaves    12:16:53

12   of Absence Policy."  Do you see that?                   12:16:57

13        A.   Yes.                                          12:16:59

14        (Exhibit 4 was marked for identification.)         12:16:59

15   BY MR. PAUL:                                            12:16:59

16        Q.   And this one appears to be -- the most recent    12:16:59

17   effective date appears to be January 1st, 2016.  Do you    12:17:06

18   agree with that?                                        12:17:10

19        A.   Yes.                                          12:17:11

20        Q.   Okay.  And again, we'll come back to these some    12:17:12

21   more in particular, but just in -- you're familiar with    12:17:16

22   this policy I guess?                                    12:17:19

23        A.   I am.                                         12:17:20

24        Q.   Okay.  Just in summary fashion, what is it?    12:17:21

25        A.   So this is -- I've referenced the medical    12:17:23

                                                                  65

```
 1    leaves of absence policy.  This is the short-term        12:17:29
 2    disability, and long-term disability falls under this    12:17:33
 3    policy.  The benefits are for non-contract or non-union  12:17:38
 4    employees only.  So it's basically if the employee is    12:17:45
 5    unable to work due to a personal illness or injury, then 12:17:51
 6    they should apply for short-term disability.             12:17:58
 7        Q.    Okay.  And this is -- this includes the New    12:18:06
 8    York Life or the Cigna long-term disability that you     12:18:07
 9    discussed earlier?                                       12:18:09
10        A.    Yes.                                           12:18:10
11        Q.    So --                                          12:18:10
12        A.    So the --                                      12:18:11
13        Q.    -- none of the -- I'm sorry.                   12:18:11
14        A.    Short-term disability is for 26 weeks.  And if 12:18:12
15    the employee is unable to return to work, then they are  12:18:15
16    considered for long-term disability.                     12:18:19
17        Q.    Okay.  And in that example, is the specific job 12:18:22
18    held for that person pending that six-month period of    12:18:27
19    time?  Or 26 weeks rather, I think you said.             12:18:30
20        A.    It depends.                                    12:18:35
21        Q.    What does it depend on?                        12:18:37
22        A.    If there is a business need for the job to be  12:18:40
23    filled prior to the exhaustion of the STD period, then   12:18:44
24    it is possible for the employee to be taken off that     12:18:53
25    position.                                                12:18:55
```

66

Jolanda Johnson                                              May 5, 2021

 1        Q.   I'm sorry.  Did you say at the expiration of     12:18:56

 2   the short-term or during the short-term disability?        12:18:59

 3        A.   Expiration.  So typically, in general, if        12:19:01

 4   there's not a business need for the job to be filled, if   12:19:03

 5   the employee returns to work within that six-month         12:19:06

 6   period, then they return to their job.  However, if the    12:19:10

 7   employee is unable to return after six months, then they   12:19:14

 8   are removed from that position and they are considered     12:19:19

 9   for long-term disability.                                  12:19:21

10        Q.   Okay.  And does anything like that exist for     12:19:24

11   the union employees, what you just described?              12:19:29

12        A.   No.                                              12:19:32

13        Q.   Are you familiar with this?  This is entitled    12:19:33

14   "Vocational Rehabilitation Program Reasonable              12:19:49

15   Accommodations."  Are you familiar with this policy?       12:19:51

16        A.   I'm aware of the policy.  I know it exists.      12:19:54

17        Q.   Okay.                                            12:20:00

18        A.   And I am familiar with the process to the        12:20:00

19   extent with FMLA, if we receive a request, and if the      12:20:04

20   FMLA request there is some sort of accommodation           12:20:11

21   required, like an employee is only able to work X amount   12:20:14

22   of hours per week or they require -- you know, they        12:20:21

23   can't operate machinery, whatever the case may be, we      12:20:26

24   will send them actually the form you just scrolled past,   12:20:31

25   but the accommodation form to the employee for them to     12:20:37

                                                                      67

Jolanda Johnson                                                    May 5, 2021

```
 1   complete.  But the form is returned to medical, so we're    12:20:42

 2   only involved to the extent of -- if the medical -- the     12:20:48

 3   FMLA medical certification gives some sort of indication    12:20:52

 4   that there's a need for an accommodation.                   12:20:56

 5       Q.   I'm -- I'm --                                      12:21:00

 6            (Simultaneous colloquy.)                           12:21:04

 7       A.   Instead of sending the FMLA form to medical,       12:21:04

 8   we'll just go ahead and send them a letter of               12:21:07

 9   accommodation.  And then it's the employee's                12:21:09

10   responsibility to have the form completed and then          12:21:12

11   returned to medical.                                        12:21:14

12       Q.   Okay.  Let me just back up a minute.  So you're    12:21:15

13   saying the FMLA department will send out this reasonable    12:21:18

14   accommodation form that's Bates numbered 22076 when         12:21:23

15   there's something on the medical certification form that    12:21:27

16   indicates the need for an accommodation?                    12:21:30

17       A.   Yes.  The FMLA medical certification form, yes.    12:21:32

18       Q.   Okay.  Could there be any other documentation      12:21:35

19   that the FMLA department would receive that would put       12:21:40

20   the company at -- that would trigger an accommodation       12:21:43

21   request other than a medical certification form?            12:21:46

22       A.   I mean, is it possible?  Yes.  If we were to       12:21:49

23   receive something -- and I know it has happened.  Like,     12:21:53

24   for example, the MD-3 form where the employee -- better     12:21:56

25   yet, not the MD-3 form but the sickness form from the       12:22:01
```

68

USCA4    1326

| | | |
|---|---|---|
| 1 | RRB.  The employees will submit it to KEPRO.  KEPRO, in | 12:22:05 |
| 2 | turn, will send it to us, the benefits department, and | 12:22:11 |
| 3 | then we, in turn, will forward it on to the RRB. | 12:22:15 |
| 4 | Q.   Have you ever seen this accommodation form that | 12:22:20 |
| 5 | CSX used to request a medical leave of absence or a | 12:22:26 |
| 6 | disability leave of absence? | 12:22:31 |
| 7 | A.   I have not. | 12:22:33 |
| 8 | Q.   Okay.  And other than that one example for the | 12:22:34 |
| 9 | union employee that you've already described, do you | 12:22:37 |
| 10 | have any knowledge about any other disability leave of | 12:22:40 |
| 11 | absences that are longer than the FMLA for union | 12:22:44 |
| 12 | employees? | 12:22:53 |
| 13 | A.   No. | 12:22:53 |
| 14 | Q.   After that example you gave of if the MLA | 12:22:54 |
| 15 | department receives a certification form or other | 12:23:14 |
| 16 | information that indicates the need for an | 12:23:17 |
| 17 | accommodation, does the FMLA department have any | 12:23:17 |
| 18 | other -- do they take any other actions other than | 12:23:22 |
| 19 | sending it to the medical department? | 12:23:25 |
| 20 | A.   You said if there's any indication on the FMLA | 12:23:26 |
| 21 | form? | 12:23:34 |
| 22 | Q.   Well, I mean I'll broaden it, but if I -- you | 12:23:34 |
| 23 | know, tell me if you don't understand the question.  But | 12:23:37 |
| 24 | in the example that you gave of where the FMLA | 12:23:40 |
| 25 | department receives information such as on a medical | 12:23:44 |

69

| | | |
|---|---|---|
| 1 | certification form that indicates the need for an | 12:23:48 |
| 2 | accommodation, I believe your testimony was that you | 12:23:51 |
| 3 | would send that to the medical department? | 12:23:53 |
| 4 | A.   No.   We would initiate -- we'll send the | 12:23:55 |
| 5 | accommodation form to the employee.  The employee would | 12:24:00 |
| 6 | then be responsible to have the form completed and | 12:24:05 |
| 7 | returned to medical for further review and handling. | 12:24:08 |
| 8 | Q.   Got it.  Okay.  So I skipped a step, I guess. | 12:24:13 |
| 9 | So the -- there would be a letter and a form that would | 12:24:16 |
| 10 | go out to the employee, and then it's up to the employee | 12:24:20 |
| 11 | to submit that to the medical department or not? | 12:24:22 |
| 12 | A.   Correct. | 12:24:24 |
| 13 | Q.   Okay.  After that step of sending the employee | 12:24:25 |
| 14 | the accommodation form, does the FMLA department have | 12:24:32 |
| 15 | any other involvement in that request for accommodation? | 12:24:36 |
| 16 | A.   No. | 12:24:38 |
| 17 | Q.   Okay. | 12:24:39 |
| 18 | A.   Well, let me back up.  To the extent, if it's | 12:24:41 |
| 19 | related to hours worked, some sort of hours worked | 12:24:46 |
| 20 | restriction, yes. | 12:24:50 |
| 21 | Q.   Okay.  Can you explain what you mean, please? | 12:24:51 |
| 22 | A.   So like, for example -- and this is more for | 12:24:55 |
| 23 | non-train and engine employees, but if they -- they're | 12:25:01 |
| 24 | not -- they can't work overtime, for example.  So once | 12:25:05 |
| 25 | medical receives that information, they will notify | 12:25:11 |

Jolanda Johnson                                                      May 5, 2021

 1    KEPRO in regards to the outcome of the accommodation        12:25:16

 2    request.                                                    12:25:21

 3        Q.   Okay.                                              12:25:23

 4            MS. BIRD:  Greg, on that last exhibit, did you      12:25:26

 5    mark that last thing as an exhibit?  Because there was a    12:25:29

 6    bunch of stuff in that same...                              12:25:31

 7            MR. PAUL:  I just marked the whole thing as          12:25:35

 8    Exhibit 4.                                                  12:25:37

 9            MS. BIRD:  Okay.  There's a bunch --                 12:25:40

10            MR. PAUL:  But it looks --                           12:25:41

11            MS. BIRD:  -- of stuff in there, but that's          12:25:41

12    fine.                                                       12:25:43

13            MR. PAUL:  I'm sorry?  Yeah.                         12:25:43

14            MS. BIRD:  There's a bunch of different topics       12:25:44

15    and things in there.  I just wanted to make sure we got     12:25:46

16    the Bates numbers for that whole exhibit.                   12:25:47

17            MR. PAUL:  Yeah.  Starts at 22066.  Should be        12:25:49

18    consecutive through 22080.  See if this is the same.        12:25:57

19        BY MR. PAUL:                                            12:26:37

20        Q.   Okay.  Let me ask you about this last one,         12:26:37

21    which is Bates numbered 22080.  This one is entitled        12:26:40

22    "Short and Long-Term Disability, FMLA, and Leaves of        12:26:45

23    Absence."  Do you see that?                                 12:26:49

24        A.   Could you enlarge that?                            12:26:50

25        Q.   You bet.  Take a look at that and let me know      12:26:55

                                                                        71

| | | |
|---|---|---|
| 1 | when you're ready. | 12:26:59 |
| 2 | A.   Okay. | 12:27:38 |
| 3 | Q.   All good? | 12:27:40 |
| 4 | A.   Yes. | 12:27:41 |
| 5 | Q.   Let me make sure there's nothing at the bottom | 12:27:41 |
| 6 | there.  Yeah, that's the end of it. | 12:27:44 |
| 7 | Are you familiar with this policy? | 12:27:45 |
| 8 | A.   This is not a policy. | 12:27:47 |
| 9 | Q.   Okay.  What is it? | 12:27:48 |
| 10 | A.   It's just -- I would consider just an overview | 12:27:50 |
| 11 | of ways an employee can be off. | 12:27:56 |
| 12 | Q.   Okay.  And is this both union and non-union | 12:28:02 |
| 13 | employees? | 12:28:06 |
| 14 | A.   Combination. | 12:28:06 |
| 15 | Q.   What does that mean?  Both?  Or what do you | 12:28:10 |
| 16 | mean? | 12:28:13 |
| 17 | A.   Yeah, both. | 12:28:13 |
| 18 | Q.   Okay.  So, in other words, this document we're | 12:28:14 |
| 19 | looking at, Bates No. 022080, applies to both union and | 12:28:16 |
| 20 | non-union employees at CSX? | 12:28:23 |
| 21 | A.   Yes. | 12:28:25 |
| 22 | Q.   With respect to this first category of medical | 12:28:26 |
| 23 | leaves of absence, what is the process for a union | 12:28:36 |
| 24 | employee to apply for and be considered for a medical | 12:28:40 |
| 25 | leave of absence? | 12:28:44 |

72

Jolanda Johnson                                                              May 5, 2021

```
 1        A.   Medical leaves of absence, this is -- this is    12:28:45
 2   the actual medical leaves of absence policy, the MLOA.     12:28:56
 3   So that's going back to the policy we just looked at.      12:29:03
 4   I'm not sure if you noticed, but in the upper left-hand    12:29:07
 5   corner, it says "Intermodal."  So there is a policy for,   12:29:10
 6   like, Intermodal Transportation Corp. and Technology,      12:29:17
 7   but once again, regardless of the company, the MLOA or     12:29:21
 8   the medical leaves of absence policy, it's the same as     12:29:27
 9   far as who's eligible, which is only -- it's              12:29:30
10   non-contracted, non-union employees.                      12:29:34
11        Q.   Okay.  Are you aware of any medical leave of     12:29:41
12   absence policy like the one in Exhibit 4 that exists at    12:29:43
13   CSX for union employees?                                   12:29:48
14        A.   No.                                              12:29:49
15        Q.   And to your knowledge, is there none?  In other  12:29:50
16   words, is it a true statement CSX does not have a          12:29:56
17   medical leave of absence policy for its union employees?   12:29:59
18        A.   No.                                              12:30:02
19        Q.   That's incorrect or correct?                     12:30:03
20        A.   No, there's not a medical leaves of absence      12:30:05
21   policy for union employees.                                12:30:08
22        Q.   Okay.  Is there a procedure or practice -- I'm   12:30:10
23   looking at topic No. 7 -- with respect to a disability    12:30:23
24   or medical leave of absence policy for union employees?   12:30:25
25        A.   Not that I'm aware of.                           12:30:29
```

                                                                         73

Jolanda Johnson                                                        May 5, 2021

```
 1        Q.   All right.                              12:30:36

 2             MR. PAUL:  Thank you.  I don't have any other   12:30:38

 3   questions.                                        12:30:39

 4             THE DEPONENT:  Okay.  So I didn't know --   12:30:40

 5             MR. PAUL:  Do you want to go off the record   12:30:44

 6   or --                                             12:30:45

 7             THE DEPONENT:  No, because you was asking me   12:30:45

 8   about the leaves, like the medical leaves of absence,   12:30:47

 9   maternity, FMLA, and military.  You was wondering -- I   12:30:50

10   thought you was going down the path you wanted me to   12:30:55

11   identify which ones were for union or management or   12:30:58

12   both.                                             12:31:02

13             MR. PAUL:  Well, sure.                   12:31:04

14             THE DEPONENT:  I thought that's -- I'm sorry.   12:31:05

15             MS. BIRD:  See, you can't instruct some of   12:31:09

16   them.  You can't --                               12:31:13

17             (Simultaneous colloquy.)                12:31:13

18             MS. BIRD:  That's okay.  Tell him everything   12:31:15

19   you know, Jolanda.                                12:31:17

20      BY MR. PAUL:                                    12:31:18

21        Q.   So we're going back -- is this the document you   12:31:18

22   want me to go back to, No. 22080?                  12:31:20

23        A.   Yeah, so the medical leaves of absence is for   12:31:22

24   active management employees.  The maternity leave that   12:31:25

25   it's referencing is only for active management   12:31:30
```

74

1    employees.  The disability coverage, if you'll notice,    12:31:34

2    it referenced short-term and long-term disability.        12:31:40

3    That's going back to the medical leaves of absence.  So,  12:31:44

4    again, only active management employees.  FMLA would be   12:31:49

5    for management and union.  And then military leave is     12:31:53

6    for management and union.                                 12:31:56

7        Q.   Okay.  Great.  Well, thank you for that          12:31:58

8    clarification.                                            12:32:01

9            MR. PAUL:  I don't have any other questions.      12:32:03

10           MS. BIRD:  I don't have any questions either.     12:32:05

11           THE VIDEOGRAPHER:  Madam Court Reporter,          12:32:09

12   anything to add before I read us off the record?          12:32:11

13           This concludes the --                             12:32:17

14           COURT REPORTER:  Can I get copy orders on the     12:32:17

15   record, Counsel?                                          12:32:20

16           MS. BIRD:  I don't know what you said.            12:32:26

17           COURT REPORTER:  I'm sorry.  Could I get copy     12:32:27

18   orders on the record, please?                             12:32:27

19           MS. BIRD:  Yes.  I'd like to have a copy of the   12:32:27

20   transcript.  I'd also like to have a copy of the video    12:32:29

21   but not synced.                                           12:32:32

22           MR. PAUL:  I don't know about the video, so       12:32:35

23   I'll have to get back to you on that, but -- unless you   12:32:38

24   know what Jeff has ordered in other -- I'm asking the     12:32:40

25   court reporter -- what Jeff has ordered in other cases.   12:32:43

                                                                    75

Jolanda Johnson                                                    May 5, 2021

1        But we would definitely want a transcript.          12:32:45

2              THE VIDEOGRAPHER:   This concludes today's     12:32:51

3     deposition.   The time is 12:32, and we're now off the  12:32:52

4     record.                                                 12:32:56

5              (Deposition concluded at 12:32 p.m.)

6                          *  *  *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                                    76

EXHIBIT
1

# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA AT HUNTINGTON

JUSTIN ADKINS, et al,

                    Plaintiffs,

v.

CSX CORPORATION, et al.,

                    Defendants.

Civil Action No.: 3:18-cv-00321

## PLAINTIFF ESTATE OF CHAD LITTLE'S RESPONSES TO DEFENDANT CSX <u>TRANSPORTATION, INC.'S FIRST SET OF INTERROGATORIES</u>

Plaintiff Estate of Chad Little ("Plaintiff") hereby provides the following Responses to Defendant CSX Transportation, Inc.'s ("CSXT") first set of interrogatories pursuant to Federal Rule of Civil Procedure 34:

## <u>GENERAL OBJECTIONS</u>

1.    Plaintiff objects to the Definitions contained in Defendant's First Set of Interrogatories to the extent that they attempt to define terms by other than their ordinary, common meanings.

2.    Plaintiff objects to the Instructions contained in Defendant's First Set of Interrogatories on the grounds that they are vague, overly broad, unduly burdensome and seek to impose on plaintiffs' obligations other than those authorized by the applicable Rules of Civil Procedure.

USCA4 Appeal: 21-2051   Doc: 32-3   Filed: 07/30/2022   Pg: 393 of 607

| Dr. Craig Heligman CSX Transportation, Inc. CSX Corporation | Information regarding the events complained of, including Defendants' rules, policies, procedures and practices; the handling of Plaintiff's formal disciplinary investigation; and Plaintiff's dismissal. |
| --- | --- |

INTERROGATORY NO. 2: Identify the categories of damages and the precise total amount of monetary damages sought in this litigation as well as all calculations underlying such amounts.

ANSWER: Objection. A precise total of monetary damages sought and calculations of such is not possible at this time as damages continue to accrue and because not all information responsive to this request has been identified by Plaintiff. Further, information responsive to this request is in possession of Defendant, particularly with regard to wages and benefits, and has not been fully produced as yet. Additionally, Plaintiff seeks non-economic damages which are difficult to quantify, are considered a fact issue for the jury, and are not the type of calculation disclosure contemplated by Rule 26.  See e.g. E.E.O.C. v. Wal-Mart Stores, Inc., 276 F.R.D. 637, 639–40 (E.D. Wash. 2011); Williams v. Trader Publ'g, Co., 218 F.3d 481, 486 n. 3 (5th Cir.2000).

Plaintiff seeks all damages available under the law plus prejudgment and other interest, including, but not limited to: damages for back pay and benefits, front

USCA4   1336

pay, compensatory damages, punitive damages, out of pocket expenses, liquidated damages, contributions to fringe benefits including pension and retirement, offset for tax consequences of a judgment, reinstatement to the position Plaintiff had been awarded with all seniority and benefits Plaintiff would have otherwise accrued, Plaintiff's expert witness fees, attorneys' fees and the cost of bringing this action.

Economic damages for front pay and back pay, will be calculated based upon Plaintiff's rate of pay at the time of his dismissal, plus all increases for which he would have been eligible, multiplied by the hours he reasonably would have worked during the period of time from his date of dismissal through trial (back pay), and the hours he reasonably would have worked until retirement (front pay). Additional economic damages for out-of-pocket expenses are still being compiled and will be calculated based upon the entire amount that Plaintiff incurred as a result of his dismissal from employment.

INTERROGATORY NO. 3: If you seek any relief other than the monetary damages specified above, describe with specificity each other type of relief sought and the factual basis for your claim that you are entitled to this relief.

ANSWER: Plaintiff seeks to be reinstated to his prior employment with all seniority restored. Plaintiff is entitled to this relief based upon laws under which he has brought suit, including: the ERISA, the Rehabilitation Act,  the West Virginia

either personal or commercial, and if so, state the style of each such case/matter, the date on which it was filed, the court where it was filed, and the outcome.

ANSWER: Plaintiff objects to this Interrogatory as it exceeds the limitations of Fed. R. Civ. P. 33 which states that no more than 25 interrogatories be served unless otherwise stipulated or ordered by the court.

Dated this 19th day of June 2020.

/s/ Jeff R. Dingwall
Jeff R. Dingwall
CA Bar #265432
Eight & Sand
550 West B Street
Fourth Floor
San Diego, CA 92101
Tel: (619) 796-3464
jeff@eightandsandlaw.com
Pro Hac Vice

Gregory G. Paul
WV Bar #8129
Morgan & Paul, PLLC
100 First Avenue, Suite 1010
Pittsburgh, PA 15222
Tel: (844) 374-7200
gregpaul@morganpaul.com

Kenneth R. Reed
Kenneth R. Reed, Attorney PSC
241 Elm Street
Ludlow, KY 41016
Tel: (859) 331-4443
kenreedatty@gmail.com
Applicant for Pro Hac Vice

C. Kiel Garella
Garella Law, P.C.
409 East Boulevard
Charlotte, NC 28303
Tel: (980) 321-7934

kiel@gljustice.com
Pro Hac Vice

Mark F. Underwood
Underwood Law Office, Inc.
923 3rd Ave
Huntington, WV 25701
Tel: (304) 522-0508
munderwood@underwoodlawoffices.com

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA AT HUNTINGTON

JUSTIN ADKINS, et al,

                    Plaintiffs,

v.

CSX CORPORATION, et al.,

                    Defendants.

Civil Action No.: 3:18-cv-00321

## PLAINTIFF ESTATE OF CHAD LITTLE'S RESPONSES TO DEFENDANT CSX TRANSPORTATION, INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

Plaintiff Estate of Chad Little("Plaintiff") hereby provides the following Responses to Defendant CSX Transportation, Inc.'s ("CSXT") first set of requests for production of documents pursuant to Federal Rule of Civil Procedure 35:

### GENERAL OBJECTIONS

1.    Plaintiff objects to the Definitions contained in Defendant's First Requests for Production of Documents to the extent that they attempt to define terms by other than their ordinary, common meanings.

2.    Plaintiff objects to the Instructions contained in Defendant's First Requests for Production of Documents on the grounds that they are vague, overly

RESPONSE:  Objection: Overbroad and Attorney Work Product. Notwithstanding this Objection, Plaintiff will produce documents in his possession, custody and control if and when an agreed upon protective order is in place.

REQUEST NO. 6: All documents that evidence, support, summarize, calculate, discuss, relate, or refer to any damages, injuries, or losses you claim to have suffered in connection with this action (including back pay, front pay, compensatory damages for emotional distress and/or humiliation and personal indignity), including but not limited to documents prepared by an expert regarding damages.

RESPONSE:  Plaintiff will produce documents in his possession, custody and control if and when an agreed upon protective order is in place. Plaintiff will supplement as discovery is ongoing and consistent with the Court's Scheduling Order for expert disclosures.

REQUEST NO. 7: All documents sent to, prepared by, or received from any expert witness you intend to call at trial including documents pertaining to compensation of the expert; documents containing facts or data on which the expert relied in forming opinions; documents containing assumptions relied upon by the expert; and written reports.

RESPONSE:   Plaintiff will produce documents in his possession, custody and control if and when an agreed upon protective order is in place. Plaintiff will execute an appropriate authorization.


REQUEST NO. 10: All documents relating to your cessation of employment with CSXT.

RESPONSE: Plaintiff will produce documents in his possession, custody and control if and when an agreed upon protective order is in place.


REQUEST NO. 11: All documents relating to any grievances you or your Union have raised or filed, regarding your employment with CSXT or your claims in this lawsuit.

RESPONSE:   Plaintiff will produce documents in his possession, custody and control if and when an agreed upon protective order is in place.


REQUEST NO. 12: All documents relating to income or monies received by you from any source since the cessation of your employment with CSXT, including but not limited to unemployment compensation benefits, copies of your state and federal income tax returns with all attachments, W-2 forms, and bank statements for the years 2017 through the date of the trial in this action.

RESPONSE:  Objection: collateral source doctrine. Without waiving this objection, Plaintiff will produce documents in his possession, custody and control if and when an agreed upon protective order is in place. Plaintiff will sign an appropriate authorization.


REQUEST NO. 13: All documents relating to Plaintiff's health insurance coverage and any health-related costs or damages from cessation of your employment with CSXT until the date of trial in this matter, including but not limited to communications about health insurance coverage, health insurance plan documents, the amounts paid for health insurance benefits, explanation of benefits forms, bills, or other health statements.

RESPONSE:   Plaintiff will produce documents in his possession, custody and control if and when an agreed upon protective order is in place.


REQUEST NO. 14: All documents relating to efforts by you to obtain or secure employment after your employment with CSXT ended, including but not limited to resumes, job application forms, notes, advertisements, and correspondence submitted, received or made in connection with all searches for, acceptances of, or rejections of alternate employment.

Dated this 19th day of June 2020.

/s/ Jeff R. Dingwall
Jeff R. Dingwall
CA Bar #265432
Eight & Sand
550 West B Street
Fourth Floor
San Diego, CA 92101
Tel: (619) 796-3464
jeff@eightandsandlaw.com
Pro Hac Vice

Gregory G. Paul
WV Bar #8129
Morgan & Paul, PLLC
100 First Avenue, Suite 1010
Pittsburgh, PA 15222
Tel: (844) 374-7200
gregpaul@morganpaul.com

Kenneth R. Reed
Kenneth R. Reed, Attorney PSC
241 Elm Street
Ludlow, KY 41016
Tel: (859) 331-4443
kenreedatty@gmail.com
Applicant for Pro Hac Vice

C. Kiel Garella
Garella Law, P.C.
409 East Boulevard
Charlotte, NC 28303
Tel: (980) 321-7934
kiel@gljustice.com
Pro Hac Vice

Mark F. Underwood
Underwood Law Office, Inc.
923 3rd Ave
Huntington, WV 25701
Tel: (304) 522-0508
munderwood@underwoodlawoffices.com

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of

1. Plaintiff's Responses to CSX Transportation, Inc.'s First Set of

Interrogatories; and

2. Plaintiff's Responses to CSX Transportation, Inc.'s First Set of Requests

for Production of Documents.

to be served electronically via email on:

> Melissa Foster Bird                    *Attorneys for Defendants*
> Megan Basham Davis
> NELSON MULLINS RILEY &
> SCARBOROUGH LLP
> 949 Third Avenue, Suite 200
> Huntington, West Virginia 25719
> (304) 526-3503
> melissa.fosterbird@nelsonmullins.com
> megan.davis@nelsonmullins.com
> brandy.hayton@nelsonmullins.com
> lauri.epstein@nelsonmullins.com
> anna.johnson@nelsonmullins.com

Dated this 19th day of June 2020.

> /s/ Jeff R. Dingwall
> JEFF R. DINGWALL
> Attorney for Plaintiffs

**EXHIBIT 2**

## POST-TERMINATION WAGE INFORMATION DEMONSTRATIVE EXHIBIT

**The following Plaintiffs have failed to produce any post termination wage information:**

1. Grover Kelley
2. Estate of Chad Little
3. Michael D. Potter
4. Michael L. Potter
5. Clay Stiltner

**The following Plaintiffs have failed to produce complete post-termination wage information:**

| Plaintiffs | Missing Years of Post-termination Wage Information | Incomplete Post-termination Wage Information |
|---|---|---|
| 6. Tony Abdon | Failed to produce wage information for 2018. | |
| 7. Brandon Adkins | Failed to produce wage information for 2020. | The post-termination wage information produced sets forth combined wages of Plaintiff and his spouse. As a result, Brandon Adkins's individual wages and damages are not discernible. |
| 8. Bobby Akers | Failed to produce complete wage information for 2019. | |
| 9. Gerald Barber | | The post-termination wage information produced sets forth combined wages of Plaintiff and his spouse in 2017 and 2020. As a result, Gerald Barber's individual wages and damages are not discernible. |
| 10. James Blain | Failed to produce complete wage information for 2020. | |
| 11. Devery Brown | Failed to produce complete wage information for 2018. Failed to produce any wage information for 2019 and 2020. | |
| 12. Michael Campbell | Failed to produce wage information for 2020. | |
| 13. Quincy Christian | Failed to produce complete wage information for 2018. | |

| | | |
|---|---|---|
| 14. Randall Craycraft | | The post-termination wage information produced for 2020 sets forth combined wages of Plaintiff and his spouse. As a result, Randall Craycraft's individual wages and damages are not discernible. |
| 15. James Deal | Failed to produce wage information for 2017. | |
| 16. Chad Dowdy | Failed to produce complete wage information for 2020. | |
| 17. Jerry Flocker | Failed to produce complete wage information for 2020. | The post-termination wage information produced sets forth combined wages of Plaintiff and his spouse. As a result, Jerry Flocker's individual wages and damages are not discernible. |
| 18. Edwin Glowacki | | The post-termination wage information produced sets forth combined wages of Plaintiff and his spouse. As a result, Edwin Glowacki's individual wages and damages are not discernible. |
| 19. David Manis | Failed to produce wage information for 2020. | |
| 20. Homer Maynard | Failed to produce wage information for 2017, 2019, and 2020. | |
| 21. Robert Mosteller | Failed to produce wage information for 2020. | The post-termination wage information produced for 2018 sets forth combined wages of Plaintiff and his spouse. As a result, Robert Mosteller's individual wages and damages are not discernible. |
| 22. Jeremy Napier | Failed to produce wage information for 2020. | |
| 23. Kevin Palmer | Failed to produce wage information for 2019. | |
| 24. Jonathan Rowe | Failed to produce complete information for 2018. Failed to produce wage information for 2017, 2019, and 2020. | |
| 25. Dennis Sargent | Failed to produce wage information for 2018 and 2019. | |
| 26. Eric Speaks | Failed to produce wage information for 2020. | The post-termination wage information produced sets forth |

| | | |
|---|---|---|
| | | combined wages of Plaintiff and his spouse. As a result, Eric Speaks's individual wages and damages are not discernible. |
| 27. Danny Stewart | Failed to produce wage information for 2017 and 2018. | |
| 28. Todd Thayer | Failed to produce complete post-termination wage information for 2018 and 2019 | |
| 29. Michael Williams | | The post-termination wage information produced for 2017, 2018, and 2019 sets forth combined wages of Plaintiff and his spouse. As a result, Michael Williams's individual wages and damages are not discernible. |



**EXHIBIT 3**

Opp
& COMPANY, INC.

March 22, 2021

Gregory G. Paul, Esq.
Paul Law Offices, PLLC
100 First Avenue, Suite 1010
Pittsburgh, PA 15222

Jeff R. Dingwall, Esq.
Eight & Sand – Law Office of Jeff R. Dingwall, P.C.
550 West B Street, Fourth Floor
San Diego, CA 92101

Re:    Adkins, et al. v. CSX Transportation (CSX)

Dear Messrs. Paul and Dingwall:

At your request, I have prepared the following preliminary computations and analysis concerning the earnings losses for the named Plaintiffs (see the enclosed listing) as a result of their termination from CSX. This analysis is as a result of my review of the information detailed in Exhibit A for each named Plaintiff. Based upon this information, I have the following opinions:

# <u>Summary of Lost Earnings without Consideration of Post-Termination Earnings</u>

**<u>Total Losses Based Upon First Exposure Retirement Ages:</u>**           $      86,285,287
    Assumes that the named plaintiffs would have
    retired when they first met the Railroad Retirement
    Board's (RRB) 30/60 provision, if applicable
    (see the enclosed schedule)

**<u>Total Losses Based Upon Maximized Benefit Retirement Ages:</u>**           $    93,134,293
    Assumes that the named plaintiffs would have retired
    when they would have maximized their RRB benefits
    at their normal Social Security retirement ages
    (see the enclosed schedule)

399 Perry Street, Suite 201, Castle Rock, CO 80104  Office: 303.694.7507  Fax: 303.694.7508  Web: OppandCompany.com

March 22, 2021
Gregory G. Paul, Esq.
Jeff R. Dingwall, Esq.
Page 2

## Key Assumptions and Basis for Computations:

A.    These calculations are based upon the following source information for each named plaintiff:

  1.    The named plaintiff's RRB Form G-90c2 which provides the individual's creditable railroad earnings by year and their deemed and actual service months by year.

  2.    A listing of the named plaintiffs which provided the following for each individual:

    a.    Dates of birth.

    b.    Marital status and number of other dependents with ages.

    c.    Craft held at time of termination.

    d.    Date of termination.

B.    The earnings barring termination for each named plaintiff was determined based upon the following assumptions:

  1.    The last full year of pre-termination earnings for each named plaintiff was used as the starting point for these computations.

  2.    The starting point amount was then adjusted by contractual increases prescribed by the applicable contracts through the end of the current contracts.

  3.    The post-contract amounts were then adjusted by historical average National Carrier Conference Committee (NCCC) contract increases based upon the appliable future time horizons.

  4.    The projected future NCCC rates were determined by utilizing the 'Look-Back' approach by matching the projected future earnings loss time period[1] to the same period historically, rounded to the nearest five years. That is, if the earnings loss is expected to continue for 20 years in the future, the 20-year historical average NCCC rate was used.

---

[1]  The longer maximized RRB benefit retirement age was used for purposes of calculation.

March 22, 2021
Gregory G. Paul, Esq.
Jeff R. Dingwall, Esq.
Page 3

C.   The health benefits barring termination for each named plaintiff was determined based upon the following assumptions:

1.   The 2017 through 2020 health benefits were assumed to be equal to the actual average amounts paid by Class 1 railroads for Medical, Dental and Vision coverage for railroaders and their dependents.

2.   Post-2020 amounts were then adjusted by historical average medical cost increases (CPI-M) based upon the appliable future time horizons.

3.   The projected future CPI-M rates were determined by utilizing the 'Look-Back' approach by matching the projected future earnings loss time period[1] to the same period historically, rounded to the nearest five years. That is, if the health benefit loss is expected to continue for 20 years in the future, the 20-year historical average CPI-M rate was used.

4.   It is important to note, that an average CPI-M annual rate of increase may significantly understate losses in this category. Class 1 railroad premiums have out-average CPI-rates by between 1.15% and 3.27% during the past 5 to 40 years.

5.   Class 1 family rates were used for all married named plaintiffs.

6.   Class 1 individual rates were used for all single named plaintiffs without other dependents, or where marital status was not provided.

7.   Class 1 family rates were used for all single named plaintiffs with other dependents through the date the youngest dependent reached age 26, with Class 1 individual rates used thereafter.

D.   The RRB Tier I, Tier II and Medicare deductions barring termination for each named plaintiff was determined based upon the following assumptions:

1.   The named plaintiff's historical and projected future lost railroad wages are computed net of Tier I (6.20% - subject to annual maximums), Tier II (4.90% - subject to annual maximums) and Medicare (1.45% for the first $200,000 per year and 2.35% thereafter) deductions.

---

[1] The longer maximized RRB benefit retirement age was used for purposes of calculation.

