CASE NO. 21-2051

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

JUSTIN ADKINS; JUSTIN BLAKE; EDWIN GLOWACKI; ERIC
JORDAN; KEVIN PALMER; DENNIS SARGENT; TRAVIS
THORNSBERRY; MICHAEL WILLIAMS; JOHN BAKER; JAMES
BLAIN; DEVERY BROWN; JAMES DEAL; JONATHAN JEFFERS;
ROBERT MOSTELLER; MICHAEL L. POTTER; MICHAEL D. POTTER;
JESSEE WALLACE; TIMOTHY WITT; JOHN BILLS; MICHAEL
CLARK; RANDALL CRAYCRAFT; JOHN FRASURE; SAMMY MADDIX;
JAMES STINNETT; TODD THAYER; MICHAEL CAMPBELL; TONY
ABDON; THE ESTATE OF CHAD LITTLE; BRANDON ADKINS;
JACQUELINE MARSHALL; HOMER MAYNARD; SCOTT MORRISON;
JEREMY NAPIER; SHAWN PATTERSON; MATTHEW WOODS; JOHN
CARPENTER; QUINCY CHRISTIAN; GREGORY HAMM;
ETHAN MULLINS; MICHAEL OWENS; JONATHAN ROWE; DANNY
STEWART; LLOYD WILLIAMS; DAVID MANIS; JOSHUA FERGUSON;
ERIC SPEAKS; DONALD STEPHENS; JASON BARKER; CHAD DOWDY;
JERRY FLOCKER; GROVER KELLEY; CHRISTOPHER CLAY
STILTNER; DENNIS HUTCHINSON; JOSHUA HALL; ZACH POTTER;
DEANNA LANHAM; SAMUEL PRESTON; BOBBY AKERS; GERALD
BARBER,

**Plaintiffs – Appellants**

**v.**

CSX TRANSPORTATION, INCORPORATED; CRAIG S. HELIGMAN,
M.D.; GUS THOELE; CURT SHOGREN; MILTON STORM; DELANDO
JONES; TOM DEANGELO; SHAWN LUSK; ELIZABETH CREEDON;
KENNETH RAY EMERSON

**Defendants – Appellees**

———————————

**Appeal from the United States District Court
for the Southern District of West Virginia**

———————————

**JOINT APPENDIX
VOLUME 4 OF 6**

———————————

Jeff R. Dingwall
EIGHT & SAND
750 West Fir Street, Suite 602
San Diego, CA 92101
Tel: (619) 796-3464
Fax: (619) 717-8762
jeff@eightandsandlaw.com

Gregory G. Paul
PAUL LAW OFFICES
100 First Avenue, Suite 1010
Pittsburgh, PA 15222
Tel: (412) 417-5862
Fax: (888) 822-9421
gregpaul@morgan-paul.com

**ATTORNEYS FOR APPELLANTS**

Brian D. Schmalzbach
MCGUIRE WOODS
800 East Canal Street
Richmond, VA 23219
P: 804−775−7873
E:bschmalzbach@mcguirewoods.com

Samuel Lewis Tarry , Jr.
MCGUIRE WOODS
800 East Canal Street
Richmond, VA 23219
P: 804−775−7873
E:starry@mcguirewoods.com

Davis M. Walsh
MCGUIRE WOODS
800 East Canal Street
Richmond, VA 23219
P: 804−775−7873
E: dwalsh@mcguirewoods.com

Kathryn M. Barber
MCGUIRE WOODS
800 East Canal Street
Richmond, VA 23219
P: 804−775−7873
E:kbarber@mcguirewoods.com

Melissa Foster Bird

NELSON MULLINS RILEY &
SCARBOROUGH
P. O. Box 1856
Huntington, WV 25719
P: 304-526-3500
E:melissa.fosterbird@nelsonmullins.com

**ATTORNEYS FOR APPELLEES**

# TABLE OF CONTENTS
## APPENDIX VOLUME 4 OF 6

| ECF # | Description | Page # |
|---|---|---|
| 416-1 | Deposition of Dr. Shannon Johnson, D.C. 5/20/21 | 1551 |
| 416-2 | Deposition of Craig S. Heligman 4/28/21 | 1567 |
| 417-1 | Defendants' Exhibit re: Plaintiffs' Deposition Testimony | 1583 |
| 417-2 | Defendants' Exhibit re: Plaintiffs' OSHA Complaints | 1603 |
| 417-3 | Deposition of Kelly Crouch 5/13/21 | 1620 |
| 417-4 | Defendants' Exhibit re: Collective Bargaining Agreement | 1633 |
| 419-1 | Deposition of Craig S. Heligman 4/29/21 | 1638 |
| 427 | Order Granting in Part and Denying in Part Defendants' Motion to Strike | 1645 |
| 428 | Minute Entry re: Hearing on Plaintiffs' Motion to Compel Discovery 6/19/21 | 1652 |
| | Transcript of Hearing on Plaintiffs' Motion to Compel Discovery 6/19/21 | 1653 |
| 430 | Order on Plaintiffs' Motion to Compel Discovery 7/20/21 | 1685 |
| 436-1 | Defendants' Exhibit: Correspondence re: 30(b)(6) Deposition | 1688 |
| 436-2 | Defendants' Exhibit: Correspondence re: Meet and Confer | 1692 |
| 436-2 | Defendants' Exhibit: Legal Hold Notice | 1694 |
| 439 | Order on Plaintiff's Motion for Partial Summary Judgment and Defendants' Motion for Summary Judgment as to Defamation Claim 7/30/21 | 1696 |
| 440 | Order on Defendants' Motion for Summary Judgment as to Wrongful Discharge, ERISA, Rehab Act, and WVHRA Claims 7/30/21 | 1705 |

| | | |
|---|---|---|
| 441 | Order on Defendants' Motion for Summary Judgment as to Invasion of Privacy Claim 8/2/21 | 1710 |
| 442 | Order on Defendants' Motion for Summary Judgment as to IIED Claim 8/2/21 | 1718 |
| 443 | Order on Defendants' Motion for Summary Judgment as to Tortious Interference Claim 8/2/21 | 1726 |
| 444 | Minute Entry re: Hearing on Motion for Summary Judgment 8/5/21 | 1735 |
| | Transcript of Hearing on Motion for Summary Judgment 8/5/21 | 1736 |
| 445 | Order on Defendants' Motion for Summary Judgment as to Federal Railroad Safety Act Claim 8/10/21 | 1807 |
| 448-1 | Defendants' Exhibit: Correspondence re: 30(b)(6) Deposition | 1816 |
| 448-2 | Defendants' Exhibit: Correspondence re: Supplemental Briefing | 1818 |

Page 1

1        IN THE UNITED STATES DISTRICT COURT

2     FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3              AT HUNTINGTON

4       CIVIL ACTION NO. 3:18-CV-00321

5      HON. JUDGE ROBERT C. CHAMBERS

6

7          JUSTIN ADKINS, ET AL.,

8             Plaintiffs

9

10               V.

11

12       CSX TRANSPORTATION, INC., ET AL.,

13            Defendants

14

15

16

17

18

19

20

21

22  Job No. CS4574707

23  DEPONENT:  DR. SHANNON JOHNSON, D.C.

24  DATE:      MAY 20, 2021

25  REPORTER:  VICTORIA JADICK

Page 2

1                        APPEARANCES

2

3    ON BEHALF OF THE DEFENDANTS, CSX TRANSPORTATION, INC.,

4    Megan Basham Davis

5    Melissa Foster Bird

6    Nelson Mullins Riley & Scarborough LLP

7    949 Third Avenue

8    Suite 200

9    Huntington, West Virginia 25701

10   Telephone No.: (304) 526-3503

11   Facsimile No.: (304) 526-3599

12   E-mail: megan.davis@nelsonmullins.com

13           melissa.fosterbird@nelsonmullins.com

14   (Appeared via videoconference)

15

16   ON BEHALF OF THE PLAINTIFFS, JUSTIN ADKINS,

17   ET AL.:

18   Kenneth R. Reed

19   Kenneth R. Reed, Attorney PSC

20   241 Elm Street

21   Ludlow, Kentucky 41016

22   Telephone No.: (859) 331-4443

23   Facsimile No.: (859) 291-2226

24   E-mail: kenreedatty@gmail.com

25   (Appeared via videoconference)

Page 3

1                    APPEARANCES (CONTINUED)

2

3    AND

4

5    John Patrick L. Stephens

6    Underwood Law Office, Inc.

7    923 Third Avenue

8    Huntington, West Virginia 25701

9    Telephone No.: (304) 522-0508

10   E-mail: pstephens@underwoodlawoffices.com

11   (Appeared via videoconference)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                            INDEX

2                                               Page

3    PROCEEDINGS                                  6

4    DIRECT EXAMINATION BY MS. DAVIS              7

5

6

7                          EXHIBITS

8    Exhibit                                    Page

9    1 - COII Form                              149

10   2 - Letter dated August 20,2017            159

11   3 - Letter dated July 21, 2017             167

12   4 - Off Work Forms                         168

13     [All exhibits CONFIDENTIAL]

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1                          STIPULATION

2

3    The deposition of DR. SHANNON JOHNSON, D.C. was taken at

4    KENTUCKIANA COURT REPORTERS, 730 WEST MAIN STREET, SUITE

5    101, LOUISVILLE, KENTUCKY 40202, via videoconference in

6    which all participants attended remotely, on FRIDAY the

7    21ST day of MAY, 2021 at approximately 9:07 a.m.; said

8    deposition was taken pursuant to the FEDERAL Rules of

9    Civil Procedure. The oath in this matter was sworn

10   remotely pursuant to FRCP 30. It is agreed that VICTORIA

11   JADICK, being a Notary Public and Court Reporter for the

12   State of KENTUCKY, may swear the witness.

13

14

15

16

17

18

19

20

21

22

23

24

25

1  DOTs, and directions, you know?  I do a lot of things

2  under that fedically -- medi -- federal medical

3  examiner's title as well.  So -- but anyway, of -- of

4  that -- my active patients that I'm treating, I think in

5  the past -- and I'm just trying to think back to the

6  past couple of weeks, I think we have four or five

7  people that's off of work right now.

8       Q    Okay.  Have you ever had a period in time

9  where you had a large number of people -- of patients

10  being treated off of work?

11      A    Yes.

12      Q    And what were those periods of time?  Can you

13  remember, like, specific instances?

14      A    Well, we've had -- well, back in -- when the

15  Raceland car shops were open in the early 2000s, I would

16  say that there was several at that time, and it just --

17  it had just had -- up until the railroad quit letting me

18  or quit accepting my paperwork -- that we had several

19  railroaders that would come in to get treated.  But, you

20  know, again, today's climate's different.  The biggest

21  employer we have that's active in this area now is the

22  school system, you know.  So, you know, that's a very --

23  the rail -- the brickyard is in South Shore, it's about

24  a half-hour drive, but I still treat some of them.  But

25  as far as heavy labor, you know, the railroad was the

Page 115

1    biggest employer, and Raceland and Russell have

2    essentially shut down, so I don't -- I don't have a lot

3    of heavy labor patients now.

4        Q    Is Raceland in Greenup County?

5        A    Yes.  And Russell.

6        Q    I thought so.  Okay.

7        A    They're both -- they're both about -- both --

8    let's see, Raceland is about five minutes from my office

9    and Russell's probably less than ten from there -- where

10   the -- they -- the hubs are.

11       Q    So we talked about this number of, like,

12   generally have about five or six patients off at a time

13   currently.  That's your current number.

14       A    Right.

15       Q    Can you remember the maximum amount, like on

16   the -- the greater end of the spectrum, the most people

17   you've had out at once?

18       A    Oh, probably at the -- at the same time,

19   probably in the 20s.

20       Q    In the 20s, and in what time period would that

21   be?

22       A    That was back when -- when the Russell and

23   Raceland was both operational.  I guess Russell's

24   technically still operational, but they don't have very

25   many employees there.

Page 116

1     Q   When did that change?

2     A   Well, it -- it changed primarily when they

3 accused us of fraud and wouldn't allow patients to -- to

4 be here, and --

5     Q   Now, that -- when Russell was operational,

6 when was Russell no longer operational?

7     A   Just in the past couple years.

8     Q   Now, I know that CSX -- you -- I think you

9 testified that CSX wouldn't accept work excuses from you

10 anymore.  Is that right -- is fair that you said that?

11    A   That's -- that's what I was told.

12    Q   Did you ever submit an insurance reimbursement

13 for a CSX patient and the insurance not pay for it?

14    A   Correct.

15    Q   The insurance wouldn't pay for it?

16    A   Correct.  I have sev -

17    Q   Which patient?

18    A   I have several patients that are not on that

19 list and I -- it -- I'm not -- it's HIPAA.  But I have

20 patients that are currently either retired from the

21 railroad or currently still working for the railroad, to

22 come in just for treatment, they've been denied and

23 stated that it's not medically necessary.  And that they

24 had self-employed through the railroad so that -- that

25 comes from the railroad.  So I have several instances

1    when I spoke to the insurance company, they -- we've

2    even ap -- you know, appealed, they wouldn't -- they

3    wouldn't accept them.

4        Q    Well, they -- it sounds like they -- the

5    insurance wasn't accepted because they were finding that

6    the treatment wasn't medically necessary, but it's still

7    --

8        A    A first visit -- well, let's just not get into

9    that because that has nothing to do with what we're

10   talking about here.  But let's just tell you that a

11   patient came in that hadn't been in my office in over

12   two years, it was a spouse of an employee, and they said

13   it was not medically necessary.  They weren't being

14   taken off work, they just came in to get treated.  I had

15   several instances of that that, you know, if we want to

16   go into other things that's not due to today, why we're

17   here, so the railroad has conspired.

18       Q    What insurance agreements -- we do need to go

19   into that, that's directly relevant to this lawsuit.  So

20   what insurance agreements told you that, that they're

21   not medically necessary, what insurance company?

22       A    Aetna.

23       Q    Aetna.  Anyone else?

24       A    No.

25       Q    How many patients has this occurred with?

Page 118

1    A    I can name -- I can think of four, three --
2    three definite, possibly four, just off the top of my
3    head.
4    Q    All right.  Without revealing the name of the
5    patient, can you give me the identificat -- some
6    identificatio -- wow, I can't talk today -- the first
7    patient, was that a CSX employee; a current one?
8    A    One is retired, two are current.  No.  I'm
9    sorry, two are retired, one is current, and one is a
10   spouse.
11   Q    Since 2017, besides those four patients, have
12   you treated any CSX employee or spouse of a CSX
13   employee?
14   A    Yes.
15   Q    How many?
16   A    In three -- in four years?
17   Q    Yes.
18   A    I -- I -- I can't give you an exact number.
19   I've treated a few people that -- I mean, 20 to 25,
20   that's a guess.
21   Q    Did Aetna reimburse you for those charges?
22   A    I'm counting the ones they denied.
23   Q    Okay.  But aside from the four people that we
24   talked about that were denied, there were two retired
25   folks, the current employee, and the spouse.  The

Page 119

1  remaining folks, did Aetna reimburse you for those

2  charges?

3      A    To my knowledge, yes.

4      Q    Yes.  When the insurance company said that

5  those four folks' treatment wasn't medically necessary,

6  what did you do in response?

7      A    We appealed it.

8      Q    What was the result of the appeal?

9      A    Denied.

10     Q    Did the insurance company give you any other

11 information for why they said it was not medically

12 necessary, did they have a code or anything else?

13     A    No, ma'am.  They just said it wasn't medical

14 necessarily.  They said it was reviewed by their medical

15 staff and deemed unnecessary.

16     Q    What kind of treatment were you providing for

17 the first retired individual?

18     A    Same thing that we're just discussing,

19 manipulation, passive modalities, and probably

20 therapeutic as well.  I can't 100 percent say that.

21     Q    What was that retired person's injury or

22 presentation to you?

23     A    I don't know.  I don't have the records in

24 front of me.

25     Q    Okay.  What about the second retired person,

Page 120

1    what kind of treatment did you do -- perform on the

2    second retired person?

3         A    The typical chiropractic --

4              MR. REED:  Objection.  Can you hear me now?

5              THE WITNESS:  Yes.  Yes.

6              MR. REED:  You're getting into things about

7         that can specifically identify that -- and I

8         understand about plaintiff's waiver -- but these

9         other patients haven't waived anything.  So I think

10        you've got enough to understand the circumstances,

11        so I'm going to -- I'm going to ask you, you know,

12        either to move on, or quit getting into so much

13        detail because it can be identified from the types

14        of treatment and the fact that the -- this -- and it

15        -- this got nothing to do with the case, so --

16             MS. DAVIS:  Respectfully, Ken, I'm going to

17        disagree with you.  I -- this isn't any personal

18        identifiable information.  Are you instructing --

19             MR. REED:  It is too, when you are talking

20        about conditions and treatment, it -- absolutely is

21        -- it is absolutely is.

22             MS. DAVIS:  Are you instructing your client not

23        to answer?

24             MR. REED:  I meant that particular question

25        about specific treatment, yes.  I'm telling him not

Page 121

1      to answer that.

2    BY MS. DAVIS:

3      Q    Without revealing any personally identifiable

4    information, is there anything else that you can tell me

5    about the other four patients' treatments?

6      A    Other than the fact that they had -- two of

7    them were treated one time and the other two were

8    treated, maybe, three times.  And they were deemed

9    medically nec -- unnecessary.

10     Q    And were you performing those same modalities

11   that we talked about, the exercise, the therapy, the --

12     A    No.  I can't answer that.  I don't have the

13   records in front of me.

14     Q    So besides those four patients, every other

15   CSX employee or spouse of a CSX employee that you've

16   treated has been reimbursed by the insurance company?

17     A    I can't answer that.  I don't know.

18     Q    Have you received any correspondence from the

19   insurance company with regard to any of the remaining

20   patients refusing to pay for treatment?

21     A    I can't answer that.  I don't know that 100

22   percent.  I can't say --

23     Q    Are you --

24     A    -- yes or no.

25     Q    -- are you presently aware of any that you can

Page 163

1    don't recall who asked for the letters, but I do
2    remember doing them.
3         Q    Did you speak with Mr. Giuliano?
4         A    I don't recall.
5         Q    Have you ever spoken with any union members
6    about the CSX employees who were fired?
7         A    I -- I don't know if anyone ever called me
8    prior to their hearings and asked for if there's any
9    information or not.  If they did, I mean, it would --
10   you know, I wouldn't say that I'll be shocked.  But,
11   again, that's four years ago and to be honest with you,
12   I don't recall if -- if I spoke to anyone on their
13   behalf.  Obviously I spoke to someone, whether it was
14   the patient or a representative in order to get the
15   names to do the letters.  And I did do all these myself,
16   so --
17        Q    Did anyone give you an outline or a draft of
18   what the letter should say?
19        A    No, ma'am.  That's a brief narrative.  That's
20   my writing.  You can look at any brief narrative I write
21   for any patient and that would be very, very similar.
22        Q    And -- so I just want to cover for the record,
23   why was it that you wrote this?  Why did you feel this
24   was warranted?
25        A    They were going into a hearing with CSX

Page 164

1   because they had been dismissed from their job and

2   stating they had fraudulently went off work.  This is

3   the only information you -- you guys -- oh, I'm saying

4   you guys.  CSX let them go based on that information on

5   that first exhibit you showed me, which told nothing of

6   how it happened.  So this explained how it happened.

7   This explained where they were, and this explained why

8   they were off work.  The other one was just a form that

9   sends it in to CSX.  Again, I want to reiterate that all

10  these patients that were dismissed and told they could

11  no longer come to me for their care -- ongoing care and

12  ongoing -- when they -- when they found another doctor,

13  every one, 100 percent, were -- continued off work based

14  on the same information.  So every doctor, medical

15  doctor, chiropractor, whatever, agreed with me.  So this

16  information is -- is accurate.

17      Q    How do you know that?

18      A    What do you mean, how do I know that?

19      Q    How do you know that it's accurate?

20      A    Because the patients -- most of the patients

21  who went to medical doctors, medical doctors told them

22  to come back to me for their care and I continued their

23  treatment.  It doesn't matter -- it doesn't matter if

24  I'm -- I'm going to treat my patient regardless of

25  whether CSX takes the paperwork from me or not.  If

Page 165

1    they're hurt, I'm going to treat them.  That's my job,

2    just like your job's to represent someone.  So I don't

3    care how that's done.  I was doing right, and I continue

4    to do right.  That's just like I still treat some

5    patients that have long since retired from the railroad.

6    They were hurt, and, you know, I still treat them on

7    occasion.  And most of the time it's due to a flare-up

8    of something that happened 15 years -- that I treated

9    way back then.  You know, what's -- what's --

10       Q    How do you -- sorry.

11       A    I'm going to -- now, you're -- you're --

12    you're -- you're correct.  I mean, you're trying to

13    catch me with my -- me saying, I'm absolutely,

14    positively, 100 percent.  But to my knowledge, every

15    patient that I treated, no -- no one was told that I had

16    done something wrong.

17       Q    How do you know that all these patients were

18    kept off of work?

19       A    That's what I'm saying.  If you're catching me

20    saying all of them, I can't 100 percent say that.  But,

21    to my knowledge, every patient was -- they substantiated

22    what I said and what I was doing.

23       Q    And what is that knowledge based on?

24       A    Well, some of them were because they were

25    still patients.

1            IN THE UNITED STATES DISTRICT COURT FOR THE

2                SOUTHERN DISTRICT OF WEST VIRGINIA

3                        AT HUNTINGTON

4

5    _____
                                    )
6    JUSTIN ADKINS, et al.,         )
                                    )
7              Plaintiffs,          )
                                    ) Case No.
8          -vs                      ) 3:18-CV-00321
                                    )
9    CSX CORPORATION, et al.,       )
                                    )
10             Defendants.          )
                                    )
11

12

13

14   VIDEOTAPED DEPOSITION OF CRAIG HELIGMAN, M.D., VOLUME

15   I, conducted remotely by Laura L. Maes, CSR No. 9836,

16   on behalf of the Plaintiffs, commencing at the hour

17   of 7:03 a.m. on Wednesday, April 28, 2021.

18

19

20

21

22

23

24

25

                                                              2

Craig Heligman, M.D.                                                    April 28, 2021

```
 1    APPEARANCES:  (VIA ZOOM)

 2

      For the Plaintiffs:
 3
          EIGHT & SAND
 4        BY:  JEFF R. DINGWALL, (Pro Hac Vice)
          550 West B Street, Fourth Floor
 5        San Diego, California 92101
          619.796.3464
 6        jeff@eightandsandlaw.com

 7

      For the Plaintiffs:
 8
          GARELLA LAW, P.C.
 9        BY:  C. KIEL GARELLA, ESQ. (Pro Hac Vice)
          409 East Boulevard
10        Charlotte, North Carolina 28303
          980.321.7934
11        kiel@gljustice.com

12

13    For the Plaintiffs:

14        MORGAN & PAUL, PLLC
          BY:  GREGORY G. PAUL, ESQ.
15        100 First Avenue, Suite 1010
          Pittsburgh, Pennsylvania 15222
16        844.374.7200
          gregpaul@morganpaul.com

17

18    For the Plaintiffs:

19        UNDERWOOD LAW OFFICE, INC.
          BY:  JOHN PATRICK L. STEPHENS, ESQ.
20        923 Third Avenue
          Huntington, West Virginia 25701
21        304.486.3350

22

23

24

25
```

                                                                            3

USCA4    1568

Craig Heligman, M.D.                                                    April 28, 2021

```
 1    For the Defendants:

 2         NELSON, MULLINS, RILEY & SCARBOROUGH, LLP
           BY:  MELISSA FOSTER BIRD, ESQ.
 3         949 Third Avenue, Suite 200
           Huntington, West Virginia 25701
 4         304.526.3500
           melissa.fosterbird@nelsonmullins.com
 5

 6

 7    Also present:

 8         KYLE LOSKAMP, VIDEOGRAPHER

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

USCA4    1569

Craig Heligman, M.D.                                                    April 28, 2021

1                              I N D E X

2

3    WITNESS

4      CRAIG HELIGMAN, M.D.

5

6    EXAMINATION                                          PAGE

7      MR. DINGWALL                                         7

8      MR. PAUL                                           187

9                        E X H I B I T S

10                                                        PAGE

11    Exhibit 1    Second Amended Notice of              10
                   Deposition of Craig S. Heligman
12
      Exhibit 2    Three Letters to William Fergus       62
13                 with attachments

14    Exhibit 3    9/20/2017 Letter from Dr.             95
                   Heligman
15
      Exhibit 4    ACA Choosing Wisely Document         110
16

17    Exhibit 5    9/23/2017 Letter from Dr.            122
                   Heligman
18
      Exhibit 6    E-mail with Attachments -            126
19                 CSXT(Adkins)022527-556

20    Exhibit 7    Certification of Ongoing             241
                   Illness or Injury Forms
21                 (CONFIDENTIAL)

22

23

24

25

                                                                5

USCA4   1570

Craig Heligman, M.D.                                          April 28, 2021

```
 1    of each one of them.  If there's one you'd like me      07:13
 2    to look at, I'm happy to do so.                          07:13
 3        Q.   Going back to the Charge Letter, it states      07:13
 4    that information received from the Chief Medical         07:13
 5    Officer on July 14th, 2017, quote:                       07:13
 6              "That you were dishonest and                   07:14
 7               attempted to defraud the                      07:14
 8               company and/or benefits                       07:14
 9               providers when you, as well as                07:14
10               more than 50 other craft                      07:14
11               employees, submitted                          07:14
12               potentially fraudulent                        07:14
13               documentation."                               07:14
14          Is that right?                                     07:14
15        A.   I believe that's generally the language.        07:14
16    If you have a copy for me to look at, I'm happy to       07:14
17    confirm it.                                              07:14
18        Q.   Okay.  Was it your opinion as of July 14th,     07:14
19    2017, that the plaintiffs in this case were             07:14
20    dishonest?                                               07:14
21        A.   It was my opinion at the time that there        07:14
22    was some potential for that, yes, but did I know,       07:14
23    no.                                                      07:14
24        Q.   Okay.  Was it your opinion as of July 14th,     07:14
25    2017, that the plaintiffs in this case attempted to      07:14
```

17

```
 1   defraud the company?                              07:14

 2        A.   I'm sorry.  Could you restate that one more  07:15

 3   time?                                             07:15

 4        Q.   Yes.                                    07:15

 5             Was it your opinion as July 14th, 2017,  07:15

 6   that the plaintiffs in this case had attempted to  07:15

 7   defraud the company?                              07:15

 8        A.   No, it was my opinion that there was that  07:15

 9   possibility.  It was the responsibility of the   07:15

10   investigation and hearing process to determine what  07:15

11   the facts were in the case and make a decision upon  07:15

12   completion of those investigations.              07:15

13        Q.   Was it your opinion as of July 14th, 2017,  07:15

14   that the plaintiffs in this case attempted to    07:15

15   defraud benefits providers?                      07:15

16        A.   Again, I thought there was potential for  07:15

17   that.  However, it was the responsibility, following  07:15

18   the process and procedures of the investigation and  07:15

19   hearing, for others to make the determination as to  07:15

20   the guilt or innocence according to the charges.  07:15

21        Q.   And was it your opinion as of July 14th,  07:15

22   2017, that the plaintiffs in this case submitted  07:16

23   potentially fraudulent documentation?            07:16

24        A.   I feel that it was potentially that way.  07:16

25   The documents themselves I don't believe were    07:16
```

                                                              18

Craig Heligman, M.D.                                      April 28, 2021

```
 1   actually fraudulent.  I believe some of the          07:16
 2   information presented in those documents could have  07:16
 3   led us down that pathway.                            07:16
 4       Q.   What specific information in the documents  07:16
 5   could have led us down the pathway of fraudulent     07:16
 6   documentation?                                       07:16
 7       A.   We had somewhere around 70 individuals from 07:16
 8   two different chiropractic providers.  The           07:16
 9   information on each and every one of those forms was 07:16
10   very similar.  The time period in which the          07:16
11   providers were approving or certifying absence time  07:17
12   or disability periods were pretty much the same.     07:17
13          And so the consistency of a large number of   07:17
14   cases or the information on these forms for these    07:17
15   individual cases that were presented really within a 07:17
16   very short time period was the concern.  And it was  07:17
17   the pattern of information at the time that we        07:17
18   received it that was concerning, not necessarily     07:17
19   what was on any -- any one document.                 07:17
20       Q.   Okay.  Other than -- I'm sorry.  And I'll   07:17
21   back up for a second.                                07:17
22          You stated that the information that you      07:17
23   provided on July 14th, 2017, was a collection of     07:17
24   Certificate of Ongoing Illness or Injury documents;  07:17
25   is that right?                                        07:17
```

19

Craig Heligman, M.D.                                              April 28, 2021

```
 1        A.   Yes.                                    07:17

 2        Q.   And you provided those documents to the Law  07:17

 3   Department and to the Labor Relations team; is that  07:17

 4   right?                                            07:18

 5        A.   I first provided it to the Law Department,  07:18

 6   and then I believe it was transferred over to Labor  07:18

 7   Relations.                                        07:18

 8        Q.   What caused you to provide that information  07:18

 9   to the Law Department?                            07:18

10        A.   At that time period, we had received -- I  07:18

11   think it was 20 or 21 of those forms all in the same  07:18

12   day, and that was very unusual.  We actually receive  07:18

13   quite a large number of documents every day of the  07:18

14   week, and to have 20 or more forms provided from one  07:18

15   practitioner or one geographical area in one day,  07:18

16   that's pretty unusual.  In fact, I've never        07:18

17   experienced that at CSX or prior to my work at CSX.  07:18

18        Q.   And so was it the number of forms that you  07:18

19   received that caused you to contact the Law        07:18

20   Department?                                       07:18

21        A.   Not the number, but the combination of    07:19

22   factors -- the large number, the location, and     07:19

23   specifically to limited to two practitioners.  So  07:19

24   it's that combination of common practitioners,     07:19

25   common date or common time period, and common      07:19
```

                                                           20

Craig Heligman, M.D.                                              April 28, 2021

```
 1   documents that we received all at once.  Very, very   07:19

 2   unusual set of circumstances.                         07:19

 3        As time progressed from that first             07:19

 4   collection, I asked our team to continue to collect   07:19

 5   them to see if there was any additional pattern, and  07:19

 6   when we started receiving a large number of them      07:19

 7   over the next few weeks is when I presented that to   07:19

 8   the Law Department and asked their opinion if there   07:19

 9   was anything we needed to do further with this        07:19

10   information.                                          07:19

11   Q.   What was your first -- when was your first       07:19

12   contact with the Law Department regarding these COII  07:19

13   forms?                                                07:20

14   A.   I actually don't recall a specific date.         07:20

15   It would have been towards the end of June of 2017.   07:20

16   Q.   And is there any way for you to determine        07:20

17   when your first contact was with the Law Department?  07:20

18   A.   No.                                              07:20

19   Q.   There's -- you have no way of tracking           07:20

20   whether you sent an e-mail or sent these documents    07:20

21   in hard copy to the Law Department?                   07:20

22   A.   You would have to check with our                 07:20

23   document -- the records-keeping department.  They     07:20

24   would be able to track that down.  As I said, I       07:20

25   don't remember if it was something I carried to the   07:20
```

21

Craig Heligman, M.D.                                                                April 28, 2021

```
 1   Law Department.  That's probably the more likely        07:20
 2   scenario, but I wouldn't rule out having sent them       07:20
 3   by e-mail.                                               07:20
 4       Q.   Who specifically in the Law Department did     07:20
 5   you contact?                                             07:20
 6       A.   I contacted our employment attorney.           07:20
 7       Q.   And who is that?                               07:20
 8       A.   Michael Burns.                                 07:20
 9       Q.   Did you receive any guidance from             07:20
10   Mr. Burns?                                               07:21
11            MS. FOSTER BIRD:  I'm going to object here     07:21
12   to attorney/client privilege for any conversations      07:21
13   that were held between Dr. Heligman and Mr. Burns,       07:21
14   including any legal advice or recommendations that       07:21
15   were given.                                              07:21
16   BY MR. DINGWALL:                                         07:21
17       Q.   And I don't want to know the substance of     07:21
18   any conversations you had with Mr. Burns.  I'm just      07:21
19   asking whether he provided you with any guidance.        07:21
20            MS. FOSTER BIRD:  That's what -- beyond a      07:21
21   "Yes" or a "No" answer, I would object.                  07:21
22            THE WITNESS:  He did provide guidance.         07:21
23   BY MR. DINGWALL:                                         07:21
24       Q.   And at some point, I believe, you stated      07:21
25   that the matter was referred from the Law Department     07:21
```

22

Craig Heligman, M.D.                                          April 28, 2021

| | | |
|---|---|---|
| 1 | to the Labor Relations team; is that right? | 07:21 |
| 2 | A.   That's my recollection, yes. | 07:21 |
| 3 | Q.   And do you know when that occurred? | 07:21 |
| 4 | A.   I do not know the specific date. | 07:21 |
| 5 | Q.   How did you become aware that the matter | 07:22 |
| 6 | was referred from the Law Department to the Labor | 07:22 |
| 7 | Relations team? | 07:22 |
| 8 | A.   When someone from Labor Relations contacted | 07:22 |
| 9 | me to request additional information. | 07:22 |
| 10 | Q.   And who was it on the Labor Relations team | 07:22 |
| 11 | that contacted you? | 07:22 |
| 12 | A.   I think it was Penny Dreher that was the | 07:22 |
| 13 | first person that contacted me.  She was the | 07:22 |
| 14 | individual that was managing the administration | 07:22 |
| 15 | process for all these cases. | 07:22 |
| 16 | Q.   Do you know Ms. Dreher's title, or at the | 07:22 |
| 17 | time did you know her title? | 07:22 |
| 18 | A.   I don't recall, no. | 07:22 |
| 19 | Q.   Do you recall when she first contacted you? | 07:22 |
| 20 | A.   No, I do not. | 07:22 |
| 21 | Q.   Is that something you could find out? | 07:22 |
| 22 | A.   I don't know.  Again, I don't have ability | 07:22 |
| 23 | to look in my e-mails that long ago.  I guess I | 07:23 |
| 24 | could ask Ms. Dreher if she remembers, but that's | 07:23 |
| 25 | the only way I could do it. | 07:23 |

23

Craig Heligman, M.D.                                                April 28, 2021

```
 1        Q.   Do you know if she contacted you by phone    07:23

 2   or by e-mail or in person?                             07:23

 3        A.   It would either have been by e-mail or       07:23

 4   telephone.  It was not in person for the first         07:23

 5   contact.                                               07:23

 6        Q.   In your handling of these cases involving    07:23

 7   the COII forms in 2017, did you keep any records of    07:23

 8   your communications with either the Law Department     07:23

 9   or the Labor Relations team?                           07:23

10        A.   No.                                          07:23

11        Q.   Is that your practice generally not to keep  07:23

12   records of communications regarding potentially        07:23

13   fraudulent activity?                                   07:23

14        A.   We have retention rules on our e-mails, and  07:23

15   there was no reason for me to retain any e-mails.      07:23

16   We don't record our phone calls.  We don't record     07:24

17   chat.  So it's my practice not to retain any of them   07:24

18   unless I'm made aware of a legal reason to do so.      07:24

19             And then as I stated previously, it's        07:24

20   our -- we have a department that goes back and does    07:24

21   the review on all the retained e-mails.  I don't do    07:24

22   that, and I don't have access to that information so   07:24

23   far or so long ago.                                    07:24

24        Q.   At any point from June 2017 to the present,  07:24

25   have you ever been advised to retain documents or      07:24
```

                                                                    24

Craig Heligman, M.D.                                                    April 28, 2021

```
 1    seemed to occur consistent with times when there may   08:26
 2    have been reduced work and individuals were            08:26
 3    furloughed for a short time.  Potentially it was for   08:26
 4    work injuries, but the timing of -- so the kind of     08:26
 5    things that Dr. Johnson and Dr. Carey were endorsing   08:26
 6    were the same things that we saw in 2017, just not     08:26
 7    in the same volume and not all at the same time.       08:26
 8          So it was really -- there was no -- there        08:26
 9    was consistency with how we received information.      08:26
10    Was this person potentially extending time off?       08:26
11    Well, not anymore, or less than perhaps other          08:26
12    providers and other employees have in the past from   08:27
13    time to time.                                          08:27
14          So we had concerns, but there wasn't             08:27
15    anything that we could say was clearly concerning      08:27
16    that we needed to look into it further.                08:27
17      Q.    Did you ever document those concerns?         08:27
18      A.    No, sir.                                       08:27
19      Q.    Did you ever contact Dr. Carey or             08:27
20    Dr. Johnson to discuss your concerns with them?       08:27
21      A.    I attempted to contact Dr. Johnson on one     08:27
22    occasion.                                              08:27
23      Q.    And when was that?                             08:27
24      A.    It was either -- it was earlier in 2017, or   08:27
25    it could have been 2016.  I don't remember the exact  08:27
```

65

USCA4    1579

Craig Heligman, M.D.                                          April 28, 2021

```
 1   date.                                           08:27

 2       Q.   And was it prior to you sending this letter  08:27

 3   to Mr. Fergus on July 14th, 2017?               08:27

 4       A.   My recollection had nothing to do with this  08:27

 5   incident that we're discussing today.           08:27

 6       Q.   Okay.  And did you, in fact, talk to   08:27

 7   Dr. Johnson?                                     08:27

 8       A.   No.                                     08:28

 9       Q.   Did you ever send a letter or an e-mail to  08:28

10   Dr. Johnson letting him know that you'd like to  08:28

11   speak with him?                                 08:28

12       A.   No.                                     08:28

13       Q.   And what about Dr. Carey?              08:28

14       A.   No.                                     08:28

15       Q.   Did you ever contact any of the employees  08:28

16   prior to July of 2017 who treated with Dr. Carey or  08:28

17   Dr. Johnson to let them know you had concerns?  08:28

18       A.   No.                                     08:28

19       Q.   So your -- the suspicions that you refer to  08:28

20   in this letter to Mr. Fergus on July 14th, 2017,  08:28

21   were anecdotal; is that right?                 08:28

22       A.   Yes, that's correct.                  08:28

23       Q.   Okay.  And you also refer in this letter to  08:28

24   patterns that were clearly fraudulent; is that  08:28

25   right?                                          08:29
```

                                                          66

Craig Heligman, M.D.                                                    April 28, 2021

```
 1        A.   I said we were not able to identify      08:29

 2   patterns that were clearly fraudulent.            08:29

 3        Q.   So in making that statement, was it -- were  08:29

 4   you communicating to Mr. Fergus that you now      08:29

 5   believed you did have a pattern that was clearly  08:29

 6   fraudulent?                                       08:29

 7        A.   I was, again, identifying that there was a  08:29

 8   pattern that was of concern that had the potential  08:29

 9   for fraudulent behavior, and I was asking -- I was  08:29

10   notifying Mr. Fergus to make the determination as to  08:29

11   whether or not it meant -- or it met their        08:29

12   definition of fraudulent behavior for the purposes  08:29

13   of administering the RRB benefits.                08:29

14        Q.   And you understood that you sending this  08:29

15   letter to Mr. Fergus had the potential of causing  08:29

16   the Railroad Retirement Board to deny benefits to  08:30

17   the employees in question; right?                 08:30

18        A.   There was that potential, yes.          08:30

19        Q.   Okay.  And you understood that when you  08:30

20   sent this letter?                                 08:30

21        A.   Yes, I did.                             08:30

22        Q.   And you wrote this letter in -- and     08:30

23   provided your professional medical opinions;      08:30

24   correct?                                          08:30

25        A.   I provided my opinions.                 08:30
```

                                                              67

```
 1       Q.    Your professional medical opinion; correct?    08:30
 2       A.    The medical opinion was -- as I stated         08:30
 3  there, in my professional medical opinion -- that         08:30
 4  the providers continued to keep employees off work        08:30
 5  for much longer than is medically appropriate.  That      08:30
 6  was my medical opinion.                                   08:30
 7       Q.    Okay.  What was the basis for your medical     08:30
 8  opinion that you provided to Mr. Fergus?                  08:30
 9       A.    The time period in which the employees had     08:30
10  remained off work for relatively minor                    08:30
11  musculoskeletal conditions.  I've been a practicing       08:30
12  physician for over 30 years now, and they also            08:31
13  exceeded the general guidelines from the major            08:31
14  references that discuss expectations for disability,      08:31
15  periods of times for various medical conditions.          08:31
16           In this case, the time periods were              08:31
17  significantly in excess of what my clinical               08:31
18  experience was as well as the medical references          08:31
19  that are published.                                       08:31
20       Q.    You conclude your letter to Mr. Fergus on      08:31
21  Page 2 of Exhibit 2 by, quote, saying:                    08:31
22               "I strongly urge you to fully                08:31
23                 investigate all of these cases             08:31
24                 for potential conspiracy to                08:31
25                 defraud RRB sickness and                   08:31
```

68

**EXHIBIT 1**

| Plaintiff | Citation | Testimony |
|---|---|---|
| Abdon, Tony L. (ECF No. 356-6) | 66:16-22 | "Did you ever report any safety concerns at CSX?<br><br>**I have reported safety concerns. It usually involved high weeds or mud puddles or loose boards on walkways, things like that.**<br><br>Can you recall when the last time it was that you reported a safety concern?<br><br>**I cannot give you an exact time.**" |
| Adkins, Brandon S. (ECF No. 356-7) | 38:1-11 | ". . . **if I felt an injury occurred. And then they would write then immediately, you know, take me probably upstairs to that manager's office. And then that's when the questioning and --- and all of those --- that type of things, you know, would occu**r.<br><br>But that never happened to you. Right?<br><br>**No, ma'am. No, no, no. No, you just asked the question on, you know, how they handled the injuries and different things like that . . .** " |
| Adkins, Justin R. (ECF No. 356-8) | 113:9-22 | "**I know – I do know that if you occurred an injury, it was policy to report that injury promptly. But I was never made aware that if you had a discomfort --- I was aware that if you got a cut, something hurt, you know, that you were doing something and, man, it started hurting, you to go report this promptly, preferably immediately. But as far as aches and pains, I was not aware of that being a rule, as to, hey, if you got aches and pains, you got to tell them. I was not aware of that.**<br><br>In any event, you did not report those things to CSX on a TIIA or any other way. Is that right?<br><br>**No ma'am, I did not report it.**" |
| Akers, Bobby D. (ECF No. 356-9) | 34:20-24–35:1-5 | "Did you ever report a safety concern while you were employed by CSX?<br><br>Yes.<br><br>What safety concern did you report?<br><br>**I can't remember exactly. You just – if they asked you something safety-wise you would tell them. I consider that reporting.** |

| | | Do you recall any specific circumstance that you reported? |
|---|---|---|
| | | **No.**" |
| | 38:7-19 | "Did you ever experience any on the job injury while you were employed with CSX? |
| | | **None that I ever knew. None that I reported.** |
| | | Is the only on the job injury that you can recall the time that you heard back for the job where you were working for the steel place? |
| | | **Yeah. Now, are you talking just an injury at the time or the repetitive motion injuries?** |
| | | . . . |
| | | **Now, the repetitive motion I would consider that an injury.**" |
| | 117:7-21. | "And earlier you stated that you were never injured on the job. Correct? |
| | | **To the best of my knowledge I haven't had any.** |
| | | You never reported any on the job injury to CSX. Correct? |
| | | **Other than that of the movement.** |
| | | Just like the general movement you talked about earlier. |
| | | **Right.** |
| | | But did you ever report any condition to CSX resulting from that movement? |
| | | **Not to my knowledge. I don't think I've ever, anything written.**" |
| Baker, John R. (ECF No. 356-10) | 39:10-12 | "Have you ever reported a safety concern while at CSX? |
| | | **No.**" |
| | 41:14-16 | "Did you ever report any of these aches and pains to CSX prior to the day of your accident? |

|  |  |  |
|---|---|---|
|  |  | No." |
|  | 102:12-14 | "Did you ever report any work-related injuries while at CSX?<br><br>**No.**" |
| Barber, Gerald P.<br>(ECF No. 356-11) | 40:1-8 | "Did you ever experience any accidents or injuries at work after you hired in?<br><br>**Just typical, you know, little burns and things that you get from welding. Nothing reportable.**<br><br>Minor things?<br><br>**Yes.**<br><br>And you never had to report any injuries?<br><br>**No.**" |
|  | 49:16-24-<br>50:1-7 | "**I don't know. It's just the stress of the job. You're always pushing, and pulling, and running riveters and them impact wrenches, all different kids of things besides just burning and welding. So after a while, it wears everything out.**<br><br>You don't have one specific accident that caused that injury?<br><br>**No.**<br><br>Did you ever report any wear and tear to the railroad?<br><br>**I don't have a clue. You'd have to ask them that.**<br><br>No, no. Did you ever report your back hurting to the railroad?<br><br>**No. I liked my job, I wanted to stay there. I suffered through it.**" |
| Barker, Jason A.<br>(ECF No. 356-12) | 32:9-10 | "Have you ever reported a safety concern at CSX?<br><br>**Not that I can recall.**"<br><br>*discussing Summer 2017 having chronic neck pain* |
|  | 36:17-23 | "And you started experiencing that pain after your car wreck? |

| | | |
|---|---|---|
| | 89:19-24 | **Yes. I would say --- well, yeah. I mean, it gradually got worse.**<br><br>Did you ever report that to anybody at work?<br><br>**I'm just trying to remember. I don't believe so.**"<br><br>"Were you ever injured on the job other than what we've already talked about?<br><br>**No, I've never had an injury with CSX.**<br><br>Did you ever report any work-related injuries while at CSX?<br><br>**No.**" |
| Bills, John W.<br>(ECF No. 356-13) | 30:6-8<br><br><br>96:12-13 | "Do you ever remember filing any written reports regarding any safety concern?<br><br>**No, sir, not that I remember.**"<br><br>". . . I have reported safety concerns to the safety committee, I'm sure, numerous times.**" |
| Blake, Justin A.<br>(ECF No. 356-15) | 39:9-11<br><br><br>117:16-19 | "Have you ever reported a safety concern while you were employed at CSX?<br><br>**No.**"<br><br>"And so you've never reported any work-related injuries while at CSX.<br><br>Correct?<br><br>**Correct.**" |
| Brown, Devery E.<br>(ECF No. 356-16) | 38:2-9 | "Have you ever reported a safety concern at CSX?<br><br>**Many.**<br><br>Many? When was the last date you were concerned you reported?<br><br>**I have no idea.**<br><br>Would if have been a long time ago? |

USCA4 Appeal: 21-2051 Doc: 32-4 Filed: 07/30/2022 Pg: 42 of 274

| | | |
|---|---|---|
| | | I'm not for sure. I used to be on the safety committee." |
| Campbell, Michael D. (ECF No. 356-17) | 47:9-14 | "Did you ever have an occasion, when you were working for the railroad, to report any sort of safety concern to anyone?<br><br>**I mean, I have made phone calls to my manager.**<br><br>Uh-huh<br><br>**Meaning due to work overload, needing help.**" |
| Carpenter, John D. (ECF No. 356-18) | 38:6-21 | "While you were working at CSX did you ever report any safety concerns?<br><br>**Yeah. There was a time that we was drilling . . . me and Travis Burke, he and I was complaining about that. But they ended up changing that for us.**<br><br>Oh, they did?<br><br>**Yeah. It took about six, seven months of complaining but we got it changed.**" |
| | 43-44 | ". . . it was gradually getting, you know, more and more to where it hurt to even bend over.<br><br>Did you report that to somebody at CSX as you're required to do?<br><br>**No --- . . . only people, you know, I may have mentioned how bad my back hurt to Dave Wall on it. But I didn't actually fill anything out. And more or less was worried about not working. You know what I mean? So I wanted to make sure I was still working as long as I could.**<br><br>. . . Did you report those complaints to anybody besides mentioning to Dave Wall that you were sick --- stiff?<br><br>**No.**<br><br>Did you ask Dave Wall if he would fill out a PI-IA, which is a personal injury or illness form?<br><br>**No.**" |
| | 113:9-14 | "When you made these complaints --- the safety complaints about the way that one job was done that you were telling me earlier and you said you and I think Burr |

| | | made those complaints, were you disciplined for making those complaints about safety?<br><br>**No, no.**" |
|---|---|---|
| Christian, Quincy E.<br>(ECF No. 356-19) | 112:5-7 | "Did you ever report any work-related injuries while at CSX?<br><br>**No.**" |
| Clark, Michael L.<br>(ECF No. 356-20) | | N/A |
| Craycraft, Randall H.<br>(ECF No. 356-21) | 31:17-19 | "Did you ever report a safety concern while you were employed with CSX?<br><br>**I don't --- don't remember reporting one.**" |
| | 92:1-2 | "Did you ever report any safety concerns while at CSX?<br><br>**No.**" |
| Deal, James R.<br>(ECF No. 356-22) | 38:5-7 | "What kind of safety concerns did you report?<br><br>**Just mainly tripping hazards, housekeeping, that kind of thing. All fixed pretty quickly.**" |
| | 108:14-16 | "Did you ever report any work-related injuries while working for CSX?<br><br>**I did not.**" |
| Dowdy, Chad C.<br>(ECF No. 356-23) | 37:21-23 | "Have you ever reported a safety concern while at CSX?<br><br>**I don't believe so.**" |
| | 46:16-23 | "Have you ever tweaked your neck or back while you were at work?<br><br>**No, nothing reportable, of course, nothing that I recall as far as being reportable.**<br><br>Nothing you felt was necessary to bring to your supervisor's attention?<br><br>**No, nothing at all. Nothing as far as, you know, work related or typical job duty related.**" |
| | 119:15-18 | "You were never disciplined for reporting a safety concern, were you? |

| | | |
|---|---|---|
| | | **No, never reported a safety concern, never disciplined**." |
| Ferguson, Joshua M. (ECF No. 356-24) | 61:24-62:1-3 | "As either the president of the union or as, you know, a sheet metal worker, have you ever reported a safety concern to CSX?<br><br>**No**." |
| | 120:21-22 | "Did you ever have an on-the-job injury at CSX?<br><br>**No. I never had a reportable injury**." |
| | 138:1-11 | "Prior to the shoulder injury of June 12 of 2017 did you ever report any problems with your neck or back to anybody at CSX?<br><br>**No**.<br><br>Did you ever fill out a PIIA for any of those conditions?<br><br>**No**.<br><br>Were you reporting to anyone at CSX that you had problems with your back, neck or shoulder that required any job modifications or any time off?<br><br>**No**." |
| Flocker, Jerry L. (ECF No. 356-25) | 31:8-10 | "Did you ever report a safety concern while you were employed with CSX?<br><br>**No, sir, not that I remember**." |
| | 89:16-20 | "The only work-related injury that you've ever reported while at CSX was your broken finger in the 1990s. Is that correct?<br><br>**Yes. I think so**." |
| Frasure, John K. (ECF No. 356-26) | 36:24-37:1-2 | "Have you ever had an opportunity while working at CSX to report a safety concern?<br><br>**No**." |
| Glowacki, Edwin F. (ECF No. 356-27) | 38:1-10 | "Did you ever report a safety concern?<br><br>**Yes. Every time before the safety meeting, everyone that was on the safety team, you know, like 30 45 minutes prior to it, you know, you'd walk around the** |

| | | |
|---|---|---|
| | | **shop and you'd go ask, you know, other guys that were working if they had anything, you know, unsafe that they wanted to bring up.**<br><br>Did you ever have to report that up the chain at CSX?<br><br>**Yes ma'am.**" |
| | 40:20-23 | "Did you ever report an accident to CSX?<br><br>**No, ma'am.**<br><br>Did you ever report an injury to CSX?<br><br>**Yes, ma'am.**" |
| | 102:19-21 | "You were never disciplined for reporting safety concerns, were you?<br><br>**No, ma'am.**" |
| Hamm, Gregory T.<br>(ECF No. 356-28) | 32:5-7 | "Have you ever reported a safety concern while employed with CSX?<br><br>**I don't believe I have. Don't believe.**"<br><br>"Did you ever report any work-related injury while employed by CSX?<br><br>**No, sir.**" |
| | 81 | "Did you ever report any safety concerns while at CSX?<br><br>**I don't remember if I did or not.**" |
| Hutchinson, Dennis A.<br>(ECF No. 356-29) | 39:16-40:3 | "Did you ever report a safety concern while you were employed with CSX?<br><br>**Not on paper, no.**<br><br>Do you remember any specific circumstance that you reported a safety concern?<br><br>**Just the --- when they first put in the truck shop, I went in the truck shop, we did have an air--- air-related hood. It was just a regular weld. It gets very bad in there, really stuffy.**<br><br>Do your remember what year that was?<br><br>**Probably 2004, . . .** " |

| | 99:21-24 | "So the only major injury that you had was your leg --- your broken leg, and you reported that. Correct?<br><br>**Yes.**" |
|---|---|---|
| Jeffers, Jonathan<br>(ECF No. 356-30) | 40:16-41:3 | "Have you ever reported a safety concern at CSX?<br><br>**Like, there might have been that wasn't safe, yeah, I'd say something about it.**<br><br>Did CSX take care of it?<br><br>**Sometimes.**<br><br>What was an occasion where they didn't take care of it?<br><br>**Well, they got a shear machine, back in the bolting shop and it was leaking oil, hydraulic oil real bad. I called up --- it was real slippery and it took them awhile to fix it when they should have fixed it that day, you know.**" |
| | 93:9-11 | "Did you ever become disciplined for reporting a safety concern?<br><br>**No.**" |
| Jordan, Eric O.<br>(ECF No. 356-31) | 32:10-14 | "Have you ever reported a safety concern at CSX?<br><br>**No. You mean you're talking about on the job?**<br><br>Yes.<br><br>**No. If I seen one, I would say something. But no, I never did. Never did say anything.**" |
| Kelley, Grover H.<br>(ECF No. 356-32) | 81 | "Did you ever report any work-related injuries while at CSX?<br><br>**No.**<br><br>Did you ever have any work-related injuries while at CSX?<br><br>**No.**<br>. . .<br>Did you ever report any safety concerns at CSX?<br><br>**Not that I remember, no.**" |

| Little, Chad M.<br>(Brandi Little)<br>(ECF No. 356-33) | 24: 24 – 25:<br>1-12 | "Do you know if he ever reported a safety concern at CSX?<br><br>**No.**<br><br>Did he ever talk to you about any safety concerns at work or anything?<br><br>**He has by getting on the cars and off and the switching.**<br><br>What would he --- what were his concerns about those issues?<br><br>**Falling and heat exhaustion, for the most part.**<br><br>Do you know if he ever talked to ay anyone about those concerns?<br><br>**No, not to my knowledge. No."** |
|---|---|---|
| Manis, David R.<br>(ECF No. 356-35) | 45: 9-16 | "Did you ever report any safety concerns while you were working for CSX?<br><br>**Well, I didn't actually fill out any paperwork but we did mention to the foreman or our supervisor In charge or lead man or whoever we had.**<br><br>Were you ever disciplined for reporting any sort of safety concerns?<br><br>**I never was, no."** |
| Marshall, Jacqueline C.<br>(ECF No. 356-36) | 33: 4-6 | "Have you ever reported a safety concern while you were at CSX?<br><br>**No, not to my knowledge.** |
|  | 91: 9-17 | "Were you ever injured on the job, other than what we've talked about, the wear and tear on your back?<br><br>**No.**<br><br>Did you report any work-related injuries ever when at CSX?<br><br>**No.**<br><br>Were you ever disciplined for reporting an injury?<br><br>**No."** |

| | 91: 18-24 | "Does CSX require their employees to report safety concerns? |
| | | **Yes.** |
| | | In fact, CSX encourages employees to report safety concerns. Right? |
| | | **Right."** |
| | 92: 1-5 | "Did you report any safety concerns to CSX? |
| | | **Not that I can remember.** |
| | | You were never disciplined for reporting a safety concern, were you? |
| | | **No."** |
| Maynard, Homer R. (ECF No. 356-37) | 27: 7-9 | "Have you ever reported a safety concern while you were employed with CSX? |
| | | **I don't recall."** |
| | 87: 10-21 | "Does CSX require employees to report safety concerns? |
| | | **Yeah.** |
| | | Does CSX encourage employees to report safety concerns? |
| | | **Yeah.** |
| | | Did you ever report any safety concerns at CSX? |
| | | **I don't recall any. I don't ---** |
| | | And you weren't ever disciplined fore reporting any safety concerns while employed with CSX. Correct? |
| | | **I don't know of any."** |
| | 87: 4-9 | "And you don't have any symptoms or conditions currently related to that work-related injury, do you? |
| | | **Not that I'm aware of.** |
| | | And you were never disciplined for reporting an on-the-work injury, were you? |
| | | **No, I don't believe."** |

| | 85: 12-16 | "And at the time you were terminated from CSX you were being treated by Dr. Johnson for a non-work related injury. Correct? **Yes.**" |
| | 86: 15-17 | "Did you ever report any work-related injuries while at CSX? **Just the one time with my eye, I believe.**" |
| Morrison, Scott M. (ECF No. 356-38) | 37: 9-25 – 38:1-6 | "Did you ever report a safety concern while you were employed with CSX? **I don't know if I did officially, because I was a member for a time on the safety committee, which we would do a walkthrough and we would point out certain safety --- safety concerns and stuff like that. And I did bring up one situation, but it was boots. I do remember having a conversation with my supervisor over that, the problems and --- sorry.** Sorry. Go Ahead. **There was a problem that concerned me with the boots and the spats we as welders had to wear in common. And I bought up --- I did bring that up while I was in the safety meeting, trying to get it addressed.** Did you ever file any paperwork with regards to the safety issue with the boots? **I don't believe I did. It was pretty much just verbal. I know my supervisor checked on everything and talked to me. And it didn't go through the way we wanted because of --- when they contacted Jacksonville, they said it was unpractical. And I believe that was the answer they gave.**" |
| Mosteller, Robert E. (ECF No. 356-39) | 36: 21-23 | "Have you ever reported a safety concern while at CSX? **Not that I recall.**" |
| | 92: 10-16 | "Does CSX encourage their employees to report safety concerns? **Just like anywhere else, if you see something let us know, I mean, it's not a --- a point of emphasis, but it's, you know --- it's like anywhere else, you know, no better, no worse. Just if you see something let us know.**" |
| | 92: 17-19 | |

| | | |
|---|---|---|
| | 90:16-24 – 91:1-8 | "Were you ever disciplined for reporting a safety concern?<br><br>**No.**"<br><br>"Would you say you were being treated exclusively for a non-work-related injury or condition?<br><br>**I can't say for sure. I'm not a medical professional. But I do know that given the things that we had to do, that might have been --- again, that might have led up to this. This could have been the tipping point, the fall. I can't say yes or no. But I believe that it's --- the work that we did it is possible that it could have led up to this injury.**<br><br>And you never reported any of --- of that to CSX though. Right?<br><br>**No, I have not reported it to CSX.**" |
| Palmer, Kevin L. (ECF No. 356-43) | 38: 2-8 | "During your time at CSX. Your employment, have you ever reported a safety concern?<br><br>**I don't recall**" |
| Patterson, Shawn D. (ECF No. 356-44) | 56: 13-22 | "You said that one of the things you did as a utility worker was look for and report safety concerns. Did you ever report safety concerns that you found?<br><br>**Yes. I actually got a $200 thanks award one time for a --- there were stairs to go down into the pit. And I reported it to a boss. And they weren't even in a big hurry to fix it down there. And I was like, these two forms, like PI-82s or something like that.**" |
| Potter, Michael D. (ECF No. 356-45) | 44: 12-15 | "At the time you worked at CSX, did you ever have the opportunity to report a safety concern or a safety condition?<br><br>**No.**" |
| | 44: 17-21 | "At any of your jobs that you worked as a boilermaker over the years did you ever have the opportunity to --- to report a safety concern or a safety condition?<br><br>**No.**" |
| | 108: 11-13 | "Did you ever report any safety concerns to anyone at CSX or any reason?<br><br>**No.**" |
| | 108: 1-8 | |

| | | |
|---|---|---|
| | | "You never reported any work-related injuries while at CSX, did you?<br><br>**No.**<br><br>And you didn't have any. Is that right?<br><br>**No.**" |
| Potter, Michael L. (ECF No. 356-46) | 30:23-24 - 31:1 | "Did you ever report a safety concern when you were employed with CSX?<br><br>**No, sir.**" |
| | 89: 8-13 | "Does CSX encourage you to report safety concerns?<br><br>**I never – I was not under the understanding that they encouraged or discouraged anybody. If, you know, an accident happens, you went and told somebody and you got help.**" |
| | 89: 14-16 | "Did you ever report any safety concerns while at CSX?<br><br>**No.**" |
| Preston, Samuel H. (ECF No. 356-47) | 34:17-19 | "And while you were reworking at CSX, did you ever have an occasion to report a safety concern to anyone?<br><br>**No.**" |
| Sargent, Dennis A. (ECF No. 356-49) | 31: 14-24 | "Did you ever report a safety concern while you were employed with CSX?<br><br>**Nothing major. I mean, sometimes you would see a little something and report it to the supervisor on hand, but--.**<br><br>Can you give me like an example of what you're referring to?<br><br>**Well, like a work area would be oily or greasy or something, you know. And you kind of report that to a supervisor that we needed to clean that up, because of slippery walking hazard, you know ---.**" |
| | 90: 17-19 | "Did you ever report any work-related injury while at CSX?<br><br>**No.**" |
| | 90: 20-24 – | "Did CSX require employees to report safety concerns? |

| | 91: 1-15 | **Yes.** |
|---|---|---|
| | | Were they encouraged to report safety concerns by CSX? |
| | | **Somewhat.** |
| | | And you said you had reported a couple safety concerns at CSX. Correct? |
| | | **Yes.** |
| | | And do you know when you reported those? |
| | | **No.** |
| | | And do you know what you reported? |
| | | **I mean, not everything or not anything specific. Like I told you before, it was --- it was usually just handled between me and a foreman out there at the time and that was it.** |
| | | Were you ever disciplined for reporting any safety concern? |
| | | **No."** |
| Speaks, Eric K. (ECF No. 356-50) | 47: 17-19 | "Have you ever reported a safety concern while you were working at CSX? |
| | | **No."** |
| | 124: 16-21 | "Were you being treated exclusively for a non-work-related injury or condition? |
| | | **Yes. I didn't get hurt at work. Yes."** |
| | 125: 4-11 | "Were you ever injured on the job other than what we've already talked about?" |
| | | **Throughout my career just, you know, minor muscle aches and, you know, strains.** |
| | | Sure |
| | | **But nothing Major, you know.** |
| | | Had you reported those to CSX? |
| | | **"No, ma'am."** |

| | 125: 12-14 | "Were you ever disciplined for reporting an injury?<br><br>**No.**" |
| | 125: 15-21 | "Was CSX --- did CSX require their employees to report safety concerns?<br><br>**Yes.**<br><br>In fact, CSX encourages their employees to report safety concern. Right?<br><br>**Yes.**" |
| Stephens, Donald A. (ECF No. 356-51) | 41:5-11 | "Have you ever reported a safety concern while you were working at CSX?<br><br>**I can't recall.** |
| Stewart, Danny M. (ECF No. 356-52) | 27: 16-18 | "Have you ever reported a safety concern while employed with CSX?<br><br>**No.**" |
| | 107:1-14 | "Does CSX require employees to report safety concerns?<br><br>**If there is safety issues, we should bring them to management's attention.**<br><br>Does CSX encourage employees to report safety concerns?<br><br>**I couldn't really say if they encourage it or not.** |
| | 107: 16-18 | "Were you ever disciplined for reporting any safety concerns?<br><br>**No.**" |
| Stiltner, Clay C. (ECF No. 356-53) | 75: 19-21 | "Have you ever reported a safety concern while at CSX?<br><br>**No, not that I'm aware of.**" |
| | 132: 6-7 | "Were you ever injured on the job?<br><br>**No.**" |
| | 132: 8-10 | "Did you ever report any work-related injuries while at CSX?<br><br>**No.**" |

| | | |
|---|---|---|
| | 132: 11-13 | "Were you ever disciplined for reporting an injury?<br><br>**No.**" |
| | 132: 15-24 – 133: 1-14 | "Does CSX require their employees to report safety concerns?<br><br>**Yes, I'm pretty sure they do.**<br><br>And, in fact, they encourage employees to report safety concerns. Right?<br><br>**Yeah.**<br><br>Have you ever reported safety concerns at CSX?<br><br>**Not that I'm aware of. Not that I can recall, no.**" |
| Stinnett, James R. (ECF No. 356-54) | 23: 14-24 – 24: 1-3 | "Have you ever made a safety report at CSX?<br><br>**Can't remember if I did or did not.**<br><br>Okay. Have you ever generated any documentation as a result of any safety concerns?<br><br>**I can't remember.**" |
| | 66: 1-5 | "I understand. Were you being treated – when you had that neck injury and you were treating with Dr. Johnson, would you consider that a nonwork-related injury?<br><br>**Overall, yeah. Probably, yeah**" |
| | 66: 20-24 | "Did CSX ever discipline you for reporting an injury?<br><br>**No. I can't remember. I don't remember it – any.**" |
| Thayer, Todd A. (ECF No. 356-55) | 32: 9-11 | "Did you ever report a safety concern while you were employed with CSX?<br><br>**Not that I recall.**" |
| Thornsberry, Travis L. (ECF No. 356-56) | 30: 21-23 | "Did you ever report a safety concern while you were employed with CSX?<br><br>**No.** |
| | 88: 9-11 | "Did you ever have any work-related injuries while you were at CSX?<br><br>**No.**" |
| | 88: 12-14 | "And you never reported any work-related injury while you were at CSX? |

| | | |
|---|---|---|
| | | **No."** |
| | 88: 15-17 | "Are CSX employees required to report safety concerns? **Yes."** |
| | 88:15-19 | "Does CSX encourage employees to report safety concerns? **Yes."** |
| | 88:23-24 – 89: 1 | "Did you ever report any safety concerns while employed for CSX? **No."** |
| Wallace, Jesse L. (ECF No. 356-57) | 38: 7-9 | "Have you ever reported a safety concern while at CSX? **No."** |
| | 87: 5-7 | "Were you being treated exclusively for a non-work-related condition by Dr. Johnson? **Yes."** |
| | 88: 10-12 | "Does CSX require employees to report safety concerns? **I'm not sure if they do or not."** |
| | 88: 13-15 | "Have you ever been disciplined for reporting a safety concern while at CSX? **No. I mean, no, I haven't."** |
| | 88: 16-17 | "Have you ever come across any safety concerns? **I don't remember. No."** |
| Williams, Lloyd K. (ECF No. 356-58) | 31: 9-10 | "Have you ever reported a safety concern at CSX? **No."** |
| | 68:14-24 – 69:1-8 | "Did you ever report any work-related injuries while you were at CSX? **No."** |
| | 69:9-16 | "Were you ever disciplined for reporting an injury? **I don't know. Like, the one this case is over.** |
| | 69: 17-19 | "Did you ever report any safety concerns while at CSX? |

| | | |
|---|---|---|
| | | **No.”** |
| | 69: 20-23 | “Were you ever discipline for reporting a safety concern?<br><br>**Not that I’m aware of.”** |
| Williams, Michael D. (ECF No. 356-59) | 35: 15-17 | “Have you ever reported a safety concern while at CSX?<br><br>**No.”** |
| | 81: 8-10 | “Did you ever report any work-related injuries while at CSX?<br><br>**No, I did not.”** |
| | 81:11-13 | “Were you ever disciplined for reporting a safety concern?<br><br>**No.”** |
| Witt, Timothy M. (ECF No. 356-60) | 44: 1-10 | “Have you ever reported a safety concern during your time at CSX?<br><br>**I’m sure I had. We had safety meetings weekly. I don’t recall ever putting anything in writing to where it was, you know, something through a chain of command that – we would have safety meeting weekly as part of a safety team. And you know, you would get with your superviso4r and we would talk about safety objects through the shop, what could be approved, what was doing well, things of that nature”** |
| | 44: 11-19 | “Do you feel like CSX would address your safety concerns?<br><br>**For the most part, I think they would. You know, being so long ago, I don’t recall details, but there were always a couple things that people make – you know, would complain about constantly, you know, maybe it was because some of the equipment being aged and they thought it wasn’t safe, but other than that, I don’t recall.**<br><br>“Did you ever report any safety concerns to CSX? |
| | 119: 9-17 | **Like we stated earlier, we had safety meetings weekly. Not that I recall ever documenting anything. That was the whole purpose of those safety meetings, that we sat down as a group with the supervisor. If anyone had any issues or questions, you know, that’s kind of broadened the spectrum from other crafts and other areas of the shop. That if** |

| | | **they had any issues, then those were addressed and taken care of.** |
| | 119:18-20 | "Were you ever disciplined for reporting a safety concern?<br><br>**No.**" |
| Woods, Matthew M. (ECF No. 356-61) | 32: 6-8 | "Have you ever reported any safety concerns as an employee at CSX?<br><br>**No, I don't think so**" |
| | 103:17-24 – 104:1-2 | "And I believe earlier, you indicated that you never made any reports related to safety concerns. Is that fair?<br><br>**I never reported any. I mean obviously, we had like monthly safety meetings where management would gather us together and you know, ask what we needed as far as, you know, more gloves or better eyeglasses or what – things of that nature, just remedial. But no, I never took exception to any particular CSX practices or made an issue of them as far as safety concerns.**" |

EXHIBIT

2

| Plaintiff | OSHA Complaint Allegations |
|---|---|
| Tony L. Abdon | This case presents the outrageous scenario of a railroad initiating a program of mass firings in of [sic] employees for treating with and following the treatment plans of their treating physicians, **in violation of 49 U.S.C. Section 20109(c)(2).** Ex. 125 ¶ 1.<br><br>The medical care providers whose treatment automatically triggered **discipline prohibited by §20109(c)(2)** by CSXT were . . . . *Id.* ¶ 14; *see also id.* ¶ 16 (alleging that CSXT "attack[ed] [ ] employees simply because they treated with [one of two chiropractors]"). |
| Brandon Adkins | This case presents the outrageous scenario of a railroad initiating a program of mass firings in of [sic] employees for treating with and following the treatment plans of their treating physicians, **in violation of 49 U.S.C. Section 20109(c)(2).** Ex. 126 ¶ 1.<br><br>The medical care providers whose treatment automatically triggered **discipline prohibited by §20109(c)(2)** by CSXT were . . . . *Id.* ¶ 14; *see also id.* ¶ 16 (alleging that CSXT "attack[ed] [ ] employees simply because they treated with [one of two chiropractors]"). |
| Justin R. Adkins | Adkins was subjected to adverse actions by Respondents **for having engaged in protected activities under 49 U.S.C. § 20109(c).** Ex. 127 ¶ 9.<br><br>The whistleblower protection provisions of the FRSA and its implementing regulations at 29 C.F.R. § 1982 et seq., prohibit a railroad from, among other things, denying, delaying, or interfering with the medical or first aid treatment of an employee injured during the course of employment, as well as from disciplining or threatening discipline to an employee for requesting medical or first aid treatment, or for following orders or a treatment of a treating physician. **49 U.S.C. § 20109(c).** *Id.* ¶ 46.<br><br>Adkins engaged in multiple protected acts, as alleged in paragraphs 1 through 44, above, including requesting medical treatment from his chosen medical provider, Dr. Johnson, and/or for following the orders of his treating physician. **49 U.S.C. § 20109(c)(2).** *Id.* ¶ 50. |
| Bobby Akers | Akers was subjected to adverse actions by Respondents **for having engaged in protected activities under 49 U.S.C. § 20109(c).** Ex. 128 ¶ 9.<br><br>The whistleblower protection provisions of the FRSA and its implementing regulations at 29 C.F.R. § 1982 et seq., prohibit a railroad |

| | from, among other things, denying, delaying, or interfering with the medical or first aid treatment of an employee injured during the course of employment, as well as from disciplining or threatening discipline to an employee for requesting medical or first aid treatment, or for following orders or a treatment of a treating physician. **49 U.S.C. § 20109(c).** *Id.* ¶ 44.<br><br>Akers engaged in multiple protected acts, as alleged in paragraphs 1 through 42, above, including requesting medical treatment from his chosen medical provider, Dr. Johnson, and/or for following the orders of his treating physician. **49 U.S.C. § 20109(c)(2).** *Id.* ¶ 48. |
|---|---|
| John Baker | Baker was subjected to adverse actions by Respondents **for having engaged in protected activities under 49 U.S.C. § 20109(c).** Ex. 129 ¶ 9.<br><br>The whistleblower protection provisions of the FRSA and its implementing regulations at 29 C.F.R. § 1982 et seq., prohibit a railroad from, among other things, denying, delaying, or interfering with the medical or first aid treatment of an employee injured during the course of employment, as well as from disciplining or threatening discipline to an employee for requesting medical or first aid treatment, or for following orders or a treatment of a treating physician. **49 U.S.C. § 20109(c).** *Id.* ¶ 44.<br><br>Baker engaged in multiple protected acts, as alleged in paragraphs 1 through 42, above, including requesting medical treatment from his chosen medical provider, Dr. Johnson, and/or for following the orders of his treating physician. **49 U.S.C. § 20109(c)(2).** *Id.* ¶ 48. |
| Gerald E. Barber | Barber was subjected to adverse actions by Respondents **for having engaged in protected activities under 49 U.S.C. § 20109(c).** Ex. 130 ¶ 9.<br><br>The whistleblower protection provisions of the FRSA and its implementing regulations at 29 C.F.R. § 1982 et seq., prohibit a railroad from, among other things, denying, delaying, or interfering with the medical or first aid treatment of an employee injured during the course of employment, as well as from disciplining or threatening discipline to an employee for requesting medical or first aid treatment, or for following orders or a treatment of a treating physician. **49 U.S.C. § 20109(c).** *Id.* ¶ 44.<br><br>Barber engaged in multiple protected acts, as alleged in paragraphs 1 through 42, above, including requesting medical treatment from his |

| | |
|---|---|
| | chosen medical provider, Dr. Johnson, and/or for following the orders of his treating physician. **49 U.S.C. § 20109(c)(2)**. *Id*. ¶ 48. |
| Jason Barker | Barker was subjected to adverse actions by Respondents **for having engaged in protected activities under 49 U.S.C. § 20109(c).** Ex. 131 ¶ 9. |
| | The whistleblower protection provisions of the FRSA and its implementing regulations at 29 C.F.R. § 1982 et seq., prohibit a railroad from, among other things, denying, delaying, or interfering with the medical or first aid treatment of an employee injured during the course of employment, as well as from disciplining or threatening discipline to an employee for requesting medical or first aid treatment, or for following orders or a treatment of a treating physician. **49 U.S.C. § 20109(c)**. *Id*. ¶ 44. |
| | Barker engaged in multiple protected acts, as alleged in paragraphs 1 through 42, above, including requesting medical treatment from his chosen medical provider, Dr. Johnson, and/or for following the orders of his treating physician. **49 U.S.C. § 20109(c)(2)**. *Id*. ¶ 48. |
| John Bills | Bills was subjected to adverse actions by Respondents **for having engaged in protected activities under 49 U.S.C. § 20109(c).** Ex. 132 ¶ 9. |
| | The whistleblower protection provisions of the FRSA and its implementing regulations at 29 C.F.R. § 1982 et seq., prohibit a railroad from, among other things, denying, delaying, or interfering with the medical or first aid treatment of an employee injured during the course of employment, as well as from disciplining or threatening discipline to an employee for requesting medical or first aid treatment, or for following orders or a treatment of a treating physician. **49 U.S.C. § 20109(c)**. *Id*. ¶ 44. |
| | Bills engaged in multiple protected acts, as alleged in paragraphs 1 through 42, above, including requesting medical treatment from his chosen medical provider, Dr. Carey, and/or for following the orders of his treating physician. **49 U.S.C. § 20109(c)(2)**. *Id*. ¶ 48. |
| James Blain | Blain was subjected to adverse actions by Respondents **for having engaged in protected activities under 49 U.S.C. § 20109(c).** Ex. 133 ¶ 9. |
| | The whistleblower protection provisions of the FRSA and its implementing regulations at 29 C.F.R. § 1982 et seq., prohibit a railroad from, among other things, denying, delaying, or interfering with the |

|  | medical or first aid treatment of an employee injured during the course of employment, as well as from disciplining or threatening discipline to an employee for requesting medical or first aid treatment, or for following orders a treatment of a treating physician. **49 U.S.C. § 20109(c).** *Id*. ¶ 44.<br><br>Blain engaged in multiple protected acts, as alleged in paragraphs 1 through 42, above, including requesting medical treatment from his chosen medical provider . . . and/or for following the orders of his treating physician. **49 U.S.C. § 20109(c)(2).** *Id*. ¶ 48. |
|---|---|
| Justin A. Blake | Blake was subjected to adverse actions by Respondents **for having engaged in protected activities under 49 U.S.C. § 20109(c).** Ex. 134 ¶ 9.<br><br>The whistleblower protection provisions of the FRSA and its implementing regulations at 29 C.F.R. § 1982 et seq., prohibit a railroad from, among other things, denying, delaying, or interfering with the medical or first aid treatment of an employee injured during the course of employment, as well as from disciplining or threatening discipline to an employee for requesting medical or first aid treatment, or for following orders or a treatment of a treating physician. **49 U.S.C. § 20109(c).** *Id*. ¶ 46.<br><br>Blake engaged in multiple protected acts, as alleged in paragraphs 1 through 44, above, including requesting medical treatment from his chosen medical provider . . . and/or for following the orders of his treating physician. **49 U.S.C. § 20109(c)(2).** *Id*. ¶ 50. |
| Devery E. Brown | This case presents the outrageous scenario of a railroad initiating a program of mass firings in of [sic] employees for treating with and following the treatment plans of their treating physicians, **in violation of 49 U.S.C. Section 20109(c)(2).** Ex. 135 ¶ 1.<br><br>The medical care providers whose treatment automatically triggered **discipline prohibited by §20109(c)(2)** by CSXT were . . . . *Id*. ¶ 14; *see also id*. ¶ 16 (alleging that CSXT "attack[ed] [ ] employees simply because they treated with [one of two chiropractors]"). |
| John D Carpenter | Complainant was subjected to adverse actions by Respondents **for having engaged in protected activities under 49 U.S.C. § 20109(c).** Ex. 136 ¶ 9.<br><br>The whistleblower protection provisions of the FRSA and its implementing regulations at 29 C.F.R. § 1982 et seq., prohibit a railroad from, among other things, denying, delaying, or interfering with the |

| | medical or first aid treatment of an employee injured during the course of employment, as well as from disciplining or threatening discipline to an employee for requesting medical or first aid treatment, or for following orders or a treatment of a treating physician. **49 U.S.C. § 20109(c).** *Id.* ¶ 45.<br><br>Complainant engaged in multiple protected acts, as alleged in paragraphs 1 through 48 above, including requesting medical treatment from his chosen medical provider, Dr. Johnson, and/or for following the orders of his treating physician. **49 U.S.C. § 20109(c)(2).** *Id.* ¶ 49. |
|---|---|
| Michael L. Clark | Clark was subjected to adverse actions by Respondents **for having engaged in protected activities under 49 U.S.C. § 20109(c).** Ex. 137 ¶ 9.<br><br>The whistleblower protection provisions of the FRSA and its implementing regulations at 29 C.F.R. § 1982 et seq., prohibit a railroad from, among other things, denying, delaying, or interfering with the medical or first aid treatment of an employee injured during the course of employment, as well as from disciplining or threatening discipline to an employee for requesting medical or first aid treatment, or for following orders or a treatment of a treating physician. **49 U.S.C. § 20109(c).** *Id.* ¶ 44.<br><br>Clark engaged in multiple protected acts, as alleged in paragraphs 1 through 42, above, including requesting medical treatment from his chosen medical provider, Dr. Johnson, and/or for following the orders of his treating physician. **49 U.S.C. § 20109(c)(2).** *Id.* ¶ 48. |
| Randall Craycraft | Craycraft was subjected to adverse actions by Respondents **for having engaged in protected activities under 49 U.S.C. § 20109(c).** Ex. 138 ¶ 9.<br><br>The whistleblower protection provisions of the FRSA and its implementing regulations at 29 C.F.R. § 1982 et seq., prohibit a railroad from, among other things, denying, delaying, or interfering with the medical or first aid treatment of an employee injured during the course of employment, as well as from disciplining or threatening discipline to an employee for requesting medical or first aid treatment, or for following orders or a treatment of a treating physician. **49 U.S.C. § 20109(c).** *Id.* ¶ 44.<br><br>Craycraft engaged in multiple protected acts, as alleged in paragraphs 1 through 42, above, including requesting medical treatment from his chosen medical provider, Dr. Carey, and/or for following the orders of his treating physician. **49 U.S.C. § 20109(c)(2).** *Id.* ¶ 48. |

| James Deal | This case presents the outrageous scenario of a railroad initiating a program of mass firings in of [sic] employees for treating with and following the treatment plans of their treating physicians, **in violation of 49 U.S.C. Section 20109(c)(2).** Ex. 139 ¶ 1.<br><br>The medical care providers whose treatment automatically triggered discipline prohibited by §20109(c)(2) by CSXT were . . . . *Id.* ¶ 14; *see also id.* ¶ 16 (alleging that CSXT "attack[ed] [ ] employees simply because they treated with [one of two chiropractors]"). |
|---|---|
| Chad Dowdy | Dowdy was subjected to adverse actions by Respondents **for having engaged in protected activities under 49 U.S.C. § 20109(c).** Ex. 140 ¶ 9.<br><br>The whistleblower protection provisions of the FRSA and its implementing regulations at 29 C.F.R. § 1982 et seq., prohibit a railroad from, among other things, denying, delaying, or interfering with the medical or first aid treatment of an employee injured during the course of employment, as well as from disciplining or threatening discipline to an employee for requesting medical or first aid treatment, or for following orders or a treatment of a treating physician. **49 U.S.C. § 20109(c).** *Id.* ¶ 44.<br><br>Dowdy engaged in multiple protected acts, as alleged in paragraphs 1 through 42, above, including requesting medical treatment from his chosen medical provider, Dr. Johnson, and/or for following the orders of his treating physician. **49 U.S.C. § 20109(c)(2).** *Id.* ¶ 49. |
| Joshua Ferguson | Ferguson was subjected to adverse actions by Respondents **for having engaged in protected activities under 49 U.S.C. § 20109(c).** Ex. 141 ¶ 9.<br><br>The whistleblower protection provisions of the FRSA and its implementing regulations at 29 C.F.R. § 1982 et seq., prohibit a railroad from, among other things, denying, delaying, or interfering with the medical or first aid treatment of an employee injured during the course of employment, as well as from disciplining or threatening discipline to an employee for requesting medical or first aid treatment, or for following orders or a treatment of a treating physician. **49 U.S.C. § 20109(c).** *Id.* ¶ 43.<br><br>Ferguson engaged in multiple protected acts, as alleged in paragraphs 1 through 46 above, including requesting medical treatment from his chosen medical provider, Dr. Johnson, and/or for following the orders of his treating physician. **49 U.S.C. § 20109(c)(2).** *Id.* ¶ 47. |

| | |
|---|---|
| Jerry Flocker | Flocker was subjected to adverse actions by Respondents **for having engaged in protected activities under 49 U.S.C. § 20109(c).**  Ex. 142 ¶ 9.<br><br>The whistleblower protection provisions of the FRSA and its implementing regulations at 29 C.F.R. § 1982 et seq., prohibit a railroad from, among other things, denying, delaying, or interfering with the medical or first aid treatment of an employee injured during the course of employment, as well as from disciplining or threatening discipline to an employee for sting medical or first aid treatment, or for following orders or a treatment of a treating physician.  **49 U.S.C. § 20109(c).**  *Id.* ¶ 43.<br><br>Flocker engaged in multiple protected acts, as alleged in paragraphs 1 through 46 above, including requesting medical treatment from his chosen medical provider, Dr. Johnson, and/or for following the orders of his treating physician.  **49 U.S.C. § 20109(c)(2).**  *Id.* ¶ 47. |
| John Frasure | Frasure was subjected to adverse actions by Respondents **for having engaged in protected activities under 49 U.S.C. § 20109(c).**  Ex. 143 ¶ 9.<br><br>The whistleblower protection provisions of the FRSA and its implementing regulations at 29 C.F.R. § 1982 et seq., prohibit a railroad from, among other things, denying, delaying, or interfering with the medical or first aid treatment of an employee injured during the course of employment, as well as from disciplining or threatening discipline to an employee for sting medical or first aid treatment, or for following orders or a treatment of a treating physician.  **49 U.S.C. § 20109(c).**  *Id.* ¶ 45.<br><br>Frasure engaged in multiple protected acts, as alleged in paragraphs 1 through 48 above, including requesting medical treatment from his chosen medical provider, Dr. Johnson, and/or for following the orders of his treating physician.  **49 U.S.C. § 20109(c)(2).**  *Id.* ¶ 49. |
| Dennis Hutchinson | Complainant was subjected to adverse actions by Respondents **for having engaged in protected activities under 49 U.S.C. § 20109(c).**  Ex. 144 ¶ 9.<br><br>The whistleblower protection provisions of the FRSA and its implementing regulations at 29 C.F.R. § 1982 et seq., prohibit a railroad from, among other things, denying, delaying, or interfering with the medical or first aid treatment of an employee injured during the course of employment, as well as from disciplining or threatening discipline to an employee for sting medical or first aid treatment, or for following |

| | |
|---|---|
| | orders or a treatment of a treating physician. **49 U.S.C. § 20109(c).** *Id.* ¶ 45.<br><br>Complainant engaged in multiple protected acts, as alleged in paragraphs 1 through 48 above, including requesting medical treatment from his chosen medical provider, Dr. Johnson, and/or for following the orders of his treating physician. **49 U.S.C. § 20109(c)(2).** *Id.* ¶ 49. |
| Jonathan Jeffers | Jeffers was subjected to adverse actions by Respondents **for having engaged in protected activities under 49 U.S.C. § 20109(c).** Ex. 145 ¶ 9.<br><br>The whistleblower protection provisions of the FRSA and its implementing regulations at 29 C.F.R. § 1982 et seq., prohibit a railroad from, among other things, denying, delaying, or interfering with the medical or first aid treatment of an employee injured during the course of employment, as well as from disciplining or threatening discipline to an employee for sting medical or first aid treatment, or for following orders or a treatment of a treating physician. **49 U.S.C. § 20109(c).** *Id.* ¶ 44.<br><br>Jeffers engaged in multiple protected acts, as alleged in paragraphs 1 through 42, above, including requesting medical treatment from his chosen medical provider . . . and/or for following the orders of his treating physician. **49 U.S.C. § 20109(c)(2).** *Id.* ¶ 48. |
| Eric Jordan | This case presents the outrageous scenario of a railroad initiating a program of mass firings in of [sic] employees for treating with and following the treatment plans of their treating physicians, **in violation of 49 U.S.C. Section 20109(c)(2).** Ex. 146 ¶ 1.<br><br>The medical care providers whose treatment automatically triggered discipline prohibited by §20109(c)(2) by CSXT were . . . . *Id.* ¶ 14; *see also id.* ¶ 16 (alleging that CSXT "attack[ed] [ ] employees simply because they treated with [one of two chiropractors]"). |
| Grover Kelley | Kelley was subjected to adverse actions by Respondents **for having engaged in protected activities under 49 U.S.C. § 20109(c).** Ex. 147 ¶ 9.<br><br>The whistleblower protection provisions of the FRSA and its implementing regulations at 29 C.F.R. § 1982 et seq., prohibit a railroad from, among other things, denying, delaying, or interfering with the medical or first aid treatment of an employee injured during the course of employment, as well as from disciplining or threatening discipline to an employee for sting medical or first aid treatment, or for following |

| | orders or a treatment of a treating physician. **49 U.S.C. § 20109(c).** *Id.* ¶ 44.<br><br>Kelley engaged in multiple protected acts, as alleged in paragraphs 1 through 47 above, including requesting medical treatment from his chosen medical provider . . . and/or for following the orders of his treating physician. **49 U.S.C. § 20109(c)(2).** *Id.* ¶ 48. |
|---|---|
| Chad M. Little | Kelley was subjected to adverse actions by Respondents **for having engaged in protected activities under 49 U.S.C. § 20109(c).** Ex. 148 ¶ 9.<br><br>The whistleblower protection provisions of the FRSA and its implementing regulations at 29 C.F.R. § 1982 et seq., prohibit a railroad from, among other things, denying, delaying, or interfering with the medical or first aid treatment of an employee injured during the course of employment, as well as from disciplining or threatening discipline to an employee for sting medical or first aid treatment, or for following orders or a treatment of a treating physician. **49 U.S.C. § 20109(c).** *Id.* ¶ 47.<br><br>Complainant engaged in multiple protected acts, as alleged in paragraphs 1 through 42, above, including requesting medical treatment from his chosen medical provider, Dr. Johnson, and/or for following the orders of his treating physician. **49 U.S.C. § 20109(c)(2).** *Id.* ¶ 51. |
| Sammy L. Maddix | Maddix was subjected to adverse actions by Respondents **for having engaged in protected activities under 49 U.S.C. § 20109(c).** Ex. 149 ¶ 9.<br><br>The whistleblower protection provisions of the FRSA and its implementing regulations at 29 C.F.R. § 1982 et seq., prohibit a railroad from, among other things, denying, delaying, or interfering with the medical or first aid treatment of an employee injured during the course of employment, as well as from disciplining or threatening discipline to an employee for sting medical or first aid treatment, or for following orders or a treatment of a treating physician. 49 U.S.C. § 20109(c). *Id.* ¶ 43.<br><br>Maddix engaged in multiple protected acts, as alleged in paragraphs 1 through 46 above, including requesting medical treatment from his chosen medical provider, Dr. Johnson, and/or for following the orders of his treating physician. **49 U.S.C. § 20109(c)(2).** *Id.* ¶ 47. |

| David R. Manis | Complainant was subjected to adverse actions by Respondents **for having engaged in protected activities under 49 U.S.C. § 20109(c).** Ex. 150 ¶ 9. |
|---|---|
| | The whistleblower protection provisions of the FRSA and its implementing regulations at 29 C.F.R. § 1982 et seq., prohibit a railroad from, among other things, denying, delaying, or interfering with the medical or first aid treatment of an employee injured during the course of employment, as well as from disciplining or threatening discipline to an employee for sting medical or first aid treatment, or for following orders or a treatment of a treating physician. **49 U.S.C. § 20109(c).** *Id.* ¶ 43. |
| | Complainant engaged in multiple protected acts, as alleged in paragraphs 1 through 42, above, including requesting medical treatment from his chosen medical provider, Dr. Johnson, and/or for following the orders of his treating physician. **49 U.S.C. § 20109(c)(2).** *Id.* ¶ 47. |
| Jaqueline Marshall | This case presents the outrageous scenario of a railroad initiating a program of mass firings in of [sic] employees for treating with and following the treatment plans of their treating physicians, **in violation of 49 U.S.C. Section 20109(c)(2).** Ex. 151 ¶ 1. |
| | The medical care providers whose treatment automatically triggered discipline prohibited by §20109(c)(2) by CSXT were . . . . *Id.* ¶ 14; *see also id.* ¶ 16 (alleging that CSXT "attack[ed] [ ] employees simply because they treated with [one of two chiropractors]"). |
| Homer R. Maynard | This case presents the outrageous scenario of a railroad initiating a program of mass firings in of [sic] employees for treating with and following the treatment plans of their treating physicians, **in violation of 49 U.S.C. Section 20109(c)(2).** Ex. 152 ¶ 1. |
| | The medical care providers whose treatment automatically triggered discipline prohibited by §20109(c)(2) by CSXT were . . . . *Id.* ¶ 14; *see also id.* ¶ 16 (alleging that CSXT "attack[ed] [ ] employees simply because they treated with [one of two chiropractors]"). |
| Scott Morrison | This case presents the outrageous scenario of a railroad initiating a program of mass firings in of [sic] employees for treating with and following the treatment plans of their treating physicians, **in violation of 49 U.S.C. Section 20109(c)(2).** Ex. 153 ¶ 1. |
| | The medical care providers whose treatment automatically triggered discipline prohibited by §20109(c)(2) by CSXT were . . . . *Id.* ¶ 14; *see* |

| | |
|---|---|
| | *also id.* ¶ 16 (alleging that CSXT "attack[ed] [ ] employees simply because they treated with [one of two chiropractors]"). |
| Robert Mosteller | Complainant was subjected to adverse actions by Respondents **for having engaged in protected activities under 49 U.S.C. § 20109(c).** Ex. 154 ¶ 9.<br><br>The whistleblower protection provisions of the FRSA and its implementing regulations at 29 C.F.R. § 1982 et seq., prohibit a railroad from, among other things, denying, delaying, or interfering with the medical or first aid treatment of an employee injured during the course of employment, as well as from disciplining or threatening discipline to an employee for sting medical or first aid treatment, or for following orders or a treatment of a treating physician. **49 U.S.C. § 20109(c).** *Id*. ¶ 44.<br><br>Complainant engaged in multiple protected acts, as alleged in paragraphs 1 through 47 above, including requesting medical treatment from his chosen medical provider, Dr. Johnson, and/or for following the orders of his treating physician. **49 U.S.C. § 20109(c)(2).** *Id*. ¶ 48. |
| Ethan Mullins | Complainant was subjected to adverse actions by Respondents **for having engaged in protected activities under 49 U.S.C. § 20109(c).** Ex. 155 ¶ 9.<br><br>The whistleblower protection provisions of the FRSA and its implementing regulations at 29 C.F.R. § 1982 et seq., prohibit a railroad from, among other things, denying, delaying, or interfering with the medical or first aid treatment of an employee injured during the course of employment, as well as from disciplining or threatening discipline to an employee for sting medical or first aid treatment, or for following orders or a treatment of a treating physician. **49 U.S.C. § 20109(c).** *Id*. ¶ 43.<br><br>Complainant engaged in multiple protected acts, as alleged in paragraphs 1 through 46 above, including requesting medical treatment from his chosen medical provider, Dr. Johnson, and/or for following the orders of his treating physician. **49 U.S.C. § 20109(c)(2).** *Id*. ¶ 47 |
| Jeremy Napier | Napier was subjected to adverse actions by Respondents **for having engaged in protected activities under 49 U.S.C. § 20109(c).** Ex. 156 ¶ 9.<br><br>The whistleblower protection provisions of the FRSA and its implementing regulations at 29 C.F.R. § 1982 et seq., prohibit a railroad from, among other things, denying, delaying, or interfering with the |

| | medical or first aid treatment of an employee injured during the course of employment, as well as from disciplining or threatening discipline to an employee for sting medical or first aid treatment, or for following orders or a treatment of a treating physician. **49 U.S.C. § 20109(c)**. *Id*. ¶ 44.

Napier engaged in multiple protected acts, as alleged in paragraphs 1 through 42, above, including requesting medical treatment from his chosen medical provider, Dr. Johnson, and/or for following the orders of his treating physician. **49 U.S.C. § 20109(c)(2)**. *Id*. ¶ 48. |
|---|---|
| Michael S. Owens | This case presents the outrageous scenario of a railroad initiating a program of mass firings in of [sic] employees for treating with and following the treatment plans of their treating physicians, **in violation of 49 U.S.C. Section 20109(c)(2)**. Ex. 157 ¶ 1.

The medical care providers whose treatment automatically triggered discipline prohibited by §20109(c)(2) by CSXT were . . . . *Id*. ¶ 14; *see also id*. ¶ 16 (alleging that CSXT "attack[ed] [ ] employees simply because they treated with [one of two chiropractors]"). |
| Kevin Palmer | Palmer was subjected to adverse actions by Respondents **for having engaged in protected activities under 49 U.S.C. § 20109(c)**. Ex. 158 ¶ 9.

The whistleblower protection provisions of the FRSA and its implementing regulations at 29 C.F.R. § 1982 et seq., prohibit a railroad from, among other things, denying, delaying, or interfering with the medical or first aid treatment of an employee injured during the course of employment, as well as from disciplining or threatening discipline to an employee for sting medical or first aid treatment, or for following orders or a treatment of a treating physician. **49 U.S.C. § 20109(c)**. *Id*. ¶ 47.

Palmer engaged in multiple protected acts, as alleged in paragraphs 1 through 45, above, including requesting medical treatment from his chosen medical provider, Dr. Johnson, and/or for following the orders of his treating physician. **49 U.S.C. § 20109(c)(2)**. *Id*. ¶ 51. |
| Shawn Patterson | This case presents the outrageous scenario of a railroad initiating a program of mass firings in of [sic] employees for treating with and following the treatment plans of their treating physicians, **in violation of 49 U.S.C. Section 20109(c)(2)**. Ex. 159 ¶ 1.

The medical care providers whose treatment automatically triggered discipline prohibited by §20109(c)(2) by CSXT were . . . . *Id*. ¶ 14; *see* |

| | *also id.* ¶ 16 (alleging that CSXT "attack[ed] [ ] employees simply because they treated with [one of two chiropractors]"). |
|---|---|
| Samuel Preston | Preston was subjected to adverse actions by Respondents **for having engaged in protected activities under 49 U.S.C. § 20109(c).** Ex. 160 ¶ 9.<br><br>The whistleblower protection provisions of the FRSA and its implementing regulations at 29 C.F.R. § 1982 et seq., prohibit a railroad from, among other things, denying, delaying, or interfering with the medical or first aid treatment of an employee injured during the course of employment, as well as from disciplining or threatening discipline to an employee for sting medical or first aid treatment, or for following orders or a treatment of a treating physician. **49 U.S.C. § 20109(c).** *Id.* ¶ 46.<br><br>Preston engaged in multiple protected acts, as alleged in paragraphs 1 through 45, above, including requesting medical treatment from his chosen medical provider, Dr. Johnson, and/or for following the orders of his treating physician. **49 U.S.C. § 20109(c)(2).** *Id.* ¶ 50. |
| Jonathan P. Rowe | This case presents the outrageous scenario of a railroad initiating a program of mass firings in of employees for treating with and following the treatment plans of their treating physicians, **in violation of 49 U.S.C. Section 20109(c)(2).** Ex. 161 ¶ 1.<br><br>The medical care providers whose treatment automatically triggered **discipline prohibited by §20109(c)(2)** by CSXT were . . . . *Id.* ¶ 14; *see also id.* ¶ 16 (alleging that CSXT "attack[ed] [ ] employees simply because they treated with [one of two chiropractors]"). |
| Dennis Sargent | Sargent was subjected to adverse actions by Respondents **for having engaged in protected activities under 49 U.S.C. § 20109(c).** Ex. 162 ¶ 9.<br><br>The whistleblower protection provisions of the FRSA and its implementing regulations at 29 C.F.R. § 1982 et seq., prohibit a railroad from, among other things, denying, delaying, or interfering with the medical or first aid treatment of an employee injured during the course of employment, as well as from disciplining or threatening discipline to an employee for sting medical or first aid treatment, or for following orders or a treatment of a treating physician. **49 U.S.C. § 20109(c).** *Id.* ¶ 45.<br><br>Sargent engaged in multiple protected acts, as alleged in paragraphs 1 through 43, above, including requesting medical treatment from his |

| | |
|---|---|
| | chosen medical provider, Dr. Johnson, and/or for following the orders of his treating physician. **49 U.S.C. § 20109(c)(2).** *Id.* ¶ 50. |
| Eric Speaks | Speaks was subjected to adverse actions by Respondents **for having engaged in protected activities under 49 U.S.C. § 20109(c).** Ex. 163 ¶ 9.<br><br>The whistleblower protection provisions of the FRSA and its implementing regulations at 29 C.F.R. § 1982 et seq., prohibit a railroad from, among other things, denying, delaying, or interfering with the medical or first aid treatment of an employee injured during the course of employment, as well as from disciplining or threatening discipline to an employee for sting medical or first aid treatment, or for following orders or a treatment of a treating physician. **49 U.S.C. § 20109(c).** *Id.* ¶ 44.<br><br>Speaks engaged in multiple protected acts, as alleged in paragraphs 1 through 43, above, including requesting medical treatment from his chosen medical provider, Dr. Johnson, and/or for following the orders of his treating physician. **49 U.S.C. § 20109(c)(2).** ¶ 48. |
| Donald Stephens | Stephens was subjected to adverse actions by Respondents **for having engaged in protected activities under 49 U.S.C. § 20109(c).** Ex. 164 ¶ 9.<br><br>The whistleblower protection provisions of the FRSA and its implementing regulations at 29 C.F.R. § 1982 et seq., prohibit a railroad from, among other things, denying, delaying, or interfering with the medical or first aid treatment of an employee injured during the course of employment, as well as from disciplining or threatening discipline to an employee for sting medical or first aid treatment, or for following orders or a treatment of a treating physician. **49 U.S.C. § 20109(c).** *Id.* ¶ 44.<br><br>Stephens engaged in multiple protected acts, as alleged in paragraphs 1 through 43, above, including requesting medical treatment from his chosen medical provider, Dr. Johnson, and/or for following the orders of his treating physician. **49 U.S.C. § 20109(c)(2).** *Id.* ¶ 48. |
| Danny Stewart | Stewart was subjected to adverse actions by Respondents **for having engaged in protected activities under 49 U.S.C. § 20109(c).** Ex. 165 ¶ 9.<br><br>The whistleblower protection provisions of the FRSA and its implementing regulations at 29 C.F.R. § 1982 et seq., prohibit a railroad from, among other things, denying, delaying, or interfering with the |

| | |
|---|---|
| | medical or first aid treatment of an employee injured during the course of employment, as well as from disciplining or threatening discipline to an employee for sting medical or first aid treatment, or for following orders or a treatment of a treating physician. **49 U.S.C. § 20109(c).** *Id.* ¶ 44.<br><br>Stewart engaged in multiple protected acts, as alleged in paragraphs 1 through 42, above, including requesting medical treatment from his chosen medical provider, Dr. Johnson, and/or for following the orders of his treating physician. **49 U.S.C. § 20109(c)(2).** *Id.* ¶ 48. |
| Christopher C. Stiltner | Stiltner was subjected to adverse actions by Respondents **for having engaged in protected activities under 49 U.S.C. § 20109(c).** Ex. 166 ¶ 9.<br><br>The whistleblower protection provisions of the FRSA and its implementing regulations at 29 C.F.R. § 1982 et seq., prohibit a railroad from, among other things, denying, delaying, or interfering with the medical or first aid treatment of an employee injured during the course of employment, as well as from disciplining or threatening discipline to an employee for sting medical or first aid treatment, or for following orders or a treatment of a treating physician. **49 U.S.C. § 20109(c).** *Id.* ¶ 44.<br><br>Stiltner engaged in multiple protected acts, as alleged in paragraphs 1 through 42, above, including requesting medical treatment from his chosen medical provider, Dr. Johnson, and/or for following the orders of his treating physician. **49 U.S.C. § 20109(c)(2).** *Id.* ¶ 48. |
| James Stinnett | Stinnett was subjected to adverse actions by Respondents **for having engaged in protected activities under 49 U.S.C. § 20109(c).** Ex. 167 ¶ 9.<br><br>The whistleblower protection provisions of the FRSA and its implementing regulations at 29 C.F.R. § 1982 et seq., prohibit a railroad from, among other things, denying, delaying, or interfering with the medical or first aid treatment of an employee injured during the course of employment, as well as from disciplining or threatening discipline to an employee for sting medical or first aid treatment, or for following orders or a treatment of a treating physician. **49 U.S.C. § 20109(c).** *Id.* ¶ 44.<br><br>Stinnett engaged in multiple protected acts, as alleged in paragraphs 1 through 45, above, including requesting medical treatment from his chosen medical provider, Dr. Johnson, and/or for following the orders of his treating physician. **49 U.S.C. § 20109(c)(2).** *Id.* ¶ 48. |

| | |
|---|---|
| Todd Thayer | Thayer was subjected to adverse actions by Respondents **for having engaged in protected activities under 49 U.S.C. § 20109(c).** Ex. 168 ¶ 9.<br><br>The whistleblower protection provisions of the FRSA and its implementing regulations at 29 C.F.R. § 1982 et seq., prohibit a railroad from, among other things, denying, delaying, or interfering with the medical or first aid treatment of an employee injured during the course of employment, as well as from disciplining or threatening discipline to an employee for sting medical or first aid treatment, or for following orders or a treatment of a treating physician. **49 U.S.C. § 20109(c).** *Id*. ¶ 44.<br><br>Thayer engaged in multiple protected acts, as alleged in paragraphs 1 through 43, above, including requesting medical treatment from his chosen medical provider, Dr. Carey, and/or for following the orders of his treating physician. **49 U.S.C. § 20109(c)(2).** *Id*. ¶ 48. |
| Travis Thornsberry | Thornsberry was subjected to adverse actions by Respondents **for having engaged in protected activities under 49 U.S.C. § 20109(c).** Ex. 169 ¶ 9.<br><br>The whistleblower protection provisions of the FRSA and its implementing regulations at 29 C.F.R. § 1982 et seq., prohibit a railroad from, among other things, denying, delaying, or interfering with the medical or first aid treatment of an employee injured during the course of employment, as well as from disciplining or threatening discipline to an employee for sting medical or first aid treatment, or for following orders or a treatment of a treating physician. **49 U.S.C. § 20109(c).** *Id*. ¶ 44. |
| Jesse Wallace | Wallace was subjected to adverse actions by Respondents **for having engaged in protected activities under 49 U.S.C. § 20109(c).** Ex. 170 ¶ 9.<br><br>The whistleblower protection provisions of the FRSA and its implementing regulations at 29 C.F.R. § 1982 et seq., prohibit a railroad from, among other things, denying, delaying, or interfering with the medical or first aid treatment of an employee injured during the course of employment, as well as from disciplining or threatening discipline to an employee for sting medical or first aid treatment, or for following orders or a treatment of a treating physician. **49 U.S.C. § 20109(c).** *Id*. ¶ 44. |

| | |
|---|---|
| | Wallace engaged in multiple protected acts, as alleged in paragraphs 1 through 42, above, including requesting medical treatment from his chosen medical provider, Dr. Johnson, and/or for following the orders of his treating physician. **49 U.S.C. § 20109(c)(2).** *Id.* ¶ 48. |
| Timothy M. Witt | This case presents the outrageous scenario of a railroad initiating a program of mass firings in of [sic] employees for treating with and following the treatment plans of their treating physicians, **in violation of 49 U.S.C. Section 20109(c)(2).** Ex. 171 ¶ 1.<br><br>The medical care providers whose treatment automatically triggered discipline prohibited by §20109(c)(2) by CSXT were . . . . *Id.* ¶ 14; *see also id.* ¶ 16 (alleging that CSXT "attack[ed] [ ] employees simply because they treated with [one of two chiropractors]"). |

*See* OSHA Complaints, attached as Exhibits 125-171 (Doc. Nos. 360-9 through 360-55).

1        IN THE UNITED STATES DISTRICT COURT FOR THE

2           SOUTHERN DISTRICT OF WEST VIRGINIA

3                    AT HUNTINGTON

4

5    - - - - - - - - - - - - - x

6    JUSTIN ADKINS, et al.,    :

7              Plaintiffs,     :  Case No.

8       v.                     :  3:18-CV-00321

9    CSX CORPORATION, et       :

10   al.,                      :

11             Defendants.     :

12   - - - - - - - - - - - - - x

13

14      Videotaped deposition of KELLY CROUCH, R.N.

15           Conducted Remotely via Zoom

16             Thursday, May 13, 2021

17                  6:30 a.m. PST

18

19

20

21

22

23   Reported By:

24       AMY L. STRYKER, CCR No. 30XI00226900

25    Job No.:  237373

1

```
 1            Videotaped deposition of KELLY CROUCH,

 2      R.N., conducted remotely.

 3

 4

 5            Pursuant to notice, before AMY L.

 6      STRYKER, Certified Court Reporter and Notary

 7      Public of the State of Maryland.

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                                                              2
```

Kelly Crouch, R.N.                                                                    May 13, 2021

```
1                 A P P E A R A N C E S
                      (Via Zoom)
2

3        For the Plaintiffs:

4            MORGAN & PAUL, PLLC

5            BY:  GREGORY G. PAUL, ESQ.

6            100 First Avenue, Suite 1010

7            Pittsburgh, Pennsylvania 15222

8            (844) 374-7200

9            gregpaul@morganpaul.com

10

11       For the Plaintiffs:

12           UNDERWOOD LAW OFFICE, INC.

13           BY: JOHN PATRICK L. STEPHENS, ESQ.

14           923 Third Avenue

15           Huntington, West Virginia 25701

16           (304) 486-3350

17

18

19

20

21

22

23

24

25
```

Network Deposition Services, Inc. ● networkdepo.com ● 866-NET-DEPO
USCA4    1622

1      A P P E A R A N C E S   C O N T I N U E D

2

3       For the Defendants:

4           NELSON MULLINS RILEY & SCARBOROUGH, LLP

5           BY: MELISSA FOSTER BIRD, ESQ.

6           949 Third Avenue, Suite 200

7           Huntington, West Virginia 25701

8           (304) 526-3500

9           melissa.fosterbird@nelsonmullins.com

10

11      Also Present:

12          JASON PATSILIS, VIDEOGRAPHER

13

14

15

16

17

18

19

20

21

22

23

24

25

4

Kelly Crouch, R.N.                                                                May 13, 2021

1                          C O N T E N T S

2

    EXAMINATION OF KELLY CROUCH, R.N.          PAGE

3

        By Mr. Paul                            7

4

5                         E X H I B I T S

6                  (Attached to transcript.)

7

    Exhibit 1  Certification of Ongoing        98
8               Illness or Injury forms

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

Kelly Crouch, R.N.                                          May 13, 2021

| | | |
|---|---|---|
| 1 | the provider. | 08:15:59 |
| 2 | Q   Okay.  And why is that? | 08:16:00 |
| 3 | A   Because it's becoming -- it's coming | 08:16:01 |
| 4 | directly from the person that completed the | 08:16:04 |
| 5 | form. | 08:16:06 |
| 6 | Q   Okay.  Do you know who Ms. Shumway is? | 08:16:07 |
| 7 | A   Who?  I'm sorry. | 08:16:11 |
| 8 | Q   Cheryl Shumway? | 08:16:13 |
| 9 | A   Yes, I'm familiar with the name. | 08:16:14 |
| 10 | Q   Okay.  And who is she, to your | 08:16:17 |
| 11 | knowledge? | 08:16:18 |
| 12 | A   I believe she was a clerk. | 08:16:18 |
| 13 | Q   Okay.  And what interaction did you have | 08:16:20 |
| 14 | with her? | 08:16:23 |
| 15 | A   I would receive e-mails from her from | 08:16:23 |
| 16 | time to time inquiring if documentation was | 08:16:25 |
| 17 | received. | 08:16:31 |
| 18 | Q   And that -- was that with respect to | 08:16:32 |
| 19 | return to work or absences? | 08:16:34 |
| 20 | A   It could be either, uh-huh. | 08:16:35 |
| 21 | Q   Okay.  Do you recall having any | 08:16:37 |
| 22 | conversations with her in the summer of 2017? | 08:16:38 |
| 23 | A   I mean, I may have had a conversation | 08:16:41 |
| 24 | with her.  I don't recall anything specific. | 08:16:44 |
| 25 | Q   Yeah, let me ask a better question. | 08:16:47 |

93

Kelly Crouch, R.N.                                              May 13, 2021

```
 1        Do you recall having any conversations      08:16:49

 2   with Cheryl Shumway in the summer of 2017        08:16:50

 3   concerning any employees treating with           08:16:55

 4   Dr. Carey or Johnson?                            08:16:58

 5      A    No.                                       08:16:59

 6      Q    Okay.  Prior to the summer of 2017, did  08:17:01

 7   you have any concerns about the receipt of       08:17:03

 8   Certificate of Ongoing Illness and Injury forms  08:17:07

 9   from Dr. Carey or Dr. Johnson?                   08:17:09

10      A    Say the first part again.  I'm sorry.    08:17:11

11      Q    Sure.  Before the summer of 2017, did    08:17:16

12   you have any concerns about the submission of    08:17:18

13   Certificate of Ongoing Illness and Injury forms  08:17:21

14   from Dr. Carey and Dr. Johnson?                  08:17:23

15      A    No concerns.  We -- we accepted          08:17:27

16   documentation from them.                         08:17:33

17      Q    Okay.  Did you ever have any             08:17:34

18   conversations with Dr. Heligman about any        08:17:36

19   concerns about forms received from Dr. Carey or  08:17:39

20   Dr. Johnson?                                     08:17:43

21      A    The concerns that were generated would   08:17:43

22   be that employees would be out for significant   08:17:48

23   time frames under the care of a chiropractor.    08:17:51

24   And when we would speak with the employees       08:17:56

25   about the return to work, we would ask if they   08:17:59
```

94

Kelly Crouch, R.N.                                                May 13, 2021

```
 1    were off for other items, issues, concerns.         08:18:01

 2    And at times there would be employees that          08:18:04

 3    would say that they had a heart attack or           08:18:08

 4    stroke or hip or knee replacement that would        08:18:13

 5    require treatment under a provider other than a     08:18:18

 6    chiropractor.                                       08:18:20

 7        Q   Okay.  And when do you recall those         08:18:20

 8    examples coming up?                                 08:18:23

 9        A   Say that again.                             08:18:25

10        Q   When -- those examples that you just        08:18:27

11    gave, like the heart attack or stroke and           08:18:30

12    treatment with other providers, when did            08:18:32

13    that -- when did that occur?                        08:18:34

14        A   It -- several times in dealing with any     08:18:36

15    documentation that was submitted by them prior      08:18:43

16    to us no longer accepting documentation.            08:18:47

17        Q   Okay.  I just want to make sure we're       08:18:50

18    talking about the same thing.  So my question       08:18:52

19    was before the summer of 2017 -- and it sounds      08:18:54

20    like you recall incidences where you received       08:18:58

21    forms specific to Dr. Carey and Dr. Johnson         08:19:03

22    that you learned from the employees included        08:19:05

23    conditions that should be treated with someone      08:19:09

24    other than a chiropractor.                          08:19:12

25        A   Correct.                                    08:19:13
```

                                                               95

| | | |
|---|---|---|
| 1 | Q   Okay.  And, I mean, do you recall that | 08:19:14 |
| 2 | happening, like, as early as when you started | 08:19:17 |
| 3 | with CSX? | 08:19:20 |
| 4 | A   I recall getting documentations from | 08:19:20 |
| 5 | them as early as when I started, yes. | 08:19:26 |
| 6 | Q   Okay.  And I know it's -- you know, if | 08:19:30 |
| 7 | you don't remember the specifics...  But was it | 08:19:31 |
| 8 | a circumstance, say, with the heart attack that | 08:19:33 |
| 9 | there was reference to treatment for a heart | 08:19:36 |
| 10 | attack in the Certificate of Ongoing Illness | 08:19:39 |
| 11 | from Dr. Carey or Dr. Johnson? | 08:19:41 |
| 12 | A   No. | 08:19:44 |
| 13 | Q   Okay.  So it was just information other | 08:19:44 |
| 14 | than what Dr. Carey and Dr. Johnson were | 08:19:47 |
| 15 | treating them for that would have -- | 08:19:51 |
| 16 | A   Yes -- I'm sorry. | 08:19:53 |
| 17 | Q   -- that was -- you would have expected | 08:19:54 |
| 18 | additional documentation for those other | 08:19:56 |
| 19 | conditions as opposed to the chiropractic | 08:20:00 |
| 20 | treatment conditions? | 08:20:02 |
| 21 | A   Yes; that should have been disclosed. | 08:20:03 |
| 22 | Q   Okay.  And so when you had those | 08:20:07 |
| 23 | conversations with the employee, what did you | 08:20:09 |
| 24 | tell them to do? | 08:20:10 |
| 25 | A   We would request that they would submit | 08:20:11 |

96

Kelly Crouch, R.N.                                                    May 13, 2021

```
 1    documentation from those treating providers         08:20:13

 2    that they were seeing for those conditions.         08:20:15

 3        Q    Okay.  All right.  But to be perfectly     08:20:19

 4    clear, the submission from Dr. Carey and            08:20:20

 5    Dr. Johnson prior to the summer of 2017 did not     08:20:25

 6    include any type of treatment outside of            08:20:27

 7    chiropractic care?                                  08:20:31

 8        A    I -- I don't recall.  I can't --           08:20:35

 9        Q    Okay.  I mean, that was -- I'm sorry.      08:20:38

10    Go ahead.                                           08:20:39

11        A    I just -- I can't be that specific to      08:20:39

12    know whether or not they did or did not mention     08:20:42

13    specifically those other concerns.  I -- I'm        08:20:45

14    not going to be able to remember that.              08:20:48

15        Q    No, that's understandable.  I guess the    08:20:50

16    question is:  At least with respect to any          08:20:52

17    questions about Dr. Carey and Dr. Johnson's         08:20:56

18    forms before the summer of 2017, you don't          08:20:59

19    recall that those COII forms were taking an         08:21:03

20    employee off for a condition outside of             08:21:07

21    something that was being treated by a               08:21:11

22    chiropractor?                                       08:21:13

23        A    Correct, I don't recall that.  There       08:21:14

24    could have been a mention of something else,        08:21:16

25    I -- but I can't speak to that because I don't      08:21:18
```

97

| | | |
|---|---|---|
| 1 | recall that. | 08:21:21 |
| 2 | Q   Okay.  Again, I don't want to belabor | 08:21:22 |
| 3 | this.  I think we have it down.  But just to be | 08:21:24 |
| 4 | clear, it wasn't a -- it was not a concern that | 08:21:27 |
| 5 | you had that Dr. Johnson and Dr. Carey were, | 08:21:29 |
| 6 | say, treating someone for a cardiac condition? | 08:21:32 |
| 7 | A   Correct. | 08:21:35 |
| 8 | Q   Okay.  It was just you were made aware | 08:21:35 |
| 9 | through the employee of other conditions, and | 08:21:38 |
| 10 | you asked for documentation of absences for | 08:21:39 |
| 11 | those conditions. | 08:21:43 |
| 12 | A   Yes, that's correct. | 08:21:43 |
| 13 | Q   Got it.  Okay.  Perfect. | 08:21:46 |
| 14 | All right.  If I can, I'll try to show | 08:21:48 |
| 15 | you this, what we'll mark as Exhibit 1. | 08:21:52 |
| 16 | (Exhibit 1, Certification of Ongoing | |
| 17 | Illness or Injury forms, was marked for | |
| 18 | identification and is attached to the | |
| 19 | transcript.) | |
| 20 | Q   Can you see that? | 08:21:57 |
| 21 | A   Yes. | 08:22:00 |
| 22 | Q   Okay.  And is it big enough or do you -- | 08:22:01 |
| 23 | A   Yeah, can you make it a little bigger? | 08:22:03 |
| 24 | I'm sorry. | 08:22:06 |
| 25 | Q   Yeah, sure I can.  And so when I do | 08:22:06 |

98

Kelly Crouch, R.N.                                                    May 13, 2021

```
 1    that, obviously, the whole page isn't there, so       08:22:13

 2    just tell me and I can screen up and down.  Is        08:22:15

 3    that more legible?                                     08:22:18

 4       A   Yes.                                            08:22:20

 5       Q   I guess there must be a way to -- there         08:22:20

 6    we go.                                                 08:22:24

 7           All right.  Do you recognize this              08:22:24

 8    particular document?  The form, not specific to        08:22:28

 9    the plaintiff, the employee, but the form             08:22:30

10    itself.                                                08:22:32

11       A   The form, yes.                                  08:22:33

12       Q   Is that a Certificate of Ongoing               08:22:34

13    Illness?                                               08:22:36

14       A   Yes.                                            08:22:36

15       Q   Okay.  This particular form in the top         08:22:37

16    left-hand corner says, "Revision 9-2014."  Do         08:22:40

17    you see where I read that?                             08:22:44

18       A   Yes.                                            08:22:45

19       Q   Were you involved with any either              08:22:46

20    recommended changes or changes to the                 08:22:48

21    Certificate of Ongoing Illness form while             08:22:50

22    employed at CSX?                                       08:22:53

23       A   Not at this time.                               08:22:55

24       Q   I'm sorry?                                      08:22:57

25       A   Not at this time in 2014.                       08:22:58
```

99

USCA4    1631

| 1 | Q   Okay.  How about at any other time? | 08:23:01 |

1    Q    Okay.  How about at any other time?        08:23:01

2    A    Yes.                                        08:23:04

3    Q    What was your involvement?                  08:23:04

4    A    The present one I believe that's now        08:23:06

5    2019, and there were recommendations.            08:23:10

6    Q    And what kind of changes were made on       08:23:12

7    the 2019 form versus this one?                   08:23:16

8    A    Honestly, the majority of the changes       08:23:17

9    were on the return to work form.  I don't        08:23:22

10   recall the specific changes for the Ongoing      08:23:24

11   Illness and Injury.                              08:23:29

12   Q    Okay.  Do you recall specifically that      08:23:29

13   changes were made to the Certificate of Ongoing

14   Illness, you just don't remember them?

15   A    Yes, I do believe that we added a

16   section on here to indicate whether or not it    08:23:41

17   was on-duty or off-duty injury, as well as       08:23:42

18   potential, I think, question for last date       08:23:46

19   worked.  So there were a couple changes, but     08:23:48

20   the majority of the changes were on the return   08:23:53

21   to work form.                                    08:23:54

22   Q    Okay.  I understood the first one about     08:23:57

23   indicating whether it's work-related or          08:24:01

24   unwork-related, but, I'm sorry, I just didn't    08:24:03

25   follow you on the second one.  I think you said  08:24:05

                                                      100

<div style="border:1px solid black">

**EXHIBIT 4**

</div>

# ORGANIZATION EXHIBIT
## II A

CSXT Labor Agreement 16-017-16

**MEMORANDUM OF AGREEMENT BETWEEN**
**CSX TRANSPORTATION, INC. ("CSXT" or "Carrier")**

**AND**

**THE INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS ("IAM');**

**SYSTEM COUNCIL NO. 9, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS ("IBEW");**

**THE INTERNATIONAL BROTHERHOOD OF BOILERMAKERS, IRON SHIP BUILDERS, BLACKSMITHS, FORGERS & HELPERS ("IBB");**

**THE INTERNATIONAL ASSOCIATION OF SHEET METAL, AIR, RAIL AND TRANSPORTATION WORKERS ('SMART");**

**THE BROTHERHOOD OF RAILWAY CARMEN-TCU/IAM ("BRC")**

This Agreement is effective on the 1st day of January, 2018 by and between CSX Transportation, Inc. ("CSXT", or "the Carrier", as appropriate) and the International Association of Machinists and Aerospace Workers ("IAM"), System Council No. 9, International Brotherhood of Electrical Workers ("IBEW"), the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers ("IBB"), the International Association of Sheet Metal, Air, Rail and Transportation Workers ("SMART") and the Brotherhood of Railway Carmen-TCU/IAM ("BRC") (hereinafter referred to collectively as the "Parties").

This Agreement confirms the Parties understanding regarding the performance of work at the Carrier's Huntington, WV Heavy Repair facility (HHR), which falls within the scope of work of the signatory organizations.

1. **Purpose**
   The Carrier commits to performing a minimum of one hundred seventy (175) 4-axle and/or 6-axle locomotive rebuilds, at Huntington during the term of this agreement, subject to capital approval.  This rebuild work includes, the installation of new cabs, upgraded heating and air conditioning systems, new control systems and positive train control technology. The Parties also agree that non-rebuild work within the scope of work of the signatory organizations may be performed at HHR, including regular maintenance work, fallout work, standard line work, cab enhancements and any other planned or required work.

   In an effort to retain locomotive rebuild work at HHR, the signatory organizations have agreed to certain changes to existing collective bargaining agreements to support and facilitate this effort.  It is understood that such work must be competitive with outside manufacturers as to quality, efficiency and time of completion.

   It is the Parties' understanding that the changes described in this letter are exceptions to the provisions of the collective bargaining agreements between CSX and the IAM, IBEW, IBB,

1

BROWN_000299

# ORGANIZATION EXHIBIT
## IIB

SMART and BRC respectively. As such, the terms set forth in this Agreement apply only to work to be performed at the Huntington Heavy Repair facility.

2. **Scope of Work**

The Carrier has represented that the locomotive rebuild work will generally involve, but not limited to:

1) Un-trucking the locomotive and relocating the locomotive to the High Bay from the Center Track;
2) Removing the car body and cab;
3) Disassembling and removing components under the hood;
4) Washing, blasting and priming the frame;
5) Reassembling the locomotive;
6) Wiring and piping major components;
7) Applying cab and hood; and
8) Painting locomotive.

It is the understanding of the parties that this work, along with non-rebuild work, falls primarily within the scope of work of the crafts represented by the IAM, IBEW, IBB, SMART, and BRC as described in the applicable collective bargaining agreements. In addition to work described in the Classification of Work and/or Scope Rules of the respective crafts, employees will perform all assigned work without regard to craft, including work that falls within the provisions of the Incidental Work Rule.

3. **Bulletining of Positions**

Employees will retain the job title of their craft ("Boilermaker", "Sheet Metal Worker", "Electrician", "Carman", "Carman Painter" "Machinist', etc.), in addition to their current roster positions for said crafts in which they hold seniority. Positons will be bulletined in accordance with the job bulletining provisions of the applicable collective bargaining agreement and will only be filled by individuals holding seniority in that craft.

4. **Workforce Ratio**

Upon the ratification date of this Agreement, the current overall relative ratio at HHR among members of signatory organizations shall be calculated and maintained thereafter for the life of this Agreement. New employees hired after the effective date of this Agreement will be distributed among the signatory organizations in order to maintain this ratio.

5. **Work Schedule Changes**

In order to retain work at HHR and to encourage greater efficiency, the Parties have agreed to the following work schedule changes related to the performance of this work:

1) This work is excluded from the contractual requirement that the normal work week be Monday through Friday, with a preference for rest days on Saturday and Sunday. The Parties agree, however, that rest days shall remain as scheduled consecutively.

2) The Carrier shall have discretion to move shift start times and may advance or defer the starting time of an employee by no more than two (2) hours with advance

2

BROWN_000300

**ORGANIZATION EXHIBIT**
IIC

notice of at least sixteen (16) hours, without regard to the starting times of other employees. It is also agreed that commencing and quitting times do not have to be uniform for all employees on each shift in the Department.

3) Overtime calls shall be performed via OTCS by a representative of the respective Signatory Organization as determined by the local committee. However, at management's discretion, overtime calling may be performed via OTCS by a member of management. Overtime call lists will be maintained in the secured, automated overtime calling system and made available for employees to review.

6. **Efficiency Differential Pay**

Employees covered by this Letter of Agreement will receive a pay differential, pursuant to the below schedule, per hour for all hours worked, in accordance with the Skill Differential provisions of the collective bargaining agreements, and is in addition to any other differential paid. The differential, to be referred to as Efficiency Differential Pay, shall become effective on January 1, 2018, or the date on which the work is first performed, whichever is earlier.

1) Efficiency Differential Pay Schedule
   a. Effective January 1, 2018; $ 1.50/hour
   b. Effective January 1, 2019; $ 1.50/hour
   c. Effective January 1, 2020; $ 1.50/hour
   d. Effective January 1, 2021; $ 1.75/hour
   e. Effective January 1, 2022; $ 2.00/hour

7. **Furlough Protection**

Employees on the Huntington Seniority Roster who are covered by this Agreement, who were hired prior to the effective date of this Agreement, and who performed service at the Huntington Locomotive Shop during the prior twelve (12) months, will not be subject to furlough for the life of this Agreement.

1) Employees on leave of absence on the effective date of this Agreement due to sickness, promotion or other approved absences, who return to service subsequent to the date of this Agreement, will be entitled to whatever rights they would have had as if they had been in active service at the time of this Agreement.

8. **General Provisions**
   1) This Agreement will remain in full force and effect for five (5) years from its effective date until 2359 hours, December 31, 2022, unless its term is extended by mutual agreement of the Parties.

   2) The Parties agree that the terms described in this Agreement are intended to apply to work performed at HHR.

   3) It is understood, that after the effective date of this Agreement, either party may make request for a meeting to discuss the Agreement in the event there is an issue or concern that may arise. The Parties agree to promptly arrange for a meeting to include the individual's signatory to the Agreement, or their successor(s).

USCA4    1635
BROWN_000301

## ORGANIZATION EXHIBIT
### 110

4) This Agreement remains in effect until changed or modified, as agreed by the parties, or in accordance with the provisions of the Railway Labor Act, as amended.

5) To the extent any terms of this Agreement conflict with the collective bargaining agreement between the Organization and the Carrier, the terms of this Agreement controls.

6) If any paragraph or term of this Agreement is deemed to be unlawful, invalid or unenforceable, the reminder of the Agreement shall remain in full force and effect and shall remain binding on the parties hereto in accordance with the provisions of the Railway Labor Act, as amended.

7) This Agreement is non-referable and made without prejudice or precedent to the national bargaining round.

8) Detailed force reports from the facility include names, craft designation and shift of each employee will be provided to the individuals' signatory to the Agreement, or their successor(s) on a monthly basis.

Signed at Jacksonville, FL this XXXX day of XXXXXXX, 2016.

FOR THE ORGANIZATIONS:

FOR THE CARRIER:

_____
J. Michael Perry, General Chairman
District Lodge No. 19,
International Association of Machinists and Aerospace Workers

_____
Gery Williams, III
Vice President, Mechanical

_____
J.J. Giuliano, General Chairman
System Council No. 9,
International Brotherhood of Electrical Workers

_____
Zachary Jones
Vice President, Labor Relations

_____                    /TA
John Mansker, Special Asst. to the Int'l President
Director, Railroad Division Services
International Brotherhood of Boilermakers,
Iron Ship Builders, Blacksmiths, Forgers & Helpers

_____
Barry E. Morton
Director, Labor Relations

4

USCA4    1636
BROWN_000302

ORGANIZATION EXHIBIT
11 Ɛ

_____

Joe Fraley, General Chairman
International Association of Sheet Metal, Air,
Rail and Transportation Workers


_____

Don Grissom, General Vice President
Brotherhood of Railway Carmen-TCU/IAM

5

USCA4     1637
BROWN_000303

1          IN THE UNITED STATES DISTRICT COURT FOR THE

2              SOUTHERN DISTRICT OF WEST VIRGINIA

3                      AT HUNTINGTON

4

5    _____
                                     )
6    JUSTIN ADKINS, et al.,          )
                                     )
7              Plaintiffs,           )
                                     ) Case No.
8          -vs                       ) 3:18-CV-00321
                                     )
9    CSX CORPORATION, et al.,        )
                                     )
10             Defendants.           )
                                     )
11

12

13

14        VIDEOTAPED DEPOSITION OF CRAIG HELIGMAN, M.D.,

15   VOLUME II, conducted remotely before Laura L. Maes, CSR

16   No. 9836, on behalf of the Plaintiffs, commencing at the

17   hour of 7:11 a.m. on Thursday, April 29, 2021.

18

19

20

21

22

23

24

25

                                                              315

```
 1    APPEARANCES:  (VIA ZOOM)

 2

      For the Plaintiffs:
 3
           EIGHT & SAND
 4         BY:  JEFF R. DINGWALL, (Pro Hac Vice)
           550 West B Street, Fourth Floor
 5         San Diego, California 92101
           619.796.3464
 6         jeff@eightandsandlaw.com

 7

      For the Plaintiffs:
 8
           GARELLA LAW, P.C.
 9         BY:  C. KIEL GARELLA, ESQ. (Pro Hac Vice)
           409 East Boulevard
10         Charlotte, North Carolina 28303
           980.321.7934
11         kiel@gljustice.com

12


13    For the Plaintiffs:

14         MORGAN & PAUL, PLLC
           BY:  GREGORY G. PAUL, ESQ.
15         100 First Avenue, Suite 1010
           Pittsburgh, Pennsylvania 15222
16         844.374.7200
           gregpaul@morganpaul.com
17

18    For the Plaintiffs:

19         UNDERWOOD LAW OFFICE, INC.
           BY:  JOHN PATRICK L. STEPHENS, ESQ.
20         923 Third Avenue
           Huntington, West Virginia 25701
21         304.486.3350

22

23

24

25
```

316

Craig Heligman, M.D.                                                      April 29, 2021

```
 1    For the Defendants:

 2         NELSON, MULLINS, RILEY & SCARBOROUGH, LLP
           BY:  MELISSA FOSTER BIRD, ESQ.
 3         949 Third Avenue, Suite 200
           Huntington, West Virginia 25701
 4         304.526.3500
           melissa.fosterbird@nelsonmullins.com
 5

 6

 7    Also present:

 8         KYLE LOSKAMP, VIDEOGRAPHER

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

317

USCA4    1640

1                    I N D E X

2

3   WITNESS

4     CRAIG HELIGMAN, M.D., VOLUME II

5

6   EXAMINATION                                    PAGE

7     MR. PAUL                                     321

8                    E X H I B I T S

9                                                  PAGE

10    Exhibit 8    Hearing Testimony Excerpts -     336
                   CSXT(ADKINS)001882-001896
11
      Exhibit 9    Transcript of Hearings,         387
12                 CSXT(ADKINS)00967-1025

13
      Exhibit 10   Transcript of Hearings,         410
14                 CSXT(ADKINS)002116-2153

15    Exhibit 11   Transcript of Hearings,         424
                   CSXT(ADKINS)003151-3182
16
      Exhibit 12   Transcript of Hearings,         436
17                 CSXT(ADKINS)001249-001321

18    Exhibit 13   Transcript of Hearings,         447
                   CSXT(ADKINS)002883-002932
19
      Exhibit 14   Transcript of Hearings,         450
20                 CSXT(ADKINS)005156-005174

21    Exhibit 15   Transcript of Hearings,         467
                   CSXT(ADKINS)003377-003467
22
      Exhibit 16   Transcript of Hearings,         474
23                 CSXT(ADKINS)001548-1622

24    Exhibit 17   Transcript of Hearings,         483
                   CSXT(ADKINS)002355-2372
25

                                                  318

1                    E X H I B I T S

2                                                            PAGE

3      Exhibit 18    Transcript of Hearings,              484
                     CSXT(ADKINS)00898-00919
4
       Exhibit 19    Transcript of Hearings,              494
5                    CSXT(ADKINS)000819-845

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                              319

```
 1              THE VIDEOGRAPHER:  Take you guys off the    12:28
 2    record?                                               12:28
 3              MS. FOSTER BIRD:  Yes.                       12:28
 4              THE VIDEOGRAPHER:  Yes, off the record at    12:28
 5    12:28 p.m.                                             12:28
 6              (Recess taken.)                              12:28
 7              THE VIDEOGRAPHER:  We're back on the record  12:34
 8    at 12:34 p.m.                                          12:34
 9              MR. DINGWALL:  So we had a short discussion  12:34
10    off the record, but I'll reiterate that we aren't      12:34
11    intending to move forward with Dr. Heligman's          12:34
12    deposition as a 30(b)(6) witness today because:        12:34
13              One, we never anticipated that the          12:34
14    depositions of yesterday and today would encompass     12:34
15    him as a 30(b)(6) witness; we didn't have              12:34
16    notification that he was a 30(b)(6) until just a       12:34
17    couple of days ago; we didn't receive his              12:34
18    document -- document production as a 30(b)(6)           12:34
19    witness until a couple of days ago; and we didn't      12:34
20    have enough time left today to complete his            12:34
21    deposition as a 30(b)(6) witness.                      12:34
22              So we will need to get a date on the         12:34
23    schedule for that, and we're happy to do that now     12:34
24    while we're on the record.                             12:34
25              MS. FOSTER BIRD:  We offered the Rule        12:35
```

<div align="right">512</div>

```
 1   30(b)(6) witness at this time with this witness.  We    12:35

 2   advised you several days ago that this witness would    12:35

 3   be offered on certain topics within that notice.        12:35

 4        I disagree that you were only provided             12:35

 5   documents for his Rule 30(b)(6) deposition a couple     12:35

 6   of days ago.  There were some supplemental              12:35

 7   documents, which you asked about each one of those      12:35

 8   in his personal and professional capacity               12:35

 9   deposition.                                             12:35

10        You asked for eight -- you asked for more          12:35

11   than eight hours per day for Dr. Heligman's             12:35

12   deposition.  Yesterday we did not use the full          12:35

13   eight hours.  Today we have not used the full           12:35

14   eight hours.  He is here, he is willing, he is able     12:35

15   to testify about those topics, and this will be the     12:35

16   time we are offering him to do that.                    12:35

17        MR. DINGWALL:  Okay.  Well, again, we              12:35

18   disagree on that topic, so we won't be moving           12:35

19   forward with this 30(b)(6) deposition.  It was never    12:35

20   intended to go forward yesterday or today, and we'll    12:35

21   need to schedule new dates for that.                    12:35

22        THE REPORTER:  Are we off the record?              12:36

23        THE VIDEOGRAPHER:  And this concludes              12:36

24   today's deposition.  We are going off the record at     12:36

25   12:36 p.m.  Thank you.                                  12:36
```

## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

JUSTIN ADKINS, et al.,

               Plaintiffs,

v.                                    CIVIL ACTION NO.  3:18-0321

CSX TRANSPORTATION, INC., et al.,

               Defendants.

### ORDER

Pending before the Court is Defendants' Motion to Strike. ECF No. 402. Upon review of the Motion and the parties' briefings, the Motion is **GRANTED, in part,** and **DENIED, in part**.

### I.  BACKGROUND

#### A.  Plaintiffs' Post-Termination Wage Information

According to the Defendants, on April 1, 2020, Defendant CSX Transportation ("CSXT") served each Plaintiff with interrogatories which asked the Plaintiffs to "[i]dentify the category of damages and the precise total amount of monetary damages sought in this litigation as well as all calculations underlying such amounts." *Mot.* 1. Defendant CSXT also asked the Plaintiffs to produce all documents supporting or relating to their claimed damages as well as all documents "relating to income or monies received by [Plaintiffs] from any source since the cessation of [Plaintiffs'] employment with CSXT[.]" *Id.* at 1–2.

On August 27, 2020, Defendants requested that the Plaintiffs complete authorization forms permitting the IRS to release their tax transcripts to the Defendants. *See Pls.' Ex. 1*, ECF No. 420-1. Plaintiffs assert that they completed those authorizations and were unaware that the IRS had not

supplied the Defendants with the requested records. *Pls.' Resp.* 2, ECF No. 420.

Pursuant to the Amended Scheduling Order dated September 29, 2020, responses to discovery requests were to be completed by March 8, 2021. ECF No. 281. Defendants claim that the discovery deadline has passed, and they are still not in possession of complete post-termination wage loss information. *Mot.* 2.

## B. Plaintiffs' Expert, Jeffrey B. Opp

Plaintiffs served their expert witness disclosures on March 22, 2021, *see* ECF No. 327, and they disclosed Jeffrey B. Opp as a damages expert. *Mot.* 2. Mr. Opp's disclosed report provides a "summary of lost earnings without consideration of post-termination earnings," and it provides a calculation of the Plaintiffs' total losses based upon both "first exposure retirement ages" and "maximized benefit retirement ages." *Opp. Rep.* 1, ECF No. 402-3

Within the report, Mr. Opp states, "I have prepared the following preliminary computations and analysis concerning the earnings losses for the named Plaintiffs . . . as a result of their termination from CSX." *Id.* The report later states "[f]or the purposes of this preliminary analysis I have not considered any amounts earned or received by the named plaintiffs after the dates of their termination. I will supplement these computations if I am later provided with additional information regarding this issue." *Id.* at 4.

Plaintiffs never provided Defendants with a supplemental report, and to the Court's knowledge, Defendants have not yet deposed Mr. Opp.

## II. LEGAL STANDARD

Rule 37(c)(1) of the Federal Rules of Civil Procedure provides,

> [i]f a party fails to provide information or identify a witness as required by 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or harmless.

> In addition to or instead of this sanction, the court of motion and after giving an opportunity to be heard [may impose other appropriate sanctions].

While a district court has broad discretion when it comes to determining whether evidence should be excluded under Rule 37(c)(1), the Fourth Circuit has adopted a five-factor test to determine whether nondisclosure was "substantially justified or harmless:"

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003).

### III. ANALYSIS

Defendants' Motion asks the Court to enter an order striking both the Plaintiffs' wage-loss claims and Plaintiffs' expert, Jeffrey B. Opp. The requests are addressed separately.

#### A. Plaintiffs' Post-Termination Wage Information

Defendants' Motion states that "five Plaintiffs—Grover Kelley, the Estate of Chad Little, Michael D. Potter, Michael L. Potter, and Clay Stiltner—have not produced any post-termination wage information, and twenty-four Plaintiffs . . . have produced only incomplete information." *Mot.* 2. Defendants argue that without complete wage information, they are unable to evaluate the Plaintiffs' claimed damages and cannot appropriately defend the claims against them. *Id.* at 5–6. Accordingly, Defendants insist that the wage-loss claims for the Plaintiffs who failed to provide complete post-termination wage information should be stricken pursuant to Rule 37(c)(1).

In response to the Motion, Plaintiffs claim that they have made attempts to comply with their discovery obligations since the beginning. Specifically, they argue that they "provided signed authorizations for IRS tax record[s] as requested by the Defendants, who in turn submitted the authorizations to the IRS." *Pls.' Resp.* 2. It was not until more than half a year later that the

Defendants notified Plaintiffs that they had not received the requested tax records from the IRS. *Id.* Plaintiffs assert that once they were advised of this, "counsel for Plaintiff worked tirelessly to obtain wage information from Plaintiffs on a rolling basis," and that in the last two months, Plaintiffs have supplied the Defendants with more than 2,000 pages of documents concerning Plaintiffs' wages. *Id.* Plaintiffs represent that as of "June 23, 2021, Plaintiffs have provided all post-termination wage documentation in their possession with the exception of two plaintiffs – Michael L. Potter and Grover Kelley." *Id.* at 1; *see Pls.' Ex. 2*, ECF No. 420-2 (June 10, 2021 disclosures); *Pls.' Ex. 3*, ECF No. 420-3 (June 23, 2021 letter addressing alleged deficiencies).

Here, the Court generally finds that Plaintiffs' delay in providing these records is both substantially justified and harmless. Turning to the factors from *Southern States Rack and Fixture*, the Court concludes that while the post-termination wage loss information is plainly important to Plaintiffs' claims, the Defendants have not suffered great surprise due to the delayed disclosure. It is clear from Plaintiffs' response that a large portion of the "incomplete information" Defendants sought was already in their possession in the form of deposition testimony. To the extent that Defendants may have suffered some surprise due to the late disclosures, the Court finds that surprise has been cured by Plaintiffs' supplementation in advance of trial.

Additionally, the Court does not believe the post-termination wage evidence will disrupt the trial, nor does the Court believe that the evidence would have made an impact on any of the pending motions for summary judgment, as the Defendants' motion for summary judgment is not targeted at the individual Plaintiffs.

Most significantly, the Court is satisfied with Plaintiffs' explanation for the delay. While it appears from Defendants' Motion that Plaintiffs did not attempt to comply with their discovery obligations until a year after being ordered to do so by the Court, *see Mot.* 2, the Court believes

the Plaintiffs have acted in good faith. Plaintiffs claim, and Defendants do not dispute, that Plaintiffs attempted to comply with Defendants' discovery request by signing authorizations for IRS tax records last summer. *Pls.' Resp.*, 2. Defendants have further failed to rebut Plaintiffs' claims that the Defendants did not notify Plaintiffs that they had not received the authorized tax records until March 2021. *Id.* Since that time, Plaintiffs have provided significant amounts of documentation to the Defendants in an attempt to satisfy the discovery requests, and the Court is satisfied that more than two months in advance of trial, they have cured the deficiencies for all but a few Plaintiffs. *See Defs.' Reply* 4, ECF No. 422 (specifically identifying only three remaining deficiencies).

Accordingly, the Court declines to strike the majority of Plaintiffs' post-termination wage loss claims. Notwithstanding that conclusion, the Court grants Defendants' Motion as to the two Plaintiffs who have continued to fail to produce wage loss information: Grover Kelley and Michael L. Potter.[1] Additionally, the Court notes that an exhibit Plaintiffs' Response indicates two named Plaintiffs, Jeremy Napier and Dennis Sargent, were still "looking" for their W-2s for certain years. *See* ECF No. 420-3. If those documents have not been provided to the Defendants by the entry date of this Order, the Court grants Defendants' motion to strike their wage loss claims for the years for which those Plaintiffs have failed to produce documentation.

## B. Plaintiffs' Expert Jeffrey B. Opp

Federal Rule of Civil Procedure 26(a)(2)(B)(i) requires parties' experts to provide a report containing "a complete statement of all opinions the witness will express and the basis and reasons for them." Because Plaintiffs never provided the Defendants with a supplemental report, Defendants contend that Mr. Opp's report is incomplete and therefore violative of Rule 26. They

---

[1] Michael Potter has voluntarily withdrawn his past wage loss claim, and Plaintiffs' counsel has represented that the Grover Kelley is making more money now than he made working at CSXT. *Pls.' Resp.* 3.

submit that "[w]ithout a complete report that meets the requirements of Rule 26(a)(2), Defendants simply cannot adequately prepare for trial and have been unfairly prejudiced in their ability to address Mr. Opp's opinions in their dispositive motions." *Mot*. 8.

In response, Plaintiffs argue that Mr. Opp's report is complete, and has been since it was provided to the Defendants on March 22, 2021. *Pls.' Resp.* 3. While his report states that it would be supplemented if he was provided with additional information, Plaintiffs argue that because post-termination wage loss changes every day, they typically would not need to provide such supplementation until thirty days before trial. *Id.* at 3–4. Additionally, Plaintiffs reason that Defendants have no basis to claim that that the report is deficient, because "[t]hrough deposition testimony of each Plaintiff last summer and the updated wage information, Defendants have known what each Plaintiff has done since their termination from CSX in 2017." *Id.* at 4.

The Court finds that it has no basis upon which to find that Mr. Opp's report is incomplete. While the report states that it is a "preliminary analysis," Mr. Opp expressly conditioned supplementation upon being supplied additional information. *Opp. Rep.* 4 ("I will supplement these computations *if* I am later provided with additional information regarding this issue.") (emphasis added). Without evidence that Mr. Opp has been provided with additional information, the Court cannot conclude that he was required to supplement his report.

Additionally, Defendants have not shown that they will be prejudiced by Mr. Opp's report or his testimony at trial, nor have they demonstrated that they will be unable to take a complete deposition of Mr. Opp. The Court has concluded that the Defendants are completely advised of Plaintiffs' earnings that would reduce their post-termination wage loss claims. Accordingly, to the extent they believe it is necessary question Mr. Opp about post-termination damages, nothing will stop them from doing so.

The Court does note that Defendants are entitled to depose Mr. Opp if they so desire. The Court has not been recently advised as to the status of scheduling. Consequently, the Court will require the parties to communicate with each other and promptly schedule the expert deposition, if requested by the Defendants.

## IV. CONCLUSION

In sum, the Defendants' Motion is **GRANTED, in part,** and **DENIED, in part**. The Motion is granted to the extent it seeks to strike the wage loss claims of Plaintiffs Grover Kelley and Michael L. Potter. Additionally, if Plaintiffs Jeremy Napier and Dennis Sargent have not yet produced their missing W-2 forms, their wage loss claims for those years are stricken. The Motion is denied to the extent it seeks to strike the wage loss claims of the remaining Plaintiffs. Finally, the Motion is denied to the extent it seeks to strike Plaintiffs' expert Mr. Opp.

The Court **DIRECTS** the Parties to communicate with each other and promptly schedule the deposition of Mr. Opp, should Defendants desire to take it. The Court will extend the discovery/deposition deadline to accommodate the completion of his deposition. If the Parties have difficulty agreeing upon a timely deposition, they shall contact the Court immediately.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER:        July 15, 2021

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE

# Courtroom Minute Entry

**Room:** Huntington                    **Case No.:** 3:18-cv-00321                    **Type:** Civil
**Caption:** Adkins et al v. CSX Transportation, Inc. et al                    **Judge:** Cheryl A. Eifert

**Started:**  7/19/2021 10:59:11 AM
**Ends:**     7/19/2021 11:41:02 AM          **Length: 00:41:52**

Judge: Cheryl A. Eifert
Courtroom Deputy: Heidi L. Guerra
Judicial Assistant: Laura Tatman
Law Clerk: Jenna Hess
Plaintiffs' Counsel: Charles Kiel Garella; Gregory G. Paul; Kenneth R. Reed
Defense Counsel: Melissa Foster Bird; Megan Basham Davis; Davis Michael Walsh

**10:59:17 AM**    **TELEPHONIC MOTION HEARING**
**10:59:47 AM**    Judicial Assistant: Laura Tatman
**10:59:49 AM**    Called case, noted appearances of counsel
**11:01:57 AM**    Parties discussed Motion to Compel Discovery Responses
**11:40:54 AM**    Hearing Adjourned

IN THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF WEST VIRGINIA, HUNTINGTON DIVISION

BEFORE THE HONORABLE CHERYL A. EIFERT, MAGISTRATE JUDGE

---o0o---

JUSTIN ADKINS, et al.,

          Plaintiffs,

vs.                           No. 3:18-CV-00321

CSX TRANSPORTATION, INC.,
et al.,

          Defendants.
_____/

---o0o---

TRANSCRIPT FROM AN ELECTRONIC RECORDING

TELEPHONIC MOTION HEARING

MONDAY, JULY 19, 2021, 11:00 A.M.

---o0o---

APPEARANCES:
(All telephonically)

For the Plaintiffs:   MORGAN & PAUL
                       100 First Avenue, Suite 1010
                       Pittsburgh, Pennsylvania  15222
                       BY:  GREGORY G. PAUL

                       GARELLA LAW
                       409 East Boulevard
                       Charlotte, North Carolina  28303
                       BY:  CHARLES KIEL GARELLA

Transcribed by:     KATHY L. SWINHART, CSR
                       Court-approved Transcriber
                       (304) 528-2244

Proceedings recorded by electronic sound recording,
transcript produced by computer-aided transcription.

1                    APPEARANCES (Continued)

2

    For the Plaintiffs (Cont'd):

3

                    KENNETH R. REED, ESQ.
4                   241 Elm Street
                    Ludlow, Kentucky  41016

5

6    For the Defendants:

7                   NELSON MULLINS RILEY & SCARBOROUGH
                    Post Office Box 1856
8                   Huntington, West Virginia  25719-1856
                    BY:  MELISSA FOSTER BIRD

9

                    NELSON MULLINS RILEY & SCARBOROUGH
10                  949 Third Avenue, Suite 200
                    Huntington, West Virginia  25701
11                  BY:  MEGAN BASHAM DAVIS

12                  MCGUIRE WOODS
                    800 East Canal Street
13                  Richmond, Virginia  23219
                    BY:  DAVIS MICHAEL WALSH

14

15

16

17

18

19

20

21

22

23

24

25

1

1          HUNTINGTON, WEST VIRGINIA

2          MONDAY, JULY 19, 2021, 10:59 A.M.

3              ---o0o---

4          THE JUDICIAL ASSISTANT:  Hello, everyone.  This is

5    Laura, Judge Eifert's judicial assistant.  We are here today

6    on the case of Adkins and others versus CSX Transport, Inc.,

7    et al.  That is case No. 3:18-CV-321.  This is regarding

8    plaintiffs' motion to compel discovery responses, document

9    No. 406.

10         May I have plaintiffs' counsel, please?

11         MR. GARELLA:  This is Kiel Garella.  I'm sorry,

12   we're talking over each other.

13         MR. PAUL:  And also Greg Paul, and also Ken Reed is

14   on here as well.

15         THE JUDICIAL ASSISTANT:  All right.  Counsel for

16   defendants, please?

17         MS. BIRD:  Good morning.  This is Melissa Foster

18   Bird.  I have in the same office with me Megan Davis, and

19   Davis Walsh from McGuire Woods is also on the line.

20         THE JUDICIAL ASSISTANT:  All right.  Thank you.

21         MR. WALSH:  Good morning.

22         THE JUDICIAL ASSISTANT:  So if that is everyone, I

23   will remind you before the judge comes in to identify

24   yourself when speaking and for the sake of a transcript, if

25   anyone orders that.  And if you'll please hold one moment

2

1    for Judge Eifert.

2        (Brief pause in proceedings.)

3            THE COURT:  Good morning.

4            MS. BIRD:  Good morning Your Honor.

5            MR. PAUL:  Good morning, Your Honor.

6            THE COURT:  All right.  I have read your briefs.

7    And before we get started and I allow you to argue your

8    positions, I'd like someone to answer a few questions for

9    me, someone on the plaintiffs' side.

10            So in your motion to compel, you agree that the

11    discovery deadline was April 22nd, and you agree that the

12    Local Rules generally require motions to compel to be filed

13    within 30 days of the date that the discovery responses are

14    due.  But you allege that there was some delay in your

15    filing of this motion because you did not discover until

16    recently that there were documents withheld that I guess

17    were never identified or never the subject of a privilege

18    log.

19            Is that correct?

20            MR. GARELLA:  Your Honor, this is Kiel Garella on

21    behalf of the plaintiffs.

22            I think that is generally correct.  You know, we

23    indeed served these discovery requests some time back, and

24    we received responsive documents.  You know, as we began

25    taking depositions, it became apparent that we were missing

3

1    certain things.  And we'd gotten an initial privilege log,

2    it was relatively short.  And then I believe while this

3    motion was still pending, we received an additional almost

4    2,700 pages of documents and a fairly voluminous privilege

5    log, you know, consisting of about a hundred pages and I

6    think over 300 different entries.

7          So it's not a -- I guess kind of implicit in the

8    whole course of discovery when you request documents, you

9    don't necessarily know what's out there.  And we didn't know

10   what was out there until -- until we've had that information

11   that, you know, we just didn't have everything.  And I still

12   don't know that we have everything.

13         THE COURT:  So tell me, what depositions were taken

14   and when were they taken that made you believe that there

15   were documents that should have been identified or produced

16   earlier?

17         MR. GARELLA:  Oh, Lord, now you're stretching my

18   memory, Judge.

19         I know there were several.  And, you know, in terms

20   of after each deposition where it sounded like there were

21   perhaps e-mails out there, oftentimes there was follow-up

22   with -- with counsel, and I believe in a few of those

23   instances we got some additional documents.

24         In terms of the actual dates of those, I do not have

25   that information at my fingertips.  I don't know if Greg or

4

1    someone else perhaps remembers that better than I do.  But I

2    think that it was -- it was never clear as to exactly what

3    it was.

4         And then I think that at least in terms of some of

5    those documents, you know, CSX has now asserted a claim of

6    privilege over those documents.  And so in terms of whether

7    or not they're privileged, we have substantial questions as

8    to that as well.

9         But, you know, as recently as -- I think one of the

10   last few depositions we took were Mr. Gus Thoele, a named

11   defendant, and Ms. Elizabeth Creedon.  And I believe in both

12   of those depositions, if I'm not mistaken, there were --

13   there were, you know, at least documents mentioned that we

14   had not been produced.

15        THE COURT:  All right.  So here's my issue, my

16   problem, is the discovery deadline was April 22nd, and you

17   didn't file any motion until the middle of June.  It's way

18   beyond the discovery deadline.  I think you're in the middle

19   of briefing summary judgment motions at this point and, you

20   know, I don't know what the status of that is.  But -- so

21   your motion is very late, and you've acknowledged that you

22   understand that.

23        The question then comes to my mind as to when were

24   you first aware of this suspicion that you weren't getting

25   all of the documents?  And if that was back in April, then

5

1     why didn't you bring it up then?  Why did you wait so late

2     in this case?  Because now it's just very late.

3          MR. GARELLA:  Well, the other thing I will add is

4     that the parties did, by agreement, consent to the extension

5     of discovery through June 30th.  And depositions weren't

6     even -- I think of all the -- even the named defendants

7     weren't wrapped up until a few weeks ago.

8          THE COURT:  That brings up another -- that brings up

9     another question for me.

10         So the parties apparently have some agreement about

11    extending discovery, and that was not something ever

12    presented to the Court, so there is no order extending

13    discovery.  I saw no written stipulation in the record

14    extending discovery.  I didn't see anything that mentioned

15    the date of June 30.

16         When I read the plaintiffs' briefs, it appears that

17    they believe it's some general blanket extension.  But then

18    when I read the defendants' brief, they say that it was only

19    an extension to do certain designated people's deposition.

20         So tell me what this agreement was.  Is it in

21    writing?  And if it's in writing, why wasn't it filed with

22    the Court?

23         MR. PAUL:  Your Honor, this is Greg Paul.  I can

24    probably take -- go ahead, Kiel.

25         MR. GARELLA:  No, go ahead, Greg.  You're more

6

1    knowledgeable about that than I am.

2          MR. PAUL:  Your Honor, this is Greg Paul on behalf

3    of the plaintiffs.

4          Yeah, Ms. Foster Bird and I did agree, and I think

5    there's likely e-mails, I'm not a hundred percent certain of

6    that, but we certainly agreed to extend discovery on a

7    number of topics.  And, in fact, that is still ongoing.

8    We're -- we're still scheduling depositions.  I know that's

9    a little bit out of the norm, but I think due to the unique

10   nature of this case, that was the agreement.

11         I think with the exception of Kiel -- there's the

12   one individual who we learned about later, aside from him,

13   Mr. Toeler, I believe, I think all the other topics were

14   squarely something that were discussed between the parties

15   and agreed to, to handle those depositions.  So it's not

16   really anything new.

17         It's just been there's -- this privilege log thing

18   that Kiel is referencing that is really the elephant in the

19   room because that's an enormous issue.

20         THE COURT:  Okay.  So I feel like I still didn't get

21   an answer to the question.

22         What did you agree to extend?  You say topics.  They

23   say -- as I recall, they said depositions.  So what was the

24   actual agreement?

25         MR. PAUL:  Sure.  I say topics, Your Honor, because

7

 1    I'm referring to the 30(b)(6) that we filed and those topics
 2    that would necessitate a corporate designation.  But that's
 3    why I referenced that.
 4            THE COURT:  So it's just -- the only agreement you
 5    had was to extend the time to finish the 30(b)(6)
 6    depositions?
 7            MR. PAUL:  Well, I don't want to -- also, there is
 8    two expert witnesses that we've agreed to extend as well.
 9    But in terms of fact discovery, I believe that is correct.
10            THE COURT:  All right.  So let me go back around,
11    then, to the time frame that you first became aware that
12    there were these documents that you believe CSX should have
13    either produced or placed on a privilege log, and you didn't
14    get either one of those.
15            When did that first happen?  When were you first
16    aware of it?
17            MR. PAUL:  I'm going to pull up the -- you know, I
18    guess the dates of the depositions that are in our primary
19    motion.  I believe that those -- excerpts of those
20    transcripts are attached, so I can pull those up.  But I
21    don't want to evade the Court's question, which is when did
22    we first become aware.  But certainly we most recently
23    became aware just a few days ago when the second amended
24    supplemental privilege log was submitted.  So, I mean,
25    that's -- that's, you know, just a few days ago.

8

1        But if the Court would permit, I can go look at our

2   motion for when those deposition transcripts occurred.  And

3   Mr. Garella mentioned I believe at least two of those

4   depositions happened after we filed the motion to compel.

5   But I can look for those right now.

6        THE COURT:  Well, I saw -- there were some

7   depositions attached, but those dates were in April.  There

8   might have been one in May, early May.  So I'm having

9   trouble understanding why it took you so long to file your

10  motion to compel.

11       It creates -- it creates a big problem as far as

12  logistics because I cannot extend any discovery date that

13  was set by Judge Chambers.  Only the judge who set the date

14  can extend that date.  And so as far as I'm concerned,

15  everything should have been done April 22nd.  You can agree

16  to do some things after that.  I don't necessarily have the

17  authority, nor would I enforce some kind of agreement that

18  is not in a stipulation filed with the Court, particularly

19  if the parties don't agree as to what they agreed to.

20       So the whole timing of this motion is problematic,

21  and that is why I need to know when there was -- if in fact

22  there were documents that should have been produced that

23  weren't, and you discovered that, then you may have a basis

24  for me compelling the production of those documents.  But if

25  you sat on it for three weeks, four weeks, five weeks and

9

1      didn't do anything about it, then you're in trouble because

2      that's beyond the time frame when you should have raised

3      this with the Court.

4            I mean, here we are now in mid July, and I think you

5      go to trial in September, don't you?

6            MR. PAUL:  We do.  The end of September, yes, Your

7      Honor.

8            THE COURT:  So that's why I'm trying to really drill

9      down on what's the time -- what's the timeline here, what's

10     the time frame?

11           If you found out at the end of April or you had a

12     suspicion at the end of April that there were documents that

13     should have been produced that weren't produced, then that

14     should have been brought to the Court's attention right

15     away, but certainly no later than the end of May.  I would

16     say right away because it was already beyond the date of the

17     discovery deadline.  So the minute you had that concern,

18     there should have been some activity there.

19           And that's why I'm trying to figure out, you know --

20     and I don't think you can rely on the documents produced on

21     June 25th because that's after you filed your motion, unless

22     those are the only documents you're concerned about at this

23     point, and I don't know.  I can't tell.

24           MR. PAUL:  I -- I'm just looking right now at

25     document No. 426, which was filed on July 15th, of the

10

1  second supplemental privilege log.  And, of course, we can't

2  even tell what's in that privilege log because the

3  descriptions are -- I don't think quite meet the standard.

4  But I just think there's a strong argument that we have

5  not -- we really don't even know what's out there because

6  the privilege log is deficient.  Certainly there has been

7  testimony that, yeah, we used e-mail but nothing specific.

8       One of our proffers on the 30(b)(6) has to do with

9  what are their preservation and retention issues with

10  respect to e-mails, so I'm not even sure that we can

11  articulate what the e-mails are specifically other than

12  people said they used e-mail, which is, you know,

13  understandable.

14       But this new privilege log is just so much of a

15  universe bigger than the initial one that I almost, you

16  know, feel like the July 15th deadline is the date that

17  we're working off of because it's the most recent

18  supplementation of that privilege log.

19       THE COURT:  Well, that doesn't make sense to me, but

20  okay.

21       So let me ask you this.  There's -- obviously there

22  is this new privilege log that they just filed, and so we

23  have those documents that I will consider to be one set of

24  documents, whatever is identified in that privilege log.

25  But there is apparently documents from before that time that

11

1   you're asking me to compel, but I don't understand why your

2   motion is so late on those, and I don't feel like I've

3   gotten a very good idea from you.

4          Let me ask somebody from the defendants' side,

5   what's the timeline on this?  And, you know, tell me when

6   you first became aware that the plaintiffs thought that you

7   were withholding documents.

8          MS. BIRD:  We first became aware that the plaintiffs

9   believed we --

10         THE COURT:  Who is this speaking here?

11         MS. BIRD:  I'm sorry.  This is Melissa Foster Bird.

12  I'm sorry, Your Honor.

13         THE COURT:  Okay.  Go ahead.

14         MS. BIRD:  We first became aware that the plaintiffs

15  believed we were withholding privileged documents, which we

16  disagree, but we first became aware of that after Benjamin

17  Crossman's deposition on April 26th of 2021.  After that,

18  anybody else that the plaintiffs cite to in terms of support

19  that we supposedly are withholding documents is -- started

20  most certainly thereafter with Penny Dreyer, who was deposed

21  on May 4th of 2021, and then Brian Barr, who was deposed on

22  May 6th of 2021.  That was the first time that we started

23  having conversations about withholding documents and --

24  which we have, again, disagreed with.

25         Any documents that should have been produced

12

1    pursuant to the discovery request back in 2020, April of

2    2020, we believe were produced.

3            The reason we bring this forward at that point, Your

4    Honor, and talk about the timing is because that sat for

5    many, many months without anything being done with that.

6    Then right against, up against the discovery deadline in

7    this case, which we believe has been continued only for

8    topics covered or only for depositions pursuant to the Rule

9    30(b)(6) notice and the experts, is when any sort of

10   continuation of the discovery deadline was done via

11   conversations with Judge Chambers in May when he asked for a

12   status conference.

13           So the first notice that we had that plaintiffs

14   believed that we were withholding documents, to be

15   completely fair, would have been May 5th, 2021 at Brian

16   Barr's deposition at -- and he was produced as a witness

17   pursuant to the Rule 30(b)(6) deposition topic No. 11.

18           THE COURT:  Okay.  Well, so, you know, I have -- I

19   just -- I've said this before, and I'll say it again.  The

20   timing of this motion is very problematic.  This is not the

21   way discovery is supposed to go, and I don't really

22   understand why you're all doing this discovery at the last

23   minute when the case has been around since 2018.

24           There has been plenty of time for discovery to be

25   done, and I don't understand why you waited until this -- at

13

1     this point in the litigation.  But it makes it very

2     difficult for me to produce any documents that you should

3     have -- when you should have raised this a long time ago.

4          I don't understand why it wasn't raised, you know,

5     really on April 27 when you first had your inclination that

6     there was something being withheld and then have your

7     discussions.  And you should have filed a motion in early

8     May at the latest, and even then it was late because

9     discovery was supposed to be done April 22nd.

10         Now Ms. Bird just said there was some conference

11    with Judge Chambers in May.  What happened at that?  Was

12    this issue raised?

13         MS. BIRD:  The issue of -- of documents, Your Honor,

14    I don't believe was raised.  We were asked at that status

15    conference to talk to the Court about where we were on some

16    things.  Particularly they brought up issues with regard to

17    30(b)(6) representative -- CSX representatives to speak

18    about 30(b)(6) topics.  We talked about some documents that

19    we believed hadn't been produced that were necessary to

20    plaintiffs' wage loss claims.  And the judge allowed until

21    the end of June -- well, he -- it's wasn't clean, Your

22    Honor, but there was a continuation of the deadlines.

23    However, the judge did allow additional depositions for the

24    topics in the 30(b)(6), the depositions of the experts, and

25    ordered plaintiffs to produce some wage loss information

14

1    that was missing, which we dealt with with the Court with

2    motions to strike wage loss.

3         THE COURT:  Okay.  So let me kind of start over

4    here.  We'll start with Mr. Toeler.

5         Tell me, plaintiffs, why you want to take

6    Mr. Toeler's deposition, when you became aware of Mr. Toeler

7    and what you think he can add to the case.

8         MR. GARELLA:  Your Honor, this is Kiel Garella.

9         When we found out about Mr. Toeler was -- and I have

10   to look back at our certificate of service, is when we --

11   when we noticed his deposition.  We found out through our

12   own investigation that perhaps Mr. Toeler had been treating

13   with one of the two chiropractors that are at issue in this

14   action, and I believe my understanding is he is still an

15   employee of CSX Transportation.

16        Now if that's the case, we certainly would like to

17   know why, why he was not when everybody else, if they were

18   treating at the same time, was terminated.

19        THE COURT:  Well, do you think Mr. Toeler is going

20   to know the answer to that question?

21        MR. GARELLA:  I believe he's a management employee,

22   and I believe there's a chance he might know the answer to

23   that question.  Until we ask him that question, I can't say

24   what he would testify to for sure.

25        That was -- that deposition, I just found it here,

15

1    was noticed on June the 9th of this year.

2         THE COURT:  Let me hear from the defendants on

3    Mr. Toeler.

4         MS. BIRD:  We've never heard Mr. Toeler's name come

5    out throughout this entire case.  We did not know

6    Mr. Toeler's name until the plaintiffs brought it to us.

7    That June 8th request or demand or notice, unilaterally

8    noticed deposition is the first we've heard of Mr. Toeler.

9    And we object to reopening discovery for so many reasons,

10   but including the deposition of someone that has not been

11   named by anyone in this case until June 8th.

12        THE COURT:  Okay.  I'm going to deny the request to

13   take Mr. Toeler's deposition.  I think that is just one of

14   those neverending things.  You may find out tomorrow that

15   some other employee of CSX went to one of these

16   chiropractors, and then you're going to want to take his

17   deposition as well or her deposition.  I mean, it may never

18   end.  He's never been identified as a witness, so, you

19   know -- and I don't -- to be quite honest with you, I doubt

20   very much that he could tell you why he wasn't fired by --

21   by his superiors at CSX.  I mean, people know why they've

22   been fired.  They really seldom know why they haven't been

23   fired.  So I'm going to deny your request to take his

24   deposition.

25        Now on the 30(b)(6) deposition, as I understand it,

16

1    Judge Chambers said you could go ahead and finish up the

2    30(b)(6) deposition; is that right?

3            MR. PAUL:  I believe that is correct, Your Honor.

4    This is Greg Paul.

5            MS. BIRD:  I'm sorry.  This is Melissa Foster Bird.

6            But for two issues that were going to be re-brought

7    to the Court.  One was whether or not Dr. Heligman's

8    deposition could be taken on certain topics.  That I think

9    has been decided, and we have agreed to produce Dr. Heligman

10    for deposition.  We have given the plaintiffs three dates to

11    choose from.  They have not yet told us which one they want.

12            The second issue is one that we agreed to bring to

13    you, Your Honor, if we could not get it worked out, and it's

14    about document retention and the destruction policy.  That

15    has not been briefed for the Court and is not ripe for

16    decision at this point.

17            THE COURT:  Yeah, okay.  I'm glad you figured it out

18    with the doctor because I was going to grant their motion to

19    take the doctor.  I don't -- I don't think they had any

20    obligation to take his 30(b)(6) deposition on the two days

21    that you decided he would be offered for another purpose, so

22    they had every right to get a different and separate date

23    for his role as the corporate representative.  So I'm glad

24    you worked that out.  I urge the plaintiffs' counsel to pick

25    a date and get it done, but -- so that one is resolved.

17

1           Now as far as documents --

2           MR. PAUL:  Your Honor, I'm sorry.

3           THE COURT:  Go ahead.

4           MR. PAUL:  I apologize, Your Honor.  This is Greg

5    Paul.

6           On that topic, they've offered several dates just

7    within the last two weeks of July.  Our only hesitation in

8    selecting one of those dates is until we have this e-mail

9    issue ironed out, we obviously -- Dr. Heligman is a key

10   player, and to the extent that there are e-mails, we would

11   obviously want those before taking his deposition.  So we

12   feel like, you know, being funneled into just those last two

13   weeks until this issue is resolved is a little bit, ah,

14   inappropriate.

15          But we certainly can be available, one of us can be

16   available any day that the doctor is available.  It's just

17   we would ask that the Court have an opportunity to rule on

18   this, the Court rule on this e-mail issue before we take his

19   deposition.

20          THE COURT:  All right.  Well, yeah, I think -- well,

21   I will definitely rule on that today, and we'll finish that

22   up.  But, you know, again, I want to emphasize your trial

23   begins on September 21, so there is not really a whole lot

24   of time to get this deposition completed.

25          I suggest that you take a date.  If -- if in fact

18

1   you take his deposition, and there are e-mails that have not

2   been produced that they've been ordered to produce, then

3   I'll let you take it again just to talk about those

4   documents.

5        So, you know, I'm telling --

6        MR. PAUL:  Okay.

7        THE COURT:  I'm telling both parties here that this

8   needs to be done, all this needs to be done like ASAP,

9   because it's just really late in the game to be bringing

10   these sorts of things up.  Which kind of is a segue into my

11   next concern, this whole 30(b)(6) topic of document

12   retention and retention practices.  You know, that's

13   something that you do very early on in a case.  I don't --

14   it's awfully, again, late in the game to be asking them who

15   retained what and where they keep things.  I mean, why is

16   this being done so late in the case?

17        MR. PAUL:  Your Honor, this is Greg Paul.

18        I mean, I can say that we certainly issued the first

19   version of this back in the fall and, you know, the parties

20   have worked through a number of issues, sometimes

21   successfully, sometimes not, but we've handled and completed

22   a number of topics.  I think when I filed the 30(b)(6), I

23   put -- you know, I struck through those parts that were

24   completed, and we just haven't been able to reach agreement

25   on some of them.

19

1          I don't know that that is an adequate explanation

2     for where we find ourselves, but I think I can at least say

3     I believe that the parties tried to work through a lot of

4     these cooperatively, perhaps to our own fate, but -- you

5     know.

6               THE COURT:  Okay.  Well --

7               MR. PAUL:  Given the number of plaintiffs in the

8     case, we tried to work out as many things as we could.

9               THE COURT:  It sounds like you still want to brief

10    this topic as well; is that right?

11              MS. BIRD:  At minimum, Your Honor.

12              THE COURT:  Okay.  So -- all right.  Again, I'm just

13    flabbergasted that this is all being done -- you know, so

14    you're talking really about having this topic resolved just

15    a few weeks before you go to trial, which is pretty late.

16    So -- but if you want to do your briefing on it, I'll give

17    you each 10 days and just -- I'm not doing the whole

18    response and reply stuff.  You need to anticipate in your

19    brief what you think the other side is going to say and

20    respond to it.  But you each have 10 days from today's date

21    to brief whatever this document retention issue is.

22          I'd suggest that you go on with whatever other

23    depositions you need to finish up during that time frame,

24    and I will try to get to that as quickly as possible, to see

25    whether or not a 30(b)(6) witness has to testify to that,

20

```
 1   document retention things.  Okay?
 2        MR. PAUL:  Yes, Your Honor.
 3        THE COURT:  Any other issues, any other questions or
 4   comments or concerns on this whole issue of the 30(b)(6)
 5   topic of document retention?
 6        MS. BIRD:  Not at this time, Your Honor.
 7        MR. PAUL:  I don't -- no, Your Honor.  This is Greg
 8   Paul.
 9        THE COURT:  All right.  So we've taken care of
10   Toeler.  We've taken care of the doctor, the document
11   retention issue.  You're going to do your 30(b)(6) topics
12   that Judge Chambers told you to go ahead and do.  You're
13   going to do your expert depositions.  And that just leaves
14   the two what I call different, separate categories of
15   documents.
16        The documents that are mentioned in this most recent
17   privilege log is one set, which I think the plaintiffs want
18   me to do an in camera review of; is that right?
19        MR. GARELLA:  Your Honor, this is Kiel Garella.
20        Yes.  I mean, I think, number one, the privilege log
21   doesn't -- doesn't give us -- allow us to assess the
22   validity of the claimed privilege.  There are a number of
23   folks who were involved in certain e-mails who are not
24   attorneys, who one way or the other -- and, of course, as we
25   all know, really because an attorney is copied or part of an
```

21

1    e-mail doesn't necessarily, you know, convey the

2    attorney-client privilege or attorney, you know, work

3    product protection.

4        It -- you know, certainly if an in-house lawyer is

5    operating in a, you know, capacity as a business advisor,

6    that certainly wouldn't be privileged.  Of course, we

7    have -- we have no way of knowing to what -- what is and

8    what is not privileged.  And I think unless Your Honor has

9    another idea, I think the only way to review that is with an

10   in camera review.

11       THE COURT:  Let me hear from the defendants on that.

12       MS. BIRD:  Well, part of it is the professionalism

13   and ethics responsibilities that we have and that we own of

14   not giving these documents as privileged.  We have gone

15   through these documents, we have looked at them, we have

16   scoured them more than once.  And when we find something

17   that we believe that was improperly marked or not disclosed,

18   we have come forward to the plaintiffs with that.  We just

19   did that last -- yesterday -- this past weekend when we were

20   going through documents that were inadvertently marked

21   privileged.

22       So part of this is the trust that you should have in

23   an officer of the Court to represent that something is

24   privileged when it is privileged in fact.

25       So we gave the plaintiffs a list of all of the

22

1   licensed attorneys whose names were in the to, the prime or

2   the copies of each of those documents.  We went back and

3   looked at the documents that were not marked with a

4   plaintiff -- with a licensed attorney's name and told the

5   plaintiffs why those documents were privileged, particularly

6   someone internal to CSX passing attorney-client privilege or

7   attorney work product information to another person inside

8   CSX, which would not break the privilege, and we told them

9   that.

10       So the implication that there is no ability for

11  defendants' counsel to mark something privileged when it

12  clearly is privileged, has a lawyer's name, or we have given

13  them a reason that it is not privileged -- or is privileged,

14  coupled with the fact that when we have discovered things,

15  we have come to them and said this was inadvertently marked

16  and given it to them I think is your response, that this has

17  been done, that there is no indication by anyone on the

18  plaintiffs' side that something is marked improperly, that

19  something looks like it would have become contradictory to

20  something that was said in one of these depositions that

21  they're going back to.

22       We don't believe this stuff was necessary to be

23  produced anyway, particularly not in response to the

24  discovery requests over a year ago and not in response to

25  this 30(b)(6) notice when the deponents have not even

23

1    reviewed this information.

2         So the response is they -- the effort to make an

3    issue there that is not an issue.  Now, I will do whatever

4    the Court asks us to do obviously, but there is -- there is

5    an issue being made of something that is very clearly not an

6    issue with these documents in the privilege log.

7         THE COURT:  So I think -- I think the only problem

8    that I see with your privilege log and, you know, it's a

9    problem for me maybe in part because I don't know who any of

10   these people are, but there is no -- not any kind of

11   description whatsoever of what it's about.  There has to be

12   something provided to the other side for them to be able to

13   tell whether it is a privileged piece of information or not.

14   And just the date, that it's an e-mail and the names of the

15   people don't necessarily give you enough information to tell

16   whether this would be -- I mean, what the rule requires is

17   that you describe the nature of the documents,

18   communications or tangible things, and do so in a manner

19   that, without revealing information itself privileged or

20   protected, will enable the other party to assess the claim.

21        So what the plaintiffs' counsel is saying is, well,

22   yeah, you know, maybe there is an attorney on the -- on a CC

23   line here, but that doesn't necessarily tell us anything

24   about whether this particular document is privileged or not.

25   And I think that's the main problem with the log, there is

24

1     just not enough about the subject matter.

2          Granted, it is a hard line to walk because you

3     can inadvertently disclose too much in trying to give that

4     description, but there has to be something more than it's

5     just an e-mail.  That just doesn't tell them anything.

6          So I think what I would -- and certainly, Ms. Bird,

7     I'm not questioning your ethics.  I have every reason to

8     believe that anyone who worked on this case would have

9     looked at those and made a fair conclusion that it was

10    privileged.  But people have disagreements about what is

11    privileged or not and how far that privilege reaches and

12    whether that privilege has been waived in some way, and so

13    you can have a reasonable disagreement that doesn't

14    implicate anybody's ethics whatsoever.

15         But I think what might be a wise thing to do is for

16    me to look at a sampling of these, maybe up to, say, 30

17    documents.  And what I'll do is allow the plaintiffs,

18    plaintiffs' counsel to identify 30 documents out of this

19    most recent privilege log that you want me to look at and

20    take sort of that representative sampling, and then I'll get

21    a better idea as to whether there are questions about the

22    privilege that was asserted or whether it's just clear-cut

23    and we have no reason to look at the rest of them.

24         So how long will it take the plaintiffs to produce

25    that list to the defendants?

25

1           MR. GARELLA:  Your Honor, this is Kiel Garella.

2           We can do that today.

3           THE COURT:  All right.  So by the end of today,

4     you'll identify 30 of these documents.

5           And then, Ms. Bird, what I'd like you to do is send

6     them to me in chambers, to Laura.  And if you want to put

7     any context for these documents that you think will help me

8     understand why you've declared them attorney-client

9     privilege or work product, feel free to do that.  Anything

10    that you may have said to the plaintiffs' counsel that you

11    think makes it clear that these are privileged, just any

12    other information that you want to give me that puts these

13    in some sort of context would be helpful to me.

14          And how long do you think it will take you to do

15    that if you get the list of 30 today?

16          MS. BIRD:  I would say by Thursday, Your Honor.

17          THE COURT:  All right.  So if --

18          MS. BIRD:  At the -- at the latest.  I mean, I

19    anticipate we can get them to you more quickly than that

20    honestly.  I have a deposition tomorrow is the only reason

21    I'm hesitant.

22          THE COURT:  Okay.  So I'll give you until Thursday

23    then to do that.  And like I said, and you know this, don't

24    file them with the clerk.  Just send them directly to Laura

25    or deliver them here, however you want to do it, and then I

26

1       will take a look at those right away.

2               So that takes care of that group.

3               Now there is the last group, which are -- which is

4       this amorphous document production that you don't think took

5       place completely.  And I still don't feel like I have a very

6       good sense of what it is you think they did not produce that

7       they should have.

8               MR. GARELLA:  Your Honor, this is Kiel Garella.

9               Are you talking about the most recent production?

10              THE COURT:  I don't know what you're talking about,

11      that's the problem.  I mean, I understand the documents that

12      are on the privilege log, but I don't know what else it is

13      that you think you should have been given that you weren't

14      given.  And, you know --

15              MR. GARELLA:  Sure.  No, that's a necessary

16      question.

17              I think that's -- my guess is that anything that we

18      think that we have not been given has probably been marked

19      as privileged.  I don't know that we have any specific

20      documents that we can identify and say, hey, you haven't

21      produced, you know, X, Y and Z.

22              My -- my inkling is they've probably been designated

23      as privileged in this most recent privilege log.  And if we

24      get that sorted out -- and I'll let Greg or somebody jump in

25      and correct me if I'm wrong.  But if we can get that sorted

27

1　out, I believe that would probably satisfy most of our

2　requests assuming that -- I don't think we have any specific

3　it's been turned over, and counsel is not -- you know,

4　again, we're certainly not questioning anyone's ethics.  But

5　I think as Your Honor mentioned, we can have a reasonable

6　disagreement as to whether something is privileged.

7　　　　　If it's been produced as a relevant document or it's

8　been withheld on the basis of privilege, I don't think we

9　have any other basis to further question.  I think at this

10　point, it's probably what has been marked as privileged is

11　the issue.

12　　　　　MR. PAUL:  Your Honor, this is Greg Paul.

13　　　　　That's correct.  When we first filed the motion,

14　there were a whole category, such as the FMLA screenshots,

15　that have since been produced and some other categories of

16　documents.  So what Mr. Garella said is correct as the

17　current status.

18　　　　　THE COURT:  So if I'm to understand you then, just

19　to make sure I'm clear, the documents that you were

20　referencing when you filed your motion to compel, you

21　believe that those documents have now been identified as

22　privileged on this most recent privilege list and -- or

23　they've been given to you?

24　　　　　MR. GARELLA:  Yes, I believe that's correct, Your

25　Honor.

28

1         THE COURT:  All right.  So we really don't need to

2    do anything on that other group of documents.  We just need

3    to look at -- we need to get some representative sampling

4    from this privilege log and figure out what we have there.

5    And then if there is questions that I have, we'll get

6    together again and maybe I'll need to look at more, maybe I

7    won't.  But we'll try to get that part done as soon as

8    possible.

9         And then, you know, if we need to get back together,

10   it would be good to try to do it within that -- at that time

11   when your 10 days of briefing are due.  So, you know, maybe

12   like two weeks from now we would have another conference,

13   and we can talk through the privileged documents as well as

14   this document retention topic for the 30(b)(6) witness.

15        Now, you said there were some e-mails that this

16   doctor may have that you're going to need before his

17   deposition.  And what would that be?  Would that be within

18   this group of privileged documents?

19        MR. PAUL:  This is Greg Paul.  Yes, Your Honor.

20        THE COURT:  Okay.  Well, you know, I'm going to

21   leave it up to the parties as to when you want to schedule

22   the doctor's deposition.  I think realistically it's going

23   to be, you know, probably a week at the minimum before there

24   is some resolution of the whole privileged document issue,

25   so I don't know what you want to do about that, if you want

29

```
 1    to go ahead and take his deposition and then redepose him on
 2    specific documents, or whether the defendants would prefer
 3    to put that deposition off a week or two in hope that all of
 4    this is resolved before he's deposed.
 5            So I'll let you -- I'll let you guys figure that
 6    out, and then I will take a look at this other briefing and
 7    these documents.
 8            So is that -- does that cover everything?
 9            MR. GARELLA:  This is Kiel Garella for the
10    plaintiffs, Your Honor.  I believe that covers everything
11    from our end.
12            THE COURT:  Ms. Bird?
13            MS. BIRD:  I think so, Your Honor.  Thank you.
14            THE COURT:  All right.  Okay.  Well, then this
15    matter is in recess.  Thank you.
16            MR. GARELLA:  Thank you, Judge.
17             (Proceedings were adjourned at 11:40 a.m.)
18                           ---o0o---
19
20
21
22
23
24
25
```

USCA4    1683

1    CERTIFICATION:

2         I, Kathy L. Swinhart, CSR, court-approved transcriber,

3    certify that the foregoing is a correct transcription from the

4    official electronic sound recording of the proceedings in the

5    above-entitled matter on July 19, 2021.

6

7

8    October 21, 2021
     DATE

9

10   /s/ Kathy L. Swinhart
     KATHY L. SWINHART, CSR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

**JUSTIN ADKINS, et al.,**

      **Plaintiffs,**

**v.**                                       **Case No.: 3:18-cv-00321**

**CSX TRANSPORTATION, INC., et al.,**

      **Defendants.**

### <u>ORDER</u>

Pending before the Court is Plaintiffs' Motion to Compel Discovery Responses. (ECF No. 406). The parties appeared, by counsel, for a telephonic motion hearing on July 19, 2021. For the reasons stated during the hearing, the Court **GRANTS, in part,** and **DENIES, in part,** the motion as follows:

1. The Court **DENIES** Plaintiffs' request to compel the deposition of T.J. Toeler.

2. The Court **GRANTS** Plaintiffs' request to take a Rule 30(b)(6) deposition of Craig Heligman, M.D., concerning the topics provided in the deposition notice **except** for the topic concerning Defendants' document retention and destruction policies.

3. The Court **ORDERS** the parties to file on or before **July 29, 2021,** briefs in which they argue their respective positions concerning the Rule 30(b)(6) topic concerning Defendants' document retention and destruction policies. No response or reply briefs will be permitted. After reviewing the parties' positions, the Court will rule on Plaintiffs' request for a Rule 30(b)(6) deposition on the topic of document retention and destruction policies.

4. The Court **ORDERS** Plaintiffs to identify no more than 30 documents from Defendant's recent privilege log for *in camera* review. Plaintiffs were ordered to notify Defendant CSX Transportation, Inc., on **July 19, 2021**, which 30 documents they identified, and Defendant shall provide the selected documents to the undersigned for *in camera* review on or before **July 22, 2021**. Defendant should hand-deliver, mail, or email the documents directly to Judicial Assistant, Laura Tatman. The documents shall not be filed in the official record. Defendant

may include with the documents a statement of the reasons supporting Defendant's claim of privilege, as well as the representations that Defendant made to Plaintiffs concerning the nature of the privilege.

The Clerk is instructed to provide a copy of this Order to counsel and any unrepresented parties.

**ENTERED**: July 20, 2021

Cheryl A. Eifert
United States Magistrate Judge

EXHIBIT A

 **NELSON MULLINS**

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AND COUNSELORS AT LAW

Melissa Foster Bird
(Admitted in VA WV OH & KY)
T: (304) 526-3503  F: (304) 526-3543
Melissa.FosterBird@nelsonmullins.com

949 Third Ave., Suite 200
Huntington, WV 25701
T: 304.526.3500  F: 304.526.3599
nelsonmullins.com

January 20, 2021

Gregory G. Paul
Morgan & Paul, PLLC
100 First Avenue, Suite 1010
Pittsburgh, PA 15222

RE:    *Justin Adkins, et al. v. CSX Transportation, Inc., et al.*
United States District Court for Southern District of West Virginia
Civil Action No: 3:18-cv-0321

Dear Greg:

We have received and reviewed the Notice of 30(b)(6) Deposition for Defendant CSX Transportation, Inc. ("CSXT"), that was filed on January 8, 2021, and which sets forth 40 areas of inquiry. Thank you for speaking with me about it on January 15, 2021.  As we discussed during that call, we are treating the deposition notices for the 30(b)(6) witness and for Gus Thoele, Curt Shogren and Craig Heligman as placeholder notices and they will not go forward on the date scheduled.

Also as we discussed, we are working to identify responsive documents to the Rule 30(b)(6) Notice and will produce those documents in response to the requests for which we do not have objections on or before February 8, 2021. That said, CSXT has several objections to the Notice. Although we will produce responsive policies and procedures that are not otherwise privileged, the Notice as it stands, poses undue burden to CSXT as a result of its overbreadth such that the information sought therein is not proportional to the needs of the case, and the burden or expense of the proposed discovery outweighs its likely benefits under Rule 26(b)(1).

On its face, the Notice contains very few, if any, temporal limitations with respect to the areas of inquiry and documents requested. For example, in the Notice for deposition pursuant to Rule 30(b)(6) and paragraph Number 1 seeks testimony and documents related to "Defendant's policies, procedures and practices for providing a medical leave of absence for an employee with medical restrictions following a non-work-related injury." Such a request is substantially overbroad as it seeks any such documents since the incorporation of CSXT.  This area of inquiry, and other similar paragraphs seek information that is not relevant to this matter and are not reasonably calculated to lead to the discovery of admissible evidence. In places in which there are temporal limitations, areas of inquiry seek information and documents from 2000 through present which is also

CALIFORNIA | COLORADO | DISTRICT OF COLUMBIA | FLORIDA | GEORGIA | MARYLAND | MASSACHUSETTS | NEW YORK
NORTH CAROLINA | SOUTH CAROLINA | TENNESSEE | WEST VIRGINIA

USCA4    1688

January 20, 2021
Page 2

overbroad as they seek information that is unrelated to this matter. In a sincere effort to produce relevant unprivileged documents, we propose using the time period set forth by the Court in its Order granting, in part, CSX Corporation's Motion for Protective Order (ECF 77). In that Order, the Court required that relevant information be limited from January 1, 2017, through July 1, 2018. We believe that this time period is adequate to produce information that is relevant. We propose as we schedule the deposition(s) of the corporate representative we also use this time window. Please let me know your thoughts.

The areas of inquiry set forth in the Notice are also overbroad to the extent that they are not limited to Plaintiffs in the current matter and seek information regarding employees and former employees of CSXT that are not parties here. As an example, area of inquiry Number 10 appears to request that Defendant identify by name and department any employee of CSXT who was on medical leave of absence and was subjected to any form of discipline. However, this area of inquiry, and other areas of inquiry, seek confidential information regarding employees and former employees of CSXT and pose significant privacy concerns including the disclosure of medical information and employment information of nonparties. To the extent any areas of inquiry are not limited to the Plaintiffs or seek the disclosure of private information regarding other employees or former employees of CSXT, we propose that the areas of inquiry be limited to the Plaintiffs in this matter or you propose some other way to protect the employees and former employees that are not named Plaintiffs.

Further, based on the areas of inquiry set forth in the Notice, certain documents are privileged under attorney client privilege and/or the work product doctrine pursuant to Rule 26 of the Federal Rules of Civil Procedure. Any documents that are responsive to the areas of inquiry but are privileged as a result of attorney involvement, internal or external, will be designated as privileged and a privilege log will be produced in accordance with the Federal Rules of Civil Procedure.

Based on our prior conversation on January 15, 2021, we understand that areas of inquiry related to the "Preservation of Electronic Data, including Emails, Texts, and Minutes," are related to document productions in the *Adonis Ginn v. CSX Transportation, Inc.*, matter. As we discussed, I will review documents provided in that matter and provide specific objections and responses to these areas of inquiry as appropriate. We will then revisit Paragraphs 12 through 20 in the Notice of Deposition pursuant to Rule 30(b)(6).

We are working to identify relevant policies and procedures and will produce individuals to testify as to the relevant areas of inquiry. However, prior to any deposition and production of documents, we believe that it is necessary to limit the areas of inquiry in time and scope as set forth above. Please let me know whether we can come to an agreement regarding limiting the areas of inquiry to documents and information from January 1, 2017, through July 1, 2018, and limiting the areas of inquiry to information and documents relating to Plaintiffs in this matter.

As a final matter, you have indicated that you intend to go beyond the seven-hour time limit allowed in the Federal Rules of Civil Procedure for a deposition of Dr. Heligman. However, the

January 20, 2021
Page 3

only time range you mentioned in our call was 58 hours, to align with the 58 Plaintiffs in this matter. Obviously, we object to that length of deposition for a singular person in a singular matter. I am willing to work with you in good faith to come up with an acceptable length for Dr. Heligman to sit for deposition but I need a more realistic estimate as a starting point.

I look forward to your thoughts and our continued efforts to confer regarding these deposition notices.

Very truly yours,

Melissa Foster Bird

MF/nrh
cc:    C. Kiel Garella
       Jeff R. Dingwall
       Kenneth R. Reed

EXHIBIT B

## Megan Davis

| | |
|---|---|
| **From:** | Jeff Dingwall <jeff@eightandsandlaw.com> |
| **Sent:** | Thursday, June 17, 2021 12:49 PM |
| **To:** | Melissa Foster Bird |
| **Cc:** | Nathan Hamons; Kiel Garella; Megan Davis; Gregory Paul; Patrick Stephens; Shelby Cardoza; Jen Rosenwald |
| **Subject:** | Meet & confer re Thoele Deposition |

◄External Email► - From: jeff@eightandsandlaw.com

Melissa - today Mr. Thoele testified that he received an email from Penny Dreher regarding talking points/questions for him to use in the investigations. I have not seen this email produced anywhere. Please let me know if you have produced it, and if not please do produce it as soon as possible. It is directly responsive to, among others, RFP Nos. 1, 6, 9, 17, and 23 to Mr. Thoele on behalf of the individual plaintiffs.

Mr. Thoele also testified that he has testified in at least 3 other depositions as a CSX employee, including once as a 30(b)(6) designee. Please produce these transcripts as they are directly responsive to, among others, RFP No. 11 to Mr. Thoele on behalf of the individual plaintiffs.

Mr. Thoele also testified that he was demoted from a management position to an agreement position in January of this year due to performance issues. Please produce his personnel file as it is directly responsive to RFP No. 14 on behalf of the individual plaintiffs and is relevant to his capabilities as a management employee and a hearing officer as to the plaintiffs. Similarly, please produce his job descriptions which are responsive to RFP No. 16.

Please also produce Mr. Thoele's cell phone records that reflect calls to/from Penny Dreher (and any others) during the pendency of the 2017 investigations to which he testified today and which is responsive to RFP Nos. 1, 6, 18, 23.

Please also amend and/or supplement the response of Mr. Thoele to Interrogatory No. 10 as he testified today that he received information from at least the following individuals with regard to asking questions in the formal investigations: Penny Dreher, Dr. Heligman, Melissa McDuffie. Accordingly, please also supplement and/or amend the response to RFP Nos. 7, 9 and 17 on behalf of Mr. Thoele.

Please also supplement and/or amend the response to Interrogatory No. 11 on behalf of Mr. Thoele as he testified today that the information regarding the number of times he has served as a hearing officer can be obtained from FACTS. Accordingly, please also supplement and/or amend the response to RFP Nos. 12 and 17 on behalf of Mr. Thoele.

Thank you.

**JEFF R. DINGWALL**

**EIGHT & SAND | LAW OFFICE OF JEFF R. DINGWALL, PC**
**P** (619) 796-3464 **C** (858) 361-9930 **F** (619) 717-8762 **E** jeff@eightandsandlaw.com
550 West B Street, Fourth Floor | San Diego, CA 92101

1

EXHIBIT C

PLAINTIFF'S EXHIBIT
3

Scott Kuhner 05-03-21
A. Cluff CSR 13812

| From: | LegalHoldMB☐csx.com |
| To: | Clark, Atalaya |
| Subject: | Legal Hold Notice - Abdon, Tony v CSXT 623782, 201800118 |
| Date: | Friday, February 23, 2018 8:30:02 AM |

## LEGAL HOLD NOTICE - 201800118 - PLEASE READ THE ENTIRE NOTICE AND
## RESPOND TO THE QUESTION AT THE END

The Company has received notice of a **COMPLAINT** filed by Tony Abdon **(ID No. 623782)** alleging **Retaliation for following doctor's orders**, allegedly in violation of the Federal Rail Safety Act. This notice is to inform you that in light of these legal claims, CSX and its employees are obligated to maintain and preserve relevant records and information.

> **IMPORTANT: This legal hold is your notice to immediately suspend the retention schedule for all potentially responsive records and information. Until further written notice, do not destroy, discard, delete, change or alter potentially responsive paper records, electronic documents or other electronically stored information, or physical objects. Your failure to preserve responsive records and information could subject the Company or you to court imposed sanctions.**

You should immediately act to preserve and maintain all responsive paper records (including, but not limited to, correspondence, notes, drafts, work papers, calendars, diaries, logs, etc.) or physical objects in a location that is secure and easily accessible. Electronically stored information other than emails (including, but not limited to Word documents, Excel spreadsheets, PowerPoint documents, audio recordings including voicemail, videos, instant or text messages, removable devices such as DVDs and flash drives, etc.), should be maintained in its original format and not manually or automatically moved, deleted or altered. An acceptable way to store potentially responsive emails is to copy them into an ECM folder. The name of the ECM folder should contain **201700544,** followed by your RACF ID, with an underscore between. (Example: **201700544_Z9999).**

You may be contacted in the next several weeks to determine what information you have and how to transfer it for longer-term preservation, but you should continue to preserve the information as described above until further notice. If it becomes necessary to collect your electronic documents or information, someone from the law or risk management department will contact you with further instructions. In the meantime, do not attempt to collect your electronic documents, other than copying emails to ECM, as the law department uses a standard collection and tracking protocol to meet applicable legal requirements.

**Records and information subject to this Legal Hold include:**

1. The following complete files relating to Tony Abdon.

Personnel;

Medical;

Labor Relations;

EEOC;

Internal Audit;

2. Payroll records concerning Tony Abdon;

3. Employment applications submitted by Tony Abdon;

4. CSX records (including those contained in the Risk Management System database), notes and e-mails associated with the alleged off-duty injury reported by Tony Abdon on April 28, 2017.

5. Any safety complaints, reports of unsafe conditions, or PI-82s made or filed by Tony Abdon;

6. All operational tests for Tony Abdon from January 1, 2010 to the present;

7. Records concerning Tony Abdon maintained in the Railroad Accident Reporting (RAR) System;

8. Federal Railroad Administration (FRA) violations associated with Tony Abdon;

9. Records, notes and/or e-mails concerning Tony Abdon and/or Tony Abdon's dismissal;

10. Ethics helpline Complaints made by or about Tony Abdon; and

11. Safety Complaints made by Tony Abdon or about Tony Abdon.

Please note that the items described above are general categories reflecting our best initial assessment of what information may be responsive. Please interpret these descriptions broadly and err on the side of preserving any potentially responsive information. If you have other materials not specifically described above that may be responsive, they also should be preserved. Please instruct any personnel within your department/district who you believe may possess any related records not to alter, destroy, discard, interfile, annotate, remove, rearrange or modify them, pending further instruction. If forwarding this legal hold notice to additional personnel, please copy ("CC") the designated contacts listed below.

Any questions or concerns, including any specific questions about your obligations and how to comply, should be directed to Suzanne Short at SUZANNE_SHORT@CSX.COM or Cynthia Craig Johnson at CINDY_CRAIG-JOHNSON@CSX.COM.

Thank you in advance for your cooperation.

Please click the following link and use the radio buttons to record your response. Click here

**To view a list of all legal holds where you have been identified as a custodian, please follow this link:**

My Holds

Distribution List:

Ammons, Steven <STEVE_AMMONS@CSX.COM>, Charron, Matthew <MATT_CHARRON@CSX.COM>, Clark, Atalaya <ATALAYA_CLARK@CSX.COM>, DeAngelo, Thomas <TOM_DEANGELO@CSX.COM>, Dedmon, Marla <MARLA_DEDMON@CSX.COM>, Dreher, Penny <PENNY_DREHER@CSX.COM>, Easton, Scott <SCOTT_C_EASTON@CSX.COM>, Gennette, Paula <PAULA_GENNETTE@CSX.COM>, Heligman, Craig <CRAIG_HELIGMAN@CSX.COM>, Hollenbeck, Jeff <JEFF_HOLLENBECK@CSX.COM>, Humphrey, Leighanna <LEIGHANNA_HUMPHREY@CSX.COM>, Johnson, Jolanda <JOLANDA_JOHNSON@CSX.COM>, Kuhner, Dean <SCOTT_KUHNER@CSX.COM>, Lusk, Barry <SEAN_LUSK@CSX.COM>, Meadows, Matthew <MATT_MEADOWS@CSX.COM>, Ragland, Debra <DEBRA_RAGLAND@CSX.COM>, Ramsey, Raychel <RAYCHEL_RAMSEY@CSX.COM>, Shogren, Curtis <CURTIS_SHOGREN@CSX.COM>, Sweatt, Tuesdi <TUESDI_SWEATT@CSX.COM>, Thoele, August <GUS_THOELE@CSX.COM>, Tingley, Anita <ANITA_TINGLEY@CSX.COM>, Weston, Kimberli <KIMBERLI_WESTON@CSX.COM>, Wheaton, Melissa <MELISSA_WHEATON@CSX.COM>

CSXT(ADKINS)016846

USCA4  1695

# IN THE UNITED STATES DISTRICT COURT FOR
# THE SOUTHERN DISTRICT OF WEST VIRGINIA

## HUNTINGTON DIVISION

JUSTIN ADKINS, et al.,

                Plaintiffs,

v.                                  CIVIL ACTION NO.  3:18-0321

CSX TRANSPORTATION, INC., et al.,

                Defendants.

## ORDER

Pending before the Court are Plaintiffs' Motion for Partial Summary Judgment, ECF No. 368, and Defendants' Motion for Summary Judgment, ECF No. 360.  For the reasoning provided herein, Plaintiffs' Motion is **DENIED, in part,** and Defendants' Motion is **GRANTED, in part**.[1] Plaintiffs' defamation claim is **DISMISSED**.

## I.  BACKGROUND

Each of the 56 Plaintiffs in this case were employees of CSX. Between May and July of 2017, all of the Plaintiffs visited one of two chiropractors—Shannon M. Johnson, D.C. ("Dr. Johnson") or Daniel J. Carey, II, D.C. ("Dr. Carey"). *COII*, ECF No. 378 at 2–78. The chiropractors placed all of the Plaintiffs on medical restrictions and signed a Certificate of Illness and Injury ("COII")[2] for each of them. *Id.* All of the COII listed soft-tissue injuries to the back,

---

[1] Because of the unusually large size of the Plaintiff class in this case, Defendants have filed one "master" motion for summary judgment and multiple individual memoranda as to each of the counts they seek a ruling upon. Additionally, Plaintiffs' Motion for Partial Summary Judgment addresses both their defamation and FMLA claims. The Court finds that a single order addressing all of the arguments would be unwieldy and unpractical. Accordingly, the Court will issue separate orders on the individual counts.

[2] A COII is the form CSXT requires an employee's medical provider to complete before an employee can be taken off work for an illness or injury. *Defs.' Mem.* 2. The form includes basic identifying information about the employee and has places for the medical professional to document his or her findings, diagnoses, treatment plan, the employee's duration of care with the provider, and the time frame in which the employee is unable to work.

neck, or shoulder, and all but one of the injuries complained of occurred when the Plaintiffs were off duty. *Id.* Each of the COII indicated that the Plaintiffs should remain off work for eight or more weeks. *Id.*

Dr. Craig Heligman, MD is the Chief Medical Officer for CSXT. Defendants aver that he became suspicious of the Plaintiffs and their chiropractors after he "noticed the number of COIIs submitted within weeks of each other from the same two providers, and their close similarity." *Defs.' Mem. 2.* Dr. Heligman penned a letter to the Railroad Retirement Board ("RRB") encouraging it to start an investigation.

Dr. Heligman's letter reads as follows:

I writing to inform you of my concern about the practices of two chiropractic physicians that provide services to CSX employees in the Huntington, WV area. They have both provided services in the region for a long time, and we have received numerous documents from them in the course of our normal review of medical fitness for duty issues related to our employees. In the past, we had suspicions that the providers were removing our employees from work inappropriately and potentially in relationship to business changes in the region that may have resulted in furloughs or reduced work hours. It was thought that the employees were reporting injuries while off duty and seeking out these providers for the purpose of inappropriately seeking benefits to offset potential wage losses.

In my professional medical opinion, both of these providers continued to keep employees off work for much longer than is medically appropriate. These conditions would be considered minor musculoskeletal injuries that generally would resolve without any treatment, without more than a few weeks away from work, or with no more than a couple of weeks of chiropractic care. Therefore, their practices are also highly suspicious for excessive and inappropriate treatment. Although we had suspicions, we were not able to identify patterns that were clearly fraudulent. Recently, we had a significant change in business in the area with facility closures and work reductions. Concurrent with the announcing of these business changes, we received doctor's notes withholding over fifty employees from work between June 19 and July 12, 2017. The list of employees has been expanding daily. In my opinion, the timing of these alleged injuries and the volume of cases that spiked just at this time is highly suspicious and suggestive of fraudulent practices on the part of both the employees and these two providers. I have attached a list of the employees who have submitted notes in the time period identified. Some are extensions of cases started several months to a year earlier,

some have no prior events in our records, and a few had recently been cleared to work by these providers but coincidentally had recurrences at the time the business changes were announced. However, all forms were submitted within the same short time period.

I strongly urge you to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors. I will also be notifying the appropriate licensing boards and health insurance companies so that they may initiate their own investigations.

*July 14, 2017 Letter*, ECF No. 370-2.[3]

On February 2, 2018, Plaintiffs filed a lawsuit alleging that the Defendants were liable for violating federal and state laws and for committing multiple torts. *See* ECF No. 1. The now operative Third Amended Complaint includes the following counts: (1) the Employment Retirement Income Security Act of 1974, (2) the Rehabilitation Act, (3) the West Virginia Human Relations Act, (4) the Family and Medical Leave Act of 1993, (5) defamation, (6) invasion of privacy (public disclosure of private facts), (7) tortious interference, (8) intentional infliction of emotional distress, (9) wrongful discharge, and (10) the Federal Railroad Safety Act. Plaintiffs' defamation count is based solely on Dr. Heligman's letters.

## II. LEGAL STANDARD

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

---

[3] Copies of this letter were also sent to the Plaintiffs' benefits providers (Aetna, Inc; Highmark Blue Cross Blue Shield; and United Health Care) and to the chiropractic boards of Ohio and Kentucky.

The nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

### III. ANALYSIS

Defamation is "[a] false written or oral statement that damages another's reputation." *Pritt v. Republican Nat'l Comm.*, 557 S.E.2d 853, 861 n.12 (W. Va. 2001). "The essential elements for a successful defamation action by a private individual are (1) defamatory statements; (2) a nonprivileged communication to a third party; (3) falsity; (4) reference to the plaintiff; (5) at least negligence on the part of the publisher; and (6) resulting injury." 2 Syl. pt. 1, *Crump v. Beckley Newspapers, Inc.*, 320 S.E.2d 70 (W. Va. 1983). In this case, the Court finds that Plaintiffs' defamation claims fail because Dr. Heligman's letters do not contain defamatory statements and because the Defendants are entitled to qualified privilege.

**A. The Heligman Letters Do Not Contain Defamatory Statements**

Defamatory statements tend to "reflect shame, contumely, and disgrace" upon the subject. *See* Syl. pt. 1, *Sprouse v. Clay Commc'n, Inc.*, 211 S.E.2d 674, 679 (W. Va. 1975). A statement may be described as defamatory "if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Crump*, 320 S.E.2d at 77 (citing Restatement (Second) of Torts § 559 (1977)). "[A] court should not consider words or elements in isolation, but should view them in the context of the whole article." *Id.* at 87 (quoting *Rinsley v. Brandt*, 700 F.2d 1304, 1310 (10th Cir. 1983)).

Plaintiffs allege that the Heligman letters are defamatory *per se*, *see Pls.' Br.* 15, that is that they contain "statement[s] that [are] defamatory in and of [themselves]" and that the statements are "not capable of an innocent meaning," *Pritt*, 557 S.E.2d at 857 n.4. Defamation *per se* is limited to "imputations of a crime of moral turpitude, imputations of loathsome disease, imputations of sexual misconduct by a woman, and imputations which affect a business, trade, profession or office." *Mauck v. City of Martinsburg*, 280 S.E.2d 216, 219 n.3 (W. Va. 1981).

The Supreme Court of Appeals of West Virginia has expressly held that "[a] statement of opinion which does not contain a provably false assertion of fact is entitled to full constitutional protection." Syl. pt. 4, *Maynard v. Daily Gazette Co.*, 447 S.E.2d 293 (W. Va. 1994); Syl. pt. 3, *Hupp v. Sasser*, 490 S.E.2d 880 (W. Va. 1997). In making this assessment, the reviewing court must decide whether the allegedly defamatory statement could be construed as a statement of fact or opinion. *Pritt*, 557 S.E.2d at 861; Syl. pt. 7, *Long v Egnor*, 346 S.E.2d 778, 780 (W. Va. 1986).

Upon review, the Court finds only two sentences in Dr. Heligman's letters could be read to be directly related to the Plaintiffs:

(1) "In my opinion, the timing of these alleged injuries and the volume of cases that spiked just at this time is highly suspicious and suggestive of fraudulent practices on the part of both the employees and these two providers."

(2) "I strongly urge you to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."[4]

*July 14, 2017 Letter*.

---

[4] Plaintiffs argue that "[i]n this letter, Dr. Heligman conveyed his 'professional medical opinion' that Plaintiffs sought medical treatment for 'longer than is medically appropriate'. . .." *Pls.' Br.* 13. This sentence reads "Plaintiffs" into a sentence that is clearly aimed at the chiropractors. The complete sentence in Dr. Heligman's letter reads: "In my professional medical opinion, both of these providers continued to keep employees off work for much longer than is medically appropriate." *July 14, 2017 Letter*. Plaintiffs cannot rely on this statement to support their claim for defamation because the statement is not about them.

Additionally, Plaintiffs assert that Dr. Heligman's conclusion that Plaintiffs' medical conditions "would generally resolve without any treatment, without more than a few weeks away from work or with no more than a couple weeks of chiropractic care." *Pls.' Br.* 14. Again, the Court finds that this is not an actionable statement, because it is not about the Plaintiffs, but is rather an assessment from a medical professional that injuries of this type typically do not require extensive time away from work.

The Court finds that these statements are opinions that are protected by the First Amendment. The crux of the Plaintiffs' claim is that Dr. Heligman published wrongful statements that Plaintiffs' injury reports were dishonest and fraudulent. However, Dr. Heligman's letter stops short of claiming fraud. Rather, when read within the context of the entire letter, he clearly expresses the opinion that the facts surrounding the injury reports are suspicious and should be investigated. The letter itself is couched as a professional "opinion," and the letter clearly states that CSXT was "not able to identify patterns that were clearly fraudulent." *July 14, 2017 Letter*. Further, the letter plainly states the facts Dr. Heligman based his suspicions and opinions upon. As such, the Court concludes that Dr. Heligman's statements are pure opinions and are not provably false assertions.[5]

Moreover, even if Dr. Heligman's statements were verifiable, the Court finds that that they still qualify as protected opinions because the letter "can best be understood from its language and context to represent the personal view of the author . . . who made it." *Potomac Valve & Fitting Inc. v. Crawford Fitting Co.*, 829 F.2d 1280, 1288 (4th Cir. 1987) (holding that a verifiable statement still qualifies as an "opinion" if "a reasonable reader or listener would recognize its weakly substantiated or subjective character—and discount it accordingly").

---

[5] The Court recognizes that another court has come to a different conclusion after reviewing the very same letter. *See Carey v. CSX Transp., Inc.*, No. CV 18-79-HRW, 2019 WL 181120 (E.D. Ky. Jan. 11, 2019). In *Carey*, the Court concluded that "The basis for Dr. Heligman's allegations of excessive treatment and fraud were based on nothing more than his own unsupported conclusions. Dr. Heligman never evaluated the respective employees, never requested that they be examined by another doctor, never reviewed their medical records, and never spoke with either Plaintiff." *Id.* at *4. The Court found that Dr. Heligman's statements about the chiropractors could be proven false, and therefore that they were defamatory and not merely statements of opinion. While this Court respectfully comes to a different conclusion, it notes that *Carey* dealt with the defamation action brought by chiropractors who treated the Plaintiffs in this case and that Court's opinion largely addressed statements this Court has already concluded were not directed at the Plaintiffs in this case.

Finally, notwithstanding the Court's conclusion that the statements are not defamatory in nature, the Plaintiffs' defamation claim still fails because the communication was privileged, as addressed below.

## B. The Defendants Are Entitled to Qualified Privilege

West Virginia recognizes a qualified privilege as a defense to defamation claims. *Dzinglski v. Weirton Steel Corp.*, 445 S.E.2d 219, 227 (W. Va. 1994); *Crump*, 320 S.E.2d at 77–78. In *Crump*, the West Virginia Supreme Court of Appeals stated:

> Qualified privileges are based upon a public policy that it is essential that true information be given whenever it is reasonably necessary for the protection of one's own interests, the interests of third persons or certain interests of the public.... A qualified privilege exists when a person publishes a statement in good faith about a subject in which he has an interest or duty and limits the publication of the statement to those persons who have a legitimate interest in the subject matter ... [A] bad motive will defeat a qualified privilege defense ...

*Crump*, 320 S.E.2d at 78 (internal citations omitted). "In essence, then, a defendant's conduct is subject to a qualified privilege when he acts to protect or advance his own legitimate interests, the legitimate interests of others or the legitimate interests of the public." *Dzinglski*, 445 S.E.2d at 227

The Court finds that Defendants are entitled to qualified privilege because Dr. Heligman made the statements in good faith, was acting with a legitimate interest, and limited publication to third parties who had a legitimate interest in the conduct of the employees and chiropractors.

There is no evidence that Dr. Heligman acted in bad faith. His letter only recommends the recipients start their own investigations based on his own concerns or suspicions. Dr. Heligman never asserts that Plaintiffs committed fraud. He merely states that he is "highly suspicious" of Plaintiffs' injury reports and urges an investigation. In fact, he admits that "[a]lthough we had suspicions, we were not able to identify patterns that were clearly fraudulent." *July 14, 2017 Letter*.

Next, it is clear that Dr. Heligman had a legitimate interest in the subject matter of the statements, as he was the chief medical officer for CSXT and the recipient of the COII forms. He had an interest in ensuring that employees were not fraudulently taking leave from work.

Finally, he published the letter only to parties with a legitimate interest in the subject matter: the RRB, chiropractic boards, and the Plaintiffs' insurance agencies. While the Plaintiffs argue that Defendants had no interest in reporting the suspected fraud to the RRB, insurance providers, or the Kentucky and Ohio Chiropractic Boards, *see Pls.' Reply in Supp of Mot. for Partial Summ. J.* 9–10, ECF No. 410, the Court disagrees for two reasons. First, the Plaintiffs have pointed to no legal authority for the proposition that the publisher's interest must be the same as that of the recipients. Second, to the extent that the communication must "affect a sufficiently important interest of the publisher," *see Mauck*, 280 S.E.2d at 221, the Court finds that reporting the suspicious activity was in the Defendants' business interest. Defendants had received an influx of COII forms completed by their employees and these two chiropractors. Dr. Heligman was concerned that they were acting fraudulently, based on the surrounding circumstances, but had no actual proof. Therefore, he notified individuals who were in a position to conduct investigations that could ultimately protect the Defendants' interests.

 Additionally, to the extent Plaintiffs argue that Defendants forfeited their qualified immunity by republishing the letter to uninterested persons at the Plaintiffs' individual hearings, *see Pls.' Br.* 19, the Court finds that publication of the letters at the investigative hearings was similarly privileged. The parties present (the Plaintiffs, union representatives, and other interested CSXT employees) had a legitimate interest in the subject matter of the letters, as each of the persons present at the hearings was involved in the investigation into Plaintiffs' allegedly wrongful conduct.

While a "bad motive" can defeat qualified privilege, *Crump*, 320 S.E.2d at 78, Plaintiffs' have failed to specifically identify or produce any evidence of one. Dr. Heligman's letter explained exactly what concerned him and why: the timing and volume of the reports, the nature of the injuries and time off, and the practitioners involved. Plaintiffs do not contest these facts. Plaintiffs have failed to produce even a material question of fact as to whether Dr. Heligman acted with a bad motive.

Accordingly, the Court finds that Defendants are entitled to qualified privilege for the statements made by Dr. Heligman during the course of the investigation into the conduct of the CSXT employees and their treating chiropractors. Defendants had a legitimate interest in investigating what they believed to be suspicious activity, and their communications did not exceed the privilege they enjoyed. This finding is consistent with decisions of West Virginia courts that have concluded that employers enjoy a qualified privilege when it comes to statements made during employer investigations into perceived wrongdoing. *See Dzinglski*, 445 S.E.2d at 227; *Belcher v. Wal-Mart Stores, Inc.*, 568 S.E.2d 19, 27–28 (W. Va. 2002).

## IV. CONCLUSION

Accordingly, the Court **GRANTS, in part,** Defendants' Motion for Summary Judgment and **DENIES, in part,** Plaintiffs' Motion for Partial Summary Judgment. Plaintiffs' defamation claim is **DISMISSED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER:        July 30, 2021

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

JUSTIN ADKINS, et al.,

                Plaintiffs,

v.                                 CIVIL ACTION NO.  3:18-0321

CSX TRANSPORTATION, INC., et al.,

                Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendants' Motion for Summary Judgment, ECF No. 360. Defendants filed a "Memorandum of Law in Support of Their Motion for Summary Judgment on Plaintiffs' Claim for Wrongful Discharge and Plaintiffs' Claims under ERISA, the Rehabilitation Act, and the West Virginia Human Rights Act." ("*Defs.' Mem.*"). ECF No. 362. Plaintiffs filed a response in opposition ("*Pls.' Resp.*"), ECF No. 397, and Defendants' filed a reply memorandum ("*Defs.' Reply*"), ECF No. 415. This Order addresses only Plaintiffs' wrongful discharge claim. For the reasoning provided herein, Defendants' Motion is **GRANTED, in part**,[1] and Plaintiffs' wrongful discharge claim is **DISMISSED**.

**I.  BACKGROUND**

Each of the 56 Plaintiffs in this case were employees of CSX Transportation. Between May and July of 2017, all of the Plaintiffs visited one of two chiropractors—Shannon M. Johnson, D.C. ("Dr. Johnson") or Daniel J. Carey, II, D.C. ("Dr. Carey"). *COII*, ECF No. 378 at 2–78. The

---

[1] Because of the unusually large size of the Plaintiff class in this case, Defendants have filed one "master" motion for summary judgment and multiple individual memoranda as to each of the counts they seek a ruling upon. The Court finds that a single order addressing all of the arguments would be unwieldy and unpractical. Accordingly, the Court will issue separate orders on the individual counts.

chiropractors placed all of the Plaintiffs on medical restrictions and signed a Certificate of Illness and Injury ("COII")[2] for each of them. *Id.* All of the COII listed soft-tissue injuries to the back, neck, or shoulder, and all but one of the injuries complained of occurred when the Plaintiffs were off duty. *Id.* Each of the COII indicated that the Plaintiffs should remain off work for eight or more weeks. *Id.*

CSXT's Chief Medical Officer, Dr. Craig Heligman, "noticed the high number of COIIs submitted within weeks of each other from the same two providers, and their close similarity." *Defs.' Mem.* 3. He became concerned that the COII were improperly submitted, and he notified the Railroad Retirement Board, Plaintiffs' medical benefits provides, and the chiropractic boards of Ohio and Kentucky of his concerns. *Id.*; *July 14, 2017 Letter*, ECF No. 370-2.

Soon after Dr. Heligman wrote the July 14th letter, each of the Plaintiffs received a "charge letter," informing them that they were "being held out of service" pending a formal investigation into their conduct. *Charge Letters*, ECF No. 360-1. They were informed that formal investigative hearings would be held at which they could be represented by a union representative in accordance with their collective bargaining agreements and that they could present witnesses in their defense. *Id.* Those hearings were held, *Hearing Trs.*, ECF No. 370-61–116, and Defendants ultimately concluded that Plaintiffs had violated CSXT's Operating Rules and Code of Ethics, *Termination Letters*, ECF No. 360-7. Accordingly, all 56 Plaintiffs were terminated from their employment.

On February 2, 2018, Plaintiffs filed a lawsuit alleging that the Defendants were liable for violating federal and state laws and for committing multiple torts. *See* ECF No. 1. The now operative Third Amended Complaint includes the following counts: (1) the Employment

---

[2] A COII is the form CSXT requires an employee's medical provider to complete before an employee can be taken off work for an illness or injury. *Defs.' Mem.* 2. The form includes basic identifying information about the employee and has places for the medical professional to document his or her findings, diagnoses, treatment plan, the employee's duration of care with the provider, and the time frame in which the employee is unable to work.

Retirement Income Security Act of 1974, (2) the Rehabilitation Act, (3) the West Virginia Human Relations Act, (4) the Family and Medical Leave Act of 1993, (5) defamation, (6) invasion of privacy (public disclosure of private facts), (7) tortious interference, (8) intentional infliction of emotional distress, (9) wrongful discharge, and (10) the Federal Railroad Safety Act. ECF No. 93. As noted above, this Order specifically addresses Plaintiffs' wrongful discharge claim.

## II.  LEGAL STANDARD

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

The nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

## III. ANALYSIS

West Virginia generally follows the common law rule that an employer can terminate an employee at will without explanation. *See Herbert J. Thomas Mem'l Hosp. Ass'n v. Nutter*, 795

S.E.2d 530, 540–41 (W. Va. 2016); *Harless v. First Nat'l Bank in Fairmont*, 246 S.E.2d 270, 275 (W. Va. 1978). However, the Supreme Court of Appeals of West Virginia in *Harless* recognized that when "the employer's motivation for the discharge contravenes some substantial public policy principle, then the employer may be liable to the employee for damages occasioned by the discharge." 246 S.E.2d at 275. To prevail on a wrongful discharge claim, a plaintiff must show that a substantial public policy exists. *Wounaris v. W. Va. State Coll.*, 588 S.E.2d 406, 413 (W. Va. 2003).

In this case, the Court finds that the Plaintiffs have failed to identify a substantial public policy upon which a *Harless* action may lie. Plaintiffs argue that "Plaintiffs were terminated for seeking medical treatment from an approved provider," and that such termination "violates numerous rights" including the Rehabilitation Act, the Family Medical Leave Act, and the Federal Railroad Safety Act. *Pls.' Resp.* 24. Additionally, they argue that "West Virginia also recognizes a public policy of encouraging and facilitating the best medical care possible to its residents." *Id.* (citing W. Va. Code § 55-7B-1). They posit that,

> [d]espite the clear public policy encouraging the best possible medical treatment for all residents of the state, CSX went so far as to terminate each Plaintiff for seeing a medical provider. It then went one step further and notified each terminated employee that they could no longer seek treatment from Drs. Johnson or Carey.

*Id.* at 25.

First, this Court has previously held that *Harless* wrongful discharge claims are only appropriate "when no other private cause of action could enforce the public policy at issue." *Adkins v. Cellco P'ship, Inc.*, No. CV 3:17-2772, 2017 WL 2961377, at *4 (S.D.W. Va. July 11, 2017); *see Talley v. Caplan Ind., Inc.*, No. CV 2:07-0067, 2007 WL 634903, at *2 (S.D.W. Va. Feb. 26, 2007) (holding that plaintiff wrongful discharge claim cannot be advanced where the statute providing the relevant public policy allows for a private cause of action). The Rehabilitation Act,

the Family Medical Leave Act, and the Federal Railroad Safety Act all allow for a private cause of action, and consequently, Plaintiffs cannot use a *Harless* action to remedy a violation of those substantial public policies. *See Adkins*, 2017 WL 2961377, at \*4.

Second, the Court finds that West Virginia Code § 55-7B-1 is not a recognized substantial public policy that the Plaintiffs may use to pursue their wrongful discharge claim. Section 55-7B-1 is the codification of West Virginia's Medical Professional Liability Act ("MPLA"). The MPLA governs medical malpractice and medical professional liability. While § 55-7B-1 states that "[t]he citizens of this state are entitled to the best medical care and facilities available," this declaration cannot be read as a stand-alone policy unrelated to the greater context of the MPLA. As such, this provision is irrelevant to Plaintiffs' case, because Plaintiffs are not asserting a claim against medical providers based on the provision of medical care. Additionally, even if the MPLA was somehow relevant, the Court agrees with the Defendants that Plaintiffs have failed to point to any legal authority allowing a wrongful discharge claim under this statutory provision or public policy. *See Defs.' Reply* 17.

Accordingly, the Court finds that Plaintiffs have failed to establish that a substantial public policy exists to support their wrongful discharge claim. *See Wounaris*, 588 S.E.2d at 413. Without such a showing, their wrongful discharge claim must be dismissed.

### IV. CONCLUSION

The Court **GRANTS, in part,** Defendants' Motion for Summary Judgment. Plaintiffs' wrongful discharge claim is **DISMISSED**. The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER:       July 30, 2021

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE

## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

JUSTIN ADKINS, et al.,

                Plaintiffs,

v.                                      CIVIL ACTION NO.  3:18-0321

CSX TRANSPORTATION, INC., et al.,

                Defendants.

### MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendants' Motion for Summary Judgment, ECF No. 360. Defendants filed a "Memorandum of Law in Support of Defendants' Motion for Summary Judgment Regarding Invasion of Privacy" ("*Defs.' Mem.*"). ECF No. 366. Plaintiffs filed a response in opposition ("*Pls.' Resp.*"), ECF No. 400, and Defendants filed a reply memorandum ("*Defs.' Reply*"), ECF No. 411. This issue is now ripe for consideration, and for the reasoning provided herein, Defendants' Motion is **GRANTED**, **in part**, Plaintiffs' invasion of privacy claim is **DISMISSED**.[1]

### I.  BACKGROUND

Each of the 56 Plaintiffs in this case were employees of CSX Transportation ("CSXT"). Between May and July of 2017, all of the Plaintiffs visited one of two chiropractors—Shannon M. Johnson, D.C. ("Dr. Johnson") or Daniel J. Carey, II, D.C. ("Dr. Carey"). *COII*, ECF No. 378 at 2–78. The chiropractors placed all of the Plaintiffs on medical restrictions and signed a Certificate

---

[1] Because of the unusually large size of the Plaintiff class in this case, Defendants have filed one "master" motion for summary judgment and multiple individual memoranda as to each of the counts they seek a ruling upon. The Court finds that a single order addressing all of the arguments would be unwieldy and unpractical. Accordingly, the Court will issue separate orders on the individual counts.

of Illness and Injury ("COII")[2] for each of them. *Id.* All of the COII listed soft-tissue injuries to the back, neck, or shoulder, and all but one of the injuries complained of occurred when the Plaintiffs were off duty. *Id.* Each of the COII indicated that the Plaintiffs should remain off work for eight or more weeks. *Id.*

Dr. Craig Heligman, MD is the Chief Medical Officer for CSXT. Defendants assert that he became suspicious of the Plaintiffs and their chiropractors after he "noticed the number of COIIs submitted within weeks of each other from the same two providers, and their close similarity." *Defs.' Mem.* 2. Dr. Heligman penned a letter to the Railroad Retirement Board ("RRB") encouraging it to start an investigation into potentially "fraudulent practices on the part of both employees and these two providers." *July 14, 2017 Letter*, ECF No. 370-2. That letter was forwarded to Aetna, Inc; Highmark Blue Cross Blue Shield; United Health Care; the Ohio State Chiropractic Board; and the Kentucky Board of Chiropractic Examiners. *Id.* Attached to the letter was a list of CSXT employees who had submitted COII from Drs. Johnson and Carey, their employee identification numbers, dates of treatment, and the conditions for which they sought treatment. *Id.*

Shortly after this letter was sent, pursuant to the Plaintiffs' Collective Bargaining Agreements, Plaintiffs were notified in writing of the charges against them. *See CBA Agreement*, ECF No. 360-56, at 48; *Charge Letters*, ECF No. 360-1. The "charge letters" notified the Plaintiffs that a formal investigation was to be held, and informed them that

> [t]he purpose of this investigation was to develop facts and place your responsibility, if any, in connection with information received on July 14, 2017

---

[2] A COII is the form CSXT requires an employee's medical provider to complete before an employee can be taken off work for an illness or injury. *Defs.' Mem.* 2. The form includes basic identifying information about the employee and has places for the medical professional to document his or her findings, diagnoses, treatment plan, the employee's duration of care with the provider, and the time frame in which the employee is unable to work.

from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances relating thereto.

*Charge Letters*.

Investigative hearings were held for each of the Plaintiffs where they had the benefit of a union representative and were given an opportunity to introduce evidence on their own behalf. *See Hearing Trs.*, ECF No 356-62–117.

At those hearings, Defendants introduced both the letter written by Dr. Heligman and the COII forms that were submitted by the Plaintiffs. *Defs.' Mem.* 11. By Defendants' own admission, at least one hearing, some of the introduced COII contained unredacted information including dates of birth and social security numbers. *Id.; see, e.g.*, *Christian Hearing Tr.* 19–22, ECF No. 270-74.

On August 23, 2017, the Vice President of Labor Relations Zachery Jones sent a letter to at least 14 Plaintiffs recognizing that "[d]uring the hearing, there were a few documents introduced into evidence that may have contained the social security numbers of a few employees." *Confidentiality Letters*, ECF No. 360-8. The letters stated that "[t]his is a reminder that any documents or exhibits introduced during these hearings are company property. While you may have received copies of these documents in the normal course of business and as part of your employment with the company, you remain obligated to keep this information confidential." *Id.* The letters do not identify whose personal information was disclosed.

On February 2, 2018, Plaintiffs filed a lawsuit alleging that the Defendants were liable for violating federal and state laws and for committing multiple torts. *See* ECF No. 1. The now operative Third Amended Complaint includes the following counts: (1) the Employment Retirement Income Security Act of 1974, (2) the Rehabilitation Act, (3) the West Virginia Human

Relations Act, (4) the Family and Medical Leave Act of 1993, (5) defamation, (6) invasion of privacy (public disclosure of private facts), (7) tortious interference, (8) intentional infliction of emotional distress, (9) wrongful discharge, and (10) the Federal Railroad Safety Act. This Order specifically addresses Plaintiffs' invasion of privacy claim.

## II.  LEGAL STANDARD

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

The nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

## III. ANALYSIS

The tort invasion of privacy can take one of four forms under West Virginia law: "(1) unreasonable intrusion upon the seclusion of another; (2) appropriation of another's name or likeness; (3) unreasonable publicity given to another's private life; and (4) publicity that

unreasonably places another in a false light before the public." *Crump v. Beckley Newspapers, Inc.*, 320 S.E.2d 70, 83 (W. Va. 1983) (adopting the Restatement (Second) of Torts analysis for invasion of privacy).

> In order to establish a cause of action for public disclosure of private facts, a plaintiff would need to prove the following elements: (1) that there was a public disclosure by the Defendant of facts regarding the Plaintiff; (2) that the facts disclosed were private facts; (3) that the disclosure of such facts is highly offensive and objectionable to a reasonable person of reasonable sensibilities; and (4) that the public has no legitimate interest in the facts disclosed.

*Davis v. Monsanto Co.*, 627 F. Supp. 418, 421 (S.D.W. Va. 1986).

Plaintiffs' Third Amended Complaint alleges that Defendants invaded their privacy by publicly disclosing private facts. *Third Am. Compl.* ¶¶ 2313–21. Specifically, Plaintiffs allege that "Defendants' public disclosure of Plaintiffs' social security numbers, private medical information, and other personal information constitute private, personal, and sensitive information, the disclosure of which was highly offensive and objectionable to reasonable persons of reasonable sensibilities." *Id.* at ¶ 2315.

Plaintiffs argue that the letters sent by Dr. Heligman to the RRB, Plaintiffs' benefit providers, and the chiropractic boards contained Plaintiffs' names, employee ID numbers, and medical conditions. *Pls.' Resp.* 4. Additionally, Plaintiffs submit that at each of the investigative hearings, Defendants submitted a copy of the all the Plaintiffs' COII forms. *Id.* At least some of the disclosed records contained unredacted personal information of some Plaintiffs (such as their social security numbers and dates of birth). *Id.* at 4–5; *see Confidentiality Letters*; *see, e.g.*, *Adkins Hearing Tr.* 10, ECF No. 370-62 (showing admission of COII forms at hearing); *Christian Hearing Tr.* 19–22 (Representative Sandburg objecting to distribution of COII forms and prior disclosure of social security numbers and dates of birth).

In this case, the Court finds that Plaintiffs have failed to raise a material question of fact regarding the first element of the tort, public disclosure. The kind of publication required to establish public disclosure of private facts is not "mere communication to a third party," but rather "widespread publicity." *Davis*, 627 F. Supp. at 421; *see Mays v. Marshall Univ. Bd. of Governors*, No. 14-788, 2015 WL 6181508, at *6 (W. Va. Oct. 20, 2015) ("'Publicity,' in the context of invasion of privacy, entails that disclosure be widespread and not limited to a single person or a small group of people."); Restatement (Second) of Torts § 625D, cmt. a (1977) ("'Publicity' . . . means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge."). Typical examples of public disclosure include newspaper publications, radio broadcasts, and statements to large audiences. Restatement (Second) of Torts § 625D, cmt. a.

While some of the Defendants' alleged disclosures may be considered objectionable, the Court has no basis to find that any of the disclosures were sufficiently widespread to be actionable. Plaintiffs have not even attempted to quantify the number of people who viewed the Plaintiffs' information. Based on the parties' exhibits, the Court can surmise that Dr. Heligman's letter was sent to five individuals. *July 14, 2017 Letter*. Moreover, based on the Defendants' "Confidentiality Letters" the Court can concluded that *some* unredacted COIIs were disseminated to approximately 14 Plaintiffs. [3] *See Confidentiality Letters*. These estimations are not sufficient to raise a material question of fact about widespread publication.

---

[3] Significantly, neither party makes any attempt to name which Plaintiffs' information was left unredacted. As such, there is no way for the Court to conclude whose information was disseminated. While one transcript, which was not identified by the Plaintiffs, suggests that the dates of birth and social security numbers of Plaintiff Donald Ste[phens], Plaintiff Jonathan Jeffers, Plaintiff James Blai[n], and five other unnamed individuals' information were disseminated at Plaintiff Matthew Woods's Hearing, *see Woods Hearing* 9–10, ECF No. 370-116, this is plainly insufficient to find that the Plaintiffs as a whole had their information publicized, let alone publicly.

Moreover, to the extent the Plaintiffs base their claim on the introduction of the redacted COII at the Plaintiffs investigatory hearings, even if there were enough individuals present at the hearings to consider the publication widespread, the Court finds that Defendants are entitled to qualified privilege. In *Crump v. Beckley Newspapers, Inc.*, the West Virginia Supreme Court held that "[a] qualified privilege exists when a person publishes a statement in good faith about a subject in which he has an interest or duty and limits the publication of the statement to those persons who have a legitimate interest in the subject matter." 320 S.E.2d at 78 (quoting *Swearingen v. Parkersburg Sentinel Co.*, 26 S.E.2d 209, 215 (W. Va. 1943)). This privilege is available as a bar to liability in an invasion of privacy claim. *Id.* at 83; *Taylor v. W. Va. Dep't of Health & Hum. Res.*, 788 S.E.2d 295, 315 (W. Va. 2016).

Here, Plaintiffs have offered no compelling argument to rebut Defendants' claim that the redacted COII were disclosed only to individuals who had a legitimate interest in the information therein. While Plaintiffs argue that "there is no reason one employee needs to know about the conditions and treatment plan of another employee in the context of a disciplinary hearing for alleged fraud," *Pls.' Resp.* 6, the information contained in the redacted COII was clearly relevant to each individual investigation because the very basis of the Defendants' suspicions was the curiously similar nature of the more than 56 COII submitted by Drs. Carey and Johnson. Plaintiffs undoubtedly had an interest in understanding the allegations of fraud that had been levied against them, as did the CSXT employees who were charged with conducting the investigations and making determinations about the Plaintiffs' conduct. Because there is no evidence that those disclosures were made in bad faith, qualified privilege attaches, and Defendants may not be held liable for publication of the COII at the investigative hearings.

## IV. CONCLUSION

Accordingly, the Court **GRANTS**, **in part**, Defendants' Motion for Summary Judgment. Plaintiffs' invasion of privacy claim is **DISMISSED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER:        August 2, 2021

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE

## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

JUSTIN ADKINS, et al.,

       Plaintiffs,

v.                            CIVIL ACTION NO.  3:18-0321

CSX TRANSPORTATION, INC., et al.,

       Defendants.

### <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is Defendants' Motion for Summary Judgment, ECF No. 360. Defendants filed a "Memorandum of Law in Support of Defendants' Motion for Summary Judgment as to Plaintiffs' Intentional Infliction of Emotional Distress Claim" ("*Defs.' Mem.*"). ECF No. 365. Plaintiffs declined to file a responsive memorandum.[1] For the reasoning provided herein, Defendants' Motion is **GRANTED**, **in part**. Plaintiffs' intentional infliction of emotional distress claim is **DISMISSED**.[2]

### I.  BACKGROUND

Each of the 56 Plaintiffs in this case were employees of CSX Transportation ("CSXT"). Between May and July of 2017, all of the Plaintiffs visited one of two chiropractors—Shannon M. Johnson, D.C. ("Dr. Johnson") or Daniel J. Carey, II, D.C. ("Dr. Carey"). *COII*, ECF No. 378 at 2–78. The chiropractors placed all of the Plaintiffs on medical restrictions and signed a Certificate

---

[1] Defendants nevertheless filed a reply memorandum. ECF No. 414.
[2] Because of the unusually large size of the plaintiff class in this case, Defendants have filed one "master" motion for summary judgment and multiple individual memoranda as to each of the counts they seek a ruling upon. The Court finds that a single order addressing all of the arguments would be unwieldy and impractical. Accordingly, the Court will issue separate orders on the individual counts.

of Illness and Injury ("COII")[3] for each of them. *Id.* All of the COII listed soft-tissue injuries to the back, neck, or shoulder, and all but one of the injuries complained of occurred when the Plaintiffs were off duty. *Id.* Each of the COII indicated that the Plaintiffs should remain off work for eight or more weeks. *Id.*

Dr. Craig Heligman, MD is the Chief Medical Officer for CSXT. Defendants aver that he became suspicious of the Plaintiffs and their chiropractors after he "noticed the number of COIIs submitted within weeks of each other from the same two providers, and their close similarity." *Defs.' Mem.* 2. Dr. Heligman penned a letter to the Railroad Retirement Board ("RRB") encouraging it to start an investigation. *July 14, 2017 Letter*, ECF No. 370-2. That letter was forwarded to the Plaintiffs' medical benefits providers (Aetna, Inc; Highmark Blue Cross Blue Shield; and United Health Care), the Ohio State Chiropractic Board, and the Kentucky Board of Chiropractic Examiners. *Id.*

Shortly after this letter was sent, pursuant to their Collective Bargaining Agreements, Plaintiffs were notified in writing of the charges against them. *See CBA Agreement*, ECF No. 360-56, at 48; *Charge Letters*, ECF No. 360-1. The "charge letters" notified the Plaintiffs that a formal investigation was to be held, and informed them that

> [t]he purpose of this investigation was to develop facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances relating thereto.

*Charge Letters*.

---

[3] A COII is the form CSXT requires an employee's medical provider to complete before an employee can be taken off work for an illness or injury. *Defs.' Mem.* 2. The form includes basic identifying information about the employee and has places for the medical professional to document his or her findings, diagnoses, treatment plan, the employee's duration of care with the provider, and the time frame in which the employee is unable to work.

Investigative hearings were held for each of the Plaintiffs where they had the benefit of union representation and were given an opportunity to introduce evidence on their own behalf. *See Hearing Trs.*, ECF No 370-61–116.

After the hearings, the Defendants concluded that the Plaintiffs had violated Operating Rule 104.2 and the CSX Code of Ethics.[4] *See Termination Letters*, ECF No. 360-7. Accordingly, all of the Plaintiffs were terminated. *Id.* Plaintiffs had the opportunity to appeal their terminations, and of those who took that opportunity, four were reinstated. *Public Law Board Decisions*, ECF No. 360-6.

On February 2, 2018, Plaintiffs filed a lawsuit alleging that the Defendants were liable for violating federal and state laws and for committing multiple torts. *See* ECF No. 1. The now operative Third Amended Complaint includes the following counts: (1) the Employment Retirement Income Security Act of 1974, (2) the Rehabilitation Act, (3) the West Virginia Human

---

[4] As explained at the Plaintiffs' hearings, Operating Rule 104.2 states that "Employee behavior must be respectful, courteous. Employees must not be any of the following: . . . [d]ishonest." *See, e.g.*, *Barker Hearing Tr.* 11, ECF No. 370-67.
The pertinent parts of the Code of Ethics were also read during the hearings:

> Integrity, Transparency, and Respect. The basics of ethical behavior aren't complicated, but business situations can be.
> . . .
> Who must follow our Code? Everyone in all levels of our Company has a responsibility to know and follow our Code including all employees and officers of CSX and its wholly owned subsidiaries.
> . . .
> Accountability of a bad decision can result in serious harm to employees in our Company. Violations of our Code or Company policies may result in disciplinary action up to and including termination of employment.
> . . .
> Fraud and theft are crimes that can cause lasting damage to our reputation as well as our bottom line. Fraud and theft are completely contrary to our culture and core values. We do not tolerate this activity under any circumstance by anyone working at or on behalf of CSX. Fraud is an intentional misrepresentation of fact that deceives or is intended to deceive another individual or entity for financial or personal gain. Fraud can take form of offering false or fictitious information, reports, or claims to another person. It also includes taking unfair advantage of someone either through manipulation, concealing something, misusing inside information, or misrepresenting facts. Some examples of workplace fraud may include misrepresentation of time sheets or expense reports, abusing or misusing Company equipment, material, property, or credit cards[, and] dishonest accounting practices.

*Id.* at 11–12.

Relations Act, (4) the Family and Medical Leave Act of 1993, (5) defamation, (6) invasion of privacy (public disclosure of private facts), (7) tortious interference, (8) intentional infliction of emotional distress, (9) wrongful discharge, and (10) the Federal Railroad Safety Act. This Order specifically addresses Plaintiffs' intentional infliction of emotional distress claim.

## II.  LEGAL STANDARD

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

The nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

## III. ANALYSIS

Under West Virginia law, to prevail on a claim of intentional infliction of emotional distress, a plaintiff must prove the following elements:

(1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with

the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

*Travis v. Alcon Lab'ys, Inc.*, 504 S.E.2d 419, 425 (W. Va. 1998). "Whether the alleged conduct may be reasonably considered outrageous is a threshold question for the court; whether the conduct is in fact outrageous is a question for the jury." *Radford v. Hammons*, No. 2:14-cv-24854, 2015 WL 738062, at \*5 (S.D.W. Va. Feb. 20, 2015) (quoting *Gilco v. Logan Cnty. Comm'n*, No. 11-cv-0032, 2012 WL 3580056, at \*5 (S.D.W. Va. Aug. 17, 2012)) (internal quotations omitted).

Count VIII of Plaintiffs' Third Amended Complaint states that the Defendants' "actions, as alleged herein, are atrocious, utterly intolerable in a civilized community, and are so extreme and outrageous as to exceed all possible bounds of decency." *Third Am. Compl.* ¶ 2331. Yet, it is unclear which of the Defendants' actions Plaintiffs' Complaint intended to implicate. Defendants assert that "Plaintiffs' depositions . . . reveal that Plaintiffs' claims of emotional distress are based on no more than Defendants' investigations into suspected improprieties and the termination of Plaintiffs[] from their employment from CSXT." *Defs.' Mem.* 9 (citing *Craycraft Dep.* 97, ECF No. 370-20;[5] *Demonstrative Ex. 5*, ECF No. 360-65).

Plaintiffs declined the opportunity to respond to Defendants' Motion, and in doing so, have failed to rebut Defendants' evidence showing that Plaintiffs' intentional infliction of emotional

---

[5]     Q. How did CSX inflict emotional distress on you?
        A. They terminated me from my employment.
        Q. Any other conduct other than terminating you?
        . . .
        A. I don't --- I don't think so.
        Q. How did Dr. Heligman inflict emotional distress on you?
        . . .
        A. Charged me with fraud.

- 5 -

distress claims are based solely on the Defendants' investigation into and termination of the Plaintiffs. *See* Fed. R. Civ. P. 56(e).[6]

The West Virginia Supreme Court of Appeals has expressly held that distress that results from being terminated by an employer cannot be used to sustain a claim of intentional infliction of emotional distress. *See* Syl. pt. 2, *Dzinglski v. Weirton Steel Corp.*, 445 S.E.2d 219, 221 (W. Va. 1994). An employee may, however, assert a claim for intentional infliction of emotional distress, if "the employee's distress results from the outrageous manner by which the employer effected the discharge." *Id.*

Thus, without a showing that Defendants conducted the investigations or terminations in an outrageous manner, Plaintiffs' claim cannot survive. Here, Defendants submit that they provided the Plaintiffs with fair and impartial investigations, as required by the Plaintiffs' collective bargaining agreements ("CBAs"). Pursuant to the CBAs, Defendants issued charge letters requesting that Plaintiffs attend the formal investigative hearings. *See Charge Letters*. The Plaintiffs were provided notice that they could present evidence and witnesses and that they were entitled to union representation. *Id.* Those hearings were duly held, *Hearing Trs.*, and Defendants ultimately concluded that Plaintiffs had violated CSXT's Operating Rules and Code of Ethics. *Termination Letters*.

While Plaintiff's Third Amended Complaint includes some statements that could be read as *allegations* that the Defendants, and specifically Dr. Heligman, had already made up their minds about the Plaintiffs' actions and thus that the investigations were not impartial,[7] Plaintiffs' Third

---

[6] Federal Rule of Civil Procedure 56(e) provides that "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: . . . consider the fact undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it."

[7] Throughout the First Amended Complaint Plaintiffs allege:

    1.   "The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by [Drs. Carey or Johnson],

Amended Complaint alone cannot rebut Defendants' evidence that the investigations were conducted in accordance with Plaintiffs' CBAs and that the terminations were handled in a civil manner. *See Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) ("As a general rule, when one party files a motion for summary judgment, the non-movant cannot merely rely on matters pleaded in the complaint, but must, by factual affidavit or the like, respond to the motion."); *Celotex Corp.*, 477 U.S. at 324 ("Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is genuine issue for trial.'"). Accordingly, the Court finds that Plaintiffs have failed to establish genuine issues of material fact such that this claim should be submitted to a jury.

Additionally, even if the Plaintiffs had established a material question of fact regarding the Defendants' conduct, the Court finds that the Defendants are entitled to qualified privilege. West Virginia recognizes qualified privilege as a potential bar to liability for intentional infliction of emotional distress claims. *See Dzinglski*, 445 S.E.2d at 227–28. "[A] defendant's conduct is subject to a qualified privilege when he acts to protect or advance his own legitimate interest, the

---

had engaged 'in a concerted effort to defraud' CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers." *See, e.g.*, *Third Am. Compl.* ¶ 22.

2.  "… Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation. *See, e.g.*, *Third Am. Compl.* ¶ 31.

3.  "Through his testimony during the disciplinary investigation, Dr. Heligman confirmed that he had no proof that [each Plaintiff] or any of the employees went to Drs. Johnson or Carey for any improper purpose." *See, e.g.*, *Third Am. Compl.* ¶ 35.

4.  "Dr. Heligman did not personally examine or treat [Plaintiffs] or any of the other CSX/CSXT employees." *See, e.g.*, *Third Am. Compl.* ¶ 37.

5.  "According [to] CSX/CSXT, the purpose of the formal disciplinary investigation of [each Plaintiff] was to 'develop the facts and place … responsibility, if any' yet more than a month before [each Plaintiff's] investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud." *See, e.g.*, *Third Am. Compl.* ¶ 46.

Each of these statements was repeated in the "Summary of Action" for each Plaintiff.

legitimate interest of others or the legitimate interests of the public." *Id.* (citing *Crump v. Beckley Newspapers*, 320 S.E.2d 70, 78–79 (W. Va. 1983)).

Here, the Defendants[8] acted in furtherance of their legitimate interest of investigating and preventing employee fraud and are therefore shielded from liability by qualified privilege. *See id.* ("Such a finding is consistent with the *Crump* proposition that a qualified privilege attaches to actions designed to protect the defendant's legitimate interest, such as, in this case, when a company is informed that one of its own management employees may be engaged in improper conduct.").

### IV. CONCLUSION

Accordingly, the Court **GRANTS**, **in part**, Defendants' Motion for Summary Judgment. Plaintiffs' intentional infliction of emotional distress claim is **DISMISSED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER:        August 2, 2021

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE

---

[8] The Court notes that the individual Defendants named in the Third Amended Complaint were all CSXT employees who either supervised the Plaintiffs or played a role in the investigations and/or disciplinary proceedings. *See Third Am. Compl.* ¶¶ 6–10, 11.

- 8 -

IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

JUSTIN ADKINS, et al.,

                Plaintiffs,

v.                                        CIVIL ACTION NO.  3:18-0321

CSX TRANSPORTATION, INC., et al.,

                Defendants.

### **MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendants' Motion for Summary Judgment, ECF No. 360. Defendants filed a "Memorandum of Law in Support of Defendants' Motion for Summary Judgment as to Plaintiffs' Tortious Interference Claim" ("*Defs.' Mem.*"). ECF No. 367. Plaintiffs filed a response in opposition ("*Pls.' Resp.*"), ECF No. 395, and Defendants filed a reply memorandum ("*Defs.' Reply*"), ECF No. 412. This issue is now ripe for consideration, and for the reasoning provided herein, Defendants' Motion is **GRANTED**, **in part**, and Plaintiffs' tortious interference claim is **DISMISSED**.[1]

## I.  BACKGROUND

Each of the 56 Plaintiffs in this case were employees of CSX Transportation ("CSXT"). Between May and July of 2017, all of the Plaintiffs visited one of two chiropractors—Shannon M. Johnson, D.C. ("Dr. Johnson") or Daniel J. Carey, II, D.C. ("Dr. Carey"). *COII*, ECF No. 378 at 2–78. The chiropractors placed all of the Plaintiffs on medical restrictions and signed a Certificate

---

[1] Because of the unusually large size of the Plaintiff class in this case, Defendants have filed one "master" motion for summary judgment and multiple individual memoranda as to each of the counts they seek a ruling upon. The Court finds that a single order addressing all of the arguments would be unwieldy and impractical. Accordingly, the Court will issue separate orders on the individual counts.

of Illness and Injury ("COII")[2] for each of them. *Id.* All of the COII listed soft-tissue injuries to the back, neck, or shoulder, and all but one of the injuries complained of occurred when the Plaintiffs were off duty. *Id.* Each of the COII indicated that the Plaintiffs should remain off work for eight or more weeks. *Id.*

Dr. Craig Heligman, MD is the Chief Medical Officer for CSXT. Defendants aver that he became suspicious of the Plaintiffs and their chiropractors after he "noticed the number of COIIs submitted within weeks of each other from the same two providers, and their close similarity." *Defs.' Mem.* 2. Dr. Heligman penned a letter to the Railroad Retirement Board ("RRB") encouraging it to start an investigation. *July 14, 2017 Letter*, ECF No. 370-2. That letter was forwarded to Plaintiffs' medical benefits providers (Aetna, Inc; Highmark Blue Cross Blue Shield; and United Health Care), the Ohio State Chiropractic Board, and the Kentucky Board of Chiropractic Examiners. *Id.*

On August 25, 2017, Dr. Heligman wrote a second letter to Plaintiffs informing them that "the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey, II, DC." *August 25, 2017 Letter*, ECF No 360-2.

On February 2, 2018, Plaintiffs filed a lawsuit alleging that the Defendants were liable for violating federal and state laws and for committing multiple torts. *See* ECF No. 1. The now operative Third Amended Complaint includes the following counts: (1) the Employment Retirement Income Security Act of 1974, (2) the Rehabilitation Act, (3) the West Virginia Human Relations Act, (4) the Family and Medical Leave Act of 1993, (5) defamation, (6) invasion of

---

[2] A COII is the form CSXT requires an employee's medical provider to complete before an employee can be taken off work for an illness or injury. *Defs.' Mem.* 2. The form includes basic identifying information about the employee and has places for the medical professional to document his or her findings, diagnoses, treatment plan, the employee's duration of care with the provider, and the time frame in which the employee is unable to work.

privacy (public disclosure of private facts), (7) tortious interference, (8) intentional infliction of emotional distress, (9) wrongful discharge, and (10) the Federal Railroad Safety Act. This Order specifically addresses Plaintiffs' claim of tortious interference.

## II.  LEGAL STANDARD

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

The nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

## III. ANALYSIS

To state a prima facie case for tortious interference, a plaintiff must demonstrate:

(1) existence of a contractual or business relationship or expectancy;
(2) an intentional act of interference by a party outside that relationship or expectancy;
(3) proof that the interference caused the harm sustained; and
(4) damages.

Syl. pt. 2, *Torbett v. Wheeling Dollar Sav. & Tr. Co.*, 314 S.E.2d 166, 167 (W. Va. 1983).

> If a plaintiff makes a prima facie case, a defendant may prove justification or privilege, affirmative defenses. Defendants are not liable for interference that is negligent rather than intentional, or if they show defenses of legitimate competition between plaintiff and themselves, their financial interest in the induced party's business, their responsibility for another's welfare, their intention to influence another's business policies in which they have an interest, their giving of honest, truthful requested advice, or other factors that show the interference was proper.

*Id.*

Plaintiffs allege that the Defendants intentionally interfered with the contractual or business relationships they had with their medical providers, Drs. Carey and Johnson, and their medical benefits providers. *See Third Am. Compl.*, ¶¶ 2322–29; *Pls' Resp.* 6–7, ECF No. 395. Plaintiffs' tortious interference claim is based on the two letters sent by Dr. Heligman. The first was a July 14, 2017 letter to the RRB (which was later forwarded to Plaintiffs' medical benefit providers), in which Dr. Heligman urged the recipient to investigate the Plaintiffs' cases for potential fraud. *July 14, 2017 Letter*. Plaintiffs assert that this letter interfered with Plaintiffs' benefits. *Pls.' Resp.* 7.

The second letter was addressed to Plaintiffs, and it read, in pertinent part:

> The purpose of this correspondence is to advise you that the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey, II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

*July 25, 2017 Letter*. Plaintiffs contend that this letter interfered with Plaintiffs' contractual and doctor-patient relationships with their chiropractors. *Pls.' Resp.* 7.

Defendants argue that summary judgment is appropriate on this claim because Plaintiffs have "failed[ed] to identify intentional conduct of Defendants which induced Plaintiffs to break any contract or business relationship with Plaintiffs' chiropractors or benefit providers." *Defs.' Mem.* 6. They specifically argue that "each Plaintiff's own testimony demonstrates that he or she

was able to continue treatment with the chiropractors and each continued to receive medical benefits until Plaintiffs' employment with CSXT was terminated." *Id.* Additionally, Defendants submit that they are entitled to qualified privilege, because "Plaintiffs' claim is based on actions that were taken by Defendants in furtherance of CSXT's legitimate interest in preventing fraud." *Id.*

The Court agrees with Defendants and concludes (1) Plaintiffs have failed to produce any evidence that they were prevented from going to see Drs. Carey or Johnson, or that their benefits providers refused to pay out benefits while they were still employed, and (2) Defendants are shielded from liability because they acted in furtherance of their legitimate business interest of investigating and preventing potential fraud by their employees.

Deposition testimony provided by the Defendants shows that while the Plaintiffs felt like the Defendants tried to interfere with their doctor-patient relationships, they were not prevented from continuing to see their doctors. *See Demonstrative Ex. 4,* ECF No. 360-64 (listing deposition testimony of each Plaintiff regarding tortious interference). Similarly, Plaintiffs' testimony shows that their insurance companies continued to pay for treatment up until the time they were terminated. *Id.* Plaintiffs failed to rebut this testimony.

In fact, the only evidence Plaintiffs produced to suggest Defendants interfered with Plaintiffs' contractual relationships was limited to three brief deposition excerpts from individual Plaintiffs. These excerpts suggest that these Plaintiffs felt they could no longer see their doctors of choice and/or that they believed their insurance would not cover their visits if they continued to see the chiropractors. *See Pls.' Resp.* 8 (citing *Mosteller Dep.* 84, ECF No. 370-38; *Mullins Dep.* 79, ECF No. 370-39; *Owens Dep.* 91–92, ECF No. 370-41). Not only do these statements fail to show any intentional interference on behalf of the Defendants, but Plaintiffs' Counsel's careful

quotations can only be described as blatant and intentional misrepresentations of Mr. Mosteller, Mr. Mullins, and Mr. Owens's testimony.

Counsel's out-of-context citation to Mr. Mosteller's testimony reads, "I guess any ---- anything from Dr. Johnson, which in other words was kind of trying to push you away from your doctor." *Pls.' Resp.* 7 (citing *Mosteller Dep.* 84).[3] Upon review, however, Mr. Mosteller went on to testify that he was not personally affected by the letter because he continued to see Dr. Johnson until he was terminated, and his insurance continued to pay for those appointments. *Mosteller Dep.* 85.[4]

Next, Counsel cites to Mr. Mullins's deposition in which he testified that Defendants

thought they could infringe on my benefits by choosing who I see, and CSX really don't have the authority to do that. . . . I feel like they set forth who I can see and who I can't. And it's my understanding, it's my right to see the doctor of my choosing within the network.

*Mullins Dep.* 79. However, immediately before this statement Mullins testified:

. . . they intentionally tried to make me seek treatment elsewhere, which in full disclosure, I would have been fine seeking treatment elsewhere because at the end of the day it don't matter what healthcare provider I'm using. It's not about the healthcare provider, it's about the injury. And regardless I'm not fraudulent, so I'll use any provider I need to.
However, during the time they wanted me to switch providers, I was already released. So they --- it didn't personally affect me at the time.

*Id.*

---

[3] Prior to making this statement, Mr. Mosteller was asked what CSX did to attempt to interfere with his relationship with Dr. Johnson. Mr. Mosteller then answered, "The letter that I received, and I'm sure you probably have there, that said that they would no longer be accepting I guess any --- anything from Dr. Johnson, which in other words was kind of trying to push you away from your doctor."

[4]      Q. How did that affect you?
         Attorney Dingwall: Object to the form.
         A. Me personally, it did not affect me. I continued to see Dr. Johnson until I was released.
         Q. Did your insurance pay for those appointments?
         A. Yes.

Finally, Counsel cites to the deposition of Mr. Owens, who, when asked when asked what he thought intentional interference with his medical or benefit providers meant, testified:

> I guess that means that you couldn't go to the doctor of your choice.
> . . .
> Yes, but my benefits wouldn't continue unless I seeked another doctor.
> . . .
> If you don't have sick leave documents, all that would stop. They weren't accepting the documents from Dr. Carey anymore. So if I wanted to receive medical treatment from Dr. Carey, it wouldn't have been accepted. My benefits would have been stopped.

*Owens Dep.* 91–92. Once again, this quotation entirely distorts Mr. Owens's testimony. In reality, Plaintiffs' carefully placed ellipses omit Mr. Owens's admissions that he continued to see Dr. Carey and that his insurance carrier continued to cover those visits. *Id.*[5]

Thus, when Plaintiffs' only evidence of injury is viewed in context, it does more to harm Plaintiffs' claim than to help it. Without evidence of actual interference or damages, Plaintiffs' claim cannot continue.

Additionally, the Court finds that even if Plaintiffs had produced evidence that Defendants interfered with their contractual or business relationships, Defendants' conduct was privileged. Plaintiffs have presented no argument suggesting that Defendants were acting outside of the scope of their employment or outside of their interest in protecting CSXT from potential fraud and employee misconduct. Instead, Plaintiffs assert that Defendants' claim of privilege is defeated by "bad motive." *See Pls.' Resp.* 11–13.

---

[5]     Q. I know we keep saying the same thing back and forth to each other. You continued to see Dr. Carey. Right?
A. Right.
Q. And your insurance continued to cover visits with Dr. Carey. Right?
A. Yes, but my benefits wouldn't continue unless I seeked another doctor. So to me that got something to do with it.

- 7 -

While it is undeniable that a bad motive will overcome a claim of qualified privilege, *see* Syl. pt. 4, *Dzinglski v. Weirton Steel corp.*, 445 S.E.2d 219, 221 (W. Va. 1994), Plaintiffs fail to identify what the individual Defendants' bad motives were and suggests that Defendant CSXT "acted with a bad motive to terminate [Plaintiffs] to save money on fringe benefits." *Pls.' Resp.* 13. To support the latter allegation, Plaintiffs point to the testimony of a CSX corporate representative who testified that "CSX has to pay an exorbitant amount of fringe benefits towards the employees' health and welfare benefits." *Dreher Dep.* 28, ECF No. 395-10. Once again, this testimony is taken out of context. This portion of Ms. Dreher's testimony simply described the consequences to CSXT of employees fraudulently obtaining health and welfare benefits, and it cannot be reasonably read as an admission that CSXT investigated the employees only to cut back on fringe benefit expenses.[6]

Regardless, even if Defendant CSXT did have a bad motive, the Court agrees with the Defendants that "a party cannot be liable for interference with a contract if that party has a financial interest in the contract." *Wood Cnty. Airport Auth. v. Crown Airways, Inc.*, 919 F. Supp. 960, 968 (S.D.W. Va. 1996). Here, CSXT was the source of Plaintiffs' medical benefits. Consequently, even

---

[6] This excerpt of Ms. Dreher's testimony comes from her response to questions about her role in the charging and investigative process. When asked what type of information she gathered, she testified, "From the Union Benefits Administrator, the amount of health and welfare benefits that an employee would receive if they mark off sick. And from our Finance Department, the fringe benefit piece of how much CSX pays toward union employee's health and welfare benefits." When asked if that information was "relevant to the decision to charge an employee with a rule violation," she testified that "[i]t just shows the magnitude of the fraud," and that it is relevant to develop the full facts of the charge." *Dreher Dep.* 27. When asked to clarify what she meant by "develop the full facts of the charge," she testified:

> In the Collective Bargaining Agreement and Railway Labor Act, we have to develop full record to prove a charge against employee. And so we charge the employee with dishonesty and with fraud and the Code of Ethics fraud that you mentioned earlier.
>
> It shows that they – they were dishonest in trying to attempt to have a financial gain with their actions. And their actions of marking off for an extended period of absence shows that they would receive extended health and welfare benefits for nearly one year and eight months longer than what they should. *And as a result of that is CSX has to pay an exorbitant amount of fringe benefits towards the employees' health and welfare benefits.*

*Id.* at 27–28 (emphasis added).

if CSXT is not entitled to qualified privilege, it still cannot be held liable for tortious interference with Plaintiffs' benefits.

## IV. CONCLUSION

Accordingly, the Court **GRANTS**, **in part**, Defendants' Motion for Summary Judgment. Plaintiffs' tortious interference claim is **DISMISSED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER:        August 2, 2021

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE

# District Judge Daybook Entry

## United States District Court - Southern District of West Virginia at Huntington

Date:   8/5/2021                    Case Number  3:18-cv-00321

Case Style              Adkins vs. CSX Transportation, Inc.

Type of hearing         Motion Hearing

Before the Honorable: 2514-Chambers

Court Reporter          Kathy Swinhart                    Courtroom Deputy  Law Clerk

Attorney(s) for the Plaintiff or Government

Gregory Paul, Patrick Stephens, Kenneth Reed

Attorney(s) for the Defendant(s)

Davis Walsh, Melissa Bird, Samuel Tarryr

Law Clerk               Casey Waldeck

Probation Officer

## Court Times

| Start Time | Stop Time | Court Time Description |
|---|---|---|
| 1:29 PM | 3:01 PM | Non-Trial Time/Uncontested Time |

Non-Trial Time/Uncontested Time 01:32

## Courtroom Notes

Hearing scheduled to commence: 1:30 p.m.
Hearing commenced: 1:29 p.m.

Motion by CSX Transportation, Inc., Elizabeth Creedon, Tom DeAngelo, Kenneth Ray Emerson, Craig S. Heligman, Delando Jones, Shawn Lusk, Curt Shogren, Milton Storm, Gus Thoele for Summary Judgment. ECF No. 360

Motion by Plaintiffs for Partial Summary Judgment. ECF NO. 368,

Motions taken under advisement.
Names of settled plaintiffs placed on the record.

Trial continued generally.

Adjourned  3:01 p.m.

IN THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF WEST VIRGINIA, HUNTINGTON DIVISION

BEFORE THE HONORABLE ROBERT C. CHAMBERS, JUDGE

---o0o---

JUSTIN ADKINS, et al.,

                Plaintiffs,

vs.                            No. 3:18-CV-00321

CSX TRANSPORTATION, INC.,
et al.,

                Defendants.
_____/

---o0o---

REPORTER'S TRANSCRIPT OF PROCEEDINGS

MOTION HEARING

THURSDAY, AUGUST 5, 2021, 1:30 P.M.

---o0o---

For the Plaintiffs:    MORGAN & PAUL
                        100 First Avenue, Suite 1010
                        Pittsburgh, Pennsylvania  15222
                        BY:  GREGORY G. PAUL

                        UNDERWOOD & PROCTOR LAW OFFICES
                        923 Third Avenue
                        Huntington, West Virginia  25701
                        BY:  JOHN PATRICK L. STEPHENS

                  (Appearances continued next page...)

Reported by:    KATHY L. SWINHART, CSR
                  Official Court Reporter
                  (304) 528-2244

1                      APPEARANCES (Continued)

2

    For the Plaintiffs (Cont'd):
3
                    KENNETH R. REED, ESQ.
4                   241 Elm Street
                    Ludlow, Kentucky  41016
5

6    For the Defendants:

7                   NELSON MULLINS RILEY & SCARBOROUGH
                    Post Office Box 1856
8                   Huntington, West Virginia  25719-1856
                    BY:  MELISSA FOSTER BIRD
9
                    MCGUIRE WOODS
10                  800 East Canal Street
                    Richmond, Virginia  23219
11                  BY:  DAVIS MICHAEL WALSH
                    and  SAMUEL LEWIS TARRY, JR.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                              1

1              HUNTINGTON, WEST VIRGINIA

2           THURSDAY, AUGUST 5, 2021, 1:28 P.M.

3                    ---o0o---

4        THE COURT:  Good afternoon.

5        MR. PAUL:  Good afternoon, Your Honor.

6        MS. BIRD:  Good afternoon.

7        MR. STEPHENS:  Good afternoon, Your Honor.

8        THE COURT:  Are we ready to proceed?

9        MS. BIRD:  Yes, sir.

10        THE COURT:  All right.  So I wanted to hear argument

11   on the remaining dispositive motions.  I recall the defense

12   has several.  The plaintiff has one motion for partial summary

13   judgment, part of which has been ruled upon but not all of

14   which, so I wanted the chance for counsel to come in and

15   argue.

16        It strikes me that, first, it makes sense to take up

17   those claims that have as a matter of their elements the

18   balance shifting test that is common to all of us.  My

19   recollection is that that would include the Family Medical

20   Leave Act retaliation claim, and then the claims that the

21   plaintiffs brought under ERISA, the state Human Rights Act and

22   the Rehabilitation Act.

23        So I'd like your argument from both sides about those

24   first, and then we'll shift to -- after that, I think we still

25   have the Family Medical Leave Act interference claim and then

2

1      the Rail Safety Act claim.

2              And as far as I'm concerned, as long as you use a

3      microphone, you can remain at counsel table, but you need to

4      use the microphone so that my court reporter can hear

5      everything.  All right?

6              MS. BIRD:  Is there any order by which you would like

7      to hear those, Your Honor?  Only because we're splitting the

8      FMLA motion and the other three, ERISA, West Virginia Human

9      Rights Act and Rehabilitation Act.  Would you rather hear the

10     FMLA first?

11             THE COURT:  No, I think I'd actually rather hear the

12     FMLA retaliation claim, ERISA, Rehab Act and Human Rights Act

13     because I think all those have that common foundation of the

14     balance shifting where, it seems to me, the principal argument

15     is over whether there is evidence of pretext and whether the

16     plaintiff has evidence to overcome that.  So --

17             MS. BIRD:  Agreed, Your Honor.

18             Go ahead and start.

19             MR. WALSH:  Your Honor, Davis Walsh for the

20     defendants.  I'm going to address the FMLA retaliation --

21             THE COURT:  All right.

22             MR. WALSH:  I'll address both the FMLA, but I will

23     address retaliation first and then concede the floor.

24             I think you've already hit on the key legal issue,

25     which is pretext.  You know, I think that the parties in terms

3

1    of retaliation --

2         THE COURT:  Is your microphone on?

3         MR. WALSH:  It is.

4         If it's easier, I could go to the --

5         THE COURT:  Well -- or you might just speak up a

6    little bit.  The microphones are not great in here.

7         MR. WALSH:  Let me make it a little bit easier.

8         THE COURT:  All right.

9         MS. BIRD:  And the court reporter's life easier

10   because she's the most important person, right?

11        MR. WALSH:  Is this better, Your Honor?

12        THE COURT:  Yes, it is.

13        MR. WALSH:  Okay.  Great.  It must be something with

14   my microphone.

15        You've already hit on the key legal issue.  We are at

16   a point, I think, where the parties agree on the fundamentals,

17   and we come down to pretext.

18        In the plaintiffs' brief, they cited three reasons to

19   claim that there were pretext, and in the reply, our response

20   was simply that those are non sequiturs.

21        The first one is that Dr. Heligman used the term

22   subconscious or unconscious in his deposition describing the

23   fraud.  This is a situation of the plaintiffs picking out a

24   word but ignoring what Dr. Heligman said in full.

25        What he explained, maybe not as a lawyer would have

4

1    explained those terms, is that what he was saying is that they

2    didn't -- he's not claiming that they went into the

3    examination room and said, hey, Doc, I want to get off of

4    work, can you give me a note?  But they went into the

5    examination room -- they went to the chiropractors who are

6    most known to be likely to give out-of-work information

7    regardless of what the actual injury was, but to instead base

8    that off of what the plaintiff told them the injury was.

9          So instead of -- in essence, if we wanted to give this

10   sort of a criminal law analogy, and I'm not saying there's a

11   crime being committed, but as an analogy, there is still

12   fraudulent intent from what Dr. Heligman said.  But the words

13   weren't spoken, hey, I want you to do this thing that you're

14   not supposed to do, actually out loud.

15         I also would point out that I'm not exactly sure how

16   this is evidence of pretext.  Because the pretext argument

17   that the plaintiffs need to make, and frankly have not made,

18   is that CSX's reason for dismissing or charging the plaintiffs

19   that they were -- that they were involved in this submission

20   of fraudulent COIIs is that -- that the actual reason was for

21   them seeking Family Medical Leave Act leave.  And there is

22   simply nothing in the record where the plaintiffs have pointed

23   to that that's the real reason that the plaintiffs were

24   dismissed, was the attempting to seek leave.

25         You know, I think we cited to the Kariotis case out of

5

1    the Seventh Circuit, and I think in the preamble of that, the

2    Seventh Circuit does a good job explaining that in that case,

3    the plaintiff had claimed similar claims -- she claimed Title

4    VII discrimination, I think age discrimination, and FMLA

5    discrimination, for that matter.  And the Seventh Circuit

6    said, well, it's possible that she was discriminated in each

7    of those ways, but that you need to show the reason she was

8    fired was actually about taking the Family Medical Leave Act

9    leave, and I don't believe the plaintiffs have shown that.

10          THE COURT:  In that case, as I recall, the employer

11   claimed that it was essentially the act of seeking the leave

12   on an improper basis that was its reason for taking that

13   adverse action.

14          MR. WALSH:  Right, I believe -- yes, that is correct.

15          And then among -- and again, the FMLA is not a strict

16   liability statute.  I think at times the plaintiffs' brief

17   attempts to say the fact that they were fired after seeking

18   leave means that there was a retaliation or means that there

19   was interference.  The FMLA is not a strict liability statute

20   as that case points out.  The fact that she sought the leave

21   improperly provided the basis on which she was eventually

22   dismissed.

23          So looking back at the pretext, I frankly am lost at

24   how Dr. Heligman's statement somehow or another shows that she

25   was actually fired because she -- or, excuse me, not she --

6

1    that the plaintiffs were actually fired because they sought

2    Family Medical Leave Act leave.

3           And the second reason that the plaintiffs cited in

4    their brief is that Dr. Heligman's letters to the RRB predated

5    the investigative hearings.  Now, there are a number of

6    factual reasons why the letters predated the investigative

7    hearings, namely those letters are what kicked off the

8    actual -- the further investigation into the particular

9    issues.  But fundamentally I come back to the same point, I

10   don't see how that shows pretext, that somehow or another what

11   really was happening is they were fired for seeking Family

12   Medical Leave Act leave.

13          THE COURT:  Well, I guess in fairness to plaintiffs --

14   of course, plaintiffs' counsel will speak on behalf of the

15   plaintiffs.  But my understanding is their argument is that

16   when you look at Dr. Heligman's letter and then the speed

17   within which CSX took action sending out these discharge

18   notices and all that, and that it was all based upon sort of

19   speculation and supposition, that Dr. Heligman's letter and

20   all CSX knew at the time it was sending these firing notices

21   was that, well, you've got these so-called suspicious

22   circumstances of a number of people filing -- I forget the --

23   I know the acronym, I forget the name of the document that's

24   the leave statement that the doctors have to sign.

25          That there was, I guess one way to characterize it, a

7

1  rush to judgment based upon inadequate considerations, and

2  that that's what plaintiffs claim rings false about the

3  reasons for the action, and that it -- that this action

4  occurred so quickly after these notices were filed by the

5  employees, that that's what supports the inference of a

6  discriminatory intent.

7          MR. WALSH:  And I think I would -- I have two points

8  that we want to make on that.

9          One is, looking at the case law for inadequate

10  investigation or rush to judgment, assuming that occurred,

11  which we would dispute, do not overcome -- or are

12  insufficient.  If you look at the Seventh Circuit decision in

13  Scruggs, or some of the other case law we cited in the brief,

14  that the adequacy of the investigation doesn't undermine the

15  belief that the defendant had or the employer had.

16          I think that the other important consideration here is

17  that looking at the whole process factually, the letters were

18  step one.  Okay.  The letters to the RRB were step one.  Then

19  there were charge letters.  The plaintiffs were given the

20  opportunity under the collective bargaining agreement to have

21  a full hearing, which they had, to appeal that hearing and

22  then ultimately go to the public law board.

23          Of the remaining plaintiffs, the public law board --

24  except one, the public law board upheld that CSX had proven

25  fraud.  And the one plaintiff who remains, the public law

8

1    board frankly found that he had committed the fraud or they --

2    CSX had proved that, but there was some mitigation.  So they

3    re -- put him back on service, just not with back pay.

4         So I think that while the plaintiffs want to focus on

5    step one, looking at the entire factual picture and the entire

6    record, there simply shows a consistency in CSX's belief of

7    what happened, which was ultimately beared out not only

8    through the collective bargaining agreement process, but also

9    through the public law board upholding that.

10        So, again, this is simply not -- the consistency, I

11   think, would weigh in favor of it not being pretextual.  In

12   fact, I think the consistency shows that what was suspected

13   was beared out through the longer investigation and ultimately

14   through the public law board.

15        The last thing that the plaintiffs cited in their

16   brief in terms of pretext is claiming that Dr. Heligman had

17   testified on one hand he was not interfering with the

18   doctor-patient relationship, and on the other hand in his

19   deposition he criticized the doctor -- the chiropractor's

20   care.  I go back to I'm not entirely sure why that shows

21   pretext.

22        You're talking about a deposition where he says that

23   he's not interfering with the doctor-patient relationship, and

24   Your Honor has already ruled on that issue to some extent in

25   the tortious interference claim.  But simply saying in a

9

1    deposition that he didn't agree with the chiropractor's

2    care -- Dr. Heligman is an occupational medicine doctor --

3    again, I don't think this shows any sort of pretext, that the

4    real reason these plaintiffs were allegedly fired or the real

5    reason they were fired is allegedly their seeking leave under

6    the Family Medical Leave Act.

7            The Family Medical Leave Act retaliation and

8    interference come from the same premise that you don't have

9    any greater rights.  That the employer could have fired you

10   for the act.  The Family Medical Leave Act doesn't provide you

11   additional rights.

12           And here, the plaintiffs were fired, and then the

13   parties agree that the reason was part of -- was based on

14   CSX's belief, that was ultimately upheld by the public law

15   board almost unanimously, for this fraudulent submission of

16   COIIs.

17           THE COURT:  All right.

18           MR. WALSH:  Thank you.

19           THE COURT:  Thank you.

20           MS. BIRD:  Do you want to hear the FMLA response or do

21   you want to hear the rest of it?

22           THE COURT:  Well, I think the rest of it first.

23           MS. BIRD:  Okay.  Your Honor, let me address one point

24   that you just raised with Mr. Day -- I just said I wouldn't do

25   that, and I did it -- with Mr. Walsh, and that is the timing

10

1     of what happened.

2           The plaintiffs complain of the timing and the speed at

3     which there was a letter charging the employees soon after the

4     letter to the RRB, but you have to keep in context here that

5     we're dealing with a collective bargaining agreement that sets

6     specific time limits for which plaintiffs have to be charged

7     pursuant to that collective bargaining agreement if there is a

8     rules violation.

9           So in these cases, Dr. Heligman's letter is the

10    triggering event that starts that timing for the collective

11    bargaining agreement.  And the first action under the

12    collective bargaining agreement is a charge letter, which

13    charges the employees with a possible rules violation and then

14    starts the investigative process.  So that charge letter is

15    really the only way that CSX could investigate this situation

16    that was suspicious.

17          They had 67 or more COIIs from the same two

18    chiropractors in the same location taking them off work, and

19    what were they supposed to do with that?  Their only recourse

20    really under the collective bargaining agreement, each one of

21    these plaintiffs, was to charge them with a possible rules

22    violation, which they did, and then that led to the

23    investigation, which is the investigative hearing transcripts

24    which we've all seen and are very familiar with, which then

25    led to a termination letter, which was appealed internally and

11

1    then also appealed to the public law board.

2           So the speed at which this happened, first of all, was

3    dictated by the collective bargaining agreement.  Let's start

4    with that.  But secondly, that charge letter that may have

5    been speedy, as they say, was the only real way to do this

6    investigation.  There was no right for CSX to go out and get

7    information from these plaintiffs otherwise because their

8    collective bargaining agreement started the process.

9           THE COURT:  All right.

10          MS. BIRD:  So I just want to address that part of what

11   was said.

12          THE COURT:  Sure.

13          MS. BIRD:  And you're right, Your Honor, as we were

14   coming in here today, we were talking about how these claims,

15   these causes of action that you asked us to address first do

16   have the same basis and the same arguments.

17          With regard to the ERISA claim, the prima facie case

18   is that it starts with you had to have a prohibited action,

19   which was there for the purpose of interfering or denying

20   somebody their rights.

21          With regard to the West Virginia Human Rights Act,

22   there has to be a protected class and some adverse action

23   taken because of -- because the plaintiff was a member of that

24   protected class.

25          In the Rehabilitation Act, you have to start with

12

1   somebody being disabled and then otherwise qualified for the

2   job but then somehow discriminated against because of that

3   disability.

4        In all three of those causes of action, it starts with

5   something improper has to be shown before there is a prima

6   facie case which shifts the burden of proof to even talk about

7   pretext.

8        In this case, throughout all of the evidence, every

9   single piece of evidence shows a consistent theme, and that

10  theme is the COIIs came in.  There was an excessive number of

11  those COIIs.  CSX, through the collective bargaining

12  agreement, decided to investigate that.  And then these

13  plaintiffs were ultimately terminated because of the rules

14  violation that was alleged in those COIIs.

15       There is zero evidence here that there was any reason

16  or discussion, thought, plan or intention to deny people

17  benefits, and that is what these charges and ultimate

18  terminations came from.  There is zero information, there is

19  zero evidence that these people, these plaintiffs were charged

20  because they were some protected class under the West Virginia

21  Human Rights Act, or because they were disabled under the

22  Rehabilitation Act.

23       Every single piece of evidence, including Dr.

24  Heligman's testimony, including the testimony which we heard

25  from their expert just yesterday, which we don't have the

13

1    transcript of yet, every single piece of evidence leads to CSX

2    saw a suspicious activity and investigated it.  It had nothing

3    to do with the medical information within that.  The only

4    reason that came into play is because it was a medical

5    document that was suspicious.

6         But what they did was they went out and investigated a

7    situation because of their own belief that a rules violation

8    and a policy consideration had been violated, and that was

9    ethics and honesty.  And every single piece of information

10   leads back to this suspicion resulting in a charge letter so

11   that those suspicions could be investigated.

12        Ultimately the plaintiffs were terminated and, of the

13   remaining plaintiffs, only one was put back to work.  And like

14   Davis said, the public law board in that case said, oh, yeah,

15   you committed fraud, but we're putting you back to work for

16   another reason.

17        Every single other one of these were upheld because,

18   in fact, they were terminated because they violated the ethics

19   policy and the code of honesty.

20             THE COURT:  All right.  Thank you.

21             MS. BIRD:  Thank you.

22             MR. PAUL:  Good afternoon, Your Honor.

23             THE COURT:  Good afternoon.

24             MR. PAUL:  Greg Paul on behalf of the plaintiffs.

25             THE COURT:  Welcome back.

14

1          MR. PAUL:  Thank you.

2          As an initial matter, just before I forget, we have

3    settled six cases, and to the extent there is any rulings made

4    today, you know, at some point maybe we can get those on the

5    record.

6          THE COURT:  Sure.

7          MR. PAUL:  Second, if I could before getting into the

8    FMLA and other the causes of action, Ms. Foster Bird brought

9    up the collective bargaining agreement.  And at some point, I

10   imagine we will be briefing motions in limine, and one of the

11   really important things is there is a long-standing Supreme

12   Court precedent, Gardner versus Great West and others, the law

13   of the land versus the law of the shop.  So anything that

14   happens under the collective bargaining agreement is by its

15   very nature limited to that law of the shop, and that is

16   separate and distinct from any federal employment law or

17   right, whether that is the FMLA, ERISA, et cetera.

18          So, for instance, when the argument was made that the

19   only recourse was to investigate this under the collective

20   bargaining agreement, I don't think that is accurate.  For

21   instance, under the FMLA, this is the substantive provision.

22   Had that COII, the certificate of ongoing illness, which we

23   think we have strong evidence triggered notice of potential

24   FMLA, that would have triggered a series of rights and

25   responsibilities for the employer and the employee, such as

15

1    CSX sending out the medical certification form.  That form

2    would have to come back within, I think, 15 days.  If CSX had

3    questions about that, they can request clarification, and they

4    can request a second opinion.  There is even circumstances

5    where they could get a third opinion.

6         So there are certain rights under the substantive

7    provision of the FMLA that would have provided a lot of

8    protection and the ability of CSX to investigate and also the

9    employee to respond.

10        And I know that it sounds like I am arguing the FMLA

11   substative provision, but I bring that up now only because

12   it's both intertwined with the FMLA retaliation, and it is

13   directly responsive to one example of how CSX was not limited

14   by the collective bargaining agreement --

15        THE COURT:  Okay.

16        MR. PAUL:  -- substantively.

17        THE COURT:  All right.

18        MR. PAUL:  Turning to the FMLA retaliation provision,

19   we agree in this case, none of the plaintiffs asked for FMLA

20   specifically.  We know that.  Most of them, if not all of them

21   didn't have any training under the FMLA, so it really just

22   starts with that one-page certificate of ongoing illness.

23        And what Ms. Johnson, the FMLA director, and even Dr.

24   Heligman had testified, there is a little box on that Medgate

25   intake form that said, you know, could this be FMLA eligible,

16

1   and those were checked yes for the plaintiffs.

2          So at that initial gate, it didn't -- it was just

3   known as medical leave, not FMLA, but that doesn't mean that

4   they're not protected under the FMLA retaliation provisions.

5   Because had they been approved, then CSX then would get into

6   the burden-shifting and the pretext about whether there was

7   actual evidence that they were engaged in fraud.

8          Which kind of goes back to one more basic point, if I

9   can.  There is very conflicting evidence from Dr. Heligman

10  directly that sometimes, say the letter to the RRB, he

11  carefully, or the legal department or labor relations

12  carefully wrote that to say they were suspected of fraud.

13  Other times in Dr. Heligman's deposition or in the hearing

14  transcript, he clearly says -- and we quoted in our document

15  at 397, document No. 397 -- that he had already concluded,

16  that Dr. Heligman had already concluded that they had engaged

17  in a scheme of fraud.

18         So those are kind of two different concepts.

19         THE COURT:  Well, I agree.  But I've read through --

20         MR. PAUL:  Yes.

21         THE COURT:  -- I suspect what is probably all or at

22  least a vast portion of his deposition.  And honestly I think

23  it's a fair conclusion, which is the conclusion that I reach,

24  that he was trying to be very careful not to literally accuse

25  people of a crime, not to literally accuse them of fraud.

17

1        But clearly he believed, and he cited reasons for it,

2  that this was sort of a collective action on behalf of the

3  employees, whether it was done as a result of some express

4  agreement which he couldn't prove, or whether it was just a

5  tacit practice, that everybody who went to these two

6  chiropractors at this time and got reports that were similar

7  were really participating in a at least tacit agreement to try

8  to file these COIIs and to get on some type of leave.

9        And so the fact that he admits that he's not accusing

10  them of fraud, to me, really is kind of beside the point.

11        MR. PAUL:  Well, I agree in the context of the letter

12  to the RRB and the insurance company.  His testimony in

13  deposition and then back in 2017 was that he had concluded

14  that they engaged in fraud without any evidence.

15        THE COURT:  Right.

16        So, you know, honestly the principal reason that I

17  wanted to hear this argument is I am at a point in my analysis

18  where I really think that I've got to determine as it respects

19  not only the FMLA retaliation, but the ERISA, Rehab, and Human

20  Rights Act claims, that at least for the purposes of today I'm

21  satisfied that you've stated a prima facie case.

22        CSX comes back with its proffered reasons for taking

23  this adverse action, and I really wanted to hear your

24  arguments about what evidence you have to demonstrate, to meet

25  your burden that that is pretextual.

18

1          MR. PAUL:  Sure.  Yeah, and that starts with I think

2     Dr. Heligman's testimony that we've quoted is inconsistent

3     with itself.

4          Meaning maybe -- okay.

5          THE COURT:  No, I understand what you're saying.

6          MR. PAUL:  And I'm not saying that they had to call

7     out the CSX police and do surveillance, but certainly there is

8     a lot of cases out there where you have that.  But I think all

9     of us expected, at least on our side expected to see just a

10    little bit more.  I mean, just some evidence other than the

11    coincidence of the number of COIIs, which, you know, they're

12    all individual.  And some people -- as we know, Devery Brown

13    had been on disability for over a year, so he would have no

14    incentive to defraud the company of anything.  Others had

15    treated with the chiropractors for years.  So it's -- I mean,

16    each individual is critical to evaluate whether there was a

17    legitimate basis for that fraud.

18         So when they just say everybody was engaged in fraud,

19    I mean, they've got to look a little bit deeper, I think, to

20    articulate that non-discriminatory reason.  Or if the Court

21    felt otherwise, and it was our burden then to shift back and

22    to explain why it was not a legitimate reason, we've gone

23    through the fact that it was a predetermined process, the fact

24    that, you know, the COIIs themselves provided legitimate

25    medical conditions and the length of time.

19

1          One of their bases is to say that they were all

2     basically two months, but the chiropractors would explain or

3     others would explain that that is a legitimate time to treat

4     those type of conditions.

5          So I think, you know, a jury should certainly be able

6     to --

7          THE COURT:  You've got responses to many of the

8     arguments that CSX raised, but it also seems clear to me that

9     the law is that an employer who offers a justification can be

10    wrong, even about the justification, and that doesn't

11    necessarily lead then to plaintiffs being able to meet their

12    burden to show that there's an inference of discrimination as

13    a result of a pretext.

14         So here, one of the things I am curious about is I

15    understand why you were -- the people you represent were very

16    skeptical of Dr. Heligman's first letter.  But then what I'm

17    looking at is, after that letter, a process that triggered

18    that resulted in some level of hearings consistent with the

19    collective bargaining agreement and ultimately, as I

20    understand it, with the exception of maybe three or four cases

21    where many people didn't appeal, but those who did except for

22    three or four had the decisions against them affirmed.

23         So how is it that -- where is the evidence that this

24    was a pretextual termination process?

25         MR. PAUL:  Sure.

20

1          Well, we cited from Dr. Heligman's testimony.  In

2     those hearings that happened back in 2017, he had testified

3     that they were already guilty before the investigation even

4     happened.  I mean, he testified at the opening of each of

5     those investigations, I have concluded that they engaged in a

6     scheme of fraud, so that is a predetermined investigation by

7     nature.  I mean, he had already reached the conclusion before

8     he heard the testimony.

9          THE COURT:  Was he the decision-maker at the --

10    throughout this process?

11         MR. PAUL:  He -- well, that's tricky.  He was

12    certainly the only witness on behalf of the company, you know,

13    to testify.  I think he was definitely the decision-maker with

14    respect to certain things like initiating the charge.

15         THE COURT:  Okay.

16         MR. PAUL:  But when it comes to the ultimate

17    decision-maker, I think that was referred through labor

18    relations to a management head, who relied exclusively upon

19    Dr. Heligman's testimony.  So --

20         THE COURT:  Well, so I will come back to where I

21    started a moment ago.

22         The fact is an employer can be wrong -- and I'm not

23    saying they even were wrong here because it got upheld through

24    the process --

25         MR. PAUL:  Sure.

21

1          THE COURT:  -- and many people didn't even appeal.

2          But where it's clear even an employer can be wrong,

3    that doesn't in and of itself prove their basis was

4    pretextual.

5          MR. PAUL:  No, not if they were wrong.  And I am not

6    sure if Your Honor is getting to that honest belief doctrine,

7    if this is the time to address it or not, because --

8          THE COURT:  Well, perhaps.  I mean, until I started

9    reading the briefing on this case, I hadn't seen that

10   terminology used, and I don't know that in my mind it's

11   anything other than a label for that which we commonly apply

12   already anyway, which is determining whether an employer had a

13   good faith basis for the action that they took.

14         MR. PAUL:  Right.

15         THE COURT:  And so here, honestly it's hard for me to

16   find that there wasn't a good faith basis for their action

17   when they initiated a process that is performed under the

18   collective bargaining agreement that resulted in largely the

19   approval of the discharges that they filed.

20         MR. PAUL:  So, I mean, that's where I started out with

21   the limitations of the collective bargaining agreement.  I

22   mean, the only scope that the investigation in the collective

23   bargaining agreement has is of the collective bargaining

24   agreement itself, which for railroaders does not include any

25   federal employment law.  It is possible that some other

22

1    collective bargaining agreements do, but they are limited in

2    their very nature by -- so when we talk about the public --

3            THE COURT:  How does that change the result here?

4            MR. PAUL:  Sure.

5            THE COURT:  I agree they're limited, but here it was,

6    I understand, expressly the purpose of this review to

7    determine whether or not the termination decision based upon

8    Dr. Heligman's suspicions was sufficient under the collective

9    bargain agreement.  They said it was.

10           MR. PAUL:  Well, limited to -- sure, those rule

11   violations, but limited to that conduct, not limited to any

12   violation of any federal employment law.  So that just wasn't

13   considered.

14           THE COURT:  Well, but -- okay.  I'm not sure that I

15   think that matters or that I understand perhaps your point.

16   Because what we're talking about is whether or not the

17   employer essentially had a good faith basis for taking the

18   action.  They can be wrong, they can be quick to judge --

19   there are plenty of cases that talk about that sort of

20   thing -- that sort of criticism does not rise to the level of

21   being evidence of pretext.

22           It seems to me there's got to be something more, and I

23   don't know where the more is here.

24           MR. PAUL:  Okay.  And maybe it would be important to

25   draw a distinction between their good faith effort to

23

1    initially charge versus their supposed good faith effort to

2    terminate, if I can talk about that for a minute.

3            THE COURT:  Sure.

4            MR. PAUL:  I mean, because certainly getting an influx

5    of COIIs would give rise to, sure, let's look into it.  But

6    then when you actually -- and if your reason, one of the

7    reasons was to get out of the coming layoff announcement, and

8    about half the people weren't even subject to the layoff, that

9    is a critical fact that would have come up during a reasonable

10   investigation.

11           As to how --

12           THE COURT:  Well, it seems to me that -- and I admit

13   perhaps I haven't spent as much time as I'd like thinking it

14   through, but it seems to me that cuts both ways.

15           On the one hand, yes, you could say, you know, they

16   took this action quickly in order to reduce, essentially

17   reduce the effect of the furlough.  But it seems to me that we

18   could also say the reverse, that in this case they had little

19   incentive to take this action against people who weren't even

20   on the furlough list.

21           MR. PAUL:  Right.  And I guess --

22           THE COURT:  Because you weren't going to be

23   furloughed, so you don't -- so CSX had no motive to dump them

24   off of the furlough list.

25           MR. PAUL:  Right.  So why would that support -- I

24

1     mean, I'm not asking a question.  I understand --

2          THE COURT:  I guess that's what I get to.

3          So I don't see how -- it seems me it's almost an

4     inference that one could argue could cut in favor of either

5     side here, and that's why I have trouble sort of figuring out

6     if it really deserves to be a material --

7          MR. PAUL:  Yeah.

8          THE COURT:  -- element of my consideration.

9          MR. PAUL:  Well, our argument would be and our, you

10    know, statement on that would be that someone who is not

11    subject to the layoff at all should not be scooped up with all

12    of these other suspicions through the investigation.

13         THE COURT:  Well, you may be right, but the inference

14    that I'm trying to say is that maybe that supports the

15    inference that it was really their reaction to all of these

16    COIIs coming -- and their similarities that was the motivating

17    force here and not trying to play fast and loose with

18    furloughs or that sort of thing.

19         MR. PAUL:  So I'm not agreeing with this, but that may

20    be true in June of 2017, but that certainly wasn't true in

21    August of 2017 when they made the decision to terminate.

22         So, you know, I think Dr. Heligman testified at first

23    he wasn't sure if people were laid off or not, he just saw a

24    pattern that throughout the course of those three months or

25    slightly under three months, you know, evidence certainly did

25

1    come out and people testified I wasn't subject to lay off or

2    furlough.  Or they said I don't treat with just this

3    chiropractor, I've been treating with an orthopedist, I mean,

4    other things that would substantiate this wasn't, as I think

5    their suspicion was in June, that they were first going to

6    these chiropractors just to get paperwork completed.

7            And just for instance, I mean to cite our brief again,

8    it's document No. 397, page 5 and 6 of 27, Dr. Heligman

9    testified that he had no reason to believe that the illnesses

10   were not legitimate, that the COIIs did not appear fraudulent,

11   because that's at direct odds with the suspicion in June that

12   he would have felt.

13           And then later he testifies that they went to the

14   chiros, quote, with the sole intent of obtaining medical

15   documentation for the purpose of seeking benefits improperly,

16   that is the fraud, end quote.

17           So those are two different worlds to look at this COI

18   and say there's nothing suspicious about it, which he

19   testified to versus the letter to the RRB that suggests

20   otherwise, and then later to say that that was a fraud.  It's

21   that type of inconsistent testimony that could support an

22   inference for a jury to conclude that it was pretextual.

23           Now, you know, we think there is more going on than

24   just this one day when these COIIs came into the medical

25   department.  I mean, we think that there was a plot by CSX to

26

1 　try to eliminate the work force.  And that could be done

2 　legitimately I suppose, but the way they went about doing it

3 　here by accusing people of fraud was not.

4 　　　　　I don't know if you have any other questions.

5 　　　　　THE COURT:  Well, I think -- I'm not sure, both sides

6 　may have cited the Mercer case.  That was the Fourth Circuit

7 　case I know the defense cited because it cited approval of

8 　that Seventh Circuit case that they've argued about.  But the

9 　language was there, and then there was another per curiam

10 　later on in the circuit which also seemed to approve of the

11 　Seventh Circuit case, but then used this kind of language:

12 　　　　　The district court must evaluate whether plaintiff has

13 　demonstrated such weaknesses, implausibilities,

14 　inconsistencies, incoherencies or contradictions in the

15 　employer's proffered legitimate reasons for its action that a

16 　reasonable fact finder could rationally find worthy of

17 　credence.

18 　　　　　And while I appreciate that in his deposition

19 　Dr. Heligman made the statements you're referred to -- I don't

20 　question it's in there, I just haven't read through it -- is

21 　that what this boils down to then on the plaintiffs' side?  Is

22 　really your evidence of pretext actually just Heligman's

23 　inconsistencies in his testimony?

24 　　　　　MR. PAUL:  So it's not only, but it's primarily

25 　because he was the only witness.

27

1          So this is not an example where an employer did an

2     investigation and had five witnesses, and they said different

3     things so you have to weigh things.  You could argue that that

4     could be inconsistent but not evidence of pretext.  When it's

5     the sole witness, Dr. Heligman, the only witness that they

6     ever had and his testimony is inconsistent over time, that's

7     what would support the pretext analysis.

8          THE COURT:  Well, and maybe you can refresh my

9     recollection about this.

10          So did Dr. Heligman make in his testimony during the

11    investigatory hearings the same type of statements that you

12    pointed to here that were inconsistent or contradictory?

13          MR. PAUL:  Yes.

14          THE COURT:  So --

15          MR. PAUL:  Yes.  And we've summarized those at

16    document 397 starting at page 3 through 8.

17          THE COURT:  I remember some of that being laid out.  I

18    just frankly didn't remember --

19          MR. PAUL:  Yeah.

20          THE COURT:  -- what the source was, whether it was the

21    hearings or whether it was his deposition in this case.

22          MR. PAUL:  It was both because -- well, I mean, I

23    guess you could say it was the deposition because in the

24    deposition we asked him about the hearing.  But there is

25    the -- I don't know if that makes sense.

28

1          THE COURT:  It might, but that still leaves me a bit

2     confused.  Because if in his testimony at the hearings he

3     described really what he summarized in the letter that started

4     all this, and in that summarization he alluded to the fact

5     that there were all of these unusually high number of COIIs in

6     a short period of time, that these were also temporally

7     related to sort of the swirling news around the workplace

8     about the new people at the top and the possibility of major

9     changes, furloughs, layoffs, et cetera, that he found that

10    this sudden influx that, as he reported in his letter, were

11    reports that were very similar, strikingly similar in the way

12    it described the employees' complaints, their symptoms, the

13    conclusions that they should be off work for this precise

14    period, and the fact that these were all coming from two

15    medical providers -- and I attach no negative sort of

16    inference to the fact that these were chiropractors at all.

17          But it would -- those were the things that he said in

18    the letter, and that's what I assume was principally his

19    testimony at the hearings, and so even if he contradicts that

20    later in his deposition testimony or undercuts it by saying,

21    well, I didn't really mean fraud, oh, I'm not saying that they

22    didn't really have problems or medical conditions, I mean,

23    even if he backtracks that in the deposition, I'm not sure how

24    that goes to proving that CSX was essentially guilty of using

25    a pretextual basis for the discharge.

29

1          MR. PAUL:  Well, there are certainly -- in his

2    depositions, litigation depositions, there were certainly a

3    number of inconsistencies that came up.  But, I mean, I think

4    we've hit this point that in contrast to the letter to the RRB

5    where it was a suspicion, he definitely testified at those

6    hearings, you know, along the lines that, in his deposition,

7    he read the response from the investigation hearing.  I found

8    these employees' actions to be concerted fraud, effort to

9    defraud CSXT and the Railroad Retirement Board and insurance

10   providers for the extended benefits.

11         And the key is that nothing happened between his

12   letter to the RRB and those hearings in terms of what Dr.

13   Heligman did as an investigation that would change that.

14   That's why it's so predetermined.  And the reason it was

15   predetermined is a whole host of reasons that fit into kind of

16   a mix, whether it's the ERISA benefits because they don't have

17   to pay the health insurance if they're not on extended sick or

18   if they're -- have a disability or the use of the FMLA, that

19   they have to hold those jobs.  Because we know or we believe

20   that there was a real effort to eliminate positions, and that

21   wouldn't have happened had they given the FMLA protections and

22   ways to provide other information for the employees to support

23   their medical conditions, rather than just have it rest

24   exclusively with Dr. Heligman just based on his suspicion.

25         THE COURT:  Okay.  Thank you.

30

1          MR. PAUL:  Thank you.

2          THE COURT:  All right.  Brief reply?

3          MR. WALSH:  In terms of reply on retaliation, there's

4    just a couple little factual points I want to hit on.

5          One, Dr. Heligman is not the only person, not the only

6    actor in this case.  He was the person who identified the

7    issue, brought it forward.  The terminating officer for most

8    all these cases is a gentleman named Brian Barr -- the

9    terminating officer or decision-maker was a gentleman named

10   Brian Barr, who looked at the hearing transcript, the facts

11   established and made his decision.

12         Dr. Heligman is right now, I think, a boogeyman for

13   the plaintiffs, but that's not how the process played out.

14         THE COURT:  Was he the only witness at the hearings?

15         MR. WALSH:  I don't believe that is accurate.

16         The charging officer was also a witness, so they would

17   have somebody in the craft who would charge the employee who

18   would testify, and Dr. Heligman would also testify.

19         THE COURT:  Well, but to your knowledge, was all the

20   evidence that formed the basis for the decision by the board

21   Dr. Heligman's complaints or his criticisms of the COIIs?

22         MR. WALSH:  I think that is generally accurate, but

23   that goes to his analysis.  I think it's inaccurate to say

24   that all -- that nothing happened between the time of the RRB

25   letter and the hearings.  You know, as Ms. Bird pointed out,

31

1    it started the investigative process.  There was more that was

2    done.  It didn't change anybody's mind.

3            Ultimately, Your Honor, the question I think you've

4    asked is what is the evidence of pretext, and they simply --

5    that there was some sort of motive out there.  And at this

6    point plaintiffs' counsel has only put forward a supposition,

7    frankly a baseless supposition, that there was some plot to

8    eliminate the work force.  There is simply no evidence of that

9    at this point.

10           Pointing out what are perceived inconsistencies from

11   Dr. Heligman saying they did commit fraud to they might have

12   committed fraud simply isn't evidence of pretext, I would

13   submit.  And frankly I also disagree that he was inconsistent.

14   But in terms of retaliation, those are the points I have to

15   make.

16           If you have any questions --

17           THE COURT:  All right.  Thank you.

18           MR. WALSH:  Do you want to talk about -- I'm sorry.

19           MS. BIRD:  Let me just add -- that's okay.  Go ahead.

20           Let me just add one thing to what was said, that Dr.

21   Heligman and the charging officer were the witnesses on behalf

22   of CSX.  On behalf of the plaintiffs, they testified

23   themselves.  They also had the opportunity and were offered

24   the opportunity at every hearing to present any other

25   witnesses they wanted to present, including the chiropractors,

32

1   which did not come, including any medical treaters, which

2   would have alleviated or supported their claim that they were

3   properly off work for a medical condition.  So there were --

4   there was other evidence at the hearings.  It wasn't just Dr.

5   Heligman saying his point.

6        And the person who is missing here is the person who

7   made the decision to charge the plaintiffs and made the

8   decision to terminate the plaintiffs.  He testified in this

9   case for half a day.  His name is Brian Barr.  At one point,

10  he was superintendent of this area, in Huntington and the

11  division here.  He's now at CSX.  He's about the third person

12  in charge of CSX.  He was involved in this process from day

13  one when this information was brought to him to make a

14  decision whether or not to charge these plaintiffs and

15  investigate the situation, which was the way to do this under

16  the collective bargaining agreement.

17       So when he made -- when those charge letters went out,

18  evidence was heard at the hearing.  The plaintiffs all had the

19  opportunity to bring any other evidence they wanted to bring,

20  which would have been carried through through their appeal and

21  through the arbitration to the public law board, and they did

22  what they needed to do.  Some of them submitted medical

23  records.  Some of them submitted other things.  None of them

24  brought any other witnesses, which they were allowed to do,

25  and all of them testified as to the situation on behalf of

33

1    themselves.

2            THE COURT:  All right.  Thank you.

3            MR. PAUL:  May I just briefly?

4            THE COURT:  Yes.

5            MR. PAUL:  I think bringing up Mr. Barr, who was the

6    top management person --

7            THE COURT:  Right.

8            MR. PAUL:  -- his deposition I think was taken after,

9    so we don't have the benefit of that in the briefing.

10           If the Court would want some supplemental briefing --

11           THE COURT:  Well, they brought it up.  I hadn't seen

12   it referred to at all in the briefing before.

13           Is there something you want to say responsive to

14   what --

15           MR. PAUL:  Well, what's probably the biggest, most

16   important thing that came out of his testimony and other

17   managers is that typically almost always after a hearing, the

18   hearing officer would make a recommendation, and that didn't

19   happen in these cases, and there's really no explanation for

20   that other than that it was also predetermined.  But it's kind

21   of an important fact because it shows an irregularity in the

22   way that things were normally done in that collective

23   bargaining agreement process.

24           And not to re-urge what I said earlier about the FMLA,

25   but when counsel says that the plaintiffs could have brought

34

1   in -- maybe she didn't say their doctor, but medical evidence

2   or something to support their claim, that's exactly what the

3   substantive process of the FMLA would have provided.  So it's,

4   I think, a separate process, but an important one, that would

5   have shown light on why they were treated.

6          THE COURT:  All right.  Thank you.

7          MR. PAUL:  Thank you.

8          THE COURT:  All right.  Let's go with the interference

9   claim, then.

10         MR. WALSH:  Your Honor, on the interference claim, I

11  think again we're down to just a couple issues, and you've

12  already addressed some of them with Mr. Paul.

13         One of the key issues is does the good faith belief

14  doctrine, or however we want to refer to it, apply.  I think

15  the case law, as you've pointed out, is clear that it does

16  apply.  The plaintiffs' main argument I would say against that

17  is to claim that it doesn't apply, that the Fourth Circuit

18  hasn't adopted that.

19         I don't think -- I'm sorry.

20         THE COURT:  No, go ahead.

21         MR. WALSH:  I frankly just disagree.  You've already

22  talked about the cases, I don't need to spend time talking

23  about them, where the Fourth Circuit has cited approvingly to

24  the Seventh Circuit and other circuits' determinations on

25  that.

USCA4 1771

35

1          So the question simply is did -- I'm sorry.

2          THE COURT:  Well, one of the questions I wanted to

3     raise, and I didn't want to interrupt you, but you caught me

4     thinking about it.

5          MR. WALSH:  That's --

6          THE COURT:  And that is, I'm trying to determine what

7     if any practical effect there was by the way this was handled

8     in terms of the Family Medical Leave Act.

9          So people who filed COIIs didn't go to work.

10         MR. WALSH:  Yes, Your Honor.

11         THE COURT:  They were off work.

12         MR. WALSH:  Yes.

13         THE COURT:  And I assume then that -- so what was

14    their legal status with CSX during the period when they

15    submitted their COIIs and stopped working under those notices

16    up to the point of when they got a discharge notice?

17         MR. WALSH:  I'm going to have to defer to Ms. Bird.  I

18    believe they were just considered off work at that point.

19         MS. BIRD:  That's right, Your Honor, they were

20    considered off work.

21         THE COURT:  Well, they were off work, but what does

22    that mean in terms of entitlement to any benefits or --

23         MS. BIRD:  Everything continued.

24         THE COURT:  Meaning all their health insurance --

25         MS. BIRD:  Except that -- yes, everything continued,

36

1    Your Honor.  Some of them submitted for Railroad Retirement

2    Board medical leave, which they would get medical pay.  Some

3    of them submitted and got insurance benefits for being out of

4    service.  But they were still employees of CSX; their jobs

5    were protected and held until this process played out.  They

6    were receiving RRB benefits in terms of pay because they were

7    off work sick, right, but their jobs were protected and just

8    going through the process of discipline.

9            THE COURT:  Okay.  Thank you for clearing that up.

10           MR. WALSH:  And legally, Your Honor, that's the key

11   second point we wanted to make.  There simply is no prejudice

12   here.  Even if you assume for a second there was interference,

13   and I think that most every piece of evidence that plaintiffs

14   cited goes to the question of whether there was adequate

15   notice for FMLA purposes, that's not something we moved on in

16   the summary judgment, you know, motion.

17           So at the end of the day, the second main point here

18   is there is simply no prejudice because whether they were

19   specifically deemed FMLA off or they were off work sick or

20   they were whatever it may be.  They were still able to take

21   that leave, or they still took that leave.  They weren't

22   required to come to work, they --

23           THE COURT:  But they weren't told they were on family

24   medical leave act.

25           MS. BIRD:  No, they were not told they were on Family

37

1    Medical Leave Act, but I think -- and I am forgetting the

2    cases, but I know we've cited them in our reply, that this is

3    a function of a reform statute in that a technical

4    misclassification does not result in any damages or prejudice

5    to the plaintiff in terms of an interference claim.

6         THE COURT:  Well, okay.  So I understand that would

7    perhaps cover all of the employees and show there's no injury

8    up until the point of the discharge.  The discharge notice

9    certainly went out within the 12-week period that is

10    guaranteed for family medical leave.  So wouldn't then the

11    possibility of interference start to arise again?

12         MR. WALSH:  It is theoretically possible, but that's

13    not what happened here.  Because for the employees who were

14    discharged and ultimately upheld by the public law board, the

15    Family Medical Leave Act, as I said before, doesn't provide

16    any greater rights than they would have otherwise.  They were

17    fired for their breach of the CSX rules, ultimately dismissed

18    for their breach of the CSX rules.

19         For those handful of employees who were reinstated by

20    the public law board, their positions were protected.  They

21    went back to where they were, and that is what required under

22    the Family Medical Leave Act.  Again, whether it was done with

23    a particular paperwork under the Family Medical Leave Act and

24    whatever else is immaterial given the effect was ultimately

25    the same.

38

1          THE COURT:  All right.  Thank you.

2          All right.  Mr. Paul?

3          MR. PAUL:  Thank you.

4          Initially I couldn't find the Fourth Circuit case on

5     it, but the concept of retaliatory discharge under both

6     sections of the FMLA is recognized by the Sixth circuit in

7     Seeger versus Cincinnati Bell, 681 F.3d 274, Sixth Circuit

8     2012.

9          So what I'm hearing is that an argument under

10    interference, it falls something short of termination.  And

11    that can be the case under certain facts, but that's not what

12    happened here.  They're so related.

13         But, in other words, you know, we've already talked

14    about how none of the plaintiffs were informed of their rights

15    or responsibilities under the FMLA, which would have certainly

16    triggered a bunch of deadlines for them and their doctors to

17    respond to get that FMLA certified.  CSX and Jolanda Johnson,

18    Ms. Johnson and others testified that they knew about the

19    possibility of that leave, and Ms. Johnson testified the

20    reason she didn't trigger any FMLA substantive protections was

21    because they were suspected of fraud, which kind of is another

22    predetermined way.

23         I mean, certainly you could send someone the

24    paperwork.  It's really -- I even think they used a third

25    party administrator, Kepro, to send the paperwork, and then

39

1    you can do your investigation.  And if you ultimately

2    concluded there was some improper motive, then you could, you

3    know, invalidate that leave.  But it's very clear, and that's

4    why we moved for summary judgment on this claim, that none of

5    that happened.

6         THE COURT:  Well, although it's characterized in the

7    briefing as this honest belief rule, doesn't this claim also

8    perhaps come down to the same analysis, that being whether or

9    not CSX essentially had a good faith belief that it had the

10   right to take this discharge action in view of its perception

11   that these employees tried to pull a fast one?

12        MR. PAUL:  Yeah, so I'm not sure it's even in dispute,

13   but the briefing is out there that intent is not a requirement

14   for an interference claim.

15        So if that is true, and I --

16        THE COURT:  But it's not interference if they have a

17   legitimate reason for taking the adverse action that's not

18   based upon a discriminatory reason.

19        MR. PAUL:  I think --

20        THE COURT:  It seems to me -- I agree with you, I

21   think it still gets us to exactly the same place in terms of

22   the evidence, and that's whether there is evidence that CSX

23   took this action essentially pretextually to try to defeat one

24   or more of the rights that the employees had under these

25   various federal and state acts.

40

1          MR. PAUL:  I think another way of saying it, if I can

2     try a different way, is because there's no intent requirement

3     in the interference claim, any belief, honest or otherwise, is

4     not relevant.  But I think what Your Honor is suggesting -- if

5     that's true, then honest belief doesn't matter at all.

6          But I think what Your Honor is thinking is that if it

7     later comes -- information comes up that kind of casts doubt

8     on the legitimacy of that -- and I'm not making that up,

9     that's part of the FMLA regulations.  If any reason comes up

10    to cast doubt upon the validity of the certification, then an

11    employer has, you know, an opportunity to request

12    recertification or do all kinds of things.  That's the process

13    that should have been played out for an interference claim.

14    That's how it's very, very different.

15          Because otherwise how can courts almost everywhere, to

16    my knowledge everywhere say intent is not a factor in an

17    interference claim if an employer could pull the honest belief

18    and say that's what we believe.

19          Which leads to another question, which is if -- I

20    believe the -- well, not I believe.  I believe one of the

21    first cases that came out on honest belief was an employer

22    fired someone because they thought the person was stealing

23    from the cash register, and the person was black, and they

24    were fired.  And later the employer found out that that person

25    wasn't even there, so it couldn't have been him.  So they

41

1    said, well, that's not race discrimination, that was just an

2    honest belief.

3            But there has to be some evidence that they made a

4    mistake, right?  I mean, CSX has not done that at all.

5    Otherwise any employer anywhere could say I honestly believed

6    X, Y and Z, and they would get off the hook in any case.  So

7    there has to be some acknowledgement that what they believed

8    was wrong.

9            THE COURT:  Well, I don't know that -- I may be

10   misconstruing some of these cases, but I've always considered

11   this, that the employer has to have an objective basis for its

12   decision.  Meaning it can be wrong, but there has to be at the

13   time the decision is made an objective good faith belief in

14   what it's doing.

15           And the Mercer case talked about this somewhat.  They

16   kind of rejected the plaintiff's explanation of her sort of

17   defense as to why she was really a good employee and how they

18   had to be wrong about that.  And the court I think is very

19   clear in saying, well, it's not up to us to decide whether the

20   employee was a good employee or a bad employee.  All we can do

21   and all we are authorized to do here is look at whether or not

22   the employer met its responsibility.

23           And they said there, and cited the Seventh Circuit

24   case we've talked about, they said there, showing that there

25   might be inconsistencies in the way that the employer

42

1    justifies their decision, you know, there -- I assume you

2    agree here there is not direct evidence of discriminatory

3    intent under any of these statutory schemes, right?

4         MR. PAUL:  That's correct.

5         THE COURT:  So it's all based on whether or not an

6    inference is to be supported from the other evidence.  And so

7    it seems to me that in the Mercer case and in the Seventh

8    Circuit case and others, it's not literally just an employer

9    saying, well, I believe this, I'm off the hook.  The court

10   looks at the evidence about it and whether there is a good

11   faith basis for it.

12        And so I come back to where I kind of started, and I

13   probably got more confused than helped, but it does seem to me

14   that ultimately the interference claim rests really under the

15   same analysis that the retaliation claims rest on.  And that

16   is, is there evidence here sufficient to have a jury decide

17   that this may have been pretextual on the part of CSX?

18        MR. PAUL:  The only problem, Your Honor, is that with

19   the interference claim, we look at the actual elements.  Not

20   one of those elements asks about intent or about honest

21   belief.

22        THE COURT:  No, but it is not interference to take an

23   adverse action against an employee who is on Family Medical

24   Leave Act.  It doesn't create an inference because the

25   employer may have lots of reasons and basis to do that.  And

43

1    in the Seventh Circuit case, it literally was this person went

2    on Family Medical Leave Act; while that person is on leave, we

3    determined that her basis for that leave -- and I forgot what

4    the facts were there, but they explained it in the Mercer

5    case.  But the basis upon which she sought her leave act leave

6    was false, and so there the court affirmed that the employer

7    still has the right to take action.

8         So here, plaintiff is -- defendant is claiming that

9    even if you were entitled to leave act for all of this time,

10   while you were exercising that time, while you were on leave,

11   we determined that you gave fraudulent or false reasons, a

12   false medical statement essentially, and so we have the right

13   to take that action, and that does not constitute interference

14   with the leave act.

15        MR. PAUL:  I would just -- you know, we referenced

16   that section about the cast doubt on the validity of the

17   certification.  I think that's where that falls in the, in the

18   substantive provision.

19        And I know the cases, they often -- counsel and courts

20   can get those two confused because I think they do sometimes

21   overlap.  But I do think in the substantive provision, there

22   is just no place for that analysis.

23        And the regulations specify that if -- that happens

24   often in the social media context, right?  Somebody is on

25   leave, approved FMLA leave, and a co-worker says, hey, look,

44

1    they're skiing or whatever, and that comes back, that is

2    reason to cast doubt upon the validity that triggers a certain

3    process.

4            Or an employer could not do that --

5            THE COURT:  I completely agree with that.

6            MR. PAUL:  Yeah.

7            THE COURT:  And here what we're faced with is the

8    employer deciding not simply that somebody is or isn't injured

9    or disabled, but rather that essentially they lied, they've

10   committed a fraud by participating in the COIIs under these

11   circumstances.

12           So it's the violation of that truth -- and that's

13   literally what they say, and there's no hiding that.  CSX says

14   in charging letters, we think you provided false information.

15   And under the collective bargaining agreement, we can fire

16   people for providing false information.

17           So that's different from saying, well, we're not sure

18   that you are still disabled or that really your doctor's

19   determination that you can't work for two months is a fair

20   medical determination, so -- they didn't treat this as

21   something under the Family Medical Leave Act clearly, but

22   instead they treated it as an employee providing false

23   information.

24           MR. PAUL:  Under the collective bargaining agreement,

25   and I guess that's the really important point I want to make.

45

1    Had CSX said we received information that cast doubt on the

2    validity, it wouldn't just end there.  Then it goes back to

3    the employer and his and her health care provider to explain

4    why that leave was consistent with the medical reasons.  That

5    never happened in this case.  And if it did, that would have

6    given the employees a huge opportunity under the FMLA to

7    explain the situation rather than just focused solely on the

8    collective bargaining process.

9              THE COURT:  Okay.

10             MR. PAUL:  Okay.  Thank you.

11             MR. WALSH:  Your Honor, just two final points on that

12    part, and then I can address the plaintiffs' motion if you'd

13    like.

14             The first is we've heard a lot about predetermined,

15    but predetermined is not pretextual, and I think that's

16    important in the analysis.  Because even assuming the

17    plaintiffs were right, which we would not give, a

18    predetermined outcome is not evidence that these plaintiffs

19    were fired for seeking Family Medical Leave Act, ERISA

20    benefits, whatever it may be at that point.  So I think

21    there's an important distinction to make there.

22             And frankly the case law simply does not say that CSX

23    must admit it was wrong under the honest belief doctrine.  I

24    think the cases that you and I have talked about, each time

25    the employer still believed, as CSX does, that it was right.

46

1          Mr. Paul has made a point about the process under the

2   Family Medical Leave Act, and that if it had been processed as

3   family medical leave, other things would have occurred.

4   Again, I think the dispositive question is here the honest

5   belief doctrine, but I would point out that under the FMLA,

6   the rights under FMLA are no greater to available to the

7   employee than would have otherwise been available.  So this is

8   a place where the CBA sets forth rights that are available to

9   the plaintiff that were followed, that went through and

10  ultimately led to dismissal.  The FMLA, as stated in the

11  regulations, did not provide any greater protections or rights

12  to the employee, you know, when those things are followed.

13          On the plaintiffs' motion that was discussed briefly,

14  I'm happy to answer any questions, but I do want to point out

15  that in the reply the plaintiffs have effectively conceded

16  their motion.  In the original motion, the plaintiffs moved on

17  FMLA in toto, both interference and retaliation.  In the

18  reply, the plaintiffs have now stated they are only moving on

19  two elements of retaliation and two elements of interference.

20  That is frankly not what they moved on.  Rule 56 would require

21  them to state what they moved on in the original motion.

22          And we can talk about -- Judge Faber has an opinion

23  that hits on the proper use of summary judgment.  There is

24  other ones out there.  This is not a circumstance where the

25  plaintiffs were moving on liability, but not damages.  They're

47

1    now moving on just two elements after seeing the fact that

2    they frankly can't meet the other elements.

3          So I'm happy to address any questions you may have.

4          THE COURT:  All right.  Thank you.

5          All right.  One more to go, that is the Rail Safety

6    Act.

7          MS. BIRD:  That's right, Your Honor.

8          Your Honor, this is a very specific statute, very

9    specific because it is there to promote the safety at the

10   railroad and also to reduce accidents and injuries at the

11   railroad.

12         And part of the basic factor that goes through all of

13   the argument I'm going to make, it is necessary, if the

14   plaintiffs are complaining about an injury and that they were

15   terminated because of an injury, that they have to also prove

16   that that injury occurred at work.  The case law supports

17   that, the statute supports that, and it is a necessary element

18   under both the Third Circuit case and the Sixth Circuit case

19   that we filed in our briefing that they must have been injured

20   while they were at work.

21         And in this case, there is absolutely no evidence

22   whatsoever that any of these plaintiffs were injured while

23   they were at work, and I'll point to a couple of things.

24         And I can go through the statutory scheme, but I know

25   the Court has read the briefs and understands the briefs that

48

1    we have in front of us.

2          On 20109(a)(4), that is one cause of action, that is

3    the one for retaliation for reporting a work-related injury.

4    That was a claim that plaintiffs made in the complaint.  We

5    moved for summary judgment on that issue.  Plaintiffs dropped

6    that claim in their response.  In their response, they did not

7    address 20109(a), which is retaliation for reporting of

8    work-related injury or illness.  I think the reason is clear,

9    they didn't do that because there was no work-related injury

10   or illness to report.

11         As to 20109(b)(1)A, 20109(b)(1)A, that is the claim

12   that plaintiffs were fired for reporting a hazardous condition

13   at work.  Let's start with the fact that they did not exhaust

14   their administrative remedy on that issue.  Under the scheme

15   with the FRSA, they have to go through the Department of Labor

16   through OSHA in order -- as a first step for making those

17   claims.  In those claims to the OSHA, they did not at all

18   mention any of this hazardous activity reporting argument that

19   they now try to make.  So they have not exhausted their

20   administrative remedy on that issue and have in fact then

21   waived making that claim in this court.

22         The third argument they tried to make under the FRSA,

23   20109(c), is that they claim that they can -- that the

24   defendants interfered with their ability to follow a treatment

25   plan walking -- with their treating provider, or physician is

49

1    what the statute says, and we can argue about whether or not

2    the chiropractor falls under that.  Under the plain language

3    of 209 -- 20109(c), a chiropractor does not fall under that,

4    and there is a case specifically on point that we cited in our

5    motion that held that chiropractors are not treating

6    physicians, that the language of the scheme requires that, and

7    they do not meet that.  So that is one reason.

8          More importantly, as to 20109(c) it requires that

9    there be a workplace injury in order for that treating

10   physician plan to come into play.  That did not happen here.

11   Although there are some broad-based arguments about they were

12   weakened by their work on the railroad, there is simply no

13   evidence to support that.

14         The chiropractor, when asked that specific question,

15   Dr. Johnson testified -- I asked him or Megan asked him, once

16   you noticed influx, did you reach out to CSX to determine if

17   there was anything happening to cause an influx?  He said,

18   Well, no.  It had nothing to do with CSX.  It had to do their

19   being hurt at home.  Not one person that I'm aware of came in

20   during that time that were CSX employees that claimed that it

21   was a work accident.

22         There is simply no information in this case from him

23   or from anyone else that this happened off the job or they

24   were somehow weakened which caused their out-of-work injury

25   which they reported on the COIIs.

50

1          They said they would rely on Dr. Freeman, their expert

2     retained witness for this evidence.  Dr. Freeman was deposed

3     yesterday.  Unfortunately we don't have the benefit of Dr.

4     Freeman's transcript.  Dr. Freeman said, No, I don't know.  I

5     don't know how they were hurt, that's not what I'm looking at.

6          Every one of the COIIs said they were injured off of

7     job.  Their complaints to OSHA said they were injured off the

8     job.  OSHA complaints were denied because they were injured

9     off the job.  And there is no evidence that is presented in

10    this case to show that they were injured in any other way that

11    would allow 20109(c) to apply.

12         I can walk through the statutory scheme if the judge

13    would like, or you can ask questions, however you'd like to

14    handle it, but that is the crux of this entire motion.  There

15    is no work-related injury to allow for a claim that FRSA was

16    violated.

17         THE COURT:  All right.  Thank you.

18         MR. PAUL:  Your Honor, it is correct, the (a)(4) claim

19    is gone, so we do not respond to that because, you know --

20         THE COURT:  Okay.

21         MR. PAUL:  The (b)(1)A has to do with two things

22    actually, I think a little bit more than counsel had argued.

23    It's a hazardous safety condition but also -- and B is also

24    the refusal to work because of that hazardous condition.  And

25    there are some new cases, two out of the ARB, Ingrodi and

51

1    Cieslicki, which is actually in the Fourth Circuit, but not a

2    Fourth Circuit -- just within the Fourth Circuit at the

3    Department of Labor, and then the Kurec versus CSX case, those

4    are all in the last couple of years, that have clearly said

5    that those hazardous conditions do not have to be work

6    related.

7         And so the examples in those cases were one gentleman

8    who was not on call -- I think that's an important fact -- he

9    was called a derailment.  He had had two glasses of wine with

10   dinner, and he said, I don't feel safe to work, you know, and

11   he was terminated.  And they found in his favor because

12   clearly drinking wine would not be a work-related event, but

13   nonetheless it impacted the safety that would happen at work.

14        And there was -- the other example, the gentleman in

15   Grady was vomiting and had diarrhea, and so he had reported

16   back that he didn't feel he was safe to work because of those

17   conditions and was terminated, and that was also overturned.

18        THE COURT:  Weren't those cases where the employee was

19   being required by the railroad to come in to work?

20        MR. PAUL:  Yes.

21        THE COURT:  And did that happen here?

22        MR. PAUL:  Well, normally -- I want to answer this

23   way, I am not evading it.  I mean, to answer your question,

24   no, at the time they completed the COIIs, the certificates of

25   ongoing illness, they were not being required to work, but

52

1    that's why they did the certificate of ongoing illness.

2          In other words, if they didn't do a certificate of

3    ongoing illness, they would be terminated -- excuse me --

4    terminated for not showing up.

5          THE COURT:  Well, okay.

6          MR. PAUL:  It --

7          THE COURT:  So they indicated to CSX they had this

8    illness, they filed the COII, their conditions prevented them

9    from working, and CSX did not try to make any of them come in.

10          MR. PAUL:  Well, no, that's correct, but it was

11    because they needed the treatment, whether it was a couple

12    hours to sober up -- two glasses of wine, but whatever -- to

13    get back to where you could work safely or, for these

14    gentlemen, a couple of weeks or two months to get back to

15    where they could work safely.

16          THE COURT:  What did CSX do in response to the COIIs

17    that constituted or resulted in some hazardous condition?  I

18    mean, it seems to me in those cases those are striking

19    examples of the difference.

20          Because those cases involve CSX tried to make somebody

21    come to work who shouldn't be at work, and had they gone to

22    work, they might have been a danger to themselves or others.

23    And here we've got people who said, we've got injuries or

24    conditions that keep us from being able to work, and CSX

25    allowed that, they didn't call them in to work.

53

1          Now we know they took punitive action --

2          MR. PAUL:  Of course.

3          THE COURT:  -- and stated that that action was because

4     of other reasons, this supposed lie about these forms, but

5     what I don't see is where -- I don't see how you could argue

6     that there is a failure of CSX or an intent by CSX to

7     discriminate against somebody for reporting a hazardous

8     condition that never existed because people were never called

9     in to work.

10          MR. PAUL:  Well, there are a different set of facts

11     between those cases, they are.

12          THE COURT:  Right.

13          MR. PAUL:  But, I mean, in our situation here, CSX did

14     not honor that report of an unsafe condition.  And it is

15     complicated when you are reporting yourself as an unsafe

16     condition, but they didn't recognize that.  They immediately

17     questioned it for the reasons we've already talked about.

18          THE COURT:  Well, they questioned it, though, in a

19     completely different context and not a context, it seems to

20     me, that implicates the Rail Safety Act.

21          As you can probably tell from my responses to your

22     argument, I think you're really stretching this act beyond

23     reasonable application by making these claims here.  These

24     people all said we've got medical conditions that keep us from

25     working.  Those medical conditions you now agree are not

54

1    work-related conditions that would result in the implication

2    of an (a)(1) or (a)(4) argument, but you argue that they fall

3    within this hazardous conditions or even the other provision

4    about interfering with somebody's treatment.

5            So --

6            MR. PAUL:  Yeah, if I could address that.

7            THE COURT:  Well, okay.  But first, just in terms of

8    the hazardous work condition, I don't see that a hazardous

9    work condition was created or suggested since CSX didn't try

10   to make these people come to work despite their health.

11           MR. PAUL:  I think the only -- or not the only way,

12   but one way of looking at it is if the employees had not

13   submitted the certificate of ongoing illnesses and reported to

14   work, and then they would have avoided this entire suspicion,

15   they would have put themselves and others at risk for the

16   injuries that they had --

17           THE COURT:  Well, obviously I think if CSX had called

18   people the next day and said, hey, despite your COII, come to

19   work tomorrow, then maybe you've got -- maybe then you've got

20   a plausible argument that CSX at that point knows that these

21   people have a health condition that makes it perhaps hazardous

22   for them to come to work, and in that context, I could see an

23   argument that this is a violation.

24           But somebody calls CSX and says, I've got the flu, I'm

25   not working today, then I don't think CSX is on notice that

55

1    there's a hazardous work condition possible just because that

2    person is sick and should not work that day.  I think a

3    hazardous condition arises only if CSX is telling them you

4    need to come to work despite that.

5         MR. PAUL:  Well, I don't think that the plaintiffs in

6    this case knew that they were going -- by submitting the COIIs

7    at that time.  But certainly the effect of all of these

8    people, people other than the plaintiffs being charged for

9    submitting the certificate of ongoing illness would certainly

10   be a deterrent to other employees submitting them in the

11   future.

12        I mean, that's --

13        THE COURT:  Okay.

14        MR. PAUL:  And obviously the plaintiffs would have no

15   reason to have known, you know, not to submit the COIIs.  They

16   thought they were doing the right thing, and almost

17   immediately CSX took negative action, you know, on them.

18        The (c)(2) plan I think is pretty straightforward in

19   the sense that, yes, the Fourth Circuit has not ruled on it,

20   but other circuits have, requiring there to be a

21   work-related -- a treatment plan for work-related.  And our

22   argument is very simple.  If these were sedentary jobs, we

23   would have no argument for the most part under the normal set

24   of facts.  But when you have cumulative, repetitive stress

25   injuries, and CSX has had a cumulative program for years,

56

1    acknowledging that machinists and electricians and the

2    plaintiffs themselves testified about working in small corners

3    at repetitive angles, that it is very reasonable that a jury

4    could conclude that part of the treatment with the

5    chiropractors was related to the years of work.  If an

6    employee was there six months, maybe not.

7              THE COURT:  Where is the interference with that

8    medical treatment?

9              MR. PAUL:  The interference is with questioning their

10   treatment, accusing them of fraud with treating with these two

11   chiropractors, and then saying we're not going to accept your

12   paperwork for it.

13             THE COURT:  From those particular --

14             MR. PAUL:  From those two providers.

15             THE COURT:  Well, so first I have to admit it strikes

16   me as questionable in that CSX did not say you can't go get

17   treatment from these two chiropractors.  Or even we're going

18   to tell the insurer that -- not to pay for treatment rendered

19   by these guys because, you know, we think they're lying or

20   whatever.  And I'm not sure where the interference with

21   treatment arises.

22             I understand CSX said we're not going to trust the

23   chiropractors' reports when it comes to approving you for

24   being off work.  And in fact, we think you're lying about

25   this, and this is all part of a scheme, and so we're

57

1    discharging you.  Again, it seems to me that the -- I'm not

2    sure where this could constitute a violation of this provision

3    of the Rail Safety Act.

4         MR. PAUL:  Well, I mean, I certainly understand Your

5    Honor's distinction between treatment and paperwork related to

6    the treatment, but let's use FMLA as an example.  If someone

7    was treating with a chiropractor and having great success,

8    whatever the case may be, and then they need FMLA

9    certification paperwork, and an employer said we're not going

10   to accept that -- excuse me -- not going to accept that from

11   Dr. Johnson or Dr. Carey, that is interference with a very

12   important part of not just their medical treatment, but the

13   justification for the absence.

14        THE COURT:  And I think you're probably right, it

15   might be a violation of the Family Medical Leave Act, but I

16   don't think that means that it also constitutes a violation of

17   this part of the Rail Safety Act.

18        MR. PAUL:  I think only in the sense that it's

19   interfering with the treatment plan because while, yes, on the

20   one hand a railroader, one of the plaintiffs could continue to

21   treat with Dr. Johnson or Dr. Carey, any paperwork necessary

22   to justify an absence related to that treatment for a flare-up

23   of pain would not be accepted.

24        THE COURT:  Then the other question I've got is, as I

25   recall -- and I admit, I have not spent a lot of time

58

1    especially recently looking over the COIIs themselves, just

2    kind of generally got familiar when I started reviewing all

3    this.  But it seems abundantly clear that none of the COIIs

4    claim that this -- that these conditions were work-related

5    injuries.

6           MR. PAUL:  Should I respond?

7           THE COURT:  Yeah.

8           MR. PAUL:  Yeah, okay.  So, one, the certificate of

9    ongoing illness form is a CSX form, and it is true that there

10   is no box or anything that asks that question.  It would be

11   nice if there was.  That's one thing, they designed the form.

12          Two, most of them are just discussing the treatment.

13   All of them discuss some measure of treatment that the

14   chiropractors performed.  Some of them indicate, and we don't

15   dispute this, that the straw that broke the camel's back is

16   what we would say happened outside of work, lifting a hot tub,

17   changing a wheel, et cetera.

18          Yeah, so we definitely agree that all of the

19   plaintiffs except for one who settled --

20          THE COURT:  Is that Woods, is that who settled?

21          MR. PAUL:  Yeah, that's Woods, that's one of --

22          MS. BIRD:  I didn't hear you.

23          THE COURT:  Woods.

24          MR. PAUL:  That with the exception of Mr. Woods, all

25   the others, the incident that precipitated them going out of

59

1    work occurred off property, right, somewhere else.  But

2    because of the nature of their work and the cumulative

3    build-up, that their testimony is that the treatment was

4    related.  And some even testified that one of the reasons that

5    they treated with one of these chiropractors was because of

6    its location to the workplace.  It was on the way such that

7    they could get treatment before or after work.

8         THE COURT:  Well, the statute that you're quoting

9    from, the prohibition is against interfering with treatment of

10   an employee who is injured during the course of employment.

11   And so if these forms don't indicate -- and I'm sorry I don't

12   have a better recollection.  I thought it was clear that the

13   forms indicated this was all off-the-job conditions, that

14   these were people were not claiming that they got injured on

15   the job or even that the job exacerbated some condition.

16        So --

17        MR. PAUL:  There's two points --

18        THE COURT:  -- I have trouble believing that it would

19   be a violation of the Rail Safety Act for the employer to --

20   I'm trying to think of a hypothetical, but it's probably more

21   complicated to try to do that here.

22        It doesn't seem that the employer was faced with forms

23   that indicated these are people who are claiming that they

24   have a work-related component to their medical -- causation to

25   their medical condition.

60

1          MR. PAUL:  I think there's two parts, the testimony is

2     there's two parts to the form.  I think the employee fills out

3     the very top part which is, like, where you work, your name

4     and address, and then the chiropractor or other physician or

5     health care provider completes the bottom part.

6          But I think that when you look at those, if you look

7     one by one, the majority of them just say something like --

8     it's kind of chicken scratch -- you know, injured on the lawn

9     mower or on the ATV.  There's nothing -- things like that, but

10    there is no --

11         THE COURT:  When a worker is literally claiming that

12    an injury resulted from work, is there not some other form

13    that they have to file, whether it's I fell off the engine, or

14    whether it's I did a lot of lifting at work today, and when I

15    went home, I had to go to the doctor, my back was injured or

16    sore?

17         MR. PAUL:  Most certainly there is when that injury

18    happens at work on property.  I think the gray area for

19    years -- and now we're getting a little bit outside of

20    employment law.  But I think for years, there was this

21    cumulative nature, whether it's carpal tunnel or repetitive

22    stress -- and, sure, people wouldn't, like, run to the office

23    and fill out an injury report because there wasn't a specific

24    acute injury.  It was more an occupational illness over time.

25         And so I think that can get tricky, and I think that's

61

1  a gray area in injury law, and I think that's a gray --

2        THE COURT:  I agree, it probably is a gray area, and

3  that's another reason why I'm skeptical of having the Rail

4  Safety Act apply to this factual scenario, even when I take

5  this in the light most favorable to the plaintiffs.

6        MR. PAUL:  But if it were true, like, let's say that a

7  machinist, you know, works there 20 years, did the same type

8  of repetitive work, received treatment for that, never to the

9  point where it had to take him off of work, but then he goes

10 golfing and then he is doing some yard work, and that build-up

11 of that strain in muscle is what caused him to mark off that

12 day, that is what we're saying the plaintiffs have evidence it

13 happened to them.

14       THE COURT:  Okay.

15       MR. PAUL:  So I think that's -- I think those were all

16 the points that I had.

17       THE COURT:  Okay.  Thank you.

18       MR. PAUL:  Thank you.

19       MS. BIRD:  That's the evidence that hasn't been shown

20 because that's the evidence we haven't seen.

21       And you're right, there is a form called a PI-1A for

22 CSX -- that's the name of it -- that allows you to fill out a

23 form if your injury or illness occurs at work or is related to

24 your work, and that was not filled out in any of these cases.

25       More importantly, after the COIIs were produced, which

62

1   had the chiropractor's assessment of how the injury happened

2   in many respects -- loading a kayak, falling off a car,

3   tailgate of a truck, overturning a lawn mower -- none of them

4   said, none of the COIIs said that anything happened at work or

5   related to their work at all.

6        More importantly, in every one of the cases that were

7   filed with OSHA through the Department of Labor -- the

8   Department of Labor and OSHA through the FRSA process, not one

9   of them said it was work related, not one.  And in fact,

10   that's why they were all denied by the Department of Labor.

11   And those complaints and those denials are evidence in this

12   case because every one of them said it happened at home, it

13   did not happen on the job.

14        This was evaluated, and this issue has been determined

15   in two different circuits, the Third Circuit in the Port

16   Authority Transportation Hudson Corp. versus U.S. Department

17   of Labor case -- that's the Third Circuit case -- and in the

18   Sixth Circuit case, the Grand Trunk Railroad Company versus

19   U.S. Department of Labor case.

20        In both of those cases, this exact issue was

21   discussed, and this is --

22        THE COURT:  Meaning where an employee claims that

23   they've got a condition that is aggravated?

24        MS. BIRD:  Had a condition that did not occur at work,

25   but in fact they were filing a Federal Rail Safety Act

63

1    complaint.

2            THE COURT:  Okay.

3            MS. BIRD:  And in both of those cases, it was found

4    that only applies to work-related, on-the-job injuries in both

5    of those cases.

6            There is -- there is, number one, no evidence

7    whatsoever in this case about this cumulative trauma disorder

8    leading up to an off-the-job injury.  There is no evidence to

9    even say that in this case.  But secondly, even if this

10   cumulative trauma had a part in this, these two cases would

11   say those are not on-the-job, work-related injuries and,

12   therefore, they are not covered by the FRSA.

13           So in both of those cases that have been decided by

14   two different circuits -- there is not a case in the Fourth

15   Circuit, let's not make one.  In the Fourth Circuit, there is

16   not a case on point but, in fact, that work-related injuries

17   are not covered, and you cannot violate the Federal Railroad

18   Safety Act by terminating someone who did not have an

19   on-the-job injury.

20           THE COURT:  All right.  Thank you.

21           MS. BIRD:  Thank you.

22           THE COURT:  All right.  So first I appreciate the

23   briefing that you all have done in this case, it was quite

24   well done, and I appreciate the arguments today.

25           I can tell you this much right now, and that is,

64

1    first, I'm inclined to say I'm going to end up granting

2    summary judgment for the defendant as to the Rail Safety Act

3    claim.  I want to think about the arguments I've heard with

4    respect to the leave act in both contexts as well as the other

5    acts.

6          Also I've got I guess what I consider bad news, and

7    that is that as you, I'm sure, are aware, we've had compressed

8    periods where we've had jury trials, and jury trials have been

9    interrupted.  As a result, we're currently in a period where

10   we are having jury trials.  I hope that continues.  I'm not

11   completely sure that it will if West Virginia's COVID numbers

12   continue to deteriorate the way they have in the last

13   literally few days.

14         Be that as it may, as a result of the backlog of

15   criminal cases, I cannot give you the trial date that we had

16   selected long ago and tried to plan on in this case.  I've

17   just got too many criminal cases that are coming up.  I have

18   to schedule them under a speedy trial clock.  That means that

19   I have to schedule them for trial during a fixed period.  And

20   that unless we get back to where we are precluding all trials,

21   which wouldn't help you either, I'm going to have trials,

22   criminal trials scheduled throughout the period the three

23   weeks or so that we had hoped to try this case.

24         So as a result, I don't -- this is the kind of case

25   that I think there is too much to it to expect you all to kind

65

1    of be ready at the drop of a hat, and so I'd rather not expect

2    that of you.  Given that I have to schedule trials through

3    this period, I'm going to continue this case.

4         What I'd like to suggest is this.  I hope to make my

5    decision on the remaining motions within the next week.  Once

6    I've done that, that will -- honestly, it seems to me, that

7    unless I grant summary judgment in favor of the defendant and

8    there is no trial necessary, if trial is going to proceed on

9    one or more of these claims, it's probably going to be the

10   same evidence and the same length of trial and so forth that

11   we currently expect.  So what I would be inclined to do is

12   make my decisions, and once I do, if there are claims that

13   survive, I would then expect to have some type of

14   teleconference with you as quickly as possible to talk about

15   scheduling and to get this back on the calendar.  And honestly

16   that's about the best I can tell you right now.

17        So I'm happy to hear any questions or reactions you

18   might have to that.

19        MR. PAUL:  The only immediate question is, does that

20   impact our pretrial order that was due today?

21        THE COURT:  Yes.  I can't see a need for you to go

22   through the steps of the pretrial and the other things, the

23   other disclosures that are required unless and until we have a

24   better fix of the trial date --

25        MR. PAUL:  Thank you, Your Honor.

66

1          THE COURT:  -- because I know there's a lot of work to

2     that.

3          And then honestly I want to decide these motions also

4     before I expect you to go through that process because it will

5     be dramatically affected by my rulings if I don't grant full

6     summary judgment.

7          MS. BIRD:  Thank you, Your Honor.  That was it.  I was

8     going to ask the same question.

9          THE COURT:  Okay.  All right.

10         Yes?

11         MR. PAUL:  I mentioned this earlier.  Could we put the

12    settlements on the record for those plaintiffs?

13         THE COURT:  Sure.

14         MR. PAUL:  They are Tony Abdon, Mike Campbell --

15         THE COURT:  Go slow here so we can -- go ahead.

16         MR. PAUL:  Should I start again?

17         THE COURT:  Yes.

18         MR. PAUL:  The first one is Tony Abdon, A-B-D-O-N.

19    Mike Campbell.  Chad Little, the Estate of Chad Little.

20    Matthew Woods.  John Frasure, F-R-A-S-U-R-E.  And Kevin

21    Palmer.

22         THE COURT:  All right.

23         MS. BIRD:  That's correct, Your Honor.  That brings me

24    to one additional point, though, that I want to just bring to

25    the Court's attention.

67

1          In this case, there are individually named defendants,

2    as you know.  There is CSX Transportation, there is Dr.

3    Heligman, the medical provider, and then there are eight other

4    defendants.  With the settlement of those cases, that removes

5    six of the defendants.  Am I right about -- six, removes six

6    of the defendants from having anything to do with this case.

7          We've approached the plaintiffs and asked that those

8    people be voluntarily dismissed, those six that have nothing

9    to do with the other cases.  We'd also ask that the two -- you

10   know, the other individually named defendants are dismissed,

11   but we're not there yet, but that is out there.  And we're

12   hoping that we can get those dismissals for those six

13   individually named defendants that only have to do with those

14   settled plaintiffs.

15         THE COURT:  Well, I take it the way you're addressing

16   this, there wasn't an explicit part of the settlement that

17   contemplated dismissal of claims against those defendants.

18         MS. BIRD:  We did not because the settlements were

19   done one by one.

20         THE COURT:  Well, all right.  So I expect you all to

21   address that with each other and then see where that leads.

22         Typically when we get a settlement, we do an order

23   giving the parties like 30 days to finalize everything and

24   submit an agreed order.  I'm not inclined to do that here.

25   With the case active, I'm sure you all will take care of that.

68

1          But how long do you expect it will be before you

2     execute settlement agreements and prepare orders as to those

3     particular plaintiffs --

4          MS. BIRD:  Very likely --

5          THE COURT:  -- and/or the defendants?

6          MS. BIRD:  Easily within 30 days, Your Honor.  We just

7     came to an agreement on the terms sheets today.  I don't think

8     there's any hold-up or liens or anything else but for one

9     person.  Could be, but I don't even know that that's right,

10    it's a possibility.  So I anticipate within 30 days it will be

11    resolved.

12         THE COURT:  All right.  Well, we're not going to enter

13    any special orders or separate orders with respect to those,

14    then.

15         All right.  Is there anything else we need to take up

16    on the record?

17         MR. PAUL:  No.  Thank you.

18         THE COURT:  All right.  We're going to go off the

19    record.

20       (Off the record at 2:59 p.m.)

21         THE COURT:  All right.  Thank you all for your

22    appearance today.  We stand adjourned.

23             (Proceedings were concluded at 3:01 p.m.)

24                        ---o0o---

25

USCA4 1805

1     CERTIFICATION:

2           I, Kathy L. Swinhart, CSR, certify that the foregoing

3     is a correct transcript from the record of proceedings in the

4     above-entitled matter as reported on August 5, 2021.

5

6

7     September 10, 2021
      DATE

8

9     /s/ Kathy L. Swinhart
      KATHY L. SWINHART, CSR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

USCA4 Appeal: 21-2051   Doc: 32-4   Filed: 07/30/2022   Pg: 262 of 274

## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

JUSTIN ADKINS, et al.,

               Plaintiffs,

v.                                CIVIL ACTION NO.  3:18-0321

CSX TRANSPORTATION, INC., et al.,

               Defendants.

### MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendants' Motion for Summary Judgment, ECF No. 360. Defendants filed a "Memorandum of Law in Support of Their Motion for Summary Judgment as to Plaintiffs' Claim Under the FRSA" ("*Defs.' Mem.*"). ECF No. 364. Plaintiffs filed a response in opposition ("*Pls.' Resp.*"), ECF No. 396, and Defendants filed a reply memorandum ("*Defs.' Reply*"), ECF No. 417. On August 5, 2021, the Court heard oral arguments on the viability of Plaintiffs' claim under the Federal Railroad Safety Act. This issue is now ripe for consideration, and for the reasoning provided herein, Defendants' Motion is **GRANTED**, **in part**, and Plaintiffs' Federal Railroad Safety Act claim is **DISMISSED**.[1]

### I.  BACKGROUND

Each of the Plaintiffs in this case were employees of CSX Transportation ("CSXT").[2] Between May and July of 2017, all of the Plaintiffs visited one of two chiropractors—Shannon M.

---

[1] Because of the unusually large size of the Plaintiff class in this case, Defendants have filed one "master" motion for summary judgment and multiple individual memoranda as to each of the counts they seek a ruling upon. The Court finds that a single order addressing all of the arguments would be unwieldy and unpractical. Accordingly, the Court will issue separate orders on the individual counts.

[2] To date, the docket indicates that there are fifty-six Plaintiffs in this case. However, at the motions hearing held by the Court on August 5, 2021, the parties indicated that six of those Plaintiffs have settled with the Defendants.

Johnson, D.C. ("Dr. Johnson") or Daniel J. Carey, II, D.C. ("Dr. Carey"). *COII*, ECF No. 378 at 2–78. The chiropractors placed all of the Plaintiffs on medical restrictions and signed a Certificate of Illness and Injury ("COII")[3] for each of them. *Id.* All of the COII listed soft-tissue injuries to the back, neck, or shoulder. *Id.* Each of the COII indicated that the Plaintiffs should remain off work for eight or more weeks. *Id.*

CSXT's Chief Medical Officer, Dr. Craig Heligman, "noticed the high number of COIIs submitted within weeks of each other from the same two providers, and their close similarity." *Defs.' Mem.* 3. He became concerned that they were improperly submitted. *Id.* "As a result of his opinion that these employees may be attempting to fraudulently obtain extended benefits, Dr. Heligman notified the Railroad Retirement Board ("RRB") Office of Inspector General by letter and requested an investigation because 'the timing of these alleged injuries . . . is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers.'" *Id.*; *July 14, 2017 Letter*, ECF No. 370-2. That letter was also sent to Plaintiffs' medical benefits providers and the chiropractic board of Ohio and Kentucky. *July 14, 2017 Letter*.

Soon after Dr. Heligman wrote his letter to the RRB, Plaintiffs received "charge letters" informing them that they were "being held out of service" pending a formal investigation into their conduct. *Charge Letters*, ECF No. 360-1. Plaintiffs were informed that formal investigative hearings would be held at which they could be represented by a union representative in accordance with their collective bargaining agreements and that they could present witnesses in their defense. *Id.*

---

[3] A COII is the form CSXT requires an employee's medical provider to complete before an employee can be taken off work for an illness or injury. *Defs.' Mem.* 2. The form includes basic identifying information about the employee and has places for the medical professional to document his or her findings, diagnoses, treatment plan, the employee's duration of care with the provider, and the time frame in which the employee is unable to work.

USCA4    1808

Each of the Plaintiffs in this case had a full investigative hearing and the benefit of union representation. *Hearing Trs.*, ECF No. 370-61–116. Defendants ultimately concluded that Plaintiffs had violated CSXT's Operating Rules and Code of Ethics, and they were all terminated from their employment with CSXT. *Termination Letters*, ECF No. 360-7.

After their terminations, Plaintiffs filed OSHA complaints with the United States Department of Labor. *See OSHA Compls*. ECF No. 360-9–55. In their OSHA Complaints, all of the remaining Plaintiffs reported off-duty injuries. *Id.*

On February 2, 2018, Plaintiffs filed a lawsuit alleging that the Defendants were liable for violating federal and state laws and for committing multiple torts. *See* ECF No. 1. The now operative Third Amended Complaint includes the following counts: (1) the Employment Retirement Income Security Act of 1974, (2) the Rehabilitation Act, (3) the West Virginia Human Relations Act, (4) the Family and Medical Leave Act of 1993, (5) defamation, (6) invasion of privacy (public disclosure of private facts), (7) tortious interference, (8) intentional infliction of emotional distress, (9) wrongful discharge, and (10) the Federal Railroad Safety Act.

## II.  LEGAL STANDARD

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

The nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

### III. ANALYSIS

To state a *prima facie* case under the Federal Railroad Safety Act ("FRSA"), "a plaintiff must project sufficient admissible evidence to establish that: (1) the employee engaged in a protected activity; (2) the employer knew that the employee engaged in the protected activity; (3) the employee suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action." *Conrad v. CSX Transp., Inc.*, 824 F.3d 103, 107 (4th Cir. 2016) (citation and internal quotations marks omitted).

In this case, Plaintiffs have asserted that the Defendants violated two different provisions of the FRSA.[4] The Court believes it is necessary to address the provisions individually.

### A. Hazardous Work Conditions: § 20109(b)

Plaintiffs allege that Defendants violated the FRSA by terminating them for reporting a hazardous safety condition and/or refusing to work based on their physical impairments. *Pls.' Resp.* 8; *Third Am. Compl.* ¶ 2348.

Pursuant to subsection (b) of § 20109,

---

[4] Plaintiffs' Third Amended Complaint implicates a third possible violation of the FRSA under 49 U.S.C. § 20109(a)(4), which forbids railroad carriers taking adverse actions against rail employees who notify or attempt to notify the railroad carrier of a work-related injuries or illnesses. *See Third Am. Compl.* ¶¶ 2350–51. However, at the motions hearing, Plaintiffs confirmed that they are no longer pursuing a cause of action under that provision.

A railroad carrier engaged in interstate or foreign commerce, or an officer or employee of such a railroad carrier, shall not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee for—

(A) reporting, in good faith, a hazardous safety or security condition [or]

(B) refusing to work when confronted by a hazardous safety or security conditions related to the performance of the employee's duties . . .."

49 U.S.C. § 20109(b)(1)(A)–(B).

The Court agrees with the Defendants and the numerous courts that have held that "hazardous safety or security conditions" are those that relate to the physical conditions of the workplace and that the protections of subsection (b) do not extend to off-duty infirmities or injuries. *See Ziparo v. CSX Transp., Inc.*, 443 F. Supp. 3d 276, 297 (N.D.N.Y. 2020);[5] *Weber v. BNSF Ry. Co.*, No. 4:18-CV-00367-O, 2019 WL 9100375, at *8 (N.D. Tex. Dec. 6, 2019), *aff'd*, 989 F.3d 320 (5th Cir. 2021);[6] *Murdock v. CSX Tranps., Inc.*, No. 3:15-CV-01242, 2017 WL 1165995, at *5 (N.D. Ohio Mar. 29, 2017);[7] *Port Auth. Trans-Hudson Corp. v. Sec'y, U.S. Dep't of Lab.*, 776 F.3d 157, 166 (3d Cir. 2015).[8] As such, Plaintiffs' injuries do not constitute hazardous safety or security conditions under the FRSA. To hold otherwise would unreasonably expand the protections of the FRSA and would essentially grant railroad employees unlimited time off work for injuries and illness, even if those infirmities have no connection to their employment. *See Port Auth. Trans-Hudson Corp.*, 776 F.3d at 162, 167. On this basis alone, Plaintiffs' claims under subsection (b) fail.

---

[5] "'Hazardous safety or security conditions' have generally been found to be physical conditions that are within the control of the rail carrier employer; circumstances outside of the carrier's control and non-work related conditions are not included."

[6] "[S]ubsection (b) does not protect an employee who reports an off-duty infirmity as a hazardous condition."

[7] "The word 'condition' is used throughout subsection (b). It is used relative to 'equipment, track, or structures,' in subsection (b)(2)(B). I, therefore, find Congress did not contemplate 'condition' as used in § 20109(b) to include personal illnesses."

[8] "[W]e think that subsection (b)(1)(A) must be read as having at least some work-related limitation, even though no such limitation appears on the face of the statute."

Furthermore, even if the Plaintiffs' injuries could constitute hazardous safety conditions, the Court finds the claim still fails. As was discussed at the motions hearing, the Court is not convinced that a hazard ever actually existed in this case, because once the Plaintiffs' COII were submitted, CSXT did not ask or require any of the Plaintiffs to work. This is distinguishable both from the classic hazardous conditions cases where the employee noted a pre-existing hazardous condition and the cases Plaintiffs cite where an employee was retaliated against for refusing to work under eminently hazardous conditions. *See, e.g.*, *Ingrodi v. CSX Transp.*, Inc., No. 2020-0030, 2021 WL 1337706 (ARB Mar. 31, 2021) (plaintiff called off a work shift while ill because he believed he could not safely operate a train and would be "a danger to himself and/or co-workers"); *Kurec v. CSX Transp., Inc.*, No. 518CV0670LEKTWD, 2020 WL 6484056, at *13 (N.D.N.Y. Nov. 4, 2020) (plaintiff refused to report to work on a specific occasion while intoxicated because he believed it was unsafe for him to drive).

Lastly, the Court notes that Plaintiffs did not report their injuries as hazardous safety conditions to CSXT. *See Ziparo*, 443 F. Supp. 3d at 296 (noting that to succeed on a claim under § 20109(b)(1)(A) claim "a plaintiff must show that he had a reasonable belief that the activity he was reporting was a hazardous safety or security condition, which requires a showing that the belief was both objectively and subjectively reasonable.").[9] Consequently, Plaintiffs may not use § 20109(b) to contest the legality of their terminations.

**B.  Discipline for Following Physician's Orders: § 20109(c)**

Plaintiffs also allege that Defendants violated the FRSA by disciplining them "for requesting medical or first aid treatment, or for following orders or a treatment plan of a treating

---

[9] Similarly, Plaintiffs cannot rely on § 20109(b)(1)(B), because that section only protects "refusals" to work if the employee "has notified the railroad carrier of the existence of the hazardous condition and the intention not to perform further work." § 20109(b)(2).

physician." *Pls.' Resp.* 12 (quoting § 20109(c)(2)). Defendants, however, argue that Plaintiffs cannot show that they engaged in a protected activity under subsection (c) "because they were not 'injured during the course of employment.'" *Defs.' Mem.* 15.[10]

Subsection (c) of the FRSA reads as follows:

**(c) Prompt medical attention.**—

> **(1) Prohibition.**--A railroad carrier or person covered under this section may not deny, delay, or interfere with the medical or first aid treatment of an employee who is injured during the course of employment. If transportation to a hospital is requested by an employee who is injured during the course of employment, the railroad shall promptly arrange to have the injured employee transported to the nearest hospital where the employee can receive safe and appropriate medical care.

> **(2) Discipline.**--A railroad carrier or person covered under this section may not discipline, or threaten discipline to, an employee for requesting medical or first aid treatment, or for following orders or a treatment plan of a treating physician, except that a railroad carrier's refusal to permit an employee to return to work following medical treatment shall not be considered a violation of this section if the refusal is pursuant to Federal Railroad Administration medical standards for fitness of duty or, if there are no pertinent Federal Railroad Administration standards, a carrier's medical standards for fitness for duty. For purposes of this paragraph, the term "discipline" means to bring charges against a person in a disciplinary proceeding, suspend, terminate, place on probation, or make note of reprimand on an employee's record.

49 U.S.C. § 20109(c).

Notably, subsection (c)(1) expressly prohibits the railroad carrier from denying, delaying, or interfering with the medical treatment of a railroad employee "who is injured during the course of employment." Subsection (c)(2), on the other hand, does not specifically require that the medical treatment sought be for an injury that occurred "during the course of employment."

---

[10] Because the Court dismisses Plaintiffs' claims on the basis that their injuries were not work-related, it declines to address Defendants' argument that § 20109(c) does not apply to medical orders or treatment plans of chiropractors. *See Defs.' Mem.* 18–19.

This Court joins the other courts throughout the country who have analyzed subsection (c)(2) and found that it "applies only to *on-duty* injuries" despite the lack of an explicit limitation in the text. *Grand Trunk W. R.R. Co. v. United States Dep't of Lab.*, 875 F.3d 821, 823 (6th Cir. 2017) (emphasis in original); *see Port Authority Trans-Hudson Corp.*, 776 F.3d at 160; *Williams v. Illinois Cent. R.R. Co.*, No. 3:16-CV-838-CWR-FKB, 2018 WL 716568, at *5 (S.D. Miss. Feb. 5, 2018); *Goad v. BNSF Ry. Co.*, No. 15-00650-CV-W-HFS, 2016 WL 7131597, at *3 (W.D. Mo. Mar. 2, 2016).

Because the scope of subsection (c)(2) is ambiguous, courts have turned to the traditional canons of statutory interpretation to determine the breadth of its protections. *See, e.g.*, *Grand Trunk W. R.R. Co.*, 875 F.3d at 825. For example, in *Grand Trunk*, the Sixth Circuit held that the language and objectives of subsection (c) lead to the conclusion that the (c)(1) and (c)(2) should be read together, as *"*[t]he purpose of subsection (c)(1) is to ensure employees receive prompt medical attention if they are injured on the job," and "the antiretaliation provision, subsection (c)(2), effectuates that purpose by protecting medical treatment for work injuries." *Id.* at 826–27.

Finally, the stated purpose of the FRSA and its legislative history support reading the provisions together. *See id.* at 829–31; 49 U.S.C. § 20101 ("The purpose of this chapter is to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents.").

In sum, the Court finds that subsection (c)(2) of the FRSA cannot be read to prohibit the discipline of railroad employees seeking medical treatment for off-duty injuries.[11] Accordingly, Plaintiffs may not use it to vindicate their terminations.

---

[11] Plaintiffs attempt to argue that "[b]ecause CSX did nothing to determine whether the Plaintiffs' musculoskeletal symptomology, and their concurrent treatment with Drs. Johnson or Carey, was in any way work related, and as they have not disclosed any expert on this topic, they have no basis to conclude that Plaintiffs['] musculoskeletal impairments and medical treatment were not work-related." *Pls.' Resp.* 14. Plaintiffs, however, overlook their own

## IV. CONCLUSION

In light of the foregoing, the Court **GRANTS, in part,** Defendants' Motion for Summary

Judgment. Plaintiffs' Federal Railroad Safety Act claim is **DISMISSED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any

unrepresented parties.

ENTER:        August 10, 2021

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE

---

COII forms, OSHA Complaints, and depositions, in which they self-reported off-work injuries. *See COII*; *OSHA Compls.*; *Demonstrative Ex. 7*, ECF No. 360-67 (citing Plaintiffs' deposition testimony regarding the causes and manifestations of their injuries); *see also U.S. Dep't of Labor OSHA Findings*, ECF No. 360-4–5 (dismissing OSHA complaints after noting that Plaintiffs' injuries occurred off-duty).

Additionally, it is Plaintiffs' burden to show evidence that they engaged in a protected activity under the FRSA. While Plaintiffs' expert Dr. Michael Freeman wrote that railway workers commonly sustain musculoskeletal injuries similar to those reported by the Plaintiffs due to the type of work they engage in, *Freeman Rep.* 14, ECF No. 367-5, Plaintiffs failed to produce any evidence showing that *their own* injuries were actually caused by their work.

EXHIBIT 1

**Rebecca Mitchell**

| | |
|---|---|
| **From:** | Melissa Foster Bird |
| **Sent:** | Friday, August 6, 2021 4:06 PM |
| **To:** | Greg Paul; Tarry, Samuel L. Jr.; Walsh, Davis M. |
| **Cc:** | Jeff Dingwall; Ken Reed Gmail; Kiel Garella; Patrick Stephens; Megan Davis; Nathan Hamons; Rebecca Mitchell |
| **Subject:** | RE: Adkins et al v CSX |

Greg –

Brian Barr was deposed in early May and Dr. Heligman has been offered for his Rule 30(b)(6) deposition since the end of April, you (and the court) relied extensively on his individual deposition.  The Court heard the Motions for Summary Judgment, which have been fully briefed since late June, and didn't ask for or invite supplemental briefing.  I'm happy to entertain the idea your Motion if you can give me some proffer of the reasons for your request but they are not evident to me at this time.

Melissa

**From:** Greg Paul <gregpaul@paullaw.com>
**Sent:** Friday, August 6, 2021 11:12 AM
**To:** Melissa Foster Bird <Melissa.FosterBird@nelsonmullins.com>; Tarry, Samuel L. Jr. <starry@mcguirewoods.com>; Walsh, Davis M. <DWalsh@mcguirewoods.com>
**Cc:** Jeff Dingwall <jeff@eightandsandlaw.com>; Ken Reed Gmail <kenreedatty@gmail.com>; Kiel Garella <kiel@gljustice.com>; Patrick Stephens <pstephens@underwoodlawoffices.com>
**Subject:** Adkins et al v CSX

◄**External Email**► - From: gregpaul@paullaw.com

Melissa,
We are going to file a motion for a supplemental briefing schedule on the MSJs to include depositions of previously unavailable transcripts such as Brian Barr referenced at the oral argument and also the scheduled 30(b)(6) of Dr. Heligman. We also have the pending motion with the Magistrate Judge concerning document retention and emails that may reopen discovery. Please advise whether you consent to this motion. Thank you. Greg.

--
Gregory G. Paul
Attorney at Law
Paul Law Offices, PLLC
Presidio: 1808 Wedemeyer Street, Suite 216, San Francisco, CA 94129
First & Market Building: 100 First Avenue, Suite 1010, Pittsburgh, PA 15222
(412) 259-8375 (PA)
(415) 326-8300 (CA)
(844) 374-7200 (toll free)
(888) 822-9421 (fax)
www.paullaw.com
www.erisadisabilitybenefits.com

**Confidentiality Notice:** The information contained in this electronic mail message and any attachments is confidential and may contain proprietary information or be legally privileged. This information is intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or

agent responsible for delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system. Thank you.

<div style="border:1px solid black">

**EXHIBIT 2**

</div>

## Rebecca Mitchell

| | |
|---|---|
| **From:** | Melissa Foster Bird |
| **Sent:** | Sunday, August 8, 2021 8:03 PM |
| **To:** | Greg Paul |
| **Cc:** | Tarry, Samuel L. Jr.; Walsh, Davis M.; Jeff Dingwall; Ken Reed Gmail; Kiel Garella; Patrick Stephens; Megan Davis; Nathan Hamons; Rebecca Mitchell |
| **Subject:** | RE: Adkins et al v CSX |

CSXT does not believe supplemental briefing and further delay are necessary. These particular issues have been well known to the Plaintiffs for months. Both Curt Shogren and Brian Barr were deposed on May 6, before briefing on the Motions for Summary Judgment and well-before the dispositive motions Responses and Replies were filed. In fact, Plaintiffs sought and received a continuance of the original briefing schedule in June to accommodate evidence including depositions. Further, CSXT has offered multiple days for Dr. Heligman's corporate representative deposition over the past months and only after the oral argument on the motions for summary judgment did Plaintiffs accept a date. If Plaintiffs believed any of the testimony was "essential to justify" the summary judgment motion or opposition to Defendants' Motion your clients could have sought an additional extension pursuant to Rule 56(d). Finally, Plaintiffs' untimely Motion to Compel was filed approximately six weeks after the Motion for Summary Judgment deadline and all documents and privilege logs have been produced. The Court has heard all of the dispositive Motions, and decided all but three, and no additional evidence or briefing was requested. CSXT does not consent to your Motion for supplemental unnecessary briefing.

---

**From:** Greg Paul <gregpaul@paullaw.com>
**Sent:** Friday, August 6, 2021 4:38 PM
**To:** Melissa Foster Bird <Melissa.FosterBird@nelsonmullins.com>
**Cc:** Tarry, Samuel L. Jr. <starry@mcguirewoods.com>; Walsh, Davis M. <DWalsh@mcguirewoods.com>; Jeff Dingwall <jeff@eightandsandlaw.com>; Ken Reed Gmail <kenreedatty@gmail.com>; Kiel Garella <kiel@gljustice.com>; Patrick Stephens <pstephens@underwoodlawoffices.com>; Megan Davis <megan.davis@nelsonmullins.com>; Nathan Hamons <nathan.hamons@nelsonmullins.com>; Rebecca Mitchell <rebecca.mitchell@nelsonmullins.com>
**Subject:** Re: Adkins et al v CSX

Melissa,
Now that the trial date is being rescheduled, it makes sense to conclude the outstanding discovery which is pending before the magistrate judge. Brian Barr was brought up at the hearing and the court should have the benefit of his testimony along with Curt Shogrun related to the hearing process. Let me know if we have your consent. Thank you.
Greg

Sent from my iPhone

> On Aug 6, 2021, at 4:05 PM, Melissa Foster Bird <Melissa.FosterBird@nelsonmullins.com> wrote:
>
>
> Greg –
>
> Brian Barr was deposed in early May and Dr. Heligman has been offered for his Rule 30(b)(6) deposition since the end of April, you (and the court) relied extensively on his individual deposition. The Court heard the Motions for Summary Judgment, which have been fully briefed since late June, and didn't ask

for or invite supplemental briefing. I'm happy to entertain the idea your Motion if you can give me some proffer of the reasons for your request but they are not evident to me at this time.

Melissa

---

**From:** Greg Paul <gregpaul@paullaw.com>
**Sent:** Friday, August 6, 2021 11:12 AM
**To:** Melissa Foster Bird <Melissa.FosterBird@nelsonmullins.com>; Tarry, Samuel L. Jr. <starry@mcguirewoods.com>; Walsh, Davis M. <DWalsh@mcguirewoods.com>
**Cc:** Jeff Dingwall <jeff@eightandsandlaw.com>; Ken Reed Gmail <kenreedatty@gmail.com>; Kiel Garella <kiel@gljustice.com>; Patrick Stephens <pstephens@underwoodlawoffices.com>
**Subject:** Adkins et al v CSX

◄**External Email**► - From: gregpaul@paullaw.com

Melissa,
We are going to file a motion for a supplemental briefing schedule on the MSJs to include depositions of previously unavailable transcripts such as Brian Barr referenced at the oral argument and also the scheduled 30(b)(6) of Dr. Heligman. We also have the pending motion with the Magistrate Judge concerning document retention and emails that may reopen discovery. Please advise whether you consent to this motion. Thank you. Greg.

--
Gregory G. Paul
Attorney at Law
Paul Law Offices, PLLC
Presidio: 1808 Wedemeyer Street, Suite 216, San Francisco, CA 94129
First & Market Building: 100 First Avenue, Suite 1010, Pittsburgh, PA 15222
(412) 259-8375 (PA)
(415) 326-8300 (CA)
(844) 374-7200 (toll free)
(888) 822-9421 (fax)
www.paullaw.com
www.erisadisabilitybenefits.com

**Confidentiality Notice:** The information contained in this electronic mail message and any attachments is confidential and may contain proprietary information or be legally privileged. This information is intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system. Thank you.

**Confidentiality Notice**
This message is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged, confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately either by phone (800-237-2000) or reply to this e-mail and delete all copies of this message.