CASE NO. 21-2051

———————————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————————

JUSTIN ADKINS; JUSTIN BLAKE; EDWIN GLOWACKI; ERIC
JORDAN; KEVIN PALMER; DENNIS SARGENT; TRAVIS
THORNSBERRY; MICHAEL WILLIAMS; JOHN BAKER; JAMES
BLAIN; DEVERY BROWN; JAMES DEAL; JONATHAN JEFFERS;
ROBERT MOSTELLER; MICHAEL L. POTTER; MICHAEL D. POTTER;
JESSEE WALLACE; TIMOTHY WITT; JOHN BILLS; MICHAEL
CLARK; RANDALL CRAYCRAFT; JOHN FRASURE; SAMMY MADDIX;
JAMES STINNETT; TODD THAYER; MICHAEL CAMPBELL; TONY
ABDON; THE ESTATE OF CHAD LITTLE; BRANDON ADKINS;
JACQUELINE MARSHALL; HOMER MAYNARD; SCOTT MORRISON;
JEREMY NAPIER; SHAWN PATTERSON; MATTHEW WOODS; JOHN
CARPENTER; QUINCY CHRISTIAN; GREGORY HAMM;
ETHAN MULLINS; MICHAEL OWENS; JONATHAN ROWE; DANNY
STEWART; LLOYD WILLIAMS; DAVID MANIS; JOSHUA FERGUSON;
ERIC SPEAKS; DONALD STEPHENS; JASON BARKER; CHAD DOWDY;
JERRY FLOCKER; GROVER KELLEY; CHRISTOPHER CLAY
STILTNER; DENNIS HUTCHINSON; JOSHUA HALL; ZACH POTTER;
DEANNA LANHAM; SAMUEL PRESTON; BOBBY AKERS; GERALD
BARBER,

**Plaintiffs – Appellants**

**v.**

CSX TRANSPORTATION, INCORPORATED; CRAIG S. HELIGMAN,
M.D.; GUS THOELE; CURT SHOGREN; MILTON STORM; DELANDO
JONES; TOM DEANGELO; SHAWN LUSK; ELIZABETH CREEDON;
KENNETH RAY EMERSON

**Defendants – Appellees**

————————————

**Appeal from the United States District Court
for the Southern District of West Virginia**

————————————

## JOINT APPENDIX
## VOLUME 5 OF 6

————————————

Jeff R. Dingwall
EIGHT & SAND
750 West Fir Street, Suite 602
San Diego, CA 92101
Tel: (619) 796-3464
Fax: (619) 717-8762
jeff@eightandsandlaw.com

Gregory G. Paul
PAUL LAW OFFICES
100 First Avenue, Suite 1010
Pittsburgh, PA 15222
Tel: (412) 417-5862
Fax: (888) 822-9421
gregpaul@morgan-paul.com

### ATTORNEYS FOR APPELLANTS

Brian D. Schmalzbach
MCGUIRE WOODS
800 East Canal Street
Richmond, VA 23219
P: 804−775−7873
E:bschmalzbach@mcguirewoods.com

Samuel Lewis Tarry , Jr.
MCGUIRE WOODS
800 East Canal Street
Richmond, VA 23219
P: 804−775−7873
E:starry@mcguirewoods.com

Davis M. Walsh
MCGUIRE WOODS
800 East Canal Street
Richmond, VA 23219
P: 804−775−7873
E: dwalsh@mcguirewoods.com

Kathryn M. Barber
MCGUIRE WOODS
800 East Canal Street
Richmond, VA 23219
P: 804−775−7873
E:kbarber@mcguirewoods.com

Melissa Foster Bird

NELSON MULLINS RILEY &
SCARBOROUGH
P. O. Box 1856
Huntington, WV 25719
P: 304-526-3500
E:melissa.fosterbird@nelsonmullins.com

**ATTORNEYS FOR APPELLEES**

## TABLE OF CONTENTS
## APPENDIX VOLUME 5 OF 6

| ECF # | Description | Page # |
|---|---|---|
| 448-3 | Deposition of Craig S. Heligman 4/28/21 (Vol. I) | 1820 |
| | Deposition of Craig S. Heligman 4/29/21 (Vol. II) | 2130 |
| 448-4 | Defendants' Exhibit: Correspondence re: Deposition Dates | 2331 |
| 448-5 | Defendants' Exhibit: Correspondence re: Deposition Dates | 2335 |
| 448-6 | Defendants' Exhibit: Correspondence re: Deposition Dates | 2336 |
| 448-7 | Deposition (30(b)(6)) of Penny Dreher 5/4/21 | 2341 |

1          IN THE UNITED STATES DISTRICT COURT FOR THE

2              SOUTHERN DISTRICT OF WEST VIRGINIA

3                      AT HUNTINGTON

4

5     _____
                                        )
6     JUSTIN ADKINS, et al.,            )
                                        )
7               Plaintiffs,             )
                                        ) Case No.
8            -vs                        ) 3:18-CV-00321
                                        )
9     CSX CORPORATION, et al.,          )
                                        )
10              Defendants.             )
                                        )
11

12

13

14

15        VIDEOTAPED DEPOSITION OF CRAIG HELIGMAN, M.D.

16                 VOLUME I PAGES 1 - 313

17                   CONDUCTED REMOTELY

18               WEDNESDAY, APRIL 28, 2021

19

20

21

22    REPORTED BY:  LAURA L. MAES, CSR NO. 9836

23

24

25

                                                        1

```
 1              IN THE UNITED STATES DISTRICT COURT FOR THE

 2                 SOUTHERN DISTRICT OF WEST VIRGINIA

 3                          AT HUNTINGTON

 4

 5      _____
                                        )
 6      JUSTIN ADKINS, et al.,          )
                                        )
 7                  Plaintiffs,         )
                                        ) Case No.
 8            -vs                       ) 3:18-CV-00321
                                        )
 9      CSX CORPORATION, et al.,        )
                                        )
10                  Defendants.         )
                                        )
11

12

13

14      VIDEOTAPED DEPOSITION OF CRAIG HELIGMAN, M.D., VOLUME

15      I, conducted remotely by Laura L. Maes, CSR No. 9836,

16      on behalf of the Plaintiffs, commencing at the hour

17      of 7:03 a.m. on Wednesday, April 28, 2021.

18

19

20

21

22

23

24

25
```

2

Craig Heligman, M.D.                                                                April 28, 2021

```
 1      APPEARANCES:  (VIA ZOOM)


 2
        For the Plaintiffs:
 3
            EIGHT & SAND
 4          BY:  JEFF R. DINGWALL, (Pro Hac Vice)
            550 West B Street, Fourth Floor
 5          San Diego, California 92101
            619.796.3464
 6          jeff@eightandsandlaw.com


 7
        For the Plaintiffs:
 8
            GARELLA LAW, P.C.
 9          BY:  C. KIEL GARELLA, ESQ. (Pro Hac Vice)
            409 East Boulevard
10          Charlotte, North Carolina 28303
            980.321.7934
11          kiel@gljustice.com


12


13      For the Plaintiffs:

14          MORGAN & PAUL, PLLC
            BY:  GREGORY G. PAUL, ESQ.
15          100 First Avenue, Suite 1010
            Pittsburgh, Pennsylvania 15222
16          844.374.7200
            gregpaul@morganpaul.com

17


18      For the Plaintiffs:

19          UNDERWOOD LAW OFFICE, INC.
            BY:  JOHN PATRICK L. STEPHENS, ESQ.
20          923 Third Avenue
            Huntington, West Virginia 25701
21          304.486.3350

22

23

24

25
```

3

USCA4    1822

Craig Heligman, M.D.                                                    April 28, 2021

```
 1    For the Defendants:

 2         NELSON, MULLINS, RILEY & SCARBOROUGH, LLP
           BY:  MELISSA FOSTER BIRD, ESQ.
 3         949 Third Avenue, Suite 200
           Huntington, West Virginia 25701
 4         304.526.3500
           melissa.fosterbird@nelsonmullins.com
 5

 6

 7    Also present:

 8         KYLE LOSKAMP, VIDEOGRAPHER

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

USCA4   1823

Craig Heligman, M.D.                                                    April 28, 2021

1                              I N D E X

2

3      WITNESS

4        CRAIG HELIGMAN, M.D.

5

6      EXAMINATION                                              PAGE

7        MR. DINGWALL                                             7

8        MR. PAUL                                               187

9                          E X H I B I T S

10                                                             PAGE

11       Exhibit 1    Second Amended Notice of                  10
                      Deposition of Craig S. Heligman
12
         Exhibit 2    Three Letters to William Fergus           62
13                    with attachments

14       Exhibit 3    9/20/2017 Letter from Dr.                 95
                      Heligman
15
         Exhibit 4    ACA Choosing Wisely Document             110
16

17       Exhibit 5    9/23/2017 Letter from Dr.                122
                      Heligman
18
         Exhibit 6    E-mail with Attachments -                126
19                    CSXT(Adkins)022527-556

20       Exhibit 7    Certification of Ongoing                 241
                      Illness or Injury Forms
21                    (CONFIDENTIAL)

22

23

24

25

                                                                 5

USCA4    1824

```
 1                    WEDNESDAY, APRIL 28, 2021

 2                         7:03 A.M.

 3

 4           THE VIDEOGRAPHER:  Here begins the         07:01

 5    videotaped deposition of Craig Heligman, Media 1,  07:01

 6    Volume I, in the matter of Adkins versus CSX in the 07:01

 7    United States District Court in the Southern       07:01

 8    District of West Virginia at Huntington.  The case 07:01

 9    number today is 3:18-cv-00321.                     07:01

10           Today's date is April 28th, 2021.  The time 07:01

11    on the monitor is 7:03 a.m.  Your video operator   07:01

12    today is Kyle Loskamp, representing Network         07:01

13    Deposition Services Incorporated, located at 1800  07:01

14    Century Park East, Suite 150, Los Angeles,         07:01

15    California.  The phone number is (310) 557-3400.   07:01

16           Our court reporter today is Laura Maes.     07:02

17    Today's deposition is taken on behalf of the       07:02

18    plaintiff and taken via Zoom Videoconference.      07:02

19           Will counsel please introduce yourselves    07:02

20    and state whom you represent?                      07:02

21           MR. DINGWALL:  Jeff Dingwall for the        07:02

22    plaintiffs.                                        07:02

23           MR. PAUL:  Greg Paul as well.               07:02

24           MS. FOSTER BIRD:  Sorry, Greg.              07:02

25           Melissa Foster Bird, I represent CSX,       07:02
```

6

Craig Heligman, M.D.                                                    April 28, 2021

| | | |
|---|---|---|
| 1 | Dr. Heligman, and the other defendants in this | 07:02 |
| 2 | action. | 07:02 |
| 3 | THE VIDEOGRAPHER:  Thank you very much. | 07:02 |
| 4 | Will the court reporter please swear in the | 07:02 |
| 5 | witness? | 07:02 |
| 6 | THE REPORTER:  Mr. Dingwall -- | 07:02 |
| 7 | MR. DINGWALL:  Oh, I'm sorry.  Yes, I guess | 07:02 |
| 8 | we need to enter into a stipulation that the court | 07:02 |
| 9 | reporter, who is a Maryland court reporter, is | 07:02 |
| 10 | agreeable to all parties to administer the oath to | 07:02 |
| 11 | this witness. | 07:02 |
| 12 | MS. FOSTER BIRD:  We so stipulate. | 07:02 |
| 13 | MR. DINGWALL:  Thank you. | 07:02 |
| 14 | | 07:02 |
| 15 | Whereupon, CRAIG HELIGMAN, M.D., | |
| 16 | being first duly sworn or affirmed to testify to the | |
| 17 | truth, the whole truth, and nothing but the truth, | |
| 18 | via Zoom, was examined and testified as follows: | |
| 19 | | 07:02 |
| 20 | EXAMINATION | 07:02 |
| 21 | BY MR. DINGWALL: | 07:02 |
| 22 | Q.   Good morning, Dr. Heligman. | 07:03 |
| 23 | A.   Good morning. | 07:03 |
| 24 | Q.   Am I saying your name right? | 07:03 |
| 25 | A.   Yes, it's Heligman. | 07:03 |

7

USCA4    1826

Craig Heligman, M.D.                                                    April 28, 2021

```
 1        Q.   Okay.  Great.  Thank you very much.        07:03

 2             I'm Jeff Dingwall, one of the attorneys for  07:03

 3   the plaintiffs in this case.  I want to see if we    07:03

 4   can agree on a few rules at the outset.             07:03

 5             Will you tell me if you don't understand a  07:03

 6   question that I ask?                                 07:03

 7        A.   Yes, I will.                               07:03

 8        Q.   Okay.  Will you tell me if you find a      07:03

 9   question confusing?                                  07:03

10        A.   Yes.                                       07:03

11        Q.   Will you tell me if I have assumed a fact  07:03

12   incorrectly in one of my questions?                 07:03

13        A.   Yes.                                       07:03

14        Q.   Will you tell me if you don't know the    07:03

15   answer to a question?                                07:03

16        A.   Yes.                                       07:03

17        Q.   And do you think you need to be reminded of 07:03

18   any of these rules?                                  07:03

19        A.   No.                                        07:03

20        Q.   All right.  Very good.                     07:03

21             I'm going to start off by entering an      07:03

22   exhibit -- just so we can all use eDepoze because I  07:04

23   know we're all excited about it.  And if you can let 07:04

24   me know when you get that, Dr. Heligman.             07:04

25        A.   Okay.  I have it.  It's just showing up    07:04
```

8

Craig Heligman, M.D.                                                April 28, 2021

```
 1   now.                                              07:04
 2        Q.   All right.  And this is just a copy of the   07:04
 3   deposition notice that we served for today's      07:04
 4   deposition.                                        07:04
 5        Have you seen this document before?           07:04
 6        A.   Yes, I have.                             07:04
 7        Q.   Okay.  And you're appearing pursuant to  07:04
 8   this notice; is that right?                        07:04
 9        A.   That's correct.                          07:04
10        MS. FOSTER BIRD:  You know, I'm just going    07:04
11   to go on record.  Actually, I don't think that was 07:04
12   ever served.  For any of the witnesses, we did not 07:04
13   get deposition notices.  We have no objection to the 07:04
14   noticed deposition and it going forward.  If it says 07:04
15   anything more than it's just a notice, it was not  07:04
16   served.                                            07:04
17        MR. DINGWALL:  All right.  Well, we can       07:04
18   always fix that.                                   07:04
19        MS. FOSTER BIRD:  I'm not complaining.  I'm   07:04
20   just saying if it has anything else in it, I did not 07:04
21   see it.                                            07:05
22        MR. DINGWALL:  But did you get a copy of it   07:05
23   there, Melissa?                                    07:05
24        MS. FOSTER BIRD:  I did.  Let me -- yeah,     07:05
25   if that's it -- if it's just the one-page unsigned 07:05
```

9

USCA4    1828

Craig Heligman, M.D.                                                  April 28, 2021

```
 1    notice of deposition, that's fine.                    07:05

 2            MR. DINGWALL:  It's three pages.  There's a   07:05

 3    second page where the -- on the signature...          07:05

 4            MS. FOSTER BIRD:  Okay.                        07:05

 5            MR. DINGWALL:  And then there's a proof of     07:05

 6    service.  So, anyway, as long as you don't find       07:05

 7    anything objectionable on there, we can go forward.   07:05

 8            MS. FOSTER BIRD:  We can go forward.           07:05

 9    BY MR. DINGWALL:                                       07:05

10        Q.   Okay.  Dr. Heligman, in 2017, you testified  07:05

11    in the formal investigations of each of the           07:05

12    plaintiffs in this case; is that right?               07:05

13        A.   Yes, it is.                                   07:05

14            (Exhibit 1 was marked for identification and

15    attached to the transcript.)                          07:05

16    BY MR. DINGWALL:                                       07:05

17        Q.   Okay.  And the testimony you provided in     07:05

18    those formal investigations was in your capacity as   07:05

19    the Chief Medical Officer at CSX; is that right?      07:05

20        A.   Yes.                                          07:05

21        Q.   Were you physically present for each of      07:05

22    those formal investigations?                          07:05

23        A.   I was physically present for most of them,   07:06

24    but not all of them.                                  07:06

25        Q.   Okay.  To the extent that you were not       07:06
```

                                                                    10

USCA4      1829

Craig Heligman, M.D.                                                    April 28, 2021

```
 1   physically present, how did you testify in those          07:06
 2   investigations?                                           07:06
 3       A.   That was by telephone.                           07:06
 4       Q.   Okay.  For the investigations in which you       07:06
 5   were physically present, where did they take place?       07:06
 6       A.   It was at our offices in Huntington, West        07:06
 7   Virginia.                                                 07:06
 8       Q.   And for the investigations in which you          07:06
 9   participated by phone, where were you physically          07:06
10   present?                                                  07:06
11       A.   In one case, I was in Omaha at a vendor          07:06
12   visit, and at the -- I believe there was only two        07:06
13   that I did by phone, if I remember correctly.  The       07:06
14   other one would have been at my office here in           07:06
15   Jacksonville.                                             07:06
16       Q.   Okay.  Do you remember specifically which       07:06
17   investigations you participated in by phone?             07:06
18       A.   I do not.                                        07:06
19       Q.   Okay.  But as to all of the investigations      07:06
20   in which you testified, you were present either by       07:06
21   phone or in person when the Charge Letters were read     07:06
22   into the record; is that right?                          07:07
23       A.   Yes, that's correct.                            07:07
24       Q.   Okay.  And you were also copied on each and     07:07
25   every one of the Charge Letters for the plaintiffs       07:07
```

                                                                    11

1    in this case; is that right?                    07:07

2         A.   No, I was not actually given a copy of each    07:07

3    of the Charge Letters.                          07:07

4         Q.   Okay.  So if a Charge Letter for any of the    07:07

5    plaintiffs in this case had a CC at the bottom of it    07:07

6    with your name on it, is it your testimony that you    07:07

7    did not receive that?                           07:07

8         A.   I would have seen many of them, but I don't    07:07

9    believe I received all of them, no.  I don't keep a    07:07

10   file of Charge Letters.  They're held in a different    07:07

11   location in our system.                         07:07

12        Q.   Okay.  Would you agree that you were copied    07:07

13   on the Charge Letters for the plaintiffs in this    07:07

14   case?                                          07:07

15        A.   If my name was listed as a CC, then yes.    07:07

16        Q.   Okay.  And how would you have obtained --    07:07

17   I'm sorry -- how would you have received those    07:07

18   Charge Letters?                                07:07

19        A.   It would have either been through an e-mail    07:08

20   that I was CC'd on or it would have been during the    07:08

21   time I would have reviewed the case in our    07:08

22   administrative database where those letters are    07:08

23   housed.                                        07:08

24        Q.   Okay.  And did you participate in drafting    07:08

25   the language in the Charge Letters?            07:08

                                                          12

Craig Heligman, M.D.                                                    April 28, 2021

```
 1        A.    No.                                          07:08

 2        Q.    Did you have an opportunity to review the    07:08

 3   Charge Letters before they were sent?                   07:08

 4        A.    No.                                          07:08

 5        Q.    Have you reviewed the Charge Letters at any  07:08

 6   point up till now?                                      07:08

 7        A.    I may have looked at some of them or even    07:08

 8   all of them, but I -- I don't remember that part.       07:08

 9        Q.    You heard them read into the record in each  07:08

10   of the investigations in which you testified;           07:08

11   correct?                                                07:08

12        A.    Yes.                                         07:08

13        Q.    And if there was anything incorrect about    07:08

14   the language that you heard read into the record        07:08

15   from the Charge Letter, you would have corrected        07:08

16   that; right?                                            07:08

17        A.    I didn't write the Charge Letters, so it     07:09

18   wouldn't have been my place to make any corrections.    07:09

19        Q.    But if there was anything that you had       07:09

20   specific knowledge of with regard to the Charge         07:09

21   Letters and you heard it read incorrectly, you would    07:09

22   have made a correction; right?                          07:09

23        A.    Again, I didn't write the Charge Letters.    07:09

24   That was not my position in the proceedings.  So,       07:09

25   no, if -- I wouldn't have known if it was correct or    07:09
```

                                                                    13

Craig Heligman, M.D.                                                    April 28, 2021

```
 1   incorrect.  There's -- Labor Relations and our      07:09

 2   Charging Officers would be the ones responsible for 07:09

 3   assuring the accuracy of those charges.             07:09

 4       Q.   Have you reviewed any of the Charge Letters 07:09

 5   in preparation for your testimony today?            07:09

 6       A.   I believe I reviewed a couple of them.     07:09

 7   They're very similar, so I didn't see reason to     07:09

 8   review all of them.                                 07:09

 9       Q.   Would you agree that generally the Charge  07:09

10   Letters for the plaintiffs in this case state that  07:10

11   the investigations -- I'm sorry -- the purpose of   07:10

12   the investigations was to determine the facts and   07:10

13   place responsibility, if any, in connection with an 07:10

14   incident that occurred in the vicinity of Russell,  07:10

15   Kentucky with information received from the CSXT     07:10

16   Chief Medical Officer on July 14th, 2017?           07:10

17       A.   That sounds correct.                       07:10

18       Q.   Okay.  And the Chief Medical Officer that  07:10

19   the Charge Letters referred to was you; is that     07:10

20   right?                                              07:10

21       A.   Yes, that is correct.                      07:10

22       Q.   So the basis for the Charge Letters,       07:10

23   according to the language that we just agreed upon, 07:10

24   was that you provided information on July 14th,      07:10

25   2017; correct?                                      07:10
```

                                                                        14

Craig Heligman, M.D.                                                    April 28, 2021

```
 1        A.   Yes.                                          07:10

 2        Q.   Okay.  And what information did you provide   07:10

 3   on July 14th, 2017?                                     07:11

 4        A.   I presented a collection of COII documents    07:11

 5   or the certification of injury and illness              07:11

 6   documents, from two specific chiropractic providers     07:11

 7   in the Greater Huntington area.                         07:11

 8        Q.   And who did you provide that information       07:11

 9   to?                                                      07:11

10        A.   It was originally presented to our Law         07:11

11   Department, and then it was presented to the Labor       07:11

12   Relations team.                                          07:11

13        Q.   In what format did you provide that            07:11

14   documentation to the Law Department?                     07:11

15        A.   I had presented it either directly in a        07:11

16   hard copy or by e-mail.  I don't remember precisely      07:11

17   which one it was.                                        07:11

18        Q.   Have you searched your e-mail at any time      07:11

19   up to the present to look for that?                      07:11

20        A.   Our e-mails are purged on a regular basis      07:12

21   and they don't go back that far.  Any e-mails that       07:12

22   were written would be provided through the discovery     07:12

23   process.                                                 07:12

24        Q.   So any e-mails from that time period are no    07:12

25   longer in existence; is that your testimony?            07:12
```

                                                                        15

Craig Heligman, M.D.                                                      April 28, 2021

```
 1        A.   No, sir.  What I'm saying is I can't do the   07:12
 2   search.  My e-mail box is purged, I believe, after     07:12
 3   18 months, and so anything that far back -- you        07:12
 4   know, we're talking five years ago -- would not be     07:12
 5   available to me in my e-mail box.                       07:12
 6             What I'm saying is that we have a team that   07:12
 7   is able to search the stored documents, the stored     07:12
 8   e-mails that are -- and they work through the Law      07:12
 9   Department for purposes of providing discovery as --   07:12
10   you know, if any cases do come up.  So I don't have    07:13
11   access to that research tool.  I can only look in my   07:13
12   own e-mail box.                                         07:13
13        Q.   Okay.  During the course of this case, have   07:13
14   any e-mails been provided to you from that time        07:13
15   period?                                                 07:13
16        A.   Yes.                                          07:13
17        Q.   And which -- who provided those e-mails to    07:13
18   you?                                                    07:13
19        A.   They were presented by Ms. Foster Bird.       07:13
20        Q.   Okay.  And do you know if those e-mails       07:13
21   have been produced in this case?                        07:13
22        A.   To my knowledge, they have been.              07:13
23        Q.   Do you recall the contents of those           07:13
24   e-mails?                                                07:13
25        A.   The -- I don't recall the specific content    07:13
```

                                                                      16

USCA4    1835

Craig Heligman, M.D.                                    April 28, 2021

```
 1   of each one of them.  If there's one you'd like me   07:13
 2   to look at, I'm happy to do so.                        07:13
 3       Q.   Going back to the Charge Letter, it states   07:13
 4   that information received from the Chief Medical       07:13
 5   Officer on July 14th, 2017, quote:                     07:13
 6              "That you were dishonest and                07:14
 7               attempted to defraud the                   07:14
 8               company and/or benefits                    07:14
 9               providers when you, as well as             07:14
10               more than 50 other craft                   07:14
11               employees, submitted                       07:14
12               potentially fraudulent                     07:14
13               documentation."                            07:14
14           Is that right?                                 07:14
15       A.   I believe that's generally the language.     07:14
16   If you have a copy for me to look at, I'm happy to     07:14
17   confirm it.                                            07:14
18       Q.   Okay.  Was it your opinion as of July 14th,  07:14
19   2017, that the plaintiffs in this case were            07:14
20   dishonest?                                             07:14
21       A.   It was my opinion at the time that there     07:14
22   was some potential for that, yes, but did I know,      07:14
23   no.                                                    07:14
24       Q.   Okay.  Was it your opinion as of July 14th,  07:14
25   2017, that the plaintiffs in this case attempted to    07:14
```

17

USCA4    1836

Craig Heligman, M.D.                                                    April 28, 2021

```
 1    defraud the company?                              07:14

 2         A.   I'm sorry.  Could you restate that one more   07:15

 3    time?                                             07:15

 4         Q.   Yes.                                     07:15

 5              Was it your opinion as July 14th, 2017,  07:15

 6    that the plaintiffs in this case had attempted to  07:15

 7    defraud the company?                              07:15

 8         A.   No, it was my opinion that there was that  07:15

 9    possibility.  It was the responsibility of the    07:15

10    investigation and hearing process to determine what  07:15

11    the facts were in the case and make a decision upon  07:15

12    completion of those investigations.               07:15

13         Q.   Was it your opinion as of July 14th, 2017,  07:15

14    that the plaintiffs in this case attempted to     07:15

15    defraud benefits providers?                       07:15

16         A.   Again, I thought there was potential for  07:15

17    that.  However, it was the responsibility, following  07:15

18    the process and procedures of the investigation and  07:15

19    hearing, for others to make the determination as to  07:15

20    the guilt or innocence according to the charges.  07:15

21         Q.   And was it your opinion as of July 14th,  07:15

22    2017, that the plaintiffs in this case submitted  07:16

23    potentially fraudulent documentation?             07:16

24         A.   I feel that it was potentially that way.  07:16

25    The documents themselves I don't believe were     07:16
```

                                                                          18

USCA4    1837

Craig Heligman, M.D.                                              April 28, 2021

```
 1   actually fraudulent.  I believe some of the        07:16
 2   information presented in those documents could have 07:16
 3   led us down that pathway.                           07:16
 4       Q.   What specific information in the documents 07:16
 5   could have led us down the pathway of fraudulent    07:16
 6   documentation?                                      07:16
 7       A.   We had somewhere around 70 individuals from 07:16
 8   two different chiropractic providers.  The          07:16
 9   information on each and every one of those forms was 07:16
10   very similar.  The time period in which the         07:16
11   providers were approving or certifying absence time 07:17
12   or disability periods were pretty much the same.    07:17
13           And so the consistency of a large number of 07:17
14   cases or the information on these forms for these   07:17
15   individual cases that were presented really within a 07:17
16   very short time period was the concern.  And it was 07:17
17   the pattern of information at the time that we       07:17
18   received it that was concerning, not necessarily    07:17
19   what was on any -- any one document.                07:17
20       Q.   Okay.  Other than -- I'm sorry.  And I'll  07:17
21   back up for a second.                               07:17
22           You stated that the information that you    07:17
23   provided on July 14th, 2017, was a collection of    07:17
24   Certificate of Ongoing Illness or Injury documents; 07:17
25   is that right?                                       07:17
```

                                                              19

Craig Heligman, M.D.                                                April 28, 2021

| | | |
|---|---|---|
| 1 | A.    Yes. | 07:17 |
| 2 | Q.    And you provided those documents to the Law | 07:17 |
| 3 | Department and to the Labor Relations team; is that | 07:17 |
| 4 | right? | 07:18 |
| 5 | A.    I first provided it to the Law Department, | 07:18 |
| 6 | and then I believe it was transferred over to Labor | 07:18 |
| 7 | Relations. | 07:18 |
| 8 | Q.    What caused you to provide that information | 07:18 |
| 9 | to the Law Department? | 07:18 |
| 10 | A.    At that time period, we had received -- I | 07:18 |
| 11 | think it was 20 or 21 of those forms all in the same | 07:18 |
| 12 | day, and that was very unusual.  We actually receive | 07:18 |
| 13 | quite a large number of documents every day of the | 07:18 |
| 14 | week, and to have 20 or more forms provided from one | 07:18 |
| 15 | practitioner or one geographical area in one day, | 07:18 |
| 16 | that's pretty unusual.  In fact, I've never | 07:18 |
| 17 | experienced that at CSX or prior to my work at CSX. | 07:18 |
| 18 | Q.    And so was it the number of forms that you | 07:18 |
| 19 | received that caused you to contact the Law | 07:18 |
| 20 | Department? | 07:18 |
| 21 | A.    Not the number, but the combination of | 07:19 |
| 22 | factors -- the large number, the location, and | 07:19 |
| 23 | specifically to limited to two practitioners.  So | 07:19 |
| 24 | it's that combination of common practitioners, | 07:19 |
| 25 | common date or common time period, and common | 07:19 |

20

USCA4    1839

Craig Heligman, M.D.                                    April 28, 2021

```
 1    documents that we received all at once.  Very, very    07:19

 2    unusual set of circumstances.                          07:19

 3         As time progressed from that first                07:19

 4    collection, I asked our team to continue to collect    07:19

 5    them to see if there was any additional pattern, and   07:19

 6    when we started receiving a large number of them       07:19

 7    over the next few weeks is when I presented that to    07:19

 8    the Law Department and asked their opinion if there    07:19

 9    was anything we needed to do further with this         07:19

10    information.                                           07:19

11    Q.   What was your first -- when was your first        07:19

12    contact with the Law Department regarding these COII   07:19

13    forms?                                                 07:20

14    A.   I actually don't recall a specific date.         07:20

15    It would have been towards the end of June of 2017.    07:20

16    Q.   And is there any way for you to determine         07:20

17    when your first contact was with the Law Department?   07:20

18    A.   No.                                               07:20

19    Q.   There's -- you have no way of tracking            07:20

20    whether you sent an e-mail or sent these documents     07:20

21    in hard copy to the Law Department?                    07:20

22    A.   You would have to check with our                  07:20

23    document -- the records-keeping department.  They      07:20

24    would be able to track that down.  As I said, I       07:20

25    don't remember if it was something I carried to the    07:20
```

                                                           21

Craig Heligman, M.D.                                                April 28, 2021

```
 1   Law Department.  That's probably the more likely      07:20

 2   scenario, but I wouldn't rule out having sent them     07:20

 3   by e-mail.                                             07:20

 4        Q.   Who specifically in the Law Department did   07:20

 5   you contact?                                           07:20

 6        A.   I contacted our employment attorney.         07:20

 7        Q.   And who is that?                             07:20

 8        A.   Michael Burns.                               07:20

 9        Q.   Did you receive any guidance from            07:20

10   Mr. Burns?                                             07:21

11        MS. FOSTER BIRD:  I'm going to object here        07:21

12   to attorney/client privilege for any conversations    07:21

13   that were held between Dr. Heligman and Mr. Burns,     07:21

14   including any legal advice or recommendations that     07:21

15   were given.                                            07:21

16   BY MR. DINGWALL:                                       07:21

17        Q.   And I don't want to know the substance of    07:21

18   any conversations you had with Mr. Burns.  I'm just    07:21

19   asking whether he provided you with any guidance.      07:21

20        MS. FOSTER BIRD:  That's what -- beyond a          07:21

21   "Yes" or a "No" answer, I would object.                07:21

22        THE WITNESS:  He did provide guidance.            07:21

23   BY MR. DINGWALL:                                       07:21

24        Q.   And at some point, I believe, you stated     07:21

25   that the matter was referred from the Law Department   07:21
```

                                                                   22

Craig Heligman, M.D.                                                    April 28, 2021

```
 1    to the Labor Relations team; is that right?      07:21
 2         A.    That's my recollection, yes.          07:21
 3         Q.    And do you know when that occurred?   07:21
 4         A.    I do not know the specific date.      07:21
 5         Q.    How did you become aware that the matter  07:22
 6    was referred from the Law Department to the Labor  07:22
 7    Relations team?                                  07:22
 8         A.    When someone from Labor Relations contacted  07:22
 9    me to request additional information.            07:22
10         Q.    And who was it on the Labor Relations team  07:22
11    that contacted you?                              07:22
12         A.    I think it was Penny Dreher that was the  07:22
13    first person that contacted me.  She was the     07:22
14    individual that was managing the administration  07:22
15    process for all these cases.                     07:22
16         Q.    Do you know Ms. Dreher's title, or at the  07:22
17    time did you know her title?                     07:22
18         A.    I don't recall, no.                   07:22
19         Q.    Do you recall when she first contacted you?  07:22
20         A.    No, I do not.                         07:22
21         Q.    Is that something you could find out?  07:22
22         A.    I don't know.  Again, I don't have ability  07:22
23    to look in my e-mails that long ago.  I guess I  07:23
24    could ask Ms. Dreher if she remembers, but that's  07:23
25    the only way I could do it.                      07:23
```

                                                              23

Craig Heligman, M.D.                                                April 28, 2021

```
 1        Q.   Do you know if she contacted you by phone    07:23

 2   or by e-mail or in person?                             07:23

 3        A.   It would either have been by e-mail or       07:23

 4   telephone.  It was not in person for the first         07:23

 5   contact.                                               07:23

 6        Q.   In your handling of these cases involving    07:23

 7   the COII forms in 2017, did you keep any records of    07:23

 8   your communications with either the Law Department     07:23

 9   or the Labor Relations team?                           07:23

10        A.   No.                                          07:23

11        Q.   Is that your practice generally not to keep  07:23

12   records of communications regarding potentially        07:23

13   fraudulent activity?                                   07:23

14        A.   We have retention rules on our e-mails, and  07:23

15   there was no reason for me to retain any e-mails.      07:23

16   We don't record our phone calls.  We don't record     07:24

17   chat.  So it's my practice not to retain any of them   07:24

18   unless I'm made aware of a legal reason to do so.      07:24

19             And then as I stated previously, it's        07:24

20   our -- we have a department that goes back and does    07:24

21   the review on all the retained e-mails.  I don't do    07:24

22   that, and I don't have access to that information so   07:24

23   far or so long ago.                                    07:24

24        Q.   At any point from June 2017 to the present,  07:24

25   have you ever been advised to retain documents or      07:24
```

                                                                        24

Craig Heligman, M.D.                                          April 28, 2021

```
 1   e-mails or any communications regarding the        07:24

 2   plaintiffs in this matter?                         07:24

 3          MS. FOSTER BIRD:  I'm going to object to    07:24

 4   the extent that any recommendations came from legal 07:24

 5   counsel inside or outside CSX.  So I'm going to     07:24

 6   object to that question if -- if it is with regard 07:24

 7   to legal counsel.                                  07:24

 8   BY MR. DINGWALL:                                   07:24

 9      Q.   Do you have an answer, Dr. Heligman?       07:25

10      A.   I -- I will follow my attorney's advice.  07:25

11          MS. FOSTER BIRD:  So I've objected to that 07:25

12   question because it calls for -- I think we -- it  07:25

13   calls for attorney/client privilege information.   07:25

14          MR. DINGWALL:  So whether Dr. Heligman was 07:25

15   advised to retain any documents regarding the      07:25

16   plaintiffs in this matter is attorney/client       07:25

17   privilege?                                         07:25

18          MS. FOSTER BIRD:  Yes.                      07:25

19          MR. DINGWALL:  And you can provide a        07:25

20   privilege log to that extent?                      07:25

21          MS. FOSTER BIRD:  For all of the            07:25

22   conversations, probably not.  That's not the basis 07:25

23   for a privilege log.                               07:25

24          MR. DINGWALL:  Well, if you're asserting    07:25

25   privilege, I think it's proper.                    07:25
```

                                                              25

Craig Heligman, M.D.                                            April 28, 2021

```
 1    BY MR. DINGWALL:                          07:25

 2        Q.   Dr. Heligman, I think you stated that you  07:25

 3    received COII documents for approximately 70  07:26

 4    individuals; is that right?                 07:26

 5        A.   For this group of individuals, yes.  07:26

 6        Q.   Okay.  And all 70 of those individuals  07:26

 7    treated with either Dr. Shannon Johnson or   07:26

 8    Dr. Daniel Carey; is that right?            07:26

 9        A.   Yes, sir.                          07:26

10        Q.   Okay.  How many of those 70 individuals  07:26

11    were ultimately terminated?                 07:26

12        A.   I don't remember.  A large majority, but I  07:26

13    don't remember the precise number.          07:26

14        Q.   And do you know if investigations were held  07:26

15    for all 70 individuals?                     07:26

16        A.   To my knowledge, yes.              07:26

17        Q.   And did you testify in the investigations  07:26

18    for all 70 individuals?                     07:26

19        A.   To the best of my recollection, yes.  07:26

20        Q.   Have you testified in any legal proceedings  07:26

21    stemming from the 70 individuals and the submission  07:26

22    of their COII forms?                        07:26

23        A.   I believe I've been deposed on one case so  07:27

24    far.                                        07:27

25        Q.   And which case is that?            07:27
```

                                                          26

Craig Heligman, M.D.                                                    April 28, 2021

```
 1        A.    I believe it was Adonis Ginn.          07:27
 2        Q.    Other than that case and this case, are you  07:27
 3   aware of any other legal cases that you'll be      07:27
 4   testifying in?                                     07:27
 5        A.    Not to my knowledge.  These are the only  07:27
 6   ones I recall at this point.                       07:27
 7        Q.    Okay.  In your communications with -- is it  07:27
 8   Penny Dreher?  Am I saying that right?             07:27
 9        A.    Yes.                                     07:27
10        Q.    Okay.  In your communications with her, did  07:27
11   she provide you any guidance with regard to the    07:27
12   submission of the COII forms?                       07:27
13        A.    No.                                      07:27
14        Q.    What was the substance of your            07:27
15   communications with her?                            07:27
16        A.    It was mostly process.  She would have been  07:27
17   responsible for making arrangements to identify the  07:28
18   Charging Officer, the Hearing Officer, making       07:28
19   arrangements for locations, perhaps, of where we    07:28
20   would be doing the hearings.  But it was purely      07:28
21   administrative.                                      07:28
22        Q.    When was the determination made to conduct  07:28
23   the formal investigations with regard to the        07:28
24   plaintiffs in this case?                            07:28
25        A.    I don't remember the precise date.  The    07:28
```

                                                                    27

Craig Heligman, M.D.                                    April 28, 2021

```
 1   Collective Bargaining Agreements have rules that      07:28
 2   stipulate what the time frames are for our ability    07:28
 3   to charge individuals under the Collective            07:28
 4   Bargaining Agreement.                                 07:28
 5       Q.   Whose decision was it to conduct the formal  07:28
 6   investigations at to the plaintiffs in this matter?   07:28
 7       A.   I don't know if there was one individual.    07:28
 8   I believe it was a decision in combination with our   07:28
 9   legal team and our Labor Relations team.  I don't     07:28
10   really know who, if any one person, made the          07:29
11   decision.                                             07:29
12       Q.   Other than Michael Burns in the Law          07:29
13   Department and Penny Dreher in Labor Relations, did   07:29
14   you personally discuss this matter with anybody else  07:29
15   in the company?                                       07:29
16           MS. FOSTER BIRD:  I'll object to the extent   07:29
17   it involves discussions with anyone in the Law        07:29
18   Department.  Other than that, go ahead.               07:29
19           THE WITNESS:  I know I would have discussed   07:29
20   the -- some of the issues with my medical team, with  07:29
21   perhaps individual in our risk management team,       07:29
22   perhaps additional individuals for Labor Relations,   07:29
23   or our field administration team.  They would have    07:29
24   all been involved in the process, and so it wouldn't  07:29
25   surprise me if I held conversations with any or all   07:29
```

                                                           28

| | | |
|---|---|---|
| 1 | of them. | 07:30 |
| 2 | BY MR. DINGWALL: | 07:30 |
| 3 | Q.    And did you keep any documentation | 07:30 |
| 4 | regarding communications with any of the individuals | 07:30 |
| 5 | or teams that you just mentioned? | 07:30 |
| 6 | A.    No. | 07:30 |
| 7 | Q.    Do you typically keep appointments on a | 07:30 |
| 8 | calendar system? | 07:30 |
| 9 | A.    Typically, yes, I do. | 07:30 |
| 10 | Q.    And would you have calendar appointments | 07:30 |
| 11 | with the individuals that you just talked about | 07:30 |
| 12 | regarding this matter? | 07:30 |
| 13 | A.    Not necessarily.  My calendar is primarily | 07:30 |
| 14 | used for specific team meetings or one-on-one | 07:30 |
| 15 | discussions where it's specific to we want to meet | 07:30 |
| 16 | at this point in time about this particular subject. | 07:30 |
| 17 | But frequently I will communicate by telephone or by | 07:30 |
| 18 | e-mail or face to face with individuals without | 07:30 |
| 19 | having a specific appointment on the calendar. | 07:30 |
| 20 | Q.    Have you gone back at any time and looked | 07:31 |
| 21 | to see if you kept or had appointments on your | 07:31 |
| 22 | calendar with anybody involving the matter that | 07:31 |
| 23 | we're here for today? | 07:31 |
| 24 | A.    No. | 07:31 |
| 25 | Q.    Is that something that you could do? | 07:31 |

29

Craig Heligman, M.D.                                                      April 28, 2021

```
 1        A.   No.  Again, that data is --              07:31

 2        Q.   Why not?                                 07:31

 3        A.   -- that data is purged consistent with our   07:31

 4   records retention process for our e-mail.          07:31

 5        Q.   And so is that something that would have to   07:31

 6   be obtained through another department?            07:31

 7        A.   Yes.  I don't know if they're able to look   07:31

 8   at our calendars from that period of time or not.  07:31

 9        Q.   How far back does your calendar go?      07:31

10        A.   I believe it's 18 months is the standard   07:31

11   records retention.                                 07:31

12        Q.   What system do you use for calendaring?  07:31

13        A.   We use the Microsoft Outlook program.    07:31

14        Q.   And what system do you use for e-mail?   07:32

15        A.   Also Outlook.                            07:32

16        Q.   And is the e-mail retention policy       07:32

17   18 months as well?                                 07:32

18        A.   I believe that is correct, yes.          07:32

19        Q.   And are you able to search your e-mail or   07:32

20   your calendar at least for the past 18 months?     07:32

21        A.   I could do that.                         07:32

22        Q.   Okay.  Other than the COII forms for the   07:32

23   plaintiffs in this case, did you provide any other   07:32

24   information either to Labor Relations or to the Law   07:32

25   Department?                                        07:32
```

                                                                              30

Craig Heligman, M.D.                                    April 28, 2021

```
 1        A.    I think that was the basis -- that was the    07:32
 2   only information I presented at that point in time.      07:32
 3   There were some letters I had written and               07:32
 4   attachments to those letters that I would have also      07:32
 5   shared with them.                                        07:32
 6        Q.    Did anybody within the company, from          07:33
 7   June 2017 through the dates of the investigations of     07:33
 8   the plaintiffs in this matter, ask you to go back        07:33
 9   and collect more information?                            07:33
10          MS. FOSTER BIRD:  I'm going to object to          07:33
11   the extent that request, if there was one, came from     07:33
12   legal counsel.  So if it came from legal counsel,        07:33
13   that is privileged and please do not answer.             07:33
14          THE WITNESS:  Could you restate the               07:33
15   question for me, please?                                 07:33
16   BY MR. DINGWALL:                                         07:33
17        Q.    Did anybody in the company, from June of      07:33
18   2017 through the dates of the formal investigations      07:33
19   of the plaintiffs in this case, ask you to go back       07:33
20   and obtain more information?                             07:33
21        A.    The answer is no, but I'm not sure what       07:33
22   "more information" really means.                         07:33
23        Q.    What was the basis for you answering no?      07:34
24        A.    Because I don't recall anybody asking me to   07:34
25   gather more information.  I did my own review of the     07:34
```

                                                          31

Craig Heligman, M.D.                                          April 28, 2021

```
 1   cases.  I did my own review of the medical records    07:34

 2   that we held on those individuals.  But nobody asked   07:34

 3   me to do that.                                          07:34

 4        Q.   Are you saying that you reviewed medical      07:34

 5   documentation outside of the COIIs for any of the       07:34

 6   plaintiffs in this case?                                07:34

 7        A.   We have employee health records and we have   07:34

 8   a case management system, and so we will frequently     07:34

 9   have information concerning those subject matters --    07:34

10   or that subject matter for our employees.  And what     07:34

11   I was curious about was whether or not we had any       07:34

12   additional information in our files with regards to     07:34

13   the COII or the cases that the COIIs represented for    07:34

14   those individuals.                                      07:35

15        Q.   What is the document system you use for       07:35

16   medical records for employees?                          07:35

17        A.   We use an Oracle database.  It's ECM.  I      07:35

18   don't know what those initials stand for, but it's a    07:35

19   document imaging folder system for retention of         07:35

20   digital documents.                                      07:35

21        Q.   And would that system contain all medical     07:35

22   records that have been submitted to the company for     07:35

23   all employees?                                          07:35

24        A.   It would have been for any documents that     07:35

25   we received from employees or other sources that        07:35
```

                                                              32

USCA4    1851

Craig Heligman, M.D.                                        April 28, 2021

```
 1   should be in the employee's health record.  We also   07:35

 2   have a section for their EAP and drug testing          07:35

 3   information.  That would be considered part of the     07:35

 4   employee health record.                                07:36

 5          We also have a case management system where     07:36

 6   we will document when we received documents, for       07:36

 7   example, or what we do with the information or when    07:36

 8   we receive phone calls from individuals.  And so we    07:36

 9   have that as a separate system.  It's not part of      07:36

10   that digital document retention program.               07:36

11   Q.    Prior to the investigations that were held       07:36

12   for the plaintiffs in this matter, did you search      07:36

13   that medical document retention system for documents   07:36

14   regarding the plaintiffs?                              07:36

15   A.    Yes, I did.                                       07:36

16   Q.    And what specifically did you look for?          07:36

17   A.    I was looking for information with regards        07:36

18   to was this the first time we had an issue of this     07:36

19   nature with the employee, was there additional         07:36

20   information with regards to either the medical issue   07:36

21   or the providers.  I was interested in finding out,    07:36

22   again, if we had any additional information that       07:37

23   would help clarify the situation.                       07:37

24          And although we had some information where      07:37

25   some of the individuals had already submitted prior    07:37
```

33

USCA4      1852

```
 1    COIIs for the same condition from the same          07:37
 2    practitioners, there really wasn't any specific     07:37
 3    pattern of who did or did not submit prior          07:37
 4    information.                                         07:37
 5           These documents get submitted as part of     07:37
 6    the notification process in many cases, or it could 07:37
 7    be that they were off work for a period of time and 07:37
 8    had to submit medical information in order to be    07:37
 9    cleared to come back to work.  So I was just trying 07:37
10    to, again, understand more about the individual     07:37
11    cases.                                              07:37
12       Q.   If a COII form is submitted on behalf of an 07:37
13    employee, how does it arrive at CSX?                07:37
14       A.   Most commonly by fax.  On the other hand,   07:37
15    we do accept them by e-mail, which is becoming more 07:37
16    common.                                             07:38
17       Q.   And are those typically submitted by        07:38
18    medical providers?                                  07:38
19       A.   It's a mix of coming directly from medical  07:38
20    providers and from the employees themselves.  For   07:38
21    our physical exams, they would be submitted from our 07:38
22    vendor, not from the employee or the practitioners  07:38
23    themselves.                                         07:38
24       Q.   And is it an acceptable practice at CSX for 07:38
25    a medical provider to submit a COII form on behalf  07:38
```

34

USCA4    1853

| | | |
|---|---|---|
| 1 | of a patient? | 07:38 |
| 2 | A.   Yes, it happens frequently. | 07:38 |
| 3 | Q.   Is there any requirement that an employee | 07:38 |
| 4 | submit a COII form following medical treatment? | 07:38 |
| 5 | A.   The COII is a tool that we use to assist | 07:38 |
| 6 | with the employee being able to meet their | 07:38 |
| 7 | responsibility of communicating with the company | 07:38 |
| 8 | under their Collective Bargaining Agreement.  In | 07:38 |
| 9 | other words, each of the agreements have a | 07:39 |
| 10 | requirement for the employee to notify the company | 07:39 |
| 11 | periodically if they're going to be off for medical | 07:39 |
| 12 | reasons.  We offer the COII as a means for the | 07:39 |
| 13 | employee to do that. | 07:39 |
| 14 | However, if the employee submits medical | 07:39 |
| 15 | documents that have the same information that allows | 07:39 |
| 16 | us to understand why they're off for medical | 07:39 |
| 17 | reasons, we accept letters from doctors, we will | 07:39 |
| 18 | accept the actual medical records, but the most | 07:39 |
| 19 | common way it's done is the employee will submit the | 07:39 |
| 20 | COII or ask their physician to submit it on their | 07:39 |
| 21 | behalf. | 07:39 |
| 22 | Q.   How would an employee know what information | 07:39 |
| 23 | would need to be submitted to the company in order | 07:39 |
| 24 | to take time off for a medical condition? | 07:39 |
| 25 | A.   They don't have to submit any medical | 07:39 |

35

USCA4    1854

```
 1   information in order to take the time off.  They do    07:39

 2   have a responsibility under their Collective           07:39

 3   Bargaining Agreement to notify the employer, CSX in    07:39

 4   this case, as to what their status is, whether         07:40

 5   they're able to return to work or not and what's the   07:40

 6   reason for them to continue to be off.                 07:40

 7          So if it's a medical one, they'll provide       07:40

 8   that medical information on the COII.  So they're      07:40

 9   not asking permission to be off work.  They're         07:40

10   simply keeping us up to date on their status with      07:40

11   regards to their ability to work.                      07:40

12      Q.   And that requirement comes from the            07:40

13   Collective Bargaining Agreement?                       07:40

14      A.   It's part of the Collective Bargaining         07:40

15   Agreement, and then for those that -- it's primarily   07:40

16   the Collective Bargaining Agreement.  I think for      07:40

17   some management people, it is a policy that's on the   07:40

18   Gateway.                                               07:40

19      Q.   But as far as agreement employees, those       07:40

20   that would fall under a Collective Bargaining          07:40

21   Agreement, the requirement to notify the company of    07:40

22   their medical condition is a creature of the           07:41

23   Collective Bargaining Agreement; is that right?        07:41

24      A.   Yes, that's correct.                           07:41

25      Q.   Okay.  So there is no policy or procedure      07:41
```

36

Craig Heligman, M.D.                                                        April 28, 2021

```
 1    from CSX that requires agreement employees to        07:41
 2    provide notice of their medical condition to the     07:41
 3    company?                                             07:41
 4        A.    Not prior to -- or not prior to them       07:41
 5    leaving for medical reasons.  To my knowledge, they  07:41
 6    will have a mark-off system.  Each group has their   07:41
 7    own process in who they should notify when they need 07:41
 8    to mark off work for a medical reason.               07:41
 9            We primarily monitor the incoming            07:41
10    information with regards to the periodic             07:41
11    notification, as we're required to do under the      07:41
12    Collective Bargaining Agreement, and when they're    07:41
13    ready to return to work, we'll review their case at  07:42
14    that point in time.                                  07:42
15        Q.    And is it fair to say, then, that as long  07:42
16    as an agreement employee keeps the company apprised  07:42
17    of his or her medical condition and availability for 07:42
18    work, there would be no issue as far as discipline?  07:42
19        A.    Not -- not to my knowledge, no.            07:42
20        Q.    How did you determine that the plaintiffs  07:42
21    in this case were dishonest?                         07:42
22        A.    I didn't determine they were dishonest.  I 07:42
23    advised the individuals we already spoke about that  07:43
24    I thought there was a pattern of behavior based on   07:43
25    the submission of the COIIs in this geographical     07:43
```

37

USCA4    1856

Craig Heligman, M.D.                                              April 28, 2021

```
 1    region from the same two practitioners.  It was for     07:43
 2    others to determine whether or not the employee was     07:43
 3    dishonest.                                              07:43
 4        Q.   How did you determine that the plaintiffs      07:43
 5    in this case attempted to defraud the company?          07:43
 6        A.   I didn't make that determination.  Again, I    07:43
 7    identified a pattern and said -- had suggested that     07:43
 8    this was a possible issue that should be addressed.     07:43
 9    But it was up to other individuals to make that         07:43
10    determination as to whether that, you know, they       07:43
11    were doing anything inappropriate.                      07:43
12        Q.   And in the context of the plaintiffs in        07:43
13    this case and specifically the charges that led to      07:44
14    their formal investigation, what did it mean that       07:44
15    they were dishonest?                                    07:44
16        A.   I'm not sure I understand the question.        07:44
17        Q.   If we back up a little bit to the language     07:44
18    we discussed in the Charge Letter, it said that the     07:44
19    investigations were for the purpose of determining      07:44
20    the facts and placing the responsibility in             07:44
21    connection with information received from you on        07:44
22    July 14, 2017, that the employee was dishonest.         07:44
23        A.   Okay.                                          07:44
24        Q.   So in what ways were the plaintiffs in this    07:44
25    case dishonest that led to the charges being sent       07:44
```

                                                                      38

| | | |
|---|---|---|
| 1 | out? | 07:44 |
| 2 | A.   I believe it was because of the concern | 07:45 |
| 3 | that they were misrepresenting their status, and | 07:45 |
| 4 | that would constitute potential dishonesty. | 07:45 |
| 5 | Q.   Okay.  And what specifically did you deem | 07:45 |
| 6 | to be dishonest? | 07:45 |
| 7 | A.   Again, I didn't determine that they were | 07:45 |
| 8 | dishonest.  We -- I identified that there was a | 07:45 |
| 9 | large number of COIIs received in a very short | 07:45 |
| 10 | period of time in the same geographical area from | 07:45 |
| 11 | the same two practitioners.  So for my purposes, I | 07:45 |
| 12 | felt that this was a pattern that could represent | 07:45 |
| 13 | either dishonesty or fraud or other reasons why | 07:45 |
| 14 | individuals would do this. | 07:45 |
| 15 | But it certainly wasn't a medical reason. | 07:45 |
| 16 | I could not explain this on a medical basis, and, | 07:45 |
| 17 | therefore, I delivered this information to other | 07:45 |
| 18 | individuals to determine whether or not it was a | 07:45 |
| 19 | potential violation of company policy, Collective | 07:46 |
| 20 | Bargaining Agreement, and subject to disciplinary | 07:46 |
| 21 | action. | 07:46 |
| 22 | Q.   Your involvement in the investigations of | 07:46 |
| 23 | the plaintiffs in this case had nothing to do with | 07:46 |
| 24 | your medical opinion? | 07:46 |
| 25 | A.   It had to do with the -- again, the pattern | 07:46 |

39

Craig Heligman, M.D.                                                April 28, 2021

```
 1   of documentation.  If the information had been, say,   07:46
 2   a large number of people that had provided             07:46
 3   misinformation potentially on an expense form and it   07:46
 4   was very similar and we received the same documents    07:46
 5   in a short period of time, those documents would not   07:46
 6   have come to me.                                       07:46
 7        The fact that there was medical information       07:46
 8   on those documents meant that it was up to me.  I      07:46
 9   was recipient for that information.  But it was,       07:46
10   again, the pattern, not the specifics of the medical   07:46
11   information that was on there other than to state it   07:46
12   was very similar across the cases.  I think that       07:47
13   with myself as a physician, I would be able to see     07:47
14   that pattern where perhaps others would not.           07:47
15   Q.   So your position as a physician made you          07:47
16   uniquely qualified to identify a pattern of            07:47
17   employees receiving treatment from two providers?      07:47
18   A.   I think it allowed me to interpret the            07:47
19   medical information on those forms and to reach some   07:47
20   conclusion as to what it meant.                        07:47
21   Q.   And what conclusions did you reach about          07:47
22   what it meant?                                         07:47
23   A.   To me it appeared to mean that we had two         07:47
24   providers in this one small area and we were           07:47
25   receiving very much identical statements on each and   07:47
```

                                                                    40

```
 1    every one of the COIIs from these two practitioners.   07:47
 2           We don't see this on -- we just haven't          07:48
 3    seen this ever.  In my career, I've never seen it.     07:48
 4    And so it's an unusual set of circumstances to see      07:48
 5    every single document say two months off work for a     07:48
 6    nonspecific soft tissue, musculoskeletal-type           07:48
 7    complaint in a very small geographical area.            07:48
 8           So I reviewed it.  I thought I don't know         07:48
 9    why we're seeing this, and I took the information to    07:48
10    other individuals in hopes that they could help me     07:48
11    understand why I could potentially be seeing this      07:48
12    pattern and to determine whether or not it meant       07:48
13    anything from a policy, procedure, or disciplinary     07:48
14    perspective.                                            07:48
15       Q.   Is it fair to assume that as the Chief          07:48
16    Medical Officer, you don't review every COII form      07:48
17    that comes in?                                          07:48
18       A.   I don't review every single COII form.  We      07:48
19    have a team of nurses that would be responsible for    07:49
20    viewing those first.  If they had any questions         07:49
21    about the information on the COIIs, they would then    07:49
22    consult me.                                             07:49
23       Q.   How did the COII forms of the plaintiffs in    07:49
24    this case come to your attention?                       07:49
25       A.   One of our nurses had been -- was the first    07:49
```

                                                                41

Craig Heligman, M.D.                                                      April 28, 2021

1    person to actually see this pattern.  Again, I think    07:49

2    we received 20 or 21 forms from these two providers    07:49

3    in the same day or within two or three days, and it    07:49

4    was -- again, it was so unusual that she brought it    07:49

5    to my attention and said, "What -- what should I do,    07:49

6    if anything?"    07:49

7        Q.    And what nurse was that?    07:49

8        A.    Kelly Crouch.    07:49

9        Q.    And what did you advise Ms. Crouch?    07:49

10        A.    I asked her to continue to monitor it and    07:49

11    to see what other forms -- if there was a continuing    07:49

12    pattern or not.    07:49

13        Q.    How long -- well, when did Ms. Crouch first    07:50

14    bring this to your attention?    07:50

15        A.    I don't remember the exact date.  It was    07:50

16    towards the middle of June 2017.    07:50

17        Q.    You would agree that the Collective    07:50

18    Bargaining Agreement requires disciplinary events to    07:50

19    occur in a certain period of time; right?    07:50

20        A.    Yes.    07:50

21        Q.    Okay.  And so you would agree that it would    07:50

22    be important to keep track of dates upon which this    07:50

23    potentially disciplinary conduct comes to your    07:50

24    attention; right?    07:50

25        A.    No.    07:50

42

```
 1        Q.    Well, you would agree that if disciplinary    07:50
 2   action isn't taken within a certain amount of time,     07:50
 3   as set forth in the Collective Bargaining Agreement,    07:50
 4   it could be overturned or improper; correct?           07:50
 5        A.    Yes.                                         07:50
 6        Q.    Okay.  And so how are you sure that those    07:50
 7   timelines were met based upon when you learned of       07:51
 8   this potential conduct?                                 07:51
 9        A.    That's the responsibility of our Labor       07:51
10   Relations team and our labor attorney, employment      07:51
11   attorneys to make sure that we adhere to the           07:51
12   provisions in the Collective Bargaining Agreement.     07:51
13        Q.    And what information did you provide to      07:51
14   those individuals to set -- or to establish the        07:51
15   timeline in which discipline needed to occur?          07:51
16        A.    When we had a sufficient number of          07:51
17   documents to suggest that we actually did have an      07:51
18   issue present in that area.                            07:51
19        Q.    And what did you determine to be the        07:51
20   sufficient number of documents?                        07:51
21        A.    I had no set number in mind.  We watched    07:51
22   the process for a couple, three weeks or so, and we    07:51
23   just continued to collect the information.  When we    07:52
24   had a significant volume over that time period is      07:52
25   when I approached our Law Department and ultimately    07:52
```

43

```
 1    Labor Relations, and they determined the appropriate    07:52
 2    timeline for the disciplinary process.                  07:52
 3        Q.    And what was that timeline based upon?         07:52
 4        A.    Again, you would have to ask other             07:52
 5    individuals.  I did not establish the timeline and I    07:52
 6    am not responsible for making those determinations.     07:52
 7        Q.    And so you'd have kept no records about any    07:52
 8    of the timing of these documents coming in or           07:52
 9    communications you had with anybody regarding them?     07:52
10        A.    No.                                            07:52
11        Q.    Okay.  The Charge Letter also stated that      07:52
12    the plaintiffs in this case, quote:                     07:53
13            "Attempted to defraud the                        07:53
14             company."                                       07:53
15          Is that right?                                     07:53
16        A.    Yes.                                            07:53
17        Q.    And what does it mean to attempt to defraud    07:53
18    the company with regard to these plaintiffs?            07:53
19        A.    Well, I think that's more of a legal           07:53
20    definition, and I defer to others to actually define    07:53
21    it for you.  My understanding is that they were         07:53
22    attempting to receive some sort of gain for             07:53
23    inappropriate reasons.                                  07:53
24        Q.    You testified in each of the investigations    07:53
25    for the plaintiffs; right?                              07:53
```

                                                                  44

| | | |
|---|---|---|
| 1 | A.   Yes. | 07:53 |
| 2 | Q.   And in so doing, you stated that you had | 07:53 |
| 3 | direct information about the information that was in | 07:53 |
| 4 | the Charge Letters; correct? | 07:53 |
| 5 | A.   Yes. | 07:53 |
| 6 | Q.   And so if you were unable to understand or | 07:53 |
| 7 | define what it meant to attempt to defraud the | 07:53 |
| 8 | company, you would have said so in the | 07:53 |
| 9 | investigation; correct? | 07:54 |
| 10 | A.   I would have made that statement, but, | 07:54 |
| 11 | again, my understanding of fraud is that it is | 07:54 |
| 12 | something that has to be determined by other | 07:54 |
| 13 | individuals.  I was merely presenting the | 07:54 |
| 14 | information, and the determination of whether it met | 07:54 |
| 15 | the threshold for the definition of fraud was not | 07:54 |
| 16 | mine to make.  It was for others to make that | 07:54 |
| 17 | determination. | 07:54 |
| 18 | So when I'm defining fraud, I'm using a | 07:54 |
| 19 | layman's understanding of the word, not the legal | 07:54 |
| 20 | definition. | 07:54 |
| 21 | Q.   Well, the charges state that the basis for | 07:54 |
| 22 | the charge is information that you provided on | 07:54 |
| 23 | July 14th that, quote: | 07:54 |
| 24 | "You were dishonest" -- meaning | 07:54 |
| 25 | the employee was dishonest -- | 07:54 |

45

| | | |
|---|---|---|
| 1 | "and attempted to defraud the | 07:54 |
| 2 | company and/or benefits | 07:54 |
| 3 | providers." | 07:54 |
| 4 | Correct? | 07:54 |
| 5 | A.    Yes. | 07:54 |
| 6 | Q.    So did you provide information that the | 07:54 |
| 7 | employees attempted to defraud the company? | 07:55 |
| 8 | A.    The information I presented was the | 07:55 |
| 9 | collection of COIIs and the concern that this | 07:55 |
| 10 | represented a pattern that could suggest something | 07:55 |
| 11 | else was happening in our environment that required | 07:55 |
| 12 | investigation. | 07:55 |
| 13 | Q.    Wouldn't that be a more appropriate basis | 07:55 |
| 14 | for an investigation rather than an accusation of | 07:55 |
| 15 | fraud? | 07:55 |
| 16 | A.    You would have to refer -- or I would defer | 07:55 |
| 17 | to others to follow the proper process for | 07:55 |
| 18 | scheduling and holding investigations under the | 07:55 |
| 19 | Collective Bargaining Agreement.  That's not my | 07:55 |
| 20 | area. | 07:55 |
| 21 | If our Labor Relations team, our field | 07:55 |
| 22 | administration team wrote the Charge Letter and it | 07:55 |
| 23 | was done in accordance with the requirements of the | 07:55 |
| 24 | labor agreement, again, that is not my area of | 07:55 |
| 25 | expertise.  I did not write the Charge Letter. | 07:55 |

46

Craig Heligman, M.D.                                                    April 28, 2021

```
 1        Q.   And then, similarly, what does it mean with    07:56

 2   regard to these plaintiffs that they attempted to       07:56

 3   defraud benefits providers?                             07:56

 4        A.   The concern was that, as it came to be        07:56

 5   identified afterwards, there were other issues going    07:56

 6   on in that local area with regards to potential for     07:56

 7   furloughs and for other things related to the           07:56

 8   various Collective Bargaining Agreement that would      07:56

 9   affect our employees.                                   07:56

10             So in our labor agreements, if someone is     07:56

11   furloughed, they will have a defined period of when     07:56

12   benefits will be continued.  If there are other         07:56

13   reasons for them to make changes under the labor        07:56

14   agreement, there would be other provisions similar      07:56

15   to that.  However, if the individual is off for         07:57

16   medical reasons, then those benefits could be           07:57

17   extended for up to two years.                           07:57

18             So the potential there was for an             07:57

19   inappropriate presentation for the purposes of          07:57

20   gaining their benefits under potentially fraudulent     07:57

21   circumstances, and that was the actual issue for        07:57

22   these investigations.                                   07:57

23        Q.   If an employee was terminated, what impact    07:57

24   would that have on their benefits?                      07:57

25        A.   If they are terminated, my understanding is   07:57
```

                                                                            47

Craig Heligman, M.D.                                         April 28, 2021

```
 1   their benefits are discontinued, but I'm not the     07:57
 2   expert in that area.  I would defer to, again, our    07:57
 3   Labor Relations and our legal team for that.          07:57
 4        Q.   How did you come to know that if an         07:57
 5   employee was off on medical, their benefits would     07:57
 6   extend for two years?                                 07:57
 7        A.   We deal with people that are off work for   07:58
 8   medical reasons pretty much every day, and so we do   07:58
 9   have an understanding of that part of the Collective  07:58
10   Bargaining Agreement.                                 07:58
11        Q.   Do you know what the cost to the company is 07:58
12   to provide benefits to an employee for two years?     07:58
13        A.   I don't know the specific cost.  The        07:58
14   cumulative cost for this group of individuals was     07:58
15   calculated and it was approximately $16,000 per       07:58
16   individual or over a million dollars for the group,   07:58
17   and that was a statement that was made in each of     07:58
18   the investigations.                                   07:58
19        Q.   And how was that calculation made?          07:58
20        A.   It was provided to me by other individuals  07:58
21   that made that calculation.                           07:58
22        Q.   Who provided that to you?                   07:58
23        A.   I actually don't remember.                  07:59
24        Q.   How do you know that it's accurate?         07:59
25        A.   Because it would have come from either our  07:59
```

48

```
 1    Law Department, our field administrative Labor     07:59
 2    Relations or benefits teams that would be able to  07:59
 3    calculate that information.  I'm not responsible for 07:59
 4    paying the premium.  We would have to have received 07:59
 5    that from another part of the company.             07:59
 6        Q.   And over what period of time were those   07:59
 7    dollar amounts calculated?                         07:59
 8        A.   It would have been for the two-year period 07:59
 9    of concern should someone be off work for medical  07:59
10    reasons.                                           07:59
11        Q.   Okay.  So it's your understanding that the 07:59
12    calculation of $16,000 per individual was the cost 07:59
13    of ensuring one employee for the period of         07:59
14    two years?                                         07:59
15        A.   That's generally my understanding, yes.   07:59
16        Q.   Okay.  And is it your understanding that  07:59
17    because the plaintiffs in this case were terminated, 08:00
18    that those benefits were not paid to them?         08:00
19        A.   That is my understanding, yes.            08:00
20        Q.   Okay.  And do you know what the cost of   08:00
21    benefits are for an employee who is furloughed?    08:00
22        A.   Again, the calculation for the monthly    08:00
23    benefits is dependent upon what those benefits are 08:00
24    under the agreement, and I don't know that answer. 08:00
25        Q.   Okay.  Was that information provided to you 08:00
```

                                                                      49

Craig Heligman, M.D.                                              April 28, 2021

```
 1   prior to you testifying in the formal          08:00

 2   investigations?                                08:00

 3        A.   That was not a calculation that was  08:00

 4   presented to me.  However, the -- I believe it was a  08:00

 5   four-month period -- I think it was a four-month  08:00

 6   period for those people that were entering into  08:00

 7   those furlough situations.                     08:00

 8             I don't know for those that were not  08:00

 9   furloughed, what they may have been able to receive.  08:00

10   I just know that for the two-year period, if they're  08:01

11   off for medical reasons, that their benefits --  08:01

12   their health benefits specifically would be    08:01

13   continued for two years.                       08:01

14        Q.   And which specific benefits providers did  08:01

15   the plaintiffs in this case attempt to defraud?  08:01

16        A.   It wasn't specifically the benefits  08:01

17   providers.  It was the company.  The company pays  08:01

18   the premium for the benefits.                  08:01

19        Q.   Okay.  So the language in the Charge Letter  08:01

20   that the plaintiffs in this case attempted to  08:01

21   defraud benefits providers is not accurate?    08:01

22        A.   The company provides the benefits.  If it  08:01

23   weren't for their employment, these benefits would  08:01

24   not have been offered.                         08:01

25        Q.   You sent letters to, among other people,  08:01
```

50

Craig Heligman, M.D.                                                    April 28, 2021

| | | |
|---|---|---|
| 1 | the Office of Inspector General for the Railroad | 08:02 |
| 2 | Retirement Board; correct? | 08:02 |
| 3 |     A.    Yes. | 08:02 |
| 4 |     Q.    Okay.  And the Railroad Retirement Board is | 08:02 |
| 5 | a benefits provider to these plaintiffs; right? | 08:02 |
| 6 |     A.    Yes. | 08:02 |
| 7 |     Q.    And you also copied that letter to Aetna; | 08:02 |
| 8 | is that right? | 08:02 |
| 9 |     A.    Yes. | 08:02 |
| 10 |     Q.    And is Aetna a benefits provider of these | 08:02 |
| 11 | plaintiffs? | 08:02 |
| 12 |     A.    Aetna is one of the three health care | 08:02 |
| 13 | insurance companies that provide health insurance | 08:02 |
| 14 | for craft employees under the national agreement. | 08:02 |
| 15 |     Q.    So they would be a benefits provider; | 08:02 |
| 16 | correct? | 08:02 |
| 17 |     A.    Yes. | 08:02 |
| 18 |     Q.    And the same for Highmark Blue Cross Blue | 08:02 |
| 19 | Shield? | 08:02 |
| 20 |     A.    Yes. | 08:02 |
| 21 |     Q.    And also United Healthcare? | 08:02 |
| 22 |     A.    Yes. | 08:02 |
| 23 |     Q.    And those were all benefits providers that | 08:02 |
| 24 | you copied on your letter to the Railroad Retirement | 08:02 |
| 25 | Board; correct? | 08:02 |

51

USCA4    1870

Craig Heligman, M.D.                                          April 28, 2021

| | | |
|---|---|---|
| 1 | A.   Correct. | 08:02 |
| 2 | MR. DINGWALL:  Okay.  We've been going for | 08:02 |
| 3 | about an hour. | 08:02 |
| 4 | Do you want to take, say, a five-minute | 08:03 |
| 5 | break? | 08:03 |
| 6 | MS. FOSTER BIRD:  Yeah, let's stick with | 08:03 |
| 7 | the five minutes if we can.  Yeah, that's great. | 08:03 |
| 8 | Thank you. | 08:03 |
| 9 | MR. DINGWALL:  Sounds good. | 08:03 |
| 10 | THE VIDEOGRAPHER:  Off the record at | 08:03 |
| 11 | 8:03 a.m. | 08:03 |
| 12 | (Recess taken.) | 08:08 |
| 13 | THE VIDEOGRAPHER:  We are back on the | 08:09 |
| 14 | record at 8:09 a.m. | 08:09 |
| 15 | BY MR. DINGWALL: | 08:09 |
| 16 | Q.   Dr. Heligman -- sorry.  Dr. Heligman, do | 08:09 |
| 17 | you understand that each of the plaintiffs in this | 08:09 |
| 18 | case were terminated from employment following the | 08:09 |
| 19 | formal investigations in which you testified? | 08:09 |
| 20 | A.   There were a few that were not, but most of | 08:09 |
| 21 | them, yes. | 08:09 |
| 22 | Q.   And I'm specifically referring to the | 08:09 |
| 23 | plaintiffs in this case. | 08:09 |
| 24 | So do you understand that they were all | 08:09 |
| 25 | terminated? | 08:09 |

52

```
 1        A.    Yes.                                      08:09

 2        Q.    Okay.  And do you understand that each of 08:09

 3   the plaintiffs in this case were fired because it   08:09

 4   was -- they were found to have violated CSX         08:09

 5   Operating Rule 104.2(a)?                            08:09

 6        A.    Yes.                                      08:09

 7        Q.    Okay.  And also that they were found to   08:09

 8   have violated the Code of Ethics policy?            08:09

 9        A.    Correct.                                  08:09

10        Q.    Okay.  And is it your understanding that  08:09

11   CSX Operating Rule 104.2(a) states, quote:          08:10

12              "Employee behavior must be               08:10

13               respectful and courteous.               08:10

14               Employees must not be any of            08:10

15               the following..."                       08:10

16        And then letter (a) is "dishonest"?            08:10

17        A.    Yes.                                      08:10

18        Q.    Okay.  And is it your understanding that  08:10

19   the specific portion of the ethics policy that the  08:10

20   plaintiffs in this case were found to have been     08:10

21   violated is with regard to fraud?                  08:10

22              THE WITNESS:  Mr. Dingwall, can I ask you 08:10

23   to hold for a second?  There's noise outside my room 08:10

24   and I need to ask them to be quiet.                08:10

25              MR. DINGWALL:  Sure.  Let's go -- let's go 08:10
```

53

USCA4    1872

Craig Heligman, M.D.                                                April 28, 2021

```
 1    off the record for a second.                      08:10
 2             THE VIDEOGRAPHER:  Off the record at 8:10   08:10
 3    a.m.                                               08:10
 4             (Recess taken.)                           08:10
 5             THE VIDEOGRAPHER:  Back on the record at  08:11
 6    8:11 a.m.                                          08:11
 7    BY MR. DINGWALL:                                   08:11
 8        Q.   All right.  Dr. Heligman, right before we 08:11
 9    took a little break there, I asked you if it was   08:11
10    your understanding that the portion of the ethics  08:11
11    policy that the plaintiffs in this case were found 08:11
12    to be in violation of refers to fraud?             08:11
13        A.   I believe that's correct, yes.            08:11
14        Q.   Okay.  What about the plaintiffs in this --08:11
15    well, I'm sorry.  Let me start over.               08:11
16             How were the employees in this case       08:11
17    dishonest under Rule 104.2(a)?                      08:11
18        A.   Again, the issue of dishonesty was the    08:11
19    determination of those individuals that determined 08:11
20    the outcome of the hearing and their discipline.   08:12
21    The -- my understanding is dishonesty was in that  08:12
22    they potentially presented information that misled 08:12
23    or was inappropriate at that moment in time.       08:12
24        Q.   So were the employees actually dishonest or08:12
25    were they potentially dishonest?                   08:12
```

54

Craig Heligman, M.D.                                                April 28, 2021

```
 1        A.   When I presented the information, it was to    08:12
 2   present the potential and whether or not it should      08:12
 3   be investigated.  The Charge Letter was a state --      08:12
 4   was a statement made that they were.                    08:12
 5             Again, the manner in which the Charge          08:12
 6   Letter is written is subject to interpretation by       08:12
 7   our field administration and Labor Relations team.      08:12
 8   They have to be written in such a manner in order to    08:13
 9   initiate the investigation and the hearing process.     08:13
10   They're being charged with this.  They're not being     08:13
11   found guilty at the time the Charge Letter is sent      08:13
12   out.  That is the purpose of the investigation and      08:13
13   the hearing.                                            08:13
14        Q.   You would agree that it would not be          08:13
15   appropriate to conduct formal investigations of        08:13
16   employees without a belief that they were actually      08:13
17   in violation of things with which they're charged;     08:13
18   right?                                                  08:13
19        A.   Yes.                                          08:13
20        Q.   Okay.  And that belief came from you;         08:13
21   correct?                                                08:13
22        A.   No.                                           08:13
23        Q.   Who was of the belief that the plaintiffs    08:13
24   in this case were in violation and needed to be        08:13
25   investigated?                                           08:13
```

                                                                     55

Craig Heligman, M.D.                                                    April 28, 2021

```
 1        A.    It would have been the drafters of the       08:13
 2   Charge Letter and ultimately the Charging Officer.      08:14
 3        Q.    The drafters of the Charge Letter and the    08:14
 4   Charging Officer were operating on information that     08:14
 5   was provided by you; correct?                           08:14
 6        A.    Yes.                                          08:14
 7        Q.    Okay.  Are you aware of anyone else that     08:14
 8   provided information that formed the basis of the       08:14
 9   Charge Letter and the formal investigation?             08:14
10        A.    Not to my knowledge.                         08:14
11        Q.    Okay.  Are you aware of anyone else besides  08:14
12   yourself that provided substantive testimony in the     08:14
13   formal investigations of the plaintiffs in this         08:14
14   matter?                                                 08:14
15        A.    Not to my knowledge.                         08:14
16        Q.    And how did the plaintiffs in this case      08:14
17   violate the ethics policy?                              08:14
18        A.    Again, that was the charge.  It was the      08:14
19   response of the -- of other individuals to write the    08:14
20   Charge Letter, make the charges.  I was presented at    08:15
21   the investigations as a witness.  The information       08:15
22   that led to that Charge Letter being written was        08:15
23   because I presented the information to those            08:15
24   individuals.                                            08:15
25             It was my concern that there was a            08:15
```

                                                                           56

USCA4    1875

```
 1   potential for dishonesty and potential for fraud.  I    08:15
 2   was not aware of why that may have been an issue,       08:15
 3   but it was a pattern amongst all of these employees     08:15
 4   that was suspect.  It wasn't an individual issue.       08:15
 5   It was simply a pattern of documentation, given the     08:15
 6   two practitioners in that geographical area, that       08:15
 7   was highly unusual.                                     08:15
 8          Whether or not it actually represented           08:15
 9   fraud or dishonesty was whether -- was the decision     08:15
10   of the individuals that reviewed the information I      08:15
11   provided and the results of the testimony at the --     08:15
12   collected at the time of the hearing, including my      08:15
13   own and those of the employees and any witnesses        08:16
14   that the employees chose to bring to the hearing.       08:16
15          There's likely other documents that may          08:16
16   have been reviewed outside of that that I was           08:16
17   unaware of, but the Charge Letter was written on the    08:16
18   basis of the information I presented.  Whether or       08:16
19   not it represented dishonesty or fraudulent behavior    08:16
20   on the part of the individual employee was not my       08:16
21   decision to make.                                       08:16
22      Q.   Are you aware of anybody at the company         08:16
23   besides yourself with a medical background that         08:16
24   reviewed the investigation transcripts of the           08:16
25   plaintiffs in this matter?                              08:16
```

57

Craig Heligman, M.D.                                              April 28, 2021

```
1        A.   I'm the only physician and was the only      08:16

2    physician at that time at this company.               08:16

3        Q.   Okay.  Are you aware of anyone from outside  08:16

4    of the company that reviewed the transcripts of the   08:16

5    formal investigations of the plaintiffs in this       08:17

6    matter?                                               08:17

7        A.   I don't know.                                08:17

8        Q.   Did you personally seek information from     08:17

9    anybody outside of the company regarding the charges  08:17

10   or your testimony in the formal investigations?       08:17

11       A.   No.                                          08:17

12       Q.   Was it your understanding that the           08:17

13   potential outcome of the formal investigations of     08:17

14   the plaintiffs in this matter would be dismissal?     08:17

15       A.   Yes.                                         08:17

16       Q.   And was it your understanding that the       08:17

17   company was going to rely on the testimony that you   08:17

18   provided in those investigations?                     08:17

19       A.   They would be relying on my testimony and    08:17

20   the testimony of the employees and the testimony      08:17

21   given of the Charging Officer and the                 08:17

22   decision-making that was conducted following          08:17

23   completion of the investigative hearings.  It was     08:17

24   not solely based upon my opinions or documents.       08:18

25       Q.   You intended for the company to rely on      08:18
```

                                                                        58

Craig Heligman, M.D.                                                April 28, 2021

```
 1    your testimony; right?                          08:18

 2        A.    No, sir.                              08:18

 3        Q.    You did not expect the company to lend any    08:18

 4    credibility to your testimony?                  08:18

 5        A.    That's not what I said.               08:18

 6        Q.    Okay.  So you expected, at least in part,    08:18

 7    for the company to rely on the testimony that you    08:18

 8    provided?                                       08:18

 9        A.    I expected them to look at the information    08:18

10    I presented and make a determination as to what the    08:18

11    next action should be.                          08:18

12        Q.    You understood that if the plaintiffs in    08:18

13    this case were fired following the formal        08:18

14    investigations, that they would lose their benefits;    08:18

15    correct?                                        08:18

16        A.    That was my understanding, yes.       08:18

17        Q.    And you voluntarily testified in each of    08:18

18    the formal investigations of the plaintiffs in this    08:18

19    matter; right?                                  08:19

20        A.    I was asked to provide that testimony and    08:19

21    be a witness on behalf of the company.          08:19

22        Q.    And who asked you to provide that     08:19

23    testimony?                                      08:19

24        A.    That would have been undoubtedly the team    08:19

25    from Labor Relations and our field administration    08:19
```

                                                              59

USCA4     1878

Craig Heligman, M.D.                                        April 28, 2021

1    team.                                              08:19

2        Q.    And how was that communicated to you?   08:19

3        A.    Either verbally or by e-mail.  As you   08:19

4    pointed out, I was the person that collected the  08:19

5    information and presented it to those other       08:19

6    individuals, and that was the collection of       08:19

7    information that initiated the decision-making on --  08:19

8    on their end.                                      08:19

9        Q.    Did you discuss the substance of the    08:19

10   testimony you were going to provide in the formal 08:19

11   investigations with anyone in the company?        08:19

12            MS. FOSTER BIRD:  I'm sorry.  I was on    08:19

13   mute.  I'm going to object to the extent that that 08:19

14   is anyone in the Law Department or in the Legal    08:20

15   Department.  Otherwise, you can answer.            08:20

16            THE WITNESS:  The decision was made by a  08:20

17   group of individuals coming to a conclusion.  I    08:20

18   can't, again, state who made the decision.  I spoke 08:20

19   with many people.  No one told me what to say in the 08:20

20   course of my testimony at those hearings.          08:20

21   BY MR. DINGWALL:                                   08:20

22       Q.    Did anybody in the company provide you with 08:20

23   guidance as to how to testify in the formal       08:20

24   investigations?                                    08:20

25            MS. FOSTER BIRD:  Again, same objection.  08:20

                                                              60

Craig Heligman, M.D.                                                        April 28, 2021

| | | |
|---|---|---|
| 1 | THE WITNESS:  The only thing that was | 08:20 |
| 2 | provided to me was a statement that I could read at | 08:20 |
| 3 | each of the individual hearings to make sure that | 08:20 |
| 4 | the information presented was represented | 08:20 |
| 5 | accurately. | 08:20 |
| 6 | And so the statement about the language in | 08:20 |
| 7 | the charge with the ethics information or the | 08:21 |
| 8 | language for that, the rule information, and the | 08:21 |
| 9 | calculation made on the total benefits that were at | 08:21 |
| 10 | issue, that was a written statement that was | 08:21 |
| 11 | provided so I could consistently provide that | 08:21 |
| 12 | information. | 08:21 |
| 13 | Otherwise, my instructions were to | 08:21 |
| 14 | basically answer the questions truthfully. | 08:21 |
| 15 | BY MR. DINGWALL: | 08:21 |
| 16 | Q.   Who provided that statement to you? | 08:21 |
| 17 | MS. FOSTER BIRD:  Objection to the extent | 08:21 |
| 18 | it was somebody in the Law Department, if it was. | 08:21 |
| 19 | THE WITNESS:  I don't know who the | 08:21 |
| 20 | actual -- I don't know who gave the final approval | 08:21 |
| 21 | to use that statement. | 08:21 |
| 22 | BY MR. DINGWALL: | 08:21 |
| 23 | Q.   How was the statement provided to you? | 08:21 |
| 24 | A.   It was -- it was handed to me, if I | 08:21 |
| 25 | remember correctly. | 08:21 |

61

USCA4    1880

Craig Heligman, M.D.                                          April 28, 2021

```
 1        Q.   And you don't recall who handed it to you?   08:21
 2        A.   It could have been one of our attorneys.     08:22
 3        Q.   And did you carry that statement with you    08:22
 4   to each of the investigations?                         08:22
 5        A.   Yes.                                          08:22
 6        Q.   And did you carry it in hard copy?           08:22
 7        A.   Yes.                                          08:22
 8        Q.   Did you provide it as an exhibit to any of   08:22
 9   the investigations?                                    08:22
10        A.   No.                                          08:22
11        Q.   Did you read it verbatim in each of the      08:22
12   investigations?                                        08:22
13        A.   Yes.                                          08:22
14        Q.   I'll introduce another exhibit.  This will   08:22
15   be Exhibit 2.  Let me know when you have it.           08:22
16             (Exhibit 2 was marked for identification and
17   attached to the transcript.)                           08:23
18             THE WITNESS:  Yes, I have it.                 08:23
19   BY MR. DINGWALL:                                       08:23
20        Q.   All right.  And this is a 13-page document,  08:23
21   so you should be able to page over using the arrows    08:23
22   on your screen there.                                  08:23
23        A.   Yes, I can.                                  08:23
24        Q.   Okay.  And if you need to take a moment to   08:23
25   look through all 13 pages, that's just fine, but the   08:23
```

62

Craig Heligman, M.D.                                                April 28, 2021

```
 1    first page is a letter dated July 14th, 2017, and      08:23
 2    it's on your letterhead to a Mr. William Fergus; is    08:23
 3    that right?                                            08:23
 4        A.   Yes, that's correct.                          08:23
 5        Q.   Okay.  And there's an attachment, and then    08:23
 6    there's another letter on Page 5 that's dated          08:23
 7    July 21, 2017, again, on your letterhead to a          08:23
 8    Mr. William Fergus; is that right?                     08:23
 9        A.   Yes.                                          08:24
10        Q.   And then on Page 7 of this exhibit is a       08:24
11    July 28, 2017 letter on your letterhead to             08:24
12    Mr. William Fergus as well; is that right?             08:24
13        A.   Yes, that's correct.                          08:24
14        Q.   All right.  And we talked about this a        08:24
15    little bit ago, but this is a letter that you sent     08:24
16    to the U.S. Railroad Retirement Board Office of        08:24
17    Inspector General; is that right?                      08:24
18        A.   Yes, sir, it is.                              08:24
19        Q.   Okay.  And in that letter, you stated that    08:24
20    you had suspicions in the past about the providers     08:24
21    removing your employees from work inappropriately;     08:24
22    is that right?                                         08:24
23        A.   Yes, that's correct.                          08:24
24        Q.   And the providers that you're referring to    08:24
25    in this letter were Dr. Johnson and Dr. Carey; is      08:24
```

63

```
 1   that right?                                   08:24

 2        A.    Yes, that's correct.               08:24

 3        Q.    What suspicions in the past did you have?  08:24

 4        A.    These individuals were -- many of our  08:25

 5   employees saw these individuals over time.  I don't  08:25

 6   remember the full length of time for either one of  08:25

 7   them.                                         08:25

 8            I know Dr. Johnson had been a practitioner  08:25

 9   in the area for a very long time.  My predecessor  08:25

10   had mentioned Dr. Johnson being a provider in that  08:25

11   area, so he was well aware of him for the duration  08:25

12   of his time here, and so Dr. Johnson was a known  08:25

13   entity.  Many of our employees saw him.  We received  08:25

14   many COIIs and other documents from Dr. Johnson  08:25

15   specifically, fewer from Dr. Carey.  And so we were  08:25

16   aware of both of the individuals.             08:25

17            The information that was presented was  08:25

18   provided consistent with how we received information  08:25

19   from other practitioners.  It would be submitted on  08:25

20   behalf of employees.  We knew that they were  08:26

21   practitioners in the area that our employees  08:26

22   preferred.  That wasn't a problem for us.  So we  08:26

23   just had a volume of information from both  08:26

24   practitioners.                                08:26

25            The difficulty was that, anecdotally, it  08:26
```

64

1    seemed to occur consistent with times when there may    08:26

2    have been reduced work and individuals were    08:26

3    furloughed for a short time.  Potentially it was for    08:26

4    work injuries, but the timing of -- so the kind of    08:26

5    things that Dr. Johnson and Dr. Carey were endorsing    08:26

6    were the same things that we saw in 2017, just not    08:26

7    in the same volume and not all at the same time.    08:26

8          So it was really -- there was no -- there    08:26

9    was consistency with how we received information.    08:26

10    Was this person potentially extending time off?    08:26

11    Well, not anymore, or less than perhaps other    08:26

12    providers and other employees have in the past from    08:27

13    time to time.    08:27

14          So we had concerns, but there wasn't    08:27

15    anything that we could say was clearly concerning    08:27

16    that we needed to look into it further.    08:27

17        Q.    Did you ever document those concerns?    08:27

18        A.    No, sir.    08:27

19        Q.    Did you ever contact Dr. Carey or    08:27

20    Dr. Johnson to discuss your concerns with them?    08:27

21        A.    I attempted to contact Dr. Johnson on one    08:27

22    occasion.    08:27

23        Q.    And when was that?    08:27

24        A.    It was either -- it was earlier in 2017, or    08:27

25    it could have been 2016.  I don't remember the exact    08:27

65

Craig Heligman, M.D.                                              April 28, 2021

```
 1    date.                                                08:27

 2        Q.   And was it prior to you sending this letter  08:27

 3    to Mr. Fergus on July 14th, 2017?                    08:27

 4        A.   My recollection had nothing to do with this  08:27

 5    incident that we're discussing today.               08:27

 6        Q.   Okay.  And did you, in fact, talk to        08:27

 7    Dr. Johnson?                                         08:27

 8        A.   No.                                          08:28

 9        Q.   Did you ever send a letter or an e-mail to  08:28

10    Dr. Johnson letting him know that you'd like to     08:28

11    speak with him?                                      08:28

12        A.   No.                                          08:28

13        Q.   And what about Dr. Carey?                    08:28

14        A.   No.                                          08:28

15        Q.   Did you ever contact any of the employees   08:28

16    prior to July of 2017 who treated with Dr. Carey or  08:28

17    Dr. Johnson to let them know you had concerns?       08:28

18        A.   No.                                          08:28

19        Q.   So your -- the suspicions that you refer to  08:28

20    in this letter to Mr. Fergus on July 14th, 2017,    08:28

21    were anecdotal; is that right?                       08:28

22        A.   Yes, that's correct.                        08:28

23        Q.   Okay.  And you also refer in this letter to  08:28

24    patterns that were clearly fraudulent; is that      08:28

25    right?                                               08:29
```

                                                                    66

Craig Heligman, M.D.                                            April 28, 2021

```
1        A.    I said we were not able to identify        08:29

2   patterns that were clearly fraudulent.               08:29

3        Q.    So in making that statement, was it -- were  08:29

4   you communicating to Mr. Fergus that you now          08:29

5   believed you did have a pattern that was clearly      08:29

6   fraudulent?                                           08:29

7        A.    I was, again, identifying that there was a  08:29

8   pattern that was of concern that had the potential   08:29

9   for fraudulent behavior, and I was asking -- I was   08:29

10  notifying Mr. Fergus to make the determination as to  08:29

11  whether or not it meant -- or it met their            08:29

12  definition of fraudulent behavior for the purposes    08:29

13  of administering the RRB benefits.                    08:29

14       Q.    And you understood that you sending this    08:29

15  letter to Mr. Fergus had the potential of causing    08:29

16  the Railroad Retirement Board to deny benefits to    08:30

17  the employees in question; right?                     08:30

18       A.    There was that potential, yes.             08:30

19       Q.    Okay.  And you understood that when you     08:30

20  sent this letter?                                     08:30

21       A.    Yes, I did.                                 08:30

22       Q.    And you wrote this letter in -- and         08:30

23  provided your professional medical opinions;         08:30

24  correct?                                              08:30

25       A.    I provided my opinions.                     08:30
```

                                                                67

Craig Heligman, M.D.                                      April 28, 2021

```
 1        Q.   Your professional medical opinion; correct?   08:30

 2        A.   The medical opinion was -- as I stated        08:30

 3   there, in my professional medical opinion -- that       08:30

 4   the providers continued to keep employees off work      08:30

 5   for much longer than is medically appropriate.  That    08:30

 6   was my medical opinion.                                 08:30

 7        Q.   Okay.  What was the basis for your medical     08:30

 8   opinion that you provided to Mr. Fergus?                08:30

 9        A.   The time period in which the employees had     08:30

10   remained off work for relatively minor                  08:30

11   musculoskeletal conditions.  I've been a practicing     08:30

12   physician for over 30 years now, and they also          08:31

13   exceeded the general guidelines from the major          08:31

14   references that discuss expectations for disability,    08:31

15   periods of times for various medical conditions.        08:31

16             In this case, the time periods were           08:31

17   significantly in excess of what my clinical             08:31

18   experience was as well as the medical references        08:31

19   that are published.                                     08:31

20        Q.   You conclude your letter to Mr. Fergus on     08:31

21   Page 2 of Exhibit 2 by, quote, saying:                  08:31

22             "I strongly urge you to fully                 08:31

23                investigate all of these cases             08:31

24                for potential conspiracy to                08:31

25                defraud RRB sickness and                   08:31
```

68

```
 1                    disability benefit programs by      08:31
 2                    our employees and their             08:31
 3                    chiropractors."                     08:31
 4             Is that right?                             08:31
 5        A.    Yes, that's correct.                      08:31
 6        Q.    Okay.  And what is the basis for your claim  08:31
 7   that there was a conspiracy with regard to the      08:32
 8   plaintiffs in this case?                            08:32
 9        A.    There was a large volume of individuals all  08:32
10   from the same geographical area all seeing the same  08:32
11   two practitioners.  That was the basis.             08:32
12        Q.    Okay.  Did you have any information that  08:32
13   led you to believe that these employees had all    08:32
14   gotten together and decided that they were going to  08:32
15   do this?                                            08:32
16        A.    I do not know what those employees did on  08:32
17   their own time.                                     08:32
18        Q.    Do you have -- did you have any information  08:32
19   that led you to believe that the doctors, Dr. Carey  08:32
20   and Dr. Johnson, got together and decided that they  08:32
21   were going to attempt to defraud benefit providers?  08:32
22        A.    I do not know what either provider's      08:32
23   intentions were.                                    08:32
24        Q.    Did you have any information that Dr. Carey  08:32
25   or Dr. Johnson got together with these employees   08:32
```

69

Craig Heligman, M.D.                                      April 28, 2021

```
 1    specifically and decided that they were going to      08:32

 2    attempt to defraud benefits providers?                08:33

 3        A.    I have no knowledge as to what discussions   08:33

 4    took place between the practitioners and their        08:33

 5    patients.                                             08:33

 6        Q.    And so when you sent this letter on         08:33

 7    July 14th, 2017, to Mr. Fergus, you had no evidence   08:33

 8    whatsoever that there was any fraud committed by      08:33

 9    anybody; correct?                                     08:33

10        A.    Again, I was identifying a pattern that we  08:33

11    saw, and I was urging Mr. Fergus to investigate       08:33

12    that.  The context is that there had already been a   08:33

13    major issue with another railroad where there was     08:33

14    identification of fraud for similar reasons.          08:33

15            Also I -- pardon me?                          08:33

16        Q.    Go ahead.                                   08:33

17        A.    Also I had just completed my responsibility 08:33

18    as the designated industry representative to the      08:33

19    Disability Advisory Committee for the RRB, so         08:33

20    these -- this information was fresh in my memory.     08:34

21            I was aware of the RRB and what they did      08:34

22    and what their responsibilities were.  I also knew    08:34

23    that they had investigated the prior issues from the  08:34

24    other railroad, and so I urged them to, again,        08:34

25    consider this in our case and to investigate it.      08:34
```

                                                            70

```
 1              My urging was to investigate it, not to      08:34
 2      make any decisions on their behalf.                  08:34
 3          Q.   What other railroad was investigated by the 08:34
 4      RRB?                                                  08:34
 5          A.   The Long Island Railroad.                   08:34
 6          Q.   And when was that?                          08:34
 7          A.   I want to -- I don't remember the exact     08:34
 8      dates.  I want to say it was somewhere in the 2008   08:34
 9      time period.  It was -- there are many articles in   08:34
10      the lay press that discusses it.  I'd have to pull   08:34
11      those out and look at the exact dates for you if you 08:35
12      need me to.                                          08:35
13          Q.   This July 14th letter that you sent to      08:35
14      Mr. Fergus has an attachment, which is a spreadsheet 08:35
15      essentially, containing a number of employees who    08:35
16      you believed submitted potentially fraudulent        08:35
17      documentation from Dr. Carey and Dr. Johnson; is     08:35
18      that right?                                          08:35
19          A.   Yes.                                        08:35
20          Q.   Okay.  And it was your desire that the RRB  08:35
21      would investigate those individual employees that    08:35
22      you listed in that spreadsheet; correct?             08:35
23          A.   I left up to Mr. Fergus to determine how to 08:35
24      conduct his investigation.                           08:35
25          Q.   But you strongly urged him to fully         08:35
```

71

Craig Heligman, M.D.                                            April 28, 2021

```
 1   investigate them; correct?                      08:35

 2        A.    I strongly urged him to investigate the   08:35

 3   individuals listed and what that meant for the RRB.  08:35

 4        Q.    And you sent this letter to the RRB but   08:35

 5   also copied, as we discussed earlier, Aetna,    08:35

 6   Highmark Blue Cross Blue Shield, and United     08:36

 7   Healthcare; correct?                            08:36

 8        A.    Yes.  And I also copied the Ohio State   08:36

 9   Chiropractic Board and the -- excuse me -- Kentucky  08:36

10   Board of Chiropractic Examiners.                08:36

11        Q.    And was it your hope, in copying those   08:36

12   entities, that they would also investigate these   08:36

13   employees and chiropractors?                    08:36

14        A.    It was my intent that all of these parties   08:36

15   should investigate and make determinations for   08:36

16   themselves as to what to do with the information.   08:36

17        Q.    And you understood, in sending this letter   08:36

18   to Aetna, Highmark, and United Healthcare, that it   08:36

19   had the potential to cause these employees to lose   08:36

20   benefits from those providers; correct?         08:36

21        A.    I knew that it had the potential, yes.   08:36

22        Q.    And you knew that in sending this letter to   08:36

23   the Ohio State Chiropractic Board and the Kentucky   08:36

24   Board of Chiropractic Examiners, that it had the   08:37

25   potential to cause either disciplinary or licensing   08:37
```

72

Craig Heligman, M.D.                                      April 28, 2021

```
 1    issues for Dr. Carey and Dr. Johnson; correct?      08:37

 2        A.    That is the purpose for the boards, so yes. 08:37

 3        Q.    Okay.  Did Mr. Fergus ever respond to your  08:37

 4    letter?                                              08:37

 5        A.    He did respond and he acknowledged the      08:37

 6    acceptance of the -- the receipt of the information. 08:37

 7        Q.    Beyond that communication, did you receive  08:37

 8    any other communication from the Railroad Retirement 08:37

 9    Board with regard to this matter?                    08:37

10        A.    Over time since then I was advised that it  08:37

11    was sent to an investigations team.  I believe       08:37

12    they're out of Philadelphia.  I don't know what the  08:37

13    outcome was of the RRB investigation.                08:37

14        Q.    Okay.  You've never been notified that the  08:37

15    RRB found any wrongdoing; is that right?             08:37

16        A.    No, I was never notified of any outcome.    08:38

17        Q.    Okay.  And were you ever notified by Aetna  08:38

18    that they found any wrongdoing?                      08:38

19        A.    No.                                        08:38

20        Q.    Were you ever notified by Highmark Blue     08:38

21    Cross Blue Shield that they found any wrongdoing?    08:38

22        A.    No.                                        08:38

23        Q.    Were you ever notified by United Healthcare 08:38

24    that they found any wrongdoing?                      08:38

25        A.    No.                                        08:38
```

73

Craig Heligman, M.D.                                          April 28, 2021

| | | |
|---|---|---|
| 1 | Q.   And are you aware that the Ohio and | 08:38 |
| 2 | Kentucky Chiropractic Boards dismissed the | 08:38 |
| 3 | complaints that you made against Dr. Johnson and | 08:38 |
| 4 | Dr. Carey? | 08:38 |
| 5 | A.   I received a letter from one of them, but I | 08:38 |
| 6 | understand that neither board had any reason to take | 08:38 |
| 7 | any action. | 08:38 |
| 8 | Q.   Are you aware of any independent entity or | 08:38 |
| 9 | organization that has found any wrongdoing with | 08:38 |
| 10 | regard to the plaintiffs in this matter or | 08:39 |
| 11 | Dr. Johnson and Dr. Carey? | 08:39 |
| 12 | A.   No. | 08:39 |
| 13 | Q.   What was the volume of COII forms that CSX | 08:39 |
| 14 | received in 2017? | 08:39 |
| 15 | A.   The total volume? | 08:39 |
| 16 | Q.   Yes. | 08:39 |
| 17 | A.   I don't know.  Hundreds, potentially | 08:39 |
| 18 | thousands. | 08:39 |
| 19 | Q.   Okay.  Is there any way to look that | 08:39 |
| 20 | information up? | 08:39 |
| 21 | A.   No, not without hand-counting every fax | 08:39 |
| 22 | that we received and identifying what that fax was. | 08:39 |
| 23 | Q.   Did you attempt to do that at any time in | 08:39 |
| 24 | 2017? | 08:39 |
| 25 | A.   No. | 08:39 |

74

Craig Heligman, M.D.                                                April 28, 2021

```
 1        Q.   What was the volume of COII forms that CSX   08:40
 2   received from the Tri-State area in 2017?              08:40
 3        A.   I don't know.                                08:40
 4        Q.   And when I say "Tri-State area," I'm         08:40
 5   referring to Kentucky, Ohio, and West Virginia.        08:40
 6             Can we agree on that?                        08:40
 7        A.   Yes.                                         08:40
 8        Q.   Okay.  And is your answer still the same?    08:40
 9        A.   Yes.                                         08:40
10        Q.   Okay.  How many CSX employees are there --   08:40
11   I'm sorry.  Let me back up.                            08:40
12             How many CSX agreement employees are there   08:40
13   in the Tri-State area?                                 08:40
14        A.   I don't know.                                08:40
15        Q.   How many CSX employees were there in the     08:40
16   Tri-State area in 2017?                                08:40
17        A.   I don't know.                                08:40
18        Q.   How many CSX employees in the Tri-State      08:40
19   area treated with any kind of medical professional     08:40
20   in 2017?                                               08:41
21        A.   I don't know.                                08:41
22        Q.   What percentage of the CSX workforce in the  08:41
23   Tri-State area submitted COII forms in 2017?           08:41
24        A.   I don't know that either.                    08:41
25        Q.   How was it that you determined that the      08:41
```

                                                               75

USCA4    1894

```
 1   volume of COII forms that you received in 2017 was      08:41
 2   any different than you had received at any other        08:41
 3   point in time?                                          08:41
 4       A.   Oh, at that point in time, I think we had      08:41
 5   approximately 21,000 employees scattered across the     08:41
 6   eastern United States.  For us to receive the kind      08:41
 7   of volume we did at that point in time from a single    08:41
 8   or a couple of practitioners in that very short         08:41
 9   period of time, we just never had seen that before.     08:41
10   Usually we get one or two.  We may get one from a       08:41
11   practitioner and never see that practitioner again.     08:42
12           So for me to actually be aware and come to      08:42
13   recognize the name of any treating provider is          08:42
14   pretty rare.  There's a handful that I can tell you     08:42
15   I probably would recognize their names and have some    08:42
16   understanding of -- of estimating the volume of         08:42
17   cases.  But the reality is there are so many            08:42
18   practitioners and so many employees that there's no     08:42
19   pattern that could be identified.                       08:42
20           This was the only time that we saw so many      08:42
21   documents in a short time from a very limited number    08:42
22   of practitioners.  It's just never happened.  We had    08:42
23   never identified this pattern at any other time with    08:42
24   me being at CSX and, to my knowledge, in any time       08:42
25   that we had this process established at CSX.  In        08:43
```

Craig Heligman, M.D.                                    April 28, 2021

```
 1   fact, in my career, I'd never seen this happen        08:43

 2   before.                                               08:43

 3       Q.   How do you know that you had -- it had       08:43

 4   never happened before?                                08:43

 5       A.   Again, in my capacity as a Chief Medical     08:43

 6   Officer or in my capacity in other organizations      08:43

 7   where I had previously worked doing the similar kind  08:43

 8   of work, you have an understanding of the workforce,  08:43

 9   you have an understanding of the spread, but you      08:43

10   don't necessarily take issue with any one provider    08:43

11   or any one geographical area.                         08:43

12           There's just so much that comes across that   08:43

13   there's no pattern to it.  We can't state, with any   08:43

14   high degree of confidence, that this one              08:43

15   practitioner saw employees in a geographical area     08:43

16   like this.                                            08:44

17           This was unique.  The first -- the first      08:44

18   time we saw it when we had 20 or so forms come in on  08:44

19   the exact same day -- and looking at the dates, I     08:44

20   think at one point I calculated on the dates of the   08:44

21   last visit that Dr. Johnson had at least a day when   08:44

22   all he saw were CSX employees at this moment in       08:44

23   time.                                                 08:44

24           I had never come across that before.  My      08:44

25   team had never come across that before.  This was an  08:44
```

                                                          77

Craig Heligman, M.D.                                                    April 28, 2021

```
 1   extremely unique set of circumstances.              08:44

 2        Q.   Given that there is no requirement that an  08:44

 3   employee submit a COII form, it's possible, isn't   08:44

 4   it, that CSX employees could be treating with the   08:44

 5   same treater all the time and you would not know?   08:44

 6        A.   That is correct.  Employees may seek       08:44

 7   treatment from any practitioner they desire, and if 08:44

 8   they see a practitioner and they don't make us aware 08:45

 9   of it, I would have no way of knowing.              08:45

10        Q.   So you don't actually know if there was a  08:45

11   pattern other than in this particular instance COII 08:45

12   forms were submitted; correct?                      08:45

13        A.   I can only make comments on the information 08:45

14   that we do receive, not on the information we don't 08:45

15   receive.                                            08:45

16        Q.   And you made the comment that there was a  08:45

17   day that Dr. Johnson only saw CSX employees; is that 08:45

18   right?                                              08:45

19        A.   No, sir.                                  08:45

20             What I said was that when I looked at the  08:45

21   date -- last date of service on the -- that was     08:45

22   provided on the forms, there are large enough people 08:45

23   that were seen on that date where, in my estimation, 08:45

24   assuming an average time for an appointment that we 08:45

25   generally go by for physicians and the number of    08:45
```

78

Craig Heligman, M.D.                                          April 28, 2021

```
 1    hours in a given day that is a standard workday for    08:45
 2    a provider, my conclusion was it's likely that this    08:46
 3    group of employees -- or Dr. Johnson had only seen     08:46
 4    CSX employees on that particular day.                  08:46
 5          I'm not saying he did or didn't.  I'm just       08:46
 6    saying, based on my knowledge about standards of       08:46
 7    practice in a clinic, it seemed odd that you would     08:46
 8    only see employees from one employer on any one day.   08:46
 9    It can happen, particularly if you have a small town   08:46
10    where there's a limited group of practitioners and,    08:46
11    say, you have an employer that has a relationship      08:46
12    with a practitioner in the town and they want all      08:46
13    their employees seen for a particular exam.  That      08:46
14    happens with some level of frequency.                  08:46
15          But in this case, that wasn't the scenario.      08:46
16    It just seemed unusual for a practitioner when there   08:46
17    are many chiropractic providers in that Tri-State      08:46
18    area -- and I don't know the full number.  I just      08:47
19    know what we see -- but there are a large enough       08:47
20    number of chiropractic practitioners in that area to   08:47
21    make the statement that this was unusual.              08:47
22          Why would so many employees seek care from       08:47
23    Dr. Johnson on the same day?  I don't have an answer   08:47
24    for that.  I'm just saying it piqued my curiosity      08:47
25    and I wanted to try to figure out why this situation   08:47
```

                                                              79

```
 1   was occurring.                                    08:47

 2       Q.   You would agree that it would be important  08:47

 3   to answer that question prior to terminating the  08:47

 4   employment of this many employees; right?         08:47

 5       A.   That was the purpose of the investigation.  08:47

 6       Q.   And what was learned in the investigation  08:47

 7   that gave you an answer to that question?         08:47

 8       A.   Clearly the decision-makers that reviewed  08:47

 9   the testimony, that reviewed the transcripts,     08:47

10   reviewed whatever other information they had at hand  08:47

11   thought they had enough information to make a      08:48

12   determination that, in fact, the employees were   08:48

13   guilty of those charges.                          08:48

14       Q.   Are you aware of anybody else that -- are  08:48

15   you aware of anybody at CSX that ever contacted    08:48

16   Dr. Johnson or Dr. Carey regarding the plaintiffs in  08:48

17   this case?                                         08:48

18       A.   I have no knowledge of that.              08:48

19       Q.   And are you aware of anyone in the company  08:48

20   that contacted the plaintiffs in this case prior to  08:48

21   the formal investigations to ask them to provide   08:48

22   additional information regarding their treatment?  08:48

23       A.   I have no knowledge of that.              08:48

24       Q.   And so while you wanted an answer to the   08:48

25   question of why these employees were treating with  08:48
```

                                                                        80

Craig Heligman, M.D.                                                      April 28, 2021

```
 1    these two particular providers, you made no effort    08:48
 2    to find that out; is that right?                      08:48
 3        A.   The issue was of the pattern.  The           08:48
 4    requirement of the employee is to provide the         08:48
 5    information necessary in -- under the Collective      08:49
 6    Bargaining Agreement.  This pattern of documents      08:49
 7    that we received was unusual.  The issue wasn't the   08:49
 8    medical information on the documents, per se.  The    08:49
 9    issue was the volume of forms we received.            08:49
10            As I used as an analogy earlier, if the --    08:49
11    if the group that managed our expense accounts and    08:49
12    reviewed those reports saw a similar volume of a      08:49
13    similar nature from a limited group of employees in   08:49
14    a limited geographical area, they wouldn't be         08:49
15    calling the vendors where the money was spent and     08:49
16    ask them why this happened.                           08:49
17            They would, however, potentially take it to   08:49
18    someone internally to the company to inquire whether  08:49
19    or not we should investigate this further.  And       08:49
20    that's what I did.                                    08:49
21        Q.   You would agree that all of the plaintiffs   08:49
22    in this case complied with the requirements of the    08:50
23    Collective Bargaining Agreement with regard to the    08:50
24    documentation that they needed to provide; correct?   08:50
25        A.   Yes.                                         08:50
```

81

USCA4    1900

Craig Heligman, M.D.                                                    April 28, 2021

```
 1         Q.    At some point, you heard about an          08:50

 2   announcement -- well, actually, let me step back for   08:50

 3   a second.                                              08:50

 4              How many chiropractors are there -- well,   08:50

 5   let me step back.                                      08:50

 6              How many chiropractors were there in 2017   08:50

 7   in the Tri-State area?                                 08:50

 8              MS. FOSTER BIRD:  May I -- before we go any  08:50

 9   further, let me qualify this Tri-State thing.          08:50

10              Are you saying all of Kentucky, all of      08:50

11   Ohio, all of West Virginia?  Is that what you're       08:50

12   calling the Tri-State, or are you geographically       08:50

13   limiting it?                                           08:50

14              MR. DINGWALL:  I'm calling it all three of  08:50

15   those areas.                                           08:50

16              MS. FOSTER BIRD:  All three -- all three    08:50

17   whole states?                                          08:50

18              MR. DINGWALL:  All three whole states.      08:50

19              MS. FOSTER BIRD:  Okay.                     08:50

20              Go ahead.  I'm sorry.                       08:50

21              THE WITNESS:  That's okay.                  08:50

22              I have no idea -- as I stated before, I     08:50

23   have no idea what the total number of chiropractic     08:50

24   professionals are in the Tri-State area that were      08:51

25   discussed.                                             08:51
```

                                                                        82

```
1    BY MR. DINGWALL:                                   08:51

2         Q.   Do you have any knowledge of how many    08:51

3    chiropractors there were within a 25-mile radius of 08:51

4    Huntington, West Virginia in 2017?                 08:51

5         A.   I have no idea.                          08:51

6         Q.   How about a 50-mile radius?              08:51

7         A.   I have no idea.                          08:51

8         Q.   Do you know if there were any other      08:51

9    chiropractors in 2017 in that area besides Dr. Carey 08:51

10   and Dr. Johnson?                                   08:51

11        A.   Yes.                                     08:51

12        Q.   And who were they?                       08:51

13        A.   I don't recall their names.  We receive  08:51

14   forms from multiple chiropractors in that          08:51

15   geographical area besides Dr. Carey and Dr. Johnson. 08:51

16   I don't recall.                                    08:51

17        Q.   So you do have -- so you do have an idea of 08:51

18   how many chiropractors there were in the area at the 08:51

19   time?                                              08:51

20        A.   No, sir, I don't.  In order to do that, I 08:51

21   would need to go through the licensing and their   08:51

22   addresses and do a count.                          08:51

23             So I don't know.  If you'd like to consult 08:51

24   the state licensing boards, I'm sure they can      08:51

25   provide that count for you, but I'm not able to.   08:52
```

                                                            83

1    All I can tell you is that we have seen documents        08:52

2    from several other chiropractic professionals in         08:52

3    that area, but we have never seen the large volume        08:52

4    of documents from those professionals as we had with     08:52

5    Dr. Carey and Dr. Johnson.                                08:52

6         Q.   You would agree that in order to make a         08:52

7    determination as to the propriety of these two           08:52

8    providers treating this many employees, it would be      08:52

9    incumbent upon you to determine how many other           08:52

10   providers there were?                                     08:52

11        A.   No, sir, it's not.                              08:52

12        Q.   Okay.  And you would also agree that in         08:52

13   determining whether these chiropractors were             08:52

14   properly treating these employees, it would be           08:52

15   incumbent to reach out to other chiropractors in the     08:52

16   area?                                                     08:52

17        A.   No, sir, it is not necessary for that.          08:53

18        Q.   Okay.  Now, at some point in June or July       08:53

19   of 2017, you learned about an announcement of the        08:53

20   reduction of forces in or around the Huntington,         08:53

21   West Virginia area; is that right?                        08:53

22        A.   Yes, sir.                                        08:53

23        Q.   Okay.  And when did you learn about the         08:53

24   announcement of the reduction in forces?                  08:53

25        A.   It was sometime following the receipt of        08:53

84

| | | |
|---|---|---|
| 1 | the initial batch of documents. | 08:53 |
| 2 | Q.   And when you say "initial batch of | 08:53 |
| 3 | documents," you're referring to the COII forms? | 08:53 |
| 4 | A.   Yes, sir. | 08:53 |
| 5 | Q.   And you don't know when you actually first | 08:53 |
| 6 | received that initial batch? | 08:53 |
| 7 | A.   Again, I don't recall the dates.  I'm sure | 08:53 |
| 8 | if you have them in front of you, we can look and | 08:53 |
| 9 | see, but I don't recall the exact dates. | 08:53 |
| 10 | Q.   And you have no way of figuring out that | 08:53 |
| 11 | information? | 08:53 |
| 12 | A.   Not without looking at the documents. | 08:53 |
| 13 | Q.   Okay.  And what did you learn about the | 08:53 |
| 14 | announcement of the reduction in forces? | 08:54 |
| 15 | A.   Just that.  I was made aware that there | 08:54 |
| 16 | were furloughs that were going to take place in that | 08:54 |
| 17 | area and it affected several different crafts. | 08:54 |
| 18 | There may have been some other agreements that were | 08:54 |
| 19 | going to be exercised.  That part wasn't discussed | 08:54 |
| 20 | with me.  I was just told about the idea that there | 08:54 |
| 21 | were going to be furloughs in that area and they had | 08:54 |
| 22 | a list of individuals to be named that was based on | 08:54 |
| 23 | their seniority. | 08:54 |
| 24 | Q.   How did you learn about the announcement of | 08:54 |
| 25 | the reduction in forces? | 08:54 |

Craig Heligman, M.D.                                          April 28, 2021

```
 1       A.   I believe that actually came from a person   08:54
 2   in Labor Relations, and I don't recall who actually   08:54
 3   told me.                                               08:54
 4       Q.   How was it communicated to you?              08:54
 5       A.   Verbally.                                    08:54
 6       Q.   And were there any e-mail communications     08:55
 7   that you were aware of about the potential -- or       08:55
 8   about the force reductions?                            08:55
 9       A.   I don't recall.                              08:55
10       Q.   Do you know why that information was         08:55
11   communicated to you?                                   08:55
12       A.   You would have to ask others as to why, but  08:55
13   my understanding was it coincided with me presenting   08:55
14   the COII information to our legal and Labor            08:55
15   Relations groups, and they, in turn, told me that     08:55
16   this was taking place.  And the assumption was there  08:55
17   was some -- some level of connection between the      08:55
18   two -- two of them.                                    08:55
19       Q.   Okay.  How often in your career have you     08:55
20   been notified about force reductions?                  08:55
21       A.   Never.  This was the first.                  08:55
22       Q.   And how, if at all, did you consider that    08:55
23   information about the force reductions with regard     08:56
24   to the COII forms that you received?                   08:56
25       A.   It had the potential to explain some of the  08:56
```

                                                              86

Craig Heligman, M.D.                                        April 28, 2021

```
 1   behavior.                                         08:56

 2        Q.   How so?                                 08:56

 3        A.   As we discussed earlier, their benefits --   08:56

 4   if they were off work for medical reasons, then  08:56

 5   their benefits would be extended longer than what   08:56

 6   they would have otherwise received in the course of   08:56

 7   being furloughed.                                 08:56

 8        Q.   Did you cross-reference those individuals   08:56

 9   who were set to be furloughed with those individuals   08:56

10   who submitted COII forms from Dr. Johnson and     08:56

11   Dr. Carey?                                        08:56

12        A.   I did not, but I believe our Labor      08:56

13   Relations and field administration teams did that   08:56

14   correlation.                                      08:56

15        Q.   Okay.  The conditions noted on the COII   08:56

16   forms by Dr. Johnson and Dr. Carey were all       08:57

17   relatively minor musculoskeletal conditions; right?   08:57

18        A.   Yes, sir.                               08:57

19        Q.   And that was what you understood based on   08:57

20   your review of those COII forms; right?           08:57

21        A.   Yes, that's correct.                    08:57

22        Q.   Okay.  And as a general matter, you don't   08:57

23   consider relatively minor musculoskeletal conditions   08:57

24   to be abnormal, do you?                           08:57

25        A.   No, sir.                                08:57
```

87

Craig Heligman, M.D.                                                    April 28, 2021

```
 1        Q.   It's probably safe to say that a          08:57
 2   significant portion of the population has some       08:57
 3   relatively minor musculoskeletal condition; right?   08:57
 4        A.   The medical literature would support nearly 08:57
 5   a hundred percent of the adult population would      08:57
 6   experience minor musculoskeletal conditions.         08:57
 7        Q.   Okay.  And given that, you certainly       08:57
 8   wouldn't find it abnormal for a railroad worker to   08:57
 9   have a relatively minor musculoskeletal condition;   08:57
10   right?                                               08:58
11        A.   That's correct.                            08:58
12        Q.   Okay.  The opinions you offered in the     08:58
13   formal investigations of the plaintiffs in this case 08:58
14   were your medical opinions; is that right?           08:58
15        A.   They're opinions that I made as -- in my   08:58
16   position of the Chief Medical Officer, so, yes,      08:58
17   there were some medical opinions.  But I am also an  08:58
18   employee of the organization with administrative     08:58
19   responsibility, so I was also making comments with   08:58
20   reference to my administrative role within the       08:58
21   organization.                                        08:58
22        Q.   The testimony that you provided in the     08:58
23   formal investigation included your opinions as to    08:58
24   the propriety of the treatment that was provided by  08:58
25   Dr. Johnson and Dr. Carey to the plaintiffs; right?  08:58
```

88

Craig Heligman, M.D.                                                April 28, 2021

```
 1        A.    I did make comments with regard to my       08:58
 2   observations as to the diagnoses listed and the        08:58
 3   length of time that both Dr. Carey and Dr. Johnson     08:58
 4   were listing on the forms.                             08:59
 5        Q.    Okay.  And those opinions that you offered   08:59
 6   in the formal investigations were based on diagnoses   08:59
 7   you made; correct?                                     08:59
 8        A.    No, sir.  They were based on the diagnoses  08:59
 9   listed by the treating providers.                      08:59
10        Q.    But it was your opinion that the course of   08:59
11   treatment pursued by Dr. Johnson and Dr. Carey was     08:59
12   not appropriate given the diagnoses; is that right?    08:59
13        A.    No.                                          08:59
14        Q.    No, it's not right or, no, that was not     08:59
15   your testimony?                                        08:59
16        A.    No, your statements were incorrect.          08:59
17        Q.    Okay.  So it was not your opinion in your   08:59
18   testimony in the formal investigations that the --     08:59
19   Dr. Carey and Dr. Johnson were providing              08:59
20   inappropriate treatment?                               08:59
21        A.    No.  Based on what was listed on the COIIs   08:59
22   and then in some of the -- in some of the             08:59
23   investigations, the employees had provided some        09:00
24   additional records.  There was no indication that      09:00
25   the treatment itself was inappropriate from the        09:00
```

                                                                        89

1    standpoint of a chiropractic professional providing     09:00

2    chiropractic care.                                        09:00

3         Q.   So you were not of the opinion that the        09:00

4    care that Dr. Johnson and Dr. Carey provided to the      09:00

5    plaintiffs in this case was below the standard of        09:00

6    care for a chiropractor, are you?                         09:00

7         A.   No, I didn't make that statement.  There      09:00

8    were -- there were other statements I did make --         09:00

9    excuse me -- did make that appeared that the length      09:00

10   of treatment being provided was more than one would     09:00

11   expect for the diagnoses listed.  And in some of the    09:00

12   cases, there was a document that I did present as        09:00

13   a -- as an exhibit that identified that the length       09:00

14   of time may have been excessive for needing to be       09:01

15   off work or for length of recovery.                      09:01

16        Q.   So you don't dispute the diagnoses that        09:01

17   were made by Dr. Johnson and Dr. Carey with regard      09:01

18   to the plaintiffs in this case; is that right?          09:01

19        A.   That's correct.                                 09:01

20        Q.   Okay.  But it is your opinion that the        09:01

21   treatment was not appropriate; right?                    09:01

22        A.   That's not what I said.  What I'm saying is    09:01

23   that the duration of the treatment being delivered      09:01

24   and the duration of the recommendations of reduced      09:01

25   and absent -- and not performance of various            09:01

                                                                   90

Craig Heligman, M.D.                                      April 28, 2021

```
 1    activities was -- excuse me.  Let me start over.      09:01

 2            It wasn't the treatment itself.  It was the  09:01

 3    length of time that treatment was delivered and it   09:01

 4    was the length of time that the providers were       09:01

 5    recommending that the person avoid work activities   09:01

 6    that was at issue.  That did not meet standards of   09:02

 7    those kinds of recommendations if you compare it to  09:02

 8    what is recommended by the medical literature and    09:02

 9    what is identified in the two references that are    09:02

10    commonly cited for determining lengths of            09:02

11    disability.                                          09:02

12        Q.   So you don't take issue with the diagnoses; 09:02

13    correct?                                             09:02

14        A.   Correct.                                    09:02

15        Q.   And you don't take issue with the actual    09:02

16    treatment that was being provided; correct?          09:02

17        A.   Correct.                                    09:02

18        Q.   But you did take issue with the length of   09:02

19    the treatment; is that right?                        09:02

20        A.   To some degree, yes.                        09:02

21        Q.   Okay.  And it was the length of treatment   09:02

22    that you felt created a pattern that lends itself    09:02

23    towards potential fraud?                             09:02

24        A.   No.                                         09:02

25        Q.   Okay.  Help me out.                         09:02
```

                                                               91

Craig Heligman, M.D.                                           April 28, 2021

```
 1        A.   Sure.  Happy to do that.              09:03

 2        Q.   All right.  So what specifically was it   09:03

 3   about the treatment that these employees were     09:03

 4   getting from Dr. Carey and Dr. Johnson that you felt  09:03

 5   lended itself towards allegations of fraud?       09:03

 6        A.   There's a fairly large body of literature  09:03

 7   that looks at the doctor/patient relationship.    09:03

 8   Amongst those it's clear that health care         09:03

 9   professionals will misrepresent information to    09:03

10   various agencies to assist their patients to receive  09:03

11   benefits.  That's in the literature.             09:03

12        So that's a concern, knowing that           09:03

13   information, also knowing the duration of time that  09:03

14   the practitioner said they should not be at work was  09:03

15   in excess of what the medical literature and the  09:04

16   disability duration references would recommend.   09:04

17   People being off work that long is not healthy, and  09:04

18   they should have recovered with acceptable lengths  09:04

19   of treatment.                                     09:04

20        So while I don't believe that the treatment  09:04

21   given was incorrect or the fact of being -- or even  09:04

22   the professional that's delivering the treatment.  09:04

23   It was the fact that the health professional and the  09:04

24   patients were continuing to be off work for lengths  09:04

25   of time that didn't match with the diagnoses being  09:04
```

92

```
 1    provided.                                          09:04

 2           Now, what the intent was behind that I'm    09:04

 3    unclear.  But the pattern of behavior over this 70 09:04

 4    or so employees, when all we had was a COII from two 09:04

 5    specific chiropractic professionals in a small     09:04

 6    geographical area, was still highly unusual.       09:05

 7       Q.   Was the testimony that you provided in the 09:05

 8    formal investigations of the plaintiffs in this case 09:05

 9    made to a reasonable degree of medical certainty?  09:05

10       A.   That's a legal definition, and so my answer 09:05

11    is this is based upon my professional experience as 09:05

12    a provider, my review of the medical literature, and 09:05

13    awareness of the disability duration guidelines and 09:05

14    the nature of appropriate treatment for the        09:05

15    conditions listed.                                 09:05

16       Q.   You would agree that it would not be       09:05

17    appropriate to opine on the course of treatment for 09:05

18    a patient without physically examining them;       09:05

19    correct?                                           09:05

20       A.   The -- the issue is that I'm not here to   09:05

21    interfere with the doctor/patient relationship.  We 09:06

22    don't do that.  It would be inappropriate to do so. 09:06

23    But I also am not here to make a selection of      09:06

24    providers for the employees.  They choose to do what 09:06

25    they choose to do and they work with their health  09:06
```

93

1    care provider.  That is the doctor/patient          09:06

2    relationship.                                       09:06

3        My observation was that for this set of         09:06

4    individuals, the duration of time off being         09:06

5    recommended by the practitioners was different from 09:06

6    the standard of care being recommended in the       09:06

7    medical literature and the length of time off was   09:06

8    not consistent with standards being recommended by  09:06

9    the disability duration guidelines that have been   09:06

10   published.                                          09:06

11       Q.   So you agree that it was inappropriate to  09:06

12   send letters to Dr. Johnson and Dr. Carey to let    09:06

13   them know that CSX would no longer take medical      09:06

14   documentation from them on behalf of employees;     09:06

15   correct?                                            09:07

16       A.   But that's not what we did.                09:07

17       Q.   You did not send a letter to Dr. Johnson   09:07

18   and Dr. Carey letting them know that you would not  09:07

19   accept documentation from them any longer?          09:07

20       A.    It was documentation specific to CSX forms, 09:07

21   so we would not accept COIIs or return-to-work      09:07

22   information from those practitioners.  We did not   09:07

23   advise them that the employees were unable to see   09:07

24   them.  We did not advise them that we wouldn't      09:07

25   receive medical information or medical records.     09:07

94

Craig Heligman, M.D.                                              April 28, 2021

```
 1            It was strictly an issue of we no longer     09:07
 2     were able to accept forms that were completed by    09:07
 3     them for the purposes of determining ongoing absence 09:07
 4     for medical reasons and return to work.             09:07
 5        Q.   Well, you did send letters to the           09:07
 6     plaintiffs in this matter stating that the CSX      09:07
 7     Medical Department is no longer accepting any       09:07
 8     medical documentation completed by Shannon Johnson  09:08
 9     or Daniel Carey; is that right?                     09:08
10        A.   Do you have a copy of that letter I can     09:08
11     look at?  The -- I don't remember the exact         09:08
12     language.  However, the intent was specific to the  09:08
13     medical forms.  That's the documentation we were    09:08
14     referencing.                                        09:08
15            Thank you.                                   09:08
16        Q.   So I just sent you over what we've marked   09:08
17     as Exhibit 3.  Let me know when you have that.      09:08
18            (Exhibit 3 was marked for identification and
19     attached to the transcript.)                        09:08
20            THE WITNESS:  I do have it.                   09:08
21     BY MR. DINGWALL:                                    09:08
22        Q.   Okay.  And this is a letter dated           09:08
23     September 20th, 2017, on your letterhead, to an S.M. 09:08
24     Morrison; is that right?                            09:08
25        A.   Yes, sir.                                   09:08
```

95

Craig Heligman, M.D.                                                                April 28, 2021

```
 1        Q.   All right.  And Mr. Morrison is one of the    09:08
 2   plaintiffs in this case.                                09:08
 3             And this letter is signed by you; correct?    09:08
 4        A.   Yes, that's correct.                          09:08
 5        Q.   And you would agree that in the second        09:08
 6   sentence of this letter, it states:                     09:08
 7                  "The purpose of this                     09:08
 8                   correspondence is to advise             09:08
 9                   you that the CSX Medical                09:08
10                   Department is no longer                 09:08
11                   accepting any medical                   09:09
12                   documentation completed by              09:09
13                   Shannon Johnson, D.C., or               09:09
14                   Daniel Carey, II, D.C."                 09:09
15             Correct?                                      09:09
16        A.   Yes, that's correct.                          09:09
17        Q.   Okay.  And that would be an interference      09:09
18   with the doctor/patient relationship.                   09:09
19             You agree; right?                             09:09
20        A.   No, I don't agree with that at all.  If you   09:09
21   look at the second sentence -- or the sentence right    09:09
22   after that:                                             09:09
23                  "If you continue to have a need          09:09
24                   to be off [..] work for a               09:09
25                   medical reason or wish to               09:09
```

                                                                                      96

Craig Heligman, M.D.                                    April 28, 2021

```
 1                    return to work from a medical          09:09
 2                    leave, please provide                 09:09
 3                    sufficient updated medical            09:09
 4                    documentation from your               09:09
 5                    primary care or treating              09:09
 6                    physician, other than the two         09:09
 7                    referenced above, within              09:09
 8                    30 days [of] the date of this         09:09
 9                    letter."                              09:09
10         So what we were referring to was simply the     09:09
11    COII or documentation that would reflect the         09:09
12    information requested on the COII and similarly on    09:09
13    our attending physician return-to-work statement.     09:09
14         So this was only to address the CSX             09:09
15    management of the absence of the employee under the   09:09
16    Collective Bargaining Agreement or under company     09:10
17    policy.  There was nothing that would prevent the    09:10
18    employee from continuing to seek care from either    09:10
19    practitioner.                                        09:10
20      Q.   It's just that they couldn't use that care    09:10
21    as a basis to justify their time off from work;      09:10
22    correct?                                             09:10
23      A.   They could not use those practitioners to     09:10
24    validate the reason -- the medical reasons for their 09:10
25    absence.                                             09:10
```

97

```
 1        Q.   Okay.                                    09:10

 2        A.   Again, this is an administrative task.  It  09:10

 3   is not a treatment issue.                          09:10

 4        Q.   You are not a licensed chiropractor; is  09:10

 5   that right?                                        09:10

 6        A.   That is correct.                         09:10

 7        Q.   You are not an orthopedist?             09:10

 8        A.   Again, correct.                          09:10

 9        Q.   You are not a neurologist?              09:10

10        A.   That is also correct.                    09:10

11        Q.   You are not licensed to practice in West  09:10

12   Virginia?                                          09:10

13        A.   Correct.                                 09:10

14        Q.   You're not licensed to practice in       09:10

15   Kentucky?                                          09:11

16        A.   Correct.                                 09:11

17        Q.   You're not licensed to practice in Ohio?  09:11

18        A.   Yes, that's correct.                     09:11

19        Q.   Okay.  Have you ever had an active medical  09:11

20   practice?                                          09:11

21        A.   Yes.                                     09:11

22        Q.   When was the last time you had a practice  09:11

23   in which you personally examined patients and made  09:11

24   diagnoses?                                         09:11

25        A.   It was just prior to me taking a position  09:11
```

                                                               98

| | | |
|---|---|---|
| 1 | at CSX. | 09:11 |
| 2 | Q.   And when was that? | 09:11 |
| 3 | A.   2012. | 09:11 |
| 4 | Q.   Okay.  And what was the nature of your | 09:11 |
| 5 | practice? | 09:11 |
| 6 | A.   It was a broad occupational medicine | 09:11 |
| 7 | practice.  I saw patients myself.  I also consulted | 09:11 |
| 8 | for various organizations.  I received referrals | 09:11 |
| 9 | from insurance companies, from attorneys to review | 09:11 |
| 10 | documents or to examine patients.  So it was a | 09:11 |
| 11 | fairly broad practice both in legal administrative, | 09:11 |
| 12 | direct patient care. | 09:11 |
| 13 | Q.   When you were in practice and you had a | 09:12 |
| 14 | patient that had a condition that was outside of | 09:12 |
| 15 | your expertise, did you refer that patient out to a | 09:12 |
| 16 | different provider? | 09:12 |
| 17 | A.   I did. | 09:12 |
| 18 | Q.   And you believe that's the proper thing to | 09:12 |
| 19 | do; correct? | 09:12 |
| 20 | A.   Yes. | 09:12 |
| 21 | Q.   Okay.  And did you ever refer patients to | 09:12 |
| 22 | chiropractors? | 09:12 |
| 23 | A.   Yes. | 09:12 |
| 24 | Q.   And when you made those referrals to | 09:12 |
| 25 | chiropractors, were they for musculoskeletal | 09:12 |

99

| | | |
|---|---|---|
| 1 | conditions? | 09:12 |
| 2 | A.   Yes. | 09:12 |
| 3 | Q.   And that was because you felt that it was | 09:12 |
| 4 | outside of your area of specialty to treat them; is | 09:12 |
| 5 | that right? | 09:12 |
| 6 | A.   No. | 09:12 |
| 7 | Q.   Was it because you felt that it was you | 09:12 |
| 8 | were unable to provide the course of treatment that | 09:12 |
| 9 | those patients needed? | 09:12 |
| 10 | A.   No, it was primarily because the individual | 09:12 |
| 11 | had a preference for manual manipulation or other | 09:12 |
| 12 | chiropractic care as opposed to a physical | 09:13 |
| 13 | therapist, who may not be able to deliver that kind | 09:13 |
| 14 | of service.  I don't -- I'm not trained in manual | 09:13 |
| 15 | manipulation, and if a patient had a preference for | 09:13 |
| 16 | that, they would need to see an osteopathic | 09:13 |
| 17 | professional or a chiropractic professional. | 09:13 |
| 18 | Q.   And your job at -- as this Chief Medical | 09:13 |
| 19 | Officer at CSX is to essentially determine the | 09:13 |
| 20 | fitness for duty of the individuals based on the | 09:13 |
| 21 | medical information that you receive from other | 09:13 |
| 22 | providers; is that right? | 09:13 |
| 23 | A.   Yes, that's correct. | 09:13 |
| 24 | Q.   Okay.  And that's because you don't | 09:13 |
| 25 | personally examine any employees; right? | 09:13 |

USCA4    1919

Craig Heligman, M.D.                                              April 28, 2021

```
 1        A.    That's correct.                        09:13

 2        Q.    And that's because you don't have the   09:13

 3   training to necessarily evaluate all conditions that  09:13

 4   an employee might suffer; is that right?           09:13

 5        A.    That's not correct.                     09:14

 6        Q.    Okay.  Well, if you -- you are not      09:14

 7   qualified to render an opinion regarding           09:14

 8   psychological treatment of an employee; right?     09:14

 9        A.    I can render an opinion, yes.           09:14

10        Q.    Okay.  And that's something that is within  09:14

11   your specialty?                                    09:14

12        A.    Yes.                                    09:14

13        Q.    Okay.  And so if you received an opinion  09:14

14   from a mental health provider for an employee, you  09:14

15   could evaluate as to whether that recommendation was  09:14

16   proper or not?                                     09:14

17        A.    I can make a recommendation with regards to  09:14

18   fitness for duty based on the information provided  09:14

19   by those other professionals.  I can also render an  09:14

20   opinion as to what the information means as         09:14

21   delivered by these professionals.                  09:14

22              Would I hold myself out as a mental health  09:14

23   professional to deliver treatment?  No.  But I do  09:15

24   have knowledge of certain standards as it applies to  09:15

25   the ability to determine fitness for duty across a  09:15
```

101

```
 1   broad range of medical conditions.  It's not limited    09:15
 2   to musculoskeletal conditions.                          09:15
 3       Q.   But you certainly wouldn't tell a mental       09:15
 4   health provider that was treating a CSX employee        09:15
 5   that they needed to conduct their treatment in a        09:15
 6   certain way, would you?                                 09:15
 7       A.   No, I would not.                               09:15
 8       Q.   Okay.  And the same would be true, for         09:15
 9   example, if you received documentation from a           09:15
10   cardiologist?                                           09:15
11       A.   Correct.  I would not tell those               09:15
12   individuals how to deliver treatment to their           09:15
13   patients.                                               09:15
14       Q.   Okay.  That's because you're not a             09:15
15   specialist in those areas; right?                       09:15
16       A.   I'm not a specialist in those areas.  Those    09:15
17   are not the -- that's not the patient population        09:15
18   that I would see as a clinician.                        09:15
19       Q.   Are you a member of any professional           09:16
20   organizations?                                          09:16
21       A.   Yes.                                           09:16
22       Q.   Which ones?                                    09:16
23       A.   American College of Occupational &             09:16
24   Environmental Medicine, the American Medical            09:16
25   Association, and the International Academy of           09:16
```

102

USCA4      1921

Craig Heligman, M.D.                                                                                                              April 28, 2021

| | | |
|---|---|---|
| 1 | Independent Medical Evaluators. | 09:16 |
| 2 | Q.    Do any of those entities of which you're a | 09:16 |
| 3 | member provide ongoing training to its members? | 09:16 |
| 4 | A.    All three do. | 09:16 |
| 5 | Q.    And as a licensed doctor, are you required | 09:16 |
| 6 | to obtain regular continuing education credits? | 09:16 |
| 7 | A.    Yes. | 09:16 |
| 8 | Q.    And what are the requirements for you to do | 09:16 |
| 9 | so? | 09:16 |
| 10 | A.    It depends upon the state of licensure. | 09:16 |
| 11 | Each state has its own requirements. | 09:16 |
| 12 | Q.    You are licensed in Florida; is that right? | 09:16 |
| 13 | A.    Yes. | 09:16 |
| 14 | Q.    Okay.  And where else? | 09:16 |
| 15 | A.    Currently I hold an active license in | 09:17 |
| 16 | Missouri and an inactive license in Kansas. | 09:17 |
| 17 | Q.    Do the organizations that you belong to | 09:17 |
| 18 | provide any guidance on the diagnosis and treatment | 09:17 |
| 19 | of musculoskeletal injuries? | 09:17 |
| 20 | A.    Yes. | 09:17 |
| 21 | Q.    Did you consult any of that guidance prior | 09:17 |
| 22 | to testifying in the formal investigations of the | 09:17 |
| 23 | plaintiffs in this case? | 09:17 |
| 24 | A.    I used my collective knowledge from my | 09:17 |
| 25 | experience as a clinician as well as the information | 09:17 |

<div align="right">103</div>

1    from educational courses, references I've read, and    09:17

2    the medical literature that I have read.  It wasn't    09:17

3    specific to any organization or any specific    09:17

4    reference.    09:17

5        Q.    And I believe that you entered into the    09:17

6    investigation -- I'm sorry.  Let me start over.    09:17

7            I believe that during the course of your    09:17

8    testimony in the formal investigations, you entered    09:18

9    exhibits of documents that you relied upon in    09:18

10   forming your opinion as to the propriety of the    09:18

11   length of treatment that the plaintiffs were    09:18

12   receiving; correct?    09:18

13       A.    No, I don't believe that's correct.    09:18

14       Q.    Okay.  You didn't offer any exhibits in --    09:18

15   as part of your testimony in the formal    09:18

16   investigations?    09:18

17       A.    No, you specified to length of treatment.    09:18

18   I don't -- if there was anything on length of    09:18

19   treatment, it was the Choosing Wisely two-page    09:18

20   document that I presented.  And I don't have it in    09:18

21   front of me, so if you have that, I'd be happy to    09:18

22   review it and discuss whatever information is in    09:18

23   there.    09:18

24       Q.    Where did you obtain the Choosing Wisely    09:18

25   document?    09:18

                                                        104

Craig Heligman, M.D.                                    April 28, 2021

```
 1        A.   It's a published document.  I don't        09:18

 2   remember the publication date for that.              09:18

 3        The -- the Academy -- I believe it's of         09:18

 4   Internal Medicine had started a Choosing Wisely      09:18

 5   series.  It wasn't focused on specific chiropractic  09:19

 6   care.  This document happened to be a document       09:19

 7   prepared in conjunction with the chiropractic        09:19

 8   societies -- or the professional chiropractic        09:19

 9   societies, but they also look at appropriateness for 09:19

10   other cardiac tests, for other laboratory tests.  It 09:19

11   covers a fairly broad spectrum of medical practice.  09:19

12        Q.   Was the information in that document        09:19

13   peer-reviewed?                                        09:19

14        A.   To the best of my knowledge, yes.          09:19

15        Q.   And by what entity or entities was it      09:19

16   peer-reviewed?                                        09:19

17        A.   Again, you'd have to look on the document. 09:19

18   It states...                                          09:19

19        Q.   Was that something that was important for  09:19

20   you to determine before offering it as an exhibit in 09:19

21   the investigations?                                   09:19

22        A.   What was important?                         09:19

23        Q.   Determining whether that document was      09:19

24   peer-reviewed.                                        09:20

25        A.   Yes.  In the course of providing           09:20
```

105

Craig Heligman, M.D.                                                    April 28, 2021

```
 1    information and reviewing medical information, it is    09:20
 2    important for it to be peer-reviewed.                   09:20
 3        Q.    Prior to testifying in the formal            09:20
 4    investigations, did you consult with any other         09:20
 5    medical profession -- professionals?                   09:20
 6        A.    No.                                          09:20
 7        Q.    Do the -- well, is there any reason why you  09:20
 8    could not have consulted, prior to testifying in the   09:20
 9    formal investigation, with any independent licensed    09:20
10    chiropractors?                                         09:20
11        A.    So let me restate the question so I          09:20
12    understand.  Was there anything that would prevent     09:20
13    me from consulting other health care professionals?    09:21
14            Is that -- is that your question in            09:21
15    specific to chiropractic professionals?                09:21
16        Q.    Yes.                                          09:21
17        A.    No, there's nothing that would prevent me    09:21
18    from consulting other professionals.                   09:21
19        Q.    And you chose not to do so, though; is that  09:21
20    right?                                                 09:21
21        A.    Yes, that's correct.                         09:21
22        Q.    Okay.  But you would agree that the best     09:21
23    way to determine the propriety of the care that was    09:21
24    being provided by Dr. Johnson and Dr. Carey to the     09:21
25    plaintiffs in this case would be to consult other      09:21
```

106

```
 1   professionals in that field?                    09:21

 2       A.   No.                                     09:21

 3       Q.   Okay.  Is there any reason why you could 09:21

 4   not have consulted with an independent orthopedist 09:21

 5   prior to testifying in the formal investigations? 09:21

 6       A.   Is there any reason that would prevent me? 09:21

 7   No.                                              09:21

 8       Q.   Is there any reason that you couldn't have 09:21

 9   consulted with independent neurologists with regard 09:21

10   to the treatment that the plaintiffs were receiving? 09:21

11       A.   There's nothing that would prevent me from 09:22

12   doing so.                                        09:22

13       Q.   And there's nothing that prevented you from 09:22

14   simply asking the employees who had submitted these 09:22

15   COIIs to go get another opinion, is there?       09:22

16       A.   Yes.                                    09:22

17       Q.   And what is that?                        09:22

18       A.   We don't send individuals out for       09:22

19   evaluations except for certain circumstances.    09:22

20       Q.   And those certain circumstances are what? 09:22

21       A.   There's a provision in the Collective   09:22

22   Bargaining Agreement that's called a three-doctor 09:22

23   panel.  Under those circumstances, we would be   09:22

24   required to send individuals out for further     09:22

25   evaluation.                                      09:22
```

                                                            107

```
 1              There's -- there's not a strong reason to     09:22
 2     send anyone out for a second opinion with regards to   09:22
 3     determining things that I am required to determine     09:23
 4     as part of my job.  If I have the knowledge to         09:23
 5     determine fitness for duty on these individuals, I     09:23
 6     do so.  We don't get second opinions or independent    09:23
 7     medical examinations just for the sole purpose of      09:23
 8     having them.                                            09:23
 9         Q.   Well, in this case, it wouldn't be for the    09:23
10     sole purpose of just having them.  It would be for     09:23
11     the purpose of determining whether a significant       09:23
12     number of employees committed fraud or not; right?     09:23
13         A.   No.  No, that wouldn't be a reason for        09:23
14     doing a referral for another opinion.                  09:23
15         Q.   So the ongoing employment of 50-plus          09:23
16     individuals was not a sufficient basis to collect      09:23
17     more information in which to make a determination?     09:23
18         A.   No, it wasn't a medical issue.                09:23
19         Q.   So whether the employees at issue were        09:24
20     treating for a sufficient period of time was not a     09:24
21     medical issue?                                          09:24
22         A.   No.  The issue of answering the question as   09:24
23     to were these employees dishonest or were they         09:24
24     acting fraudulently, that's not a medical              09:24
25     determination.                                          09:24
```

108

Craig Heligman, M.D.                                    April 28, 2021

1       Q.   Well, that determination was made based on          09:24

2    the course of treatment they were seeking; correct?         09:24

3       A.   No.                                                  09:24

4       Q.   So what was the basis for determining               09:24

5    whether they were being dishonest or being                  09:24

6    fraudulent?                                                  09:24

7       A.   It was the number of cases we received,             09:24

8    number of documents received from two specific              09:24

9    practitioners in a small geographical area all at           09:24

10   the same time, that in following which, we -- or            09:24

11   following which, I was told that there are business         09:24

12   issues going on in that area for reduction in force         09:25

13   furloughs -- other changes that may motivate an             09:25

14   individual to present information at that moment in         09:25

15   time.                                                       09:25

16        The diagnosis, the treatment, the duration             09:25

17   of care wasn't the issue.  It was the issue of              09:25

18   whether or not the volume of cases that we saw at           09:25

19   that time had reason for being sent in.                     09:25

20        As I said before, if we had similar                    09:25

21   situations with submission of expense reports,              09:25

22   similar submission of payroll submissions that the          09:25

23   respective departments felt were out of -- out of           09:25

24   the ordinary for their specific areas of interest,          09:25

25   they would present that to the same group I did to          09:25

                                                           109

Craig Heligman, M.D.                                                April 28, 2021

```
 1    look at whether or not it should be investigated.    09:25
 2            This wasn't a medical issue.  This was a     09:26
 3    behavioral issue at that moment in time.             09:26
 4        Q.   I'm going to send over what I've marked as  09:26
 5    Exhibit 4, and let me know when you have it.         09:26
 6            (Exhibit 4 was marked for identification and
 7    attached to the transcript.)                         09:26
 8            THE WITNESS:  Yes, I have it.                 09:26
 9    BY MR. DINGWALL:                                      09:26
10        Q.   And this is a three-page document, and it's 09:26
11    entitled "Choosing Wisely"; is that right?           09:26
12        A.   Yes, that's correct.                        09:26
13        Q.   And this is a document that you submitted   09:26
14    as an exhibit in the formal investigation of the     09:26
15    plaintiffs in this case; is that right?              09:26
16        A.   Yes.  Not all of them, but some of them.    09:26
17        Q.   And you relied upon this document as a      09:26
18    basis for your -- I'm sorry.  You relied upon this   09:26
19    document as at least one of the bases for your       09:26
20    opinions offered in your testimony; is that right?   09:26
21        A.   Yes.                                        09:26
22        Q.   Okay.  Other than this document, was there  09:26
23    any other medical literature that you relied upon in 09:27
24    testifying in the formal investigations?             09:27
25        A.   Again, there's several documents that I've  09:27
```

                                                                      110

Craig Heligman, M.D.                                          April 28, 2021

```
 1   used in the past that -- during my collective      09:27
 2   experience and education.  This was the one that was  09:27
 3   fairly appropriate for the set of circumstances and  09:27
 4   would be a reasonable reference for the discussion  09:27
 5   about chiropractic care.                          09:27
 6           There are other guidelines.  There's the  09:27
 7   MDGuidelines that can discuss this.  The          09:27
 8   Occupational -- let's see -- Occupational         09:27
 9   Disability -- it's, I believe, the ODA.  I'm trying  09:27
10   to remember the exact language.  There's also a   09:27
11   treatment guidelines referenced by the American   09:27
12   College of Occupational Environmental Medicine    09:27
13   that's been published that discuss the treatment of  09:28
14   musculoskeletal conditions.                       09:28
15           So this was a nice summary, but it        09:28
16   certainly wasn't the only document that I would have  09:28
17   used to form an opinion.                          09:28
18      Q.   Will you agree that in a circumstance where  09:28
19   the jobs and livelihoods of 50-plus individuals were  09:28
20   on the line, the best information was the -- well,  09:28
21   let me start over.                                09:28
22           You would agree that in a circumstance    09:28
23   where there were 50-plus employees with their jobs  09:28
24   and livelihoods on the line, you would only want to  09:28
25   use the best documentation and support for your   09:28
```

                                                              111

USCA4    1930

```
 1   opinions; right?                              09:28
 2        A.   I'm not sure I really understand the    09:28
 3   question.                                      09:28
 4        Q.   Well, you were testifying in the formal  09:28
 5   investigations of 50-plus employees; correct?   09:28
 6        A.   Yes, that's correct.                  09:28
 7        Q.   And you knew that the outcome of those  09:28
 8   formal investigations was potentially termination of  09:28
 9   all of the employees; right?                    09:29
10        A.   Yes, that's correct.                  09:29
11        Q.   And in testifying, you would want to take  09:29
12   great care that you provided only the best      09:29
13   information upon which the decision-makers would  09:29
14   make a decision on their employment; right?     09:29
15        A.   I wanted to present information that was  09:29
16   sufficient to assist with the decision-making.  It  09:29
17   is not a listing of every peer-reviewed article that  09:29
18   potentially addresses this.  There are hundreds of  09:29
19   thousands of articles in the medical literature that  09:29
20   are peer-reviewed that address musculoskeletal  09:29
21   conditions.  There's no way to present all that  09:29
22   information in the course of a hearing for these  09:29
23   investigations.                                 09:29
24        I selected the one document that I thought  09:29
25   was representative -- or most representative of the  09:29
```

112

```
 1    information being discussed.  However, the        09:29

 2    investigation itself was an administrative process, 09:29

 3    not a medical review process.                      09:29

 4          So this was ancillary to the actual          09:30

 5    proceedings of the investigation and the ultimate  09:30

 6    decision-making with regards to the employee's     09:30

 7    decision to -- or the decision that led to the     09:30

 8    termination of these employees.                    09:30

 9     Q.   So of the hundreds and thousands of          09:30

10    documents that exist out there that you could have 09:30

11    referred to, the Choosing Wisely document was the  09:30

12    one that you felt most appropriate for the         09:30

13    circumstances?                                     09:30

14     A.   Yes, for the lay medical population, this    09:30

15    was a very good resource.  That was the intention  09:30

16    for this document.                                 09:30

17     Q.   And you're not suggesting that this          09:30

18    document was a substitute for the opinions and     09:30

19    treatment of Dr. Johnson and Dr. Carey, are you?   09:30

20     A.   No, I was using this to reflect what a       09:30

21    reliable provider organization was establishing as a 09:30

22    reasonable standard.                               09:31

23     Q.   Okay.  So you're suggesting that this        09:31

24    Choosing Wisely document is the reasonable standard 09:31

25    to which Dr. Johnson and Dr. Carey should be held? 09:31
```

113

Craig Heligman, M.D.                                              April 28, 2021

```
 1        A.    I think it is a reasonable standard for the    09:31
 2   discussion that we were having.  Whether or not you       09:31
 3   should hold a specific provider to a specific             09:31
 4   standard is a different issue.                            09:31
 5        Q.    Well, what standard should Dr. Carey and       09:31
 6   Dr. Johnson be held to?                                   09:31
 7        A.    They should be held to the standard that       09:31
 8   their licensing agency allows them or that -- that        09:31
 9   they have.  They should meet the licensing               09:31
10   requirements of their state boards.  They should         09:31
11   meet the educational requirements that allows them       09:31
12   to graduate from their training program.  Again,         09:31
13   whatever's required of them for the purposes of          09:31
14   holding themselves out as a licensed chiropractic        09:31
15   provider is what they should be held to.                 09:32
16             This document was simply a summary document    09:32
17   for laypeople to discuss these issues with their         09:32
18   providers.  It was not meant to be a standard of         09:32
19   care that each and every professional should be held     09:32
20   to.                                                       09:32
21             Again, this is the American Board of the       09:32
22   Internal Medicine Foundation along with the American     09:32
23   Chiropractic Association that was published for the      09:32
24   purpose of educating a lay population, a patient         09:32
25   population.  And the intent was look at these           09:32
```

                                                                      114

USCA4    1933

Craig Heligman, M.D.                                                                          April 28, 2021

```
 1    issues; discuss them with your provider.              09:32

 2            Now, for each individual case, for each       09:32

 3    individual interaction between a provider of health   09:32

 4    care services and their patient, these may not        09:32

 5    always apply.  And, therefore, you do have to rely    09:32

 6    on your training, your education, your knowledge,     09:32

 7    your experience, and the literature that you've read  09:32

 8    to determine what the best course of action is when   09:33

 9    you're treating a patient.                            09:33

10            This is a population-driven document that     09:33

11    was designed for educating a non-medical population.  09:33

12       Q.   And so the purpose of you presenting this     09:33

13    document in the formal investigation was to educate   09:33

14    the plaintiffs in this case?                          09:33

15       A.   Yes, to a large degree.                       09:33

16       Q.   Okay.  And so in educating them, you would    09:33

17    want to give them an opportunity to absorb that       09:33

18    education and then put it into practice; correct?     09:33

19       A.   That was not the intent of the hearing.       09:33

20       Q.   Okay.  So it was a little late, then, to      09:33

21    offer education, wasn't it?                            09:33

22       A.   No, sir.  Again, this was merely a            09:33

23    reflection of what a reliable organization or group   09:33

24    of organizations felt where there were issues that    09:33

25    both a patient and their treating provider should be  09:34
```

                                                                                             115

Craig Heligman, M.D.                                                    April 28, 2021

```
1    discussing in the course of their interactions.       09:34

2              Whether or not it actually took place,       09:34

3    whether or not the patient researches a -- their       09:34

4    medical conditions or relies simply on the            09:34

5    professional opinion of the practitioner is really    09:34

6    none of my business.  Each patient is responsible     09:34

7    for their own health and their health care.  They're  09:34

8    responsible for choosing the professionals that they  09:34

9    feel they need to see when they have a need for        09:34

10   health care.                                           09:34

11             It's the responsibility for the health care 09:34

12   professionals to deliver the health care to their     09:34

13   patient to the best of their abilities and, if        09:34

14   necessary, refer individuals on for care by           09:34

15   professionals that also may need to be involved.      09:34

16        Q.   And you --                                   09:34

17        A.   That, again, was not the intent of this     09:34

18   investigation.                                         09:34

19        Q.   The intent of the investigation was for you 09:34

20   to second-guess the health care decisions made by     09:34

21   the employees and their health care providers;        09:35

22   correct?                                               09:35

23        A.   No, sir.                                     09:35

24             MS. FOSTER BIRD:  Objection.  Objection.    09:35

25   That was argumentative and not necessary commentary.  09:35
```

116

USCA4    1935

```
 1              THE WITNESS:  But, no, it was not the      09:35

 2    intent of the investigation.                         09:35

 3    BY MR. DINGWALL:                                      09:35

 4       Q.   So in the Choosing Wisely document -- which  09:35

 5    you stated was for educational purposes to the       09:35

 6    employees; right?                                     09:35

 7       A.   It was for educational purposes for those    09:35

 8    present at the investigation, not just for the       09:35

 9    employees but also for anyone else that may review   09:35

10    the investigation documents, the exhibits, and for   09:35

11    those present at the investigation.                  09:35

12       Q.   So if we look, for example, at No. 4 of      09:35

13    this document, it says:                              09:35

14              "Do not provide long-term pain             09:35

15               management without a                      09:35

16               psychosocial screening or                09:35

17               assessment."                              09:35

18          Is that right?                                 09:35

19       A.   Yes, that's correct.                         09:35

20       Q.   Okay.  And it's your opinion that this       09:35

21    document and that statement contained in No. 4 was   09:36

22    for the purpose of educating a lay employee?         09:36

23       A.   Yes.                                          09:36

24       Q.   Okay.  And so you would expect the           09:36

25    plaintiffs in this case to discuss not providing     09:36
```

                                                        117

USCA4      1936

1    long-term pain management without a psychosocial    09:36

2    screening or assessment with their medical          09:36

3    providers?                                          09:36

4        A.   Again, the publication's for the purposes  09:36

5    of educating both the patient as well as the        09:36

6    practitioner, but the standard -- excuse me -- the  09:36

7    individual interactions between the provider and the 09:36

8    patient is between the two of those individuals.    09:36

9            This is merely a discussion of what would   09:36

10   be a general practice under the circumstances,      09:36

11   whether it is a description of information that the  09:36

12   health care professional should review for their own 09:36

13   practice purposes or for the education of the        09:37

14   patients.                                           09:37

15           But, and specific to No. 4, it is highly    09:37

16   appropriate for a practitioner to take into account 09:37

17   the psychosocial factors involved in pain           09:37

18   management.  There's absolutely no question that's  09:37

19   an appropriate action to take, and that is true not 09:37

20   just of chiropractic providers, but all health care 09:37

21   professionals.                                      09:37

22       Q.   And you have evidence that Dr. Carey and   09:37

23   Dr. Johnson did not take those into consideration?  09:37

24       A.   I have no evidence of that whatsoever.  I  09:37

25   don't know what -- I have no evidence they did or   09:37

                                                            118

Craig Heligman, M.D.                                                     April 28, 2021

```
 1    did not do that, I should say.               09:37

 2         Q.   Okay.  And, again, you would -- with regard  09:37

 3    to No. 3 of this document, you would expect the  09:37

 4    statement --                                    09:37

 5              "Avoid protracted use of            09:37

 6                 passive or palliative physical   09:37

 7                 therapeutic modalities for low   09:37

 8                 back pain disorders unless       09:38

 9                 they support the goal(s) of an   09:38

10                 active treatment plan."          09:38

11         -- as something that would be educational  09:38

12    for a lay employee?                            09:38

13         A.   For both a lay population as well as the  09:38

14    treating providers.                            09:38

15         Q.   So that's a topic you would expect the  09:38

16    plaintiffs in this case to have discussed with  09:38

17    Dr. Johnson and Dr. Carey?                     09:38

18         A.   Again, the interaction between a health  09:38

19    care provider and their patient is between the two  09:38

20    of them.                                       09:38

21         Q.   Okay.  And if you look at the very bottom  09:38

22    of this document on Page 1, you would agree that it  09:38

23    says, quote:                                   09:38

24              "The items -- these items are       09:38

25                 provided solely for              09:38
```

119

| | | |
|---|---|---|
| 1 | informational purposes and are | 09:38 |
| 2 | not intended as a substitute | 09:38 |
| 3 | for consultation with a | 09:38 |
| 4 | medical professional." | 09:38 |
| 5 | Is that right? | 09:38 |
| 6 | A.   Yes.  It also goes on to state: | 09:38 |
| 7 | "Patients with any specific | 09:38 |
| 8 | questions about the items on | 09:39 |
| 9 | this list or their individual | 09:39 |
| 10 | situation should consult their | 09:39 |
| 11 | physician." | 09:39 |
| 12 | Q.   Correct. | 09:39 |
| 13 | And so you're not offering this as any sort | 09:39 |
| 14 | of substitute for the decisions of the plaintiffs in | 09:39 |
| 15 | this case as to how they made their medical | 09:39 |
| 16 | determinations; is that right? | 09:39 |
| 17 | A.   That is correct. | 09:39 |
| 18 | Q.   And you're not offering this document as a | 09:39 |
| 19 | substitute for the diagnoses or treatment plans of | 09:39 |
| 20 | Dr. Johnson and Dr. Carey with regard to the | 09:39 |
| 21 | plaintiffs; correct? | 09:39 |
| 22 | A.   Yes, that's correct also. | 09:39 |
| 23 | MR. DINGWALL:  Why don't we take another | 09:39 |
| 24 | break?  Call it five minutes. | 09:39 |
| 25 | Is that good for everyone? | 09:39 |

120

```
 1              MS. FOSTER BIRD:  Can we have more like --     09:39

 2              Dr. Heligman, do you need to eat?  Would       09:39

 3    you like to have a little longer than five?             09:39

 4              THE WITNESS:  It would be nice to go grab a    09:39

 5    bite.                                                    09:39

 6              MS. FOSTER BIRD:  Yes.                         09:39

 7              MR. DINGWALL:  Well, I was going to say we     09:39

 8    might be a little premature on a lunch break, and       09:39

 9    I'm not even a hundred percent sure that we're going    09:39

10    to need one.  But how would we do it?                   09:39

11              Like, a ten-minute one now, and if it looks   09:40

12    like we're going to go real long, we can take a         09:40

13    lunch?                                                  09:40

14              THE WITNESS:  Well, it's 12:40 p.m. my time   09:40

15    zone.                                                   09:40

16              MR. DINGWALL:  All right.  Well, let's        09:40

17    take -- let's take ten and we'll come back and then     09:40

18    we can make the call on that.                           09:40

19              MS. FOSTER BIRD:  Okay.                        09:40

20              THE VIDEOGRAPHER:  Off the record at          09:40

21    9:40 a.m.                                               09:40

22              (Recess taken.)                                09:49

23              THE VIDEOGRAPHER:  We are back on the         09:53

24    record at 9:53 a.m.                                     09:53

25
```

121

Craig Heligman, M.D.                                                    April 28, 2021

| | | |
|---|---|---|
| 1 | BY MR. DINGWALL: | 09:53 |
| 2 | Q.   All right.  Dr. Heligman, I'm sending over | 09:53 |
| 3 | another exhibit that we've marked as No. 5. | 09:53 |
| 4 | A.   Okay. | 09:53 |
| 5 | Q.   It's just a one-page document. | 09:53 |
| 6 | Do you have that there? | 09:54 |
| 7 | (Exhibit 5 was marked for identification and | 09:54 |
| 8 | attached to the transcript.) | 09:54 |
| 9 | THE WITNESS:  Yes, I do. | 09:54 |
| 10 | BY MR. DINGWALL: | 09:54 |
| 11 | Q.   All right.  And this is an August 23rd, | 09:54 |
| 12 | 2017 letter, on your letterhead again, to | 09:54 |
| 13 | Dr. Shannon Johnson; is that right? | 09:54 |
| 14 | A.   Yes. | 09:54 |
| 15 | Q.   And the letter states: | 09:54 |
| 16 | "The purpose of this | 09:54 |
| 17 | correspondence is to advise | 09:54 |
| 18 | you that CSX will no longer | 09:54 |
| 19 | accept any medical | 09:54 |
| 20 | documentation completed by | 09:54 |
| 21 | your office on behalf of any | 09:54 |
| 22 | CSX employee." | 09:54 |
| 23 | Is that right? | 09:54 |
| 24 | A.   Yes. | 09:54 |
| 25 | Q.   Okay.  And you would agree with me that it | 09:54 |

122

Craig Heligman, M.D.                                                    April 28, 2021

```
 1    would be, again, inappropriate to interfere with the   09:54
 2    relationship between a CSX employee and his or her      09:54
 3    chosen medical provider; correct?                       09:54
 4         A.   Yes, I would agree that we would not want     09:54
 5    to interfere in the doctor/patient relationship.        09:54
 6         Q.   But you would agree that you telling a        09:54
 7    medical provider that you will not accept any           09:54
 8    medical documentation from them any longer would be     09:54
 9    an interference with that relationship; right?          09:55
10         A.   No, that's not correct.                       09:55
11         Q.   Okay.  And so if a CSX employee treated       09:55
12    with Dr. Johnson following you sending this letter      09:55
13    to him and then provided documentation to CSX, you      09:55
14    would not accept that; right?                           09:55
15         A.   We would not accept that for the              09:55
16    decision-making for fitness for duty or validating a    09:55
17    medical-related absence.  We would not accept it for    09:55
18    administrative use, but we would be happy to review     09:55
19    it.  This is, again, identifying that we would not      09:55
20    use it for administrative reasons.                      09:55
21         Q.   And you would agree that that's something     09:55
22    that could potentially dissuade an employee from        09:55
23    treating with a provider if the company was refusing    09:55
24    to accept documentation from that provider?             09:55
25         A.   I can't speak for any one patient, but, no,   09:55
```

123

Craig Heligman, M.D.                                    April 28, 2021

1    I don't think it would dissuade anyone from seeking      09:56

2    medical care from a provider they trust and feel is      09:56

3    giving them quality medical care.                        09:56

4         Q.   Even if the company had already notified       09:56

5    the federal government and several other benefits        09:56

6    providers of suspected fraud based on treatment with     09:56

7    that employee?                                           09:56

8         A.   Again, that's the decision-making by the       09:56

9    individual patient.  The patient may select             09:56

10   whichever practitioner or provider they would feel       09:56

11   comfortable seeing.  People seek out-of-network         09:56

12   benefits or -- excuse me -- out-of-network providers     09:56

13   and they're willing to pay more for that.  They're       09:56

14   willing to pay for medical services that are not         09:56

15   reimbursable under their health insurance plan.          09:56

16        So, no, I don't think this would dissuade           09:56

17   anyone from seeking medical services from                09:56

18   Dr. Johnson if they felt that Dr. Johnson was the        09:56

19   best practitioner for them.                              09:56

20        Q.   And what impact did this letter that you       09:56

21   sent to Dr. Johnson have on an employee's ability to     09:56

22   obtain benefits for treatment with Dr. Johnson?          09:57

23        A.   None whatsoever.                               09:57

24        Q.   Okay.  And so what was the basis, then, of     09:57

25   you sending this letter to Dr. Johnson?                  09:57

                                                         124

Craig Heligman, M.D.                                      April 28, 2021

```
 1        A.    To advise Dr. Johnson that we would not      09:57
 2   accept documentation from him on behalf of a patient   09:57
 3   who is an employee of CSX.  And that did not prevent   09:57
 4   Dr. Johnson from continuing to treat those             09:57
 5   individuals; only reflected that we would not accept   09:57
 6   the documentation from him for administrative          09:57
 7   purposes.                                              09:57
 8        Q.    So at any time did you communicate to       09:57
 9   Dr. Johnson that "While we won't accept any medical    09:57
10   documentation from you, we will still make sure that   09:57
11   benefits are paid for treatment that you provide"?     09:57
12        A.    That's not my responsibility.  It's         09:57
13   Dr. Johnson's responsibility to determine whether or   09:57
14   not he meets the requirements for being in network     09:57
15   or out of network with any health insurance company.   09:58
16        Q.    And at any time did you communicate to any  09:58
17   CSX employees that while you would not accept          09:58
18   documentation from Dr. Johnson, they were still free   09:58
19   to treat with him and you would still -- and their     09:58
20   treatment would still be covered by benefits?          09:58
21        A.    Again, it's up to the patient to determine  09:58
22   who's in their network, out of network, what they      09:58
23   want to pay for, what they want their insurance        09:58
24   company to pay for.  There's no need for me to send    09:58
25   any notification to any employee on that -- on that    09:58
```

                                                            125

| 1 | basis. | 09:58 |
| 2 | MR. DINGWALL:  Object as nonresponsive. | 09:58 |
| 3 | BY MR. DINGWALL: | 09:58 |
| 4 | Q.   Did you communicate in any way to any CSX | 09:58 |
| 5 | employees that, while you would not accept | 09:58 |
| 6 | documentation from Dr. Johnson, they were still free | 09:58 |
| 7 | to treat with him? | 09:58 |
| 8 | A.   No, there was no reason to do that. | 09:58 |
| 9 | Q.   Okay.  And did you communicate to any CSX | 09:58 |
| 10 | employees that, while you would not accept | 09:58 |
| 11 | documentation from Dr. Johnson, any treatment with | 09:58 |
| 12 | him would still be covered by their benefits? | 09:59 |
| 13 | A.   Again, that's not my responsibility, so no. | 09:59 |
| 14 | Q.   Okay.  I'll introduce what we've marked as | 09:59 |
| 15 | Exhibit 6.  Let me know when you have this. | 09:59 |
| 16 | A.   I have it. | 09:59 |
| 17 | (Exhibit 6 was marked for identification and | |
| 18 | attached to the transcript.) | 09:59 |
| 19 | BY MR. DINGWALL: | 09:59 |
| 20 | Q.   Okay.  This is a 30-page document.  First | 09:59 |
| 21 | page is CSXT(Adkins)022527. | 09:59 |
| 22 | And do you recognize the first page of this | 09:59 |
| 23 | document, Dr. Heligman? | 09:59 |
| 24 | A.   Yes, this is an e-mail from myself to Jason | 09:59 |
| 25 | Peak. | 09:59 |

126

Craig Heligman, M.D.                                                    April 28, 2021

```
 1        Q.    Okay.  And who is Jason Peak?           09:59

 2        A.    Jason Peak was the Director of Risk     10:00

 3   Management at the time this e-mail was sent.       10:00

 4        Q.    And why did you send this e-mail to Jason  10:00

 5   Peak?                                              10:00

 6        A.    Our Risk Management Department are -- is  10:00

 7   the group that manages our claims, whether it's for  10:00

 8   on-duty injuries or freight claims or other -- other  10:00

 9   kinds of claims made against the company.          10:00

10        My primary interaction with Jason would be   10:00

11   for on-duty injury or illness claims against the   10:00

12   company, and so the intent here was just to bring  10:00

13   him into the loop on what was happening at that    10:00

14   moment in time with this group of individuals and  10:00

15   allow him to review his records to determine if    10:00

16   there was any issues that would be affected or that  10:00

17   would affect his -- his circumstances or his       10:00

18   decision-making.                                   10:00

19        Q.    And were there any issues that affected his  10:00

20   decision-making that he communicated to you?       10:01

21        A.    Not that I recall, no.                  10:01

22        Q.    And did you make a determination as to  10:01

23   whether any of the plaintiffs in this lawsuit had  10:01

24   work-related injuries?                             10:01

25        A.    No, all of the documents that were      10:01
```

127

```
 1   presented to us were for non-work-related injuries.   10:01

 2       Q.   And how did you determine that the injuries   10:01

 3   were non-work-related?                                 10:01

 4       A.   It was a -- made as a statement on those      10:01

 5   forms.  Most of the individuals said they fell at      10:01

 6   home or fell outside.  They -- they did not advise     10:01

 7   us that it was a work issue.                           10:01

 8            If there had been a work injury, then the     10:01

 9   employee was responsible for reporting it to           10:01

10   management and to completing the PI-1A form, which     10:01

11   is their report of injury, and then also to provide    10:01

12   a -- if treatment was sought, to provide               10:01

13   documentation with regard to that treatment.           10:01

14            So to my knowledge and to -- the purpose      10:02

15   here for referring this to Jason Peak was to confirm   10:02

16   that these were not work-related events or that had    10:02

17   been reported as work-related events.                  10:02

18       Q.   And it looks like there's a number of         10:02

19   attachments to this e-mail that you sent to Mr. Peak   10:02

20   on July 6th; is that right?                            10:02

21       A.   Yes.                                          10:02

22       Q.   Okay.  One is a medical notes batch; is       10:02

23   that right?                                            10:02

24            Or I guess there's -- there's -- one,         10:02

25   two -- three medical notes batches; is that right?     10:02
```

| | | |
|---|---|---|
| 1 | A.   Let me see what -- I think there's more | 10:02 |
| 2 | than three.  Let me see -- one, two, three, four, | 10:02 |
| 3 | five -- looks like six attachments in this case. | 10:03 |
| 4 | Q.   Right. | 10:03 |
| 5 | And three of them are entitled "Medical | 10:03 |
| 6 | Notes Batch"; is that right? | 10:03 |
| 7 | A.   Yes. | 10:03 |
| 8 | Q.   And then two of them are entitled "Shannon | 10:03 |
| 9 | Johnson Patient List"; right? | 10:03 |
| 10 | A.   Yes. | 10:03 |
| 11 | Q.   And then one is entitled "Fraud Review | 10:03 |
| 12 | Tracking"; is that right? | 10:03 |
| 13 | A.   Yes. | 10:03 |
| 14 | Q.   Okay.  In the -- in the body of this e-mail | 10:03 |
| 15 | to Mr. Peak, you state that: | 10:03 |
| 16 | "We had HR look them up and see | 10:03 |
| 17 | if there was a correlation | 10:03 |
| 18 | with furlough dates, but there | 10:03 |
| 19 | wasn't." | 10:03 |
| 20 | Is that right? | 10:03 |
| 21 | A.   Yes, that's correct. | 10:03 |
| 22 | Q.   Okay.  And is that statement made that you | 10:03 |
| 23 | looked up to see if the COII notes -- I'm sorry. | 10:03 |
| 24 | Let me start over. | 10:03 |
| 25 | Was it your intention in communicating that | 10:03 |

129

1    to Mr. Peak that you looked up to see if there was a    10:03

2    correlation between the COII notes that were    10:04

3    submitted and the furlough dates?    10:04

4        A.    Partially that, but also just the fact that    10:04

5    we didn't know who was or wasn't on a furlough list.    10:04

6    And so we asked HR to do some comparisons for us to    10:04

7    see what was -- you know, who was on which list and    10:04

8    just advising that we couldn't find a specific    10:04

9    correlation amongst the larger group.  In other    10:04

10    words, all of them were not on a furlough list.    10:04

11        Q.    Okay.    10:04

12        A.    They may have been involved in other things    10:04

13    that were coming up, but they weren't actively on a    10:04

14    furlough list at that point in time.    10:04

15        Q.    And so with regard to that lack of    10:04

16    correlation with the furlough list, that bit of    10:04

17    information would not support a finding of fraud;    10:04

18    correct?    10:04

19        A.    It wouldn't support or refute the    10:04

20    allegation.  It's the one piece of information on    10:04

21    which we would, you know, make that determination.    10:05

22        Q.    Can you tell me, within this document that    10:05

23    we've marked as Exhibit 6, if all of the attachments    10:05

24    that are noted in that e-mail header are part of    10:05

25    this document?    10:05

Craig Heligman, M.D.                                    April 28, 2021

```
 1        A.   Well, it's probably been five years since I    10:05
 2   saw this.  And then it looks like there is also this    10:05
 3   letter -- excuse me -- this e-mail from Penny           10:05
 4   Dreher, and so I can't say for sure if that was part    10:05
 5   of the attachment or not.                               10:06
 6        Q.   Okay.  Well, let's, I guess, go back to       10:06
 7   Page 1 and up to the header of that e-mail again.       10:06
 8        A.   Okay.                                         10:06
 9        Q.   Are the -- is the document entitled           10:06
10   "20170623 Medical Notes Batch" a document that you      10:06
11   would have created?                                     10:06
12        A.   Yes, that looks like one I would have         10:06
13   created.                                                10:06
14        Q.   Okay.  And what is that document?             10:06
15        A.   Basically it's a listing of the               10:06
16   information.  If you look on Page 2, this is a          10:06
17   listing that says "Fax SR Administrator."  This is      10:06
18   from our fax mailbox.                                   10:06
19             And so actually the nurse mentioned in --     10:07
20   in that e-mail, Pam Kessler, would have actually        10:07
21   been the person to pull this information out.  I        10:07
22   can't tell if that's the attachment labeled "Medical    10:07
23   Notes Batch."                                           10:07
24             If you go further in -- if I can get to it.   10:07
25   If you go to Page 10, that would be the list that I     10:07
```

                                                                131

Craig Heligman, M.D.                                    April 28, 2021

```
 1   would have prepared.                          10:07

 2        Q.   Okay.  So Page 10 going into --     10:07

 3        A.   Right.  Page --                      10:07

 4        Q.   -- I guess -- so 10 going into 16?   10:07

 5        A.   Right.  Through -- through Page 15 would  10:07

 6   have been the spreadsheet I created -- or     10:08

 7   spreadsheets.  And then on Page 18, it's formatted a  10:08

 8   little bit differently, but that would also be the   10:08

 9   same spreadsheet that I would have created.   10:08

10        Q.   Okay.  And this is essentially the   10:08

11   spreadsheet that you sent to the RRB; is that right?  10:08

12        A.   Yes, that's correct.                10:08

13        Q.   Okay.  So how do we know what the "20170623  10:08

14   Medical Notes Batch" is?                      10:08

15        A.   We probably wouldn't specifically know  10:08

16   because it's not labeled on here and it's a   10:08

17   five-year-old e-mail.  After five years, I have to   10:08

18   admit my memory for specific e-mails isn't perfect.  10:09

19        Q.   Did you save that "20170623 Medical Notes  10:09

20   Batch" anywhere?                              10:09

21        A.   I'd have to do a search to see if it's in  10:09

22   my files still.                               10:09

23        Q.   Is there any reason it wouldn't be?  10:09

24        A.   If it was not named the same way.  If it  10:09

25   was named for the purpose of sending it to Mr. Peak,  10:09
```

                                                        132

| | | |
|---|---|---|
| 1 | then it may not be identified that way. | 10:09 |
| 2 | Q.   Do you have a naming convention for | 10:09 |
| 3 | documents that you keep? | 10:09 |
| 4 | A.   No, not really. | 10:09 |
| 5 | Q.   Well, you could probably search fairly | 10:09 |
| 6 | easily for a document by this name; right? | 10:09 |
| 7 | A.   Yes. | 10:09 |
| 8 | Q.   Okay.  And then the "20170629 Medical Notes | 10:09 |
| 9 | Batch," again, how would we know if that's present | 10:09 |
| 10 | in this document or not? | 10:10 |
| 11 | A.   Same issue.  It's not specifically labeled | 10:10 |
| 12 | that I can see on these documents, and the way it's | 10:10 |
| 13 | printed out is not the easiest to read. | 10:10 |
| 14 | Q.   Okay.  And, again, the same for the | 10:10 |
| 15 | "20170622 Medical Notes Batch"? | 10:10 |
| 16 | A.   Yes, that's correct. | 10:10 |
| 17 | Q.   And then there's two attachments that say | 10:10 |
| 18 | "Shannon Johnson Patient List." | 10:10 |
| 19 | A.   Mm-hmm. | 10:10 |
| 20 | Q.   But, again, I don't see anything within | 10:10 |
| 21 | this document that is identified as a "Shannon | 10:10 |
| 22 | Johnson Patient List." | 10:10 |
| 23 | Do you? | 10:10 |
| 24 | A.   In all likelihood, again, it's not labeled. | 10:10 |
| 25 | But Page 2, 3, and I'm going on through -- through | 10:10 |

133

| | | |
|---|---|---|
| 1 | Page 9 were likely the attachments that would have | 10:11 |
| 2 | been labeled that.  If you look at Page 6, it has | 10:11 |
| 3 | "Carey Chiropractic" at the top.  And let me find | 10:11 |
| 4 | the other one.  And then Page 2 at the top -- oh, | 10:11 |
| 5 | also says "Carey Chiropractic."  Let me see.  Let me | 10:11 |
| 6 | run through the rest of the attachments. | 10:11 |
| 7 | No, I -- I would not be able to | 10:11 |
| 8 | specifically correlate these pages with a specific | 10:11 |
| 9 | document title.  My belief is that it's referencing | 10:12 |
| 10 | the pages that are showing "Fax SR Administrator." | 10:12 |
| 11 | Q.   Okay.  But there's nothing within this | 10:12 |
| 12 | document that's identified as "Shannon Johnson | 10:12 |
| 13 | Patient List"; right? | 10:12 |
| 14 | A.   Not that I can -- not that I can see. | 10:12 |
| 15 | Q.   Okay.  On the document that is entitled | 10:12 |
| 16 | "Carey Chiropractic," which is Page 2 -- I think | 10:12 |
| 17 | it's 2 through 9. | 10:12 |
| 18 | Does that look right? | 10:12 |
| 19 | A.   Right.  That is correct, yes. | 10:12 |
| 20 | May I go back just one step, please? | 10:12 |
| 21 | Q.   Sure. | 10:13 |
| 22 | A.   Starting on Page 10, this is the | 10:13 |
| 23 | spreadsheet I would have prepared.  You can see that | 10:13 |
| 24 | both Dr. Johnson and Dr. Carey are identified as to | 10:13 |
| 25 | the employees' names on -- on those lines.  I don't | 10:13 |

134

Craig Heligman, M.D.                                          April 28, 2021

```
 1    know if this is the name -- or the document name      10:13

 2    that is listed in the attachment, but it does show    10:13

 3    Dr. Johnson on here as well as Dr. Carey.             10:13

 4        Q.    Okay.  So going back to the Pages 2 through 10:13

 5    8 and, I guess, starting on Page 2 --                  10:13

 6        A.    Yes.                                         10:13

 7        Q.    -- is it your understanding that these --    10:13

 8    that this document reflects medical documentation      10:13

 9    sent from Carey Chiropractic to the CSX Medical        10:13

10    Department?                                            10:13

11        A.    Yes, this is the fax mailbox.  As you can    10:13

12    see by the "Fax SR Administrator," that's how it's    10:14

13    labeled.  And so these documents would have been      10:14

14    identified as documents we received to this fax       10:14

15    mailbox and, since it's listed as Dr. -- or Carey     10:14

16    Chiropractic, received from that clinic.              10:14

17        Q.    Now, it looks like there's a number of      10:14

18    employees who had information sent from Carey          10:14

19    Chiropractic that are redacted.                       10:14

20            Do you see that?                              10:14

21        A.    There's a lot of lines that are redacted.   10:14

22        Q.    Do you know if those names are redacted     10:14

23    because they are individuals who are not a part of    10:14

24    this lawsuit?                                          10:14

25        A.    I do not know.                              10:14
```

<div align="right">135</div>

Craig Heligman, M.D.                                          April 28, 2021

1    Q.   Okay.  If there were individuals during        10:14

2    this time frame, as reflected on Page 2 through 8 in   10:15

3    this exhibit, who were submitting COIIs from Carey      10:15

4    Chiropractic, would you expect that they would have     10:15

5    been subject to the same formal investigation that      10:15

6    the plaintiffs in this case were?                       10:15

7    A.   I wouldn't know.  I don't know what these          10:15

8    documents are.                                          10:15

9    Q.   Well, if we look at, for example, the fifth        10:15

10   and sixth entries on Page 2, they're in green.          10:15

11   A.   Yes.                                               10:15

12   Q.   And they both say "COII" as "Subject";            10:15

13   correct?                                                10:15

14   A.   Correct.                                           10:15

15   Q.   And the dates are 3/17 and 5/17 of 2017;          10:15

16   right?                                                  10:15

17   A.   Correct.                                           10:15

18   Q.   And that would have been within the time           10:15

19   frame that you were investigating the plaintiffs in     10:15

20   this case; correct?                                     10:15

21   A.   No, our -- our investigation or receipt of         10:15

22   documents that were of concern did not happen until     10:16

23   June.                                                   10:16

24   Q.   Okay.  So if anybody treated prior to             10:16

25   June of 2017, you were not considering them as part     10:16

                                                             136

Craig Heligman, M.D.                                              April 28, 2021

```
 1   of the investigation into potential fraud?        10:16
 2        A.   No.  What I'm saying is that our         10:16
 3   investigation was triggered by the number of      10:16
 4   documents we saw in the middle of June, not by this 10:16
 5   list.  This was a look-back just to see what we had 10:16
 6   potentially received in the past similar to what I 10:16
 7   mentioned I looked at before, the older medical    10:16
 8   records in their -- each of the person's medical   10:16
 9   files.                                             10:16
10        So, again, I don't know the names here and    10:16
11   not all of them are labeled specifically.  So this 10:16
12   is merely a list, and I'm only assuming that they  10:16
13   are records that were received from Dr. Carey's    10:17
14   office because that's the heading on this list.  But 10:17
15   this was the fax mailbox, and I don't look at this 10:17
16   mailbox.  So the nurses manage the information flow 10:17
17   from this mailbox.                                 10:17
18        Q.   If you look at the first entry that's in 10:17
19   black on Page 2, do you see that?  Its "Subject" is 10:17
20   "Jonathan Rowe."                                   10:17
21        A.   Page -- okay.                            10:17
22        Q.   Still on --                              10:17
23        A.   I see that.  Mm-hmm.                      10:17
24        Q.   Okay.  And Jonathan Rowe is a plaintiff in 10:17
25   this lawsuit.                                       10:17
```

                                                                  137

| | | |
|---|---|---|
| 1 | You understand that; right? | 10:17 |
| 2 | A.    Yes. | 10:17 |
| 3 | Q.    And do you see the date on that entry as | 10:17 |
| 4 | 9/9 of 2016? | 10:17 |
| 5 | A.    Yes, I do. | 10:17 |
| 6 | Q.    Okay.  And do you know why Mr. Rowe would | 10:17 |
| 7 | have been considered part of this investigation if | 10:18 |
| 8 | his documentation was well prior to the June 2017 | 10:18 |
| 9 | time frame you referenced? | 10:18 |
| 10 | A.    He must have submitted a COII in the time | 10:18 |
| 11 | frame that we had reviewed.  So it was from, say, | 10:18 |
| 12 | the middle of June of 2017 through approximately | 10:18 |
| 13 | July of the same year.  Again, I'd have to go back | 10:18 |
| 14 | and look at the full list of documents to determine | 10:18 |
| 15 | which form Mr. Rowe had submitted at that time. | 10:18 |
| 16 | Q.    But certainly you would have taken into | 10:18 |
| 17 | consideration the fact that Mr. Rowe had been | 10:18 |
| 18 | treating for almost a year prior to the time frame | 10:18 |
| 19 | that you were concerned with; correct? | 10:18 |
| 20 | A.    Yes.  Ultimately, we would have considered | 10:18 |
| 21 | the fact that some of these individuals had been | 10:18 |
| 22 | under treatment with both Dr. Carey and Dr. Shannon | 10:18 |
| 23 | for a number of months, if not years, prior to this | 10:18 |
| 24 | time period. | 10:19 |
| 25 | Q.    And that's something that would mitigate | 10:19 |

138

```
 1   against fraudulent activity; correct?              10:19

 2       A.   Not necessarily.                          10:19

 3       Q.   So if you found that an employee had      10:19

 4   treated with Dr. Carey or Dr. Johnson for a period 10:19

 5   of time earlier than June of 2017 and who also was 10:19

 6   not subject to the furlough, you would agree that  10:19

 7   there would be no rational basis to deem that they 10:19

 8   were committing fraud; right?                      10:19

 9       A.   No, I wouldn't agree with that statement. 10:19

10       Q.   Is that because Melissa shook her head when 10:19

11   you -- when I asked you that question?             10:19

12       A.   No.  I'd be happy to explain my rationale 10:19

13   if you'd like.                                     10:19

14       Q.   Please do.                                10:19

15       A.   Sure.                                     10:19

16            So a person may choose a practitioner or  10:20

17   may report to their practitioner that they're unable 10:20

18   to work for any number of reasons.  One, it could  10:20

19   absolutely be the God's honest truth.  They really 10:20

20   can't do it.                                       10:20

21            If it's a prolonged period of time when   10:20

22   there are other circumstances -- you know, furlough 10:20

23   is only one -- they may have a life set of         10:20

24   circumstances where they need to continue benefits 10:20

25   but they need to provide child care at home because 10:20
```

                                                            139

Craig Heligman, M.D.                                                    April 28, 2021

```
 1   there is no one else there to do it for them.  None   10:20
 2   of these are medical excuses for why they would tell  10:20
 3   their provider why they feel pain.                    10:20
 4          And so there are a number of reasons why       10:20
 5   one would want to continue their benefits but not     10:20
 6   work.  Furlough is only one of them.  That is why --  10:20
 7   if we go back to our Choosing Wisely document, that   10:20
 8   is why you're supposed to do a psychological and      10:21
 9   social review of the circumstances, to make sure      10:21
10   that you're actually treating a medical problem and   10:21
11   not a psychosocial issue.                             10:21
12      Q.   And did you make a determination whether      10:21
13   any of the employees that are the plaintiffs in this  10:21
14   case were treating for an improper person --          10:21
15   purpose?                                              10:21
16      A.   I did not have sufficient information to      10:21
17   make individualized assessments of any of the         10:21
18   employees.                                            10:21
19      Q.   Okay.  But you, yourself, did not make any    10:21
20   kind of a psychosocial assessment?                    10:21
21      A.   No.  Again, I wasn't the treating            10:21
22   professional in this case.                            10:21
23      Q.   Correct.                                      10:21
24          And so the best thing to do is to defer to     10:21
25   them; correct?                                        10:21
```

                                                                        140

```
 1        A.    No.  What I'm deferring to the provider is    10:21
 2   they're responsible for their own doctor/patient        10:21
 3   relationship.  It is between the patient and the        10:21
 4   doctor.  I was neither in this set of circumstances.    10:21
 5   I was the Chief Medical Officer for CSX, and I had      10:21
 6   my own responsibilities.                                10:22
 7        Q.    Which was to the company; correct?           10:22
 8        A.    No, it was to identify when I felt that --   10:22
 9   well, No. 1, the primary reason is fitness for duty,    10:22
10   and that's for safety reasons.  If someone is unfit     10:22
11   to work and they've presented a safety hazard, we       10:22
12   wouldn't want them to be at work.  On the other         10:22
13   hand, if they're able to be medically clear, we         10:22
14   would welcome back -- welcome them back at any time     10:22
15   with open arms.                                         10:22
16        My administrative function is to be                10:22
17   cognizant of these factors that people have in their    10:22
18   lives and to recognize that the potential exists for   10:22
19   employees individually or collectively to not          10:22
20   necessarily share the full set of information with     10:22
21   us.  It's also for me to recognize that providers,     10:22
22   as I said, also have a predilection to helping their   10:22
23   employ -- their patients seek whatever it is that      10:22
24   the patient is seeking.  Usually it's a benefits       10:23
25   issue.                                                 10:23
```

141

Craig Heligman, M.D.                                                    April 28, 2021

| | | |
|---|---|---|
| 1 | So understanding the dynamics of the | 10:23 |
| 2 | situation, we go back to the concept that my | 10:23 |
| 3 | responsibility was to identify things or | 10:23 |
| 4 | abnormalities in my practice, in my responsibility | 10:23 |
| 5 | as the Chief Medical Officer, and present them to | 10:23 |
| 6 | the organization.  I have an equal responsibility to | 10:23 |
| 7 | the employee to make sure that I'm making good | 10:23 |
| 8 | decisions on their behalf when it comes to fitness | 10:23 |
| 9 | for duty. | 10:23 |
| 10 | Q.   As of today, do you have any evidence that | 10:23 |
| 11 | any of the plaintiffs in this case defrauded any | 10:23 |
| 12 | benefits providers? | 10:23 |
| 13 | A.   Again, I don't have the results of the RRB | 10:23 |
| 14 | investigation.  The issue wasn't necessarily the | 10:23 |
| 15 | benefit providers.  In this set of circumstances, it | 10:23 |
| 16 | was potential -- potential dishonesty and fraud | 10:23 |
| 17 | against the company that pays for the benefits. | 10:24 |
| 18 | MR. DINGWALL:  I'll object as | 10:24 |
| 19 | nonresponsive. | 10:24 |
| 20 | BY MR. DINGWALL: | 10:24 |
| 21 | Q.   Do you today have any evidence that any of | 10:24 |
| 22 | the plaintiffs involved in this case defrauded any | 10:24 |
| 23 | benefits providers? | 10:24 |
| 24 | A.   Not for the benefit providers, no. | 10:24 |
| 25 | Q.   Do you have any evidence today that any of | 10:24 |

142

1    the plaintiffs in this case defrauded the company?     10:24

2        A.   The decision was made by the individuals     10:24

3    reviewing the investigative information, the hearing   10:24

4    transcripts and exhibits -- it was determined that     10:24

5    the individuals that were dismissed did -- in fact,    10:24

6    were guilty of the charges rendered, which is fraud    10:24

7    and dishonesty.                                        10:24

8        Q.   And I'm going to go back and ask you the      10:24

9    question again.                                        10:24

10        Do you have any evidence today that any of        10:24

11   the plaintiffs in this case defrauded the company?     10:24

12       A.   It's not my decision.  So do I have           10:25

13   evidence?  I don't know what the individuals that      10:25

14   made those decisions based it upon.  I was             10:25

15   presenting information.  I did not make a decision.     10:25

16   So do I have all of the evidence that the              10:25

17   decision-makers had?  I don't know.                    10:25

18       Q.   So you do not have any evidence that anyone   10:25

19   committed any fraud in this case; is that right?       10:25

20       A.   I don't have an opinion.                      10:25

21       Q.   So you don't have any evidence on which to    10:25

22   base an opinion; correct?                              10:25

23       A.   I don't have the full set of documents that  10:25

24   the decision-makers had or the rationale they used     10:25

25   to make their decisions.  So I don't have the          10:25

                                                                143

```
 1   necessary information to answer your question.  I      10:25
 2   don't have a full set of documentation to be able to   10:25
 3   make the decision, nor was I the one responsible for   10:25
 4   making it.                                             10:25
 5       Q.   And do you have any evidence today that any   10:25
 6   of the plaintiffs in this case were dishonest?         10:25
 7       A.   Again, it was not my responsibility to make   10:26
 8   the decision on whether or not they were guilty of     10:26
 9   the charges.  That was a different part of the         10:26
10   organization with a different group of individuals.    10:26
11          I was not privy to all of the                   10:26
12   decision-making and the factors that went into that    10:26
13   decision-making, so I don't have an opinion and I      10:26
14   don't -- did not make the decision with regards to     10:26
15   the guilt or innocence of any of these employees.      10:26
16       Q.   Understood.  And I'm going to -- I'm going    10:26
17   to ask the question again because I think that was     10:26
18   nonresponsive.                                         10:26
19          Do you, as you sit here today, have any         10:26
20   evidence that any of the plaintiffs in this case       10:26
21   were dishonest?                                        10:26
22       A.   All I have is the documentation that we've    10:26
23   already discussed.  Whether it is proof of the guilt   10:26
24   or innocence of the individual is subject to someone   10:26
25   else's determination.                                  10:26
```

                                                                    144

Craig Heligman, M.D.                                      April 28, 2021

```
 1        Q.   And so you have not formed an opinion on      10:26

 2   that -- on whether any of the plaintiffs in this        10:26

 3   case were dishonest?                                    10:27

 4        A.   It was not my responsibility to make that     10:27

 5   determination.                                          10:27

 6        Q.   But have you formed an opinion?               10:27

 7        A.   Again, it's not an opinion that I should      10:27

 8   have to make.  I wasn't responsible for the             10:27

 9   procedures, whether or not they met or did not meet     10:27

10   the criteria under the Collective Bargaining            10:27

11   Agreement.  I merely presented the information.  I      10:27

12   have no opinion on this issue.                          10:27

13        Q.   You have no opinion whatsoever as to          10:27

14   whether any of the 50-plus individuals that were        10:27

15   fired deserved to be fired?                             10:27

16        A.   Again, it was a business decision based       10:27

17   upon other decision-makers looking at the facts and     10:27

18   evidence.  All I can say is that all of these -- or     10:27

19   most of them went up to the Public Law Board and        10:27

20   were upheld.  I think maybe two to four cases were      10:27

21   overturned at the Public Law Board, and those cases     10:27

22   apparently were based upon information that was not     10:27

23   available to me.                                        10:27

24             So the answer to your question is I don't     10:28

25   have an opinion because it was not one for me to        10:28
```

                                                          145

Craig Heligman, M.D.                                    April 28, 2021

```
 1   make.  And all I can state is that the Public Law      10:28
 2   Board, who reviewed all the information, for the       10:28
 3   most part, found in favor of the company, not in       10:28
 4   favor of the employees, so they upheld the             10:28
 5   terminations.                                          10:28
 6           MR. DINGWALL:  Okay.  Why don't we take a      10:28
 7   lunch break?                                           10:28
 8           THE WITNESS:  Okay.  How long?                 10:28
 9           MS. FOSTER BIRD:  30 minutes tops.             10:28
10           MR. DINGWALL:  Well, let's go off the          10:28
11   record.                                                10:28
12           THE VIDEOGRAPHER:  Off the record at 10:28     10:28
13   a.m.                                                   10:28
14           (Recess taken.)                                11:15
15           THE VIDEOGRAPHER:  We are back on the          11:15
16   record at 11:15 a.m.                                   11:15
17   BY MR. DINGWALL:                                       11:15
18      Q.   All right.  Dr. Heligman, did you have a       11:15
19   nice break?                                            11:16
20      A.   Oh, I managed to get something to eat.         11:16
21      Q.   Good deal.                                     11:16
22           We had briefly talked about Exhibit No. 2,     11:16
23   which is the series of letters that you sent to        11:16
24   Mr. Fergus at the Railroad Retirement Board, and I     11:16
25   want to ask you a couple questions about those         11:16
```

                                                                    146

Craig Heligman, M.D.                                                        April 28, 2021

| | | |
|---|---|---|
| 1 | again. | 11:16 |
| 2 | A.    Okay. | 11:16 |
| 3 | Q.    If you need to pull them up, go ahead. | 11:16 |
| 4 | A.    Here we go.  Exhibit 2, you said? | 11:16 |
| 5 | Q.    Yes. | 11:16 |
| 6 | A.    Okay.  I have it up. | 11:16 |
| 7 | Q.    All right.  Did anyone besides yourself | 11:16 |
| 8 | have input on the contents of this letter that you | 11:16 |
| 9 | sent to Mr. Fergus on July 14th, 2017? | 11:16 |
| 10 | MS. FOSTER BIRD:  I'll object to the extent | 11:16 |
| 11 | that he discussed this with anybody from the Legal | 11:16 |
| 12 | Department or any of the lawyers for CSX. | 11:16 |
| 13 | Otherwise, you can answer. | 11:16 |
| 14 | THE WITNESS:  In the law -- excuse me.  I | 11:16 |
| 15 | actually don't remember.  I -- I don't think I did. | 11:16 |
| 16 | BY MR. DINGWALL: | 11:17 |
| 17 | Q.    Okay.  And when you say you don't think you | 11:17 |
| 18 | did, you mean you didn't have any input from anybody | 11:17 |
| 19 | else in drafting this letter? | 11:17 |
| 20 | A.    No, I drafted this letter myself.  Others | 11:17 |
| 21 | may have reviewed it, but it's my letter. | 11:17 |
| 22 | Q.    Okay.  And that was my next question. | 11:17 |
| 23 | Did anybody else review it before it was | 11:17 |
| 24 | sent to the Railroad Retirement Board? | 11:17 |
| 25 | MS. FOSTER BIRD:  Same objection. | 11:17 |

147

Craig Heligman, M.D.                                              April 28, 2021

```
 1            THE WITNESS:  We may have -- or excuse me      11:17

 2    -- I should say I may have.  I don't remember who it   11:17

 3    may have been, though.                                 11:17

 4    BY MR. DINGWALL:                                        11:17

 5       Q.    Okay.  Would there be any records showing     11:17

 6    that you had e-mailed it to anybody else for review?   11:17

 7       A.    I don't know.                                 11:17

 8       Q.    Was this a letter that you composed on your   11:17

 9    computer?                                              11:17

10       A.    On my work computer, yes.                     11:17

11       Q.    And was it saved on your work computer?       11:17

12       A.    Yes.                                          11:17

13       Q.    Okay.  And so to the extent that it           11:17

14    was e-mailed to anybody, that could be found either    11:18

15    through a search of your own e-mail or through the     11:18

16    archives; is that right?                               11:18

17       A.    It would have to be through the archives.     11:18

18       Q.    Okay.  And is the same true for the           11:18

19    July 21, 2017 e-mail -- or sorry -- letter that you    11:18

20    sent to Mr. Fergus?                                    11:18

21            MS. FOSTER BIRD:  I'll just have a             11:18

22    continuing objection to these.  If they were          11:18

23    reviewed or had input from somebody from the Law       11:18

24    Department, I would expect that to be privileged.      11:18

25    Otherwise, go ahead.                                   11:18
```

                                                                      148

| | | |
|---|---|---|
| 1 | THE WITNESS:  The subsequent two letters I | 11:18 |
| 2 | sent were not reviewed by anyone else. | 11:18 |
| 3 | BY MR. DINGWALL: | 11:18 |
| 4 | Q.   Okay.  And that's the July 21, 2017 letter | 11:18 |
| 5 | and the -- let's see -- July 28, 2017 letter? | 11:18 |
| 6 | A.   Yes, that's correct. | 11:18 |
| 7 | Q.   Okay.  And the purpose of those last two | 11:18 |
| 8 | letters, the July 21 and July 28, were simply to | 11:18 |
| 9 | provide the Railroad Retirement Board with an update | 11:19 |
| 10 | of some additional employees; is that right? | 11:19 |
| 11 | A.   Yes, that's correct. | 11:19 |
| 12 | Q.   But you were still requesting that | 11:19 |
| 13 | Mr. Fergus fully investigate the chiropractors and | 11:19 |
| 14 | the employees that you had listed in your | 11:19 |
| 15 | attachments; is that right? | 11:19 |
| 16 | A.   Yes, that's correct. | 11:19 |
| 17 | And I should actually clarify something. | 11:19 |
| 18 | This is to the Inspector General's office, and so | 11:19 |
| 19 | this is -- the Inspector General has oversight of | 11:19 |
| 20 | the RRB.  It's not necessarily to the RRB itself. | 11:19 |
| 21 | Q.   Understood, but thank you for that | 11:19 |
| 22 | clarification. | 11:19 |
| 23 | And did you decide to write these letters | 11:19 |
| 24 | of your own volition? | 11:19 |
| 25 | A.   Yes. | 11:19 |

149

Craig Heligman, M.D.                                                     April 28, 2021

```
1          Q.   Okay.  Were you consulted on the decision    11:19
2     to discipline any of the employees following the      11:20
3     formal investigations that were conducted?            11:20
4          A.   No.                                          11:20
5          Q.   Did you have any communication with any of  11:20
6     the charging managers prior to the formal             11:20
7     investigations that you testified in?                 11:20
8          A.   No.                                          11:20
9          Q.   Did you send any documents to any of the    11:20
10    charging managers prior to the formal investigations  11:20
11    that you testified in?                                 11:20
12         A.   No.                                          11:20
13         Q.   Did you have any communications with any of  11:20
14    the individuals involved in the formal                11:20
15    investigations in between the formal investigation    11:20
16    and the time that the employees were terminated?       11:20
17         A.   No.                                          11:20
18         Q.   Prior to your testimony in the formal        11:21
19    investigations of the plaintiffs in this case, had    11:21
20    you ever testified in a formal investigation before?  11:21
21         A.   Yes.                                          11:21
22         Q.   On how many occasions?                        11:21
23         A.   Very few.  Three or four times, perhaps.     11:21
24         Q.   And do you remember the circumstances of    11:21
25    those occasions?                                        11:21
```

USCA4    1969

Craig Heligman, M.D.                                                April 28, 2021

```
 1        A.   They were related to positive testing in     11:21

 2   our drug and alcohol program.                          11:21

 3        Q.   Okay.  Is CSX a member of the American       11:21

 4   Association of Railroads?                              11:21

 5        A.   Yes.                                         11:21

 6        Q.   And that's AAR -- well, if I refer to it as  11:21

 7   "AAR," will you understand that I'm talking about      11:21

 8   the American Association of Railroads?                 11:21

 9        A.   Yes, I will.                                 11:22

10        Q.   Okay.  And that's an industry group; is      11:22

11   that correct?                                          11:22

12        A.   Yes, that is correct.                        11:22

13        Q.   Does the AAR, to your knowledge, provide     11:22

14   any guidance to its railroad members regarding         11:22

15   cumulative trauma disorders?                           11:22

16        A.   I have not been -- received, I should say.   11:22

17   I have not received any information from the A --      11:22

18   from the AAR to -- on that subject, no.                11:22

19        Q.   Okay.  Are you aware of any guidance         11:22

20   provided by the AAR on ergonomics?                     11:22

21        A.   No.                                          11:22

22        Q.   Okay.  So in your time at CSX, you have      11:22

23   never seen any guidance or documentation from the      11:22

24   AAR regarding cumulative trauma disorders?             11:22

25        A.   That's correct.  I have not seen any.        11:22
```

                                                                   151

USCA4    1970

Craig Heligman, M.D.                                                April 28, 2021

```
 1        Q.    Okay.  And the same that you've never seen   11:22
 2   any guidance from the AAR regarding ergonomics; is      11:22
 3   that right?                                             11:22
 4        A.    That's correct.                              11:23
 5        Q.    Okay.  Other than guidance from the AAR,     11:23
 6   are you aware of any documentation or guidance at       11:23
 7   CSX regarding ergonomics for its employees?            11:23
 8        A.    The ergonomics programs are -- or have been  11:23
 9   managed by our Industrial Hygiene Group and Bart        11:23
10   Edgar, also, in the past, other individuals that are    11:23
11   no longer at the company.                               11:23
12        Q.    You said Bart -- what was the last name?     11:23
13        A.    Edgar, E-d-g-a-r.                            11:23
14        Q.    And who was Bart Edgar?                      11:23
15        A.    He is currently the manager in our drug and  11:23
16   alcohol testing program.                                11:23
17        Q.    Okay.  Is the -- is the ergonomics program   11:24
18   that is administered by the Industrial Hygiene Group    11:24
19   shared with the Medical Department?                     11:24
20        A.    Information is shared with us, yes, as       11:24
21   needed.                                                 11:24
22        Q.    Okay.  Did you consult with the Industrial   11:24
23   Hygiene Group regarding its ergonomics program at       11:24
24   any time prior to your testimony in the formal          11:24
25   investigations of the plaintiffs in this case?          11:24
```

                                                                    152

1        A.   I speak with those individuals on a regular    11:24

2    basis.  Sometimes it's on ergonomics if that's the     11:24

3    topic of concern, but I spoke with -- I didn't speak    11:24

4    with anybody about ergonomics as it pertains to         11:24

5    this -- the reason we're here today.                    11:24

6        Q.   Okay.  What does the ergonomics program at     11:24

7    CSX consist of?                                         11:24

8        A.   Again, I'd have to defer to our IH team.       11:24

9        Q.   Do you have access to documents regarding      11:25

10   the ergonomics program at CSX?                          11:25

11       A.   I have access if I need to, yes.               11:25

12       Q.   And how would you access those documents?      11:25

13       A.   I'd probably go over to Mr. Bullock's          11:25

14   office and ask him where they are.                      11:25

15       Q.   And who's Mr. Bullock?                         11:25

16       A.   Billy Bullock is -- or was at that time --     11:25

17   the Director of Industrial Hygiene.  About a year       11:25

18   ago he changed roles, but he is still involved in       11:25

19   the Industrial Hygiene Group.                           11:25

20       Q.   Are the documents regarding the ergonomics     11:25

21   program at CSX accessible via computer?                 11:25

22       A.   Yes, all our programs should be accessible     11:25

23   on the -- on Gateway.                                   11:25

24       Q.   So if you needed to look something up          11:25

25   regarding the ergonomics program, you could do so       11:25

153

Craig Heligman, M.D.                                    April 28, 2021

| | | |
|---|---|---|
| 1 | from your computer? | 11:26 |
| 2 | A.    For the most part, yes. | 11:26 |
| 3 | Q.    What is your understanding of the purpose | 11:26 |
| 4 | of the ergonomics program at CSX? | 11:26 |
| 5 | A.    It's considered a safety program, | 11:26 |
| 6 | preventative in nature. | 11:26 |
| 7 | Q.    In what way is it preventative in nature? | 11:26 |
| 8 | A.    Ergonomics has to do with the interaction | 11:26 |
| 9 | between the worker and the work or the workstation. | 11:26 |
| 10 | And so the understanding is if you position the | 11:26 |
| 11 | workstation and the work to be done correctly as it | 11:26 |
| 12 | -- as it's compared to where the workers are, then | 11:26 |
| 13 | you'll have a potential for a reduction in | 11:26 |
| 14 | complaints of typically musculoskeletal symptoms, | 11:26 |
| 15 | but there could be other issues. | 11:26 |
| 16 | Q.    Is it your understanding that certain jobs | 11:26 |
| 17 | at CSX are more likely to result in musculoskeletal | 11:27 |
| 18 | injuries than others? | 11:27 |
| 19 | A.    To my knowledge, we don't have any jobs at | 11:27 |
| 20 | CSX where there's a concern for cumulative trauma. | 11:27 |
| 21 | And that -- that term is actually quite outdated. | 11:27 |
| 22 | Q.    What term would you use? | 11:27 |
| 23 | A.    The current research on that suggests that | 11:27 |
| 24 | it's just not cumulative and it's not trauma. | 11:27 |
| 25 | There's not necessarily a specific term for it. | 11:27 |

154

1        Q.    Is it your position that repetitive stress    11:27

2    does not cause musculoskeletal injuries in railroad    11:27

3    workers?                                               11:27

4        A.    What I'm saying is that that's a much        11:28

5    larger discussion.  So the concept of repetitive or   11:28

6    cumulative trauma actually has, by and large, been    11:28

7    debunked.                                              11:28

8        Q.    And how has it been debunked?                11:28

9        A.    It -- the concept of simple repetition of    11:28

10   movement of the body through space doesn't cause       11:28

11   injury.                                                11:28

12       Q.    And what is the basis for your -- for that   11:28

13   statement?                                             11:28

14       A.    Because the research that I've been made     11:28

15   aware of and have viewed myself looks at issues        11:28

16   beyond repetition.  You're looking at not just         11:28

17   repetition, but force, duration, position,             11:28

18   temperature, vibration.                                11:28

19            There are multiple factors that go into the   11:28

20   potential for these workplace-type -- potentially      11:28

21   workplace-type exposures that could potentially        11:28

22   cause the onset of musculoskeletal complaints.         11:29

23   Whether or not it constitutes the definition of an     11:29

24   injury is unlikely.  The reporting of these kinds of   11:29

25   cases, if you will, under OSHA is as an occupational   11:29

                                                                        155

Craig Heligman, M.D.                                                April 28, 2021

```
 1   illness, not as an occupational injury.              11:29

 2       Q.   What's the distinction between an           11:29

 3   occupational illness and an occupational injury?     11:29

 4       A.   Typically an occupational injury is more of 11:29

 5   an acute-type event.  There's a point in time where  11:29

 6   an event takes place and an injury occurs.           11:29

 7           Occupational illness is something that may   11:29

 8   have been an event that over time an illness has     11:29

 9   developed potentially due to an exposure in the      11:29

10   workplace.  A common one would be noise exposure,    11:29

11   another one being the potential for a toxicological  11:29

12   exposure or -- or skin or inhalation exposures to    11:30

13   chemicals.                                           11:30

14       Q.   And would a musculoskeletal disorder fall   11:30

15   underneath an occupational illness?                  11:30

16       A.   That's how it's to be reported.            11:30

17       Q.   Okay.  So the musculoskeletal disorders     11:30

18   that were reported on the COIIs for the plaintiffs   11:30

19   in this matter could be considered occupational      11:30

20   illnesses?                                           11:30

21       A.   I don't see how.                            11:30

22       Q.   And why not?                                11:30

23       A.   My recollection, without looking at them    11:30

24   once again, is that these were all single-event      11:30

25   acute events that occurred outside of the workplace. 11:30
```

156

| | | |
|---|---|---|
| 1 | So I don't see -- how can you consider it an | 11:30 |
| 2 | occupational illness? | 11:30 |
| 3 | Q.   You would agree that if someone had treated | 11:30 |
| 4 | for a period of time for a musculoskeletal issue and | 11:31 |
| 5 | it just happened to have been part of their COII | 11:31 |
| 6 | that you received in June or July of 2017, that | 11:31 |
| 7 | doesn't necessarily mean it was an acute injury; | 11:31 |
| 8 | right? | 11:31 |
| 9 | A.   I wouldn't agree with that at all, no. | 11:31 |
| 10 | Q.   Okay.  And you would agree that just | 11:31 |
| 11 | because a symptom manifested itself outside of work | 11:31 |
| 12 | does not mean that it's not a work-related injury; | 11:31 |
| 13 | right? | 11:31 |
| 14 | A.   What you're talking about is the subjective | 11:31 |
| 15 | experience of a symptom or a pain complaint. | 11:31 |
| 16 | Doesn't rule it -- rule in or rule out when that | 11:31 |
| 17 | event may have occurred to induce that pain. | 11:31 |
| 18 | Q.   And so an employee who has subjective | 11:31 |
| 19 | symptoms that they believe are work-related have a | 11:31 |
| 20 | valid claim; is that right? | 11:32 |
| 21 | A.   A valid claim?  No, not necessarily. | 11:32 |
| 22 | Q.   So if an employee has a subjective pain | 11:32 |
| 23 | that they're experiencing, you would discount that? | 11:32 |
| 24 | A.   That's not what I said. | 11:32 |
| 25 | Just as you are claiming that a pain | 11:32 |

157

```
 1   experienced at home had the potential for having its    11:32
 2   onset or instigating factor at work, pain              11:32
 3   experienced at work can have its instigating factor    11:32
 4   that occurred at home.  You can't make a causal        11:32
 5   relationship simply on the basis of the fact that      11:32
 6   someone has reported musculoskeletal pain.             11:32
 7        Q.   Right.  And so you have no basis to          11:32
 8   determine, one way or the other, whether the           11:32
 9   symptoms that were reported by the plaintiffs on       11:32
10   their COII forms were causally related to something    11:33
11   that occurred at home versus at work; right?           11:33
12        A.   No, most of them actually said this          11:33
13   occurred outside of work.                              11:33
14        Q.   You would agree that a manifestation of a    11:33
15   symptom is not necessarily causally related to where   11:33
16   it occurred; right?                                    11:33
17        A.   The manifestation of symptoms are a          11:33
18   totally separate issue as to a causation evaluation.   11:33
19   There -- you have to do more than just say someone     11:33
20   has pain or a symptom to make a statement about        11:33
21   causation.                                             11:33
22            On the basis of what I reviewed for this      11:33
23   group of cases, these were all reported as events      11:33
24   that occurred off the job.  And had they occurred on   11:33
25   the job, it would be their responsibility to report    11:33
```

                                                                      158

USCA4      1977

```
 1    it as such and complete the PI-1A or the first      11:33

 2    report of injury and manage that through the on-duty 11:34

 3    injury process.                                      11:34

 4            None of them have done that.  And so the     11:34

 5    information that is available to us -- or to me at    11:34

 6    the time -- was these occurred at home, not at work. 11:34

 7        Q.   Well, you would agree for those that        11:34

 8    submitted COIIs in 2017, they were terminated;       11:34

 9    right?                                               11:34

10        A.   The individuals that were found guilty of   11:34

11    the charges were terminated.  Yes, that's correct.   11:34

12        Q.   So they would not have had an opportunity   11:34

13    to report a work-related injury or complete the CSX  11:34

14    forms; is that right?                                11:34

15        A.   No, that's not correct.  These events       11:34

16    occurred --                                          11:34

17        Q.   So after --                                 11:34

18        A.   Pardon me?                                  11:34

19        Q.   Go ahead.                                   11:34

20        A.   The charges occurred after the reported     11:34

21    medical condition.  They had plenty of time to       11:34

22    report it.                                           11:34

23        Q.   And so if the symptoms manifested           11:34

24    themselves outside of work, there's nothing to       11:34

25    prevent an employee from reporting that as a         11:35
```

159

Craig Heligman, M.D.                                          April 28, 2021

```
 1    work-related injury; right?                    11:35
 2         A.    They would have to -- they could report it.  11:35
 3    They would also have to identify the onset date and  11:35
 4    the circumstances around the onset of why they  11:35
 5    believe it's a work-related event.  But, yes, they  11:35
 6    could report it if they had a symptom outside of  11:35
 7    work.  If they felt it was work-related, they could  11:35
 8    report that.                                    11:35
 9         Q.    And what if they don't know if it's  11:35
10    work-related or not?                            11:35
11         A.    Then it probably isn't.            11:35
12         Q.    And what makes you say that?        11:35
13         A.    Because I think most people are smart  11:35
14    enough to figure that out.  If they say "I fell at  11:35
15    home," they fell at home.  If they fell at work,  11:35
16    they fell at work.  I think people are not going to  11:35
17    mix those two events up.                        11:35
18         Q.    Well, you don't contend that people  11:35
19    suddenly get a new body when they leave work and go  11:35
20    home, do you?                                   11:36
21         A.    No, of course not.                 11:36
22         Q.    Okay.  So if someone leaves work without  11:36
23    any manifestation of any symptoms, goes home and,  11:36
24    say, lifts up their child and suddenly blows out  11:36
25    their back, can you rule out that that was not  11:36
```

                                                          160

```
 1    work-related?                                    11:36

 2        A.    Yes.                                   11:36

 3        Q.    How?                                   11:36

 4        A.    You would use the standards for causation   11:36

 5    analysis.  There's a publication by NIOSH that was   11:36

 6    reiterated in the American College of Occupational &   11:36

 7    Environmental Medicine guidelines to the evaluation   11:36

 8    of musculoskeletal injuries.  You would have to look   11:36

 9    at the plausibility issues, the Bradford Hill     11:36

10    criteria, the literature in the area, as well as   11:36

11    looking at the statements from the -- individual   11:36

12    statements from the provider or the health care   11:36

13    provider of the medical records.                 11:36

14          But, quite honestly, if someone goes home   11:36

15    and lifts up their child and hurts their back, they   11:37

16    hurt their back lifting up their child.          11:37

17        Q.    So you can say that unequivocally without   11:37

18    doing all of the things you just said needed to be   11:37

19    done to determine causation?                     11:37

20        A.    Again, it's quite unusual for someone to   11:37

21    leave work with absolutely no musculoskeletal    11:37

22    symptoms and have a sudden onset of a            11:37

23    musculoskeletal symptom lifting something at home   11:37

24    and claiming it's work-related.                  11:37

25          So based on your hypothetical situation, I   11:37
```

161

```
 1    would say, with a hundred percent degree of          11:37
 2    certainty, that if you had no symptoms at work, went 11:37
 3    home, lifted your child, experienced back pain, your 11:37
 4    back pain was caused by that -- lifting that child   11:37
 5    at home, not at work.                                11:37
 6        Q.   Okay.  And so, conversely, you would not    11:37
 7    ever dispute a claim of a work-related injury if an  11:37
 8    employee left home with no symptoms, went to work,   11:37
 9    picked up a hammer, and blew out their back; is that 11:37
10    right?                                               11:37
11        A.   Again, you're looking at a different        11:37
12    factor.  So a hammer typically doesn't weigh as much 11:38
13    as most children, but the issue as you look at each  11:38
14    incident based upon these facts that are present at  11:38
15    the time, if they lifted an object at work and had   11:38
16    an acute onset of low back pain, then we would say   11:38
17    that the two are likely related.                     11:38
18         The expectation is that the person would        11:38
19    complete our injury form and would then secure       11:38
20    treatment for that if they felt it was necessary.    11:38
21    But experiencing pain doesn't necessarily mean that  11:38
22    it was a severe injury either.                       11:38
23        Q.   Well, does it have to be a severe injury to 11:38
24    be work-related?                                     11:38
25        A.   No, it does not.                            11:38
```

Craig Heligman, M.D.                                            April 28, 2021

 1        Q.   Okay.  And so there's really no way to        11:38

 2   differentiate without going through that whole         11:38

 3   causation analysis, is there, as to whether            11:38

 4   something was work-related or not?                     11:38

 5        A.   Based on the examples we gave, yes, I can     11:38

 6   make that determination because I can go through       11:38

 7   that process in my own head.  It's a common event.     11:39

 8   I'm -- certainly recognize the causation analysis      11:39

 9   process, and I think these are fairly simple           11:39

10   examples.  If you'd like to discuss a more complex     11:39

11   one, it would take more time to do.                    11:39

12        Q.   Well, the body's pretty complex, you would   11:39

13   agree; right?                                          11:39

14        A.   Yes, I would.                                11:39

15        Q.   Especially the spine; correct?               11:39

16        A.   Not necessarily more complex than anything   11:39

17   else in the body.                                      11:39

18        Q.   Okay.  So it's less complex than an elbow?   11:39

19        A.   Again, I would say the complexity of the     11:39

20   body is not necessarily the issue when you do a        11:39

21   causation analysis.  The body is a complex issue.      11:39

22   You know, there's many things that go into it.         11:39

23   There's a lot of reasons for having low back pain      11:39

24   that have nothing to do with the                       11:39

25   musculoskeletal-type complaints.                       11:39

                                                                 163

Craig Heligman, M.D.                                                    April 28, 2021

```
 1          So I think you have to say that each and       11:39

 2   every body system, organ system, body part has its    11:40

 3   own complexities.  And so it's a fairly generic        11:40

 4   statement saying one area's more complex than the      11:40

 5   other.  I just don't think that's the case.  You       11:40

 6   have to look at a person holistically.                 11:40

 7       Q.    Right.                                       11:40

 8          And so without looking holistically at the     11:40

 9   plaintiffs in this case and without doing a full       11:40

10   causation analysis, you cannot offer an opinion, one   11:40

11   way or the other, as to whether their injuries were    11:40

12   work-related or not; correct?                          11:40

13       A.    I can base a decision on work-relatedness    11:40

14   based on the information provided at that time.  And   11:40

15   in all these cases, these incidents were reported as   11:40

16   occurring off duty.  Had the employee decided it was   11:40

17   work-related, they would have had reporting            11:40

18   mechanisms for that and they could have so stated on   11:40

19   the COII as well.                                      11:40

20          The fact of the matter is this is a very       11:41

21   simple issue.  It's not a complex issue at all.  The   11:41

22   question is:  If it occurred at work, why didn't       11:41

23   they report it?  They reported these issues as being   11:41

24   -- occurring at home, off work.  There's no reason     11:41

25   to go into more detail than that on my part.           11:41
```

                                                                    164

1          They had plenty of opportunities to make a          11:41

2    statement that the medical issues were work-related    11:41

3    both during the investigation and when they sought     11:41

4    medical care, or they could have also reported that    11:41

5    incident as occurring at work at any point in time.    11:41

6    The fact is they stated that it all occurred at        11:41

7    home, off the job.  I have no reason to disagree       11:41

8    with it.                                               11:41

9         Q.   And so you recognize the distinction         11:41

10   between the onset of a symptom and the causation of    11:41

11   that symptom; correct?                                 11:41

12        A.   Yes.                                          11:41

13        Q.   Okay.  And so it's your opinion that as       11:41

14   long as the onset of the symptom occurs outside of     11:42

15   the work, it's a non-work-related injury?              11:42

16        A.   Not what I said.                             11:42

17        Q.   Well, help me understand.                    11:42

18        A.   What this person stated on their forms, the  11:42

19   provider reported it was an off-duty event.  The       11:42

20   employee reported it was an off-duty event.  A slip    11:42

21   and fall at home is a slip and fall at home.  You      11:42

22   can't translate that to a work-related incident.       11:42

23          So I think these cases are fairly               11:42

24   cut-and-dried.  Not a single person reported an        11:42

25   on-duty injury or illness in this particular case.     11:42

                                                            165

```
 1        Q.   Well, again, I think you may be making --    11:42
 2   or not making a distinction between the onset and       11:42
 3   the causation.  If someone slips and falls at home,     11:42
 4   that would be the onset of a symptom, but the actual    11:42
 5   injury itself, the causation could be many different    11:42
 6   factors; correct?                                       11:43
 7        A.   Not in my opinion.  I think if you slip and   11:43
 8   fall and you say you hurt your knee, you slipped and    11:43
 9   fell and you hurt your knee.  I'm not sure what         11:43
10   causal factor you think would be in play other than    11:43
11   that.                                                   11:43
12        Q.   Well, let's say a worker has a minor knee     11:43
13   sprain -- or they think it's a knee sprain -- at        11:43
14   work, some kind of pain in their knee at work, and     11:43
15   they don't think much of it and they go home and       11:43
16   they slip and fall, and then it's found out they       11:43
17   have a torn meniscus.                                   11:43
18             Can you separate the -- the symptomology --  11:43
19   or the causation at work versus the causation at       11:43
20   home?                                                   11:43
21        A.   Yes.  In all likelihood, the slip and fall   11:43
22   had the greater force and, if they fell in a certain   11:43
23   fashion, was the likely cause of that meniscal         11:43
24   injury.  The -- again, it's a matter of diagnosis      11:43
25   and the objective evidence presented at the time      11:44
```

                                                              166

1    they're evaluated.                                11:44

2         If they said "I felt pain at work" and you   11:44

3    don't know why, it could have been also a         11:44

4    degenerative knee or preexisting meniscal injury  11:44

5    that created the pain at work before they had the  11:44

6    knee sprain.                                       11:44

7         So in most cases, meniscal tears are         11:44

8    degenerative in nature and not traumatic.  So in all  11:44

9    likelihood, the patient could have had the meniscal  11:44

10   tear present before work, experienced pain at work,  11:44

11   and fell after they left work.  So then you are now  11:44

12   complicating the, quote-unquote, "causation        11:44

13   analysis" in its entirety.                         11:44

14      Q.   And those are all things that you need to  11:44

15   consider before you can state definitively as to   11:44

16   whether something is work-related or               11:44

17   non-work-related; correct?                         11:44

18      A.   Again, you base the determination of work  11:44

19   causation on an analysis of the information that's  11:44

20   made available to you at the time the analysis is  11:44

21   done.  In this case, the employees had stated to   11:44

22   their provider and it was reiterated by the provider  11:45

23   that these events were things that took place off  11:45

24   work.  I have no reason to question it.  There's   11:45

25   no --                                              11:45

                                                        167

Craig Heligman, M.D.                                    April 28, 2021

```
 1        Q.   But you're questioning --              11:45

 2        A.   There's no contradictory information in  11:45

 3   this case.  Not one person has made a statement that 11:45

 4   their musculoskeletal pain was work-related or that  11:45

 5   they even thought it was.  So no causation analysis  11:45

 6   was really necessary.  It was a simple statement    11:45

 7   that the employee made this all occurred off work.  11:45

 8        Q.   Well, if you don't question how -- the   11:45

 9   basis for the employees stating how they were       11:45

10   injured on their COII forms, why would you question 11:45

11   that they were submitting those forms at all?       11:45

12        A.   I'm not sure I follow.                    11:45

13        Q.   Well, the -- the basis of the formal      11:45

14   investigations against these plaintiffs in this case 11:45

15   was that they submitted COII forms in a manner that 11:45

16   was potentially fraudulent; right?                  11:46

17        A.   No.  Again, let me restate this for you.  11:46

18             The reason that this became a concern is  11:46

19   because we had a large number of documents submitted 11:46

20   from the same two providers in a very small -- a    11:46

21   very short time frame in a specific local area.      11:46

22             It had nothing to do with the content of  11:46

23   those COIIs.  It had to do with the volume, the     11:46

24   timing, and the location.  It didn't matter what was 11:46

25   on the medical documentation.  There's no question  11:46
```

168

USCA4    1987

```
 1   of work-relatedness.  Nobody asked us to address      11:46

 2   that, and so it was not addressed.  To do so now      11:46

 3   doesn't make any sense to me.                         11:46

 4        Q.   Okay.  And I appreciate you saying that.    11:46

 5             So the entire basis for the formal          11:46

 6   investigations of the plaintiffs in this case was     11:46

 7   the volume, the timing, and the location of the       11:46

 8   COIIs; is that right?                                 11:47

 9        A.   Right.  It was a collection of a            11:47

10   significant number of documents coming from the same  11:47

11   practitioners in one area.                            11:47

12        Q.   Okay.  And there's no other basis for the   11:47

13   formal investigation that you're aware of; is that    11:47

14   right?                                                11:47

15        A.   That was the basis for the information that 11:47

16   I had that I presented to other officials in the      11:47

17   organization, who decided that this was of            11:47

18   significance that it should be investigated further.  11:47

19        Q.   Okay.  And just so we're clear, when you    11:47

20   say "volume," you're talking about the number of      11:47

21   COIIs that actually came in to your office; is that   11:47

22   right?                                                11:47

23        A.   Yes, that's correct.                        11:47

24        Q.   And when you say "timing," you're talking   11:47

25   about the period of time over which those COII forms  11:47
```

Craig Heligman, M.D.                                              April 28, 2021

```
 1    came in; correct?                                      11:47

 2         A.    Yes, that's correct.                        11:47

 3         Q.    And when you say "location," you're talking 11:47

 4    about the fact that the COII forms came in from two    11:47

 5    providers; is that right?                              11:47

 6         A.    Right, location being where those providers 11:47

 7    and employees were located.  And then the fourth one   11:47

 8    was the specific two providers.                        11:47

 9         Q.    Okay.  So the location is the fact that the  11:47

10    COIIs were submitted by employees in a certain         11:47

11    geographic area; is that right?                        11:47

12         A.    Yes.                                         11:47

13         Q.    Okay.  And then the fact that all of those  11:47

14    COIIs came in from one of two providers; is that       11:47

15    right?                                                 11:47

16         A.    Right.                                       11:47

17         Q.    Okay.  And with regard to timing, what was  11:47

18    the specific time frame that you considered to be      11:47

19    relevant to the investigation of the plaintiffs in     11:47

20    this case?                                             11:47

21         A.    From the time that we initially started     11:47

22    recognizing the volume that we received and the time   11:47

23    that we collected that information and presented it    11:47

24    to other people within the organization to determine   11:47

25    what next steps should be.                             11:49
```

170

USCA4    1989

1      Q.   Okay.  And what specifically were those        11:49

2   dates?                                                 11:49

3      A.   I don't recall when I specifically may have    11:49

4   spoken with those individuals, either individually     11:49

5   or collectively, but the date this letter went out     11:49

6   to Mr. Fergus was taken as the date where we had       11:49

7   sufficient information to charge individuals for the   11:49

8   potential of dishonesty and fraud.                     11:49

9      Q.   Sticking with the timing issue, was the        11:49

10  focus of the investigation based upon the timing       11:49

11  that the COIIs were received in your office or based   11:50

12  upon the time that the plaintiffs received             11:50

13  treatment?                                             11:50

14     A.   It was based upon the time at which we felt    11:50

15  there was a sufficient recognizable pattern.           11:50

16     Q.   Okay.  But was the pattern based upon the      11:50

17  time that the COIIs were received in your office?      11:50

18     A.   It was based on a time when we thought we      11:50

19  had sufficient numbers to say this is a pattern of     11:50

20  behavior, that it wasn't just a single day or a        11:50

21  one-off event.  It was that we had collected           11:50

22  sufficient documentation to say this is a pattern of   11:50

23  behavior that was demonstrated by a large number of    11:50

24  individuals over a relatively short period of time,    11:50

25  located in that jurisdiction by these -- by these      11:50

                                                               171

| | | |
|---|---|---|
| 1 | two providers. | 11:50 |
| 2 | When we reached the conclusion that a | 11:50 |
| 3 | pattern of that nature was present is when the | 11:51 |
| 4 | decision was made to submit these letters to the RRB | 11:51 |
| 5 | and other recipients and to charge the individuals. | 11:51 |
| 6 | Q.   I'm just trying to understand what exactly | 11:51 |
| 7 | constituted the pattern that formed your -- the | 11:51 |
| 8 | basis for your moving forward with this | 11:51 |
| 9 | investigation. | 11:51 |
| 10 | A.   I wasn't the one that made the decision to | 11:51 |
| 11 | move forward with the investigation.  I was the one | 11:51 |
| 12 | that collected the forms and presented them to other | 11:51 |
| 13 | parts of the organization and asked for their | 11:51 |
| 14 | opinion with regard to what next steps should be | 11:51 |
| 15 | taken. | 11:51 |
| 16 | Q.   You would agree that there's a distinction | 11:51 |
| 17 | to be made between an employee who had been treating | 11:51 |
| 18 | for, let's say, a year with either Dr. Johnson and | 11:51 |
| 19 | Dr. Carey and happened to submit a COII in June of | 11:51 |
| 20 | 2017 versus someone who just went one time and then | 11:51 |
| 21 | submitted a COII in June of 2017; right? | 11:52 |
| 22 | A.   I think there's a difference in the | 11:52 |
| 23 | treatment issues potentially.  If there's a | 11:52 |
| 24 | difference in the analysis and some individuals who | 11:52 |
| 25 | had been seeing Dr. Carey or Dr. Johnson for longer | 11:52 |

172

Craig Heligman, M.D.                                    April 28, 2021

```
 1   periods of time than just a single event and we      11:52

 2   received those documents in the same time frame,     11:52

 3   there may or may not have been a relationship, but   11:52

 4   that was for the investigation to determine.         11:52

 5       Q.   But you were the one who ultimately         11:52

 6   identified the pattern of these documents being      11:52

 7   submitted to your office; right?                     11:52

 8       A.   Yes.                                         11:52

 9       Q.   And you were the one who brought that to    11:52

10   the Law Department and the Labor Relations           11:52

11   Department; right?                                   11:52

12       A.   Yes.                                         11:52

13       Q.   So ultimately it was your decision as to    11:52

14   what the pattern was; correct?                       11:52

15       A.   Ultimately what I did was I identified that 11:52

16   we had collected a large number of COII documents    11:53

17   over a short period of time from the same local area 11:53

18   from two practitioners.  That was an unusual         11:53

19   situation.                                           11:53

20            And, therefore, when it looked like we had  11:53

21   60 or 70 cases that came to light within three or    11:53

22   four weeks, that was significant enough, in my       11:53

23   opinion, to take it to others to determine whether   11:53

24   or not further review of the circumstances should be 11:53

25   made.                                                11:53
```

173

```
 1        Q.   So, again, that was based entirely upon the    11:53
 2    date on which your office received the COII forms;        11:53
 3    right?                                                    11:53
 4        A.   No, that's not true.  It is based upon when     11:53
 5    we had sufficient numbers that I felt it was a            11:53
 6    significant pattern that was really irrefutable that     11:53
 7    we had not seen in any other way, shape, or form         11:54
 8    throughout my experience at CSX.                         11:54
 9            There was 60 -- we have never received 60        11:54
10    or 70 COIIs or any other medical forms or set of         11:54
11    medical documents from that large number of a group      11:54
12    from a -- from one or two providers in a local area.     11:54
13    It was a very unique set of circumstances.               11:54
14            There was a large volume relative to our         11:54
15    daily experience.  And when you reach the number of      11:54
16    60 to 70 individuals, then I thought it was              11:54
17    appropriate to present that to other individuals in      11:54
18    the organization and let them decide if any further      11:54
19    action should be taken.                                  11:54
20        Q.   You had to make a determination at some         11:54
21    point as to what the cutoff was at -- regarding the      11:54
22    timing of the COIIs and referring it to Labor            11:54
23    Relations and the Law Department; right?                 11:54
24        A.   It was my decision as to when I brought it      11:54
25    to their attention, yes.                                 11:55
```

174

1    Q.   Okay.  But it was also your decision as to    11:55

2    how far back to include COIIs that had been    11:55

3    submitted; right?    11:55

4    A.   We started from the date that we received    11:55

5    those 20 or so documents all in the same day.  We    11:55

6    did a retrospective review of their cases after    11:55

7    that.    11:55

8    Q.   Okay.  And when you conducted the    11:55

9    retrospective analysis, what did that include?    11:55

10    A.   Again, we were trying to determine if there    11:55

11    was any other time when we saw the same kind of    11:55

12    pattern, and we could not identify one.    11:55

13         We recognized that our employees in this    11:55

14    group of individuals, several of them -- I don't    11:55

15    remember how many -- had seen one or -- one or the    11:55

16    other of these practitioners previously, whether it    11:55

17    was an ongoing event every couple months or on a    11:55

18    more continuous basis or a less frequent basis or    11:56

19    for different reasons that could have been the case.    11:56

20         But the actual issue was the pattern wasn't    11:56

21    even beginning to start until the first time we saw    11:56

22    these 20 or so cases show up all on the same day.    11:56

23    Q.   So was your retrospective analysis limited    11:56

24    to whether you had seen similar patterns of COII    11:56

25    forms being submitted to your office?    11:56

175

```
 1        A.   What we are looking for is any information    11:56

 2    for these two practitioners.  We don't have the        11:56

 3    capacity to do an ongoing evaluation of volume from    11:56

 4    different professionals.  We don't have the            11:56

 5    staffing.  We don't have the data management           11:56

 6    capacity.                                              11:56

 7        Q.   So was it essentially tribal knowledge as     11:56

 8    to whether this is something that had ever happened    11:56

 9    before?                                                11:56

10        A.   All I can tell you is that in the times I     11:56

11    had worked for CSX, it was never brought to my         11:56

12    attention.                                             11:56

13        Q.   Which doesn't mean it didn't happen; right?   11:57

14        A.   I don't know.  Again, it was never brought    11:57

15    to my attention.  It was never brought to my           11:57

16    predecessor's attention.  So all I can tell you is     11:57

17    what I experienced.                                    11:57

18        Q.   What predecessors did you speak with?         11:57

19        A.   My prior boss was Dr. Thomas Neilson.         11:57

20        Q.   And when did you speak with him?              11:57

21        A.   I did not speak with him about this case.     11:57

22    All I'm saying is that in my experience with him for   11:57

23    three years -- and I knew Dr. Neilson actually         11:57

24    before I started working at CSX -- in our day-to-day   11:57

25    discussions, there was no evidence that we were        11:57
```

<div align="center">176</div>

Craig Heligman, M.D.                                        April 28, 2021

1    seeing the kind of pattern that we now experience in    11:57
2    2017.                                                   11:57
3            Again, yes -- is it anecdotal?  Perhaps.        11:57
4    But usually it's very unusual for a Chief Medical       11:57
5    Officer to recognize, without any doubts, the names     11:58
6    and locations of various providers in, you know, 20,    11:58
7    21, 22 states.  It doesn't -- doesn't happen very       11:58
8    often.  There's a handful of names I could              11:58
9    potentially think of where me might recognize the       11:58
10   names when they come in.                                11:58
11       Q.   During the investigations that you             11:58
12   testified in, did you become aware that medical         11:58
13   records had been shared with a number of different      11:58
14   employees?                                              11:58
15       A.   No, I don't recall any medical records         11:58
16   being shared with any other employees.                 11:58
17       Q.   Are you aware, in any of the investigations    11:58
18   that you testified in, that COII forms for all of       11:58
19   the charged employees were shared with all of the      11:59
20   charged employees?                                      11:59
21       A.   Yes, the COIIs were shared on the basis of     11:59
22   how we were conducting the investigations.             11:59
23       Q.   And you recognize that the COII forms          11:59
24   contained personal and private information of the       11:59
25   individuals; correct?                                   11:59

                                                             177

```
 1        A.    There were names, dates of births, the form    11:59

 2   request, the employee ID, and last four of their          11:59

 3   Social Security Number.                                    11:59

 4        Q.    In some instances, those COIIs contained        11:59

 5   the entire Social Security Number; is that right?          11:59

 6        A.    In some cases, that was correct, yes.           11:59

 7        Q.    And that information was distributed among       11:59

 8   all of the charged employees; right?                        11:59

 9        A.    No.  The individuals were grouped by craft       11:59

10   and union affiliation, so not every person received         11:59

11   every single -- or I should say the investigations          12:00

12   were grouped.  The COIIs were exhibits at all of the        12:00

13   investigations.                                             12:00

14             When we discovered that there was                 12:00

15   information that was of concern to employees in our         12:00

16   initial group of individuals that went through the         12:00

17   investigation process, we went -- went ahead and          12:00

18   then had that information redacted and advised those      12:00

19   individuals that may have received it that they           12:00

20   should not distribute it any further.                      12:00

21        Q.    And not only was that information shared        12:00

22   among the charged employees, it was also shared           12:00

23   among union representatives who attended the formal       12:00

24   investigations; right?                                     12:00

25        A.    The union representatives were there as        12:00
```

178

Craig Heligman, M.D.                                        April 28, 2021

```
 1   part of their responsibility under the Collective    12:00

 2   Bargaining Agreement.  But, yes, they would have      12:01

 3   received all the exhibits, just as the employees      12:01

 4   would have.                                           12:01

 5       Q.   And it was also shared among CSX management  12:01

 6   personnel who were present at the investigations;     12:01

 7   right?                                                12:01

 8       A.   The -- yes, it would have been shared with   12:01

 9   the individuals who had a need to see the exhibits.   12:01

10   I honestly don't recall if the Charging Officer had   12:01

11   a reason to view them, but certainly the Hearing      12:01

12   Officer did.                                          12:01

13       Q.   And you would agree that Social Security     12:01

14   Numbers are private, confidential information;        12:01

15   correct?                                              12:01

16       A.   Yes, they're private information.            12:01

17       Q.   And you would agree that medical diagnoses   12:01

18   and medical conditions are private personal           12:01

19   information; right?                                   12:01

20       A.   It's considered personal information for     12:01

21   the interests of the doctor/patient relationship,     12:01

22   yes.                                                  12:01

23       Q.   And you would agree that that is not         12:01

24   information that should be shared publically;         12:01

25   correct?                                              12:01
```

                                                              179

Craig Heligman, M.D.                                        April 28, 2021

1        A.   It has an issue of whether or not there was      12:02

2    a need to know.  So when there is a need to know the      12:02

3    information, then, yes, it may be shared.                 12:02

4        Q.   Well, the charged employees did not have a       12:02

5    need to know everybody else's medical condition;          12:02

6    right?                                                    12:02

7        A.   In the manner in which the investigations        12:02

8    were conducted, then, yes, they would have had a          12:02

9    need to see the exhibits.  And so this was done in        12:02

10   accordance with the requirements of the                   12:02

11   investigation process.                                    12:02

12       Q.   There was no requirement that employees be       12:02

13   investigated together, is there?                          12:02

14       A.   That's outside the scope of my -- my             12:02

15   responsibilities.  I didn't make any determination        12:02

16   along how the investigations were to be conducted.        12:02

17       Q.   Well, you introduced the exhibits, did you       12:02

18   not?                                                      12:02

19       A.   Yes.                                             12:02

20       Q.   Okay.  So you had a decision to make as to       12:02

21   whether to disclose that private information amongst       12:02

22   all of the individuals in the investigation; right?       12:03

23       A.   As part of the investigation process, it         12:03

24   was -- I had presented those as exhibits in the           12:03

25   course of the investigation process; therefore,           12:03

                                                                    180

Craig Heligman, M.D.                                              April 28, 2021

1    those present had a need to know.                    12:03

2        Q.    Nobody in the investigation needed to know  12:03

3    the individual Social Security Numbers, did they?    12:03

4        A.    We don't ask for those Social Security     12:03

5    Numbers on those forms.  If there was a potential    12:03

6    oversight on the part of the employee and they added 12:03

7    their entire Social Security Number and we           12:03

8    identified that, we fixed the problem and, again,    12:03

9    advised the employees not to share that information  12:03

10   beyond the scope of the investigation.               12:03

11       Q.    As the individual introducing those        12:03

12   exhibits in the investigation, though, it was        12:03

13   incumbent upon you to make sure that you were not    12:03

14   disclosing private information; correct?             12:03

15       A.    It's my responsibility to present the      12:03

16   exhibits, not to confirm that the employee did or    12:04

17   did not fill out those forms accurately.             12:04

18       Q.    Okay.  So you're blaming the employee for  12:04

19   putting their Social Security Number on a form but   12:04

20   take no responsibility for disclosing that           12:04

21   information; is that right?                           12:04

22       A.    What I'm saying is --                       12:04

23           MS. FOSTER BIRD:  I'm going to object.  I'm   12:04

24   going to object.  That was a misstatement of his     12:04

25   testimony.  You can ask a question, but you cannot   12:04

                                                              181

Craig Heligman, M.D.                                              April 28, 2021

| | | |
|---|---|---|
| 1 | restate something he supposedly said and then | 12:04 |
| 2 | misstate it, which is what you did. | 12:04 |
| 3 | MR. DINGWALL:  Well, Dr. Heligman told me | 12:04 |
| 4 | at the outset he would let me know if he didn't | 12:04 |
| 5 | understand my question or if I did -- said something | 12:04 |
| 6 | wrong, and I'm sure he's capable of doing so. | 12:04 |
| 7 | MS. FOSTER BIRD:  I have the right to make | 12:04 |
| 8 | an objection.  I've made it.  Thank you. | 12:04 |
| 9 | BY MR. DINGWALL: | 12:04 |
| 10 | Q.   You can go ahead and answer, Dr. Heligman. | 12:04 |
| 11 | A.   You'll have to ask the question again. | 12:04 |
| 12 | Q.   So is it your position that the employees | 12:04 |
| 13 | are to blame for the disclosure of their Social | 12:04 |
| 14 | Security Numbers because they included their Social | 12:04 |
| 15 | Security Numbers on the COII form? | 12:04 |
| 16 | A.   What I'm saying is we never requested it, | 12:04 |
| 17 | that when we presented the documents that were | 12:05 |
| 18 | needed for the purposes of the investigation, we did | 12:05 |
| 19 | so. | 12:05 |
| 20 | One of the employees identified -- or it | 12:05 |
| 21 | could be one of the union officials that identified | 12:05 |
| 22 | that the Social Security Numbers were on those | 12:05 |
| 23 | forms.  We then proceeded to redact them for the -- | 12:05 |
| 24 | for the rest of the investigations.  There was no | 12:05 |
| 25 | mal-intent in that and there was no specific issue | 12:05 |

182

USCA4   2001

| | | |
|---|---|---|
| 1 | beyond that. | 12:05 |
| 2 | Q.   But you take responsibility for your role | 12:05 |
| 3 | in introducing those documents without first making | 12:05 |
| 4 | sure that the confidential information was redacted | 12:05 |
| 5 | or otherwise not shared; right? | 12:05 |
| 6 | A.   Well, again, the documents were delivered | 12:05 |
| 7 | as a need to know.  So the information that the | 12:05 |
| 8 | individuals that were charged during the | 12:05 |
| 9 | investigation process had those -- had a right to | 12:05 |
| 10 | those exhibits.  Those exhibits were distributed. | 12:05 |
| 11 | At a later date, it was identified by | 12:05 |
| 12 | either an employee or a group of employees or one of | 12:05 |
| 13 | the union officials that said this was an oversight. | 12:06 |
| 14 | They would like to have -- they were concerned about | 12:06 |
| 15 | it.  We said we understand.  We corrected the | 12:06 |
| 16 | problem.  We advised the employees that had already | 12:06 |
| 17 | received the unredacted documents to not disclose | 12:06 |
| 18 | the information any further. | 12:06 |
| 19 | Q.   What was the need-to-know basis for | 12:06 |
| 20 | employees in an investigation -- well, let me start | 12:06 |
| 21 | over. | 12:06 |
| 22 | The formal investigations involved multiple | 12:06 |
| 23 | charged employees; correct? | 12:06 |
| 24 | A.   Yes. | 12:06 |
| 25 | Q.   So in some cases, there might have been | 12:06 |

183

```
 1   two, three, or four employees charged in the same    12:06

 2   investigation; right?                                12:06

 3       A.   The -- the number varied, but, yes, there   12:06

 4   were multiple employees at each of the               12:06

 5   investigations.                                      12:06

 6       Q.   And in those investigations in which you    12:06

 7   testified, you introduced documents, including the   12:06

 8   COII forms; correct?                                 12:07

 9       A.   That's correct.                             12:07

10       Q.   And you introduced the COII forms of        12:07

11   everybody that was involved in the investigation;    12:07

12   correct?                                             12:07

13       A.   That's because we had to demonstrate that   12:07

14   there was a patten present.  Without multiple        12:07

15   documents, then you can't present a pattern.         12:07

16       Q.   And so there was no way for you to present  12:07

17   a pattern without disclosing Social Security         12:07

18   Numbers?                                             12:07

19       A.   There was no way to present the pattern     12:07

20   without presenting the COII documents of all the     12:07

21   individuals involved.                                12:07

22       Q.   But you certainly could have redacted the   12:07

23   Social Security Numbers; correct?                    12:07

24       A.   We certainly could have redacted the Social 12:07

25   Security Numbers, and we did so when we identified   12:07
```

184

```
 1   the issue.  But there was no intent of thinking that    12:07
 2   this was something that was of concern until the        12:07
 3   employees had identified it and said that they were     12:07
 4   concerned.  We resolved that issue.                     12:08
 5        Q.   Well, as a medical professional and the       12:08
 6   Chief Medical Officer of a major corporation, that's    12:08
 7   something you should have known beforehand; right?      12:08
 8        A.   It's an issue that we did not recognize at    12:08
 9   the time.  We fixed it, and we went forward.            12:08
10        Q.   So you gave yourself the benefit of the       12:08
11   doubt; right?                                           12:08
12        A.   We recognized the problem.  We fixed it.      12:08
13   We moved on.                                            12:08
14        Q.   How did you fix it?                           12:08
15        A.   The information was redacted.  The            12:08
16   employees were each individually sent a -- I believe    12:08
17   they were sent a letter and told verbally not to        12:08
18   share the information beyond the scope of the           12:08
19   investigation itself.                                   12:08
20        Q.   You can't un-ring the bell, though; right?    12:08
21        A.   Again, we recognized the problem.  We fixed   12:08
22   it.  We moved on.                                       12:08
23        Q.   So I think what I'm hearing you say is you    12:09
24   recognized the problem, you fixed it, and you moved     12:09
25   on; right?                                              12:09
```

                                                                     185

Craig Heligman, M.D.                                            April 28, 2021

```
 1          A.    I'm pretty sure that's what I said, yes.      12:09

 2          Q.    Okay.  Dr. Heligman, what is your             12:09

 3    educational background?                                   12:09

 4          A.    How far back would you like me to go?         12:09

 5          Q.    Undergraduate, please.                        12:09

 6          A.    University of Missouri, I received a B.A.     12:09

 7    in Biology.  I then went to medical school at             12:09

 8    St. Louis University.  I received my M.D.  I went         12:09

 9    into internship at the Naval Hospital Pensacola in        12:09

10    Pensacola, Florida.  Then I -- during that time           12:09

11    period, I applied for and received my medical             12:09

12    license from the State of Missouri.                       12:09

13          I did five years on active duty in the              12:09

14    Navy, did my residency at Methodist Hospital in           12:09

15    Indianapolis in the specialty of occupational             12:10

16    medicine.  During that time period, I also received       12:10

17    a Master's -- a Master's in Health at Purdue and          12:10

18    completed my residency.                                   12:10

19          I applied for board certification at the            12:10

20    earliest opportunity and, again, passed the test,         12:10

21    received my official notice of board                      12:10

22    certification -- I believe it was January of 1996.        12:10

23    I've also participated in ongoing continuing medical      12:10

24    education throughout the course of my career in           12:10

25    excess of what is required by any licensing state         12:10
```

186

Craig Heligman, M.D.                                                    April 28, 2021

| | | |
|---|---|---|
| 1 | that I held a license in. | 12:10 |
| 2 | Q.   And your board certification is in | 12:10 |
| 3 | occupational medicine? | 12:10 |
| 4 | A.   That's correct. | 12:10 |
| 5 | Q.   Okay. | 12:10 |
| 6 | MR. DINGWALL:  Well, we've been going for | 12:10 |
| 7 | just about an hour again.  Let's take a five-minute | 12:11 |
| 8 | break. | 12:11 |
| 9 | THE WITNESS:  Okay. | 12:11 |
| 10 | THE VIDEOGRAPHER:  Off the record at | 12:11 |
| 11 | 12:11 p.m. | 12:11 |
| 12 | (Recess taken.) | 12:27 |
| 13 | THE VIDEOGRAPHER:  We are back on the | 12:30 |
| 14 | record at 12:30 p.m. | 12:30 |
| 15 | | 12:30 |
| 16 | EXAMINATION | 12:30 |
| 17 | BY MR. PAUL: | 12:30 |
| 18 | Q.   Good afternoon, Dr. Heligman.  My name is | 12:30 |
| 19 | Greg Paul, and we are going to continue with your | 12:30 |
| 20 | deposition today, looking at some documents, | 12:30 |
| 21 | following up on Mr. Dingwall's questions today. | 12:30 |
| 22 | Sound good? | 12:30 |
| 23 | A.   I'm at your disposal. | 12:30 |
| 24 | Q.   All right.  Thank you. | 12:30 |
| 25 | Just before we look at those, I just want | 12:30 |

187

Craig Heligman, M.D.                                                    April 28, 2021

```
 1    to ask you a few questions on the background of the    12:30

 2    Certificate of Ongoing Illness form.                   12:30

 3            Is that a document that was generated by        12:30

 4    the Medical Department at CSX?                          12:30

 5        A.   Mr. Paul, you're echoing on my end.            12:30

 6        Q.   Okay.  Am I echoing now?                       12:30

 7        A.   No, it's fine.                                 12:30

 8        Q.   Okay.  Let me know -- let me know if that      12:30

 9    happens again.                                          12:30

10            So you didn't hear my question or it was        12:30

11    just difficult to hear because of an echo?             12:30

12        A.    It was difficult, but you asked if the COII   12:31

13    was a form that was created by the Medical             12:31

14    Department?                                             12:31

15        Q.    That's correct.                               12:31

16        A.    The answer is yes.                            12:31

17        Q.    Okay.  And approximately -- well, has the     12:31

18    COII form been in existence since you came to CSX as   12:31

19    Associate --                                            12:31

20        A.    Yes.                                          12:31

21        Q.    -- Medical Director?                          12:31

22        A.    Yes.                                          12:31

23        Q.    Okay.  Have there -- have there been          12:31

24    different forms or versions of it over the years       12:31

25    that you've been there?                                12:31
```

188

Craig Heligman, M.D.                                          April 28, 2021

```
 1        A.    Yes.                                  12:31

 2        Q.    Okay.  Approximately how many versions have  12:31

 3   there been since you came aboard?               12:31

 4        A.    I think we've updated it one or two times  12:31

 5   since I've been here.  We've received COIIs     12:31

 6   completed that actually date back to about three  12:31

 7   CMOs ago, so it's been updated a few times over the  12:31

 8   years.                                          12:31

 9        Q.    Okay.  And just, if you could, explain what  12:31

10   the purpose is of the Certificate of Ongoing Illness  12:31

11   or Injury.                                      12:31

12        A.    Certainly.                           12:31

13             When an employee is off work for medical  12:31

14   reasons, they have an obligation under their    12:32

15   Collective Bargaining Agreement to keep the employer  12:32

16   informed as to their status and when they're ready  12:32

17   to return to work or -- or if they're not ready to  12:32

18   return to work.                                 12:32

19             The COII is intended as a tool for the  12:32

20   employee to have their provider let us know whether  12:32

21   or not they're able to return to work or not and to  12:32

22   give us some background on the medical issues so we  12:32

23   can ascertain, with some level of expectation, when  12:32

24   we think they might be able to come back.       12:32

25        Q.    And is the COII used for both work-related  12:32
```

189

Craig Heligman, M.D.                                                April 28, 2021

```
 1   and non-work-related absences?                    12:32

 2        A.    Yes.                                    12:32

 3        Q.    Okay.  And is there an appropriate period  12:32

 4   of time that requires -- excuse me -- appropriate    12:32

 5   period of time of an absence that requires the use   12:32

 6   of a Certificate of Ongoing Illness?               12:32

 7        A.    It depends on the Collective Bargaining   12:32

 8   Agreement, but, generally speaking, it's every      12:32

 9   45 days or so.  We are willing to accept medical    12:33

10   records or other statements from the treating       12:33

11   physician as long as it provides us with similar    12:33

12   information.                                        12:33

13        Q.    Okay.  Yeah, I think you testified earlier  12:33

14   today about that fact.  And I appreciate the        12:33

15   45 days.                                            12:33

16             My question was a little bit different, but  12:33

17   while we're on the 45 days, does that mean that if  12:33

18   an employee is going to be off work for longer than  12:33

19   45 days, they have to resubmit an updated COII form?  12:33

20        A.    That's correct.                         12:33

21        Q.    Okay.  The question that I meant to ask --  12:33

22   and perhaps I didn't ask it well -- is if an        12:33

23   employee is, say, off for three days, do they have  12:33

24   to submit a COII, or is there a defined period of   12:33

25   time that requires the use of that form?            12:33
```

190

Craig Heligman, M.D.                                          April 28, 2021

```
 1        A.   I understand.                          12:33

 2             No, the COII form is the -- again, the  12:33

 3   periodic notification to the employer.  If an     12:33

 4   individual is off work for minor medical issues that 12:33

 5   are less than seven days, then we use what's called  12:34

 6   our doctor's note process.  The information     12:34

 7   requested isn't as -- as much, and really it's used 12:34

 8   to administer the attendance points system.     12:34

 9             Individuals who are away from work for  12:34

10   whatever reason may be -- may have points assigned  12:34

11   to their attendance record.  And at a certain level 12:34

12   when there's so many cumulative points, they may    12:34

13   receive a disciplinary letter or some sort of    12:34

14   intervention like that.  The medical part of that is 12:34

15   in the Collective Bargaining Agreements, and each    12:34

16   one is a little bit different.                   12:34

17             If an employee is away for an emergent or 12:34

18   significantly urgent medical problem, then those  12:34

19   points can be waived, and so the employee would send 12:34

20   us a note from the provider outlining what the issue 12:34

21   was.  We would say whether it meets the definition  12:34

22   in the agreement or not, and then it would be    12:34

23   determined if points would be waived for that    12:35

24   particular event.                               12:35

25             For absences that are longer than      12:35
```

191

1   seven days, for a person to return to work, we have       12:35

2   what we call an MD-3 form.  That's our attending          12:35

3   physician statement.  So if there's a serious            12:35

4   medical concern that is less than seven days, a          12:35

5   surgery, or a medical-related absence of seven days      12:35

6   or longer, we ask that the employee complete an MD-3     12:35

7   form before they come back to work.  And we would do     12:35

8   our fitness-for-duty review at that point in time.       12:35

9          So for short duration, minor medical issues       12:35

10  potentially, or a notification of a short-term           12:35

11  emergency need for services, we use our doctor's         12:35

12  note process.  Serious medical issues and longer         12:35

13  than seven-day absences for return-to-work purposes,     12:35

14  it's the MD-3 form.  And for ongoing absence of a        12:35

15  longer period of time, then we use a COII for the        12:36

16  periodic update of the information.                       12:36

17     Q.   Okay.  And I know -- I think you mentioned        12:36

18  earlier that typically these forms have been faxed       12:36

19  into the Medical Department; is that correct?            12:36

20     A.   Faxed or e-mailed.  We just don't see a lot      12:36

21  of hand-carried anymore.                                 12:36

22     Q.   Okay.  Or first-class mail, is that true,        12:36

23  too?                                                     12:36

24     A.   First-class mail, yes.                           12:36

25     Q.   Okay.  So typically e-mail and fax.              12:36

                                                              192

```
1              And is it correct to say that they do come    12:36
2    to the Medical Department in Jacksonville?             12:36
3        A.   Yes, we have several fax lines that the       12:36
4    nurses monitor so they can manage the incoming         12:36
5    information.                                           12:36
6        Q.   Okay.  And is this a fax line in the          12:36
7    Medical Department that goes right to, like, an        12:36
8    e-mail or electronic format as opposed to the old      12:36
9    school-type?                                           12:36
10       A.   Yes, it's a digital fax, so it comes to a     12:36
11   specified mailbox.                                     12:36
12       Q.   And -- and right now we're just talking       12:36
13   general process, but whose job responsibility by       12:36
14   title is responsible for reviewing those forms when    12:36
15   they come into the Medical Department?                 12:37
16       A.   We have three nurses, and although they       12:37
17   have their individual responsibilities, they can       12:37
18   potentially review any of the fax boxes to keep the    12:37
19   information flowing.                                    12:37
20            So we have one that is focused on the         12:37
21   return to work for off-duty medical issues, one of     12:37
22   the nurses will be doing the doctors' notes as part    12:37
23   of their primary job responsibilities, and the third   12:37
24   nurse's primary responsibility would be related to     12:37
25   the on-duty medical issues.                            12:37
```
                                                                   193

1       Q.    Okay.  And back in 2017, do you remember      12:37

2   which nurse was responsible for reviewing the COIIs     12:37

3   that came in?                                           12:37

4       A.    Kelly Crouch.                                 12:37

5       Q.    Okay.  And I guess -- well, I can ask her,    12:37

6   but just -- I guess your her supervisor; right?         12:37

7       A.    I was at that time.  I'm not today.           12:37

8       Q.    Okay.  Did she have any job                   12:37

9   responsibilities to review the completeness of those    12:37

10  forms as they come in?                                  12:38

11      A.    Yes.  They come in with various levels of     12:38

12  completeness.  As long as there's sufficient            12:38

13  information for us to understand what the issues         12:38

14  are, we don't really get hung up too much about         12:38

15  dotting the I's and crossing the T's in every single    12:38

16  case.                                                   12:38

17      Q.    In the event that someone like Kelly or       12:38

18  yourself deemed a COII insufficient, what's the         12:38

19  process for making it compliant?                        12:38

20      A.    Typically it's either a phone call,           12:38

21  potentially a letter that goes back to the employee     12:38

22  with a new form.  Typically we accept the COIIs as      12:38

23  they come in.  Usually there's sufficient               12:38

24  information.                                            12:38

25      Q.    Okay.  But it sounds like if there's any      12:38

                                                                    194

Craig Heligman, M.D.                                                    April 28, 2021

| | | |
|---|---|---|
| 1 | question about completeness or other accurateness of | 12:38 |
| 2 | the COII, it's the nurse that would reach out to the | 12:38 |
| 3 | employee to -- to fix it or to get additional | 12:39 |
| 4 | information? | 12:39 |
| 5 | A.   Yes, that's typically part of their | 12:39 |
| 6 | responsibility. | 12:39 |
| 7 | Q.   Okay.  And we're obviously going to look at | 12:39 |
| 8 | some of these.  I know you've seen a lot of them. | 12:39 |
| 9 | But is it accurate to say that the employee | 12:39 |
| 10 | fills part of those out, and then the doctor's | 12:39 |
| 11 | office or whatever health care provider's office | 12:39 |
| 12 | fills out other parts of it? | 12:39 |
| 13 | A.   Right.  The expectation is that the | 12:39 |
| 14 | employee completes the demographics section at the | 12:39 |
| 15 | top, and then the medical office or provider would | 12:39 |
| 16 | complete the rest of it. | 12:39 |
| 17 | Q.   Okay.  Has it ever been the policy or | 12:39 |
| 18 | practice there at CSX at the Medical Department to | 12:39 |
| 19 | reach out to the health care provider for any | 12:39 |
| 20 | additional information that's necessary? | 12:39 |
| 21 | A.   Yes, we do that from time to time. | 12:39 |
| 22 | Q.   Okay.  So it's accurate to say it's an | 12:39 |
| 23 | option to both contact the employee or the health | 12:39 |
| 24 | care provider if there's any questions about the | 12:39 |
| 25 | COII? | 12:39 |

195

USCA4   2014

Craig Heligman, M.D.                                          April 28, 2021

```
 1        A.   Right.                                    12:39

 2        Q.   Okay.  And I understand your testimony    12:39

 3   today that you reviewed the COIIs for the plaintiffs 12:39

 4   in this case, and you've explained the reasons why.  12:40

 5        But my question is:  Outside of this case,      12:40

 6   is it accurate to say that it's not part of your job 12:40

 7   responsibilities to review the COIIs?  Or is that    12:40

 8   not true?                                            12:40

 9        A.   It depends on the circumstances.  Most of  12:40

10   the documentation is handled by the nurses.  They    12:40

11   understand the, you know, policies, practices,       12:40

12   expectations on the medical side.  They can handle   12:40

13   most of this information without my intervention.    12:40

14        When there are questions, that's when they      12:40

15   bring me into it.  And it could be a COII, could be  12:40

16   an MD-3, could be almost any number of things        12:40

17   regarding medical issues that occur throughout the   12:40

18   company.                                             12:40

19        Q.   What are some -- what are the circumstances 12:40

20   that you would get involved in reviewing an incoming 12:40

21   COII?                                                12:40

22        A.   Well, if it's perhaps incomplete in the    12:40

23   nurse's mind and they want to know -- if we need to  12:40

24   get additional information, they may ask about that. 12:41

25   But we also review them not just in realtime, but    12:41
```

196

Craig Heligman, M.D.                                              April 28, 2021

1    there may be issues for cases that are ongoing.  And     12:41

2    I'm trying to get acquainted with the facts of the       12:41

3    case, and I'll go through the medical file and our       12:41

4    case management notes and review the COIIs at that       12:41

5    time.                                                    12:41

6        Q.   Okay.  Do you have any job                      12:41

7    responsibilities -- and right now this is at any         12:41

8    time that you've been with CSX, so if it's changed,      12:41

9    just let me know and we'll narrow it down.               12:41

10          Have you ever had any job responsibilities        12:41

11   with respect to the administration of the Family         12:41

12   Medical Leave Act or FMLA?                               12:41

13       A.   No, I do not administer that.                   12:41

14       Q.   Okay.  And if I use a word other than           12:41

15   "administer," do you or does anyone in the Medical       12:41

16   Department have any job responsibilities with            12:41

17   respect to any aspect of the FMLA?                       12:41

18       A.   Oh, we have some responsibilities.  It          12:42

19   depends upon the group that administers that program     12:42

20   to determine whether or not they have a question         12:42

21   about the medical information, and they will send        12:42

22   that information to the nurse or to myself.              12:42

23          Just a quick example, an individual               12:42

24   submitted an FMLA form that has a recommendation for     12:42

25   restricted activity at work.  That would be              12:42

                                                              197

1    forwarded to our department for review to determine      12:42

2    if there's any need to look into an accommodation        12:42

3    issue.                                                    12:42

4          Frequently there's a medication issue that         12:42

5    may come up and they would like us to opine on that      12:42

6    for safety reasons.  We also ask that they send us a     12:42

7    notification if individuals are off work under FMLA      12:42

8    for drug and alcohol treatment.  We do have a fairly     12:42

9    robust program in that area, so we'd want to know        12:42

10   about those cases and get them into our EAP team.        12:42

11         In cases where there's a question of               12:43

12   whether or not the usage pattern of FMLA was             12:43

13   potentially questionable, then the FMLA office may       12:43

14   also send those to me and take a review of the           12:43

15   information provided.                                     12:43

16         Those are the broad strokes of what we do          12:43

17   with FMLA.                                                12:43

18      Q.   Okay.  And is that currently or is that          12:43

19   historically the case?                                    12:43

20      A.   Both.                                            12:43

21      Q.   Okay.  Because I know at some point CSX          12:43

22   switched over to using Kepro; is that correct?           12:43

23      A.   Yes.  And I don't actually know the name of      12:43

24   the company they had been using before Kepro.            12:43

25      Q.   Okay.  So with respect to your testimony         12:43

198

```
 1    about your involvement in the FMLA, has that been      12:43

 2    the same regardless of whether Kepro was in the        12:43

 3    picture with respect to FMLA administration?           12:43

 4        A.   Yes.                                           12:43

 5        Q.   Okay.  All right.  And I wanted to ask you     12:43

 6    if you've had any training while at CSX under the       12:44

 7    FMLA?                                                   12:44

 8        A.   No specific -- let's see -- their routine      12:44

 9    training that we have to go through on a periodic       12:44

10    basis where they discuss employee responsibilities      12:44

11    and what we need to do for FMLA.  But as far as         12:44

12    formal training beyond that, I've been in practice      12:44

13    since the FMLA came to fruition, and I've had to        12:44

14    manage issues related to FMLA in various capacities     12:44

15    for a long time now.                                    12:44

16        Q.   Okay.  Now, I'm not asking you any type of     12:44

17    a legal conclusion on this one, so don't take it        12:44

18    that way.                                               12:44

19             When you review -- when you have reviewed      12:44

20    Certificate of Ongoing Illnesses in general, have       12:44

21    you, yourself, or anyone that works under you in the    12:44

22    Medical Department ever considered that to be a         12:44

23    request for leave under the FMLA?                       12:44

24        A.   What happens is when we receive information    12:45

25    that we think it could be something that the            12:45
```

1    employee could request FMLA for, we have an area on        12:45

2    our case management system that can be check-boxed.        12:45

3    And that generates a report that goes to the FMLA         12:45

4    office saying that, you know, they're off work for         12:45

5    medical reasons.  We don't know what they did with        12:45

6    regard to FMLA, possibly could request it.                12:45

7           We don't know their eligibility at that            12:45

8    point.  It's for the FMLA office to decide what to        12:45

9    do with the information we send them after that.          12:45

10        Q.   Okay.  And I appreciate that description,        12:45

11   and by the way that you answered it, I think you          12:45

12   answered my question "Yes," but let me just make          12:45

13   sure that's clear for the record.                         12:45

14          So is your testimony:  The fact that there         12:45

15   is a process in place where a box can get checked in      12:45

16   the database management system that somebody in the       12:45

17   Medical Department thinks could be FMLA-qualifying,       12:45

18   does that mean that that's happened while you've          12:46

19   been at CSX?                                              12:46

20        A.   Oh, yes.  Yes, that was -- we introduced        12:46

21   that as we went into developing our case management       12:46

22   system.                                                   12:46

23        Q.   Okay.  And what's the name of that case         12:46

24   management system again, please?                          12:46

25        A.   Currently the company is called Cority,         12:46

                                                                    200

Craig Heligman, M.D.                                        April 28, 2021

```
 1    C-o-r-i-t-y.  Previously it was Medgate.        12:46

 2         Q.   Okay.  Do you recall what it was back in   12:46

 3    2017?                                           12:46

 4         A.   It's been Medgate since I first was aware  12:46

 5    of it in probably 1999 or so, I think.          12:46

 6         Q.   Okay.  Okay.  And, again, this is not a    12:46

 7    legal question I'm asking you, but have you had any  12:46

 8    training or do you have any understanding in the way 12:46

 9    that you go about doing your job duties about what   12:46

10    can be a potential FMLA-qualifying leave?       12:46

11         A.   Again, I've had some training in the course 12:46

12    of our routine information distributed here at CSX.  12:47

13    It was mostly on-the-job-type training since I was   12:47

14    already established and working at the time FMLA     12:47

15    came about.  So I've taken some courses in my past   12:47

16    when the FMLA first came out and picked up       12:47

17    additional information under the guidance of various 12:47

18    employment attorneys I've worked with in the past.  12:47

19         Q.   Okay.  With respect to that box that can be 12:47

20    checked, has that been in existence since at least   12:47

21    2017?                                           12:47

22         A.   Yes.                                  12:47

23         Q.   Okay.  Do you recall when that FMLA box,   12:47

24    for lack of a better word, began?               12:47

25         A.   I want to say we added it when we developed 12:47
```

                                                            201

Craig Heligman, M.D.                                                    April 28, 2021

1    the -- when we purchased the software or purchased      12:47

2    the system, I think we added it at that time.  And      12:47

3    it's -- we've tried to consider various                 12:47

4    possibilities and workflows, some successful, not --    12:48

5    some not so successful, but the FMLA box that we        12:48

6    added, I believe, came in from the beginning of when    12:48

7    we started using Medgate or Cority.                     12:48

8         Q.   Okay.  And when was that again,               12:48

9    approximately?                                          12:48

10        A.   I want to say 2000- -- hang on.  I want to     12:48

11   say 2014 was about the time we started establishing     12:48

12   ourselves using that program.                           12:48

13        Q.   And I take it it's one of the three nurses    12:48

14   that would check that FMLA box; is that correct?        12:48

15        A.   Or any of the other nurses that were          12:48

16   present prior to -- to when we had these three.         12:48

17        Q.   Of course.                                    12:48

18             Okay.  But when it comes to that FMLA box,    12:48

19   it would be one of the nurses in the CSX Medical        12:48

20   Department who would check it; is that right?           12:48

21        A.   Yes, that's correct.                          12:48

22        Q.   Okay.  Are you aware of any, you know,        12:48

23   guidance or policy or training that -- that has been    12:48

24   provided since 2014 to the present to inform or         12:49

25   educate the nurses as to what may be an                 12:49

                                                                        202

1   FMLA-qualifying event?                                12:49

2        A.   Again, outside of the routine requirements  12:49

3   that all of the employees have to receive for          12:49

4   general information, I don't know if any of them       12:49

5   received specific formal training on FMLA itself.      12:49

6             So, again, it's not something we             12:49

7   administer.  We have an understanding of it and what   12:49

8   it means and how it may interact with the cases that   12:49

9   we have, but they don't have a need to know the ins    12:49

10  and outs of FMLA because it's not really part of       12:49

11  their job.  So I don't recall that we've established   12:49

12  a formal training program for them.                    12:49

13       Q.   Okay.  Have any of the nurses ever come to   12:49

14  you for guidance on whether to check that FMLA box;    12:50

15  that is, questions about what could be an              12:50

16  FMLA-qualifying event?                                 12:50

17       A.   No.  Most of the time when you receive a     12:50

18  COII, it's 45 days out from the time they've been      12:50

19  off work.  All of those have the potential for being   12:50

20  qualified under FMLA, and so the actual default is     12:50

21  the box is checked, for the most part.                 12:50

22       Q.   Oh, okay.                                    12:50

23            And that's been the case since 2014 to the   12:50

24  present?                                               12:50

25       A.   Whether or not that default was set at that  12:50

                                                            203

Craig Heligman, M.D.                                                    April 28, 2021

| | | |
|---|---|---|
| 1 | time, I don't remember. | 12:50 |
| 2 | Q.   Okay.  So is it accurate to say that, while | 12:50 |
| 3 | I understand on the one hand that the nurses don't | 12:50 |
| 4 | have, like, per se, FMLA administrative duties, | 12:50 |
| 5 | the -- is it correct to say the purpose of the | 12:50 |
| 6 | box -- and there's a default on that box for a COII | 12:50 |
| 7 | form -- then it gets -- that document gets | 12:50 |
| 8 | electronically sent over to the FMLA department? | 12:51 |
| 9 | A.   Not the COII.  It generates a report | 12:51 |
| 10 | automatically from the system, and that report then | 12:51 |
| 11 | is automatically forwarded to the FMLA office. | 12:51 |
| 12 | Q.   And is that Jolanda Johnson?  Is that your | 12:51 |
| 13 | understanding? | 12:51 |
| 14 | A.   Yes, it was Jolanda Johnson at that time. | 12:51 |
| 15 | Since then she still has some responsibility for | 12:51 |
| 16 | FMLA, but there are other people involved in that as | 12:51 |
| 17 | well. | 12:51 |
| 18 | Q.   Okay.  Do you have any knowledge about | 12:51 |
| 19 | whether that default FMLA box was checked for the | 12:51 |
| 20 | plaintiffs in this case when the COIIs came in in | 12:51 |
| 21 | 2017? | 12:51 |
| 22 | A.   I looked at several of them, and all but | 12:51 |
| 23 | one that I looked at, it had already been checked. | 12:51 |
| 24 | Q.   Okay.  So this means that -- just trying to | 12:51 |
| 25 | clarify, when you -- are you testifying that when | 12:51 |

204

Craig Heligman, M.D.                                                    April 28, 2021

```
 1   you looked at the certificate in this case, you also    12:51

 2   checked the database to see whether the box was         12:52

 3   checked?                                                 12:52

 4        A.   No, no.  I did this recently and as --         12:52

 5   really as part of the preparation for today's           12:52

 6   activity.  And it looked like -- again, I didn't        12:52

 7   look at all of them, but a large number of them had     12:52

 8   the box checked and one of them did not.                12:52

 9        Q.   Okay.  So just getting it clear here, back    12:52

10   at the time in 2017, is it correct to say that you      12:52

11   did not look into whether the FMLA boxes were           12:52

12   checked for these plaintiffs?                           12:52

13        A.   That is correct.                              12:52

14        Q.   Okay.  Recently, you mean, like, in the       12:52

15   last couple of weeks, you -- in preparation for this    12:52

16   deposition, you went back and looked?                   12:52

17        A.   Yes.                                          12:52

18        Q.   Okay.  And is it your testimony that all      12:52

19   except one of the plaintiffs in this case, the FMLA     12:52

20   default box was checked?                                12:52

21        A.   No, I didn't look at every single one of      12:53

22   the individuals.  I looked at a non-scientific          12:53

23   selection of them.  And one of them was checked --      12:53

24   excuse me -- all of them were checked except for        12:53

25   one.  So while I can't speak to what had occurred in    12:53
```

Craig Heligman, M.D.                                                April 28, 2021

1    2017, I can tell you that most of the time the box    12:53

2    was checked.                                          12:53

3        Q.   Okay.  And I apologize if this is            12:53

4    repetitive, but can you just tell me how you went     12:53

5    about checking -- what you did in order to check      12:53

6    that box?                                             12:53

7            Just what steps did you take?                 12:53

8        A.   I went to our case management system, I      12:53

9    opened up the cases that were on this particular      12:53

10   case, and looked at the notes as well as looked at    12:53

11   the data and where that check box -- the check box    12:53

12   that was there.  Just, again, part of the process of  12:53

13   reviewing the information in preparation, and that     12:53

14   FMLA box was present.  It was checked.  It's kind of   12:54

15   right up in front on our initial screen.              12:54

16           And that's about the extent of it.            12:54

17       Q.   Okay.  And is -- that case management        12:54

18   field, if that's the correct term, is that part of a  12:54

19   medical file or a personnel file or something else?   12:54

20       A.   No, it's really just a trigger for us to     12:54

21   say -- again, trying to let the FMLA team know "Do     12:54

22   we need to" -- you know, "If you want to send -- if    12:54

23   you think it's appropriate to send the information     12:54

24   about FMLA to these employees, these cases came in     12:54

25   to us."  That's really the only purpose for that      12:54

                                                              206

Craig Heligman, M.D.                                    April 28, 2021

| | | |
|---|---|---|
| 1 | box. | 12:54 |
| 2 | Q.  Okay.  And the non-scientific study that | 12:54 |
| 3 | you did -- or not study, but the non-scientific | 12:54 |
| 4 | search, approximately how many people did you bring | 12:54 |
| 5 | up -- | 12:54 |
| 6 | A.  About a -- | 12:54 |
| 7 | Q.  -- of the plaintiffs? | 12:54 |
| 8 | A.  About a dozen. | 12:54 |
| 9 | Q.  And do you remember who they were? | 12:54 |
| 10 | A.  No, unfortunately I don't. | 12:55 |
| 11 | Q.  Okay.  Was it a -- did you just randomly | 12:55 |
| 12 | pick approximately 12 people from the plaintiffs, or | 12:55 |
| 13 | did you just go in alphabetical order or something | 12:55 |
| 14 | else? | 12:55 |
| 15 | A.  No, it was kind of a random selection.  I | 12:55 |
| 16 | wanted to pull up a few of the cases to refresh my | 12:55 |
| 17 | memory in preparation for the deposition. | 12:55 |
| 18 | Q.  Okay.  And do you happen to remember who | 12:55 |
| 19 | the person was that didn't have the box checked? | 12:55 |
| 20 | Did that stand out in your mind at all? | 12:55 |
| 21 | A.  It actually may have been Mr. Ginn'scase | 12:55 |
| 22 | since I'd already been deposed on his case.  I think | 12:55 |
| 23 | that -- | 12:55 |
| 24 | Q.  I see. | 12:55 |
| 25 | A.  I think that was the issue there. | 12:55 |

207

USCA4    2026

Craig Heligman, M.D.                                                April 28, 2021

```
 1        Q.   Okay.  So you believe it was Mr. Ginn that    12:55
 2   did not have the box checked?                           12:55
 3        A.   Correct.                                      12:55
 4        Q.   Okay.  Because I was going -- if you're not   12:55
 5   -- are you sure it was Gin?  Because if not, I just     12:55
 6   want to ask you:  What were the circumstances, if       12:56
 7   any, that stood out as that one person being            12:56
 8   different than the other, if that was the case?         12:56
 9        A.   His case was separate from the individuals    12:56
10   that you're representing, and I had already been        12:56
11   deposed on his case.                                    12:56
12        Q.   Got it, okay.                                 12:56
13             And if we wanted to look at that box and      12:56
14   that screen, other than referring to it as the case    12:56
15   management system, is there any more specific term      12:56
16   that you're aware of to describe what that screen       12:56
17   is?                                                     12:56
18        A.   It's just the new-case landing screen where   12:56
19   we put the basic information in.                        12:56
20        Q.   Okay.  After that box is checked and it       12:56
21   gets sent over to the FMLA people, do you or anybody    12:56
22   that work under you in the Medical Department have      12:56
23   any further involvement, in general?  I know there      12:56
24   could be a case-by-case exception, but in general.      12:57
25        A.   No, we -- we wouldn't have any further        12:57
```

208

USCA4    2027

| | | |
|---|---|---|
| 1 | involvement. | 12:57 |
| 2 | Q. Okay. Have you ever had any training under | 12:57 |
| 3 | the Americans with Disabilities Act, Rehabilitation | 12:57 |
| 4 | Act, or any other similar state disability | 12:57 |
| 5 | discrimination law? | 12:57 |
| 6 | A. Not specific to the states. I have -- I | 12:57 |
| 7 | have received some training in ADA. Again, ADA came | 12:57 |
| 8 | to fruition at a time when it was early in my | 12:57 |
| 9 | practice. So I have a working knowledge that can be | 12:57 |
| 10 | -- I can answer questions, I know what my | 12:57 |
| 11 | responsibilities are, but I'm not the expert. | 12:57 |
| 12 | Q. Okay. Are you familiar with the term | 12:57 |
| 13 | "reasonable accommodation"? | 12:57 |
| 14 | A. Yes. | 12:57 |
| 15 | Q. Okay. And, again, not in the legal sense, | 12:57 |
| 16 | but in terms of your job duties or training that | 12:57 |
| 17 | you've received at CSX, what does that mean to you? | 12:57 |
| 18 | A. It's a phrase used in the Americans with | 12:57 |
| 19 | Disabilities Act. | 12:57 |
| 20 | "Reasonable" is not particularly well | 12:57 |
| 21 | defined, but the simple answer is if an individual | 12:58 |
| 22 | is unable to perform their essential functions and | 12:58 |
| 23 | they would like to be accommodated for the ability | 12:58 |
| 24 | to continue to do their job, it is the employer's | 12:58 |
| 25 | responsibility to determine what reasonable | 12:58 |

209

USCA4   2028

1    accommodation may be offered to that employee so          12:58

2    that they may continue to perform the essential           12:58

3    functions of their job.                                   12:58

4         Q.    And what job duties do you have, if any,       12:58

5    with respect to reasonable accommodations at CSX?         12:58

6         A.    Most of the requests for job accommodation     12:58

7    will come through for my review, and we also have a       12:58

8    vocational -- well, we used to have two full-time          12:58

9    vocational rehab managers.  We currently have a           12:58

10   part-time consultant that handles it.  But it would       12:58

11   first go through either myself or our vocational          12:58

12   rehab specialists, and then we would then proceed to      12:58

13   initiate the process.                                     12:59

14        Q.    Are you familiar with a medical leave of       12:59

15   absence as being a form of a reasonable                   12:59

16   accommodation under the disability discrimination         12:59

17   laws?                                                     12:59

18        A.    What I understand that to be is leave as an    12:59

19   accommodation, and, yes, I'm familiar with it.  We        12:59

20   apply that from time to time as an accommodation.         12:59

21   Again, I don't believe it's well defined, but we use      12:59

22   it as an accommodation for some people.                   12:59

23        Q.    Okay.  And when it comes to that specific      12:59

24   topic as medical leave of absence as a form of an         12:59

25   accommodation, do you or anyone in the Medical            12:59

                                                                     210

```
 1   Department have job responsibilities with respect to   12:59

 2   that?                                                   12:59

 3        A.   I'm part of the team that would review        12:59

 4   that -- that topic, and if leave as an accommodation   12:59

 5   is being recommended by the team, we would advise      12:59

 6   the employee of such -- potentially either myself,     12:59

 7   one of the nurses, our voc rehab person, or            01:00

 8   potentially the manager.                               01:00

 9        Q.   And does that team have a name?              01:00

10        A.   No, it's an informal group of individuals    01:00

11   to look at all the information, make sure that we're   01:00

12   doing the interactive process, collecting the          01:00

13   appropriate information, discussing the case with a    01:00

14   manager, reviewing the medical information,            01:00

15   potentially up to and including talking with the       01:00

16   treating provider.                                     01:00

17            And so we, as a group -- and the group may    01:00

18   change depending upon the case, but it's really        01:00

19   trying to look at all angles for the requested         01:00

20   accommodation to determine whether or not the          01:00

21   company is able to grant that accommodation.           01:00

22        Q.   If it doesn't have a name, is it -- would     01:00

23   it be accurate to call it, like, a reasonable          01:00

24   accommodation committee?  Or is that too formal?       01:00

25        A.   It's really too formal.                      01:00
```

211

1         You know, some of our accommodations are          01:01

2    very simple.  It doesn't take a lot of people to       01:01

3    figure it out, and it doesn't even necessarily take    01:01

4    us collecting a job accommodation request form.        01:01

5    Some employees -- in fact, the vast majority of the    01:01

6    accommodations that we provide, the employee simply    01:01

7    has to make a request to their manager for something   01:01

8    simple, and typically it's granted.                    01:01

9         Again, a simple example may be for someone        01:01

10   with a hearing impairment that wants a visual alarm    01:01

11   or specialized equipment for telephonic purposes.      01:01

12   We'll provide that, and it doesn't even require        01:01

13   anything more formal than the employee asking their    01:01

14   manager and us securing the equipment.                 01:01

15       Q.   So an accommodation can be verbal.  It        01:01

16   doesn't have to require the use of the formal job      01:01

17   accommodation request form?                            01:01

18       A.   That's correct.                               01:01

19       Q.   Okay.  And you mentioned earlier about the    01:01

20   essential functions of the job.                        01:01

21       Do you remember that?                              01:02

22       A.   Yes.                                          01:02

23       Q.   Okay.  How do you go about, assuming you      01:02

24   have, to determine the essential functions of a        01:02

25   person's job?                                          01:02

                                                                      212

Craig Heligman, M.D.                                          April 28, 2021

```
 1        A.   I would rely on information from the        01:02
 2   manager, information from the employee, the job       01:02
 3   description.  But, by and large, it's someone         01:02
 4   outside of myself who would actually have to define   01:02
 5   the essential functions as they exist.                01:02
 6        Q.   Okay.  And the job descriptions, are you -- 01:02
 7   as an occupational medicine and medical director at   01:02
 8   CSX, are you familiar with at least all of the job    01:02
 9   descriptions of the plaintiffs in this case?          01:02
10        A.   I'm probably familiar with most of them.  I 01:02
11   couldn't recite them for you, but I'm sure I've seen  01:02
12   them.                                                 01:02
13        Q.   Okay.  Have you ever gone on field visits   01:02
14   to see how jobs are performed?                        01:02
15        A.   Yes.                                        01:02
16        Q.   Okay.  And was that, you know, like, part   01:02
17   of your job duties or was that just fun, like, to     01:03
18   see what an engineer does?  Well, let me ask a more   01:03
19   serious question.  But, I mean, is that -- like,      01:03
20   tell me the circumstances of how you actually did     01:03
21   that, went out in the field and saw how work was      01:03
22   performed.                                            01:03
23        A.   Different ways.  Sometimes it's a request   01:03
24   to come out and take a look at something.  That's     01:03
25   pretty unusual.  Most of the time it's -- we're       01:03
```

213

Craig Heligman, M.D.                                         April 28, 2021

```
 1    going out to just -- for our own information, to      01:03

 2    look at the job, learn what they do.  We may talk to  01:03

 3    the employees as they do their job.  We may go to     01:03

 4    our training center and actually attempt to do some   01:03

 5    of the work ourselves -- not very well I have to      01:03

 6    say, but we attempt.                                  01:03

 7           Also I've had prior experience with            01:03

 8    providing services to other railroads, so I've been   01:03

 9    to other railroad facilities prior to coming to CSX.  01:03

10    So I don't make those trips too frequently anymore.   01:03

11       Q.   Have you ever been to the Huntington, you     01:04

12    know, mechanical shop or the Russell car shop in      01:04

13    Kentucky?                                             01:04

14       A.   I've been there but not to observe any job    01:04

15    functions.                                            01:04

16       Q.   Okay.  And I forgot to ask you -- before we   01:04

17    move on too quickly -- who else was on that -- I      01:04

18    don't know what to call it other than accommodation   01:04

19    committee that's less formal?                         01:04

20       A.   And it's not necessarily a meeting of all     01:04

21    people at the same time, so it's more of a process.   01:04

22           We would talk to the operating manager for     01:04

23    that individual to find out what the business issues  01:04

24    are.  We would include our employment attorney to     01:04

25    make sure that we're following the rules as we        01:04
```

214

Craig Heligman, M.D.                                                    April 28, 2021

```
 1   should.  We would involve our vocational            01:04
 2   rehabilitation consultant or manager if they're --  01:04
 3   of the employee at that time.                        01:04
 4        We would -- and someone -- it may not be        01:04
 5   myself, but someone would communicate directly with 01:04
 6   the employee to get some information.  We would, if  01:05
 7   needed, get the job accommodation form completed by  01:05
 8   the treating provider, and if that wasn't completely 01:05
 9   clear, on some occasions, we would contact the       01:05
10   treating provider to gather additional information.  01:05
11        So the operating manager, our employment        01:05
12   attorney, vocational rehabilitation, myself -- those 01:05
13   are the most common participants.                    01:05
14     Q.   Okay.  And if I understood you correctly,     01:05
15   it's not a meeting or a telephone call.  It's more   01:05
16   of a process; is that what you said?                 01:05
17     A.   Right.  And I -- I forgot to mention we       01:05
18   also involve our HR business partner in that as      01:05
19   well, whoever's responsible for the HR function, to  01:05
20   help us gather the information.                       01:05
21     Q.   Now, you mentioned you have some prior        01:05
22   railroad experience?                                 01:05
23     A.   Yes.                                          01:05
24     Q.   Okay.  Can you tell me about that, please?    01:05
25     A.   I was invited to be a regional consulting     01:05
```

215

Craig Heligman, M.D.                                                    April 28, 2021

```
 1   physician by the Union Pacific Railroad.  I believe      01:06
 2   that was in 1998.  And that responsibility grew into     01:06
 3   a larger responsibility, and I was consulting for        01:06
 4   them as an assistant medical director.                   01:06
 5            During that time period, I was also invited     01:06
 6   to be the medical consultant for Kansas City             01:06
 7   Southern, which that started in 2004.  And I             01:06
 8   continued to be the medical director, the chief          01:06
 9   medical officer for Kansas City Southern until I         01:06
10   came onboard at CSX.  I stopped working for Union        01:06
11   Pacific -- I want to say it was 2006.                    01:06
12            And so three Class I Railroads, including       01:06
13   CSX, and I was also asked to consult with a short        01:06
14   line, the Rio Grande Pacific.                            01:06
15       Q.   And what time period was the Rio Grande         01:07
16   Pacific?                                                 01:07
17       A.   I want to say it was 2006, 2007, perhaps --     01:07
18   maybe later -- until I started with CSX.                 01:07
19       Q.   Okay.  Did all of those consulting jobs end     01:07
20   when you came to CSX?                                    01:07
21       A.   Yes, I started CSX as a full-time position.     01:07
22       Q.   That was 2012?                                  01:07
23       A.   January of 2012.                                01:07
24       Q.   Okay.  And I think you were associate           01:07
25   medical director for, what, like, three years and       01:07
```

216

Craig Heligman, M.D.                                                    April 28, 2021

```
 1    then took over from Dr. Neilson?                    01:07

 2         A.   Yes, that's correct.                      01:07

 3         Q.   Okay.  With respect to this consulting for  01:07

 4    the other railroads, was that through a private     01:07

 5    company or just you as an individual?               01:07

 6              Or how did that work?                      01:07

 7         A.   I put together an LLC and operated under   01:07

 8    that.                                                01:07

 9         Q.   Okay.  What was the name of the LLC,        01:07

10    please?                                              01:07

11         A.   It was Heligman Consultants.               01:07

12         Q.   Okay.                                       01:08

13         A.   And my career pathway is a little bit       01:08

14    disjointed at times.  I also had an actual           01:08

15    corporation.  And I've also been Heligman Consulting  01:08

16    when I was getting into doing the private consulting  01:08

17    work originally.  I then went to a full-employment    01:08

18    position, closed out that corporation, and then       01:08

19    after I left full employment with, of course,         01:08

20    benefits, I again reopened under an LLC entity to     01:08

21    perform the consulting work.                          01:08

22         Q.   Okay.  I know you mentioned earlier today   01:08

23    about the Long Island Railroad fraud case that        01:08

24    the -- I believe the U.S. Attorney's office and the   01:08

25    Railroad Retirement Board investigated.               01:08
```

                                                                217

Craig Heligman, M.D.                                                    April 28, 2021

```
 1              That's what you were referring to earlier?    01:08
 2         A.   Yes, sir.                                     01:08
 3         Q.   Okay.  And did you have any involvement        01:08
 4    with that as a consultant or otherwise?                 01:08
 5         A.   No, I did not.                                01:08
 6         Q.   Okay.  My understanding is that that really   01:08
 7    had to do with fraudulent -- piling fraudulent          01:09
 8    disability benefits with the United States Railroad     01:09
 9    Retirement Board, coupled with a fairly generous        01:09
10    pension -- early pension program that the Long          01:09
11    Island Railroaders had.                                 01:09
12              Does that sound right to you?                 01:09
13              Are we talking about the same thing?          01:09
14         A.   Yes, that sounds right.                       01:09
15              The other issue that came up was that all     01:09
16    of the employees were directed to two specific          01:09
17    health care providers.  I believe they were             01:09
18    orthopedic surgeons, and I believe they were also --    01:09
19    they had some legal issues related to that.  I can't    01:09
20    remember what the penalty was, whether there was        01:09
21    fines or jail time or -- or what the outcome of the     01:09
22    lawsuit, but there were two specific orthopedic         01:09
23    surgeons is my recollection.                            01:09
24         Q.   Is -- the fact that your recollection is      01:09
25    that there were these two orthopedic surgeons           01:09
```

218

USCA4    2037

Craig Heligman, M.D.                                                    April 28, 2021

```
 1    involved in the Long Island Railroad situation, is      01:09

 2    that what made you think about it when the              01:09

 3    plaintiffs in this case were treating with the two      01:10

 4    chiropractors?                                          01:10

 5        A.    That was -- that was one of the issues that   01:10

 6    may have come to mind, yes.                             01:10

 7        Q.    Okay.  Were there any other issues?  I        01:10

 8    mean, other -- let me ask that a little better way.     01:10

 9            Other than the Long Island Railroad             01:10

10    incident that you're familiar with, were you aware      01:10

11    of anything else in terms of fraudulent                 01:10

12    or potentially fraudulent claims at any of these        01:10

13    other railroads that you've worked for?                 01:10

14        A.    No, I've never been involved in that, any     01:10

15    potentially fraudulent claims.  There's always          01:10

16    disagreements about various aspects of on-duty          01:10

17    injuries or other claims against the company, but       01:10

18    none specific related to fraud.                         01:10

19        Q.    I wanted to follow up on the -- I know you    01:11

20    said you hadn't been to Huntington or Russell for       01:11

21    the purpose of looking at jobs.                         01:11

22            Have you ever been to any other facilities      01:11

23    at CSX -- while working at CSX -- for the purpose of    01:11

24    watching how job tasks are performed?  And I'm          01:11

25    really talking about for union employees, agreement     01:11
```

                                                                          219

Craig Heligman, M.D.                                    April 28, 2021

```
 1   employees.                                        01:11

 2        A.   Because the rest of us are kind of boring,  01:11

 3   actually.                                         01:11

 4        Q.   Agreed.                                 01:11

 5        A.   I've been to the training facility and  01:11

 6   have -- as I mentioned, had watched people learn how  01:11

 7   to do their jobs.  I've made some attempts to drive  01:11

 8   a spike -- failed miserably.  We've -- I've been on  01:11

 9   trips on the locomotive with the individuals.  I   01:11

10   hosted, at that time, the new NTSB medical officers  01:11

11   on a trip on one of our trains.  I've been to some  01:12

12   of the shops, been to yard offices.               01:12

13        Again, I can't give you specifics.  I just   01:12

14   don't remember all of the events.  I've been to    01:12

15   intermodal yards on a couple different occasions in  01:12

16   a couple different locations.  We have a -- an auto  01:12

17   ramp where the stevedores have to load and unload   01:12

18   the -- the automobiles from the auto racks.        01:12

19        So it's a mixed bag.                         01:12

20        Q.   Okay.  What about at prior railroads, the  01:12

21   same question?                                    01:12

22        A.   Yes, both at Kansas City Southern and at  01:12

23   Union Pacific.  Again, mixed bag of events going on,  01:12

24   tours of various locations for various reasons.    01:12

25   Most of it was for my education, not necessarily to  01:12
```

                                                          220

Craig Heligman, M.D.                                                  April 28, 2021

| | | |
|---|---|---|
| 1 | define essential functions. | 01:12 |
| 2 | Q.   Okay.  Fair enough.  Because that's where | 01:12 |
| 3 | the question started, so let me broaden that beyond | 01:13 |
| 4 | the essential functions. | 01:13 |
| 5 | But is it -- I mean, is it accurate to say | 01:13 |
| 6 | that either from field tests or from talking to | 01:13 |
| 7 | managers or from reading job descriptions, that | 01:13 |
| 8 | you're familiar with the job duties of each and | 01:13 |
| 9 | every one of the plaintiffs in this case? | 01:13 |
| 10 | A.   Yes, I believe so. | 01:13 |
| 11 | Q.   Okay.  And just to be complete, have you | 01:13 |
| 12 | ever watched any videos of the job tasks of the | 01:13 |
| 13 | plaintiffs in this case?  Not specifically the | 01:13 |
| 14 | plaintiffs, but the job description or the job | 01:13 |
| 15 | duties, rather. | 01:13 |
| 16 | A.   I can't recall what specific job videos I | 01:13 |
| 17 | may have seen, but I've seen demonstrations of | 01:13 |
| 18 | people performing job tasks for a variety of jobs. | 01:13 |
| 19 | I can't remember which ones they are, and I can't | 01:13 |
| 20 | remember which jobs are associated with which | 01:13 |
| 21 | employees in this case. | 01:13 |
| 22 | Q.   Sure. | 01:13 |
| 23 | Okay.  And we -- I think we've covered the | 01:13 |
| 24 | essential functions or the reasonable accommodation | 01:13 |
| 25 | piece of job duties, so let's just put that bucket | 01:14 |

221

Craig Heligman, M.D.                                                April 28, 2021

```
 1    over there.                                          01:14

 2              What other purposes have you reviewed the  01:14

 3    job duties of the railroaders, whether at CSX or the 01:14

 4    other railroaders -- other railroads?  Excuse me.    01:14

 5       A.   Well, the most common one these days is we   01:14

 6    have to submit forms to the RRB.  There's a form     01:14

 7    that -- when someone applies for disability benefits 01:14

 8    with the RRB, there's a few forms that are sent to   01:14

 9    our company to complete by the -- whoever in the --  01:14

10    whoever at the company is able to respond to those   01:14

11    forms.                                               01:14

12              One of them is a vocational form, and so as 01:14

13    part of the completion of that form, I attach a job  01:14

14    description on every case.  So I have printed out,   01:14

15    read, reviewed job descriptions on a regular basis   01:14

16    in order to comply with completion of those forms    01:15

17    for the RRB.                                          01:15

18       Q.   Okay.  Is it your understanding that, in     01:15

19    part, that's to assist the RRB in determining        01:15

20    whether someone is entitled to own-occupation        01:15

21    benefits, meaning that they cannot do their railroad 01:15

22    job?                                                  01:15

23       A.   Own-occupation or total perm.  It's either  01:15

24    one, I believe, yes.                                  01:15

25       Q.   Okay.  So it's for the purpose of assisting  01:15
```

222

```
 1   or supplying information to the Railroad Retirement    01:15
 2   Board to determine their eligibility for benefits,     01:15
 3   that is, whether they can do their railroad job or     01:15
 4   not?                                                   01:15
 5       A.   Correct.  It's information from the           01:15
 6   employer to the RRB so they make -- may make claims    01:15
 7   decisions on it.                                       01:15
 8       Q.   Okay.  So we've got the reasonable            01:15
 9   accommodation piece, the RRB piece.                    01:15
10           Are there any other reasons that you've        01:15
11   educated yourself about the job duties of various      01:15
12   railroaders -- railroad jobs?                          01:15
13       A.   Several years ago -- and please don't ask     01:16
14   me to give you dates because I really don't            01:16
15   remember -- there was a process in place where we      01:16
16   hired a company to go out and actually review the      01:16
17   jobs and update the job descriptions, and I don't      01:16
18   recall the company.                                    01:16
19           The individuals involved in that process       01:16
20   are no longer with the company, so I don't know        01:16
21   where that information is or where or how it was       01:16
22   used.  I just know it was conducted in order to        01:16
23   update job descriptions.  And as part of that, I       01:16
24   reviewed some of the information that was collected    01:16
25   for what the job descriptions were at that point in    01:16
```

223

Craig Heligman, M.D.                                                    April 28, 2021

```
 1   time.                                              01:16

 2        Q.   Okay.  Do you remember the name of that  01:16

 3   consulting group?                                  01:16

 4        A.   I really don't, no.                      01:16

 5        Q.   Okay.  Is it accurate to say that part   01:16

 6   of -- well, let me -- let me go back.              01:16

 7             Are there any other reasons that we haven't 01:16

 8   talked about so far about why you have studied or  01:16

 9   educated yourself about the job duties of          01:16

10   railroaders?                                       01:17

11        A.   Well, the most important reason to know  01:17

12   what the -- what the employee does in the form of  01:17

13   their job is to do appropriate decision-making on  01:17

14   fitness for duty.  If you don't know what their job 01:17

15   is, then how can you say whether they're fit to    01:17

16   perform it?  And so without any knowledge of their 01:17

17   job, I couldn't really act as the Chief Medical    01:17

18   Officer.                                           01:17

19        Q.   I've been watching Anderson Cooper do    01:17

20   Jeopardy, and he says, every other word, "Well     01:17

21   said," "Well said" or "Well done," "Well done."    01:17

22             Yeah, I can imagine that's probably one of 01:17

23   the biggest; right?  How do you determine fitness  01:17

24   for duty if you don't understand the job?  Got it. 01:17

25             Any others that we haven't talked about so 01:17
```

                                                                    224

| | | |
|---|---|---|
| 1 | far? | 01:17 |
| 2 | A.   I don't think so. | 01:17 |
| 3 | Q.   Okay.  Part of occupational medicine | 01:17 |
| 4 | includes preventive medicine; is that right? | 01:17 |
| 5 | A.   The Occupational Medicine Board is under | 01:17 |
| 6 | the -- one of the three divisions of the American | 01:17 |
| 7 | Board of Preventive Medicine. | 01:17 |
| 8 | Q.   Okay.  So that's a "Yes"; right? | 01:17 |
| 9 | A.   Yes. | 01:18 |
| 10 | Q.   Understood.  Yep, got it. | 01:18 |
| 11 | And can you say that board again, American | 01:18 |
| 12 | Preventive Medicine? | 01:18 |
| 13 | A.   The American Board of Preventive Medicine. | 01:18 |
| 14 | There's three divisions.  There's Occupational | 01:18 |
| 15 | Medicine, General Prevention in Public Health, and | 01:18 |
| 16 | Aerospace Medicine. | 01:18 |
| 17 | Q.   Okay.  And is -- is it correct to say that | 01:18 |
| 18 | another reason that you've studied or educated | 01:18 |
| 19 | yourself on job duties of railroaders is to prevent | 01:18 |
| 20 | injuries in the workplace? | 01:18 |
| 21 | A.   Yes, I think that's a fair assessment. | 01:18 |
| 22 | Q.   Okay.  And where does that fall in the | 01:18 |
| 23 | structure of CSX specifically, like, that -- those | 01:18 |
| 24 | job duties of preventing occupational injuries? | 01:18 |
| 25 | A.   It's really a day-to-day concept that we | 01:18 |

225

Craig Heligman, M.D.                                        April 28, 2021

```
 1    have to understand.  So in the case of an applicant   01:18

 2    who desires to work for CSX, I need to learn at       01:18

 3    least enough about their medical information to know  01:18

 4    if their medical profile would put them at risk if    01:19

 5    they were to perform job functions for CSX,           01:19

 6    depending upon what the job is.                       01:19

 7          It's kind of the opposite of the return to      01:19

 8    work following a medical event for fitness for duty.  01:19

 9    So it's on return to work and at -- at new hire.      01:19

10          Also part of that is we're responsible for      01:19

11    ongoing surveillance exams for different agencies,    01:19

12    whether it's OSHA, FRA, Motor Carriers.  We have to   01:19

13    manage the medical process and surveillance exams     01:19

14    for those kinds of functions.  And so if someone is   01:19

15    not meeting the medical guidance for those types of   01:19

16    jobs, we -- we would make those determinations, see   01:19

17    if there's a medical ability fit with the ability to  01:19

18    do the job.                                           01:19

19       Q.   Okay.  Does -- while you've been employed     01:19

20    at CSX, are you aware of any -- I just don't know     01:19

21    what to call them -- but, you know, where people are  01:20

22    required to exercise, like, 15 minutes before their   01:20

23    shift to stretch?                                     01:20

24          Does that concept sound familiar?              01:20

25       A.   Sure.                                         01:20
```

                                                              226

| | | |
|---|---|---|
| 1 | I think we are still doing that.  The | 01:20 |
| 2 | individuals involved in that program, a lot of them | 01:20 |
| 3 | have changed jobs or aren't with the company any | 01:20 |
| 4 | longer.  But we've promoted people to warm up before | 01:20 |
| 5 | they do greater physical activity that might be | 01:20 |
| 6 | required of them at work.  So there's a series of | 01:20 |
| 7 | stretching exercises that are recommended. | 01:20 |
| 8 | Mr. Edgar, who we talked about on the | 01:20 |
| 9 | ergonomics side, he was also involved in that | 01:20 |
| 10 | process when he was with the wellness team and | 01:20 |
| 11 | promoted that exercise program also. | 01:20 |
| 12 | Q.   Is that part of the Risk Management | 01:20 |
| 13 | Department or some other department? | 01:20 |
| 14 | A.   Some other department.  We had a wellness | 01:20 |
| 15 | team that started in the Medical Department when I | 01:20 |
| 16 | first came to CSX.  It then moved under a different | 01:20 |
| 17 | person's jurisdiction.  It moved again and again and | 01:21 |
| 18 | changed how we do our wellness functions, and so | 01:21 |
| 19 | today we are, again, modifying how we provide | 01:21 |
| 20 | wellness services to our employees. | 01:21 |
| 21 | Q.   Okay.  And briefly how is that? | 01:21 |
| 22 | What -- what changed? | 01:21 |
| 23 | A.   The leadership views.  We had a leadership | 01:21 |
| 24 | change in 2017 -- their viewpoint on how it fits | 01:21 |
| 25 | into the business.  The benefits that we may have | 01:21 |

227

```
1    gained from doing some of our wellness activities,    01:21

2    were they effective or not?  Were they something     01:21

3    that the employees participated in or not?           01:21

4           We went from a larger number of contracted    01:21

5    health and wellness professionals, whether they were 01:22

6    certified trainers or nutritionists that were        01:22

7    scattered around the system.  As the change in the   01:22

8    organization occurred, that number of people         01:22

9    reduced.  And at this point in time, the contract    01:22

10   for those individuals is discontinued at the end     01:22

11   of -- I believe it's May 1st or the end of May.  I   01:22

12   don't remember now.                                  01:22

13          And they're looking at modifying how we do    01:22

14   that.  So I understand we are looking for a wellness 01:22

15   manager to coordinate efforts, which will be mostly  01:22

16   associated with some of our benefits and vendored    01:22

17   activities.                                          01:22

18          So it's -- it has changed and progressed      01:22

19   over the years in many different ways.               01:22

20      Q.   What was the change that you referenced in   01:22

21   2017?                                                01:22

22      A.   We had a leadership change.  The -- and,     01:22

23   again, I'm not a finance guy either.  But there was  01:22

24   a group of individuals that promoted Mr. Hunter      01:22

25   Harrison to come in as the CEO of CSX.  I think it   01:23
```

                                                                    228

Craig Heligman, M.D.                                                    April 28, 2021

```
 1    was March of 2017.  Our former CEO then retired and      01:23
 2    our leadership changed to Mr. Harrison, and he           01:23
 3    brought in his leadership team and our top               01:23
 4    leadership changed over the next few years.              01:23
 5         Q.   He wasn't around very long, was he, at CSX?    01:23
 6         A.   Unfortunately, he passed away after --         01:23
 7    really at maybe even six months.                         01:23
 8         Q.   Yeah, it was December of '17.                  01:23
 9         A.   Right.  Six or eight months, I think.          01:23
10         Q.   Okay.  Did -- you had occasion to work with    01:23
11    Mr. Harrison?                                            01:23
12         A.   No, I never had the opportunity to meet        01:23
13    him.                                                     01:23
14         Q.   Okay.  All right.  In the tenure that he       01:23
15    was at CSX, were you aware of any policies that          01:23
16    changed with respect to medical leave or family         01:23
17    medical leave or accommodations at all?                 01:24
18         A.   No, nothing really changed in that area.      01:24
19         Q.   Okay.  In the period of time that he was       01:24
20    there, did you notice any changes at all in the way      01:24
21    that you did your job in the Medical Department?         01:24
22         A.   No real change in how I did my job.  Most      01:24
23    recently we had another reorganization and our           01:24
24    medical functions were moved to different managers.      01:24
25    But beyond that, the actual functions remain the         01:24
```

229

Craig Heligman, M.D.                                                    April 28, 2021

```
 1   same.                                              01:24
 2           MR. PAUL:  Okay.  I'm good plowing through, 01:24
 3   but if anybody needs a break, you just tell me.    01:24
 4   BY MR. PAUL:                                        01:24
 5       Q.   But what's -- what's your -- what are your 01:24
 6   thoughts on that?                                   01:24
 7       A.   I'm good right now.                         01:24
 8           THE REPORTER:  I would love one.           01:24
 9           MS. FOSTER BIRD:  The court reporter's the 01:24
10   most important person, Dr. Heligman.  Sorry.       01:24
11           MR. PAUL:  Yeah.                            01:24
12           THE WITNESS:  I understand.                 01:24
13           MR. PAUL:  All right.  We'll go off the    01:24
14   record.  What do you need, five minutes or something 01:24
15   like that or..?                                     01:25
16           THE REPORTER:  Ten.                         01:25
17           MR. PAUL:  Ten?                             01:25
18           Yeah, am I talking too fast?               01:25
19           THE REPORTER:  You're much better.  Thank  01:25
20   you.                                                01:25
21           THE VIDEOGRAPHER:  Off the record at       01:25
22   1:25 p.m.                                           01:25
23           (Recess taken.)                             01:33
24           THE VIDEOGRAPHER:  We are back on the      01:33
25   record at 1:33 p.m.                                 01:33
```

                                                              230

Craig Heligman, M.D.                                                    April 28, 2021

```
 1    BY MR. PAUL:                                      01:33
 2        Q.   All right.  Dr. Heligman, we just took a  01:33
 3    short break.  We're back on the record.          01:33
 4             Are you all ready?                       01:33
 5        A.   I'm ready.                               01:33
 6        Q.   Okay.  Great.                            01:33
 7             Are you familiar with the American       01:33
 8    Association of Railroads?                         01:33
 9        A.   Yes.                                     01:33
10        Q.   Okay.  What is that organization?        01:33
11        A.   It's an industry organization that       01:33
12    represents the interests of the freight rail      01:33
13    industry.                                         01:33
14        Q.   Okay.  And with -- to drill down on that a  01:33
15    little bit with respect to medical issues, does the  01:33
16    AAR -- are they involved with any medical issues?  01:34
17        A.   There is a Chief Medical Officer, a medical  01:34
18    committee under the risk management committee within  01:34
19    the AAR.                                          01:34
20        Q.   Okay.  And were you aware that -- well, let  01:34
21    me ask you:  Are you aware of any studies that    01:34
22    they've performed with respect to repetitive stress  01:34
23    injuries or cumulative trauma diseases?           01:34
24        A.   No.                                      01:34
25        Q.   Okay.  I think you testified earlier that  01:34
```

231

USCA4    2050

Craig Heligman, M.D.                                                      April 28, 2021

```
 1   the term "cumulative trauma disease," I believe, is    01:34
 2   no longer kind of in?                                   01:34
 3       A.   Right.  Their -- they don't really provide    01:34
 4   a replacement name, but the concept of cumulative or   01:34
 5   repetitive trauma really isn't something that is       01:34
 6   considered supported by most evidence-based            01:34
 7   practices.                                             01:34
 8       Q.   Okay.  Do you know who Mark Badders is?       01:35
 9       A.   Mr. Badders, I believe, was an industrial     01:35
10   hygienist that was a CSX employee some years ago       01:35
11   long before I came on the scene.                       01:35
12       Q.   Okay.  Who's in charge of Industrial          01:35
13   Hygiene in 2017 to the present, if you know?           01:35
14       A.   In 2017, Billy Bullock was the Director of    01:35
15   Industrial Hygiene.  I think a year ago we             01:35
16   transitioned his role, and Brooke Martin is the        01:35
17   current Director of Industrial Hygiene.  Billy is      01:35
18   serving a different function at this point in time.    01:35
19   He's still involved with Industrial Hygiene but        01:35
20   doesn't run the department.                            01:35
21       Q.   Okay.  And with respect to your job duties    01:35
22   from 2017 till now -- actually, strike that.           01:35
23            With respect to your job duties since         01:35
24   you've been at CSX, have you had any job duties with   01:35
25   respect to the prevention of repetitive stress         01:35
```

                                                                              232

```
 1   injuries in the union crafts or jobs?              01:36

 2        A.   I had no direct responsibility.  The    01:36

 3   Industrial Hygiene Group was moved under -- under  01:36

 4   me.  I believe it occurred in 2015 when I assumed  01:36

 5   the role of Chief Medical Officer, or it could have 01:36

 6   been shortly thereafter.                           01:36

 7        Q.   Okay.  Let me make sure I understood that 01:36

 8   correctly.  You're saying around about 2015, the    01:36

 9   Industrial Hygiene Group came under your            01:36

10   supervision?                                        01:36

11        A.   Correct.                                  01:36

12        Q.   Okay.  So what were your job duties with  01:36

13   respect to that more specifically over the          01:36

14   Industrial Hygiene Group?                           01:36

15        A.   Administrative oversight.  Dr. Bullock is 01:36

16   extremely knowledgeable.  There wasn't a lot of     01:36

17   supervision I had to do for him.  He -- he and his  01:36

18   team are responsible for the issues about ergonomics 01:36

19   and exposures, doing the measurements for noise      01:36

20   exposure, potential chemical exposures, air          01:37

21   monitoring, those kinds of things.                   01:37

22        Q.   Okay.  So when it comes to just -- I want  01:37

23   to ask you a more specific question.                 01:37

24             Like, the -- assessing the risks of        01:37

25   repetitive injury to a machinist or a carman in      01:37
```

Craig Heligman, M.D.                                                    April 28, 2021

```
 1   Huntington or Russell, did you have any job duties     01:37
 2   with respect to that?                                  01:37
 3       A.   I had no direct involvement in that, no.      01:37
 4       Q.   Okay.  Would it be accurate to say that       01:37
 5   that's the job duties of the Industrial Hygiene        01:37
 6   Department or somebody else?                            01:37
 7       A.   Well, it was a combination of the             01:37
 8   Industrial Hygiene Group to review some of that        01:37
 9   information.  Bart Edgar also was involved.  He has     01:37
10   a Master's in Ergonomics.  He handled much of our      01:37
11   office ergonomics, was a participant on the tool       01:37
12   committee to look at -- that was one of the things     01:37
13   they would look at with acquisition of new tools for   01:37
14   was it -- excuse me -- ergonomically appropriate for   01:37
15   the job.  He helped design some tools in the field     01:37
16   and some carts.                                         01:38
17           So it was a combination of the Industrial      01:38
18   Hygiene team and Mr. Edgar.  He's, again, changed      01:38
19   roles over the years but has always been helpful in    01:38
20   the ergonomics area since that was his formal          01:38
21   education.                                              01:38
22       Q.   Okay.  Great.  Thank you.                     01:38
23           I want to switch topics a little bit.  I       01:38
24   think -- I can't remember if it was in today's         01:38
25   deposition or perhaps in maybe some testimony at the   01:38
```

234

Craig Heligman, M.D.                                            April 28, 2021

```
 1   hearing, but there was reference to a GS something    01:38

 2   or other, but there were three medical plans.         01:38

 3         Is that basically correct?                      01:38

 4     A.   I think you're referencing the National        01:38

 5   Health Plan under the union agreement.                01:38

 6     Q.   Yeah.                                           01:38

 7     A.   There are -- United Health is the              01:38

 8   administrator overall, but the employees have a       01:38

 9   choice of three different plans.  And one is          01:38

10   directly managed by United Health, one by Aetna, one  01:38

11   by Blue Cross Blue Shield.                            01:38

12     Q.   Okay.  And is it correct to say that those     01:39

13   are all employer-sponsored health plans?             01:39

14     A.   It's a negotiated issue, but the employer      01:39

15   does pay the insurance premium for the employees.     01:39

16     Q.   Okay.  And that's -- I understand that's       01:39

17   likely, if not certainly, part of the union           01:39

18   agreement, but is it correct to say that those        01:39

19   health plans, those three that you mentioned, are a   01:39

20   part of the employee benefits that CSX provides to    01:39

21   its employees?                                        01:39

22     A.   It's part of the union benefits that were      01:39

23   negotiated.                                           01:39

24     Q.   Okay.  So in other words -- and if I ask       01:39

25   you a question, I'm sure you'll tell me if you don't  01:39
```

235

Craig Heligman, M.D.                                    April 28, 2021

```
 1    know the answer.  I think that was part of the      01:39

 2    ground rules before.                                01:39

 3            But in other words, like, the union crafts, 01:39

 4    like the plaintiffs in this case, would not have    01:39

 5    those medical benefits or that choice of those three 01:39

 6    medical benefit plans if they were not an employee  01:39

 7    of CSX; is that --                                  01:39

 8        A.    That is correct.                          01:39

 9        Q.    Okay.  So in that sense, the employee     01:39

10    benefits -- that is the health plan that we're      01:40

11    talking about now -- are not through the union.     01:40

12    They're through CSX?                                01:40

13        A.    Again, it's a negotiation with the union  01:40

14    membership.  It's different -- say, with our        01:40

15    management employees, we have an Aetna plan, and our 01:40

16    benefits team under Total Rewards manages that      01:40

17    relationship.                                       01:40

18            Labor Relations and the other railroads,    01:40

19    their Labor Relations teams bring in a negotiator   01:40

20    for some of these issues to actually negotiate at   01:40

21    the very top level between all of the railroads that 01:40

22    are participating in the national plan and all of   01:40

23    the unions that participate in the national plan,   01:40

24    and they negotiate what the plan should be.         01:40

25            So once that negotiation is completed, the  01:40
```

236

```
 1    employer -- in this case, our CSX employees -- CSX      01:40
 2    pays the premium under that agreement so that the       01:41
 3    union members may have their health benefit.  Again,    01:41
 4    it's completely a negotiated benefit at the very top    01:41
 5    level.                                                  01:41
 6        Q.   Okay.  All right.  Is there anyone that you    01:41
 7    supervise in the Medical Department that has job        01:41
 8    responsibilities with respect to those three health    01:41
 9    plans?                                                  01:41
10        A.   No, none of us has any responsibility with    01:41
11    regards to those health plans.                          01:41
12        Q.   You said it's administered by United          01:41
13    Healthcare, was it?                                     01:41
14        A.   That's correct.  I think that's the primary   01:41
15    third-party administrator for all three health         01:41
16    plans.                                                  01:41
17        Q.   After the plaintiffs in this case were        01:41
18    terminated, did your department -- or do you have      01:41
19    any knowledge about whether COBRA notices were         01:41
20    mailed out, if you know what that is?  And if not, I   01:41
21    can back up a step.                                     01:42
22        A.   No, I know what you mean by COBRA, but, no,   01:42
23    I don't know.                                           01:42
24        Q.   Okay.  That's not something that you're       01:42
25    involved -- you or your department's involved with?    01:42
```

                                                                                237

Craig Heligman, M.D.                                    April 28, 2021

```
 1        A.   No, we are not involved in that.  That's    01:42

 2   correct.                                              01:42

 3        Q.   Okay.  And I know earlier you mentioned     01:42

 4   that there was something -- and also in the           01:42

 5   transcripts that we're going to look at later -- the  01:42

 6   $16,000 number stands out as the cost, I believe you  01:42

 7   said, to CSX per employee for 24 months or two years  01:42

 8   of health care benefits?  Is that --                  01:42

 9        A.   That's the number that was given to me,     01:42

10   yes.                                                  01:42

11        Q.   Okay.  And, again, if this isn't your area, 01:42

12   tell me, but that strikes me as a low number, you     01:42

13   know, $16,000 a year, based upon some of the          01:42

14   information I've seen that the railroad pays          01:42

15   premiums.                                             01:42

16        A.   Again, all I can say is that that's the     01:42

17   number that I remember seeing.  If it's different --  01:42

18   if it's different in the testimony I gave at any of   01:42

19   the -- any of the hearings, the information in that   01:43

20   transcript is going to be the most accurate.          01:43

21        Q.   Okay.  Yeah.  No, I'm -- I'm not suggesting 01:43

22   that, and I don't believe it is different.  I'm just  01:43

23   asking how -- where you got that information or how   01:43

24   it was calculated.                                    01:43

25        A.   Someone else calculated the information,    01:43
```

238

Craig Heligman, M.D.                                              April 28, 2021

```
 1    gave me the numbers to use for the purposes of the    01:43

 2    investigation.                                         01:43

 3         Q.    Okay.  And you don't remember who that is?  01:43

 4         A.    I -- I don't.                               01:43

 5         Q.    Do you remember what department it came     01:43

 6    from?                                                  01:43

 7         A.    Not specifically, no.                       01:43

 8         Q.    Okay.  If you -- and, again, I don't want   01:43

 9    you to guess, but just based upon your knowledge of   01:43

10    how that happened, do you think it was the Labor      01:43

11    Relations Department that provided you that?          01:43

12         MS. FOSTER BIRD:  I'm going to object here.       01:43

13    Just put my objection on the record that if it came   01:43

14    through Legal or it was the Legal Department, that     01:43

15    would be something that would be protected within an  01:43

16    attorney/client or product privilege.  So to the      01:44

17    extent it could have come from Legal, I'll make that  01:44

18    objection.                                             01:44

19         MR. PAUL:  I understand your objection.  I        01:44

20    don't think you said that, though.  But, yeah --      01:44

21    yeah, I'm not --                                       01:44

22         MS. FOSTER BIRD:  Actually, earlier he said       01:44

23    he didn't know if it came from Legal or Labor         01:44

24    Relations.  He's gone through that earlier, and I     01:44

25    was giving you plenty of leeway to talk about that,   01:44
```

                                                                    239

Craig Heligman, M.D.                                    April 28, 2021

| | | |
|---|---|---|
| 1 | but I do have to put -- | 01:44 |
| 2 | MR. PAUL:  Sure. | 01:44 |
| 3 | MS. FOSTER BIRD:  -- the objection on the | 01:44 |
| 4 | record. | 01:44 |
| 5 | MR. PAUL:  Oh, understood. | 01:44 |
| 6 | BY MR. PAUL: | 01:44 |
| 7 | Q.    Again, without guessing, but if you had to | 01:44 |
| 8 | make an educated opinion about where it came from, | 01:44 |
| 9 | do you think it was Labor Relations or you just | 01:44 |
| 10 | really don't know? | 01:44 |
| 11 | A.    I just don't remember.  It could have been | 01:44 |
| 12 | the Law Department.  It could have been Labor | 01:44 |
| 13 | Relations.  There were a lot of people involved in | 01:44 |
| 14 | discussions around this issue at that time, and I | 01:44 |
| 15 | just don't remember who actually did those | 01:44 |
| 16 | calculations. | 01:44 |
| 17 | Q.    Okay.  But it sounds like, from your | 01:44 |
| 18 | testimony, that those calculations were given to you | 01:44 |
| 19 | specifically for the hearings; is that correct? | 01:45 |
| 20 | A.    Yes. | 01:45 |
| 21 | Q.    Okay.  When did you first become aware of | 01:45 |
| 22 | those figures?  Just, like, a couple days before the | 01:45 |
| 23 | hearings, or was it earlier in the process? | 01:45 |
| 24 | A.    I don't remember the timing.  It was | 01:45 |
| 25 | prior -- certainly prior to the point where I had to | 01:45 |

240

Craig Heligman, M.D.                                        April 28, 2021

```
 1   be a witness at the investigation.  It was probably   01:45

 2   at least a few days before that first -- first        01:45

 3   appearance at a hearing.  But other than that, I      01:45

 4   just don't remember the exact timing.                 01:45

 5        Q.   All right.                                  01:45

 6             MR. PAUL:  Jeff, can we take a look at what  01:45

 7   we'll mark as Exhibit 7, please?                      01:45

 8             (Exhibit 7 was marked for identification and

 9   attached to the transcript (CONFIDENTIAL).            02:05

10             MR. DINGWALL:  Should be there.             01:45

11             MR. PAUL:  All right.  Looks good.  Thank   01:45

12   you.                                                  01:45

13             THE WITNESS:  Okay.  I have it.             01:45

14   BY MR. PAUL:                                          01:45

15        Q.   Dr. Heligman, you have that?               01:45

16        A.   Yes, sir.                                   01:46

17             MR. PAUL:  Melissa?                         01:46

18             MS. FOSTER BIRD:  [Nods head.]              01:46

19   BY MR. PAUL:                                          01:46

20        Q.   Okay.  All right.  This is a document that  01:46

21   we're marking as Exhibit 7, and it's a compilation    01:46

22   of Certificate of Ongoing Illness.                    01:46

23             Do you see that?                            01:46

24        A.   I do.                                       01:46

25        Q.   Okay.  So I'm just going to go through and  01:46
```
                                                               241

Craig Heligman, M.D.                                                    April 28, 2021

```
 1   ask you some questions about these.  And I know you      01:46
 2   haven't seen them all, and if you need time at any       01:46
 3   point to review these documents, just let me know.       01:46
 4   But I imagine at this point in your career, you've       01:46
 5   seen them a lot, many times.                             01:46
 6           So just using this first one as an example       01:46
 7   for Mr. Adkins, and you can see this one is dated --     01:46
 8   or not dated -- excuse me -- at the top right corner     01:46
 9   called "Carrier Exhibit E."                              01:46
10           Is it just generally your understanding         01:46
11   that Certificate of Ongoing Illnesses were made an      01:46
12   exhibit at each of the plaintiffs' hearings?            01:46
13       A.   Yes.                                            01:46
14       Q.   Okay.  So if we were to take, like, a          01:46
15   spectrum of all the times, using one plaintiff as an    01:47
16   example, that you reviewed their Certificate of         01:47
17   Ongoing Illnesses, would it start when --               01:47
18           Was it Kelly, the nurse?                         01:47
19       A.   Yes.                                            01:47
20       Q.   -- or perhaps one of the other nurses first    01:47
21   brought this to your attention in June of 2017?        01:47
22       A.   Right.  That would have been the first time    01:47
23   I would have looked at this particular group of         01:47
24   COIIs.                                                   01:47
25       Q.   Okay.  And then -- yeah, I don't know if       01:47
```

                                                                          242

| | | |
|---|---|---|
| 1 | it's easier -- just -- maybe just go right along | 01:47 |
| 2 | with it.  But when's the next time that you recall | 01:47 |
| 3 | looking at the Certificate of Ongoing Illnesses for | 01:47 |
| 4 | these plaintiffs? | 01:47 |
| 5 | A.   I looked at the group of them on and off | 01:47 |
| 6 | over the next few weeks.  I had to generate my | 01:47 |
| 7 | spreadsheet to list them all to prepare for the | 01:47 |
| 8 | outgoing letters, to prepare it for other | 01:47 |
| 9 | individuals who were going to be reviewing the | 01:47 |
| 10 | information.  So it was kind of an intermittent | 01:47 |
| 11 | activity. | 01:48 |
| 12 | Q.   Okay.  And, again, I don't want to be | 01:48 |
| 13 | repetitive of what you said before, but when you -- | 01:48 |
| 14 | when Kelly or perhaps one of the other nurses first | 01:48 |
| 15 | came to you in June of 2017, I think you testified | 01:48 |
| 16 | you checked a database that included past medical | 01:48 |
| 17 | records for each of the plaintiffs? | 01:48 |
| 18 | A.   I did that after we collected a certain | 01:48 |
| 19 | number of these forms.  I don't remember exactly | 01:48 |
| 20 | when in the timing, but we had collected these | 01:48 |
| 21 | forms.  We continued to watch whether more were | 01:48 |
| 22 | coming in or not. | 01:48 |
| 23 | And so as I was preparing my list of cases, | 01:48 |
| 24 | I did go through the case management system and the | 01:48 |
| 25 | employee health records to see if there was other | 01:48 |

243

```
 1    information that was present that was relevant to    01:48

 2    the receipt of this COII.                            01:48

 3       Q.   Okay.  I believe that the first date of      01:49

 4    these is June 20th of 2017, so if we use that date   01:49

 5    as an example, do you believe that you reviewed      01:49

 6    these other medical records for the plaintiffs in    01:49

 7    between June 20th of '17 and when you wrote the      01:49

 8    letter to the Railroad Retirement Board, Fergus?     01:49

 9       A.   Yes.                                          01:49

10       Q.   Okay.  It would have been in that window?    01:49

11       A.   Yes, sir.                                     01:49

12       Q.   Okay.  At any other time -- so in this       01:49

13    example, after the first letter to the Railroad      01:49

14    Retirement Board -- did you ever review any of the   01:49

15    employees' other medical records again?              01:49

16       A.   I may have.  I don't remember.  But as we    01:49

17    wrote the first letter, we had the next group of     01:49

18    cases come in, so I would have focused on reviewing  01:49

19    those medical files.  And then the third group,      01:49

20    again, focusing on that group as they came in.       01:49

21    Whether that --                                       01:49

22       Q.   Okay.  Fair enough.  Yeah.                    01:49

23       A.   I couldn't say if I went back and looked at  01:49

24    any of the first set of cases again or not.          01:50

25       Q.   Okay.  No, let's -- let me ask a slightly    01:50
```

Craig Heligman, M.D.                                                    April 28, 2021

```
 1    different question -- well, the same question, just      01:50
 2    different time frame.                                    01:50
 3           If we now make the period of time from            01:50
 4    June 20th of '17 to the date of the last or what I       01:50
 5    believe is the third letter to the Railroad             01:50
 6    Retirement Board, Fergus, did you ever review any of     01:50
 7    the plaintiffs' medical records outside of that          01:50
 8    period of time; in other words, after your third         01:50
 9    letter to the Railroad Retirement Board?                 01:50
10       A.   Not that I recall with respect to this           01:50
11    case.                                                    01:50
12       Q.   Okay.  Actually, let me clarify that a           01:50
13    little bit just so it's clear.  Some -- in some of       01:50
14    the hearings, there were medical records other than      01:50
15    the COII that were presented in evidence.                01:50
16           Do you recall that?                               01:50
17       A.   Yes, some employees did present additional       01:50
18    information at the hearings, and the information         01:50
19    they presented was not in the medical records or in      01:50
20    the employee health record that I reviewed prior to      01:50
21    the hearing.  That's actually not an uncommon            01:51
22    occurrence.                                              01:51
23           So at the time that the hearing took place,       01:51
24    the employee submitted additional information.  That     01:51
25    additional medical information was not provided to       01:51
```

                                                                    245

Craig Heligman, M.D.                                                April 28, 2021

| | | |
|---|---|---|
| 1 | me prior to the time of the investigation. | 01:51 |
| 2 | Q.   And, I mean, I think I know the answer, but | 01:51 |
| 3 | why is that? | 01:51 |
| 4 | A.   It's the nature of the process.  The | 01:51 |
| 5 | investigation is there to allow the employee to | 01:51 |
| 6 | present their case.  It's an investigative hearing | 01:51 |
| 7 | to determine whether or not the charge was correct | 01:51 |
| 8 | or not, and the employee is allowed to be | 01:51 |
| 9 | represented by a union official, they are allowed to | 01:51 |
| 10 | present new information, and they are allowed to | 01:51 |
| 11 | present witnesses.  And that's just the process. | 01:51 |
| 12 | Q.   Okay.  I was wrong.  I thought you were | 01:52 |
| 13 | going to say because it didn't exist; in other | 01:52 |
| 14 | words, that it's updated medical that | 01:52 |
| 15 | chronologically did not exist at the time that you | 01:52 |
| 16 | reviewed the database back in June of '17. | 01:52 |
| 17 | I mean, that's a possibility, too, right, I | 01:52 |
| 18 | suppose? | 01:52 |
| 19 | A.   That's always possible, but the reality is, | 01:52 |
| 20 | quite frankly, when we receive medical information, | 01:52 |
| 21 | we do not always receive medical information timely | 01:52 |
| 22 | to when the actual medical activity occurred.  We | 01:52 |
| 23 | may receive it months, if not years, after the fact. | 01:52 |
| 24 | And it just depends on the circumstances of whatever | 01:52 |
| 25 | the case is as to whether or not we receive it | 01:52 |

246

```
 1    timely or not.                                      01:52

 2         Q.   Okay.  So let me go back to my original   01:52

 3    question so I can try to do a better job at making  01:52

 4    it a little clearer.  For the moment, I want to     01:52

 5    leave out any medical records that were presented at 01:52

 6    the hearing.                                        01:52

 7         A.   Okay.                                     01:53

 8         Q.   Okay.  So just looking at the period of   01:53

 9    time, the question is:  Did you review any          01:53

10    plaintiffs' medical records after that initial      01:53

11    review of the database in June of 2017 other than   01:53

12    what you may have looked at at the hearing?         01:53

13         A.   No, I reviewed the employee health record 01:53

14    for each of these cases, and no additional medical  01:53

15    records were submitted until the hearing.           01:53

16         Q.   Okay.  And what was the reason that you   01:53

17    looked in the database back in June -- I guess      01:53

18    potentially July -- but June or July of '17, what   01:53

19    was the reason that you looked in the database for  01:53

20    other medical records?                              01:53

21         A.   Really to get a familiarity with some of 01:53

22    the medical information we already had for these    01:53

23    employees.  Some employees we had virtually nothing 01:53

24    other than their employment physical.  Some we had  01:53

25    extensive records and COIIs and MD-3s.  Some had    01:54
```

```
 1    prior forms that were completed by the two          01:54

 2    chiropractic providers, Dr. Carey and Dr. Johnson.   01:54

 3    Some did not.                                        01:54

 4         It was a very mixed group and not at all        01:54

 5    out of the ordinary for what we do on a daily basis  01:54

 6    when we see the employee's health record.            01:54

 7         Q.   Okay.  And when you say the "employee      01:54

 8    health record," is that, like, the medical file on   01:54

 9    that particular employee?                            01:54

10         A.   Yes, we collect the medical information and 01:54

11    place it in a digital folder, and the information    01:54

12    that we collect is driven by time of hire, what --   01:54

13    you know, what exam was done, ongoing exams that may 01:54

14    be done, periodic receipt of COIIs, periodic receipt 01:54

15    of MD-3s.  Many times there'll be medical records    01:54

16    that are attached.  It could be a work injury.  It   01:55

17    could be an off-duty medical issue.                  01:55

18         It's really highly variable.  Some of the       01:55

19    Collective Bargaining Agreements don't require the   01:55

20    same periodicity.  For the COIIs, we may not have    01:55

21    any information related to when they were off work   01:55

22    for medical reasons.  Some we have extensive         01:55

23    information.  So it really is a very -- a broad       01:55

24    variety of volume of information that may be in      01:55

25    their employee health record.                        01:55
```

```
 1      Q.   Okay.  The point, though, is that you were      01:55
 2  looking at the -- I don't want to say you actually       01:55
 3  reviewed every single document, but the point is did     01:55
 4  you review -- or did you get access to the entire        01:55
 5  medical file for that particular employee, one of        01:55
 6  the plaintiffs?                                           01:55
 7      A.   Yes.                                             01:55
 8      Q.   Okay.  So whether or not, you know -- I          01:55
 9  don't know -- did you go back and look at the             01:55
10  original fitness-for-duty exam upon hire?                 01:55
11      A.   In some cases.  You know, when you have a        01:55
12  file that's a thousand pages, you're not probably         01:56
13  going to look at every page.  When you have a file        01:56
14  that has only the application exam, you're probably       01:56
15  just going to look at that.                               01:56
16      Q.   Yeah, understood.                                01:56
17           Was the purpose, though, to see whether the      01:56
18  treatment with the chiropractors was consistent with     01:56
19  the past medical history in the CSX medical file?        01:56
20      A.   Not so much consistency, but just to learn      01:56
21  if they had prior medical issues that we had              01:56
22  addressed.                                                01:56
23      Q.   And why was that important at that time of      01:56
24  June or July of 2017?                                     01:56
25      A.   It was to hopefully understand potentially      01:56
```

```
 1    why we were receiving this volume of COIIs at that    01:56
 2    moment in time from that location and those two       01:56
 3    practitioners.  It's for my own education             01:56
 4    predominantly.                                        01:56
 5        Q.   Back in 2017, did you have an understanding  01:56
 6    of the approximate age groups of the workforce in     01:56
 7    Huntington or Russell?                                01:56
 8        A.   No.                                          01:57
 9        Q.   Okay.  All right.  Taking a look at this     01:57
10    first page, and you'll see in the bottom right-hand   01:57
11    corner what are called Bates numbers.  I'm sure       01:57
12    you've come across that.  So if it's easier, I think  01:57
13    we should refer to that 5702 number --                01:57
14             Do you see that?                             01:57
15        A.   Yes, I do.                                   01:57
16        Q.   -- as opposed to, like, Page 1 of 77.        01:57
17    That's probably a little less clear.                  01:57
18             Does that -- does that work for you?         01:57
19        A.   That works.                                  01:57
20        Q.   Okay.  So this form, up in the top left,     01:57
21    says Revision 9 of 2014; is that correct?             01:57
22        A.   Yes, that's correct.                         01:57
23        Q.   Okay.  And I know you mentioned earlier      01:57
24    that there's maybe been a couple changes to it        01:57
25    during your tenure at CSX; is that right?             01:57
```

                                                                   250

Craig Heligman, M.D.                                      April 28, 2021

| | | |
|---|---|---|
| 1 | A.   That's correct.  The most recent revision | 01:57 |
| 2 | was probably 2019. | 01:57 |
| 3 | Q.   Okay.  But before 2019, say -- so from, to | 01:57 |
| 4 | your knowledge, 2012 to 2018, to leave a little | 01:57 |
| 5 | cushion, do you believe there was maybe a change or | 01:57 |
| 6 | two in there? | 01:58 |
| 7 | A.   There could have been.  I -- I don't | 01:58 |
| 8 | remember the exact dates of when the form was | 01:58 |
| 9 | revised. | 01:58 |
| 10 | Q.   Okay.  And does anything stand -- I | 01:58 |
| 11 | understand that you don't know the specific date, | 01:58 |
| 12 | but does any issue stand out about why the changes | 01:58 |
| 13 | were made that you have knowledge of? | 01:58 |
| 14 | A.   For the 2019 revision, yes.  We wanted to | 01:58 |
| 15 | add some check boxes and some dates to match more of | 01:58 |
| 16 | how we collect the information on the MD-3s just for | 01:58 |
| 17 | consistency purposes.  That was the basic reason for | 01:58 |
| 18 | the changes.  Also we adjusted some of the | 01:58 |
| 19 | demographics, formatting it to make sure we got all | 01:58 |
| 20 | the information onto one page. | 01:58 |
| 21 | Q.   Okay.  So in this form, it looks like | 01:58 |
| 22 | there's the top part that the employee fills out or | 01:58 |
| 23 | is expected that the employee would fill out, and | 01:58 |
| 24 | the bottom part is what the doctor fills out. | 01:58 |
| 25 | Is that a fair general statement? | 01:58 |

251

```
 1        A.    Yes.                                    01:58

 2        Q.    Okay.  Now, in this form -- this CSX form   01:58

 3   is asking for the last four numbers of the Social    01:59

 4   Security Number.                                  01:59

 5            Do you see where I read that?              01:59

 6        A.    I do.                                   01:59

 7        Q.    Okay.  And it also asks the "Occupation" or  01:59

 8   "Craft"; is that correct?                          01:59

 9        A.    Yes.                                    01:59

10        Q.    Okay.  And this "F&O," do you know what   01:59

11   that stands for?                                  01:59

12        A.    I believe that's fireman and oiler.        01:59

13        Q.    Okay.  Do you have -- do you have an       01:59

14   understanding of what that position does?          01:59

15        A.    I don't have as full an understanding of    01:59

16   that role as I do some of the other positions.       01:59

17        Q.    Okay.  Under the "Division/Shop," I guess   01:59

18   that informs you that Mr. Adkins works in the       01:59

19   Huntington Heavy Repair; right?                    01:59

20        A.    Yes.                                    01:59

21        Q.    And in the Mechanical Department; is that   01:59

22   correct?                                          01:59

23        A.    Yes.                                    01:59

24        Q.    Okay.  Now, in this particular form, did    01:59

25   you ever consider looking at the job duties of the    01:59
```

252

```
 1    fireman/oiler, or was that not necessary?          01:59

 2         A.    For this purpose, it wasn't necessary.   02:00

 3         Q.    Okay.  And then in this example -- and I  02:00

 4    think you mentioned earlier that -- I believe your  02:00

 5    testimony was that a majority of the forms indicated 02:00

 6    that the incident leading to this treatment did not 02:00

 7    happen at work or it happened outside of work; is   02:00

 8    that correct?                                       02:00

 9         A.    Yes, that's correct.                     02:00

10         Q.    Okay.  So are you -- I know this seems    02:00

11    obvious, but are you referring to that first part   02:00

12    that the treating health care provider writes in?   02:00

13         In this case, "Picking up tree limbs at        02:00

14    home," is that what you were referring to?          02:00

15         A.    Yes.                                      02:00

16         Q.    Okay.  And did you at any time consider the 02:00

17    fact that a fireman and oiler, which I understand is 02:00

18    a labor position -- but my question is:  Did you    02:00

19    ever consider the job duties in determining whether 02:00

20    this was exclusively -- the treatment; I'm not      02:01

21    talking about the injury -- but the treatment with, 02:01

22    in this case, Dr. Carey was only related to picking 02:01

23    up the tree limbs or also work-related duties?      02:01

24         A.    It was not specified on this form.       02:01

25         Q.    Okay.  So that's one way of answering it, 02:01
```

1   and I appreciate that.                              02:01

2        So this form does not call for the employee    02:01

3   or the health care provider's assessment of whether 02:01

4   it's work-related or non-work-related; is that      02:01

5   correct?                                            02:01

6        A.   Yes, that's correct.                       02:01

7        Q.   Okay.  And I'm sure you're familiar with a 02:01

8   lot of forms for, perhaps, Workers' Comp or other   02:01

9   reasons where there is a box that says, "Is this     02:01

10  work-related or not?"  Right?                        02:01

11       A.   Right.  Health insurance forms may have    02:01

12  that as well.  Every state has a different form that 02:01

13  potentially is sent to the state.                    02:01

14       Q.   So I guess if it's not indicated on the    02:02

15  form, I guess my question is:  Did you consider      02:02

16  that, in this case, Mr. Adkins' treatment with       02:02

17  Dr. Carey is both related to the tree limbs at home  02:02

18  and also as a result of his duties as a fireman and  02:02

19  oiler?                                               02:02

20       A.   No, I did not consider that.  I pretty much 02:02

21  accepted this at face value that the reason that     02:02

22  Mr. Adkins was seeing Dr. Carey was because he had   02:02

23  some injury related to picking up tree limbs at      02:02

24  home.                                                02:02

25       Q.   Okay.  And I don't want to go through, you  02:02

                                                        254

1    know, all of these terms, but just looking at the        02:02

2    "Diagnosis and Concurrent Conditions," what does         02:02

3    that mean to you, just in a nutshell?                     02:02

4           Like, what is that -- what's your                  02:02

5    interpretation of what the -- Dr. Carey wrote under       02:02

6    "Diagnosis and Concurrent Conditions"?                    02:02

7       A.    Low back pain and leg pain.                      02:02

8       Q.    Okay.  And are those -- I'm sorry.  I'm          02:02

9    sorry.  Go ahead.                                         02:02

10      A.    [Inaudible.]                                      02:03

11      Q.    Okay.  Yeah.                                      02:03

12            And then what are those codes next to the        02:03

13   terminology like "Sciatica" and "Lumbar" -- whatever     02:03

14   it says there?                                            02:03

15      A.    Those would be ICD-9 codes.  The ICD-9 code      02:03

16   system was retired and replaced by the ICD-10, which     02:03

17   has a completely different format.                        02:03

18      Q.    These are billing codes for insurance           02:03

19   purposes?                                                 02:03

20      A.    They're not billing codes.  They're             02:03

21   diagnostic codes.  It's the International               02:03

22   Classification of Diseases, I think, is what "ICD"      02:03

23   actually stands for.  It's to be used essentially as    02:03

24   a worldwide reference for consistency of labeling       02:03

25   and identifying diagnoses.                              02:03

Craig Heligman, M.D.                                                April 28, 2021

```
 1        Q.   Okay.  Now, this bottom part, where it says      02:03
 2   "Duration of Care" for Mr. Adkins, states April 21st       02:03
 3   of '17 through June 21st of 2017.                          02:03
 4             Do you see that?                                 02:03
 5        A.   I do.                                            02:03
 6        Q.   Okay.  And so did you give any weight to         02:03
 7   the fact that the duration of the care starting in         02:04
 8   April of 2017 was before any of the plaintiffs were        02:04
 9   made aware of the potential layoffs or job                 02:04
10   abolishment?                                               02:04
11        A.   Restate that for me, if you wouldn't mind.       02:04
12        Q.   Sure.                                            02:04
13             Did you give any weight or consideration to      02:04
14   the fact that, in this case, Mr. Adkins started            02:04
15   treating with Mr. Carey in April of 2017, before          02:04
16   there was any notification of the layoffs or job           02:04
17   abolishments, which I believe was in June of 2017?         02:04
18        A.   Okay.  The answer is no.  We were focused        02:04
19   on the date that we received the document, and the         02:04
20   date that Dr. Carey signed this was 6/21/17, which         02:04
21   is consistent with the volume of documents that we         02:04
22   received June 20th, June 21st.                             02:05
23             But, no, I wasn't really looking at their        02:05
24   start date at that moment in time.                         02:05
25        Q.   Okay.  Now, that's a good point.  Let me --      02:05
```

                                                                      256

Craig Heligman, M.D.                                          April 28, 2021

```
 1    let me clarify this so we're perfectly clear.  What    02:05
 2    I actually read from was the "Duration of Care,"       02:05
 3    right, starting in April 21st of 2017 through          02:05
 4    June 21st of '17.                                      02:05
 5            Do you see where I read that?                  02:05
 6       A.   Yes.                                           02:05
 7       Q.   "Duration of Care" doesn't mean that           02:05
 8    Mr. Adkins cannot work; correct?                       02:05
 9       A.   That's correct.                                02:05
10       Q.   Okay.  So I think what's more important to     02:05
11    drill down on is the next question:                    02:05
12               "[From] the most recent episode             02:05
13                of care within the total                   02:05
14                duration of care noted above,              02:05
15                what dates or date range was               02:05
16                the employee unable to work?"              02:05
17            Do you see where I read that?                  02:05
18       A.   Yes.                                           02:05
19       Q.   Okay.  So similar question, but did you        02:05
20    give any consideration to the fact that Mr. Adkins     02:05
21    has been unable to work, according to Dr. Carey,       02:05
22    dating back to April 2000- -- excuse me --             02:06
23    April 21st of 2017, prior to any notification of       02:06
24    upcoming layoffs?                                      02:06
25       A.   I would have considered it, but, again, I      02:06
```

257

```
 1    was more focused on the document timing, when we       02:06
 2    received it.  Since I had no awareness that the        02:06
 3    employee was off work starting in April, I was only    02:06
 4    made aware of that when we received this document in   02:06
 5    June.  And, again, it doesn't state when Mr. Adkins    02:06
 6    was picking up the tree limbs at home.  Maybe he       02:06
 7    went in for treatment a month after the event.  It     02:06
 8    doesn't state.                                         02:06
 9          So although the time frame is helpful in         02:06
10    some respects, it's not necessarily very precise.      02:06
11    And so the focus for me was the receipt of the         02:06
12    documents from that large group of people first on     02:06
13    the June 20th, June 21st time period and then with     02:07
14    the subsequent three, four weeks.                      02:07
15    Q.    Okay.  But when it comes to the issue of         02:07
16    suspected fraud for Mr. Adkins, would you agree that   02:07
17    the fact that he is treating with Dr. Carey in April   02:07
18    of 2017 and unable to work since April of 2017 would   02:07
19    not be suspicious?                                     02:07
20    A.    I honestly don't know how to answer that         02:07
21    question.  I don't know what Dr. Carey or what         02:07
22    Mr. Adkins knew at that point in time.  I can just     02:07
23    respond to what I knew of.                             02:07
24          [Technical interruption.]                        02:07
25          THE WITNESS:  Did we lose him?                   02:07
```

258

```
 1              THE REPORTER:  I think we did.        02:07

 2              MR. PAUL:  Sorry.  I lost you there.  I'm   02:08

 3    not sure why.  I just touched my ear bud and I went   02:08

 4    down.                                          02:08

 5    BY MR. PAUL:                                    02:08

 6       Q.   So -- I'm sorry -- do you remind repeating  02:08

 7    your answer?  Or I can ask the question again.  I   02:08

 8    just didn't hear it.                           02:08

 9       A.   No, I was making a statement that I wasn't   02:08

10    focused on the time period prior to June 20th,   02:08

11    June 21st.  I don't know what Mr. Adkins knew or   02:08

12    didn't know.  I don't know what Dr. Carey did or   02:08

13    didn't know.  It was just a matter of we received   02:08

14    this document in that time frame.              02:08

15              So the relevance of the period of     02:08

16    treatment, it is what it is.  It's -- I accept that   02:08

17    he was under treatment from 4/21/17 to 6/21/17, and   02:08

18    at this time, it was expected he would be able to   02:08

19    return to work approximately on August 21st of that   02:08

20    year.  That's all I have.  Again, I take this   02:08

21    information for face value.                    02:09

22       Q.   Okay.  So, yeah, there's -- you did not   02:09

23    think, like, that April date was incorrect or have   02:09

24    any reason to believe that that was altered; is that   02:09

25    correct?                                       02:09
```

                                                            259

Craig Heligman, M.D.                                                    April 28, 2021

```
 1        A.   That's correct.                              02:09

 2        Q.   Okay.  But I guess I'm just having a little  02:09

 3   trouble understanding if -- if the reason that you     02:09

 4   were suspicious of fraudulent activity was in order    02:09

 5   to get out of a layoff or a job abolishment and if     02:09

 6   it's true that Mr. Adkins and the other people were    02:09

 7   not informed of a job layoff until June of 2017,       02:09

 8   would you agree that there's nothing suspicious        02:09

 9   about him being off of work in April of 2017 for the   02:09

10   purpose of avoiding a layoff and to extend benefits?   02:09

11        A.   If this was the only form that I saw, the    02:09

12   answer to your question is no, I would find nothing    02:09

13   suspicious about the form or the time period.          02:09

14        Q.   And Mr. Adkins would be in the clear, then,  02:09

15   when it comes to being accused of fraudulent           02:10

16   activity if he was an individual?                      02:10

17        A.   Again, if this was the only form I looked    02:10

18   at, you are -- I would say yes to your -- to your      02:10

19   question, but it wasn't.  It was one of 70 or so       02:10

20   cases that came in in a similar time frame.            02:10

21             And so that was the suspicious event, not    02:10

22   that we received a COII from any particular employee   02:10

23   or any particular physician or provider or any         02:10

24   particular location, for that matter.  It was the      02:10

25   entirety of the volume from employees in this          02:10
```

260

Craig Heligman, M.D.                                    April 28, 2021

```
 1    location from these two specific practitioners.        02:10
 2         Q.   Okay.  So as we go through and look at        02:10
 3    these individual CIOO[sic] forms, is your testimony     02:10
 4    going to be the same, that there was nothing            02:10
 5    suspicious on any one individual CIO[sic] form of       02:10
 6    the plaintiffs?                                         02:10
 7         A.   That would be correct.                        02:10
 8         Q.   Okay.  And I know you testified earlier       02:10
 9    that I think you had called one of the                  02:10
10    chiropractors, and I believe it was Dr. Johnson --      02:11
11    or attempted to call him; is that right?                02:11
12         A.   That's correct, but not in association with   02:11
13    this particular issue.                                  02:11
14         Q.   Correct.  Okay.  Yeah.                        02:11
15              But it was not Dr. Carey.  It was             02:11
16    Dr. Johnson?                                            02:11
17         A.   That's correct.                               02:11
18         Q.   Okay.  And is it your testimony that you      02:11
19    did not attempt to reach out to Dr. Carey or           02:11
20    Dr. Johnson with respect to any of the plaintiffs in   02:11
21    this case?                                              02:11
22         A.   That is correct.                              02:11
23         Q.   Okay.                                         02:11
24              MS. FOSTER BIRD:  Hey, Greg.  I need five     02:11
25    minutes whenever you get to a good place to stop.       02:11
```

                                                            261

Craig Heligman, M.D.                                                                April 28, 2021

```
 1                 MR. PAUL:  Good as any.              02:11

 2                 MS. FOSTER BIRD:  All right.  Let's do it.  02:11

 3      Let's take five minutes.  Just let me go run to the   02:11

 4      restroom.                                      02:11

 5                 MR. PAUL:  Of course.               02:11

 6                 THE VIDEOGRAPHER:  Off the record at  02:11

 7      2:11 p.m.                                      02:11

 8                 (Recess taken.)                     02:16

 9                 THE VIDEOGRAPHER:  Back on the record at  02:16

10      2:16 p.m.                                      02:16

11                 MR. PAUL:  All right.  Great.       02:16

12      BY MR. PAUL:                                   02:16

13          Q.   If we could look at the next document,  02:16

14      we're just going to go in order.  So it'll be Bates  02:16

15      No. 5776 for Bobby Akers.                      02:16

16                 Do you have that in front of you?   02:16

17          A.   I do.                                 02:16

18          Q.   Okay.  Now, this form, at the top left,  02:16

19      appears to say "Revision" -- it looks like April of  02:16

20      2013 to me, but I can't be sure.               02:16

21                 Does that seem right to you?        02:16

22          A.   Yes.                                  02:16

23          Q.   Okay.  So one thing that stands out as  02:16

24      different to me is that it's requesting the complete  02:16

25      Social Security Number rather than the last four  02:16
```

```
 1   digits.                                            02:16

 2          Do you see that?                            02:16

 3      A.    I do.   It's blacked out, but I think you 02:17

 4   are correct.                                       02:17

 5      Q.    Okay.   At least that's a different form  02:17

 6   from Mr. Adkins' form that we just looked at a     02:17

 7   moment ago?                                        02:17

 8      A.    Right.   I believe earlier I stated that we 02:17

 9   received many different iterations of this form.   02:17

10   The employees don't always use the most recent form, 02:17

11   which we would prefer they do, but they don't always 02:17

12   do that.                                           02:17

13      Q.    Okay.   Got it.                           02:17

14          Is this -- if you know, how does an         02:17

15   employee have access to these forms?               02:17

16          Is it online or something?                  02:17

17      A.    They're located on our Employee Gateway.  02:17

18   Also all employees have access the Gateway.  They  02:17

19   can print it out.   They can ask a supervisor to   02:17

20   print it out for them.   Honestly, some of the older 02:17

21   forms you can Google and find them.   Some of the  02:17

22   union offices have copies of them for distribution. 02:17

23      Q.    Okay.   In this case, Mr. Akers, he's     02:17

24   identifying his position as a "Carman/Painter."    02:17

25          Do you know what the duties of a            02:18
```

| | | |
|---|---|---|
| 1 | carman/painter are? | 02:18 |
| 2 | A.    That one's pretty straightforward.  Carmen | 02:18 |
| 3 | are the individuals that were to repair the actual | 02:18 |
| 4 | cars -- the train cars, not the locomotives.  And | 02:18 |
| 5 | then as a painter, he'd be responsible for also | 02:18 |
| 6 | doing painting of those -- of that equipment. | 02:18 |
| 7 | Q.    Okay.  Based upon your knowledge of the | 02:18 |
| 8 | duties of a carman and painter, would you agree that | 02:18 |
| 9 | those involve repetitive movements? | 02:18 |
| 10 | A.    No. | 02:18 |
| 11 | Q.    Okay.  What -- why do you believe a | 02:18 |
| 12 | carman's duties are not repetitive in nature? | 02:18 |
| 13 | A.    Well, for clarification, you need to define | 02:18 |
| 14 | what you mean by "repetitive."  So if you're looking | 02:18 |
| 15 | at the issue of the alleged repetitive or cumulative | 02:18 |
| 16 | trauma, the literature states that the repetition | 02:18 |
| 17 | cycle -- forgive me.  It's been a long time since | 02:19 |
| 18 | I've looked at this. | 02:19 |
| 19 | The repetition cycle has to be at least | 02:19 |
| 20 | twice a minute for it to be considered repetitive, | 02:19 |
| 21 | at a minimum, and we don't really have jobs where | 02:19 |
| 22 | these movements occur at a repetition rate or cycle | 02:19 |
| 23 | rate of two times a minute for the duration of an | 02:19 |
| 24 | entire work shift.  It doesn't occur.  Our | 02:19 |
| 25 | individuals will perform a task; they may stop; they | 02:19 |

264

Craig Heligman, M.D.                                                    April 28, 2021

```
 1   may rest; they may take their required breaks.      02:19

 2            So it doesn't meet the clinical definition  02:19

 3   or the research definition of "repetitive."        02:19

 4       Q.    Okay.  Is it your testimony, then, that all  02:19

 5   of the plaintiffs in this case -- that the job     02:19

 6   duties were not repetitive under that definition of  02:19

 7   two repetitions a minute?                          02:19

 8       A.    That's correct.                          02:19

 9       Q.    Okay.  And your basis of that is -- I'm    02:19

10   sorry.  Did you mention a study or -- or a source?  02:19

11       A.    There is a book published by NIOSH        02:20

12   called -- it's -- the Yellow Book is how we define  02:20

13   it.  There's a couple of other research articles.   02:20

14   And, you know, we're talking about this subject    02:20

15   today, but there are several other articles that   02:20

16   will define the parameters of the use of extremities  02:20

17   for work, repetition being only one item.          02:20

18            You also have to do it over the course of a  02:20

19   duration.  So it is at least half a shift of       02:20

20   continuing to do this -- do this motion.  What are  02:20

21   the forces involved?  Is it high force, low force?  02:20

22   And there's some cutoffs in the research for that  02:20

23   that I don't recall offhand.  There's vibration.   02:20

24   There's also issues of awkward posture.            02:20

25            So when you're doing a forceful,            02:20
```

265

1    quote-unquote, "repetitive activity" in an awkward    02:20

2    angle for a long duration of time, then you're more    02:21

3    likely to report musculoskeletal symptoms -- not    02:21

4    necessarily identify injury, but symptoms.    02:21

5         For the shorter issues that don't meet    02:21

6    those -- that level of criteria, then it really    02:21

7    doesn't even fall under the rubric of cumulative or    02:21

8    repetitive trauma.  It just doesn't -- it doesn't    02:21

9    meet the definition.  And our jobs -- typically we    02:21

10   have enough breaks in place.    02:21

11        Our jobs may have some element of    02:21

12   repetition.  It may have some element of force.  It    02:21

13   may have some element of duration.  But typically we    02:21

14   don't see that combination of factors for a long    02:21

15   period of time on a sustained basis for our jobs.    02:21

16   This is not assembly line, typically.  It's not meat    02:21

17   packing.  So we don't see that kind of job in our    02:21

18   work environment.    02:22

19       Q.    Okay.  So just let me clarify two points,    02:22

20   if I may.  One is that definition of two repetitions    02:22

21   a minute comes from the NIOSH Yellow Book.    02:22

22        Did I understand that correctly?    02:22

23       A.    I believe it's stated there, but I don't    02:22

24   recall for sure.  Again, I wasn't fully prepared to    02:22

25   respond to these issues.  But there are other    02:22

                                                            266

Craig Heligman, M.D.                                              April 28, 2021

```
 1    research articles that would define it, and I       02:22
 2    believe the cutoff was at least two cycles per      02:22
 3    minute.                                             02:22
 4        Q.   Is the NIOSH Yellow Book something that you  02:22
 5    use in the regular course of your job duties at CSX?  02:22
 6        A.   It's a reference that's available.  It's   02:22
 7    online.  Anyone can look at it.                      02:22
 8        Q.   Okay.                                       02:22
 9        A.   I was actively engaged when they published  02:22
10    it, and there are some good points about it and some  02:22
11    not so good points about it.                         02:22
12        Q.   Okay.  Would you agree that the fact that   02:22
13    if any one of the plaintiffs did not meet the       02:22
14    definition of "repetition," as you've described it,  02:22
15    does not mean that they don't suffer aches and pains  02:22
16    that require the treatment from a chiropractor?     02:23
17        A.   Not every ache and pain requires the       02:23
18    treatment of a chiropractor.  It's really up to the  02:23
19    patient or the person to decide when it's sufficient  02:23
20    to seek medical treatment.                          02:23
21             They also have a choice of seeing someone   02:23
22    that provides chiropractic services.  They can see   02:23
23    an osteopathic provider.  They can see an allopathic  02:23
24    provider.  They can be referred for a physical      02:23
25    therapist.  They can go to a massage therapist.  For  02:23
```

                                                              267

1    nonspecific musculoskeletal complaints, there are a    02:23

2    whole host of providers that one may choose to see      02:23

3    and seek care from.                                     02:23

4        Q.   Right.  And that -- that consideration of      02:23

5    receiving treatment in any one of the manners that      02:23

6    you mentioned, including a chiropractor, is separate    02:23

7    from a determination of whether they meet the           02:23

8    definition of "repetitive" under NIOSH's                02:23

9    definition -- "repetition" under NIOSH's definition?    02:23

10       A.   That's correct.  Not every ache and pain       02:23

11   would meet the definition of two cycles per minute      02:24

12   of duration, et cetera.                                 02:24

13       Q.   All right.  Looking at this Certificate of     02:24

14   Ongoing Illness, are you able to identify, based        02:24

15   upon your review of it, whether Mr. Akers was           02:24

16   treating with Dr. Johnson for a work-related,           02:24

17   non-work-related symptoms, or a combination of both?    02:24

18       A.   It's not stated whether it's work-related      02:24

19   or not work-related.  I mean, really this issue has     02:24

20   been addressed.  And I think every one of these         02:24

21   cases were submitted through proper channels for        02:24

22   review by OSHA, and a hundred percent of them, to my    02:24

23   knowledge, were turned back from OSHA saying these      02:24

24   weren't work-related issues.  So --                     02:24

25       Q.   I appreciate your elaboration.  My question    02:24

                                                            268

```
 1    was a little different, which is:  Just looking at    02:25

 2    this form, which you reviewed back in June of 2017,   02:25

 3    is there anything on this form that informs you       02:25

 4    whether Mr. Akers was treating with Mr. Johnson for   02:25

 5    work-related, non-work-related symptoms, or a         02:25

 6    combination of both?                                  02:25

 7        A.   It does not state.                           02:25

 8        Q.   Okay.  And then if we look at the "Duration  02:25

 9    of Care" and the date range of the employee being     02:25

10    unable to work, do you see where it says -- it looks  02:25

11    like a 9 to me, September, perhaps, 12th of '16       02:25

12    through present, and then it has a date, July 6th of  02:25

13    2017.                                                 02:25

14        Do you see where I read that?                     02:25

15        A.   Yes.                                         02:25

16        Q.   Okay.  And, you know, maybe after we         02:25

17    establish this, we won't have to do it in every one,  02:25

18    but similar to where we looked at Mr. Adkins, if you  02:25

19    were looking at this COII and Mr. Akers as            02:25

20    information as an individual, there's nothing         02:25

21    suspicious about the dates of treatment or the date   02:26

22    he was unable to work; is that correct?               02:26

23        A.   There's nothing suspicious on the form.      02:26

24    The only comment I would make -- we discussed this    02:26

25    earlier -- is this is a fairly prolonged time period  02:26
```

269

```
 1    to be receiving care only from a chiropractic      02:26

 2    provider for these medical conditions.             02:26

 3        Q.    Okay.  Now there's a question about that. 02:26

 4             I believe in one of the hearings, you'd    02:26

 5    testified -- you know, I don't have it right in     02:26

 6    front of me, but we'll get to it tomorrow -- but are 02:26

 7    there -- my question is:  Are there a certain       02:26

 8    standard or range of treatments that most insurance 02:26

 9    companies permit with a chiropractor?              02:26

10             Does that make sense, that question?  I can 02:26

11    try it again if it doesn't.                         02:26

12        A.    Let me take a shot at it.  The insurance  02:26

13    companies are responsible for determining which     02:26

14    practitioners are in their network or out of their  02:26

15    network for reimbursement purposes.  The insurance  02:26

16    companies also would expect a practitioner to work  02:27

17    within the scope of their practice and what is      02:27

18    allowed under their license.                        02:27

19             So in response to the question, the        02:27

20    insurance company would expect a chiropractic       02:27

21    provider to deliver chiropractic care and work      02:27

22    within that scope of their -- work within the scope 02:27

23    of which their license allows them to do so.        02:27

24    There's no expectation that Dr. Johnson would be    02:27

25    performing surgery on these individuals.  It's      02:27
```

270

Craig Heligman, M.D.                      April 28, 2021

| | | |
|---|---|---|
| 1 | highly doubtful that an insurance company would | 02:27 |
| 2 | reimburse Dr. Johnson to perform surgery. | 02:27 |
| 3 | Does that kind of answer the question? | 02:27 |
| 4 | Q. It -- it does, you know, and I really do | 02:27 |
| 5 | appreciate the thoroughness of that. And I just | 02:27 |
| 6 | didn't ask my question in a specific enough way, but | 02:27 |
| 7 | that was helpful. | 02:27 |
| 8 | The question I was trying to ask was: Do | 02:27 |
| 9 | insurance companies only approve a certain number of | 02:28 |
| 10 | treatments with a chiropractor in any given period | 02:28 |
| 11 | of time, whether that's a calendar year or 12-month | 02:28 |
| 12 | period? | 02:28 |
| 13 | A. Most insurance companies do, yes. | 02:28 |
| 14 | Q. Okay. And are you familiar with what the | 02:28 |
| 15 | three insurance companies that the railroaders -- | 02:28 |
| 16 | that are provided through CSX, do you know what that | 02:28 |
| 17 | range is -- or not range, but a specific number of | 02:28 |
| 18 | treatments that's permitted? | 02:28 |
| 19 | A. I don't know the specific number. I can | 02:28 |
| 20 | tell you that, in my experience, it's generally been | 02:28 |
| 21 | 22 visits. But, again, insurance companies vary. | 02:28 |
| 22 | It depends on how the benefits have been negotiated. | 02:28 |
| 23 | Q. And that has to do with the payment of the | 02:28 |
| 24 | treatment; correct? | 02:28 |
| 25 | A. Right. So if the insurance company -- | 02:28 |

271

Craig Heligman, M.D.                                          April 28, 2021

```
 1    let's say the individual's maxed out their number of    02:28

 2    visits under their insurance plan.  There's nothing     02:28

 3    that would prevent the patient from continuing to       02:28

 4    see that provider and pay out of pocket.                02:28

 5        Q.   Right.  Exactly.                                02:29

 6            Okay.  And that's -- there's no policy or        02:29

 7    anything at CSX that interferes with an employee who    02:29

 8    wants to get chiropractic treatment in excess of        02:29

 9    what's paid for by one of the three insurance           02:29

10    companies; is that correct?                             02:29

11        A.   That's correct.  We would have no in- -- no    02:29

12    influence on that at all.  The person may seek care     02:29

13    from whatever provider they choose and see them for     02:29

14    as long as they choose.                                 02:29

15        Q.   Okay.  With respect to the two individuals     02:29

16    that we've talked about so far, when you went back      02:29

17    and looked at their medical file back in June or        02:29

18    July of 2017, you did not keep any notes or charts      02:29

19    or anything about whether -- about that at all, did     02:29

20    you?                                                    02:29

21        A.   The only notes I kept would have been in       02:29

22    one of the other exhibits.  There's a column where      02:29

23    I'd entered some notes, talked about perhaps what       02:30

24    the medical issue was or how long they may have been    02:30

25    seeking -- seeing the provider.  That's the extent      02:30
```

                                                                    272

Craig Heligman, M.D.                                              April 28, 2021

```
 1   of my notes for these cases.                        02:30

 2       Q.   Okay.  And that was an exhibit earlier     02:30

 3   today that you had -- that was attached to          02:30

 4   an e-mail?                                          02:30

 5       A.   Yes.                                       02:30

 6       Q.   Okay.  Those are the only notes that you   02:30

 7   kept?                                               02:30

 8       A.   That's correct.                            02:30

 9       Q.   Okay.  All right.  If we go to the next    02:30

10   page, please, Bates No. 5755.  This actually looks  02:30

11   like another one for Mr. Akers.  I don't know why   02:30

12   that's in here twice, so we'll go to the next page  02:30

13   for Chad Dowdy, which is Bates No. 5709.            02:30

14       A.   Yes.                                       02:30

15       Q.   This also appears to be a form that -- the 02:30

16   CSX form requests a Social Security Number; is that 02:30

17   correct?                                            02:30

18       A.   Yes.                                       02:30

19       Q.   Now, granted this one appears -- I don't   02:30

20   know at what point it was blacked out or if somebody 02:31

21   attempted to black it out.                          02:31

22            Do you see where it says his craft -- I'm  02:31

23   sorry.  Go ahead.                                   02:31

24       A.   Yeah, I don't know either, but, again, I'll 02:31

25   just point out this is also the 2013 revision.      02:31
```

273

```
 1        Q.    Correct.   Okay.                        02:31

 2              Now, do you have an understanding of what a  02:31

 3    utility worker does?                               02:31

 4        A.    Again, they're -- they would do some -- I'm  02:31

 5    not as familiar with the full spectrum, but they   02:31

 6    don't have a fully defined scope.  They may be --  02:31

 7    they're kind of a -- what am I trying to say? --   02:31

 8    utility player on a baseball team.  They can play  02:31

 9    many positions.                                    02:31

10        Q.    Okay.  And does this form inform you of any  02:31

11    basis for Mr. Dowdy's treatment with Dr. Johnson   02:31

12    that the symptoms that he was experiencing were    02:31

13    work-related, non-work-related, or a combination of  02:31

14    both?                                              02:31

15        A.    Makes no statement.                      02:31

16        Q.    Okay.  Did you -- now, in this case, the  02:32

17    treatment range appears to start on June 19th, and  02:32

18    looks like his estimated return unrestricted work  02:32

19    date is two months later on August 19th of 2017.  02:32

20              Do you see that?                         02:32

21        A.    Yes, I do.                               02:32

22        Q.    Okay.  Do you have any understanding of the  02:32

23    basis for that estimated return-to-work date?  First  02:32

24    based on this form, and then I'll ask you in       02:32

25    general.  But based on this form..?                02:32
```

Craig Heligman, M.D.                                                    April 28, 2021

```
 1        A.   No, this is a form that's -- again, this    02:32

 2   section is completed by the provider, so you'd have   02:32

 3   to ask Dr. Johnson that question.                     02:32

 4        Q.   Okay.  Do you have an understanding, based  02:32

 5   on your, you know, education and experience as a      02:32

 6   doctor or otherwise, that chiropractic treatment for  02:33

 7   a month or two months -- is that standard?            02:33

 8        A.   I'm going to answer -- if it's okay, answer 02:33

 9   that question two ways.                               02:33

10        Q.   Sure.                                       02:33

11        A.   If you look at the evidence-based           02:33

12   recommendations for chiropractic care, typically it   02:33

13   is delivered early in injury, for the most part, not  02:33

14   always, but you're looking for improvement in the     02:33

15   symptoms and the medical condition in the first two   02:33

16   to three visits.                                      02:33

17            And there's an expectation that if your      02:33

18   first two or three visits had no impact at all,       02:33

19   meaning seriously zero impact -- there's no evidence  02:33

20   of improvement after the first few visits -- then     02:34

21   the expectation is that further chiropractic care     02:34

22   would not be a benefit.                               02:34

23            If, however, there is improvement in the     02:34

24   first few visits, then the expectation is, in the     02:34

25   next two to four weeks or six to 12 visits, that you  02:34
```

275

USCA4    2094

```
 1    would maximize the benefit from chiropractic care.      02:34
 2    So that's what the medical literature would say.        02:34
 3          Is it standard to see treatment delivered         02:34
 4    outside of the scope of that -- that medical            02:34
 5    evidence-based protocol?  The answer is yes.  It's      02:34
 6    completely standard to see treatment delivered for      02:34
 7    far longer than what the medical literature would       02:34
 8    suggest is useful.                                      02:34
 9       Q.    Okay.  With respect to the first part of       02:34
10    your answer, were you -- and I'm talking about the      02:34
11    part where you said if there's not improvement          02:35
12    within the first two or three visits; right?            02:35
13          Do you remember that part?                        02:35
14       A.    Yes, I do.                                     02:35
15       Q.    And is that in the context of recovery from    02:35
16    all symptoms or pain management or something else?      02:35
17       A.    Improvement can be somewhat subjective.  So    02:35
18    when you're dealing with primarily subjective           02:35
19    findings, the expectation of improvement would be,      02:35
20    again, reduction in pain symptoms.  Potentially it      02:35
21    could also be an improvement in function.               02:35
22          It doesn't necessarily mean a complete            02:35
23    alleviation of symptoms, but there has to be some       02:35
24    evidence that the person is reporting an improvement    02:35
25    in how they feel and what they're able to do            02:35
```

276

```
 1   following treatment.                          02:35

 2       Q.   I mean, I think I understand your answer   02:35

 3   there and I appreciate that, but, I mean, have you  02:35

 4   heard of people who regularly treat with        02:35

 5   chiropractors for pain management on a regular  02:35

 6   basis?                                          02:36

 7       A.   Yes.                                   02:36

 8            So some individuals will choose to go in  02:36

 9   and receive manual manipulation once, and they're  02:36

10   fine.  That -- that resolves their symptoms.  If  02:36

11   they have a new episode, they come in.  They may see  02:36

12   the person in the next month, receive the same  02:36

13   treatment, and that's sufficient.  Could be that  02:36

14   they need two or three treatments in that time  02:36

15   period.  It could be one time they experience the  02:36

16   symptom and they need six or eight visits rather  02:36

17   than the one visit.                             02:36

18            So periodic use of a chiropractic provider  02:36

19   is not what I'm trying to describe.  It's the   02:36

20   ongoing treatment of the chiropractic care three to  02:36

21   four or five times a week for a long duration of  02:36

22   time.  It's not the intermittent onset of new  02:36

23   symptoms.                                       02:36

24       Q.   Is there anything on this particular form  02:37

25   that indicates how often Dr. Johnson intended to  02:37
```

| | | |
|---|---|---|
| 1 | treat Mr. Dowdy? | 02:37 |
| 2 | A.    No. | 02:37 |
| 3 | Q.    Okay.  And that -- would that be important | 02:37 |
| 4 | information to know? | 02:37 |
| 5 | A.    Not for the purposes of reviewing the COII, | 02:37 |
| 6 | no. | 02:37 |
| 7 | Q.    Okay.  All right.  If you turn the page to | 02:37 |
| 8 | the next one, please, it's Bates No. 5748. | 02:37 |
| 9 | A.    Yes. | 02:37 |
| 10 | Q.    This is for Chad -- Chad Little. | 02:37 |
| 11 | Do you have that in front of you? | 02:37 |
| 12 | A.    I do. | 02:37 |
| 13 | Q.    Okay.  And are you familiar with what an | 02:37 |
| 14 | engineer does? | 02:37 |
| 15 | A.    Yes, an engineer operates the locomotive. | 02:37 |
| 16 | Q.    Okay.  Now, looking at this form, can you | 02:37 |
| 17 | just tell me what that -- what -- your | 02:38 |
| 18 | interpretation, in summary fashion, of why he was | 02:38 |
| 19 | treating with Dr. Johnson? | 02:38 |
| 20 | A.    From my understanding of reading this form, | 02:38 |
| 21 | Mr. Little sought care from Dr. Johnson because he | 02:38 |
| 22 | had low back pain. | 02:38 |
| 23 | Q.    Okay.  Were you -- do you have any | 02:38 |
| 24 | knowledge or recollection from when you reviewed | 02:38 |
| 25 | Mr. Little's medical file that he had been off for a | 02:38 |

278

1    heart condition?                                    02:38

2        A.   No, that I do not recall being in our     02:38

3    medical record.                                     02:38

4        Q.   Okay.  If that is accurate -- and I believe  02:38

5    it is.  Otherwise, I wouldn't ask you about it.  But  02:38

6    if it is accurate that he had had -- I believe it   02:38

7    was a heart attack.  It was some type of a heart    02:38

8    condition -- that he had been off for some time     02:38

9    prior to this, is that the type of information that  02:38

10   would have been -- should have been in the medical  02:38

11   file at CSX?                                         02:38

12       A.   If an individual is off work for a heart   02:39

13   attack or other cardiac condition, my expectation is  02:39

14   that the COII should be completed by the            02:39

15   cardiologist or the other physician treating the    02:39

16   heart condition, not the chiropractic provider.     02:39

17            In my opinion, the heart attack is a much  02:39

18   more serious medical condition than a nonspecific   02:39

19   low back pain.  And so I cannot answer the question  02:39

20   why the employee would have the expectation for     02:39

21   Dr. Johnson to provide periodic updates for support  02:39

22   of him being off work as opposed to sending         02:39

23   information from his cardiologist or, if he needed  02:39

24   it, a cardiothoracic surgeon.                       02:39

25       Q.   If it's correct that Mr. Little was off for  02:39

                                                          279

Craig Heligman, M.D.                                        April 28, 2021

```
 1   a -- you know, a period of time prior to this form    02:39
 2   for heart conditions, would he have been required to  02:39
 3   submit a Certificate of Ongoing Illness for those     02:39
 4   absences greater than 45 days?                         02:39
 5       A.   He would be expected to submit the COII,      02:40
 6   but it's up to the employee -- let me start over.     02:40
 7            We don't know why that employee is off       02:40
 8   work.  So if the employee submits a form from the     02:40
 9   chiropractor saying "I'm under treatment for low      02:40
10   back pain and that's why I'm off work," we don't      02:40
11   challenge that.  However, one would conclude if       02:40
12   you're off for a heart attack, you're not going to    02:40
13   get your medical documentation to be off work         02:40
14   completed by a chiropractor.                          02:40
15       Q.   But do you have a recollection of whether    02:40
16   any cardiologist or medical doctor submitted any      02:40
17   Certificate of Ongoing Illness for Mr. Little         02:40
18   related to his heart condition?                        02:40
19       A.   No.  To my understanding and my review,      02:40
20   there was no information about his cardiac            02:40
21   condition.  There were several employees that, after 02:40
22   the fact, were identified as having medical           02:40
23   conditions that would completely explain their       02:40
24   absence from work for periods of time.  But it       02:40
25   doesn't explain why they didn't tell us.             02:40
```

                                                                    280

1      Q.   Back in 2017, in June or July of 2017, did    02:41

2   you have any knowledge about whether engineers were    02:41

3   subject to any layoffs at all or job abolishments?    02:41

4      A.   I was not aware of any.    02:41

5      Q.   Okay.  So if it's true that Mr. Little was    02:41

6   never subject to a layoff, then you would have no    02:41

7   reason to find anything on this form suspicious?    02:41

8      A.   It had nothing to do with knowledge about a    02:41

9   layoff.  I just don't find anything suspicious on    02:41

10  this form.    02:41

11     Q.   Okay.  Have you ever been made aware that    02:41

12  Mr. Little shot himself in front of his wife and    02:41

13  child?    02:41

14     A.   No, I don't recall knowing that.    02:41

15          MS. FOSTER BIRD:  Sorry.  I was going to    02:41

16  object, but go ahead.    02:41

17  BY MR. PAUL:    02:41

18     Q.   All right.  We'll go to the next page,    02:41

19  please.  This is Bates No. -- looks like --    02:42

20  actually, it looks like the numbers got a little    02:42

21  bigger.  It looks like 14136 for Christopher    02:42

22  Stiltner.    02:42

23          Do you see that?    02:42

24     A.   Yes.    02:42

25     Q.   Okay.  I think we've already talked about    02:42

281

Craig Heligman, M.D.                                                  April 28, 2021

| | | |
|---|---|---|
| 1 | the utility workers. | 02:42 |
| 2 | So is your answer the same with respect to | 02:42 |
| 3 | Mr. Stiltner's job duties? | 02:42 |
| 4 | A.   I think our utility workers also may do the | 02:42 |
| 5 | hustling of the locomotives, moving them around if | 02:42 |
| 6 | needed.  Again, that -- but otherwise, yes. | 02:42 |
| 7 | Q.   And it's the information on this top part | 02:42 |
| 8 | of the form that he worked in the Mechanical | 02:42 |
| 9 | Department in Louisville. | 02:42 |
| 10 | Were you aware of any layoffs or job | 02:42 |
| 11 | abolishments in Louisville in 2017? | 02:42 |
| 12 | A.   No. | 02:42 |
| 13 | Q.   And is it correct that -- | 02:42 |
| 14 | MS. FOSTER BIRD:  What page are you on, | 02:42 |
| 15 | Greg? | 02:42 |
| 16 | MR. PAUL:  I'm on Bates No. 14136.  It's | 02:42 |
| 17 | Page 6 of 77. | 02:42 |
| 18 | MS. FOSTER BIRD:  Yeah, I'm not sure -- I'm | 02:42 |
| 19 | going to that.  Hold on.  Let me interrupt for one | 02:43 |
| 20 | second here.  Sorry. | 02:43 |
| 21 | MR. PAUL:  It's all right. | 02:43 |
| 22 | MS. FOSTER BIRD:  Do you see where it says | 02:43 |
| 23 | "Division/Shop" and it says "Louisville"?  I just | 02:43 |
| 24 | want to make -- I just don't want you -- I just want | 02:43 |
| 25 | to be sure that you know it could be the Louisville | 02:43 |

282

Craig Heligman, M.D.                                              April 28, 2021

```
 1    division but not the Louisville shop.          02:43
 2            MR. PAUL:  Okay.  No, that's fine.      02:43
 3            MS. FOSTER BIRD:  I just wanted to say  02:43
 4    that.  Okay.                                    02:43
 5            MR. PAUL:  Yeah, that's -- that's fine. 02:43
 6    BY MR. PAUL:                                    02:43
 7        Q.   Do you -- Doctor, just on that topic, I 02:43
 8    mean, do you know whether there's a Louisville shop 02:43
 9    or a Louisville division or both?               02:43
10            Do you have any knowledge about that?   02:43
11        A.   The divisions were changed and how we  02:43
12    organize our -- our railroad changed around that 02:43
13    time, and so I don't know really what divisions were 02:43
14    active at that moment.  The employees are -- had 02:44
15    their seniority in a specific region or a specific 02:44
16    area based upon when they started with the company, 02:44
17    and so that seniority may not be transferable from 02:44
18    location to location.                           02:44
19            And -- and as was said, even though they 02:44
20    may say the division was Louisville, their home 02:44
21    residence may not be in Louisville and their work 02:44
22    may not be in Louisville.  It may have just been a 02:44
23    management structure out of Louisville covered this 02:44
24    area.  And in this case, Mr. Stittner's[sic] address 02:44
25    is listed in Ashland, Kentucky.                 02:44
```

                                                                   283

USCA4    2102

Craig Heligman, M.D.                                                  April 28, 2021

```
 1        Q.   Okay.  Got it.                              02:44

 2             Well, I forgot what I was going to ask you.  02:45

 3   I'll have to come back to it.                          02:45

 4             Do you recall testifying earlier that when  02:45

 5   you first -- in June of 2017, first reviewed some of  02:45

 6   these forms, that you had someone from Human          02:45

 7   Resource look into which employees were subject to    02:45

 8   layoff?                                               02:45

 9        A.   That's correct.  Our HR team, in            02:45

10   conjunction with Labor Relations, attempted to        02:45

11   identify which of these employees were on a list --   02:45

12   either already on the list or going to be             02:45

13   subjectively placed on a list for furlough.  And I    02:45

14   don't recall specifically which employees those       02:45

15   were.                                                 02:45

16        Q.   But did that happen because you requested   02:45

17   it?                                                   02:46

18        A.   It happened because it was part of the      02:46

19   review process.  I didn't ask for that myself.  I     02:46

20   was not aware that furloughs were occurring, and I    02:46

21   wasn't aware of any kind of changes from a Human      02:46

22   Resources or employment perspective for that region.  02:46

23   So it was up to HR and LR to bring that to my         02:46

24   attention.                                            02:46

25        Q.   And do you remember who specifically looked  02:46
```

                                                                     284

USCA4    2103

Craig Heligman, M.D.                                                      April 28, 2021

```
 1    into that in Human Resources or Labor Relations?    02:46

 2         A.    I don't.                                 02:46

 3         Q.    Okay.  And we can go back and look at that   02:46

 4    exhibit if you want, but my recollection was that    02:46

 5    the Human Resources conclusion was that there was    02:46

 6    not a connection between the two -- that is, the    02:46

 7    layoffs; is that correct?                           02:46

 8         A.    I think the statement I used in that e-mail   02:46

 9    was that they couldn't identify a pattern.  Or we    02:46

10    could go back and look at it and read it again if    02:46

11    you'd like.                                         02:46

12         Q.    Yeah, we can.                            02:47

13         But -- but your recollection is that --       02:47

14    that a pattern could not be identified between the    02:47

15    Certificates of Ongoing Illness that you received in   02:47

16    June or July and the layoffs; is that correct?      02:47

17         A.    Right.  There was not a one-to-one       02:47

18    consistency.  So not everybody that submitted a form   02:47

19    was on a furlough list or a reorganization list, and   02:47

20    there are some people on that list that we had no    02:47

21    COIIs for.  So there wasn't a one-to-one            02:47

22    coordination between the two lists.                 02:47

23         Q.    Okay.  Back to this particular exhibit --   02:47

24    well, first of all, do you -- do you need to go back   02:47

25    and look at that exhibit if you want to, or is      02:47
```

285

Craig Heligman, M.D.                                                April 28, 2021

```
 1   that --                                          02:47

 2       A.   Only if you want me to do so.           02:47

 3       Q.   Okay.  No, that's all right.            02:47

 4            Looking at this form, is it correct to say   02:47

 5   that there's no information on here that informs you   02:47

 6   whether Mr. Stiltner was treating for symptoms    02:47

 7   related to a work-related incident or a           02:47

 8   non-work-related incident or a combination of both?   02:47

 9       A.   That's correct.  There's nothing on this   02:48

10   form that would say one way or the other.         02:48

11       Q.   And this form, the "Duration of Care" and   02:48

12   it looks like the "unable to work" appear to be the   02:48

13   same, which is May 21st of 2017.                  02:48

14            Do you see that?                         02:48

15       A.   I do.                                    02:48

16       Q.   Okay.  And same question, there's --    02:48

17   there's nothing suspicious about that, in and of  02:48

18   itself, just looking at Mr. Stiltner as an        02:48

19   individual on this form?                          02:48

20       A.   That's correct.                          02:48

21       Q.   All right.  Go to the next page, please.   02:48

22   Actually, this looks like another one for         02:48

23   Mr. Stiltner.  Let's see.  I think we can skip over   02:48

24   this one.                                         02:48

25            All right.  The next one is for Casey    02:48
```

286

USCA4   2105

| | | |
|---|---|---|
| 1 | Clark, which is Bates No. 12535.  Just let me know | 02:48 |
| 2 | when you're there. | 02:48 |
| 3 |     A.    I'm there. | 02:48 |
| 4 |     Q.    Okay.  Are you familiar with the duties of | 02:48 |
| 5 | an electrician? | 02:49 |
| 6 |     A.    Again, I have a working knowledge.  I can't | 02:49 |
| 7 | give you the specifics of the full list of their | 02:49 |
| 8 | activities. | 02:49 |
| 9 |     Q.    Okay.  Is it -- and if you don't know, tell | 02:49 |
| 10 | me -- but is it your understanding that Mr. Clark, | 02:49 |
| 11 | as an electrician, works on locomotives or something | 02:49 |
| 12 | else, or don't you know? | 02:49 |
| 13 |     A.    It's my understanding he could work on | 02:49 |
| 14 | locomotives. | 02:49 |
| 15 |     Q.    And would that -- I mean, do you have any | 02:49 |
| 16 | knowledge about if that's true that an electrician, | 02:49 |
| 17 | in part, works on locomotives, that they have to | 02:49 |
| 18 | crouch into awkward positions in order to perform | 02:49 |
| 19 | their job duties? | 02:49 |
| 20 |     A.    Potentially, yes. | 02:49 |
| 21 |     Q.    All right.  In this particular case, it | 02:49 |
| 22 | appears that the duration of care and the inability | 02:50 |
| 23 | to work are the same, starting in June 19th of 2017. | 02:50 |
| 24 |         In order to determine whether Mr. Clark had | 02:50 |
| 25 | previously had any impairments related to what he's | 02:50 |

287

Craig Heligman, M.D.                                          April 28, 2021

1    treating for here, what options did you have to find      02:50

2    out about that?                                           02:50

3         A.   I don't think I understand the question.        02:50

4         Q.   Me either.  Let me try it again.  All           02:50

5    right?                                                    02:50

6              First, let's look at the "Attending             02:50

7    Physician's Statement."  And just in general terms,       02:50

8    what -- what was Mr. Clark treating with Mr. Johnson      02:50

9    for, according to this form?                              02:50

10        A.   Again, without going into the medical           02:50

11   terms, primarily low back pain and lower extremity        02:50

12   pain.                                                     02:50

13        Q.   Okay.  So to try to ask a clearer question,     02:50

14   if it was important to you to find out if Mr. Clark       02:51

15   had treated for those same or similar conditions          02:51

16   prior to June of 2017, what options did you have at       02:51

17   your disposal?                                            02:51

18        A.   Well, first, on review of this form, it         02:51

19   wasn't that important to know, but I would have gone      02:51

20   back through the medical record to see if he had          02:51

21   been treated before and had made us aware of it.          02:51

22        Q.   And I think we covered this in broad terms,     02:51

23   but I believe you testified it also would have been       02:51

24   an option, if you thought it appropriate, to call         02:51

25   Mr. Clark or his health care provider to get more         02:51

                                                        288

Craig Heligman, M.D.                                            April 28, 2021

```
 1   information about this treatment; is that correct?    02:51
 2       A.   If it was appropriate.  But, again, under    02:51
 3   these circumstances, it wasn't necessary.             02:51
 4       Q.   Okay.  And -- and why is that?               02:51
 5       A.   Because, again, as I've already pointed      02:51
 6   out, we don't interfere with the doctor/patient       02:51
 7   relationship.  And so this form is completed merely   02:52
 8   as an administrative function.  It wasn't meant to    02:52
 9   determine appropriateness of care.  It was not meant  02:52
10   to determine whether anybody had been treated before  02:52
11   or subsequent to the receipt of this information.     02:52
12           It was simply an administrative tool to       02:52
13   document what the employee and their health           02:52
14   professional have reported as the medical reason for  02:52
15   their being absent at this moment in time.  It's not  02:52
16   to be used as a causation analysis.  It's not used    02:52
17   to report a workplace injury.  There are completely   02:52
18   separate processes for all of those things.           02:52
19           So it's really not important for us to make   02:52
20   any -- any decisions on this form other than to       02:52
21   accept it for face value.                             02:52
22       Q.   Okay.  And I guess that -- does your answer  02:52
23   right there tie into the fact that if Mr. Clark --    02:52
24   just reviewing this form, there's nothing suspicious  02:53
25   about it as an individual?                            02:53
```

                                                                    289

Craig Heligman, M.D.                                          April 28, 2021

1        A.    That's correct.  As an individual, I see      02:53

2    nothing particularly suspicious about it.                02:53

3        Q.    Okay.  But I guess at the time that you saw    02:53

4    this form along with others who treated with             02:53

5    Dr. Johnson, you had -- I believe you testified          02:53

6    some -- I don't recall the word you used -- but some     02:53

7    concerns along the lines that -- of Mr. Johnson          02:53

8    treating patients in the past prior to June of 2017?     02:53

9        A.    We had some concerns.  That's correct.  And    02:53

10   honestly it was because of the number of employees       02:53

11   that would see Dr. Johnson spread out over time over     02:53

12   many years.  There was never -- up until June of         02:53

13   2017, there was never this large influx of documents     02:53

14   from Dr. Johnson or Dr. Carey.                           02:53

15           We never disputed that the employee had the      02:53

16   right to see either practitioner.  We never              02:54

17   challenged either practitioner at all.  There were       02:54

18   times when we had asked for medical records from         02:54

19   these practitioners, doing a return-to-work              02:54

20   fitness-for-duty review, but we never interfered         02:54

21   with the doctor/patient relationship.                    02:54

22           This was an administrative function.  The        02:54

23   employee had a responsibility under the Collective       02:54

24   Bargaining Agreement.  We were the administrators of     02:54

25   receipt of that information because it did have          02:54

                                                                  290

1    medical information on these forms and it was to be    02:54

2    placed in the medical record.  But, otherwise, it    02:54

3    was purely an administrative function and used    02:54

4    solely for that purpose.    02:54

5        Q.   I recall that from one of the hearings --    02:54

6    and if you don't recall, that's fine.  We'll look at    02:54

7    it tomorrow.  But I believe your testimony was that    02:54

8    the concern over Dr. Johnson treating with -- with    02:54

9    someone was, like, ten years ago.    02:54

10        Does that sound right?    02:54

11        A.   I think the concern -- I don't remember the    02:55

12    statement.  I'm sure we will look at it.  But    02:55

13    Dr. Johnson had been a practitioner in that area for    02:55

14    a very long time.  We've been present in that area    02:55

15    for a very long time, so it's not surprising to me    02:55

16    that Dr. Johnson would see a large number of our    02:55

17    employees.    02:55

18        Q.   Right.    02:55

19        What did Dr. Neilson tell you about    02:55

20    Dr. Johnson's treatment of railroad workers    02:55

21    specifically?    02:55

22        A.   My recollection is Dr. Neilson just shared    02:55

23    with me that we saw a lot of these COII forms from    02:55

24    Dr. Johnson.  He thought -- again, it was his    02:55

25    impression that Dr. Johnson may have overtreated or    02:55

291

Craig Heligman, M.D.                                                    April 28, 2021

```
 1    declared that employees should be off work for       02:55

 2    injuries that he was treating for an extended period  02:55

 3    of time.  There was a potential that it corresponded  02:55

 4    to other times when there were furloughs in the       02:56

 5    area.                                                  02:56

 6          But that was the extent of it.  We never        02:56

 7    took any action.  We had no reason to do so.  We      02:56

 8    just had no -- again, there was no documentation      02:56

 9    such as we received in 2017 to say, "Okay.  Now we    02:56

10    really think we do have a problem."  It was           02:56

11    completely an individualized interpretation of the    02:56

12    information.                                           02:56

13       Q.   Okay.  And was it just one conversation you   02:56

14    had with Dr. Neilson about Dr. Johnson?               02:56

15       A.   It was probably not the only conversation     02:56

16    we held about Dr. Johnson over the three years I      02:56

17    worked with Dr. Neilson, but I can't tell you how     02:56

18    often we really spoke about him.  You know, maybe --  02:56

19       Q.   Yeah.                                         02:56

20       A.   -- about once a year.                         02:56

21       Q.   Do you remember the context of the            02:56

22    conversation with Dr. Neilson regarding Dr. Johnson?  02:56

23          In other words, was it specific to one          02:56

24    employee or -- or just an in-general conversation?    02:56

25       A.   It was an in-general conversation.            02:57
```

                                                                            292

Craig Heligman, M.D.                                          April 28, 2021

```
 1          Q.   Okay.  All right.  Let's go to the next      02:57

 2    one, please.  Actually, this is another one for         02:57

 3    Casey Clark, so I think we can skip that one, and       02:57

 4    we'll go to Devery Brown, Bates No. 8736.               02:57

 5          A.   Okay.                                        02:57

 6          Q.   Identifies as a boilermaker.                 02:57

 7               Are you familiar with the job tasks of a     02:57

 8    boilermaker?                                            02:57

 9          A.   Again, the -- I have a general               02:57

10    understanding, but the job tasks themselves are not     02:57

11    necessarily a direct reflection of the title.  These    02:57

12    are craft positions that were listed in -- under the    02:57

13    unions, and those jobs changed over time but the        02:57

14    craft title never did.                                  02:57

15          Q.   Kind of like -- kind of like -- I'm sorry.   02:57

16    Go ahead.                                               02:57

17          A.   No, I'm sorry.  I was finished.              02:57

18          Q.   Okay.  Kind of like the fireman, when the    02:57

19    trains haven't run on coal for some time?               02:57

20          A.   That's correct.                              02:58

21          Q.   Got it.                                      02:58

22               Is there anything on this form that informs  02:58

23    you whether Mr. Brown's treatment with Dr. Johnson      02:58

24    was work-related, non-work-related, or a combination    02:58

25    of both?                                                02:58
```

                                                              293

| | | |
|---|---|---|
| 1 | A.   No. | 02:58 |
| 2 | [Train horn sounds.] | 02:58 |
| 3 | Q.   That's exciting.  Who's got the train horn? | 02:58 |
| 4 | A.   Good question.  I don't know. | 02:58 |
| 5 | Q.   Okay. | 02:58 |
| 6 | A.   There's three or four railroads that run | 02:58 |
| 7 | along this track every now and then. | 02:58 |
| 8 | Q.   Yeah. | 02:58 |
| 9 | MS. FOSTER BIRD:  It was a sign from God. | 02:58 |
| 10 | MR. PAUL:  To wrap it up? | 02:58 |
| 11 | MS. FOSTER BIRD:  To zip it. | 02:58 |
| 12 | THE WITNESS:  You'd think that the tracks | 02:58 |
| 13 | right outside our door belong to us, but they don't. | 02:58 |
| 14 | MR. PAUL:  Yup. | 02:58 |
| 15 | BY MR. PAUL: | 02:58 |
| 16 | Q.   Okay.  So looking at this form, is it | 02:58 |
| 17 | possible for you to tell whether Mr. Brown was | 02:59 |
| 18 | treating with Mr. Johnson for aches and pains | 02:59 |
| 19 | related to his job duties as a boilermaker or | 02:59 |
| 20 | something else? | 02:59 |
| 21 | A.   It's not stated. | 02:59 |
| 22 | Q.   Okay.  All right.  Go to the next one, | 02:59 |
| 23 | Dennis Hutchinson.  And it appears -- you have that | 02:59 |
| 24 | in front of you? | 02:59 |
| 25 | A.   I do. | 02:59 |

294

Craig Heligman, M.D.                                                    April 28, 2021

| | | |
|---|---|---|
| 1 | Q.   It appears he's a carman. | 02:59 |
| 2 | Do you see that? | 02:59 |
| 3 | A.   I do. | 02:59 |
| 4 | Q.   Okay.  And I think one of our other | 02:59 |
| 5 | gentlemen was a carman and a painter, as I recall, | 02:59 |
| 6 | but either way you're familiar with the job duties | 02:59 |
| 7 | of a carman; correct? | 02:59 |
| 8 | A.   Yes. | 02:59 |
| 9 | Q.   Okay.  Is there anything on this form that | 02:59 |
| 10 | informs you whether Mr. Hutchinson's treatment with | 02:59 |
| 11 | Mr. Johnson was work-related, non-work-related, or a | 02:59 |
| 12 | combination of both? | 02:59 |
| 13 | A.   No, it does not state. | 02:59 |
| 14 | Q.   Okay.  In this particular form, the | 02:59 |
| 15 | duration of care and the inability to work appears | 03:00 |
| 16 | to date back to March 15th of 2016. | 03:00 |
| 17 | Do you see that? | 03:00 |
| 18 | A.   I do. | 03:00 |
| 19 | Q.   Okay.  And although it may seem obvious, | 03:00 |
| 20 | that would clearly predate -- if that's accurate, | 03:00 |
| 21 | that would clearly predate any notice of upcoming | 03:00 |
| 22 | layoffs in June of 2017; is that correct? | 03:00 |
| 23 | A.   That would be correct. | 03:00 |
| 24 | Q.   Okay.  Go to the next one, please. | 03:00 |
| 25 | Actually, we can skip Ms. Lanham for various | 03:00 |

295

USCA4    2114

|  |  |  |
|---|---|---|
| 1 | reasons.  So we will go to David Manis, Bates No. | 03:00 |
| 2 | 5778. | 03:00 |
| 3 |         Do you have that in front of you? | 03:00 |
| 4 |    A.   I do. | 03:00 |
| 5 |         MS. FOSTER BIRD:  Hey, Greg, I just want to | 03:00 |
| 6 | back up.  Since you skipped Lanham, I didn't know if | 03:00 |
| 7 | you were doing the whole exhibit or not.  I just | 03:00 |
| 8 | want to back up to tell you that Casey Clark, which | 03:00 |
| 9 | was one of the ones that you mentioned before, is | 03:00 |
| 10 | also not a plaintiff here.  So if for some reason | 03:00 |
| 11 | you're skipping the ones in the exhibit, I just want | 03:00 |
| 12 | to make you aware of that. | 03:00 |
| 13 |         It was -- the exhibit attached, some of | 03:01 |
| 14 | this was the exhibit attached to the hearing, but | 03:01 |
| 15 | now you're skipping people who are not plaintiffs | 03:01 |
| 16 | and Casey Clark was also not a plaintiff.  So -- | 03:01 |
| 17 |         MR. PAUL:  Okay. | 03:01 |
| 18 |         [Crosstalking.] | 03:01 |
| 19 |         MS. FOSTER BIRD:  -- or what it is, but I'm | 03:01 |
| 20 | just putting that on the record for completeness. | 03:01 |
| 21 |         MR. PAUL:  My -- my oversight is what it | 03:01 |
| 22 | is.  All right. | 03:01 |
| 23 |         Anything further?  We can get on with | 03:01 |
| 24 | Mr. Manis?  Okay. | 03:01 |
| 25 |  |  |

296

```
 1    BY MR. PAUL:                                   03:01
 2         Q.   All right, Dr. Heligman.  Looks like 03:01
 3    Mr. Manis is a painter.  We've already talked about 03:01
 4    the job duties that you're familiar with as a  03:01
 5    painter.                                       03:01
 6              Do you know, I mean, what's involved with 03:01
 7    painting, like, a railroad car or a locomotive, you 03:01
 8    know, whether it's manual or a spray gun or     03:01
 9    something else?                                03:01
10         A.   I think it could be a combination depending 03:01
11    upon what the needs are.                       03:01
12         Q.   Okay.  Notwithstanding your definition of 03:01
13    "repetition" under NIOSH, but just in general, do 03:01
14    you have any understanding of whether Mr. Manis' 03:02
15    painting duties were repetitive in nature -- not 03:02
16    under the NIOSH definition?                    03:02
17         A.   What definition should I use?        03:02
18         Q.   A definition of -- well, that's a -- that's 03:02
19    a fair point.  Let me -- let me back up a minute. 03:02
20              Like, do you have any understanding of what 03:02
21    a painter is required to do in terms of his or her 03:02
22    arms?                                          03:02
23         A.   Considering I've painted many homes myself, 03:02
24    there is a movement of the arm with a paintbrush, 03:02
25    with the roller, potentially with a paint gun.  But 03:02
```

297

```
 1    specifically to rail operations, if he's hand        03:02

 2    painting versus using a paint room with a paint gun,  03:02

 3    the activities are somewhat different and the use of   03:02

 4    the hand is different.                                 03:03

 5        Q.   Is -- a painter like Mr. Manis, you know,     03:03

 6    in a mechanical shop in Huntington, do you have any    03:03

 7    idea of how much they have to lift?                    03:03

 8        A.   I would have to look at the specific job      03:03

 9    description.  But if you look at the mechanical        03:03

10    employees, most of the job descriptions are going to   03:03

11    list either 50 pounds or potentially 100 pounds.  I    03:03

12    think in most mechanical -- I have to look at the      03:03

13    job description again.  It's either considered         03:03

14    medium or heavy work under the definitions provided    03:03

15    by the Dictionary of Occupational Titles.              03:03

16        Q.   Okay.  And what -- as I recall, medium work   03:03

17    goes up to -- what is it -- 25 or 50?                  03:03

18        A.   Medium is up to 50 pounds occasionally.       03:03

19    For heavy work, it's up to 100 pounds.  For very       03:03

20    heavy, it's up to 150 pounds.                          03:03

21        Q.   Okay.  And -- I'm sorry -- you believe that   03:04

22    the painting duties would require somewhere between    03:04

23    medium and heavy?                                      03:04

24        A.   In the mechanical world, it's either going    03:04

25    to be medium or heavy.                                 03:04
```

298

1        Q.    Okay.  And same question here, this -- this    03:04

2    CII -- COII form does not provide any information as     03:04

3    to whether Mr. Manis' treatment with Dr. Johnson is      03:04

4    work-related, non-work-related, or a combination of      03:04

5    both; correct?                                           03:04

6        A.    That's correct.                                03:04

7             And I'm more than happy to sit here and         03:04

8    answer questions on all these pages, but I think you     03:04

9    need to understand that this form itself is not how      03:04

10   we report our on-duty injuries.  There's a process      03:04

11   in place.  And had any of these employees been          03:04

12   seeking care for a work-related injury, it was their    03:04

13   responsibility at the time they thought the incident    03:04

14   occurred to report that to their manager and            03:04

15   complete the PI-1A.                                      03:04

16             We have a regulatory responsibility for       03:05

17   submitting all work-related injuries up to our          03:05

18   reporting agency.  In this case, it's the FRA, and      03:05

19   in other -- in other jurisdictions, it's typically      03:05

20   OSHA.                                                    03:05

21             So if this person had a work-related          03:05

22   injury, this isn't the form they would submit.  They    03:05

23   would submit the PI-1A, and we would move on from       03:05

24   there.  In this set of circumstances, none of these     03:05

25   individuals submitted a PI-1A to designate that they    03:05

                                                             299

Craig Heligman, M.D.                                                        April 28, 2021

```
1     were reporting a work injury.  At no time did they    03:05

2     report to their manager that they were experiencing   03:05

3     what they thought was a work-related injury or        03:05

4     illness.                                              03:05

5           So, again, I'm happy to sit here with you       03:05

6     and go through each and every one of these pages,     03:05

7     but this document, in most cases, is not used -- or   03:05

8     I should say never will be used for reporting         03:05

9     on-duty injury.  And whether or not the employee or   03:05

10    the provider states that it was an off-duty or        03:06

11    on-duty issue, it's not relevant.                     03:06

12       Q.   So a couple questions on that.                03:06

13           Do you have an understanding of what an FRA    03:06

14    reportable injury is?                                 03:06

15       A.   Yes.                                          03:06

16       Q.   Okay.  What is that?                          03:06

17       A.   An FRA reportable injury has -- it has to     03:06

18    be occurring on the job, in the course of doing       03:06

19    their work, and generally on property.  We have a     03:06

20    reporting officer that actually makes the reporting   03:06

21    determination.  I'm not the expert in that area.      03:06

22    There is a regulation and a guidance manual that      03:06

23    discusses what -- what incidents may be considered    03:06

24    FRA reportable, and I rely on the reporting officer   03:06

25    to make the final determination.                      03:06
```

```
 1          All I'm saying is this document is not used   03:06
 2     for that purpose.  And so regardless of what the   03:07
 3     person may say or write, we don't use it to define 03:07
 4     whether or not it's an FRA reportable incident.    03:07
 5          Q.   Okay.  Would you agree that it's up to an 03:07
 6     employee whether or not to file an injury claim?   03:07
 7          A.   It's up to the employee.  In fact, it's the 03:07
 8     employee's responsibility to report when they      03:07
 9     experience an -- an on-duty injury or if they      03:07
10     believe that they may have injured themselves at   03:07
11     work.  It is their responsibility to report that.  03:07
12          It is the employer's responsibility to then   03:07
13     review that case and, if it meets the FRA          03:07
14     requirements, to report it to the FRA.  But this is 03:07
15     not the format we use for that purpose.            03:07
16          Q.   No, I think you've made that clear, and I 03:07
17     appreciate that.  Let me ask a different question. 03:07
18          So under a hypothetical that an employee --   03:07
19     a railroad employee does not get injured on the    03:07
20     property of the railroad but is seeking treatment  03:08
21     for a combination of symptoms that occurred from   03:08
22     working over many years and also from other        03:08
23     activities such as golfing, tennis, or cutting wood, 03:08
24     a combination of those two is the reason that the  03:08
25     person is seeking treatment.  Okay?                03:08
```

301

Craig Heligman, M.D.                                          April 28, 2021

| | | |
|---|---|---|
| 1 | That -- under that hypothetical, would you | 03:08 |
| 2 | agree that the employee is not required to report an | 03:08 |
| 3 | injury because it didn't happen on property? | 03:08 |
| 4 | A.   If the injury did not happen on property, | 03:08 |
| 5 | then, no, they have no obligation to report.  On the | 03:08 |
| 6 | other hand, if they believe that their ongoing | 03:08 |
| 7 | health condition was due to something that they have | 03:08 |
| 8 | participated in at work, then, yes, it would be | 03:08 |
| 9 | their responsibility to report it as soon as they | 03:08 |
| 10 | recognize that that was potentially present. | 03:08 |
| 11 | So, for example, if someone believed that | 03:08 |
| 12 | they developed a respiratory problem and they | 03:09 |
| 13 | decided it was due to an exposure that occurred at | 03:09 |
| 14 | work over time, at some point when they reach that | 03:09 |
| 15 | conclusion, it would be their responsibility to | 03:09 |
| 16 | report it. | 03:09 |
| 17 | Q.   Okay.  Now, you're familiar that | 03:09 |
| 18 | railroaders do not have -- or at least railroaders | 03:09 |
| 19 | at CSX do not have Workers' Compensation under any | 03:09 |
| 20 | particular state law; is that correct? | 03:09 |
| 21 | A.   That is correct. | 03:09 |
| 22 | Q.   Okay.  And are you familiar that | 03:09 |
| 23 | railroaders are covered by a federal law called the | 03:09 |
| 24 | Federal Employers' Liability Act? | 03:09 |
| 25 | A.   Yes. | 03:09 |

302

Craig Heligman, M.D.                                                  April 28, 2021

```
 1        Q.   Okay.  And without getting into the legal    03:09
 2    particulars of that statute or law, what is your      03:09
 3    understanding of the Federal Employers' Liability     03:09
 4    Act with respect to any training that you've had on   03:09
 5    the railroad or your job duties?                       03:09
 6        A.   It is the law that governs how we manage     03:09
 7    the work injury -- it's how a person may make a        03:09
 8    claim for a work injury.  So making a claim against   03:09
 9    a company for what they believe to be a workplace     03:09
10    exposure, injury, illness, it's a litigation issue.  03:10
11    It's not an FRA reportability issue.                   03:10
12            And so under FELA, there's some things that   03:10
13    you have to prove that you don't -- that were         03:10
14    eliminated by most Worker Compensation laws.          03:10
15    Workers' Compensation is generally believed to be a   03:10
16    no-fault set of -- of laws handled by primarily an    03:10
17    administrative law judge -- or I should say the       03:10
18    final decision-maker is the administrative law        03:10
19    judge.                                                 03:10
20            On FELA, we still have tort.  And, again,     03:10
21    I'm not a lawyer, but still under FELA, there's an    03:10
22    obligation to prove causation and blame and why.      03:10
23    Was it the company?  Was it the employee?  What       03:10
24    roles did those parties have in the course of the     03:10
25    injury or illness that made it related to work?  And  03:10
```

1    what damages maybe finally are due to the employee?    03:10

2    But it has very little to do with reportability    03:10

3    under FRA.    03:11

4         So we're talking about a regulatory    03:11

5    function of reporting injuries and filing a claim    03:11

6    against a company for a presumed illness or injury    03:11

7    that a plaintiff feels was due to their work at the    03:11

8    railroad.  They're two totally separate issues.    03:11

9    They seem to overlap in our practices, but they're    03:11

10   really two completely separate issues.  Anyone can    03:11

11   file a claim.    03:11

12       Q.   Have you -- with respect to FELA and your    03:11

13   job duty's general knowledge of the railroad, have    03:11

14   you heard the expression or the terminology that an    03:11

15   employer -- railroad employer may be liable for    03:11

16   injuries if they're caused by work, even in the    03:11

17   slightest?    03:11

18       A.   Again, I don't know the exact language, but    03:11

19   --    03:11

20         MS. FOSTER BIRD:  Let me object to, first    03:11

21   of all, asking questions about legal propositions;    03:11

22   secondly, the misstatement of the law.    03:11

23   BY MR. PAUL:    03:11

24       Q.   You were saying, Dr. Heligman?    03:11

25       A.   There may be issues where work is thought    03:12

Craig Heligman, M.D.                                              April 28, 2021

```
 1    to be a contributing factor.  And, again, it's a      03:12
 2    litigation issue that is formally decided through     03:12
 3    the legal process.  It's not a medical issue.         03:12
 4         But these forms, again, are not used to          03:12
 5    determine reporting status under FRA.  It's not used  03:12
 6    for the purpose of --                                 03:12
 7         Q.   Sure.                                        03:12
 8         A.   -- FELA activity.  This is an                03:12
 9    administrative tool used solely for the notification  03:12
10    of the company as to our employees' medical status    03:12
11    and ability to return to work or not.  That's the     03:12
12    only purpose for this form.                            03:12
13         Q.   Okay.  Great.                                03:12
14         Last question on this topic -- and, again,       03:12
15    I'm not asking about any legal issues.  I'm asking    03:12
16    about your experience working on railroads --          03:12
17    primarily CSX, but any railroad.                       03:12
18         Are you familiar with that process of when       03:12
19    someone claims a work-related injury, that a          03:12
20    determination can be made about a percentage that is  03:12
21    work-related and a percentage that's                   03:12
22    non-work-related with respect to that injury?         03:13
23         MS. FOSTER BIRD:  Gosh, I'm going to object      03:13
24    to that question as being kind of a legal question    03:13
25    for which he is not qualified to answer.              03:13
```

305

| | | |
|---|---|---|
| 1 | BY MR. PAUL: | 03:13 |
| 2 | Q.   You can answer if you understand it. | 03:13 |
| 3 | A.   All I know is that there may be a | 03:13 |
| 4 | contributing factor, but beyond that, I'm not the | 03:13 |
| 5 | expert. | 03:13 |
| 6 | Q.   Yeah.  Understood. | 03:13 |
| 7 | Contributing factor, can you -- I think I | 03:13 |
| 8 | know what you mean, but can you explain what you | 03:13 |
| 9 | mean when you use the term "contributing factor"? | 03:13 |
| 10 | A.   All I'm saying is that in the litigation of | 03:13 |
| 11 | the case, if it is determined that work may have | 03:13 |
| 12 | been a part of the reason for the medical issue, | 03:13 |
| 13 | that there is some level of apportionment. | 03:13 |
| 14 | Again, it's -- it's a litigation process. | 03:13 |
| 15 | I'm not an attorney.  I understand, to a degree, | 03:13 |
| 16 | what FELA is and what the elemental differences are | 03:13 |
| 17 | between FELA and Workers' Compensation, but the | 03:13 |
| 18 | claims process, the litigation around a FELA claim | 03:14 |
| 19 | is out of my area of expertise. | 03:14 |
| 20 | Q.   Okay.  Thank you. | 03:14 |
| 21 | Just to wrap things up for today, if we | 03:14 |
| 22 | were to go through this exhibit -- and I guess you | 03:14 |
| 23 | would have an opportunity to do that offline if you | 03:14 |
| 24 | chose to, as could counsel, including myself.  If we | 03:14 |
| 25 | were to go through these, and for any form that -- | 03:14 |

306

```
 1    like -- like this one for Mr. Manis that does not      03:14

 2    indicate the source of the treatment, whether it's     03:14

 3    work-related, non-work-related, or a combination of    03:14

 4    the both, your answer would be the same as we've       03:14

 5    talked about so far?                                   03:14

 6        A.   Yes, this form is not used for determining    03:14

 7    work-relatedness.                                      03:14

 8        Q.   Okay.  But I guess -- okay.  I think you've   03:14

 9    answer that question, but let me just make it          03:14

10    perfectly clear.                                       03:14

11         I mean, if -- other examples, if they don't      03:14

12    identify where the injury occurred -- that is, at      03:14

13    work or not at work -- if they're similar to this      03:15

14    form, would you agree that you -- the Certificate of   03:15

15    Ongoing Illness form does not inform you of whether    03:15

16    the treatment with the chiropractor, whether           03:15

17    Dr. Johnson or otherwise, is work-related,             03:15

18    non-work-related, or a combination of both?            03:15

19        A.   Again, it's not used for that purpose.  If    03:15

20    it's not stated on the form, I will -- whatever the    03:15

21    employee and the provider states is what it is.  And   03:15

22    the assumption is that they did not report any         03:15

23    on-duty injuries through the normal process, that      03:15

24    the medical conditions addressed on these forms are    03:15

25    not work-related.  If they were work-related, we       03:15
```

307

Craig Heligman, M.D.                                                April 28, 2021

```
 1   would have a separate reporting process and we would    03:15

 2   be able to find that information out.                   03:15

 3          In all of these cases, none of them had          03:15

 4   reported an on-duty injury, and, therefore, the         03:15

 5   assumption was always that this was a personal          03:16

 6   medical issue.                                          03:16

 7       Q.   That was your assumption; correct?             03:16

 8       A.   No, it is -- it was actually identified in     03:16

 9   the review process at OSHA.  So when these cases         03:16

10   were submitted for official review through the OSHA     03:16

11   process -- and forgive me for not stating the proper    03:16

12   job -- titles of the officials -- it was found that     03:16

13   there's no basis for saying this was a work-related     03:16

14   issue.                                                  03:16

15       Q.   Right.                                         03:16

16          And is it your understanding, either from        03:16

17   whatever you've reviewed with OSHA or looking at        03:16

18   these forms, that that -- not OSHA's determination,     03:16

19   but your determination and testimony -- that that is    03:16

20   because these injuries did not happen on the            03:16

21   property of CSX?                                        03:16

22       A.   My assumption is in the absence of a           03:16

23   reported injury at work, then the medical conditions    03:16

24   being documented on these forms are not                03:16

25   work-related.                                           03:17
```

                                                                    308

Craig Heligman, M.D.                                              April 28, 2021

```
 1              MR. PAUL:  All right.  I think we're good      03:17
 2    for today.                                              03:17
 3              MS. FOSTER BIRD:  Before we go off the        03:17
 4    record, I want to address something in this             03:17
 5    document.                                               03:17
 6              I don't know if you've marked it as an        03:17
 7    exhibit, but if you go to Page 33 of this document,     03:17
 8    there is a COII that is inserted in here.  It has no    03:17
 9    carrier exhibit indication at the top, which            03:17
10    indicates it was part of an exhibit to a hearing.       03:17
11    It also has no Bates stamp number at the bottom.  It    03:17
12    is dated in 2018.  It is for a person who I don't       03:17
13    believe is a plaintiff.                                 03:17
14              I don't know where this came from, but to     03:17
15    the extent you're admitting this as an exhibit, it's    03:17
16    problematic for a number of reasons, along with some    03:17
17    of those others that had -- you know, are not           03:17
18    plaintiffs.  So...                                      03:17
19              MR. PAUL:  Okay.  We did mark it as an        03:17
20    exhibit.  I believe it's Exhibit 7.  I will take a      03:18
21    look at that, but I think your objection is noted.      03:18
22    And I will look into that and see what the -- why       03:18
23    that's in there.  It may be that, you know, I           03:18
24    consolidated these or had someone consolidate these    03:18
25    so we could use this -- you know, flip through them     03:18
```

                                                                    309

1    more easily than pulling up an individual one, but    03:18

2    I'll look into that.                                  03:18

3              MS. FOSTER BIRD:  Okay.  Thank you.          03:18

4              MR. PAUL:  All right.  Anything else for     03:18

5    today?                                                 03:18

6              MS. FOSTER BIRD:  Not from me.               03:18

7              MR. PAUL:  Okay.  Everybody have a good      03:18

8    night.  I think we're off the record.                 03:18

9              THE VIDEOGRAPHER:  We're going off the       03:18

10   record at 3:18 p.m.  Thank you very much.             03:18

11             (At 3:18 p.m. the Volume I deposition of    03:18

12              CRAIG HELIGMAN, M.D. was adjourned.)        03:18

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                               310

1              IN THE UNITED STATES DISTRICT COURT FOR THE

2                 SOUTHERN DISTRICT OF WEST VIRGINIA

3                          AT HUNTINGTON

4

5      _____
                                       )
6      JUSTIN ADKINS, et al.,          )
                                       )
7                   Plaintiffs,        )
                                       ) Case No.
8              -vs                     ) 3:18-CV-00321
                                       )
9      CSX CORPORATION, et al.,        )
                                       )
10                  Defendants.        )
                                       )
11

12

13

14

15       VIDEOTAPED DEPOSITION OF CRAIG HELIGMAN, M.D.

16            VOLUME II, PAGES 314 - 517

17                 CONDUCTED REMOTELY

18            THURSDAY, APRIL 29, 2021

19

20

21

22     REPORTED BY:  LAURA L. MAES, CSR NO. 9836

23

24

25

                                                              314

1          IN THE UNITED STATES DISTRICT COURT FOR THE

2              SOUTHERN DISTRICT OF WEST VIRGINIA

3                        AT HUNTINGTON

4

5    _____

                                          )

6    JUSTIN ADKINS, et al.,               )

                                          )

7              Plaintiffs,                )

                                          ) Case No.

8          -vs                            ) 3:18-CV-00321

                                          )

9    CSX CORPORATION, et al.,             )

                                          )

10             Defendants.                )

                                          )

11

12

13

14       VIDEOTAPED DEPOSITION OF CRAIG HELIGMAN, M.D.,

15   VOLUME II, conducted remotely before Laura L. Maes, CSR

16   No. 9836, on behalf of the Plaintiffs, commencing at the

17   hour of 7:11 a.m. on Thursday, April 29, 2021.

18

19

20

21

22

23

24

25

                                                            315

```
 1    APPEARANCES:  (VIA ZOOM)

 2

      For the Plaintiffs:
 3
          EIGHT & SAND
 4        BY:  JEFF R. DINGWALL, (Pro Hac Vice)
          550 West B Street, Fourth Floor
 5        San Diego, California 92101
          619.796.3464
 6        jeff@eightandsandlaw.com

 7

      For the Plaintiffs:
 8
          GARELLA LAW, P.C.
 9        BY:  C. KIEL GARELLA, ESQ. (Pro Hac Vice)
          409 East Boulevard
10        Charlotte, North Carolina 28303
          980.321.7934
11        kiel@gljustice.com

12

13    For the Plaintiffs:

14        MORGAN & PAUL, PLLC
          BY:  GREGORY G. PAUL, ESQ.
15        100 First Avenue, Suite 1010
          Pittsburgh, Pennsylvania 15222
16        844.374.7200
          gregpaul@morganpaul.com

17

18    For the Plaintiffs:

19        UNDERWOOD LAW OFFICE, INC.
          BY:  JOHN PATRICK L. STEPHENS, ESQ.
20        923 Third Avenue
          Huntington, West Virginia 25701
21        304.486.3350

22

23

24

25
                                                         316
```

```
 1    For the Defendants:

 2          NELSON, MULLINS, RILEY & SCARBOROUGH, LLP
            BY:  MELISSA FOSTER BIRD, ESQ.
 3          949 Third Avenue, Suite 200
            Huntington, West Virginia 25701
 4          304.526.3500
            melissa.fosterbird@nelsonmullins.com
 5

 6

 7    Also present:

 8          KYLE LOSKAMP, VIDEOGRAPHER

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

317

```
1                         I N D E X

2

3    WITNESS

4       CRAIG HELIGMAN, M.D., VOLUME II

5

6    EXAMINATION                                    PAGE

7       MR. PAUL                                     321

8                      E X H I B I T S

9                                                    PAGE
```

```
10      Exhibit 8     Hearing Testimony Excerpts -   336
                      CSXT(ADKINS)001882-001896
11
        Exhibit 9     Transcript of Hearings,        387
12                    CSXT(ADKINS)00967-1025

13
        Exhibit 10    Transcript of Hearings,        410
14                    CSXT(ADKINS)002116-2153

15      Exhibit 11    Transcript of Hearings,        424
                      CSXT(ADKINS)003151-3182
16
        Exhibit 12    Transcript of Hearings,        436
17                    CSXT(ADKINS)001249-001321

18      Exhibit 13    Transcript of Hearings,        447
                      CSXT(ADKINS)002883-002932
19
        Exhibit 14    Transcript of Hearings,        450
20                    CSXT(ADKINS)005156-005174

21      Exhibit 15    Transcript of Hearings,        467
                      CSXT(ADKINS)003377-003467
22
        Exhibit 16    Transcript of Hearings,        474
23                    CSXT(ADKINS)001548-1622

24      Exhibit 17    Transcript of Hearings,        483
                      CSXT(ADKINS)002355-2372
25
```

Craig Heligman, M.D.                                                    April 29, 2021

1                          E X H I B I T S

2                                                              PAGE

3        Exhibit 18    Transcript of Hearings,                484
                       CSXT(ADKINS)00898-00919
4
         Exhibit 19    Transcript of Hearings,                494
5                      CSXT(ADKINS)000819-845

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                                    319

```
 1                THURSDAY, APRIL 29, 2021

 2                     7:11 A.M.

 3

 4         THE VIDEOGRAPHER:  Here begins the          07:11

 5    videotaped deposition of Craig Heligman, Volume II,  07:11

 6    Media 1, in the matter of Adkins versus CSX in the   07:11

 7    United States District Court of the Southern         07:11

 8    District of West Virginia at Arlington[sic].  The    07:11

 9    case number today is 3:18-cv-00321.                  07:11

10         Today's date is April 29th, 2021.  The time     07:11

11    on the monitor is 7:11 a.m.  Your video operator     07:11

12    today is Kyle Loskamp, representing Network           07:11

13    Deposition Services Incorporated, located at 1800    07:11

14    Century Park East, Suite 150 in Los Angeles,         07:12

15    California.  The phone number is (310) 557-3400.     07:12

16         The court reporter today is Laura Maes, and     07:12

17    today's deposition is being taken on behalf of the   07:12

18    plaintiff and taken via Zoom Videoconference.        07:12

19         Counsel, would you please introduce            07:12

20    yourselves and state whom you represent?             07:12

21         MR. PAUL:  Yes.                                  07:12

22         Good morning.  My name is Greg Paul, and I      07:12

23    represent the plaintiffs in the Adkins, et al.,      07:12

24    versus CSX matter.                                   07:12

25         MS. FOSTER BIRD:  Melissa Foster Bird; I        07:12
```

```
 1   represent Dr. Heligman, CSX Transportation, and the    07:12

 2   other defendants in this case.                         07:12

 3            THE VIDEOGRAPHER:  Thank you very much.        07:12

 4            Would the court reporter please swear in       07:12

 5   the witness?                                            07:12

 6            THE REPORTER:  Counsel, are we going along     07:12

 7   with the same stipulation for swearing in?             07:12

 8            MR. PAUL:  Yes.                                07:12

 9            MS. FOSTER BIRD:  That's right.                07:12

10                                                           07:12

11            Whereupon, CRAIG HELIGMAN, M.D.,               07:12

12     being first duly sworn or affirmed to testify to the

13     truth, the whole truth, and nothing but the truth, via

14       Zoom, was examined and testified as follows:       07:12

15                                                           07:12

16                      EXAMINATION                          07:12

17   BY MR. PAUL:                                            07:12

18       Q.   Good morning, Dr. Heligman.                    07:13

19       A.   Good morning.                                  07:13

20       Q.   How are you doing this morning?                07:13

21       A.   Fine.  Thank you.                              07:13

22       Q.   Great.                                         07:13

23            We're in the continuation of your             07:13

24   deposition from yesterday and we've already            07:13

25   established all the same stipulations, and this is     07:13
```

                                                               321

```
 1   under oath.                                        07:13

 2          Is that -- do you understand that?          07:13

 3      A.   Yes, I do.                                  07:13

 4      Q.   Okay.  Great.                               07:13

 5          Since yesterday's deposition when we        07:13

 6   concluded, did you review any additional documents  07:13

 7   in preparation for today's deposition?             07:13

 8      A.   No.                                         07:13

 9      Q.   Okay.  Did you speak with anyone other than  07:13

10   attorneys in this matter since the conclusion of   07:13

11   yesterday's deposition till this morning?          07:13

12      A.   No.                                         07:13

13      Q.   Okay.  All right.  I wanted to ask you a    07:13

14   couple questions about prior testimony because     07:13

15   primarily -- not to hide the ball -- we're going to  07:13

16   get into some hearings that you testified to related  07:14

17   to the plaintiffs back in 2017.                    07:14

18          But before we do that, I want to ask you --  07:14

19   I am familiar with your testimony in the Ginn case,  07:14

20   which was related to this incident we're talking    07:14

21   about; is that correct?                            07:14

22          Do you recall that?                         07:14

23      A.   Yes.                                        07:14

24      Q.   Okay.  Has there been any other testimony   07:14

25   outside of the hearings pursuant to the Collective  07:14
```

                                                          322

Craig Heligman, M.D.                                        April 29, 2021

```
 1    Bargaining Agreement that you've testified      07:14

 2    concerning this incident?  And the incident I'm  07:14

 3    describing is the treatment with chiropractors in 07:14

 4    2017.                                            07:14

 5        A.   No.                                     07:14

 6        Q.   Okay.  And if I were to broaden that scope 07:14

 7    a little bit and ask have you ever testified     07:14

 8    regarding a Certificate of Ongoing Illness at any 07:14

 9    time in your career with CSX, do you recall doing 07:14

10    that?                                            07:14

11        A.   Other than the current proceedings?     07:14

12        Q.   Correct.                                07:14

13        A.   No.                                     07:14

14        Q.   Okay.  And prior to testifying in these 07:14

15    hearings related to the plaintiffs, had you ever 07:15

16    testified in an investigation hearing pursuant to 07:15

17    the Collective Bargaining Agreement before?      07:15

18        A.   Yes, as I mentioned yesterday, I have.  07:15

19        Q.   Okay.  Can you refresh my memory about  07:15

20    that, please?  I don't recall that.              07:15

21        A.   These were a few investigations that were 07:15

22    held with regards to our drug and alcohol testing 07:15

23    program for individuals that had tested positive. 07:15

24    There were a few of those that I participated in as 07:15

25    a witness.                                       07:15
```

323

1          Q.   Okay.  I may not have been around for that.    07:15

2     If I -- then I apologize.                                07:15

3          Okay.  So the context of that was not -- it         07:15

4     was not related to any of the plaintiffs in this         07:15

5     matter; correct?                                         07:15

6          A.   As far as I know, that's correct.              07:15

7          Q.   Okay.  To the best of your memory, you were    07:15

8     called to testify in an investigation regarding drug     07:15

9     and alcohol issues or -- is that correct?                07:15

10         A.   Yes, that's correct.                           07:15

11         Q.   Okay.  And, just ballpark, was that, you       07:15

12    know, many years ago or recently or -- or                07:15

13    approximately what time frame?                           07:15

14         A.   Not recently.  It would have preceded 2017.    07:16

15    I'm trying to think when exactly it was.  Maybe          07:16

16    2015, '16, perhaps.                                      07:16

17         Q.   Okay.  And I take it that was as part of       07:16

18    your job responsibilities as a medical director; is     07:16

19    that correct?                                            07:16

20         A.   Yes, that's correct.                           07:16

21         Q.   And did you say that was maybe three or        07:16

22    four?                                                    07:16

23         A.   Right, three or four.  We had a specific       07:16

24    situation with our collection company and the           07:16

25    equipment they were using, and I was commenting on      07:16

                                                              324

Craig Heligman, M.D.                                    April 29, 2021

```
 1   that.                                               07:16

 2        Q.   Okay.  So other than those three or four  07:16

 3   drug and alcohol hearings and the hearings in -- in 07:16

 4   this case, had you ever testified in any            07:16

 5   investigation hearing pursuant to a Collective      07:16

 6   Bargaining Agreement before at CSX?                 07:16

 7        A.   No.                                        07:16

 8        Q.   Okay.  Had you ever testified at an       07:16

 9   investigation hearing pursuant to a Collective      07:16

10   Bargaining Agreement at any of the other railroads  07:17

11   that you either worked for or consulted for?        07:17

12        A.   None that I can recall, no.               07:17

13        Q.   Okay.  All right.  Now, the -- you covered 07:17

14   this yesterday, but it looked to me like there were 07:17

15   about 12 investigation hearings related to the      07:17

16   plaintiffs in this matter.                          07:17

17        Does that sound about right?                   07:17

18        A.   It sounds about right.  I -- I don't      07:17

19   remember the exact number.                          07:17

20        Q.   Okay.  Yeah, I might be one or two off,   07:17

21   but -- and it looks like, from the transcripts and  07:17

22   as I recall your testimony, that perhaps all but one 07:17

23   were in person.                                     07:17

24        Is that -- let me ask you this:  Were the      07:17

25   majority of the times that you testified in person  07:17
```
                                                              325

Craig Heligman, M.D.                                              April 29, 2021

```
 1    as opposed to on the phone?                          07:17
 2         A.   Yes, I believe all but two were handled in 07:17
 3    our Huntington division office, other than two that  07:17
 4    were held by phone.  They were held by phone because 07:17
 5    those individuals were in other cities.              07:17
 6         Q.   Okay.  Got it.                              07:18
 7              And it looks to me based upon the           07:18
 8    information, including the termination letters, that 07:18
 9    these hearings occurred primarily, in fact, all but  07:18
10    one exclusively, in August of 2017.                  07:18
11              Does that sound right to you?               07:18
12         A.   That sounds correct.                        07:18
13         Q.   Okay.  In fact, more specifically, the     07:18
14    first one that I've been able to identify is         07:18
15    August 4th, 2017, throughout that month, and then    07:18
16    August 24th of '17.  And then there's a remainder    07:18
17    one that occurred in October of 2017.                07:18
18              Does that -- does that sound right, or not 07:18
19    sure?                                                07:18
20         A.   That -- that sounds right to me.  I don't  07:18
21    have the dates in front of me, but I'll -- if you're 07:18
22    looking at it, I will agree with it.                 07:18
23         Q.   Okay.  No, that's fine.                     07:18
24              And it looks -- it looks like the reason    07:18
25    for -- well, let me rephrase that.                    07:18
```

326

```
 1              Is it your understanding that those      07:19
 2    hearings were scheduled by craft?                  07:19
 3        A.   It's by craft and whichever union those   07:19
 4    individuals were -- were members of.               07:19
 5        Q.   Okay.  All right.  And can you just tell me 07:19
 6    the format of the hearings?  Start -- not the ones 07:19
 7    by phone, but the ones that you went in Huntington. 07:19
 8    I believe you said it was at the Huntington shop.  07:19
 9              Was it a conference room?                07:19
10        A.   Yes, it was a conference room.  We had -- I 07:19
11    think the -- I think the very first one was held in 07:19
12    a conference room at the Russell, Kentucky facility. 07:19
13    But it was organized about the same way.           07:19
14              We -- the employees in the group that were 07:19
15    under investigation at that time and being         07:19
16    represented by the same union official were present 07:19
17    in the room.  The Hearing Officer, the Charging    07:20
18    Officer, and myself were present as we got started. 07:20
19    Usual procedures for recording the activities for  07:20
20    transcription later.  We were all able to see each 07:20
21    other during the course of the event.  Then I was, 07:20
22    of course, asked to leave until it was my turn to  07:20
23    testify.                                           07:20
24        Q.   Okay.  And what is your understanding of  07:20
25    the role of a Hearing Officer as it pertains to    07:20
```

                                                          327

| | | |
|---|---|---|
| 1 | these specific hearings of the plaintiffs? | 07:20 |
| 2 | A.   My understanding is the Hearing Officer's | 07:20 |
| 3 | responsibility is to make sure that the hearing goes | 07:20 |
| 4 | along in accordance with the rules and procedures | 07:20 |
| 5 | laid out for the investigation hearing.  That's | 07:20 |
| 6 | about the extent of my understanding for that role. | 07:20 |
| 7 | Q.   Did you have any involvement in the | 07:20 |
| 8 | selection of the Hearing Officer for the plaintiffs | 07:21 |
| 9 | in this matter? | 07:21 |
| 10 | A.   I did not. | 07:21 |
| 11 | Q.   Did you have any communications with anyone | 07:21 |
| 12 | in Labor Relations concerning the selection of the | 07:21 |
| 13 | Hearing Officer for the plaintiffs in this case? | 07:21 |
| 14 | A.   No. | 07:21 |
| 15 | Q.   Okay.  And what is your understanding of | 07:21 |
| 16 | the role of the Charging Officer? | 07:21 |
| 17 | A.   My understanding is that the -- in each of | 07:21 |
| 18 | these investigations or any other investigation, the | 07:21 |
| 19 | Charging Officer is responsible for reading the | 07:21 |
| 20 | actual charges into the record.  And that's, again, | 07:21 |
| 21 | the extent of my understanding. | 07:21 |
| 22 | Q.   And what was your understanding of your | 07:21 |
| 23 | role in the investigations for the plaintiffs in | 07:21 |
| 24 | this case? | 07:21 |
| 25 | A.   I was present as a witness. | 07:21 |

328

| | | |
|---|---|---|
| 1 | Q.   Okay.  Now, it looked to me, but I wanted | 07:21 |
| 2 | to ask you -- it looked to me, from reading the | 07:21 |
| 3 | transcripts, that you were the only witness on | 07:21 |
| 4 | behalf of the company. | 07:21 |
| 5 | Is that your recollection? | 07:21 |
| 6 | A.   That would be my recollection. | 07:21 |
| 7 | Q.   Okay.  And when it comes to selecting the | 07:21 |
| 8 | exhibits that the company was going to present, were | 07:22 |
| 9 | you -- did you select those exhibits? | 07:22 |
| 10 | A.   Well, I was, of course, the source of the | 07:22 |
| 11 | COIIs originally.  I was provided the documents with | 07:22 |
| 12 | regard to the language for the rules and ethics | 07:22 |
| 13 | information for presentation, but those are | 07:22 |
| 14 | available on our intranet.  But the total group of | 07:22 |
| 15 | documents and exhibits that were to be presented | 07:22 |
| 16 | were put into a packet for me by -- I don't even | 07:22 |
| 17 | know who it was, but it was probably someone in | 07:22 |
| 18 | Labor Relations or our field administration team | 07:22 |
| 19 | that put the packet together for me. | 07:22 |
| 20 | Q.   Okay.  And was that packet the same for | 07:22 |
| 21 | each of the hearings? | 07:22 |
| 22 | A.   The Choosing Wisely document that we | 07:22 |
| 23 | discussed yesterday was not originally part of the | 07:23 |
| 24 | packet, and so I had that available should the issue | 07:23 |
| 25 | come up concerning issues of chiropractic care. | 07:23 |

329

Craig Heligman, M.D.                               April 29, 2021

```
 1        Q.   Okay.  Let me just back up one moment when    07:23
 2    it comes to the exhibits.  I know you said that, of    07:23
 3    course, you were involved with the Certificate of     07:23
 4    Ongoing Illnesses, but then you referenced some       07:23
 5    rules, whether those were the ethical rules or the    07:23
 6    operating rules.                                       07:23
 7            Is that part of the packet that came from     07:23
 8    Labor Relations to you, or did all of the             07:23
 9    exhibits -- were they prepared by Labor Relations     07:23
10    and given to you?                                      07:23
11        A.   Well, I, of course, provided the COIIs to    07:23
12    Labor Relations, and then they put everything         07:23
13    together into a single packet of information for me   07:23
14    to use at the hearing itself.  Same thing with the    07:23
15    printouts for the -- the ethics policy and the rules  07:23
16    that were effective.  Then I had the -- as I          07:24
17    mentioned yesterday, there was a printout of a        07:24
18    summary statement with regards to the dollar amounts  07:24
19    that were calculated.                                  07:24
20            The effort was to make sure that the         07:24
21    information that was to be consistently used at each  07:24
22    of the investigations, that I was presenting it       07:24
23    consistently.                                          07:24
24        Q.   Okay.  Allow me to come back to that in one  07:24
25    moment.  When you said the -- the COIIs that you      07:24
```

<div align="right">330</div>

Craig Heligman, M.D.                                          April 29, 2021

```
 1   gave to Labor Relations, were you referring to back    07:24
 2   in June of 2017 and/or right before the hearing?       07:24
 3        Does that make sense?                             07:24
 4      A.   Are you asking me when I presented them to     07:24
 5   Labor Relations?                                       07:24
 6      Q.   Well, I recall your testimony yesterday        07:24
 7   that when you received, you know, the group or -- or   07:24
 8   incoming COIIs back in June of '17, that I believe     07:24
 9   your testimony was you gave them to the Legal          07:24
10   Department and the Labor Relations Department; is      07:25
11   that correct?                                          07:25
12      A.   No, that's not correct.  We discussed the      07:25
13   topic.  I didn't necessarily hand over the            07:25
14   documents.                                             07:25
15        We continued to collect additional COIIs         07:25
16   until such a time that when I presented the            07:25
17   information again to our team that were making the     07:25
18   decisions on whether to -- whether we should proceed   07:25
19   with an investigation, whether they felt that, at      07:25
20   that point in time, it was appropriate to move         07:25
21   forward.  And at that point, I provided the            07:25
22   documents.                                             07:25
23      Q.   Okay.  And to be a little more specific --     07:25
24   I'm sorry -- when did you provide the COIIs to Labor   07:25
25   Relations, approximately?                              07:25
```

                                                                    331

```
 1        A.   It was shortly prior to when the Charge    07:25

 2   Letters were being prepared.                          07:25

 3        Q.   Okay.  All right.  And do you remember who  07:25

 4   you gave them to specifically?                        07:25

 5        A.   I do not.                                    07:25

 6        Q.   Okay.  All right.  Then I think you started 07:25

 7   to talk about another topic I wanted to ask you       07:25

 8   about.  And, you know, I don't -- I don't mean this   07:25

 9   in a derogatory way, but were you referring to        07:26

10   basically a cheat sheet or whatever document you      07:26

11   brought to the hearings to read in?                   07:26

12        A.    It was a single page that allowed me to,   07:26

13   again, recite the information that was to be          07:26

14   presented in the course of the investigation         07:26

15   concerning the benefits issues, the dollar figure.    07:26

16             Again, it's in each and every one of the    07:26

17   investigations.  I just used that page to read from   07:26

18   because I want to make sure that we provide that      07:26

19   information consistently.  It's not something I       07:26

20   wanted to have to memorize in order to present, and   07:26

21   for the record we wanted to make sure it was          07:26

22   identical in each and every investigation.            07:26

23        Q.   Okay.  And who prepared that document that  07:26

24   you read from in each of the investigations?          07:26

25             MS. FOSTER BIRD:  I'll object if it was     07:26
```

332

Craig Heligman, M.D.                              April 29, 2021

```
1    someone in the Law Department.  You know, I guess    07:26

2    there's an attorney/client, work product privilege  07:26

3    that comes in here at some point if it's someone in  07:26

4    the Law Department, so I'll object to that part of   07:27

5    the answer -- the question.                          07:27

6         THE WITNESS:  And I don't recall the exact      07:27

7    author.  It may have been someone in the Law         07:27

8    Department.  It could have been someone in Labor     07:27

9    Relations.  I just don't remember who it was.        07:27

10   BY MR. PAUL:                                         07:27

11        Q.   But you did not draft it; is that correct? 07:27

12        A.   That is correct.                           07:27

13        Q.   Okay.  And as far as you know, I mean, was 07:27

14   there only one version of that document that you     07:27

15   read in, or were there multiple versions?            07:27

16        A.   As far as I know, there was just one       07:27

17   version.                                             07:27

18        Q.   Okay.  Well, let me -- maybe I didn't ask  07:27

19   that clear enough.  Or maybe I did.  I don't know.   07:27

20        What I meant was -- clearly the one that        07:27

21   you read into the hearings was the same basically,   07:27

22   so what I meant was, like, prior to that final       07:27

23   version that you read, were there drafts that went   07:27

24   back and forth between you and anyone else or not?   07:27

25        A.   No, I just received the final draft.       07:27
```

333

| | | |
|---|---|---|
| 1 | Q.   Okay.   Got it. | 07:27 |
| 2 | Now, these hearings, I know you said they | 07:28 |
| 3 | were recorded. | 07:28 |
| 4 | Do you know whether the actual audio | 07:28 |
| 5 | portion is maintained by anybody or -- or do you not | 07:28 |
| 6 | have knowledge of that? | 07:28 |
| 7 | A.   That's outside the scope of my | 07:28 |
| 8 | responsibilities.   I know that there were actually | 07:28 |
| 9 | two devices being used for recording to make sure | 07:28 |
| 10 | that we had a primary and a backup. | 07:28 |
| 11 | Q.   Yeah.   Okay. | 07:28 |
| 12 | Now, it looks like, at least from the | 07:28 |
| 13 | transcripts, that the testimony of all the witnesses | 07:28 |
| 14 | was not under oath. | 07:28 |
| 15 | Do you recall that? | 07:28 |
| 16 | A.   I -- I don't. | 07:28 |
| 17 | Q.   Okay.   Have you had a chance to review | 07:28 |
| 18 | these transcripts since 2017 of your testimony? | 07:28 |
| 19 | A.   I've reviewed some, none recently.   And I | 07:28 |
| 20 | have not reviewed all of them.   I was not provided | 07:28 |
| 21 | copies of all of them. | 07:28 |
| 22 | Q.   Okay.   Was all of your testimony truthful | 07:28 |
| 23 | at the hearings? | 07:28 |
| 24 | A.   Yes, sir. | 07:28 |
| 25 | Q.   Okay.   So is it if you were asked to take | 07:29 |

334

Craig Heligman, M.D.                                                     April 29, 2021

```
 1    an oath, your testimony would have been the same?    07:29
 2       A.   Yes, sir.                                    07:29
 3       Q.   Okay.                                        07:29
 4            MR. PAUL:  All right.  Melissa, are you      07:29
 5    able to have access to the exhibits?                 07:29
 6            MS. FOSTER BIRD:  Let me see.                07:29
 7            MR. DINGWALL:  Hang on.  I'm going to send   07:29
 8    over a new passcode here.                            07:29
 9            MS. FOSTER BIRD:  Let's go off the record    07:29
10    while we're doing this, if you don't care, Greg.     07:29
11            MR. PAUL:  Yeah, that's fine.                07:29
12            THE VIDEOGRAPHER:  Off the record at 7:29    07:29
13    a.m.                                                 07:29
14            (Recess taken.)                              07:29
15            THE VIDEOGRAPHER:  We are back on the        07:33
16    record at 7:33 a.m.                                  07:33
17            MR. PAUL:  Okay.  Great.                     07:33
18    BY MR. PAUL:                                         07:33
19       Q.   We're back on the record after a short      07:33
20    break regarding technology.                          07:33
21            Dr. Heligman, I wanted to ask you:  The     07:33
22    statement that was provided to you from either the  07:33
23    Law Department or Labor Relations, did you agree     07:33
24    with the content of it?                              07:33
25       A.   I had no reason to dispute it.  It was a    07:33
```

                                                                    335

```
 1   statement that was prepared from other resources    07:33
 2   that I didn't have access to.                        07:33
 3       Q.   But, I mean, if -- if -- I guess I'm        07:33
 4   asking:  Is it correct to say that you read that in  07:33
 5   every hearing kind of like Groundhog Day?  Right?    07:33
 6       A.   Right.                                       07:33
 7       Q.   Okay.  And when you read it, even though    07:33
 8   you weren't under oath, you believed it was true?    07:33
 9       A.   Yes.                                         07:33
10       Q.   Okay.  So in other words, you didn't take   07:33
11   any issue with reading it and you believed it to be  07:34
12   accurate?                                             07:34
13       A.   As far as I knew, yes.                       07:34
14       Q.   Okay.                                         07:34
15            MR. PAUL:  All right.  Let's take a look at  07:34
16   Exhibit 8.  Let me know if everybody can see that.   07:34
17            (Exhibit 8 was marked for identification and
18   attached to the transcript.)                          07:34
19            THE WITNESS:  I can see it.                   07:34
20   BY MR. PAUL:                                           07:34
21       Q.   Okay.  So these are excerpts of your         07:34
22   testimony from hearing transcripts.  Of course,       07:34
23   they're multiple pages long.  And for any of these    07:34
24   exhibits, if you want to take the time to read them,  07:34
25   I'm happy to accommodate that.  We can either, you    07:34
```

                                                                                 336

| 1  | know, do that live on the record or take a break. | 07:34 |
| 2  | But I have some very specific questions for | 07:34 |
| 3  | you, so I'm not going to ask you to -- I'm not going | 07:34 |
| 4  | to go through everything, but I want to give you | 07:34 |
| 5  | that opportunity.  Of course, you have counsel, and | 07:34 |
| 6  | if there's anything that needs to come out, there'll | 07:34 |
| 7  | be an opportunity to do that. | 07:34 |
| 8  | But does that make sense? | 07:34 |
| 9  | A.   Yes. | 07:34 |
| 10 | Q.   Okay.  So this -- this particular exhibit | 07:34 |
| 11 | is concerning T.L. Abdon, and I know other | 07:35 |
| 12 | investigations concerned more than one employee, so | 07:35 |
| 13 | some may be a little longer than the other.  But I'd | 07:35 |
| 14 | like to first draw your attention to Page 9.  So | 07:35 |
| 15 | we're on Page 7 right now, so if we go two | 07:35 |
| 16 | forward... | 07:35 |
| 17 | A.   Oh, okay. | 07:35 |
| 18 | Q.   And for the record -- | 07:35 |
| 19 | MS. FOSTER BIRD:  Let me just -- let me | 07:35 |
| 20 | just say if I'm on Exhibit 8, I'm looking at one for | 07:35 |
| 21 | Michael Campbell, and it starts on Page 10 -- nope, | 07:35 |
| 22 | I'm not.  Abdon, Page 7, sorry about that.  I was on | 07:35 |
| 23 | the wrong one.  Got it. | 07:35 |
| 24 | MR. PAUL:  That's okay. | 07:35 |
| 25 | THE WITNESS:  And just for clarity, this is | 07:35 |

337

Craig Heligman, M.D.                                                    April 29, 2021

```
 1    the Bates No. 1884?                              07:35

 2    BY MR. PAUL:                                     07:35

 3        Q.   That's correct.  Yeah, that's correct.  07:35

 4             So I want to draw your attention to --  07:35

 5             MS. FOSTER BIRD:  188 --                07:35

 6             MR. PAUL:  I'm sorry?                    07:35

 7             MS. FOSTER BIRD:  Which one?  1882 or 4? 07:35

 8             MR. PAUL:  1884.                         07:36

 9             MS. FOSTER BIRD:  Okay.                  07:36

10             MR. PAUL:  So on Page 9 of the transcript. 07:36

11             MS. FOSTER BIRD:  Yes, I'm sorry.       07:36

12             MR. PAUL:  Okay.  Everybody there?      07:36

13             MS. FOSTER BIRD:  Yes.                  07:36

14    BY MR. PAUL:                                     07:36

15        Q.   Okay.  And I want to draw your attention to 07:36

16    the center of the page around Line 21 where it  07:36

17    states that you've:                             07:36

18             "Had a significant number of           07:36

19              employees who have seen these         07:36

20              providers in the past."               07:36

21             Do you see where I read that?          07:36

22        A.   Yes, I do.                             07:36

23        Q.   Okay.  And we touched on this a little bit 07:36

24    the other day.  But in -- in that sentence, you were 07:36

25    referring to approximately how long ago that you had 07:36
```

                                                          338

Craig Heligman, M.D.                                              April 29, 2021

| | | |
|---|---|---|
| 1 | seen a significant number of employees who either | 07:36 |
| 2 | treated with Dr. Johnson or Dr. Carey in the past? | 07:36 |
| 3 | A.   Well, again, I don't have a specific | 07:36 |
| 4 | number.  I can say that for as long as I've been | 07:36 |
| 5 | with CSX, we've received many forms from those | 07:36 |
| 6 | individuals over the course of the time I've been | 07:37 |
| 7 | with CSX.  My predecessor also had seen a number of | 07:37 |
| 8 | forms from those practitioners over the years of his | 07:37 |
| 9 | tenure with CSX. | 07:37 |
| 10 | And so certainly Dr. Johnson and -- mostly | 07:37 |
| 11 | Dr. Johnson but also Dr. Carey, they were not | 07:37 |
| 12 | unknown names to us.  And so, again, they're a | 07:37 |
| 13 | practitioner in the area.  They seemed to be | 07:37 |
| 14 | practitioners our employees preferred, which was | 07:37 |
| 15 | just fine with us. | 07:37 |
| 16 | But, again, the unique set of circumstances | 07:37 |
| 17 | was -- as I testified at the hearing, it was just | 07:37 |
| 18 | unusual to see so many all in a very short period of | 07:37 |
| 19 | time. | 07:37 |
| 20 | Q.   Understood. | 07:37 |
| 21 | With respect to Mr. Abdon, did you ever or | 07:37 |
| 22 | anybody that works for you check to see if Mr. Abdon | 07:37 |
| 23 | had treated with either of those two chiropractors | 07:37 |
| 24 | in the past before this incident? | 07:37 |
| 25 | A.   I don't think anybody that had worked for | 07:38 |

339

Craig Heligman, M.D.                                                    April 29, 2021

| | | |
|---|---|---|
| 1 | me had done that.  I did go through each of the | 07:38 |
| 2 | individuals' medical records, and because I don't | 07:38 |
| 3 | have it in front of me, I can't tell you | 07:38 |
| 4 | specifically which of those employees I may have | 07:38 |
| 5 | identified as having a prior -- prior treatment with | 07:38 |
| 6 | Dr. Johnson or Dr. Carey.  I'd have to look at | 07:38 |
| 7 | that -- that separate page. | 07:38 |
| 8 | Q.   Okay.  Are you referring to what we touched | 07:38 |
| 9 | on yesterday, which is when you got these COII forms | 07:38 |
| 10 | in, you went on the computer and looked for each | 07:38 |
| 11 | employee to see whether they had -- what their prior | 07:38 |
| 12 | medical history was? | 07:38 |
| 13 | A.   That's correct. | 07:38 |
| 14 | Q.   Okay.  So we're talking about the same | 07:38 |
| 15 | event; is that right? | 07:38 |
| 16 | A.   Yes, sir. | 07:38 |
| 17 | Q.   Okay.  And did you also reach out to the | 07:38 |
| 18 | FMLA department and to -- to solicit information | 07:38 |
| 19 | about whether any of the plaintiffs in this case had | 07:38 |
| 20 | been on prior FMLA leave? | 07:38 |
| 21 | A.   No. | 07:38 |
| 22 | Q.   Okay.  Are you aware of anyone who | 07:38 |
| 23 | researched that information; that is, whether any of | 07:38 |
| 24 | the current plaintiffs were on prior FMLA leave? | 07:39 |
| 25 | A.   No. | 07:39 |

340

Craig Heligman, M.D.                                    April 29, 2021

```
 1        Q.   Okay.  Do you have access to that        07:39

 2   information in the medical records that you were   07:39

 3   reviewing back in 2017?                            07:39

 4        A.   No, it's not included in the medical     07:39

 5   records.  We will potentially add an FMLA physician 07:39

 6   certification form to the record if we receive it  07:39

 7   from the FMLA office.                              07:39

 8        Q.   Okay.  Got it.                           07:39

 9             Now, looking at this paragraph on Page 9 of 07:39

10   the transcript, is it correct to say that the --   07:39

11   what I'm going to call the window of suspicion with 07:39

12   respect to receiving COII forms from these two     07:39

13   chiropractors, did that begin on June 19th?        07:39

14        A.   Well, that's what it says in my testimony 07:39

15   at the hearing.  And, as I said, I don't recall the 07:39

16   exact date, but this looks correct.                07:39

17        Q.   Okay.  So would the window that you were 07:39

18   concerned about concerning the treatment from these 07:39

19   two chiropractors start on June 19th?              07:40

20             That's a correct statement?             07:40

21        A.   Again, it looks like the correct date.  I 07:40

22   don't have all those documents in front of me to   07:40

23   confirm it.  But that was the testimony I gave at  07:40

24   the hearing and that was more proximate to the     07:40

25   actual time of the events, so I would say that     07:40
```

                                                              341

1    June 19th through the middle of July is accurate.      07:40

2        Q.   Okay.  So it's accurate to say from          07:40

3    June 19th to the middle of July is the window of       07:40

4    suspicion that you had concerning the receipt of       07:40

5    COII forms from Dr. Carey and Dr. Johnson?             07:40

6        A.   Right.  That's when the large volume had      07:40

7    started, and we continued to follow it up through      07:40

8    July.                                                  07:40

9        Q.   Okay.  Now, is it accurate to say that that   07:40

10   window of suspicion was expanded beyond the middle     07:40

11   of July?                                               07:40

12       Is that accurate?                                  07:40

13       A.   I don't think we followed up quite that far   07:40

14   out.  The influx started in the middle part of June,   07:41

15   and we continued to actually look for these forms as   07:41

16   they came in to see if the volume continued to stay    07:41

17   elevated.  As far as looking at it past July, we may   07:41

18   have collected a few more, but I don't honestly        07:41

19   remember.                                              07:41

20       Q.   The reason I ask is I -- you know, I know     07:41

21   we've talked about this, but there were three          07:41

22   letters that went to the Railroad Retirement Board.    07:41

23   So I was trying to see when that window of suspicion   07:41

24   ended, if it ever did.                                 07:41

25       A.   Well, I don't know if I would even call it    07:41

                                                                 342

Craig Heligman, M.D.                                      April 29, 2021

```
 1   a window of suspicion.  I would just say that was    07:41

 2   the time frame in which we experienced the influx of 07:41

 3   forms.  When we advised both Dr. Johnson and         07:41

 4   Dr. Carey that we would no longer accept forms that  07:41

 5   they submitted on behalf of our employees, that      07:41

 6   really closed out any issues that we may have had    07:41

 7   with either practitioner.                            07:42

 8        Q.   Okay.  And I think we've covered that date,07:42

 9   but I recall that was sometime in July; is that      07:42

10   right?                                               07:42

11        A.   Again, I don't remember the date, but if --07:42

12        Q.   Yeah.                                      07:42

13        A.   -- that's what it was, that's what it was. 07:42

14        Q.   Okay.  We can come back to that.           07:42

15             But you're referring to an actual letter   07:42

16   that went out to Dr. Johnson and Dr. Carey saying    07:42

17   that you're not going to accept their documentation  07:42

18   any longer; right?                                   07:42

19        A.   Yes, that's correct.                       07:42

20        Q.   Okay.  So whatever the date of that letter,07:42

21   that would be accurate?                              07:42

22        A.   Yes.                                       07:42

23        Q.   Okay.  Did you -- were you aware that one  07:42

24   of the nurses had at least called one of the         07:42

25   plaintiffs to tell them that verbally, that the      07:42
```

343

Craig Heligman, M.D.                                            April 29, 2021

```
 1     Medical Department was no longer going to accept any    07:42

 2     documentation from Dr. Carey and Dr. Johnson?          07:42

 3          A.   Yes, I believe that the nurse did tell       07:42

 4     probably more than one person that.                    07:42

 5          Q.   Okay.  That's what I wanted -- I mean, it's   07:42

 6     in one of the transcripts.  We'll get to it.  But I    07:42

 7     was just wondering if that was something that you      07:43

 8     directed that they do to let the -- let the people     07:43

 9     know -- you know, let the -- let the employees know?   07:43

10          A.   Well, it wasn't the formal notification to   07:43

11     the employees.  So we did send a separate letter out   07:43

12     to the employees concurrent with sending the letters   07:43

13     to Dr. Johnson and Dr. Carey.                          07:43

14               However, other -- our other employees may    07:43

15     have submitted forms from those two practitioners,     07:43

16     and our nurse would, in turn, contact those            07:43

17     individuals to say that, "Look, we're -- we            07:43

18     apologize, but we're no longer accepting forms from    07:43

19     those practitioners.  Can you send us one from         07:43

20     another treating provider?"                            07:43

21          Q.   And to your knowledge, did these letters go  07:43

22     out not just to the plaintiffs in this case, but to    07:43

23     any CSX employee who treated with Dr. Johnson or       07:43

24     Dr. Carey?                                             07:43

25          A.   I don't remember if we sent them out to      07:43
```

                                                                344

Craig Heligman, M.D.                                              April 29, 2021

```
 1   other employees.  We may have as they submitted --    07:43

 2   or if they had submitted forms from those             07:44

 3   practitioners.  I just don't remember.  Usually the   07:44

 4   phone call handled it.                                07:44

 5        Q.    So, I mean, if -- if one of the nurses     07:44

 6   contacted the employees, was that more of a one-off   07:44

 7   as opposed to a concerted effort to inform the        07:44

 8   employees that they -- that they would no longer --   07:44

 9   that you would no longer accept documentation from    07:44

10   them --                                               07:44

11        A.    Yes.                                        07:44

12        Q.    -- the chiropractors?                       07:44

13        A.    Yes.                                        07:44

14        Q.    Okay.  If you could turn to the next page,  07:44

15   please, which would be Page 10 of the transcript,     07:44

16   Bates 1885.                                           07:44

17        A.    Okay.                                       07:44

18        Q.    And in particular, starting right around   07:44

19   Line 28, your testimony starts that, in part:         07:44

20              "If the employee marks off               07:44

21               sick, the employee can file             07:44

22               sickness benefits with the              07:44

23               Railroad Retirement Board..."           07:44

24         And if you need to read the rest of that,       07:44

25   you can.                                              07:44
```

                                                                        345

| | | |
|---|---|---|
| 1 | But my question is, in a nutshell:  Was it | 07:44 |
| 2 | your belief that it was the motivation of the | 07:45 |
| 3 | employees and the plaintiffs in this case to extend | 07:45 |
| 4 | their health benefits for two years by marking off | 07:45 |
| 5 | sick? | 07:45 |
| 6 | A.   The primary issue would be the health | 07:45 |
| 7 | insurance for the two years.  But in my experience | 07:45 |
| 8 | in dealing with these kinds of cases, when | 07:45 |
| 9 | individuals are going off for medical reasons and | 07:45 |
| 10 | their benefits -- excuse me -- their health | 07:45 |
| 11 | insurance is continued, usually they're also | 07:45 |
| 12 | submitting documents to the RRB for sick benefits or | 07:45 |
| 13 | for supplemental income from other insurance | 07:45 |
| 14 | providers that they have paid for. | 07:45 |
| 15 | There are voluntary benefits that some of | 07:45 |
| 16 | our union members have purchased extended policies. | 07:45 |
| 17 | Q.   You're talking, like, short-term disability | 07:45 |
| 18 | or Aflac or something like that? | 07:45 |
| 19 | A.   Right. | 07:46 |
| 20 | Q.   Okay.  So let's -- yeah.  Sorry.  Go ahead. | 07:46 |
| 21 | A.   No, I'm sorry.  That's all. | 07:46 |
| 22 | Q.   Okay.  So it's -- let's just, you know, lay | 07:46 |
| 23 | it all out.  So by having a chiropractor mark an | 07:46 |
| 24 | employee off sick, one, that would trigger CSX's | 07:46 |
| 25 | obligation to pay for health insurance for | 07:46 |

346

Craig Heligman, M.D.                                                          April 29, 2021

| | | |
|---|---|---|
| 1 | two years; is that correct? | 07:46 |
| 2 | A.   No. | 07:46 |
| 3 | Q.   Okay.  What's -- what did I get wrong on | 07:46 |
| 4 | that one? | 07:46 |
| 5 | A.   For an individual who is not able to work | 07:46 |
| 6 | due to a medical condition, their health benefit may | 07:46 |
| 7 | be continued for up to two years.  It is -- their | 07:46 |
| 8 | family health benefits or -- are covered for up to | 07:46 |
| 9 | one year following the last day worked.  It doesn't | 07:46 |
| 10 | necessarily have to be a chiropractic practitioner. | 07:46 |
| 11 | It could be any health care provider that is | 07:46 |
| 12 | submitting the correct forms to continue -- that | 07:46 |
| 13 | meet the -- the carrier's requirements. | 07:47 |
| 14 | There's a form called the proof of | 07:47 |
| 15 | disability form, and the employees do have their | 07:47 |
| 16 | provider write or complete that form and submit it | 07:47 |
| 17 | to Railroad Enrollment in order to extend those | 07:47 |
| 18 | benefits.  But that's -- again, it's a periodic form | 07:47 |
| 19 | that must be completed.  If that form's not | 07:47 |
| 20 | completed, then the insurance carrier may | 07:47 |
| 21 | discontinue benefits. | 07:47 |
| 22 | Q.   Okay.  Did I get it wrong when I said that | 07:47 |
| 23 | CSX was responsible for paying for those extended | 07:47 |
| 24 | benefits? | 07:47 |
| 25 | A.   CSX is still responsible for paying the | 07:47 |

347

USCA4   2163

| | | |
|---|---|---|
| 1 | premium. | 07:47 |
| 2 | Q.   I'm sorry.  That's -- so that's where I | 07:47 |
| 3 | misspoke. | 07:47 |
| 4 | A.   Right.  So -- as long as the proof of | 07:47 |
| 5 | disability forms are completed properly, it's | 07:47 |
| 6 | properly documented with the Railroad Enrollment and | 07:47 |
| 7 | subsequently the health insurance carrier, then CSX | 07:47 |
| 8 | would continue to pay the premiums for up to one | 07:47 |
| 9 | year for the full family and up to one year for the | 07:47 |
| 10 | employee themselves. | 07:48 |
| 11 | Q.   Okay.  And I got it.  Yep, okay. | 07:48 |
| 12 | A.   I'm sorry.  One year for family, two years | 07:48 |
| 13 | for the employee.  Excuse me. | 07:48 |
| 14 | Q.   Okay.  And that's if an employee goes off | 07:48 |
| 15 | on sick or -- or disability? | 07:48 |
| 16 | A.   That's correct. | 07:48 |
| 17 | Q.   Okay.  And if an employee does not go off | 07:48 |
| 18 | on sick or disability but is furloughed, then is it | 07:48 |
| 19 | correct to say that CSX is only responsible for | 07:48 |
| 20 | paying the premiums for four months? | 07:48 |
| 21 | A.   That's my understanding for this period of | 07:48 |
| 22 | time.  I don't know if there are different standards | 07:48 |
| 23 | for other furlough periods. | 07:48 |
| 24 | Q.   Okay.  And, of course, if I ask you a | 07:48 |
| 25 | question that you don't know, just tell me, but is | 07:48 |

348

Craig Heligman, M.D.                                                April 29, 2021

```
 1    it your understanding that CSX would pay the      07:48

 2    premiums for four months for the employee and     07:48

 3    family, or don't you know?                         07:48

 4         A.   I don't remember.                        07:48

 5         Q.   Okay.  But is it accurate to say that you  07:48

 6    believe that was the motivation for the plaintiffs  07:48

 7    in this case to extend their health insurance --   07:48

 8    we're going to talk about the other stuff, too --  07:48

 9    but at least on this prong, extend the health      07:48

10    insurance for themselves and/or their family?      07:49

11         A.   Yes, sir.                                07:49

12         Q.   Okay.  And then the second prong, I think  07:49

13    you said, is that when someone goes off on sick or  07:49

14    disability, they may be eligible for Railroad      07:49

15    Retirement Board sickness and/or disability; is that  07:49

16    correct?                                           07:49

17         A.   Yes.                                     07:49

18         Q.   And then the third prong, they may --    07:49

19    depending on each individual, they may have        07:49

20    purchased additional sickness or disability coverage  07:49

21    like short-term disability; is that right?         07:49

22         A.   Yes, that's correct.                     07:49

23         Q.   Okay.  Were there any other benefits that  07:49

24    an employee stood to gain by marking off sick as   07:49

25    opposed to being furloughed that you're aware of,  07:49
```

349

USCA4   2165

| 1 | you know, at this hearing? | 07:49 |
| 2 | A.   That's all I'm aware of. | 07:49 |
| 3 | Q.   Okay.  Did you have an understanding back | 07:49 |
| 4 | in 2017 whether the furloughs were temporary or | 07:49 |
| 5 | permanent in nature for the employees in Huntington | 07:50 |
| 6 | and Raceland, Kentucky? | 07:50 |
| 7 | A.   I do not know, and I did not know at that | 07:50 |
| 8 | time. | 07:50 |
| 9 | Q.   Okay.  So if -- if we find out from | 07:50 |
| 10 | Mr. Shogren or -- or Mr. Thoele or somebody else | 07:50 |
| 11 | that -- that, say, the third trick of Raceland came | 07:50 |
| 12 | back in late 2017 or '18, that those furloughs were | 07:50 |
| 13 | temporary, you just don't have any knowledge of | 07:50 |
| 14 | that; right? | 07:50 |
| 15 | A.   No. | 07:50 |
| 16 | Q.   Okay.  If there was some category of | 07:50 |
| 17 | employees who returned from furlough, is it correct | 07:50 |
| 18 | to say that CSX would be responsible for paying | 07:50 |
| 19 | their health insurance through their career leading | 07:50 |
| 20 | up to retirement? | 07:50 |
| 21 | A.   I'm not exactly sure I understand the | 07:50 |
| 22 | question.  But the health benefits are, again, a | 07:50 |
| 23 | negotiated part of their agreement, and, of course, | 07:50 |
| 24 | once the agreement is signed off by the company and | 07:50 |
| 25 | by the union, we would be -- we would abide by that | 07:51 |

1    agreement.                                          07:51

2        Q.   Okay.  So to put that in nutshell fashion,   07:51

3    if an employee remained employed with CSX, whatever   07:51

4    the terms of the agreements are with the union, the   07:51

5    company, CSX, may be responsible for paying their   07:51

6    health insurance and other employee benefits        07:51

7    throughout their career; is that right?             07:51

8        A.   Well, again, it's -- it's in the contract,   07:51

9    so if -- it states as long as they're an employee of   07:51

10   the company, and then we would continue to pay those   07:51

11   premiums.                                            07:51

12       Q.   Okay.                                       07:51

13       A.   But it, again, has to be a provision in the   07:51

14   Collective Bargaining Agreement.                    07:51

15       Q.   Okay.  But you were aware of that back in   07:51

16   2017?                                                07:51

17       A.   Yes.                                        07:51

18       Q.   Okay.  And have you ever had any            07:51

19   discussions with anyone at CSX about this being an   07:51

20   opportunity to save CSX paying money for health     07:51

21   insurance for the rest of an employee's career?     07:52

22       A.   No.                                         07:52

23       Q.   Okay.  Have you ever heard about that in   07:52

24   any other context, even outside of the railroad,    07:52

25   where an employer tries to get rid of employees in   07:52

                                                         351

```
 1    order to not pay them employee benefits?           07:52

 2        A.   No.                                        07:52

 3        Q.   Okay.  Have you ever had any training that 07:52

 4    would inform you that doing that would be           07:52

 5    potentially illegal?                                07:52

 6        A.   Not specific to that, no.                  07:52

 7        Q.   Okay.  So you've not had the -- more       07:52

 8    specifically, you've not had any training that would 07:52

 9    inform you of any laws that would make it illegal to 07:52

10    interfere with an employee's benefits?              07:52

11        A.   I'm not sure what you're -- I guess I'm not 07:52

12    sure what you're asking.  We -- we have not had     07:52

13    training specific to what employee benefits are for 07:52

14    the individual crafts or union agreements.          07:52

15        Q.   Okay.  All right.  Can you make room for   07:52

16    the possibility that CSX used this opportunity and  07:53

17    the treatment with the chiropractors as an          07:53

18    opportunity to terminate a large number of employees 07:53

19    for the purpose of getting out of paying them health 07:53

20    insurance and other employee benefits?              07:53

21           MS. FOSTER BIRD:  I'm going to object to     07:53

22    that question.  "Make room for the possibility" is, 07:53

23    I think, vague and really incapable of being        07:53

24    answered.  I'll object to the question, but answer  07:53

25    it, Dr. Heligman, if you think you can.             07:53
```

Craig Heligman, M.D.                                April 29, 2021

```
 1              THE WITNESS:  The answer is no, I wouldn't    07:53
 2    make any room for that possibility.                    07:53
 3    BY MR. PAUL:                                           07:53
 4       Q.   Okay.  So -- but you understood my             07:53
 5    question, is that correct, notwithstanding the         07:53
 6    objection?                                             07:53
 7       A.   My understanding of the question is that       07:53
 8    you're asking my opinion as to whether or not the      07:53
 9    company may have used this opportunity for a cost      07:53
10    savings by removing employees from employment.  And    07:53
11    the answer is no, I do not believe that at all.        07:53
12    This is not at all anything that we have been          07:53
13    advised to do, and our company would not use this as   07:53
14    an opportunity that you're alluding to.                07:54
15       Q.   Okay.  So it's your testimony that there's     07:54
16    zero percent possibility that that occurred?           07:54
17       A.   To the best of my knowledge, I've never        07:54
18    heard that topic ever discussed.  And so, no, in my    07:54
19    experience, I have not seen CSX operate that way.      07:54
20       Q.   Okay.  Back in 2017 and '18, did you have      07:54
21    any involvement with a large number of conductors      07:54
22    and trainmen being fired for alleged misuse of FMLA?   07:54
23       A.   I'm aware that that occurred, yes.             07:54
24       Q.   Okay.  Did you have any -- do you have any     07:54
25    involvement in that, for instance, the review of any   07:54
```

                                                         353

```
 1   FMLA forms to determine appropriateness of          07:54

 2   treatment, et cetera?                                07:54

 3       A.   I believe I did review some of those cases  07:54

 4   and -- to help gather information regarding the      07:54

 5   individual episodes to determine if it met a pattern 07:55

 6   or -- or not of inappropriate FMLA use.              07:55

 7       Q.   Okay.  So is it more accurate to say that   07:55

 8   not only were you aware of it, you participated, in  07:55

 9   part, in that event?                                 07:55

10       A.   Again, those cases that I reviewed were     07:55

11   submitted to me for an opinion on the medical        07:55

12   information, the expectations on the pattern of use  07:55

13   presented by the employee of their FMLA calendar,    07:55

14   and, in some cases, actually to contact the treating 07:55

15   physician for clarification.  The decision-making on 07:55

16   termination was nothing I had anything to do with.   07:55

17       Q.   Okay.  You have any -- did you ever have    07:55

18   any conversations with anyone about the termination  07:55

19   of the engineers and conductors for alleged misuse   07:55

20   of FMLA was a concerted effort on behalf of CSX to   07:55

21   terminate employees who were using medical leave?    07:55

22       A.   No, that was not ever -- never mentioned to 07:56

23   me.                                                  07:56

24       Q.   Okay.  All right.  If we can turn the page  07:56

25   to Page 11 of this exhibit, please.  All right.      07:56
```

                                                            354

| 1 | Just draw your attention to -- in this case, it's -- | 07:56 |
|---|---|---|
| 2 | Mr. DeAngelo appears to be asking you questions. | 07:56 |
| 3 | Was this -- this part of the transcript | 07:56 |
| 4 | still a part that you were reading from the cheat | 07:56 |
| 5 | sheet? | 07:56 |
| 6 | A.   And are you referring to starting on Line | 07:56 |
| 7 | 10? | 07:56 |
| 8 | Q.   Yes. | 07:56 |
| 9 | A.   Yes, this is the information that would be | 07:56 |
| 10 | on that page. | 07:56 |
| 11 | Q.   Okay.  And for that matter, does -- is all | 07:56 |
| 12 | the rest of the testimony on this page part of the | 07:56 |
| 13 | cheat sheet? | 07:57 |
| 14 | MS. FOSTER BIRD:  You know, I'm going to | 07:57 |
| 15 | object to the use of the term "cheat sheet."  That's | 07:57 |
| 16 | something you keep saying.  He did not say that.  He | 07:57 |
| 17 | said there was a one-page document with information | 07:57 |
| 18 | written on it.  You then apologized for the use of | 07:57 |
| 19 | the term "cheat sheet," but now you've injected it | 07:57 |
| 20 | into your questioning. | 07:57 |
| 21 | So I'm going to object to the use of the | 07:57 |
| 22 | term "cheat sheet" as we go forward. | 07:57 |
| 23 | MR. PAUL:  I object to your testimony as | 07:57 |
| 24 | mischaracterizing my question.  I didn't apologize. | 07:57 |
| 25 | I said I don't mean it in a derogatory way.  But I'm | 07:57 |

355

| 1 | happy to call it something other than a cheat sheet | 07:57 |
| 2 | for the purpose of this so we can move on, if that's | 07:57 |
| 3 | okay. | 07:57 |
| 4 | BY MR. PAUL: | 07:57 |
| 5 | Q.   But, Dr. Heligman, what do you want me to | 07:57 |
| 6 | call this one-page document that -- that you read | 07:57 |
| 7 | into each of those exhibits?  I'm happy to call it | 07:57 |
| 8 | whatever you want. | 07:57 |
| 9 | A.   It's a written statement. | 07:57 |
| 10 | Q.   Okay.  Well, let me ask you this:  Do you | 07:57 |
| 11 | still have a copy of that written statement? | 07:57 |
| 12 | A.   I don't have one handy.  It may -- may | 07:57 |
| 13 | still be on my computer somewhere, but I would have | 07:57 |
| 14 | to look for it. | 07:57 |
| 15 | MR. PAUL:  Okay.  I would ask that you -- | 07:57 |
| 16 | that counsel talk to Dr. Heligman to see if that | 07:58 |
| 17 | document exists because then we could make it an | 07:58 |
| 18 | exhibit, and rather than refer to it as a "cheat | 07:58 |
| 19 | sheet" or anything else, I could refer to it as an | 07:58 |
| 20 | exhibit. | 07:58 |
| 21 | BY MR. PAUL: | 07:58 |
| 22 | Q.   But you -- you believe it may be on your | 07:58 |
| 23 | computer because someone from the Law Department or | 07:58 |
| 24 | Labor Relations sent it to you and you may have | 07:58 |
| 25 | saved it? | 07:58 |

356

Craig Heligman, M.D.                                          April 29, 2021

| | | |
|---|---|---|
| 1 | A.   I may have saved it with other documents | 07:58 |
| 2 | related to these cases, and anything that -- that I | 07:58 |
| 3 | have, I'm happy to share.  It was requested in the | 07:58 |
| 4 | course of the litigation, and if anybody -- if I | 07:58 |
| 5 | have it, I'm happy to share it. | 07:58 |
| 6 | Q.   Okay.  But are you thinking that if it | 07:58 |
| 7 | exists, it's not, like, in a hard, printed-out piece | 07:58 |
| 8 | of paper like it once was.  It's more likely to be | 07:58 |
| 9 | an electronic document? | 07:58 |
| 10 | A.   It would more likely be an electronic | 07:58 |
| 11 | document at this point.  I -- | 07:58 |
| 12 | Q.   Okay. | 07:58 |
| 13 | A.   -- don't have any paper files, really, | 07:58 |
| 14 | anymore. | 07:58 |
| 15 | Q.   Okay.  And I apologize.  You want me to | 07:58 |
| 16 | call it testimony summary?  Or what -- what do you | 07:58 |
| 17 | want me to call it?  I'll call it anything you want. | 07:58 |
| 18 | A.   It's a simple written statement. | 07:59 |
| 19 | Q.   Written statement, okay. | 07:59 |
| 20 | All right.  And so my question was on this | 07:59 |
| 21 | written statement:  Do you believe that that pretty | 07:59 |
| 22 | much covers all the rest of your testimony on | 07:59 |
| 23 | Page 11? | 07:59 |
| 24 | A.   Yes, the rest of that page would be from | 07:59 |
| 25 | that statement. | 07:59 |

357

Craig Heligman, M.D.                                                        April 29, 2021

```
 1        Q.   Okay.  Now, on Line 17, Mr. DeAngelo asks    07:59

 2    you:                                                   07:59

 3              "I guess -- so based on your                 07:59

 4               total investigation here, what             07:59

 5               did you -- what did you                     07:59

 6               conclude from this -- from                  07:59

 7               this incident and with this                07:59

 8               group in particular?"                       07:59

 9         Do you see where I read that?                     07:59

10    A.   Yes.                                              07:59

11        Q.   Okay.  And can you read your response at      07:59

12    Line 21 through 23, please?                            07:59

13    A.   Yes, I can.                                       07:59

14              "I found that these employees'              07:59

15               actions to be concerted fraud             07:59

16               effort to defraud CSXT, the               07:59

17               Railroad Retirement Board, and             07:59

18               insurance providers of                     07:59

19               extended benefits."                        07:59

20        Q.   And you believe that's true today; correct?  07:59

21        A.   I believe that this group individually made  07:59

22    the decision to select the provider that they did at  08:00

23    the same time for the purpose of making an attempt    08:00

24    to protect their benefits.                            08:00

25        Q.   Okay.  And I think we talked about the       08:00
```

```
 1    first part, and just to drill down on it a little        08:00
 2    bit:  The concerted fraud effort against CSX is in       08:00
 3    order for CSX to pay the premiums of the health          08:00
 4    insurance; is that correct?                              08:00
 5         A.   Yes, and, as I said, to the Railroad           08:00
 6    Retirement Board and insurance providers.                08:00
 7         Q.   We're going to do -- yeah, we're going to      08:00
 8    do that now.                                             08:00
 9         A.   Okay.                                          08:00
10         Q.   And is the concerted effort to defraud the    08:00
11    Railroad Retirement Board with respect to an             08:00
12    employee applying for sick or disability benefits        08:00
13    through the federal government?                          08:00
14         A.   Yes.                                           08:00
15         Q.   Okay.  And this is the one I'm having a        08:00
16    little hard time understanding.                          08:01
17              How does the concerted fraud effort impact    08:01
18    the insurance providers of the extended benefits?       08:01
19         A.   Well, the insurance providers are the ones    08:01
20    that are -- in this case are for discussing other       08:01
21    insurance companies that employees may have              08:01
22    purchased a short-term or long-term disability           08:01
23    product.  Could have also been the health insurance     08:01
24    providers who may still be continuing to pay claims     08:01
25    when they would not have otherwise been liable for      08:01
```

                                                                  359

USCA4   2175

| | | |
|---|---|---|
| 1 | those claims had that person not been insured. | 08:01 |
| 2 | Q. Got it. Okay. | 08:01 |
| 3 | So I think I understand the first one for | 08:01 |
| 4 | sure. Insurance providers of extended benefits | 08:01 |
| 5 | could be short-term disability through a private | 08:01 |
| 6 | insurance company; right? | 08:01 |
| 7 | A. It could be that but also the health care | 08:01 |
| 8 | insurance. | 08:01 |
| 9 | Q. Yeah, so there's two prongs, right, at | 08:01 |
| 10 | least from how I understand your testimony. The | 08:01 |
| 11 | short-term, that would be if it was through an | 08:01 |
| 12 | insurance provider and someone was not, in fact, | 08:02 |
| 13 | unable to work, that would be a concern; is that | 08:02 |
| 14 | correct? | 08:02 |
| 15 | A. Yes. | 08:02 |
| 16 | Q. Okay. Then the second one with respect to | 08:02 |
| 17 | the health insurance, are you saying that the | 08:02 |
| 18 | treatment that they received from the chiropractors, | 08:02 |
| 19 | if paid for by one of those three insurance | 08:02 |
| 20 | companies, would be fraud? | 08:02 |
| 21 | A. No, what I'm saying is that if -- let me | 08:02 |
| 22 | give you an example. If an employee is covered by | 08:02 |
| 23 | United Healthcare and the company has been paying | 08:02 |
| 24 | the premium -- I don't know that the breakdown, but | 08:02 |
| 25 | if the employee had a copay for that premium, the | 08:02 |

```
 1    premium gets paid to the insurance company, to       08:02
 2    United Healthcare, in order to ultimately pay the     08:02
 3    providers for any services being provided to that     08:02
 4    covered employee.                                      08:02
 5          If you no longer have a policy with United       08:02
 6    Healthcare because the premiums are not being paid,    08:03
 7    then the patient would be responsible directly to     08:03
 8    the provider for payment of all services.  You also    08:03
 9    would not have the protection of the insurer's        08:03
10    network, which have usually negotiated rates that     08:03
11    may be less expensive than what you would pay         08:03
12    directly to the practitioner.                          08:03
13          So if you fraudulently have been continuing      08:03
14    your health benefits and someone is paying the        08:03
15    premium -- or the employee's share perhaps as well    08:03
16    of that premium, and that discontinues, then the     08:03
17    health care provider doesn't have to pay those       08:03
18    bills.  If you continue to pay the premium, the       08:03
19    health care provider has to continue to pay those    08:03
20    bills.                                                 08:03
21          So if you extend those benefits that the        08:03
22    employer has paid for, then the insurance company is  08:03
23    continuing to pay bills.                               08:04
24      Q.    All right.  I've got to break that down.       08:04
25    I'm sorry to go over this.  I just -- I can't quite   08:04
```

                                                            361

```
 1    follow all of that.                              08:04
 2           The first part I understood is -- if an   08:04
 3    employee is paying a copay, would they be defrauding  08:04
 4    themselves?                                      08:04
 5       A.   No, what I'm saying is there's an employee  08:04
 6    portion of the premium.  Okay?                   08:04
 7       Q.   Sure.                                    08:04
 8       A.   That's not really what we're discussing.  08:04
 9           But the company pays the vast majority of  08:04
10    the premium to the health insurance company in order  08:04
11    to extend that benefit.  If you do not have that  08:04
12    coverage, the health insurance company is not going  08:04
13    to pay claims submitted by an uncovered person.  08:04
14    Okay?  They don't have coverage; they're not going  08:04
15    to pay the claim.                                08:04
16       Q.   Sure.                                    08:04
17       A.   If that coverage is then extended by virtue  08:04
18    of the fact that they potentially had committed  08:04
19    fraud in order to extend that coverage, then the  08:05
20    insurance company is now responsible for paying  08:05
21    bills that maybe they shouldn't have because the  08:05
22    premium never should have been paid.            08:05
23       Q.   Okay.  So that's part and parcel of the  08:05
24    alleged fraud on CSX.  Because CSX is paying the  08:05
25    premium and it's extended for two years, as a   08:05
```

                                                         362

Craig Heligman, M.D.                                                    April 29, 2021

1    natural consequence of that, the insurance company      08:05

2    is then responsible for part of a bill that            08:05

3    otherwise would not exist; is that..?                  08:05

4        A.    Right.  If you carry it out to the extreme   08:05

5    point, yes, that's -- that's the point I'm trying to   08:05

6    make.                                                   08:05

7        Q.    Okay.  So presumably an insurance company,   08:05

8    like one of those three, enjoys receiving the          08:05

9    premiums but not necessarily paying out the claims;    08:05

10   is that..?                                              08:05

11       A.    No, the issue is that it is a business.       08:05

12   And insurers receive premium into a -- and             08:05

13   essentially it's a pooled amount of money that they    08:05

14   then have to subsequently pay claims that are          08:05

15   appropriately submitted.  If a claim is                08:05

16   inappropriately submitted, then they should not be     08:06

17   liable to pay that claim.                               08:06

18       Q.    Sure.                                         08:06

19       A.    So I'm not here saying that insurance         08:06

20   companies, their sole purpose is to avoid paying       08:06

21   claims.  That's not at all what I'm saying.  I'm       08:06

22   saying if they're not a covered person, then the       08:06

23   insurance company is not responsible for paying the    08:06

24   claims for individuals that they don't cover.          08:06

25       Q.    Okay.  Yeah.                                  08:06

                                                                    363

Craig Heligman, M.D.                                    April 29, 2021

```
 1              I mean, are you familiar with the Federal   08:06
 2    False Claims Act at all?                              08:06
 3              Have you ever come across that?             08:06
 4        A.   Not by that name, no.                        08:06
 5        Q.   Okay.  They -- have you ever heard of "qui   08:06
 6    tam"?                                                 08:06
 7        A.   No.                                          08:06
 8        Q.   No?  Okay.                                   08:06
 9              There's a concept out there that goes back  08:06
10    to Abraham Lincoln, when people were submitting       08:06
11    higher than normal bills to buy equipment for the     08:06
12    Civil War.  And in more recent times, it's more akin  08:06
13    in the billing industry for either billing for        08:06
14    services that were not performed or just generally    08:06
15    submitting a false claim to the federal government.   08:06
16    But if you've not had any training on that, I won't   08:06
17    ask you.                                              08:07
18              But is it -- on the topic we're talking     08:07
19    about right now, it would be -- is it akin to saying  08:07
20    that the employees were submitting false claims for   08:07
21    treatment that they otherwise should not be           08:07
22    receiving from the chiropractors?                     08:07
23        A.   No.                                          08:07
24        Q.   Okay.                                        08:07
25        A.   That's -- that's not what I'm saying.        08:07
```

                                                            364

Craig Heligman, M.D.                                          April 29, 2021

```
 1        Q.   Okay.  So do you believe that the        08:07
 2   chiropractors were in a conspiracy with the specific  08:07
 3   individual employees to extend their benefits?     08:07
 4        A.   I think the employees selected this      08:07
 5   practitioner or one of these two practitioners, and  08:07
 6   the practitioners elected to continue to endorse   08:07
 7   disability where it probably didn't truly exist for  08:07
 8   an extended period of time for the purpose of      08:07
 9   extending benefits.                                08:08
10        Q.   And do you believe that these two        08:08
11   chiropractors did that with each and every one of  08:08
12   the plaintiffs in this case?                       08:08
13        A.   I don't think that -- in my opinion, that  08:08
14   an outright statement was made by either the       08:08
15   provider or the employee to the other saying, "Look,  08:08
16   I want to extend my benefits.  Can you disable me?"  08:08
17   I don't think that kind of conversation took place.  08:08
18             I think, though, that there -- if you    08:08
19   understand the dynamics between patients and       08:08
20   providers in general, you have to be cognizant that  08:08
21   there are social drivers and psychological drivers  08:08
22   for why a patient may tell a provider of their     08:08
23   symptoms that they don't share with the           08:08
24   practitioner.  I don't have privy to what took place  08:08
25   in the practitioner's office.                      08:09
```

                                                              365

Craig Heligman, M.D.                                                April 29, 2021

```
1              So what I'm saying is when you look at the      08:09
2    bulk of information and the timing, that it seems         08:09
3    rather odd to me why this group of individuals would      08:09
4    select one of these two practitioners specifically        08:09
5    in order to -- all at the same time, concurrent with      08:09
6    a point in time that there were changes in our            08:09
7    business and furloughs going on in that area.             08:09
8              I think individuals will make attempts to       08:09
9    protect themselves if they think something bad may        08:09
10   be happening in their future.  But it really just         08:09
11   comes back to the number of cases at that moment in       08:09
12   time from only two practitioners and in that local        08:09
13   region.                                                   08:09
14        Q.   But you had suspicions of Dr. Johnson for       08:09
15   many, many years of this type of conduct, haven't         08:09
16   you?                                                      08:10
17             MS. FOSTER BIRD:  I'm going to object.  I       08:10
18   think that "this type of conduct," it needs to be         08:10
19   defined.  I'll object to that question.                   08:10
20             MR. PAUL:  Sure.  I can rephrase it.            08:10
21   BY MR. PAUL:                                              08:10
22        Q.   Well, first, Doctor, did you understand my      08:10
23   question or would you like me to -- I'm happy to          08:10
24   rephrase it.                                              08:10
25        A.   Why don't you go ahead and do that?            08:10
```

366

USCA4    2182

| | | |
|---|---|---|
| 1 | Q.   Sure. | 08:10 |
| 2 | Is it correct to say that you've had | 08:10 |
| 3 | suspicions with respect to Dr. Johnson for many, | 08:10 |
| 4 | many years with regard to his submission of | 08:10 |
| 5 | paperwork withholding CSX employees from work | 08:10 |
| 6 | inappropriately? | 08:10 |
| 7 | A.   Yes. | 08:10 |
| 8 | Q.   Okay.  I think we've established today | 08:10 |
| 9 | right now that if there was a fly on the wall, you | 08:10 |
| 10 | do not -- a fly on the wall in Dr. Johnson or | 08:10 |
| 11 | Dr. Carey's office, you do not believe that any of | 08:10 |
| 12 | the plaintiffs in this case had a conversation with | 08:10 |
| 13 | Dr. Carey or Dr. Johnson that would -- that would be | 08:10 |
| 14 | a conspiracy to defraud anybody? | 08:10 |
| 15 | A.   Again, I don't know what took place in that | 08:10 |
| 16 | office. | 08:10 |
| 17 | Q.   Nor should you; right? | 08:11 |
| 18 | A.   I just don't know what took place.  But in | 08:11 |
| 19 | my personal clinical experience, I do know that | 08:11 |
| 20 | patients may have reasons of their own that they | 08:11 |
| 21 | don't share with their practitioner.  That's all I | 08:11 |
| 22 | can say. | 08:11 |
| 23 | Q.   Yeah, but -- go ahead.  I'm sorry. | 08:11 |
| 24 | A.   But, again, in my clinical experience, I | 08:11 |
| 25 | can't say that a patient would walk into a | 08:11 |

367

Craig Heligman, M.D.                                    April 29, 2021

```
 1   provider's office, say, "Look, I'm getting fired.    08:11
 2   Can you help me extend my benefits?"  I don't think  08:11
 3   that kind of conversation takes place in a           08:11
 4   practitioner's office.                               08:11
 5       Q.   Okay.  And you don't have any reason to     08:11
 6   believe that any of the plaintiffs in this case      08:11
 7   engaged in a conspiracy or a conversation with       08:11
 8   Dr. Johnson or Dr. Carey for the purpose of          08:11
 9   defrauding anybody?                                  08:11
10       A.   No.  Again, the issue is that there could   08:11
11   have been an implicit kind of conversation.  There   08:11
12   could have been things that were not stated in the   08:12
13   office that may have led them down that pathway.  I  08:12
14   don't know.  I'm just saying that the facts are we   08:12
15   received over 70 documents from Dr. Johnson and      08:12
16   Dr. Carey all in a very short period of time in that 08:12
17   location, at the time that their business change is  08:12
18   occurring in that location as well.                  08:12
19           Beyond that, I can't tell you what took      08:12
20   place on an individual day in an individual          08:12
21   conversation between any employee and any            08:12
22   practitioner.  It just was a very unusual set of     08:12
23   circumstances that made no sense from a clinical     08:12
24   standpoint.                                          08:12
25       Q.   Well, I -- I understand your testimony on   08:12
```

368

```
 1   that point, but even before June of 2017, is it      08:12

 2   correct to say that you were suspicious of           08:13

 3   Dr. Johnson and his treatment of CSX employees?      08:13

 4       A.   I was suspicious that he was prolonging the  08:13

 5   care and filling out forms that allowed individuals  08:13

 6   to remain off work under medical supervision.        08:13

 7            Now, that means I disagreed with            08:13

 8   Dr. Johnson based upon the limited information I had  08:13

 9   at the time.  We don't receive entire copies of      08:13

10   people's medical records from any source, so this    08:13

11   was a -- an opinion that was generated over time.    08:13

12   It's not really any different than, perhaps, some    08:13

13   other opinions I might have had in other cases for   08:13

14   different reasons.                                    08:13

15            But the idea was we had no reason to         08:13

16   interfere or to take any action because we didn't    08:14

17   have any specific evidence to do so -- only until    08:14

18   June 2017.  That was the first time that it looked   08:14

19   to me like we had a reason to question, officially,  08:14

20   what was taking place in that location with those    08:14

21   two practitioners.                                    08:14

22       Q.   So is it fair to say that in June of 2017,  08:14

23   you were suspicious of Dr. Johnson and his treatment  08:14

24   of CSX employees?                                     08:14

25       A.   I was suspicious of the pattern of          08:14
```

369

Craig Heligman, M.D.                                    April 29, 2021

```
 1    information that was sent to us at that moment in      08:14
 2    time.  It was unusual.  It was in excess of anything  08:14
 3    we'd received from Dr. Johnson or Dr. Carey or any     08:14
 4    other practitioner throughout the system since I'd     08:14
 5    been with CSX.  As I said, in my other work with       08:14
 6    other companies prior to CSX, I'd never seen this      08:14
 7    happen.                                                08:14
 8         Q.   Okay.  And --                                08:14
 9         A.   So it was very unusual.                      08:14
10         Q.   Okay.  The -- I'm not positive if I got an   08:15
11    answer to this question, but do you have any           08:15
12    evidence that any of the plaintiffs in this case had   08:15
13    a conversation for the purpose of conspiring with      08:15
14    Dr. Carey or Dr. Johnson for the purpose of            08:15
15    defrauding anybody?                                    08:15
16         A.   I was never privy to any conversation        08:15
17    between the employee and their practitioner, period.   08:15
18         Q.   Now, are you familiar with a term like       08:15
19    "hired gun" or "whore doctor"?                         08:15
20         A.   I've heard those phrases used.               08:15
21         Q.   Okay.  What's your understanding of a hired  08:15
22    gun?                                                   08:15
23         A.   Basically the two derogatory terms are       08:15
24    potentially used for, in this case, medical            08:15
25    practitioners who are hired by an attorney on the      08:15
```

                                                           370

```
 1   plaintiffs' side or the defense side for the sole     08:15

 2   purpose of presenting information.  And they          08:15

 3   consistently do that time and time again in multiple  08:16

 4   cases over time to recite the exact same thing in     08:16

 5   each and every case.  It's a --                       08:16

 6       Q.   And what's your understanding of a --        08:16

 7   what's your understanding of a whore doctor?          08:16

 8            MS. FOSTER BIRD:  Are you saying "whore,"     08:16

 9   like, w-h-o-r-e whore?                                08:16

10            MR. PAUL:  Yeah.                              08:16

11            THE WITNESS:  I've heard those terms,         08:16

12   "hired gun," "whore doctor," the same way.  It's      08:16

13   really a derogatory term.  I don't use it myself.  I  08:16

14   think it's inappropriate.                             08:16

15            But the terminology is meant to be a         08:16

16   derogatory statement about an individual provider     08:16

17   who, for whatever their own purposes are, are         08:16

18   paid -- as an expert, perhaps -- to make statements   08:16

19   in favor of one side or the other, and they're        08:16

20   consistently used time and time again by one side or  08:16

21   the other.  It's typically going to be in a legal     08:17

22   setting, some sort of litigation where they have to   08:17

23   present opinions.                                      08:17

24            Again, I don't -- I don't use those terms.   08:17

25   I don't believe that it's appropriate to do so, but   08:17
```

```
 1    that's my understanding of how it's used.          08:17

 2    BY MR. PAUL:                                        08:17

 3        Q.    Okay.  Do you believe that Dr. Johnson and   08:17

 4    Dr. Carey were unethically completing forms on     08:17

 5    behalf of CSX employees for many years?            08:17

 6        A.    I think the individuals were completing   08:17

 7    forms on behalf of, in this case, our employees to  08:17

 8    the best of their ability in order to advocate for  08:17

 9    their patients.                                     08:17

10        Q.    Do you believe that Dr. Johnson and Carey   08:17

11    had a reputation in the community as completing CSX  08:17

12    forms inappropriately or unethically?              08:17

13        A.    Again, I'm not a member of that community.  08:17

14    I can only state what we've seen, and we had seen a  08:17

15    large number of forms in the past over the years   08:18

16    from Dr. Johnson certainly and also from Dr. Carey  08:18

17    less -- to a lesser degree.                         08:18

18           And while I may have, based on limited       08:18

19    information, found disagreement with their opinions,  08:18

20    I won't go over the edge and say that they were     08:18

21    doing anything particularly unethical or illegal    08:18

22    relative to any other practitioner whose documents I  08:18

23    would have seen for the same reasons.              08:18

24        Q.    Do you have any opinion as to whether      08:18

25    Dr. Johnson or Dr. Carey had a reputation in the   08:18
```

                                                              372

1    community of completing CSX forms any way that the      08:18

2    employee requested?                                     08:18

3        A.   Again, I'm not a member of the community.      08:18

4    I don't know how the community have used Dr. Johnson    08:18

5    or Dr. Carey.  I can only make the statement based      08:18

6    upon the information that I have seen from              08:18

7    their offices.  And based on the completion of the     08:18

8    forms that we've received, really it's no different    08:18

9    than other practitioners may have seen individuals     08:19

10   for similar reasons.                                    08:19

11       Q.   So, I'm sorry, does that mean that, in your    08:19

12   experience, you believe that Dr. Johnson and Carey's    08:19

13   forms were completed in a very similar way to other     08:19

14   chiropractors'?                                         08:19

15       A.   No, what I'm saying is that if you have        08:19

16   someone off for, say, the generic low back pain and     08:19

17   you have a practitioner that's been treating that       08:19

18   person for a long period of time and they've           08:19

19   endorsed their inability to work for a long period      08:19

20   of time, I've seen that from Dr. Johnson, from         08:19

21   Dr. Carey, from practitioners throughout the            08:19

22   country, not just at CSX, but in the course of my       08:19

23   entire career.                                          08:19

24          And so the reasons for why one may do that       08:19

25   is their own, but it's not consistent with the best     08:19

                                                                    373

```
 1    medical evidence-based treatment for how you manage    08:19
 2    nonspecific low back pain.                             08:19
 3         But my position in these cases were not to        08:19
 4    criticize a practitioner's treatment.  I don't have    08:20
 5    the information necessary to do that other than it's   08:20
 6    not how I would have handled the case if they were     08:20
 7    my patient.  But since I do not get involved with      08:20
 8    the doctor/patient relationship for any of our         08:20
 9    employees, I don't interfere.                          08:20
10        Q.   And it's your testimony that you did not      08:20
11    interfere with any of the doctor/patient              08:20
12    relationships between Dr. Johnson and Dr. Carey and    08:20
13    the plaintiffs in this case?                           08:20
14        A.   That's correct.  I did not interfere with     08:20
15    anyone's doctor/patient relationship.                  08:20
16        Q.   All right.  If we could take a look at        08:20
17    Page 17 of this exhibit, please.                       08:20
18             MS. FOSTER BIRD:  Greg, we've been going      08:20
19    for about an hour and 20 minutes kind of -- after we   08:20
20    got going.  Can we take a break before you go back     08:20
21    to Page 17?                                            08:20
22             MR. PAUL:  Absolutely, yeah.                  08:20
23             MS. FOSTER BIRD:  Let's do that.  Five        08:20
24    minutes?                                               08:20
25             MR. PAUL:  Sure.                              08:20
```

| | | |
|---|---|---|
| 1 | THE VIDEOGRAPHER:  Off the record at | 08:20 |
| 2 | 8:21 a.m. | 08:20 |
| 3 | (Recess taken.) | 08:27 |
| 4 | THE VIDEOGRAPHER:  We are back on the | 08:27 |
| 5 | record at 8:27 a.m. | 08:27 |
| 6 | BY MR. PAUL: | 08:27 |
| 7 | Q.   Okay.  Doctor, we're back on the record | 08:27 |
| 8 | after a short break. | 08:27 |
| 9 | Are you all set to go? | 08:27 |
| 10 | A.   Yes. | 08:27 |
| 11 | Q.   Okay.  If I can draw your attention to | 08:27 |
| 12 | Page 17 of this exhibit, which is Bates No. 1892, | 08:27 |
| 13 | round about Line 17 -- I'm sorry.  That's the wrong | 08:27 |
| 14 | line.  It's Page 17.  Hold on.  Let me find it. | 08:27 |
| 15 | Sorry.  It's Page 15.  My fault.  Go back two. | 08:28 |
| 16 | All right.  I know you may not remember | 08:28 |
| 17 | this exactly, but down there toward the end, | 08:28 |
| 18 | Mr. Campbell's asking you if Mr. Abdon's situation | 08:28 |
| 19 | was totally different than everybody else. | 08:29 |
| 20 | Do you see where I read that? | 08:29 |
| 21 | A.   Yes. | 08:29 |
| 22 | Q.   Okay. | 08:29 |
| 23 | A.   Around Line 37? | 08:29 |
| 24 | Q.   Yeah. | 08:29 |
| 25 | And the reason is -- and I've got to find | 08:29 |

375

Craig Heligman, M.D.                                    April 29, 2021

```
 1    it -- is that Mr. Abdon was scheduled to retire the    08:29

 2    next month.  And I want to -- do you remember that     08:29

 3    or is that -- is that too long ago?                    08:29

 4        A.   That would be too long ago.                   08:29

 5             MS. FOSTER BIRD:  Hold on.  What page are      08:29

 6    we on?  Can you give me a Bates number?  I'm now        08:29

 7    lost.                                                  08:29

 8             MR. PAUL:  Yeah, I'm lost, too.  We were       08:29

 9    on --                                                  08:29

10             MS. FOSTER BIRD:  Okay.                        08:29

11             MR. PAUL:  We were on 15, which is Bates       08:29

12    No. 1890.                                              08:29

13             MS. FOSTER BIRD:  Right.  That's what I'm      08:29

14    seeing, yeah.                                          08:29

15             MR. PAUL:  Yeah.  And now I'm going to go      08:29

16    over to -- oh, maybe it's right in between.  I'm       08:29

17    sorry.  Here we go.  It's actually Page 16, right in   08:29

18    between 15 and 17.                                     08:29

19    BY MR. PAUL:                                           08:29

20        Q.   So let's take a look at Page 16, which is     08:29

21    Bates No. 1891.                                        08:29

22        A.   Okay.                                         08:29

23        Q.   And the -- part of the testimony or           08:29

24    questioning, rather, from Mr. Campbell is that         08:29

25    Mr. Abdon was 59 and a half years old and that he      08:29
```

                                                                 376

| 1 | was going to retire soon. | 08:30 |
| 2 | A.   Okay. | 08:30 |
| 3 | Q.   Are you familiar with the -- the fact that | 08:30 |
| 4 | railroaders are eligible to retire if they are aged | 08:30 |
| 5 | 60 and have 30 years of service? | 08:30 |
| 6 | A.   Yes, I'm familiar with that. | 08:30 |
| 7 | Q.   Okay.  I mean, of course, railroaders can | 08:30 |
| 8 | retire earlier than that, but in order to get a full | 08:30 |
| 9 | pension from the Railroad Retirement Board, they | 08:30 |
| 10 | have to be aged 60 and 30; is that correct? | 08:30 |
| 11 | A.   That's my understanding, yes. | 08:30 |
| 12 | Q.   Okay.  Did you ever conduct any analysis | 08:30 |
| 13 | concerning Mr. Abdon and with respect to his age and | 08:30 |
| 14 | whether he was subject to furlough? | 08:30 |
| 15 | A.   Did I -- no, I did not look at any one | 08:30 |
| 16 | individual with respect to that. | 08:30 |
| 17 | Q.   Okay.  So are you saying that not only with | 08:30 |
| 18 | respect to Mr. Abdon, but with respect to any of the | 08:30 |
| 19 | plaintiffs, you did not look at their age or | 08:30 |
| 20 | eligibility for furlough or retirement? | 08:30 |
| 21 | A.   No, I did not look at that at all. | 08:31 |
| 22 | Q.   Are you aware of whether anybody else | 08:31 |
| 23 | looked at those factors for the plaintiffs? | 08:31 |
| 24 | A.   Not to my knowledge. | 08:31 |
| 25 | Q.   Okay.  And I think this is clear from your | 08:31 |

377

| | | |
|---|---|---|
| 1 | testimony so far, but when it comes to the medical | 08:31 |
| 2 | conditions of the plaintiffs in this case, is there | 08:31 |
| 3 | anyone else at CSX that was qualified to interpret | 08:31 |
| 4 | the medical information on the COII forms other than | 08:31 |
| 5 | yourself? | 08:31 |
| 6 | A.   I'm the only physician at the company, so, | 08:31 |
| 7 | no, I would believe that they would defer to my | 08:31 |
| 8 | opinion on those things. | 08:31 |
| 9 | Q.   Okay.  Does that mean that with respect to | 08:31 |
| 10 | however many nurses there were at the time, they | 08:31 |
| 11 | work under you and your certification and licenses? | 08:31 |
| 12 | Is that correct? | 08:31 |
| 13 | A.   Well, no, they don't work under me in my | 08:31 |
| 14 | certification.  We're individual employees of the | 08:31 |
| 15 | company.  However, the nurses would defer to my | 08:31 |
| 16 | medical opinion. | 08:31 |
| 17 | Q.   Sure.  Okay. | 08:31 |
| 18 | But when it comes to the medical | 08:31 |
| 19 | interpretation of the Certificate of Ongoing Illness | 08:32 |
| 20 | forms or, in some cases, additional medical | 08:32 |
| 21 | evidence, whether inside or outside of CSX, do you | 08:32 |
| 22 | have any knowledge of anyone who is qualified to | 08:32 |
| 23 | interpret that other than yourself? | 08:32 |
| 24 | A.   I guess I don't quite understand the | 08:32 |
| 25 | question. | 08:32 |

378

Craig Heligman, M.D.                                    April 29, 2021

```
 1        Q.   Yeah.                                    08:32

 2        A.   The --                                   08:32

 3        Q.   Okay.                                    08:32

 4        A.   Yeah.                                    08:32

 5        Q.   Let me break it down if I can -- unless you   08:32

 6   were going to say something, but I'll try to do a   08:32

 7   better job.                                        08:32

 8        A.   Yes, please.                             08:32

 9        Q.   When it comes to your review of the      08:32

10   Certificate of Ongoing Illness forms and the       08:32

11   interpretation of the same --                      08:32

12        A.   Right.                                   08:32

13        Q.   -- is it correct to say that you are the 08:32

14   only medical doctor who is qualified to review those  08:32

15   at CSX?                                            08:32

16        A.   I am the only medical person employed by 08:32

17   CSX.  I'm the only one here with an M.D. or D.O.    08:32

18   degree or any practitioner-level degree.  So I'm it.  08:32

19        Q.   Okay.  Yup.                              08:33

20             And just for the sake of being complete, 08:33

21   and it's correct to say that neither you or, to your  08:33

22   knowledge, no one at CSX consulted with any external  08:33

23   physicians for the review of medical information on  08:33

24   behalf of the plaintiffs, including COII forms?     08:33

25        A.   No.  But, again, the COII form is an     08:33
```

                                                        379

| | | |
|---|---|---|
| 1 | administrative tool.  It's not meant to be used to | 08:33 |
| 2 | fully interpret the medical care or interpretation | 08:33 |
| 3 | of medical information.  It is a summary statement | 08:33 |
| 4 | used for administrative purposes. | 08:33 |
| 5 | Q.   Okay.  Let me ask a slightly different | 08:33 |
| 6 | question.  When it comes to determining the | 08:33 |
| 7 | reasonableness of the plaintiffs' medical treatment | 08:33 |
| 8 | in this case, is there anyone other than you that | 08:33 |
| 9 | was qualified to review those documents? | 08:33 |
| 10 | A.   There's nobody other than me that has an | 08:33 |
| 11 | M.D. at this company.  The COII contains a summary | 08:33 |
| 12 | of medical information.  It is not the medical | 08:34 |
| 13 | record.  I don't use the COII solely for the purpose | 08:34 |
| 14 | of interpreting or rendering opinions on medical | 08:34 |
| 15 | care and whether or not it meets standard of care or | 08:34 |
| 16 | medical evidence-based treatment.  It is an | 08:34 |
| 17 | administrative tool. | 08:34 |
| 18 | And so all I can say is if I see a COII | 08:34 |
| 19 | form that comes in every two months religiously for | 08:34 |
| 20 | someone with low back pain over the course of a year | 08:34 |
| 21 | or more, I would, in my own mind as a physician, | 08:34 |
| 22 | question why is that because it doesn't make any | 08:34 |
| 23 | sense to me clinically.  But I would not use that | 08:34 |
| 24 | for the purposes of making any statements regarding | 08:34 |
| 25 | quality care, appropriateness of care, submission of | 08:34 |

380

Craig Heligman, M.D.                                          April 29, 2021

```
 1    medical claims to insurance companies.            08:35
 2            The COII is merely a tool that the employee  08:35
 3    may use to -- to meet the requirements of their    08:35
 4    Collective Bargaining Agreement for the purposes of 08:35
 5    advising the company of their being off work for    08:35
 6    medical reasons.  That's it.                        08:35
 7      Q.   What's your definition of a medical record  08:35
 8    in the context of your testimony just now saying    08:35
 9    that the COII is not a medical record?              08:35
10      A.   Well, it's not a medical record.  The       08:35
11    medical record is what is produced by the health    08:35
12    care provider that documents their interaction or   08:35
13    activities with the patient.  That's not what the   08:35
14    COII is used for.  It is --                         08:35
15      Q.   Okay.  I'm sorry.  Go ahead.                 08:35
16      A.   I'm saying the medical record is what        08:35
17    records the interaction between the doctor and      08:35
18    patient, not the COII.                              08:35
19      Q.   Okay.  Let's draw a distinction between a    08:36
20    medical record and a medical treatment record.      08:36
21            So is -- the basis of your testimony right  08:36
22    now is -- are you saying that a medical record is   08:36
23    only that which documents the interaction between a 08:36
24    health care provider and a patient?                 08:36
25      A.   The medical records or medical record or     08:36
```

381

```
 1    medical treatment record is a documentation of the      08:36
 2    interaction between a health care provider and a        08:36
 3    patient.  Just as I don't consider the COII a           08:36
 4    medical record, it is a document that contains          08:36
 5    medical information.                                    08:36
 6            If I submit a claim for disability              08:36
 7    benefits, medical information is on that form.  It      08:36
 8    is not a medical record.  It is a form to be            08:36
 9    submitted to the disability insurance carrier.  Just    08:36
10    as this form has medical information on it that has     08:37
11    to be submitted to the employer, it doesn't make it     08:37
12    a medical record.                                       08:37
13        Q.   And where do you -- what definition of         08:37
14    "medical record" do you use and where does it come      08:37
15    from?                                                   08:37
16        A.   The medical record is a documentation of       08:37
17    the interaction between the provider and the            08:37
18    patient.  That's it.  Where does it come from?  I       08:37
19    have no legal definition for you, but it is a           08:37
20    document that is created to document, specifically,     08:37
21    the interactions between a provider and -- and their    08:37
22    patient.  That's it.                                    08:37
23        Q.   When -- you're familiar with the phrase        08:37
24    "narrative letter" in the medical context?              08:37
25        A.   I'm familiar with the phrase "narrative        08:37
```

```
 1   letter," yes.                                       08:37

 2        Q.   Okay.  And I know for at least some of the  08:37

 3   plaintiffs, some of the health care providers wrote  08:37

 4   a narrative letter.                                  08:37

 5           Do you consider a narrative letter to be a   08:37

 6   medical record?                                      08:37

 7        A.   No, it does not document the interaction   08:37

 8   between the health care provider and the patient.    08:38

 9   It is a summary of information presented from the    08:38

10   practitioner to the recipient of that letter.        08:38

11        Q.   All right.  If we could take a look at Page 08:38

12   21, please, Bates No. 1896, and starting at Line 18, 08:38

13   please.  Let me know if you've had a chance to find  08:38

14   that.                                                08:38

15        A.   I'm at 1896.                               08:38

16           Which line are we at?                        08:38

17        Q.   Starting at Line 18.  18 through 23, if you 08:38

18   could review that, please.                           08:38

19        A.   Okay.                                      08:38

20        Q.   Okay.  My question is:  Do you today still 08:38

21   agree that that's a reasonable statement that:       08:38

22              "The fact [..] that somebody              08:38

23               works a whole lot would have             08:38

24               probably the tendency to --              08:38

25               especially at the age of                 08:38
```

                                                                383

```
 1              Mr. Abdon -- have the tendency      08:39

 2              to, if they work a                  08:39

 3              considerable amount of time --      08:39

 4              of more muscular issues and         08:39

 5              stuff?"                             08:39

 6         That's the question.                     08:39

 7    A.   Right.                                   08:39

 8    Q.   I'm going to -- okay.                    08:39

 9    A.   I'll say how I interpreted that.  My     08:39

10  interpretation of the question was:  As a person 08:39

11  ages, are they more likely to experience aches and 08:39

12  pains?  And the answer is yes.                  08:39

13    Q.   And would that tendency to experience more 08:39

14  aches and pains support or not support ongoing  08:39

15  treatment with a chiropractor?                  08:39

16    A.   I don't think that the two are related,  08:39

17  actually.                                       08:39

18    Q.   Okay.  Is that -- is that, in part, because 08:39

19  you believe that there's a spectrum of care with 08:39

20  respect to these aches and pains that we're talking 08:39

21  about, and on the one spectrum, you believe that 08:39

22  conditions such as muscular aches and pains can get 08:40

23  better by themselves and that the body can heal 08:40

24  itself?                                         08:40

25         You subscribe to that?                   08:40
```

384

1       A.   Well, I think that the body does have the        08:40

2  capacity to heal itself.  The fact that you have          08:40

3  more aches and pains as you age, I think, is a fact.      08:40

4  The selection of whether or not you seek treatment        08:40

5  or intervention for your aches and pains is a             08:40

6  separate issue.  Some people experience aches and         08:40

7  pains every day, and they can tolerate them and do        08:40

8  their regular activities without any problem.             08:40

9  Others feel that it's not tolerable and they seek         08:40

10 care.                                                      08:40

11      Where they seek care is really a matter of           08:40

12 their preference.  It's entirely reasonable to            08:40

13 select a chiropractor for treatment of those kinds        08:40

14 of conditions, just as it's entirely reasonable to        08:40

15 seek care from a massage therapist, from an               08:40

16 allopathic physician like myself or an osteopathic        08:40

17 physician or a physical therapist.  Those are all         08:41

18 reasonable courses of action, in my opinion.              08:41

19      Q.   And on the other end of the spectrum, for       08:41

20 example, there could be surgical intervention that        08:41

21 could be causing aches and pains in -- in the body;       08:41

22 right?  I mean --                                         08:41

23      A.   Well, or there could be aches and pains         08:41

24 that ultimately require surgical intervention.            08:41

25      Q.   Sure.                                           08:41

385

```
 1              And do you -- I'm sorry.  Go ahead.  I      08:41
 2    didn't mean to interrupt you.                         08:41
 3         A.   It goes both ways.                          08:41
 4         Q.   Yeah, of course.                            08:41
 5              So would you agree, though, that with       08:41
 6    respect to that turf in between doing nothing and     08:41
 7    letting the body healing itself and surgical          08:41
 8    intervention, that the appropriate course of care is  08:41
 9    solely and exclusively between that of the health     08:41
10    care provider and the patient?                        08:41
11         A.   I'm not sure I follow the exact question,   08:41
12    but my opinion would be that what takes place         08:41
13    between the doctor and the patient is between the     08:41
14    doctor and the patient.                               08:41
15         Q.   Okay.  But with respect to the              08:41
16    reasonableness of the care and the course of          08:41
17    treatment, would you agree that it is not the         08:42
18    position of the medical director of CSX to interfere  08:42
19    with that -- those decisions?                         08:42
20         A.   That's correct.  It is not my position to   08:42
21    interfere with the doctor/patient relationship with   08:42
22    any of our employees.                                 08:42
23         Q.   Okay.  All right.  I think we're done with  08:42
24    this exhibit, so I'm going to attempt to close this   08:42
25    down.  And let's take a look at what should be        08:42
```

                                                                    386

```
 1    Exhibit 9.  And it is, yeah.  So if you could take a    08:42

 2    look at Exhibit 9, please.                              08:42

 3         A.   Okay.  I'm -- I'm there.                       08:42

 4              (Exhibit 9 was marked for identification and

 5    attached to the transcript.)                            08:42

 6    BY MR. PAUL:                                             08:42

 7         Q.   Okay.  And, similarly, this is a hearing      08:42

 8    transcript for four individuals identified in the       08:42

 9    top left-hand corner.  And if we go to Page 38,         08:42

10    which is Bates No. 970.                                 08:42

11         A.   Okay.  I see that.                             08:43

12         Q.   And I want to -- I want to ask you to look    08:43

13    at Lines 17 through 28.                                  08:43

14         A.   Okay.                                          08:43

15         Q.   Okay.  And that's -- I'm not going to do      08:43

16    this for every hearing, but this is the same            08:43

17    language that you read from the -- hold on.  I wrote    08:43

18    it down -- written statement that was provided to       08:43

19    you from Labor Relations or Legal Department;           08:43

20    correct?                                                08:43

21         A.   Yes.                                           08:43

22         Q.   Okay.  And I'll represent to you that, you    08:43

23    know, perhaps with an insignificant sentence or         08:43

24    something of difference, that these are all             08:43

25    primarily the same.  And I'm happy to give you the      08:43
```

<div align="right">387</div>

```
 1   opportunity to review each and every one of these.    08:43

 2             But similar to the question I asked you      08:44

 3   before, do you stand behind your testimony that this   08:44

 4   was the conclusion of your investigation with          08:44

 5   respect to the named plaintiffs?                       08:44

 6       A.   Yes.                                          08:44

 7       Q.   And we've now gone through the substance of   08:44

 8   that paragraph with respect to the employee benefits   08:44

 9   and -- and the impact on a number of employee          08:44

10   benefits, whether private or through the federal       08:44

11   government; correct?                                   08:44

12       A.   Yes.                                          08:44

13       Q.   And your testimony would be the same if I     08:44

14   were to ask you all those questions again?             08:44

15       A.   Yes.                                          08:44

16       Q.   In other words, your testimony applies        08:44

17   equally to each of the individual plaintiffs in this   08:44

18   case on this topic?                                    08:44

19       A.   Yes, that's correct.  This is the statement   08:44

20   that I read at the time of each of the hearings, and   08:44

21   it should be documented in the transcript of those     08:44

22   hearings.                                              08:44

23       Q.   Okay.  Turning your attention to Line 40,     08:44

24   Mr. -- and is it Thoele or Thoele[phonetic]?  I'm      08:44

25   not really sure.  Do you know?                         08:44
```

| | | |
|---|---|---|
| 1 | A.    I believe Thoele. | 08:44 |
| 2 | Q.    Thoele?  Okay. | 08:44 |
| 3 | A.    Thoele. | 08:45 |
| 4 | Q.    Okay.  Great. | 08:45 |
| 5 | He asks you the question at Line 40: | 08:45 |
| 6 | "Dr. Heligman, what rules did | 08:45 |
| 7 | the employees violate?" | 08:45 |
| 8 | Do you see that? | 08:45 |
| 9 | A.    I do. | 08:45 |
| 10 | Q.    And can you read your answer, please? | 08:45 |
| 11 | A.    Yes. | 08:45 |
| 12 | "The employees violated Rule | 08:45 |
| 13 | 104.2 when they were | 08:45 |
| 14 | dishonest.  104.2 is" -- and | 08:45 |
| 15 | it continues on the next page | 08:45 |
| 16 | -- "employee behavior must be | 08:45 |
| 17 | respectful and courteous. | 08:45 |
| 18 | Employees must not be any of | 08:45 |
| 19 | the following:  A. Dishonest, | 08:45 |
| 20 | or B. Insubordinate, or C. | 08:45 |
| 21 | Disloyal, or D. Quarrelsome." | 08:45 |
| 22 | Q.    Yeah, and it continues, but you don't need | 08:45 |
| 23 | to read all that. | 08:45 |
| 24 | That -- was that still part of the written | 08:45 |
| 25 | statement? | 08:45 |

389

| | | |
|---|---|---|
| 1 | A.   Yes. | 08:45 |
| 2 | Q.   Okay.  And do you stand behind that | 08:45 |
| 3 | testimony today? | 08:45 |
| 4 | A.   Yes.  It was -- the rule is the rule, and I | 08:45 |
| 5 | would stand behind it, yes. | 08:45 |
| 6 | Q.   Okay.  And did your investigation conclude | 08:45 |
| 7 | that the employees had violated those rules? | 08:45 |
| 8 | A.   Yes. | 08:46 |
| 9 | Q.   Okay.  Now, there's mention there at the | 08:46 |
| 10 | bottom about: | 08:46 |
| 11 | "CSX[T] Code of Ethics is a | 08:46 |
| 12 | zero-tolerance policy." | 08:46 |
| 13 | Do you see that? | 08:46 |
| 14 | A.   I do. | 08:46 |
| 15 | Q.   Okay.  Can you tell me -- I mean, do you | 08:46 |
| 16 | have any information on that other than the | 08:46 |
| 17 | statement of the policy? | 08:46 |
| 18 | A.   Well, again, the -- | 08:46 |
| 19 | Q.   What does that mean?  Yeah. | 08:46 |
| 20 | A.   -- the statement was part of the charges. | 08:46 |
| 21 | It was the findings of the decision-makers at the | 08:46 |
| 22 | company after reviewing the transcripts of the | 08:46 |
| 23 | investigation that leveraged the final decision. | 08:46 |
| 24 | But I have no reason to disagree with it, and so the | 08:46 |
| 25 | statements I made are the statements I made.  And | 08:46 |

<div align="right">390</div>

Craig Heligman, M.D.                                                    April 29, 2021

| | | |
|---|---|---|
| 1 | the question is that the CSXT Code of Ethics is a | 08:46 |
| 2 | zero-tolerance policy. | 08:46 |
| 3 | And did you ask me what that meant? | 08:46 |
| 4 | Q. Yeah. | 08:46 |
| 5 | I mean, other than reading from the | 08:46 |
| 6 | statement, what -- did you ever have any training on | 08:46 |
| 7 | what that means in terms of where the rubber hits | 08:46 |
| 8 | the road, about what that means to have a | 08:46 |
| 9 | zero-tolerance policy? | 08:47 |
| 10 | A. I mean, a zero-tolerance policy is | 08:47 |
| 11 | basically if -- it doesn't matter as to the size or | 08:47 |
| 12 | the volume or the cost of the infraction. There's a | 08:47 |
| 13 | zero-tolerance for dishonesty. If you submit an | 08:47 |
| 14 | inappropriate expense report even one time, it's a | 08:47 |
| 15 | terminable offense. And that's what the code of | 08:47 |
| 16 | ethics is really trying to -- to target. | 08:47 |
| 17 | Q. Okay. Okay. If I could draw your | 08:47 |
| 18 | attention to Page 46 or Bates No. 978. | 08:47 |
| 19 | A. I'm sorry. Which page was that again? | 08:47 |
| 20 | Q. It's Page 46. | 08:47 |
| 21 | A. Okay. | 08:47 |
| 22 | Q. At Line 20 -- if you could take a look and | 08:48 |
| 23 | review Line 21 through 29, please. | 08:48 |
| 24 | A. Okay. | 08:48 |
| 25 | Q. So Mr. Grissom has asked you the question, | 08:48 |

391

1    pulling some language out of your July 14th letter,    08:48

2    which I believe is the one to the Railroad    08:48

3    Retirement Board, on the topic of:    08:48

4              "In the past, we had suspicion    08:48

5               that the providers were moving    08:48

6               our employees from working    08:48

7               inappropriately."    08:48

8         Do you see where I read that?    08:48

9    A.   Yes.  Actually, the -- the word isn't    08:48

10   "moving."  It should have been "removing."    08:48

11   Q.   I assumed there was a type error there.    08:48

12        When you were -- when Mr. Grissom asked you    08:48

13   the question how long ago in the past you had those    08:48

14   suspicions, it looks like you responded:    08:48

15              "Over at least 10 years [ago]."    08:48

16        Is that correct?    08:48

17   A.   Right.  I was referencing conversations    08:48

18   that we discussed yesterday that I had with my    08:48

19   predecessor.    08:49

20   Q.   Okay.  That's what I figured.  That's    08:49

21   Dr. Neilson?    08:49

22   A.   Yes, sir.    08:49

23   Q.   Because you weren't at CSX ten years ago    08:49

24   from 2017; right?    08:49

25   A.   Yes, that's correct.    08:49

                                                        392

Craig Heligman, M.D.                                                    April 29, 2021

```
 1        Q.   Okay.  And you weren't doing any consulting   08:49
 2   with CSX ten years prior to 2017?                       08:49
 3        A.   No.                                            08:49
 4        Q.   Okay.  So this is -- "ten years ago" refers   08:49
 5   to conversations that you had with Dr. Neilson          08:49
 6   concerning the chiropractors or just one of the         08:49
 7   chiropractors?                                           08:49
 8        A.   Predominantly it was Dr. Johnson.  Again,     08:49
 9   we -- I had discussed Dr. Johnson's presence in that    08:49
10   community with Dr. Neilson, and we had discussed it     08:49
11   a couple of times, if not more, with each other.        08:49
12             Dr. Neilson had been with the company, I      08:49
13   believe, since 2001, prior to me -- to my arrival in    08:49
14   2012.  And so that "over ten years" phrase was          08:49
15   really a collective experience of referencing myself    08:50
16   and Dr. Neilson's experience based on conversations     08:50
17   I had had with Dr. Neilson.                             08:50
18        Q.   Okay.  And the suspicions that existed for    08:50
19   over the past ten years were that Dr. Johnson was       08:50
20   completing COII forms inappropriately or               08:50
21   unethically?                                            08:50
22        A.   The concern was that he was withholding       08:50
23   employees for reasons other than, perhaps,             08:50
24   appropriate medical indications.                       08:50
25        Q.   Okay.  And that suspicion dating back over    08:50
```

                                                              393

| | | |
|---|---|---|
| 1 | ten years via Dr. Neilson, is that something that | 08:50 |
| 2 | you considered when you initiated or generated the | 08:50 |
| 3 | charges against the plaintiffs in your conclusions | 08:50 |
| 4 | of the same investigation? | 08:50 |
| 5 | A.   Certainly I can't erase my memory.  So when | 08:50 |
| 6 | we started seeing this volume from those two | 08:51 |
| 7 | practitioners at that moment in time, I think it | 08:51 |
| 8 | actually led me to believe that our suspicions may | 08:51 |
| 9 | have been correct and that they should be further | 08:51 |
| 10 | investigated. | 08:51 |
| 11 | Q.   If I can draw your attention to Page 48 and | 08:51 |
| 12 | 49, please. | 08:51 |
| 13 | A.   You said 48? | 08:51 |
| 14 | Q.   Yeah, I believe it starts at 48 and goes | 08:51 |
| 15 | over to 49, so -- but, yes, certainly 48. | 08:51 |
| 16 | A.   Okay.  Which..? | 08:51 |
| 17 | Q.   Yup, at the very -- Lines 41 through 43 on | 08:51 |
| 18 | Page 48, please, if you could review those. | 08:51 |
| 19 | A.   Yes, I've reviewed them. | 08:51 |
| 20 | Q.   And then I'll turn -- I'll turn the page to | 08:51 |
| 21 | your -- to your answer at Lines 2 through -- 2 and | 08:51 |
| 22 | 3. | 08:51 |
| 23 | Do you see that? | 08:51 |
| 24 | A.   Yes, I do. | 08:51 |
| 25 | Q.   Okay.  We talked about it briefly, but I | 08:51 |

<div align="right">394</div>

1    don't think we had your prior testimony.                08:52

2              But do you agree that with respect to the     08:52

3    three insurance plans that the railroaders are          08:52

4    covered for, that it's standard, as you say here, to    08:52

5    have between 22 and 26 visits approved for              08:52

6    chiropractic treatment?                                 08:52

7        A.   Right.  The -- the question that was posed     08:52

8    to me was that under the National Healthcare Plan of    08:52

9    United Healthcare, that the plan allows for 26          08:52

10   visits per year for a patient to go see a               08:52

11   chiropractor.                                           08:52

12             And my response is that that was pretty       08:52

13   standard.  In my experience at -- in my experience     08:52

14   with other health care insurance companies, 22 to 26   08:52

15   visits per year for chiropractic care is not at all    08:52

16   unusual.                                                08:52

17       Q.   Okay.  And just to be clear, I mean, the      08:52

18   three types of health insurance that the railroaders   08:52

19   are eligible for fall under that GA-23,000 National    08:52

20   Healthcare Plan?                                        08:52

21       A.   Yes, that's correct.                           08:52

22       Q.   Okay.  And, again, this -- that range of 22   08:52

23   to 26 visits is part of an insurance plan about what   08:53

24   will be paid as opposed to what is medically           08:53

25   appropriate; is that correct?                           08:53

                                                           395

```
 1        A.   Yes, the insurance companies have          08:53
 2   determined that this is the allowable coverage for   08:53
 3   chiropractic care.  How they arrived at that number  08:53
 4   of visits is -- you'd have to ask the various        08:53
 5   insurance companies how they made that               08:53
 6   determination.  Whether or not it was based on any   08:53
 7   specific body of medical literature, I just couldn't 08:53
 8   say.                                                 08:53
 9        Q.   Okay.  All right.  If I could draw your    08:53
10   attention to Page 54, please.                        08:53
11        A.   Okay.  And that's Bates No. 986?           08:54
12        Q.   Correct.  Yep.  And we're going to look at, 08:54
13   you know, around Lines 10 through 18, please.        08:54
14        A.   Okay.                                      08:54
15        Q.   Okay.  So the question I have for you is -- 08:54
16   well, first, do you agree that -- with your          08:54
17   testimony that you responded "Yes" to the question   08:54
18   that:                                                08:54
19             "The furloughs made this a                 08:54
20               significant part of [the]                08:54
21               evidence toward[s] your                  08:54
22               investigation?"                          08:54
23             Do you see that?                           08:54
24        A.   Yes, I do.                                 08:54
25        Q.   Okay.  So I just want to break that down   08:54
```

| | | |
|---|---|---|
| 1 | just for clarity. | 08:54 |
| 2 | Your testimony the other day was that when | 08:54 |
| 3 | you originally received -- or your department | 08:54 |
| 4 | originally received the COII forms, you were not | 08:54 |
| 5 | aware of any upcoming furloughs; is that correct? | 08:54 |
| 6 | A.   That is correct. | 08:54 |
| 7 | Q.   Okay.  Is it correct to say that once you | 08:54 |
| 8 | became aware of the furloughs, that that was a | 08:54 |
| 9 | significant factor in your investigation? | 08:54 |
| 10 | A.   Yes. | 08:54 |
| 11 | Q.   Okay.  You're aware, though, however, that | 08:54 |
| 12 | many of the plaintiffs in this case were not subject | 08:55 |
| 13 | to furlough; is that correct? | 08:55 |
| 14 | A.   I wasn't aware of that until later. | 08:55 |
| 15 | But the answer is yes, I was aware that all | 08:55 |
| 16 | the COIIs for employees in this group, not all of | 08:55 |
| 17 | them were on a furlough list. | 08:55 |
| 18 | Q.   Okay.  And when did you learn that | 08:55 |
| 19 | information? | 08:55 |
| 20 | A.   It was, again, somewhere in that period | 08:55 |
| 21 | between after we started seeing the first volume of | 08:55 |
| 22 | forms and the time that I had sent the letter to the | 08:55 |
| 23 | RRB Inspector General's office. | 08:55 |
| 24 | Q.   Okay.  So by the time that you testified at | 08:55 |
| 25 | any of these hearings that we're going through, you | 08:55 |

397

Craig Heligman, M.D.                                              April 29, 2021

1      were aware that not all of the plaintiffs in this          08:55

2      case were subject to furlough; is that correct?           08:55

3          A.   Yes, by the time that this investigation          08:55

4      was held, I was aware of that.                             08:55

5          Q.   Okay.  Do you remember where that                 08:55

6      information came to you from; that is, which              08:55

7      employees were subject to furlough and which             08:55

8      weren't?                                                   08:55

9          A.   It was either from our HR group or Labor          08:56

10     Relations.  They would have held those lists.  I          08:56

11     don't know the specific person that showed me the         08:56

12     list.  I -- I never actually had a copy of the            08:56

13     documents.  I was just shown various lists.               08:56

14         Q.   Okay.  Back in 2017, where did you                08:56

15     physically work?                                           08:56

16         A.   I work at the headquarters building at 500        08:56

17     Water Street in Jacksonville, Florida.                     08:56

18         Q.   Okay.  And that's been the case since at          08:56

19     least 2017 to the present?                                 08:56

20         A.   It's the only place I've been since working       08:56

21     with -- for CSX.                                           08:56

22         Q.   Okay.  And where -- and is that true that's       08:56

23     where the Medical Department is located as well?          08:56

24         A.   Yes.                                              08:56

25         Q.   Okay.  And where is the Labor Relations           08:56

                                                                       398

| | | |
|---|---|---|
| 1 | Department located? | 08:56 |
| 2 | A.   They're -- at that time, they were in a | 08:56 |
| 3 | different part of Jacksonville.  We had rented some | 08:56 |
| 4 | other office buildings. | 08:56 |
| 5 | Q.   Okay.  So in 2017, the Medical Department | 08:56 |
| 6 | was still in Jacksonville but in a different | 08:57 |
| 7 | physical building? | 08:57 |
| 8 | A.   Right, and Labor Relations was in a | 08:57 |
| 9 | separate office building that we had leased.  Since | 08:57 |
| 10 | that time, we've consolidated many of our buildings | 08:57 |
| 11 | and people into the headquarters building. | 08:57 |
| 12 | Q.   Okay.  So Labor Relations is in the same | 08:57 |
| 13 | building as you are right now? | 08:57 |
| 14 | A.   Yes. | 08:57 |
| 15 | Q.   Okay.  Do you recall roughly when that move | 08:57 |
| 16 | occurred? | 08:57 |
| 17 | A.   Again, when we had new leadership come in | 08:57 |
| 18 | in 2017, there was a series of changes.  When their | 08:57 |
| 19 | move actually occurred, I couldn't say.  It may have | 08:57 |
| 20 | been in 2018 or so.  Just -- just in the last few | 08:57 |
| 21 | months, they moved all of us onto the same floor. | 08:57 |
| 22 | So we've made many, many changes in our organization | 08:57 |
| 23 | since 2017. | 08:57 |
| 24 | Q.   Okay.  And just for the sake of the record, | 08:57 |
| 25 | when you say they moved "us" to the same floor, | 08:57 |

399

```
 1    you're referring to Labor Relations and Medical?     08:57

 2        A.   Yes.                                         08:58

 3        Q.   Okay.  And back in 2017 to the present,      08:58

 4    where is the Human Resource Department located?       08:58

 5        A.   They've been mostly in the headquarters      08:58

 6    building.  They had some individuals that were in     08:58

 7    other locations.  They had also sent some             08:58

 8    individuals out to the field offices.  And, once      08:58

 9    again, as of just several weeks ago, I am now on the  08:58

10    same floor with both Labor Relations and Total        08:58

11    Rewards and Human Resources.                          08:58

12        Q.   Okay.  I'm sorry.  What's Total Rewards?     08:58

13    Sounds like something where I get gas.                08:58

14        A.   Total Rewards -- there's a different vice    08:58

15    president that we consider over our kind of Human     08:58

16    Resources group and relative to our Total Rewards.    08:58

17    Total Rewards is predominantly the benefits arm, and  08:58

18    they relocated myself and my team from one part of    08:58

19    the company and moved us under the vice president of  08:59

20    Total Rewards.                                        08:59

21        Q.   Okay.  And since 2017 to the present, is     08:59

22    the Legal Department also located at 500 Water         08:59

23    Street in Jacksonville?                               08:59

24        A.   Yes.                                         08:59

25        Q.   Okay.  All right.  If I could draw your      08:59
```

| 1 | attention to Page 26, please. | 08:59 |
| 2 | A.   And is that Bates No. 1004? | 08:59 |
| 3 | MS. FOSTER BIRD:  Did you say 26 or do you | 08:59 |
| 4 | mean 56? | 08:59 |
| 5 | MR. PAUL:  I said 56.  I'm sorry. | 08:59 |
| 6 | MS. FOSTER BIRD:  I'm sorry. | 08:59 |
| 7 | THE WITNESS:  56?  Okay. | 08:59 |
| 8 | BY MR. PAUL: | 08:59 |
| 9 | Q.   Yeah.  No, I may have misspoke. | 08:59 |
| 10 | A.   So we're on 0988? | 08:59 |
| 11 | Q.   Correct.  Yep.  Thank you. | 08:59 |
| 12 | A.   Okay. | 08:59 |
| 13 | Q.   And drawing your attention to Lines 26 | 09:00 |
| 14 | through 34, please. | 09:00 |
| 15 | A.   Yes. | 09:00 |
| 16 | Q.   All right.  So we've talked before about | 09:00 |
| 17 | the -- at least three different ways of -- of the | 09:00 |
| 18 | fraud upon the Railroad Retirement or insurance | 09:00 |
| 19 | extended benefits.  I believe we've covered that; | 09:00 |
| 20 | correct?  So I don't think we need to go there. | 09:00 |
| 21 | But your testimony, starting at | 09:00 |
| 22 | Page[sic] 30, states: | 09:00 |
| 23 | "I'm saying that there was a | 09:00 |
| 24 | likelihood of concerted | 09:00 |
| 25 | effort, either consciously or | 09:00 |

<div align="right">401</div>

```
 1                    unconsciously, among[st] the          09:00

 2                    employees who are seeking care         09:00

 3                    from these two providers               09:00

 4                    because they know, when they           09:00

 5                    go to this provider, that              09:00

 6                    [the] provider will do                 09:00

 7                    whatever the employee wants            09:00

 8                    them to do."                           09:00

 9               Do you see where I read that?               09:00

10          A.   Yes.                                        09:00

11          Q.   And do you stand behind that testimony?     09:00

12          A.   Yes.  And I think that it's a -- again,     09:00

13     it's an advocacy relationship between a provider and  09:00

14     their patient.  And patients will know what to        09:01

15     expect in most cases if they've seen a practitioner   09:01

16     before or if they were referred to a particular       09:01

17     practitioner by someone they trust.                   09:01

18          Q.   Okay.  Can you explain how one of the       09:01

19     plaintiffs in this case or any of the plaintiffs in   09:01

20     this case could unconsciously defraud the United      09:01

21     States Railroad Retirement Board, CSX, or insurance   09:01

22     companies?                                            09:01

23          A.   Probably "subconsciously" is the better     09:01

24     term.  But, again, we're going back to the issue of   09:01

25     what the psychosocial issues are with regard to an    09:01
```

<div align="right">402</div>

```
 1    interaction between a person and their health care      09:01

 2    provider.                                               09:01

 3            So if you have an individual -- and I'll        09:01

 4    use the example in this case where there's a concern    09:01

 5    that an individual may be losing their job -- and       09:01

 6    they know that if they were off work for medical        09:02

 7    reasons, that their benefits would be extended, it      09:02

 8    would make sense that they would seek out a health      09:02

 9    care professional that they had a high likelihood or    09:02

10    probability that that health care provider would        09:02

11    fill out a form on their behalf.                        09:02

12            In other words, the provider would be known     09:02

13    to be advocating for the employee.  If the person       09:02

14    were to come to that provider and say "I hurt and I     09:02

15    can't work," that that practitioner would take that     09:02

16    at face value and complete a form saying that the       09:02

17    employee hurts and the employee can't work.             09:02

18            So when I say "subconsciously" or -- or         09:02

19    unfortunately I used the word "unconsciously" in        09:02

20    that statement -- the interaction between the           09:02

21    provider and the practitioner is that they may both     09:03

22    understand what they're doing but they're not making    09:03

23    an -- a specific statement to that degree.              09:03

24       Q.   Okay.  Can you just for the record describe     09:03

25    what the difference between "unconscious" and           09:03
```

<div align="right">403</div>

1    "subconscious" is?                                  09:03

2        A.    "Unconscious" implies that you're obviously  09:03

3    unconscious.  You're not alert at all.             09:03

4    "Subconscious" would be that you're alert and you  09:03

5    may be doing things that you're not overtly making 09:03

6    an attempt to do, but you're trying to potentially 09:03

7    color the -- the conversation or lead someone down a 09:03

8    particular pathway subconsciously.  Not -- it's not 09:03

9    a formal intent.  It's a -- it's not that they don't 09:03

10   believe what they're saying, but they are trying to 09:03

11   color the -- the interpretation of their statements. 09:03

12        And perhaps I'm not explaining that very      09:04

13   well, but it's a distinction between someone that's 09:04

14   passed out, being unconscious, and a person that   09:04

15   subconsciously is trying to use forms other than   09:04

16   overt statements to reach a conclusion.            09:04

17       Q.    Okay.  In either event, whether it's     09:04

18   unconscious or subconscious, do you agree that it is 09:04

19   not intentional conduct?                           09:04

20       A.    Again, I can't make a statement about    09:04

21   intent.  That's something that is individualized.  09:04

22   You would have to ask other individuals what their 09:04

23   intentions were.  All I'm saying is that I         09:04

24   understand the dynamics that take place between a  09:04

25   practitioner and their patient, and I understand   09:04

                                                          404

Craig Heligman, M.D.                                    April 29, 2021

```
 1    that you need to consider the social -- or excuse me   09:04

 2    -- the psychosocial and potentially economic reasons   09:04

 3    for why a patient may tell you a certain piece of      09:04

 4    information.                                           09:04

 5       Q.    Okay.  Well, I think we can certainly agree   09:04

 6    with the first one.  If someone is unconscious,        09:05

 7    would you agree that they cannot intentionally         09:05

 8    defraud CSX, the Railroad Retirement Board, or an      09:05

 9    insurance company?                                     09:05

10       A.    Yes.                                          09:05

11       Q.    Okay.  Can we agree that if someone is        09:05

12    subconsciously, that they are not -- if they are       09:05

13    subconscious, they are not intentionally defrauding    09:05

14    CSX, the Railroad Retirement Board, or an insurance    09:05

15    company?                                               09:05

16       A.    I think they're making an attempt to          09:05

17    influence, but it's not an overt level of influence.   09:05

18    So that's why we declared it a subconscious form of    09:05

19    influencing someone's determination.  You would have   09:05

20    to ask a person what their intentions were by making   09:05

21    whatever statement they may have made, and I can't     09:05

22    do that because I'm not that person.                   09:05

23       Q.    And in this paragraph that we're reading      09:05

24    from, were you saying that there was a concerted       09:05

25    effort on behalf -- or by the employees or by the      09:05
```

405

```
 1   chiropractors or both?                          09:05

 2       A.   I'm saying it's a combination of factors.  09:06

 3   I'm saying that for whatever the motivating factor  09:06

 4   was for these employees, they chose these two    09:06

 5   practitioners for a reason, whatever that reason  09:06

 6   was, and the outcome by going to see those       09:06

 7   practitioners was that they were able to secure a  09:06

 8   COII that was signed by the practitioner holding  09:06

 9   them out of work.                                09:06

10       Q.   And you believe that that had been going on  09:06

11   for over ten years; is that correct?            09:06

12       A.   Yes.                                    09:06

13       Q.   In the statement that you say that the    09:06

14   "provider" --                                    09:06

15            You're referring to Dr. Johnson and     09:06

16   Dr. Carey; correct?                             09:06

17       A.   Yes.                                    09:06

18       Q.   -- that they will do "whatever the employee  09:06

19   wants them to do," would you agree that that falls  09:06

20   within the classification of a hired gun or a whore  09:06

21   doctor?                                         09:07

22       A.   No, I think this, again, goes back to the  09:07

23   dynamics of the patient/doctor relationship.  When I  09:07

24   see a patient and -- and mostly these patients that  09:07

25   I see are coming from workplaces.  I'm an       09:07
```

```
 1   occupational medicine physician.  Almost my entire    09:07

 2   practice was related to employees that were seeking    09:07

 3   medical care, for one reason or another, as part of    09:07

 4   their employment relationship.                         09:07

 5        People may not like their employer, but           09:07

 6   they may not say it.  They may not like their work,    09:07

 7   but they may not say it.  They may experience          09:07

 8   symptoms because -- not because of a physical issue,   09:07

 9   but because of their psychosocial environment.         09:07

10        Whether it's a manifestation of their             09:07

11   psychosocial environment or their psychosocial         09:07

12   experience versus a true physical change in their      09:08

13   body, if you don't understand how those things         09:08

14   interact, you can make mistakes on how you treat       09:08

15   that individual.                                       09:08

16        You must treat a patient holistically.  You       09:08

17   must not just look at the arm and say, "Oh, it's an    09:08

18   arm" and only treat the arm.  If you don't treat the   09:08

19   whole person, you will make mistakes on how you        09:08

20   treat that person.                                     09:08

21   Q.   When you -- let me ask you about your             09:08

22   recollection of the Certificate of Ongoing             09:08

23   Illnesses, and certainly if we need to look at them,   09:08

24   we can.                                                09:08

25        Is it your recollection that not one of the       09:08
```

```
 1   Certificate of Ongoing Illnesses said that the      09:08
 2   plaintiffs in this case were permanently disabled?  09:08
 3        A.   I don't recall seeing that statement on any 09:08
 4   of those forms.                                      09:08
 5        Q.   Okay.  And is it your recollection that    09:08
 6   those forms, in terms of a range, provided a         09:08
 7   potential return to work usually in the range of one 09:09
 8   to two months?  There are exceptions, but...         09:09
 9        A.   For the most part, it was two months.      09:09
10   Exactly.                                             09:09
11        Q.   Okay.  So it's accurate to say that none of 09:09
12   the COIIs were trying to take these plaintiffs --    09:09
13   the plaintiffs in this case -- off of work           09:09
14   permanently?                                         09:09
15        A.   The purpose of the COII was, again, to get 09:09
16   a snapshot of information to support the employee's  09:09
17   responsibility under the Collective Bargaining       09:09
18   Agreement.  On that form, we ask the provider to     09:09
19   state, to the best of their ability, what they think 09:09
20   the person's estimated time frame for their return   09:09
21   would be.  That could be extended or shortened,      09:09
22   depending upon when the next visit was and what the  09:09
23   condition of the patient is at the following visit.  09:09
24        However, on these sets of cases for those       09:09
25   individuals that had been seeing either Dr. Carey or 09:10
```

Craig Heligman, M.D.                                    April 29, 2021

```
 1 | Dr. Johnson over time, they would return to have a    09:10
 2 | COII completed at two-month intervals.                09:10
 3 |       And so while none of them made the              09:10
 4 | statement of permanent disability, it seemed that it  09:10
 5 | was very consistent that every two months they would  09:10
 6 | return to Dr. Carey or Dr. Johnson and receive        09:10
 7 | another COII extending their time off by two months.  09:10
 8 |    Q.   And when it comes to that two-month period    09:10
 9 | for those examples where that's accurate, do you      09:10
10 | have any understanding of where that two months came  09:10
11 | from?                                                 09:10
12 |    A.   You would have to ask the practitioners why   09:10
13 | they used that time interval.                         09:10
14 |    Q.   Okay.  Because if -- [technical               09:10
15 | difficulties] --                                      09:10
16 |       I just got a bad connection all of a            09:10
17 | sudden.  Can you -- can you hear me?                   09:10
18 |    A.   You're freezing up a little bit, but I'm      09:10
19 | hearing you now.                                      09:10
20 |    Q.   Okay.  Yeah.                                  09:11
21 |    A.   Now your photo is definitely frozen.          09:11
22 |       [Technical difficulties.]                       09:11
23 |       MR. PAUL:  All right.  Now it looks like        09:11
24 | everybody's back.  Is it -- do you think this is on   09:11
25 | my end?                                               09:11
```

                                                                409

| | | |
|---|---|---|
| 1 | Let's go off -- can we go off the record | 09:11 |
| 2 | for a minute?  I gotta fix this. | 09:11 |
| 3 | THE VIDEOGRAPHER:  Off the record at | 09:11 |
| 4 | 9:11 a.m. | 09:11 |
| 5 | (Recess taken.) | 09:18 |
| 6 | THE VIDEOGRAPHER:  We are back on the | 09:18 |
| 7 | record at 9:18 a.m. | 09:18 |
| 8 | BY MR. PAUL: | 09:18 |
| 9 | Q.   Okay.  Dr. Heligman, we're back on the | 09:18 |
| 10 | record after a short break.  We're done with that | 09:18 |
| 11 | exhibit, and I would ask you to take a look at -- | 09:18 |
| 12 | what are we up to?  9?  Let me see.  Yeah, 10, | 09:18 |
| 13 | rather, I'm sorry.  This is marked Exhibit 10. | 09:18 |
| 14 | A.   Okay. | 09:18 |
| 15 | (Exhibit 10 was marked for identification and | |
| 16 | attached to the transcript.) | 09:18 |
| 17 | MR. PAUL:  Let me know if everybody's able | 09:18 |
| 18 | to see that. | 09:18 |
| 19 | THE WITNESS:  I have it open. | 09:18 |
| 20 | BY MR. PAUL: | 09:18 |
| 21 | Q.   Okay.  Great. | 09:18 |
| 22 | This is a transcript for three individuals | 09:18 |
| 23 | starting with Mr. Adkins, Marshall, and Maynard, and | 09:19 |
| 24 | I draw your attention to Page 31, please. | 09:19 |
| 25 | A.   And, again, that's Bates No. 2123? | 09:19 |

410

Craig Heligman, M.D.                                            April 29, 2021

```
 1         Q.   That's correct.  Yup.                      09:19

 2         A.   Okay.                                      09:19

 3         Q.   Okay.  Let me find that line.  Okay.  Line  09:19

 4    29, please, Mr. Edmonds asked you the question:       09:19

 5              "Have you researched their                  09:19

 6                medical records further than              09:19

 7                these forms that were                     09:19

 8                presented in Exhibit D?"                  09:19

 9              See where I read that?                      09:19

10         A.   Yes.                                        09:20

11         Q.   Okay.  And your testimony was:              09:20

12              "I had no reason to do so."                 09:20

13              Is that correct?                            09:20

14         A.   That's correct.                             09:20

15         Q.   Okay.  But I think we've established that   09:20

16    back in June and/or July of 2017, you -- you did, in  09:20

17    fact, review the medical records that CSX had in its  09:20

18    possession on the computer; is that correct?          09:20

19         A.   I did.                                      09:20

20              But the question "Have you researched their 09:20

21    medical records further than the forms that were      09:20

22    presented," I guess it was my interpretation that he  09:20

23    was referencing the actual health record, the care    09:20

24    provided by the practitioner, and I had not reviewed  09:20

25    those.  Perhaps I misinterpreted the question at      09:20
```

                                                                  411

1    that time.                                        09:20

2        Q.   Oh, I see.                               09:20

3        A.   I did -- I did review their employee health    09:20

4    record, and there may or may not have been any    09:20

5    actual medical records or other COII forms or other    09:20

6    forms in that record.                             09:20

7        Q.   Okay.  So is it your testimony that the way    09:20

8    you understood that question on Page 31 is "Did you    09:21

9    review the underlying chiropractic treatment notes    09:21

10   for the COII?"                                    09:21

11       A.   Right, that was my interpretation, and    09:21

12   maybe I misinterpreted the question.             09:21

13       Q.   Okay.  And then is your answer the same in    09:21

14   that context, that you had no reason to review the    09:21

15   underlying chiropractic notes for the COII?       09:21

16       A.   That's correct.  Again, the COII form is    09:21

17   used for administrative purposes for the employee to    09:21

18   be able to be responsive to their obligations under    09:21

19   the Collective Bargaining Agreement.  It doesn't    09:21

20   constitute a medical record.                      09:21

21       Q.   Okay.  So -- but to further elaborate --    09:21

22   not on this transcript, but your testimony yesterday    09:21

23   is that you did, in fact, review actual medical    09:21

24   records that were in CSX's possession back in June    09:21

25   and July of 2017?                                 09:22

                                                      412

```
 1        A.   If there were medical records in there,      09:22
 2   then, yes, I looked at them.  But there are some --     09:22
 3   actually, fewer medical records than there were         09:22
 4   forms and examinations that we may have done            09:22
 5   required by regulation or for other reasons.  We        09:22
 6   don't typically have a lot of personal medical          09:22
 7   records in the employee's health file.                  09:22
 8        Q.   Okay.  All right.  If you could turn the      09:22
 9   page, please, to Page 32, Bates No. 2124.               09:22
10        A.   Okay.                                         09:22
11        Q.   So, I mean, to understand the question, I     09:22
12   think you need to start at Line 1 and go down to 18.    09:22
13   If you need to review that, just take your time and     09:23
14   let me know when you're ready.                          09:23
15        A.   Okay.                                         09:23
16        Q.   With respect to these three individuals, I    09:23
17   mean, would you agree that you have no reason to         09:23
18   believe that they did not have legitimate illnesses     09:23
19   as reported on the Certificate of Ongoing Illness?      09:23
20        A.   I never said that they had or that they       09:23
21   didn't have legitimate reasons to seek care.  The       09:23
22   question was that these individuals:                    09:23
23             "Have been lumped into a group               09:23
24              of others, yet these three                  09:23
25              could have legitimate                       09:23
```

                                                                413

Craig Heligman, M.D.                                                    April 29, 2021

```
 1                    illness."                        09:23

 2        I said Yes:                                   09:23

 3              "There's [..] that possibility,         09:23

 4              but then I don't know if                09:23

 5              that's probable or not at this          09:23

 6              point in time."                         09:24

 7      Q.   Well, at any point in time, going back to  09:24

 8   the summer of 2017 till today, I mean, is it correct  09:24

 9   to say that you don't have any reason to believe   09:24

10   that all of the plaintiffs' medical illnesses were  09:24

11   legitimate?                                        09:24

12      A.   Well, again, I wasn't -- wasn't using the  09:24

13   COIIs to be particularly critical of anyone's      09:24

14   medical care.  The form was used for administrative  09:24

15   reasons so that the employee may be responsive to  09:24

16   their responsibility under the Collective Bargaining  09:24

17   Agreement.                                         09:24

18           And as I stated before, the COII is not a  09:24

19   medical record.  And I can make some personal      09:24

20   judgments, based on my own clinical experience,    09:24

21   about any medical -- medically related statement,  09:24

22   but I can't say, one way or the other, whether a   09:24

23   person did or did not seek medical care            09:24

24   appropriately or whether or not that care was      09:24

25   delivered appropriately or inappropriately because I  09:25
```

                                                                        414

1    never have received the full medical file from -- on      09:25

2    any of these cases.                                       09:25

3        Q.   Okay.  I'm going to go back to the question      09:25

4    again.  I'm happy to allow you any opportunity to         09:25

5    explain, but if you could answer the question "Yes"       09:25

6    or "No," then we can at least get that part on the        09:25

7    record and move on to another topic.                      09:25

8            Is it correct to say for all of the               09:25

9    plaintiffs in this case that you do not have any          09:25

10   reason to believe that their illnesses were not           09:25

11   legitimate as reported in the Certificate of Ongoing      09:25

12   Illnesses?                                                09:25

13       A.   That would be a correct statement.               09:25

14       Q.   Okay.  And just to elaborate, I mean, CSX        09:25

15   has a Police Department; right?                           09:25

16       A.   We do.                                           09:25

17       Q.   And that Police Department has the ability       09:25

18   to conduct surveillance of individuals; is that           09:25

19   correct?                                                  09:25

20           MS. FOSTER BIRD:  I'm going to object to          09:25

21   the knowledge base here.  You probably need to            09:25

22   establish whether or not he has knowledge of what         09:25

23   the Police Department can do before --                    09:26

24   BY MR. PAUL:                                              09:26

25       Q.   Do you have any knowledge about --               09:26

                                                              415

```
 1              MR. PAUL:  I'm sorry.                    09:26
 2              MS. FOSTER BIRD:  -- before making a     09:26
 3    statement, kind of cross-examination-type, leading 09:26
 4    question that you did.                             09:26
 5              MR. PAUL:  I'm happy to rephrase it.     09:26
 6    BY MR. PAUL:                                       09:26
 7         Q.   Doctor, do you have any knowledge about  09:26
 8    CSX's resources to conduct surveillance either     09:26
 9    internally or externally on its employees?         09:26
10         A.   I have some knowledge, yes.              09:26
11         Q.   Okay.  What is that knowledge?           09:26
12         A.   The Claims Department, most commonly in the 09:26
13    course of their claims investigation, could use    09:26
14    private investigators to conduct surveillance in the 09:26
15    course of their claims assessment.                 09:26
16         Q.   Okay.  And is it correct to say that you're 09:26
17    not aware of any surveillance that was conducted on 09:26
18    behalf of CSX or by CSX on any of the plaintiffs in 09:26
19    this matter?                                       09:26
20         A.   No, not to my knowledge.                 09:26
21         Q.   Okay.  And it sounds like so far, I mean, 09:26
22    you agree that all the plaintiffs -- you have no    09:26
23    reason to believe they did not have a legitimate   09:26
24    medical illness.  You just question the length of  09:27
25    time and timing that the chiropractors took the    09:27
```

                                                             416

```
 1    plaintiffs off.                                    09:27

 2            Is that a fair summary?                    09:27

 3       A.   Fair statement except for one item.  Really  09:27

 4    they were seeing these providers for injuries, not  09:27

 5    for illnesses.                                     09:27

 6       Q.   Okay.  And can you just draw the           09:27

 7    distinction, please?                               09:27

 8       A.   Again, an injury is considered a -- more a  09:27

 9    point-in-time issue.  Illness is something that    09:27

10    occurs over time, for the most part, and is an     09:27

11    ongoing problem.                                   09:27

12            And I will -- I guess I would say that for  09:27

13    some of these individuals, they were seeking care  09:27

14    over time for a pain complaint, whether it's ongoing  09:27

15    chronic low back pain or some other ongoing pain   09:27

16    complaint, and I would allow that that would be    09:27

17    potentially considered an illness.  But many of them  09:27

18    were also seeking care for point-in-time events.   09:27

19       Q.   Okay.  And is it also a possibility that   09:27

20    some of the plaintiffs were treating for a         09:28

21    combination of both injuries and illnesses?        09:28

22       A.   Anything's possible.                       09:28

23       Q.   Well, I mean, isn't it possible that one of  09:28

24    the plaintiffs -- or any of the plaintiffs were    09:28

25    treating for a chronic pain condition that you would  09:28
```

Craig Heligman, M.D.                                                    April 29, 2021

```
 1    categorize that as an illness?                    09:28

 2          Is that correct?                            09:28

 3      A.   Yes.  If you're being very strict with     09:28

 4    categorization, someone that meets the definition of  09:28

 5    chronic pain would be considered an illness as    09:28

 6    opposed to an injury.                             09:28

 7      Q.   Okay.  And in addition to the treatment of  09:28

 8    that chronic illness, it's possible that any of the  09:28

 9    plaintiffs could have had a specific incident that  09:28

10    would be categorized as an injury?                09:28

11      A.   That would be a true statement, yes.       09:28

12      Q.   Okay.  And if that hypothetical person     09:28

13    continued to treat with a chiropractor, it could be  09:28

14    for a combination of both the specific injury and  09:28

15    the underlying chronic pain illness?              09:28

16      A.   Absolutely.  You could have a combination  09:28

17    of factors at any given time.                     09:29

18      Q.   Okay.  So on this topic round about Line   09:29

19    11, you state:                                    09:29

20              "The records for treatment and          09:29

21               full acknowledgment of what            09:29

22               care was provided would need           09:29

23               to be submitted for review."           09:29

24          Can you explain what you meant by that, in  09:29

25    particular, "full acknowledgment"?               09:29
```

418

Craig Heligman, M.D.                                                    April 29, 2021

```
 1        A.    Sure.                                    09:29

 2              So in order to make a fully informed     09:29

 3    medical opinion, what I was explaining there is that  09:29

 4    I would need to have the full treatment record, not  09:29

 5    necessarily just the treatment record from the two  09:29

 6    chiropractic providers.                            09:29

 7              But if other practitioners were involved in  09:29

 8    the care of the same condition, you would need to  09:29

 9    see those records as well to get a full picture of  09:29

10    what these individuals' health profile would be.   09:29

11    And, in fact, if you wanted to extend it even      09:29

12    further, if they're seeing individuals for other   09:30

13    health complaints and they have manifested as      09:30

14    similar pain complaints, you might need to see those  09:30

15    records.                                           09:30

16              All I was really trying to get at with that  09:30

17    comment was -- and I was trying to answer the      09:30

18    question posed to me, and the issue is what would  09:30

19    influence my decision-making on whether or not a,  09:30

20    quote-unquote, "legitimate illness" was present.   09:30

21    And all I was getting at was I can't do it from a  09:30

22    COII.  I need the actual medical records if you're  09:30

23    asking for a medical opinion.                      09:30

24        Q.    Okay.  And isn't that what you do in your  09:30

25    regular duties performing fitness-for-duty         09:30
```

                                                                       419

Craig Heligman, M.D.                                                    April 29, 2021

```
 1    evaluations?                                        09:30

 2        A.    In some respects.                         09:30

 3              So when we're doing a fitness-for-duty    09:30

 4    evaluation, you have to use the information that's  09:30

 5    made available to you at the moment in time.  You   09:30

 6    can't go on and request records for the entire      09:30

 7    lifespan of the person's health care experience.    09:30

 8    You need to make a determination based on the       09:31

 9    information provided, and once you have sufficient  09:31

10    information to be able to render a fitness-for-duty  09:31

11    opinion, you go ahead and do it.                    09:31

12        Q.    Okay.  But to be clear, you were not      09:31

13    required or asked to perform a fitness-for-duty on  09:31

14    any of the plaintiffs; correct?                     09:31

15        A.    That is correct.                          09:31

16        Q.    And -- and tell me if I'm wrong, but it   09:31

17    seems like in the normal course of things, you would 09:31

18    do a fitness-for-duty evaluation when an employee is 09:31

19    released to return to work?                         09:31

20        A.    We would do -- yes, you are correct.  When 09:31

21    they're released to return to work is when we do our 09:31

22    fitness-for-duty assessments.                       09:31

23              But the question that we're discussing from 09:31

24    the transcript is specific for these three          09:31

25    individuals.  The question was have they:           09:31
```

                                                                        420

```
 1              "Been lumped into a group of          09:31
 2                 others, yet these three could      09:31
 3                 have legitimate illness?"          09:31
 4         And I said that was a possibility and I    09:31
 5    didn't know if that was probable or not.        09:31
 6         The second question was:                   09:32
 7              "And what would it take to make       09:32
 8                 this probable?"                     09:32
 9         And I responded that:                       09:32
10              "The records for treatment and       09:32
11                 full acknowledgment of what       09:32
12                 care was provided would need      09:32
13                 to be submitted for review."      09:32
14         Meaning that the employee would need to   09:32
15    share their medical information with us in order to  09:32
16    render a medical opinion.  The point being I can't   09:32
17    really answer the question of probability or   09:32
18    possibility without seeing the actual medical  09:32
19    records.                                        09:32
20      Q.   I think -- I think that's clear, but, I  09:32
21    mean, back in 2017 and even, for that matter, at any  09:32
22    time concerning these plaintiffs, you -- you never  09:32
23    performed a medical evaluation to determine whether  09:32
24    there was a legitimate illness; correct?        09:32
25      A.   Again, there's no reason to do so.  We were  09:32
```

421

1    using the submission of a COII, and when we receive          09:32

2    a COII, we don't do a fitness-for-duty evaluation.          09:32

3    They're off work.                                            09:32

4        Q.   Right.  So, I mean, I guess -- I think              09:32

5    we're talking about the same thing.  I just want to         09:32

6    make it crystal clear.                                       09:32

7            I mean, there was no reason for you to do            09:32

8    so -- that is, perform a medical evaluation --               09:32

9    because you had no reason to doubt that each of the          09:33

10   plaintiffs have a legitimate medical illness?               09:33

11       A.   Again, I had no reason to look into it.  I         09:33

12   don't know if it was or wasn't legitimate.  The             09:33

13   document was being submitted for administrative             09:33

14   reasons, not for medical -- for review of                   09:33

15   fitness-for-duty purposes.                                   09:33

16       Q.   Sure.                                               09:33

17           Let me give you a comparison because I              09:33

18   believe you did say you had some duties as a medical         09:33

19   director with respect to the administration of the          09:33

20   FMLA; is that correct?                                       09:33

21       A.   I function in an advisory capacity.                 09:33

22       Q.   Okay.  Are you familiar with a circumstance         09:33

23   where an employee or an employee's health care              09:33

24   provider submits a certification for FMLA leave?            09:33

25       A.   Are you asking if I know that physicians            09:33

                                                            422

| | | |
|---|---|---|
| 1 | submit FMLA certification forms? | 09:33 |
| 2 | Q.   Yes. | 09:33 |
| 3 | A.   Yes, I'm aware of that. | 09:33 |
| 4 | Q.   Okay.  And have you at any time had any job | 09:33 |
| 5 | duties at CSX to review those medical certification | 09:33 |
| 6 | forms? | 09:33 |
| 7 | A.   I've reviewed some, not all. | 09:33 |
| 8 | Q.   Okay. | 09:34 |
| 9 | A.   A very small percentage, actually. | 09:34 |
| 10 | Q.   Okay.  Are you familiar with the process | 09:34 |
| 11 | that if the employer has reason to cast doubt on the | 09:34 |
| 12 | validity of the certification or if it's incomplete | 09:34 |
| 13 | in any manner, that you can -- that there's -- there | 09:34 |
| 14 | are some options including requesting clarification | 09:34 |
| 15 | from the health care provider? | 09:34 |
| 16 | A.   Yes, I'm aware of that. | 09:34 |
| 17 | Q.   Okay.  And under some circumstances, you | 09:34 |
| 18 | can even request a second opinion from another | 09:34 |
| 19 | doctor with respect to that FMLA certification? | 09:34 |
| 20 | A.   Yes, and if those two opinions disagree, | 09:34 |
| 21 | you're allowed to request a third opinion. | 09:34 |
| 22 | Q.   Okay.  So the point being, at least with | 09:34 |
| 23 | respect to the FMLA, an employer has some options if | 09:34 |
| 24 | they question the legitimacy of that certification | 09:34 |
| 25 | or the content of the material. | 09:34 |

                                                                    423

1          Do you agree with that?                    09:34

2     A.   Yes.                                        09:34

3     Q.   Okay.  Now, compare that to here and I      09:34

4  think -- I think we're on the same page here.  Just  09:34

5  trying to make it clear.                            09:34

6          With respect to these COII forms, there is  09:34

7  no reason for you to second-guess the COII forms or  09:35

8  question the legitimacy of the illness; correct?     09:35

9     A.   Correct.                                    09:35

10     Q.   Okay.  And that's the reason there was no    09:35

11  reason to do so, as you state here on Line 16 of     09:35

12  Page 32; is that accurate?                          09:35

13     A.   That's correct.  Yes, that's correct.       09:35

14     Q.   Okay.  All right.  I'm going to close this   09:35

15  exhibit and go to Exhibit 11, please.               09:35

16          (Exhibit 11 was marked        for identification  09:35

17  and attached to the transcript.)                    09:35

18          MR. PAUL:  Well, I guess I'm the one doing   09:35

19  it.  I'm asking myself to open it.                  09:35

20          Let me know if everybody can see it.        09:35

21          MS. FOSTER BIRD:  Say again which one,      09:35

22  Greg.  I'm sorry.  I was...                         09:35

23          MR. PAUL:  Yes, it's Exhibit 11.            09:35

24          MS. FOSTER BIRD:  Thank you.                09:35

25          MR. PAUL:  Yup.                             09:35

                                                       424

Craig Heligman, M.D.                                April 29, 2021

```
 1    BY MR. PAUL:                                    09:35

 2        Q.   Do you have it up, Doctor?            09:35

 3        A.   I do.                                 09:35

 4        Q.   Okay.  So this concerns a little larger  09:35

 5    group of people starting with a Mr. Sparling and  09:35

 6    going through Patterson.                        09:36

 7        A.   Yes, that's correct.                  09:36

 8        Q.   And if I can draw your attention to Page  09:36

 9    30, please.                                     09:36

10        A.   And that's Bates No. 3155?            09:36

11        Q.   That is correct, yeah.                09:36

12        A.   Okay.                                 09:36

13        Q.   With respect to this hearing and the  09:36

14    others, for that matter, did you ever have any  09:36

15    discussions with Mr. Thoele in advance of the   09:36

16    hearing concerning the plaintiffs?             09:36

17        A.   No, I met Mr. Thoele briefly in passing  09:36

18    when we -- there was a discussion about what actions  09:36

19    were to be taken.  And Mr. Thoele is based out of  09:36

20    Waycross, Georgia, and he came down to talk to the  09:36

21    Labor Relations team about being the Hearing    09:36

22    Officer.  I met him at that moment, and I didn't see  09:37

23    Mr. Thoele again until we saw each other in     09:37

24    Huntington.                                     09:37

25        Q.   Okay.  Now, at Line 5, Mr. Thoele asks you:  09:37
```

                                                        425

Craig Heligman, M.D.                                        April 29, 2021

| | | |
|---|---|---|
| 1 | "Dr. Heligman" -- Heligman, | 09:37 |
| 2 | excuse me -- "what rules did | 09:37 |
| 3 | the employes violate?" | 09:37 |
| 4 | And similar to your earlier testimony, you | 09:37 |
| 5 | read from the written statement that was provided by | 09:37 |
| 6 | the Labor Relations Department or Legal Department; | 09:37 |
| 7 | is that correct? | 09:37 |
| 8 | A.   Yes, that's correct. | 09:37 |
| 9 | Q.   Okay.  But you believe that that testimony | 09:37 |
| 10 | is true, as you've testified here today under oath? | 09:37 |
| 11 | A.   To the best of my knowledge, yes. | 09:37 |
| 12 | Q.   Okay.  Take a look at Page 35.  All right. | 09:37 |
| 13 | Really, if you could take a look at Lines 1 through | 09:38 |
| 14 | 22, please. | 09:38 |
| 15 | A.   1 through 22. | 09:38 |
| 16 | MS. FOSTER BIRD:  Is it Bates No. 3160? | 09:38 |
| 17 | MR. PAUL:  It is. | 09:38 |
| 18 | THE WITNESS:  Okay.  And I've read that | 09:38 |
| 19 | section. | 09:38 |
| 20 | BY MR. PAUL: | 09:38 |
| 21 | Q.   Okay.  Great. | 09:38 |
| 22 | You had testified that it was an assumption | 09:38 |
| 23 | that you made concerning the removal of at least | 09:38 |
| 24 | these plaintiffs -- or some of the plaintiffs | 09:38 |
| 25 | identified in this transcript about trying to file | 09:38 |

426

```
 1    fraudulent claims against CSX; is that correct?      09:38

 2        A.   Well, again, I was referencing the topic we  09:38

 3    keep coming back to, which is the potential that     09:39

 4    fraud could have been occurring because of the       09:39

 5    volume of forms.  That piqued my interest.  That was 09:39

 6    the assumption at the time of receiving that volume  09:39

 7    of documentation.                                    09:39

 8            So, yes, it was the assumption we had that   09:39

 9    led us to -- or led me to consult others to          09:39

10    determine what the next steps would be.              09:39

11        Q.   Okay.  But even as of today, you have no     09:39

12    actual knowledge of any fraudulent submissions by    09:39

13    any of the plaintiffs to CSX, the Railroad           09:39

14    Retirement Board, or the insurance companies?        09:39

15        A.   No, all I know is the results of the         09:39

16    decisions to terminate various individuals and that  09:39

17    it was submitted for appeal up through the Public    09:39

18    Law Board.  And the Public Law Board, for the most   09:39

19    part, found that CSX followed procedures properly    09:39

20    and there was no reason to overturn the dismissals.  09:39

21        Q.   And, in fact, a little later down in this,   09:39

22    you had testified that you have no idea what          09:39

23    Mr. Barker's intentions were with respect to the     09:39

24    submission of any fraudulent claims; is that         09:40

25    correct?                                             09:40
```

                                                            427

Craig Heligman, M.D.                                    April 29, 2021

| | | |
|---|---|---|
| 1 | A. Yes, that's correct. | 09:40 |
| 2 | Q. And that's true for all the plaintiffs; | 09:40 |
| 3 | right? | 09:40 |
| 4 | A. Absolutely. | 09:40 |
| 5 | Q. Okay. If you go to Page 47, please, and | 09:40 |
| 6 | that is Bates Nos. 3172. | 09:40 |
| 7 | A. And I am there. | 09:40 |
| 8 | Q. All right. Okay. If you could read Lines | 09:40 |
| 9 | 1 through 13, please. | 09:40 |
| 10 | A. Okay. | 09:40 |
| 11 | Q. So it looks like you're referencing, as you | 09:40 |
| 12 | have previously, that you made one attempt to | 09:40 |
| 13 | contact Dr. Johnson, and in this case, you said you | 09:40 |
| 14 | don't know if it was for Mr. Barker or not. | 09:40 |
| 15 | Do you see that? | 09:41 |
| 16 | A. Yes. | 09:41 |
| 17 | Q. Okay. And then at Line 9, where you say "I | 09:41 |
| 18 | don't recall," you say: | 09:41 |
| 19 | "I think it had more to do with | 09:41 |
| 20 | the fact [that] we were | 09:41 |
| 21 | receiving such a high volume, | 09:41 |
| 22 | and I was questioning what was | 09:41 |
| 23 | going on." | 09:41 |
| 24 | Do you see where I read that? | 09:41 |
| 25 | A. I do. | 09:41 |

428

Craig Heligman, M.D.                                                    April 29, 2021

```
 1        Q.   Now, would you agree that that would lead a    09:41
 2   reader to believe that you made a call to              09:41
 3   Dr. Johnson concerning the receipt of a high volume   09:41
 4   of COII forms in 2017?                                09:41
 5        A.   Yes.                                         09:41
 6        Q.   Okay.  And is that accurate?                 09:41
 7        A.   I would defer to my statement made in 2017   09:41
 8   for what I did in 2017, and if there is any           09:41
 9   inconsistency in my testimony today, I apologize for  09:41
10   that.  I do not remember the exact timing for the     09:41
11   call to Dr. Johnson, and it may certainly have been   09:41
12   related to this issue.  And because this test -- the  09:41
13   testimony given in 2017 was closer to that time       09:42
14   period, I would defer to that statement.              09:42
15        Q.   Okay.  That makes sense.                    09:42
16             And if -- if that's more accurate that you  09:42
17   made a call to Dr. Johnson back in 2017, do you       09:42
18   believe that would have been with respect to one or   09:42
19   more individuals or the larger receipt of COII forms  09:42
20   in June and July of 2017?                             09:42
21        A.   Well, based on my statement recorded here,  09:42
22   I had said that it was related to a concern about     09:42
23   why we were seeing such a high volume of documents.   09:42
24   And so, again, I'll defer to my recollection from     09:42
25   2017 made in 2017 rather than five years later.       09:42
```

                                                                        429

Craig Heligman, M.D.                                                          April 29, 2021

```
 1        Q.    Okay.   Thank you.                        09:42

 2              Okay.   If you could take a look at the next  09:42

 3   page, 48, Bates No. 3173.                            09:42

 4        A.    Okay.                                     09:43

 5        Q.    Lines 20 through 28, please.              09:43

 6        A.    Yes.                                      09:43

 7        Q.    Okay.   And in response to the question   09:43

 8   essentially what caused you to raise a flag for      09:43

 9   Mr. Dowdy, you made reference, starting at Line 23,  09:43

10   about:                                              09:43

11              "Dr. Johnson's practices in the           09:43

12               past," quote, "would keep                09:43

13               people off work for inordinate           09:43

14               periods of time and for no               09:43

15               apparent reason."                        09:43

16          And the sentence continues:                  09:43

17              "But we had no basis to suggest           09:43

18               that there was an attempt for            09:43

19               fraud in the past because the            09:43

20               volume wasn't reaching the               09:43

21               volume that we had received in           09:43

22               this one particular set of               09:43

23               circumstances."                          09:43

24          See where I read that?                        09:43

25        A.    Yes, I do.                                09:43
```

<div align="right">430</div>

Craig Heligman, M.D.                                                April 29, 2021

1        Q.    Okay.   What do you mean by "inordinate      09:43

2   periods of time" with respect to Dr. Johnson keeping    09:43

3   people off work?                                         09:44

4        A.    Well, as we were discussing earlier,         09:44

5   chiropractic providers primarily see individuals for    09:44

6   various musculoskeletal complaints, most commonly       09:44

7   low back pain, neck pain.   And Dr. Johnson's cases,     09:44

8   in many regards, would have held people out of work     09:44

9   for much longer periods of time than I would in my      09:44

10  clinical practice and, actually, longer than what       09:44

11  would be recommended in other medical references        09:44

12  that discuss lengths of disability.                      09:44

13        And so this statement is just a rewording         09:44

14  of what we've discussed a couple times during our       09:44

15  testimony yesterday and today.                           09:44

16       Q.    All right.   Is it fair to say that that      09:44

17  could be categorized as a disagreement rather than      09:44

18  fraud; that is, how long a period of time someone       09:44

19  should be held off work?                                 09:44

20       A.    I would say it's a disagreement.   Whether   09:44

21  it's fraudulent or not is really a legal issue, not     09:45

22  a medical issue.                                         09:45

23       Q.    Well, when you've reached conclusions that   09:45

24  we've talked about today in the hearings that you       09:45

25  found the providers' actions and the employees'         09:45

                                                              431

```
 1    actions to be a concerted effort to defraud, is that    09:45
 2    a medical term?                                         09:45
 3         A.    No, that's not a medical term.               09:45
 4         Q.    But that was your opinion based on your      09:45
 5    testimony at these hearings; correct?                   09:45
 6         A.    That was the -- that was my opinion based    09:45
 7    upon my role in the organization as the Chief           09:45
 8    Medical Officer, not as a health care professional.     09:45
 9         Q.    Okay.  The second part of that question --   09:45
10    I'm sorry, not question -- the second part of your      09:45
11    testimony, starting at Line 23, states with respect     09:45
12    to Dr. Johnson's practice and for holding people off    09:46
13    work "for no apparent reason."                          09:46
14           Do you see where I read that?                    09:46
15         A.  Yes, I do.                                     09:46
16         Q.    Okay.  So what's your basis that             09:46
17    Dr. Johnson would hold CSX employees off of work for    09:46
18    no apparent reason?                                     09:46
19         A.    Well, let's look at -- again, the kind of    09:46
20    cases that a typical chiropractic professional would    09:46
21    be seeing is for musculoskeletal pain complaints        09:46
22    primarily of the spine.                                 09:46
23           If you look at the kind of treatment that a      09:46
24    chiropractor is able to provide under their license,    09:46
25    then the treatment that they provide is -- is           09:46
```

                                                                    432

```
 1    limited to passive modalities, manual manipulation,    09:46
 2    and if I'm missing something, I apologize because I     09:46
 3    don't know what is -- was the official full scope.      09:46
 4    But, by and large, those conditions would be more       09:46
 5    likely to recover in a matter of weeks to a few         09:47
 6    months.                                                 09:47
 7              And if you're providing chiropractic care,    09:47
 8    then the literature, both in the chiropractic           09:47
 9    literature and the medical literature, would say if     09:47
10    that person is not improving under your care, then      09:47
11    they should be referred for care to another             09:47
12    professional, that maybe the diagnosis is not           09:47
13    absolutely correct, and maybe there's something else    09:47
14    going on that another health care professional could    09:47
15    identify and treat differently.                         09:47
16              I don't believe that there really are any     09:47
17    conditions that a chiropractic professional would       09:47
18    treat that will hold somebody out of work for years     09:47
19    at a time for a continuous -- continuous treatment.     09:47
20    So I guess what I'm saying is even if you see a         09:47
21    chiropractor once every other month, that doesn't       09:47
22    mean that chiropractic care is being delivered and      09:47
23    would be consistent with holding that person out of     09:48
24    work for that time period.                              09:48
25         Q.   Okay.   The -- the testimony in this          09:48
```

433

| 1 | transcript that Dr. Johnson's practices in the past | 09:48 |
| 2 | would keep people off either for inordinate periods | 09:48 |
| 3 | of time or for no apparent reason were not directed | 09:48 |
| 4 | at any of the plaintiffs in this case; correct? | 09:48 |
| 5 | A.   It was a general statement about my | 09:48 |
| 6 | observations based upon the COIIs we received from | 09:48 |
| 7 | Dr. Johnson over the course of years. | 09:48 |
| 8 | Q.   That was referred to as the "past | 09:48 |
| 9 | practices"; correct? | 09:48 |
| 10 | A.   Yes, sir. | 09:48 |
| 11 | Q.   Okay.  So just to ask you straight up, | 09:48 |
| 12 | did -- your testimony at this time about Dr. Johnson | 09:48 |
| 13 | keeping people off for inordinate periods of time or | 09:48 |
| 14 | for no apparent reason at all, was that with respect | 09:48 |
| 15 | to specifically any of the individual plaintiffs in | 09:48 |
| 16 | this case? | 09:48 |
| 17 | A.   Not specific to any individual in this | 09:48 |
| 18 | case.  Again, it was a comment over observations -- | 09:48 |
| 19 | or observations made over time, but not specifically | 09:48 |
| 20 | directed at any one of these individuals. | 09:48 |
| 21 | MR. PAUL:  Okay.  I'm going to move on to | 09:49 |
| 22 | another exhibit unless you prefer to take the lunch | 09:49 |
| 23 | break now.  It'll probably be a little bit more than | 09:49 |
| 24 | ten minutes to get through the next transcript, but | 09:49 |
| 25 | I'm happy to do whatever you'd like. | 09:49 |

434

```
 1              MS. FOSTER BIRD:  It's up to you,        09:49

 2    Dr. Heligman.  I'm fine.                           09:49

 3              THE WITNESS:  I will defer to others.  If 09:49

 4    they need to take a break now, I'm fine.  I can wait 09:49

 5    ten minutes.  It's -- I think it's up to the court  09:49

 6    reporter, if she's ready to take a break.          09:49

 7              MR. PAUL:  All right.  Why don't we just  09:49

 8    take a break now, and we'll -- we'll pick it up in,  09:49

 9    say, 45 minutes?                                   09:49

10              THE WITNESS:  Okay.                       09:49

11              MR. PAUL:  That'd be pretty -- pretty close 09:49

12    to 2:00 your time?  No, 1:00.                       09:49

13              THE WITNESS:  1:00 our time.              09:49

14              MS. FOSTER BIRD:  1:30.                   09:49

15              MR. PAUL:  1:30.  Okay.  Good.            09:49

16              Okay.  We're off the record.  Thank you.  09:49

17              THE VIDEOGRAPHER:  Off the record at      09:49

18    9:49 a.m.                                           09:49

19              (Recess taken.)                           10:31

20              THE VIDEOGRAPHER:  We are back on the     10:31

21    record at 10:31 a.m.                                10:31

22    BY MR. PAUL:                                        10:31

23        Q.  All right.  Dr. Heligman, we're back on the 10:31

24    record after a short lunch break.                   10:31

25              You all set to go?                        10:31
```

```
 1        A.   Yes, sir.                               10:31

 2             (Exhibit 12 was marked for identification and

 3        attached to the transcript.)

 4   BY MR. PAUL:                                       10:31

 5        Q.   Okay.  I have introduced what's been marked  10:31

 6   as Exhibit 12.  If you could take a look at that,  10:31

 7   please.                                           10:31

 8        A.   Okay.  I have it before me.             10:31

 9        Q.   Okay.  And just like the others, you can  10:31

10   see this is a transcript for a number of employees.  10:31

11   But we're going to go to Page 58, which -- I don't  10:31

12   know any other way to do it than to just click that  10:32

13   right arrow.                                      10:32

14        A.   Okay.  And so that'll be Bates No. 1273?  10:32

15        Q.   That is correct.                        10:32

16        A.   Okay.                                   10:32

17        Q.   I'll draw your attention -- to see the  10:32

18   question, you'd have to start at Line 12 and then go  10:32

19   down to Line 21.  If you could review that, please.  10:32

20        A.   I will.  Okay.                          10:32

21        Q.   All right.  So the question I have for you  10:33

22   is that the allegation when -- where you say "I   10:33

23   think" -- well, first of all, the question was    10:33

24   what's your position on Dr. Shannon and Dr. Carey  10:33

25   being liars; right?  And you said no, you don't   10:33
```

                                                      436

```
 1    think they're liars; is that correct?          10:33

 2         A.   Yes, that is how I answered it.  Yes.  10:33

 3         Q.   Yeah.  Okay.  I just want to provide the  10:33

 4    context of the question.                        10:33

 5              However, you go on to say that -- that you  10:33

 6    think that "they knew," referring to Dr. Johnson and  10:33

 7    Carey; correct?                                 10:33

 8         A.   No, I'm sorry.  The "they" would be    10:33

 9    referring to the employees.                     10:33

10         Q.   Okay.  And if we need to look at other  10:33

11    parts of this transcript, you're welcome, but are  10:33

12    you talking about the plaintiffs in this case, that  10:33

13    they knew the practice patterns?                10:33

14         A.   Yes.                                   10:33

15         Q.   Okay.  So all of the plaintiffs in this  10:33

16    case, you're testifying, knew the practice patterns  10:34

17    of Johnson and Carey ahead of time; is that correct?  10:34

18         A.   That would be my observation and opinion,  10:34

19    yes.                                            10:34

20         Q.   Okay.  And when you say "ahead of time,"  10:34

21    are you referring to -- what are you referring to?  10:34

22         A.   Before they actually saw the providers.  10:34

23         Q.   Okay.  So meaning not ahead of time of the  10:34

24    layoff; is that correct?                        10:34

25         A.   Correct.  My best recollection of the  10:34
```

                                                          437

Craig Heligman, M.D.                                      April 29, 2021

```
 1   timing was that many of them had seen the        10:34

 2   practitioners prior to the formal notification the  10:34

 3   furloughs were occurring.                         10:34

 4       Q.   Okay.  So what evidence do you have that  10:34

 5   the plaintiffs in this case knew the practice     10:34

 6   patterns of Dr. Johnson and Dr. Carey ahead of time?  10:34

 7       A.   Well, as we stated before or discussed   10:34

 8   before, Dr. Johnson and Dr. Carey were practitioners  10:34

 9   that had seen many of our employees from that area.  10:34

10   Employees have a tendency to talk to each other,  10:35

11   and, for better or worse, they tend to share their  10:35

12   experiences with various professionals in their  10:35

13   geographical area.  It's not unusual for that to  10:35

14   occur at all.                                     10:35

15           In this case, I believe that they likely  10:35

16   spoke with each other about these individuals.  As I  10:35

17   said before, they'd also -- I had my own suspicions  10:35

18   prior to this time, but it's a supposition based on  10:35

19   the information that I had reviewed from Dr. Johnson  10:35

20   and Carey and my experience with those practitioners  10:35

21   in that area and other employees that have sought  10:35

22   out care with those practitioners.                10:35

23       Q.   Well, rather than a supposition, isn't it  10:35

24   pure speculation as to each individual plaintiff?  10:35

25       A.   Yes.                                      10:36
```

                                                                438

Craig Heligman, M.D.                                                    April 29, 2021

1        Q.    Okay.  Have you read any of the depositions    10:36

2    of any of the plaintiffs in this case?                   10:36

3        A.    No.                                            10:36

4        Q.    And back -- back in 2017, is it correct to     10:36

5    say that you had zero information about what any of       10:36

6    the plaintiffs in this case knew about the practice      10:36

7    patterns of Dr. Johnson and Dr. Carey?                   10:36

8        A.    That would be correct.                         10:36

9        Q.    Then a little further down in that             10:36

10   paragraph, you reference -- the sentence starts:         10:36

11            "And that the two providers                     10:36

12             endorsed that, and so you have                 10:36

13             an enabling environment that,                  10:36

14             again, led to this increase of                 10:36

15             reports at the time that the                   10:36

16             furlough was announced."                       10:36

17       Do you see where I read that?                        10:36

18       A.    Yes.                                           10:36

19       Q.    Okay.  Is the enabling environment that       10:36

20   you're using in that paragraph or in your testimony      10:36

21   referring to Dr. Johnson and Dr. Carey's endorsement     10:36

22   of the determination of inability to work?               10:36

23       A.    Yes.                                           10:37

24       Q.    And to be clear and to be fair to you, you     10:37

25   have -- your testimony has been that at least for        10:37

                                                                  439

USCA4    2255

Craig Heligman, M.D.                                              April 29, 2021

1    the past ten years, either through Dr. Neilson or      10:37

2    your own experience, you believe that Dr. Johnson      10:37

3    more so and, to some extent, Dr. Carey fostered that   10:37

4    enabling environment for time away from work?          10:37

5         A.   Yes.                                         10:37

6         Q.   However, you have zero evidence, and it's    10:37

7    pure speculation that any of the plaintiffs in this    10:37

8    case endorsed that enabling environment?               10:37

9         A.   Yes.  Correct.                               10:37

10        Q.   Okay.  All right.  If we turn the page to    10:37

11   the next page, Page 59, please.                        10:38

12        A.   Okay.                                         10:38

13        Q.   It starts at Page -- well, the question      10:38

14   starts at Line 7 -- excuse me -- 21 and ends at 26;    10:38

15   right?                                                 10:38

16        A.   Okay.                                         10:38

17        Q.   So my question is:  This testimony           10:38

18   referring to Dr. Johnson and Dr. Carey as you say      10:38

19   enabling the behavior of their patients, is that       10:38

20   another way of saying that you believe that            10:38

21   Dr. Johnson and Dr. Carey were manipulating the --     10:38

22   their patients and, in this case, the CSX employees    10:38

23   in the way that they provided treatment?               10:38

24        A.    No, I believe that these providers were     10:38

25   advocating for their employee -- excuse me -- for      10:39

                                                                440

| | |
|---|---|
| 1 | their patients to whatever means or end that the | 10:39 |
| 2 | employee may have desired at that point in time as | 10:39 |
| 3 | expressed by their pain complaints. | 10:39 |
| 4 | Q. Okay. Well, is it accurate to say that | 10:39 |
| 5 | many health care providers will advocate for their | 10:39 |
| 6 | patients? | 10:39 |
| 7 | Is there anything improper or inappropriate | 10:39 |
| 8 | about that? | 10:39 |
| 9 | A. I think you have to look at what you mean | 10:39 |
| 10 | by "advocate" or "advocacy." So if your belief that | 10:39 |
| 11 | advocacy means you provide people what they want, | 10:39 |
| 12 | that's one form. If you say advocacy is for what | 10:39 |
| 13 | they need, that's a different issue. And I think | 10:39 |
| 14 | you can look at it from those two different | 10:39 |
| 15 | perspectives. | 10:39 |
| 16 | There are times when as a practitioner -- | 10:39 |
| 17 | and I'm speaking from my own experience as a | 10:39 |
| 18 | clinician -- where the best thing for the patient is | 10:40 |
| 19 | to advocate for something that they need but may not | 10:40 |
| 20 | want. | 10:40 |
| 21 | Q. And are you referring to short-term | 10:40 |
| 22 | disability benefits or benefits of that nature? | 10:40 |
| 23 | A. Broadly speaking. It could be also that an | 10:40 |
| 24 | individual may not want to return to work at that | 10:40 |
| 25 | moment in time and yet the best thing that you could | 10:40 |

441

```
 1   do for that individual is to help him get back to      10:40

 2   work.  It could be, as you said, signing off on        10:40

 3   disability paperwork when disability may not be the    10:40

 4   best thing to their health.                            10:40

 5          So, again, advocacy -- I believe there's a      10:40

 6   difference between advocating for a patient's          10:40

 7   desires or their wants as opposed to what their        10:40

 8   needs are and that are in their best interests as a    10:40

 9   -- for their health.                                   10:40

10      Q.   Let's take a look at Page 62, please, which    10:41

11   is Bates No. 1277.                                     10:41

12      A.   You said 1277?                                 10:41

13      Q.   That's correct.                                10:41

14      A.   Okay.  I'm there.                              10:41

15      Q.   And starting at about Line 27 through 36,      10:41

16   please take a look at that.                            10:41

17      A.   Yes.                                           10:41

18      Q.   I'm trying to see where that went.  Okay.      10:41

19   Here you go.  Specific to Line 31, you testified       10:42

20   that:                                                  10:42

21              "What we're saying is that the              10:42

22               providers were selected for a              10:42

23               specific purpose."                         10:42

24          Do you see that?                                10:42

25      A.   I do.                                          10:42
```

<div align="right">442</div>

Craig Heligman, M.D.                                            April 29, 2021

```
 1          Q.   And, again, is this testimony specific to    10:42

 2    all of the plaintiffs in this case?                     10:42

 3          A.   Yes.                                          10:42

 4          Q.   And you believe that each and every one of   10:42

 5    the plaintiffs in this case selected treatment with     10:42

 6    Dr. Carey or Dr. Johnson for the specific purpose of    10:42

 7    those three things we talked about earlier today --     10:42

 8    either defrauding CSX to have health care coverage      10:42

 9    for two years rather than four months, the Railroad     10:42

10    Retirement Board for the purpose of sickness or         10:42

11    disability benefits, and private insurance companies    10:42

12    for the purposes of that they would have to have        10:42

13    ongoing coverage that they otherwise wouldn't be        10:43

14    entitled to; is that correct?                           10:43

15          A.   Yes, I believe these employes selected       10:43

16    those two practitioners knowing that they would         10:43

17    receive the advocacy they desired.                      10:43

18          Q.   Now, we talked earlier about how a number    10:43

19    of the plaintiffs in this case were not subject to      10:43

20    layoff at all.                                          10:43

21          Do you recall that?                               10:43

22          A.   Yes, I do.                                   10:43

23          Q.   Okay.  So what was the basis for continuing  10:43

24    the investigation, testifying at the hearing in         10:43

25    support of their concerted actions to defraud the       10:43
```

                                                                   443

Craig Heligman, M.D.                                    April 29, 2021

```
 1   entities that we talked about if they were not      10:43

 2   subject to layoff?                                   10:43

 3       A.   My understanding is that many of them could 10:43

 4   have been subject to other issues not related to the 10:43

 5   furloughs.  I don't have direct knowledge of what    10:43

 6   all those issues were on the Labor Relations side,   10:43

 7   but I do believe that all of them were seeking care  10:43

 8   from Dr. Carey or Dr. Johnson for the purposes of    10:44

 9   receiving a note, in this case a COII, that would    10:44

10   remove them or continue to keep them out of work.    10:44

11       Q.   Okay.  Do you remember any of those other   10:44

12   incentives, for lack of a better word, other than a  10:44

13   potential layoff today?                              10:44

14       A.   I don't -- again, I don't know all those    10:44

15   specific details.  But, again, it could be simply    10:44

16   that they wanted to continue their benefits and not  10:44

17   be at work.  And that to me is as much a secondary   10:44

18   gain as knowing that you're going to be furloughed   10:44

19   and then seeking care.  It doesn't really make a     10:44

20   difference to me personally.                         10:44

21       Q.   What you just described, would that fall    10:44

22   into a category of an employee who just wanted some  10:44

23   paid time off and didn't want to work?               10:45

24       A.   Well, in this case, they weren't being paid 10:45

25   to be off work unless they were receiving RRB        10:45
```

444

Craig Heligman, M.D.                                                                  April 29, 2021

```
 1   benefits.  But, yes, there are times when an        10:45
 2   employee may choose to seek medical care for the    10:45
 3   purposes of potentially being off work legitimized  10:45
 4   by a medical excuse.                                 10:45
 5       Q.   Other than pure speculation, do you have   10:45
 6   any reason to believe that any of the plaintiffs in 10:45
 7   this case who were not subject to a layoff fall into 10:45
 8   that category?                                       10:45
 9       A.   I wouldn't know their motivations at all,  10:45
10   no.                                                  10:45
11       Q.   And when you say you "wouldn't know their  10:45
12   motivations at all," is that true that you did not  10:45
13   know their motivations back in 2017 as well as      10:45
14   today?                                               10:45
15       A.   That's correct.                            10:45
16       Q.   And do you have any opinion about whether  10:45
17   anyone else at CSX had information as to their      10:45
18   motivations back in 2017?                            10:45
19       A.   No, I don't know.                          10:46
20       Q.   Do you have any information at all about   10:46
21   any of the patients that Dr. Johnson or Dr. Carey   10:46
22   provided to persons other than railroaders?         10:46
23       A.   No, I have no knowledge of the -- their    10:46
24   patient population.  No.                            10:46
25       Q.   Okay.  And let me just be a little more    10:46
```

                                                                                        445

```
 1   specific.  Have -- have you ever heard from any CSX   10:46
 2   employee that his or her friend, spouse, relative     10:46
 3   treated with Dr. Johnson or Carey at all?             10:46
 4       A.   Again, you're asking me if I heard from any  10:47
 5   other CSX person if they had sought care from         10:47
 6   Dr. Johnson or Dr. Carey?                             10:47
 7       Q.   Other than a -- other than a railroader      10:47
 8   himself or herself, yeah.                             10:47
 9       A.   No, I'm not familiar with that geographical  10:47
10   area from the health care delivery perspective.       10:47
11       Q.   Okay.  No, I mean, I know you're in          10:47
12   Jacksonville and you don't live in that area, but I   10:47
13   was just wondering if maybe someone who did, even a   10:47
14   supervisor, ever said to you, "Dr. Heligman, you      10:47
15   know, Dr. Johnson and Dr. Carey are quality           10:47
16   providers, and I know that because my sister sees     10:47
17   them."                                                10:47
18            Anything like that?                          10:47
19       A.   No.                                          10:47
20       Q.   Okay.  Did you ever perform any type of an   10:47
21   investigation into how Dr. Johnson or Dr. Carey       10:47
22   treated non-railroaders in their treatment?           10:47
23       A.   No, I have no reason to do that.             10:47
24       Q.   All right.  That's all the questions I have  10:47
25   for that exhibit.                                     10:48
```

446

```
 1        A.   Okay.                                      10:48

 2        Q.   All right.  Hopefully you'll see an exhibit  10:48

 3   transcript for Clark, Barber, Potter, Z., and       10:48

 4   Hutchinson.  Let me know if you have that handy.    10:48

 5             MS. FOSTER BIRD:  What number is it, Greg?  10:48

 6             MR. PAUL:  It is Exhibit 13.              10:48

 7             THE WITNESS:  Yes, I have that open.      10:48

 8             (Exhibit 13 was marked for identification and

 9   attached to the transcript.)

10   BY MR. PAUL:                                        10:48

11        Q.   Okay.  Great.                             10:48

12             Let's take a look at Page 29, please.     10:48

13        A.   And that's Bates No. 2886?                10:48

14        Q.   That is correct, yeah.                    10:48

15        A.   Okay.                                     10:48

16        Q.   Okay.  Let's see if I missed that.  Give me  10:48

17   a moment, please.  Okay.  Actually, I apologize.    10:49

18   It's the next page on Page 30.                      10:49

19        A.   Okay.                                     10:49

20        Q.   I thought there was a question that was on  10:49

21   the earlier page, but you're asked a question at the  10:49

22   top, right around Line 2:                           10:49

23             "Dr. Heligman, the four Charged           10:49

24              Employees here today were on             10:49

25              this Exhibit E, the Raceland             10:49
```

447

| | | |
|---|---|---|
| 1 | Car Shop agreement of some | 10:49 |
| 2 | sort, that had these gentlemen | 10:49 |
| 3 | protected for six years, I | 10:50 |
| 4 | believe." | 10:50 |
| 5 | And your answer was: | 10:50 |
| 6 | "I believe that's correct, | 10:50 |
| 7 | yes." | 10:50 |
| 8 | Do you see where I read that? | 10:50 |
| 9 | A.   I do. | 10:50 |
| 10 | Q.   Do you know what that means, "protected for | 10:50 |
| 11 | six years"? | 10:50 |
| 12 | A.   The best I can explain it as is there was a | 10:50 |
| 13 | prior agreement with the Raceland Car Shop, and | 10:50 |
| 14 | those employees are covered under that agreement and | 10:50 |
| 15 | they had some sort of job -- or benefits protection | 10:50 |
| 16 | for that period of time.  That's the extent of my | 10:50 |
| 17 | knowledge of that agreement. | 10:50 |
| 18 | Q.   Okay.  Does that mean that these -- at | 10:50 |
| 19 | least perhaps these four charged employees were | 10:50 |
| 20 | entitled, under an agreement with the railroad, to | 10:50 |
| 21 | receive pay even if they were laid off? | 10:50 |
| 22 | Or is that something different? | 10:50 |
| 23 | A.   I don't know.  I would defer that to | 10:50 |
| 24 | someone in Labor Relations that can explain it in | 10:50 |
| 25 | greater detail than I can. | 10:50 |

448

Craig Heligman, M.D.                                    April 29, 2021

```
 1        Q.   Okay.  And who, during this time in 2017,   10:50
 2    was your go-to person in the Labor Relations        10:50
 3    Department?                                          10:51
 4        A.   Well, I mean, there were several           10:51
 5    individuals.  I don't -- the person that was kind of 10:51
 6    coordinating the efforts for the investigation was   10:51
 7    Penny Dreher.  But beyond that, there are many       10:51
 8    people in Labor Relations I've dealt with.           10:51
 9        Q.   Okay.  Now, we -- Penny's been             10:51
10    identified -- or Ms. Dreher, rather.  Excuse me.     10:51
11             But, I mean, just in response to my        10:51
12    question, was she the primary contact for you in     10:51
13    Labor Relations or not?                              10:51
14        A.   Well, there -- there is no primary contact. 10:51
15    If there's an issue that comes up with a particular  10:51
16    agreement, I would direct my question to the person  10:51
17    in Labor Relations that has the most knowledge about 10:51
18    that particular agreement.  Penny was -- or          10:51
19    Ms. Dreher was -- was coordinating the efforts in    10:51
20    this particular endeavor, but there was no one       10:51
21    person in Labor Relations that I would say is my     10:51
22    go-to person.                                        10:52
23        Q.   Okay.  Now, again, you're asked the        10:52
24    question here on Page 30 from Mr. Thoele:            10:52
25             "What did your investigation               10:52
```

                                                            449

```
 1                   conclude?"                        10:52

 2            And you testified:                       10:52

 3               "I found that the providers'          10:52

 4               actions and employees' actions        10:52

 5               to be a concerted effort to           10:52

 6               defraud CSXT, the Railroad            10:52

 7               Retirement Board, and                 10:52

 8               insurance providers of                10:52

 9               extended benefits."                   10:52

10            Do you see where I read that?            10:52

11       A.    I do.                                   10:52

12       Q.    Okay.  As compared to the employees who may  10:52

13  have been subject to a layoff, did you, with respect  10:52

14  to these four employees and plaintiffs, believe that  10:52

15  their motivation was somehow related to their job     10:52

16  protection that's referenced at the top of this       10:52

17  page?                                               10:52

18       A.    As I said before, I really don't know what  10:52

19  their motivation was.                                 10:52

20       Q.    Okay.  We'll close that exhibit and go to   10:53

21  the next one, Exhibit 14.  And this transcript is      10:53

22  for Mr. Speaks, Stephens, Webb, and Ferguson.  Let    10:53

23  me know when you get there, please.                    10:53

24            (Exhibit Number        was marked for

25  identification and attached to the transcript.)
```

                                                        450

```
 1              THE WITNESS:  And I have it open.        10:53

 2     BY MR. PAUL:                                      10:53

 3         Q.   And if I could draw your attention to Page  10:53

 4     30, please.                                       10:53

 5         A.   And that is Bates No. 5168; correct?     10:53

 6         Q.   That's correct.  Correct.  Yeah.         10:53

 7         A.   Okay.                                     10:53

 8         Q.   All right.  In right about Lines 8 or 9,  10:53

 9     you mention the furlough and also knowing that    10:54

10     additional business changes were occurring.       10:54

11              What -- what were those, more specifically,  10:54

12     other "business changes" that were occurring other  10:54

13     than the furlough?                                10:54

14         A.   Well, as I had previously noted, we were --  10:54

15     the entire company was undergoing some major changes  10:54

16     with our new leadership that was incoming in March  10:54

17     of that year, and there was a progressive series of  10:54

18     changes within the company, progressive changes in  10:54

19     Huntington, in general, as far as moving individuals  10:54

20     around, management responsibilities, volume of work  10:54

21     being done in any given area that was going to     10:54

22     change.                                            10:54

23              For example, the office building that we  10:54

24     used in Huntington was nearly empty when we did    10:54

25     these hearings.  Since then, people have been moved  10:54
```

                                                              451

Craig Heligman, M.D.                                                April 29, 2021

```
 1    back into the building.                          10:54

 2          So those kinds of changes.  There was a    10:54

 3    series of changes related to the business, and   10:54

 4    that's what I was referencing.                   10:55

 5      Q.   Okay.  Now, in the following paragraph --  10:55

 6    I'm sorry -- not the following, but from the same  10:55

 7    paragraph but a little further down, you state --  10:55

 8    starting at Line 22, you testified:              10:55

 9              "In all likelihood, there's            10:55

10              probably some people that are          10:55

11              seeking care for appropriate           10:55

12              reasons and there are some             10:55

13              that are not, but you                  10:55

14              can't tell that from any one           10:55

15              individual document."                  10:55

16          See where I read that?                     10:55

17      A.   Yes.                                       10:55

18      Q.   And is the one individual document that   10:55

19    you're referring to the Certificate of Ongoing   10:55

20    Illness?                                          10:55

21      A.   Yes.                                       10:55

22      Q.   So is it correct to say that this testimony  10:55

23    means that there is a certain number of plaintiffs  10:55

24    in this case who you agree were treating for     10:55

25    appropriate reasons and not for the purpose of   10:55
```

452

Craig Heligman, M.D.                                                April 29, 2021

```
 1   avoiding a layoff or other event?              10:55

 2       A.   Yes, I -- I still think that there is that   10:55

 3   possibility.                                   10:55

 4       Q.   Okay.  As you sit here today, I mean, do   10:55

 5   you endorse that philosophy of what I'm going to   10:56

 6   call fishing with a net rather than a line?    10:56

 7       A.   Well, I don't quite understand the analogy,   10:56

 8   but let me, perhaps, explain.                  10:56

 9            There were individuals who, after we   10:56

10   completed the investigations, had identified that   10:56

11   they were seeking medical care for reasons other   10:56

12   than going to see one of these individuals.  One   10:56

13   example, I believe, was a woman who had a both   10:56

14   knee -- or both knees were replaced.           10:56

15            So she had bilateral knee replacements, and   10:56

16   yet all we had on record for her were the COIIs   10:56

17   from -- I think in this case was Dr. Johnson.  10:56

18            Another person was off work for a heart   10:56

19   attack or other cardiac reason.  We never had any of   10:57

20   those records, and the only form of information we   10:57

21   had was a record or the COIIs from Dr. Johnson or   10:57

22   Dr. Carey.                                      10:57

23            Those individuals had legitimate medical   10:57

24   reasons why they would be off for prolonged periods   10:57

25   of time, yet we never knew about it.  I think there   10:57
```

<div align="right">453</div>

```
 1  was one person that also was going in -- I want to    10:57

 2  say it was either for neck or low back surgery, and   10:57

 3  I believe that individual was exonerated when we      10:57

 4  discovered that.                                      10:57

 5         So individuals may have been seeking care      10:57

 6  appropriately, but they may not have been seeking     10:57

 7  documentation from the right practitioner.            10:57

 8      Q.   Okay.  But when it comes to the submission   10:57

 9  of a Certificate of Ongoing Illness, is it your       10:57

10  testimony that an employee such as the plaintiffs in  10:57

11  this case are required to submit additional medical   10:57

12  documentation outside of the Certificate of Ongoing   10:58

13  Illness?                                              10:58

14      A.   No, but at the time of the hearing, they     10:58

15  could have submitted any number of documents from     10:58

16  any health care provider to substantiate why they     10:58

17  should be exonerated of the charges.  Most of them    10:58

18  did not, some submitted a letter, some submitted      10:58

19  some medical records, but nobody ever submitted a     10:58

20  body of medical records that clearly was -- allowed   10:58

21  me to understand why they would be off for these      10:58

22  conditions at that moment in time.                    10:58

23         None of the employees invited Dr. Carey or     10:58

24  Dr. Johnson to be present for the investigation, and  10:58

25  they would have been allowed to do that as well.  So  10:58
```

<div align="right">454</div>

```
 1    even after the investigations, I really had very      10:58

 2    little information from a medical perspective, and    10:58

 3    it really didn't change any opinion on it with        10:58

 4    regards to the information on the COII.               10:58

 5        Q.   So is it your testimony that you expected    10:59

 6    the plaintiffs in this case to bring in medical       10:59

 7    records of their treatment to the hearing in front    10:59

 8    of their co-workers?                                  10:59

 9        A.   No, what I'm saying is that the employees,   10:59

10    as part of the investigative process, would be        10:59

11    allowed to bring in whatever documentation and bring  10:59

12    in whatever witnesses they felt were necessary to     10:59

13    exonerate them of the charges.  That's -- that's my   10:59

14    statement.                                            10:59

15        Q.   Okay.  But would you agree that none of the  10:59

16    plaintiffs in this case were charged with providing   10:59

17    inadequate medical documentation for their absence    10:59

18    from work?                                            10:59

19        A.   That's correct.                             10:59

20        Q.   And had they been charged with failure to    10:59

21    provide adequate documentation of their medical       10:59

22    absence, they would have been on notice to provide    10:59

23    additional medical documentation?                     10:59

24        A.   That is -- that really doesn't make any      11:00

25    sense to me.  If I were under investigation for       11:00
```

Craig Heligman, M.D.                                        April 29, 2021

```
 1   whatever reason, I would bring in whatever           11:00
 2   information I thought I could lay my hands on in     11:00
 3   order to protect myself and exonerate myself from   11:00
 4   these charges.                                       11:00
 5        We received very little information at the      11:00
 6   time of the hearing, and even after the hearing, we 11:00
 7   didn't receive much in the way of information.  So I 11:00
 8   personally believe that we gave the employees the   11:00
 9   opportunity to present their case, and they chose   11:00
10   not to bring in additional information or additional 11:00
11   witnesses.                                           11:00
12        Q.   Well, some -- some employees brought in   11:00
13   additional information, including additional medical 11:00
14   evidence; right?                                     11:00
15        A.   Yes, that's correct.  Again --             11:00
16        Q.   And by and large -- I'm sorry.  Go ahead.  11:00
17        A.   What I'm saying is that, yeah, some did -- 11:00
18        Q.   Okay.                                       11:00
19        A.   -- but some did not.  And those people --  11:01
20   for example, the lady with the bilateral knee        11:01
21   replacement -- and I found this out from someone     11:01
22   else after the fact, that she had testified that she 11:01
23   had her knee replacements during this investigation. 11:01
24   But I don't think she ever submitted any medical     11:01
25   records before, during, or after to substantiate    11:01
```

                                                              456

```
 1    that.                                              11:01
 2         Q.   So when the employees and the plaintiffs in  11:01
 3    this case were charged with fraud and not failure to  11:01
 4    provide sufficient medical documentation, help --  11:01
 5    help us explain to them where the connection is   11:01
 6    between charging someone with fraud and requiring  11:01
 7    additional medical information.                    11:01
 8              MS. FOSTER BIRD:  Help you explain to whom?  11:01
 9              MR. PAUL:  Well, ideally a jury, but you  11:01
10    can explain it to us, the listeners of this        11:01
11    deposition.                                        11:02
12              MS. FOSTER BIRD:  You said "help us explain  11:02
13    to them."  You mean the jury?                      11:02
14              MR. PAUL:  Yeah.                          11:02
15              MS. FOSTER BIRD:  Okay.                   11:02
16              THE WITNESS:  Would you mind restating the  11:02
17    question for me, please?                           11:02
18    BY MR. PAUL:                                       11:02
19         Q.   Sure.                                    11:02
20              So we've established on this line of     11:02
21    questioning that none of the plaintiffs were charged  11:02
22    with failure to provide adequate information to    11:02
23    document their absence; correct?                   11:02
24         A.   That's correct.                          11:02
25         Q.   And we've established in prior testimony  11:02
```

                                                         457

```
 1   that you have no reason to question the legitimacy    11:02

 2   of the treatment that's documented in the            11:02

 3   Certificate of Ongoing Illnesses for the plaintiffs; 11:02

 4   correct?                                              11:02

 5        A.   Yes.                                        11:02

 6        Q.   And it sounds like, from your testimony     11:02

 7   now, your expectation is that if you were being       11:02

 8   charged with fraud, you would have come in with       11:02

 9   additional medical records to the hearing.            11:02

10        A.   I would have come in with whatever          11:02

11   information I could gather to explain what I'm being  11:02

12   charged with and why it's not accurate.  That's what  11:02

13   I would do.                                           11:02

14        Q.   Okay.  And my question, you know, more      11:02

15   specifically is -- and we can do this if you want:    11:03

16   You know, we can look at the Charge Letter and then   11:03

17   we can look at the Termination Letter, and where is   11:03

18   it in the Charge Letter that draws the connection     11:03

19   that would make a reasonable person figure out that   11:03

20   they had to bring more medical documents to your      11:03

21   attention at the hearing?                             11:03

22        A.   Okay.  Well, maybe I should go with an      11:03

23   analogy, then.                                        11:03

24             So we mentioned -- or I -- I should say I   11:03

25   mentioned before that if we had a large number of     11:03
```

                                                                    458

Craig Heligman, M.D.                                                April 29, 2021

```
 1    employees that had submitted expense reports to        11:03
 2    our -- to the department that manages those expense    11:03
 3    reports, and we thought they were being submitted      11:03
 4    such that they had claims of expenses that were        11:03
 5    consistent from report to report in excess of what     11:03
 6    we might expect to receive for that kind of report     11:03
 7    or for that kind of expense, then we would take it     11:03
 8    to the proper individuals within our company to        11:04
 9    determine should we do something with regards to       11:04
10    discipline for those individuals.                      11:04
11          Now, when we do our expense reports, we do       11:04
12    not have to submit every single receipt.  So if we     11:04
13    had those set of circumstances and we brought that     11:04
14    group of people to an investigation and we charged     11:04
15    them, as we did here, with potential fraud and         11:04
16    dishonesty, are you telling me that you wouldn't       11:04
17    bring in the receipts to demonstrate the legitimacy    11:04
18    of all those expenses?                                 11:04
19          What I'm saying, then, is why didn't they        11:04
20    bring in all the medical records to show the           11:04
21    appropriateness or legitimacy of the reasons that      11:04
22    led to the generation of that COII?                    11:04
23       Q.   So it seems that -- I'll ask you:  Do you      11:04
24    believe that charging the plaintiffs with fraud,       11:04
25    based upon the fact that your department received a    11:04
```

459

USCA4   2275

Craig Heligman, M.D.                                                      April 29, 2021

```
 1    higher than normal volume of Certificate of Ongoing      11:05

 2    Illnesses, reasonably puts the plaintiffs on notice      11:05

 3    that they should have supplied additional medical        11:05

 4    evidence to substantiate their absence from work?        11:05

 5        A.   Well, this was not legal proceedings, per       11:05

 6    se.  Nobody present had any legal training, to my        11:05

 7    knowledge.  This was a process put into place            11:05

 8    through the Collective Bargaining Agreement.             11:05

 9            And so, again, what I'm saying is if             11:05

10    someone is telling me that they don't believe           11:05

11    whatever is on the document that I submitted was         11:05

12    inappropriately or inaccurately submitted, I would       11:05

13    be bringing in whatever information I could that         11:05

14    would substantiate that this document, in fact, was      11:05

15    completely above board, there's no fraud involved, I     11:05

16    can substantiate everything on that form, and I was      11:06

17    not fraudulent.  I would be defending myself by          11:06

18    providing that information.  That's all I'm trying       11:06

19    to make the point of.                                    11:06

20            This hearing was taking place under the          11:06

21    Collective Bargaining Agreement provisions, the          11:06

22    employer has to render a charge, the hearing has to      11:06

23    be held, and the employee should be represented by       11:06

24    their union representation.  And they are permitted      11:06

25    to bring in whatever evidence, whatever documents,       11:06
```

460

```
 1   whatever witnesses they choose in order to defend     11:06

 2   their position.  Whether it's a medical document or   11:06

 3   not, they should be able to bring in whatever it is   11:06

 4   they want.                                            11:06

 5        I'm not saying that they have to bring in        11:06

 6   all their health records and share it with the       11:06

 7   world.                                                11:06

 8        Q.   Do you remember our conversation about the  11:06

 9   FMLA or the family medical leave in terms of          11:06

10   documentation of the certification form?              11:07

11        A.   Yes.                                         11:07

12        Q.   Okay.  So rather than, you know, go with     11:07

13   the nuclear option of accusing all of the plaintiffs  11:07

14   of fraud, did you ever consider sending a letter      11:07

15   telling the employees the truth of your concerns?     11:07

16        And let me be more specific.                      11:07

17        Did you ever consider sending a letter,           11:07

18   communication, telephone call to any of the           11:07

19   plaintiffs saying, "Here's what's going on.  We have  11:07

20   suspicions of these two chiropractors completing      11:07

21   certification forms that are self-serving, either to  11:07

22   themselves or to the plaintiffs, and we want you to   11:07

23   explain to us why that's not the case"?               11:07

24        A.   No.                                          11:07

25        Q.   Okay.  And to your knowledge, did -- any of  11:07
```

461

```
 1    the plaintiffs in this case, were they offered FMLA    11:07

 2    leave by CSX during this time in 2017?                11:07

 3         A.    That I don't know.                         11:08

 4         Q.    Okay.  So the point being:  Do you have any 11:08

 5    knowledge -- or the question being, rather -- excuse  11:08

 6    me.  The question being:  Are you aware of any other  11:08

 7    process that the plaintiffs in this case could have   11:08

 8    supplied additional medical evidence other than       11:08

 9    being accused of fraud and going to these hearings?   11:08

10         A.    They could have, at any point in time,     11:08

11    submitted whatever they wanted to submit.  We would   11:08

12    receive it.  But when they submitted the COII, the    11:08

13    only purpose for that COII was to meet their          11:08

14    obligations under the Collective Bargaining           11:08

15    Agreement.  We do not require that they submit        11:08

16    specific medical records or anything else.            11:08

17              They could also submit the medical records  11:08

18    in lieu of the COII, but merely -- the COII process   11:08

19    was merely for the employee to meet their             11:08

20    obligations under the Collective Bargaining           11:08

21    Agreement.  There's no reason for anyone in my        11:08

22    department or myself to then call an employee and     11:09

23    say, "Hey, can you send these medical records         11:09

24    instead of the COII?"  That's not the purpose of the  11:09

25    COII.                                                 11:09
```

                                                                462

```
 1        Q.   Let me draw your attention to Page 34,        11:09

 2   please, Bates No. 5172.                                 11:09

 3        A.   Okay.                                         11:09

 4        Q.   And your testimony starts on Line 18, goes    11:09

 5   through 24.  If I can draw your attention to that.      11:09

 6   And, in fairness, there's a question above that that    11:09

 7   starts at Line 11 through 16.  If you want to review    11:10

 8   that as well.                                           11:10

 9        A.   Okay.                                         11:10

10        Q.   Okay.  In summary fashion, I mean, would      11:10

11   you agree that your testimony there is stating that     11:10

12   the wording on the Certificate of Ongoing Illnesses     11:10

13   for the plaintiffs in this case is not fraudulent or    11:10

14   not considered fraudulent?                              11:10

15        A.   I would say that I took the information for    11:10

16   face value.  In other words, I believe that the         11:10

17   information placed on that form did come from the        11:10

18   provider's office and that the provider was             11:10

19   documenting the information accurately.  I had no        11:10

20   reason to believe otherwise.                            11:10

21        Q.   Okay.  So I appreciate that, but in terms     11:10

22   of a "Yes" or "No" answer, would you agree both that    11:10

23   your testimony here on Page 34 and today is that you    11:10

24   would testify and have testified that the               11:10

25   Certificate of Ongoing Illnesses would not be           11:11
```

463

Craig Heligman, M.D.                                     April 29, 2021

```
 1    considered fraudulent?                              11:11
 2        A.   That would be correct, yes.                11:11
 3        Q.   All right.  If we can back up two pages to 11:11
 4    Page 32, please.                                    11:11
 5        A.   Okay.                                       11:11
 6        Q.   Now, in general, are you familiar with time 11:11
 7    limits in which the company must charge employees   11:11
 8    under various Collective Bargaining Agreements?      11:11
 9        A.   I know there is a timeline that            11:11
10    we're required to maintain.                         11:11
11        Q.   Okay.  And do you have any knowledge as to 11:11
12    why your letter to the Railroad Retirement Board was 11:11
13    used as the incident date to trigger those          11:11
14    timelines?                                          11:11
15        A.   Because that was when -- at that point when 11:11
16    we felt it was appropriate to notify the RRB, we had 11:11
17    collected sufficient information to demonstrate a   11:11
18    pattern of -- a pattern that suggested there were   11:12
19    some concerns here about why the employees were     11:12
20    submitting forms in such great volume from these two 11:12
21    practitioners in this local area all at the same    11:12
22    time.                                               11:12
23        Q.   Okay.  And is it your testimony that the   11:12
24    date of that letter to the Railroad Retirement Board 11:12
25    is the first time that you acknowledged a pattern   11:12
```
                                                                464

| | | |
|---|---|---|
| 1 | sufficient to have the company charge the employees | 11:12 |
| 2 | and plaintiffs in this case? | 11:12 |
| 3 | A.   Well, the date selected for the charge was | 11:12 |
| 4 | made by the Labor Relations group that wrote the | 11:12 |
| 5 | Charge Letters.  I had no involvement in the Charge | 11:12 |
| 6 | Letter at all.  I was there to provide the | 11:12 |
| 7 | underlying information and I wrote the letter to the | 11:12 |
| 8 | RRB. | 11:12 |
| 9 | Q.   I'm sorry.  Did you say you wrote the | 11:13 |
| 10 | letter to the RRB? | 11:13 |
| 11 | A.   Yes, that was the letter I wrote -- I think | 11:13 |
| 12 | we talked about that earlier -- that we may have had | 11:13 |
| 13 | some other people review it prior to it going out, | 11:13 |
| 14 | but I wrote it. | 11:13 |
| 15 | Q.   Okay.  Do you recall any conversations with | 11:13 |
| 16 | anybody in the Labor Relations Department about | 11:13 |
| 17 | choosing the date of that RRB letter as the incident | 11:13 |
| 18 | date? | 11:13 |
| 19 | A.   I don't recall specific conversations.  I | 11:13 |
| 20 | just don't recall. | 11:13 |
| 21 | Q.   Okay.  Is it accurate to say that you first | 11:13 |
| 22 | considered potential fraud on June 20th of 2017, at | 11:13 |
| 23 | least with respect to these plaintiffs? | 11:13 |
| 24 | A.   I think I would say it was a curiosity at | 11:13 |
| 25 | that point in time. | 11:14 |

465

Craig Heligman, M.D.                                    April 29, 2021

```
 1        Q.    Okay.  And at what point did it grow beyond      11:14
 2   a curiosity after June 20th of 2017?                        11:14
 3        A.    We continued to see incoming forms from          11:14
 4   these two practitioners in that particular location.        11:14
 5        Q.    Okay.  And on that spectrum of a curiosity,      11:14
 6   did it grow to a suspicion, or was there something          11:14
 7   in between curiosity and suspicion?                         11:14
 8        A.    Well, again, I can't give you a point in         11:14
 9   time when I said, "Oh, aha!  This is the time of            11:14
10   suspicion."  We collected these documents over time        11:14
11   to see whether or not the volume was going to              11:14
12   continue to increase or not, and it did.                    11:14
13           What number would move from curiosity to           11:14
14   suspicion, I don't know.  I can't make that                 11:14
15   statement.  All I can say is we continued to receive        11:14
16   these documents.  During that time period of               11:15
17   receiving the documents, I consulted various               11:15
18   individuals within my organization and received           11:15
19   advice, and then those individuals made decisions to       11:15
20   pursue the actions that were ultimately pursued that       11:15
21   led up to the Charge Letters being written and the         11:15
22   hearings being held.                                        11:15
23        Q.    And those individuals, you're referring to      11:15
24   the Labor Relations Department and the Legal               11:15
25   Department?                                                 11:15
```

                                                              466

```
 1        A.    Predominantly, yes.                    11:15

 2        Q.    And whether -- I mean, as you sit here now,  11:15

 3   who else was involved, when you say predominantly,  11:15

 4   other than the Legal Department and the Labor       11:15

 5   Relations in that decision?                         11:15

 6        A.    Well, we had individuals from -- from HR.  11:15

 7   There may have been some individuals in Employee    11:15

 8   Services.  Again, the reporting structure's         11:15

 9   changed so much since 2017.  These groups moved     11:15

10   around and the people moved around a bit.  But it   11:16

11   was a collective decision, if you will, made under  11:16

12   guidance of the Labor Relations group, the Human    11:16

13   Resources group, and our Law Department.            11:16

14        Q.    Okay.  I'd like you to take a look at    11:16

15   another exhibit that we'll mark as Exhibit 14.  I   11:16

16   have that up.                                        11:16

17             THE REPORTER:  I thought it was 15 by now.  11:16

18   No?                                                  11:16

19             MR. PAUL:  You know, you're right.  I     11:16

20   apologize.  It is 15.                                11:16

21             (Exhibit 15 was marked for identification and

22   attached to the transcript.)

23   BY MR. PAUL:                                         11:16

24        Q.    Starts with Christian, Owens, Carpenter,  11:16

25   and -- and some others?                             11:16
```

467

| | | |
|---|---|---|
| 1 | A.   Yes, I have that in front of me. | 11:16 |
| 2 | Q.   Okay.  If you could take a look at Page -- | 11:16 |
| 3 | could it be 117?  Yeah.  Okay. | 11:16 |
| 4 | MS. FOSTER BIRD:  Page what? | 11:17 |
| 5 | MR. PAUL:  Page 117, 1-1-7, which is not as | 11:17 |
| 6 | bad as it looks because it's an excerpt of just | 11:17 |
| 7 | Dr. Heligman's testimony. | 11:17 |
| 8 | BY MR. PAUL: | 11:17 |
| 9 | Q.   So it's Page 13 of the 16 group, Bates | 11:17 |
| 10 | No. 3464. | 11:17 |
| 11 | A.   Okay.  I've got that in front of me. | 11:17 |
| 12 | Q.   Okay.  All right.  I'm drawing your | 11:17 |
| 13 | attention to Lines 1 through 16, please. | 11:17 |
| 14 | A.   Okay. | 11:17 |
| 15 | Q.   All right.  And, in particular, about the | 11:17 |
| 16 | middle -- right around Lines 9 or 10 you -- in part, | 11:17 |
| 17 | the sentence picks up -- your testimony picks up: | 11:17 |
| 18 | "And the fraudulent issue is | 11:18 |
| 19 | I've got 67 and counting | 11:18 |
| 20 | number of employees from CSX | 11:18 |
| 21 | in the Greater Huntington, | 11:18 |
| 22 | West Virginia area that have | 11:18 |
| 23 | all gone to one or[sic] two | 11:18 |
| 24 | practitioners with the sole | 11:18 |
| 25 | intent of obtaining medical | 11:18 |

468

```
 1                 documentation for the              11:18

 2                 purpose[s] of seeking benefits     11:18

 3                 inappropriate[ly].  That's the     11:18

 4                 fraud."                            11:18

 5         Do you see where I read that?             11:18

 6     A.    Yes, I do.                               11:18

 7     Q.    Okay.  When you testified and used the term  11:18

 8   "sole intent," are you testifying that the       11:18

 9   plaintiffs were only seeking the care of Dr. Carey  11:18

10   and Dr. Johnson for the purpose of seeking benefits  11:18

11   and not any legitimate medical condition?        11:18

12     A.    I think they selected these professionals,  11:18

13   again, as I stated before, knowing their pattern of  11:18

14   practice prior to seeking care.                  11:18

15         And I'm not saying they didn't -- I'm not  11:18

16   saying they didn't have an issue that could be   11:18

17   treated by a chiropractic professional.  I'm saying  11:19

18   they selected these particular chiropractic       11:19

19   professionals knowing in advance that if they wanted  11:19

20   to have a form completed to their advantage, that  11:19

21   they could receive that from these two           11:19

22   practitioners.                                   11:19

23     Q.    Okay.  But my question is:  What did you  11:19

24   mean by "sole intent"?                           11:19

25     A.    I think that their intent was to obtain a  11:19
```

Craig Heligman, M.D.                                                    April 29, 2021

```
 1    document, the COII, and have it filled out that      11:19

 2    would endorse their absence from work for medical    11:19

 3    reasons.                                             11:19

 4        Q.   Does "sole" mean only exclusive in the way  11:19

 5    that you know it?                                    11:19

 6        A.   It would be my interpretation.  If they had 11:19

 7    other reasons for being there, they may have other   11:19

 8    reasons.                                             11:19

 9             Again, I don't know their full intent.  I   11:19

10    don't know their specific intent.  My interpretation 11:19

11    of the facts as they were at that point in time --   11:20

12    and I still hold this opinion -- that if it not      11:20

13    were -- if it not were for the issue of wanting to   11:20

14    have a COII completed that continued or initiated    11:20

15    their time off work, they may have selected a        11:20

16    different professional.                              11:20

17        Q.   Okay.  And it's your testimony, then and    11:20

18    today, that each of the plaintiffs in this case, it  11:20

19    was their sole intent to obtain benefits            11:20

20    inappropriately, and that's the fraud; is that       11:20

21    correct?                                             11:20

22        A.   Yes.  And I think "benefits" should be      11:20

23    taken more generically.  It may have been the        11:20

24    extension of the health benefits.  It may have been  11:20

25    just to extend their time off work.  It may have     11:20
```

Craig Heligman, M.D.                                                              April 29, 2021

```
 1   been for the endorsement of -- of other issues.  But      11:20

 2   that, in my mind, is the intent for why they may           11:20

 3   have selected these two providers specifically.            11:20

 4       Q.   All right.  If you could turn to the next         11:21

 5   page, 118, which is Bates No. 3465, please.                11:21

 6       A.   Yes.                                              11:21

 7       Q.   Now, looking at Line 9, you don't testify         11:21

 8   till the bottom, but I want to ask you about               11:21

 9   Mr. Thoele's characterization of your role.  At Line       11:21

10   9, he states:                                             11:21

11           "Dr. Heligman -- Heligman is                       11:21

12            the one that generated this                       11:21

13            Investigation due to the --                       11:21

14            from what he stated earlier,                      11:21

15            the amount of paperwork that                      11:21

16            came into his office.  That                       11:21

17            is, I believe, [..] what CSX                      11:21

18            pays him to do..."                                11:21

19       Do you disagree with any of Mr. Thoele's               11:21

20   characterization of your role?                             11:21

21       A.   Well, again, I -- it's kind of a disjointed       11:21

22   statement.  But I believe what he's referencing is         11:22

23   that my job is to receive and review paperwork as          11:22

24   the Chief Medical Officer.                                 11:22

25       Q.   What is your understanding of what -- well,       11:22
```

471

Craig Heligman, M.D.                                                        April 29, 2021

```
 1   what is your response to Mr. Thoele's description    11:22

 2   that you're the one that generated this              11:22

 3   investigation?                                        11:22

 4       A.   Well, as we discussed earlier, certainly we 11:22

 5   would not have held investigations had it not been   11:22

 6   for my role in collecting the documents and          11:22

 7   presenting it to other authorities within the        11:22

 8   organization.                                         11:22

 9       Q.   Well, and it may be, you know, parsing       11:22

10   words.  That's why I'm just trying to get the most   11:22

11   accurate testimony here today.  I mean, it's true    11:23

12   that you generated the basis of the Charge Letters.  11:23

13   I know you didn't generate the Charge Letters         11:23

14   themselves, but the basis for the Charge Letters,    11:23

15   that's correct; right?                                11:23

16       A.   I provided a document, and it was deemed    11:23

17   that there should be a charge made.                   11:23

18       Q.   Okay.  And with the verbiage that           11:23

19   Mr. Thoele uses that you "generated this             11:23

20   investigation" -- and I guess -- I think we've       11:23

21   established you were the only witness at these       11:23

22   investigations for the plaintiffs.                   11:23

23           That's correct; right?                        11:23

24       A.   Yes.                                          11:23

25       Q.   Okay.  In this -- your testimony -- we can  11:23
```

472

Craig Heligman, M.D.                                                                    April 29, 2021

```
 1   look at it on Page 33.  Let me get that.  It's just    11:23

 2   back a handful of pages, but if you want to take a      11:23

 3   look at Page 33.                                        11:23

 4            Are you there?                                 11:23

 5       A.   Not yet.                                       11:23

 6       Q.   Okay.                                          11:24

 7       A.   That's Bates No. 3380?                         11:24

 8       Q.   Correct.                                       11:24

 9       A.   Okay.                                          11:24

10       Q.   And is it also correct to say that you         11:24

11   generated this investigation to the extent that your   11:24

12   participation in it concluded where it states, Line    11:24

13   37, that, quote:                                        11:24

14            "I found that the providers'                   11:24

15             actions and the employees'                    11:24

16             actions to be [a] concerted                    11:24

17             effort to defraud CSXT, [the]                  11:24

18             Railroad Retirement Board, and                 11:24

19             the insurance providers of                     11:24

20             extended benefits"?                            11:24

21            Do you agree with that?                        11:24

22       A.   Yes, the -- the information that I stated       11:24

23   there was accurately reflected in all of the            11:24

24   investigations.                                         11:24

25       Q.   Okay.  All right.  Let's take a look at        11:24
```

473

Craig Heligman, M.D.                                                    April 29, 2021

```
 1   Exhibit 16.                                          11:24

 2            (Exhibit 16 was marked for identification and

 3   attached to the transcript.)                         11:25

 4   BY MR. PAUL:                                          11:25

 5       Q.   This is a transcript starting with           11:25

 6   Mr. Adkins, Clark, and -- and several others.        11:25

 7       A.   Okay.  I have it.                            11:25

 8       Q.   And you may have cleared this up for -- for  11:25

 9   the record earlier, but I want to take a look at      11:25

10   Page 34, please.                                     11:25

11       A.   Again, Bates No. 1555?                       11:25

12       Q.   That's correct.                             11:25

13       A.   Okay.                                        11:25

14       Q.   Okay.  You were asked the question by        11:25

15   Mr. Giuliano at Line 31:                             11:25

16            "Did you or any of your staff              11:25

17              contact Dr. Johnson or Dr.                 11:25

18              Carey for clarification or                 11:25

19              more documentation?"                       11:25

20         You responded:                                  11:25

21            "I made an attempt to contact               11:25

22              them and my call was not                   11:26

23              returned."                                 11:26

24         Do you see where I read that?                   11:26

25       A.   Yes, at the bottom of the page.              11:26
```

474

Craig Heligman, M.D.                                                      April 29, 2021

```
 1        Q.   Okay.  And I think we've already          11:26
 2   established that earlier, that you're going with the 11:26
 3   testimony that you gave back in 2017 as being likely 11:26
 4   more reliable that you did, in fact, contact         11:26
 5   Dr. Johnson related to the incidents in June and     11:26
 6   July of 2017?                                        11:26
 7        A.   Right, or made the attempt to do so.       11:26
 8        Q.   Correct.  Yeah.                            11:26
 9             And this question's a little unclear, but  11:26
10   did you ever make any attempt to call Dr. Carey?     11:26
11        A.   No.                                        11:26
12        Q.   Okay.  And when you called Dr. Johnson, it 11:26
13   was just one time or more than one?                  11:26
14        A.   Just the one time.                         11:26
15        Q.   Okay.  And what were you going to say to   11:26
16   him?                                                 11:26
17        A.   Again, it's five years ago, and I would say 11:26
18   that I would have asked him, you know, "We're        11:26
19   receiving all these documents.  Can you explain      11:26
20   that?"  Explain what's happening, as far as he could 11:26
21   tell.                                                11:27
22        Q.   Okay.  And is that something that you      11:27
23   called, like, on your own impetus, or was that also  11:27
24   something that was at the advice of either Labor     11:27
25   Relations or the Law Department?                     11:27
```

                                                                          475

```
 1            MS. FOSTER BIRD:  To the extent that it was    11:27
 2    the advice of any of the Law Department, I'm going     11:27
 3    to instruct you not to answer based on the             11:27
 4    attorney/client privilege.                             11:27
 5            THE WITNESS:  I chose to do it.                 11:27
 6    BY MR. PAUL:                                           11:27
 7        Q.   On your own -- I mean, as medical director    11:27
 8    of CSX?                                                11:27
 9        A.   Yes.                                          11:27
10        Q.   Okay.  And did you -- thinking that this      11:27
11    was of such a magnitude that it, you know, went from   11:27
12    suspicion of fraud, did you ever think about writing   11:27
13    him a letter?                                          11:27
14        A.   No.                                           11:27
15        Q.   Did you ever think about calling him back a   11:27
16    second time?                                           11:27
17        A.   No.  When I placed the call the first time,   11:27
18    someone answered -- I don't know who it was.  I gave   11:27
19    my name and explained the nature of the call, and I   11:28
20    don't know where the receiver was, but after that,    11:28
21    all I heard honestly was laughter.  And I -- nobody    11:28
22    ever picked up the phone after that, so I             11:28
23    disconnected.  And I felt there was no reason to       11:28
24    make any further attempts.                             11:28
25        Q.   Okay.  I'm sorry.  So you called and          11:28
```

                                                                      476

| | | |
|---|---|---|
| 1 | someone answered the phone.  You explained the | 11:28 |
| 2 | purpose of your call? | 11:28 |
| 3 | A.   I introduced myself and I explained that I | 11:28 |
| 4 | would like to speak with Dr. Johnson.  I don't know | 11:28 |
| 5 | exactly what I -- I said.  I may or may not have | 11:28 |
| 6 | said that it was in relationship to the number of | 11:28 |
| 7 | forms we had seen, but my typical pattern is to | 11:28 |
| 8 | introduce myself, explain who I was and who I wanted | 11:28 |
| 9 | to speak with, and sometimes I'll explain the | 11:28 |
| 10 | purpose.  It just depends on the circumstances, but | 11:28 |
| 11 | that's the general format that I use. | 11:29 |
| 12 | And in this particular set of | 11:29 |
| 13 | circumstances, I was waiting for a response, I heard | 11:29 |
| 14 | people laughing on the phone.  And nobody ever | 11:29 |
| 15 | picked up the phone after that, so I disconnected -- | 11:29 |
| 16 | Q.   Okay.  That -- | 11:29 |
| 17 | A.   -- and elected not to make any further | 11:29 |
| 18 | calls. | 11:29 |
| 19 | Q.   Okay.  That's what I was confused about. | 11:29 |
| 20 | So did somebody put you on hold? | 11:29 |
| 21 | A.   No.  I don't know what they did -- as I | 11:29 |
| 22 | said, I don't know what they did with the receiver, | 11:29 |
| 23 | but what I heard was laughter on the other end.  And | 11:29 |
| 24 | I could tell there was more than one person.  I | 11:29 |
| 25 | couldn't tell you how many, but it was more than one | 11:29 |

477

```
 1   person.  I don't know what they were laughing about.   11:29

 2   I'd like to believe it wasn't me.  But nobody ever    11:29

 3   came back to the phone, so I disconnected.            11:29

 4        Q.   Okay.  So how long do you think you -- how   11:29

 5   long approximately a period of time from when the     11:29

 6   person that answered the phone and you responded      11:30

 7   explaining the purpose of your call and that you      11:30

 8   heard laughter before you hung up?                    11:30

 9        A.   A minute, two minutes, something of that    11:30

10   nature.                                               11:30

11        Q.   Okay.  So pretty long.                      11:30

12             I mean, don't you think that's long, to     11:30

13   wait a minute or two on a phone?                      11:30

14        A.   I think so.  On the other hand, I also      11:30

15   recognize how busy offices are, and I've been put on  11:30

16   hold for longer periods of time waiting for the       11:30

17   provider to pick up.  And so I feel it's appropriate  11:30

18   to allow the practitioner time to answer the phone.   11:30

19   I don't take any offense at that.                     11:30

20        Q.   And did you hear laughter that whole one or  11:30

21   two minutes?                                          11:30

22        A.   Pretty much, yes.                           11:30

23        Q.   Okay.  The person who answered the phone,   11:30

24   do you recall if it was a man or a woman?             11:30

25        A.   It was higher pitched.  It sounded like a   11:30
```

                                                                478

| | | |
|---|---|---|
| 1 | female voice. | 11:30 |
| 2 | Q.   Okay.  And did -- the person who answered | 11:30 |
| 3 | the phone, did they respond in any way to your -- to | 11:30 |
| 4 | your description of why you were calling? | 11:30 |
| 5 | A.   I think they acknowledged that I -- you | 11:31 |
| 6 | know, that I had called them, obviously, and told me | 11:31 |
| 7 | to wait. | 11:31 |
| 8 | Q.   Oh, okay.  That's what I was getting at. | 11:31 |
| 9 | So did they say "Please hold the line for a | 11:31 |
| 10 | minute" or "Wait a moment"? | 11:31 |
| 11 | A.   Yes. | 11:31 |
| 12 | Q.   Okay.  So -- | 11:31 |
| 13 | A.   To the best of my knowledge, yes. | 11:31 |
| 14 | Q.   In other words, is there anything in the | 11:31 |
| 15 | conversation that you had with whoever answered the | 11:31 |
| 16 | phone that you thought was rude or inappropriate? | 11:31 |
| 17 | A.   No. | 11:31 |
| 18 | Q.   Okay.  All right.  If you could turn to the | 11:31 |
| 19 | next page -- well, hold on.  Are you on 35?  I went | 11:31 |
| 20 | to 36.  I think it's on the same page.  Give me one | 11:31 |
| 21 | moment, please. | 11:32 |
| 22 | Okay.  Yeah, at the bottom of Page 35, say, | 11:32 |
| 23 | starting with Line 32 through 40, can you take a | 11:32 |
| 24 | look at that, please? | 11:32 |
| 25 | A.   I'm sorry.  Which lines are we looking at | 11:32 |

Craig Heligman, M.D.                                                    April 29, 2021

```
 1   again?                                              11:32
 2      Q.   32 through 40 on Page 35, which is Bates    11:32
 3   1556.                                               11:32
 4      A.   Okay.                                       11:32
 5      Q.   Okay.  You've had a chance to review that.  11:32
 6           So your testimony there starting at Line 36 11:32
 7   picks up:                                           11:32
 8              "However, the concern with this          11:32
 9               is that the providers --                11:32
10               provider were not acting                11:32
11               appropriately from a medical            11:32
12               perspective."                           11:32
13           Do you see that?                            11:32
14      A.   Yes, I do.                                  11:32
15      Q.   Okay.  Now, that was referring obviously -- 11:32
16   "the medical perspective" is referring specifically 11:32
17   to Dr. Johnson or Dr. Carey; is that correct?       11:32
18      A.   Yes.                                        11:32
19      Q.   So whatever medical perspective that they   11:32
20   were offering and you think it was inappropriate, do 11:32
21   you attribute any fault to the plaintiffs with      11:33
22   respect to your perception of "inappropriate medical 11:33
23   perspective"?                                       11:33
24      A.   No, the two providers are responsible for   11:33
25   completing the forms.  It's their responsibility to 11:33
```

                                                              480

```
 1    complete it to the best of their abilities, I          11:33

 2    suppose.                                               11:33

 3        Q.    And then on Line 40 there, Mr. Giuliano      11:33

 4    states that "That's a pretty sharp accusation" that    11:33

 5    you're making against the chiropractors.               11:33

 6            Do you see that?                                11:33

 7        A.    Yes, that -- yes.                             11:33

 8        Q.    And if you turn to the next page, 36,         11:33

 9    Mr. Giuliano asks you what do you have to back up       11:33

10    that sharp accusation, and you introduce a document;   11:33

11    is that correct?                                        11:33

12        A.    Yes, that's correct.                          11:33

13        Q.    And I know you described that document the    11:33

14    other day, so I don't think we need to do that         11:33

15    again, but I'd like to ask you:  What was your         11:33

16    purpose in bringing this document along to some of     11:33

17    the later hearings?                                     11:33

18        A.    Well, I couldn't necessarily predict what    11:33

19    questions were going to be asked of me.  It was a      11:34

20    medical issue that -- it was a medical issue on        11:34

21    these forms that were -- that was present, and it      11:34

22    was two chiropractic providers.  I thought that it     11:34

23    would be possible that they would inquire as to        11:34

24    questions about medical care, and I wanted to be       11:34

25    prepared to be responsive to that.                     11:34
```

                                                                    481

Craig Heligman, M.D.                                                      April 29, 2021

| | | |
|---|---|---|
| 1 | Q.   Okay.  So on the one hand, you've | 11:34 |
| 2 | testified, you know, I think today and certainly | 11:34 |
| 3 | yesterday, that it's absolutely a true statement | 11:34 |
| 4 | that you, as medical director, are not supposed to | 11:34 |
| 5 | interfere with the treatment between a patient and, | 11:34 |
| 6 | in this case, Dr. Carey and Dr. Johnson; is that | 11:34 |
| 7 | correct? | 11:34 |
| 8 | A.   Yes, that's correct. | 11:34 |
| 9 | Q.   But on the other hand, you've introduced a | 11:34 |
| 10 | document that's calling into question the medical | 11:34 |
| 11 | treatment of Dr. Carey and Dr. Johnson with respect | 11:34 |
| 12 | to the plaintiffs; correct? | 11:34 |
| 13 | A.   Also correct. | 11:34 |
| 14 | MR. PAUL:  All right.  Why don't we take a | 11:34 |
| 15 | short break?  Five minutes is fine with me, but if | 11:35 |
| 16 | anybody needs longer, that's all right, and then | 11:35 |
| 17 | we'll continue on. | 11:35 |
| 18 | THE VIDEOGRAPHER:  Off the record at | 11:35 |
| 19 | 11:35 a.m. | 11:35 |
| 20 | (Recess taken.) | 11:44 |
| 21 | THE VIDEOGRAPHER:  We are back on the | 11:44 |
| 22 | record at 11:44 a.m. | 11:44 |
| 23 | MR. PAUL:  All right.  Great. | 11:44 |
| 24 | BY MR. PAUL: | 11:44 |
| 25 | Q.   Doctor, we're back on the record after a | 11:44 |

482

```
 1    short break.  I have introduced Exhibit 17, if you    11:44

 2    can take a look at that, please.  This is concerning   11:44

 3    Thayer, Maddix, Manis, Stinnett, and Akers.            11:45

 4            (Exhibit 17 was marked for identification and

 5    attached to the transcript.)                           11:45

 6            THE WITNESS:  Okay.  I have it up.              11:45

 7    BY MR. PAUL:                                           11:45

 8        Q.   Okay.  And, again, I'd like you to look at     11:45

 9    Page 42, please.                                       11:45

10        A.   And that's Bates No. 2364?                     11:45

11        Q.   That's correct.  Yeah.                         11:45

12        A.   Okay.                                          11:45

13        Q.   And, in particular, just look at Lines 1       11:45

14    through 10, please.                                    11:45

15        A.   Okay.  I've read that.                         11:45

16        Q.   Okay.  So for these particular plaintiffs      11:45

17    that are identified in the top left-hand corner,       11:46

18    similar to your prior testimony, do you agree that     11:46

19    the Certificate of Ongoing Illnesses do not appear     11:46

20    to be fraudulent?                                      11:46

21        A.   That's correct.  As I said in this            11:46

22    statement and previously during this deposition, the  11:46

23    documents themselves were not the fraudulent issue.   11:46

24        Q.   And going down a little further -- I'll       11:46

25    find the line here in a moment, but the question is:   11:46
```

Craig Heligman, M.D.                                                   April 29, 2021

| | | |
|---|---|---|
| 1 | You agree that it was your impression that the | 11:46 |
| 2 | employees were seeking out these two providers in | 11:46 |
| 3 | order to secure an opinion to hold them off | 11:46 |
| 4 | unnecessarily?  And that's Lines 23 through 26. | 11:46 |
| 5 | A.   Yes. | 11:46 |
| 6 | Q.   I'm sorry.  If you said something, I missed | 11:46 |
| 7 | it, but please take your time. | 11:46 |
| 8 | A.   No, I -- I see where you are and I've | 11:47 |
| 9 | looked at it. | 11:47 |
| 10 | Q.   Okay.  And do you agree that that -- that | 11:47 |
| 11 | the Certificate of Ongoing Illnesses were not | 11:47 |
| 12 | fraudulent?  Your impression was that the plaintiffs | 11:47 |
| 13 | were -- and others were seeking to be held out | 11:47 |
| 14 | unnecessarily by Dr. Johnson and Dr. Carey? | 11:47 |
| 15 | A.   Correct.  It was the large volume of | 11:47 |
| 16 | documents received from those two practitioners over | 11:47 |
| 17 | a short period of time in that local area. | 11:47 |
| 18 | Q.   I want you to take a look at another | 11:47 |
| 19 | exhibit, which is Exhibit 18. | 11:47 |
| 20 | A.   You said Exhibit 18? | 11:47 |
| 21 | Q.   Yes, that's correct. | 11:47 |
| 22 | (Exhibit 18 was marked for identification and | |
| 23 | attached to the transcript.) | |
| 24 | BY MR. PAUL: | 11:47 |
| 25 | Q.   And, in particular, if you could look at | 11:47 |

484

Craig Heligman, M.D.                                                    April 29, 2021

```
 1    Page 36, please.                                    11:48

 2         A.    And that would be Bates No. 0909?        11:48

 3         Q.    You got there faster than I did, so give me  11:48

 4    one second.  That sounds right, but -- yup, 0909.   11:48

 5         A.    Okay.                                     11:48

 6         Q.    And on this topic, you were asked about   11:48

 7    complaints that you had made to the Chiropractic     11:48

 8    Board concerning Dr. Johnson and Dr. Carey.          11:48

 9    That's -- you know, that's at the top of the page.   11:48

10         Do you need a chance to review that?           11:48

11         A.    Yes, I see where your -- I see where you're  11:48

12    looking, yes.                                        11:48

13         Q.    Okay.  And you did, in fact -- well, let me  11:48

14    ask you this:  We know that the letter that you      11:48

15    wrote to the Railroad Retirement Board was copied to  11:48

16    a number of insurance companies, and I believe that  11:48

17    letter was also copied to the Chiropractic Board.    11:49

18         Is that your recollection?                      11:49

19         A.    Yes, for Ohio and Kentucky.               11:49

20         Q.    Okay.  And other than that letter, did you  11:49

21    ever make any verbal or written complaints to anyone  11:49

22    about Dr. Carey or Dr. Johnson?                      11:49

23         A.    No.                                        11:49

24         Q.    And there was somewhere in this transcript  11:49

25    where it appeared -- I'm going to go on the page      11:49
```

485

Craig Heligman, M.D.                                                    April 29, 2021

```
 1   before -- it appeared that you had just received      11:49

 2   information concerning the results.  Let's see.       11:49

 3        A.   Yes, at the top of the page, Line 5.         11:49

 4        Q.   Ah, there it is.  Yeah.  Thank you.          11:49

 5             So, like, just by coincidence, the date of  11:49

 6   this investigation, you received a letter from the    11:49

 7   Chiropractic Board?                                    11:49

 8        A.   Yes.                                          11:49

 9        Q.   Okay.  So these -- I mean, as far as I can   11:49

10   tell, these transcripts aren't dated, but if my       11:49

11   math's right -- or not my math, but if my review of   11:50

12   the termination letters is correct, Mr. Rowe --       11:50

13   okay.  That makes sense.  Mr. Rowe's was in October   11:50

14   of 2017, a little later than the August ones, so I    11:50

15   guess it would follow from your -- the date of your   11:50

16   letter in July until October.                          11:50

17             Is it your understanding that either the    11:50

18   Ohio or the Kentucky Board's governing chiropractors  11:50

19   reviewed the matter, the complaint?                    11:50

20        A.   I had confirmation and a response from the  11:50

21   Kentucky Board.  I never received any response or     11:50

22   acknowledgment from the Ohio Board.                    11:50

23        Q.   Okay.  And is your testimony here back in   11:50

24   2017 correct that the Chiropractic Board in Kentucky  11:50

25   held a closed-board session and dropped the claim or  11:50
```

486

```
 1    dismissed the claim, as you say in Line 9?          11:50

 2       A.    Yes.                                        11:50

 3       Q.    Okay.  Have you heard anything from the     11:51

 4    Kentucky Chiropractic Board since that time?         11:51

 5       A.    No.                                         11:51

 6       Q.    Matter was closed; is that it?              11:51

 7       A.    As far as I know.  I never received any     11:51

 8    other information.                                   11:51

 9       Q.    Okay.  And when you said you -- you         11:51

10    received the letter, I take it -- was it just the    11:51

11    letter, not a telephone call or anything like that?  11:51

12       A.    Correct.  I actually have a letter from the 11:51

13    Board saying that -- well, what I stated in that --  11:51

14    in the hearing.                                      11:51

15       Q.    Okay.  And did you ever hear from the Ohio  11:51

16    Chiropractic Board or whatever it's called?          11:51

17       A.    No.                                         11:51

18       Q.    Okay.  And I think you testified, but just  11:51

19    while we're on the topic, did you ever hear back     11:51

20    from the United States Railroad Retirement Board?    11:51

21       A.    I heard back in writing that they received  11:51

22    the information that I sent them.  I received a      11:51

23    telephone call advising that they had referred it to 11:51

24    their investigative team.  And I forget the date,    11:51

25    but it was sometime after that that they confirmed   11:51
```

487

1      they were initiating their investigation.              11:51

2          Q.   And do you -- to the best of your             11:52

3      recollection, was that back in 2017?                   11:52

4          A.   No, it was -- it was at least a couple        11:52

5      years after that.  But it -- I haven't received any    11:52

6      information on the outcome of their investigation.     11:52

7          Q.   Okay.  So if it was -- and, again, this is    11:52

8      a range, but if it was a couple of years after 2017,   11:52

9      I mean, do you think you received the phone call       11:52

10     from the Railroad Retirement Board, like, in 2020 or   11:52

11     something or..?                                        11:52

12         A.   It could have been.  I -- all I know is       11:52

13     that I remember receiving the phone call advising      11:52

14     that they were initiating the investigation.  I        11:52

15     honestly don't remember the date at all.               11:52

16         Q.   Okay.                                         11:52

17         A.   I just know it was --                         11:52

18         Q.   I'm sorry.                                    11:52

19         A.   -- a long time after the circumstances.       11:52

20         Q.   Sure.                                         11:52

21              And was that the only contact that you've     11:52

22     had with the Railroad Retirement Board that you just   11:52

23     described on this topic?                               11:52

24         A.   For this investigation, yes.                  11:52

25         Q.   Sure.                                         11:52

                                                              488

Craig Heligman, M.D.                                          April 29, 2021

 1            And I take it by that testimony, like, no          11:52

 2   investigator from the Railroad Retirement Board or          11:53

 3   the U.S. Attorney's Office has interviewed you              11:53

 4   concerning any of these allegations?                        11:53

 5        A.    That's correct.                                  11:53

 6        Q.    Okay.  And, to your knowledge, has anyone        11:53

 7   else at CSX been interviewed by the Railroad               11:53

 8   Retirement Board investigators or U.S. Attorney's          11:53

 9   Office?                                                     11:53

10            MS. FOSTER BIRD:  I'm going to object to          11:53

11   the extent that anything you know you've learned           11:53

12   from counsel, that would be privileged under the           11:53

13   attorney/client privilege.                                 11:53

14            THE WITNESS:  I don't know if anybody             11:53

15   contacted -- from the RRB had contacted anyone here        11:53

16   at CSX.  I haven't heard anything at all.                  11:53

17   BY MR. PAUL:                                               11:53

18        Q.    From anybody?                                    11:53

19        A.    From anybody.                                    11:53

20            MS. FOSTER BIRD:  Same objection.                 11:53

21   BY MR. PAUL:                                               11:53

22        Q.    For the sake of being complete, the other      11:53

23   people -- entities that were copied on the letter to      11:53

24   the Railroad Retirement Board, have you ever heard        11:53

25   from Aetna or any of the insurance companies'             11:53

                                                                489

Craig Heligman, M.D.                                                April 29, 2021

| | | |
|---|---|---|
| 1 | investigation units? | 11:53 |
| 2 | A.   I -- one of the insurance companies ask | 11:54 |
| 3 | that you submit these kinds of concerns via their | 11:54 |
| 4 | Internet site, and so I went to the Website and | 11:54 |
| 5 | entered the complaint there.  I did receive notice | 11:54 |
| 6 | that they were looking at it.  I don't remember if | 11:54 |
| 7 | they had sent anything after that.  But other than | 11:54 |
| 8 | that information, I don't know what their final | 11:54 |
| 9 | conclusions were. | 11:54 |
| 10 | Q.   Okay.  And can you give an approximate time | 11:54 |
| 11 | frame of when you submitted that online complaint? | 11:54 |
| 12 | A.   It would have been concurrent with sending | 11:54 |
| 13 | the letters out. | 11:54 |
| 14 | Q.   Okay.  Did Mr. Fergus from the Railroad | 11:54 |
| 15 | Retirement Board ever contact you directly? | 11:54 |
| 16 | A.   Other than to acknowledge receipt of the | 11:54 |
| 17 | information, no. | 11:54 |
| 18 | Q.   Okay.  To your knowledge, has the U.S. | 11:54 |
| 19 | Attorney's Office initiated any investigation kind | 11:55 |
| 20 | of like they did with the Long Island Railroad? | 11:55 |
| 21 | A.   Not to my knowledge. | 11:55 |
| 22 | MS. FOSTER BIRD:  I'll object to the extent | 11:55 |
| 23 | if anything that you know has been learned from | 11:55 |
| 24 | counsel, it's attorney/client privilege. | 11:55 |
| 25 | THE WITNESS:  Not to my knowledge. | 11:55 |

490

```
 1   BY MR. PAUL:                                    11:55
 2       Q.   All right.  If we could take a look at Page  11:55
 3   44, please.  And I've got that as Bates No. 917.  11:55
 4       A.   Okay.  And I have that up in front of me.  11:55
 5       Q.   So we referenced this earlier, and I    11:55
 6   mentioned to you that we might get to it a little  11:56
 7   bit later.  If you look at Lines 21 and 22, you   11:56
 8   testified that, in summary fashion, your opinion --  11:56
 9   it's your:                                       11:56
10           "Opinion but it is also a fact           11:56
11            that the body heals itself."            11:56
12       Do you see that?                             11:56
13       A.   Yes, I do.                              11:56
14       Q.   Okay.  Can you describe the context -- and,  11:56
15   you know, I'd welcome you to read other parts of  11:56
16   that page or even earlier if it's helpful, but what  11:56
17   was the context that you were giving an opinion and  11:56
18   a fact that the body heals itself with respect to  11:56
19   these -- this plaintiff, which is Mr. Rowe?      11:56
20       A.   Well, at the -- up in the top part of the  11:56
21   page, Line 5, the comment from Mr. Perry was:    11:56
22           "So Mr. Rowe slipped on some             11:56
23            steps or fell on his steps and          11:56
24            felt pain in his back.  He              11:56
25            didn't go to a provider.                11:56
```

491

Craig Heligman, M.D.                                                    April 29, 2021

| | | |
|---|---|---|
| 1 | How's he going to get better?" | 11:56 |
| 2 | And my comment was: | 11:56 |
| 3 | "Well, actually, in most cases, | 11:57 |
| 4 | the kinds of conditions that | 11:57 |
| 5 | are described in the[se] | 11:57 |
| 6 | records the body heals." | 11:57 |
| 7 | And his comment was: | 11:57 |
| 8 | "(Well) [..] that's an opinion. | 11:57 |
| 9 | You never examined Mr. Rowe, | 11:57 |
| 10 | did you?" | 11:57 |
| 11 | I said: | 11:57 |
| 12 | "No, I haven't examined him, | 11:57 |
| 13 | but, no, it's not just an | 11:57 |
| 14 | opinion based upon -- it's | 11:57 |
| 15 | a..." | 11:57 |
| 16 | And he interrupted: | 11:57 |
| 17 | "It's a -- no, it's an opinion | 11:57 |
| 18 | based on what's written in | 11:57 |
| 19 | those documents.  It's an | 11:57 |
| 20 | opinion." | 11:57 |
| 21 | I said: | 11:57 |
| 22 | "It is my opinion, but it is | 11:57 |
| 23 | also a fact that the body | 11:57 |
| 24 | heals itself.  You don't | 11:57 |
| 25 | necessarily need treatment for | 11:57 |

492

USCA4   2308

Craig Heligman, M.D.                                                    April 29, 2021

```
 1                 the body to heal."                    11:57
 2           And I still stand by that.                  11:57
 3           When you receive a -- if you cut your       11:57
 4    finger, the finger heals.  You don't necessarily   11:57
 5    have to have treatment for that.  When you sprain  11:57
 6    your ankle, your ankle recovers.  You don't        11:57
 7    necessarily have to have treatment for that.       11:57
 8           It's a matter of degree.  The body does     11:57
 9    have the capacity to heal itself.                  11:57
10       Q.   Was your testimony right here and specific 11:57
11    to Mr. Rowe for the purpose of asserting that      11:57
12    Mr. Rowe's treatment with the chiropractor was not 11:58
13    appropriate and unwarranted?                       11:58
14       A.   No, I was answering Mr. Perry's questions. 11:58
15       Q.   Okay.  So it's just a general statement,   11:58
16    not anything specific to Mr. Rowe or the other     11:58
17    plaintiffs; is that right?                         11:58
18       A.   Yes, that's correct.                       11:58
19       Q.   All right.  Take a look at another exhibit.11:58
20    Okay.  We've got Exhibit 19.  It should be up there.11:58
21    And this is concerning Mr. Brown, Witt, Morrison,  11:58
22    and M.L. Potter.                                   11:58
23           THE REPORTER:  I have 18, but I might be    11:58
24    wrong.                                             11:58
25           THE WITNESS:  Okay.  So I have to scroll to 11:58
```

493

| | | |
|---|---|---|
| 1 | get to 19? | 11:58 |
| 2 | MS. FOSTER BIRD:  Scroll down on the side. | 11:58 |
| 3 | Scroll down on the side. | 11:58 |
| 4 | THE REPORTER:  Counsel, let me check for a | 11:59 |
| 5 | moment here. | 11:59 |
| 6 | MR. PAUL:  Sure. | 11:59 |
| 7 | MS. FOSTER BIRD:  Did you find it, | 11:59 |
| 8 | Dr. Heligman? | 11:59 |
| 9 | THE WITNESS:  Yes, I did. | 11:59 |
| 10 | MS. FOSTER BIRD:  Okay. | 11:59 |
| 11 | THE REPORTER:  It is 19.  Thank you. | 11:59 |
| 12 | MR. PAUL:  Okay.  Does everybody have -- | 11:59 |
| 13 | THE WITNESS:  Yes. | 11:59 |
| 14 | MR. PAUL:  -- the correct document? | 11:59 |
| 15 | BY MR. PAUL: | 11:59 |
| 16 | Q.   Okay.  If you could take a look at Page 35, | 11:59 |
| 17 | please. | 11:59 |
| 18 | (Exhibit 19 was marked for identification and | |
| 19 | attached to the transcript.) | 11:59 |
| 20 | THE WITNESS:  And that'll be Bates No. | 11:59 |
| 21 | 0831? | 11:59 |
| 22 | MR. PAUL:  Correct. | 11:59 |
| 23 | THE WITNESS:  Okay. | 11:59 |
| 24 | BY MR. PAUL: | 11:59 |
| 25 | Q.   All right.  And Lines 8 through 19 is what | 11:59 |

494

Craig Heligman, M.D.                                                              April 29, 2021

```
 1    I wanted to ask you about when -- when you've had a      12:00

 2    chance to take a look at that.                           12:00

 3         A.   Okay.  I've read it.                           12:00

 4         Q.   Okay.  Similar to a prior transcript we've     12:00

 5    looked at, but you stand behind that testimony that      12:00

 6    you gave that, in this case, these four                  12:00

 7    plaintiffs -- but, for that matter, the other            12:00

 8    plaintiffs as well -- were going to these                12:00

 9    practitioners for the purpose of getting a note for      12:00

10    them to be off for medical reasons, and you              12:00

11    understood that to be for inappropriate medical          12:00

12    reasons?                                                 12:00

13         A.   Yes, that was my opinion in the other case     12:00

14    as it is here.                                           12:00

15         Q.   And the inappropriate medical reasons, you     12:00

16    would agree that's the scope of chiropractic care        12:00

17    and not something else; is that right?                   12:00

18         A.   I'm not sure I understand that question.       12:01

19         Q.   Sure.                                          12:01

20              I mean, when you're -- in this transcript,     12:01

21    when you referenced inappropriate medical reasons,       12:01

22    are you referring to the care that the                   12:01

23    chiropractors, Dr. Johnson and Carey, gave to the        12:01

24    plaintiffs?                                              12:01

25         A.   No, I'm saying that it was the medical         12:01
```

```
 1   circumstances were the vehicle used to submit this    12:01

 2   form and to remain off work.  It could have been for  12:01

 3   any other set of circumstances where they were        12:01

 4   allowed to be off work.  It -- it wasn't necessarily  12:01

 5   even this case.  It happened to be a medical issue,   12:01

 6   not any other issue.                                  12:01

 7       Q.   All right.  If we could take a look at       12:01

 8   Page 39, please.                                      12:02

 9       A.   And that would be 0835; correct?             12:02

10       Q.   Correct.                                     12:02

11       A.   Okay.                                        12:02

12       Q.   And there's a tape-recording that's played  12:02

13   somewhere around Lines 10 through 17.  If you can     12:02

14   take a look at that, please.                          12:02

15       A.   Okay.                                        12:02

16       Q.   And this appears to be a recording from      12:02

17   Kelly from CSX Medical.  We touched on it a little    12:02

18   bit earlier, but she's apparently informing that CSX  12:02

19   will no longer accept any medical documentation from  12:02

20   one of the chiropractors; is that correct?            12:02

21       A.   Yes, that's correct.                         12:02

22       Q.   So can you tell -- tell us a little bit      12:02

23   about that process of -- what knowledge you have      12:02

24   about the process to arrive at the conclusion that    12:02

25   CSX would no longer accept any medical documentation  12:03
```

                                                                    496

```
 1    from Dr. Carey or Dr. Johnson?                    12:03

 2        A.   Okay.  Just so I understand, are you asking  12:03

 3    me how we came to that conclusion that led up to us  12:03

 4    sending them letters?                             12:03

 5        Q.   Yeah.  And I can try to break it down a   12:03

 6    little bit because I don't know that we want to   12:03

 7    limit it to the letters because there's obviously a  12:03

 8    telephone call that was made as well.             12:03

 9         Do you know who made the decision -- or      12:03

10    multiple people who were involved in the decision --  12:03

11    to no longer accept medical documentation from   12:03

12    Dr. Johnson and Carey?                            12:03

13        A.   I think we're going to have to wait for an  12:03

14    objection.                                        12:03

15         MS. FOSTER BIRD:  Could you restate your     12:03

16    question?  And I'm sorry.                         12:03

17         MR. PAUL:  Yeah.                             12:03

18    BY MR. PAUL:                                      12:03

19        Q.   Do you have any knowledge of who made the  12:03

20    decision to no longer accept medical documentation  12:04

21    from Dr. Carey and Dr. Johnson?                   12:04

22         MS. FOSTER BIRD:  Sorry about that.  I was   12:04

23    not listening.  I object to the extent that it calls  12:04

24    for communications, as part of the attorney/client  12:04

25    privilege, with the Legal Department or others.   12:04
```

Craig Heligman, M.D.                                                April 29, 2021

```
 1              THE WITNESS:  And, therefore, I cannot    12:04

 2   answer.                                             12:04

 3   BY MR. PAUL:                                        12:04

 4       Q.   Well, I disagree.  You can answer.  I'm    12:04

 5   allowed to ask who made the decision.  I'm not      12:04

 6   allowed to ask about the content of the             12:04

 7   communications.                                     12:04

 8              MS. FOSTER BIRD:  I disagree.  We're going 12:04

 9   to object to that question.  I'm going to instruct  12:04

10   him not to answer.  Giving the answer to your       12:04

11   question would actually violate the attorney/client 12:04

12   privilege, so...                                    12:04

13   BY MR. PAUL:                                        12:04

14       Q.   Did you, Doctor, make the decision to no   12:04

15   longer accept medical documentation from Dr. Johnson 12:04

16   and Dr. Carey?                                      12:04

17       A.   I consulted others within the organization 12:04

18   to request permission to do that.                   12:04

19       Q.   So it was your decision?                   12:04

20       A.   No, it was a discussion with others.       12:05

21       Q.   Did you -- did Labor Relations make the    12:05

22   decision to no longer accept medical documentation  12:05

23   from Dr. Carey and Dr. Johnson?                     12:05

24       A.   I consulted others in the organization and 12:05

25   received advice as to what I could do, and the      12:05
```

                                                              498

```
 1   letters were written and then submitted to Dr. Carey   12:05

 2   and Dr. Johnson.                                        12:05

 3       Q.   I appreciate that.  My question's a little    12:05

 4   bit different because it's more specific.               12:05

 5           So did you consult with anyone in Human         12:05

 6   Resources Department concerning no longer accepting     12:05

 7   medical documentation from Dr. Johnson and             12:05

 8   Dr. Carey?                                             12:05

 9       A.   No.                                            12:05

10       Q.   Did you consult with anyone in Labor          12:05

11   Relations concerning the decision to no longer         12:05

12   accept medical documentation from Dr. Johnson or       12:05

13   Dr. Carey?                                             12:05

14       A.   No.                                            12:05

15       Q.   Did you consult with anyone in Field          12:05

16   Administration concerning the decision to no longer    12:05

17   accept medical documentation from Dr. Johnson and      12:06

18   Dr. Carey?                                             12:06

19       A.   No.                                            12:06

20       Q.   Did you consult with any governing boards,    12:06

21   like the Chiropractic Boards in Ohio and Kentucky,     12:06

22   concerning the decision to no longer accept medical    12:06

23   documentation from Dr. Carey and Dr. Johnson?          12:06

24       A.   No, but I wouldn't need their permission      12:06

25   anyway.                                                12:06
```

                                                                499

Craig Heligman, M.D.                                          April 29, 2021

```
 1        Q.    Did you consult with anyone other than the    12:06

 2   Legal Department at CSX concerning the decision to        12:06

 3   no longer accept medical documentation from               12:06

 4   Dr. Carey and Dr. Johnson?                                12:06

 5        A.    Not to the best of my recollection.            12:06

 6        Q.    Was the decision to no longer accept           12:06

 7   medical documentation from Dr. Carey and Dr. Johnson      12:06

 8   permanent in nature or was it more of a temporary         12:06

 9   censure?                                                  12:06

10        A.    My recollection is that was intended to be     12:07

11   permanent.                                                12:07

12        Q.    In the time that you've been at CSX as         12:07

13   either associate medical director or medical             12:07

14   director, have you ever been involved in any             12:07

15   decision to not accept medical documentation from        12:07

16   any provider of any kind?                                 12:07

17        A.    No, other than this set of circumstances.     12:07

18        Q.    Understood.                                    12:07

19              When you worked or consulted with other       12:07

20   railroads, have you ever been involved in the            12:07

21   decision to not accept medical documentation from        12:07

22   any provider of any kind?                                 12:07

23        A.    No.                                            12:07

24              MR. PAUL:  All right.  I just need a -- a      12:08

25   short break to discuss this -- your objection, so if     12:08
```

                                                                    500

| | | |
|---|---|---|
| 1 | you just give us five minutes, I will be right back | 12:08 |
| 2 | on the record. | 12:08 |
| 3 | So can we go off the record for a moment? | 12:08 |
| 4 | THE VIDEOGRAPHER:  Off the record at | 12:08 |
| 5 | 12:08 p.m. | 12:08 |
| 6 | (Recess taken.) | 12:08 |
| 7 | THE VIDEOGRAPHER:  We're back on the record | 12:13 |
| 8 | at 12:13 p.m. | 12:13 |
| 9 | BY MR. PAUL: | 12:13 |
| 10 | Q.   All right.  Thank you, Doctor.  We're back | 12:13 |
| 11 | on the record after a short break. | 12:13 |
| 12 | We were talking about the decision to no | 12:13 |
| 13 | longer take medical documentation from Dr. Carey and | 12:13 |
| 14 | Dr. Johnson. | 12:13 |
| 15 | Before seeking any type of legal advice | 12:13 |
| 16 | from the Legal Department at CSX, can you tell me, | 12:13 |
| 17 | did you form an opinion as to whether CSX should | 12:13 |
| 18 | accept medical documentation from Dr. Johnson and | 12:14 |
| 19 | Dr. Carey? | 12:14 |
| 20 | A.   Yes. | 12:14 |
| 21 | Q.   Okay.  And tell me what opinions you | 12:14 |
| 22 | formed. | 12:14 |
| 23 | A.   It was my opinion that given the | 12:14 |
| 24 | circumstances we had with Drs. Johnson and Carey | 12:14 |
| 25 | that led up to the series of investigations where we | 12:14 |

501

```
 1    felt that they weren't appropriately completing the    12:14

 2    forms on behalf of our employees, if we had            12:14

 3    questions about that, then we should not continue to   12:14

 4    accept those forms from those two practitioners any    12:14

 5    longer.                                                12:14

 6         Q.   Okay.  And it was the basis for that         12:14

 7    opinion, what you've testified to yesterday and        12:14

 8    today, in terms of their past history as well as the   12:14

 9    predetermined absences for work for the plaintiffs?    12:15

10         A.   Again, we felt that they were extending      12:15

11    absences, and it was my medical opinion that it was    12:15

12    not completely credible on a medical basis.  If we     12:15

13    made the determination that that was the basis for     12:15

14    these investigations, it would make no sense for us    12:15

15    to then turn around and start accepting their forms    12:15

16    again.                                                 12:15

17         So I requested -- I discussed the case and        12:15

18    I was able to send those letters to those              12:15

19    practitioners, advising them we would no longer be     12:15

20    willing to accept their medical documentation in the   12:15

21    way of the forms we're discussing.  However, the       12:15

22    employees were able to seek medical care from those    12:15

23    two practitioners if they so chose and their           12:16

24    insurance -- or they chose to pay for that service     12:16

25    out of pocket.                                         12:16
```

                                                                    502

```
 1              [Dog barking.]                          12:16

 2         MR. PAUL:  Yeah, it's a little bit of a      12:16

 3    problem.                                          12:16

 4    BY MR. PAUL:                                      12:16

 5       Q.    Did -- any of the employees, once they  12:16

 6    learned about the change in policy to no longer take  12:16

 7    those documentations, did any of them reach out to  12:16

 8    either you or the Medical Department?             12:16

 9       A.    Which employees are we speaking of now? 12:16

10       Q.    We are talking about if any of the      12:16

11    employees ever, like, issued a complaint or       12:16

12    something about the decision to no longer accept  12:16

13    Carey or Johnson.                                 12:16

14       A.    If they did, I have not heard about it. 12:16

15       Q.    Okay.  Were there any -- were you aware of  12:16

16    any internal complaints about -- made through, like,  12:16

17    the hotline or the ethics line internally at CSX  12:17

18    concerning that decision?                         12:17

19       A.    Not to my knowledge, no.                 12:17

20       Q.    Okay.                                     12:17

21              [Closes door.]                          12:17

22         MS. FOSTER BIRD:  That's kind of mean of     12:17

23    you, Greg.                                         12:17

24         MR. PAUL:  It really is, I know.             12:17

25         MS. FOSTER BIRD:  It just wanted love.       12:17
```

503

Craig Heligman, M.D.                                        April 29, 2021

```
 1              MR. PAUL:  Yeah, on my terms.  All right?   12:17

 2              MS. FOSTER BIRD:  Must be a female.        12:17

 3   BY MR. PAUL:                                          12:17

 4      Q.   Did -- the idea or the concept to no longer  12:17

 5   take that medical documentation from Dr. Carey and   12:17

 6   Johnson, did you generate that idea?                 12:17

 7      A.   Was it my idea to not want to accept those   12:17

 8   documents?  Is that -- saying that it was initiated  12:17

 9   by myself?                                           12:18

10      Q.   That's correct.  That's the question.        12:18

11      A.   Yes, yes.                                     12:18

12      Q.   All right.  We're going to switch topics a   12:18

13   little bit.                                           12:18

14              In this lawsuit, I imagine you've seen a  12:18

15   copy of the complaint at some point over the past    12:18

16   several years?                                        12:18

17      A.   At some point, yes.                           12:18

18      Q.   Yeah.  Okay.                                  12:18

19              And is it your understanding that the --  12:18

20   that CSX Transportation has been identified as a     12:18

21   defendant, as well as a number of individual         12:18

22   defendants?                                           12:18

23              Are you aware of that?                     12:18

24      A.   Yes.                                          12:18

25      Q.   Okay.  And are you aware that you were       12:18
```

Craig Heligman, M.D.                                          April 29, 2021

```
 1    identified as an individual defendant, you know, in   12:18
 2    your capacity as medical director?                    12:18
 3          MS. FOSTER BIRD:  That's a misstatement.        12:18
 4    He was identified and sued in an individual           12:18
 5    capacity.                                             12:18
 6          MR. PAUL:  Okay.  We'll get to that.            12:18
 7    BY MR. PAUL:                                          12:18
 8      Q.   Is it your understanding that CSX is being     12:18
 9    sued also, as well as you in an individual capacity?  12:18
10      A.   Yes, but I really don't understand why.        12:19
11      Q.   Okay.  Do you -- again, without getting        12:19
12    into any conversations you've had with any            12:19
13    attorneys, is your testimony the same that you just   12:19
14    do not have an understanding of why you've been sued  12:19
15    in the individual capacity?                           12:19
16      A.   That's correct.  I was acting in my            12:19
17    capacity as the Chief Medical Officer as an employee  12:19
18    of CSX, and I don't know why a suit would be filed    12:19
19    against me personally for acting as the Chief         12:19
20    Medical Officer as an employee of CSX.                12:19
21      Q.   Okay.  Would you agree that absent the         12:19
22    truth, that accusing someone of fraud is defamatory?  12:19
23          MS. FOSTER BIRD:  I'm going to object to        12:19
24    the extent that calls for a legal conclusion.         12:19
25    Answer if you know and to the extent that you can.    12:19
```

505

```
 1              THE WITNESS:  Again, I can't.  I can't    12:20

 2    answer that because it is a legal issue and I'm not  12:20

 3    an attorney.                                          12:20

 4    BY MR. PAUL:                                          12:20

 5        Q.    Okay.  Has anyone ever accused you of       12:20

 6    defamation before?                                    12:20

 7        A.    No.                                          12:20

 8        Q.    Okay.  Do you know what defamation is in    12:20

 9    the non-legal sense?                                  12:20

10        A.    Basically saying untruths about someone for 12:20

11    whatever reason.                                       12:20

12        Q.    Okay.  And do you believe that you have     12:20

13    testified and said untruthful things about any of     12:20

14    the plaintiffs in this case?                          12:20

15        A.    Not to my knowledge, no.                     12:20

16        Q.    When you've concluded, after investigation, 12:20

17    that the plaintiffs in this case -- that their         12:20

18    actions to be a concerted effort to defraud CSXT,      12:20

19    the Railroad Retirement Board, and insurance           12:21

20    providers, do you believe that to be untrue?           12:21

21        A.    I believe the statement was made            12:21

22    accurately.  In some cases, individuals were           12:21

23    exonerated after the hearings.  In most cases, they    12:21

24    were not.                                              12:21

25        Q.    Were you involved in the decision to        12:21
```

506

```
 1    exonerate any of the employees?              12:21

 2         A.   I was not involved in the decision-making   12:21

 3    to exonerate or to uphold the charges.  And all of   12:21

 4    these that were upheld were, as far as I know,   12:21

 5    submitted through the Public Law Board, and the   12:21

 6    Public Law Board found in favor of CSX.  And I would   12:21

 7    be led to believe that they found that my statements   12:21

 8    were, in fact, supportable in their minds, and those   12:21

 9    decisions were not overturned.               12:21

10         Q.   Now, I know you're not a lawyer, but are   12:21

11    you familiar with the standard of review that the   12:22

12    Public Law Board uses in determining whether to   12:22

13    uphold discipline?                           12:22

14         A.   No.                                12:22

15         Q.   Did you provide -- with respect to my   12:22

16    original question about the employees that were -- I   12:22

17    think you used the word "exonerated," I understand   12:22

18    your testimony that you were not involved in that   12:22

19    decision or those decisions.                 12:22

20              Were you asked to provide any input with   12:22

21    respect to the decision to exonerate certain   12:22

22    employees?                                   12:22

23         A.   No.                                12:22

24         Q.   These -- today we've gone through a number   12:22

25    of the hearing transcripts and we've established   12:22
```

                                                           507

| | | |
|---|---|---|
| 1 | that the majority -- in fact, I believe, all but | 12:22 |
| 2 | one -- happened in August of 2017.  So I want to ask | 12:22 |
| 3 | you a broad question, and then if we need to drill | 12:22 |
| 4 | down on more specifics, we can. | 12:22 |
| 5 | But my broad question is with respect to | 12:22 |
| 6 | all the plaintiffs in this case and the date that | 12:23 |
| 7 | you testified at the hearing.  Okay?  So that's | 12:23 |
| 8 | Point A. | 12:23 |
| 9 | A.   Okay. | 12:23 |
| 10 | Q.   And Point B is the date of the termination | 12:23 |
| 11 | letters, which to give you a sampling -- they vary, | 12:23 |
| 12 | but I'm willing to establish a fairly broad | 12:23 |
| 13 | parameter here.  So if the hearings took place in | 12:23 |
| 14 | August primarily -- and if it's true that the dates | 12:23 |
| 15 | of termination are on a different piece of paper, | 12:23 |
| 16 | then we're going to have to wait a minute. | 12:23 |
| 17 | But the broad question is:  Between the | 12:23 |
| 18 | date of the hearing and the date of the termination, | 12:23 |
| 19 | which I'm going to represent is generally about a | 12:23 |
| 20 | month or two, did you ever have any conversations | 12:23 |
| 21 | with anyone in Field Administration or Labor | 12:23 |
| 22 | Relations about anything regarding these plaintiffs? | 12:24 |
| 23 | A.   I don't recall.  I may or may not have. | 12:24 |
| 24 | But I wasn't involved in the decision on the actions | 12:24 |
| 25 | following the investigation. | 12:24 |

508

Craig Heligman, M.D.                                                    April 29, 2021

1        Q.   Okay.  So let me -- let me ask the question    12:24

2    a slightly different way.                               12:24

3        Did any of the investigating officers or           12:24

4    the Hearing Officers contact you after the hearing      12:24

5    for any of the plaintiffs to get either additional      12:24

6    information or to get -- to get any additional          12:24

7    information from you?                                    12:24

8        A.   Not that I recall, no.                         12:24

9        Q.   Okay.  Now, in going through some of the --    12:24

10   or all of the transcripts today, you recall that        12:24

11   part that I've read now numerous times that after       12:25

12   the investigation, you concluded that:                  12:25

13              "The providers' actions and the              12:25

14               employees' actions to be a                  12:25

15               concerted effort to defraud                 12:25

16               CSXT, the Railroad Retirement               12:25

17               Board, and insurance providers              12:25

18               of extended benefits."                      12:25

19       Would you today as you testify make that            12:25

20   same decision and conclude that the employees'          12:25

21   actions were a concerted effort to defraud those        12:25

22   entities?                                               12:25

23       A.   The language that was in each of those         12:25

24   investigations was the language used in the charges,    12:25

25   and so I would support that that statement still        12:25

                                                                  509

```
 1    remains the charge.                              12:25

 2         Q.   Do you mind repeating that?  I didn't quite  12:25

 3    follow it.  Or I can ask you another question.   12:25

 4         A.   The statement that you're referring to  12:25

 5    about the concerted effort to defraud the employer  12:25

 6    or whatever the statement was, that statement was,  12:25

 7    again, one of those statements that was to be read  12:26

 8    into the record consistently with every           12:26

 9    investigation.  And that -- that was part of the --  12:26

10    that was the charge being levied against these   12:26

11    individuals.                                      12:26

12              And so the charge remains the same, and I  12:26

13    still support the -- the charges that were made  12:26

14    against the employee.                             12:26

15         Q.   All of the employees; right?  All of the  12:26

16    plaintiffs at least?                              12:26

17         A.   Again, all the employees, the end result  12:26

18    following completion of the investigation.  Not  12:26

19    every employee was terminated as a result of the  12:26

20    investigation.                                    12:26

21         Q.   And with respect to the employees who were  12:26

22    exonerated after the hearing but before the Public  12:26

23    Law Board, did you -- were you aware of any criteria  12:26

24    that were used to determine that they should not be  12:27

25    found guilty?                                     12:27
```

510

USCA4    2326

| | | |
|---|---|---|
| 1 | A.   Again, I was not involved in the | 12:27 |
| 2 | decision-making.  However, my understanding was that | 12:27 |
| 3 | there were -- there was other medical information | 12:27 |
| 4 | presented that they felt would explain why the | 12:27 |
| 5 | person had been off work, and, therefore, they | 12:27 |
| 6 | should not be found guilty of those charges. | 12:27 |
| 7 | However, we never received that medical information | 12:27 |
| 8 | in the Medical Department. | 12:27 |
| 9 | MR. PAUL:  All right.  I believe those are | 12:27 |
| 10 | all the questions I have for Dr. Heligman today. | 12:27 |
| 11 | MS. FOSTER BIRD:  Does that mean all of you | 12:27 |
| 12 | are finished? | 12:27 |
| 13 | MR. PAUL:  Well, I can't speak for | 12:27 |
| 14 | everybody, but... | 12:27 |
| 15 | MS. FOSTER BIRD:  I mean, you decide? | 12:27 |
| 16 | MR. PAUL:  Yeah, let's decide. | 12:27 |
| 17 | Are you intending to cross-examine or hold | 12:27 |
| 18 | off on that? | 12:27 |
| 19 | MS. FOSTER BIRD:  I am not going to | 12:27 |
| 20 | cross-examine him.  I'm ready to go off the record | 12:28 |
| 21 | on this one and start with the Rule 30(b)(6). | 12:28 |
| 22 | MR. PAUL:  Okay.  Let me check on that and | 12:28 |
| 23 | I'll get back to you.  Just give us a minute. | 12:28 |
| 24 | MS. FOSTER BIRD:  Okay.  All right. | 12:28 |
| 25 | Kyle, are we off the record? | 12:28 |

511

```
 1              THE VIDEOGRAPHER:  Take you guys off the      12:28

 2    record?                                                 12:28

 3              MS. FOSTER BIRD:  Yes.                        12:28

 4              THE VIDEOGRAPHER:  Yes, off the record at     12:28

 5    12:28 p.m.                                              12:28

 6              (Recess taken.)                               12:28

 7              THE VIDEOGRAPHER:  We're back on the record   12:34

 8    at 12:34 p.m.                                           12:34

 9              MR. DINGWALL:  So we had a short discussion   12:34

10    off the record, but I'll reiterate that we aren't       12:34

11    intending to move forward with Dr. Heligman's           12:34

12    deposition as a 30(b)(6) witness today because:         12:34

13              One, we never anticipated that the           12:34

14    depositions of yesterday and today would encompass      12:34

15    him as a 30(b)(6) witness; we didn't have               12:34

16    notification that he was a 30(b)(6) until just a        12:34

17    couple of days ago; we didn't receive his              12:34

18    document -- document production as a 30(b)(6)           12:34

19    witness until a couple of days ago; and we didn't      12:34

20    have enough time left today to complete his            12:34

21    deposition as a 30(b)(6) witness.                       12:34

22              So we will need to get a date on the         12:34

23    schedule for that, and we're happy to do that now      12:34

24    while we're on the record.                             12:34

25              MS. FOSTER BIRD:  We offered the Rule        12:35
```

                                                              512

Craig Heligman, M.D.                                                    April 29, 2021

```
 1   30(b)(6) witness at this time with this witness.  We    12:35

 2   advised you several days ago that this witness would     12:35

 3   be offered on certain topics within that notice.         12:35

 4          I disagree that you were only provided            12:35

 5   documents for his Rule 30(b)(6) deposition a couple      12:35

 6   of days ago.  There were some supplemental               12:35

 7   documents, which you asked about each one of those       12:35

 8   in his personal and professional capacity                12:35

 9   deposition.                                              12:35

10          You asked for eight -- you asked for more         12:35

11   than eight hours per day for Dr. Heligman's              12:35

12   deposition.  Yesterday we did not use the full           12:35

13   eight hours.  Today we have not used the full            12:35

14   eight hours.  He is here, he is willing, he is able      12:35

15   to testify about those topics, and this will be the      12:35

16   time we are offering him to do that.                     12:35

17          MR. DINGWALL:  Okay.  Well, again, we             12:35

18   disagree on that topic, so we won't be moving            12:35

19   forward with this 30(b)(6) deposition.  It was never     12:35

20   intended to go forward yesterday or today, and we'll     12:35

21   need to schedule new dates for that.                     12:35

22          THE REPORTER:  Are we off the record?             12:36

23          THE VIDEOGRAPHER:  And this concludes             12:36

24   today's deposition.  We are going off the record at      12:36

25   12:36 p.m.  Thank you.                                   12:36
```

                                                                    513

Craig Heligman, M.D.                                          April 29, 2021

1          MS. FOSTER BIRD:  Dr. Heligman, as part of       12:36

2     this deposition process, you have the option to read   12:36

3     and sign your deposition, or you can trust that        12:36

4     Laura took it down correctly.  I will leave it up to   12:36

5     you, given that it is a video deposition, which I      12:36

6     understand it was very long.  If you'd like to read    12:36

7     it and confirm that she took everything down right,    12:36

8     it's up to you.  You can make that decision.           12:36

9          THE WITNESS:  Although I trust Laura, I           12:36

10    would like to read and sign.                           12:36

11         MS. FOSTER BIRD:  Okay.  We'll do that.           12:36

12         (At 12:36 p.m. the Volume II deposition of        12:36

13          CRAIG HELIGMAN, M.D. was adjourned.)             12:36

14

15

16

17

18

19

20

21

22

23

24

25

                                                             514

| | EXHIBIT 4 |
|---|---|

**Rebecca Mitchell**

| | |
|---|---|
| **From:** | Melissa Foster Bird |
| **Sent:** | Wednesday, April 28, 2021 1:45 PM |
| **To:** | Jeff Dingwall |
| **Cc:** | Greg Paul; Kiel Garella; pstephens@underwoodlawoffices.com; Megan Davis; Nathan Hamons; Rebecca Mitchell; Shelby Cardoza; Jen Rosenwald |
| **Subject:** | RE: Adkins - Rule 30(b)(6) Notice of Deposition and additional requested depositions |

We have provided deposition dates and times for Heligman, Crouch (see below), Johnson, Dreher, Barr, Johnson and Kuhner.

I need to provide a date for Male.  The L/R representative is currently off of leave and I will confirm that deposition as soon as they return.  I have asked that you hold **May 7** for that deposition.

Crouch – she was scheduled for this Friday but has been postponed at  Kiel's request.  Last night I offered  the dates of May 13 and 14.  I will schedule her for **May 14 at 10:00 a.m. Eastern**.

I have also confirmed:
Kenneth  Emerson on **May 13** at 11:00 a.m.
Milton Storm – **May 12** at 1:00
Elizabeth Crreedon on **May 1**2 at 9:00
Cheryl Shumway  - **May 11** at 10:00 a.m.
Confirming Brian Barr on **May 6** at 1:00

---

**From:** Jeff Dingwall <jeff@eightandsandlaw.com>
**Sent:** Tuesday, April 27, 2021 8:52 PM
**To:** Melissa Foster Bird <Melissa.FosterBird@nelsonmullins.com>
**Cc:** Greg Paul <gregpaul@paullaw.com>; Kiel Garella <kiel@gljustice.com>; pstephens@underwoodlawoffices.com; Megan Davis <megan.davis@nelsonmullins.com>; Nathan Hamons <nathan.hamons@nelsonmullins.com>; Rebecca Mitchell <rebecca.mitchell@nelsonmullins.com>; Shelby Cardoza <shelby@eightandsandlaw.com>; Jen Rosenwald <jen@paullaw.com>
**Subject:** Re: Adkins - Rule 30(b)(6) Notice of Deposition

Melissa - will you please provide us with available dates for these 30(b)(6) designees as soon as possible so that we can start planning our calendars and scheduling reporters?

Thank you,

Jeff

**JEFF R. DINGWALL**

**EIGHT & SAND  |  LAW OFFICE OF JEFF R. DINGWALL, PC**
**P** (619) 796-3464  **C** (858) 361-9930  **F** (619) 717-8762 **E** jeff@eightandsandlaw.com
550 West B Street, Fourth Floor  |  San Diego, CA 92101

On Mon, Apr 26, 2021 at 4:36 PM Melissa Foster Bird <Melissa.FosterBird@nelsonmullins.com> wrote:

Subject to our forgoing and upcoming objections,  and conversations and agreements on time and other limitations,  the following topics in  the Rule 30b6 Notice of Deposition will be addressed (maybe fully and maybe in part) by the listed witnesses:

1. Topic 1
    a. Dr. Craig Heligman
    b. Kelly Caudell Crouch

2. Topic 2
    a. Dr. Craig Heligman
    b. Kelly Caudell Crouch

3. Topic 3
    a. Dr. Craig Heligman
    b. Kelly Caudell Crouch
    c. Jolanda Johnson

4. Topic 4
    a. Dr. Craig Heligman
    b. Kelly Caudell Crouch

5. Topic 5
    a. Dr. Craig Heligman
    b. Kelly Caudell Crouch

6. Topic 6
    a. Jolanda Johnson

7. Topic 7
    a. Jolanda Johnson

8. Topic 9

      a.  Dr. Craig Heligman
      b.  L/R Representative

9.  Topic 11
      a.  Penny Dreher
      b.  Dr. Craig Heligman
      c.  L/R Representative
      d.  Brian Barr
      e.  Ben Crossman
      f.  Scott Kuhner
      g.  Nick Male

10.  Topic 16
      a.  Dr. Craig Heligman

11.  Topic 17
      a.  Dr. Craig Heligman

12.  Topic 18
      a.  Dr. Craig Heligman
      b.  Jolanda Johnson

13.  Topic 19
      a.  Dr. Craig Heligman

14.  Topic 39
      a.  Dr. Craig Heligman

This is the first list in response to the Amended Rule 30(b)(6) Notice and correspondence between Greg Paul and me, and it will be updated.

Melissa

 **NELSON MULLINS**

**MELISSA FOSTER BIRD**  PARTNER

melissa.fosterbird@nelsonmullins.com

She/Her/Hers

949 THIRD AVE. | SUITE 200

HUNTINGTON, WV 25701

T 304.526.3503   M 304.634.6919   F 304.526.3543
NELSONMULLINS.COM   VCARD   VIEW BIO

**Confidentiality Notice**
This message is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged, confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately either by phone (800-237-2000) or reply to this e-mail and delete all copies of this message.

EXHIBIT
5

## Rebecca Mitchell

| | |
|---|---|
| **From:** | Nathan Hamons |
| **Sent:** | Wednesday, August 11, 2021 11:53 AM |
| **To:** | Rebecca Mitchell |
| **Cc:** | Nathan Hamons |
| **Subject:** | FW: Adkins, et al. v. CSX, et al. - Hearing on Plaintiffs' Motion to Compel |

**From:** Tarry, Samuel L. Jr.
**Sent:** Tuesday, July 13, 2021 9:16 AM
**To:** 'Melissa Foster Bird' <Melissa.FosterBird@nelsonmullins.com>; pstephens@underwoodlawoffices.com; Kiel Garella <kiel@gljustice.com>
**Cc:** Megan Davis <megan.davis@nelsonmullins.com>; Jeff Dingwall <jeff@eightandsandlaw.com>; Greg Paul <gregpaul@paullaw.com>; Ken Reed Gmail <kenreedatty@gmail.com>; Jen Rosenwald <jen@paullaw.com>; Walsh, Davis M. <DWalsh@mcguirewoods.com>
**Subject:** RE: Adkins, et al. v. CSX, et al. - Hearing on Plaintiffs' Motion to Compel

A related scheduling question – Dr. Heligman is still holding dates later this month to complete the 30(b)(6) depositions. Would July 26, 27, or 28 work on the calendar or do we need to find other dates?

Thanks,
Sam

**Samuel L. Tarry Jr.**
Partner
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219-3916
T:  +1 804 775 7873
M: +1 804 347 9078
F:  +1 804 698 2188
starry@mcguirewoods.com
Bio | VCard | www.mcguirewoods.com

<div style="border:1px solid black; text-align:center;">

**EXHIBIT 6**

</div>

## Rebecca Mitchell

| | |
|---|---|
| **From:** | Nathan Hamons |
| **Sent:** | Wednesday, August 11, 2021 11:48 AM |
| **To:** | Rebecca Mitchell |
| **Subject:** | FW: 30(b)(6) deposition |

**From:** Greg Paul <gregpaul@paullaw.com>
**Sent:** Friday, August 6, 2021 11:13 AM
**To:** Tarry, Samuel L. Jr. <starry@mcguirewoods.com>
**Cc:** Jeff Dingwall <jeff@eightandsandlaw.com>; Walsh, Davis M. <DWalsh@mcguirewoods.com>; Megan Davis <megan.davis@nelsonmullins.com>; Melissa Foster Bird <Melissa.FosterBird@nelsonmullins.com>
**Subject:** Re: 30(b)(6) deposition

<div style="border:2px solid black; background:#b6f000;">

**EXTERNAL EMAIL; use caution with links and attachments**

</div>

Sam,
Yes- August 23 works for us. Thank you. Greg.

On Mon, Aug 2, 2021 at 9:31 AM Tarry, Samuel L. Jr. <starry@mcguirewoods.com> wrote:

> It turns out that week is tricky because of an obligation he has a for a (virtual/zoom) trial. But he can clear that Monday, August 23rd.
>
>
>
> Can you make the 23rd work?
>
>
>
> **Samuel L. Tarry Jr.**
> Partner
> McGuireWoods LLP
> Gateway Plaza
> 800 East Canal Street
> Richmond, VA 23219-3916
> T:  +1 804 775 7873
> M: +1 804 347 9078
> F:  +1 804 698 2188
> starry@mcguirewoods.com
> Bio | VCard | www.mcguirewoods.com
>
> <div style="border:1px solid black; width:200px; height:40px;"></div>

**From:** Jeff Dingwall <jeff@eightandsandlaw.com>
**Sent:** Friday, July 30, 2021 2:38 PM
**To:** Tarry, Samuel L. Jr. <starry@mcguirewoods.com>
**Cc:** Greg Paul <gregpaul@paullaw.com>; Walsh, Davis M. <DWalsh@mcguirewoods.com>; Megan Davis <megan.davis@nelsonmullins.com>; Melissa Foster Bird <Melissa.FosterBird@nelsonmullins.com>
**Subject:** Re: 30(b)(6) deposition

**EXTERNAL EMAIL; use caution with links and attachments**

Unfortunately neither of us are available on the 26th. Are there other options available?


**JEFF R. DINGWALL**


**EIGHT & SAND | LAW OFFICE OF JEFF R. DINGWALL, PC**

**P** (619) 796-3464  **C** (858) 361-9930  **F** (619) 717-8762 **E** jeff@eightandsandlaw.com

550 West B Street, Fourth Floor  |  San Diego, CA 92101




On Fri, Jul 30, 2021 at 9:53 AM Tarry, Samuel L. Jr. <starry@mcguirewoods.com> wrote:

Just spoke with him. The end of the month is more difficult than mid-month, but he is blocking off Thursday, August 26th. And he's releasing the 11th to other obligations.


Please let me know if the 26th isn't doable on your end. I understand the request for setting this on a date post-guidance from the court and will try to make work.


Sam


**Samuel L. Tarry Jr.**
Partner
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219-3916
T:  +1 804 775 7873
M: +1 804 347 9078
F:  +1 804 698 2188
starry@mcguirewoods.com
Bio | VCard | www.mcguirewoods.com

**From:** Greg Paul <gregpaul@paullaw.com>
**Sent:** Friday, July 30, 2021 11:27 AM
**To:** Tarry, Samuel L. Jr. <starry@mcguirewoods.com>
**Cc:** Walsh, Davis M. <DWalsh@mcguirewoods.com>; Jeff Dingwall <jeff@eightandsandlaw.com>; Megan Davis <megan.davis@nelsonmullins.com>; Melissa Foster Bird <Melissa.FosterBird@nelsonmullins.com>; Bowman, Margaret A. <MBowman@mcguirewoods.com>
**Subject:** Re: 30(b)(6) deposition

<div style="background-color:#b6ff00">**EXTERNAL EMAIL; use caution with links and attachments**</div>

Sam,

We would like to take Dr. Heligman's deposition after the Magistrate Judge makes a ruling on the pending motion regarding emails, etc. Unless that decision comes out soon, it may be better to find a later date. Is Dr. Heligman have availability later in the month? Thank you. Greg

On Thu, Jul 29, 2021 at 5:29 PM Tarry, Samuel L. Jr. <starry@mcguirewoods.com> wrote:

Related - Greg/Jeff, if you guys don't want that deposition date I will go ahead and tell him to release it and we will try to find you something later on the calendar.

Sam

Sent from my iPhone

On Jul 29, 2021, at 7:43 PM, Walsh, Davis M. <DWalsh@mcguirewoods.com> wrote:

Good evening,

Following up on Sam's email, you should have (or will shortly) received a link to our Sharefile site to download the documents Sam referenced below. If you all need anyone else from your side added to the Sharefile link, let us know.

Davis

**From:** Tarry, Samuel L. Jr. <starry@mcguirewoods.com>
**Sent:** Wednesday, July 28, 2021 1:12 PM
**To:** Jeff Dingwall <jeff@eightandsandlaw.com>; Gregory Paul <gregpaul@paullaw.com>

**Cc:** Walsh, Davis M. <DWalsh@mcguirewoods.com>; Megan Davis
<megan.davis@nelsonmullins.com>; Melissa Foster Bird <Melissa.FosterBird@nelsonmullins.com>
**Subject:** 30(b)(6) deposition


Jeff/Greg:


Dr. Heligman is holding Wednesday August 11 for the corporate deposition. He's available in
Jacksonville the full day on east coast time. Will that work for the rescheduling?


We'll send you a link to the documents he's reviewed thus far in preparation for the 30(b)(6)
testimony – hoping to get that out tonight.


Thanks,

Sam


**Samuel L. Tarry Jr.**
Partner
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219-3916
T:  +1 804 775 7873
M: +1 804 347 9078
F:  +1 804 698 2188
starry@mcguirewoods.com
Bio | VCard | www.mcguirewoods.com

*This e-mail from McGuireWoods may contain confidential or privileged information. If you are not the intended
recipient, please advise by return e-mail and delete immediately without reading or forwarding to others.*

--

Gregory G. Paul
Attorney at Law
Paul Law Offices, PLLC

Presidio: 1808 Wedemeyer Street, Suite 216, San Francisco, CA 94129

First & Market Building: 100 First Avenue, Suite 1010, Pittsburgh, PA 15222

(412) 259-8375 (PA)

(415) 326-8300 (CA)

(844) 374-7200 (toll free)

(888) 822-9421 (fax)
www.paullaw.com

www.erisadisabilitybenefits.com

**Confidentiality Notice:** The information contained in this electronic mail message and any attachments is confidential and may contain proprietary information or be legally privileged. This information is intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system. Thank you.

--
Gregory G. Paul
Attorney at Law
Paul Law Offices, PLLC
Presidio: 1808 Wedemeyer Street, Suite 216, San Francisco, CA 94129
First & Market Building: 100 First Avenue, Suite 1010, Pittsburgh, PA 15222
(412) 259-8375 (PA)
(415) 326-8300 (CA)
(844) 374-7200 (toll free)
(888) 822-9421 (fax)
www.paullaw.com
www.erisadisabilitybenefits.com

**Confidentiality Notice:** The information contained in this electronic mail message and any attachments is confidential and may contain proprietary information or be legally privileged. This information is intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system. Thank you.

Penny Dreher                                                                May 4, 2021

1              IN THE UNITED STATES DISTRICT COURT FOR THE

2                  SOUTHERN DISTRICT OF WEST VIRGINIA

3                          AT HUNTINGTON

4

5        _____
                                        )
6        JUSTIN ADKINS, et al.,         )
                                        )
7                  Plaintiffs,          )
                                        ) Case No.
8              -vs                      ) 3:18-CV-00321
                                        )
9        CSX CORPORATION, et al.,       )
                                        )
10                 Defendants.          )
                                        )
11

12

13

14

15           VIDEOTAPED DEPOSITION OF PENNY DREHER

16                        30 (B)(6)

17                     CONDUCTED REMOTELY

18                   TUESDAY, MAY 4, 2021

19

20

21

22       REPORTED BY:  LAURA L. MAES, CSR NO. 9836

23

24

25

                                                              1

1          IN THE UNITED STATES DISTRICT COURT FOR THE

2              SOUTHERN DISTRICT OF WEST VIRGINIA

3                      AT HUNTINGTON

4

5    _____
                                     )
6    JUSTIN ADKINS, et al.,          )
                                     )
7              Plaintiffs,           )
                                     ) Case No.
8          -vs                       ) 3:18-CV-00321
                                     )
9    CSX CORPORATION, et al.,        )
                                     )
10             Defendants.           )
                                     )
11

12

13

14      VIDEOTAPED DEPOSITION OF PENNY DREHER, 30(B)(6)

15   conducted remotely before Laura L. Maes, CSR No. 9836, on

16   behalf of the Plaintiffs, commencing at the hour of 9:11

17   a.m. on Tuesday, May 4, 2021.

18

19

20

21

22

23

24

25

                                                              2

Penny Dreher                                                                                    May 4, 2021

```
 1      APPEARANCES:  (VIA ZOOM)

 2

 3      For the Plaintiffs:

 4          GARELLA LAW, P.C.
            BY:  C. KIEL GARELLA, ESQ. (Pro Hac Vice)
 5          409 East Boulevard
            Charlotte, North Carolina 28303
 6          980.321.7934
            kiel@gljustice.com
 7

 8

 9      For the Plaintiffs:

10
            UNDERWOOD LAW OFFICE, INC.
11          BY:  JOHN PATRICK L. STEPHENS, ESQ.
            923 Third Avenue
12          Huntington, West Virginia 25701
            304.486.3350
13

14      For the Defendants:

15          NELSON, MULLINS, RILEY & SCARBOROUGH, LLP
            BY:  MELISSA FOSTER BIRD, ESQ.
16          949 Third Avenue, Suite 200
            Huntington, West Virginia 25701
17          304.526.3500
            melissa.fosterbird@nelsonmullins.com
18

19

20      Also present:

21          JASON PATSALIS, VIDEOGRAPHER

22

23

24

25
```

                                                                                                      3

USCA4    2343

Penny Dreher                                                                    May 4, 2021

```
 1                      I N D E X

 2

 3    WITNESS

 4       PENNY DREHER

 5

 6    EXAMINATION                              PAGE

 7       MR. GARELLA                            6

 8                   E X H I B I T S

 9                                             PAGE

10    Exhibit 1    Amended Notice of 30 (b)(6)     9
                   Deposition and Request for
11                 Production of Documents

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

                                                              4

USCA4    2344

Penny Dreher                                                                May 4, 2021

```
 1                    TUESDAY, MAY 4, 2021

 2                         9:11 A.M.

 3

 4          THE VIDEOGRAPHER:  Good morning.  We are on    09:10

 5     the record.                                         09:11

 6          Here begins the remote deposition of Penny     09:11

 7     Dreher, in the matter of Adkins versus CSX          09:11

 8     Corporation.  This is presiding in the United States 09:11

 9     District Court of the Southern District of Virginia 09:11

10     at Huntington, Case No. 3:18-CV-00321.              09:11

11          Today's date is May 4th, 2021, and the time    09:11

12     is 9:11 a.m. Pacific Standard Time.                 09:11

13          The video operator today is Jason Patsalis     09:11

14     representing Network Deposition Services, located at 09:11

15     1800 Century Park East, Suite 150 in Los Angeles,   09:11

16     California, phone number (310) 557-3400.            09:11

17          The court reporter today is Laura Maes.        09:11

18     This is a remote deposition through Zoom video      09:11

19     conferencing.                                       09:12

20          Would counsel present please identify          09:12

21     yourselves for the record and who you represent.    09:12

22          MR. GARELLA:  This is Kiel Garella on          09:12

23     behalf of the Plaintiffs.                           09:12

24          MS. FOSTER BIRD:  Melissa Foster Bird on       09:12

25     behalf of CSX Transportation and the other          09:12
```

5

USCA4    2345

Penny Dreher                                                            May 4, 2021

```
1    Defendants, today I'm also representing the witness    09:12

2    Penny Dreher.                                          09:12

3         MR. STEPHENS:  And Patrick Stephens for the       09:12

4    Plaintiffs as well.                                    09:12

5         MS. FOSTER BIRD:  Oh, sorry Patrick.              09:12

6         MR. STEPHENS:  That's okay, Melissa.              09:12

7         THE VIDEOGRAPHER:  The court reporter will        09:12

8    now administer the oath to the witness.                09:12

9         MR. GARELLA:  Before we administer the            09:12

10   oath, we will put our regular stipulation regarding    09:12

11   remote oaths on the record.                            09:12

12        (Stipulated by the parties the witness can        09:12

13   be sworn remotely.)                                    09:12

14        MS. FOSTER BIRD:  That's right.  Agree.           09:12

15                                                          09:12

16            Whereupon, PENNY DREHER,                       09:12

17    being first duly sworn or affirmed to testify to the       09:12

18    truth, the whole truth, and nothing but the truth, via      09:12

19       Zoom, was examined and testified as follows:      09:12

20                                                          09:12

21                    EXAMINATION                           09:12

22   BY MR. GARELLA:                                        09:12

23     Q.  Would you please state your full name for       09:12

24   the record?                                            09:12

25     A.  Penny Butler Dreher.                             09:12
```

6

May 4, 2021

```
 1        Q.   And, Ms. Dreher, we just concluded your      09:13

 2   individual deposition.  Now we are taking your         09:13

 3   deposition in your capacity as a corporate             09:13

 4   representative.                                         09:13

 5        Do you understand that?                            09:13

 6        A.   Yes, sir.                                     09:13

 7        Q.   Okay.  And I will avoid going over all the   09:13

 8   basic stuff that we already went over.                  09:13

 9        But if you could, give me a brief                  09:13

10   description of your current job title and where you    09:13

11   work.                                                   09:13

12        A.   Current job title is a Senior Labor          09:13

13   Relations Manager.  I work in Jacksonville, Florida    09:13

14   for CSX Transportation.  I manage the mechanical       09:13

15   shop craft agreements.                                  09:13

16        Q.   And in 2017, what was your job position      09:13

17   there?                                                  09:13

18        A.   I was a Manager of Labor Relations in the    09:13

19   Arbitration and Discipline Department.                 09:13

20        Q.   Okay.  And my understanding is that you      09:13

21   oversaw discipline for certain crafts in that          09:13

22   position; right?                                        09:13

23        A.   Yes.                                          09:13

24        Q.   Okay.  Have you ever been deposed as a       09:13

25   corporate representative before?                       09:13
```

7

Penny Dreher                                                          May 4, 2021

```
 1      A.    No.                                      09:13

 2      Q.    Do you know what that entails?           09:13

 3      A.    Slightly.                                09:14

 4      Q.    Okay.  Do you understand that you are here  09:14

 5   to testify on behalf of what the corporation knows  09:14

 6   and not what you personally know?                 09:14

 7      A.    Yes.                                      09:14

 8      Q.    Okay.  What did you do in preparation for  09:14

 9   your testimony as a corporate representative today?  09:14

10      A.    I met with my legal counsel.             09:14

11      Q.    Okay.  Did you review any documents?     09:14

12      A.    No.                                       09:14

13      Q.    Okay.  How long did you meet with your   09:14

14   legal counsel?                                     09:14

15      A.    Just for an hour.                         09:14

16      Q.    Okay.  And when did you meet with her?   09:14

17      A.    This morning and yesterday.              09:14

18      Q.    Okay.  Are you currently an officer of CSX  09:14

19   Transportation?                                    09:14

20      A.    I'm a manager, yes.  I don't know what your  09:14

21   term means "officer."                              09:14

22      Q.    But are you -- you have been -- are you --  09:14

23   have you been designated to speak on behalf of the  09:14

24   corporation today?                                 09:14

25      A.    Yes.                                      09:15
```

8

USCA4    2348

Penny Dreher                                                                    May 4, 2021

1      Q.   And who designated you to speak on behalf        09:15

2    of the corporation?                                     09:15

3      A.   I don't know.                                    09:15

4      Q.   Okay.  How did you find out that you would       09:15

5    be designated as a corporate representative?           09:15

6      A.   My counsel.                                      09:15

7      Q.   And when did you first find out that you         09:15

8    would be designated today as a corporate rep?          09:15

9      A.   Yesterday.                                       09:15

10     Q.   Okay.  Let's go ahead and I'm going to mark      09:15

11   this as Exhibit 1 to your deposition same as before.   09:15

12          (Exhibit 1 was marked for identification and     09:15

13   attached to the transcript.)                           09:15

14   BY MR. GARELLA:                                         09:15

15     Q.   Ms. Dreher, do you recognize the document        09:15

16   that I'm showing you that has been marked as            09:15

17   Exhibit 1 to this deposition?                           09:15

18     A.   Yes.                                             09:15

19     Q.   And this is an Amended Notice of 30 (b)(6)       09:15

20   Deposition and Request for Production of Documents.     09:15

21          Do you see that?                                 09:15

22     A.   Yes.                                             09:16

23     Q.   When was the first time you saw this             09:16

24   document?                                               09:16

25     A.   About a week ago.  It was included in a          09:16

                                                                           9

Penny Dreher                                                    May 4, 2021

```
 1    link for discovery documents that were provided.     09:16

 2         Q.   Okay.  Did you have an understanding at     09:16

 3    that point in time of what this was?                 09:16

 4         A.   No.                                         09:16

 5         Q.   And I take it from your testimony earlier,  09:16

 6    you didn't know at that time you were going to be    09:16

 7    designated to speak on behalf of any of these        09:16

 8    topics?                                              09:16

 9         A.   Correct.                                    09:16

10         Q.   And we can go through this.  My            09:16

11    understanding is, you are only here to speak about   09:16

12    one single topic.  There is a number of topics in    09:16

13    here, but only one topic; is that right?            09:16

14         A.   I thought I was going to talk about two    09:16

15    topics.                                              09:16

16         Q.   Okay.  What topics are you ready to discuss 09:16

17    today?                                               09:16

18         A.   I thought I was going to talk about No. 9  09:16

19    and possibly No. 11.                                 09:16

20              MS. FOSTER BIRD:  Kiel, I will represent to 09:16

21    you for the record before you go another step, she   09:16

22    will testify about part of exhibit -- Topic 9, and   09:16

23    she can testify about part of Topic 11.              09:17

24              She is not the witness, we will not produce 09:17

25    one witness to talk fully about any of these topics  09:17
```

                                                                  10

1    probably, but specifically not 9 and 11.                    09:17

2            As to No. 9, she can talk about the               09:17

3    policies, procedures and practices of disciplining        09:17

4    and/or terminating employees who are off work for         09:17

5    medical leave or of absence.                              09:17

6            She can also -- under No. 11, she is a            09:17

7    person knowledgeable and has input concerning the         09:17

8    decision to charge, discipline and terminate              09:17

9    Plaintiffs.                                                09:17

10           MR. GARELLA:  And maybe I'm wrong, but I          09:17

11   understood that she was only being designated under       09:17

12   Topic No. 11 for today.                                   09:17

13           MS. FOSTER BIRD:  Okay.  That's fine.             09:17

14           MR. GARELLA:  And, well, let me -- let me         09:17

15   stop sharing real quick and I'm going to look just        09:17

16   to make sure I am correct.                                09:18

17           In the last e-mail I have, Topic 9 is             09:18

18   Dr. Heligman -- Heligman and a Labor Relations            09:18

19   Representative, an unnamed Labor Relations                09:18

20   Representative.  Is that going to be Ms. Dreher?          09:18

21           MS. FOSTER BIRD:  She knows part of it.  I        09:18

22   mean, I'm trying to be as comprehensive as I can.         09:18

23   She is going to be part of it, and particularly as        09:18

24   to these employees and whether or not there was an        09:18

25   assessment of medical leave or how that worked under      09:18

11

May 4, 2021

```
 1    No. 9.                                          09:18

 2           There would be somebody that is presented   09:18

 3    from the Labor Relations Department to talk about it   09:18

 4    more broadly.                                    09:18

 5           And then also No. 11, like I said, she has   09:18

 6    knowledge on and had input concerning the decision   09:19

 7    to discharge, discipline and terminate the       09:19

 8    Plaintiff, the Plaintiffs.                       09:19

 9           So you can ask her about No. 9 is what I am   09:19

10    saying.  She is not the end all, be all to talk   09:19

11    about that topic, but she does have knowledge and   09:19

12    will present knowledge on behalf of the company, and   09:19

13    No. 11.                                          09:19

14    BY MR. GARELLA:                                  09:19

15       Q.   Okay.  Let put this exhibit back up.     09:19

16           Ms. Dreher, so I understand, you are      09:19

17    prepared today to speak on behalf of CSX         09:19

18    Transportation as to Topic 9 and Topic 11; is that   09:19

19    right?                                           09:19

20       A.   Yes.                                     09:19

21       Q.   Are there any other topics in this -- in   09:19

22    this deposition notice that you are prepared or   09:19

23    authorized to speak on?                          09:19

24       A.   No, sir.                                 09:19

25       Q.   Okay.  Well, let's jump right in.        09:19
```

12

May 4, 2021

```
 1          As to Topic No. 9, "The policies,          09:19

 2   procedures and practices of accommodating,        09:19

 3   reassigning, disciplining and/or terminating      09:20

 4   employees who are off from work on a medical leave 09:20

 5   of absence," what did you do to prepare yourself and 09:20

 6   acquaint yourself with these policies, procedures  09:20

 7   and practices to testify today as a corporate      09:20

 8   representative?                                     09:20

 9       A.   I didn't prepare for it.  I am -- but I am 09:20

10   prepared to speak about it, because I have worked   09:20

11   with those policies and I have worked with those    09:20

12   policies for years.                                 09:20

13       Q.   Okay.  What are those policies?            09:20

14       A.   There is an IDPAP policy, there is an      09:20

15   attendance policy, there is also the Collective     09:20

16   Bargaining Agreement.  And -- and I think those are 09:20

17   pretty much everything that it entails in No. 9.    09:20

18       Q.   In terms of -- how do those impact --      09:20

19   policies impact an employee who is off work -- off  09:20

20   from work on a medical leave of absence?            09:20

21       A.   The -- when employees are marked off, they 09:20

22   have to provide our Medical Department documentation 09:20

23   to justify their leave of absence.  Under their     09:20

24   Collective Bargaining Agreement, if they fail to    09:21

25   provide any documentation to support their leave,   09:21
```

13

| | | |
|---|---|---|
| 1 | there is a self-executing (inaudible) forfeiture | 09:21 |
| 2 | rule in all of the Mechanical Department agreements. | 09:21 |
| 3 | And so they would actually -- we don't consider that | 09:21 |
| 4 | discipline, we consider that terminating the | 09:21 |
| 5 | employee under the self-executing CBA rule. | 09:21 |
| 6 | Q.   And that's an agreement within the union; | 09:21 |
| 7 | right? | 09:21 |
| 8 | A.   Yes. | 09:21 |
| 9 | Q.   And that's not -- I mean, CSX does not | 09:21 |
| 10 | actually make the decision to terminate, so to | 09:21 |
| 11 | speak? | 09:21 |
| 12 | A.   Well, it's based on the employee's response | 09:21 |
| 13 | to CSX. | 09:21 |
| 14 | Q.   And that's the only they don't notify the | 09:21 |
| 15 | company of a need for medical leave of absence; | 09:21 |
| 16 | right? | 09:21 |
| 17 | A.   It's -- it's not just notifying the company | 09:21 |
| 18 | for request for medical leave of absence.  It's a | 09:21 |
| 19 | requirement under our policy.  Under the Medical | 09:21 |
| 20 | Department policy, they are required to keep CSX | 09:21 |
| 21 | notified of their reason for being marked off, and | 09:21 |
| 22 | they have to provide medical documentation to | 09:22 |
| 23 | justify their leave of absence under the policy. | 09:22 |
| 24 | Q.   Do you know what that medical documentation | 09:22 |
| 25 | is? | 09:22 |

14

USCA4    2354

Penny Dreher                                                              May 4, 2021

1      A.   It could be anything between an MB3, a COII      09:22

2   form.  There is different forms that the Medical        09:22

3   Department requires.                                     09:22

4      Q.   And tell me the difference, if you know,         09:22

5   between you said an MD3 and a COII.                      09:22

6      A.   It's my understanding, the MD3 form is the       09:22

7   initial form that would take an employee out of          09:22

8   service, and then the COII form is an ongoing            09:22

9   certified illness form, where the doctor goes into       09:22

10   more detail about the treatment.                         09:22

11      Q.   So would every employee who takes a medical      09:22

12   leave of absence need to submit an MD3?  Is that         09:22

13   what it was?                                             09:22

14      A.   Yes, that is required.  And if they do not,      09:22

15   then that's where the self-executing CBA rule comes      09:22

16   into play.                                               09:22

17      Q.   And how are employees informed of these --       09:23

18   of this policy?                                          09:23

19      A.   All the policies are located on CSX              09:23

20   employee gateway for the employees' review, and the     09:23

21   employees are required to know the terms of their        09:23

22   Collective Bargaining Agreement when they initially      09:23

23   start as a new hire.                                     09:23

24      Q.   Okay.  In this case, with the Plaintiffs in      09:23

25   this case, did they submit MD3 forms?                    09:23

                                                                    15

Penny Dreher                                                    May 4, 2021

```
 1       A.   I don't know.                      09:23

 2       Q.   Okay.  That wouldn't go to you?    09:23

 3       A.   No.  It would go to the Medical Department. 09:23

 4       Q.   Okay.  And then after that, they have to  09:23

 5   submit the COII form; right?                09:23

 6       A.   Yes, that's correct.               09:23

 7       Q.   And that goes also to the Medical  09:23

 8   Department?                                 09:23

 9       A.   Yes.                               09:23

10       Q.   Okay.  Now, if an employee is injured and 09:23

11   cannot work, what is the policy or procedure for  09:23

12   providing accommodation to that employee?   09:23

13       A.   I don't know.  I don't know the answer to 09:23

14   that.                                       09:23

15          MS. FOSTER BIRD:  And that is not part of  09:23

16   the topic that she has been designated to discuss. 09:23

17          MR. GARELLA:  Okay.  You know, it's kind of 09:24

18   hard when I don't know what she is here to --  09:24

19          MS. FOSTER BIRD:  I just told you.  It's  09:24

20   discipline and terminating employees who are off  09:24

21   work for medical leave of absence, not accommodating 09:24

22   or reassigning.                             09:24

23   BY MR. GARELLA:                             09:24

24       Q.   With respect to discipline and disciplinary 09:24

25   action against an employee who is off on a medical 09:24
```

                                                          16

Penny Dreher                                                                      May 4, 2021

```
 1   leave of absence, is that -- tell me about that         09:24
 2   process.  Is it different from a normal disciplinary     09:24
 3   process?                                                 09:24
 4        A.   In that process, there -- there may be         09:24
 5   other people involved.  If the employee is misusing      09:24
 6   FMLA, marking off for medical reason or marking off      09:24
 7   sick, and there is different officers of the company     09:24
 8   that would review the documentation that the             09:24
 9   employee presented.                                      09:24
10        And then once it's been determined that the         09:24
11   employee has misused or fraudulently marked off,         09:24
12   then that's where our IDPAP, our Individual              09:24
13   Accountability Policy would come into play as far as     09:25
14   the type of handling the employee would receive          09:25
15   under the Collective Bargaining Agreement.               09:25
16        Q.   And you said IDPAP?  Say that one more         09:25
17   time.                                                    09:25
18        A.   It's, I-D-P-A-P.                               09:25
19        Q.   And what was that acronym?                     09:25
20        A.   It's -- it's the Individual Development,       09:25
21   Performance and Accountability Policy.                   09:25
22        Q.   Is that a -- kind of a -- it lays out the     09:25
23   discipline for various different violations; is that     09:25
24   fair?                                                    09:25
25        A.   Yeah.  It lays out, if the employee is         09:25
```

17

USCA4    2357

| | | |
|---|---|---|
| 1 | found guilty of certain violations, what the level | 09:25 |
| 2 | of discipline would be based on those violations. | 09:25 |
| 3 | Q.  And at CSX, is there a progressive | 09:25 |
| 4 | discipline policy?  You know, if you get more than | 09:25 |
| 5 | one strike, does that count against you moving | 09:25 |
| 6 | forward? | 09:25 |
| 7 | A.  So if it's a non-major offense, then there | 09:25 |
| 8 | is a progression.  If it's a major offense, then it | 09:25 |
| 9 | could lead to dismissal. | 09:25 |
| 10 | Q.  Is it always if an employee is found guilty | 09:26 |
| 11 | of a major offense?  Is that always dismissal, or | 09:26 |
| 12 | does it just depend? | 09:26 |
| 13 | A.  It depends on the facts and circumstances. | 09:26 |
| 14 | Q.  Okay.  Is there a chart or a way that you | 09:26 |
| 15 | step up with -- in terms of the non-major offenses? | 09:26 |
| 16 | A.  Yes.  It starts at a serious one violation. | 09:26 |
| 17 | It's also internally called a non-major, so either | 09:26 |
| 18 | serious or non-major, and it progresses from one | 09:26 |
| 19 | to three. | 09:26 |
| 20 | Q.  And so what is -- is level -- is a three, | 09:26 |
| 21 | that -- is that when you start looking at | 09:26 |
| 22 | termination? | 09:26 |
| 23 | A.  Yes. | 09:26 |
| 24 | Q.  Okay.  And so in terms of imposing | 09:26 |
| 25 | discipline for an employee who is off of work, are | 09:26 |

18

Penny Dreher                                                                    May 4, 2021

```
1    they notified the same way an employee who is still    09:26
2    working is?                                             09:26
3         A.   Notifying the employee that they have been    09:26
4    disciplined?                                            09:26
5         Q.   That they have been -- for the whole          09:26
6    process, they have been charged with discipline         09:26
7    throughout?                                              09:27
8         A.   Okay.  Yes.  It's always handled to the       09:27
9    employee in writing to their address on record.         09:27
10        Q.   Okay.  And is the -- is that the same          09:27
11   policy for an employee who is not off work on           09:27
12   medical leave?                                           09:27
13        A.   Yes, it's the same policy, in the same        09:27
14   format that it's done in writing to the current        09:27
15   record of address.                                      09:27
16        Q.   And what about the policy, procedure and      09:27
17   practice for terminating an employee who is off work   09:27
18   on a medical leave of absence; is that any different   09:27
19   than terminating or disciplining an employee who is    09:27
20   not off work?                                           09:27
21        A.   It is the same policy.                        09:27
22        Q.   I think we probably covered that.  We will    09:27
23   talk about Topic No. 11 now, which is:                  09:27
24             "Identify and produce the                     09:27
25              persons most knowledgeable who               09:27
```

19

```
 1              made the decision or had any          09:27

 2              input concerning the decision         09:27

 3              to charge, discipline and             09:27

 4              terminate Plaintiffs."                09:27

 5         Are you ready to speak on that topic today? 09:27

 6    A.   Yes, I am.                                  09:28

 7    Q.   And what have you done to prepare yourself  09:28

 8  to speak on behalf of CSX Transportation as to     09:28

 9  Topic No. 11?                                       09:28

10    A.   I reviewed documents that were provided in  09:28

11  the discovery.  I have also met with my legal      09:28

12  counsel.  And I reviewed my internal notes and     09:28

13  documents involving some of the cases.             09:28

14    Q.   Do you still have those internal notes?     09:28

15    A.   It's the -- the appeal.  Yes, I do.  It's   09:28

16  the appeal records, NRHDO response to the union's  09:28

17  appeal.                                            09:28

18    Q.   And are those notes, or are those actual    09:28

19  documents that were mailed out?                    09:28

20    A.   Those are actual documents in response to   09:28

21  their claim that -- internally we have an electronic 09:28

22  handling process with our union, so it -- those are 09:28

23  not mailed, those are uploaded into our labor claim 09:28

24  tracking system.                                   09:28

25    Q.   And so do you have any personal notes with  09:28
```

20

```
 1    respect to anything that you reviewed today?        09:29

 2         A.   No.                                        09:29

 3         Q.   Okay.  And we're talking about the decision 09:29

 4    to -- to charge, discipline and terminate           09:29

 5    Plaintiffs.                                          09:29

 6              And I know we went over this in your prior 09:29

 7    deposition, but if you could, tell me your role in  09:29

 8    the decision to charge, discipline and terminate    09:29

 9    Plaintiffs.                                          09:29

10         A.   Okay.  I initially was notified internally 09:29

11    in Labor Relations.  The Assistant Vice President    09:29

12    Rob Miller notified my boss at the time, Director    09:29

13    Melissa Wheaton, that Dr. Heligman had identified a  09:29

14    group of individuals that were going to be charged   09:29

15    with fraud.                                          09:29

16              And I was provided the list of individuals 09:29

17    from the AVP Rob Miller, and I was told to           09:29

18    coordinate the charges with Dr. Heligman.  And so I  09:29

19    worked with Dr. Heligman to identify the dates that  09:29

20    he was available.  We have certain time limits and   09:29

21    provisions in the agreement that we have to comply   09:29

22    with involving disciplining employees.  And so I     09:30

23    handled and coordinated the charges for              09:30

24    Dr. Heligman.                                        09:30

25              I reached out to the field managers and    09:30
```

21

Penny Dreher                                                          May 4, 2021

```
 1    notified them that the employees would need to be        09:30

 2    entered into an assessment into facts.  And then         09:30

 3    once they entered the assessment, I provided the         09:30

 4    evidence that Dr. Heligman provided me for the           09:30

 5    hearing.                                                 09:30

 6         Q.   Okay.  And so if I understand you, you         09:30

 7    first found this out from Dr. Heligman; right?           09:30

 8         A.   I found it out not directly from               09:30

 9    Dr. Heligman, but I found it out internally through      09:30

10    my senior leadership team.                               09:30

11         Q.   Okay.  But the information that was            09:30

12    provided that was provided came from Dr. Heligman,       09:30

13    is that right, with respect to Plaintiffs?              09:30

14         A.   Yes.                                           09:30

15         Q.   And he had asked to charge these employees     09:30

16    with some form of discipline; is that right?            09:30

17         A.   He -- he notified us that he had notified      09:30

18    the Railroad Retirement Board of his findings, that      09:30

19    he found that all of the COII forms that he received     09:31

20    for the Plaintiffs did not validate their time off       09:31

21    work.  And so he had suspected that they were            09:31

22    fraudulently filing these COII forms.                   09:31

23             And so the charge is to develop the facts       09:31

24    during the hearing to find out if we can prove that      09:31

25    they are guilty of the rules that we cited in the        09:31
```

                                                                        22

```
 1   hearing.                                      09:31

 2       Q.   Okay.  And in terms of the charging  09:31

 3   process, you didn't make the decision to charge any  09:31

 4   Plaintiff in this action with any violation of a  09:31

 5   company rule; is that right?                  09:31

 6       A.   Right.                               09:31

 7       Q.   Who made that decision?              09:31

 8       A.   I don't know.                        09:31

 9       Q.   But the only person who had information  09:31

10   about the reason they were being charged that you  09:31

11   know of is Dr. Heligman?                      09:31

12       A.   Yes.                                 09:31

13       Q.   But you are not aware one way or the other  09:31

14   whether he was the one that made the decision to  09:31

15   charge?                                       09:31

16       A.   No, I don't know.                    09:31

17       Q.   Okay.  And from the outset, once you know,  09:31

18   you received this information, what input did you  09:32

19   have regarding the decision to charge these    09:32

20   employees with discipline?                    09:32

21       A.   I didn't have any input on the decision to  09:32

22   charge.                                       09:32

23       Q.   Okay.  And we can look at it again.  Maybe  09:32

24   we should do this one more time so we can hopefully  09:32

25   streamline this a little bit.  Topic No. 11 here, we  09:32
```

23

```
 1    have got any person who --                           09:32

 2              "The persons most knowledgeable            09:32

 3               who made the decision or had              09:32

 4               any input concerning the                 09:32

 5               decision to charge, discipline           09:32

 6               and terminate Plaintiffs."               09:32

 7         As you sit here today as a corporate           09:32

 8    representative, which aspects of Topic No. 11 are   09:32

 9    you prepared to speak on behalf of the corporation  09:32

10    for?                                                09:32

11       A.   The input concerning the decision to        09:32

12    charge, discipline and terminate Plaintiffs.        09:32

13       Q.   Okay.  Is that -- I thought you just said   09:32

14    you didn't have any input on the decision to charge; 09:32

15    is that correct?                                    09:32

16       A.   No.  I didn't have a decision to charge,    09:32

17    but I had input on the information that needed to be 09:32

18    gathered to develop the charge.                     09:33

19       Q.   And what do you mean by that?  Did you have 09:33

20    any input on whether or not an employee would be    09:33

21    charged?                                            09:33

22       A.   No.                                         09:33

23       Q.   Okay.  And so what input did you -- did you 09:33

24    have regarding the charging process?                09:33

25       A.   Once it was already identified that the     09:33
```

24

Penny Dreher                                                                    May 4, 2021

| 1 | employees would be charged, then I assisted | 09:33 |
| 2 | Dr. Heligman in finding out the rules around their | 09:33 |
| 3 | health and welfare plan, how many months they would | 09:33 |
| 4 | receive if they were furloughed versus marking off | 09:33 |
| 5 | sick. | 09:33 |
| 6 | And then I reached out to the Finance | 09:33 |
| 7 | Department to find out the fringe benefit piece of | 09:33 |
| 8 | just the health and welfare alone, so that he could | 09:33 |
| 9 | enter that into evidence during the hearing. | 09:33 |
| 10 | Q.   And did you gather that information?  Was | 09:33 |
| 11 | it your decision to gather that information, or were | 09:33 |
| 12 | you directed to do that by someone? | 09:33 |
| 13 | MS. FOSTER BIRD:  I will object to the | 09:33 |
| 14 | extent that the request could have come from anyone | 09:34 |
| 15 | in the Legal Department. | 09:34 |
| 16 | But you can answer it around that | 09:34 |
| 17 | objection. | 09:34 |
| 18 | THE WITNESS:  I would say it's protected by | 09:34 |
| 19 | Legal. | 09:34 |
| 20 | MS. FOSTER BIRD:  Okay. | 09:34 |
| 21 | BY MR. GARELLA: | 09:34 |
| 22 | Q.   So you received the information from Legal; | 09:34 |
| 23 | is that fair? | 09:34 |
| 24 | MS. FOSTER BIRD:  That's not what she said. | 09:34 |
| 25 | MR. GARELLA:  Well, did you receive -- if | 09:34 |

25

Penny Dreher                                                    May 4, 2021

```
 1    she received information from Legal, she can say      09:34

 2    that she received information from Legal.  I am not   09:34

 3    trying to find out what that is.                      09:34

 4            MS. FOSTER BIRD:  That wasn't your            09:34

 5    question.                                             09:34

 6            MR. GARELLA:  Okay.  Can the court reporter   09:34

 7    read back my question, please.                       09:34

 8            (Record read as follows:                     09:35

 9                "Q.  And did you gather that             09:35

10                 information?  Was it your               09:35

11                 decision to gather that                09:35

12                 information, or were you                09:35

13                 directed to do that by                 09:35

14                 someone?                                09:35

15                "A.  It's protected by Legal.           09:35

16                "Q.  So you received the                09:35

17                 information from Legal; is             09:35

18                 that fair?")                            09:35

19    BY MR. GARELLA:                                       09:35

20        Q.  Were you directed to gather -- who were you  09:35

21    directed to gather information from?                  09:35

22        A.  It's protected under the former objection.   09:35

23        Q.  And were you directed by the Legal           09:35

24    Department to gather information?                     09:35

25        A.  Legal was involved.                           09:35
```

                                                                    26

Penny Dreher                                                                    May 4, 2021

```
 1       Q.   Okay.  Who else was involved in directing    09:35

 2   you to gather information?                             09:35

 3       A.   My senior leadership team in Labor            09:35

 4   Relations.                                             09:35

 5       Q.   Okay.  And what type of information was       09:35

 6   gathered?                                              09:35

 7       A.   From the Union Benefits Administrator, the    09:35

 8   amount of health and welfare benefits that an          09:35

 9   employee would receive if they mark off sick.  And     09:35

10   from our Finance Department, the fringe benefit        09:35

11   piece of how much CSX pays towards a union             09:35

12   employee's health and welfare benefit.                 09:36

13       Q.   Okay.  And was that relevant in the           09:36

14   decision to charge an employee with a rule             09:36

15   violation?                                             09:36

16       A.   It just shows the magnitude of the fraud.     09:36

17       Q.   Okay.  So it was -- it was relevant, I        09:36

18   think, is what are you saying?                         09:36

19       A.   I think it's relevant to develop the full     09:36

20   facts of the charge.                                   09:36

21       Q.   Okay.  And when you say "develop the full     09:36

22   facts of the charge," what do you mean by that?        09:36

23       A.   In the Collective Bargaining Agreement and    09:36

24   Railway Labor Act, we have to develop full record to   09:36

25   prove a charge against employee.  And so we charge     09:36
```

27

Penny Dreher                                                                                    May 4, 2021

1    the employee with dishonesty and with fraud and the          09:36

2    Code of Ethics fraud that you mentioned earlier.             09:36

3        It shows that they -- they were dishonest               09:36

4    in trying to attempt to have a financial gain with           09:36

5    their actions.  And their actions of marking off for         09:36

6    an extended period of absence shows that they would          09:37

7    receive extended health and welfare benefits for             09:37

8    nearly one year and eight months longer than what            09:37

9    they should.  And a result of that is CSX has to pay          09:37

10   an exorbitant amount of fringe benefits towards the          09:37

11   employees' health and welfare benefits.                      09:37

12       Q.   And so is it fair to say that from when you         09:37

13   began this process of charging the employees with            09:37

14   discipline, that your role was to gather the                 09:37

15   evidence that would support the charge?                      09:37

16       A.   Yes.                                                09:37

17       Q.   Okay.  And that was taken into                     09:37

18   consideration, I guess, as well in the discipline           09:37

19   decision; correct?                                           09:37

20       A.   Yeah.  The evidence that was submitted             09:37

21   during the formal hearing is what was taken into             09:37

22   consideration at that stage of discipline.                   09:37

23       Q.   Okay.  How much time did CSX spend                 09:37

24   gathering evidence to support the charge of a rule           09:37

25   violation with respect to Plaintiffs here today?            09:38

28

Penny Dreher                                                                    May 4, 2021

1      A.    Well, Dr. Heligman already had all of the        09:38

2   COII forms.  And, I mean, it only takes a few            09:38

3   minutes to pull down the rule in the Code of Ethics.     09:38

4   Maybe an hour or so just to reach out and make           09:38

5   contact with the Finance Department and the Union        09:38

6   Benefits Administrator to find out the answers to        09:38

7   those questions.                                         09:38

8      Q.    Was all that information gathered and           09:38

9   introduced at the investigation hearing for these        09:38

10  employees?                                               09:38

11     A.    The COII forms were provided by                 09:38

12  Dr. Heligman and entered into the hearing, as well       09:38

13  as his letters to the RRB.                               09:38

14          As far as the health and welfare piece with      09:38

15  the fringe benefits and the extension of benefits,       09:38

16  that was just testimony provided by Dr. Heligman.        09:38

17     Q.    Okay.  But he had been given a document         09:38

18  that was prepared by someone in the Finance              09:38

19  Department?                                              09:39

20     A.    He was not given a document.  He was -- it      09:39

21  was communicated to him what the answer was to that      09:39

22  question.                                                09:39

23     Q.    And how was that communicated?                  09:39

24     A.    Either via e-mail or verbal.                    09:39

25     Q.    And is that something that you communicated     09:39

                                                                        29

Penny Dreher                                                                May 4, 2021

| 1  | to him?                                          | 09:39 |
| 2  | A.   I believe I did.                            | 09:39 |
| 3  | Q.   Okay.  And but you don't recall if it was   | 09:39 |
| 4  | verbal or e-mail?                                | 09:39 |
| 5  | A.   No, I don't recall.                         | 09:39 |
| 6  | Q.   Of the Plaintiffs in this action, did you   | 09:39 |
| 7  | have involvement with each of them -- well, let me | 09:39 |
| 8  | strike that.                                     | 09:39 |
| 9  | Of the named Plaintiffs in this action,          | 09:39 |
| 10 | were you involved with the charge, discipline and | 09:39 |
| 11 | decision to terminate all of them?              | 09:39 |
| 12 | A.   There were -- it was based on my -- the    | 09:39 |
| 13 | territories that I was covering.  A large group of | 09:39 |
| 14 | these employees were mechanical forces, so the   | 09:39 |
| 15 | mechanical forces, I had overseen the process.   | 09:39 |
| 16 | I never have a decision to charge or I do        | 09:40 |
| 17 | not make the final determination to discipline an | 09:40 |
| 18 | employee.  Labor Relations' role is to act as a  | 09:40 |
| 19 | partner.  And so we provide guidance to the relevant | 09:40 |
| 20 | parties of the evidence, and if we can support the | 09:40 |
| 21 | decision that is made.                          | 09:40 |
| 22 | Q.   And so you said for everybody in the       | 09:40 |
| 23 | Mechanical Department at least, you were involved in | 09:40 |
| 24 | this decision to charge and discipline those     | 09:40 |
| 25 | Plaintiffs; is that right?                      | 09:40 |

30

May 4, 2021

```
 1        A.   I didn't make the decision.  I was involved    09:40

 2   in fact-finding and coordinating and giving my          09:40

 3   recommendation at the end of the hearing and the        09:40

 4   evidence that was produced.                             09:40

 5        Q.   And that's for all of the Plaintiffs who      09:40

 6   are in the Mechanical Department though; is that        09:40

 7   right?                                                  09:40

 8        A.   Yes.                                          09:40

 9        Q.   Okay.  And then there were some, either in    09:40

10   Transportation or otherwise, that you were not         09:40

11   involved with?                                          09:40

12        A.   Correct.                                      09:40

13        Q.   Okay.  And we discussed this before, but      09:40

14   after the formal disciplinary investigation, there     09:41

15   is a transcript; right?                                 09:41

16        A.   Yes.                                          09:41

17        Q.   And that's a transcript of the entire         09:41

18   proceeding?                                             09:41

19        A.   Yes.  The Hearing Officer downloads the       09:41

20   recorder, and the Facts Department authenticates or    09:41

21   sent -- they -- they type up the transcript.  And      09:41

22   then the Hearing Officer authenticates it.  And once   09:41

23   it's authenticated, then that's when I receive a       09:41

24   copy of it.                                             09:41

25        Q.   Okay.  Maybe I missed that before.           09:41
```

                                                                    31

1          The Hearing Officer actually reviews it and    09:41

2    makes sure that it's accurate?                        09:41

3          A.    Yes.                                      09:41

4          Q.    And the Hearing Officer also submits to you   09:41

5    exhibits from the hearing; is that right?             09:41

6          A.    Not to me, to the Facts Department.       09:41

7          Q.    But -- and those are -- okay.  They also --   09:41

8    Hearing Officer also may submit a notice of findings   09:41

9    to the Facts Department; is that right?               09:41

10         A.    Yes.  I mean, not always, but sometimes   09:41

11   they do.                                              09:41

12         Q.    Okay.  And ultimately, those are the      09:41

13   documents that are sent to you to render a            09:41

14   recommendation; is that right --                      09:42

15         A.    Yes.                                      09:42

16         Q.    -- as to discipline?                      09:42

17         A.    Yes.  I -- I -- we review those only for  09:42

18   major cases or a serious case that could result in    09:42

19   dismissal.                                            09:42

20         Q.    In this case, we're talking about a major   09:42

21   offense for all the Plaintiffs; is that right?        09:42

22         A.    Yes.                                      09:42

23         Q.    And so you would have reviewed all of those   09:42

24   documents we just discussed for at least the          09:42

25   mechanical -- the Plaintiffs who were in the          09:42

                                                                          32

Penny Dreher                                                          May 4, 2021

```
1    Mechanical Department; is that fair?          09:42

2        A.   Yes, that's correct.                 09:42

3        Q.   Okay.  And then based on that review, you  09:42

4    would make a recommendation; right?           09:42

5        A.   Yes.                                  09:42

6        Q.   And who was that recommendation made to?  09:42

7        A.   For the mechanical shop craft employees  09:42

8    that were involved, the recommendation would go to  09:42

9    the Vice President Brian Barr.  He was the Vice  09:42

10   President at the time.  And also James Turner was  09:42

11   the Chief Mechanical Officer.  So it went to both of  09:42

12   those individuals.                             09:42

13       Q.   And what role did James Turner have in the  09:42

14   disciplinary process?                          09:43

15       A.   Brian Barr was the Vice President, and from  09:43

16   what I recall, he initially made the decision on the  09:43

17   first group of cases.                          09:43

18            But James Turner worked hand in hand with  09:43

19   Brian Barr.  That was his second -- he was the  09:43

20   second in command.  And so James Turner had the  09:43

21   authority to make the decisions.               09:43

22       Q.   So -- and if I understand you correctly,  09:43

23   you would make a recommendation to either Mr. Turner  09:43

24   or Mr. Barr, is that right, for --            09:43

25       A.   Yes.                                  09:43
```

                                                                        33

| | | |
|---|---|---|
| 1 | Q.   -- for disciplinary outcome? | 09:43 |
| 2 | A.   They were both copied on the same | 09:43 |
| 3 | recommendation. | 09:43 |
| 4 | Q.   Okay.  And then they would respond to you; | 09:43 |
| 5 | is that right? | 09:43 |
| 6 | A.   Yes.  They would respond to me and copy the | 09:43 |
| 7 | Facts team. | 09:43 |
| 8 | Q.   And in each of the cases for the | 09:43 |
| 9 | mechanical -- employees in the Mechanical | 09:43 |
| 10 | Department, did they agree with your recommendation? | 09:43 |
| 11 | A.   Yes. | 09:43 |
| 12 | Q.   And what was that recommendation? | 09:43 |
| 13 | A.   For most of the cases, it was dismissal. | 09:43 |
| 14 | Q.   And I'm only talking about the Plaintiffs | 09:44 |
| 15 | in this case here today. | 09:44 |
| 16 | Were there any Plaintiffs that you didn't | 09:44 |
| 17 | recommend be dismissed? | 09:44 |
| 18 | A.   Not that I recall. | 09:44 |
| 19 | Q.   Okay.  How long did it take either Mr. Barr | 09:44 |
| 20 | or Mr. Turner to reply to your recommendation? | 09:44 |
| 21 | A.   It's based on their schedule, but they also | 09:44 |
| 22 | are aware of the time limits involved. | 09:44 |
| 23 | A lot of those e-mails, we -- we let them | 09:44 |
| 24 | know whether we have a day or two days remaining | 09:44 |
| 25 | under the Collective Bargaining Agreement to issue a | 09:44 |

34

Penny Dreher                                                    May 4, 2021

```
 1    discipline decision.  So it would -- I don't know    09:44

 2    the exact answer, but it's all based on the timing   09:44

 3    and how much time they had per the agreement.        09:44

 4        Q.   And I think I understand this correctly,    09:44

 5    but when they respond, they respond to the Facts     09:44

 6    team; is that right?                                 09:44

 7        A.   Yes.  But they will also copy me on their   09:44

 8    response.                                            09:45

 9        Q.   And that's via e-mail?                      09:45

10        A.   Yes.                                        09:45

11        Q.   Okay.  And I think you said there is a      09:45

12    couple of the Plaintiffs in this action that were    09:45

13    members of the Transportation side of things.        09:45

14             Did you have any involvement with either of 09:45

15    them?                                                09:45

16        A.   There were several T&E forces involved.     09:45

17    And I did handle some -- I can't remember exactly    09:45

18    who it was.  But based on the region and the         09:45

19    territory that I managed at the time, I -- I was     09:45

20    involved in a few of those decisions.                09:45

21        Q.   Okay.  Does a name like Tony Abdon, does    09:45

22    that stand out to you?                               09:45

23        A.   Yes.                                        09:45

24        Q.   Were you involved with the decision or the  09:45

25    recommendation to discipline him?                    09:45
```

                                                                     35

Penny Dreher                                                                May 4, 2021

```
1      A.   Yes.                                    09:45

2      Q.   And what about Chad Little?             09:45

3      A.   Yes.                                    09:45

4      Q.   Okay.  What about Matthew Woods?        09:45

5      A.   No.                                     09:45

6      Q.   Or Michael Campbell?                    09:45

7      A.   No.                                     09:46

8      Q.   Okay.  And who did you consult in       09:46

9   formulating your recommendation that an employee  09:46

10  receive discipline?                             09:46

11      MS. FOSTER BIRD:  You can tell him who you  09:46

12  consulted.                                      09:46

13      THE WITNESS:  Okay.  So our Legal team was  09:46

14  involved and Dr. Heligman and of course Brian Barr  09:46

15  and James Turner.  If it involved a different craft  09:46

16  other than mechanical, it would go to the senior  09:46

17  leader of that region.                          09:46

18  BY MR. GARELLA:                                 09:46

19      Q.   Okay.  Is it common to involve the Legal  09:46

20  Department in assessing discipline to an employee?  09:46

21      A.   Not day-to-day, not in the day-to-day  09:47

22  charges.                                        09:47

23      Q.   Okay.  Was there a -- is it common in major  09:47

24  violations?                                     09:47

25      A.   I would say it's not uncommon.  I don't  09:47
```

36

Penny Dreher                                                                    May 4, 2021

```
 1    know how frequently it occurs.                    09:47

 2          But, for instance, there are some other     09:47

 3    cases that involve a legal review, and they would be  09:47

 4    involved.                                         09:47

 5       Q.   What do you mean by legal review?  Oh, you  09:47

 6    mean by the Law Department?                        09:47

 7       A.   Yes.                                       09:47

 8       Q.   Okay.  And once you have made your         09:47

 9    recommendation and it's agreed with, it goes back to  09:47

10    the Facts system; right?                           09:47

11       A.   Yes.                                       09:47

12       Q.   And they generate a disciplinary letter; is  09:47

13    that right?                                        09:47

14       A.   That's correct.                            09:47

15       Q.   And then that discipline -- that discipline  09:47

16    letter is sent out to the employee.                09:47

17       A.   Yes.  It's sent to the employee's home     09:47

18    address in writing, and then it's also e-mailed to  09:47

19    their union representative, and the assessing       09:47

20    officer is copied as well as Labor Relations.       09:48

21       Q.   And I believe in this case, you said       09:48

22    Dr. Heligman had input at least into the decision to  09:48

23    discipline employees; is that right?               09:48

24       A.   Yes.                                       09:48

25       Q.   Was that every one of the Plaintiffs or    09:48
```

                                                                                      37

```
 1    just some?                                      09:48

 2        A.   Well, he's the one that decided to charge    09:48

 3    the Plaintiffs.  And then at the end of it, based on  09:48

 4    the review of the record, if there was additional   09:48

 5    information that was provided during the hearings   09:48

 6    that he needed to review, he would review those    09:48

 7    individuals.                                    09:48

 8             But as far as if there was no additional    09:48

 9    evidence provided, he was not involved in those    09:48

10    cases.                                          09:48

11        Q.   Okay.  Do you know approximately how many   09:48

12    of those cases he -- the Plaintiffs' cases he was   09:48

13    involved with?                                  09:48

14        A.   I don't know the numbers.              09:48

15        Q.   Okay.  Was it a handful or more than that?  09:48

16        A.   I would say more than a handful.       09:48

17        Q.   Okay.  And in each of those cases, I    09:49

18    believe you said he -- he still recommended      09:49

19    discipline?                                     09:49

20        A.   Yes.                                   09:49

21        Q.   And that discipline is termination; right?  09:49

22        A.   Yeah.  There -- there were other cases   09:49

23    involved that it might -- the employee may have not  09:49

24    been terminated, but the Plaintiffs in this case,   09:49

25    they were terminated.                           09:49
```

38

```
 1            MR. GARELLA:  Okay.  I see that we are      09:49
 2    running short on time, and I'm going to go ahead and  09:49
 3    leave it at that.  And we will take the rest of it    09:49
 4    with our next 30 (b)(6) witness unless Melissa has    09:49
 5    any questions for you.                                09:49
 6            MS. FOSTER BIRD:  What do you mean, we'll    09:49
 7    take up the rest?  You mean we will take up later     09:49
 8    with somebody else?                                   09:49
 9            MR. GARELLA:  Yeah.  You named two other     09:49
10    folks on this -- for Topic No. 11, and you said      09:49
11    there's other folks for Topic No. 9.  And so we will 09:49
12    address those with other people.                     09:49
13            MS. FOSTER BIRD:  Okay.  That's fine.        09:49
14            MR. GARELLA:  Is that cool?                  09:49
15            MS. FOSTER BIRD:  Okay.                      09:49
16            MR. GARELLA:  Sorry, Laura, I went over my   09:49
17    45 minutes.  We are off the record.  Let's go off    09:49
18    the record.  Sorry.                                  09:50
19            THE VIDEOGRAPHER:  We are going off the      09:50
20    record.  The time is 9:50.                           09:50
21            (At 9:50 a.m the deposition of              09:50
22            PENNY DREHER was adjourned.)                 09:50
23
24
25
```

                                                                                          39