March 22, 2021
Gregory G. Paul, Esq.
Jeff R. Dingwall, Esq.
Page 4

      2.     The employee and employer Tier II contribution rate is tied to the solvency of the RRB fund. As a result, the contribution rate of both the employer and employee has fluctuated historically. Ultimately though, the contribution rate is based upon the future solvency of the fund. Consequently, for purposes of this analysis, I have assumed that the employee Tier II contribution rate will remain at 4.90% after 2021.

E.     For purposes of this preliminary analysis, I have not considered any amounts earned or received by the named plaintiffs after the dates of their termination. I will supplement these computations if I am later provided with additional information regarding this issue.

F.     The first exposure and maximized RRB retirement ages barring termination for each named plaintiff was determined based upon the following assumptions:

      1.     The first exposure retirement age (if applicable) was determined by computing the age the individual would have met the RRB's 30/60 requirement. That is, having at least 360 service months (30 years from the effective hire date) and be at least age 60. Based upon hire date, some of the named plaintiffs would have never met the 30/60 provision barring their termination.

      2.     The maximized RRB retirement age (if applicable) was determined by computing the age the individual would have reached their normal Social Security retirement age (variously between ages 66 and 67 depending on year of birth).

      3.     The effective hire date for each named plaintiff was computed by subtracting their actual service months (per the individual's RRB Form from G-90C2) from their effective termination date.

      4.     In instances where a named plaintiff's termination date was after their first exposure retirement age date, only the maximized RRB retirement age was used.

      5.     In instances where a named plaintiff's first exposure retirement age date was within one year of the maximized RRB retirement age date, only the maximized RRB retirement age was used.

March 22, 2021
Gregory G. Paul, Esq.
Jeff R. Dingwall, Esq.
Page 5

G.   Loss or (gain) in Tier I and II benefits as a result of termination are based upon the following assumptions:

1.   The Tier I and Tier II losses are equal to the difference between the benefits that the named plaintiffs could have expected barring termination and the amounts they can expect as a result of termination.

2.   Tier I and Social Security benefits are computed using an individual's highest 35 years of indexed earnings per RRB and Social Security regulations.

3.   The named plaintiff's RRB Form from G-90C2 only provides the individual's historical railroad earnings. As such, estimates of historical non-railroad earnings must be used.

4.   For purposes of this analysis, I have assumed that the named plaintiffs earned non-railroad amounts equal to their percentage of the maximum creditable Tier I/Social Security earnings for their full years of railroad employment. That is, if an individual earned an average of 50.00% of the maximum creditable Tier I/Social Security during their full years of railroad work, I have assumed that they earned 50.00% of the maximum creditable Tier I/Social Security amounts during their years of non-railroad work and years of partial railroad work. This method may understate losses in this category given that an individual's railroad earnings are usually higher than their non-railroad amounts. Further, given that these non-railroad earnings are applied equally to both sides of the computation, the effect on the net result is not material.

5.   The named plaintiffs must have at least 60 service months in order to qualify for any Tier II benefit based upon RRB regulations.

6.   In instances where the named plaintiff met the RRB's 30/60 provision prior to their termination, only the first exposure retirement age Tier I and II benefits were calculated on a "With Termination" basis. This has the effect of reducing losses in this category, but is appropriate given the lack of post-termination earnings.

7.   Post-retirement Tier I benefits are assumed to increase at the average rate of the consumer price index for wage earners (CPI-W) based upon RRB and Social Security regulations. The projected future CPI-W rates were determined by utilizing the 'Look-Back' approach by matching the projected future loss time period to the same period historically, rounded to the nearest five years.

8.   Post-retirement Tier II benefits are assumed to increase at the average rate of 1/3rd CPI-W based upon RRB and Social Security regulations.

March 22, 2021
Gregory G. Paul, Esq.
Jeff R. Dingwall, Esq.
Page 6

H.    These losses have been brought to present value using the average rate of return of United
      States Treasury Bonds (T-Bill) between the date of this report and the named plaintiff's work-
      life expectancy and life expectancy as follows:

      1.    The projected future T-Bill rates were determined by utilizing the 'Look-Back' approach
            by matching the projected future loss time period (work-life and life expectancy) to the
            same period historically, rounded to the nearest five years. That is, if the named
            plaintiff's work-life expectancy is 20 years, the 20-year historical average T-Bill rate was
            used. Further, if the named plaintiff's life expectancy is 40 years, the 40-year historical
            average T-Bill rate was used.

      2.    The discount/(escalation) rate is based upon the difference between the growth rates of
            the amounts being measured (NCCC, CPI-M, CPI-W and 1/3rd CPI-W) and the T-Bill
            rates, rounded to the nearest five years. These differences or 'Spreads' are provided in 5-
            year intervals and is listed on the enclosed schedule).

      3.    The present value is the fund required today to replace future losses such that, at the
            end of the future loss period, the fund's balance after annual withdrawals will be zero.

Enclosed is a copy of my resume, a rate schedule for the firm, as well as my testimony record.

I will update and/or expand these computations if I receive additional information concerning this matter.
This report has been prepared in connection with the above referenced matter and is not to be used for
any other purpose.

Sincerely,

Jeffrey B. Opp
JBO/sld
Enclosures

| | **EXHIBIT 4** |
|---|---|

**Megan Davis**

| | |
|---|---|
| **From:** | Melissa Foster Bird |
| **Sent:** | Monday, March 29, 2021 4:14 PM |
| **To:** | Greg Paul; kiel@gljustice.com; jeff@eightandsandlaw.com; Ken Reed Gmail; pstephens@underwoodlawoffices.com |
| **Cc:** | Megan Davis; Nathan Hamons; Rebecca Mitchell |
| **Subject:** | FW: Adkins v. CSXT--Expert and Damages Discovery |
| **Attachments:** | LTR to Greg re Expert and Wage Discovery - 4852-5307-3123 3.docx |

Greg, et al. –

I will respond to the other issues we discussed regarding depositions and scheduling  in a separate email.  However, attached please find a meet and confer letter regarding information needed to supplement Plaintiffs' written discovery responses.  Thank you –

Melissa

**From:** Nathan Hamons <nathan.hamons@nelsonmullins.com>
**Sent:** Monday, March 29, 2021 4:10 PM
**To:** Melissa Foster Bird <Melissa.FosterBird@nelsonmullins.com>
**Cc:** Megan Davis <megan.davis@nelsonmullins.com>; Rebecca Mitchell <rebecca.mitchell@nelsonmullins.com>
**Subject:** Adkins v. CSXT--Expert and Damages Discovery

1



**NELSON MULLINS**

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AND COUNSELORS AT LAW

Melissa Foster Bird
(Admitted in VA WV OH & KY)
T: (304) 526-3503  F: (304) 526-3543

Melissa.FosterBird@nelsonmullins.com

949 Third Ave., Suite 200
Huntington, WV 25701
T: 304.526.3500  F: 304.526.3599
nelsonmullins.com

March 29, 2021

Greg Paul, Esq.
MORGAN & PAUL, PLLC
100 First Avenue, Suite 1010
Pittsburgh, PA  25222

RE:     *Justin Adkins, et al. v. CSX Transportation, Inc., et al.*
        **United States District Court for Southern District of West Virginia**
        **Civil Action No: 3:18-cv-0321**

Dear Greg:

I am writing in reference to Defendant, CSX Transportation Inc's ("CSXT") First Set of Interrogatories and First Set of Requests for Production of Documents. This letter seeks to resolve outstanding discovery requests regarding expert information and wage information of Plaintiffs. Accordingly, please supplement Plaintiffs' responses to CSXT's discovery requests as soon as possible.

CSXT has received the expert disclosures naming Jeffrey Opp and Doctor Michael Freeman as retained experts in this matter and each expert's written report. Notably, CSXT did not receive information sent to, relied upon, or otherwise received from each expert in formulating their opinions or preparing their respective reports as previously requested through written discovery.

Federal Rule of Civil Procedure 26(a)(2)(B)(ii) requires that an expert report contain "any exhibits that will be used to summarize or support" the expert's opinions. Additionally, CSXT previously requested all documents sent to any expert whom Plaintiffs intend to call at trial. CSXT specifically requested:

> **REQUEST NO. 7:**   All documents sent to, prepared by, or received from any expert witness you intend to call at trial including documents pertaining to compensation of the expert; documents containing facts or data on which the expert relied in forming opinions; documents containing assumptions relied upon by the expert; and written reports.

CALIFORNIA | COLORADO | DISTRICT OF COLUMBIA | FLORIDA | GEORGIA | MARYLAND | MASSACHUSETTS | NEW YORK
NORTH CAROLINA | SOUTH CAROLINA | TENNESSEE | WEST VIRGINIA

Greg Paul, Esq.
March 29, 2021
Page 2

Please supplement Plaintiffs' answers to CSXT's Interrogatory Number 24 and CSXT's Requests for Production of Documents Numbers 6 and 7, as these discovery requests specifically seek information related to Plaintiffs' disclosed experts including all documents sent to, prepared by, or received from any expert.

Additionally, Plaintiffs have not provided tax information despite CSXT's previously issued written discovery requests. Request for Production of Documents Number 12 requests that Plaintiffs produce:

> **REQUEST NO. 12:** All documents relating to income or monies received by you from any source since the cessation of your employment with CSXT, including but not limited to unemployment compensation benefits, copies of your state and federal income tax returns with all attachments, W-2 forms, and bank statements for the years 2017 through the date of the trial in this action.

At this time, CSXT has not received any information responsive to Request for Production Number 12 for all Plaintiffs. This Request seeks copies of Plaintiffs' federal and state income tax returns from the cessation of each Plaintiff's employment through the date of trial in this action. Accordingly, please supplement Plaintiffs' Responses to Requests for Production of Documents Number 12 and provide copies of Plaintiffs' income tax returns for 2017, 2018, 2019, and 2020, along with other responsive documents as soon as possible.

Please accept this letter as an attempt to resolve these issues and please provide responsive information as soon as possible. Failure to provide responsive information will require CSXT to file a Motion to Compel with the Court.

Should you have any questions or wish to discuss this matter, please feel free to contact me.

Very truly yours,

Melissa Foster Bird

MFB/NRH/rm9
cc:    Jeffrey R. Dingwall, Esq. (via email)
       C. Kiel Garella, Esq. (via email)
       Mark F. Underwood, Esq. (via email)
       John Patrick L. Stephens (via email)
       Kenneth R. Reed, Esq. (via email)

## Megan Davis

| | |
|---|---|
| **From:** | Melissa Foster Bird |
| **Sent:** | Friday, April 16, 2021 11:39 AM |
| **To:** | Greg Paul |
| **Cc:** | Megan Davis; Nathan Hamons; Rebecca Mitchell |
| **Subject:** | Adkins - depositions and written discovery regarding wages |

In efforts to get the requested depositions scheduled, I want to inform you, again, that Kendall Quentin, Ann Reinke, and Bryan Rhode are no longer employed by CSX Transportation, Inc., and, as a result, we will not be able to produce these individuals for depositions.

Also, I am following up on the letter sent on May 29, 2021, requesting that Plaintiffs provide their tax returns and other information in their possession related to wages since their employment with CSXT. As I have mentioned, the Department of the Treasury will not issue tax returns or tax transcripts to third parties even with the use of an authorization. After July 2019, the Department of Treasury will only provide Tax Transcripts to the taxpayer's mailing address of record. We previously requested tax records from the Department of the Treasury in July of 2020 ; however, we believe that these records were sent to Plaintiffs' mailing addresses.  Please forward us the tax turns for the Plaintiffs from 2017 to present as requested in written discovery.

Melissa



## NELSON MULLINS

**MELISSA FOSTER BIRD  PARTNER**
melissa.fosterbird@nelsonmullins.com

She/Her/Hers
**949 THIRD AVE. | SUITE 200**
**HUNTINGTON, WV 25701**
T **304.526.3503**  M **304.634.6919**  F **304.526.3543**
**NELSONMULLINS.COM**  **VCARD**  **VIEW BIO**

USCA4    1359

## Megan Davis

| | |
|---|---|
| **From:** | Melissa Foster Bird |
| **Sent:** | Thursday, April 22, 2021 6:09 AM |
| **To:** | gregpaul@paullaw.com |
| **Cc:** | Rebecca Mitchell; Megan Davis; Nathan Hamons |
| **Subject:** | Adkins - Additional depo scheduled, wage information and depo dates request, possible mediation |
| **Attachments:** | 2021.04.21 - Updated Deposition Schedule.pdf |

Attached please find a new schedule with an additional deposition added.  I expect that I will have more to add by tomorrow morning.

I am reupping our request for the tax records or other wages information post termination.  Also, please provide dates to depose your experts (per my request) and dates that you are available for depositions of Chiropractors Carey and Johnson.

Finally – I am in communication with CSXT  regarding its interest in scheduling a mediation in this matter and I understand that you have reserved time with Don O'Dell.

MFB



# NELSON MULLINS

**MELISSA FOSTER BIRD  PARTNER**
melissa.fosterbird@nelsonmullins.com

She/Her/Hers

**949 THIRD AVE. | SUITE 200**
**HUNTINGTON, WV 25701**

T 304.526.3503   M 304.634.6919   F 304.526.3543

**NELSONMULLINS.COM   VCARD   VIEW BIO**

**Megan Davis**

| | |
|---|---|
| **From:** | Melissa Foster Bird |
| **Sent:** | Friday, April 30, 2021 11:40 AM |
| **To:** | Greg Paul |
| **Cc:** | Jeff Dingwall; Kiel Garella; pstephens@underwoodlawoffices.com; kenreedatty@gmail.com; Megan Davis; Nathan Hamons; Rebecca Mitchell |
| **Subject:** | Adkins - depositions and wages information. |

Greg,

I wanted to follow up with you regarding my prior requests for (1) Plaintiffs' wages since 2017, and (2) deposition dates for Plaintiffs' experts.  Additionally, as I have not heard back from you regarding deposition dates for Chiropractors Carey and Johnson, I am going to move forward with noticing their depositions.

Thank you for your attention to these issues.

Melissa



**NELSON MULLINS**

**MELISSA FOSTER BIRD  PARTNER**
melissa.fosterbird@nelsonmullins.com
She/Her/Hers
949 THIRD AVE. | SUITE 200
HUNTINGTON, WV 25701
T 304.526.3503   M 304.634.6919   F 304.526.3543
NELSONMULLINS.COM   VCARD   VIEW BIO

**Rebecca Mitchell**

| | |
|---|---|
| **From:** | Greg Paul <gregpaul@paullaw.com> |
| **Sent:** | Friday, May 21, 2021 1:20 PM |
| **To:** | Melissa Foster Bird |
| **Cc:** | Jeff Dingwall; Kiel Garella; Patrick Stephens; Ken Reed Gmail; Megan Davis; Nathan Hamons; Rebecca Mitchell |
| **Subject:** | Re: Adkins - mediation and meet and confer |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

What time is good to talk today? You originally requested earnings records by next Wednesday.

Sent from my iPhone

On May 21, 2021, at 10:03 AM, Melissa Foster Bird <Melissa.FosterBird@nelsonmullins.com> wrote:

1. CSX will not agree to go forward with the mediation on June 3-4 and it will have to be postponed.  As of today we have not received any post-termination wage information for the Plaintiffs and it is impossible to evaluate the most basic component of the Plaintiffs' alleged damages.  We were promised a rolling production of the wage information starting yesterday (5/20) and still none has been received.
2. At the conference with the Court on Monday we were instructed to report to the Court today (5/21) regarding our agreements about outstanding discovery.  We met for almost two hours on Wednesday.  Yesterday I sent you the notes of what I believe our agreements were.  I have not heard from you since Wednesday.  If I do not hear from you by 3:00 EST  this afternoon I plan to report to the Court on behalf of the Defendants.

Melissa



**MELISSA FOSTER BIRD**  PARTNER
melissa.fosterbird@nelsonmullins.com
She/Her/Hers
**949 THIRD AVE. | SUITE 200**
**HUNTINGTON, WV 25701**
T 304.526.3503   M 304.634.6919   F 304.526.3543
NELSONMULLINS.COM   VCARD   VIEW BIO

**Confidentiality Notice**
This message is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged, confidential or otherwise legally

USCA4 Appeal: 21-2051 Doc: 32-3 Filed: 07/30/2022 Pg: 420 of 607

exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately either by phone (800-237-2000) or reply to this e-mail and delete all copies of this message.

# District Judge Daybook Entry

## United States District Court - Southern District of West Virginia at Huntington

Date:   6/14/2021             Case Number  3:18-cv-00321

Case Style             Adkins vs. CSX Transportation, Inc.

Type of hearing          Telephonice Case Management Conference

Before the Honorable: 2514-Chambers

Court Reporter        Kathy Swinhart                    Courtroom Deputy  Terry Justice

Attorney(s) for the Plaintiff or Government

Greg Paul, Patrick Stephens, Kiel Garella, Jeff Dingwell

Attorney(s) for the Defendant(s)

Melissa Foster Byrd, Megan Davis

Law Clerk          Casey Waldeck

Probation Officer

## Court Times

| Start Time | Stop Time | Court Time Description |
|---|---|---|
| 1:33 PM | 1:58 PM | Non-Trial Time/Uncontested Time |

Non-Trial Time/Uncontested Time 00:25

## Courtroom Notes

Telephone conference scheduled to commence: 1:30 p.m.
Telephone conference commenced: 1:33 p.m.

The Court and counsel discussed dates for outstanding depositions, issues regarding Plaintiffs' disclosure of post-termination wage information, and concerns about the upcoming trial date.

The Court directs the parties to meet and confer on or before June 21, 2021, to discuss Defendant's claim of inadequate post-termination wage information. Plaintiff will then have until June 28, 2021, to file a formal response to Defendants' Motion to Strike (ECF No. 402).

The Court expects the parties to confirm deposition dates for Plaintiffs' experts as soon as possible.

Recessed: 1:58 p.m.

IN THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF WEST VIRGINIA, HUNTINGTON DIVISION

BEFORE THE HONORABLE ROBERT C. CHAMBERS, JUDGE

---o0o---

JUSTIN ADKINS, et al.,

                    Plaintiffs,

vs.                                          No. 3:18-CV-00321

CSX TRANSPORTATION, INC.,
et al.,

                    Defendants.
_____/


---o0o---

REPORTER'S TRANSCRIPT OF PROCEEDINGS

TELEPHONIC CASE MANAGEMENT CONFERENCE

MONDAY, JUNE 14, 2021, 1:30 P.M.

---o0o---




For the Plaintiffs:    MORGAN & PAUL
                       100 First Avenue, Suite 1010
                       Pittsburgh, Pennsylvania  15222
                       BY:  GREGORY G. PAUL

                       UNDERWOOD & PROCTOR LAW OFFICES
                       923 Third Avenue
                       Huntington, West Virginia  25701
                       BY:  JOHN PATRICK L. STEPHENS

            (Appearances continued next page...)


Reported by:  KATHY L. SWINHART, CSR
              Official Court Reporter
              (304) 528-2244

1                        APPEARANCES (Continued)

2

     For the Plaintiffs (Cont'd):
3
                         GARELLA LAW
4                        409 East Boulevard
                         Charlotte, North Carolina  28303
5                        BY:  CHARLES KIEL GARELLA

6                        EIGHT & SAND
                         110 West C Street, Suite 1903
7                        San Diego, California  92101
                         BY:  JEFFREY R. DINGWALL
8

9    For the Defendants:

10                       NELSON MULLINS RILEY & SCARBOROUGH
                         Post Office Box 1856
11                       Huntington, West Virginia  25719-1856
                         BY:  MELISSA FOSTER BIRD
12
                         NELSON MULLINS RILEY & SCARBOROUGH
13                       949 Third Avenue, Suite 200
                         Huntington, West Virginia  25701
14                       BY:  MEGAN BASHAM DAVIS

15

16

17

18

19

20

21

22

23

24

25

USCA4 1366

1

```
 1              HUNTINGTON, WEST VIRGINIA
 2         MONDAY, JUNE 14, 2021, 1:30 P.M.
 3                   ---o0o---
 4         THE COURT:  This is Judge Chambers.  Who else is on
 5    the line?
 6         MR. PAUL:  Good afternoon, Judge Chambers.  This is
 7    Greg Paul on behalf of plaintiffs, and there is other counsel
 8    as well.
 9         THE COURT:  All right.
10         MR. STEPHENS:  Yes, Your Honor.  This is Patrick
11    Stephens on behalf of plaintiffs as well.
12         THE COURT:  Okay.
13         MR. GARELLA:  Kiel Garella as well, Your Honor.
14         THE COURT:  All right.
15         MR. DINGWALL:  And Jeff Dingwall for the plaintiffs.
16         THE COURT:  All right.  And for the defendants?
17         MS. BIRD:  Your Honor, it's Melissa Foster Bird and
18    Megan Davis for the defendants.
19         THE COURT:  Okay.  All right.  So this was previously
20    scheduled as a case management conference.  I inquired last
21    week whether the parties thought we needed to proceed.  I
22    understand the defendant indicated that it felt we needed to
23    proceed with the conference today, and I was advised there
24    were I guess three matters, the status of disclosures, motion
25    practice and upcoming deadlines.
```

2

1          So, Ms. Bird, do you want to tell us what's on the

2     plate for the defendant?

3          MS. BIRD:  Yes, Your Honor.

4          Your Honor, you'll remember that on May 17th, we had

5     the conference with the Court regarding some ongoing discovery

6     issues that we had been having.  And as we walked away from

7     that conference, the Court asked us to confer with regard to

8     the discovery, outstanding discovery issues and report back to

9     the Court, which we did on May 21st.

10         At that time, we reported to the Court several

11    agreements that the parties had made.  First, for a list of

12    depositions that would occur before -- that would be completed

13    before June 30th.  That included three named defendants, one

14    employee pursuant to a Rule 30(b)(6) notice, plaintiffs'

15    expert witnesses, and the union representatives that were

16    named in plaintiffs' Rule 26(a) disclosures.

17         We have dates for the three named defendants.  We will

18    have a date for the one remaining CSX employee by the end of

19    the day today.  But we still do not have dates for the

20    plaintiffs' expert witnesses, nor do we have dates for the

21    union representatives which we identified.  That is one of the

22    problems.

23         Your Honor, we also have a huge issue with

24    post-termination wage information.  We filed a motion to

25    strike the wage loss claim of twenty -- I think 26 plaintiffs

3

1   or 29 plaintiffs this morning because we continue to not have

2   the post-termination wage information that was requested more

3   than a year ago that the Court addressed in the last

4   conference that we had on May 17th and that was agreed to

5   provide -- to be provided before now.

6        We have given the plaintiffs lots of time.  We

7   discussed this issue in the mediation and came to some, I

8   think, agreements about dates.  Plaintiffs believe those to be

9   confidential, so I won't report those to the Court unless

10  given permission.  But we agreed to some dates, and yet still

11  we do not have post-termination wage information from the

12  plaintiffs.

13       That has completely stopped the ability to evaluate or

14  move forward in this case in almost any respect to getting to

15  a trial date in September.

16       We had a mediation, Your Honor, on June 3rd, and that

17  mediation could not proceed as a full mediation -- although it

18  was a very productive day because we broke plaintiffs down

19  into buckets with which we could possibly discuss settlement.

20  We are unable to move forward evaluating this case because we

21  simply don't have wage information, which is a huge mitigating

22  factor in the plaintiffs' damages allegation.  That is another

23  concern.

24       So at this point, Your Honor, defendants believe that

25  it's time to reevaluate a number of things.  The necessity

4

1    for -- to discuss the disclosures and opinions of plaintiffs'

2    experts, which has been identified as being only preliminary

3    still today, which have not been finalized.  The in -- the

4    failure of plaintiffs to produce their experts for deposition

5    by the end of the month so that those depositions will be

6    completed as we reported to the Court that they would be by

7    the end of the month.  The failure of plaintiffs to update the

8    information that they promised to update about certain wage

9    claims and other discovery that we promised the Court we would

10   update in our May 21st letter to the Court.  And then the

11   failure of plaintiffs to provide deposition dates for the

12   union representatives as we agreed.

13          So at this point, the case, which is barreling toward

14   a trial date, is at a standstill because plaintiffs have

15   failed to adequately address the issue, one of the central

16   issues in this case, which is the wage loss and the expert

17   opinions.

18          Although promised to the defendants and to the Court

19   in an e-mail and a discussion on -- in May, they still have

20   not happened.  And for that reason, we believed it was

21   necessary for us to go forward with this conference in order

22   to bring -- to bring these issues before the Court.

23          THE COURT:  All right.  Thank you.

24          Mr. Paul?

25          MR. PAUL:  Thank you, Your Honor.  I will start with

5

1    what we perceive to be the easiest one.

2         The list of union representatives that was identified

3    by defendants I believe was over a dozen.  We have never

4    represented them.  We never represented that we would produce

5    them for deposition.  We certainly agreed that their

6    depositions could go forward, although never being previously

7    noticed, and we still stand behind that, but they have to be

8    subpoenaed.  We have no control over them and don't represent

9    them.  So that seems to be an easy one at least from our

10   perspective.

11        The more difficult one is since our conference, we've

12   produced --

13        THE COURT:  Well, hold on.  Mr. Paul, let me stop you

14   there.

15        So, Ms. Bird, was it your understanding that the

16   plaintiffs were agreeing to produce these union reps, not just

17   identify them?

18        MS. BIRD:  That was my understanding, Your Honor.

19   They've been identified in the Rule 26(a)(1) disclosure.  It

20   was my understanding that they were going to produce them for

21   deposition after they were identified by the defendants on May

22   24th, which we did, and that was part of the agreement that we

23   reported to the Court.  That was part of the e-mail exchanges

24   that we had prior to reporting that to the Court.  And we

25   identified them by May 24th, and that has been the end of

6

1    that.

2         These are witnesses that are on plaintiffs' Rule

3    26(a)(1) disclosures, which we have asked the plaintiffs to

4    produce for deposition.

5         MR. PAUL:  May I, Your Honor?

6         THE COURT:  Yes.

7         MR. PAUL:  That's very inaccurate.  Most of those

8    union representatives were also identified in defendants' Rule

9    26 because they attended various investigation hearings.  And

10   there is no documentation anywhere, nor could we agree to

11   produce them because we don't represent them.  We don't have

12   any control over them.

13        Some of them are CSX employees, and some aren't if

14   they are higher up in the union structure.  But that is an

15   absolute incorrect statement to say that we ever agreed to do

16   that, as we couldn't.

17        THE COURT:  Well, so first, obviously I don't have

18   anything in front of me that would allow me to agree or

19   disagree with one side about this.  If they were identified in

20   plaintiffs' disclosures, then I think defendant certainly has

21   a right to take their depositions.  If the plaintiffs are not

22   going to produce them, then I'm going to give the defendant

23   the time to take these depositions.  I would expect the

24   parties to act quickly because we do have a trial date

25   looming.  But if the defendant is going to have to go search

7

1    them out and subpoena them, that is going to take time, and

2    that's going to jeopardize the plaintiffs' trial date.  So

3    just keep that in mind.

4         Go ahead.  What was your next response to, Mr. Paul?

5         MR. PAUL:  Yes, Your Honor.

6         With respect to the wage documents, since our last

7    conference we've produced over 2,000 documents of W-2s or tax

8    returns or tax transcripts, which is what defendants

9    originally requested authorization for last summer.  But when

10   they did not get them, we did not hear from them over the past

11   two months.

12        We have really worked around the clock to get all of

13   them from all of the plaintiffs, and we have wage earning

14   documents for certified people who have not worked since 2017

15   to the present such that they wouldn't have any, except for

16   three people, and that's Grover Kelley, M.L. Potter and Z.

17   Potter.  Those are three clients that we have been unable to

18   get in touch with and, therefore, do not have any wage

19   information for them.

20        We do know with respect to the Potters that their

21   deposition testimony was that they had -- a year ago, last

22   summer, that they had worked through the local boilermakers

23   union, so we know they have some earnings, but not much.  So

24   that's one issue that we have, just three people.

25        With respect to --

8

1          THE COURT:  Mr. Paul, have you seen the motion that

2     Ms. Bird filed today?

3          MR. PAUL:  No, Your Honor.  It was just filed a few

4     hours ago.

5          THE COURT:  All right.  Go ahead, then.

6          MR. PAUL:  But I agree, you know, we have some

7     discovery issues that pertain to the guidance that we'll be

8     filing as well with the magistrate judge.  But at least with

9     respect to those, other than those three, they have claimed

10    deficiencies, but have not identified what those deficiencies

11    are.  So, I guess, you know, unless directed otherwise by the

12    Court, we will take that up with the filing of their motion.

13          But we've certainly done everything we can and have

14    largely succeeded, you know, in that effort over the past

15    several weeks since this issue was brought to our attention.

16          Should I continue with respect to the experts or --

17          THE COURT:  Yes.

18          MR. PAUL:  Okay.  With respect to the two expert

19    witnesses, an economist and a medical doctor, we have just

20    last Friday, I believe, provided the available dates for the

21    medical witness, and we're waiting for available dates from

22    the economist to provide.  I mean, none of them have been

23    noticed, and we're cooperating trying to get those.  The

24    expert witnesses are -- don't appear to be available until

25    July, but we are working to try to squeeze that in.

9

1          But we have provided counsel with available dates for

2   Dr. Freeman and have not yet provided dates for Mr. Opp.

3          THE COURT:  Have you provided final reports?

4          MR. PAUL:  So, Your Honor, we have not supplemented

5   any report, nor do we think we need to.  I mean, I think it's

6   common for the experts -- we had an expert deadline, just like

7   CSX did, and we met it with the preliminary report.  I think

8   the only issue that comes up is, of course, until the day of

9   trial, they can't do the final subtraction because there could

10   be earnings right up until the end of September.

11          So there is no additional report, additional topic,

12   nor do I think there could be.  It's just supplementation of

13   any potential wages as they continue year to date through

14   trial.

15          So that's the only --

16          THE COURT:  Well, did your reports explain that that

17   was the only contingency to their final conclusions?

18          MR. PAUL:  Yes, they did.  I mean, there is a section

19   that indicated they won't have that information to substitute

20   and provide the final numbers.  So, yeah, that's true.

21          THE COURT:  All right.  So the defense can consider

22   those as final reports subject only to supplementation based

23   upon changes in earnings between now and trial?

24          MR. PAUL:  Correct, subtraction or addition, however

25   you want to look at it.

10

1          THE COURT:  Right.

2          MS. BIRD:  Your Honor, that -- I'm sorry.

3          THE COURT:  Go ahead.

4          MS. BIRD:  That goes back to the wage loss

5     information.

6          The report specifically says this is a preliminary

7     analysis.  The report says I've not considered

8     [unintelligible] received by the named plaintiffs.  The report

9     says I will supplement these computations if I'm provided with

10     additional information.  And that goes back to the fact that

11     the wage information that is necessary to evaluate all of

12     these cases simply has not been provided to either the

13     defendants nor to the plaintiffs' experts.

14          So we're not talking about a small amount.  We're not

15     talking about just simple subtraction.  We can't even get wage

16     information -- I would disagree with Mr. Paul about the number

17     of people we have information for.  We have five people that

18     have not produced information at all and several more that

19     have years of gaps.

20          So the expert report --

21          THE COURT:  Years of gaps since this precipitating

22     event?

23          MS. BIRD:  Yes, sir.  I mean, I can just start -- I

24     could start listing them.  Many of them don't have any

25     information at all for 2018.  The terminations happened in

11

1    2017.  Many more of them don't have information that can be

2    separated out from their spouse's with whom they're married

3    and filing jointly.

4         It is impossible to get a true estimation of wage loss

5    for these 29 plaintiffs, the five that are missing and the

6    other 24 that the information is not full.  It is impossible

7    to fully evaluate their damages claim because the information

8    has simply not been provided.  It hasn't been provided to the

9    defendants.  It hasn't been provided to plaintiffs' experts.

10   It hasn't been provided to defendants' expert.  We cannot --

11   it is just not there for us.

12        And to ask the defendants to go forward trying to

13   evaluate this case without the information that is needed to

14   evaluate this case, it is more than just subtraction.  It's

15   analysis of the wage information and projecting it out and all

16   of the things that economists do.

17        But at this point, we have a plaintiffs' expert

18   opinion that has two giant numbers with absolutely no

19   mitigation done, although the plaintiffs' own expert admits it

20   has to be done.  So we are sitting here with these two big

21   numbers and absolutely no way to properly evaluate them.

22        THE COURT:  Well, Mr. Paul --

23        MR. PAUL:  Yes.

24        THE COURT:  -- you said you produced 2,000 pages, but

25   that doesn't really tell me much.  There may be 10,000 pages

12

1    worth of discoverable information.

2         So what is your sense of what it's going to take for

3    you to finish getting this wage information from your clients?

4         MR. PAUL:  So with the exception of the three people

5    that we previously talked about, we have the wage information

6    that they gave us in response to what they have done from 2017

7    to the present.

8         I don't know if --

9         THE COURT:  Well --

10        MR. PAUL:  -- defendants have done the work that we

11   have, but the depositions that were taken last year, they were

12   asked the question what have you done since CSX in 2017, and

13   they answered those questions whether they were working,

14   retired or on disability.

15        So it's not a function of -- not everybody has

16   consistent earnings, particularly with the layoffs during

17   COVID.  But we can certify that with the exception of the

18   three, that we have provided -- we've talked to every client,

19   provided the information that they had with respect to wages.

20        And we've even provided things that we would take the

21   position under a proper objection as we've lodged what are a

22   collateral source, but we still provided whether they are on

23   disability or age.  But those are the documents.  There is

24   nothing for us to supplement.

25        Again, they've alleged deficiencies, but not told us

13

1    what.  We're happy to consider that.  But as far as we're

2    concerned, with the exception of the three, we've provided

3    everything our clients have.

4         And I know that this issue came up before, but it

5    is -- you know, we're being accused of not cooperating here,

6    but the fact is everybody was satisfied with our clients

7    signing authorizations last summer, and they did.  And quite

8    frankly, I think defendants just dropped the ball on following

9    up with the IRS records.  And as soon as we were alerted to

10   that, we have really worked nonstop to try to get everything

11   we can from our clients and have.

12        So --

13        THE COURT:  I thought the problem with the IRS was

14   that the IRS wasn't accepting these third party requests.

15        MR. PAUL:  That's correct, but we didn't know that

16   until just a couple of months ago.

17        THE COURT:  Okay.  Well, so the defendant didn't know

18   it either, though.  So nobody knew it, either side, I'm sure.

19        MR. PAUL:  Well -- sorry.

20        THE COURT:  Go ahead.

21        MR. PAUL:  We didn't -- no, no, I mean the letters

22   were sent from defendants to the IRS, so I think any issue

23   with that would likely come back to them.  I don't have any

24   knowledge of that.

25        I'm just saying that when it became, you know, on our

14

1    radar, we've done everything we can with the exception of

2    these three, which, you know, is something that we just don't

3    know where they are.  There may be good reason, maybe they

4    don't, but that's the exception not the rule.

5              THE COURT:  Well, all right.  Ms. Bird, what do you

6    want the Court to do?

7              MS. BIRD:  I want the Court to strike those wages for

8    the people who have not provided proper information in order

9    to address the mitigation issues that are part of the claim

10   that they now -- that they're required to prove.

11             THE COURT:  Have you addressed all of the plaintiffs

12   for whom you feel you have deficient wage information in this

13   motion that was filed today?

14             MS. BIRD:  Yes, sir.

15             THE COURT:  All right.  And how many plaintiffs are

16   included in that?

17             MS. BIRD:  29.

18             THE COURT:  Okay.  Well, so what I'm inclined to do is

19   to make the plaintiffs -- give the plaintiffs a few days to

20   review this motion, of course.  But then I would like to

21   direct that on or before this day next week, lead counsel for

22   each side have a conference to discuss what the defendant has

23   raised with respect to its claim of inadequate wage

24   information.  And at least that would provide, it sounds to

25   me, a fair statement of what the defendant believes is

KATHY L. SWINHART, Official Court Reporter  (304) 528-2244

15

1    deficient so that the plaintiffs have something specific to

2    respond to.

3            And then I'll give the plaintiffs seven more days to

4    file a response, a formal response to the defense motion.  My

5    hope is that once the plaintiffs have reviewed this motion,

6    that you two can talk and perhaps work through a resolution of

7    some of these.

8            There are already a ton of pending dispositive

9    motions, as you well know.  To be blunt about it, I'm not

10   inclined to take on a whole nother major motion that is a

11   predicate motion for everything else.  So I want you two to

12   talk about this and see what, if anything, can be worked out

13   to try to complete the information gathering that the

14   defendant is entitled to and to have some type of a plan.  And

15   then to the extent that you can't work that out, we'll just

16   have to treat this as a -- for what it is, as a formal motion.

17           But I want you folks to confer about it before the

18   plaintiffs respond to the formal motion and see if you can

19   avoid, minimize or reduce the issues that are presented.

20           From what I've heard today, and I have my court

21   reporter here, so it's on the record -- not that I wouldn't

22   accept Mr. Paul's representation, I would.  But it sounds to

23   me like the plaintiff has issued final reports.  Now I

24   understand they are subject to supplementation for this

25   post-termination wage information, and that that will require

16

1    substantive work by plaintiffs' -- one or both of the

2    plaintiffs' experts.  But it seems to me this at least closes

3    the door on plaintiffs' experts coming up with any new or

4    different theories or different opinions.  And I don't think I

5    can do much else at this point until we work through this

6    post-termination wage information and resolve it one way or

7    the other.

8            The defendant wants to depose the plaintiffs' experts,

9    and you've got a date for one, and plaintiffs say the other

10   will be available in July.  So please confirm that as quickly

11   as possible.

12           And, Ms. Bird, I don't know want to tell you about the

13   union reps.  I don't have enough in front of me to conclude

14   that plaintiffs somehow agreed to produce those people.  I

15   don't know whether you all have had an exchange in writing or

16   otherwise about that.  But at this point it sounds like the

17   plaintiffs are not in a position to provide them, and so I

18   don't know what else this Court can do right now.  I suppose

19   you'll just have to figure out how you want to go forward and

20   schedule depositions and subpoena these people.

21           When is discovery supposed to be completed?  Are we

22   already past that date?

23           MS. BIRD:  It's way past.

24           THE COURT:  Yeah.

25           MS. BIRD:  And that's the frustration that I have with

17

1    the experts.  We have no dates for one of the experts.  We

2    have dates late in July and August for another expert.  We

3    have a September trial date in a case that is not a simple

4    matter.  And my frustration continues to be that it's not okay

5    that we're waiting until July and August to depose experts in

6    a case of this magnitude for a September trial date.

7            It's not as easy as subtraction to take 56 employees

8    and try to figure out and extrapolate future wage loss.  We

9    can't take this huge number that their experts have proposed

10   and work backwards from that because we can't even

11   cross-examine the experts because we haven't been provided

12   information within the plaintiffs' control.

13           THE COURT:  Do you --

14           MS. BIRD:  And I --

15           THE COURT:  Go ahead.

16           MS. BIRD:  And, you know, I appreciate and I will try,

17   I will continue to try to work out deals like we did on May

18   17th, which has not happened, which has not been complied with

19   as we reported to the Court.  I will continue to do that, and

20   we can continue to report to the Court, but we just keep

21   kicking the can down the road without the defendants being

22   able to properly evaluate and analyze this case.  And we're

23   coming up on a trial date of a significant magnitude in a

24   very, very short period of time, three months.

25           MR. PAUL:  Your Honor, if I may.

18

1        To answer your question, by agreement the parties

2   agreed to extend discovery through June 30th on this topic.

3        THE COURT:  Well, okay.  So I appreciate your concern,

4   Ms. Bird.  It certainly is reasonable.  It may well be that

5   the Court is going to have to revisit this trial date.  I'd

6   like to see what happens to try to isolate these issues and

7   deal with them each.  And I think I'm going to have to wait to

8   see how that plays out before I can tell you anything about

9   the current trial date.

10       But I recognize that in a case of this nature, this

11  complicated and this big, this many people, if the plaintiffs

12  can't pin down all of the information for post-termination

13  wage loss and its experts and make those things final, then

14  they're either not going to get to use them or I'm going to

15  have to revisit this trial date or some combination of those

16  things.  So at this point, I think that's about the best I can

17  do or say.

18       So what I'd like you to do is confer about the

19  defendants' motions so that the plaintiffs can see precisely

20  which plaintiffs have not completed the post-termination wage

21  documentation and what is going to be entailed to finish that

22  and talk to these expert about how quickly you can get them

23  available for deposition.

24       It seems to me that if there are a number of

25  plaintiffs for whom post-termination wage information has been

19

1    provided, that the plaintiffs should be able to have their

2    expert do a supplementation quickly to show the effect of that

3    post-termination wage information and at least demonstrate and

4    apply the methodology that the experts intend to use to figure

5    out how these post-termination wages affect the claim.  And so

6    that's pretty basic, it seems to me.

7          And I certainly understand and agree with the

8    defendants that they're entitled to that information, and that

9    they can't be -- the defendants can't be expected to evaluate

10   this case without it.  So I think it is incumbent upon

11   plaintiffs to try to get this sorted out to at least reduce

12   the magnitude of defendants' complaint about this information

13   not being final.

14         So is there anything else that the parties want me to

15   address?

16         MR. PAUL:  Not from the plaintiffs' perspective.

17   Thank you, Your Honor.

18         MS. BIRD:  Not at this time.  Thank you, Your Honor.

19         THE COURT:  All right.  Well, I expect to hear back

20   from you folks maybe after you talk next week, and we'll take

21   it from there.

22         MR. PAUL:  Okay.  Thank you very much.

23         THE COURT:  Thank you.  This ends the call.

24             (Proceedings were concluded at 1:58 p.m.)

25                       ---o0o---

```
 1    CERTIFICATION:

 2           I, Kathy L. Swinhart, CSR, certify that the foregoing

 3    is a correct transcript from the record of proceedings in the

 4    above-entitled matter as reported on June 14, 2021.

 5

 6

 7    October 19, 2021
      _____
      DATE

 8

 9    /s/ Kathy L. Swinhart
      _____
      KATHY L. SWINHART, CSR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

KATHY L. SWINHART, Official Court Reporter (304) 528-2244

1       IN THE UNITED STATES DISTRICT COURT FOR THE

2           SOUTHERN DISTRICT OF WEST VIRGINIA

3                   AT HUNTINGTON

4

5    - - - - - - - - - - - - x

6    JUSTIN ADKINS, et al.,    :

7              Plaintiffs,     :   Case No.

8       v.                     :   3:18-CV-00321

9    CSX CORPORATION, et al.,  :

10             Defendants.      :

11   - - - - - - - - - - - - x

12

13        Videotaped Deposition of AUGUST THOELE

14           Conducted Remotely via Zoom

15             Thursday, June 17, 2021

16                  7:04 a.m.

17

18

19

20

21

22

23   Reported By:

24       AMY L. STRYKER, CCR No. 30XI00226900

25    Job No.:  239095

1

August Thoele                                                        June 17, 2021

1          Videotaped Deposition of AUGUST THOELE,

2     conducted remotely.

3

4

5          Pursuant to notice, before AMY L.

6     STRYKER, Certified Court Reporter and Notary

7     Public of the State of Maryland.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                                              2

August Thoele                                                                    June 17, 2021

1                    A P P E A R A N C E S

2

3          For the Plaintiffs:

4              EIGHT & SAND

5              BY:  JEFF R. DINGWALL, ESQ.

6              550 West B Street, Fourth Floor

7              San Diego, California 92101

8              (619) 796-3464

9              jeff@eightandsandlaw.com

10

11         For the Plaintiffs:

12             UNDERWOOD LAW OFFICE

13             BY:  JOHN PATRICK L. STEPHENS, ESQ.

14             923 Third Avenue

15             Huntington, West Virginia 25701

16             (304) 486-3350

17

18

19

20

21

22

23

24

25

                                                                            3

USCA4    1389

```
 1      A P P E A R A N C E S   C O N T I N U E D

 2

 3       For the Defendants:

 4           NELSON MULLINS RILEY & SCARBOROUGH, LLP

 5           BY: MELISSA FOSTER BIRD, ESQ.

 6           949 Third Avenue, Suite 200

 7           Huntington, West Virginia 25701

 8           (304) 526-3500

 9           melissa.fosterbird@nelsonmullins.com

10

11       Also Present:

12            KYLE LOSKAMP, Videographer

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    C O N T E N T S

2

    EXAMINATION OF AUGUST THOELE              PAGE

3

        By Mr. Dingwall                        7

4

5                      E X H I B I T S

6              (Attached to transcript.)

7     THOELE DEPOSITION EXHIBITS

8     Exhibit 1   Defendant Gus Thoele's        83
                  Responses to Plaintiff
9                 Brandon Adkins's First
                  Requests for Production of
10                Documents

11    Exhibit 2   Defendant Gus Thoele's        85
                  Answers to Plaintiff
12                Brandon Adkins's First Set
                  of Interrogatories

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                        5

June 17, 2021

```
 1      Q    Understood.                              07:22:56

 2           Were you provided any sort of           07:23:00

 3   compensation beyond your normal pay for serving 07:23:02

 4   in this role as the hearing officer?            07:23:06

 5      A    No.                                      07:23:08

 6      Q    I assume, though, that all your travel  07:23:09

 7   and other expenses were paid for by the         07:23:14

 8   company?                                         07:23:18

 9      A    Yes, they were.                          07:23:18

10      Q    Okay.  After that -- well, do you recall 07:23:20

11   approximately when that first phone call was    07:23:28

12   from Ms. Dreher?                                 07:23:30

13      A    No.  I just know it was just prior to   07:23:32

14   the hearings.  I don't -- I don't know, like,   07:23:34

15   the timeline.                                    07:23:40

16      Q    Do you know approximately how long      07:23:41

17   before the first investigation it was that you  07:23:44

18   spoke with Ms. Dreher?                           07:23:47

19      A    No, I do not.                            07:23:50

20      Q    After that first phone call with        07:23:51

21   Ms. Dreher, what was the next communication you 07:23:56

22   had with her?                                    07:23:57

23      A    I had a meeting with her in             07:24:03

24   Jacksonville.                                    07:24:04

25      Q    And do you remember approximately when  07:24:04
```

                                                        21

August Thoele                                                    June 17, 2021

```
 1   that was?                                      07:24:08

 2       A    Just prior to the hearings.  I don't  07:24:13

 3   know.                                          07:24:15

 4       Q    Was anybody else in that meeting besides  07:24:15

 5   yourself and Ms. Dreher?                       07:24:18

 6       A    Yes.                                  07:24:20

 7       Q    Who else was there?                   07:24:21

 8       A    Dr. Heligman and Melissa Wheaton-     07:24:23

 9   McDuffie.                                      07:24:30

10       Q    Who is Melissa Wheaton-McDuffie?      07:24:30

11       A    She's from the legal department.  I  07:24:33

12   think she worked in LR.                        07:24:35

13       Q    In Labor Relations?                   07:24:37

14       A    Yes.                                  07:24:40

15       Q    Okay.                                 07:24:41

16       A    Sorry about that.                     07:24:42

17       Q    That's okay.  I know what you mean.  I  07:24:43

18   just want to make sure the record was clear.   07:24:47

19            And what was the substance of that    07:24:52

20   meeting?                                       07:24:54

21       A    Basically, to discuss, like I was     07:24:54

22   saying, on how we should proceed with, you     07:24:59

23   know, interviewing the employees during the    07:25:02

24   investigation.                                 07:25:06

25       Q    Okay.  And what did you come to       07:25:06
```

                                                          22

June 17, 2021

```
 1   understand that your job was going to be in the        07:25:14

 2   investigations?                                          07:25:20

 3      A    I was gonna -- hold the hearing just            07:25:21

 4   like I would any other hearing.  But when it            07:25:23

 5   came to the point of the -- in the process of           07:25:24

 6   the hearing to where the employees would be             07:25:27

 7   questioned, we had to ask the group as a whole          07:25:30

 8   of how they felt they wanted to go forward, do          07:25:36

 9   they want to do it individually or did they             07:25:40

10   want to do it in a group setting.  Because this         07:25:42

11   is their medical issues, whatever -- you know,          07:25:44

12   whatever they're dealing with.  So I didn't             07:25:47

13   know if they wanted to do it private or if they         07:25:50

14   wanted to do it in a group setting.  That               07:25:52

15   was -- like, it seemed to be an important part          07:25:55

16   of these hearings.                                       07:25:59

17      Q    And then was it ultimately decided that         07:26:00

18   the investigations would go forward in a group          07:26:11

19   setting?                                                 07:26:15

20      A    Yes.  There was never -- I don't think          07:26:17

21   there was ever a doubt that they were going to          07:26:19

22   do them in a group setting.  It's just that one         07:26:21

23   portion of the hearing we needed to know -- and         07:26:24

24   it was basically just asking the employees what         07:26:27

25   they felt comfortable in doing.                          07:26:30
```

                                                                                    23

```
 1      Q    Okay.  Do you remember if that              07:26:31

 2   conversation or that question was given to the      07:26:35

 3   employees actually during the investigations?       07:26:39

 4      A    Going back and reviewing some of the        07:26:40

 5   scripts -- or some of the transcripts, I think      07:26:46

 6   I did ask on record some, and some were done        07:26:49

 7   off record with the general chairman.               07:26:52

 8      Q    Okay.  Do you recall any of the             07:26:55

 9   investigations that you served as the hearing       07:27:01

10   officer in where any of the individuals             07:27:03

11   requested that they -- that portion of the          07:27:06

12   investigation go forward individually?              07:27:09

13      A    No.                                         07:27:12

14      Q    Okay.                                       07:27:16

15      A    Nobody -- nobody wanted to do it            07:27:17

16   individually.                                       07:27:18

17      Q    Okay.  And the --

18      A    The very first one that I did was just      07:27:24

19   one individual, so that was -- that was             07:27:27

20   probably the only one.                              07:27:29

21      Q    Right.  In the meeting that you had in      07:27:34

22   Jacksonville with Penny Dreher and Dr. Heligman     07:27:36

23   and Ms. Wheaton-McDuffie, was there any             07:27:39

24   conversation about making sure that medical         07:27:41

25   information was protected or otherwise not          07:27:45
```

                                                                    24

Page 1

1           IN THE UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3                     AT HUNTINGTON

4            CIVIL ACTION NO. 3:18-CV-00321

5             HON. JUDGE ROBERT C. CHAMBERS

6

7                 JUSTIN ADKINS, ET AL.,

8                      Plaintiffs

9

10                         V.

11

12          CSX TRANSPORTATION, INC., ET AL.,

13                     Defendants

14

15

16

17

18

19

20

21

22   Job No. CS4574707

23   DEPONENT:  DR. SHANNON JOHNSON, D.C.

24   DATE:      MAY 20, 2021

25   REPORTER:  VICTORIA JADICK

Page 2

1                        APPEARANCES

2

3    ON BEHALF OF THE DEFENDANTS, CSX TRANSPORTATION, INC.,

4    Megan Basham Davis

5    Melissa Foster Bird

6    Nelson Mullins Riley & Scarborough LLP

7    949 Third Avenue

8    Suite 200

9    Huntington, West Virginia 25701

10   Telephone No.: (304) 526-3503

11   Facsimile No.: (304) 526-3599

12   E-mail: megan.davis@nelsonmullins.com

13          melissa.fosterbird@nelsonmullins.com

14   (Appeared via videoconference)

15

16   ON BEHALF OF THE PLAINTIFFS, JUSTIN ADKINS,

17   ET AL.:

18   Kenneth R. Reed

19   Kenneth R. Reed, Attorney PSC

20   241 Elm Street

21   Ludlow, Kentucky 41016

22   Telephone No.: (859) 331-4443

23   Facsimile No.: (859) 291-2226

24   E-mail: kenreedatty@gmail.com

25   (Appeared via videoconference)

Page 3

1                   APPEARANCES (CONTINUED)

2

3    AND

4

5    John Patrick L. Stephens

6    Underwood Law Office, Inc.

7    923 Third Avenue

8    Huntington, West Virginia 25701

9    Telephone No.: (304) 522-0508

10   E-mail: pstephens@underwoodlawoffices.com

11   (Appeared via videoconference)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                            INDEX

2                                                   Page

3    PROCEEDINGS                                     6

4    DIRECT EXAMINATION BY MS. DAVIS                 7

5

6

7                          EXHIBITS

8    Exhibit                                         Page

9    1 - COII Form                                   149

10   2 - Letter dated August 20,2017                 159

11   3 - Letter dated July 21, 2017                  167

12   4 - Off Work Forms                              168

13     [All exhibits CONFIDENTIAL]

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1                       STIPULATION

2

3    The deposition of DR. SHANNON JOHNSON, D.C. was taken at

4    KENTUCKIANA COURT REPORTERS, 730 WEST MAIN STREET, SUITE

5    101, LOUISVILLE, KENTUCKY 40202, via videoconference in

6    which all participants attended remotely, on FRIDAY the

7    21ST day of MAY, 2021 at approximately 9:07 a.m.; said

8    deposition was taken pursuant to the FEDERAL Rules of

9    Civil Procedure. The oath in this matter was sworn

10   remotely pursuant to FRCP 30. It is agreed that VICTORIA

11   JADICK, being a Notary Public and Court Reporter for the

12   State of KENTUCKY, may swear the witness.

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 114

1    DOTs, and directions, you know?  I do a lot of things

2    under that fedically -- medi -- federal medical

3    examiner's title as well.  So -- but anyway, of -- of

4    that -- my active patients that I'm treating, I think in

5    the past -- and I'm just trying to think back to the

6    past couple of weeks, I think we have four or five

7    people that's off of work right now.

8         Q    Okay.  Have you ever had a period in time

9    where you had a large number of people -- of patients

10   being treated off of work?

11        A    Yes.

12        Q    And what were those periods of time?  Can you

13   remember, like, specific instances?

14        A    Well, we've had -- well, back in -- when the

15   Raceland car shops were open in the early 2000s, I would

16   say that there was several at that time, and it just --

17   it had just had -- up until the railroad quit letting me

18   or quit accepting my paperwork -- that we had several

19   railroaders that would come in to get treated.  But, you

20   know, again, today's climate's different.  The biggest

21   employer we have that's active in this area now is the

22   school system, you know.  So, you know, that's a very --

23   the rail -- the brickyard is in South Shore, it's about

24   a half-hour drive, but I still treat some of them.  But

25   as far as heavy labor, you know, the railroad was the

Page 115

1    biggest employer, and Raceland and Russell have
2    essentially shut down, so I don't -- I don't have a lot
3    of heavy labor patients now.
4         Q    Is Raceland in Greenup County?
5         A    Yes.  And Russell.
6         Q    I thought so.  Okay.
7         A    They're both -- they're both about -- both --
8    let's see, Raceland is about five minutes from my office
9    and Russell's probably less than ten from there -- where
10   the -- they -- the hubs are.
11        Q    So we talked about this number of, like,
12   generally have about five or six patients off at a time
13   currently.  That's your current number.
14        A    Right.
15        Q    Can you remember the maximum amount, like on
16   the -- the greater end of the spectrum, the most people
17   you've had out at once?
18        A    Oh, probably at the -- at the same time,
19   probably in the 20s.
20        Q    In the 20s, and in what time period would that
21   be?
22        A    That was back when -- when the Russell and
23   Raceland was both operational.  I guess Russell's
24   technically still operational, but they don't have very
25   many employees there.

Page 116

1      Q     When did that change?

2      A     Well, it -- it changed primarily when they

3   accused us of fraud and wouldn't allow patients to -- to

4   be here, and --

5      Q     Now, that -- when Russell was operational,

6   when was Russell no longer operational?

7      A     Just in the past couple years.

8      Q     Now, I know that CSX -- you -- I think you

9   testified that CSX wouldn't accept work excuses from you

10  anymore.  Is that right -- is fair that you said that?

11     A     That's -- that's what I was told.

12     Q     Did you ever submit an insurance reimbursement

13  for a CSX patient and the insurance not pay for it?

14     A     Correct.

15     Q     The insurance wouldn't pay for it?

16     A     Correct.  I have sev -

17     Q     Which patient?

18     A     I have several patients that are not on that

19  list and I -- it -- I'm not -- it's HIPAA.  But I have

20  patients that are currently either retired from the

21  railroad or currently still working for the railroad, to

22  come in just for treatment, they've been denied and

23  stated that it's not medically necessary.  And that they

24  had self-employed through the railroad so that -- that

25  comes from the railroad.  So I have several instances

Page 117

1    when I spoke to the insurance company, they -- we've

2    even ap -- you know, appealed, they wouldn't -- they

3    wouldn't accept them.

4        Q    Well, they -- it sounds like they -- the

5    insurance wasn't accepted because they were finding that

6    the treatment wasn't medically necessary, but it's still

7    --

8        A    A first visit -- well, let's just not get into

9    that because that has nothing to do with what we're

10   talking about here.  But let's just tell you that a

11   patient came in that hadn't been in my office in over

12   two years, it was a spouse of an employee, and they said

13   it was not medically necessary.  They weren't being

14   taken off work, they just came in to get treated.  I had

15   several instances of that that, you know, if we want to

16   go into other things that's not due to today, why we're

17   here, so the railroad has conspired.

18       Q    What insurance agreements -- we do need to go

19   into that, that's directly relevant to this lawsuit.  So

20   what insurance agreements told you that, that they're

21   not medically necessary, what insurance company?

22       A    Aetna.

23       Q    Aetna.  Anyone else?

24       A    No.

25       Q    How many patients has this occurred with?

Page 118

1    A    I can name -- I can think of four, three --
2    three definite, possibly four, just off the top of my
3    head.
4    Q    All right.  Without revealing the name of the
5    patient, can you give me the identificat -- some
6    identificatio -- wow, I can't talk today -- the first
7    patient, was that a CSX employee; a current one?
8    A    One is retired, two are current.  No.  I'm
9    sorry, two are retired, one is current, and one is a
10   spouse.
11   Q    Since 2017, besides those four patients, have
12   you treated any CSX employee or spouse of a CSX
13   employee?
14   A    Yes.
15   Q    How many?
16   A    In three -- in four years?
17   Q    Yes.
18   A    I -- I -- I can't give you an exact number.
19   I've treated a few people that -- I mean, 20 to 25,
20   that's a guess.
21   Q    Did Aetna reimburse you for those charges?
22   A    I'm counting the ones they denied.
23   Q    Okay.  But aside from the four people that we
24   talked about that were denied, there were two retired
25   folks, the current employee, and the spouse.  The

Page 119

1  remaining folks, did Aetna reimburse you for those

2  charges?

3      A    To my knowledge, yes.

4      Q    Yes.  When the insurance company said that

5  those four folks' treatment wasn't medically necessary,

6  what did you do in response?

7      A    We appealed it.

8      Q    What was the result of the appeal?

9      A    Denied.

10     Q    Did the insurance company give you any other

11 information for why they said it was not medically

12 necessary, did they have a code or anything else?

13     A    No, ma'am.  They just said it wasn't medical

14 necessarily.  They said it was reviewed by their medical

15 staff and deemed unnecessary.

16     Q    What kind of treatment were you providing for

17 the first retired individual?

18     A    Same thing that we're just discussing,

19 manipulation, passive modalities, and probably

20 therapeutic as well.  I can't 100 percent say that.

21     Q    What was that retired person's injury or

22 presentation to you?

23     A    I don't know.  I don't have the records in

24 front of me.

25     Q    Okay.  What about the second retired person,

Page 120

```
 1   what kind of treatment did you do -- perform on the
 2   second retired person?
 3       A    The typical chiropractic --
 4            MR. REED:  Objection.  Can you hear me now?
 5            THE WITNESS:  Yes.  Yes.
 6            MR. REED:  You're getting into things about
 7       that can specifically identify that -- and I
 8       understand about plaintiff's waiver -- but these
 9       other patients haven't waived anything.  So I think
10       you've got enough to understand the circumstances,
11       so I'm going to -- I'm going to ask you, you know,
12       either to move on, or quit getting into so much
13       detail because it can be identified from the types
14       of treatment and the fact that the -- this -- and it
15       -- this got nothing to do with the case, so --
16            MS. DAVIS:  Respectfully, Ken, I'm going to
17       disagree with you.  I -- this isn't any personal
18       identifiable information.  Are you instructing --
19            MR. REED:  It is too, when you are talking
20       about conditions and treatment, it -- absolutely is
21       -- it is absolutely is.
22            MS. DAVIS:  Are you instructing your client not
23       to answer?
24            MR. REED:  I meant that particular question
25       about specific treatment, yes.  I'm telling him not
```

Page 121

 1      to answer that.

 2   BY MS. DAVIS:

 3      Q    Without revealing any personally identifiable

 4   information, is there anything else that you can tell me

 5   about the other four patients' treatments?

 6      A    Other than the fact that they had -- two of

 7   them were treated one time and the other two were

 8   treated, maybe, three times.  And they were deemed

 9   medically nec -- unnecessary.

10      Q    And were you performing those same modalities

11   that we talked about, the exercise, the therapy, the --

12      A    No.  I can't answer that.  I don't have the

13   records in front of me.

14      Q    So besides those four patients, every other

15   CSX employee or spouse of a CSX employee that you've

16   treated has been reimbursed by the insurance company?

17      A    I can't answer that.  I don't know.

18      Q    Have you received any correspondence from the

19   insurance company with regard to any of the remaining

20   patients refusing to pay for treatment?

21      A    I can't answer that.  I don't know that 100

22   percent.  I can't say --

23      Q    Are you --

24      A    -- yes or no.

25      Q    -- are you presently aware of any that you can

Page 163

1    don't recall who asked for the letters, but I do

2    remember doing them.

3         Q    Did you speak with Mr. Giuliano?

4         A    I don't recall.

5         Q    Have you ever spoken with any union members

6    about the CSX employees who were fired?

7         A    I -- I don't know if anyone ever called me

8    prior to their hearings and asked for if there's any

9    information or not.  If they did, I mean, it would --

10   you know, I wouldn't say that I'll be shocked.  But,

11   again, that's four years ago and to be honest with you,

12   I don't recall if -- if I spoke to anyone on their

13   behalf.  Obviously I spoke to someone, whether it was

14   the patient or a representative in order to get the

15   names to do the letters.  And I did do all these myself,

16   so --

17        Q    Did anyone give you an outline or a draft of

18   what the letter should say?

19        A    No, ma'am.  That's a brief narrative.  That's

20   my writing.  You can look at any brief narrative I write

21   for any patient and that would be very, very similar.

22        Q    And -- so I just want to cover for the record,

23   why was it that you wrote this?  Why did you feel this

24   was warranted?

25        A    They were going into a hearing with CSX

1  because they had been dismissed from their job and

2  stating they had fraudulently went off work.  This is

3  the only information you -- you guys -- oh, I'm saying

4  you guys.  CSX let them go based on that information on

5  that first exhibit you showed me, which told nothing of

6  how it happened.  So this explained how it happened.

7  This explained where they were, and this explained why

8  they were off work.  The other one was just a form that

9  sends it in to CSX.  Again, I want to reiterate that all

10  these patients that were dismissed and told they could

11  no longer come to me for their care -- ongoing care and

12  ongoing -- when they -- when they found another doctor,

13  every one, 100 percent, were -- continued off work based

14  on the same information.  So every doctor, medical

15  doctor, chiropractor, whatever, agreed with me.  So this

16  information is -- is accurate.

17      Q    How do you know that?

18      A    What do you mean, how do I know that?

19      Q    How do you know that it's accurate?

20      A    Because the patients -- most of the patients

21  who went to medical doctors, medical doctors told them

22  to come back to me for their care and I continued their

23  treatment.  It doesn't matter -- it doesn't matter if

24  I'm -- I'm going to treat my patient regardless of

25  whether CSX takes the paperwork from me or not.  If

Page 165

1  they're hurt, I'm going to treat them.  That's my job,

2  just like your job's to represent someone.  So I don't

3  care how that's done.  I was doing right, and I continue

4  to do right.  That's just like I still treat some

5  patients that have long since retired from the railroad.

6  They were hurt, and, you know, I still treat them on

7  occasion.  And most of the time it's due to a flare-up

8  of something that happened 15 years -- that I treated

9  way back then.  You know, what's -- what's --

10      Q    How do you -- sorry.

11      A    I'm going to -- now, you're -- you're --

12  you're -- you're correct.  I mean, you're trying to

13  catch me with my -- me saying, I'm absolutely,

14  positively, 100 percent.  But to my knowledge, every

15  patient that I treated, no -- no one was told that I had

16  done something wrong.

17      Q    How do you know that all these patients were

18  kept off of work?

19      A    That's what I'm saying.  If you're catching me

20  saying all of them, I can't 100 percent say that.  But,

21  to my knowledge, every patient was -- they substantiated

22  what I said and what I was doing.

23      Q    And what is that knowledge based on?

24      A    Well, some of them were because they were

25  still patients.

Page 2

1    FLOCKER, GOVER KELLEY,
      CHRISTOPHER CLAY
2    STILTNER, and DENNIS
      HUTCHINSON,              PLAINTIFFS,
3

4    VS.

5
      CSX TRANSPORTATION,
6    INC.; CRAIG S.
      HELIGMAN, M.D.; GUS
7    THOELE; CURT SHOGREN;
      MILTON STORM; DELANDO
8    JONES; TOM DEANGELO;
      SHAWN LUSK; ELIZABETH
9    CREEDON; and KENNETH
      RAY EMERSON,            DEFENDANTS.

10

11

12        ZOOM DEPOSITION OF DANIEL J. CAREY, D.C.

13

14         On the 27th day of May 2021, beginning at
    approximately 9:05 A.M., before me, Kathy J. Davis,
    Registered Merit Reporter and Notary Public, appeared
15    via Zoom DANIEL J. CAREY, D.C., Witness, who being by me
    first duly sworn, gave his oral deposition in the causes
16    pursuant to notice of counsel and for the respective
    parties as hereinafter set forth.  Said deposition is to
17    be used pursuant to F.R.C.P. Rule 30 and for any and all
    purposes allowed under the Federal Rules of Civil
18    Procedure.

19

20

21

22

23

24

Page 3

1

     APPEARANCES:

2

                    ON THE BEHALF OF THE PLAINTIFFS:

3

                    Mr. C. Kiel Garella
4                   Garella Law, P.C.
                    409 East Boulevard
5                   Charlotte, North Carolina  28303
                    (980) 321-7934
6                   Kiel@gljustice.com
7                   Mr. Patrick Stephens
                    Underwood Law Office, Inc.
8                   923 3rd Avenue
                    Huntington, West Virginia  25701
9                   Pstephens@underwoodlawoffices.com
10

11                  ON THE BEHALF OF THE DEFENDANTS:
12                  Mrs. Megan Basham Davis
                    Nelson, Mullins, Riley & Scarbourough LLP
13                  949 3rd Avenue
                    Suite 200
14                  Post Office Box 1856
                    Huntington, West Virginia  25701
15                  Megan.Davis@NelsonMullins.com
16
17
18
19
20
21
22
23
24

Page 4

1                           INDEX

2   WITNESS

3   Daniel J. Carey, D.C.

4          EXAMINATION BY MRS. DAVIS              5

5

6

7   EXHIBITS

8    NONE

9

10

11

    REPORTER'S CERTIFICATE PAGE                 157

12  ERRATA SHEET - PAGE                         159

    WITNESS SIGNATURE PAGE - PAGE               160

13

14                    *    *    *    *    *

15

16

17

18

19

20

21

22

23

24

Page 66

1        A.    I think they were just afraid to come into our

2   office, you know, is what I think was going on because,

3   you know, I've worked in this profession for 35 years

4   and I've always had railroaders.  Between the Huntington

5   and the Russell office I've always had railroaders that

6   I was treating.  And today -- I mean, I have a few, but

7   they're retired.  They come in and get care.

8        Q.    After 2017, did you treat any railroaders and

9   find that the insurance would not pay for any treatment?

10       A.    No.  We didn't have trouble with the insurances

11  paying.

12       Q.    So they were still able to treat with you?

13       A.    Uh-huh.

14       Q.    Is that a yes?

15       A.    Yes.

16       Q.    Okay.  When you refer patients to other

17  healthcare providers, do you follow up with the patient

18  to determine if they've followed up on a referral?

19       A.    Usually they're still under my care; so if

20  they've been -- and usually I will want to see any

21  testing they did.  And if it's pain management, a lot of

22  times I'll want to see what they injected because the

23  patients don't know whether they're injecting the joint,

24  a disc; so I -- the thing I like about pain management

Page 67

1    is it's diagnostic as well as therapeutic.  If I think a

2    guy has a disc problem, and a pain management does an

3    epidural injection and there's no relief, it's probably

4    not the disc; so that means it could be the joint's the

5    source of the pain.  So if a new patient came in to me

6    and has had a chronic history of back problems and has

7    been to pain management, I usually want to see their

8    records because it will map out for me specifically what

9    his problems were.  Because what he responds to me --

10   what he responded to and the way the injection tells me

11   what his problem is.

12        Q.   What other circumstances call for you to

13   request records from other treating physicians?

14        A.   Usually, you know, if they've been to another

15   chiropractor I may ask to see their records of imaging.

16   I don't usually ask for their treatment notes because

17   chiropractors use so many different techniques for

18   adjusting, and I never base my adjustment off of what

19   someone else does.  Usually I'm looking at records to

20   better figure out a diagnosis or better figure out a

21   treatment pattern for the patient, just trying to figure

22   out what their main pain generator is in the back.

23        Q.   Do you do any X-rays in-house?

24        A.   Not -- once I moved in to this new office here

Page 68

1    about three years ago, I have Holzer Clinic right beside

2    me; so I just ship them over to Holzer Clinic or

3    wherever they want to go.  If they go to Huntington

4    Internal Medicine -- I just leave it to them.  I say,

5    "Here's your prescription.  Take it in to the facility

6    and hand it to them, and they'll send you back to their

7    X-ray tech.  They'll do an image and then the

8    radiologist will send a report over to me."

9        Q.    What office were you in three years ago?

10       A.    It was an office here in Proctorville, but it

11   was up the road from here.  We moved down to this office

12   three, four years ago.

13       Q.    Do you recall when exactly you moved your

14   office?

15       A.    No.  I mean, I could find that date out for

16   you, if you need it, but I don't know the exact date we

17   moved down here.

18       Q.    Where was your old office located?  What

19   address?

20       A.    It was on the same street.  I think it was

21   7955 State Route 7.

22       Q.    Was it closer to the high school?

23       A.    Yeah.  It was right in front of it.  Are you

24   familiar with the area?

1    Q.   Yes.

2    A.   If you know where Kit Carson's used to be, I

3    was right beside him and the T-shirt place.  I was right

4    in the center.

5    Q.   Did the number of exam rooms change when you

6    moved to the new office?

7    A.   Back then I had one exam room in that office

8    there and I have two here; so I guess I would say I

9    added an exam room.

10    Q.   What about the lobby?  Do you have a larger

11    lobby now in your new office?

12    A.   No.  It's actually a little smaller.

13    Q.   Okay.  Were you able to perform X-rays in-house

14    at your old office?

15    A.   Yes.

16    Q.   Was it your practice to do so back then?

17    A.   I would, if I felt the patients needed them.  A

18    lot of times I would ship patients out.  If it was a

19    bigger patient where I felt that my X-ray machine

20    wouldn't get a good enough image on them, I would ship

21    them out.  Really I prefer to ship them out just to give

22    the liability more so to the reading radiologist versus

23    myself because you're responsible -- if there's the

24    slightest shadow and, God forbid, a tumor on there and

Page 1

1        IN THE UNITED STATES DISTRICT COURT

2     FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3               AT HUNTINGTON

4       CIVIL ACTION NO. 3:18-CV-00321

5      HON. JUDGE ROBERT C. CHAMBERS

6

7         JUSTIN ADKINS, ET AL.,

8           Plaintiffs

9

10                V.

11

12      CSX TRANSPORTATION, INC., ET AL.,

13          Defendants

14

15

16

17

18

19

20

21

22   Job No. CS4574707

23   DEPONENT:   DR. SHANNON JOHNSON, D.C.

24   DATE:      MAY 20, 2021

25   REPORTER:   VICTORIA JADICK

```
                                                Page 2

1                         APPEARANCES

2

3    ON BEHALF OF THE DEFENDANTS, CSX TRANSPORTATION, INC.,

4    Megan Basham Davis

5    Melissa Foster Bird

6    Nelson Mullins Riley & Scarborough LLP

7    949 Third Avenue

8    Suite 200

9    Huntington, West Virginia 25701

10   Telephone No.: (304) 526-3503

11   Facsimile No.: (304) 526-3599

12   E-mail: megan.davis@nelsonmullins.com

13            melissa.fosterbird@nelsonmullins.com

14   (Appeared via videoconference)

15

16   ON BEHALF OF THE PLAINTIFFS, JUSTIN ADKINS,

17   ET AL.:

18   Kenneth R. Reed

19   Kenneth R. Reed, Attorney PSC

20   241 Elm Street

21   Ludlow, Kentucky 41016

22   Telephone No.: (859) 331-4443

23   Facsimile No.: (859) 291-2226

24   E-mail: kenreedatty@gmail.com

25   (Appeared via videoconference)
```

Page 3

1                   APPEARANCES (CONTINUED)

2

3     AND

4

5     John Patrick L. Stephens

6     Underwood Law Office, Inc.

7     923 Third Avenue

8     Huntington, West Virginia 25701

9     Telephone No.: (304) 522-0508

10    E-mail: pstephens@underwoodlawoffices.com

11    (Appeared via videoconference)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                           INDEX

2                                              Page

3    PROCEEDINGS                                 6

4    DIRECT EXAMINATION BY MS. DAVIS             7

5

6

7                          EXHIBITS

8    Exhibit                                    Page

9    1 - COII Form                             149

10   2 - Letter dated August 20,2017           159

11   3 - Letter dated July 21, 2017            167

12   4 - Off Work Forms                        168

13      [All exhibits CONFIDENTIAL]

14

15

16

17

18

19

20

21

22

23

24

25

Page 170

1    Q    Do you know if your patients would've told you

2  that their bosses need it, or did a manager speak to you

3  directly?

4    A    Well, a boss -- I mean, the patient would tell

5  us if their boss needed a form.  So --

6    Q    Okay.

7    A    -- you know, again, I -- I can't answer that.

8  Not four years later.

9    Q    So you're not quite sure why you were sending

10  faxes to the local shop?

11    A    Well, I think it's customary.  Like I said, I

12  -- if I remember correctly, some of the bosses wanted a

13  note sent to them.  Then we had to send to Jacksonville

14  for them to, you know, be marked off at the main spot.

15    Q    I'm going to zoom in just a little bit because

16  those fax numbers are pretty small.  Can you see the

17  number at the top pretty good?

18    A    Yes.

19    Q    Okay.  And that's your fax number, right?

20    A    Yes.

21    Q    So the stamp means that it was faxed from your

22  office?

23    A    Correct.

24    Q    And it looks like there's a date and time

25  stamp on it as well.  Is that customary when you send a

Page 171

1  fax, that it includes the date and time?

2     A    Yeah.  That's usually what's -- whatever is on

3  the fax machine, yes.

4     Q    Okay.  So what date was this fax sent?

5     A    Looks like a 6-19 of '17.

6     Q    Let me zoom in.  Yeah.  6-19 of 2017?

7     A    Yes.

8     Q    And it was sent at 10:28 a.m.; is that right?

9     A    Yes.  That's what it says.

10     Q    For John Baker, the patient?

11     A    Correct.

12     Q    And you can tell that it was sent to the

13  Huntington shop based on this fax number down here.

14  Would you agree with me?

15     A    I have to assume that, yes.

16     Q    Okay.  I'm going to scroll down to another

17  one.  Kind of hard to see these because the writing's

18  small, so I'm going to zoom in again.  Is that your fax

19  number at the top again?

20     A    Yes.

21     Q    And it's the same date, right?  June 19, 2017?

22     A    Correct.

23     Q    And it looks like this was sent on behalf of

24  Robert Mosteller one minute later, at 10:29 a.m.; is

25  that right?

Page 172

1      A    Yup.

2      Q    Would you assume that --

3      A    I'm sorry, yes.  I shouldn't say yup.

4      Q    I'm guilty of that too.  Would -- so would you

5    agree with me that Baker and Mosteller were probably

6    treated around the same time that day?

7      A    I can't say that.  I mean, you know, a lot of

8    times with a smaller office like we are, you get

9    paperwork, you kind of do it at the same time.  She

10   would have to have waited for me to get the office tests

11   done in order, you know, for whatever went to

12   Jacksonville.  So if this went to Huntington at the same

13   time as we sent the -- that one form to Jacksonville, we

14   would have sent them at the same time.  So that -- that

15   -- that doesn't mean they were here at the exact same

16   time.

17     Q    All right.  But it does mean they're treated

18   on the same day, right?  Because it says on the form,

19   "was treated in my office on--"

20     A    Right.

21     Q    Okay.

22     A    Yeah.

23     Q    So you agree that they were treated in your

24   office on the same day?

25     A    Correct.

Page 173

1     Q    Okay.  Let's go down to the next form.  And

2   these are all work ex -- off-work excuses, right?

3     A    Yes.

4     Q    And in that same day, it looks like another

5   form was sent on behalf of Donald Stephens.  And what

6   time was that sent?

7     A    10:44 a.m.

8     Q    And was he also treated on the same day?

9     A    Well, according to that record, yes.

10    Q    Okay.  But do you have any reason to dispute

11  the record?

12    A    No.  That's our -- that's our record.  For our

13  off-work slip.

14    Q    Right.  And Jonathon Jeffers  is on the next

15  form.  What time was that fax sent?

16    A    10:46.  Again, that stamped time is

17  irrelevant.  It's just whenever they did the paperwork

18  and sent them together.  I mean, that doesn't mean they

19  were treated two minutes apart.

20    Q    But you did have four individuals who were

21  treating with you on that date before 10:46 a.m., right?

22    A    Yes.

23    Q    All right.  Let's look at the next form. Looks

24  like the same date.  James Blaine  was treated on

25  6-19-17.  And what time did that fax go?

Page 174

1      A      10:50.

2      Q      Okay.

3      A      1:23 -- no, thirteen would be -- yeah.   1:23.

4      Q      I'm terrible at military time so thank you for

5    translating that for me.   So would this have been after

6    the lunch break, she came back and faxed another form on

7    your behalf?

8      A      Either that or he came in after lunch.   Some

9    of these patients have been patients prior to that date.

10   And so therefore their -- their files are a lot easier

11   and quicker to do.   John Baker --

12     Q      So you didn't have any --

13     A      John Baker, Dennis Sargent, and if you go back

14   up, I can -- another one of those patients -- were

15   employee -- were patients of mine prior to becoming CSX

16   employees and they had been taken off work before with

17   their other company and they -- they already have an

18   existing -- they're not a new patient.   So therefore,

19   some of this paperwork is easier to do because they're

20   an existing patient.   They already have a -- an existing

21   file to add to.   So some of these patients are not just

22   new, some of these -- three of these you've named have

23   been patients of mine for years.

24     Q      Understood.   But they all, so far, have needed

25   an off-work excuse on June 19th?

Page 175

1      A    Okay.

2      Q    Is that correct?

3      A    Yes.

4      Q    Okay.  And so for Dennis Sargent, what time --

5  it looks like we already established it was sent at

6  13:23, Would you agree?

7      A    Yeah.  1:23.  Yes.  I'm going to have to turn

8  my sound down.  That fax sound is horrible.

9          MS. DAVIS:  My office is really quiet.  I don't

10      know where that's coming from.

11      Q    All right.  The next record is for Jason

12  Barker.  And he was treated on the same date, correct?

13      A    Yes.

14      Q    And this fax was sent two minutes later after

15  Dennis Sargent's fax; is that right?

16      A    Yeah.  Yes.

17      Q    He did it again.  All right.  The next fax is

18  also for treatment on June 19, 2017; is that right?

19      A    Yes.

20      Q    And you treated Jesse --

21      A    Right.  I -- I can tell you -- that -- that is

22  why these numbers are written on the bottom of this.

23  When they get their notes done, then they fill that out

24  and fax it in for the patient and they've written the

25  number on it so that they could gather those and go.  So

1  --

2      Q    Right.

3      A    Yes.  That's at -- that's at 1:37.

4      Q    For Jesse Wallace?

5      A    Yes.

6      Q    All right.  And that same day you saw Casey

7  Clark?

8      A    Yes.  That's at 2:11.

9      Q    2:11.

10      A    But, you know, the one thing that you're not

11  bringing out, I know you were talking about these going

12  off.  But do you realize that the maj -- so far you've

13  named off two or three that were released to go back to

14  work very quickly.  So when we were talking about the

15  estimated return to work being two months, at least two

16  of those that went by, I don't even think were off more

17  than two weeks, maybe three, which would have been like

18  six visits.  So you know, that's -- I -- I know that you

19  want to look at this and -- and make it look bad.  But I

20  mean, a lot of these people were back to work, released

21  to go back to CSX.

22      Q    But so far, all these forms are taking them

23  off work exactly --

24      A    I --

25      Q    -- two months, right?  Is that right?

Page 177

1      A    That's because six to eight weeks, I've --
2   I've -- I've said this all -- all morning long and all
3   afternoon that my contention is if you have a non-
4   complicated sprain/strain that is bad enough that you
5   cannot work, I'm going to estimate it at six to eight
6   weeks.  When we have football players, the same thing.
7   But if we can get them better faster that's great.  But
8   I tell the coach this is going to take six to eight
9   weeks for them to get healed up --
10     Q    Six to eight --
11     A    -- some of them come back faster.
12     Q    Okay.
13     A    So that's why.  I mean, there is -- there's no
14  other reason.  You can send -- you can fax -- you can
15  send 40 of these through and every one of them is going
16  to show eight weeks.  I -- I can -- I can tender that,
17  we'll save some time.  No matter what date they were
18  taken off, they're going to have an estimated return to
19  work in two months.
20     Q    All right, so let's --
21     A    That's eight -- that's eight weeks.  I contend
22  that, I'm not arguing that, I to this day still do that.
23  The Norfolk and Southern patients that I have, I have
24  three patients right now that are off work for the
25  railroad over at Portsmouth and I put down eight weeks

Page 178

1  as an estimated off work.  If they get better faster,

2  awesome.  But if they don't, it's eight weeks -- six to

3  eight weeks.  So we have to put a date, so we put eight

4  weeks.

5       Q    Why -- since this is a range of six to eight

6  weeks, why do you do eight instead of a different

7  number?  A smaller number?

8       A    It just makes it ea -- it just makes it easier

9  on me in the -- the paperwork wise and -- and for Becky

10  it's just -- it's an easier number.  It -- four weeks --

11  four weeks, eight weeks ,you know, that -- that -- so

12  six falls in the middle.  So it's just easier to

13  estimate a little higher.  We were taught in school you

14  never tell someone a number that is not reachable.  You

15  -- you want to give them worst case scenario.  So worst

16  case scenario is eight weeks.  Hopefully, just like a

17  few these you've shown were -- were better in a couple

18  of weeks.  So worst case scenario on a -- on a simple

19  sprain/strain, is you hope eight weeks at the -- at

20  worst case scenario.  Do some of them continue on?  Yes.

21  Do some of them never return to work?  Yes.  You know.

22  But some people get better, it just takes them a while.

23  Some get bet -- better faster and some don't come to me

24  at all, I have to send them on.  So I -- I contend, if

25  you show me another 30 that has that date on it with an

Page 179

1   estimated return to work two months from that, I contend
2   that that's what I put and that's -- I've given you my
3   reason.  You know, no other reason than that.
4       Q    All right.  Do you agree with me that Sammy
5   Maddox's off work form was sent at 14:25 p.m.?
6       A    Yes.  And I will also contend to you that his
7   employment -- his insurance is ran out and Sammy is
8   still a patient, currently, for that.
9       Q    And I'm going to turn now to the fax sheet.
10  Same day, right?  6-19-2017?
11      A    Yes.
12      Q    And an off-work slip was admitted for Jeffrey
13  Webb at 14: 41?
14      A    Yes it was.
15      Q    All right.  This is another form, June 19,
16  2017, correct?
17      A    Yes.
18      Q    All right.  Treatment date of June 19, 2017,
19  for John Carpenter, correct?
20      A    Yes.  And he also --
21      Q    And this one was faxed --?
22      A    Yes.  And he also returned to work in less
23  than four weeks.
24      Q    And it -- this form was faxed at 14:51, right?
25      A    Correct.

Page 180

```
 1        Q    Okay.  All right.  And then we have Gregory
 2   Hamm, was he also treated on June 19, 2017?
 3        A    According to that record, yes.
 4        Q    And you have no reason to dispute that record,
 5   right?
 6        A    No, ma'am.  I told you earlier I will not
 7   discontend [sic] any of these.  I know that is our
 8   paperwork and that is our fax stamp, and I will tell you
 9   that is when he was -- it was faxed.
10        Q    It was faxed at 15:16, correct?
11        A    That's correct.
12        Q    So you issued 13 off work slips on that day
13   just for CSX employees alone, right?
14        A    That is correct.
15        Q    Oh, I left off one and I apologize.  It's
16   actually 15.  Was this Edwin Glowacki treated on
17   6-19-2017?
18        A    According to that record, yes.
19        Q    And you faxed it at -- or your office faxed it
20   to CSX on June 19, 2017, at 16:17, correct?
21        A    Correct.
22        Q    Do you send copies of the work slip home with
23   your patients?
24        A    I can't answer that 100 percent, but if they
25   want a copy, they can have it.  It's their record.
```

Page 181

1    Q    Do you have any explanation for how all 14 of

2    these employees ended up in your office at the same day

3    needing work excuses?

4    A    I cannot answer that.

5    Q    Did you offer any patient advice on avoiding

6    these injuries in the future?

7    A    Well, obviously.  That's the whole reason for

8    them to do the exercises.  And like I said -- and I want

9    it on the record that several of those that you showed

10   me were back to work within four weeks.  I can't tell

11   you exactly, but I know of three to four those that were

12   very few records in my office.

13   Q    How many national medical journals do you

14   read?

15   A    Nat -- probably on occasion I read the journal

16   of -- JMPT is a chiropractic journal.  I don't read it

17   all the time, but I do flip through it on occasion.

18   Q    Have you ever seen anything that has to do

19   with the annual incidence of American males who miss

20   time off work every year for minor musculoskeletal

21   injuries suffered at home?

22   A    No.  I think you asked me this earlier, I -- I

23   haven't.

24   Q    So when you rea -- when you realized that you

25   were having such a big influx of CSX employees during

Page 182

1    this time period, what actions did you take to try and
2    alleviate the significant health risks to your patient
3    pool?
4        A    Can we go back to the bigger screen.  Are --
5    there we go.  I feel like I'm looking to the side.  You
6    know, I treat them the same as I do any -- anybody else
7    I treat.  You know, if they're heavy, we try to discuss,
8    you know, weight loss.  They'll do an exercise to try to
9    strengthen their core.  You know, if they smoke we
10   recommend that they don't smoke.  If they use any
11   tobacco, we talk about how that constricts blood flow
12   which de -- decreases recovery time.  All these things
13   are discussed.  Does everyone listen to me?  No.  But,
14   you know, we do discuss how to be better and not to have
15   this happen.  But, you know, to be honest with you, I
16   don't know how many people actually listen to what we
17   say.  My wife's a dental hygienist and we both discuss
18   all the time how treatment compliance is hard when it
19   comes to preventative things.
20            MS. DAVIS:  Sure.  I want to take five minutes
21        to check my notes and I think I'll be able to finish
22        up in the next couple of minutes, If you don't mind
23        having one more five-minute break.
24            THE WITNESS:  Sure.
25            MS. DAVIS:  All right.  Let's go off the

                                                        Page 183

1      record.

2              COURT REPORTER:  We are going off the record.

3                (OFF THE RECORD)

4              COURT REPORTER:  We are back on the record.

5              MS. DAVIS:  No.

6              MR. REED:  Okay.

7      BY MS. DAVIS:

8          Q    Dr. Johnson, the thing that I'm kind of

9      getting hung up on is how can you submit work excuses

10     with everyone being out of work for two months, when you

11     testified you didn't expect it to take that long.  Why

12     would you do that?

13         A    As I said it was worst case scenario, six to

14     eight weeks.  I said that we were fortunate some of

15     those ones that you showed me were only out of work for

16     up to four weeks, which is great.  So you know, they

17     were returned to work, not every one of them.  Like I

18     said, there's one guy in that list that is still a

19     patient.  He's having to pay out of his pocket because

20     he has no insurance.  Because, you know, he was

21     terminated but he's still a patient because he likes his

22     care.  He comes in once a month, but it's related to

23     that -- why he went off work there.

24         Q    I think you testified that it's just simpler

25     for your office to assume the worst-case scenario just

Page 184

1   for paperwork purposes?

2        A     No. That's -- that's not exactly how I -- I

3   said. You said why eight weeks instead of six? And I

4   said that we were taught in school to -- you have to

5   assume the worst, worst case scenario is eight weeks.

6   You hope it's mo -- less but you can't prove that or

7   disprove it, you know, you have to just do it. I would

8   -- I would love it if every patient was better in less

9   than four weeks. I wish everybody got better and never

10  had to go off work. But it's -- that's just not

11  happening.

12       Q     You talked earlier about submitting some slips

13  to the RRB, too -- it's like an orange document. I

14  think you said --

15       A     I think it is.

16       Q     -- do you recall that?

17       A     I think it's a booklet or something.

18       Q     Do you also use that eight week estimate for

19  that submission as well?

20       A     Yes. All that paperwork has to -- to match

21  up.

22       Q     Okay. So would the same be for any disability

23  slips that you fill out for patients?

24       A     Correct.

25       Q     Okay. Between May and July of 2017, did you

Page 185

1   recognize that there was a jump in the number of CSX

2   patients with off-the-job injuries being treated by you?

3       A    You asked me that earlier and yeah.  I mean,

4   it was obvious that there was more.  Yes.

5       Q    Did you recognize that at the time?

6       A    I -- I knew we were busy at -- at the time

7   when they were coming in.  Just like you said that day.

8   I mean, obviously I wasn't thinking what in the world's

9   going on.  But, I mean, you know, they come in, they

10  tell me what they -- is wrong and we had the findings.

11  So, I mean, I had to believe what they said.  I mean

12  it's plausible.

13      Q    Do you rec -- okay -- and do you recognize it

14  now that it was a big jump?

15      A    Yes.  You would have to say it's a big jump.

16          MS. DAVIS:  Those are all the questions I have

17      for you at the moment.  Your attorney may have some

18      questions.  I thank you for your time and I pass the

19      witness.

20          THE WITNESS:  Thank you.

21          MR. REED:  I have no questions of the doctor.

22          COURT REPORTER:  Ms. Foster Bird and Mr.

23      Stephens, do you have any questions?

24          MS. FOSTER BIRD:  No.  I do not.

25          COURT REPORTER:  Mr. Stephens --

Page 186

1          MS. DAVIS:  Ken, do you want to instruct the

2     witness on reading and signing?

3          MR. REED:  That's fine.  He -- Shannon, you

4     have the opportunity to read through this to make

5     sure everything was recorded accurately.

6          THE WITNESS:  I'll waive that right.

7          MR. REED:  Okay.

8          COURT REPORTER:  All right.  This concludes the

9     deposition and we're going off the record.

10              (DEPOSITION CONCLUDED AT 1:47 P.M)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              IN THE UNITED STATES DISTRICT COURT FOR THE

2                 SOUTHERN DISTRICT OF WEST VIRGINIA

3                          AT HUNTINGTON

4

5      _____
                                       )
6      JUSTIN ADKINS, et al.,          )
                                       )
7                  Plaintiffs,         )
                                       ) Case No.
8              -vs                     ) 3:18-CV-00321
                                       )
9      CSX CORPORATION, et al.,        )
                                       )
10                 Defendants.         )
                                       )
11

12

13

14     VIDEOTAPED DEPOSITION OF CRAIG HELIGMAN, M.D., VOLUME

15     I, conducted remotely by Laura L. Maes, CSR No. 9836,

16     on behalf of the Plaintiffs, commencing at the hour

17     of 7:03 a.m. on Wednesday, April 28, 2021.

18

19

20

21

22

23

24

25
```

2

```
 1      APPEARANCES:  (VIA ZOOM)


 2

        For the Plaintiffs:
 3
            EIGHT & SAND
 4          BY:  JEFF R. DINGWALL, (Pro Hac Vice)
            550 West B Street, Fourth Floor
 5          San Diego, California 92101
            619.796.3464
 6          jeff@eightandsandlaw.com


 7

        For the Plaintiffs:
 8
            GARELLA LAW, P.C.
 9          BY:  C. KIEL GARELLA, ESQ. (Pro Hac Vice)
            409 East Boulevard
10          Charlotte, North Carolina 28303
            980.321.7934
11          kiel@gljustice.com


12


13      For the Plaintiffs:

14          MORGAN & PAUL, PLLC
            BY:  GREGORY G. PAUL, ESQ.
15          100 First Avenue, Suite 1010
            Pittsburgh, Pennsylvania 15222
16          844.374.7200
            gregpaul@morganpaul.com

17

18      For the Plaintiffs:

19          UNDERWOOD LAW OFFICE, INC.
            BY:  JOHN PATRICK L. STEPHENS, ESQ.
20          923 Third Avenue
            Huntington, West Virginia 25701
21          304.486.3350

22

23

24

25
```

3

USCA4    1441

Craig Heligman, M.D.                                                      April 28, 2021

```
 1    For the Defendants:

 2         NELSON, MULLINS, RILEY & SCARBOROUGH, LLP
           BY:  MELISSA FOSTER BIRD, ESQ.
 3         949 Third Avenue, Suite 200
           Huntington, West Virginia 25701
 4         304.526.3500
           melissa.fosterbird@nelsonmullins.com
 5

 6

 7    Also present:

 8         KYLE LOSKAMP, VIDEOGRAPHER

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

USCA4    1442

Craig Heligman, M.D.                                                                 April 28, 2021

1                            I N D E X

2

3       WITNESS

4         CRAIG HELIGMAN, M.D.

5

6       EXAMINATION                                           PAGE

7         MR. DINGWALL                                          7

8         MR. PAUL                                            187

9                        E X H I B I T S

10                                                            PAGE

11      Exhibit 1    Second Amended Notice of              10
                     Deposition of Craig S. Heligman
12
        Exhibit 2    Three Letters to William Fergus       62
13                   with attachments

14      Exhibit 3    9/20/2017 Letter from Dr.             95
                     Heligman
15
        Exhibit 4    ACA Choosing Wisely Document         110
16

17      Exhibit 5    9/23/2017 Letter from Dr.            122
                     Heligman
18
        Exhibit 6    E-mail with Attachments -           126
19                   CSXT(Adkins)022527-556

20      Exhibit 7    Certification of Ongoing             241
                     Illness or Injury Forms
21                   (CONFIDENTIAL)

22

23

24

25

                                                              5

Craig Heligman, M.D.                                      April 28, 2021

1    issues for Dr. Carey and Dr. Johnson; correct?      08:37

2        A.    That is the purpose for the boards, so yes.  08:37

3        Q.    Okay.  Did Mr. Fergus ever respond to your  08:37

4    letter?                                             08:37

5        A.    He did respond and he acknowledged the     08:37

6    acceptance of the -- the receipt of the information. 08:37

7        Q.    Beyond that communication, did you receive 08:37

8    any other communication from the Railroad Retirement 08:37

9    Board with regard to this matter?                   08:37

10       A.    Over time since then I was advised that it 08:37

11   was sent to an investigations team.  I believe      08:37

12   they're out of Philadelphia.  I don't know what the  08:37

13   outcome was of the RRB investigation.               08:37

14       Q.    Okay.  You've never been notified that the 08:37

15   RRB found any wrongdoing; is that right?            08:37

16       A.    No, I was never notified of any outcome.   08:38

17       Q.    Okay.  And were you ever notified by Aetna 08:38

18   that they found any wrongdoing?                     08:38

19       A.    No.                                        08:38

20       Q.    Were you ever notified by Highmark Blue    08:38

21   Cross Blue Shield that they found any wrongdoing?    08:38

22       A.    No.                                        08:38

23       Q.    Were you ever notified by United Healthcare 08:38

24   that they found any wrongdoing?                     08:38

25       A.    No.                                        08:38

                                                              73

Craig Heligman, M.D.                                                    April 28, 2021

```
 1        Q.   And are you aware that the Ohio and       08:38

 2   Kentucky Chiropractic Boards dismissed the         08:38

 3   complaints that you made against Dr. Johnson and   08:38

 4   Dr. Carey?                                         08:38

 5        A.   I received a letter from one of them, but I  08:38

 6   understand that neither board had any reason to take  08:38

 7   any action.                                        08:38

 8        Q.   Are you aware of any independent entity or  08:38

 9   organization that has found any wrongdoing with   08:38

10   regard to the plaintiffs in this matter or        08:39

11   Dr. Johnson and Dr. Carey?                        08:39

12        A.   No.                                      08:39

13        Q.   What was the volume of COII forms that CSX  08:39

14   received in 2017?                                 08:39

15        A.   The total volume?                       08:39

16        Q.   Yes.                                     08:39

17        A.   I don't know.  Hundreds, potentially    08:39

18   thousands.                                        08:39

19        Q.   Okay.  Is there any way to look that    08:39

20   information up?                                   08:39

21        A.   No, not without hand-counting every fax  08:39

22   that we received and identifying what that fax was.  08:39

23        Q.   Did you attempt to do that at any time in  08:39

24   2017?                                             08:39

25        A.   No.                                      08:39
```

74

Craig Heligman, M.D.                                                    April 28, 2021

```
 1        Q.   What was the volume of COII forms that CSX      08:40

 2   received from the Tri-State area in 2017?                 08:40

 3        A.   I don't know.                                   08:40

 4        Q.   And when I say "Tri-State area," I'm            08:40

 5   referring to Kentucky, Ohio, and West Virginia.          08:40

 6             Can we agree on that?                           08:40

 7        A.   Yes.                                            08:40

 8        Q.   Okay.  And is your answer still the same?       08:40

 9        A.   Yes.                                            08:40

10        Q.   Okay.  How many CSX employees are there --      08:40

11   I'm sorry.  Let me back up.                               08:40

12             How many CSX agreement employees are there      08:40

13   in the Tri-State area?                                    08:40

14        A.   I don't know.                                   08:40

15        Q.   How many CSX employees were there in the        08:40

16   Tri-State area in 2017?                                   08:40

17        A.   I don't know.                                   08:40

18        Q.   How many CSX employees in the Tri-State         08:40

19   area treated with any kind of medical professional       08:40

20   in 2017?                                                  08:41

21        A.   I don't know.                                   08:41

22        Q.   What percentage of the CSX workforce in the     08:41

23   Tri-State area submitted COII forms in 2017?             08:41

24        A.   I don't know that either.                       08:41

25        Q.   How was it that you determined that the        08:41
```

75

USCA4    1446

1   volume of COII forms that you received in 2017 was      08:41

2   any different than you had received at any other         08:41

3   point in time?                                           08:41

4       A.   Oh, at that point in time, I think we had       08:41

5   approximately 21,000 employees scattered across the      08:41

6   eastern United States.  For us to receive the kind       08:41

7   of volume we did at that point in time from a single     08:41

8   or a couple of practitioners in that very short          08:41

9   period of time, we just never had seen that before.      08:41

10  Usually we get one or two.  We may get one from a        08:41

11  practitioner and never see that practitioner again.      08:42

12       So for me to actually be aware and come to          08:42

13  recognize the name of any treating provider is           08:42

14  pretty rare.  There's a handful that I can tell you      08:42

15  I probably would recognize their names and have some     08:42

16  understanding of -- of estimating the volume of          08:42

17  cases.  But the reality is there are so many             08:42

18  practitioners and so many employees that there's no      08:42

19  pattern that could be identified.                        08:42

20       This was the only time that we saw so many          08:42

21  documents in a short time from a very limited number     08:42

22  of practitioners.  It's just never happened.  We had     08:42

23  never identified this pattern at any other time with     08:42

24  me being at CSX and, to my knowledge, in any time        08:42

25  that we had this process established at CSX.  In          08:43

76

Craig Heligman, M.D.                                          April 28, 2021

```
 1   fact, in my career, I'd never seen this happen          08:43
 2   before.                                                 08:43
 3       Q.   How do you know that you had -- it had         08:43
 4   never happened before?                                  08:43
 5       A.   Again, in my capacity as a Chief Medical       08:43
 6   Officer or in my capacity in other organizations        08:43
 7   where I had previously worked doing the similar kind    08:43
 8   of work, you have an understanding of the workforce,    08:43
 9   you have an understanding of the spread, but you        08:43
10   don't necessarily take issue with any one provider     08:43
11   or any one geographical area.                           08:43
12            There's just so much that comes across that   08:43
13   there's no pattern to it.  We can't state, with any    08:43
14   high degree of confidence, that this one               08:43
15   practitioner saw employees in a geographical area      08:43
16   like this.                                              08:44
17            This was unique.  The first -- the first      08:44
18   time we saw it when we had 20 or so forms come in on   08:44
19   the exact same day -- and looking at the dates, I      08:44
20   think at one point I calculated on the dates of the    08:44
21   last visit that Dr. Johnson had at least a day when    08:44
22   all he saw were CSX employees at this moment in        08:44
23   time.                                                   08:44
24            I had never come across that before.  My      08:44
25   team had never come across that before.  This was an   08:44
```

                                                                    77

```
 1  extremely unique set of circumstances.                08:44

 2      Q.   Given that there is no requirement that an   08:44

 3  employee submit a COII form, it's possible, isn't     08:44

 4  it, that CSX employees could be treating with the     08:44

 5  same treater all the time and you would not know?     08:44

 6      A.   That is correct.  Employees may seek          08:44

 7  treatment from any practitioner they desire, and if   08:44

 8  they see a practitioner and they don't make us aware  08:45

 9  of it, I would have no way of knowing.                08:45

10      Q.   So you don't actually know if there was a    08:45

11  pattern other than in this particular instance COII   08:45

12  forms were submitted; correct?                        08:45

13      A.   I can only make comments on the information   08:45

14  that we do receive, not on the information we don't    08:45

15  receive.                                              08:45

16      Q.   And you made the comment that there was a    08:45

17  day that Dr. Johnson only saw CSX employees; is that  08:45

18  right?                                                08:45

19      A.   No, sir.                                      08:45

20           What I said was that when I looked at the    08:45

21  date -- last date of service on the -- that was       08:45

22  provided on the forms, there are large enough people  08:45

23  that were seen on that date where, in my estimation,  08:45

24  assuming an average time for an appointment that we   08:45

25  generally go by for physicians and the number of      08:45
```

78

Craig Heligman, M.D.                                          April 28, 2021

```
 1   hours in a given day that is a standard workday for    08:45
 2   a provider, my conclusion was it's likely that this    08:46
 3   group of employees -- or Dr. Johnson had only seen     08:46
 4   CSX employees on that particular day.                  08:46
 5        I'm not saying he did or didn't.  I'm just        08:46
 6   saying, based on my knowledge about standards of       08:46
 7   practice in a clinic, it seemed odd that you would     08:46
 8   only see employees from one employer on any one day.   08:46
 9   It can happen, particularly if you have a small town   08:46
10   where there's a limited group of practitioners and,    08:46
11   say, you have an employer that has a relationship      08:46
12   with a practitioner in the town and they want all      08:46
13   their employees seen for a particular exam.  That      08:46
14   happens with some level of frequency.                  08:46
15        But in this case, that wasn't the scenario.       08:46
16   It just seemed unusual for a practitioner when there   08:46
17   are many chiropractic providers in that Tri-State      08:46
18   area -- and I don't know the full number.  I just      08:47
19   know what we see -- but there are a large enough        08:47
20   number of chiropractic practitioners in that area to   08:47
21   make the statement that this was unusual.              08:47
22        Why would so many employees seek care from        08:47
23   Dr. Johnson on the same day?  I don't have an answer   08:47
24   for that.  I'm just saying it piqued my curiosity      08:47
25   and I wanted to try to figure out why this situation   08:47
```

                                                                  79

1    was occurring.                                          08:47

2        Q.   You would agree that it would be important     08:47

3    to answer that question prior to terminating the        08:47

4    employment of this many employees; right?               08:47

5        A.   That was the purpose of the investigation.     08:47

6        Q.   And what was learned in the investigation      08:47

7    that gave you an answer to that question?               08:47

8        A.   Clearly the decision-makers that reviewed      08:47

9    the testimony, that reviewed the transcripts,           08:47

10   reviewed whatever other information they had at hand     08:47

11   thought they had enough information to make a            08:48

12   determination that, in fact, the employees were         08:48

13   guilty of those charges.                                08:48

14       Q.   Are you aware of anybody else that -- are      08:48

15   you aware of anybody at CSX that ever contacted         08:48

16   Dr. Johnson or Dr. Carey regarding the plaintiffs in    08:48

17   this case?                                              08:48

18       A.   I have no knowledge of that.                   08:48

19       Q.   And are you aware of anyone in the company     08:48

20   that contacted the plaintiffs in this case prior to     08:48

21   the formal investigations to ask them to provide        08:48

22   additional information regarding their treatment?       08:48

23       A.   I have no knowledge of that.                   08:48

24       Q.   And so while you wanted an answer to the       08:48

25   question of why these employees were treating with      08:48

                                                                    80

Craig Heligman, M.D.                                                April 28, 2021

1    A.    I did make comments with regard to my          08:58

2    observations as to the diagnoses listed and the      08:58

3    length of time that both Dr. Carey and Dr. Johnson   08:58

4    were listing on the forms.                           08:59

5    Q.    Okay.  And those opinions that you offered     08:59

6    in the formal investigations were based on diagnoses 08:59

7    you made; correct?                                   08:59

8    A.    No, sir.  They were based on the diagnoses     08:59

9    listed by the treating providers.                    08:59

10   Q.    But it was your opinion that the course of     08:59

11   treatment pursued by Dr. Johnson and Dr. Carey was   08:59

12   not appropriate given the diagnoses; is that right?  08:59

13   A.    No.                                            08:59

14   Q.    No, it's not right or, no, that was not        08:59

15   your testimony?                                      08:59

16   A.    No, your statements were incorrect.            08:59

17   Q.    Okay.  So it was not your opinion in your      08:59

18   testimony in the formal investigations that the --   08:59

19   Dr. Carey and Dr. Johnson were providing             08:59

20   inappropriate treatment?                             08:59

21   A.    No.  Based on what was listed on the COIIs     08:59

22   and then in some of the -- in some of the            08:59

23   investigations, the employees had provided some      09:00

24   additional records.  There was no indication that    09:00

25   the treatment itself was inappropriate from the      09:00

89

1     standpoint of a chiropractic professional providing     09:00

2     chiropractic care.     09:00

3          Q.   So you were not of the opinion that the     09:00

4     care that Dr. Johnson and Dr. Carey provided to the     09:00

5     plaintiffs in this case was below the standard of     09:00

6     care for a chiropractor, are you?     09:00

7          A.   No, I didn't make that statement.  There     09:00

8     were -- there were other statements I did make --     09:00

9     excuse me -- did make that appeared that the length     09:00

10    of treatment being provided was more than one would     09:00

11    expect for the diagnoses listed.  And in some of the     09:00

12    cases, there was a document that I did present as     09:00

13    a -- as an exhibit that identified that the length     09:00

14    of time may have been excessive for needing to be     09:01

15    off work or for length of recovery.     09:01

16         Q.   So you don't dispute the diagnoses that     09:01

17    were made by Dr. Johnson and Dr. Carey with regard     09:01

18    to the plaintiffs in this case; is that right?     09:01

19         A.   That's correct.     09:01

20         Q.   Okay.  But it is your opinion that the     09:01

21    treatment was not appropriate; right?     09:01

22         A.   That's not what I said.  What I'm saying is     09:01

23    that the duration of the treatment being delivered     09:01

24    and the duration of the recommendations of reduced     09:01

25    and absent -- and not performance of various     09:01

                                                          90

Craig Heligman, M.D.                                           April 28, 2021

```
 1    activities was -- excuse me.  Let me start over.    09:01

 2            It wasn't the treatment itself.  It was the   09:01

 3    length of time that treatment was delivered and it   09:01

 4    was the length of time that the providers were      09:01

 5    recommending that the person avoid work activities   09:01

 6    that was at issue.  That did not meet standards of   09:02

 7    those kinds of recommendations if you compare it to  09:02

 8    what is recommended by the medical literature and    09:02

 9    what is identified in the two references that are    09:02

10    commonly cited for determining lengths of            09:02

11    disability.                                          09:02

12        Q.   So you don't take issue with the diagnoses;  09:02

13    correct?                                             09:02

14        A.   Correct.                                    09:02

15        Q.   And you don't take issue with the actual    09:02

16    treatment that was being provided; correct?          09:02

17        A.   Correct.                                    09:02

18        Q.   But you did take issue with the length of   09:02

19    the treatment; is that right?                        09:02

20        A.   To some degree, yes.                        09:02

21        Q.   Okay.  And it was the length of treatment   09:02

22    that you felt created a pattern that lends itself    09:02

23    towards potential fraud?                             09:02

24        A.   No.                                         09:02

25        Q.   Okay.  Help me out.                         09:02
```

                                                              91

Craig Heligman, M.D.                                          April 28, 2021

```
 1        A.    Sure.   Happy to do that.              09:03

 2        Q.    All right.  So what specifically was it  09:03

 3   about the treatment that these employees were     09:03

 4   getting from Dr. Carey and Dr. Johnson that you felt 09:03

 5   lended itself towards allegations of fraud?       09:03

 6        A.    There's a fairly large body of literature 09:03

 7   that looks at the doctor/patient relationship.    09:03

 8   Amongst those it's clear that health care         09:03

 9   professionals will misrepresent information to    09:03

10   various agencies to assist their patients to receive 09:03

11   benefits.   That's in the literature.             09:03

12        So that's a concern, knowing that            09:03

13   information, also knowing the duration of time that 09:03

14   the practitioner said they should not be at work was 09:03

15   in excess of what the medical literature and the  09:04

16   disability duration references would recommend.   09:04

17   People being off work that long is not healthy, and 09:04

18   they should have recovered with acceptable lengths 09:04

19   of treatment.                                     09:04

20        So while I don't believe that the treatment 09:04

21   given was incorrect or the fact of being -- or even 09:04

22   the professional that's delivering the treatment. 09:04

23   It was the fact that the health professional and the 09:04

24   patients were continuing to be off work for lengths 09:04

25   of time that didn't match with the diagnoses being 09:04
```

92

```
 1   provided.                                          09:04

 2          Now, what the intent was behind that I'm    09:04

 3   unclear.  But the pattern of behavior over this 70 09:04

 4   or so employees, when all we had was a COII from two 09:04

 5   specific chiropractic professionals in a small     09:04

 6   geographical area, was still highly unusual.       09:05

 7       Q.   Was the testimony that you provided in the 09:05

 8   formal investigations of the plaintiffs in this case 09:05

 9   made to a reasonable degree of medical certainty?  09:05

10       A.   That's a legal definition, and so my answer 09:05

11   is this is based upon my professional experience as 09:05

12   a provider, my review of the medical literature, and 09:05

13   awareness of the disability duration guidelines and 09:05

14   the nature of appropriate treatment for the        09:05

15   conditions listed.                                 09:05

16       Q.   You would agree that it would not be      09:05

17   appropriate to opine on the course of treatment for 09:05

18   a patient without physically examining them;       09:05

19   correct?                                           09:05

20       A.   The -- the issue is that I'm not here to  09:05

21   interfere with the doctor/patient relationship.  We 09:06

22   don't do that.  It would be inappropriate to do so. 09:06

23   But I also am not here to make a selection of      09:06

24   providers for the employees.  They choose to do what 09:06

25   they choose to do and they work with their health  09:06
```

93

Craig Heligman, M.D.                                                          April 28, 2021

```
 1    care provider.  That is the doctor/patient          09:06

 2    relationship.                                        09:06

 3          My observation was that for this set of        09:06

 4    individuals, the duration of time off being          09:06

 5    recommended by the practitioners was different from  09:06

 6    the standard of care being recommended in the        09:06

 7    medical literature and the length of time off was    09:06

 8    not consistent with standards being recommended by   09:06

 9    the disability duration guidelines that have been    09:06

10    published.                                           09:06

11       Q.   So you agree that it was inappropriate to    09:06

12    send letters to Dr. Johnson and Dr. Carey to let     09:06

13    them know that CSX would no longer take medical      09:06

14    documentation from them on behalf of employees;      09:06

15    correct?                                             09:07

16       A.   But that's not what we did.                  09:07

17       Q.   You did not send a letter to Dr. Johnson     09:07

18    and Dr. Carey letting them know that you would not   09:07

19    accept documentation from them any longer?           09:07

20       A.   It was documentation specific to CSX forms,  09:07

21    so we would not accept COIIs or return-to-work       09:07

22    information from those practitioners.  We did not    09:07

23    advise them that the employees were unable to see    09:07

24    them.  We did not advise them that we wouldn't       09:07

25    receive medical information or medical records.      09:07
```

94

USCA4    1457

1          It was strictly an issue of we no longer          09:07

2     were able to accept forms that were completed by        09:07

3     them for the purposes of determining ongoing absence    09:07

4     for medical reasons and return to work.                 09:07

5          Q.    Well, you did send letters to the            09:07

6     plaintiffs in this matter stating that the CSX          09:07

7     Medical Department is no longer accepting any           09:07

8     medical documentation completed by Shannon Johnson      09:08

9     or Daniel Carey; is that right?                         09:08

10         A.    Do you have a copy of that letter I can      09:08

11    look at?  The -- I don't remember the exact             09:08

12    language.  However, the intent was specific to the      09:08

13    medical forms.  That's the documentation we were        09:08

14    referencing.                                            09:08

15         Thank you.                                         09:08

16         Q.    So I just sent you over what we've marked    09:08

17    as Exhibit 3.  Let me know when you have that.          09:08

18         (Exhibit 3 was marked for identification and

19    attached to the transcript.)                            09:08

20         THE WITNESS:  I do have it.                        09:08

21    BY MR. DINGWALL:                                        09:08

22         Q.    Okay.  And this is a letter dated            09:08

23    September 20th, 2017, on your letterhead, to an S.M.    09:08

24    Morrison; is that right?                                09:08

25         A.    Yes, sir.                                    09:08

                                                         95

Craig Heligman, M.D.                                                April 28, 2021

| | | |
|---|---|---|
| 1 | Q.   All right.  And Mr. Morrison is one of the | 09:08 |
| 2 | plaintiffs in this case. | 09:08 |
| 3 | And this letter is signed by you; correct? | 09:08 |
| 4 | A.   Yes, that's correct. | 09:08 |
| 5 | Q.   And you would agree that in the second | 09:08 |
| 6 | sentence of this letter, it states: | 09:08 |
| 7 | "The purpose of this | 09:08 |
| 8 | correspondence is to advise | 09:08 |
| 9 | you that the CSX Medical | 09:08 |
| 10 | Department is no longer | 09:08 |
| 11 | accepting any medical | 09:09 |
| 12 | documentation completed by | 09:09 |
| 13 | Shannon Johnson, D.C., or | 09:09 |
| 14 | Daniel Carey, II, D.C." | 09:09 |
| 15 | Correct? | 09:09 |
| 16 | A.   Yes, that's correct. | 09:09 |
| 17 | Q.   Okay.  And that would be an interference | 09:09 |
| 18 | with the doctor/patient relationship. | 09:09 |
| 19 | You agree; right? | 09:09 |
| 20 | A.   No, I don't agree with that at all.  If you | 09:09 |
| 21 | look at the second sentence -- or the sentence right | 09:09 |
| 22 | after that: | 09:09 |
| 23 | "If you continue to have a need | 09:09 |
| 24 | to be off [..] work for a | 09:09 |
| 25 | medical reason or wish to | 09:09 |

96

1              IN THE UNITED STATES DISTRICT COURT FOR THE

2                 SOUTHERN DISTRICT OF WEST VIRGINIA

3                         AT HUNTINGTON

4

5     _____

                                      )
6     JUSTIN ADKINS, et al.,          )
                                      )
7              Plaintiffs,            )
                                      ) Case No.
8          -vs                        ) 3:18-CV-00321
                                      )
9     CSX CORPORATION, et al.,        )
                                      )
10             Defendants.            )
                                      )
11

12

13

14       VIDEOTAPED DEPOSITION OF PENNY DREHER, 30(B)(6)

15    conducted remotely before Laura L. Maes, CSR No. 9836, on

16    behalf of the Plaintiffs, commencing at the hour of 9:11

17    a.m. on Tuesday, May 4, 2021.

18

19

20

21

22

23

24

25

                                                                    2

```
 1     APPEARANCES:  (VIA ZOOM)

 2

 3     For the Plaintiffs:

 4          GARELLA LAW, P.C.
            BY:  C. KIEL GARELLA, ESQ. (Pro Hac Vice)
 5          409 East Boulevard
            Charlotte, North Carolina 28303
 6          980.321.7934
            kiel@gljustice.com
 7

 8

 9     For the Plaintiffs:

10
            UNDERWOOD LAW OFFICE, INC.
11          BY:  JOHN PATRICK L. STEPHENS, ESQ.
            923 Third Avenue
12          Huntington, West Virginia 25701
            304.486.3350
13

14     For the Defendants:

15          NELSON, MULLINS, RILEY & SCARBOROUGH, LLP
            BY:  MELISSA FOSTER BIRD, ESQ.
16          949 Third Avenue, Suite 200
            Huntington, West Virginia 25701
17          304.526.3500
            melissa.fosterbird@nelsonmullins.com
18

19

20     Also present:

21          JASON PATSALIS, VIDEOGRAPHER

22

23

24

25
```

3

USCA4   1461

1                           I N D E X

2

3    WITNESS

4      PENNY DREHER

5

6    EXAMINATION                               PAGE

7      MR. GARELLA                               6

8                      E X H I B I T S

9                                              PAGE

10     Exhibit 1    Amended Notice of 30 (b)(6)     9
                    Deposition and Request for
11                  Production of Documents

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                         4

Penny Dreher                                                                May 4, 2021

```
 1          As to Topic No. 9, "The policies,              09:19

 2     procedures and practices of accommodating,          09:19

 3     reassigning, disciplining and/or terminating        09:20

 4     employees who are off from work on a medical leave  09:20

 5     of absence," what did you do to prepare yourself and 09:20

 6     acquaint yourself with these policies, procedures   09:20

 7     and practices to testify today as a corporate       09:20

 8     representative?                                      09:20

 9       A.   I didn't prepare for it.  I am -- but I am   09:20

10     prepared to speak about it, because I have worked   09:20

11     with those policies and I have worked with those    09:20

12     policies for years.                                 09:20

13       Q.   Okay.  What are those policies?              09:20

14       A.   There is an IDPAP policy, there is an        09:20

15     attendance policy, there is also the Collective     09:20

16     Bargaining Agreement.  And -- and I think those are 09:20

17     pretty much everything that it entails in No. 9.    09:20

18       Q.   In terms of -- how do those impact --        09:20

19     policies impact an employee who is off work -- off  09:20

20     from work on a medical leave of absence?            09:20

21       A.   The -- when employees are marked off, they   09:20

22     have to provide our Medical Department documentation 09:20

23     to justify their leave of absence.  Under their     09:20

24     Collective Bargaining Agreement, if they fail to    09:21

25     provide any documentation to support their leave,   09:21
```

13

| | | |
|---|---|---|
| 1 | there is a self-executing (inaudible) forfeiture | 09:21 |
| 2 | rule in all of the Mechanical Department agreements. | 09:21 |
| 3 | And so they would actually -- we don't consider that | 09:21 |
| 4 | discipline, we consider that terminating the | 09:21 |
| 5 | employee under the self-executing CBA rule. | 09:21 |
| 6 | Q.   And that's an agreement within the union; | 09:21 |
| 7 | right? | 09:21 |
| 8 | A.   Yes. | 09:21 |
| 9 | Q.   And that's not -- I mean, CSX does not | 09:21 |
| 10 | actually make the decision to terminate, so to | 09:21 |
| 11 | speak? | 09:21 |
| 12 | A.   Well, it's based on the employee's response | 09:21 |
| 13 | to CSX. | 09:21 |
| 14 | Q.   And that's the only they don't notify the | 09:21 |
| 15 | company of a need for medical leave of absence; | 09:21 |
| 16 | right? | 09:21 |
| 17 | A.   It's -- it's not just notifying the company | 09:21 |
| 18 | for request for medical leave of absence.  It's a | 09:21 |
| 19 | requirement under our policy.  Under the Medical | 09:21 |
| 20 | Department policy, they are required to keep CSX | 09:21 |
| 21 | notified of their reason for being marked off, and | 09:21 |
| 22 | they have to provide medical documentation to | 09:22 |
| 23 | justify their leave of absence under the policy. | 09:22 |
| 24 | Q.   Do you know what that medical documentation | 09:22 |
| 25 | is? | 09:22 |

14

May 4, 2021

```
 1        A.   It could be anything between an MB3, a COII   09:22

 2   form.  There is different forms that the Medical        09:22

 3   Department requires.                                    09:22

 4        Q.   And tell me the difference, if you know,      09:22

 5   between you said an MD3 and a COII.                     09:22

 6        A.   It's my understanding, the MD3 form is the    09:22

 7   initial form that would take an employee out of         09:22

 8   service, and then the COII form is an ongoing           09:22

 9   certified illness form, where the doctor goes into      09:22

10   more detail about the treatment.                        09:22

11        Q.   So would every employee who takes a medical   09:22

12   leave of absence need to submit an MD3?  Is that        09:22

13   what it was?                                            09:22

14        A.   Yes, that is required.  And if they do not,   09:22

15   then that's where the self-executing CBA rule comes     09:22

16   into play.                                              09:22

17        Q.   And how are employees informed of these --    09:23

18   of this policy?                                         09:23

19        A.   All the policies are located on CSX           09:23

20   employee gateway for the employees' review, and the     09:23

21   employees are required to know the terms of their       09:23

22   Collective Bargaining Agreement when they initially     09:23

23   start as a new hire.                                    09:23

24        Q.   Okay.  In this case, with the Plaintiffs in   09:23

25   this case, did they submit MD3 forms?                   09:23
```

                                                                    15

Penny Dreher                                                                    May 4, 2021

```
1        A.   I don't know.                          09:23

2        Q.   Okay.  That wouldn't go to you?         09:23

3        A.   No.  It would go to the Medical Department.  09:23

4        Q.   Okay.  And then after that, they have to  09:23

5    submit the COII form; right?                     09:23

6        A.   Yes, that's correct.                    09:23

7        Q.   And that goes also to the Medical       09:23

8    Department?                                      09:23

9        A.   Yes.                                    09:23

10       Q.   Okay.  Now, if an employee is injured and  09:23

11   cannot work, what is the policy or procedure for  09:23

12   providing accommodation to that employee?        09:23

13       A.   I don't know.  I don't know the answer to  09:23

14   that.                                            09:23

15            MS. FOSTER BIRD:  And that is not part of  09:23

16   the topic that she has been designated to discuss.  09:23

17            MR. GARELLA:  Okay.  You know, it's kind of  09:24

18   hard when I don't know what she is here to --     09:24

19            MS. FOSTER BIRD:  I just told you.  It's  09:24

20   discipline and terminating employees who are off  09:24

21   work for medical leave of absence, not accommodating  09:24

22   or reassigning.                                  09:24

23   BY MR. GARELLA:                                  09:24

24       Q.   With respect to discipline and disciplinary  09:24

25   action against an employee who is off on a medical  09:24
```

                                                                         16

Penny Dreher                                                      May 4, 2021

```
 1   leave of absence, is that -- tell me about that    09:24
 2   process.  Is it different from a normal disciplinary 09:24
 3   process?                                            09:24
 4       A.   In that process, there -- there may be     09:24
 5   other people involved.  If the employee is misusing 09:24
 6   FMLA, marking off for medical reason or marking off 09:24
 7   sick, and there is different officers of the company 09:24
 8   that would review the documentation that the        09:24
 9   employee presented.                                 09:24
10          And then once it's been determined that the 09:24
11   employee has misused or fraudulently marked off,    09:24
12   then that's where our IDPAP, our Individual         09:24
13   Accountability Policy would come into play as far as 09:25
14   the type of handling the employee would receive     09:25
15   under the Collective Bargaining Agreement.          09:25
16       Q.   And you said IDPAP?  Say that one more     09:25
17   time.                                               09:25
18       A.   It's, I-D-P-A-P.                           09:25
19       Q.   And what was that acronym?                 09:25
20       A.   It's -- it's the Individual Development,   09:25
21   Performance and Accountability Policy.              09:25
22       Q.   Is that a -- kind of a -- it lays out the  09:25
23   discipline for various different violations; is that 09:25
24   fair?                                               09:25
25       A.   Yeah.  It lays out, if the employee is     09:25
```

17

USCA4    1467

| | | |
|---|---|---|
| 1 | found guilty of certain violations, what the level | 09:25 |
| 2 | of discipline would be based on those violations. | 09:25 |
| 3 | Q.  And at CSX, is there a progressive | 09:25 |
| 4 | discipline policy?  You know, if you get more than | 09:25 |
| 5 | one strike, does that count against you moving | 09:25 |
| 6 | forward? | 09:25 |
| 7 | A.  So if it's a non-major offense, then there | 09:25 |
| 8 | is a progression.  If it's a major offense, then it | 09:25 |
| 9 | could lead to dismissal. | 09:25 |
| 10 | Q.  Is it always if an employee is found guilty | 09:26 |
| 11 | of a major offense?  Is that always dismissal, or | 09:26 |
| 12 | does it just depend? | 09:26 |
| 13 | A.  It depends on the facts and circumstances. | 09:26 |
| 14 | Q.  Okay.  Is there a chart or a way that you | 09:26 |
| 15 | step up with -- in terms of the non-major offenses? | 09:26 |
| 16 | A.  Yes.  It starts at a serious one violation. | 09:26 |
| 17 | It's also internally called a non-major, so either | 09:26 |
| 18 | serious or non-major, and it progresses from one | 09:26 |
| 19 | to three. | 09:26 |
| 20 | Q.  And so what is -- is level -- is a three, | 09:26 |
| 21 | that -- is that when you start looking at | 09:26 |
| 22 | termination? | 09:26 |
| 23 | A.  Yes. | 09:26 |
| 24 | Q.  Okay.  And so in terms of imposing | 09:26 |
| 25 | discipline for an employee who is off of work, are | 09:26 |

18

| | | |
|---|---|---|
| 1 | they notified the same way an employee who is still | 09:26 |
| 2 | working is? | 09:26 |
| 3 | A.   Notifying the employee that they have been | 09:26 |
| 4 | disciplined? | 09:26 |
| 5 | Q.   That they have been -- for the whole | 09:26 |
| 6 | process, they have been charged with discipline | 09:26 |
| 7 | throughout? | 09:27 |
| 8 | A.   Okay.  Yes.  It's always handled to the | 09:27 |
| 9 | employee in writing to their address on record. | 09:27 |
| 10 | Q.   Okay.  And is the -- is that the same | 09:27 |
| 11 | policy for an employee who is not off work on | 09:27 |
| 12 | medical leave? | 09:27 |
| 13 | A.   Yes, it's the same policy, in the same | 09:27 |
| 14 | format that it's done in writing to the current | 09:27 |
| 15 | record of address. | 09:27 |
| 16 | Q.   And what about the policy, procedure and | 09:27 |
| 17 | practice for terminating an employee who is off work | 09:27 |
| 18 | on a medical leave of absence; is that any different | 09:27 |
| 19 | than terminating or disciplining an employee who is | 09:27 |
| 20 | not off work? | 09:27 |
| 21 | A.   It is the same policy. | 09:27 |
| 22 | Q.   I think we probably covered that.  We will | 09:27 |
| 23 | talk about Topic No. 11 now, which is: | 09:27 |
| 24 | "Identify and produce the | 09:27 |
| 25 | persons most knowledgeable who | 09:27 |

19

| | | |
|---|---|---|
| 1 | made the decision or had any | 09:27 |
| 2 | input concerning the decision | 09:27 |
| 3 | to charge, discipline and | 09:27 |
| 4 | terminate Plaintiffs." | 09:27 |
| 5 | Are you ready to speak on that topic today? | 09:27 |
| 6 | A.    Yes, I am. | 09:28 |
| 7 | Q.    And what have you done to prepare yourself | 09:28 |
| 8 | to speak on behalf of CSX Transportation as to | 09:28 |
| 9 | Topic No. 11? | 09:28 |
| 10 | A.    I reviewed documents that were provided in | 09:28 |
| 11 | the discovery.  I have also met with my legal | 09:28 |
| 12 | counsel.  And I reviewed my internal notes and | 09:28 |
| 13 | documents involving some of the cases. | 09:28 |
| 14 | Q.    Do you still have those internal notes? | 09:28 |
| 15 | A.    It's the -- the appeal.  Yes, I do.  It's | 09:28 |
| 16 | the appeal records, NRHDO response to the union's | 09:28 |
| 17 | appeal. | 09:28 |
| 18 | Q.    And are those notes, or are those actual | 09:28 |
| 19 | documents that were mailed out? | 09:28 |
| 20 | A.    Those are actual documents in response to | 09:28 |
| 21 | their claim that -- internally we have an electronic | 09:28 |
| 22 | handling process with our union, so it -- those are | 09:28 |
| 23 | not mailed, those are uploaded into our labor claim | 09:28 |
| 24 | tracking system. | 09:28 |
| 25 | Q.    And so do you have any personal notes with | 09:28 |

20

1          IN THE UNITED STATES DISTRICT COURT FOR THE

2               SOUTHERN DISTRICT OF WEST VIRGINIA

3                         AT HUNTINGTON

4

5     - - - - - - - - - - - - x

6    JUSTIN ADKINS, et al.,     :

7               Plaintiffs,     :  Case No.

8       v.                      :  3:18-CV-00321

9    CSX CORPORATION, et al.,   :

10              Defendants.      :

11    - - - - - - - - - - - - x

12

13     30(b)(6) Videotaped Deposition of MACON JONES

14               Conducted Remotely via Zoom

15                 Monday, May 17, 2021

16                    8:08 a.m. PST

17

18

19

20

21

22

23     Reported By:

24        AMY L. STRYKER, CCR No. 30XI00226900

25     Job No.:  237387

                                                          1

1              30(b)(6) Videotaped Deposition of MACON

2       JONES, conducted remotely.

3

4

5              Pursuant to notice, before AMY L.

6       STRYKER, Certified Court Reporter and Notary

7       Public of the State of Maryland.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2

```
 1              A P P E A R A N C E S
                    (Via Zoom)
 2

 3       For the Plaintiffs:

 4           MORGAN & PAUL, PLLC

 5           BY:  GREGORY G. PAUL, ESQ.

 6           100 First Avenue, Suite 1010

 7           Pittsburgh, Pennsylvania 15222

 8           (844) 374-7200

 9           gregpaul@morganpaul.com

10

11       For the Plaintiffs:

12           UNDERWOOD LAW OFFICE, INC.

13           BY: JOHN PATRICK L. STEPHENS, ESQ.

14           923 Third Avenue

15           Huntington, West Virginia 25701

16           (304) 486-3350

17           munderwood@underwoodlawoffices.com

18

19

20

21

22

23

24

25
```

                                                                    3

Macon Jones                                                    May 17, 2021

1        A P P E A R A N C E S   C O N T I N U E D
              (Via Zoom)

2

3     For the Defendants:

4         NELSON MULLINS RILEY & SCARBOROUGH LLP

5         BY: MELISSA FOSTER BIRD, ESQ.

6         949 Third Avenue, Suite 200

7         Huntington, West Virginia 25701

8         (304) 526-3500

9         melissa.fosterbird@nelsonmullins.com

10

11    Also Present:

12         JASON PATSALIS, VIDEOGRAPHER

13

14

15

16

17

18

19

20

21

22

23

24

25

4

USCA4   1474

Macon Jones                                                      May 17, 2021

1                        C O N T E N T S

2

3    EXAMINATION OF MACON JONES                    PAGE

4        By Mr. Paul                                7

5

6                        E X H I B I T S

              (Attached to transcript.)

7

8    Exhibit 1   Plaintiffs' Amended Notice      34
                 of 30(b)(6) Deposition and
9                Request for Production of
                 Documents

10

11   Exhibit 2   Discipline/termination          67
                 letters to CSX employees

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                              5

USCA4    1475

| | | |
|---|---|---|
| 1 | Q   Okay.  Any other positions under the | 08:22:39 |
| 2 | analyst? | 08:22:40 |
| 3 | A   Then there is a specialist underneath | 08:22:41 |
| 4 | them. | 08:22:44 |
| 5 | Q   What's the difference between the | 08:22:44 |
| 6 | analyst and a specialist? | 08:22:45 |
| 7 | A   One is higher.  It's that intermediate | 08:22:47 |
| 8 | level between manager and specialist would be | 08:22:51 |
| 9 | the analyst. | 08:22:53 |
| 10 | Q   Okay.  Any other positions that we | 08:22:54 |
| 11 | haven't talked about in Labor Relations? | 08:22:56 |
| 12 | A   No, because there -- we used to have | 08:22:57 |
| 13 | some crafts and clerical employees in Labor | 08:23:01 |
| 14 | Relations, but they're all specialists now, | 08:23:04 |
| 15 | so... | 08:23:06 |
| 16 | Q   Okay.  And are those all nonunion | 08:23:07 |
| 17 | positions? | 08:23:09 |
| 18 | A   Correct.  I mean, I say that -- you're | 08:23:09 |
| 19 | asking kind of, like, a yes-or-no question and | 08:23:13 |
| 20 | it's a little bit more nuance than that.  We've | 08:23:16 |
| 21 | got a position called a TC manager that -- | 08:23:19 |
| 22 | where they still maintain seniority rights, but | 08:23:21 |
| 23 | they are managers.  So it's a little bit of a | 08:23:24 |
| 24 | hybrid kind of position, so I don't want to, | 08:23:26 |
| 25 | like, just say yes or no when it's a little bit | 08:23:29 |

21

Macon Jones                                                        May 17, 2021

```
 1   more nuance.                                        08:23:32

 2      Q   Yeah.  No, that's perfect.  And if it's      08:23:34

 3   a yes or no, I'll appreciate you answering it,      08:23:35

 4   and I'll certainly give you the opportunity you     08:23:38

 5   need to explain.                                    08:23:40

 6           Any other hybrid positions other than       08:23:41

 7   that?                                               08:23:44

 8      A   No.  I think that pretty much covers our     08:23:44

 9   department.                                         08:23:47

10      Q   Okay.  Great.                                08:23:47

11           Okay.  And what position did you hold       08:23:50

12   prior to August of 2018?                            08:23:51

13      A   Sure.  So when I started, I started in       08:23:54

14   2015, in September, and I came in as a manager.     08:23:57

15   And then in probably -- it would have been          08:24:02

16   early 2018 I moved into a senior manager            08:24:04

17   position prior to taking this position.             08:24:08

18      Q   And those -- both of those positions,        08:24:13

19   the manager and senior manager, were in Labor       08:24:17

20   Relations?                                          08:24:20

21      A   Correct.                                     08:24:20

22      Q   Okay.  And how did your job duties           08:24:21

23   differ, if they did, as a senior manager or         08:24:25

24   manager compared to a director?                     08:24:29

25      A   Yeah.  So the senior manager and manager     08:24:30
```

                                                                     22

```
 1   role were the core -- was a discipline kind of        08:24:33

 2   case handler, if you will, and when I moved --        08:24:36

 3   the only thing that really changed was I moved        08:24:40

 4   into a leadership management position where I         08:24:42

 5   managed the team who handled discipline cases         08:24:45

 6   in addition to handling a little bit of the           08:24:49

 7   caseload myself.                                      08:24:53

 8      Q    Okay.  Just so we have kind of that           08:24:53

 9   process when it comes to discipline down, can         08:24:55

10   you kind of explain the process of how                08:24:59

11   discipline starts, and then -- I know you             08:25:02

12   mentioned a hearing, and then I think you             08:25:05

13   mentioned some on-property appeals.  But can          08:25:07

14   you kind of walk us through that generically.         08:25:09

15   You know, not specific to any plaintiff, just         08:25:12

16   generically.                                          08:25:15

17      A    Sure.  So once we -- I'll -- first            08:25:15

18   knowledge, once we gain, you know, information,       08:25:18

19   material information that some kind of rule or        08:25:21

20   policy or other bad act has occurred, then that      08:25:26

21   would kick off the collective bargained-for           08:25:30

22   process, which is a hearing, notice, et cetera,       08:25:33

23   et cetera.                                            08:25:35

24         So once we have our first knowledge,            08:25:35

25   depending on the agreement, we would have to          08:25:37
```

23

Macon Jones                                                        May 17, 2021

```
 1   notice the employee or let them know that        08:25:38

 2   they're subject to an investigation for          08:25:40

 3   whatever it is, whatever the facts might be.     08:25:43

 4   So we send a notice or a Charge Letter, is what  08:25:45

 5   some people call it, to the employee.  The next  08:25:48

 6   thing that happens is a hearing.  We have an     08:25:52

 7   investigation where there's -- a transcript is   08:25:54

 8   generated as a result of that, whatever happens  08:25:58

 9   or is said during the hearing.  And that's       08:26:00

10   where the company and the union and employee     08:26:02

11   can put on evidence and witnesses and ask        08:26:05

12   questions of each other, et cetera, et cetera.   08:26:07

13         After that, a transcript and exhibit is    08:26:10

14   generated, and then a decision is made.  And     08:26:12

15   the part that we would come in -- when I say     08:26:16

16   "we"; myself or people on my team -- is that we  08:26:18

17   would also look at that evidence, the            08:26:20

18   transcript and the exhibits, and we would        08:26:24

19   provide some feedback to the business and to     08:26:26

20   the decisionmaker.  But then the decision-       08:26:28

21   maker, which would be a field leader, would      08:26:30

22   decide what level of discipline to assess, if    08:26:32

23   any, based on that record, then a letter would   08:26:35

24   go out.  And that's the front-end discipline     08:26:38

25   process.                                         08:26:41
```

24

May 17, 2021

```
 1          And then at that point the employee          08:26:42
 2    would have the opportunity to file a grievance     08:26:44
 3    or a claim through their CDA process, which        08:26:46
 4    would kick off a whole 'nother kind of lane to     08:26:51
 5    challenge the outcome of that discipline.          08:26:54
 6       Q    And how many layers of an appeal are       08:26:56
 7    there after the decision is made for               08:26:59
 8    discipline?                                         08:27:02
 9       A    It depends on the agreement.  But most     08:27:02
10    of them it's kind of a -- a one level.  They       08:27:05
11    would appeal it to the HDO level or the highest    08:27:08
12    designated officer level, and the HDO would        08:27:11
13    respond to that.  And the response could be        08:27:13
14    granted, denied, partially granted or denied.      08:27:17
15    And then it would be conferenced; so just a        08:27:20
16    discussion between the union and the company on    08:27:23
17    the case.  And then at that point the union        08:27:26
18    would have the opportunity, if they wanted to,     08:27:29
19    to list it for arbitration for an arbitrator to    08:27:31
20    review the record in an appellate format and       08:27:34
21    then decide whether to uphold the company's        08:27:37
22    decision or, you know, modify it in some way.      08:27:40
23       Q    Okay.  And that labor board process, is    08:27:43
24    it correct to say that that review is limited      08:27:46
25    to the hearing transcript and exhibits that        08:27:49
```

                                                                    25

Macon Jones                                                    May 17, 2021

```
 1    occurred at the hearing?                          08:27:51

 2        A    Yeah.  And anything that would have been 08:27:53

 3    produced by the parties in the on-property        08:27:55

 4    process.  So when the union appeals it, they      08:27:58

 5    can supplement the record.  There's rules         08:28:01

 6    around what's property to be supplemented and     08:28:03

 7    what's not.  But those things, assuming the       08:28:06

 8    rules were followed, then that information        08:28:09

 9    would be included as well.                        08:28:11

10        Q    Okay.  But is that process, you know,    08:28:12

11    starting with the notice or Charge Letter to      08:28:14

12    the hearing on property appeals going all the     08:28:16

13    way up possibly to a labor board, is that         08:28:20

14    review limited to whether there was a violation   08:28:23

15    of the Collective Bargaining Agreement in terms   08:28:27

16    of the discipline?                                08:28:30

17        A    Sorry, could you say that one more time. 08:28:30

18        Q    Sure.  That whole process that you       08:28:34

19    described, starting with the Charge Letter        08:28:36

20    going all the way up to I think what you called   08:28:38

21    arbitration or the public law board, is that      08:28:40

22    another way of calling it that same thing?        08:28:43

23        A    Yes.                                      08:28:45

24        Q    Yeah.  Okay.  That process, is it        08:28:48

25    correct to say that it's limited -- the review,   08:28:49
```

                                                              26

| | | |
|---|---|---|
| 1 | the appeals are limited to whether there is a | 08:28:51 |
| 2 | violation of the Collective Bargaining | 08:28:54 |
| 3 | Agreement in terms of the discipline? | 08:28:56 |
| 4 | A    The -- I would say that in many cases | 08:28:57 |
| 5 | that's -- the situation is whether there is a | 08:29:05 |
| 6 | violation.  But whether it's a violation | 08:29:06 |
| 7 | oftentimes is a question of fact, and an | 08:29:08 |
| 8 | arbitrator does have the ability to say, Well, | 08:29:12 |
| 9 | I believe this witness even though the company | 08:29:14 |
| 10 | didn't believe them, and make a decision based | 08:29:17 |
| 11 | on the factual determination.  You know, we | 08:29:19 |
| 12 | would say that an arbitration precedent finds | 08:29:21 |
| 13 | that arbitrators are supposed to defer to the | 08:29:24 |
| 14 | factfindings and to the credibility | 08:29:27 |
| 15 | determinations of the company into those | 08:29:30 |
| 16 | investigations.  The arbitrators may or may not | 08:29:32 |
| 17 | do that, and they can make a decision based on | 08:29:36 |
| 18 | fact. | 08:29:39 |
| 19 | Q    Let me ask it a slightly different way. | 08:29:39 |
| 20 | I mean, I think you answered the question, I | 08:29:40 |
| 21 | appreciate that, I just want to ask it a little | 08:29:42 |
| 22 | bit differently.  Is it a correct statement to | 08:29:45 |
| 23 | say that that process of the hearing and the | 08:29:46 |
| 24 | potential arbitration or labor board does not | 08:29:48 |
| 25 | look to see whether there's violations of any | 08:29:51 |

27

| | | |
|---|---|---|
| 1 | state or federal employment laws, for instance? | 08:29:54 |
| 2 | A    No, they're not supposed to. | 08:29:57 |
| 3 | Q    Okay. | 08:30:01 |
| 4 | A    So I would say that's ina- -- that's | 08:30:01 |
| 5 | correct, that's what the arbitrators are | 08:30:02 |
| 6 | supposed to do, is just interpreting the | 08:30:05 |
| 7 | Collective Bargaining Agreement, that's right. | 08:30:07 |
| 8 | Q    Okay.  So -- just so the record's clear, | 08:30:08 |
| 9 | you agree that it is a correct statement that | 08:30:10 |
| 10 | that process leading up to the arbitration does | 08:30:12 |
| 11 | not consider whether there were any violations | 08:30:15 |
| 12 | of state or federal employment law. | 08:30:18 |
| 13 | A    Correct. | 08:30:20 |
| 14 | Q    Okay.  Now, when you said they're not | 08:30:21 |
| 15 | supposed to, I just want -- what do you mean by | 08:30:24 |
| 16 | that? | 08:30:26 |
| 17 | A    Arbitrators consider all kinds of | 08:30:27 |
| 18 | things.  I mean, there's no real recourse if | 08:30:29 |
| 19 | they decide to go outside the bounds of what | 08:30:30 |
| 20 | they're supposed to do, other than to say that | 08:30:35 |
| 21 | they may not get used anymore, because most | 08:30:36 |
| 22 | arbitrators are selected jointly by the | 08:30:40 |
| 23 | parties, by the union and by the company.  So | 08:30:42 |
| 24 | if they go too far off the reservation, then | 08:30:44 |
| 25 | they just wouldn't get picked again. | 08:30:48 |

28

```
 1     A    I don't know that I could speak on that.        08:38:30

 2     Q    Well --                                          08:38:34

 3          (Simultaneous crosstalk -- inaudible.)

 4     Q    -- on this topic when it says                    08:38:34

 5   "accommodating," what does that mean to you?            08:38:36

 6     A    So accommodating -- like you said, I             08:38:37

 7   think reassigning would be a form of that.  If          08:38:40

 8   you have, say -- and I don't know, I'm just             08:38:44

 9   using an example.  But if you have, like, a             08:38:47

10   clerk or somebody who's covered by a Collective         08:38:49

11   Bargaining Agreement, that there's no impact to         08:38:51

12   seniority, and instead of standing up they need         08:38:53

13   to sit down to work at their computer, for              08:38:55

14   instance, then I don't see how that would               08:38:58

15   create any kinds of headaches.  But that's              08:39:01

16   generally not the case.                                 08:39:04

17     Q    Okay.  And I apologize if you answered           08:39:05

18   this.  I just want it to be clear.  So when it          08:39:09

19   comes to, like -- and this is while you're at           08:39:12

20   CSX.  Have you ever had any training or are you         08:39:14

21   aware of any policies, procedures, or practices         08:39:18

22   that would, as a form of an accommodation,              08:39:20

23   provide an employee an approved medical leave           08:39:25

24   of absence?                                             08:39:28

25     A    You're saying the medical leave of              08:39:28
```

                                                                        37

| | | |
|---|---|---|
| 1 | absence would be the accommodation? | 08:39:30 |
| 2 | Q   That's correct. | 08:39:31 |
| 3 | A   So there are.  So the agreements do talk | 08:39:33 |
| 4 | about absent employees, that they can request | 08:39:35 |
| 5 | and go on leaves of absences and medical leaves | 08:39:38 |
| 6 | of absences; and that is something that | 08:39:41 |
| 7 | employees do. | 08:39:45 |
| 8 | Q   Okay.  It sounds like your knowledge, | 08:39:45 |
| 9 | though, is based upon whatever medical leave of | 08:39:47 |
| 10 | absence is provided for in a Collective | 08:39:51 |
| 11 | Bargaining Agreement; is that right? | 08:39:53 |
| 12 | A   Yes.  I mean, it would be related to the | 08:39:54 |
| 13 | Collective Bargaining Agreements, yes. | 08:39:58 |
| 14 | Q   Okay.  So aside from the Collective | 08:39:59 |
| 15 | Bargaining Agreements, are you aware of any | 08:40:02 |
| 16 | policies, procedures, or practices at CSX on | 08:40:04 |
| 17 | the topic of providing a medical leave of | 08:40:07 |
| 18 | absence as a form of an accommodation under | 08:40:10 |
| 19 | state or federal law? | 08:40:13 |
| 20 | A   No, I can't speak to that. | 08:40:14 |
| 21 | Q   Okay.  Meaning that you're not aware of | 08:40:16 |
| 22 | any policies, procedures, or practices at CSX | 08:40:20 |
| 23 | on that topic? | 08:40:22 |
| 24 | A   That's correct, I'm not aware. | 08:40:24 |
| 25 | Q   Okay.  Have we covered the -- I think we | 08:40:26 |

```
 1   covered accommodating and reassigning.  Is          08:40:29

 2   there anything else you wanted to say on those       08:40:31

 3   topics?                                              08:40:34

 4      A   No.                                           08:40:34

 5      Q   Okay.  The next one is disciplining           08:40:34

 6   and/or terminating employees.  So when it comes      08:40:37

 7   to the policies, procedures, and practices of        08:40:40

 8   disciplining and terminating employees who are       08:40:43

 9   off work on a medical leave of absence, was          08:40:46

10   your testimony earlier -- and we can go through      08:40:51

11   it again if we need to -- responsive to that         08:40:54

12   topic when we talked about the notice or Charge      08:40:56

13   Letter, the hearing, the on-property appeal,         08:41:00

14   arbitration or labor board, that process, is         08:41:04

15   that responsive to this topic?                       08:41:08

16      A   Right.  I mean, I think so.  I mean,          08:41:09

17   it's the same process whether you're on a            08:41:12

18   medical leave of absence of not.  I don't --         08:41:14

19   the medical leave of absence wouldn't have           08:41:16

20   anything to do with it.                              08:41:17

21         If we're going to take disciplinary           08:41:18

22   action against an employee, we would have to         08:41:21

23   follow the collectively bargained-for process       08:41:23

24   either way.                                          08:41:26

25      Q   Okay.  No, I appreciate that.  That's        08:41:27
```

                                                                        39

|  |  |  |
|---|---|---|
| 1 | helpful. | 08:41:29 |
| 2 | But when I was earlier asking you about | 08:41:29 |
| 3 | your background and we kind of started to get | 08:41:31 |
| 4 | into that process, we really weren't talking | 08:41:33 |
| 5 | about Topic No. 9.  And rather than have you | 08:41:35 |
| 6 | repeat all that, I'm just asking is -- is it | 08:41:37 |
| 7 | your testimony, as a corporate representative, | 08:41:40 |
| 8 | that the policies, procedures, and practices | 08:41:42 |
| 9 | for disciplining and/or terminating employees | 08:41:45 |
| 10 | are what you described at the beginning of this | 08:41:48 |
| 11 | deposition? | 08:41:50 |
| 12 | A    Yes, I would absolutely agree with that. | 08:41:50 |
| 13 | Q    Okay.  Now, we've talked about the | 08:41:53 |
| 14 | respective Collective Bargaining Agreements, | 08:41:58 |
| 15 | but I want to ask you a slightly different | 08:41:59 |
| 16 | question, which is:  Are there any policies, | 08:42:02 |
| 17 | procedures, or practices for disciplining or | 08:42:07 |
| 18 | terminating an employee outside of the | 08:42:09 |
| 19 | Collective Bargaining Agreement such as a | 08:42:10 |
| 20 | discipline or attendance policy, for instance? | 08:42:12 |
| 21 | A    Sure.  So the -- the way I describe it | 08:42:15 |
| 22 | generally is if the process is outlined in the | 08:42:18 |
| 23 | Collective Bargaining Agreement with the | 08:42:21 |
| 24 | substance or the progression, if you will, the | 08:42:22 |
| 25 | level of discipline, those things are | 08:42:26 |

40

Macon Jones                                                    May 17, 2021

```
 1      A    No.  There's nothing -- nothing          09:06:43

 2   formalized.  I mean, not that I'm aware of.       09:06:44

 3   Again, if one of the managers has a Post-it       09:06:46

 4   Note stuck somewhere, then they can do it         09:06:49

 5   however they want to, but I'm not privy to        09:06:51

 6   that.                                             09:06:53

 7      Q    No, no, right.  I'm not asking about      09:06:53

 8   that.  I'm asking, like, in Labor Relations are   09:06:55

 9   there any forms -- that could be something like   09:06:58

10   a memo to the file or even just a notebook --     09:07:00

11   that, you know, thoughts are recorded as you're   09:07:03

12   reviewing the transcript and the hearings?        09:07:09

13      A    No, there's nothing.                      09:07:10

14      Q    Okay.                                     09:07:12

15         MS. FOSTER BIRD:  Hey, Greg, we've been     09:07:17

16   going almost an hour.  Can we take five           09:07:19

17   minutes?                                          09:07:21

18         MR. PAUL:  Yeah, absolutely.                09:07:22

19         MS. FOSTER BIRD:  Okay.                     09:07:23

20         MR. PAUL:  Take a short break.              09:07:23

21         THE VIDEOGRAPHER:  We're going off the      09:07:24

22   record.  The time is 9:07 a.m.                    09:07:25

23         (Recess was held.)                          09:15:31

24         THE VIDEOGRAPHER:  We're back on the        09:15:31

25   record.  The time is 9:15 a.m.                    09:15:37
```

                                                               65

USCA4    1488

```
 1    BY MR. PAUL:                               09:15:41

 2       Q   All right, great.  We're back on the    09:15:42

 3    record after a short break.  We're still    09:15:44

 4    looking at No. 11, and I wanted to show you an    09:15:47

 5    exhibit we showed earlier.                  09:15:54

 6           MR. PAUL:  And I guess we will mark it    09:15:55

 7    now because it seems important.             09:15:56

 8       Q   This is an exhibit of 64 documents that    09:15:59

 9    I'll represent are discipline or termination    09:16:03

10    letters for the plaintiffs in this case.    09:16:06

11           Now, in Mr. Abdon's case, which is the    09:16:11

12    document we're looking at now, Bates No. 226,    09:16:16

13    it looks like Mr. Kuhner is the general      09:16:19

14    superintendent.  Is it your understanding that    09:16:22

15    he was the final decisionmaker concerning the    09:16:24

16    discipline of Mr. Abdon?                    09:16:26

17       A   Did you intend to put something on the    09:16:28

18    screen or are you just telling me --        09:16:30

19       Q   I did.  Yeah, I guess I stopped the    09:16:31

20    screen share when we took a break, so sorry    09:16:34

21    about that.  Here you go.                   09:16:36

22           All right.  Can you see that?         09:16:38

23       A   Yes.                                09:16:39

24       Q   I'll blow that up as well.          09:16:40

25           THE VIDEOGRAPHER:  And we're marking    09:16:43
```

```
 1    this as Exhibit 2?                              09:16:45

 2          MR. PAUL:  Yeah, let's mark this as       09:16:46

 3    Exhibit 2, please.                              09:16:48

 4          (Exhibit 2, Discipline/termination

 5    letters to CSX employees, was marked for

 6    identification and is attached to the

 7    transcript.)

 8    BY MR. PAUL:                                    09:16:50

 9      Q   Okay.  So having now access to look at   09:16:50

10    the exhibit, I'll ask you a question, or do you 09:16:54

11    need more time to review it?                    09:16:56

12      A   No.                                       09:16:58

13      Q   Is it your understanding that -- at       09:16:58

14    least for Mr. Abdon, that Mr. Kuhner was the    09:17:00

15    ultimate decisionmaker?                         09:17:03

16      A   Yes.                                      09:17:04

17      Q   Okay.  And if we go down to the next one  09:17:05

18    which is Mr. Adkins, you previously mentioned   09:17:07

19    Mr. Barr, vice president of mechanical.  Is     09:17:10

20    that -- his name is in the top right corner.    09:17:13

21    Do you see that?                                09:17:16

22      A   Yes.                                      09:17:17

23      Q   So is it your understanding that          09:17:17

24    Mr. Barr was the ultimate decisionmaker for     09:17:19

25    Mr. Adkins?                                     09:17:21
```

                                                          67

Macon Jones                                                    May 17, 2021

```
 1      A    I assume he signed it.  I can't see the      09:17:21

 2    bottom of it.                                       09:17:24

 3      Q    Oh, sorry.                                   09:17:25

 4      A    Yeah, there it is.  Okay.                    09:17:25

 5           Yeah, he would be the decisionmaker for      09:17:26

 6    that employee.                                      09:17:27

 7      Q    And just to be clear, I mean, is it your     09:17:28

 8    understanding that that's -- that Mr. Barr, for     09:17:31

 9    example, in this case of Mr. Adkins, was the        09:17:34

10    actual decisionmaker, not just someone who          09:17:36

11    signed the letter?  Is that correct?               09:17:39

12      A    Yes, I agree.                                09:17:41

13      Q    Okay.  And if we were to go through each     09:17:43

14    of these on the representation that these are       09:17:49

15    the actual termination letters, is it correct       09:17:51

16    that it's not just a formality, that whoever        09:17:53

17    signed this letter actually made the decision       09:17:56

18    to terminate the employee?                          09:17:58

19      A    That is the way the process is supposed      09:17:59

20    to work, yes, right.  That's my understanding.      09:18:03

21      Q    And do you have any reason to believe        09:18:05

22    that that process didn't happen with respect to     09:18:07

23    the plaintiffs in this case?                        09:18:09

24      A    I don't have any reason to believe that,     09:18:10

25    no.                                                 09:18:13
```

                                                                    68

Macon Jones                                                    May 17, 2021

```
 1      Q   Okay.  I don't know that we want to make     09:18:13

 2   this an exhibit, but I'm going to show it to        09:18:22

 3   you, and if counsel disagrees...  The primary       09:18:25

 4   reason is it's 2,876 pages long.  But I want to     09:18:28

 5   ask you just about the type of documents that       09:18:32

 6   may be in here.                                      09:18:34

 7      First off, do you know who Melissa              09:18:38

 8   Wheaton is?                                          09:18:40

 9      A   Yes.                                          09:18:41

10      Q   And have you ever worked with her?           09:18:42

11      A   Yes.                                          09:18:44

12      Q   And is she with CSX currently?               09:18:44

13      A   No.                                           09:18:49

14      Q   Do you know when she left?                   09:18:49

15      A   Probably early 2018.                         09:18:52

16      Q   And do you know why she left?                09:18:55

17      A   She took a job somewhere else.               09:19:01

18      Q   So earlier in the deposition, you know,      09:19:03

19   you kind of explained part of the process in        09:19:07

20   general terms that after a hearing and after        09:19:11

21   the decision to discipline is made, there's an      09:19:14

22   appeal process before the labor board or the        09:19:18

23   arbitration.  Do you remember that?                 09:19:22

24      A   Yes.                                          09:19:23

25      Q   Okay.  And what we're looking at now, is     09:19:24
```

                                                              69

EXHIBIT 5

| Last Name | First Name | CSX ID | Position | Date seen | RTW date | Provider | Medical Issue Reported | reason for illness noted on COII | Prior Issues? | Fax Received | Case Set | RRB Letter first knowledge | Hearing Date | FACTS File |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ▮ | | | Signal Foreman | 07/06/17 | 09/06/17 | Shannon Johnson, DC | sprain lumbar pelvis, sciatica, muscle spasms | no reason listed | No | 07/07/17 | 1 | 7/14/2017 | 8/1/2017 | 313588 |
| Hall | Joshua | 215038 | Carman | 07/06/17 | 09/04/17 | Daniel Carey II, DC | knee sprain/strain | jumped out of bed of truck and felt knee pop | kept off by this provider previously 1/21/16-6/17/16 | 07/06/17 | 1 | 7/14/2017 | 8/7/2017 | 313734 |
| Thornsberry | Travis | 223144 | Electrician | 07/27/17 | 09/24/17 | Shannon Johnson, DC | Lumbar/pelvis sprain, muscle spasms | no reason listed | Has been kep off work by this provider since 3/29/17 | 07/27/17 | 3 | 7/28/2017 | 8/24/2017 | 313870 |
| Rowe | Jonathan | 223145 | Diesel Mechanic | 7/20/2016 | none | Daniel Carey II, DC | Cervical and Lumbar sprain/strain | fell on slope at his home | No held out by provider since 5/8/2016 | 7/21/2017 | 5 | 9/20/2017 | 10/5/2017 | 315262 |
| Ferguson | Joshua | 229155 | Sheet Metal Worker | 07/12/17 | 09/12/17 | Shannon Johnson, DC | strain cervical, cervicobrachial syndrome sprain of R shoulder, muscle spams | no reason listed | Held out by same provider for same reason July 2016-Jan 2017 | 07/13/17 | 2 | 7/21/2017 | 8/9/2017 | 313648 |
| Adkins | Justin | 229559 | Diesel Electrician | 06/21/17 | 08/21/17 | Shannon Johnson, DC | sprain of cervical lights / muscle spasms | no reason listed | Similar case same provider 3/28/16 9/27/16. Updated COII received 8/17/17 extended off through 10/17/17 | 06/21/17 | 1 | 7/14/2017 | 8/24/2017 | 313710 |
| Lanham | Deanna | 231250 | Clerk | 07/07/17 | 09/04/17 | Daniel Carey II, DC | cervical/lumbar sprain/strain sclatica | fell on rock while hiking | Multiple sick day markoffs 2016 with other providers | 07/07/17 | 1 | 7/14/2017 | 8/8/2017 | 313737 |
| Stiltner | Christopher | 232870 | Utility Worker | 07/20/17 | 09/20/17 | Shannon Johnson, DC | R side sprain of lumbar pelvis | no reason listed | held out by this provider since 5/25/17 | 07/20/17 | 2 | 7/21/2017 | 8/22/2017 | 313756 |
| Woods | Matthew | 234136 | Track Foreman | 07/06/17 | 09/06/17 | Shannon Johnson, DC | Sciatica, left sprain of lumbar perlvis, sprain of cervical lights, cervicobrachial syndrome, thoracic root, muscle spasms | no reason listed | ODI 6/20/17 for chest wall contusion, back strain, abdominal pain RTW 6/23/17 on CI24. No updated RTW date for ODI. | 07/07/17 | 1 | 7/14/2017 | 8/14/2017 | 313586 |
| Barker | Jason | 234784 | Utility Worker | 06/19/17 | 08/19/17 | Shannon Johnson, DC | cervical brachial syndrome, sprain of cervical lights muscle spasms | no reason listed | No. updated COII rcd 8/17/16 with RTW 10/18/17. | 06/19/17 | 1 | 7/14/2017 | 8/7/2017, reconvened on 8/8/2017 | 313629 |
| Adkins | Brandon | 236278 | Utility Worker | 06/21/17 | 08/21/17 | Daniel Carey II, DC | lumbar strain / sprain | picking up tree limbs at home | similar case multiple providers 5/22/16-9/6/16 again off 4/21/17-6/27/17 now extended to 8/21/17 | 06/21/17 | 1 | 7/14/2017 | 8/8/2017 | 313636 |
| Palmer | Kevin | 242399 | Diesel Electrician | 07/06/17 | 09/06/17 | Shannon Johnson, DC | sprain of cervical lights, cervicocranial syndrome, muscle spasms | no reason listed | No | 07/07/17 | 1 | 7/14/2017 | 8/24/2017 | 313755 |
| Patterson | Shawn | 246601 | Utility Worker | 7/11/2017 | 9/11/2017 | Shannon Johnson, DC | thoracic spine, sprain lumbar pelvis, sprain R shoulder, cervicobrachial syndrome, | no reason listed | No | 07/12/17 | 2 | 7/21/2017 | 8/7/2017, reconvened on 8/8/2017 | 313634 |
| ▮ | | | Utility Worker | 07/07/17 | 09/05/17 | Daniel Carey II, DC | Lumbar sprain/strain, sciatica | lifting furniture at home on 7/5/2017 | No | 07/07/17 | 1 | 7/14/2017 | 8/7/2017, reconvened on 8/8/2017 | 313599 |
| Witt | Timothy | 250668 | Boilermaker | 06/21/17 | 08/21/17 | Daniel Carey II, DC | cervical/thoracic sprain/strain | no reason listed | Off since 5/4/17 and extended by same provider 6/21/17. Extended again 8/14/17 thru 9/18/17. Work excuse recd 8/30 holding off until 11/4/17. | 06/21/17 | 1 | 7/14/2017 | 8/23/2017 | 313705 |
| ▮ | | | Clerk | 07/19/17 | 09/19/17 | Shannon Johnson, DC | thoracic root disorder, thoracic spine sprain, spasms | no reason listed | held out by this provider since 7/13/16 | 07/20/17 | 2 | 7/21/2017 | 8/8/2017 | 313742 |
| Potter | Michael L | 252378 | Boilermaker | 07/19/17 | 09/20/17 | Shannon Johnson, DC | neck, back, shoulder sprain/strain muscle spasms | no reason listed | Off for similar issues with same provider 3/4/16-9/29/16 and 12/9/16-8/3/16 and 7/3/13-10/30/13 | 07/17/17 07/20/17 | 2 | 7/21/2017 | 8/23/2017 | 313707 |
| Deal | James | 252380 | Boilermaker | 07/07/17 | 09/06/17 | Daniel Carey II, DC | cervical/thoracic sprain/strain | fell in wet grass landing on back at home | No | 07/07/17 | 1 | 7/14/2017 | 8/9/2017 | 313659 |

Exhibit C
Page 13

| Last | First | ID | Job Title | Date 1 | Date 2 | Provider | Condition | Reason | Notes | Date | # | Date | Date | ID |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Maddix | Sammy | 254051 | Carman | 06/19/17 | 08/19/17 | Shannon Johnson, DC | sprain of lumbar /pelvis and muscle spasms | no reason listed | No. Update work excuse 8/23/17 for retw 10/19/17 | 06/19/17 | 1 | 7/14/2017 | 8/10/2017 | 313715 |
| ▮ | ▮ | ▮ | P&M Clerk | 06/30/17 | 08/27/17 | Daniel Carey II, DC | lumbar sprain/strain, lumbar DDD/OA | | has been kept out of work by this provider since 11/7/16 | 06/30/17 | 1 | 7/14/2017 | 8/8/2017 | 313739 |
| Hamm | Gregory | 267718 | Diesel Mechanic | 06/19/17 | 08/19/17 | Shannon Johnson, DC | Sprain of lumbar /pelvis Sprain of right knee | no reason listed | No. Updated COII recd 8/17/17 off until 10/16/17. | 06/19/17 | 1 | 7/14/2017 | 8/22/2017 | 313721 |
| Carpenter | John | 267785 | Diesel Mechanic | 06/19/17 | 08/19/17 | Shannon Johnson, DC | sprain of lumbar / pelvis / sprain of knee | no reason listed | No. Updated RTW 8/17/17 with RTW 9/18/17. | 06/19/17 | 1 | 7/14/2017 | 8/22/2017 | 313720 |
| Potter | Michael D | 267822 | Boilermaker | 07/06/17 | 09/06/17 | Shannon Johnson, DC | sprain cervical lights, cervicobrachial syndrome, sprain r shoulder | no reason listed | kept off by this provider since 3/3/17, also 2/25/16-8/25/16 | | 1 | 7/14/2017 | 8/9/2017 | 313663 |
| Mosteller | Robert | 267842 | Boilermaker | 06/19/17 | 08/19/17 | Shannon Johnson, DC | Sprain of Cervical , headaches , muscle spasms | | Yes. Just RTW 4/13/17 after being off 10/2016 for same issue and provider | 06/19/17 | 1 | 7/14/2017 | 8/9/2017 | 313703 |
| Wallace | Jesse | 267945 | Boilermaker | 06/19/17 | 08/19/17 | Shannon Johnson, DC | Sciatica Sprain of lumbar pelvis muscle spasms | | No. Updated COII recd 8/17/17 with RTW 9/18/17. MD3 recieved for RTW 8/23 with records. | 06/19/17 | 1 | 7/14/2017 | 8/9/2017 | 313702 |
| Williams | Lloyd | 267953 | Diesel Mechanic | 07/05/17 | 09/05/17 | Shannon Johnson, DC | lumbar sprain, muscle spasm | no reason listed | has been kept out of work by this provider since 3/1/17 | 07/06/17 | 1 | 7/14/2017 | 8/22/2017 | 313725 |
| Dowdy | Chad | 268429 | Utility Worker | 06/19/17 | 08/19/17 | Shannon Johnson, DC | sprain cervical lights, cervicobrachial syndrome, headaches | no reason listed | No. COII updated recd 8/16/17 with RTW 8/28/17. | 06/19/17 | 1 | 7/14/2017 | 8/7/2017, reconvened on 8/8/2017 | 313630 |
| Sargent | Dennis | 272564 | Diesel Electrician | 06/19/17 | 08/19/17 | Shannon Johnson, DC | sprain of lumbar pelvis and muscel spasms back | no reason listed | No, updated COII 8/3/17 off until 10/3/17 | 06/19/17 | 1 | 7/14/2017 | 8/24/2017 | 313713 |
| Morrison | Scott | 273044 | Boilermaker | 07/19/17 | 09/17/17 | Shannon Johnson, DC | cervical syndrome, sprain cervical lights, sprain thoracic spine | no reason listed | Held out by this provider since 5/17/17 | 07/20/17 | 2 | 7/21/2017 | 8/23/2017 | 313706 |
| Williams | Michael | 273045 | Electrician | 07/11/17 | 08/21/17 | Daniel Carey II, DC | Thoracic sprain/strain, intercostal neuritis | | Held out since 6/16/17 by this provider. Updated COII dated 8/22/17 extending time to 9/25/17 | 07/11/17 | 4 | 9/6/2017 | | |
| Blake | Justin | 273279 | Diesel Locomotive Electrician | 07/05/17 | 09/03/17 | Daniel Carey II, DC | mild thoracic sprain/strain, rotator cuff strain | lifted a box over head in garage at home | No, MD3 RTW date 9/5/17 | 07/05/17 | 3 | 7/28/2017 | 8/22/2017 | 313823 |
| Mullins | Ethan | 273369 | Diesel Mechanic | 06/21/17 | 08/21/17 | Daniel Carey II, DC | Sprain lumbar/pelvis, muscle spasms | | No. MD3 recd for RTW 8/21/17 | 06/22/17 | 1 | 7/14/2017 | 8/22/2017 | 313724 |
| Stephens | Donald | 273371 | Sheet Metal Worker | 06/19/17 | 08/19/17 | Shannon Johnson, DC | Sprain of lumbar pelvis sciatica Lt and RT hip | no reason listed | No. Updated work excuse 8/23/17 for off work until 9/18/17. | 06/19/17 | 1 | 7/14/2017 | 8/9/2017 | 313646 |
| Thayer | Todd | 273373 | Carman | 06/19/17 | 08/21/17 | Daniel Carey II, DC | lumbar strain / sprain | moving a refrigerator at home | No | 6/20/17 6/28/17 | 1 | 7/14/2017 | 8/10/2017 | 313574 |
| Preston | Samuel | 273403 | Diesel Electrician | 06/13/17 | 08/13/17 | Shannon Johnson, DC | unknown | | No | 07/11/17 | 1 | 7/14/2017 | 8/24/2017 | 313754 |
| ▮ | | ▮ | Diesel Electrician | 06/13/17 | 08/13/17 | Shannon Johnson, DC | Sprain of lumbar/pelvis/muscle spasms | no reason listed | 2nd case, not related. Updated COII 8/17/17 for RTW 10/18/17. | 06/19/17 | 1 | 7/14/2017 | 8/24/2017 | 313711 |
| Glowacki | Edwin | 273707 | Diesel Mechanic | 06/19/17 | 08/19/17 | Shannon Johnson, DC | sprain of lumbar / pelvis and muscle spasms of back | no reason listed | 3rd case unrelated but just RTW on 4/11/17. Updated work excuse recd 8/23/17 with RTW 10/16/17 | 06/19/17 | 1 | 7/14/2017 | 8/24/2017 | 313712 |
| Blaine | James | 273819 | Boilermaker | 06/19/17 | 08/19/17 | Shannon Johnson, DC | Sprain of Cervical lights, muscle spasms | | No. updated COII dated 8/17/17 with RTW 9/18/17. | 06/19/17 | 1 | 7/14/2017 | 8/9/2017 | 313661 |
| Jeffers | Jonathan | 274346 | Boilermaker | 06/19/17 | 08/19/17 | Shannon Johnson, DC | Sprain of lumbar /pelvis muscle spasms | no reason listed | No. Updated COII 8/17/17 with RTW 9/18/17. | 06/19/17 | 1 | 7/14/2017 | 8/9/2017 | 313662 |
| Baker | John | 274769 | Boilermaker | 06/19/17 | 08/19/17 | Shannon Johnson, DC | sprain of cervical and Lt shoulder muscle | no reason listed | No. Work note received 8/23/17 off until 10/16/17. | 06/19/17 | 1 | 7/14/2017 | 8/9/2017 | 313660 |
| ▮ | | ▮ | Sheet Metal Worker | 06/19/17 | 08/19/17 | Shannon Johnson, DC | Sprian of cervical, sprain of shoulder muscle spasms | no reason listed | No | 06/19/17 | 1 | 7/14/2017 | 8/9/2017 | 313647 |

Exhibit C
Page 14

| Jordan | Eric | 277088 | Diesel Electrician | 07/20/17 | 09/25/17 | Daniel Carey II, DC | cervical/lumbar sprian/strain, lumbar degenerative arthritis | neck and back pain after working at home | Has been held out of service by this provider since 5/25/17 | 07/20/17 | 2 | 7/21/2017 | 8/24/2017 | 313741 |
| Chastain | Quincy | 277683 | Diesel Mechanic | 06/21/17 | 08/21/17 | Daniel Carey II, DC | lumbar sprain strain/ rotator cuff strain | Rolled on ATV at home | off work for anxiety/depression 4/3/17 RTW 5/4/17 | 06/26/17 | 1 | 7/14/2017 | 8/22/2017 | 313718 |
| Kelley | Grover | 277812 | Utility Worker | 06/21/17 | 08/21/17 | Shannon Johnson, DC | Cervicoranial syndrome, sprain of thoracic spine lights, muscle spasm | no reason listed | No. Received MO3 RTW on 7/19/17 | 06/22/17 | 1 | 7/14/2017 | 8/7/2017, reconvened on 8/8/2017 | 313632 |
| Napier | Jeremy | 277837 | Utility Worker | 06/21/17 | 08/21/17 | Shannon Johnson, DC | sprain thoracic/lumbar lights, muscle spasm | no reason listed | No | 06/21/17 | 1 | 7/14/2017 | 8/7/2017, reconvened on 8/8/2017 | 313633 |
| ▮▮▮ | | | Conductor/UTU CO | 07/19/17 | 09/19/17 | Shannon Johnson, DC | lumbar sprain, SI Joint sprain, myospasm | no reason listed | Held out by this provider since 9/28/15 | 07/19/17 | 2 | 7/21/2017 | 8/1/2017 | 313708 |
| Owens | Michael | 522157 | Diesel Mechanic | 06/26/17 | 08/26/17 | Daniel Carey II, DC | Lumbar sprain/strain Rotator cuff strain | no reason listed | No. updated COII recd 8/21/17 off until 9/25/17 | 06/26/17 | 1 | 7/14/2017 | 8/22/2017 | 313719 |
| Maynard | Homer | 536041 | Utility Worker | 07/05/17 | 09/05/17 | Shannon Johnson, DC | sprain of cervical lights, sprain left shoulder | no reason listed | provider since2/4/16. Updated COII received 8/30 with RTW | 07/06/17 | 1 | 7/14/2017 | 8/8/2017 | 313637 |
| Campbell | Michael | 539650 | Comm maintainer technician | 07/26/17 | 09/26/17 | Shannon Johnson, DC | sprin of thoracic, L shoulder sprain, muscle spasm | no reason listed | Held off by this provider since 5/31/17 for same issue | 07/27/17 | 3 | 7/28/2017 | 8/15/2017 | 313808 |
| Little | Chad | 539659 | Conductor | 07/05/17 | 09/05/17 | Shannon Johnson, DC | sprain/strain lumbar, muscle spasm | no reason listed | has been kept out of work by this provider since 11/9/16 | 07/09/17 | 1 | 7/14/2017 | 8/4/2017 | 313607 |
| Speaks | Eric | 539836 | Sheet Metal Worker | 07/10/17 | 09/11/17 | Shannon Johnson, DC | Sprin of lights thoracic spine, sprain lumbar pelvis, sprain L shoulder, thoracic root disorder, muscle spasm. | no reason listed | Similar issue same provider 2014. | 07/17/17 | 1 | 7/14/2017 | 8/9/2017 | 313645 |
| Stewart | Danny | 573868 | Diesel Mechanic | 07/10/17 | 09/12/17 | Shannon Johnson, DC | sprain of lumbar/pelvis, muscle spasm | no reason listed | No | 07/11/17 | 1 | 7/14/2017 | 8/22/2017 | 313740 |
| Clark | Michael | 621281 | Carman | 06/22/17 | 08/22/17 | Shannon Johnson, DC | lumbar sprain, DDD, muscle spasms | no reason listed | Off since 5/6/16 for same problem, same provider. This is most recent extension. | 06/23/17 | 1 | 7/14/2017 | 8/21/2017 | 313709 |
| Manis | David | 622020 | Carman | 07/11/17 | 09/07/17 | Shannon Johnson, DC | sprain of lubar/pelvis, sprain thoracic spine, muscle spasms back | no reason listed | Held out by this provider since 2010-11 | 07/12/17 | 2 | 7/21/2017 | 8/10/2017 | 313716 |
| ▮▮▮ | | | Vehicle Operator | 07/07/17 | 09/07/17 | Shannon Johnson, DC | lumbar spinal stenosis, sprain lumbar pelvis, pain L hip, muscle spasm. | no reason listed | kept off by this provider now since 3/8/17. referring to Dr. Smith pain management. Previously off 1/9/17 2/13/17 same provider | 07/11/17 07/17/17 | 1 | 7/14/2017 | 8/14/2017 | 313587 |
| Craycraft | Randall | 623249 | Carman | 06/20/17 | 08/21/17 | Daniel Carey II, DC | COII for lumbar sprain/strain / lumbar DDD | no reason listed | off since 6/9/16 now extended. Received RTW MO3 dated 7/25/27 | 06/20/17 | 1 | 7/14/2017 | 8/7/2017 | 313732 |
| Stinnett | James | 623386 | Carman/painter | 06/22/17 | 08/22/17 | Shannon Johnson, DC | sprian/strain cervical ligs, cervicocranial syndrome, HA, muscle spasms | no reason listed | Off work 5/4/16-3/3/17 same provider same issues. | 06/23/17 | 1 | 7/14/2017 | 8/8/2017 | 313717 |
| Bills | John | 623762 | Carman | 06/21/17 | 08/27/17 | Daniel Carey II, DC | lumbar sprain/strain w radiculopathy | stepped off tailgate of truck at home | No | 06/27/17 | 1 | 7/14/2017 | 8/7/2017 | 313731 |
| Abdon | Tony | 623782 | Conductor. UTU CO | 06/22/17 | 08/22/17 | Shannon Johnson, DC | sprain/strain lumbar, muscle spasm. MO3 with office notes recd 7/20/17. | no reason listed | Off since 5/3, same issue same provider. Latest extension. | 06/23/17 | 1 | 7/14/2017 | 8/4/2017 | 313606 |
| Marshall | Jacqueline | 625076 | Utility Worker | 06/21/17 | 08/21/17 | Shannon Johnson, DC | low back sprain, knee sprain, muscle spasms | no reason listed | Off since 4/27/16 multiple extensions by same provider now through 8/21/17. multiple similar cases prior to this with same provider | 06/22/17 | 1 | 7/14/2017 | 8/8/2017 | 313635 |
| Brown | Devery | 626080 | Boilermaker | 06/02/17 | 08/22/17 | Shannon Johnson, DC | Thoracic sprian, cervicobrachial syndrome, shoulder sprain, muscle spasm | no reason listed | Off since 9/1/16 same provider same issues. Latest extension | 06/23/17 | 1 | 7/14/2017 | 8/23/2017 | 313704 |

Exhibit C
Page 15

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Potter | Zack | 626288 | Carman | 07/11/17 | 09/11/17 | Shannon Johnson, DC | sprain of lumbar/pelvis, muscle spasm back | no reason listed | Held out by this provider since 5/25/16 | 07/13/17 | 2 | 7/21/2017 | 8/21/2017 | 313736 |
| Barber | Gerald | 628703 | Carman | 07/05/17 | 09/05/17 | Shannon Johnson, DC | lumbar, sac, pelvis sprain, thoracic sprain, muscle spasm | no reason listed | has been kept out of work by this provider since 3/10/16 | 07/06/17 | 1 | 7/14/2017 | 8/21/2017 | 313735 |
| Frasure | John | 628732 | Carman | 07/25/17 | none | Shannon Johnson, DC | sprain lumbar/pelvis, muscle spasm | no reason listed | Held off by this provider since 5/25/17 same issue | 07/26/17 | 3 | 7/28/2017 | 8/7/2017 | 313824 |
| Akers | Bobby | 628955 | Carman | 07/06/17 | none | Shannon Johnson, DC | lumbar sprain and pelvis, r side sciatica, muscle spasm | no reason listed | Kept off by this provider since 9/12/16. Previously kept off 9/22/15-3/23/16, 9/13/13-5/19/14, 7/5/12-1/14/13 for same | 07/07/17 07/13/17 | 1 | 7/14/2017 | 8/8/2017 | 313693 |
| Flocker | Jerry | 628968 | Utility Worker | 06/19/17 | 08/19/17 | Shannon Johnson, DC | sprain of lumbar/pelvis sprain right and left knee muscle spasms | no reason listed | multiple similar cases prior to this with same provider most recent 2011. Updated COII 8/16/17 with RTW 9/18/17. | 06/20/17 | 1 | 7/14/2017 | 8/7/2017, reconvened on 8/8/2017 | 313631 |
| Hutchinson | Dennis | 978419 | Carman | 07/11/17 | 09/13/17 | Shannon Johnson, DC | sprain of lumbar / pelvis and muscle spasms | no reason listed | Has been kept out by this provider since 3/15/16 | 07/12/17 | 2 | 7/21/2017 | 8/21/2017 | 313738 |

Exhibit C
Page 18

USCA4    1496

EXHIBIT

1



Occupational Health Department
Craig Heligman, M.D. - Chief Medical Officer
500 Water Street, J290
Jacksonville, FL 32202
Phone 904-359-1500

August 23, 2017

J R BAKER
86 BURGESS ST
GREENUP       KY 41144

ID 274769

Re:    Medical Documentation

Dear Mr. Baker,

You recently submitted medical documentation from Johnson Chiropractic in support of your
medical leave of absence.  The purpose of this correspondence is to advise you that the CSX
Medical Department is no longer accepting any medical documentation completed by Shannon
Johnson, DC, or Daniel Carey, II, DC.  If you continue to have a need to be off of work for a
medical reason or wish to return to work from a medical leave, please provide updated medical
documentation from your primary care or treating physician, other than the two referenced
above.

If you have any questions, please contact Kelly Caudell, Medical Qualification Nurse, at 904-
359-3173 or Kelly_Caudell@csx.com.

Sincerely,

Dr. Craig Heligman
Chief Medical Officer

BAKER 000279

1              IN THE UNITED STATES DISTRICT COURT FOR THE

2                 SOUTHERN DISTRICT OF WEST VIRGINIA

3                          AT HUNTINGTON

4

5    _____

                                       )
6    JUSTIN ADKINS, et al.,            )
                                       )
7                 Plaintiffs,          )
                                       ) Case No.
8            -vs                       ) 3:18-CV-00321
                                       )
9    CSX CORPORATION, et al.,          )
                                       )
10                Defendants.          )
                                       )
11

12

13

14   VIDEOTAPED DEPOSITION OF CRAIG HELIGMAN, M.D., VOLUME

15   I, conducted remotely by Laura L. Maes, CSR No. 9836,

16   on behalf of the Plaintiffs, commencing at the hour

17   of 7:03 a.m. on Wednesday, April 28, 2021.

18

19

20

21

22

23

24

25

2

```
 1    APPEARANCES:  (VIA ZOOM)

 2
      For the Plaintiffs:
 3
          EIGHT & SAND
 4        BY:  JEFF R. DINGWALL, (Pro Hac Vice)
          550 West B Street, Fourth Floor
 5        San Diego, California 92101
          619.796.3464
 6        jeff@eightandsandlaw.com

 7
      For the Plaintiffs:
 8
          GARELLA LAW, P.C.
 9        BY:  C. KIEL GARELLA, ESQ. (Pro Hac Vice)
          409 East Boulevard
10        Charlotte, North Carolina 28303
          980.321.7934
11        kiel@gljustice.com

12

13    For the Plaintiffs:

14        MORGAN & PAUL, PLLC
          BY:  GREGORY G. PAUL, ESQ.
15        100 First Avenue, Suite 1010
          Pittsburgh, Pennsylvania 15222
16        844.374.7200
          gregpaul@morganpaul.com
17

18    For the Plaintiffs:

19        UNDERWOOD LAW OFFICE, INC.
          BY:  JOHN PATRICK L. STEPHENS, ESQ.
20        923 Third Avenue
          Huntington, West Virginia 25701
21        304.486.3350

22

23

24

25
```

                                                              3

USCA4      1499

```
 1    For the Defendants:

 2         NELSON, MULLINS, RILEY & SCARBOROUGH, LLP
           BY:  MELISSA FOSTER BIRD, ESQ.
 3         949 Third Avenue, Suite 200
           Huntington, West Virginia 25701
 4         304.526.3500
           melissa.fosterbird@nelsonmullins.com
 5

 6

 7    Also present:

 8         KYLE LOSKAMP, VIDEOGRAPHER

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                                                            4
```

```
 1                         I N D E X

 2

 3    WITNESS

 4      CRAIG HELIGMAN, M.D.

 5

 6    EXAMINATION                              PAGE

 7      MR. DINGWALL                             7

 8      MR. PAUL                               187

 9                    E X H I B I T S

10                                            PAGE

11      Exhibit 1    Second Amended Notice of   10
                     Deposition of Craig S. Heligman
12
        Exhibit 2    Three Letters to William Fergus  62
13                   with attachments

14      Exhibit 3    9/20/2017 Letter from Dr.  95
                     Heligman
15
        Exhibit 4    ACA Choosing Wisely Document  110
16
17      Exhibit 5    9/23/2017 Letter from Dr.  122
                     Heligman
18
        Exhibit 6    E-mail with Attachments -  126
19                   CSXT(Adkins)022527-556

20      Exhibit 7    Certification of Ongoing   241
                     Illness or Injury Forms
21                   (CONFIDENTIAL)

22

23

24

25
```
                                                                5

Craig Heligman, M.D.                                                  April 28, 2021

| | | |
|---|---|---|
| 1 | of each one of them.  If there's one you'd like me | 07:13 |
| 2 | to look at, I'm happy to do so. | 07:13 |
| 3 | Q.   Going back to the Charge Letter, it states | 07:13 |
| 4 | that information received from the Chief Medical | 07:13 |
| 5 | Officer on July 14th, 2017, quote: | 07:13 |
| 6 | "That you were dishonest and | 07:14 |
| 7 | attempted to defraud the | 07:14 |
| 8 | company and/or benefits | 07:14 |
| 9 | providers when you, as well as | 07:14 |
| 10 | more than 50 other craft | 07:14 |
| 11 | employees, submitted | 07:14 |
| 12 | potentially fraudulent | 07:14 |
| 13 | documentation." | 07:14 |
| 14 | Is that right? | 07:14 |
| 15 | A.   I believe that's generally the language. | 07:14 |
| 16 | If you have a copy for me to look at, I'm happy to | 07:14 |
| 17 | confirm it. | 07:14 |
| 18 | Q.   Okay.  Was it your opinion as of July 14th, | 07:14 |
| 19 | 2017, that the plaintiffs in this case were | 07:14 |
| 20 | dishonest? | 07:14 |
| 21 | A.   It was my opinion at the time that there | 07:14 |
| 22 | was some potential for that, yes, but did I know, | 07:14 |
| 23 | no. | 07:14 |
| 24 | Q.   Okay.  Was it your opinion as of July 14th, | 07:14 |
| 25 | 2017, that the plaintiffs in this case attempted to | 07:14 |

17

USCA4    1502

```
 1  defraud the company?                              07:14

 2      A.   I'm sorry.  Could you restate that one more  07:15

 3  time?                                             07:15

 4      Q.   Yes.                                     07:15

 5           Was it your opinion as July 14th, 2017,  07:15

 6  that the plaintiffs in this case had attempted to  07:15

 7  defraud the company?                              07:15

 8      A.   No, it was my opinion that there was that  07:15

 9  possibility.  It was the responsibility of the    07:15

10  investigation and hearing process to determine what  07:15

11  the facts were in the case and make a decision upon  07:15

12  completion of those investigations.               07:15

13      Q.   Was it your opinion as of July 14th, 2017,  07:15

14  that the plaintiffs in this case attempted to     07:15

15  defraud benefits providers?                       07:15

16      A.   Again, I thought there was potential for  07:15

17  that.  However, it was the responsibility, following  07:15

18  the process and procedures of the investigation and  07:15

19  hearing, for others to make the determination as to  07:15

20  the guilt or innocence according to the charges.  07:15

21      Q.   And was it your opinion as of July 14th,  07:15

22  2017, that the plaintiffs in this case submitted  07:16

23  potentially fraudulent documentation?             07:16

24      A.   I feel that it was potentially that way.  07:16

25  The documents themselves I don't believe were     07:16
```

18

USCA4    1503

```
 1    actually fraudulent.  I believe some of the          07:16
 2    information presented in those documents could have  07:16
 3    led us down that pathway.                            07:16
 4        Q.   What specific information in the documents  07:16
 5    could have led us down the pathway of fraudulent     07:16
 6    documentation?                                       07:16
 7        A.   We had somewhere around 70 individuals from 07:16
 8    two different chiropractic providers.  The           07:16
 9    information on each and every one of those forms was 07:16
10    very similar.  The time period in which the          07:16
11    providers were approving or certifying absence time  07:17
12    or disability periods were pretty much the same.     07:17
13         And so the consistency of a large number of     07:17
14    cases or the information on these forms for these    07:17
15    individual cases that were presented really within a 07:17
16    very short time period was the concern.  And it was  07:17
17    the pattern of information at the time that we        07:17
18    received it that was concerning, not necessarily     07:17
19    what was on any -- any one document.                 07:17
20        Q.   Okay.  Other than -- I'm sorry.  And I'll   07:17
21    back up for a second.                                07:17
22         You stated that the information that you        07:17
23    provided on July 14th, 2017, was a collection of     07:17
24    Certificate of Ongoing Illness or Injury documents;  07:17
25    is that right?                                        07:17
```

                                                              19

```
 1        A.    Yes.                                   07:17

 2        Q.    And you provided those documents to the Law   07:17

 3   Department and to the Labor Relations team; is that   07:17

 4   right?                                           07:18

 5        A.    I first provided it to the Law Department,   07:18

 6   and then I believe it was transferred over to Labor   07:18

 7   Relations.                                        07:18

 8        Q.    What caused you to provide that information   07:18

 9   to the Law Department?                            07:18

10        A.    At that time period, we had received -- I   07:18

11   think it was 20 or 21 of those forms all in the same   07:18

12   day, and that was very unusual.  We actually receive   07:18

13   quite a large number of documents every day of the   07:18

14   week, and to have 20 or more forms provided from one   07:18

15   practitioner or one geographical area in one day,   07:18

16   that's pretty unusual.  In fact, I've never         07:18

17   experienced that at CSX or prior to my work at CSX.   07:18

18        Q.    And so was it the number of forms that you   07:18

19   received that caused you to contact the Law         07:18

20   Department?                                       07:18

21        A.    Not the number, but the combination of    07:19

22   factors -- the large number, the location, and     07:19

23   specifically to limited to two practitioners.  So   07:19

24   it's that combination of common practitioners,     07:19

25   common date or common time period, and common      07:19
```

                                                        20

Craig Heligman, M.D.                                              April 28, 2021

```
 1   documents that we received all at once.  Very, very   07:19
 2   unusual set of circumstances.                          07:19
 3        As time progressed from that first               07:19
 4   collection, I asked our team to continue to collect   07:19
 5   them to see if there was any additional pattern, and  07:19
 6   when we started receiving a large number of them      07:19
 7   over the next few weeks is when I presented that to   07:19
 8   the Law Department and asked their opinion if there   07:19
 9   was anything we needed to do further with this        07:19
10   information.                                           07:19
11      Q.   What was your first -- when was your first    07:19
12   contact with the Law Department regarding these COII  07:19
13   forms?                                                 07:20
14      A.   I actually don't recall a specific date.      07:20
15   It would have been towards the end of June of 2017.   07:20
16      Q.   And is there any way for you to determine     07:20
17   when your first contact was with the Law Department?  07:20
18      A.   No.                                            07:20
19      Q.   There's -- you have no way of tracking        07:20
20   whether you sent an e-mail or sent these documents    07:20
21   in hard copy to the Law Department?                   07:20
22      A.   You would have to check with our              07:20
23   document -- the records-keeping department.  They     07:20
24   would be able to track that down.  As I said, I       07:20
25   don't remember if it was something I carried to the   07:20
```

21

USCA4    1506

| 1 | Law Department.  That's probably the more likely | 07:20 |
| 2 | scenario, but I wouldn't rule out having sent them | 07:20 |
| 3 | by e-mail. | 07:20 |
| 4 |     Q.   Who specifically in the Law Department did | 07:20 |
| 5 | you contact? | 07:20 |
| 6 |     A.   I contacted our employment attorney. | 07:20 |
| 7 |     Q.   And who is that? | 07:20 |
| 8 |     A.   Michael Burns. | 07:20 |
| 9 |     Q.   Did you receive any guidance from | 07:20 |
| 10 | Mr. Burns? | 07:21 |
| 11 |     MS. FOSTER BIRD:  I'm going to object here | 07:21 |
| 12 | to attorney/client privilege for any conversations | 07:21 |
| 13 | that were held between Dr. Heligman and Mr. Burns, | 07:21 |
| 14 | including any legal advice or recommendations that | 07:21 |
| 15 | were given. | 07:21 |
| 16 | BY MR. DINGWALL: | 07:21 |
| 17 |     Q.   And I don't want to know the substance of | 07:21 |
| 18 | any conversations you had with Mr. Burns.  I'm just | 07:21 |
| 19 | asking whether he provided you with any guidance. | 07:21 |
| 20 |     MS. FOSTER BIRD:  That's what -- beyond a | 07:21 |
| 21 | "Yes" or a "No" answer, I would object. | 07:21 |
| 22 |     THE WITNESS:  He did provide guidance. | 07:21 |
| 23 | BY MR. DINGWALL: | 07:21 |
| 24 |     Q.   And at some point, I believe, you stated | 07:21 |
| 25 | that the matter was referred from the Law Department | 07:21 |

22

Craig Heligman, M.D.                                              April 28, 2021

```
 1    to the Labor Relations team; is that right?       07:21

 2         A.   That's my recollection, yes.            07:21

 3         Q.   And do you know when that occurred?     07:21

 4         A.   I do not know the specific date.        07:21

 5         Q.   How did you become aware that the matter  07:22

 6    was referred from the Law Department to the Labor  07:22

 7    Relations team?                                   07:22

 8         A.   When someone from Labor Relations contacted  07:22

 9    me to request additional information.             07:22

10         Q.   And who was it on the Labor Relations team  07:22

11    that contacted you?                               07:22

12         A.   I think it was Penny Dreher that was the  07:22

13    first person that contacted me.  She was the      07:22

14    individual that was managing the administration   07:22

15    process for all these cases.                      07:22

16         Q.   Do you know Ms. Dreher's title, or at the  07:22

17    time did you know her title?                      07:22

18         A.   I don't recall, no.                     07:22

19         Q.   Do you recall when she first contacted you?  07:22

20         A.   No, I do not.                           07:22

21         Q.   Is that something you could find out?   07:22

22         A.   I don't know.  Again, I don't have ability  07:22

23    to look in my e-mails that long ago.  I guess I   07:23

24    could ask Ms. Dreher if she remembers, but that's  07:23

25    the only way I could do it.                       07:23
```

                                                                  23

Craig Heligman, M.D.                                                    April 28, 2021

```
 1        Q.   Do you know if she contacted you by phone    07:23
 2   or by e-mail or in person?                             07:23
 3        A.   It would either have been by e-mail or       07:23
 4   telephone.  It was not in person for the first         07:23
 5   contact.                                               07:23
 6        Q.   In your handling of these cases involving    07:23
 7   the COII forms in 2017, did you keep any records of    07:23
 8   your communications with either the Law Department     07:23
 9   or the Labor Relations team?                           07:23
10        A.   No.                                          07:23
11        Q.   Is that your practice generally not to keep  07:23
12   records of communications regarding potentially        07:23
13   fraudulent activity?                                   07:23
14        A.   We have retention rules on our e-mails, and  07:23
15   there was no reason for me to retain any e-mails.      07:23
16   We don't record our phone calls.  We don't record      07:24
17   chat.  So it's my practice not to retain any of them   07:24
18   unless I'm made aware of a legal reason to do so.      07:24
19             And then as I stated previously, it's        07:24
20   our -- we have a department that goes back and does    07:24
21   the review on all the retained e-mails.  I don't do    07:24
22   that, and I don't have access to that information so   07:24
23   far or so long ago.                                    07:24
24        Q.   At any point from June 2017 to the present,  07:24
25   have you ever been advised to retain documents or      07:24
```

                                                                          24

| | | |
|---|---|---|
| 1 | far? | 01:17 |
| 2 | A.   I don't think so. | 01:17 |
| 3 | Q.   Okay.  Part of occupational medicine | 01:17 |
| 4 | includes preventive medicine; is that right? | 01:17 |
| 5 | A.   The Occupational Medicine Board is under | 01:17 |
| 6 | the -- one of the three divisions of the American | 01:17 |
| 7 | Board of Preventive Medicine. | 01:17 |
| 8 | Q.   Okay.  So that's a "Yes"; right? | 01:17 |
| 9 | A.   Yes. | 01:18 |
| 10 | Q.   Understood.  Yep, got it. | 01:18 |
| 11 | And can you say that board again, American | 01:18 |
| 12 | Preventive Medicine? | 01:18 |
| 13 | A.   The American Board of Preventive Medicine. | 01:18 |
| 14 | There's three divisions.  There's Occupational | 01:18 |
| 15 | Medicine, General Prevention in Public Health, and | 01:18 |
| 16 | Aerospace Medicine. | 01:18 |
| 17 | Q.   Okay.  And is -- is it correct to say that | 01:18 |
| 18 | another reason that you've studied or educated | 01:18 |
| 19 | yourself on job duties of railroaders is to prevent | 01:18 |
| 20 | injuries in the workplace? | 01:18 |
| 21 | A.   Yes, I think that's a fair assessment. | 01:18 |
| 22 | Q.   Okay.  And where does that fall in the | 01:18 |
| 23 | structure of CSX specifically, like, that -- those | 01:18 |
| 24 | job duties of preventing occupational injuries? | 01:18 |
| 25 | A.   It's really a day-to-day concept that we | 01:18 |

225

1    have to understand.  So in the case of an applicant        01:18

2    who desires to work for CSX, I need to learn at            01:18

3    least enough about their medical information to know       01:18

4    if their medical profile would put them at risk if         01:19

5    they were to perform job functions for CSX,                01:19

6    depending upon what the job is.                            01:19

7         It's kind of the opposite of the return to           01:19

8    work following a medical event for fitness for duty.       01:19

9    So it's on return to work and at -- at new hire.           01:19

10        Also part of that is we're responsible for           01:19

11   ongoing surveillance exams for different agencies,         01:19

12   whether it's OSHA, FRA, Motor Carriers.  We have to        01:19

13   manage the medical process and surveillance exams          01:19

14   for those kinds of functions.  And so if someone is        01:19

15   not meeting the medical guidance for those types of        01:19

16   jobs, we -- we would make those determinations, see        01:19

17   if there's a medical ability fit with the ability to       01:19

18   do the job.                                                01:19

19     Q.   Okay.  Does -- while you've been employed           01:19

20   at CSX, are you aware of any -- I just don't know          01:19

21   what to call them -- but, you know, where people are       01:20

22   required to exercise, like, 15 minutes before their        01:20

23   shift to stretch?                                          01:20

24        Does that concept sound familiar?                     01:20

25     A.   Sure.                                               01:20

                                                                    226

| | | |
|---|---|---|
| 1 | I think we are still doing that.  The | 01:20 |
| 2 | individuals involved in that program, a lot of them | 01:20 |
| 3 | have changed jobs or aren't with the company any | 01:20 |
| 4 | longer.  But we've promoted people to warm up before | 01:20 |
| 5 | they do greater physical activity that might be | 01:20 |
| 6 | required of them at work.  So there's a series of | 01:20 |
| 7 | stretching exercises that are recommended. | 01:20 |
| 8 | Mr. Edgar, who we talked about on the | 01:20 |
| 9 | ergonomics side, he was also involved in that | 01:20 |
| 10 | process when he was with the wellness team and | 01:20 |
| 11 | promoted that exercise program also. | 01:20 |
| 12 | Q.   Is that part of the Risk Management | 01:20 |
| 13 | Department or some other department? | 01:20 |
| 14 | A.   Some other department.  We had a wellness | 01:20 |
| 15 | team that started in the Medical Department when I | 01:20 |
| 16 | first came to CSX.  It then moved under a different | 01:20 |
| 17 | person's jurisdiction.  It moved again and again and | 01:21 |
| 18 | changed how we do our wellness functions, and so | 01:21 |
| 19 | today we are, again, modifying how we provide | 01:21 |
| 20 | wellness services to our employees. | 01:21 |
| 21 | Q.   Okay.  And briefly how is that? | 01:21 |
| 22 | What -- what changed? | 01:21 |
| 23 | A.   The leadership views.  We had a leadership | 01:21 |
| 24 | change in 2017 -- their viewpoint on how it fits | 01:21 |
| 25 | into the business.  The benefits that we may have | 01:21 |

227

Craig Heligman, M.D.                                              April 28, 2021

```
 1   gained from doing some of our wellness activities,    01:21
 2   were they effective or not?  Were they something      01:21
 3   that the employees participated in or not?            01:21
 4          We went from a larger number of contracted     01:21
 5   health and wellness professionals, whether they were  01:22
 6   certified trainers or nutritionists that were         01:22
 7   scattered around the system.  As the change in the    01:22
 8   organization occurred, that number of people          01:22
 9   reduced.  And at this point in time, the contract     01:22
10   for those individuals is discontinued at the end      01:22
11   of -- I believe it's May 1st or the end of May.  I    01:22
12   don't remember now.                                   01:22
13          And they're looking at modifying how we do     01:22
14   that.  So I understand we are looking for a wellness  01:22
15   manager to coordinate efforts, which will be mostly   01:22
16   associated with some of our benefits and vendored     01:22
17   activities.                                           01:22
18          So it's -- it has changed and progressed       01:22
19   over the years in many different ways.                01:22
20     Q.   What was the change that you referenced in     01:22
21   2017?                                                 01:22
22     A.   We had a leadership change.  The -- and,       01:22
23   again, I'm not a finance guy either.  But there was   01:22
24   a group of individuals that promoted Mr. Hunter       01:22
25   Harrison to come in as the CEO of CSX.  I think it    01:23
```

228

Craig Heligman, M.D.                                    April 28, 2021

```
 1    was March of 2017.  Our former CEO then retired and    01:23

 2    our leadership changed to Mr. Harrison, and he         01:23

 3    brought in his leadership team and our top             01:23

 4    leadership changed over the next few years.            01:23

 5         Q.   He wasn't around very long, was he, at CSX?  01:23

 6         A.   Unfortunately, he passed away after --       01:23

 7    really at maybe even six months.                       01:23

 8         Q.   Yeah, it was December of '17.                01:23

 9         A.   Right.  Six or eight months, I think.        01:23

10         Q.   Okay.  Did -- you had occasion to work with  01:23

11    Mr. Harrison?                                          01:23

12         A.   No, I never had the opportunity to meet      01:23

13    him.                                                   01:23

14         Q.   Okay.  All right.  In the tenure that he     01:23

15    was at CSX, were you aware of any policies that        01:23

16    changed with respect to medical leave or family       01:23

17    medical leave or accommodations at all?               01:24

18         A.   No, nothing really changed in that area.     01:24

19         Q.   Okay.  In the period of time that he was     01:24

20    there, did you notice any changes at all in the way    01:24

21    that you did your job in the Medical Department?       01:24

22         A.   No real change in how I did my job.  Most    01:24

23    recently we had another reorganization and our         01:24

24    medical functions were moved to different managers.    01:24

25    But beyond that, the actual functions remain the       01:24
```

229

Craig Heligman, M.D.                                                    April 28, 2021

```
 1   same.                                               01:24

 2          MR. PAUL:  Okay.  I'm good plowing through,  01:24

 3   but if anybody needs a break, you just tell me.     01:24

 4   BY MR. PAUL:                                         01:24

 5      Q.   But what's -- what's your -- what are your   01:24

 6   thoughts on that?                                    01:24

 7      A.   I'm good right now.                          01:24

 8          THE REPORTER:  I would love one.             01:24

 9          MS. FOSTER BIRD:  The court reporter's the   01:24

10   most important person, Dr. Heligman.  Sorry.         01:24

11          MR. PAUL:  Yeah.                              01:24

12          THE WITNESS:  I understand.                   01:24

13          MR. PAUL:  All right.  We'll go off the      01:24

14   record.  What do you need, five minutes or something 01:24

15   like that or..?                                      01:25

16          THE REPORTER:  Ten.                           01:25

17          MR. PAUL:  Ten?                               01:25

18          Yeah, am I talking too fast?                  01:25

19          THE REPORTER:  You're much better.  Thank    01:25

20   you.                                                 01:25

21          THE VIDEOGRAPHER:  Off the record at         01:25

22   1:25 p.m.                                            01:25

23          (Recess taken.)                               01:33

24          THE VIDEOGRAPHER:  We are back on the        01:33

25   record at 1:33 p.m.                                  01:33
```

                                                                        230

Craig Heligman, M.D.                                    April 28, 2021

```
 1    BY MR. PAUL:                                      01:33

 2        Q.   All right.  Dr. Heligman, we just took a  01:33

 3    short break.  We're back on the record.          01:33

 4             Are you all ready?                       01:33

 5        A.   I'm ready.                               01:33

 6        Q.   Okay.  Great.                            01:33

 7             Are you familiar with the American       01:33

 8    Association of Railroads?                         01:33

 9        A.   Yes.                                     01:33

10        Q.   Okay.  What is that organization?        01:33

11        A.   It's an industry organization that       01:33

12    represents the interests of the freight rail     01:33

13    industry.                                        01:33

14        Q.   Okay.  And with -- to drill down on that a 01:33

15    little bit with respect to medical issues, does the 01:33

16    AAR -- are they involved with any medical issues? 01:34

17        A.   There is a Chief Medical Officer, a medical 01:34

18    committee under the risk management committee within 01:34

19    the AAR.                                         01:34

20        Q.   Okay.  And were you aware that -- well, let 01:34

21    me ask you:  Are you aware of any studies that   01:34

22    they've performed with respect to repetitive stress 01:34

23    injuries or cumulative trauma diseases?          01:34

24        A.   No.                                     01:34

25        Q.   Okay.  I think you testified earlier that 01:34
```

                                                        231

Craig Heligman, M.D.                                              April 28, 2021

```
 1   the term "cumulative trauma disease," I believe, is   01:34
 2   no longer kind of in?                                 01:34
 3       A.   Right.  Their -- they don't really provide   01:34
 4   a replacement name, but the concept of cumulative or  01:34
 5   repetitive trauma really isn't something that is      01:34
 6   considered supported by most evidence-based           01:34
 7   practices.                                            01:34
 8       Q.   Okay.  Do you know who Mark Badders is?       01:35
 9       A.   Mr. Badders, I believe, was an industrial    01:35
10   hygienist that was a CSX employee some years ago      01:35
11   long before I came on the scene.                      01:35
12       Q.   Okay.  Who's in charge of Industrial         01:35
13   Hygiene in 2017 to the present, if you know?          01:35
14       A.   In 2017, Billy Bullock was the Director of   01:35
15   Industrial Hygiene.  I think a year ago we            01:35
16   transitioned his role, and Brooke Martin is the       01:35
17   current Director of Industrial Hygiene.  Billy is     01:35
18   serving a different function at this point in time.   01:35
19   He's still involved with Industrial Hygiene but       01:35
20   doesn't run the department.                           01:35
21       Q.   Okay.  And with respect to your job duties   01:35
22   from 2017 till now -- actually, strike that.          01:35
23           With respect to your job duties since         01:35
24   you've been at CSX, have you had any job duties with  01:35
25   respect to the prevention of repetitive stress        01:35
```

232

1            IN THE UNITED STATES DISTRICT COURT FOR THE

2                SOUTHERN DISTRICT OF WEST VIRGINIA

3                        AT HUNTINGTON

4

5     _____
                                          )
6     JUSTIN ADKINS, et al.,              )
                                          )
7              Plaintiffs,                )
                                          ) Case No.
8              -vs                        ) 3:18-CV-00321
                                          )
9     CSX CORPORATION, et al.,            )
                                          )
10             Defendants.                )
                                          )

11

12

13

14      VIDEOTAPED DEPOSITION OF PENNY DREHER, 30(B)(6)

15   conducted remotely before Laura L. Maes, CSR No. 9836, on

16   behalf of the Plaintiffs, commencing at the hour of 9:11

17   a.m. on Tuesday, May 4, 2021.

18

19

20

21

22

23

24

25

                                                              2

Penny Dreher                                                                                  May 4, 2021

```
 1      APPEARANCES:  (VIA ZOOM)

 2


 3      For the Plaintiffs:


 4          GARELLA LAW, P.C.
            BY:  C. KIEL GARELLA, ESQ. (Pro Hac Vice)
 5          409 East Boulevard
            Charlotte, North Carolina 28303
 6          980.321.7934
            kiel@gljustice.com
 7


 8


 9      For the Plaintiffs:


10

            UNDERWOOD LAW OFFICE, INC.
11          BY:  JOHN PATRICK L. STEPHENS, ESQ.
            923 Third Avenue
12          Huntington, West Virginia 25701
            304.486.3350
13


14      For the Defendants:


15          NELSON, MULLINS, RILEY & SCARBOROUGH, LLP
            BY:  MELISSA FOSTER BIRD, ESQ.
16          949 Third Avenue, Suite 200
            Huntington, West Virginia 25701
17          304.526.3500
            melissa.fosterbird@nelsonmullins.com
18


19


20      Also present:


21          JASON PATSALIS, VIDEOGRAPHER


22


23


24


25
```

3

USCA4    1519

Penny Dreher                                                                 May 4, 2021

1                              I N D E X

2

3    WITNESS

4       PENNY DREHER

5

6    EXAMINATION                                    PAGE

7       MR. GARELLA                                    6

8                        E X H I B I T S

9                                                   PAGE

10      Exhibit 1     Amended Notice of 30 (b)(6)      9
                      Deposition and Request for
11                    Production of Documents

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                              4

| | | |
|---|---|---|
| 1 | As to Topic No. 9, "The policies, | 09:19 |
| 2 | procedures and practices of accommodating, | 09:19 |
| 3 | reassigning, disciplining and/or terminating | 09:20 |
| 4 | employees who are off from work on a medical leave | 09:20 |
| 5 | of absence," what did you do to prepare yourself and | 09:20 |
| 6 | acquaint yourself with these policies, procedures | 09:20 |
| 7 | and practices to testify today as a corporate | 09:20 |
| 8 | representative? | 09:20 |
| 9 | A.   I didn't prepare for it.  I am -- but I am | 09:20 |
| 10 | prepared to speak about it, because I have worked | 09:20 |
| 11 | with those policies and I have worked with those | 09:20 |
| 12 | policies for years. | 09:20 |
| 13 | Q.   Okay.  What are those policies? | 09:20 |
| 14 | A.   There is an IDPAP policy, there is an | 09:20 |
| 15 | attendance policy, there is also the Collective | 09:20 |
| 16 | Bargaining Agreement.  And -- and I think those are | 09:20 |
| 17 | pretty much everything that it entails in No. 9. | 09:20 |
| 18 | Q.   In terms of -- how do those impact -- | 09:20 |
| 19 | policies impact an employee who is off work -- off | 09:20 |
| 20 | from work on a medical leave of absence? | 09:20 |
| 21 | A.   The -- when employees are marked off, they | 09:20 |
| 22 | have to provide our Medical Department documentation | 09:20 |
| 23 | to justify their leave of absence.  Under their | 09:20 |
| 24 | Collective Bargaining Agreement, if they fail to | 09:21 |
| 25 | provide any documentation to support their leave, | 09:21 |

13

USCA4    1521

Penny Dreher                                                                    May 4, 2021

```
 1    there is a self-executing (inaudible) forfeiture    09:21

 2    rule in all of the Mechanical Department agreements.  09:21

 3    And so they would actually -- we don't consider that 09:21

 4    discipline, we consider that terminating the         09:21

 5    employee under the self-executing CBA rule.          09:21

 6        Q.   And that's an agreement within the union;   09:21

 7    right?                                               09:21

 8        A.   Yes.                                        09:21

 9        Q.   And that's not -- I mean, CSX does not      09:21

10    actually make the decision to terminate, so to       09:21

11    speak?                                               09:21

12        A.   Well, it's based on the employee's response 09:21

13    to CSX.                                              09:21

14        Q.   And that's the only they don't notify the   09:21

15    company of a need for medical leave of absence;      09:21

16    right?                                               09:21

17        A.   It's -- it's not just notifying the company 09:21

18    for request for medical leave of absence.  It's a    09:21

19    requirement under our policy.  Under the Medical     09:21

20    Department policy, they are required to keep CSX      09:21

21    notified of their reason for being marked off, and   09:21

22    they have to provide medical documentation to        09:22

23    justify their leave of absence under the policy.     09:22

24        Q.   Do you know what that medical documentation 09:22

25    is?                                                  09:22
```

14

USCA4    1522

Penny Dreher                                                                    May 4, 2021

```
 1        A.   It could be anything between an MB3, a COII    09:22
 2   form.   There is different forms that the Medical        09:22
 3   Department requires.                                     09:22
 4        Q.   And tell me the difference, if you know,       09:22
 5   between you said an MD3 and a COII.                      09:22
 6        A.   It's my understanding, the MD3 form is the     09:22
 7   initial form that would take an employee out of          09:22
 8   service, and then the COII form is an ongoing            09:22
 9   certified illness form, where the doctor goes into       09:22
10   more detail about the treatment.                         09:22
11        Q.   So would every employee who takes a medical    09:22
12   leave of absence need to submit an MD3?   Is that        09:22
13   what it was?                                             09:22
14        A.   Yes, that is required.   And if they do not,   09:22
15   then that's where the self-executing CBA rule comes      09:22
16   into play.                                               09:22
17        Q.   And how are employees informed of these --     09:23
18   of this policy?                                          09:23
19        A.   All the policies are located on CSX            09:23
20   employee gateway for the employees' review, and the      09:23
21   employees are required to know the terms of their        09:23
22   Collective Bargaining Agreement when they initially      09:23
23   start as a new hire.                                     09:23
24        Q.   Okay.   In this case, with the Plaintiffs in   09:23
25   this case, did they submit MD3 forms?                    09:23
```

                                                                    15

USCA4    1523

```
 1        A.   I don't know.                        09:23

 2        Q.   Okay.  That wouldn't go to you?      09:23

 3        A.   No.  It would go to the Medical Department.   09:23

 4        Q.   Okay.  And then after that, they have to   09:23

 5   submit the COII form; right?                   09:23

 6        A.   Yes, that's correct.                 09:23

 7        Q.   And that goes also to the Medical    09:23

 8   Department?                                     09:23

 9        A.   Yes.                                 09:23

10        Q.   Okay.  Now, if an employee is injured and   09:23

11   cannot work, what is the policy or procedure for   09:23

12   providing accommodation to that employee?      09:23

13        A.   I don't know.  I don't know the answer to   09:23

14   that.                                          09:23

15        MS. FOSTER BIRD:  And that is not part of   09:23

16   the topic that she has been designated to discuss.   09:23

17        MR. GARELLA:  Okay.  You know, it's kind of   09:24

18   hard when I don't know what she is here to --   09:24

19        MS. FOSTER BIRD:  I just told you.  It's   09:24

20   discipline and terminating employees who are off   09:24

21   work for medical leave of absence, not accommodating   09:24

22   or reassigning.                                09:24

23   BY MR. GARELLA:                                09:24

24        Q.   With respect to discipline and disciplinary   09:24

25   action against an employee who is off on a medical   09:24
```

                                                    16

USCA4    1524

May 4, 2021

```
 1    leave of absence, is that -- tell me about that        09:24

 2    process.  Is it different from a normal disciplinary   09:24

 3    process?                                               09:24

 4        A.   In that process, there -- there may be        09:24

 5    other people involved.  If the employee is misusing    09:24

 6    FMLA, marking off for medical reason or marking off    09:24

 7    sick, and there is different officers of the company   09:24

 8    that would review the documentation that the           09:24

 9    employee presented.                                    09:24

10         And then once it's been determined that the       09:24

11    employee has misused or fraudulently marked off,       09:24

12    then that's where our IDPAP, our Individual            09:24

13    Accountability Policy would come into play as far as   09:25

14    the type of handling the employee would receive        09:25

15    under the Collective Bargaining Agreement.             09:25

16        Q.   And you said IDPAP?  Say that one more        09:25

17    time.                                                  09:25

18        A.   It's, I-D-P-A-P.                              09:25

19        Q.   And what was that acronym?                    09:25

20        A.   It's -- it's the Individual Development,      09:25

21    Performance and Accountability Policy.                 09:25

22        Q.   Is that a -- kind of a -- it lays out the     09:25

23    discipline for various different violations; is that   09:25

24    fair?                                                  09:25

25        A.   Yeah.  It lays out, if the employee is        09:25
```

                                                                        17

| | | |
|---|---|---|
| 1 | found guilty of certain violations, what the level | 09:25 |
| 2 | of discipline would be based on those violations. | 09:25 |
| 3 | Q.  And at CSX, is there a progressive | 09:25 |
| 4 | discipline policy?  You know, if you get more than | 09:25 |
| 5 | one strike, does that count against you moving | 09:25 |
| 6 | forward? | 09:25 |
| 7 | A.  So if it's a non-major offense, then there | 09:25 |
| 8 | is a progression.  If it's a major offense, then it | 09:25 |
| 9 | could lead to dismissal. | 09:25 |
| 10 | Q.  Is it always if an employee is found guilty | 09:26 |
| 11 | of a major offense?  Is that always dismissal, or | 09:26 |
| 12 | does it just depend? | 09:26 |
| 13 | A.  It depends on the facts and circumstances. | 09:26 |
| 14 | Q.  Okay.  Is there a chart or a way that you | 09:26 |
| 15 | step up with -- in terms of the non-major offenses? | 09:26 |
| 16 | A.  Yes.  It starts at a serious one violation. | 09:26 |
| 17 | It's also internally called a non-major, so either | 09:26 |
| 18 | serious or non-major, and it progresses from one | 09:26 |
| 19 | to three. | 09:26 |
| 20 | Q.  And so what is -- is level -- is a three, | 09:26 |
| 21 | that -- is that when you start looking at | 09:26 |
| 22 | termination? | 09:26 |
| 23 | A.  Yes. | 09:26 |
| 24 | Q.  Okay.  And so in terms of imposing | 09:26 |
| 25 | discipline for an employee who is off of work, are | 09:26 |

18

```
 1   they notified the same way an employee who is still      09:26

 2   working is?                                              09:26

 3       A.   Notifying the employee that they have been      09:26

 4   disciplined?                                             09:26

 5       Q.   That they have been -- for the whole            09:26

 6   process, they have been charged with discipline          09:26

 7   throughout?                                              09:27

 8       A.   Okay.  Yes.  It's always handled to the         09:27

 9   employee in writing to their address on record.          09:27

10       Q.   Okay.  And is the -- is that the same           09:27

11   policy for an employee who is not off work on            09:27

12   medical leave?                                           09:27

13       A.   Yes, it's the same policy, in the same          09:27

14   format that it's done in writing to the current          09:27

15   record of address.                                       09:27

16       Q.   And what about the policy, procedure and        09:27

17   practice for terminating an employee who is off work     09:27

18   on a medical leave of absence; is that any different     09:27

19   than terminating or disciplining an employee who is      09:27

20   not off work?                                            09:27

21       A.   It is the same policy.                          09:27

22       Q.   I think we probably covered that.  We will      09:27

23   talk about Topic No. 11 now, which is:                   09:27

24           "Identify and produce the                        09:27

25            persons most knowledgeable who                  09:27
```

19

| 1 | made the decision or had any | 09:27 |
| 2 | input concerning the decision | 09:27 |
| 3 | to charge, discipline and | 09:27 |
| 4 | terminate Plaintiffs." | 09:27 |
| 5 | Are you ready to speak on that topic today? | 09:27 |
| 6 | A.   Yes, I am. | 09:28 |
| 7 | Q.   And what have you done to prepare yourself | 09:28 |
| 8 | to speak on behalf of CSX Transportation as to | 09:28 |
| 9 | Topic No. 11? | 09:28 |
| 10 | A.   I reviewed documents that were provided in | 09:28 |
| 11 | the discovery.  I have also met with my legal | 09:28 |
| 12 | counsel.  And I reviewed my internal notes and | 09:28 |
| 13 | documents involving some of the cases. | 09:28 |
| 14 | Q.   Do you still have those internal notes? | 09:28 |
| 15 | A.   It's the -- the appeal.  Yes, I do.  It's | 09:28 |
| 16 | the appeal records, NRHDO response to the union's | 09:28 |
| 17 | appeal. | 09:28 |
| 18 | Q.   And are those notes, or are those actual | 09:28 |
| 19 | documents that were mailed out? | 09:28 |
| 20 | A.   Those are actual documents in response to | 09:28 |
| 21 | their claim that -- internally we have an electronic | 09:28 |
| 22 | handling process with our union, so it -- those are | 09:28 |
| 23 | not mailed, those are uploaded into our labor claim | 09:28 |
| 24 | tracking system. | 09:28 |
| 25 | Q.   And so do you have any personal notes with | 09:28 |

20

USCA4    1528

1        IN THE UNITED STATES DISTRICT COURT FOR THE

2             SOUTHERN DISTRICT OF WEST VIRGINIA

3                   AT HUNTINGTON

4

5      - - - - - - - - - - - - x

6    JUSTIN ADKINS, et al.,    :

7              Plaintiffs,     :  Case No.

8      v.                      :  3:18-CV-00321

9    CSX CORPORATION, et al.,  :

10             Defendants.     :

11     - - - - - - - - - - - - x

12

13    30(b)(6) Videotaped Deposition of MACON JONES

14             Conducted Remotely via Zoom

15              Monday, May 17, 2021

16                 8:08 a.m. PST

17

18

19

20

21

22

23    Reported By:

24      AMY L. STRYKER, CCR No. 30XI00226900

25    Job No.:  237387

                                                            1

1             30(b)(6) Videotaped Deposition of MACON

2     JONES, conducted remotely.

3

4

5             Pursuant to notice, before AMY L.

6     STRYKER, Certified Court Reporter and Notary

7     Public of the State of Maryland.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                                2

```
 1              A P P E A R A N C E S
                    (Via Zoom)
 2

 3        For the Plaintiffs:

 4            MORGAN & PAUL, PLLC

 5            BY:  GREGORY G. PAUL, ESQ.

 6            100 First Avenue, Suite 1010

 7            Pittsburgh, Pennsylvania 15222

 8            (844) 374-7200

 9            gregpaul@morganpaul.com

10

11        For the Plaintiffs:

12            UNDERWOOD LAW OFFICE, INC.

13            BY: JOHN PATRICK L. STEPHENS, ESQ.

14            923 Third Avenue

15            Huntington, West Virginia 25701

16            (304) 486-3350

17            munderwood@underwoodlawoffices.com

18

19

20

21

22

23

24

25
```

3

```
 1        A P P E A R A N C E S    C O N T I N U E D
             (Via Zoom)

 2

 3      For the Defendants:

 4          NELSON MULLINS RILEY & SCARBOROUGH LLP

 5          BY: MELISSA FOSTER BIRD, ESQ.

 6          949 Third Avenue, Suite 200

 7          Huntington, West Virginia 25701

 8          (304) 526-3500

 9          melissa.fosterbird@nelsonmullins.com

10

11      Also Present:

12           JASON PATSALIS, VIDEOGRAPHER

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

USCA4    1532

Macon Jones                                                                    May 17, 2021

1                         C O N T E N T S

2

3    EXAMINATION OF MACON JONES              PAGE

4        By Mr. Paul                          7

5                      E X H I B I T S

6               (Attached to transcript.)

7

8    Exhibit 1  Plaintiffs' Amended Notice    34
                of 30(b)(6) Deposition and
9               Request for Production of
                Documents
10
     Exhibit 2  Discipline/termination        67
11              letters to CSX employees

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                                    5

USCA4    1533

Macon Jones                                                      May 17, 2021

 1      Q    Okay.  Any other positions under the         08:22:39

 2   analyst?                                             08:22:40

 3      A    Then there is a specialist underneath        08:22:41

 4   them.                                                08:22:44

 5      Q    What's the difference between the            08:22:44

 6   analyst and a specialist?                            08:22:45

 7      A    One is higher.  It's that intermediate       08:22:47

 8   level between manager and specialist would be        08:22:51

 9   the analyst.                                         08:22:53

10      Q    Okay.  Any other positions that we           08:22:54

11   haven't talked about in Labor Relations?             08:22:56

12      A    No, because there -- we used to have         08:22:57

13   some crafts and clerical employees in Labor          08:23:01

14   Relations, but they're all specialists now,          08:23:04

15   so...                                                08:23:06

16      Q    Okay.  And are those all nonunion            08:23:07

17   positions?                                           08:23:09

18      A    Correct.  I mean, I say that -- you're       08:23:09

19   asking kind of, like, a yes-or-no question and       08:23:13

20   it's a little bit more nuance than that.  We've      08:23:16

21   got a position called a TC manager that --           08:23:19

22   where they still maintain seniority rights, but      08:23:21

23   they are managers.  So it's a little bit of a        08:23:24

24   hybrid kind of position, so I don't want to,         08:23:26

25   like, just say yes or no when it's a little bit      08:23:29

                                                               21

| | | |
|---|---|---|
| 1 | more nuance. | 08:23:32 |
| 2 | Q   Yeah.  No, that's perfect.  And if it's | 08:23:34 |
| 3 | a yes or no, I'll appreciate you answering it, | 08:23:35 |
| 4 | and I'll certainly give you the opportunity you | 08:23:38 |
| 5 | need to explain. | 08:23:40 |
| 6 |     Any other hybrid positions other than | 08:23:41 |
| 7 | that? | 08:23:44 |
| 8 | A   No.  I think that pretty much covers our | 08:23:44 |
| 9 | department. | 08:23:47 |
| 10 | Q   Okay.  Great. | 08:23:47 |
| 11 |     Okay.  And what position did you hold | 08:23:50 |
| 12 | prior to August of 2018? | 08:23:51 |
| 13 | A   Sure.  So when I started, I started in | 08:23:54 |
| 14 | 2015, in September, and I came in as a manager. | 08:23:57 |
| 15 | And then in probably -- it would have been | 08:24:02 |
| 16 | early 2018 I moved into a senior manager | 08:24:04 |
| 17 | position prior to taking this position. | 08:24:08 |
| 18 | Q   And those -- both of those positions, | 08:24:13 |
| 19 | the manager and senior manager, were in Labor | 08:24:17 |
| 20 | Relations? | 08:24:20 |
| 21 | A   Correct. | 08:24:20 |
| 22 | Q   Okay.  And how did your job duties | 08:24:21 |
| 23 | differ, if they did, as a senior manager or | 08:24:25 |
| 24 | manager compared to a director? | 08:24:29 |
| 25 | A   Yeah.  So the senior manager and manager | 08:24:30 |

22

```
 1    role were the core -- was a discipline kind of        08:24:33
 2    case handler, if you will, and when I moved --        08:24:36
 3    the only thing that really changed was I moved        08:24:40
 4    into a leadership management position where I         08:24:42
 5    managed the team who handled discipline cases         08:24:45
 6    in addition to handling a little bit of the           08:24:49
 7    caseload myself.                                      08:24:53
 8        Q    Okay.  Just so we have kind of that          08:24:53
 9    process when it comes to discipline down, can         08:24:55
10    you kind of explain the process of how                08:24:59
11    discipline starts, and then -- I know you             08:25:02
12    mentioned a hearing, and then I think you             08:25:05
13    mentioned some on-property appeals.  But can          08:25:07
14    you kind of walk us through that generically.         08:25:09
15    You know, not specific to any plaintiff, just         08:25:12
16    generically.                                          08:25:15
17        A    Sure.  So once we -- I'll -- first           08:25:15
18    knowledge, once we gain, you know, information,       08:25:18
19    material information that some kind of rule or        08:25:21
20    policy or other bad act has occurred, then that      08:25:26
21    would kick off the collective bargained-for          08:25:30
22    process, which is a hearing, notice, et cetera,      08:25:33
23    et cetera.                                            08:25:35
24        So once we have our first knowledge,              08:25:35
25    depending on the agreement, we would have to         08:25:37
```

23

```
 1    notice the employee or let them know that          08:25:38

 2    they're subject to an investigation for            08:25:40

 3    whatever it is, whatever the facts might be.       08:25:43

 4    So we send a notice or a Charge Letter, is what    08:25:45

 5    some people call it, to the employee.  The next    08:25:48

 6    thing that happens is a hearing.  We have an       08:25:52

 7    investigation where there's -- a transcript is     08:25:54

 8    generated as a result of that, whatever happens    08:25:58

 9    or is said during the hearing.  And that's         08:26:00

10    where the company and the union and employee       08:26:02

11    can put on evidence and witnesses and ask          08:26:05

12    questions of each other, et cetera, et cetera.     08:26:07

13            After that, a transcript and exhibit is    08:26:10

14    generated, and then a decision is made.  And       08:26:12

15    the part that we would come in -- when I say       08:26:16

16    "we"; myself or people on my team -- is that we    08:26:18

17    would also look at that evidence, the              08:26:20

18    transcript and the exhibits, and we would          08:26:24

19    provide some feedback to the business and to       08:26:26

20    the decisionmaker.  But then the decision-         08:26:28

21    maker, which would be a field leader, would        08:26:30

22    decide what level of discipline to assess, if      08:26:32

23    any, based on that record, then a letter would     08:26:35

24    go out.  And that's the front-end discipline       08:26:38

25    process.                                           08:26:41
```

                                                                      24

Macon Jones                                                          May 17, 2021

1           And then at that point the employee          08:26:42

2      would have the opportunity to file a grievance    08:26:44

3      or a claim through their CDA process, which       08:26:46

4      would kick off a whole 'nother kind of lane to    08:26:51

5      challenge the outcome of that discipline.         08:26:54

6           Q    And how many layers of an appeal are    08:26:56

7      there after the decision is made for              08:26:59

8      discipline?                                       08:27:02

9           A    It depends on the agreement.  But most  08:27:02

10     of them it's kind of a -- a one level.  They      08:27:05

11     would appeal it to the HDO level or the highest   08:27:08

12     designated officer level, and the HDO would       08:27:11

13     respond to that.  And the response could be       08:27:13

14     granted, denied, partially granted or denied.     08:27:17

15     And then it would be conferenced; so just a       08:27:20

16     discussion between the union and the company on   08:27:23

17     the case.  And then at that point the union       08:27:26

18     would have the opportunity, if they wanted to,    08:27:29

19     to list it for arbitration for an arbitrator to   08:27:31

20     review the record in an appellate format and      08:27:34

21     then decide whether to uphold the company's       08:27:37

22     decision or, you know, modify it in some way.     08:27:40

23          Q    Okay.  And that labor board process, is 08:27:43

24     it correct to say that that review is limited     08:27:46

25     to the hearing transcript and exhibits that       08:27:49

                                                              25

```
 1   occurred at the hearing?                        08:27:51
 2       A    Yeah.  And anything that would have been   08:27:53
 3   produced by the parties in the on-property     08:27:55
 4   process.  So when the union appeals it, they   08:27:58
 5   can supplement the record.  There's rules      08:28:01
 6   around what's property to be supplemented and  08:28:03
 7   what's not.  But those things, assuming the    08:28:06
 8   rules were followed, then that information     08:28:09
 9   would be included as well.                     08:28:11
10       Q    Okay.  But is that process, you know,    08:28:12
11   starting with the notice or Charge Letter to   08:28:14
12   the hearing on property appeals going all the  08:28:16
13   way up possibly to a labor board, is that      08:28:20
14   review limited to whether there was a violation 08:28:23
15   of the Collective Bargaining Agreement in terms 08:28:27
16   of the discipline?                             08:28:30
17       A    Sorry, could you say that one more time.  08:28:30
18       Q    Sure.  That whole process that you        08:28:34
19   described, starting with the Charge Letter     08:28:36
20   going all the way up to I think what you called 08:28:38
21   arbitration or the public law board, is that   08:28:40
22   another way of calling it that same thing?     08:28:43
23       A    Yes.                                      08:28:45
24       Q    Yeah.  Okay.  That process, is it         08:28:48
25   correct to say that it's limited -- the review, 08:28:49
```

26

| 1 | the appeals are limited to whether there is a | 08:28:51 |
| 2 | violation of the Collective Bargaining | 08:28:54 |
| 3 | Agreement in terms of the discipline? | 08:28:56 |
| 4 | A   The -- I would say that in many cases | 08:28:57 |
| 5 | that's -- the situation is whether there is a | 08:29:05 |
| 6 | violation.  But whether it's a violation | 08:29:06 |
| 7 | oftentimes is a question of fact, and an | 08:29:08 |
| 8 | arbitrator does have the ability to say, Well, | 08:29:12 |
| 9 | I believe this witness even though the company | 08:29:14 |
| 10 | didn't believe them, and make a decision based | 08:29:17 |
| 11 | on the factual determination.  You know, we | 08:29:19 |
| 12 | would say that an arbitration precedent finds | 08:29:21 |
| 13 | that arbitrators are supposed to defer to the | 08:29:24 |
| 14 | factfindings and to the credibility | 08:29:27 |
| 15 | determinations of the company into those | 08:29:30 |
| 16 | investigations.  The arbitrators may or may not | 08:29:32 |
| 17 | do that, and they can make a decision based on | 08:29:36 |
| 18 | fact. | 08:29:39 |
| 19 | Q   Let me ask it a slightly different way. | 08:29:39 |
| 20 | I mean, I think you answered the question, I | 08:29:40 |
| 21 | appreciate that, I just want to ask it a little | 08:29:42 |
| 22 | bit differently.  Is it a correct statement to | 08:29:45 |
| 23 | say that that process of the hearing and the | 08:29:46 |
| 24 | potential arbitration or labor board does not | 08:29:48 |
| 25 | look to see whether there's violations of any | 08:29:51 |

27

| | | |
|---|---|---|
| 1 | state or federal employment laws, for instance? | 08:29:54 |
| 2 | A   No, they're not supposed to. | 08:29:57 |
| 3 | Q   Okay. | 08:30:01 |
| 4 | A   So I would say that's ina- -- that's | 08:30:01 |
| 5 | correct, that's what the arbitrators are | 08:30:02 |
| 6 | supposed to do, is just interpreting the | 08:30:05 |
| 7 | Collective Bargaining Agreement, that's right. | 08:30:07 |
| 8 | Q   Okay.  So -- just so the record's clear, | 08:30:08 |
| 9 | you agree that it is a correct statement that | 08:30:10 |
| 10 | that process leading up to the arbitration does | 08:30:12 |
| 11 | not consider whether there were any violations | 08:30:15 |
| 12 | of state or federal employment law. | 08:30:18 |
| 13 | A   Correct. | 08:30:20 |
| 14 | Q   Okay.  Now, when you said they're not | 08:30:21 |
| 15 | supposed to, I just want -- what do you mean by | 08:30:24 |
| 16 | that? | 08:30:26 |
| 17 | A   Arbitrators consider all kinds of | 08:30:27 |
| 18 | things.  I mean, there's no real recourse if | 08:30:29 |
| 19 | they decide to go outside the bounds of what | 08:30:30 |
| 20 | they're supposed to do, other than to say that | 08:30:35 |
| 21 | they may not get used anymore, because most | 08:30:36 |
| 22 | arbitrators are selected jointly by the | 08:30:40 |
| 23 | parties, by the union and by the company.  So | 08:30:42 |
| 24 | if they go too far off the reservation, then | 08:30:44 |
| 25 | they just wouldn't get picked again. | 08:30:48 |

28

```
 1      A    I don't know that I could speak on that.      08:38:30

 2      Q    Well --                                        08:38:34

 3           (Simultaneous crosstalk -- inaudible.)         

 4      Q    -- on this topic when it says                  08:38:34

 5   "accommodating," what does that mean to you?           08:38:36

 6      A    So accommodating -- like you said, I           08:38:37

 7   think reassigning would be a form of that.  If         08:38:40

 8   you have, say -- and I don't know, I'm just            08:38:44

 9   using an example.  But if you have, like, a            08:38:47

10   clerk or somebody who's covered by a Collective        08:38:49

11   Bargaining Agreement, that there's no impact to        08:38:51

12   seniority, and instead of standing up they need        08:38:53

13   to sit down to work at their computer, for             08:38:55

14   instance, then I don't see how that would              08:38:58

15   create any kinds of headaches.  But that's             08:39:01

16   generally not the case.                                08:39:04

17      Q    Okay.  And I apologize if you answered         08:39:05

18   this.  I just want it to be clear.  So when it         08:39:09

19   comes to, like -- and this is while you're at          08:39:12

20   CSX.  Have you ever had any training or are you        08:39:14

21   aware of any policies, procedures, or practices        08:39:18

22   that would, as a form of an accommodation,             08:39:20

23   provide an employee an approved medical leave          08:39:25

24   of absence?                                            08:39:28

25      A    You're saying the medical leave of            08:39:28
```

37

Macon Jones                                                      May 17, 2021

| | | |
|---|---|---|
| 1 | absence would be the accommodation? | 08:39:30 |
| 2 | Q   That's correct. | 08:39:31 |
| 3 | A   So there are.  So the agreements do talk | 08:39:33 |
| 4 | about absent employees, that they can request | 08:39:35 |
| 5 | and go on leaves of absences and medical leaves | 08:39:38 |
| 6 | of absences; and that is something that | 08:39:41 |
| 7 | employees do. | 08:39:45 |
| 8 | Q   Okay.  It sounds like your knowledge, | 08:39:45 |
| 9 | though, is based upon whatever medical leave of | 08:39:47 |
| 10 | absence is provided for in a Collective | 08:39:51 |
| 11 | Bargaining Agreement; is that right? | 08:39:53 |
| 12 | A   Yes.  I mean, it would be related to the | 08:39:54 |
| 13 | Collective Bargaining Agreements, yes. | 08:39:58 |
| 14 | Q   Okay.  So aside from the Collective | 08:39:59 |
| 15 | Bargaining Agreements, are you aware of any | 08:40:02 |
| 16 | policies, procedures, or practices at CSX on | 08:40:04 |
| 17 | the topic of providing a medical leave of | 08:40:07 |
| 18 | absence as a form of an accommodation under | 08:40:10 |
| 19 | state or federal law? | 08:40:13 |
| 20 | A   No, I can't speak to that. | 08:40:14 |
| 21 | Q   Okay.  Meaning that you're not aware of | 08:40:16 |
| 22 | any policies, procedures, or practices at CSX | 08:40:20 |
| 23 | on that topic? | 08:40:22 |
| 24 | A   That's correct, I'm not aware. | 08:40:24 |
| 25 | Q   Okay.  Have we covered the -- I think we | 08:40:26 |

38

| | | |
|---|---|---|
| 1 | covered accommodating and reassigning.  Is | 08:40:29 |
| 2 | there anything else you wanted to say on those | 08:40:31 |
| 3 | topics? | 08:40:34 |
| 4 |    A   No. | 08:40:34 |
| 5 |    Q   Okay.  The next one is disciplining | 08:40:34 |
| 6 | and/or terminating employees.  So when it comes | 08:40:37 |
| 7 | to the policies, procedures, and practices of | 08:40:40 |
| 8 | disciplining and terminating employees who are | 08:40:43 |
| 9 | off work on a medical leave of absence, was | 08:40:46 |
| 10 | your testimony earlier -- and we can go through | 08:40:51 |
| 11 | it again if we need to -- responsive to that | 08:40:54 |
| 12 | topic when we talked about the notice or Charge | 08:40:56 |
| 13 | Letter, the hearing, the on-property appeal, | 08:41:00 |
| 14 | arbitration or labor board, that process, is | 08:41:04 |
| 15 | that responsive to this topic? | 08:41:08 |
| 16 |    A   Right.  I mean, I think so.  I mean, | 08:41:09 |
| 17 | it's the same process whether you're on a | 08:41:12 |
| 18 | medical leave of absence of not.  I don't -- | 08:41:14 |
| 19 | the medical leave of absence wouldn't have | 08:41:16 |
| 20 | anything to do with it. | 08:41:17 |
| 21 |      If we're going to take disciplinary | 08:41:18 |
| 22 | action against an employee, we would have to | 08:41:21 |
| 23 | follow the collectively bargained-for process | 08:41:23 |
| 24 | either way. | 08:41:26 |
| 25 |    Q   Okay.  No, I appreciate that.  That's | 08:41:27 |

39

| | | |
|---|---|---|
| 1 | helpful. | 08:41:29 |
| 2 | But when I was earlier asking you about | 08:41:29 |
| 3 | your background and we kind of started to get | 08:41:31 |
| 4 | into that process, we really weren't talking | 08:41:33 |
| 5 | about Topic No. 9.  And rather than have you | 08:41:35 |
| 6 | repeat all that, I'm just asking is -- is it | 08:41:37 |
| 7 | your testimony, as a corporate representative, | 08:41:40 |
| 8 | that the policies, procedures, and practices | 08:41:42 |
| 9 | for disciplining and/or terminating employees | 08:41:45 |
| 10 | are what you described at the beginning of this | 08:41:48 |
| 11 | deposition? | 08:41:50 |
| 12 | A   Yes, I would absolutely agree with that. | 08:41:50 |
| 13 | Q   Okay.  Now, we've talked about the | 08:41:53 |
| 14 | respective Collective Bargaining Agreements, | 08:41:58 |
| 15 | but I want to ask you a slightly different | 08:41:59 |
| 16 | question, which is:  Are there any policies, | 08:42:02 |
| 17 | procedures, or practices for disciplining or | 08:42:07 |
| 18 | terminating an employee outside of the | 08:42:09 |
| 19 | Collective Bargaining Agreement such as a | 08:42:10 |
| 20 | discipline or attendance policy, for instance? | 08:42:12 |
| 21 | A   Sure.  So the -- the way I describe it | 08:42:15 |
| 22 | generally is if the process is outlined in the | 08:42:18 |
| 23 | Collective Bargaining Agreement with the | 08:42:21 |
| 24 | substance or the progression, if you will, the | 08:42:22 |
| 25 | level of discipline, those things are | 08:42:26 |

                                                              40

Macon Jones                                                                          May 17, 2021

```
 1        A    No.   There's nothing -- nothing          09:06:43

 2    formalized.   I mean, not that I'm aware of.        09:06:44

 3    Again, if one of the managers has a Post-it         09:06:46

 4    Note stuck somewhere, then they can do it           09:06:49

 5    however they want to, but I'm not privy to          09:06:51

 6    that.                                               09:06:53

 7        Q    No, no, right.   I'm not asking about      09:06:53

 8    that.   I'm asking, like, in Labor Relations are    09:06:55

 9    there any forms -- that could be something like     09:06:58

10    a memo to the file or even just a notebook --       09:07:00

11    that, you know, thoughts are recorded as you're     09:07:03

12    reviewing the transcript and the hearings?          09:07:09

13        A    No, there's nothing.                       09:07:10

14        Q    Okay.                                      09:07:12

15        MS. FOSTER BIRD:   Hey, Greg, we've been        09:07:17

16    going almost an hour.   Can we take five            09:07:19

17    minutes?                                            09:07:21

18        MR. PAUL:   Yeah, absolutely.                   09:07:22

19        MS. FOSTER BIRD:   Okay.                        09:07:23

20        MR. PAUL:   Take a short break.                 09:07:23

21        THE VIDEOGRAPHER:   We're going off the         09:07:24

22    record.   The time is 9:07 a.m.                     09:07:25

23        (Recess was held.)                              09:15:31

24        THE VIDEOGRAPHER:   We're back on the           09:15:31

25    record.   The time is 9:15 a.m.                     09:15:37
```

                                                                                65

USCA4    1546

| | | |
|---|---|---|
| 1 | BY MR. PAUL: | 09:15:41 |
| 2 | Q   All right, great.  We're back on the | 09:15:42 |
| 3 | record after a short break.  We're still | 09:15:44 |
| 4 | looking at No. 11, and I wanted to show you an | 09:15:47 |
| 5 | exhibit we showed earlier. | 09:15:54 |
| 6 | MR. PAUL:  And I guess we will mark it | 09:15:55 |
| 7 | now because it seems important. | 09:15:56 |
| 8 | Q   This is an exhibit of 64 documents that | 09:15:59 |
| 9 | I'll represent are discipline or termination | 09:16:03 |
| 10 | letters for the plaintiffs in this case. | 09:16:06 |
| 11 | Now, in Mr. Abdon's case, which is the | 09:16:11 |
| 12 | document we're looking at now, Bates No. 226, | 09:16:16 |
| 13 | it looks like Mr. Kuhner is the general | 09:16:19 |
| 14 | superintendent.  Is it your understanding that | 09:16:22 |
| 15 | he was the final decisionmaker concerning the | 09:16:24 |
| 16 | discipline of Mr. Abdon? | 09:16:26 |
| 17 | A   Did you intend to put something on the | 09:16:28 |
| 18 | screen or are you just telling me -- | 09:16:30 |
| 19 | Q   I did.  Yeah, I guess I stopped the | 09:16:31 |
| 20 | screen share when we took a break, so sorry | 09:16:34 |
| 21 | about that.  Here you go. | 09:16:36 |
| 22 | All right.  Can you see that? | 09:16:38 |
| 23 | A   Yes. | 09:16:39 |
| 24 | Q   I'll blow that up as well. | 09:16:40 |
| 25 | THE VIDEOGRAPHER:  And we're marking | 09:16:43 |

66

```
 1    this as Exhibit 2?                              09:16:45

 2          MR. PAUL:  Yeah, let's mark this as       09:16:46

 3    Exhibit 2, please.                              09:16:48

 4          (Exhibit 2, Discipline/termination

 5    letters to CSX employees, was marked for

 6    identification and is attached to the

 7    transcript.)

 8    BY MR. PAUL:                                    09:16:50

 9       Q   Okay.  So having now access to look at   09:16:50

10    the exhibit, I'll ask you a question, or do you 09:16:54

11    need more time to review it?                    09:16:56

12       A   No.                                      09:16:58

13       Q   Is it your understanding that -- at      09:16:58

14    least for Mr. Abdon, that Mr. Kuhner was the    09:17:00

15    ultimate decisionmaker?                         09:17:03

16       A   Yes.                                     09:17:04

17       Q   Okay.  And if we go down to the next one 09:17:05

18    which is Mr. Adkins, you previously mentioned   09:17:07

19    Mr. Barr, vice president of mechanical.  Is     09:17:10

20    that -- his name is in the top right corner.    09:17:13

21    Do you see that?                                09:17:16

22       A   Yes.                                     09:17:17

23       Q   So is it your understanding that         09:17:17

24    Mr. Barr was the ultimate decisionmaker for     09:17:19

25    Mr. Adkins?                                     09:17:21
```

                                                               67

```
 1        A    I assume he signed it.  I can't see the      09:17:21

 2    bottom of it.                                          09:17:24

 3        Q    Oh, sorry.                                    09:17:25

 4        A    Yeah, there it is.  Okay.                     09:17:25

 5             Yeah, he would be the decisionmaker for       09:17:26

 6    that employee.                                         09:17:27

 7        Q    And just to be clear, I mean, is it your      09:17:28

 8    understanding that that's -- that Mr. Barr, for        09:17:31

 9    example, in this case of Mr. Adkins, was the           09:17:34

10    actual decisionmaker, not just someone who             09:17:36

11    signed the letter?  Is that correct?                   09:17:39

12        A    Yes, I agree.                                 09:17:41

13        Q    Okay.  And if we were to go through each      09:17:43

14    of these on the representation that these are          09:17:49

15    the actual termination letters, is it correct          09:17:51

16    that it's not just a formality, that whoever           09:17:53

17    signed this letter actually made the decision          09:17:56

18    to terminate the employee?                             09:17:58

19        A    That is the way the process is supposed       09:17:59

20    to work, yes, right.  That's my understanding.         09:18:03

21        Q    And do you have any reason to believe         09:18:05

22    that that process didn't happen with respect to        09:18:07

23    the plaintiffs in this case?                           09:18:09

24        A    I don't have any reason to believe that,      09:18:10

25    no.                                                    09:18:13
```

| | | |
|---|---|---|
| 1 | Q    Okay.  I don't know that we want to make | 09:18:13 |
| 2 | this an exhibit, but I'm going to show it to | 09:18:22 |
| 3 | you, and if counsel disagrees...  The primary | 09:18:25 |
| 4 | reason is it's 2,876 pages long.  But I want to | 09:18:28 |
| 5 | ask you just about the type of documents that | 09:18:32 |
| 6 | may be in here. | 09:18:34 |
| 7 | First off, do you know who Melissa | 09:18:38 |
| 8 | Wheaton is? | 09:18:40 |
| 9 | A    Yes. | 09:18:41 |
| 10 | Q    And have you ever worked with her? | 09:18:42 |
| 11 | A    Yes. | 09:18:44 |
| 12 | Q    And is she with CSX currently? | 09:18:44 |
| 13 | A    No. | 09:18:49 |
| 14 | Q    Do you know when she left? | 09:18:49 |
| 15 | A    Probably early 2018. | 09:18:52 |
| 16 | Q    And do you know why she left? | 09:18:55 |
| 17 | A    She took a job somewhere else. | 09:19:01 |
| 18 | Q    So earlier in the deposition, you know, | 09:19:03 |
| 19 | you kind of explained part of the process in | 09:19:07 |
| 20 | general terms that after a hearing and after | 09:19:11 |
| 21 | the decision to discipline is made, there's an | 09:19:14 |
| 22 | appeal process before the labor board or the | 09:19:18 |
| 23 | arbitration.  Do you remember that? | 09:19:22 |
| 24 | A    Yes. | 09:19:23 |
| 25 | Q    Okay.  And what we're looking at now, is | 09:19:24 |

69