## CASE NO. 21-2051

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

**JUSTIN ADKINS; JUSTIN BLAKE; EDWIN GLOWACKI; ERIC JORDAN; KEVIN PALMER; DENNIS SARGENT; TRAVIS THORNSBERRY; MICHAEL WILLIAMS; JOHN BAKER; JAMES BLAIN; DEVERY BROWN; JAMES DEAL; JONATHAN JEFFERS; ROBERT MOSTELLER; MICHAEL L. POTTER; MICHAEL D. POTTER; JESSEE WALLACE; TIMOTHY WITT; JOHN BILLS; MICHAEL CLARK; RANDALL CRAYCRAFT; JOHN FRASURE; SAMMY MADDIX; JAMES STINNETT; TODD THAYER; MICHAEL CAMPBELL; TONY ABDON; THE ESTATE OF CHAD LITTLE; BRANDON ADKINS; JACQUELINE MARSHALL; HOMER MAYNARD; SCOTT MORRISON; JEREMY NAPIER; SHAWN PATTERSON; MATTHEW WOODS; JOHN CARPENTER; QUINCY CHRISTIAN; GREGORY HAMM; ETHAN MULLINS; MICHAEL OWENS; JONATHAN ROWE; DANNY STEWART; LLOYD WILLIAMS; DAVID MANIS; JOSHUA FERGUSON; ERIC SPEAKS; DONALD STEPHENS; JASON BARKER; CHAD DOWDY; JERRY FLOCKER; GROVER KELLEY; CHRISTOPHER CLAY STILTNER; DENNIS HUTCHINSON; JOSHUA HALL; ZACH POTTER; DEANNA LANHAM; SAMUEL PRESTON; BOBBY AKERS; GERALD BARBER,**

**Plaintiffs – Appellants**

**v.**

**CSX TRANSPORTATION, INCORPORATED; CRAIG S. HELIGMAN, M.D.; GUS THOELE; CURT SHOGREN; MILTON STORM; DELANDO JONES; TOM DEANGELO; SHAWN LUSK; ELIZABETH CREEDON; KENNETH RAY EMERSON**

**Defendants – Appellees**

––––––––––––––––––––

**Appeal from the United States District Court
for the Southern District of West Virginia**

––––––––––––––––––––

**JOINT APPENDIX
VOLUME 6 OF 6**

––––––––––––––––––––

Jeff R. Dingwall
EIGHT & SAND
750 West Fir Street, Suite 602
San Diego, CA 92101
Tel: (619) 796-3464
Fax: (619) 717-8762
jeff@eightandsandlaw.com

Gregory G. Paul
PAUL LAW OFFICES
100 First Avenue, Suite 1010
Pittsburgh, PA 15222
Tel: (412) 417-5862
Fax: (888) 822-9421
gregpaul@morgan-paul.com

**ATTORNEYS FOR APPELLANTS**

Brian D. Schmalzbach
MCGUIRE WOODS
800 East Canal Street
Richmond, VA 23219
P: 804−775−7873
E:bschmalzbach@mcguirewoods.com

Samuel Lewis Tarry , Jr.
MCGUIRE WOODS
800 East Canal Street
Richmond, VA 23219
P: 804−775−7873
E:starry@mcguirewoods.com

Davis M. Walsh
MCGUIRE WOODS
800 East Canal Street
Richmond, VA 23219
P: 804−775−7873
E: dwalsh@mcguirewoods.com

Kathryn M. Barber
MCGUIRE WOODS
800 East Canal Street
Richmond, VA 23219
P: 804−775−7873
E:kbarber@mcguirewoods.com

Melissa Foster Bird

NELSON MULLINS RILEY &
SCARBOROUGH
P. O. Box 1856
Huntington, WV 25719
P: 304-526-3500
E:melissa.fosterbird@nelsonmullins.com

**ATTORNEYS FOR APPELLEES**

# TABLE OF CONTENTS
## APPENDIX VOLUME 6 OF 6

| ECF # | Description | Page # |
|---|---|---|
| 448-8 | Deposition of Brian Barr 5/6/21 | 2380 |
| 448-9 | Deposition (30(b)(6)) of Kelly Crouch 5/13/21 | 2555 |
| 448-10 | Deposition (30(b)(6)) of Jolanda Johnson | 2592 |
| 452 | Order Denying Plaintiffs' Motion for Supplemental Briefing on Summary Judgment 8/18/21 | 2667 |
| 453 | Transcript of Hearing on Motions for Summary Judgment 8/19/21 | 2672 |
| | Minute Entry re: Hearing on Motions for Summary Judgment 8/19/21 | 2693 |
| 454 | Order re: Defendants' Privilege Log and Document Production 8/19/21 | 2694 |
| 455 | Order on Plaintiffs' Motion for Partial Summary Judgment and Defendants' Motion for Summary Judgment 8/23/21 | 2696 |
| 456 | Judgment Order 8/23/21 | 2705 |
| 457 | Certified Copy of Judgment Order 8/23/21 | 2706 |
| 461 | Notice of Appeal 9/21/21 | 2708 |

Brian Barr                                                                          May 6, 2021

```
 1      IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN

 2                   DISTRICT OF WEST VIRGINIA

 3                        AT HUNTINGTON

 4

 5    JUSTIN ADKINS, et al.,    )
                                )
 6         Plaintiffs,          )
                                )
 7    vs.                       )Civil Action No. 3:18-cv-00321
                                )
 8    CSX CORPORATION, et al.,  )
                                )
 9         Defendants.          )
      _____  )
10

11

12

13        REMOTE VIDEOTAPED DEPOSITION OF BRIAN BARR

14     THURSDAY, MAY 6, 2021, 10:03 A.M. TO 1:47 P.M. PST

15

16

17

18

19

20

21

22

23

24       Reported by Elizabeth A. Willis-Lewis, CSR 12155
                        Job No. 237189
25
```

1

USCA4    2380

Brian Barr                                                           May 6, 2021

1       IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN

2                    DISTRICT OF WEST VIRGINIA

3                          AT HUNTINGTON

4

5    JUSTIN ADKINS, et al.,    )
                               )
6          Plaintiffs,         )
                               )
7    vs.                       )Civil Action No. 3:18-cv-00321
                               )
8    CSX CORPORATION, et al.,  )
                               )
9          Defendants.         )
     _____)

10

11

12

13

14

15

16

17

18

19

20

21

22

23        REMOTE VIDEOTAPED DEPOSITION OF BRIAN BARR,

24   commencing at 10:03 a.m. PST, Thursday, May 6, 2021,

25   before Elizabeth A. Willis-Lewis, RPR, CSR No. 12155.

                                                              2

```
 1    APPEARANCES (VIA ZOOM):

 2


 3         FOR THE PLAINTIFFS:

 4         MORGAN & PAUL, PLLC
           BY:  GREGORY G. PAUL, ESQ.
 5         100 First Avenue, Suite 1010
           Pittsburgh, Pennsylvania 15222
 6         844.374.7200
           gregpaul@paullaw.com
 7


 8         FOR THE DEFENDANTS:
 9
           NELSON MULLINS
10         BY:  MELISSA FOSTER BIRD, ESQ.
           949 Third Avenue, Suite 200
11         Huntington, West Virginia 25701
           681.888.5282
12         melissa.fosterbird@nelsonmullins.com

13


14         VIDEOGRAPHER:  JASON PATSALIS

15


16         ALSO PRESENT:  PATRICK HUGHES, ESQ.

17

18

19

20

21

22

23

24

25
```

3

Brian Barr                                                                                          May 6, 2021

1                               INDEX

2

3      WITNESS:   BRIAN BARR

4

5      EXAMINATION                                        PAGE

6      By Mr. Paul                                           7

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                                            4

Brian Barr                                                                              May 6, 2021

```
 1                    INDEX TO EXHIBITS

 2     NUMBER                                     MARKED

 3     Exhibit 1    64-page document including        85
                    correspondence to T L Abdon from
 4                  S. Kuhner dated August 31, 2017,
                    Bates stamped CSXT(ADKINS)000226 -
 5                  CSXT(ADKINS)000228,
                    CSXT(ADKINS)000401 -
 6                  CSXT(ADKINS)000460.

 7     Exhibit 2    283-page hearing transcript with   119
                    exhibits Bates stamped
 8                  CSXT(ADKINS)000933 -
                    CSXT(ADKINS)001215.
 9
       Exhibit 3    14-page document titled "Frequently 160
10                  Asked Questions About FMLA,"
                    Bates stamped
11                  CSXT(Adkins)022198 -
                    CSXT(Adkins)022211.
12
       Exhibit 4    Plaintiffs' Amended Notice of      173
13                  30(b)(6) Deposition and Request
                    for Production of Documents.
14

15

16

17

18

19

20

21

22

23

24

25
```

                                                                                          5

Brian Barr                                                        May 6, 2021

```
 1              THURSDAY, MAY 6, 2021, 10:03 A.M. PST

 2

 3              THE VIDEOGRAPHER:  Good morning and afternoon.   10:02:21

 4      We are on the record.  Here begins the remote deposition   10:02:45

 5      of Brian Barr in the matter of Adkins versus CSX   10:02:48

 6      Corporation.  This is presiding in the United States   10:02:54

 7      District Court for the Southern District of West   10:02:57

 8      Virginia at Huntington, case number 3:18-cv-00321.   10:03:00

 9      Today's date is May 6th, 2021, and the time is   10:03:11

10      10:03 a.m.   10:03:15

11              The video operator today is Jason Patsalis   10:03:18

12      representing Network Deposition Services located at 1800   10:03:22

13      Century Park East, Suite 150 in Los Angeles, California,   10:03:27

14      phone number 310-557-3400.  The court reporter today is   10:03:33

15      Elizabeth Willis.  This is a remote deposition through   10:03:39

16      Zoom videoconferencing.   10:03:44

17              Would counsel present please identify   10:03:45

18      yourselves for the record and who you represent?   10:03:47

19              MR. PAUL:  Yes.  Good afternoon.  Greg Paul on   10:03:50

20      behalf of the plaintiffs Adkins et al. versus CSX.   10:03:54

21              MS. BIRD:  Melissa Foster Bird on behalf of CSX   10:03:57

22      transportation, the additional defendants and today,   10:04:01

23      Mr. Barr the witness.   10:04:05

24              THE VIDEOGRAPHER:  The court reporter will now   10:04:07

25      administer the oath to the witness.   10:04:10
```

6

USCA4    2385

```
 1                    BRIAN BARR,                      10:04:25

 2        having been first duly sworn, testified as   10:04:25

 3        follows:                                      10:04:25

 4

 5            COURT REPORTER:  Thank you.               10:04:25

 6

 7            EXAMINATION BY MR. PAUL:                  10:04:27

 8        Q.   Good afternoon in Jacksonville, Florida. 10:04:27

 9   Mr. Barr, how are you?                             10:04:30

10        A.   Good morning.  Doing well, thank you.    10:04:31

11        Q.   Thank you.  We are here today to take your 10:04:34

12   deposition, and along those lines, I want to ask you a 10:04:36

13   few questions about your background and get into the  10:04:40

14   particulars that you have been designated for regarding 10:04:43

15   input or decisions to terminate a number of the       10:04:46

16   plaintiffs in this case.  You understand that is why we 10:04:49

17   are here today?                                        10:04:51

18        A.   Yes, sir.                                   10:04:52

19        Q.   Okay.  If I ask you a question that doesn't 10:04:52

20   make any sense or you don't understand it, please tell 10:04:55

21   me.  Otherwise, I will assume you understand it.  Does 10:04:58

22   that seem fair to you?                                 10:05:01

23        A.   Seems fair.                                 10:05:02

24        Q.   Okay.  If you need a break for any reason, just 10:05:03

25   let me know we will be sure to accommodate that.  If I   10:05:07
```

7

Brian Barr                                                      May 6, 2021

```
 1   show you a document and you need more time to take a        10:05:11
 2   look at it, just let me know.  I think we have ample        10:05:13
 3   time to get through what we need to do today, but I         10:05:17
 4   don't want you to feel rushed.  And in particular, if I     10:05:19
 5   show you one part of the document and you feel there is     10:05:23
 6   another part you want to look, we can either stay on the    10:05:25
 7   record or go off the record, but want to give you all       10:05:28
 8   the opportunity you need to review the documents that we    10:05:30
 9   go over today.  Does that sound good?                       10:05:33
10        A.    Sounds good.                                     10:05:34
11        Q.    Will you just please state your name and your    10:05:35
12   current position for the record, please?                    10:05:38
13        A.    Yeah.  Brian Barr, senior vice president         10:05:40
14   Network Operations.                                         10:05:42
15        Q.    Okay.  And for how long have you held that       10:05:44
16   position?                                                   10:05:51
17        A.    About 72 hours now.                              10:05:51
18        Q.    Before we get into your work history, let me     10:05:56
19   ask you, have you ever provided deposition testimony        10:06:01
20   like this before today?                                     10:06:04
21        A.    I have once or twice, but never over Zoom.       10:06:06
22        Q.    Never over Zoom.  Okay.  That is a good point    10:06:10
23   too because if -- sometimes there might be a little         10:06:13
24   technology issue.  If you hear part of a word, just let     10:06:16
25   me know because I couldn't quite hear all of that.  But     10:06:19
```

8

Brian Barr                                                                May 6, 2021

```
 1   so it sounds like you've testified in a deposition     10:06:22

 2   before but not over Zoom; is that right?               10:06:24

 3       A.    Yeah, that's right.                           10:06:28

 4       Q.    Okay.  So they were in person?                10:06:29

 5       A.    That's correct.                               10:06:31

 6       Q.    Okay.  And approximately how long ago were    10:06:31

 7   those couple of depositions?                            10:06:34

 8       A.    I was a CSX witness in a federal court just a 10:06:36

 9   few months ago.  Prior to that, you know, it's been    10:06:41

10   several years since -- since I have been deposed.       10:06:46

11       Q.    Okay.  Let's talk about the one.  It sounds   10:06:49

12   like you were -- you actually testified in court a      10:06:52

13   couple of months ago?                                   10:06:57

14       A.    Yeah, I was the company witness in court.     10:06:58

15       Q.    Okay.  And do you remember the name of that   10:07:00

16   case?                                                   10:07:01

17       A.    I -- I do not.  It was a carman in Buffalo, New  10:07:01

18   York, that was the case at hand.                        10:07:06

19       Q.    Okay.  And was that an injury case, an        10:07:09

20   employment case or something else?                      10:07:14

21       A.    That was a age discrimination suit.           10:07:16

22       Q.    Okay.  And it was in that context of that     10:07:19

23   lawsuit that you also provided a deposition, or did you 10:07:23

24   only testify in court?                                  10:07:26

25       A.    I only testified in court.                    10:07:27
```

9

Brian Barr                                                          May 6, 2021

```
 1        Q.   Okay.  And so prior to that testimony in        10:07:28

 2   court -- I am sorry, let me ask you, was that -- was       10:07:40

 3   that a federal court in Buffalo?                           10:07:43

 4        A.   It was.                                          10:07:45

 5        Q.   Okay.  And prior to that, you said maybe a       10:07:47

 6   couple other depositions; is that right?                   10:07:52

 7        A.   I was the company witness at one in -- in        10:07:53

 8   Georgia, but that was, again, in court without a           10:07:59

 9   deposition.  Prior to that, I was deposed once or twice    10:08:02

10   in years past, I believe in Indianapolis, Indiana.  I      10:08:06

11   don't really recall what the cases were.  I remember       10:08:10

12   having to go to the deposition as a younger manager        10:08:12

13   and -- and go through that, but tape-recorder on and       10:08:15

14   attorneys on both sides of the table.                      10:08:17

15        Q.   Okay.  When you say you were a company           10:08:19

16   witness -- in Georgia, you mentioned.  Is that what you    10:08:22

17   said?                                                      10:08:27

18        A.   Yes, sir.                                        10:08:28

19        Q.   Okay.  And do you remember the case, the         10:08:28

20   caption or the case name?                                  10:08:31

21        A.   It was sent from -- Georgia was the -- the       10:08:33

22   location.  It was from a rules infraction that was a       10:08:37

23   collision between two locomotives.                         10:08:41

24        Q.   Okay.  So would you deem that to be either a     10:08:44

25   personal injury or property damage case as opposed to an   10:08:47
```

                                                                        10

Brian Barr                                                                    May 6, 2021

```
 1   employment?                                          10:08:50

 2        A.   I am sorry, yeah, that was a personal injury  10:08:50

 3   lawsuit based.                                       10:08:53

 4        Q.   Okay.  All right.  And then prior to that, you  10:08:55

 5   think that you have had a couple depositions?        10:08:58

 6        A.   Yeah, but they -- again, they were years ago.  10:08:59

 7        Q.   Like more than five or more than 10 or what  10:09:02

 8   you --                                               10:09:05

 9        A.   More than 10.                               10:09:05

10        Q.   Okay.  Were they -- were the depositions while  10:09:07

11   you were employed at CSX?                            10:09:10

12        A.   Yes, sir.                                   10:09:11

13        Q.   Okay.  Okay.  And what did you do to prepare  10:09:11

14   for today's deposition?                              10:09:19

15        A.   So I -- about a week ago, I received the e-mail  10:09:20

16   on this that we would be having the correspondence.  I  10:09:25

17   have met with the -- the attorney that is with me here  10:09:28

18   today representing myself and CSX.  I have read through  10:09:30

19   some of the material that was distributed to me from  10:09:35

20   that here over the past few days that I was issued, you  10:09:39

21   know, issued some, the charge letter and notice of  10:09:45

22   findings type things that was submitted to me to refresh  10:09:48

23   my memory of events that occurred.                   10:09:53

24        Q.   Okay.  Yeah.  So I don't want to ask you about  10:09:56

25   what you talked to -- specifically about with the  10:09:58
```

11

Brian Barr                                                    May 6, 2021

1  lawyer, but in terms of the documents you reviewed, you    10:10:01

2  mentioned notice of findings; is that correct?             10:10:04

3      A.   Yeah, I have reviewed the initial charge          10:10:05

4  letter, the summary of results to come out or the letter   10:10:09

5  of fault that was signed by myself, you know, the charge   10:10:16

6  letter, and I have read through most of the transcript     10:10:19

7  to make sure I refreshed my mind on -- on what occurred.   10:10:23

8      Q.   Okay.  I just want to make sure it is clear       10:10:26

9  because I think you -- you mentioned charge letter and     10:10:29

10 maybe you did review that, but it sounded like you         10:10:31

11 really meant the termination letter.  But let me --        10:10:34

12     A.   Oh, charge letter and termination letter.         10:10:37

13     Q.   Okay.  Fair enough.  So the charge letter you     10:10:39

14 reviewed, you also reviewed the termination letter that    10:10:42

15 has your signature on it; is that correct?                 10:10:44

16     A.   Yes, sir.                                         10:10:46

17     Q.   Okay.  And you also reviewed notice of            10:10:46

18 findings?                                                  10:10:49

19     A.   Not -- not notice of findings.  I was saying     10:10:51

20 the termination letter that -- that I would have put       10:10:54

21 out.                                                       10:10:56

22     Q.   Okay.  Well, you mentioned notice of findings,    10:10:56

23 so did you mean the termination letter or do you mean --   10:11:02

24     A.   I may have misspoke.  I didn't mean notice of     10:11:03

25 findings.  I meant the letter that was put out under my    10:11:06

                                                               12

Brian Barr                                                                                                    May 6, 2021

```
 1    signature with the termination.                      10:11:08

 2         Q.   Okay.  Do you know what a notice of findings  10:11:10

 3    is?                                                  10:11:12

 4         A.   Yes.                                        10:11:12

 5         Q.   What is a notice of findings?              10:11:13

 6         A.   The charging officer, at times, will go through  10:11:16

 7    and review the record and have a notice of findings with  10:11:18

 8    a recommendation of what -- what occurred in the case,  10:11:21

 9    and he may cite a paragraph or particular testimony  10:11:23

10    that -- that would reflect guilt in that manner.    10:11:28

11         Q.   Okay.  And so that -- a notice of finding is an  10:11:30

12    actual written document?                            10:11:33

13         A.   Yes.  It is usually in an e-mail correspondence  10:11:34

14    that comes out after the employee reads the         10:11:38

15    transcript -- that -- when I say employee, a person that  10:11:40

16    held the trial will -- will submit that e-mail.     10:11:44

17         Q.   Okay.  And that is what I wanted to just make  10:11:47

18    sure I understood.  Did you say the hearing officer or  10:11:50

19    the charging officer would submit the notice of findings  10:11:53

20    by e-mail?                                           10:11:56

21         A.   The hearing officer.                       10:11:56

22         Q.   Hearing officer.  Okay.                    10:11:58

23         A.   Yes, sir.                                   10:12:00

24         Q.   And just for the record, can you explain the  10:12:01

25    difference between a hearing officer and a charging  10:12:03
```

                                                                13

USCA4    2392

Brian Barr                                                          May 6, 2021

```
 1   officer?                                          10:12:05

 2        A.   Yeah.  So the hearing officer is the officer   10:12:05

 3   that holds the investigation.  The charging officer is   10:12:08

 4   the officer that is designated in the room that     10:12:10

 5   introduces the -- the documents or the applicable rules.  10:12:13

 6        Q.   Okay.  And so did you review any notice of   10:12:17

 7   findings in this case for any of the plaintiffs that you   10:12:20

 8   signed termination letters for?                   10:12:23

 9        A.   I did not.                              10:12:25

10        Q.   Okay.  Do you know if any notice of findings   10:12:26

11   exist for any of the plaintiffs in this case?    10:12:29

12        A.   I do not.                               10:12:31

13        Q.   Going back to 2017, do you recall reviewing any   10:12:32

14   notice of findings for any of the plaintiffs in this   10:12:40

15   case?                                             10:12:43

16        A.   I do not.                               10:12:43

17        Q.   Have you looked for notice of findings for any   10:12:43

18   plaintiffs in this case in preparation for today's   10:12:49

19   deposition?                                       10:12:51

20        A.   As I flip through the transcripts of the   10:12:51

21   investigation, I did not see a notice of findings   10:12:55

22   attached to that document.                        10:12:57

23        Q.   Okay.  Is that where you would normally find a   10:12:58

24   notice of finding is attached to the transcript?   10:13:02

25        A.   Yes, sir.                               10:13:04
```

                                                             14

Brian Barr                                                              May 6, 2021

```
 1        Q.   Okay.  And we will talk about that process in a    10:13:04

 2    little more detail in a little bit.                         10:13:09

 3             And you also -- I believe you said you reviewed    10:13:18

 4    some of the transcripts in this case or paged through       10:13:21

 5    them or can you --                                          10:13:25

 6        A.   Yes, sir.  I -- I honestly did not re-read         10:13:26

 7    each -- each and every one of the -- the transcripts        10:13:28

 8    before this.                                                10:13:30

 9        Q.   Okay.                                              10:13:33

10        A.   A lot of the investigations were the same, you     10:13:33

11    know, as I recall and as I was flipping through.            10:13:36

12        Q.   Okay.  Did you read any of the transcripts back    10:13:38

13    in 2017?                                                    10:13:41

14        A.   In 2017, as I recall when the investigations       10:13:42

15    were over, I believe I received a call that -- that went    10:13:49

16    over the transcripts.  I don't believe I read the           10:13:56

17    transcripts in their entirety in 2017.  I believe after     10:13:58

18    the investigations, I received a call from Labor            10:14:01

19    Relations, which was field administration that went         10:14:04

20    through the findings of each one of these, and this is      10:14:08

21    somewhat of an unusual case from what we -- we normally     10:14:11

22    hold from the perspective in the field.                     10:14:15

23        Q.   Okay.  So is it accurate to say that back in       10:14:17

24    2017 you did not read any of the transcripts, but you       10:14:20

25    had a phone call with someone in Labor Relations to         10:14:22
```

15

Brian Barr                                                          May 6, 2021

```
 1    discuss their findings?                              10:14:25

 2        A.   Yes.                                        10:14:26

 3        Q.   Okay.  And who did you speak with in Labor  10:14:27

 4    Relations in 2017?                                   10:14:29

 5        A.   I specifically remember Penny, going through it  10:14:31

 6    with -- with her.  I believe at the time when I spoke  10:14:36

 7    with Penny, it would have been Barry Morton that I   10:14:41

 8    probably would have had conversation with and -- and  10:14:44

 9    probably Melissa Wheaton at the time I would have had  10:14:46

10    conversation with.  But Penny was the primary that  10:14:49

11    was -- that was handling this.  She was a direct    10:14:52

12    subordinate of Melissa Wheaton.                      10:14:57

13        Q.   Okay.  Now, I missed the second name after  10:14:58

14    Penny but before Melissa.                            10:15:00

15        A.   Barry Morton, he was Labor Relations for    10:15:02

16    mechanical at the -- at the time with within CSX.    10:15:05

17        Q.   And I am sorry, was that Morgan, M-O-R-G-A-N?  10:15:09

18        A.   Morton, M-O-R-T-O-N.                         10:15:13

19        Q.   Got it.  Okay.  And so when you say Penny, is  10:15:16

20    that referring to Penny Dreher?                      10:15:18

21        A.   Yes, sir.                                    10:15:20

22        Q.   Okay.  And what was her role at the time in  10:15:21

23    '17?                                                 10:15:23

24        A.   She was in Labor Relations in field         10:15:23

25    administration at that time.  Subsequently, I have   10:15:29
```

                                                                    16

USCA4    2395

Brian Barr                                                                    May 6, 2021

1    worked with her for years.  She -- she was in mechanical    10:15:32

2    as well, but at that particular time, I believe she was    10:15:34

3    in field administration in 2017.                            10:15:37

4        Q.   Okay.  And who was Barry Morton at that time in    10:15:39

5    2017?                                                        10:15:43

6        A.   He was Labor Relations director for mechanical     10:15:43

7    at that time, so he handled the mechanical Labor            10:15:49

8    Relations portion.                                          10:15:52

9        Q.   So is that a parallel position to Penny or --      10:15:52

10   or not?                                                      10:15:56

11       A.   I don't believe it would be -- it would not be     10:15:56

12   parallel.  He would have been senior officer to Penny,      10:16:02

13   but wouldn't have a direct reporting relationship.          10:16:05

14   Larry with -- in Labor Relations, he would be --            10:16:09

15   interact with the general chairman about rules and          10:16:10

16   policies and -- and the Collective Bargaining Agreement.    10:16:13

17       Q.   Got it.  And Melissa Wharton, what was her         10:16:15

18   position in 2017?                                           10:16:19

19       A.   Melissa Wheaton, it is W-H-E-A-T-O-N.  She         10:16:20

20   would have been -- she was an attorney that was -- that     10:16:24

21   was over the field administration at the time.  I don't     10:16:27

22   know what the position level would have been called, but    10:16:30

23   she was been the seniormost member of the field            10:16:33

24   administration team.                                        10:16:36

25       Q.   Okay.  Even though she was a lawyer, is it         10:16:36

                                                                        17

USCA4    2396

Brian Barr                                                        May 6, 2021

```
 1    correct that she was in Labor Relations and not the    10:16:38

 2    legal department?                                       10:16:40

 3        A.   That is correct.                               10:16:41

 4        Q.   And so I just want to get this right.  So your 10:16:44

 5    testimony is that you believe you primarily talked to   10:16:47

 6    Penny Dreher concerning the findings from Labor         10:16:49

 7    Relations for each of the plaintiffs in this case; is   10:16:55

 8    that right?                                             10:16:57

 9        A.   That is correct.                               10:16:58

10        Q.   Okay.  And you may have spoken with Barry      10:16:58

11    Morton or Melissa Wheaton about the Labor Relations     10:17:02

12    findings as well?                                       10:17:07

13        A.   Yeah, making sure that everybody was on the    10:17:08

14    same page on the -- with the investigation and how I was 10:17:11

15    going to proceed.                                       10:17:14

16        Q.   Okay.  Now as I recall, you -- did you say --  10:17:15

17    was it a phone call that you had with Penny?            10:17:19

18        A.   Yes.                                           10:17:21

19        Q.   About the -- about the Labor Relations findings 10:17:22

20    from the hearings?                                      10:17:23

21        A.   Yes.                                           10:17:24

22        Q.   Okay.  Was that one phone call or more than one 10:17:25

23    phone call?                                             10:17:29

24        A.   I know it was a phone call after the initial   10:17:29

25    case, and I believe subsequently there was an additional 10:17:32
```

18

Brian Barr                                                      May 6, 2021

```
 1   phone call beyond that.                              10:17:36

 2       Q.   When you say the initial case, is that the  10:17:37

 3   first hearing that took place?                       10:17:39

 4       A.   Yes, sir.                                    10:17:41

 5       Q.   Okay.  We will get into those dates in a little  10:17:41

 6   bit.                                                  10:17:46

 7           And then so you recall kind of a big phone call  10:17:46

 8   after that first hearing, or were all the phone calls  10:17:50

 9   about the same in length?                             10:17:53

10       A.   I mean, the first one was definitely more   10:17:54

11   lengthy than -- than the others.                     10:17:57

12       Q.   Why is that?                                 10:17:58

13       A.   Because we went over -- Penny had read the  10:17:58

14   entire transcript at that time.  In -- in Labor      10:18:01

15   Relations, they distribute them through the field after  10:18:04

16   they were transcribed.  And Penny had read the entire  10:18:07

17   investigation, and we had gone through that          10:18:11

18   investigation and if the -- the charges had been proven.  10:18:14

19   And that is why I would have followed up with Barry and  10:18:20

20   Melissa to -- to make sure, you know, that they would  10:18:23

21   approve it and we would be able to uphold them and went  10:18:25

22   through, you know, what the testimony was.  And, you  10:18:29

23   know, I made the decision to -- based off of that    10:18:32

24   conversation and based off of the charges to -- to   10:18:36

25   terminate.                                            10:18:39
```

                                                              19

Brian Barr                                                                                      May 6, 2021

```
 1        Q.    Okay.  And when you say the first hearing, is      10:18:40

 2   that the first hearing for one of the plaintiffs that         10:18:45

 3   you were responsible for in your department, or -- or         10:18:49

 4   don't you know?                                               10:18:52

 5        A.    It would -- yes, I wouldn't have made decisions    10:18:53

 6   on people that were outside of the mechanical                 10:18:56

 7   department.                                                   10:18:59

 8        Q.    Okay.  So any conver -- is it correct to say       10:18:59

 9   that any conversations you had with Penny were about          10:19:01

10   employees that you were responsible for?                      10:19:03

11        A.    Yes.                                               10:19:05

12        Q.    Okay.  And the reason I ask is just                10:19:05

13   chronologically, one of the first hearings that happened      10:19:08

14   I don't believe was an employee that fell under you.          10:19:11

15   That is why I ask.                                            10:19:14

16        A.    Oh, I'm -- I'm sorry.  So if they didn't fall      10:19:14

17   under me, I wouldn't have gotten the transcripts and had      10:19:17

18   the conversation.  Whomever ran that department would         10:19:19

19   have made that decision.                                      10:19:22

20        Q.    Okay.  Did you ever talk to anybody kind of at     10:19:23

21   your authority level in other departments for those          10:19:28

22   small handful of people that didn't fall under your           10:19:31

23   department?                                                   10:19:34

24        A.    I did not.                                         10:19:34

25        Q.    Okay.  So like Mr. Crossman, did you ever talk     10:19:35
```

20

Brian Barr                                                          May 6, 2021

```
1    to him about discipline?                             10:19:38

2        A.   Absolutely not.                             10:19:39

3        Q.   Okay.  The findings that -- that Penny shared  10:19:40

4    with you, is that a correct way of saying it, on the  10:19:56

5    phone?                                               10:19:58

6        A.   Yes.                                        10:19:59

7        Q.   Okay.  Was that anything that you have ever  10:20:03

8    seen in writing from Penny or anyone else in the Labor  10:20:05

9    Relations Department, or was it all verbal?          10:20:08

10           MS. BIRD:  Let me just clarify, for this --   10:20:09

11   this -- this group of plaintiffs or for others?      10:20:13

12           MR. PAUL:  For the group of plaintiffs in this  10:20:15

13   case.                                                10:20:17

14           THE DEPONENT:  I don't remember seeing it in  10:20:18

15   writing from Penny.  I do remember when it went to   10:20:21

16   arbitration, I did -- I did receive that in writing that  10:20:24

17   it was upheld within the arbitration process.        10:20:29

18       BY MR. PAUL:                                     10:20:31

19       Q.   Okay.  You are talking about a labor board  10:20:31

20   decision like from a three-member panel, that type of  10:20:34

21   thing?                                               10:20:37

22       A.   Yes, I think we are down to a one-member panel  10:20:37

23   at times, you know, with the -- with the railroad, but  10:20:40

24   yes, that's right, where we would -- they would read the  10:20:42

25   case, both the union and the carrier and the         10:20:44
```

                                                             21

Brian Barr                                                                    May 6, 2021

```
 1   organization would both defend their case and then a        10:20:48

 2   decision would be rendered from there.                      10:20:50

 3        Q.   Okay.  And if I ask you a question and you         10:20:52

 4   don't know the answer, just tell me, but isn't it true      10:20:55

 5   as a general matter, not specific to these plaintiffs,      10:20:58

 6   but that process of getting to a labor board normally       10:21:00

 7   takes more than a year?                                     10:21:02

 8        A.   Depending on the timing, that -- that is          10:21:04

 9   correct.  There is members paid that -- that go through     10:21:07

10   that.  There is shared cost with the union and the          10:21:11

11   organization, and then there is the -- the -- funded by     10:21:14

12   the -- by the organization.  And then with COVID it had     10:21:16

13   really slowed things down, so I mean, I couldn't give       10:21:19

14   you, but it is not uncharacteristic to see that kind of     10:21:21

15   length.                                                     10:21:25

16        Q.   Okay.  And the reason I ask is for this line of   10:21:26

17   questioning, I just want to focus on back in 2017 either    10:21:29

18   before, during or after, shortly after, like, within       10:21:32

19   say, a month of that call with Penny, have you ever seen    10:21:36

20   anything in writing concerning either Penny or the Labor    10:21:40

21   Relations Department's findings with respect to the         10:21:43

22   discipline of these plaintiffs?                             10:21:46

23        A.   No, sir.                                          10:21:48

24        Q.   Okay.  So is it accurate to say that to your      10:21:48

25   knowledge it was all verbal, that is what Penny or          10:21:52
```

22

Brian Barr                                                                    May 6, 2021

| | | |
|---|---|---|
| 1 | perhaps Mr. Morton or Ms. Wheaton shared with you | 10:21:56 |
| 2 | concerning the findings of recommendation for discipline | 10:22:01 |
| 3 | of the plaintiffs in this case? | 10:22:03 |
| 4 | A.   Yes. | 10:22:04 |
| 5 | Q.   Okay.  In approximately or a range, how long | 10:22:04 |
| 6 | did that initial telephone call last with Penny? | 10:22:11 |
| 7 | A.   From 2017, I -- I couldn't tell you.  I -- I | 10:22:14 |
| 8 | wouldn't say it was hours, but I wouldn't say it was | 10:22:19 |
| 9 | minutes.  You know, it was probably -- you know, I don't | 10:22:21 |
| 10 | want to guess, but I don't -- it wasn't -- it wasn't a | 10:22:24 |
| 11 | short call and it wasn't a very long call. | 10:22:28 |
| 12 | Q.   Okay.  Somewhere less than an hour but more | 10:22:30 |
| 13 | than 15 minutes, something like that? | 10:22:33 |
| 14 | A.   Yeah, probably.  I would agree with that. | 10:22:35 |
| 15 | Q.   Okay.  In the subsequent calls with Penny, I | 10:22:37 |
| 16 | think it sounds like from your testimony so far, they | 10:22:44 |
| 17 | were shorter; is that right? | 10:22:46 |
| 18 | A.   That's right.  I mean, they -- they followed | 10:22:47 |
| 19 | the same line on the investigation, and we didn't have | 10:22:50 |
| 20 | to go into as much detail on what Dr. Heligman had | 10:22:54 |
| 21 | testified to or other people had testified to or the | 10:22:59 |
| 22 | evidence chain.  It was very similar in each one of the | 10:23:01 |
| 23 | cases. | 10:23:05 |
| 24 | Q.   Either similar or identical, right? | 10:23:05 |
| 25 | A.   Yes. | 10:23:07 |

23

Brian Barr                                                                May 6, 2021

```
 1        Q.   Yeah, okay.  Did you know that -- that for part    10:23:08

 2   of the testimony from Dr. Heligman that he was reading       10:23:12

 3   from notes that were given to him?                           10:23:16

 4        A.   I -- I did not.  It is not uncharacteristic for    10:23:18

 5   people to read on to the transcript when -- when they        10:23:24

 6   are transcribing or by having them when they were            10:23:28

 7   transcribed, but I did not know that.                        10:23:30

 8        Q.   Okay.  Is the reason that -- that the -- your      10:23:31

 9   telephone calls with Penny after the initial one were        10:23:35

10   shorter because the findings from Labor Relations were       10:23:38

11   the same for each of the plaintiffs after that initial       10:23:41

12   hearing?                                                     10:23:45

13        A.   Yes.                                               10:23:46

14        Q.   In fact, I mean, in other words, were all of      10:23:46

15   the recommendations that you received from Labor             10:23:48

16   Relations regarding the plaintiffs in this case the          10:23:51

17   same?                                                        10:23:52

18        A.   You know, they were and we would -- we thought    10:23:53

19   we would be able to sustain the verdict with -- with         10:23:56

20   what the findings were and how the investigation went,       10:23:59

21   yes.                                                         10:24:02

22        Q.   And when you say "sustain" -- I don't know if     10:24:02

23   you said "verdict," you may have said "verdict."  But        10:24:05

24   when you said "sustain it," are you talking about that       10:24:08

25   process under the Collective Bargaining Agreement that       10:24:10
```

24

Brian Barr                                                                    May 6, 2021

| 1 | leads to the labor board? | 10:24:13 |
|---|---|---|

1    leads to the labor board?                                    10:24:13

2         A.   Yes.                                               10:24:15

3         Q.   Okay.  You're not talking about any other --       10:24:16

4         A.   No, not necessarily.  I don't want to say yes      10:24:18

5    to that.  When -- when -- when I say released, there's       10:24:20

6    the -- there is an initial appeal internally as well         10:24:22

7    where they write it, and that is what leads to the labor     10:24:25

8    board, you know, making sure that everybody was on the       10:24:29

9    same page that we're -- you know, we -- what we thought      10:24:31

10   we could defend in the first appeal, which then goes to      10:24:33

11   the arbitrator.                                              10:24:38

12        Q.   Okay.  So the last -- is it correct to say the     10:24:39

13   last level of appeal is that labor board, but you are        10:24:45

14   saying there is a couple, maybe one or two, appeals          10:24:47

15   before that that are called on property appeals; is that     10:24:50

16   right?                                                       10:24:52

17        A.   Yeah, that's right.  The general chairman will     10:24:52

18   write a letter asking for reconsideration type of thing.     10:24:56

19        Q.   Okay.  And you are familiar with that process?     10:24:59

20        A.   I am.                                              10:25:01

21        Q.   Okay.  All right.  Before we move into that,       10:25:01

22   there is just so much to cover.                              10:25:11

23             When you were communicating with Penny back in     10:25:13

24   2017, did you ever communicate with her by e-mail?          10:25:16

25        A.   Not that I recall over -- over this particular     10:25:19

25

Brian Barr                                                    May 6, 2021

1    case.  I am sure I have sent e-mails to Penny in 2017,    10:25:23

2    but I don't remember correspondence coming back and       10:25:27

3    forth in this case.                                        10:25:29

4        Q.   Okay.  Meaning for -- in this case meaning you   10:25:30

5    do not recall having any e-mail correspondence with       10:25:34

6    Penny concerning any of the plaintiffs in this case?      10:25:36

7        A.   Any of the plaintiffs in this case regarding     10:25:38

8    the Huntington event that -- I don't remember any         10:25:41

9    correspondence and e-mail around that.                    10:25:45

10       Q.   Okay.  Have you yourself looked for any e-mail    10:25:46

11   correspondence related to any of the plaintiffs in this   10:25:49

12   case, you know, from you?                                  10:25:51

13       A.   I did not go back over the last four days and    10:25:52

14   look if there were e-mail correspondence.  Our computer   10:26:00

15   system here, I would not have them from 2017.             10:26:02

16       Q.   Okay.  At any time, you know, obviously dating   10:26:04

17   back to 2017 to the present, have you ever looked for     10:26:08

18   any e-mails related to the plaintiffs in this case?       10:26:10

19       A.   Not that I recall.                               10:26:13

20       Q.   Okay.  Do you recall -- do you know what a       10:26:16

21   litigation hold letter is?                                10:26:18

22       A.   We would call it a hold, yes, CSX hold letter    10:26:19

23   based off of the -- the evidence that -- or based off of  10:26:23

24   the court filing that was submitted.                      10:26:27

25       Q.   Okay.  That is what your understanding of a --   10:26:29

26

```
 1    I am sorry, you called it a CSX hold letter?          10:26:31

 2        A.   Yeah.  We would get a CSX hold letter that    10:26:34

 3    would correspond.  If you have any correspondence in   10:26:36

 4    this matter, you know, you would -- you would put it on 10:26:38

 5    CSX hold for the law department.                        10:26:41

 6        Q.   Okay.  Does -- can you explain what that means, 10:26:44

 7    put it on CSX hold?                                      10:26:48

 8        A.   Yeah, I wouldn't delete it.  I wouldn't get rid 10:26:49

 9    of pictures that I had.  I wouldn't get rid of texts    10:26:51

10    that I had, those kinds of things.  We would put them on 10:26:54

11    CSX -- I would put them on CSX hold, and I would store  10:26:58

12    them in a separate drive on my computer so that they    10:27:00

13    wouldn't be deleted.                                    10:27:02

14        Q.   Okay.  That is what I wanted to ask you.  So is 10:27:04

15    it -- do you remember getting a letter like that that   10:27:06

16    related to the plaintiffs in this case?                 10:27:08

17        A.   I honestly do not remember getting a letter   10:27:09

18    based off of -- of this case, no.  I do get dozens and  10:27:12

19    dozens because of my position in the past, and my name  10:27:16

20    goes on a lot of charge and dismissal letters.  Over my 10:27:21

21    23-year career, I do get dozens of those sometimes a day 10:27:25

22    depending on filings, but I don't recall one in this    10:27:29

23    particular case.                                        10:27:32

24        Q.   Okay.  When you do get such a letter like that, 10:27:32

25    it sounds like you create a separate folder on your     10:27:37
```

27

Brian Barr                                                                          May 6, 2021

```
 1    computer to preserve the e-mails and pictures or        10:27:40

 2    whatever else?                                           10:27:42

 3        A.   Yeah, absolutely.  If I -- if I was the         10:27:43

 4    investigating officer and I had pictures of it or I had  10:27:45

 5    correspondence, I -- I would put it on my H-drive on my  10:27:48

 6    computer.                                                10:27:51

 7        Q.   And is the H-drive like a local drive specific  10:27:51

 8    to your computer?                                        10:27:55

 9        A.   Yes.                                            10:27:56

10        Q.   Okay.  So when you get a litigation hold        10:27:56

11    letter, I am asking you, it sounds like from your        10:27:59

12    testimony, number one, you know not to delete things; is 10:28:03

13    that correct?                                            10:28:06

14        A.   Yes.                                            10:28:06

15        Q.   And then two, you create a folder on the        10:28:07

16    H-drive to preserve any information?                     10:28:12

17        A.   Yes, that's what I do, yes.                     10:28:14

18        Q.   Okay.  Now it seems like for the number of      10:28:16

19    plaintiffs that are in this case, even though it would   10:28:19

20    date back to potentially 2017 or '18, you would remember 10:28:22

21    creating folders for the plaintiffs.  Would you agree    10:28:26

22    with that?                                               10:28:29

23        A.   I would remember that, and I did not create a   10:28:29

24    folder for the plaintiffs.                               10:28:32

25        Q.   Okay.  To be clear, it is not that you don't    10:28:34
```

28

Brian Barr                                                                          May 6, 2021

```
 1    remember.  Your testimony is that you did not create an    10:28:42

 2    H folder for any of the plaintiffs in this case?           10:28:44

 3         A.   I absolutely did not; that's correct.            10:28:46

 4         Q.   Okay.  And you may or may not have received the   10:28:47

 5    litigation hold letter, you just don't recall?             10:28:50

 6         A.   Yeah.  I don't recall it, no.                    10:28:53

 7         Q.   Let me just broaden that question a little bit.  10:28:54

 8    Do you remember sending or receiving any e-mails from      10:29:00

 9    anyone other than Penny Dreher in this 2017 period of      10:29:02

10    time, anyone else in the labor department like you         10:29:04

11    mentioned, Barry Morton and Melissa Wheaton?               10:29:08

12         A.   No, I -- I do not.  I remember having a          10:29:12

13    conversation about it.  I don't -- I don't remember        10:29:14

14    there being correspondence around, but again, this         10:29:16

15    was -- this was an unusual case, so I think there was      10:29:20

16    more clarity for me to call during this time.              10:29:24

17         Q.   Okay.  If we were to look at, like, a timeline   10:29:27

18    of your involvement with respect to the plaintiffs in      10:29:36

19    this case, that window of time, okay, so that's what I     10:29:39

20    want to ask you a few questions about just to kind of      10:29:45

21    give you the bigger picture.  So the first question is,    10:29:47

22    when did you first get involved in any conversations or    10:29:50

23    investigation concerning any of the plaintiffs in this     10:29:56

24    case related to the, you know, certificate of ongoing      10:29:57

25    illnesses in 2017?                                         10:30:03
```

                                                                          29

Brian Barr                                                                    May 6, 2021

```
 1        A.   So I received a call in June of 2016 [sic] and      10:30:07
 2   the conversation was that Labor Relations and                10:30:12
 3   Dr. Heligman had found what would be deemed as fraud          10:30:18
 4   on -- on employees going to -- to a similar practitioner     10:30:25
 5   getting similar results and similar time off, and it was     10:30:29
 6   a large variety of people.  And the conversation was,         10:30:32
 7   you know, how -- how are we going to pursue with that         10:30:37
 8   event, and did Labor Relations have the support or field     10:30:40
 9   administration have the support to charge those              10:30:46
10   employees, which charging them is the ability to have an     10:30:48
11   investigation that's -- investigation to develop the        10:30:51
12   facts around that event occurring or not.                    10:30:56
13        So I was called to go over this.  It was               10:30:59
14   roughly, I believe at the time -- I know the letter when    10:31:02
15   I read it here now to refresh my memory says 50-plus,        10:31:05
16   but I think it was 47 employees at the time when I was       10:31:08
17   initially called that -- that had been discovered to         10:31:11
18   have an event that was real similar in timing, real         10:31:14
19   similar in diagnosis, real similar in time off.  And was     10:31:17
20   there -- did they have support of the mechanical             10:31:20
21   department to pursue those charges, and I absolutely         10:31:22
22   talked to them.  I -- I talked to Labor Relations, and I     10:31:25
23   consulted with some people in general at CSX.  That's       10:31:30
24   a -- that's a pretty big charge to levy, and I -- I gave     10:31:34
25   the authority to proceed with the investigation, which      10:31:37
```

                                                                           30

Brian Barr                                                              May 6, 2021

```
 1    started the charge letters to come out.           10:31:40

 2         Q.   Okay.  If I heard you correctly, I believe you  10:31:42

 3    said June of '16.  Could it have been June of 2017?  10:31:47

 4         A.   I am sorry.  June -- yeah, you are right.  If I  10:31:50

 5    said '16.  I was mistaken.  June of 2017.          10:31:53

 6         Q.   No problem.  And who called you in June of '17?  10:31:56

 7         A.   I believe the first conversation was Barry  10:32:00

 8    Morton from Labor Relations, then he had gotten -- Penny  10:32:02

 9    was the one who had most of the information.  So Barry  10:32:06

10    gave me a heads up on it, but I interacted with him a  10:32:12

11    lot.  He was on the same floor.  So we -- Barry had  10:32:15

12    talked to me about it.  Penny was the one I had the long  10:32:18

13    discussion with on where we were at.  What evidence  10:32:21

14    would we present?  Was it something that we -- we would  10:32:23

15    pursue?  What would the outcome be if we -- we did go  10:32:25

16    through with the investigations?  I had a conversation  10:32:28

17    with Penny about it.  She gave me the facts, that  10:32:33

18    Dr. Heligman was involved.  He had information.  I think  10:32:35

19    he had said something to the Railroad Retirement Board  10:32:38

20    about it, and we proceeded with the investigation.  10:32:42

21         Q.   Okay.  So just -- let me just back up a little  10:32:45

22    bit.  So you recall your first conversation about any of  10:32:48

23    this, you know, related to the plaintiffs and the  10:32:51

24    certificate of ongoing illnesses was a conversation with  10:32:54

25    Barry Morton?                                     10:32:57
```

                                                                        31

Brian Barr                                                                          May 6, 2021

```
 1        A.   I believe Barry was the one who notified me.    10:32:58

 2   Penny was the one I had the lengthier conversation on.    10:33:01

 3            (Simultaneous colloquy.)                         10:33:04

 4   BY MR. PAUL:                                              10:33:05

 5        Q.   I am sorry.  Go ahead.                          10:33:05

 6        A.   Penny was the one I had the lengthier           10:33:06

 7   conversation with.                                        10:33:10

 8        Q.   Okay.  Is that the same conversation that we    10:33:10

 9   talked about concerning the recommendation for            10:33:12

10   discipline from Labor Relations?                          10:33:13

11        A.   No.  That would be a separate conversation.     10:33:14

12        Q.   Okay.  So let's just -- just break it down.     10:33:18

13   That conversation you had with Barry Morton, was that in  10:33:20

14   person or over the phone?                                 10:33:23

15        A.   I would say that was probably in person because 10:33:24

16   the office on the -- he would often come to my office at  10:33:32

17   that time.  Since I was vice president of mechanical, he  10:33:34

18   was head of Labor Relations for mechanical, he would      10:33:36

19   come into my office quite a bit.                          10:33:40

20        Q.   So you both worked at the headquarters in       10:33:42

21   Jacksonville?                                             10:33:46

22        A.   Yes, sir.                                       10:33:47

23        Q.   Okay.  Does Barry Morton still work there?      10:33:47

24        A.   He does not.                                    10:33:49

25        Q.   Do you know where he is?                        10:33:50
```

                                                                                      32

USCA4      2411

Brian Barr                                                          May 6, 2021

```
 1        A.   Kansas City Southern, Kansas City, Missouri.    10:33:51

 2        Q.   Does he work for the railroad there?            10:33:54

 3        A.   He does.                                         10:33:56

 4        Q.   It sounds like not -- I mean, not just with     10:33:57

 5   respect to the plaintiffs but in general, did you         10:34:05

 6   generally see Barry Morton, like, on a daily basis if     10:34:07

 7   you were both in the office?                              10:34:11

 8        A.   Yes.                                             10:34:12

 9        Q.   I mean, it was that close of a connection       10:34:13

10   work -- working-wise?                                     10:34:16

11        A.   Yes.  If there was anything that was coming up, 10:34:17

12   he would -- he would stop by my office and I would -- or  10:34:21

13   I would stop by his office if there was, you know,        10:34:23

14   information exchange since we worked there together and   10:34:25

15   knew each other for 20 years working here.                10:34:28

16        Q.   Okay.  Now, just the best you can remember,     10:34:31

17   what information did Barry share with you at that         10:34:35

18   initial meeting that was likely in person?  Well, first   10:34:38

19   let me ask you this, I am sorry, do you remember that     10:34:43

20   meeting?                                                  10:34:46

21        A.   Yes.                                             10:34:46

22        Q.   Okay.  So I am not asking you to guess.  You    10:34:46

23   remember this initial meeting with -- with Mr. Morton?    10:34:48

24        A.   Yes.                                             10:34:51

25        Q.   Okay.  Then I will ask you the question.        10:34:52
```

                                                                        33

Brian Barr                                                                May 6, 2021

```
 1        A.   All right.  I remember Barry is the one who --    10:34:54
 2   who notified me, and the conversation was sort of, "Hey,    10:34:57
 3   Penny is going to call you about, you know,                 10:34:59
 4   investigation in Huntington," you know, with -- with        10:35:04
 5   multiple employees.  He -- he had notified me that, you     10:35:06
 6   know, Penny was going to notify me of the investigation     10:35:11
 7   based off of what was found by Dr. Heligman.                10:35:13
 8        Q.   Okay.  And when you say, "what was found by       10:35:16
 9   Dr. Heligman," do you remember Barry sharing specifics      10:35:20
10   with you of what that was that Dr. Heligman found?          10:35:23
11        A.   It was that a multitude of people had marked      10:35:25
12   off at that same location for the -- and were seeing the    10:35:30
13   same doctor and off for the same period of time.            10:35:34
14        Q.   Okay.  And was -- did you -- do you recall any    10:35:35
15   part of that initial discussion with Mr. Morton as to       10:35:38
16   the reasons why Dr. Heligman thought that they were         10:35:42
17   trying to mark off around that same period of time?         10:35:49
18        A.   I don't remember Barry having that conversation   10:35:51
19   with me.  I do not remember that as far as the              10:35:58
20   conversation.                                               10:36:00
21        Q.   Okay.                                             10:36:00
22        MS. BIRD:  Give it a minute.  You will get to          10:36:16
23   hear his dog too.                                           10:36:18
24        MR. PAUL:  No.  The dog's in daycare today.            10:36:20
25        MS. BIRD:  Dog is in daycare.  No dog today.           10:36:25
```

                                                                       34

Brian Barr                                                              May 6, 2021

```
 1        BY MR. PAUL:                                    10:36:25

 2        Q.   Okay.  In June of 2017, were you aware of any    10:36:25

 3   layoffs or job abolishments that were going on in the    10:36:37

 4   Huntington area?                                          10:36:40

 5        A.   Absolutely.                                 10:36:41

 6        Q.   Okay.  In that initial conversation with    10:36:42

 7   Mr. Morton, do you recall that topic coming up, that is   10:36:48

 8   job layoffs or abolishments?                              10:36:52

 9        A.   I don't know that it -- I don't recall it   10:36:54

10   coming up in that meeting.  But when I made the decision  10:36:58

11   on layoffs, Barry, in Labor Relations, was the one who    10:37:01

12   would direct the documents to the -- to the general       10:37:05

13   chairman to satisfy our Collective Bargaining Agreement.  10:37:07

14   So if I made the decision for layoffs, Barry made the     10:37:11

15   notification.                                             10:37:15

16        Q.   Got it.  Did you -- in that initial        10:37:16

17   conversation with Barry, did you make any connection      10:37:19

18   between what Dr. Heligman was finding and any layoffs or  10:37:24

19   job abolishments?                                         10:37:30

20        A.   I did not.  At the time, you know, I just knew  10:37:31

21   that it was going to be for employees at Huntington.  I   10:37:34

22   did not know, you know, who those employees were, what    10:37:37

23   their standing was.  I was unaware of that at the time.   10:37:40

24   I was anticipating the conversation with -- with Penny,   10:37:43

25   who had more of the information.                          10:37:46
```

                                                                      35

Brian Barr                                                         May 6, 2021

1        Q.   Okay.  And in the conversation you had with        10:37:48

2    Penny, not the one we already talked about but the one      10:37:51

3    we are going to talk about now that happened after the      10:37:56

4    in-person meeting with Mr. Morton, was that the same day    10:37:58

5    that you talked to Mr. Morton?                              10:38:02

6        A.   I don't recall, but I -- I would guess that it     10:38:03

7    was the same day.                                           10:38:05

8        Q.   Okay.  And what do you recall about the            10:38:06

9    conversation with Penny Dreher?                             10:38:08

10       A.   So the -- the conversation was that we had,        10:38:11

11   like I say, as I remember it, it was around 40 people at    10:38:15

12   that time we were making the decision if I was going to     10:38:19

13   charge or not.  We had 40 or so people that had marked      10:38:21

14   off going to the -- to the same physician, had the same     10:38:24

15   time off, and I was asking about where -- you know,         10:38:29

16   where -- where were they at.  I didn't see the markoffs     10:38:33

17   at the shop that day.  I didn't see, you know, 40-plus      10:38:36

18   people marked off at the locomotive shop at the time.      10:38:40

19   And they were primarily the furloughed employees that      10:38:43

20   were previously down there at -- at Huntington.            10:38:46

21       Q.   Okay.  I am sorry.  I didn't quite follow that.    10:38:50

22   Who -- who were previous employees at Huntington?          10:38:53

23       A.   Who -- they were employees at Huntington, some    10:38:57

24   of them had been furloughed there at Huntington is why I    10:39:00

25   didn't see that amount of people marked off at             10:39:03

                                                               36

Brian Barr                                                                      May 6, 2021

```
 1   Huntington.                                          10:39:06

 2       Q.   I see.  Okay.  All right.  And this is relayed  10:39:07

 3   to you in the, you believe, it was a phone conversation  10:39:10

 4   with Penny?                                          10:39:12

 5       A.   It was as we were going through the -- who  10:39:13

 6   was -- who was -- had the event, I couldn't understand  10:39:16

 7   how it was that many people, you know, marked off all on  10:39:21

 8   the same shift or on -- that I wasn't aware of it.  So  10:39:21

 9   we did -- we went through, you know, who was marked off  10:39:24

10   at the time and what crafts were they, those kinds of  10:39:29

11   things.                                              10:39:32

12       Q.   Okay.  And you did that the over the phone with  10:39:32

13   Penny or was she just reporting this to you?         10:39:37

14       A.   Over the -- over the phone with Penny.      10:39:39

15       Q.   Okay.  I guess let me ask a better question.  I  10:39:40

16   mean, was it during that conversation with Penny that --  10:39:43

17   were you just receiving information from Penny or were  10:39:47

18   you also looking people up and finding information about  10:39:49

19   them?                                                10:39:53

20       A.   I think -- I don't know that I was looking them  10:39:53

21   up.  I was trying to find out why they were -- where  10:39:57

22   they were all at at the time.  You know, why was I still  10:39:59

23   able to work the shift that day if I had, you know,  10:40:03

24   40-plus people off.                                  10:40:04

25       Q.   Oh, okay.  You mean more of, like, a management  10:40:06
```

                                                                                    37

Brian Barr                                                                May 6, 2021

1     of people, like, if there is -- who is working if        10:40:08

2     everybody is laid off, is that what you mean?            10:40:13

3          A.   How am I able to staff the shift, that's right.  10:40:15

4          Q.   Okay.  So that was your -- yeah, from an        10:40:17

5     operations point of view, that was your concern right    10:40:18

6     there?                                                   10:40:20

7          A.   Correct.                                        10:40:21

8          Q.   Okay.  And what -- did you draw any conclusions  10:40:22

9     at that time?                                            10:40:25

10         A.   No.  At that time, you know, it was, you know,  10:40:25

11    they are all at Huntington and they were in different   10:40:29

12    crafts.  The people that we were discussing were, you    10:40:32

13    know, Huntington locomotive shop employees.  And with   10:40:35

14    the information it was, do we want to proceed with --    10:40:39

15    with an investigation that they had all marked off, you  10:40:42

16    know, same -- same information that Dr. Heligman          10:40:48

17    testified to.  And it was -- the question was will I     10:40:53

18    proceed with the investigation to support that, and I    10:40:56

19    absolutely did at that point.                            10:40:59

20         Q.   Let me just back up a minute.  You just said   10:41:00

21    that Dr. Heligman testified about.  Are you now          10:41:04

22    referring to his testimony at the hearings?             10:41:05

23         A.   Yes, sir.  I -- I -- obviously, we didn't hold  10:41:06

24    the hearings at that time, but it was similar           10:41:08

25    information that was, you know, that was part of the     10:41:11

38

USCA4    2417

Brian Barr                                                    May 6, 2021

1    conversation.                                        10:41:13

2        Q.    Okay.   Yeah.   And we will definitely get there.   10:41:13

3    I just want to kind of stay at this point in time right   10:41:16

4    now to keep the record clear, if that is okay.   But   10:41:18

5    you're -- believe me, I will give you any opportunity   10:41:22

6    you want to -- to make sure you explain anything that   10:41:26

7    you want to.                                         10:41:27

8            But in terms of where you are right now, you   10:41:27

9    have the initial in-person meeting with Barry Morton.   10:41:29

10   Then most likely the same day, you have a telephone   10:41:32

11   conversation with Penny Dreher, and that is kind of   10:41:35

12   where we are right now.   So in that conversation with   10:41:39

13   Penny, so far it sounds like you were asking questions,   10:41:41

14   like, if there is this many people laid off, which you   10:41:46

15   believe was around 40 at the time, how -- how does that   10:41:49

16   affect operations; is that right?                    10:41:52

17       A.    That's correct.                            10:41:53

18       Q.    Okay.   And it also sounds like so far -- but I   10:41:54

19   want to ask you, at what point in time you authorized   10:41:58

20   the charge letter to be sent out?                    10:42:02

21       A.    So we had that, you know, that initial   10:42:04

22   conversation.   Part of that conversation that -- that I   10:42:08

23   was going through with -- with Penny was about what --   10:42:12

24   you know, what do they believe the charge was.   And it   10:42:19

25   was fraud for ongoing insurance was part of the   10:42:21

                                                              39

Brian Barr                                                    May 6, 2021

```
 1   conversation that they were looking at from a -- from a    10:42:26
 2   Labor Relations perspective and conversations they were    10:42:29
 3   having in that department and with -- at the time with     10:42:32
 4   Dr. Heligman.  You know, in the -- we had that             10:42:36
 5   conversation, and the same day I made the decision that    10:42:41
 6   we would pursue the investigation of it, which             10:42:45
 7   internally the investigation is the fact that they would   10:42:48
 8   be issued a charge letter.  It would be given an           10:42:51
 9   opportunity to have a communication of, "Hey, here is      10:42:55
10   what we think happened," and that we have fact-finding     10:42:58
11   investigation internally to find out what the charges      10:43:00
12   were.                                                      10:43:07
13        Q.   Okay.  So you believe you made the decision to   10:43:08
14   charge the plaintiffs in this case, like, either during   10:43:10
15   or right after that phone conversation with Penny?         10:43:13
16        A.   It would have been after.  I am sure I -- I      10:43:16
17   wouldn't have made such a, you know, a rash decision       10:43:20
18   immediately.  You know, I would -- I would have put        10:43:21
19   thought to it with -- with this.  And again, it was        10:43:23
20   early in the investigation, but it was do we want to       10:43:26
21   pursue that or not.  And I would say the count that was    10:43:29
22   actually charged and in the charge letter wasn't the       10:43:32
23   number I initially got.  But, yes, I made the decision     10:43:35
24   that day to pursue it, and then there was further          10:43:37
25   investigation from the Labor Relations Department and it   10:43:40
```

40

Brian Barr                                                                    May 6, 2021

```
 1    proceeded with actual charge letter and investigations    10:43:44

 2    set up.                                                   10:43:48

 3        Q.   Okay.  I have the certificate of ongoing         10:43:48

 4    illnesses to look at their dates, but I want to ask you,  10:43:51

 5    have you ever seen any of the certificate of ongoing      10:43:54

 6    illnesses for any of the plaintiffs in this case at any   10:43:56

 7    time back in 2017 or in preparation for today's           10:43:58

 8    deposition?                                               10:44:02

 9        A.   No, I don't believe so.  No.                     10:44:02

10        Q.   And to be clear, I can't say that all of them    10:44:06

11    were, but I believe that they were made exhibits to the   10:44:09

12    hearings.  That wouldn't change your testimony, would     10:44:12

13    it?                                                       10:44:14

14        A.   No.  When I flip through the exhibits to the     10:44:14

15    hearing, I was going through the charge letter, the       10:44:18

16    investigation itself, the dismissal letter and the        10:44:20

17    Railroad Retirement Board -- or excuse me the             10:44:25

18    arbitrator's verdict.  I didn't go through every one of   10:44:26

19    the exhibits, no.                                         10:44:29

20        Q.   Okay.  That's fine.  So you mentioned possibly   10:44:30

21    the -- Dr. Heligman's letter to the Railroad Retirement   10:44:35

22    Board.  Is that something you reviewed or no?             10:44:38

23        A.   No.  No, I -- I inadvertently said Railroad      10:44:40

24    Retirement Board.  I corrected that, in arbitration, you  10:44:44

25    know, that is all together in a packet and the exhibits   10:44:46
```

                                                                        41

Brian Barr                                              May 6, 2021

```
 1   would come behind that.                           10:44:48

 2        Q.   Got it.  Okay.  I have made a little    10:44:49

 3   handwritten chart, so I am happy to show you some of the  10:44:55

 4   certificate of ongoing illnesses.  But it looks to me  10:44:58

 5   that the earliest one that was submitted was June 20th  10:45:01

 6   of 2017.  And when I mean [sic] that, I mean of the  10:45:05

 7   plaintiffs in this case that submitted certificate of  10:45:10

 8   ongoing illness forms to the Medical Department.  Does  10:45:14

 9   that sound about right that you would have had this  10:45:18

10   conversation with Penny and with Barry at the end of  10:45:22

11   June?                                             10:45:27

12        A.   No, I think I had that conversation closer to  10:45:27

13   middle of June about what would -- you know, what was  10:45:32

14   happening, what was found.  I don't -- I don't remember  10:45:37

15   it being the end of June and I wouldn't have known about  10:45:40

16   a COII [sic].                                      10:45:46

17        Q.   I'm sorry.  I missed the last part.      10:45:47

18        A.   I wouldn't have known about a certificate of  10:45:49

19   ongoing injury, I believe you called it.  I wouldn't --  10:45:51

20   I wouldn't have gotten that in my position.  I wouldn't  10:45:53

21   have received that in my position.                 10:45:55

22        Q.   Okay.  But when Barry first came to you, it  10:45:57

23   sounds like, from your testimony, he was reporting a  10:46:00

24   concern that Dr. Heligman had concerning the receipt of  10:46:03

25   certificate of ongoing illnesses; is that correct?  10:46:07
```

                                                        42

Brian Barr                                                                    May 6, 2021

```
 1        A.   I think it was receipt -- it was -- the way I    10:46:08

 2   understood it it was receipt of markoffs, you know,        10:46:12

 3   through his department.  I -- I don't know if that was     10:46:14

 4   the initial -- I guess that would be the certificate of    10:46:18

 5   ongoing incident but -- or injury, but it was the report   10:46:20

 6   that had an exorbitant amount of people at one location    10:46:24

 7   were all marked off together.  I don't remember -- he      10:46:28

 8   never referred to it as a certificate of ongoing injury.   10:46:31

 9        Q.   Got it.  Okay.  Are you familiar with some type  10:46:34

10   of a report that was generated concerning the number of    10:46:38

11   layoffs at that time?                                      10:46:42

12        A.   What do you mean by layoffs?                     10:46:44

13        Q.   Well, whatever -- ones that was brought to your  10:46:52

14   attention by Mr. Morton concerning the number of           10:46:55

15   layoffs, I'm just -- I guess I'm asking is that            10:46:58

16   generated from some type of a report that tracks the       10:47:01

17   number of layoffs or something else?                       10:47:04

18        A.   So the conversation I had with Barry about       10:47:06

19   Penny and Dr. Heligman, that would have been something     10:47:11

20   else.  That wouldn't have been layoffs.  And the reason    10:47:14

21   I just have to clarify is Barry does the -- the layoff     10:47:16

22   report, which is people that I have, you know, made the    10:47:20

23   decision to lay off of work.  That is a separate -- I      10:47:24

24   wouldn't call, you know, this layoffs.                     10:47:27

25        Q.   Okay.  That is a good distinction, and let       10:47:30
```

                                                                              43

Brian Barr                                                                                    May 6, 2021

```
 1   me -- let me ask a different question.  Is there some      10:47:32

 2   kind of report that either you were looking at or that     10:47:35

 3   Barry brought to your attention concerning markoffs as     10:47:39

 4   opposed to layoffs?                                        10:47:42

 5       A.   No, not that I recall.                            10:47:47

 6       Q.   Okay.  So I mean, what was -- and again, I am     10:47:49

 7   talking about the conversation with Barry or with Penny,   10:47:51

 8   what information did they relay to you that raised a       10:47:56

 9   concern to you about the number of layoffs?  I am sorry    10:47:59

10   markoffs, markoffs?                                        10:48:03

11       A.   Incoming -- incoming medical documentation with  10:48:05

12   a host of people that were marked off for -- for a few     10:48:09

13   months all at once.                                        10:48:13

14       Q.   Okay.  So that's fine.  It is information that    10:48:14

15   was received by the Medical Department and Dr. Heligman    10:48:18

16   specifically; is that right?                               10:48:21

17       A.   Yes, sir.                                         10:48:22

18       Q.   You are just not sure whether it was the actual  10:48:23

19   certificate of ongoing illness or injury?                 10:48:25

20       A.   Correct.                                          10:48:27

21       Q.   Okay.  I think we got that.  All right.  Did      10:48:27

22   you give the green light to issue the charge letters for   10:48:33

23   the people under your department based upon whatever       10:48:37

24   information that the Medical Department received from      10:48:42

25   the plaintiffs?  Let me -- let me -- actually, let me      10:48:45
```

44

Brian Barr                                                                May 6, 2021

```
 1    ask that a little better.  You never reviewed any        10:48:51

 2    medical information from the plaintiffs, right?          10:48:54

 3        A.    I did not.                                     10:48:55

 4        Q.    Okay.  So I think a better question, more      10:48:56

 5    specific question, is in giving the green light to issue 10:48:58

 6    charges to the plaintiffs that were under your           10:49:03

 7    department, did you rely upon the Medical Department's    10:49:05

 8    concern of fraud?                                        10:49:09

 9        A.    Yes.                                           10:49:11

10        Q.    Okay.  And did you rely exclusively upon the   10:49:12

11    Medical Department and Dr. Heligman, specifically his    10:49:16

12    concern of fraud?                                        10:49:19

13        A.    No.                                            10:49:19

14        Q.    Okay.  What else did you rely upon?            10:49:20

15        A.    The -- Penny Dreher, you know, Melissa Wheaton, 10:49:24

16    that group that does the field administration and -- and 10:49:27

17    Labor Relations, you know, portion that everyone had     10:49:30

18    reviewed that together, and it was supported that that   10:49:35

19    would continue on.                                       10:49:39

20        Q.    I am sorry.  It was supported that it would    10:49:40

21    continue on?                                             10:49:43

22        A.    It was supported that it was a charge that we  10:49:44

23    would pursue, not just based off of Dr. Heligman         10:49:47

24    exclusively.                                             10:49:51

25        Q.    Okay.  So does that mean that your             10:49:52
```

                                                                      45

Brian Barr                                                                                      May 6, 2021

| 1  | understanding is that the three people, Penny Dreher, | 10:49:55 |
| 2  | Barry Morton and Melissa Wheaton also reviewed the | 10:50:00 |
| 3  | medical documentation submitted to Dr. Heligman and | 10:50:03 |
| 4  | concurred the charges should go forward? | 10:50:05 |
| 5  | A.   I'm -- I am not trying to be difficult with | 10:50:08 |
| 6  | this answer.  I don't know if they reviewed -- what | 10:50:10 |
| 7  | they -- I know they had conversations.  I assume they | 10:50:13 |
| 8  | had conversation.  You know, my conversation was, "Hey, | 10:50:15 |
| 9  | if that's a fact, I can't turn my head to, you know, | 10:50:17 |
| 10 | 40-plus people, you know, committing a fraud."  So it | 10:50:20 |
| 11 | was do we think we can prove that?  Do we think we know | 10:50:24 |
| 12 | that as fact?  I will go ahead and start the -- I will | 10:50:27 |
| 13 | allow the investigation to start under my authority to | 10:50:29 |
| 14 | develop the facts on.  I don't know what they | 10:50:32 |
| 15 | independently reviewed. | 10:50:35 |
| 16 | Q.   Okay.  No, that's fine.  I appreciate that | 10:50:36 |
| 17 | clarification.  So would it be more accurate to say that | 10:50:38 |
| 18 | you reviewed -- that you relied upon Dr. Heligman's | 10:50:41 |
| 19 | suspicions of fraud and Labor Relations' support of | 10:50:46 |
| 20 | Dr. Heligman to move forward with issuing the charge | 10:50:51 |
| 21 | letters? | 10:50:54 |
| 22 | A.   Yes. | 10:50:54 |
| 23 | Q.   Okay.  Any other conversations that we haven't | 10:50:54 |
| 24 | talked about prior to issuing the authority to issue the | 10:51:00 |
| 25 | charge letters? | 10:51:03 |

46

Brian Barr                                                                May 6, 2021

```
 1        A.   No.                                      10:51:04

 2        Q.   So you didn't have any conversations with    10:51:07

 3   anyone other than Barry Morton and Penny Dreher before  10:51:10

 4   issuing the decision to issue charge letters?      10:51:15

 5        A.   No, not prior.                           10:51:16

 6        Q.   Okay.  And the mechanics of how a charge letter 10:51:18

 7   gets issued, do you have knowledge of that?        10:51:23

 8        A.   Yes.                                     10:51:26

 9        Q.   Okay.  What happens after you give the green 10:51:27

10   light to issue the charge letters?                 10:51:30

11        A.   So an assessment is entered by an individual. 10:51:32

12   You know, it could be a multitude of individuals.  In  10:51:36

13   this case, I believe the charging officer wound up  10:51:41

14   being -- showing up for all of them.  So Curt would have 10:51:45

15   confirmed and he would have entered the assessment in  10:51:48

16   the assessments in our IDPAP policy.  It is a      10:51:51

17   requirement.  So when he enters in that assessment, it  10:51:55

18   goes to field administration.  Field administration, as 10:51:58

19   a department at the time, would go through and had, you 10:52:00

20   know, for lack of a better -- lack of better term, a  10:52:04

21   chain letter that would comply with Collective    10:52:08

22   Bargaining Agreement with verbiage that had the date, 10:52:10

23   the employee, their address, you know, the facts for  10:52:13

24   this investigation, this location, this time.  That  10:52:19

25   would all be done through Labor Relations in the field 10:52:21
```

                                                                47

Brian Barr                                                                May 6, 2021

```
 1   administration portion of Labor Relations.  That letter    10:52:26

 2   would be mailed within the time frames allowed in the      10:52:28

 3   Collective Bargaining Agreement, which would set up the    10:52:32

 4   initial investigation.                                     10:52:34

 5       Q.   Meaning the date for the initial investigation?   10:52:35

 6       A.   Yes, sir.                                         10:52:37

 7       Q.   Okay.  And how --                                 10:52:38

 8       A.   The date -- the date and the rule of the          10:52:41

 9   initial investigation.                                     10:52:44

10       Q.   You mean in the charging letter it will notify    10:52:45

11   the alleged rule violations and the date of the hearing?   10:52:49

12       A.   Yeah, it will have something like, "You are       10:52:53

13   going to investigation because of" type of scenario.       10:52:55

14       Q.   Okay.                                             10:52:57

15       A.   But again, you know, this one is a bit unusual.   10:52:57

16   Usually it is directly about a rule violation that         10:53:02

17   occurred, but this one is a bit of an unusual              10:53:03

18   investigation that was there.                              10:53:08

19       Q.   Meaning that it is not a specific rule            10:53:09

20   violation, like for operating or something like that.      10:53:13

21   It was just allegations of fraud and violations of the     10:53:16

22   ethics policy.  Is that what you mean?                     10:53:20

23       A.   I mean, normally it happened, you know, right     10:53:21

24   at a mile post and a person was out there saw and then     10:53:24

25   put an assessment in.                                      10:53:27
```

48

Brian Barr                                                              May 6, 2021

1      Q.    Okay.  So how, if you know, were the hearing --    10:53:29

2    excuse me, the charging officers selected for the          10:53:32

3    plaintiffs in this case in your department?                10:53:35

4      A.    The hearing officer?                               10:53:37

5      Q.    No, the charging officer.                          10:53:39

6      A.    It -- it would have been by location.  So if,      10:53:41

7    you know, Curt was at Huntington, if Dr. Heligman and      10:53:46

8    other people are going to be the witness, we select       10:53:50

9    someone that is at that location that would physically    10:53:52

10   be there at that address to enter the information on      10:53:55

11   record.                                                    10:53:57

12     Q.    Okay.  And that was going to be my next            10:53:58

13   question.  What is your understanding of the function or   10:54:00

14   job duties of a charging officer?                          10:54:02

15     A.    So again, you know, the charging officer would     10:54:05

16   introduce on record because he is there the                10:54:08

17   documentation that would support the charge, you know,     10:54:12

18   and go through the initial portion of the investigation    10:54:14

19   that, you know, "Yeah, I have firsthand knowledge, and I   10:54:18

20   have talked to" whomever.  And they would enter in the     10:54:22

21   evidence and applicable rules.                             10:54:25

22     Q.    Okay.  And you have said this is an unusual         10:54:26

23   situation.  In a more usual situation, does the charging   10:54:30

24   officer have direct knowledge of the rule violation or     10:54:33

25   whatever the topic is for the hearing?                     10:54:37

                                                                      49

Brian Barr                                                                    May 6, 2021

```
 1        A.   Yeah.  In -- in most, the charging officer is    10:54:39

 2   the person who found it.                                   10:54:44

 3        Q.   Okay.  So if a charging officer saw someone      10:54:44

 4   steal company property, he or she would be the charging    10:54:51

 5   officer for that incident?                                 10:54:54

 6        A.   It is more -- more -- most of our cases are an    10:54:56

 7   employee, you know, didn't have work boots on and was      10:55:01

 8   around, you know, the rail and the ballast, and, you       10:55:05

 9   know, we had to correct that, we would put an assessment   10:55:08

10   in for it.  Or the charging officer was the one on the     10:55:10

11   shift and the employee didn't -- didn't show up or left    10:55:13

12   early under pay, you know, it would be a direct cause      10:55:16

13   and effect to what I -- what I came across during my       10:55:20

14   work shift.                                                10:55:22

15        Q.   And that is how, under normal circumstances,     10:55:23

16   the charging officer is selected?                          10:55:26

17        A.   Correct.  He is the one who found it.            10:55:28

18        Q.   Okay.  In this case for these plaintiffs, is it  10:55:31

19   correct that the -- that the charging officers do not      10:55:33

20   have any knowledge of what happened with respect to the    10:55:36

21   alleged fraud or ethics violations?                        10:55:38

22        A.   I think they were -- they were communicated      10:55:40

23   with prior to it.  I know when Curt was selected as the    10:55:42

24   charging officer that put the assessment in, I am sure     10:55:46

25   he had conversation with what evidence he was going to     10:55:50
```

50

Brian Barr                                                            May 6, 2021

1    introduce.  That is why he had the information readily    10:55:54

2    available to enter in on record.                          10:55:57

3        Q.   Okay.  Now, I know you testified that -- that    10:55:58

4    you haven't read the transcripts of these plaintiffs,     10:56:01

5    right?                                                    10:56:04

6        A.   I glanced over them.  I didn't read them         10:56:05

7    through and through, to be honest.                        10:56:09

8        Q.   Well, okay.  I mean, that's fine.  But I          10:56:10

9    thought we established that back in 2017 through the      10:56:14

10   present that you have never read the transcripts          10:56:17

11   page-by-page for any of the plaintiffs?                   10:56:20

12       A.   No, sir.  In 2017, it was more conversation.     10:56:22

13   Preparing for this, I did glance over them again here     10:56:25

14   over the previous days to refresh my memory on what       10:56:29

15   occurred.                                                 10:56:32

16       Q.   Okay.  Now let's just -- let's just get it       10:56:32

17   right for the record because I thought you said that you  10:56:34

18   had reviewed the charge letter, the termination letter,   10:56:36

19   and maybe -- maybe some of the other exhibits, but I      10:56:40

20   didn't understand that you had read -- when you say went  10:56:47

21   through or whatever word you used, just tell me what you  10:56:50

22   did for preparing for the deposition today with respect   10:56:52

23   to -- to actually reading any of the transcript           10:56:54

24   testimony.                                                10:56:57

25       A.   I flipped through the charge letter that --      10:56:59

                                                                   51

USCA4    2430

Brian Barr                                                                    May 6, 2021

```
 1    that went out.  I flipped through the transcript of the    10:57:02

 2    investigation.  I flipped through the termination letter   10:57:08

 3    that would have went out under my signature, and read      10:57:12

 4    the arbitration award.                                     10:57:15

 5        Q.    Okay.  So the labor board decision obviously     10:57:20

 6    did not exist back in 2017 for any of the plaintiffs,      10:57:28

 7    right?                                                     10:57:31

 8        A.    I don't -- I didn't look at the date of it.      10:57:32

 9    If -- I would believe that if you said it if it went      10:57:36

10    into '18 or something.  I would definitely believe that.  10:57:39

11        Q.    Okay, yeah.  I mean if the -- and I guess we     10:57:42

12    can find them, but if the charges took place in June or    10:57:44

13    July for most of the plaintiffs, some were a little        10:57:47

14    later, it would be unlikely to get a labor board          10:57:51

15    decision in calendar year 2017 right?                      10:57:54

16        A.    Right.  It would be unusual.                     10:57:55

17        Q.    Okay.  So just --                                10:57:58

18        A.    When you say -- when you say June or July, I am  10:57:58

19    stuck on that where you asked me if it was, you know,      10:58:00

20    the last week of June or -- you know, and I would say      10:58:03

21    the second week of June.  It may have been July that --    10:58:05

22    you know, when you say June or July, it may have been      10:58:07

23    July.  I can't remember the date that all of this          10:58:10

24    initially transpired as I'm -- as I am, you know,         10:58:12

25    sitting here going back through it.  But I don't want to   10:58:15
```

52

Brian Barr                                                          May 6, 2021

1    get -- I don't -- I don't want to mislead that when I       10:58:18

2    said it was -- you know, when you asked me if it was the    10:58:20

3    end of June, it could have been.  I am not 100 percent      10:58:23

4    locked in my memory of it.                                  10:58:26

5        Q.   Sure.  Understood.  Okay.  And I apologize if      10:58:28

6    this is repetitive, but I just want to, again, want to      10:58:38

7    make sure the record is clear.  So back in 2017, did you    10:58:41

8    read any of the transcripts for any of the plaintiffs in    10:58:45

9    this case?                                                  10:58:47

10       A.   I don't believe -- no, I did not.                  10:58:48

11       Q.   Okay.  And the reason you didn't is because you    10:58:50

12   relied upon the Labor Relations' recommendation and they    10:58:53

13   told you that they read through the transcripts; is that    10:58:56

14   right?                                                      10:59:01

15       A.   Absolutely, page-for-page.                         10:59:02

16       Q.   Okay.  And did you have any reason to read         10:59:03

17   through any of the transcripts from 2017 up until a         10:59:05

18   couple of weeks ago preparing for this deposition?          10:59:07

19       A.   Not until Thursday of last week, no, sir.          10:59:09

20       Q.   Okay.  So last week, you have already testified    10:59:12

21   about you reviewed, but I just want to ask you when you     10:59:14

22   say, like, page through the transcripts, I mean, did you    10:59:17

23   actually read any of the testimony, for instance, from     10:59:20

24   Dr. Heligman?                                               10:59:22

25       A.   Yeah, I mean, I did read, you know, some of the    10:59:23

                                                                       53

Brian Barr                                                                    May 6, 2021

```
 1    words as I went through it.  You look at a transcript,    10:59:27
 2    it is the -- you know, the first portion of it is         10:59:29
 3    introductory, the rear portion of it is the closing, you  10:59:32
 4    know, and the portion in the middle I did refresh         10:59:35
 5    through some of it to make sure I was prepared for        10:59:37
 6    today's -- you know, for today's proceeding.              10:59:40
 7         Q.   Okay.  So to your knowledge either by, you      10:59:42
 8    know, paging through them or -- or otherwise, do you      10:59:47
 9    recall that Dr. Heligman was the only witness on behalf   10:59:49
10    of the company at the hearings for each of the            10:59:53
11    plaintiffs?                                               10:59:55
12         A.   I don't -- I don't believe -- no, I don't       10:59:55
13    believe he was the only witness.  I think Curt -- I saw   11:00:00
14    Curt was a witness there that was introducing evidence,   11:00:03
15    and I saw Dr. Heligman there testify at each one.  Then   11:00:05
16    there was the plaintiff and the representation, you       11:00:10
17    know, also, but I believe Curt was on every one of them   11:00:13
18    as a witness introducing the -- the evidence.            11:00:15
19         Q.   Okay.  Sure.  I would -- I would agree with     11:00:17
20    that statement.  But Curt Shogren is who you are          11:00:19
21    referring to, right?                                      11:00:23
22         A.   I am sorry, yes, Curt Shogren.                  11:00:23
23         Q.   That is okay.  And he was the charging officer? 11:00:25
24         A.   Yes.                                            11:00:27
25         Q.   So, I mean, as a charging officer, do you -- I  11:00:28
```

54

Brian Barr                                                                      May 6, 2021

```
 1    guess, you consider him a witness.  Is that basically    11:00:31

 2    right?                                                    11:00:34

 3         A.   Yes.                                            11:00:34

 4         Q.   Okay.  So if that -- we know that Curt          11:00:35

 5    testified, or at least introduced some evidence, that's  11:00:38

 6    fine.  Other -- and you mentioned the plaintiffs, some   11:00:43

 7    of the plaintiffs may have testified or their union rep, 11:00:45

 8    we know that.  Those are other witnesses, right?         11:00:47

 9         A.   Yes.                                            11:00:49

10         Q.   So aside from the hearing officer, Curt        11:00:50

11    Shogren, would you agree that Dr. Heligman was the only  11:00:53

12    witness offering testimony in support of the company?    11:00:56

13         A.   Yes, as I -- as I went through them.  Yes.     11:01:00

14         Q.   Okay.  So by nature of that, and we are going  11:01:06

15    to get to the termination decision, did you rely upon    11:01:09

16    Dr. Heligman's testimony at those hearings in making the 11:01:13

17    decision to terminate?                                   11:01:16

18         A.   So I did not rely, you know, exclusively on    11:01:18

19    that.  Again, it was with Labor Relations and you know,  11:01:24

20    what charges we had pursued and what evidence was -- was 11:01:27

21    submitted obviously through both Curt and Heligman and   11:01:34

22    that -- you know, that would be able to be sustained     11:01:40

23    in -- in findings.  So, you know, that was a large       11:01:43

24    portion of it, but I made sure we were compliant with    11:01:46

25    our Collective Bargaining Agreement as well.             11:01:49
```

55

USCA4    2434

Brian Barr                                                                    May 6, 2021

```
 1        Q.   Okay.  Yeah.  Let me break it down.  I think      11:01:51
 2   maybe I jumped ahead after the charge letter.               11:01:53
 3            MR. PAUL:  But we have been going about an          11:01:56
 4   hour.  Does anybody need a break?                           11:01:57
 5            MS. BIRD:  I do.                                    11:01:58
 6            MR. PAUL:  Sure.  Okay.                             11:01:59
 7            MS. BIRD:  Take like five minutes.                  11:01:59
 8            MR. PAUL:  Sounds good.  We are off the record.     11:02:00
 9            THE VIDEOGRAPHER:  Going off the record.  The       11:02:03
10   time is 11:02.                                              11:02:04
11            (Off the record.)                                  11:02:06
12            THE VIDEOGRAPHER:  We are back on the record.       11:08:26
13   The time is 11:08.                                          11:08:33
14      BY MR. PAUL:                                             11:08:37
15        Q.   Mr. Barr, we are back on the record after just    11:08:37
16   a short break.  You doing okay?                             11:08:40
17        A.   Absolutely.                                       11:08:41
18        Q.   All right.  Great.  I think where we left off     11:08:42
19   was, at least in the chronology of going through the        11:08:45
20   charge process, we got to where you gave the green light    11:08:50
21   to the charge letters.  And then I wanted to ask you        11:08:54
22   what your involvement was after that, the very next         11:08:56
23   thing that happened that concerned you and the              11:08:59
24   plaintiffs?                                                 11:09:02
25        A.   So after I gave the okay with the charge          11:09:02
```

                                                                    56

Brian Barr                                                    May 6, 2021

```
 1   letters, I -- I know that I selected Gus Thoele to be        11:09:07

 2   the hearing officer for the investigation.                   11:09:14

 3       Q.   Okay.  And as I recall -- is it Thoele did you      11:09:17

 4   say, or Thoele?                                              11:09:24

 5       A.   I believe it is Thoele, Gus Thoele.                 11:09:25

 6       Q.   Thoele.  Okay.  Is he the gentleman from            11:09:28

 7   Waycross, Georgia?                                           11:09:29

 8       A.   That is exactly right.                              11:09:30

 9       Q.   Okay.  And why did you select him to be the         11:09:31

10   hearing officer?                                             11:09:34

11       A.   Gus worked at a similar shop as Huntington, as     11:09:35

12   close to Huntington as you can get in shop                   11:09:39

13   characteristic.  There was a production shop there at        11:09:42

14   Waycross and a back shop that housed roughly the same        11:09:45

15   amount of employees, or closest to the amount of             11:09:49

16   employees at two locations.  Gus doesn't have any prior      11:09:51

17   work relationship there at Huntington, so there wouldn't     11:09:56

18   be, like, a personality conflict or, you know, he knew       11:09:59

19   one person or another or their, you know, family.  So he     11:10:03

20   would be close to fair and impartial person holding the      11:10:06

21   investigation as we could.  So I sent someone from           11:10:09

22   outside of Huntington so there wouldn't be any conflicts     11:10:11

23   with, you know, any personal issues that would have          11:10:14

24   occurred.                                                    11:10:16

25       Q.   Okay.  And that was your decision?                  11:10:16
```

57

USCA4    2436

Brian Barr                                                                May 6, 2021

```
 1        A.   100 percent, yes.                            11:10:19

 2        Q.   Okay.  Had you ever selected him to be a     11:10:20

 3   hearing officer before this?                           11:10:26

 4        A.   Yeah, I have selected hearing officers for -- 11:10:27

 5   for different events for sure, and have had people go be 11:10:30

 6   hearing officers at -- at locations.                   11:10:33

 7        Q.   Okay.  And in those other times with -- with 11:10:35

 8   Gus when you selected him to be a hearing officer, did 11:10:39

 9   he submit notice of findings to you?                   11:10:43

10        A.   As again, the way our process works, he      11:10:45

11   wouldn't submit them directly to me.  He would submit  11:10:51

12   them to a field administration post the investigation. 11:10:54

13        Q.   Okay.  And -- and I apologize if I -- if I    11:10:56

14   mischaracterized that, because I do believe you said   11:10:58

15   earlier those findings would get attached to the       11:11:01

16   transcript; is that correct?                           11:11:04

17        A.   Yeah, from, you know, or an internal item.   11:11:04

18   Usually if there is a notice of findings it is attached 11:11:07

19   to the documents of the transcript.                    11:11:10

20        Q.   Okay.  Obviously after the hearing and after 11:11:11

21   the transcription, right?                              11:11:14

22        A.   Yes.  Yes, sir.                              11:11:16

23        Q.   But before a decision is made with respect to 11:11:17

24   discipline, right?                                     11:11:20

25        A.   Yes.                                         11:11:21
```

                                                                          58

USCA4    2437

Brian Barr                                                                    May 6, 2021

```
 1        Q.   All right.  So let's just pick up with that      11:11:21

 2   chronology again.  Okay.  So you picked Gus to be the       11:11:25

 3   hearing officer because of his knowledge of back shops,     11:11:28

 4   car shops.  And because he was not from the Huntington      11:11:31

 5   area, you felt he would be more likely to not have any      11:11:38

 6   conflict of interest or be impartial; is that right?        11:11:41

 7        A.   Correct.                                          11:11:44

 8        Q.   Okay.  All right.  What happened next after       11:11:44

 9   that in the chronology concerning your involvement?         11:11:47

10        A.   In regard to the -- you know, to the -- to the    11:11:51

11   employees, my -- my next step would have been having the    11:12:02

12   conversation post the investigation.                        11:12:08

13        Q.   I'm sorry.  Can you repeat that, please?          11:12:09

14        A.   It would have been having the conversation post   11:12:10

15   the investigation at the next step.                         11:12:13

16        Q.   Okay.  With -- with whom?                         11:12:16

17        A.   With Penny.                                       11:12:17

18        Q.   Okay.  That's the one we already talked about?    11:12:18

19        A.   No, that was the prior to the investigation       11:12:20

20   conversation.  That was the green light to start the        11:12:24

21   charges.                                                    11:12:27

22        Q.   Okay.  All right.  So in between the time when    11:12:27

23   you selected Gus and the actual hearings took place, did    11:12:39

24   you have any conversations or involvement with any of       11:12:44

25   these charges regarding the plaintiffs?                     11:12:46
```

                                                                      59

Brian Barr                                                              May 6, 2021

| | | |
|---|---|---|
| 1 | A.   Nothing at all. | 11:12:48 |
| 2 | Q.   There is nothing for you to do in that span of | 11:12:50 |
| 3 | time; is that right? | 11:12:54 |
| 4 | A.   Correct.  I mean, you know, I have the entire | 11:12:54 |
| 5 | system mechanical, you know, this process was going on, | 11:12:56 |
| 6 | but I wouldn't have been involved with it on a -- on a | 11:12:58 |
| 7 | daily.  Now it is just the investigation that comes up. | 11:13:01 |
| 8 | Q.   Okay.  And then so tell us what you know about | 11:13:04 |
| 9 | that investigation process after the hearing takes | 11:13:08 |
| 10 | place. | 11:13:14 |
| 11 | A.   So after the -- normally -- you mean with what | 11:13:15 |
| 12 | our process is for investigations?  Is that what you are | 11:13:20 |
| 13 | asking? | 11:13:23 |
| 14 | Q.   We can do it normally and what happened in this | 11:13:23 |
| 15 | case.  But yeah, let's start with normally. | 11:13:25 |
| 16 | A.   And I -- and I think that's -- that is also | 11:13:27 |
| 17 | what happened, you know, in this case, this part I'll | 11:13:29 |
| 18 | give you.  The investigation is on record.  The | 11:13:32 |
| 19 | investigation comes back and it is transcribed by the | 11:13:34 |
| 20 | trial officer.  So if Gus would have held it, when it | 11:13:37 |
| 21 | comes back, you -- you go through and you make sure the | 11:13:40 |
| 22 | words are right, that it is the right person, you know, | 11:13:42 |
| 23 | that is on record talking.  It is more of a clerical | 11:13:44 |
| 24 | type of validation to make sure that we pick up every | 11:13:49 |
| 25 | word in context. | 11:13:53 |

60

Brian Barr                                                                    May 6, 2021

```
 1          Once that is validated, it is submitted back.    11:13:54

 2   And then that is the record for -- for the            11:13:58

 3   investigation.  Prior to that validation -- I skipped a   11:14:01

 4   step.  After the investigation is completed and the    11:14:06

 5   transcript's audio is sent to transcription, which is   11:14:12

 6   part of Labor Relations field administration side too,   11:14:15

 7   the person actually listens and types, the transcriber.   11:14:18

 8   We have to send the -- all of the exhibits down to them   11:14:21

 9   in an overnight package as well.                       11:14:24

10          So Gus would have finished the investigation,    11:14:26

11   overnighted the material that were the exhibits, Labor   11:14:29

12   Relations would have taken possession of that,         11:14:33

13   transcribed it, put that together in a packet, sent it   11:14:35

14   back to Gus.  He verifies the words are correct, the    11:14:38

15   person talking correct, and then at that point -- you    11:14:41

16   know, at that point, you know, we have a complete       11:14:44

17   investigation.                                          11:14:50

18      Q.   Okay.  Is it at that point that the hearing    11:14:50

19   officer writes the notice of findings?                 11:14:52

20      A.   Yeah, most of the time, yes.  There is times   11:14:55

21   where that does not happen, but most of the time, yes,   11:14:57

22   they -- they write a letter of findings there at the    11:15:00

23   conclusion verifying the investigation.                11:15:03

24      Q.   Okay.  So I am just trying to find out, so when   11:15:05

25   the hearing officer gets the transcription and the      11:15:07
```

                                                                           61

Brian Barr                                                                    May 6, 2021

```
 1    exhibits back, is he or she, you know, just checking      11:15:10

 2    for, like, type errors and stuff, or are they reading     11:15:13

 3    the whole thing for content as well?                      11:15:17

 4        A.   They are reading through it there is -- when I    11:15:19

 5    validated them, and I didn't validate just with Gus, but  11:15:21

 6    when I validate them, there is usually some red words in  11:15:25

 7    there because the transcriber is not 100 percent sure     11:15:28

 8    that's the right word.  So if you use a technical word,   11:15:32

 9    you know, they may not pick up on what that technical     11:15:32

10    word is in the railroad, so those are a few words or      11:15:35

11    there is a few sentences that I have to validate if that  11:15:38

12    is right or not.                                          11:15:41

13        Q.   Okay.  It sounds like you're -- you -- you have   11:15:42

14    served as a hearing officer before; is that right?        11:15:44

15        A.   Yes, sir.                                         11:15:46

16        Q.   Okay.  But I guess to answer my question a        11:15:47

17    little more directly, not in a bad way, you just went     11:15:55

18    off on a little different area.  But is it your           11:15:58

19    understanding that the hearing officer's job is, in       11:16:01

20    addition to checking for type errors or misspellings,     11:16:04

21    but to actually review the entire transcript and          11:16:07

22    exhibits and issue notice of findings?                    11:16:10

23        A.   Once he validates that the -- that the verbiage  11:16:13

24    is in there, he -- he doesn't -- he doesn't issue the     11:16:22

25    discipline on it.  But he normally, you know, can he      11:16:25
```

62

Brian Barr                                                          May 6, 2021

```
 1    give a -- he does give -- normally Gus will give a      11:16:28

 2    recommendation on there.  It is not always, it is not   11:16:31

 3    100 percent, but most of the time there is a            11:16:34

 4    recommendation there.  But that recommendation is not   11:16:36

 5    always -- that is not necessarily what the outcome of   11:16:38

 6    the investigation will be.                              11:16:43

 7         Q.   Oh, no, I understand that.  We haven't gotten  11:16:44

 8    there yet.  I think maybe I am not asking the question   11:16:47

 9    clear enough.  So let me ask it a little differently.    11:16:50

10    Of those times that a hearing officer issues notice of   11:16:55

11    findings, do you have any knowledge about whether in     11:17:00

12    general that is done based upon the hearing officer's    11:17:04

13    recollection of being at the hearing, or based upon the  11:17:07

14    review of the actual transcribed hearing and exhibits?   11:17:09

15         A.   I am sorry.  It is the hearing itself, you     11:17:13

16    know, what they learned throughout the hearing and they  11:17:15

17    are going back.  That is where they have a letter of     11:17:18

18    findings.  It is what they discovered during the         11:17:21

19    investigation.                                           11:17:23

20         Q.   During the actual hearing itself as opposed to 11:17:24

21    reading the transcript and exhibits, that is my          11:17:27

22    question.                                                11:17:29

23         A.   Yes.                                           11:17:30

24         Q.   Okay.  The former?                             11:17:31

25         A.   Yes.                                           11:17:33
```

                                                                   63

Brian Barr                                                                                    May 6, 2021

```
 1        Q.    Okay.  So you are -- and is that based upon,        11:17:34

 2   like, your understanding of how you did it as a hearing        11:17:37

 3   officer, or do you just have knowledge that is how it is       11:17:40

 4   done and that is how it is supposed to be done?                11:17:42

 5        A.    Yeah.  If you think about it like, this one had     11:17:44

 6   a couple hundred exhibits, right, like pages, this             11:17:47

 7   particular investigation?  They were all entered and          11:17:50

 8   read on record.  I don't -- I don't believe any hearing       11:17:53

 9   officer will go back and read those pages, you know,          11:17:56

10   again to say, "Now I have made my decision," you know       11:17:59

11   what I mean.  So as they went through the hours of           11:18:02

12   investigation and they go through them, when they get it    11:18:04

13   back, they verify the words are right and they -- they      11:18:07

14   give the recommendation, but I don't believe they are       11:18:09

15   going back through every one of the exhibits word-for-     11:18:12

16   word to then formulate their decision.                       11:18:13

17        Q.    Okay.  All right.  Okay.  So then it sounds       11:18:16

18   like --                                                       11:18:29

19        A.    Again, I just want to be clear, that is not      11:18:29

20   going to be necessarily the outcome of the                   11:18:31

21   investigation.                                                11:18:33

22        Q.    Yeah, okay.  In other words, I think -- let me   11:18:34

23   ask you this.  Are you -- are you saying that the fact      11:18:37

24   that a hearing officer issues notice of findings does      11:18:39

25   not mean that is going to be the outcome in terms of      11:18:44
```

Brian Barr                                                                May 6, 2021

```
 1   discipline?                                          11:18:47

 2       A.   Yeah.  They -- they don't -- they don't have  11:18:47

 3   the authority to issue the discipline as part of our  11:18:49

 4   process.                                             11:18:52

 5       Q.   Okay.  So it is more accurate to call it the  11:18:52

 6   notice of findings and recommendation?              11:18:54

 7       A.   Yes.                                        11:18:55

 8       Q.   Okay.  Is there a recommendation in this case  11:18:56

 9   to you or to Labor Relations or to both?            11:18:59

10       A.   In this particular case, it would have been --  11:19:02

11   it would have been -- normally it is to both.       11:19:11

12       Q.   To both.  Are you sometimes -- not you, but is  11:19:12

13   your position that you held back in 2017, is that   11:19:15

14   sometimes called field administration?             11:19:18

15       A.   Never.  Never.                              11:19:19

16       Q.   Sure?                                       11:19:23

17       A.   My -- my position?  Never.                  11:19:23

18       Q.   Okay.  So field administration refers to what?  11:19:24

19       A.   In our Labor -- Labor Relations organization,  11:19:27

20   you know, so LR by itself, there are -- there were  11:19:31

21   several employees that were identified as field     11:19:35

22   administration, you know.  So there was an          11:19:39

23   organizational structure at that time.  That was    11:19:42

24   probably 2017, that was probably Tony Edie ran Labor  11:19:45

25   Relations.  She had several clerical employees that  11:19:50
```

65

Brian Barr                                                              May 6, 2021

```
 1    worked for her, and they would, you know, process      11:19:51

 2    through the assessments that came in.  Tony would      11:19:55

 3    confirm with the field back and forth.  And then when --  11:19:58

 4    when discipline was due, Tony would contact myself or  11:20:01

 5    the designated officer that was doing the discipline to  11:20:04

 6    make sure that that came -- that that was submitted    11:20:07

 7    properly as part of the Collective Bargaining Agreement  11:20:09

 8    in time.                                               11:20:13

 9         Q.   Okay.  So when you said "both" referring, I  11:20:13

10    believe, to yourself and to Labor Relations, did we just  11:20:15

11    categorize you as, you know, like top brass or         11:20:19

12    management?  Like, what is the proper terminology?     11:20:22

13              MS. BIRD:  Honcho.                           11:20:25

14              THE DEPONENT:  I would have been the decision-  11:20:26

15    maker on discipline.                                   11:20:27

16         BY MR. PAUL:                                      11:20:29

17         Q.   Okay.  Because of your role in management?   11:20:29

18         A.   Yes.                                         11:20:32

19         Q.   Okay.  All right.  Now, in this case specific  11:20:43

20    to these plaintiffs, do you remember Gus Thoele or     11:20:44

21    Thoele verbally giving you any notice of findings?     11:20:47

22         A.   I don't believe I spoke to Gus post          11:20:51

23    investigation.                                         11:20:54

24         Q.   Okay.  So as far as you know, the only       11:20:55

25    conversations you had with Gus were selecting him to be  11:20:58
```

66

Brian Barr                                                    May 6, 2021

```
 1   the hearing officer?                              11:21:01
 2        A.   Yeah, I informed him he was going to be the   11:21:02
 3   hearing officer.  I gave him the address of where it was  11:21:05
 4   in Huntington because I had worked there, you know, in  11:21:08
 5   the Huntington area, and told him how long a drive it  11:21:11
 6   was from Waycross to Huntington.  You know, we sent him  11:21:15
 7   on the way that he would be doing the investigation and  11:21:18
 8   he'd be with Curt Shogren.                         11:21:22
 9        Q.   Did you have any conversations with Gus at any  11:21:22
10   time after selecting him to be the hearing officer  11:21:25
11   related to these plaintiffs?                       11:21:29
12        A.   Absolutely not, no.                      11:21:30
13        Q.   Okay.  Not even to say, "Good job," anything  11:21:32
14   like that?  Just...                               11:21:37
15        A.   No.                                      11:21:38
16        Q.   Okay.  All right.  So I think we are at the  11:21:42
17   point where --                                    11:21:47
18        A.   Between the time I selected him and the time he  11:21:48
19   held the investigation, I absolutely didn't talk to him  11:21:50
20   about what he was going to do or find out there, or  11:21:53
21   those kinds of things.  I am sure after the        11:21:56
22   investigation when it was all transpired, I -- I am sure  11:21:58
23   I told him I appreciated him going up there to hold that  11:22:00
24   because he was, you know, away from home and his family  11:22:03
25   for several days, you know, transferring back and forth.  11:22:04
```

                                                          67

Brian Barr                                                                    May 6, 2021

```
 1    I am sure I told him I appreciated him after that.  I    11:22:08

 2    generally do that with employees that I have, you know,   11:22:11

 3    where I disrupt their life and have them go do things     11:22:14

 4    that aren't under their normal territory.                 11:22:17

 5         Q.   Understood.  But do you remember having any     11:22:19

 6    conversations with Gus about the -- his findings in the   11:22:21

 7    hearings themselves?                                      11:22:26

 8         A.   I do not.                                       11:22:27

 9         Q.   Meaning, you don't recall or you did not have   11:22:30

10    any with him?                                             11:22:33

11         A.   I don't recall.  If I did, they would have been 11:22:34

12    extraordinarily brief, and I don't recall.  I generally   11:22:36

13    would have remembered that.                               11:22:39

14         Q.   Okay.  And is that primarily because you were   11:22:40

15    dealing with either Penny or other people in Labor        11:22:43

16    Relations concerning the discipline?                      11:22:46

17         A.   That's correct.  This is an unusual, you know,  11:22:47

18    an unusual case.  Usually we -- we leverage them          11:22:49

19    directly from the department.  This one wasn't leveraged  11:22:53

20    directly from the mechanical department, or -- or         11:22:56

21    transportation.  The departments I've worked in the       11:22:57

22    past, this wasn't a case that, you know, we found and     11:23:00

23    brought on ourselves.                                     11:23:02

24         Q.   Okay.  When you say leveraged, you mean it      11:23:03

25    didn't -- these charges didn't originate in your          11:23:06
```

68

Brian Barr                                                      May 6, 2021

```
 1    department.  They originated in the Medical Department?   11:23:08

 2        A.   Correct.                                         11:23:10

 3        Q.   Okay.  I just didn't understand the word         11:23:11

 4    leveraged, but you really mean like originated?           11:23:14

 5        A.   Yeah -- yeah, absolutely.                        11:23:17

 6        Q.   Okay.  Okay.  Then the hearing takes place.  It  11:23:17

 7    is transcribed.  Sounds like you said the exhibits        11:23:23

 8    either -- I think you said they get mailed to Labor       11:23:26

 9    Relations?                                                11:23:28

10        A.   Yes.                                             11:23:29

11        Q.   Could they be uploaded as well?  Is that         11:23:30

12    another option, depending on technology?                 11:23:32

13        A.   I believe they can be uploaded but we still      11:23:34

14    generally mail them just because we -- you know, we are   11:23:38

15    like a dinosaur industry and we tend to do the same       11:23:41

16    thing no matter what changes, so...                      11:23:44

17        Q.   Do you have any involvement in selecting the     11:23:46

18    exhibits that were going to be presented at the           11:23:48

19    hearings?                                                 11:23:50

20        A.   No, none whatsoever.                             11:23:50

21        Q.   Okay.  And then tell me what your role is then   11:23:52

22    post-hearing, after this thing is -- hearing is           11:23:56

23    transcribed and the exhibits are sent to Labor            11:23:59

24    Relations.                                                11:24:02

25        A.   Well, I am the decision-maker on the discipline  11:24:02
```

                                                                      69

Brian Barr                                                                                    May 6, 2021

```
 1    once the -- once the investigation is held.  So post the    11:24:05

 2    investigation, I had conversations with -- with Penny       11:24:08

 3    and -- and probably Melissa Wheaton as well, who was        11:24:11

 4    Penny's supervisor in -- in that regard, and went           11:24:15

 5    through, were we able to support what the charges --        11:24:19

 6    what the charges were?  Would we be able to sustain them    11:24:22

 7    on an appeal within the labor agreement in the              11:24:25

 8    Collective Bargaining Agreement?  You know -- you know,     11:24:29

 9    how did the investigation go overall?  You know, and       11:24:34

10    through that, it was that we -- we had charged them.  We    11:24:37

11    thought we had proven the facts regarding the charge        11:24:41

12    that we submitted, and that, you know, at that point,       11:24:43

13    I -- I slept on that and made the decision that I would     11:24:49

14    follow through with the termination on -- on consistency    11:24:54

15    with -- with each one of the charges we levied in the       11:24:58

16    mechanical department.                                      11:25:00

17         Q.   Okay.  And did you yourself do any                11:25:01

18    investigation into what each of the plaintiffs actually     11:25:05

19    engaged in when it came to the charge of fraud?             11:25:07

20         A.   I -- I did not -- well, I -- yes, I asked those   11:25:11

21    questions, you know, when conversing with Penny.  And we    11:25:15

22    went through with the investigation as stated with --       11:25:21

23    even with some of the questions from the local chairman     11:25:24

24    or the representative of the employee, you know, and        11:25:26

25    what the fraud would be with going to that same doctor      11:25:30
```

                                                                        70

Brian Barr                                                           May 6, 2021

1    and what the cost would be with the medical.  You know,      11:25:33

2    if that was fraud with medical insurance, it would be       11:25:38

3    ongoing for those post months and subsequently there.       11:25:40

4    And the amount of time off, and that was all part of        11:25:43

5    that conversation and the decision-making process.  But     11:25:46

6    beyond -- beyond that I did not interact with the           11:25:49

7    employees or interact with how specifically the events      11:25:51

8    that were happening.                                        11:25:56

9        Q.   Okay.  Well, let me ask a more specific            11:25:56

10   question.  Did you go through with anyone in Labor          11:25:58

11   Relations what the specific act of fraud was for each of    11:26:00

12   the plaintiffs in this case individually?                   11:26:06

13       A.   No.                                                11:26:10

14       Q.   Okay.  So how did you go about, you as the         11:26:10

15   decision-maker, identifying the fraud that was committed    11:26:14

16   by each of the plaintiffs individually?                     11:26:16

17       A.   Each one was charged with the -- with the same     11:26:18

18   rule and with the testimony that each one had not           11:26:23

19   provided any other documentation other than they all had   11:26:26

20   the same documentation, same time frame, same time off.    11:26:29

21   The items that came through in the investigation, you       11:26:33

22   know, the decision was -- I made the decision that, you     11:26:36

23   know, we would equally treat each employee the same and     11:26:38

24   dismiss them, you know.  And that was the decision I        11:26:43

25   made and that is, you know, fair to -- you know, every      11:26:48

                                                                        71

Brian Barr                                                    May 6, 2021

1    person was treated fairly and equally.                  11:26:51

2         Q.   Well, I mean, isn't it more accurate to say    11:26:53

3    that all the plaintiffs were lumped together because of  11:26:57

4    their treatment with one of these two chiropractors?     11:26:59

5         A.   I don't -- I don't know if I understand that   11:27:02

6    each one went to the same chiropractor, you know, that   11:27:06

7    everybody drove to the same office.  I didn't lump them  11:27:09

8    together or submit the paperwork, you know what I mean?  11:27:12

9    Like, they were all submitted at the same time and       11:27:15

10   that's what was produced to the medical department, I    11:27:17

11   don't know that we went out and -- you know, we didn't   11:27:19

12   sync -- we didn't try to lump them together.  It's how   11:27:22

13   the paperwork that comes in.                             11:27:27

14        Q.   Yeah, let me -- yeah, let me try to ask a       11:27:29

15   better question.  I mean, it sounds like it is accurate  11:27:31

16   to say that in making the decision to terminate them,    11:27:33

17   you did not look at each individual's medical condition  11:27:36

18   and determine whether they engaged in fraud by treating  11:27:39

19   with one of the two chiropractors, either Dr. Johnson or 11:27:42

20   Dr. Carey?                                               11:27:46

21        A.   I absolutely did not; that's correct.          11:27:46

22        Q.   Okay.  And so I guess what I am saying is,      11:27:48

23   is -- was the basis that you slept on it and made the    11:27:53

24   decision to terminate each and every one of the          11:27:56

25   plaintiffs was because of the pattern that the Medical   11:27:58

                                                              72

Brian Barr                                                                    May 6, 2021

```
 1    Department and Dr. Heligman specifically identified?    11:28:02

 2         A.   Yes, and what came out in the -- you know, the   11:28:06

 3    transcript and what was relayed to me, you know, from   11:28:10

 4    the -- from the investigation itself.                 11:28:12

 5         Q.   Okay.  So according to my notes, and I have the   11:28:13

 6    hearing transcripts here, the first hearing -- and I   11:28:23

 7    don't believe this involved you or anyone in your     11:28:27

 8    department, was on August 4th of 2017 for two gentlemen   11:28:30

 9    in the transportation department, Mr. Abdon and       11:28:35

10    Mr. Little.  Does that sound right, that you would not   11:28:39

11    be the management person over the transportation folks?   11:28:42

12         A.   Not at that time, no.  I was not over        11:28:45

13    transportation at that time, so I wouldn't have levied   11:28:47

14    the decision on -- on those two.                      11:28:50

15         Q.   Okay.  The next hearing that I have          11:28:51

16    chronologically happened on August 7th of 2017 for four   11:28:53

17    carmen, Mr. Bills, Craycraft, Frasure and Hall.  My   11:28:59

18    question is, during that time in '17, were you        11:29:03

19    responsible for the carmen?                           11:29:06

20         A.   Yes, sir, I was, and I am sure that is probably   11:29:08

21    the first one my signature came out on.               11:29:10

22         Q.   Okay.  And then just for the sake of being   11:29:13

23    complete, it looks like there was another hearing the   11:29:16

24    next day on August 8th, and then on August 9th and then   11:29:18

25    on August 10th, and there was a little break, and then   11:29:22
```

                                                                         73

Brian Barr                                                                May 6, 2021

1    August 15th, August 22nd, August 23rd, August 24th, and     11:29:26

2    then two individuals were on October 5th.  I guess my       11:29:31

3    broad question is, does that sound about right that         11:29:37

4    there is about 10 transcripts out there, not all of whom    11:29:41

5    were employees for you, but do you think regarding you      11:29:47

6    and your department, there is maybe seven or eight          11:29:50

7    transcripts out there, or are you not sure?                 11:29:54

8        A.   No, I believe there was like seven or something    11:29:55

9    for -- for the mechanical side as I -- as I am pretty       11:29:58

10   sure -- as I perused through them.  But the ones that       11:30:01

11   were outside the mechanical department, they probably       11:30:04

12   would not have my signature on them if they were outside    11:30:06

13   of mechanical at the -- at the office of terminating,       11:30:08

14   those are ones I wouldn't have any knowledge of.            11:30:14

15       Q.   Okay.  So in the chronology of things where we     11:30:17

16   have gotten so far is you had a, it sounds like a           11:30:19

17   conversation with Penny Dreher in Labor Relations after     11:30:23

18   the hearings?                                               11:30:26

19       A.   Yes.                                               11:30:27

20       Q.   Okay.  And I don't want to be too repetitive,      11:30:28

21   but you probably had more than one conversation.  Is       11:30:31

22   this the part we started talking about at the beginning     11:30:33

23   of the day where you had kind of a bigger conversation      11:30:36

24   after the first hearing, and then smaller conversations     11:30:38

25   with her after that?                                        11:30:40

                                                                74

Brian Barr                                                              May 6, 2021

```
 1        A.   Yes.                                        11:30:41

 2        Q.   Okay.  So to the best of your memory, do you  11:30:42

 3   think there was maybe, like, how many conversations with  11:30:46

 4   Penny post-hearing regarding the plaintiffs in this    11:30:48

 5   case?                                                  11:30:51

 6        A.   So I know after the -- you know, after the  11:30:51

 7   initial one, that was a much longer conversation.  Each  11:30:54

 8   time a hearing came back, I am confident that I was    11:30:58

 9   contacted to make sure -- you know, that we were going  11:31:01

10   to terminate as a formality to make sure we comply with  11:31:04

11   organizational structure that we have.                 11:31:07

12        Q.   Okay.  In the subsequent conversations, meaning  11:31:10

13   the conversations you had with Penny Dreher after the  11:31:13

14   first one, was it pretty much along the lines of let's,  11:31:15

15   you know, take the same approach that we did for the   11:31:18

16   first hearing?                                          11:31:21

17        A.   It was, you know, did anything different happen  11:31:22

18   in the investigation?  Was there anything outstanding?  11:31:25

19   Was there any evidence introduced by the -- the        11:31:28

20   organization or the member, you know, outside of the   11:31:31

21   scope of what we had previously talked about?  And then  11:31:33

22   I would make the decision to continue down this path and  11:31:35

23   terminate again, terminate on that independent hearing.  11:31:40

24        Q.   Okay.  And I think we established that we are  11:31:42

25   talking about the -- the same first conversation with  11:31:44
```

75

Brian Barr                                                                          May 6, 2021

1    Penny post-hearing.  I believe that is the one you said      11:31:47

2    that was probably less than an hour but more than 15         11:31:50

3    minutes; is that correct?                                    11:31:53

4        A.   Yes, that -- that would be correct.                 11:31:54

5        Q.   Okay.  And if you had to give an estimate or a      11:31:56

6    range of how long the second or third and fourth             11:31:58

7    conversations you had with Penny concerning the              11:32:00

8    employees in your department, what would be your             11:32:02

9    estimate of that?                                            11:32:04

10       A.   I would -- I would say they were -- they were,      11:32:05

11   you know, probably 15 -- you know, minutes or so, you        11:32:07

12   know, just going through the -- the formalities to make      11:32:10

13   sure that I was the responsible party that made the          11:32:13

14   decision.                                                    11:32:15

15       Q.   Okay.  And in those subsequent conversations        11:32:15

16   with Penny, do you recall going through each individual      11:32:18

17   plaintiff?  So, for example, we will take Mr. Bills,         11:32:21

18   Craycraft, Frasure and Hall, do you remember -- well,        11:32:29

19   that wouldn't be right because that would be the first       11:32:29

20   hearing.  So that is the one you went into a little more     11:32:31

21   detail.  So let me say for any of the subsequent calls       11:32:35

22   with Penny, do you remember going through and saying,        11:32:37

23   okay, did Mr. Adkins submit anything at the hearing to       11:32:39

24   change our mind that he is guilty, or Mr. Barker or          11:32:43

25   Mr. Dowdy, et cetera?                                        11:32:47

                                                                            76

Brian Barr                                                                    May 6, 2021

```
 1        A.   I know I didn't go person-by-person.  It was      11:32:48

 2   more, you know, was there anything in the investigation,    11:32:51

 3   you know, itself that they were held -- held in             11:32:53

 4   conjunction with each other.                                11:32:57

 5        Q.   Okay.  So on this very specific topic of          11:32:58

 6   whether an employee presented anything at the hearing to    11:33:02

 7   change the direction of this charge, did you rely           11:33:09

 8   exclusively upon Penny's findings?                          11:33:14

 9        A.   Yeah, the communication I had -- yeah,            11:33:18

10   absolutely, communication I had with Penny, who, you        11:33:24

11   know, read them page-for-page as we went through them,      11:33:24

12   yes.                                                        11:33:27

13        Q.   Yeah, okay.  So rather than go through each       11:33:27

14   individual, you would say, "Okay.  Penny, you read          11:33:30

15   through the hearing that took place on August 8th,          11:33:32

16   2017."  Did anything happen there to change either her     11:33:34

17   mind or Dr. Heligman's mind that the plaintiffs had         11:33:37

18   engaged in fraud or ethics violations?                      11:33:40

19        A.   Yes.                                              11:33:43

20        Q.   Okay.  And then the same thing for the other     11:33:44

21   employees, I mean the same type of conversation with        11:33:49

22   Penny, that is not going through each individual, but       11:33:51

23   just saying, "Look, you read the hearing and the            11:33:54

24   exhibits.  Did anything change your mind?"                  11:33:56

25        A.   Yes.  And -- and I don't want to mislead.        11:33:58
```

77

Brian Barr                                                                    May 6, 2021

```
 1    Like, some of that, when you read those dates off, some      11:34:00
 2    of those may have had a conversation with one of my         11:34:04
 3    subordinates who, you know, I then had a conversation       11:34:07
 4    with.  But, yeah, I made that decision on every single      11:34:09
 5    one of them, you know.  But when we are going through       11:34:12
 6    that conversation, Turner would have had some               11:34:14
 7    conversations with Penny as well about making sure that     11:34:17
 8    they went off -- that the investigations were consistent    11:34:20
 9    but I -- again, I made the decision on each one of them.    11:34:23
10    So on some of them Penny may have had a conversation        11:34:27
11    with James as well.  James was my direct report at the      11:34:32
12    time.  If, you know, the investigation came back and I      11:34:35
13    wasn't there, or if I was in a, you know, in a meeting      11:34:35
14    with -- regarding other events, you know, they may have     11:34:37
15    had a conversation that was relayed to me and then I        11:34:42
16    made the decision to contact Penny back, type of thing.     11:34:45
17         Q.   Okay.  Who is James?                              11:34:47
18         A.   James Turner was the chief mechanical officer.    11:34:49
19         Q.   James, can you spell the last name?               11:34:52
20         A.   Turner, T-U-R-N-E-R.                              11:34:54
21         Q.   And I am sorry, chief mechanical officer?         11:34:57
22         A.   Yes, sir, CMO, chief mechanical officer.          11:35:00
23         Q.   So did he work underneath you in the chain of     11:35:03
24    command back then?                                          11:35:06
25         A.   He did, yes, sir.                                 11:35:07
```

                                                                          78

USCA4     2457

Brian Barr                                                          May 6, 2021

```
 1      Q.   And you are his direct report?              11:35:08

 2      A.   I am sorry?                                  11:35:09

 3      Q.   Are you his direct report?                  11:35:11

 4      A.   No, he was my direct report.                11:35:13

 5      Q.   He was your direct report?                  11:35:15

 6      A.   Yes, sir.                                    11:35:16

 7      Q.   Okay.                                        11:35:17

 8      A.   I was vice president of mechanical then, and he  11:35:19

 9  was chief mechanical officer reporting directly to me.   11:35:21

10      Q.   Right, right.  So he is underneath you?     11:35:24

11      A.   Yes, sir.                                    11:35:27

12      Q.   Yeah, okay.  So you are just saying that in the  11:35:27

13  event you were doing something else, it is possible that  11:35:30

14  he may have handled some calls with Penny in your place   11:35:32

15  and then relayed the information to you?            11:35:37

16      A.   Yes, sir.                                    11:35:39

17      Q.   Okay.  And do you recall that happening or are  11:35:40

18  you just saying that may have happened?             11:35:43

19      A.   I don't recall that happening but, you know, at  11:35:44

20  times I don't -- you know, you read off those dates and,  11:35:46

21  you know, I know when I made the decision, but I don't    11:35:49

22  know that -- that -- that James didn't have a         11:35:52

23  conversation if I was gone and had to come back or    11:35:57

24  something of that nature, if I was in a meeting and had   11:35:59

25  to come back when the trial came back.               11:36:01
```

                                                                      79

Brian Barr                                                              May 6, 2021

1      Q.    Okay.  For the most part, it looks like          11:36:06

2   termination decisions came out about a month after the    11:36:09

3   hearings.  There is some exceptions, but does that sound  11:36:19

4   about right to you?                                        11:36:21

5      A.    Yes.  Actually, after the investigation the      11:36:22

6   Collective Bargaining Agreement will last for 30 days     11:36:24

7   post the investigation per the transcripts to be done,    11:36:26

8   the -- to meet together and discipline to be assessed.    11:36:30

9   So yeah, it is -- it is generally in that high 20 days,   11:36:32

10  generally it is, you know, 20-plus days.  We get it back  11:36:36

11  and then the discipline assessment is mailed out to, you  11:36:39

12  know, the -- the employee and the general chairman as     11:36:43

13  required.                                                  11:36:48

14     Q.    Okay.  So in between the period of time when     11:36:49

15  the hearing transcript and exhibits come back and the     11:36:54

16  date on the termination letter, did you talk to anybody   11:36:57

17  other than Penny Dreher about your decision to terminate  11:37:00

18  the plaintiffs in this case?                              11:37:03

19     A.    I honestly think I had a conversation with my    11:37:05

20  direct supervisor, you know, notifying her that -- that   11:37:10

21  I was making that decision and that I was going to be     11:37:13

22  issuing that discipline.                                   11:37:16

23     Q.    Okay.  Who is that?                              11:37:18

24     A.    Cindy Sanborn.                                   11:37:19

25     Q.    I am sorry.  The first name broke out.          11:37:22

                                                                        80

Brian Barr                                                                      May 6, 2021

```
 1        A.   It is -- her official name is Cynthia, we call      11:37:24

 2   her Cindy, Sanborn, S-A-N-B-O-R-N.                            11:37:28

 3        Q.   What was her position in 2017?                      11:37:32

 4        A.   Chief Operating Officer CSX Transportation.         11:37:34

 5             MS. BIRD:  Let me just put kind of an objection      11:37:40

 6   or statement on the record to the extent we're talking       11:37:42

 7   about the Collective Bargaining Agreement, the timing of     11:37:45

 8   the thing, just to the extent that he is testifying --       11:37:47

 9   he is testifying as to the mechanical employees that he      11:37:49

10   was working with only, the Collective -- so I -- I just      11:37:52

11   want to get that on the record because it may be             11:37:57

12   different for some of the other employees, but we            11:37:59

13   haven't consistently made that limitation.  So I just        11:38:02

14   want to, to that extent that we are just talking about       11:38:04

15   employees that he was in the chain of.                       11:38:08

16             MR. PAUL:  I think that's right, yeah.              11:38:12

17             THE DEPONENT:  And for clarity, not -- you          11:38:16

18   know, there is six union organizations under mechanical.     11:38:17

19   Like, I am using a generality that we get them out in 30     11:38:20

20   days per their agreement, some of them have                  11:38:22

21   individualized dates on the day I can mail it to them        11:38:25

22   and the day I can get them back.                             11:38:26

23        BY MR. PAUL:                                            11:38:28

24        Q.   Okay.  It's like a -- it's an approximate          11:38:28

25   number?                                                      11:38:31
```
                                                                        81

Brian Barr                                                    May 6, 2021

```
 1        A.    Yes.                                      11:38:31
 2        Q.    Okay.  So you recall speaking with Cindy  11:38:32
 3   Sanborn about the decision that you made to terminate 11:38:37
 4   them?                                                11:38:40
 5        A.    Yeah, I -- yeah, absolutely.  I remember  11:38:40
 6   mentioning it to her that -- that I was making that  11:38:42
 7   decision, and that I was going to be -- be pursuing  11:38:45
 8   that.                                                11:38:48
 9        Q.    Was that just one conversation with       11:38:48
10   Ms. Sanborn?                                         11:38:50
11        A.    Absolutely, it was just a -- more of a    11:38:51
12   notification.                                        11:38:53
13        Q.    Okay.  And did that -- what was her response? 11:38:54
14        A.    I think she was surprised that that many, you 11:38:58
15   know, employees would go to the same physician at the 11:39:03
16   same time and kind of get the same treatment, that it 11:39:07
17   was a shame that, you know, kind of everybody's      11:39:09
18   response, it was terrible that the event occurred.   11:39:12
19        Q.    Okay.  So is it fair to say that Ms. Sanborn 11:39:14
20   supported your decision to terminate all the plaintiffs 11:39:21
21   in this case?                                        11:39:24
22        A.    It wouldn't be fair to say that she supported 11:39:24
23   it.  I just literally made notification it was the   11:39:28
24   decision I made and I was pursuing.  I didn't -- I   11:39:32
25   wasn't seeking permission at the time or approval.   11:39:34
```

82

Brian Barr                                                                                    May 6, 2021

```
 1        Q.   Okay.  So you did -- you did not need her      11:39:37

 2   decision or approval to make the decision to terminate?  11:39:39

 3        A.   No.                                            11:39:41

 4        Q.   And it was yours and you made it by yourself,  11:39:41

 5   but in reliance with the Labor Relations Department; is  11:39:44

 6   that right?                                              11:39:47

 7        A.   That's correct.                                11:39:47

 8        Q.   And by nature of that, you also relied upon    11:39:48

 9   Dr. Heligman's -- his testimony in the hearings; is that 11:39:51

10   correct?                                                 11:39:53

11        A.   Yes.                                           11:39:54

12        Q.   Okay.  Anybody -- when you talked to Cynthia   11:39:54

13   Sanborn this one time, do you think it was after that    11:39:59

14   first hearing that occurred on August 7th?              11:40:02

15        A.   I think it was -- when did I put out the      11:40:05

16   termination on that first one?  Was it closer to        11:40:13

17   September 7th?                                           11:40:16

18        Q.   I -- I have the termination letters.  Is that 11:40:17

19   what you are asking?                                     11:40:19

20        A.   Yeah.  That first termination letter that would 11:40:20

21   have had my signature would have been in closer         11:40:22

22   proximity to that.                                       11:40:25

23        Q.   Let's do a little screen share.               11:40:26

24        A.   I'll believe you, I really will.              11:40:35

25             MS. BIRD:  No.  No, no.  No, we won't.        11:40:36
```

83

```
 1              MR. PAUL:  Oh, yeah, we can't be sure.        11:40:39

 2              THE DEPONENT:  Yeah -- no, that is not mine I  11:40:43

 3     don't think.                                          11:40:45

 4         BY MR. PAUL:                                       11:40:45

 5         Q.   Yeah, I know.  That is one of the others but I  11:40:46

 6     wanted to ask you, did you ever speak -- I know I asked  11:40:51

 7     you this broadly before, but did you ever speak with   11:40:55

 8     Mr. Kuhner specifically concerning his determination of  11:40:57

 9     discipline for his employee, Mr. Abdon?               11:41:01

10         A.   Absolutely not.                               11:41:04

11         Q.   Okay.  So I am going to look at a chart real   11:41:07

12     quick.                                                 11:41:10

13         A.   If I could just see that date, I just want to  11:41:12

14     finish answering that question on that first dismissed  11:41:15

15     was -- so it would have been sometime after September  11:41:18

16     6th that I would have --                               11:41:20

17         Q.   Well, the only reason I wanted to look at my   11:41:21

18     chart was I'm not sure this is the earliest date.  We  11:41:23

19     can -- we can scroll through a couple and just see, but  11:41:25

20     my chart would tell me, but it might be.               11:41:29

21              MS. BIRD:  I think the earliest one is         11:41:29

22     September 5th.                                          11:41:31

23              MR. PAUL:  Yeah.  Here's a September 5th      11:41:32

24     carmen, which would --                                 11:41:35

25              THE DEPONENT:  If I believed you, I would have  11:41:36
```

                                                                    84

| | | |
|---|---|---|
| 1 | said September 6th.  It would have been sometime after | 11:41:38 |
| 2 | September 5th. | 11:41:42 |
| 3 | (Simultaneous colloquy.) | 11:41:42 |
| 4 | BY MR. PAUL: | 11:41:42 |
| 5 | Q.   It will be close enough.  It won't -- yeah, it | 11:41:42 |
| 6 | looks like we got a handful here on September 5th. | 11:41:43 |
| 7 | A.   After I made that decision and submitted those, | 11:41:46 |
| 8 | at some point in the days following that, it could be in | 11:41:50 |
| 9 | the 6th or 7th.  It would be somewhere in that time | 11:41:52 |
| 10 | frame I just let my supervisor know that I had done | 11:41:55 |
| 11 | that. | 11:41:56 |
| 12 | Q.   Okay.  But let's -- right now, for instance, we | 11:41:57 |
| 13 | are going to mark this as Exhibit 1, and there is Bates | 11:42:00 |
| 14 | numbers down at the bottom.  In this case it is 418 for | 11:42:04 |
| 15 | Mr. Glowacki. | 11:42:09 |
| 16 | (Exhibit 1 was marked for identification.) | 11:42:11 |
| 17 | BY MR. PAUL: | 11:42:11 |
| 18 | Q.   So like, his discipline was issued on September | 11:42:11 |
| 19 | 21st.  Do you see where I read -- read that? | 11:42:13 |
| 20 | A.   Yes, sir. | 11:42:15 |
| 21 | Q.   I guess, did you have the conversation with | 11:42:17 |
| 22 | Cynthia Sanborn like, in this example, before or after | 11:42:19 |
| 23 | September 21st? | 11:42:22 |
| 24 | A.   Before September 21st. | 11:42:23 |
| 25 | Q.   Do you believe it was after that initial round | 11:42:30 |

85

Brian Barr                                                                May 6, 2021

```
 1    of what looked to be maybe September 5th and September      11:42:32
 2    6th termination letters?                                    11:42:35
 3        A.   Yes, sir, it was after the initial day or two      11:42:37
 4    of the investigations is when I made the notification.      11:42:39
 5        Q.   Okay.  And just I know a lot of these have         11:42:43
 6    these initials KSM.  Do you know who that refers to?        11:42:54
 7            MS. BIRD:  Is that the transcribing person?         11:42:58
 8    BY MR. PAUL:                                                11:43:00
 9        Q.   Do you see where I am looking at it down by        11:43:01
10    your signature?                                             11:43:03
11        A.   I do not know who that is.                         11:43:04
12        Q.   Okay.  So it is not like your secretary or        11:43:06
13    assistant or anything like that?                            11:43:09
14        A.   No, I have never had a secretary or assistant      11:43:10
15    with those initials.                                        11:43:14
16        Q.   Okay.  Is this your electronic signature?         11:43:16
17    I'm -- I'm just picking this one, but we can look at any    11:43:21
18    of the termination letters with your name.                  11:43:24
19        A.   100 percent.  There's -- that is my electronic    11:43:26
20    signature on all of them.                                   11:43:29
21        Q.   Okay.  And I mean, I guess it sounds like from    11:43:31
22    your testimony, you agree that all of these letters went   11:43:32
23    out with your blessing and authority?                       11:43:35
24        A.   100 percent, yes.                                  11:43:36
25        Q.   And knowing what you know now, would you -- do    11:43:38
```

86

Brian Barr                                                                May 6, 2021

```
 1    you stand behind those decisions to terminate each and      11:43:41

 2    every one of the plaintiffs today?                          11:43:44

 3        A.   100 percent, yes.                                  11:43:46

 4        Q.   Nothing has changed in your analysis of the        11:43:48

 5    facts from 2017 to the present?                             11:43:52

 6        A.   No, absolutely not.  I -- I think there may        11:43:54

 7    have been one in the Collective Bargaining -- or in the     11:44:02

 8    arbitration that was changed.  I don't know if it was       11:44:04

 9    mine or not.  I remember seeing in the arbitration,         11:44:07

10    there was one or two that were --that were changed out.     11:44:10

11    But at the time I made the decision with the information    11:44:12

12    we had and to this very day, I would make exactly the       11:44:14

13    same decision.                                              11:44:18

14        Q.   Okay.  Well, let me make sure I understand your    11:44:19

15    answer.  Is the fact that the labor board may have          11:44:21

16    overturned some, would that change your decision today      11:44:25

17    with respect to terminating each of the plaintiffs in       11:44:28

18    this case?                                                  11:44:31

19        A.   No, it would not.  I'm -- I'm -- I absolutely      11:44:32

20    would not.  Just pointing out the fact that I think one     11:44:35

21    or two were potentially overturned wouldn't have changed    11:44:37

22    my decision in what I did whatsoever.                       11:44:41

23        Q.   Yeah, in other words, I mean, did you have any     11:44:42

24    role to play in the labor board decision?                   11:44:44

25        A.   I -- I do not other than it is my job to make      11:44:48
```

87

Brian Barr                                                                    May 6, 2021

 1    sure when I levy the termination or the one-day,          11:44:54

 2    three-day, whatever the suspension is, that I have a      11:44:58

 3    clean investigation that can be upheld within the         11:45:03

 4    Collective Bargaining Agreement and the arbitration.  It  11:45:05

 5    is my job to make sure that those investigations are      11:45:08

 6    complete, that I have knowledge of them, I sign off on    11:45:11

 7    them and that we don't have every one of them             11:45:13

 8    overturned.                                               11:45:17

 9         Q.   Okay.  I mean, I think I know the answer but we 11:45:18

10    have got to get it for the record, but, I mean, you       11:45:23

11    didn't, like, testify before the public law board?        11:45:26

12         A.   Oh, no.  No, sir.                               11:45:29

13         Q.   Or the labor board sometimes it is called,      11:45:30

14    right?                                                    11:45:32

15         A.   No, sir, I did not.                             11:45:32

16         Q.   Okay.  So my question now is regardless of      11:45:33

17    whether the labor board reversed or upheld a decision,    11:45:35

18    is it correct to say that today you would make the same   11:45:38

19    decision that you made to terminate each and every one    11:45:41

20    of the plaintiffs in this case?                           11:45:43

21         A.   100 percent, yes.                               11:45:45

22         Q.   And just to be crystal clear, is there anything 11:45:46

23    in the law board's decision that you reviewed that        11:45:57

24    presented new facts or changed your mind with respect to  11:46:03

25    those employees?                                          11:46:06

                                                                    88

Brian Barr                                                                      May 6, 2021

```
 1        A.   Not at all.                              11:46:06

 2        Q.   I mean, I don't mean this in -- well, let me    11:46:07

 3   strike that.                                       11:46:17

 4             Is this a form letter, these termination    11:46:18

 5   letters that were sent out under your name?        11:46:20

 6        A.   I don't know that I would call them a form    11:46:23

 7   letter.  They are -- they're compliant with the policies    11:46:25

 8   and agreements that we have that come out through the    11:46:29

 9   administration, but they're -- I don't -- I don't    11:46:32

10   manually type on them.  But they are definitely    11:46:37

11   formatted in the same fashion.                     11:46:41

12        Q.   Okay.  But, I mean, you didn't dictate or write    11:46:42

13   these letters, these termination letters, did you?    11:46:45

14        A.   No, sir.                                  11:46:47

15        Q.   Okay.  Do you know who did?              11:46:48

16        A.   Our field administration department.  I    11:46:50

17   couldn't tell you which individual there.  It would have    11:46:53

18   been something that they probably use for -- it is a    11:46:55

19   clerical employee or entry level manager would have    11:46:58

20   done.                                              11:47:01

21        Q.   And that's -- when you say "field        11:47:01

22   administration," that is that either subdepartment or    11:47:03

23   part of the Labor Relations Department?            11:47:06

24        A.   Yes, sir.                                 11:47:08

25        Q.   Okay.  So did they both draft the language and    11:47:08
```

89

Brian Barr                                                           May 6, 2021

```
 1    send the letters out under your signature?          11:47:13

 2        A.    Yes.                                       11:47:14

 3        Q.    And that is perfectly fine with you.  It was  11:47:15

 4    with your authority, correct?                       11:47:18

 5        A.    Yeah, 100 percent.  That is our -- our standing  11:47:19

 6    policy.  That is our procedure here at CSX.         11:47:22

 7        Q.    Okay.  So after the hearing transcripts and the  11:47:24

 8    exhibits were created, you talked to Penny Dreher a  11:47:29

 9    couple of times that we have talked about.  And you have  11:47:35

10    talked to Cynthia Sanborn one time; is that correct?  11:47:38

11        A.    Absolutely.  And Ms. Sanborn was more of a  11:47:41

12    notification.  But I also -- I think I probably talked  11:47:44

13    to Melissa Wheaton, who was Penny's supervisor, to  11:47:46

14    verify I was terminating each one of them.          11:47:51

15        Q.    Okay.  Did you need the authority from Labor  11:47:53

16    Relations, whether it is Ms. Wheaton or anybody else?  11:47:57

17        A.    Absolutely not.  But I will say that when I do  11:48:00

18    terminations, regardless if it is this case or any other  11:48:04

19    case, I definitely look for the support of that prior  11:48:07

20    to -- to doing the termination to make sure, you know,  11:48:10

21    that we will be able to sustain it.                 11:48:13

22        Q.    Okay.  In -- in the usual case, is it correct  11:48:15

23    that to say that you would consider both the hearing  11:48:20

24    officer's notice of finding as well as the           11:48:22

25    recommendation from Labor Relations in determining   11:48:26
```

90

Brian Barr                                                    May 6, 2021

```
1    discipline?                                    11:48:28

2        A.   I don't always get a letter of findings from   11:48:29

3    the hearing officer, but I would have -- in the normal   11:48:31

4    cases, I read the investigation.  The charging officer   11:48:36

5    would be the, you know, the -- the manager in which I    11:48:40

6    would be speaking to, the one who found it, like, the    11:48:42

7    one who discovered the employee asleep or the employee   11:48:47

8    violating the rule or the employee going home.  It would 11:48:51

9    be the charging officer that I would be, you know,       11:48:55

10   having the conversation with as defined as the witness.  11:48:57

11       Q.   Okay.  But I think we did establish that when   11:48:59

12   notice of findings are done, they are done by the        11:49:02

13   hearing officer?                                11:49:05

14       A.   Yes, sir.                              11:49:05

15       Q.   Okay.                                  11:49:07

16       A.   You asked me when I put out the discipline, you 11:49:07

17   know, I -- I read that and I talk to the charging        11:49:10

18   officer, you know, directing, you know, what other       11:49:13

19   background do we have, what is up with this, and I make  11:49:16

20   my -- my decision based off of that.            11:49:19

21            (Simultaneous colloquy.)              11:49:20

22   BY MR. PAUL:                                   11:49:20

23       Q.   So it sounds like what we have so far -- I am   11:49:20

24   sorry.  Go ahead.                             11:49:24

25       A.   I don't always go with the recommendation of   11:49:24
```

91

USCA4    2470

Brian Barr                                                              May 6, 2021

```
 1    the -- of the findings.                              11:49:27

 2        Q.   Understood.  I think you said that a couple  11:49:29

 3    times so I think that is clear.  But when it comes to 11:49:30

 4    information that you rely upon to make a decision for  11:49:34

 5    discipline, it sounds like one possible source is     11:49:37

 6    speaking directly with a charging officer.            11:49:40

 7        A.   Yes.                                         11:49:43

 8        Q.   The second is reviewing the written notice of 11:49:44

 9    findings from the hearing officer; is that correct?   11:49:46

10        A.   Yes, the findings, yes.                      11:49:48

11        Q.   Yeah.  I am talking about in general.  And   11:49:52

12    third, you would receive a recommendation from the Labor 11:49:55

13    Relations Department?                                 11:49:58

14        A.   I would -- normally, I mean, if it wasn't -- if 11:50:00

15    it was an investigation that we had within our own    11:50:03

16    organization, I would confer with Labor Relations, can 11:50:06

17    you support that, you know.  There is discipline based 11:50:10

18    off of the employee's work record and the IDPAP for the 11:50:13

19    individual employee, which IDPAP is individual         11:50:17

20    development personal accountability plan on where the  11:50:21

21    employee stands, because there is -- there is          11:50:24

22    forgiveness within six months on some crafts and       11:50:26

23    statutorily come on and come off.  So I would -- I would 11:50:30

24    go through and make sure they -- they supported that and 11:50:31

25    it was able to be withheld but -- or upheld at a later 11:50:35
```

92

Brian Barr                                                          May 6, 2021

```
 1   date.  But yeah, I confer with Labor Relations on the      11:50:38
 2   terminations and more serious events, make sure that I     11:50:42
 3   am within that Collective Bargaining Agreement and the     11:50:46
 4   IDPAP policy that we have within CSX.                       11:50:50
 5        Q.   Okay.  When it comes to the discipline policy     11:50:53
 6   and evaluation of whether the charges will be upheld by    11:50:55
 7   a public law board, do you make that assessment to         11:51:07
 8   yourself or do you rely on the Labor Relations             11:51:09
 9   Department to do that?                                      11:51:11
10        A.   I rely on the Labor Relations Department to do   11:51:12
11   that.                                                       11:51:14
12        Q.   Okay.  Now, the way that I understood the        11:51:14
13   answer to the question before, I want to ask it slightly   11:51:17
14   different.  And if you disagree with the statement, just   11:51:20
15   let me know.  But is it correct to say that you do or      11:51:22
16   you do not receive a recommendation from Labor Relations   11:51:25
17   when it comes to discipline?                                11:51:28
18        A.   Again, I don't want to misstate the question     11:51:29
19   but I do discipline on hundreds of trials, you know,       11:51:36
20   hundreds of investigations, from very minor to very        11:51:39
21   serious, throughout a year.  On some of them, I do not     11:51:42
22   confer with Labor Relations; some of them I do,            11:51:45
23   depending on the case.  The more serious cases or -- or    11:51:48
24   ones that are outside of our wheelhouse, I depend on       11:51:52
25   Labor Relations to support those.  The ones that are       11:51:55
```

                                                                      93

Brian Barr                                                                      May 6, 2021

```
 1    rule violations within the mechanical organization or a    11:52:00

 2    more minor offense, I do that and don't have -- and I      11:52:03

 3    don't necessarily have the consultation of Labor           11:52:06

 4    Relations.                                                 11:52:08

 5         Q.   Okay.  So I used the word "recommendation" and   11:52:08

 6    you used the word "confer," so I just want to spend a      11:52:11

 7    minute or two on that.  So does Labor Relations, in the    11:52:14

 8    general course of things when it comes to discipline, do   11:52:18

 9    they give you a verbal or written recommendation for       11:52:21

10    discipline?                                                11:52:24

11         A.   Not on minor events.                             11:52:25

12         Q.   Okay.  On major events?                          11:52:27

13         A.   Yes.                                             11:52:29

14         Q.   And is there a distinction in your testimony     11:52:29

15    that you would like to make between Labor Relations        11:52:32

16    giving you a recommendation, which is my question, and     11:52:35

17    the way you answer it, which is you confer with Labor      11:52:37

18    Relations?                                                 11:52:41

19         A.   I would say not every case is the same as this   11:52:41

20    is what I was getting at.  So when you ask me about        11:52:43

21    discipline in general, I don't talk to them every time.    11:52:47

22    On this particular case, I absolutely talked to them as    11:52:49

23    it was, you know, a different charge than what we          11:52:53

24    traditionally do within the department.                    11:52:55

25         Q.   Okay.  Let me just back it up a little bit.  So  11:52:57
```

                                                                            94

Brian Barr                                                                May 6, 2021

```
 1    forget about minor charges because I think you've        11:53:01

 2    already talked about that, and so I'm not asking you     11:53:03

 3    specifically to the plaintiffs right now.  I am asking   11:53:03

 4    you for any major charge that you have been involved     11:53:05

 5    with, do you get a written or verbal recommendation from 11:53:08

 6    Labor Relations with respect to discipline?              11:53:12

 7        A.   Yes.                                             11:53:13

 8        Q.   Okay.  And when Labor Relations gives you a      11:53:13

 9    recommendation for discipline in those type of cases, is 11:53:18

10    it usually verbal or is it in writing?                   11:53:21

11        A.   It is usually verbal.                            11:53:24

12        Q.   And that is what happened in this case, verbal  11:53:31

13    as well, right?                                          11:53:34

14        A.   Yes.                                             11:53:35

15        Q.   You are not -- from your testimony, my question 11:53:36

16    is, you are not obligated to follow Labor Relations'     11:53:44

17    recommendation; is that correct?                         11:53:48

18        A.   I am not.                                        11:53:49

19        Q.   Nor are you obligated, I believe you testified, 11:53:49

20    to follow the notice of findings from a hearing officer? 11:53:52

21        A.   I am not.                                        11:53:54

22        Q.   And for that matter, you are not obligated to   11:53:56

23    follow any recommendations from the charging officer?    11:53:59

24        A.   Correct, I am not.                               11:54:02

25        Q.   Has there ever been a time that you can recall  11:54:06
```

95

Brian Barr                                                                          May 6, 2021

```
 1   where you haven't followed the recommendation of Labor    11:54:09

 2   Relations?                                                11:54:12

 3       A.   Yes.                                             11:54:13

 4       Q.   Okay.  And about how many times would you say    11:54:13

 5   that has happened?                                        11:54:15

 6       A.   You know, a few times in the past year, like     11:54:16

 7   three times, say, in the past year.                       11:54:22

 8       Q.   Okay.  And did it ever happen before the past    11:54:24

 9   year?                                                     11:54:29

10       A.   Yes.                                             11:54:29

11       Q.   Okay.  So are you saying like a handful of       11:54:29

12   times a year?                                             11:54:32

13       A.   Yeah.  We -- we don't -- yes.  We don't have     11:54:33

14   that many investigations we don't agree on, but yes.     11:54:40

15       Q.   Okay.  So it is a small percentage is what you   11:54:42

16   are saying?                                               11:54:45

17       A.   Yes.                                             11:54:45

18       Q.   Okay.  And, you know, I want to -- I don't want  11:54:45

19   all the -- all the examples, but if you can give a        11:54:52

20   representative example or examples of reasons why you     11:54:54

21   did not follow their recommendations of discipline from   11:54:56

22   Labor Relations, for instance, was it a change in facts   11:55:00

23   or question about disciplinary history or something       11:55:02

24   else?                                                     11:55:06

25       A.   It is generally a misunderstanding of the        11:55:06
```

96

Brian Barr                                                    May 6, 2021

1    application of the -- the operating rules in the field      11:55:09

2    and the practice of those rules is where the separation    11:55:12

3    occurs.  You know, if it is based on, you know, the        11:55:16

4    timing or the charge letters or, you know, miswording,     11:55:20

5    that is one that is in there but the application of how     11:55:26

6    rules occur or who was the more aggressive one in the      11:55:30

7    investigation.                                             11:55:35

8         If there is a workplace violence, you know, I         11:55:35

9    deem that they both go, they don't necessarily.  An        11:55:41

10   employee is in rehab state for drugs and alcohol and       11:55:45

11   they fail a drug test, I deem that they've got to go,      11:55:48

12   Labor Relations does not.  They continue to fail the       11:55:50

13   drug test when they come back, you know, there is things   11:55:53

14   in workplace practice that I can't tolerate that Labor     11:55:56

15   Relations doesn't necessarily see the same way 100         11:56:00

16   percent of the time and we will have a conversation or     11:56:02

17   disagreement about that.                                   11:56:06

18        Q.   Okay.  Got it.  Okay.  So in the chronology of   11:56:07

19   things, I think we have gotten to the point where you      11:56:13

20   made the decision to terminate the plaintiffs, and         11:56:17

21   that -- is that -- or is the date of that decision best    11:56:20

22   represented by the date on these letters?                  11:56:24

23        A.   Yes, either it would be like that date or the,   11:56:26

24   you know, the day prior.  If I made a decision then they   11:56:32

25   were -- depending on the mailing, I may have made it on    11:56:35

                                                          97

USCA4   2476

Brian Barr                                                          May 6, 2021

```
 1    September 4th and it went out September 5th, but yeah,   11:56:39

 2    that is very -- that's very close to the --             11:56:42

 3        Q.   Okay.  Yeah, that -- yeah, I didn't mean, like, 11:56:44

 4    the actual -- well, at least as of the date of the      11:56:46

 5    letter, how's that?                                     11:56:49

 6        A.   Yes, that is -- that is a fact.                 11:56:50

 7        Q.   Okay.  And specific to these plaintiffs, is it  11:56:51

 8    your testimony that you more likely than not made the   11:56:55

 9    decision the day or two before the date of the letter?  11:56:58

10        A.   Yes.                                            11:57:01

11        Q.   Okay.  Now, earlier you testified that in part  11:57:02

12    that you were considering whether this discipline would 11:57:09

13    be upheld by the labor board; is that correct?          11:57:12

14        A.   Yes.                                            11:57:15

15        Q.   And that's -- is that true throughout the       11:57:15

16    discipline process, both starting with your giving the  11:57:18

17    green light to issue the charge letters up to the date  11:57:22

18    of these termination letters, was that something that   11:57:24

19    was in your mind -- whether the discipline would be     11:57:27

20    upheld by a labor board?                                11:57:29

21        A.   Yeah, I make -- I want to make sure that it is  11:57:31

22    a clean investigation.  We -- some of the investigations 11:57:33

23    that I authorize, we find not guilty at the end of the  11:57:36

24    investigation.  So I mean, it -- it doesn't always      11:57:40

25    follow through in that same suit, but I always make sure 11:57:43
```

98

| 1 | that a clean investigation has been authorized to do | 11:57:47 |
| 2 | that. | 11:57:50 |
| 3 |    Q.   Okay.  And during that period of time that we | 11:57:50 |
| 4 | are talking about when you agree or authorize the charge | 11:57:53 |
| 5 | letters until the date of the termination, do you review | 11:57:58 |
| 6 | any of the circumstances for compliance with any state | 11:58:00 |
| 7 | or federal laws like, for instance, the Family Medical | 11:58:03 |
| 8 | Leave Act or the Americans with Disabilities Act or | 11:58:06 |
| 9 | Title 7 or any other state or federal employment law? | 11:58:10 |
| 10 |    A.   I do not.  I have a pretty strong Labor | 11:58:13 |
| 11 | Relations organization that -- that I rely on to get the | 11:58:16 |
| 12 | support of to make sure we are compliant with that in | 11:58:19 |
| 13 | which I will, you know, would be sure happened in this | 11:58:22 |
| 14 | case as well. | 11:58:28 |
| 15 |    Q.   Okay.  So is that -- is your testimony that it | 11:58:29 |
| 16 | is your expectation or knowledge that the Labor | 11:58:30 |
| 17 | Relations Department would review the terminations for | 11:58:33 |
| 18 | consideration of compliance of state and federal | 11:58:37 |
| 19 | employment laws? | 11:58:40 |
| 20 |    A.   It would be -- yeah, it would be my -- my | 11:58:41 |
| 21 | belief that that -- that is my personal belief that | 11:58:42 |
| 22 | happens as well as -- well, with field admin with | 11:58:45 |
| 23 | Melissa Wheaton, who is, you know, not acting as a CSX | 11:58:49 |
| 24 | attorney but -- but is an attorney to make sure that we | 11:58:53 |
| 25 | are compliant with -- with all of that every time we | 11:58:55 |

99

May 6, 2021

```
 1   make a decision.                                      11:58:59

 2       Q.   Okay.  Do you ever have -- I am not asking   11:59:00

 3   about the substance of the conversations, I am just   11:59:02

 4   asking if you had any conversations concerning any of 11:59:04

 5   the plaintiffs with the CSX legal department?         11:59:06

 6       A.   I did not.  Oh, I think that -- I believe there 11:59:09

 7   was a CSX attorney there, yes, when we were having the 11:59:16

 8   conversation --                                       11:59:18

 9          MS. BIRD:  Yeah.  That is correct.  Yeah.      11:59:19

10   Yeah.                                                 11:59:19

11          THE DEPONENT:  No, that was it.  First time.   11:59:19

12   BY MR. PAUL:                                          11:59:21

13       Q.   Let me ask you a more specific question.  From 11:59:21

14   the period of time that you gave the green light to   11:59:24

15   issue the charge letters up until the date of the     11:59:26

16   termination letters, did you speak with anybody in the 11:59:29

17   CSX legal department?                                 11:59:31

18       A.   I did not.                                   11:59:32

19          MS. BIRD:  That was yesterday like, two days   11:59:35

20   ago.  That is okay, or three days ago.                11:59:37

21          THE DEPONENT:  72 hours ago.                   11:59:40

22          MS. BIRD:  I know.                             11:59:48

23          THE DEPONENT:  Getting a new job, I am happy to 11:59:48

24   be here in my new spot.  I'm drinking from the fire   11:59:49

25   hose.                                                 11:59:54
```

                                                                      100

Brian Barr                                                      May 6, 2021

```
 1        BY MR. PAUL:                                  11:59:54

 2        Q.   All right.  After you issued the termination   11:59:54

 3   letters that we have marked as Exhibit 1, did you have   11:59:56

 4   any other involvement with any of the plaintiffs?    11:59:59

 5        A.   I am sorry.  Could you ask that again?    12:00:03

 6        Q.   Sure.  After the dates of these termination   12:00:05

 7   letters for the plaintiffs that we have marked as    12:00:10

 8   Exhibit 1, did you have any further involvement in, say,  12:00:12

 9   any of the on-property appeals?                      12:00:18

10        A.   I did not.                                 12:00:21

11        Q.   And is that typical that you would not be    12:00:23

12   involved in that process after issuing the termination   12:00:30

13   letters?                                             12:00:33

14        A.   Correct.  I am -- I am never involved with    12:00:34

15   those -- you know, to be honest I have regular general   12:00:36

16   chairman meeting with the labor organization, and    12:00:41

17   sometimes there is conversation with them, but I don't   12:00:44

18   remember any specifically on these cases.  But I meet    12:00:47

19   with the -- at this point, I was meeting with the    12:00:51

20   general chairman quarterly, and we would go through    12:00:53

21   items, but it wasn't the appeal process that we go    12:00:55

22   through, which is operationally happening -- would    12:00:59

23   happen with our members.                             12:01:02

24        Q.   So as I understand your testimony, but let me   12:01:03

25   make sure it is clear, you are saying you might have had   12:01:05
```

101

Brian Barr                                                                    May 6, 2021

1    quarterly meetings with the general chairman on business    12:01:08

2    unrelated to discipline?                                    12:01:11

3         A.   It was -- it was -- yeah, that is correct.  It    12:01:13

4    wasn't related to discipline.  Sometimes discipline         12:01:16

5    would come up as part of those conversations.  When you     12:01:18

6    are spending the day with, you know, six or eight           12:01:20

7    general chairmen, you never know what is going to be        12:01:23

8    conversed about on a -- on a side note, but I would meet    12:01:25

9    with the general chairman regularly.  I don't remember      12:01:28

10   anything coming up on the, you know, an appeal              12:01:32

11   informally and I -- I have never been part of the appeal   12:01:34

12   process internally.                                         12:01:37

13        Q.   Are you referring to a specific general           12:01:38

14   chairman or the general chairman?                           12:01:40

15        A.   Each organization has its own general chairman,   12:01:42

16   and I meet with a group of them every -- every quarter.     12:01:45

17        Q.   Okay.  And -- but do you remember whether it      12:01:48

18   was part of the formal agenda or -- or, you know a          12:01:51

19   conversation in the hall, do you remember ever talking      12:01:54

20   to any of the general chairmen about any of the             12:01:56

21   plaintiffs in this case?                                    12:01:59

22        A.   No, that's what I am saying, I don't even         12:01:59

23   remember it coming up there.                                12:02:02

24        Q.   Okay.  So, you know, again, looking at the        12:02:03

25   chronological flow of things, after you authorized the      12:02:06

                                                                      102

Brian Barr                                                                May 6, 2021

```
 1    termination letters being sent out and aside, obviously,    12:02:09

 2    from the deposition you are giving today and preparation    12:02:13

 3    for it, did you have any involvement with respect to the    12:02:15

 4    termination of the plaintiffs in this case?                 12:02:18

 5        A.   I did not.                                         12:02:19

 6        Q.   Okay.  So let me just drill down on that just a    12:02:21

 7    little bit more just to make sure.  Were you aware that     12:02:26

 8    some of the plaintiffs filed complaints with OSHA?          12:02:28

 9        A.   I was not.                                         12:02:32

10        Q.   Okay.  If that's --                                12:02:34

11            MS. FOSTER BIRD:  I just want to say, don't         12:02:37

12    testify to anything you have learned from me.               12:02:38

13            THE DEPONENT:  When you say between the             12:02:41

14    termination and the time on Thursday when we talked, you    12:02:42

15    know, that we were going to do this, between then and       12:02:45

16    that Thursday, I did not know complaints were filed with    12:02:48

17    OSHA.                                                        12:02:52

18        BY MR. PAUL:                                            12:02:52

19        Q.   Okay.  And then is it accurate that you don't      12:02:52

20    have any job responsibilities with respect to the OSHA      12:02:54

21    process anyway?                                             12:02:57

22        A.   Currently, no.                                     12:03:00

23            MR. PAUL:  Okay.  All right.  We have been          12:03:01

24    going for about another hour.  I think this is a pretty     12:03:05

25    good stopping break for another five-minute break, if      12:03:09
```

                                                                       103

May 6, 2021

```
1    that's good.                                          12:03:09

2         MS. BIRD:  Sure.                                 12:03:09

3         MR. PAUL:  All right.  Unless anybody needs      12:03:12

4    longer, but that is all I need.                       12:03:13

5         THE VIDEOGRAPHER:  We are going off the record.  12:03:14

6    The time is 12:03.                                    12:03:16

7         (Off the record.)                                12:03:18

8         THE VIDEOGRAPHER:  We are back on the record.    12:12:34

9    The time is 12:12.                                    12:13:00

10        BY MR. PAUL:                                      12:13:04

11        Q.  Okay.  We are back on the record after a short  12:13:04

12    break.  Mr. Barr, are you all set to go?             12:13:06

13        A.  Yes, sir.                                     12:13:08

14        Q.  Okay.  Great.  We talked generally about three  12:13:09

15    different ways that you can get recommendations that are  12:13:15

16    not binding on you, but recommendations when you are  12:13:22

17    trying to determine discipline.  The first is talking to  12:13:25

18    the charging officer.  The second is receiving written  12:13:29

19    notice of findings from the hearing officer, and third a  12:13:33

20    recommendation from Labor Relations; is that all    12:13:36

21    correct?                                              12:13:39

22        A.  Yes.                                          12:13:39

23        Q.  Okay.  Are there any others that you can think  12:13:40

24    of as a general matter?                               12:13:43

25        A.  I mean, like I said, you know, in order to --  12:13:48
```

                                                                    104

Brian Barr                                                                    May 6, 2021

1    as a fortune company, we have a large work force in          12:13:55

2    multi-department, so if an FMLA case comes up, I would       12:14:00

3    get expertise from FMLA.  If a case came out regarding       12:14:02

4    drugs and alcohol, I would get recommendation from --        12:14:08

5    from that group.  So I mean, depending on the situation,     12:14:10

6    I do rely on the staff at CSX that has expertise in that     12:14:14

7    area to assist and make sure we are compliant.               12:14:19

8         Q.   Have you ever consulted with the Medical           12:14:21

9    Department in terms of getting a recommendation for          12:14:23

10   discipline?                                                  12:14:26

11        A.   Yes, FMLA, I believe falls close to if not         12:14:27

12   under the Medical Department where they -- they work in      12:14:32

13   conjunction on -- on some cases, so I am sure if any of      12:14:35

14   those have come up, I have in the past.                      12:14:39

15        Q.   Did you ever consult with Dr. Heligman or          12:14:40

16   anyone in the Medical Department concerning the              12:14:43

17   plaintiffs in this case?                                     12:14:46

18        A.   Not directly.                                      12:14:47

19        Q.   I am sorry?                                        12:14:49

20        A.   Not directly, no.                                  12:14:50

21        Q.   What does that mean?                               12:14:53

22        A.   Based off his testimony.                           12:14:54

23        Q.   Oh, meaning, you read or you provided summaries    12:14:56

24   of his testimony at the hearings?                            12:14:58

25        A.   Yeah, that -- that's right.                        12:15:01

                                                                        105

Brian Barr                                                                May 6, 2021

```
1         Q.   Which, that you read his testimony at the        12:15:03

2    hearings or you relied upon Labor Relations summary?       12:15:05

3         A.   I relied upon the summary of his testimony at    12:15:07

4    the hearing.                                               12:15:11

5         Q.   Right, okay.  And I know -- I know I have asked   12:15:11

6    you this, I just want it to be clear.  I know that you     12:15:16

7    reviewed or paged through some of the transcripts in       12:15:19

8    preparation for today's deposition.  But prior to, say,    12:15:21

9    two weeks ago and dating back to 2017, it is 100 percent   12:15:25

10   accurate to say that you did not read the transcripts      12:15:30

11   for the plaintiffs in this case or the exhibits?           12:15:33

12        A.   That's correct.                                  12:15:35

13        Q.   And instead you relied upon Labor Relations'     12:15:35

14   summary of the same?                                       12:15:39

15        A.   That's correct.                                  12:15:40

16        Q.   And I know you said directly versus indirectly,  12:15:40

17   so other than relying upon Labor Relations' summary of     12:15:52

18   Dr. Heligman's testimony, did you ever talk to             12:15:55

19   Dr. Heligman directly about any of the plaintiffs or --    12:15:57

20   in this case?                                              12:16:01

21        A.   I did not.                                       12:16:02

22        Q.   In the summaries that Labor Relations provided   12:16:03

23   to you, those were verbal, correct?                        12:16:25

24        A.   Correct.                                         12:16:26

25        Q.   Okay.  Do you recall if anyone in the Labor      12:16:28
```

                                                                          106

Brian Barr                                                                May 6, 2021

```
1    Relations gave you verbatim or, like, quoted testimony      12:16:31

2    from Dr. Heligman from the hearings?                        12:16:36

3         A.    I don't -- I don't recall.  You know, no, they   12:16:41

4    did not.  I wouldn't -- I would remember if we went         12:16:44

5    through the, you know, the timeline that it was of the      12:16:47

6    investigation with Dr. Heligman.  Like I said, it was       12:16:50

7    more of a summary.                                          12:16:53

8         Q.    Okay.  And if nothing else, I mean, there        12:16:53

9    wouldn't have been time in that telephone call that you     12:17:00

10   had with Penny that was somewhere between 15 minutes and    12:17:02

11   an hour where she gave you recommendations after that       12:17:05

12   first hearing, correct?                                     12:17:08

13        A.    Correct.                                          12:17:09

14        Q.    Now, we can look at any of these termination     12:17:09

15   letters in Exhibit 1, but I just want to ask you, here      12:17:13

16   is one for D. A. Stephens, Bates number 447.  Is that       12:17:17

17   large enough for you to see or am I not screen sharing      12:17:22

18   and you can't see anything?                                 12:17:25

19        A.    You are not screen sharing.  I can't see        12:17:25

20   anything.                                                    12:17:27

21        Q.    Okay.  All right.  Let's fix that.               12:17:29

22        MS. BIRD:  No, we cannot see it.  It is too            12:17:29

23   small.                                                       12:17:32

24     BY MR. PAUL:                                               12:17:32

25        Q.    All right.  How about now?                       12:17:32
```

107

Brian Barr                                                    May 6, 2021

```
 1      A.   I can see it now.                          12:17:33

 2      Q.   Is that big enough?                        12:17:35

 3      A.   Yes.                                       12:17:37

 4      Q.   Obviously, the date of the investigations 12:17:37

 5 differ from plaintiff to plaintiff, but with respect to 12:17:41

 6 the language that -- it was your determination that each 12:17:44

 7 of the plaintiffs were dishonest and attempted to     12:17:50

 8 defraud the company.  Do you see where I am reading that 12:17:53

 9 in the first full paragraph?                          12:17:57

10      A.   Yes.                                       12:17:58

11      Q.   Okay.  And it states, one, that the hearing was 12:17:58

12 held "to determine the facts in connection with       12:18:05

13 information received on July 14th, 2017, from the CSXT 12:18:06

14 Chief Medical Officer that you were dishonest and     12:18:12

15 attempted to defraud the company and/or benefits      12:18:14

16 providers when you, as well as more than 50 other craft 12:18:16

17 employees, submitted potentially fraudulent           12:18:20

18 documentation."  Do you see where I read that?        12:18:22

19      A.   Yes, sir, I do.                            12:18:24

20      Q.   Okay.  And is it fair to characterize that as 12:18:25

21 the charge?                                           12:18:28

22      A.   Yes.                                       12:18:29

23      Q.   Okay.                                      12:18:32

24      A.   Can I make one comment?                    12:18:32

25      Q.   Of course.                                 12:18:33
```

108

```
 1        A.    Earlier you asked me if that investigation was    12:18:34

 2   like the middle of June or the end of June.  If it says      12:18:37

 3   on July 14th, that is what I was saying with the             12:18:40

 4   conversation that sparked.  But they sent that in on I       12:18:43

 5   think this July 14th, 2017, one here, that conversation      12:18:45

 6   would have been mid-July, not June when I was having the     12:18:49

 7   conversation about charging.  I think previously I had       12:18:52

 8   said it was mid-June and it had to be mid-July if that       12:18:54

 9   is when Dr. Heligman sent that to the -- sent that to        12:18:58

10   the board.                                                   12:19:02

11        Q.    I believe, and we can take a look at it, I        12:19:03

12   believe that that is -- July 14th is the date of the         12:19:05

13   letter that Dr. Heligman sent to the United States           12:19:08

14   Railroad Retirement Board and other insurance companies      12:19:10

15   and different boards of chiropractic.  Is that what you      12:19:13

16   are referring to?                                            12:19:17

17        A.    Yeah, because there were some letters that he     12:19:18

18   sent that sparked the conversation in its entirety that      12:19:21

19   was brought to me.                                           12:19:24

20        Q.    Okay.  So you -- I believe you testified you      12:19:25

21   have never seen that letter that Dr. Heligman sent to        12:19:27

22   the Railroad Retirement Board; is that correct?             12:19:30

23        A.    That is correct, but that was what sparked        12:19:32

24   that -- you know, Barry coming to me and then the            12:19:34

25   subsequent conversation with Penny was what was             12:19:37
```

                                                                     109

1   discovered and being sent.  So it would have been        12:19:39

2   sometime around that July 14th time frame that -- might   12:19:40

3   have been the day before or day before, but it would     12:19:43

4   have been around that time frame that the initial        12:19:46

5   conversation that it was asked if we would move forward.  12:19:47

6        Q.   Okay.  And is your testimony then that the     12:19:49

7   first conversation you had with Barry concerned          12:19:53

8   Dr. Heligman's letter to the Railroad Retirement Board?  12:19:56

9        A.   Yeah, that -- that was what I testified to     12:19:59

10  earlier, but I believe I said a June date, you know,     12:20:01

11  like mid-June, end of June kind of thing.  It had to be  12:20:05

12  July because it was -- all of that was discovered and    12:20:08

13  subsequently Heligman sent that in pretty close to that  12:20:12

14  conversation.  So I am just referencing it must have     12:20:16

15  been in mid-July, not mid-June that I would -- that that  12:20:18

16  conversation took place.                                 12:20:21

17       Q.   No.  Yeah.  No, let's straighten it out just so 12:20:22

18  we can be as accurate as we can.  I recall your          12:20:25

19  testimony earlier was that the conversation with Barry   12:20:27

20  had to do with the number of markoffs, not necessarily   12:20:31

21  Dr. Heligman's letter or certificate of ongoing          12:20:35

22  illnesses forms.                                         12:20:38

23       A.   That -- that is correct, but I am saying those 12:20:39

24  ongoing markoffs, the conversation was probably around   12:20:42

25  July.  I meant, you know, it was close to that           12:20:45

110

Brian Barr                                                                May 6, 2021

```
1    conversation is when Heligman sent that in.  This notice   12:20:48

2    says July 14th, you know, in connection with information   12:20:52

3    received on July 14th, that would have probably been       12:20:55

4    around the time I found out that the -- the event          12:20:58

5    occurred.                                                  12:21:00

6         Q.   Okay.  And you believe that to be true because   12:21:00

7    you remember talking with either Penny or Barry about      12:21:03

8    Dr. Heligman's letter to the Railroad Retirement Board?    12:21:07

9         A.   No.  Yeah, that he had found all -- you know,    12:21:09

10   that all of that had come up and that he was looking to    12:21:12

11   send that to the Railroad Retirement Board and would I     12:21:15

12   agree with pursuing, you know, the charges at that         12:21:18

13   point, and yes.  So I just -- I don't want to stir up      12:21:20

14   anything I said earlier.  I believe I referenced June      12:21:26

15   and it must have been July.                                12:21:28

16        Q.   Okay.  Fair enough.  Understanding this first    12:21:30

17   paragraph has to do with the charge, what was your         12:21:35

18   understanding when you -- when you authorized the charge   12:21:38

19   letters to be sent that each of the plaintiffs were        12:21:41

20   attempting to defraud the company?  And then I am going    12:21:45

21   to ask you about the benefits providers next.  But what    12:21:48

22   was your understanding that the plaintiffs being charged   12:21:51

23   were being dishonest and attempted to defraud the          12:21:54

24   company?                                                   12:21:57

25        A.   That they had also had the same physician,       12:21:57
```

                                                                          111

Brian Barr                                                                    May 6, 2021

```
 1    which in this case was a chiropractor, all roughly same      12:22:03

 2    time frame.  They had also had that same chiropractor,       12:22:06

 3    all had been diagnosed with minor muscular or skeleton       12:22:10

 4    issues that all were given, it was -- it was around two      12:22:16

 5    months off, each one of them with the same diagnosis.        12:22:19

 6    So when they went roughly the same ailment, same             12:22:23

 7    treatment, same diagnosis, each one of them, same            12:22:28

 8    chiropractor, same -- same ZIP code regardless of where      12:22:31

 9    they lived in the Huntington area.                           12:22:33

10         Q.   And did that information come to you from the      12:22:35

11    Labor Relations Department?                                  12:22:38

12         A.   Yes.                                               12:22:39

13         Q.   Okay.  So how is it by nature of the plaintiffs    12:22:39

14    treating with one of these two chiropractors is an           12:22:45

15    attempt to defraud the company?                              12:22:49

16         A.   Because of the -- the time off that they would     12:22:51

17    have gotten, which then would trigger their health           12:22:54

18    insurance with being off under that pretense.                12:22:57

19         Q.   Okay.  And I will show you some testimony in a     12:23:00

20    minute, you know, again right directly from                  12:23:03

21    Dr. Heligman.  But in general terms, are you referring       12:23:06

22    to the fact that if an employee marks off sick, that         12:23:09

23    their health insurance, the premiums for the health          12:23:14

24    insurance are paid by CSX for longer than as if they         12:23:17

25    were laid off?                                               12:23:20
```

                                                                        112

May 6, 2021

```
 1        A.   Yes.                                    12:23:21

 2        Q.   Okay.  And is that what you were referring to  12:23:22

 3   specifically?                                     12:23:24

 4        A.   Yes.                                     12:23:24

 5        Q.   In other words, it was your understanding when  12:23:25

 6   you issued the charge letters that each of the     12:23:29

 7   plaintiffs was trying to defraud the company by    12:23:31

 8   extending their health benefits for a longer period of  12:23:34

 9   time by marking off sick than as if they were laid off?  12:23:37

10        A.   Yes, and/or the time off itself.        12:23:39

11        Q.   Okay.  Can you explain what you mean by that?  12:23:43

12        A.   So if they weren't laid off, you know, they   12:23:45

13   were -- it was -- it was odd that they all went to the  12:23:48

14   same physician and all got the same exact treatment for  12:23:51

15   the same exact ailment, no variation.  So if they were  12:23:54

16   working, they got two months off, you know, compensated,  12:23:58

17   and if they were furloughed they got two months   12:24:00

18   additional benefits.                               12:24:03

19        Q.   So are you saying that the certificate of    12:24:04

20   ongoing illness that documented their need to be absent  12:24:06

21   was fraudulent?                                    12:24:10

22        A.   I am not questioning that -- you know, the    12:24:11

23   medical treatment.  I am -- I'm saying that it seems   12:24:14

24   fraudulent, or to launch an investigation that it is   12:24:16

25   fraudulent, that this amount of people went to the same  12:24:20
```

                                                                    113

Brian Barr                                                                      May 6, 2021

```
 1    physician, got the same treatment, got the same time    12:24:23

 2    off, you know, straight everyone equally, you know,     12:24:26

 3    treated the same with no variation.                     12:24:30

 4         Q.   Okay.                                         12:24:32

 5         A.   That --                                       12:24:32

 6              (Simultaneous colloquy.)                      12:24:34

 7         Q.   I am sorry.  Go ahead.                        12:24:34

 8         A.   That is my understanding.  That is what I     12:24:36

 9    levied the charge on.                                   12:24:38

10         Q.   Okay.  Did you yourself ever investigate or ask  12:24:38

11    anyone to investigate the medical histories of each of  12:24:42

12    the plaintiffs' conditions?                             12:24:45

13         A.   I did not.                                    12:24:48

14         Q.   Okay.  And did you ever have any conversations,  12:24:49

15    sounds like you didn't, with Dr. Heligman, but I will   12:24:52

16    broaden it to anyone in the Medical Department about any  12:24:56

17    of the plaintiffs' past use of FMLA or their medical    12:24:58

18    conditions?                                             12:25:01

19         A.   I did not.                                    12:25:01

20         Q.   Is there any other way that when you issued the  12:25:02

21    charge letters that you believed that each of the       12:25:06

22    plaintiffs were attempting to defraud the company other  12:25:09

23    than what we just talked about, which is two things, the  12:25:12

24    use of sick -- just being off from work or in an attempt  12:25:15

25    to avoid a layoff to extend benefits?                   12:25:21
```

114

```
1        A.    No, that was what sparked the -- the         12:25:24

2    investigation from my perspective.                     12:25:27

3        Q.    Okay.  And then the next part of that sentence 12:25:29

4    where the plaintiffs are also being charged with being 12:25:31

5    dishonest and attempting to defraud the benefits       12:25:36

6    providers, do you see where I read that?               12:25:39

7        A.    Yes.                                          12:25:41

8        Q.    So, again, at the time that you issued the    12:25:41

9    charge letters, what was your understanding of how each 12:25:43

10   of the plaintiffs was attempting to defraud benefits   12:25:45

11   providers?                                             12:25:50

12       A.    This is the -- so this -- it is the same thing. 12:25:50

13   If they were off or they were furloughed or -- or they 12:25:56

14   were off for a period of time and their health benefits 12:26:00

15   would have been being reduced and they -- they got this 12:26:02

16   extension through the chiropractor, it would have      12:26:05

17   continued their health benefits and their -- their     12:26:08

18   months service with the railroad ongoing, you know,    12:26:12

19   for -- for railroad retirement.                        12:26:16

20       Q.    Okay.  How would being marked off sick extend 12:26:17

21   your service credits?                                  12:26:21

22       A.    Because you still earn -- you still earn time 12:26:22

23   if you use a vacation day or a personal day that you had 12:26:25

24   accrued, you know, previously in the year, you know, for 12:26:28

25   the craft because you get them annually and they can   12:26:31
```

115

```
 1    accrue vacation throughout the year.  And I can use --     12:26:33

 2    if I am not here for two months and I take a personal      12:26:36

 3    day or vacation day, I get credited that month then for    12:26:39

 4    railroad retirement.                                       12:26:42

 5         Q.   Okay.  Now, I have heard of that.  I think I     12:26:43

 6    know what you are saying.  So as long as you have one      12:26:44

 7    paid day, you can get credit for that month through the    12:26:48

 8    Railroad Retirement Board?                                 12:26:50

 9         A.   Yes, sir.                                        12:26:51

10         Q.   And if you don't know the answer, it is fine,    12:26:52

11    but is that true even if your doctor has you off and as    12:26:54

12    unable to work?                                            12:26:57

13         A.   I don't know the answer to that.                12:26:58

14         Q.   Okay.  Are there any other ways, again at the    12:27:06

15    time you issued the charge letters, that you believed      12:27:11

16    each of the plaintiffs was attempting to defraud           12:27:13

17    benefits providers other than the ones you just            12:27:16

18    testified to?                                              12:27:19

19         A.   No, sir.                                         12:27:19

20         Q.   All right.  Now, these termination letters in    12:27:20

21    the next paragraph state, quote, "As a result of the       12:27:24

22    testimony and other evidence presented during the          12:27:27

23    investigation, it has been determined that you violated    12:27:29

24    CSX's Operating Rule 104.2.a, and Code of Ethics           12:27:32

25    policy."  Do you see where I read that?                    12:27:39
```

116

```
 1      A.   Yes, sir.                              12:27:40

 2      Q.   And is it accurate to say, as we have discussed   12:27:41

 3   in really some detail, that you exclusively relied upon   12:27:45

 4   the recommendation from Labor Relations, who you         12:27:52

 5   understand read the testimony and reviewed the exhibits  12:27:55

 6   from the hearing for each of the plaintiffs?             12:27:58

 7      A.   Yes.                                   12:28:01

 8      Q.   Other than the fact that the plaintiffs treated   12:28:03

 9   with either Dr. Johnson or Dr. Carey and the timing of   12:28:23

10   the receipt of documentation in the medical department,  12:28:28

11   do you have any evidence that any of the plaintiffs      12:28:32

12   engaged in actual fraud?                       12:28:37

13      A.   Other than what was on the, you know, the         12:28:39

14   transcripts of the investigation, no, I don't have any   12:28:46

15   evidence beyond that.                          12:28:51

16      Q.   What do you mean other than what was on the       12:28:52

17   transcripts of the investigation?              12:28:57

18      A.   Other than what Heligman had testified to at      12:28:57

19   the investigation, I don't have any knowledge of that.   12:29:00

20   I didn't interact with these employees or anything of    12:29:02

21   that nature beyond that.                       12:29:05

22      Q.   Okay.  But isn't it more accurate to say that     12:29:06

23   you relied upon the Labor Relations summary of           12:29:09

24   Dr. Heligman's testimony at the hearings?      12:29:12

25      A.   Yes.                                   12:29:14
```

                                                                          117

```
 1        Q.   Okay.                                    12:29:15

 2        A.   The summary was of Dr. Heligman's testimony  12:29:15

 3   and -- and the investigation in its entirety, including,  12:29:21

 4   you know, the other members who spoke -- the other    12:29:24

 5   parties who spoke there that, the organization's      12:29:26

 6   representative and the member, that was a totality of  12:29:30

 7   the investigation summary is what I based it off of.   12:29:33

 8        Q.   Okay.  Fair enough.  Let me ask you this.  Is  12:29:37

 9   the distinction you are making that I just referenced  12:29:39

10   Dr. Heligman, but it is more accurate to say that your  12:29:40

11   decision to dismiss the plaintiffs for the reasons set  12:29:44

12   forth in these termination letters was based upon Labor  12:29:47

13   Relations' verbal recommendation of their review of the  12:29:50

14   transcript and exhibits?                           12:29:54

15        A.   Yes.                                     12:29:56

16        Q.   Okay.  All right.  Are we still screen sharing?  12:29:56

17   Can you see?                                      12:30:21

18        A.   Yeah.                                    12:30:22

19        Q.   It is kind of small, but here, these are -- I  12:30:23

20   will represent to you that these are the hearing      12:30:27

21   transcripts that I have.  And you are welcome to look at  12:30:29

22   any of them, but I want to look at the first one that  12:30:33

23   you were involved in, which I understand to be -- I've  12:30:36

24   got to go over to my chart -- to be August 7th.  Okay.  12:30:38

25   Can you see this transcript?                       12:30:45
```

```
 1        A.   I can.                                  12:30:47

 2        Q.   The two big -- I guess it is 191 percent on my  12:30:47

 3   screen.                                           12:30:51

 4        A.   No, it is actually good here.           12:30:51

 5        Q.   Okay, good.  Let me blow it back up.    12:30:55

 6             THE VIDEOGRAPHER:  Are we on the next exhibit,  12:30:57

 7   Counsel?                                          12:30:59

 8             MR. PAUL:  We are.  I would like to mark this  12:30:59

 9   as Exhibit 2, please.  Thank you.                 12:31:01

10             (Exhibit 2 was marked for identification.)  12:31:04

11   BY MR. PAUL:                                      12:31:08

12        Q.   Now, you may have perused this in preparation  12:31:08

13   for today's deposition, but other than that you've never  12:31:12

14   seen this document; is that correct?             12:31:14

15        A.   Correct.                                12:31:14

16        Q.   Okay.  And this particular document is 283  12:31:14

17   pages, which for the moment I am just going to minimize  12:31:17

18   just so I can let you know, you know, the transcript  12:31:22

19   goes for quite a while, and then you have got these  12:31:25

20   exhibits at the end.  Same question, I mean, other than  12:31:33

21   preparing for today's deposition, you have never seen  12:31:36

22   any of these; is that correct?                    12:31:38

23        A.   Correct.  Well, I don't want to mislead.  I  12:31:39

24   mean, like, when you get to like the rule numbers and  12:31:46

25   like our code of ethics, I have seen those before, but,  12:31:48
```

119

Brian Barr                                                          May 6, 2021

| | | |
|---|---|---|
| 1 | you know, in -- in totality I have not. | 12:31:51 |
| 2 | Q.  Yeah, I mean, in terms of this document | 12:31:52 |
| 3 | collectively, you have never seen it, right? | 12:31:56 |
| 4 | A.  Correct. | 12:31:58 |
| 5 | Q.  Okay.  And what -- I think what you were just | 12:31:59 |
| 6 | trying to say, but I want to be clear about is, there | 12:32:02 |
| 7 | may be some of these exhibits that you have seen, and in | 12:32:05 |
| 8 | particular you were referencing, like, the rules? | 12:32:08 |
| 9 | A.  Correct. | 12:32:10 |
| 10 | Q.  But you are certainly familiar with the rules | 12:32:11 |
| 11 | of the railroad, right? | 12:32:12 |
| 12 | A.  Right.  I just want to make -- I don't want to | 12:32:13 |
| 13 | get fired and be accused on that. | 12:32:16 |
| 14 | Q.  You know, just because it is an exhibit, I just | 12:32:18 |
| 15 | want to ask you, I will represent that Dr. Heligman | 12:32:23 |
| 16 | wrote a couple of letters to the Railroad Retirement | 12:32:26 |
| 17 | Board, but this is one we referenced earlier dated June | 12:32:28 |
| 18 | 14th of 2017 [sic].  Do you see that or do I need to | 12:32:33 |
| 19 | make that a little bigger? | 12:32:36 |
| 20 | A.  I can see it. | 12:32:38 |
| 21 | MS. BIRD:  July 14th. | 12:32:38 |
| 22 | MR. PAUL:  I'm sorry? | 12:32:39 |
| 23 | MS. BIRD:  You just said June 14th but it is | 12:32:39 |
| 24 | July 14th. | 12:32:41 |
| 25 | MR. PAUL:  I am sorry, I meant July 14th. | 12:32:42 |

120

Brian Barr                                                            May 6, 2021

```
 1    Thank you.                                          12:32:45

 2        BY MR. PAUL:                                    12:32:46

 3        Q.   You have never seen this document before?  12:32:46

 4        A.   I did not.  I have not.                    12:32:48

 5        Q.   And did you have any communications with any of  12:32:49

 6    these entities in any manner concerning the plaintiffs:  12:32:56

 7    Aetna, Highmark Blue Cross Blue Shield, United    12:32:59

 8    Healthcare, Ohio State Chiropractic Board, Kentucky  12:33:02

 9    Board of Chiropractic Examiners?                  12:33:07

10        A.   Absolutely not.                           12:33:09

11        Q.   Are you aware of any communications that any of  12:33:10

12    those entities had with CSX following Dr. Heligman's  12:33:12

13    letter?                                            12:33:15

14        A.   I am not.                                 12:33:15

15        Q.   Okay.  In kind of the way that you referenced  12:33:18

16    the public law board and their upholding of -- of some  12:33:24

17    discipline and not upholding, perhaps, a handful of  12:33:29

18    others, was it important to you to find out if Aetna  12:33:32

19    Highmark, United Health, the State Chiropractic Boards  12:33:36

20    or the Railroad Retirement Board, what their conclusions  12:33:41

21    were, assuming they did an investigation upon receipt of  12:33:46

22    Dr. Heligman's letter?                             12:33:48

23        A.   No, other than, you know, we are good corporate  12:33:50

24    partners with -- with other companies and -- and, you  12:33:55

25    know, I was aware that they notified them, you know, at  12:33:56
```

121

USCA4    2500

```
 1    the conclusion of the investigation and summary.  But    12:33:59

 2    no, it was not anything in my wheelhouse to contact them  12:34:02

 3    or follow up with them whatsoever.                        12:34:07

 4        Q.   I mentioned to you earlier that, you know, part  12:34:09

 5    of Dr. Heligman's testimony, he testified, I will         12:34:18

 6    represent, he read from a document that was put before    12:34:24

 7    him, and other parts of the testimony, particularly in    12:34:29

 8    response to some union representatives, were not.  The    12:34:33

 9    question I have for you is, I know Labor Relations         12:34:37

10    didn't, and in particular Penny Dreher, did not recite    12:34:42

11    verbatim Dr. Heligman's testimony.  I think we have       12:34:46

12    established that, correct?                                12:34:50

13        A.   Correct.                                         12:34:51

14        Q.   I am trying to get to Dr. Heligman's part here.  12:34:51

15    Okay.                                                     12:35:02

16        A.   He is testifying there.                          12:35:04

17        Q.   He is, yeah.  Yep.  And again, this is an        12:35:05

18    example of, if you would like to review any of this in    12:35:08

19    more detail, you just let me know and we will take time   12:35:12

20    to do that.  But the question I wanted to ask you is on   12:35:14

21    the topic we are talking about.  It starts on this page.  12:35:19

22    Okay.  This is Bates number 969.  Are you able to see     12:35:37

23    this okay?  It is page 37.                                12:35:40

24        A.   I can.                                           12:35:42

25        Q.   Okay.  You know we are talking about extending   12:35:43
```

122

```
 1    health benefits as part of the reason that was in the      12:35:47

 2    termination letter.  So Dr. Heligman is testifying in      12:35:51

 3    the very last section here that, "In addition when RRB     12:35:56

 4    notifies CSXT of an employee sickness, the employee's      12:36:02

 5    health and welfare benefits continue to be paid by CSXT    12:36:06

 6    during the sickness for 2 years."  Do you see where I      12:36:10

 7    read that?                                                 12:36:13

 8         A.   I do.                                            12:36:13

 9         Q.   Okay.  And is that your understanding that that  12:36:14

10    was the alleged motivation of the plaintiffs in this       12:36:16

11    case with the fraud charges?                               12:36:19

12         A.   Yes.  And that you see before that where he      12:36:24

13    says they can be paid by Railroad Retirement Board         12:36:27

14    sickness benefits and a supplemental income from the       12:36:29

15    insurance provider from both benefits at the same time     12:36:33

16    in addition when there are -- you know, both of those      12:36:36

17    were my understanding.                                     12:36:39

18         Q.   Okay.  So both the receipt of money through      12:36:40

19    either sick -- sick benefits with Railroad Retirement      12:36:43

20    Board and the extended health coverage for which CSXT      12:36:44

21    pays the premiums?                                         12:36:50

22         A.   Yes, sir.                                        12:36:51

23         Q.   Okay.  Those are the two bases of -- of the      12:36:52

24    alleged intent to defraud?                                 12:36:55

25         A.   Yes, as -- as well as the potential that time   12:36:58
```

123

Brian Barr                                                          May 6, 2021

1    off -- you know, time off with -- was one of the others    12:37:04

2    that they could implement time off of this same            12:37:11

3    physician seeing them for the two months consecutive.      12:37:16

4        Q.   I am sorry.  I missed that part.  What do you     12:37:20

5    mean two months consecutive?                               12:37:22

6        A.   Every employee that went to these chiropractors   12:37:24

7    was off for two months, so the initial conversation when   12:37:27

8    the investigation was, you know, we had this fraud or is   12:37:29

9    every employee that seeks out this particular              12:37:32

10   chiropractic the same date gets two months off, if they    12:37:34

11   were currently working then, yeah, just got off, you       12:37:37

12   know, the two consecutive months in the summer.            12:37:39

13       Q.   Oh, okay.  So is that -- is that something you     12:37:41

14   suspected of fraud is that they wanted to have two         12:37:44

15   months off in the summer?                                  12:37:46

16       A.   Potentially yeah, that was why we -- you know,     12:37:48

17   that was part of the conversation when we launched the     12:37:50

18   investigation because not every person went for -- not     12:37:53

19   every person fell into the same bucket.  So, you know,     12:37:56

20   what would be the motivation there for going to the same   12:37:58

21   chiropractor?                                              12:38:02

22       Q.   And as far as just the two-month period of time   12:38:03

23   goes, not the summer, just the two-month period of time,   12:38:07

24   is there something you found suspicious about that in      12:38:09

25   terms of medical treatment?                                12:38:12

                                                                    124

Brian Barr                                                                    May 6, 2021

```
 1        A.   I mean, when it is -- when the conversation was    12:38:13

 2   offered to me that every single person gets the same        12:38:17

 3   amount of time off seemed odd to me.  In my experience,     12:38:21

 4   and again, I am not -- I am not a physician, but in my      12:38:26

 5   experience working here on the railroad at                  12:38:29

 6   transportation, mechanical, different departments, there    12:38:31

 7   is usually a variation in what time people come back.       12:38:34

 8   You know, people -- people come back in two weeks, four     12:38:37

 9   weeks, six weeks, you know, eight weeks, not usually a      12:38:40

10   consistent broad spectrum that everybody has that same      12:38:43

11   amount of time off.  I have people with skeletal or soft    12:38:48

12   tissue injuries who come back in 48 hours.                  12:38:51

13        Q.   Okay.  But I mean, it is accurate to say that     12:38:52

14   you don't have any medical knowledge that would say two     12:38:55

15   months is reasonable or unreasonable?                       12:38:57

16        A.   Like I said, I am agreeing with that.  When you   12:38:59

17   were asking me if I thought anything was odd about it       12:39:02

18   that no one had, you know, one week, two week, you know     12:39:05

19   what I mean?  It was all -- seemed to be exactly the        12:39:07

20   same.                                                       12:39:10

21        Q.   Okay.  And it is true you never had any           12:39:10

22   conversations with Dr. Heligman about that; is that         12:39:14

23   right?                                                      12:39:15

24        A.   Correct, I did not directly talk with            12:39:15

25   Dr. Heligman about that, correct.                           12:39:17
```

                                                                        125

Brian Barr                                                                    May 6, 2021

1        Q.   Okay.  Then when you mentioned that there was a      12:39:18

2    thought or a concern that the employees, including the      12:39:22

3    plaintiffs here, were attempting to get two months off      12:39:25

4    in the summer, who did you discuss that with?             12:39:28

5        A.   When I was in the conversation with either        12:39:31

6    Barry or Penny in the original, you know, exploring the   12:39:33

7    charge, you know, it was, you know, why would we have     12:39:38

8    40-some -- at the time, 40-some people that would be off  12:39:42

9    and all be marked off at the, you know, at the same       12:39:45

10   time.  And it was, you know, the thought process of why   12:39:48

11   that many people would seek out the same chiropractor in  12:39:53

12   the same town, you know.  And you are roughly talking,    12:39:55

13   you know, a summer here, you know, it is odd, you know,   12:39:58

14   that many people are off at the same time sending their   12:40:02

15   letters in July -- or June, whatever it was.             12:40:05

16       Q.   I am sorry.  Were you still talking?             12:40:07

17       A.   No, sir.                                         12:40:10

18       Q.   Oh, okay.  With -- I am going to break it down   12:40:11

19   in a moment, but did -- initially, did the fact that the  12:40:15

20   plaintiffs in this case marked off sick, did that in any  12:40:22

21   way affect the operations in Huntington or Russell,      12:40:27

22   Kentucky?                                                 12:40:32

23       A.   I mean, it always affects us when this many      12:40:33

24   people mark off sick, you know, or are off to some       12:40:39

25   degree.  But if you are that size of your work force and  12:40:42

126

Brian Barr                                                          May 6, 2021

```
 1    you have a substantial amount of people that are working   12:40:46

 2    that mark off, you know, it creates additional cost to     12:40:48

 3    the operations, and you have to make the decisions of      12:40:52

 4    when you are capable of repairing in the locomotive        12:40:55

 5    world or not at that point.                                12:40:59

 6        Q.   Well, I mean, yeah, I understand that.            12:41:00

 7    Specific to this period of time though, were there any     12:41:02

 8    actual problems in the operations in the mechanical        12:41:06

 9    department as a result of the plaintiffs laying off?       12:41:10

10        A.   I am -- I am sure that there were.  I don't --    12:41:15

11    you know, we transfer engines I am sure or things like     12:41:19

12    that.  I don't recall or didn't document them at the       12:41:22

13    time, but I am sure we had some -- some operational        12:41:24

14    events that did occur with this many people off.           12:41:28

15        Q.   So who would know that?  Like, the plant          12:41:30

16    manager in Huntington, would that be a good person to      12:41:32

17    ask?                                                       12:41:35

18        A.   Yeah, plant manager in Huntington, plant         12:41:35

19    manager in Russell.  Was there an impact?  Did we hit      12:41:37

20    our, you know, quota on the capital projects that were     12:41:41

21    afforded to be done that year in each quarter?  You        12:41:45

22    know, those -- just because, you know, we had them off     12:41:48

23    because we deferred work doesn't mean that we hit our      12:41:52

24    capital projects for the year or, you know, we put         12:41:54

25    air-conditioners on a locomotive, for instance, that you   12:41:56
```

127

Brian Barr                                                                    May 6, 2021

| 1 | do in -- or PTC that we had a criteria or had to | 12:41:59 |
| 2 | transfer engines for that work to be done somewhere | 12:42:02 |
| 3 | else. | 12:42:05 |
| 4 | Q.   Okay.  But weren't there a lot -- wasn't there | 12:42:05 |
| 5 | a lot of restructuring and downsizing in 2017 at CSX? | 12:42:08 |
| 6 | A.   Yeah, I call that right-sizing here at CSX in | 12:42:12 |
| 7 | 2017.  You know, we were mainstreaming.  There was a lot | 12:42:16 |
| 8 | of change for sure, but in the restructuring for sure. | 12:42:19 |
| 9 | But we were right-sizing some locations where we -- we | 12:42:22 |
| 10 | definitely had some reductions in the workforce.  We had | 12:42:27 |
| 11 | some engines taking different corridors.  At this, you | 12:42:30 |
| 12 | know, particular line segment, you can't count | 12:42:34 |
| 13 | Huntington into a lot of that over the coal reduction | 12:42:37 |
| 14 | because they were a -- they are a back shop facility. | 12:42:39 |
| 15 | They are not a production facility there at Huntington. | 12:42:42 |
| 16 | So as you are -- you're thinking about some of | 12:42:46 |
| 17 | those press releases where we did right-sizing and | 12:42:48 |
| 18 | implemented TSR.  You know, there were a lot of the | 12:42:51 |
| 19 | corridors in '17 and '18 when we were right-sizing with | 12:42:55 |
| 20 | the binding was on that corridor where we were running | 12:43:00 |
| 21 | trains on more of our core network and then we had an | 12:43:01 |
| 22 | interior network.  So we were pushing trains for faster | 12:43:05 |
| 23 | speed outside of there, and that is where a lot of the | 12:43:08 |
| 24 | changes happened. | 12:43:11 |
| 25 | Here at Huntington proper, this was a location | 12:43:12 |

128

May 6, 2021

```
 1    that had different work than that.  They are not a          12:43:14
 2    production shop.  We are not sending Qs in to come out      12:43:16
 3    and go on the train tomorrow.  Or we are not sending in     12:43:21
 4    something for a repair that is going to come out, you       12:43:23
 5    know, timely to make a Q-train.  We shuttle the power       12:43:26
 6    from Russell to Huntington, have a workforce there to       12:43:32
 7    overhaul it and shuttle it back.                            12:43:33
 8         Q.   Okay.  As you sit here today, can you remember    12:43:36
 9    any specific shortages as a result of the plaintiffs        12:43:38
10    laying off in 2017?                                         12:43:41
11         A.   I cannot remember back that far to be -- to be    12:43:45
12    honest.  I would be guessing if I gave you an answer.       12:43:47
13         Q.   Okay.  The second part of the question is, do     12:43:50
14    you remember if there were any shortages or disruptions     12:43:52
15    in production after the termination of over 50 employees    12:43:55
16    in that area?                                               12:44:00
17         A.   I think -- yeah, I definitely think that there    12:44:04
18    was -- there was some changes with -- the rebuild           12:44:07
19    process would there in Huntington, you know, capital        12:44:09
20    work we were putting in there, we sustain at that point     12:44:12
21    post-head count change.                                     12:44:15
22         Q.   Were the changes that -- that you referenced in   12:44:17
23    2017, was that brought on with the new CEO Hunter           12:44:23
24    Harrison?                                                   12:44:26
25         A.   You mean, with the restructuring?  Yes.  Well,    12:44:28
```

                                                                       129

Brian Barr                                                                                         May 6, 2021

```
 1   no.  No, there was not.  We started the restructuring on      12:44:31
 2   the Huntington Division the year prior in making some         12:44:35
 3   shifts with -- with coal reduction that -- that was           12:44:40
 4   happening on that particular corridor, and had some           12:44:45
 5   substantial changes there at Huntington and the               12:44:48
 6   Huntington Division the year prior to this that started       12:44:50
 7   the restructuring for this particular region based off        12:44:53
 8   of the volumes and the business need that was there.          12:44:56
 9        Q.   Okay.  Did you work directly with Mr. Harrison?     12:45:00
10        A.   I did.                                              12:45:03
11        Q.   Okay.  And once we get back to your educational     12:45:04
12   and work history, I will ask you about the chain of           12:45:08
13   command.  But just while we are on the topic, how did         12:45:11
14   you work with him, like, what was the relationship            12:45:14
15   business-wise?                                                12:45:16
16        A.   I was his direct report.                            12:45:17
17        Q.   Okay.  And he was the CEO; is that correct?         12:45:18
18        A.   Yes, sir.  I take that back.  I was not             12:45:22
19   actually his direct.  I was Cindy Sanborn's direct            12:45:26
20   report, and in October when she was separated, Jim Foot       12:45:29
21   replaced Ms. Sanborn in October.  And at that point, I        12:45:35
22   was not directly reporting to Mr. Harrison.  I was            12:45:38
23   directly reporting to Mr. Foot.  Mr. Harrison was just        12:45:42
24   vitally involved in the operations and I might have to        12:45:46
25   go see him when he was in town, and directly -- and           12:45:46
```

130

Brian Barr                                                                    May 6, 2021

```
 1   Mr. Foot was handling a lot of sales and marketing at    12:45:49

 2   the time.                                                12:45:51

 3       Q.   Okay.  But --                                   12:45:52

 4       A.   On paper, I did not report directly to Mr. --   12:45:54

 5   Mr. Harrison.                                            12:45:56

 6       Q.   Okay.  Got it.  Were you aware of any           12:45:57

 7   statements or discussions at work concerning             12:46:02

 8   Mr. Harrison's desire to get rid of employees who use    12:46:06

 9   family medical leave or health insurance?               12:46:10

10       A.   Absolutely not.                                 12:46:12

11       Q.   Do you have any knowledge -- well, let me ask   12:46:14

12   you this.  Did you have any job responsibilities back in 12:46:22

13   2017 or '18 with respect to train and engine folk?       12:46:24

14       A.   No, in 2017 and 2018, I did not.                12:46:33

15       Q.   Okay.  Were you aware of over 100 train and     12:46:38

16   engine people that were charged with misuse of FMLA      12:46:43

17   between Thanksgiving and New Year's Eve of 2017?         12:46:46

18       A.   I had heard in passing that there was charges   12:46:49

19   under FMLA.  I was not part of that or I didn't -- I     12:46:55

20   was, you know, working on my own organizations at the    12:46:58

21   time.  I didn't get involved with that or heard -- I     12:47:00

22   don't have any knowledge of that.                        12:47:04

23       Q.   Okay.  Other than just hearing about it at      12:47:05

24   work, you didn't have any direct involvement?            12:47:07

25       A.   Yeah, I just heard that there was some charges  12:47:09
```

131

Brian Barr                                                      May 6, 2021

```
 1    around the FMLA.                                  12:47:12

 2        Q.   Okay.  All right.  Back to this exhibit, I  12:47:12

 3    wanted to ask you, there is a section here -- do you see  12:47:16

 4    the lines off to the left, like, it says 17?      12:47:19

 5        A.   Yeah.                                     12:47:22

 6        Q.   Okay.  So in this question, Mr. Thoele is  12:47:22

 7    asking Mr. Heligman, "Based on your investigation,  12:47:27

 8    Dr. Heligman, what did you conclude?"  Dr. Heligman  12:47:30

 9    responds, "I found that the providers' actions and the  12:47:34

10    employees' actions to be a concerted effort to defraud  12:47:38

11    CSXT Railroad Retirement Board and the insurance   12:47:42

12    providers' extended benefits."  Do you see where I read  12:47:45

13    that?                                              12:47:48

14        A.   I do.                                     12:47:48

15        Q.   And -- and the fact that Dr. Heligman's   12:47:48

16    investigation concluded that, was that the basis and the  12:47:52

17    conversations that you had with Labor Relations to  12:47:54

18    terminate each of the plaintiffs?                  12:47:58

19        A.   Yeah, that -- that was certainly part of the  12:47:58

20    conversation, yes.                                 12:48:01

21        Q.   Then this next sentence I want to ask you if  12:48:01

22    you know anything about that.  The part that says the  12:48:04

23    welfare benefits cost to CSXT could be an additional  12:48:09

24    $16,000 per employee annually.  Do you see that?   12:48:12

25        A.   Yeah.                                     12:48:17
```

                                                          132

Brian Barr                                                                May 6, 2021

```
 1        Q.   Do you have any knowledge about those numbers?     12:48:20

 2        A.   I do not.  I know there was a dollar amount         12:48:22

 3   associated with it.  I -- I, you know, was told that         12:48:25

 4   post-investigation and subsequently read it in here          12:48:27

 5   preparing for this, but I don't -- I didn't come up with     12:48:30

 6   the -- I don't know -- I didn't come up with the             12:48:36

 7   $16,000.  I am sure that came from our finance group and     12:48:38

 8   Dr. Heligman.                                                12:48:41

 9        Q.   Okay.  And then a little further below where it    12:48:42

10   says in part, in fringe benefits for the two-year           12:48:45

11   extended health and welfare benefits, is it your            12:48:48

12   understanding that is what we talked about earlier, the     12:48:51

13   health and insurance premiums that CSX would have to pay    12:48:53

14   if the employee is marked off sick as opposed to being      12:48:57

15   laid off?                                                   12:49:00

16        A.   Yes.                                              12:49:00

17             (Simultaneous colloquy.)                          12:49:23

18             MR. PAUL:  That is understandable.                12:49:26

19   BY MR. PAUL:                                                 12:49:26

20        Q.   Actually, let me -- if we can go back to the       12:49:26

21   transcript, I will screen share.  But I want to ask you      12:49:55

22   if you were ever made aware of any suspicions about          12:49:57

23   either Dr. Carey or Dr. Johnson prior to the summer of       12:50:02

24   2017?                                                        12:50:06

25        A.   I was not.                                        12:50:07
```

                                                                        133

May 6, 2021

```
 1          Q.   Okay.  So we referenced a little bit about      12:50:09

 2   Dr. Heligman's testimony and some of it being kind of,      12:50:33

 3   you know, read into the record and others, you know,       12:50:36

 4   less so or not at all.  If I were to go through each and   12:50:39

 5   every one of these hearing transcripts to show you the     12:50:46

 6   results of Dr. Heligman's conclusions, would it be         12:50:51

 7   accurate to say that other than the summary provided to    12:50:57

 8   you from Labor Relations, you have never read them?        12:51:00

 9          A.   Yes.                                            12:51:02

10          Q.   Okay.  Do you have a recollection of that      12:51:03

11   example that I just gave you of Dr. Heligman's             12:51:07

12   conclusions when asked from Mr. Thoele, is that           12:51:10

13   consistent with what Labor Relations told you that in     12:51:15

14   each of the hearings concerning the plaintiffs under      12:51:18

15   your jurisdiction or department that Dr. Heligman's       12:51:20

16   conclusions were the same?                                 12:51:23

17          A.   Yes.                                            12:51:24

18          Q.   Okay.  So to be -- that was, I feel like, a    12:51:25

19   long question, so I am going to try to simplify it to     12:51:28

20   make sure I understand that -- I am happy to go through   12:51:31

21   these transcripts and read Dr. Heligman's conclusions.    12:51:35

22   But my question is, is it your recollection that in your  12:51:38

23   conversations with Labor Relations that led to your      12:51:41

24   decision to terminate the employees, that what we just   12:51:44

25   looked at in Exhibit 2 is accurate with Dr. Heligman's   12:51:47
```

                                                                            134

Brian Barr                                                              May 6, 2021

```
 1   conclusions?                                          12:51:51

 2        A.   Yes.                                        12:51:52

 3        Q.   For each and every one of the plaintiffs?  12:51:52

 4        A.   Yeah, it was very consistent on each one of the  12:51:55

 5   investigations.  Is that what -- is that what you were  12:51:57

 6   asking was the consistency in each investigation was the  12:52:03

 7   testimony?                                            12:52:05

 8        Q.   Well, let me -- I'll pull it back up just to --  12:52:06

 9        A.   What I'm saying in each of the investigations,  12:52:11

10   regardless which one it was, Dr. Heligman testified the  12:52:12

11   same consistently throughout each one of them, same  12:52:16

12   information.                                          12:52:18

13        Q.   That's correct.  Is that your understanding as  12:52:19

14   conveyed to you from Labor Relations?                 12:52:21

15        A.   That is correct.                            12:52:22

16        Q.   Okay.  You don't have the independent knowledge  12:52:23

17   because you weren't at the hearing and you didn't read  12:52:27

18   the transcripts?                                      12:52:29

19        A.   Correct.                                    12:52:30

20        Q.   Correct?  But by nature of that, you had to  12:52:31

21   rely upon the Labor Relations' summary of Dr. Heligman's  12:52:34

22   testimony and others for that matter?                 12:52:38

23        A.   Correct.                                    12:52:39

24        Q.   Were there any circumstances where you, after a  12:52:40

25   hearing, spoke to Labor Relations and decided not to  12:52:48
```

135

Brian Barr                                                        May 6, 2021

```
 1    pursue charges for any employee who treated with        12:52:50

 2    Dr. Carey or Dr. Johnson?                               12:52:54

 3        A.   No.                                            12:52:55

 4        Q.   I just want to go back up a little bit to the  12:52:58

 5    very beginning.  You testified you are currently senior 12:53:39

 6    vice president of network operations?                   12:53:42

 7        A.   Yes, sir.                                      12:53:45

 8        Q.   You have had that job for less than a week; is 12:53:46

 9    that right?                                             12:53:48

10        A.   That is correct.                               12:53:48

11        Q.   What job did you hold prior to that?          12:53:49

12        A.   Senior vice president northern region field   12:53:52

13    operations.                                             12:53:56

14        Q.   Okay.  And how long did you hold that position? 12:53:57

15        A.   Would you mind if I pulled out my phone and I 12:54:00

16    could give you the dates of them?  I am terrible on     12:54:08

17    that.  It was like, March of '18 or something of that   12:54:11

18    nature, from March of '18 until now.                    12:54:14

19        Q.   You're welcome to do that or give me an       12:54:15

20    estimate, whatever -- whatever you prefer.              12:54:16

21        A.   All right.  March of -- I am sorry.  March of 12:54:18

22    '19 to -- to this past Friday, I was senior vice        12:54:31

23    president of operations northern region.                12:54:35

24        Q.   Okay.  Was that a promotion to the network    12:54:38

25    position or lateral, or how would you describe it?      12:54:41
```

                                                                      136

Brian Barr                                                                May 6, 2021

```
 1        A.    It is a lateral position.              12:54:44

 2        Q.    Okay.  And why did you change?         12:54:45

 3        A.    Our restructuring with our chief operating    12:54:47

 4   officer, I took his direct reports to minimize the chief  12:54:51

 5   operating officer's direct reports, took on a portion of  12:54:54

 6   the company that we need to have improvement upon.    12:54:56

 7        Q.    And in summary fashion, can you describe what  12:54:59

 8   your job duties were as the supervisor of the north --    12:55:01

 9   or excuse me, senior vice president of the north field    12:55:06

10   operations?                                       12:55:09

11        A.    Yeah.  So senior vice president of operations  12:55:09

12   north -- north region, I was responsible for all field    12:55:14

13   operations for -- for about more than half of the    12:55:16

14   company, about two-thirds of the company.  I was    12:55:20

15   responsible for T&E and mechanical car operations in    12:55:22

16   that role.                                        12:55:27

17        Q.    Okay.  All right.                      12:55:28

18        A.    Network role that I have now, I am more    12:55:30

19   responsible for the operating plants where services are    12:55:33

20   and locomotive management, PTC, intermodal field    12:55:37

21   operations.                                       12:55:42

22        Q.    Okay.  And prior to that, what position did you  12:55:43

23   hold?                                             12:55:46

24        A.    Prior to that role, I was senior vice president  12:55:47

25   mechanical engineering from April 2018 to March of 2019.  12:55:52
```

137

Brian Barr                                                           May 6, 2021

```
1    With that, I had mechanical system shops and all of        12:55:59
2    engineering department.                                    12:56:05
3        Q.   Okay.  And so far, all of these jobs in           12:56:06
4    headquarters in Jacksonville?                              12:56:09
5        A.   Yes, sir.                                         12:56:11
6        Q.   And prior to that, how were you employed?         12:56:11
7        A.   I was vice president of mechanical from March     12:56:13
8    of 2017 to April of 2018.                                  12:56:16
9        Q.   Okay.  And that position would encompass the      12:56:20
10   position that you held when you issued the termination     12:56:25
11   decisions for the plaintiffs, right?                       12:56:28
12       A.   Yes, sir, that is correct.                        12:56:30
13       Q.   And -- I am sorry.                                12:56:34
14       A.   That was all mechanical, field operations as      12:56:36
15   well as the system shops.                                  12:56:38
16       Q.   So in approximate terms or range, how many        12:56:40
17   employees were you responsible for in that position?       12:56:44
18       A.   It was over 2,000 craft employees at the time.    12:56:46
19       Q.   And just for the record, can you explain during   12:56:51
20   that period of time when you were vice president of        12:56:53
21   mechanical department from March of '17 to April of '18,   12:56:56
22   what crafts specifically were you responsible for?         12:57:00
23       A.   Carmen, boilermakers, machinists, electrician,    12:57:03
24   firemen and oilers, clerical that reported up through      12:57:10
25   mechanical and -- I am missing one.                        12:57:13
```

138

Brian Barr                                                    May 6, 2021

```
 1        Q.   Sheet metal?                              12:57:22
 2        A.   Sheet metal workers.  Don't forget, general  12:57:22
 3   chair.                                               12:57:26
 4        Q.   Okay.  What about electricians?           12:57:28
 5        A.   Yeah, electricians.  I think I stated that  12:57:31
 6   electricians I was responsible for as well.         12:57:34
 7        Q.   Okay.                                      12:57:36
 8        A.   Machinists, electricians, sheet metal workers  12:57:43
 9   are the primary.  Boilermakers, clerical, firemen and  12:57:45
10   oilers are the six primary, and carmen were the seventh.  12:57:51
11        Q.   Okay.  All right.  Has there been -- are you  12:57:55
12   aware of any efforts on behalf of CSX to combine the job  12:58:01
13   duties of those crafts into one position or less     12:58:09
14   positions?                                          12:58:14
15        A.   Which positions are you referring to?     12:58:15
16        Q.   Any of the ones that you just mentioned that  12:58:22
17   you were responsible for supervising back in that time  12:58:24
18   period.                                             12:58:26
19        A.   You know, prior to me taking that vice    12:58:27
20   president of mechanical role, there was some -- some  12:58:29
21   conversation about looking to combine some of the duties  12:58:30
22   there.  The -- but a lot of it is around the union   12:58:33
23   agreement, there is an article that allows for work to  12:58:39
24   be consolidated that is less than four hours of primary  12:58:41
25   duties of one role so that we can get efficiencies out,  12:58:44
```

                                                              139

```
 1    you know, for instance, carrying water to an engine.    12:58:49

 2    Anyone can add the water, but one particular craft, at  12:58:49

 3    least in that craft has to come out and put a guru valve 12:58:53

 4    in, which is like putting a penny into a fish tank.  We  12:58:57

 5    have that one employee, call him in if he's at home so   12:59:02

 6    we can have water to an engine.  You know, it was like a 12:59:05

 7    one-minute thing.  So we -- we had leveraged that       12:59:06

 8    agreement, you know, articles in the -- Article 8 of the 12:59:10

 9    union agreement, all of the union agreements to be able 12:59:12

10    to put the guru in with multiple crafts.                12:59:15

11        Q.   Okay.  What is that called?  I mean, I know --  12:59:20

12    is there a terminology for that like, cross utilization  12:59:21

13    or just -- I don't know.  You mentioned something I      12:59:25

14    think from the Collective --                             12:59:28

15        A.   Article -- I believe it is Article 8 from the   12:59:28

16    Collective Bargaining Agreement but it is -- you know,   12:59:29

17    it is shared responsibilities and duties that allow for  12:59:32

18    one craft to do work that is not exclusivity in craft    12:59:35

19    work.                                                    12:59:39

20        Q.   Okay.  So at CSX while you have been there,     12:59:40

21    have you -- were you ever made aware or involved in any  12:59:43

22    efforts to have more shared responsibilities between the 12:59:49

23    crafts?                                                  12:59:54

24        A.   I have absolutely implemented more shared       12:59:56

25    responsibilities between the crafts.                     01:00:02
```

                                                                    140

Brian Barr                                                                May 6, 2021

```
 1      Q.    Okay.  And how have you -- how have you done        01:00:03

 2   that?                                                        01:00:06

 3      A.    I signed into an agreement with the general        01:00:07

 4   chairman that utility carmen work out in the field where    01:00:10

 5   they can attach -- we defer with the FRA, use the           01:00:14

 6   application of the Federal Railroad Administration          01:00:19

 7   rules, educated our employees and developed the training    01:00:20

 8   program.  I compensate the employees for it when they're    01:00:24

 9   utilizing it, but it is called a utility carmen where       01:00:25

10   they can help apply a brake or release a brake, they can    01:00:28

11   hang an EOT while attaching to the crew to help expedite    01:00:32

12   service of the train.                                       01:00:36

13      Q.    Okay.  And it sounds like from your answer that    01:00:37

14   these are negotiations that you have had with general       01:00:39

15   chairmen?                                                   01:00:43

16      A.    Yes, I had the conversation with general           01:00:43

17   chairmen and our Labor Relations Department fixes the       01:00:47

18   wording and gets it signed off on and works with finance    01:00:51

19   to help with compensation for it, but I -- I generate       01:00:56

20   the conversation with general chairmen.                     01:00:57

21      Q.    Are these called side letters or something --      01:00:59

22      A.    I mean, there -- there are side letters that --    01:01:03

23   that are called for within the union organization.  Some    01:01:06

24   of these, you know, we -- I mean, they are                  01:01:10

25   implementations of procedures that were allowed to be       01:01:13
```

141

Brian Barr                                                                May 6, 2021

```
 1    done in the past that we didn't necessarily do.        01:01:17

 2        Q.   Okay.  All right.  Prior to the vice president  01:01:21

 3    position, how were you employed at CSX?               01:01:26

 4        A.   I was the chief mechanical officer for the     01:01:28

 5    southern region encompassing half of the company when we  01:01:31

 6    had nine divisions, I had half -- or we had 10       01:01:38

 7    divisions, I had five of them at the time.           01:01:44

 8        Q.   Okay.  Was that also --                      01:01:46

 9        A.   Jacksonville.                                01:01:49

10        Q.   -- in Jacksonville?                          01:01:50

11        A.   That was also at the headquarters.           01:01:52

12        Q.   Okay.  Have you always worked at headquarters?  01:01:54

13        A.   Absolutely not.  We have a long list to go   01:01:56

14    through here.                                         01:01:58

15        Q.   Prior to --                                  01:01:59

16             MS. BIRD:  That's from reading off his phone.  01:02:02

17             THE DEPONENT:  Yeah.  Prior to the CMO of the  01:02:07

18    southern region, I was the division manager in       01:02:09

19    Huntington.  From December of 2013 to 2016, I was     01:02:11

20    responsible for the Huntington Division, which operated  01:02:14

21    through multiple states.  I was responsible for the T&E  01:02:19

22    that operated though there and partnered with mechanical  01:02:24

23    engineering and signals --                           01:02:27

24        Q.   Mechanics position in Jacksonville?  Sorry.  01:02:28

25        A.   That was the position -- no, that was in the  01:02:30
```

                                                                              142

USCA4    2521

Brian Barr                                                                    May 6, 2021

```
 1    field.  That was in Huntington, West Virginia.          01:02:31

 2        Q.   So division manager in Huntington and so it    01:02:34

 3    sounds like you were responsible for some train and     01:02:36

 4    engine crafts as well?                                  01:02:41

 5        A.   Yeah, 100 percent transportation.              01:02:41

 6        Q.   Oh, okay.  It was 100 percent transportation.  01:02:43

 7    So was that --                                          01:02:46

 8        A.   Yeah, I was transportation division manager and 01:02:47

 9    I had a dotted line to mechanical engineering.  You     01:02:49

10    know, they didn't report directly to me, but I was the  01:02:51

11    division manager for transportation for the most part in 01:02:54

12    Huntington.                                             01:02:59

13        Q.   Okay.  Where did you physically work when you  01:02:59

14    were division manager, like, at what building?          01:03:02

15        A.   7th Avenue there in Huntington, West Virginia, 01:03:04

16    just around the corner from the locomotive shop.        01:03:07

17        Q.   Okay.  Did you have any job responsibilities in 01:03:10

18    that position over the locomotive shop?                 01:03:12

19        A.   The locomotive shop was a heavy repair shop.   01:03:14

20    It wasn't part of the regional structure.  It was set   01:03:18

21    apart, and that was  managed by Charlie Harris at the   01:03:22

22    time and CMO in Jacksonville that encompassed project   01:03:26

23    shop, such as back shop in Waycross, Huntington and  the 01:03:30

24    car shop in Tampa.                                      01:03:35

25        Q.   Okay.                                          01:03:37
```

                                                                    143

Brian Barr                                                                May 6, 2021

```
 1        A.   I went there.  You know, I went there and        01:03:37

 2   interacted, you know, when we would have safety meetings   01:03:40

 3   and did tours.  So I mean, I physically was there.  It     01:03:43

 4   was literally around the corner from my office.            01:03:45

 5        Q.   Okay.  And prior to that, how were you           01:03:47

 6   employed?                                                  01:03:50

 7        A.   I was assistant division manager in              01:03:51

 8   transportation from October 2010 to August 2013 in        01:03:53

 9   Atlanta, Georgia.                                          01:03:57

10        Q.   When you were division manager in Huntington,   01:04:02

11   what did you say -- 2013 to 2016?                          01:04:09

12        A.   Yes, sir.                                        01:04:11

13        Q.   Did you have any experiences there with any of  01:04:12

14   the railroad employees at CSX as being dishonest or       01:04:14

15   untruthful?                                                01:04:18

16        A.   At the locomotive shop in particular, I         01:04:19

17   don't -- I didn't manage it, so I did not have the        01:04:27

18   correspondence with them on their charges.  I had the     01:04:31

19   network -- I had the field operations' side.  The --      01:04:34

20   Huntington reported to a different structure than         01:04:37

21   directly to the field positions at that time.             01:04:40

22        Q.   That is okay.  My question was intentionally a  01:04:42

23   little bit broader.  Just in that position of division    01:04:46

24   manager while you were in Huntington, did you experience  01:04:48

25   any dishonesty or fraudulent conduct on behalf of any     01:04:51
```

144

Brian Barr                                                          May 6, 2021

1    CSX employees that you interacted with?                    01:04:56

2         A.   I mean, not to -- not to -- to this degree, but  01:04:58

3    I am sure I had some investigations that were regarding,   01:05:05

4    you know, dishonesty at the time from 2013 to '16.         01:05:07

5    Given the three years I was there, I am sure there was     01:05:11

6    one investigation, but I don't -- I don't have a summary   01:05:13

7    of those.                                                  01:05:15

8         Q.   Okay.  Well, let me ask it another way.  When    01:05:16

9    you were division manager in Huntington from 2013 to       01:05:19

10   2016, did any of your experiences there predispose you     01:05:22

11   to believe that the employees in the Huntington area at    01:05:26

12   CSX were dishonest?                                         01:05:31

13        A.   Absolutely not.                                  01:05:32

14        Q.   And the same question, did anything in that      01:05:33

15   experience as division manager make you believe that any   01:05:36

16   of the employees at CSX were predisposed to commit         01:05:41

17   fraud?                                                      01:05:45

18        A.   Absolutely not.                                  01:05:45

19        Q.   All right.  And what position did you hold       01:05:46

20   prior to the division -- assistant division manager in     01:05:52

21   Georgia?                                                    01:05:55

22        A.   I was the plant superintendent at Selkirk        01:05:56

23   locomotive shops in Selkirk, New York.                     01:06:03

24        Q.   And what year was that approximately?            01:06:03

25        A.   October 2009 to September 2010.                  01:06:06

                                                                    145

Brian Barr                                                    May 6, 2021

```
 1      Q.   And what type plant was that?            01:06:09

 2      A.   Locomotive shop.                          01:06:14

 3      Q.   And prior to that, how were you employed? 01:06:16

 4      A.   I was the terminal superintendent in Waycross, 01:06:18

 5 Georgia, from April 2008 to October 2009.  It is -- it's 01:06:22

 6 a hump yard facility.                               01:06:27

 7      Q.   So that's all -- that's in the transportation 01:06:28

 8 department?                                         01:06:30

 9      A.   Yes.                                      01:06:30

10      Q.   And prior to that?                        01:06:31

11      A.   Prior to that, I was terminal superintendent at 01:06:33

12 Willard, Ohio, from February 2007 to March 2008.   01:06:36

13      Q.   And prior to that?                        01:06:42

14      A.   Assistant terminal superintendent at Willard, 01:06:44

15 Ohio, from June 2005 to June -- or excuse me, to January 01:06:48

16 2007.                                               01:06:52

17      Q.   Okay.  And prior to that?                 01:06:52

18      A.   Terminal trainmaster Avon, Indiana, hump yard, 01:06:54

19 May 2004 to June 2005.                              01:06:57

20      Q.   Is that a union position or a non-union   01:06:59

21 position?                                           01:07:02

22      A.   That was a non-union position.            01:07:02

23      Q.   And prior to that?                        01:07:04

24      A.   Terminal manager Indianapolis, Indiana,   01:07:07

25 Hawthorne, August 2003 to April 2004.              01:07:10
```

                                                        146

Brian Barr                                                              May 6, 2021

```
 1        Q.    That is also in transportation?           01:07:14

 2        A.    Also in transportation.                   01:07:16

 3        Q.    And prior to that?                         01:07:18

 4        A.    District superintendent Indianapolis, Indiana,  01:07:19

 5   February 2003 to July 2003.                           01:07:23

 6        Q.    Prior to that?                             01:07:26

 7        A.    Supervisor of train operations within the train  01:07:27

 8   dispatching center, January 2002 to January 2003,    01:07:31

 9   Indianapolis, Indiana.                                01:07:37

10        Q.    How many more do we have on here?          01:07:39

11        A.    Just one more.  Train dispatcher for       01:07:41

12   Conrail/CSX, January 1998 to January 2002.  And that was  01:07:46

13   a craft position, which I still pay dues to this day.  01:07:51

14             MS. BIRD:  You do.                          01:07:56

15             THE DEPONENT:  I do, ATDA.                  01:07:57

16   BY MR. PAUL:                                          01:07:59

17        Q.    And where were you working as a train      01:07:59

18   dispatcher?                                           01:08:02

19        A.    Indianapolis, Indiana.                     01:08:03

20        Q.    And there was a merger there where some of  01:08:05

21   Conrail's territory went to Norfolk Southern and some  01:08:09

22   and some went to CSX in 1999; is that right?         01:08:12

23        A.    That's correct.                            01:08:16

24        Q.    But your job basically stayed the same as a  01:08:17

25   train dispatcher?                                     01:08:20
```

147

Brian Barr                                                          May 6, 2021

```
 1        A.   I did.  I was a train dispatcher prior to split    01:08:21

 2   date and post to split date.                                 01:08:25

 3        Q.   Was that your first railroad job anywhere?         01:08:26

 4        A.   It was.  I am originally from Philadelphia,        01:08:29

 5   Pennsylvania.  I applied as a conductor in Philadelphia.     01:08:31

 6   They explained to us how we were going to be furloughed      01:08:33

 7   from Easter to -- or from Thanksgiving to Easter and         01:08:36

 8   offered us the train dispatching job in Pittsburgh,          01:08:37

 9   which I accepted and wound up being awarded in               01:08:41

10   Indianapolis, Indiana.  It wasn't really that close, but     01:08:42

11   I was 20 years old and I was willing to go.                  01:08:45

12        Q.   Okay.  Was that in Green Tree in Pittsburgh?       01:08:48

13        A.   I am sorry?                                        01:08:52

14        Q.   Did you work in Green Tree in Pittsburgh?          01:08:52

15        A.   I was -- I was from Philadelphia and I took        01:08:55

16   this job in Indianapolis.                                    01:08:58

17        Q.   Oh, I am sorry.  I thought you said something      01:08:59

18   about Pittsburgh.                                            01:09:02

19        A.   No.  No, that is where they told me I was going    01:09:02

20   to.  I am sorry.  When I applied in Philly and they          01:09:04

21   said, you know, you got hired as a conductor, we offer a     01:09:07

22   job under Conrail in Pittsburgh, and I was all for it.       01:09:09

23   And when it was awarded, it was actually Indianapolis.       01:09:12

24        Q.   Got it.  Okay.                                     01:09:16

25        A.   They were more short there than Pittsburgh, so     01:09:16
```

                                                                       148

Brian Barr                                                   May 6, 2021

| | | |
|---|---|---|
| 1 | I got the luxury of moving myself at 20 years old. | 01:09:18 |
| 2 | Q.  Well, I am from Pittsburgh.  That is why it | 01:09:22 |
| 3 | probably caught my attention.  All right. | 01:09:26 |
| 4 | (Simultaneous colloquy.) | 01:09:33 |
| 5 | BY MR. PAUL: | 01:09:34 |
| 6 | Q.  I went to a Steelers/Eagles game once and | 01:09:34 |
| 7 | someone gave me a bullet. | 01:09:38 |
| 8 | A.  Lucky they didn't throw some green paint on | 01:09:41 |
| 9 | you. | 01:09:43 |
| 10 | Q.  That was after security too. | 01:09:44 |
| 11 | All right.  So you hired on as a train | 01:09:46 |
| 12 | dispatcher, I'm sorry, 1998? | 01:09:51 |
| 13 | A.  Yes, sir, January of '98. | 01:09:54 |
| 14 | Q.  And how old were you then? | 01:09:55 |
| 15 | A.  I was 20 years old. | 01:09:57 |
| 16 | Q.  Okay.  And any prior full-time employment? | 01:09:59 |
| 17 | A.  Yeah, prior to that, I was like, at | 01:10:01 |
| 18 | LensCrafters making eyeglasses, you know, prior to that. | 01:10:06 |
| 19 | Q.  Okay.  And how did you find out about the job | 01:10:08 |
| 20 | opportunity, I guess, with Conrail at that time? | 01:10:12 |
| 21 | A.  At the time, I -- they were running ads in the | 01:10:14 |
| 22 | paper, you know, that they were hiring.  I was going to | 01:10:21 |
| 23 | West Chester University and they recruiting pretty | 01:10:22 |
| 24 | heavily at colleges, so I applied.  And they explained | 01:10:24 |
| 25 | to us that we would be able to work there and get our | 01:10:29 |

149

Brian Barr                                                        May 6, 2021

```
 1   degree off the extra board.  Once I got hired, that     01:10:32

 2   wasn't necessarily true.  I dropped out of college      01:10:34

 3   because I had to take the job to move to Indianapolis.   01:10:38

 4   Subsequently, I worked for Oscar Munoz that would not    01:10:40

 5   promote me from assistant division manager to division  01:10:43

 6   manager without my degree.  So it took me about six     01:10:46

 7   years of part-time college while I was a superintendent 01:10:49

 8   at, you know, multiple states at that point.  My wife,  01:10:52

 9   you know, was about to have her third child.  I was     01:10:54

10   going to school part-time in multiple states to finally 01:10:57

11   get my degree from Bellevue.                            01:11:00

12       Q.   From which university, Bellevue?                01:11:02

13       A.   Bellevue University.                            01:11:03

14       Q.   You mentioned extra board.  Can you just        01:11:05

15   explain what that is, for the record?                   01:11:08

16       A.   Extra board is when you -- in the train         01:11:10

17   dispatcher craft position, there is regular assigned    01:11:13

18   jobs and then there is an extra board, which you are a   01:11:18

19   fill-in for multiple territories.  You get called in    01:11:20

20   two-hour notice to show up and work an eight-hour shift. 01:11:23

21   You are on-call -- you're on-call around the clock and  01:11:27

22   you are just called to come in on the first, second or  01:11:29

23   third shift.                                             01:11:32

24       Q.   Does that exist for positions other than        01:11:33

25   dispatchers?                                             01:11:35
```

                                                                    150

Brian Barr                                                                    May 6, 2021

```
 1        A.   Yes, it exists for T&E ranks as well; not so    01:11:36

 2   much in mechanical.  Mechanical has positions that are    01:11:41

 3   awarded, which is outside of mechanical have --           01:11:44

 4   mechanical and engineering don't have extra boards;       01:11:48

 5   transportation does.                                      01:11:51

 6        Q.   Okay.  Got it.  So I wanted to ask you about    01:11:52

 7   your educational background.  You mentioned you started   01:11:54

 8   college in West Chester.                                  01:11:57

 9        A.   Yeah, I started -- I originally went to -- yeah 01:11:58

10   Delaware County Community College, West Chester           01:12:04

11   University, dropped out when I took the job for the       01:12:06

12   railroad, and had to really start over because it was     01:12:08

13   more than a 10-year gap at Bellevue University, and got   01:12:12

14   my degree from there.                                     01:12:16

15        Q.   Okay.  So when did you start again with         01:12:17

16   Bellevue roughly?                                         01:12:18

17        A.   Hang on one second.  I was -- it was when I was 01:12:19

18   at Wheeler, which was around 2007 -- 2006/2007 and        01:12:25

19   graduated in 2013.                                        01:12:39

20        Q.   Okay.  And that was going to night school       01:12:41

21   primarily?                                                01:12:44

22        A.   Yes.                                            01:12:44

23        Q.   And what degree did you get?                    01:12:45

24        A.   Bachelor of Science business administration.    01:12:47

25        Q.   Okay.  And any other formal education?          01:12:50
```

151

USCA4    2530

Brian Barr                                                    May 6, 2021

1         A.    I mean, I have a bunch of certificates like,    01:12:54

2     Harvard Business School, you know, for that couple of    01:12:57

3     weeks and you've got to do the project and go back and   01:12:59

4     present on it.  But they were really certificates from   01:13:03

5     CSX that they partner with -- our CEO went to Harvard so 01:13:06

6     we all went to Harvard after that.                       01:13:10

7         Q.    Okay.  Which CEO is that you are referring to? 01:13:13

8         A.    Michael Ward.                                  01:13:16

9         Q.    Yeah, okay.  All right.  So those were paid for 01:13:17

10    by CSX to promote your management skills presumably?     01:13:19

11        A.    The college was paid for by me.  I had some     01:13:22

12    slight reimbursement, like, you know, $2,500 a year but  01:13:26

13    I paid for college, you know, most of it out-of-pocket.  01:13:29

14    The certificates were from CSX to further my skill set.  01:13:32

15        Q.    Okay.  Got it.  Yeah, I was referring to the    01:13:36

16    certificates there.  Okay.  Any other education that we  01:13:38

17    haven't talked about?                                    01:13:43

18        A.    Depending if you, you know, how you -- I don't  01:13:44

19    know if you're familiar with CSX, but like, every year   01:13:47

20    we have annual training that we do.  We have a conductor 01:13:49

21    certification that I have to carry, blue flag            01:13:52

22    certification that I carried when I was in mechanical.   01:13:55

23    You know, the -- all of the policies that govern the     01:13:57

24    environment and, you know, FMLA and ethics, you know, I  01:14:00

25    do all of those, but I don't count that as formal        01:14:03

                                                                    152

1    training.  It is yearly training that we do within CSX.    01:14:06

2       Q.   Well, you read my mind because I am going to    01:14:09

3    ask you about training next.  But before we do that, are    01:14:12

4    there any other certifications that -- that you have    01:14:14

5    that we haven't talked about, I mean, other than -- I    01:14:17

6    understand what you said about the conductor    01:14:20

7    certification and things like that.  I mean, more of an    01:14:23

8    educational?    01:14:25

9       A.   No.    01:14:26

10      Q.   Not to -- as opposed to required certifications    01:14:28

11   just going to a university or other class like that?    01:14:33

12      A.   Yeah, no, I do not.    01:14:37

13      Q.   Okay.  All right.  Now when it comes to    01:14:38

14   training, can you tell me what training you have had at    01:14:40

15   CSX under the Family Medical Leave Act?    01:14:44

16      A.   You know, I know we -- we get guidance on it --    01:14:47

17   on what I called the POD over the years in -- in    01:14:51

18   training.  We -- in transportation, you take a yearly    01:14:53

19   rules test, and then they -- there is other criteria    01:14:57

20   other than the operating rules and the physical    01:15:00

21   characteristics test, you know, so it changes    01:15:02

22   intermittently.  But there is things on safety and how    01:15:05

23   you report an injury.  You know, there has been FMLA    01:15:08

24   training, environmental training, you know, we have    01:15:11

25   the -- the information that has been on posters and    01:15:13

153

Brian Barr                                                                    May 6, 2021

```
 1   things like that.  But I definitely have the training.    01:15:18
 2   But again, you know, I like Jolanda Johnson and the        01:15:27
 3   different people that work in FMLA at the headquarters      01:15:27
 4   that are the experts on it that we confer with when we      01:15:27
 5   have a question.                                            01:15:31
 6       Q.   First thing is what a POD, just so we can get      01:15:32
 7   that on the record?                                         01:15:34
 8       A.   A POD is a computer program.  It is referred to    01:15:35
 9   as a POD.  You can't do anything in automotive than what   01:15:39
10   is pushed to you from CSX, kind of a dummy tube.  It is    01:15:42
11   attached to the monitor and it passes information.  You    01:15:45
12   log in with your Social Security number or FFID, and       01:15:49
13   then there is a spot for -- if it is a session that is     01:15:52
14   monitored by a manager, they will log in to authorize     01:15:55
15   that it's visually you that's going to take the test and   01:15:59
16   someone -- they have see you while you take the test.      01:16:00
17   But that is a POD on that.  I don't know what the          01:16:05
18   acronym of the POD is for, but under the POD training,     01:16:07
19   it is our safety department, our legal department, they    01:16:10
20   gather what is expected of every field manager and craft   01:16:13
21   employee and distribute that information through an        01:16:17
22   annual training program.                                   01:16:20
23       Q.   Okay.  And is that the rules test or is that      01:16:21
24   something different?                                        01:16:23
25       A.   That is different.  We had a rules test on the    01:16:25
```

                                                                          154

USCA4    2533

Brian Barr                                                    May 6, 2021

```
 1   POD and we had -- in transportation, we had a written      01:16:29

 2   rules test for most of my time there where we had a        01:16:31

 3   separate written rules that we were required to take       01:16:35

 4   that was timed and monitored as well.                      01:16:38

 5       Q.   Okay.  I had asked you specific about the FMLA     01:16:39

 6   or the family medical leave.  Is the training that you     01:16:43

 7   received on the FMLA, was that through the POD?             01:16:45

 8       A.   I believe we have had training on FMLA through     01:16:48

 9   the POD at one point where it was referenced on.  We       01:16:50

10   have -- also in meetings that I've scheduled when I was    01:16:54

11   a division manager or superintendent, you know, people    01:16:59

12   explain what FMLA is, you know, as a guideline.  I mean,   01:17:01

13   it is commonly known and discussed, you know, here        01:17:04

14   within the railroad what the FMLA is, what the            01:17:06

15   guidelines are, you know, how it is marked off, how do    01:17:09

16   you -- how do you get it.  We have to explain to our      01:17:15

17   employees, you know, what they get it for, and we openly  01:17:17

18   talk about it.  I don't know that -- I don't know that I  01:17:19

19   ever saw like a quiz on it or anything though, but I      01:17:24

20   believe majorly it has been passed down.                  01:17:27

21       Q.   And did I understand you correctly that your     01:17:29

22   testimony was that FMLA training you received was part    01:17:32

23   of the annual rules test or not?                          01:17:34

24       A.   No, it is not part, no.  No, sir.                01:17:36

25       Q.   So you got the rules test over there by itself,  01:17:39
```

155

Brian Barr                                                    May 6, 2021

```
 1   right?                                          01:17:42
 2        A.   Right, yes, separate, completely separate, the   01:17:42
 3   rules test.                                     01:17:44
 4        Q.   Okay.                                 01:17:45
 5        A.   After the rules test, other items pop up as   01:17:45
 6   educational knowledge, so it could be like,     01:17:48
 7   environmental, you know, if you find tires dumped, this   01:17:50
 8   is what it does to the environment, you know.  There is   01:17:53
 9   other things along the way that were pushed to us over   01:17:55
10   the years.                                      01:17:58
11        Q.   Okay.  So if I broaden my question just a   01:17:58
12   little bit and just ask you, and we can restrict this   01:18:01
13   to, say, the past 10 years while you have been employed   01:18:04
14   at CSX, what training have you had with respect to state   01:18:07
15   or federal employment discrimination laws such as the   01:18:09
16   Americans with Disabilities Act, Rehabilitation Act,   01:18:13
17   FMLA, or other similar employment laws?         01:18:16
18        A.   So I am required to read them and sign off that   01:18:19
19   I read them in my position.  They are every -- at least   01:18:22
20   once a year, if not sometimes quarterly, depending on   01:18:26
21   the turnover and the rate that they come out.  I have to   01:18:29
22   certify to certain things every year, you know.  And   01:18:36
23   like our Code of Ethics, our goals, you know, I certify.   01:18:38
24   And part of that is, you know, that I will even go to   01:18:44
25   Canada and part of it is the Code of Ethics.  And there   01:18:48
```

                                                             156

Brian Barr                                                                May 6, 2021

```
 1   is some different things on there about the Disability    01:18:52

 2   Act that I certify that I understand.                     01:18:54

 3        Q.   Okay.  And just when you are saying you         01:18:56

 4   certify, are you saying that you have to certify the      01:18:58

 5   receipt of certain policies?                              01:19:01

 6        A.   Yes, that I -- policy comes up, it is timed     01:19:03

 7   that I have to read it.  It is the only thing that I can  01:19:07

 8   see there on the monitor.  I have to certify that I have  01:19:10

 9   read it in that time frame.                               01:19:12

10        Q.   And that is on the POD?                         01:19:14

11        A.   That -- for me, no, it's not on the POD.  I get 01:19:15

12   it pushed via the certification that goes as part of the  01:19:19

13   quarterly stock report.  For the quarterly stocks         01:19:23

14   report, I get all of that every time that I have to       01:19:30

15   certify, you know, the findings of -- of the numbers.     01:19:32

16        Q.   Okay.  So that's why -- okay.  So it sounds     01:19:35

17   like some of -- some of the certifications are annual     01:19:39

18   and some are quarterly; is that right?                    01:19:40

19        A.   Correct.                                        01:19:42

20        Q.   Okay.  So in addition to acknowledging and      01:19:43

21   reading the receipt of certain written policies, what     01:19:46

22   training, if any, have you had under any state or         01:19:49

23   federal employment laws?  So training -- do you           01:19:53

24   understand what I mean by that?                           01:19:56

25        A.   I do.  I don't -- I don't remember any class or 01:19:57
```

                                                                            157

Brian Barr                                                          May 6, 2021

```
 1    training on those particular policies.              01:20:00

 2        Q.   Okay.  So you don't remember any type of   01:20:02

 3    classroom or even POD training on anything specific to  01:20:04

 4    state or federal employment laws like the Americans with  01:20:08

 5    Disabilities Act or Family Medical Leave Act?       01:20:11

 6        A.   I remember -- I mean, I remember like the flier  01:20:14

 7    comes up that we have to hang -- post it in every room  01:20:18

 8    you know, in every office building, the posters and  01:20:21

 9    stuff, what the requirement is for that.  You see them  01:20:25

10    once you go in the facility.  But I have people come  01:20:26

11    back in wheelchairs that were off on short-term     01:20:30

12    disability or long-term disability, and I am explaining  01:20:32

13    what I have to do to be compliant with that, but I don't  01:20:36

14    remember.  I know as they come up, they push information  01:20:39

15    to me from the lawyers.  I know I see the posters.  I  01:20:42

16    know it pops up, but I don't remember any interactive  01:20:45

17    classroom training on it.                           01:20:47

18        Q.   Okay.  No, that's fine.  I just --         01:20:48

19        A.   When they come up, I know I have to comply  01:20:50

20    with.                                               01:20:52

21        Q.   Okay.  But it sounds like those events that you  01:20:53

22    have to comply with are reading and acknowledging   01:20:55

23    receipt of written policies; is that right?         01:20:58

24        A.   Yeah.                                       01:21:00

25        Q.   Okay.  I mean, just to give you an example, I  01:21:02
```

                                                                        158

Brian Barr                                                          May 6, 2021

```
 1   am happy to -- like, I guess we can look at one.       01:21:05

 2           MS. BIRD:  Let me place, Greg, I mean, an      01:21:11

 3   objection I guess.  This witness has been produced to  01:21:14

 4   testify about a certain part of the Rule 30(b)(6) Notice 01:21:17

 5   of Deposition.  At this part we are really far afield of 01:21:21

 6   the topics for which he was requested and produced.  I  01:21:24

 7   am allowing this to go on at some point because I think 01:21:28

 8   it directly relates to -- could directly relate to his 01:21:31

 9   decision-making, but we are getting close to being way 01:21:37

10   far away from the request for a topic to be covered in  01:21:42

11   this witness' production for the topics we covered.      01:21:44

12           MR. PAUL:  Okay.  I think I understand your     01:21:47

13   objection.  I do think it is related to the decision-   01:21:49

14   making function, but the good news is there is only a   01:21:51

15   little bit left.                                         01:21:55

16           MS. BIRD:  Kind of just like the ruling, the    01:21:57

17   notice that -- I am just telling you that at some point, 01:21:59

18   just to let you know.                                    01:22:01

19           MR. PAUL:  Yeah, I get it.  I get it.  We are   01:22:02

20   getting there.                                           01:22:04

21           Just on this topic just, for instance, we will  01:22:06

22   mark this.  Are we up to Exhibit 3 or 4?  I can't quite 01:22:09

23   remember.                                                01:22:13

24           THE VIDEOGRAPHER:  We have done two exhibits so 01:22:14

25   far.                                                     01:22:18
```

                                                          159

USCA4    2538

Brian Barr                                                                 May 6, 2021

```
 1              MR. PAUL:  All right.  So we will mark this as   01:22:18

 2    Exhibit 3, please.                                        01:22:20

 3              (Exhibit 3 was marked for identification.)      01:22:21

 4         BY MR. PAUL:                                         01:22:22

 5         Q.   Mr. Barr, if you could take a look, I mean, not 01:22:22

 6    so much at these frequently asked questions but looking   01:22:26

 7    at this one, which starts on Bates 22200, I mean, have    01:22:29

 8    you seen this before?                                     01:22:35

 9         A.   I mean, this is -- this is what I am referring  01:22:35

10    to.  I mean, like, here is some of the policies that I    01:22:37

11    will get, and some of them under my signature go out to   01:22:40

12    the field team to -- to be educated on it.  But this is,  01:22:42

13    like, the kind of material that we get.  When you see     01:22:44

14    the frequently asked questions, this is going out to      01:22:46

15    some of the junior managers that have craft employees     01:22:49

16    that report to them.  So it gives them a basis, a         01:22:52

17    minimal education on what it is.  And then they always    01:22:56

18    say at the bottom, you know, contact the expert if, you   01:22:58

19    know, required kind of scenario.  But any time you see    01:23:01

20    those with the frequently asked questions, that's things  01:23:02

21    that we push out to the field and a lot of times          01:23:05

22    under -- under my -- my authority and I cover it with     01:23:07

23    the field personnel.                                      01:23:11

24         Q.   Okay.                                           01:23:12

25         A.   Depending on the department I work in.          01:23:12
```

                                                                    160

Brian Barr                                                                    May 6, 2021

```
 1        Q.   Okay.  And my -- my question is, is this      01:23:15

 2   exhibit an example of a policy at CSX?  In this case, we  01:23:19

 3   have looked at one related to FMLA.  Is that --          01:23:23

 4        A.   Yeah, so there will be a policy and then this  01:23:25

 5   is the attachment that goes with the policy.  Like,      01:23:28

 6   they'll write the, you know, FMLA law, and then this     01:23:31

 7   just goes with that as a -- as a training date.          01:23:33

 8        Q.   Okay.                                          01:23:36

 9        A.   This is not -- we would not send an instructor 01:23:36

10   out to go through it.  Like, I would send it out, you    01:23:39

11   know, to the employees so that they understand it.       01:23:42

12        Q.   Okay.  And I guess the distinction I am just   01:23:44

13   trying to make is if it's correct that this is an        01:23:46

14   example of a policy, in this case FMLA, that's different 01:23:48

15   than any training you have received.  Does that make     01:23:51

16   sense?                                                   01:23:53

17        A.   No.                                            01:23:54

18        Q.   Okay.  So in addition to receiving, in this    01:23:55

19   case the FMLA policy, and acknowledging the receipt of   01:23:59

20   it, have you ever actually had any training on what this 01:24:02

21   policy means, like, a classroom training or through      01:24:06

22   video, something of that means?                          01:24:09

23        A.   I mean, since the conception when I worked here 01:24:11

24   before we had FMLA and since we have had FMLA, it's      01:24:15

25   definitely been explained to me over the years.  I       01:24:18
```

                                                                         161

Brian Barr                                                    May 6, 2021

1    don't -- I have never had classroom training on it, but     01:24:21

2    we have these kinds of things where we go over it and,      01:24:24

3    you know, we realize the challenges.  I understand the,     01:24:27

4    you know, employees get mark-off time for a doctor's        01:24:31

5    appointment, that they get variable amounts of time if      01:24:34

6    they can.  There's an allotment per month for -- for        01:24:37

7    mark-off days on some and not on others, but I -- I         01:24:38

8    understand what it is and go through it.  But I don't       01:24:41

9    remember having a classroom training.  I think it's just    01:24:44

10   more education throughout the course of the year that we    01:24:47

11   cover these kinds of items.                                 01:24:50

12       Q.   Okay.  That was my next and probably last          01:24:51

13   question is, did it -- did that type of education, say,     01:24:54

14   that you were just talking about on the FMLA, did that      01:24:59

15   come up, like, on an employee-specific basis, or is it      01:25:01

16   more general?                                               01:25:04

17       A.   We would -- well, we do it on an                   01:25:05

18   employee-specific basis.  It would never happen.  Like,     01:25:08

19   we would never go over an individual employee what          01:25:11

20   their -- you know, what their FMLA is and do a training     01:25:13

21   on that.                                                    01:25:15

22       Q.   No, no.  I didn't mean it like that.  I meant      01:25:15

23   like did an incident come up concerning a specific         01:25:18

24   employee and then you consulted with another department,   01:25:21

25   like the FMLA department, to see what the options were     01:25:24

                                                                      162

Brian Barr                                                    May 6, 2021

```
 1   as compared to just a more generic type of training?   01:25:27

 2        A.   Yeah, I mean, if there is -- if there is 60   01:25:30

 3   people that marked off for Christmas Eve and Christmas   01:25:33

 4   Day and they all had doctors' appointments FMLA, which   01:25:35

 5   we don't see because it is embedded in the Medical      01:25:38

 6   Department with upper management.  So in a way I don't   01:25:41

 7   see people that mark off Red Block that are drunk while  01:25:45

 8   they are at work or drunk and on-call, I don't see them, 01:25:46

 9   they're embedded.                                        01:25:50

10        But if I have like, 60 people that show marked      01:25:50

11   off FMLA and it's Christmas Day, we would ask, "Hey, do  01:25:53

12   they all have doctor appointment visits, or is this for  01:25:55

13   flare-ups?"  They say they all have doctor's             01:25:58

14   appointments, but it would be questionable why the       01:26:00

15   doctor sees them all on, you know, Thanksgiving day or   01:26:03

16   Christmas Day kind of thing.  And that is -- you know,   01:26:06

17   those kind of conversations may come up, you know, on    01:26:09

18   occasion.  But those scenario-based ones definitely we   01:26:12

19   get educated on very quickly.                            01:26:18

20        Q.   Okay.                                          01:26:20

21        A.   Because you would think FMLA is a doctor's     01:26:20

22   visit, but it might not necessarily to be for flare-ups. 01:26:22

23   It just happens that everyone has them on the third      01:26:24

24   Thursday of every November.  Did I answer your question? 01:26:29

25   I don't want to be vague there.                          01:26:40
```

163

Brian Barr                                                      May 6, 2021

```
 1        Q.   My question was just drawing a distinction      01:26:42
 2   between whether the education that you had with respect   01:26:46
 3   to some of the employment laws like the FMLA that we      01:26:50
 4   have been talking with came from outside of the policies  01:26:53
 5   that we have just looked at, if there was any actual       01:26:58
 6   training on them?                                          01:27:00
 7        A.   Yeah.  So Labor Relations has educated, FMLA    01:27:01
 8   has, you know, they have had conversations with us about  01:27:05
 9   application of them or, you know, what the policies mean   01:27:07
10   in application.                                            01:27:10
11        Q.   Okay.  And you mean with like the management?    01:27:11
12        A.   Correct.                                          01:27:14
13        Q.   Okay.                                             01:27:15
14        A.   Right.                                            01:27:15
15        Q.   And is that just broadly speaking, have you     01:27:16
16   received training like that regarding employment laws on  01:27:20
17   an annual basis or not?                                    01:27:23
18        A.   Yes.                                             01:27:25
19        Q.   Okay.  All right.  Are you able to see this     01:27:26
20   very large document?                                       01:27:53
21        A.   I can.                                           01:27:55
22        Q.   Okay.  You understand that you have been        01:27:56
23   designated as a corporate representative today on one of  01:28:00
24   the topics of this deposition notice?                      01:28:03
25        A.   Yes, sir, that is true.                          01:28:05
```

                                                                    164

Brian Barr                                                    May 6, 2021

```
 1        Q.   I believe it is Number 11, so I am going to    01:28:08

 2   look at that.  Is that big enough or you need me to blow  01:28:10

 3   that up?                                                  01:28:13

 4        A.   No, that's good.                                01:28:13

 5        Q.   So the topic 11 is to "Identify and produce the 01:28:14

 6   person or persons most knowledgeable who made the         01:28:17

 7   decision or had any input concerning the decision to      01:28:19

 8   charge, discipline and terminate plaintiffs."  Do you     01:28:22

 9   see where I read that?                                    01:28:25

10        A.   I do see where you read that.                   01:28:26

11        Q.   So from what we have covered so far, we know     01:28:28

12   that you are the person that gave the green light to       01:28:32

13   issue the charge, and you are the person that made the     01:28:35

14   decision to terminate each and every one of the            01:28:37

15   plaintiffs, correct?                                       01:28:39

16        A.   No.  Each and every one of the mechanical        01:28:41

17   plaintiffs.  I don't know if there are more plaintiffs     01:28:44

18   than mechanical.                                           01:28:46

19        Q.   Thank you.  Each and every one of the            01:28:47

20   plaintiffs for the hearing where I believe Mr. Thoele      01:28:49

21   testified, but it was all but a handful of the             01:28:55

22   plaintiffs; is that correct?                               01:28:57

23        A.   Mr. Thoele held the investigation, but that is   01:28:58

24   correct, it is all by him.                                 01:29:02

25        Q.   And when it comes to the second part of that     01:29:04
```

                                                                    165

Brian Barr                                         May 6, 2021

```
1    question about any input concerning the decision to      01:29:07

2    charge, discipline or terminate the employees -- or the  01:29:10

3    plaintiffs rather, with respect to the mechanical        01:29:14

4    employees, is that correct that you have testified on    01:29:16

5    behalf of the corporation that you received              01:29:20

6    recommendations from the Labor Relations Department,     01:29:22

7    including from Penny Dreher and also Barry Morton and    01:29:26

8    Melissa Wheaton?                                         01:29:33

9         A.   That is correct.                              01:29:34

10        Q.   Okay.  Is there anyone else who gave any input 01:29:35

11   in any way related to your decision to discipline the    01:29:39

12   plaintiffs in the mechanical department that you were    01:29:43

13   over?                                                    01:29:45

14        A.   No.  It was just myself.  You know, other than 01:29:45

15   who I've mentioned no, I don't have anyone else that     01:29:49

16   helped me with that.                                     01:29:51

17        Q.   Okay.  Well, I know -- well, I know that you   01:29:52

18   made the decision; you have testified.  But I just want  01:29:57

19   to be crystal clear about it that the only other people  01:29:59

20   that -- that you -- that gave you input concerning the   01:30:03

21   decision to terminate the plaintiffs were the three      01:30:05

22   people I listed from the Labor Relations Department,     01:30:08

23   Penny Dreher, Barry Morton and Melissa Wheaton, right?   01:30:12

24        A.   That is correct.                              01:30:15

25        Q.   And actually, let me drill down on that because 01:30:15
```

166

Brian Barr                                                    May 6, 2021

```
 1   you definitely talked about conversations with Penny    01:30:20

 2   specific to the decision to terminate.  Did you actually 01:30:21

 3   ever speak with Barry Morton or Melissa Wheaton          01:30:24

 4   concerning the decision to terminate, not the decision   01:30:27

 5   to charge?                                               01:30:29

 6       A.   Yeah.  So -- and I know we said HR and I agree, 01:30:29

 7   but Barry -- or Labor Relations, Barry is in -- Barry is 01:30:33

 8   in Labor Relations.  I am sorry.  So I definitely        01:30:37

 9   notified him because he is the one who works with        01:30:40

10   general chairman on the head count, and that kind of     01:30:43

11   thing.  So I definitely conferred with Barry and let him 01:30:46

12   know, and I definitely had a conversation with Melissa,  01:30:49

13   Penny's supervisor.                                      01:30:52

14       Q.   All right.  Let me back up a minute, because    01:30:52

15   there is a difference between you letting Barry Morton   01:30:54

16   and Melissa Wheaton know about your decision to          01:30:57

17   terminate versus my question, which is who are the       01:31:00

18   people that provided any input concerning the decision   01:31:02

19   to terminate the plaintiffs?                             01:31:05

20       A.   I would say Penny -- Penny was the one I had    01:31:06

21   most of the conversation with, and I am sure I followed  01:31:09

22   up with Melissa, who was her supervisor to confer with   01:31:11

23   her that that was -- you know, making the verification   01:31:15

24   that was the decision I was going to make.  Barry, I     01:31:20

25   would have just notified, you know, that I did it.       01:31:22
```

167

Brian Barr                                                                    May 6, 2021

```
 1        Q.   Okay.  So -- and to be like, thorough about it    01:31:24

 2   or more complete, it sounds like you notified Barry         01:31:27

 3   Morton in a similar way that you notified Cynthia --        01:31:30

 4   what was her last name again?                               01:31:35

 5        A.   Sanborn, that is correct.                         01:31:37

 6        Q.   Sanborn, you notified them; is that correct       01:31:39

 7   rather than receiving input from them?                      01:31:42

 8        A.   That is correct.                                  01:31:44

 9        Q.   Okay.  So when it comes to receiving input for    01:31:44

10   the decision to terminate, not charge, but to terminate,    01:31:47

11   it is really only Penny Dreher and --                       01:31:50

12        A.   Melissa Wheaton.                                  01:31:55

13        Q.   -- and Melissa Wheaton; is that correct?          01:31:56

14        A.   That is correct.                                  01:31:58

15        Q.   Okay.  And we talked in detail earlier about      01:31:58

16   the conversations you had with Penny, but what was it       01:32:02

17   specific to the decision to terminate that you talked to    01:32:05

18   Melissa Wheaton about?                                      01:32:07

19        A.   So Melissa was over field administration.  She    01:32:09

20   was the head of it at that time.  Everyone reported up      01:32:12

21   to her, so it was in conversation with, you know, are       01:32:15

22   the facts there that would support this charge?  Would      01:32:19

23   we be able to hold the dismissal into the field?  If        01:32:21

24   that was the case and, you know, how did the                01:32:24

25   investigations go?  How was the testimony of                01:32:30
```

                                                                           168

Brian Barr                                                          May 6, 2021

```
 1    Dr. Heligman, you know, similar conversation that I had    01:32:32

 2    with Penny but shorter since I got most of the facts        01:32:35

 3    from Penny.                                                 01:32:38

 4        Q.   Okay.  With the conversations that you had with   01:32:39

 5    Melissa Wheaton, how many do you think you had              01:32:41

 6    concerning the decision to terminate?                       01:32:44

 7        A.   I am sure after the first case, I certainly        01:32:45

 8    did.  I know -- I don't know -- I don't believe I           01:32:48

 9    followed up with her on each and every individual one.      01:32:50

10    I think after the initial -- initial wave of them, I        01:32:52

11    don't believe I followed up with Melissa beyond that.       01:32:55

12        Q.   Okay.  And what -- were those in-person or         01:32:58

13    telephone or e-mail?                                        01:33:00

14        A.   I believe they were -- they were probably over    01:33:00

15    the telephone.  Melissa is another one that works right     01:33:03

16    there in the office that may have come into my office       01:33:06

17    for them, because I interacted with her a lot at that       01:33:08

18    time, but they were over the telephone.                     01:33:12

19        Q.   And you -- you and Ms. Wheaton, you're on the      01:33:14

20    same floor at headquarters?                                 01:33:16

21        A.   We were not on the same floor, but we were in     01:33:17

22    the same building.  And, you know, she supported field      01:33:19

23    operations, and I had some of the larger part of the        01:33:23

24    field operations.  So the transportation, mechanical,       01:33:26

25    and engineering she would interact with the three of us     01:33:29
```

169

```
1   there often.                                        01:33:34

2        Q.   Okay.  And what was Melissa Wheaton's input as  01:33:34

3   it relates to your decision to terminate the plaintiffs?  01:33:40

4        A.   That she definitely -- she 100 percent would  01:33:43

5   support it with reading the transcript.  She -- she was  01:33:47

6   re-reading them, you know, kind of the fact that she  01:33:50

7   wanted to verify them and was able to support the fact  01:33:53

8   that if I terminated, she -- she -- we were in this --  01:33:56

9   part of the Collective Agreement, we were in the time  01:34:01

10  frame that we complied with the CBA, and that we -- we  01:34:03

11  get the mailing out and have those handled and looked  01:34:07

12  like it was a solid case for termination.  01:34:11

13       Q.   Did Ms. Wheaton tell that you she herself read  01:34:13

14  all of the transcripts and reviewed the exhibits?  01:34:17

15       A.   I don't know that she read all of them.  I know  01:34:19

16  she had knowledge of them.  I -- I didn't ask her.  01:34:23

17  Penny had -- Penny I had talked to.  She read it  01:34:25

18  page-for-page.  I verified that.  I didn't verify that  01:34:27

19  with Melissa, to be honest.  I know that she had -- you  01:34:30

20  know, she had facts on it but I don't know that she read  01:34:33

21  them.                                              01:34:36

22       Q.   Okay.  Once again, if you don't know the answer  01:34:36

23  just tell me, but was it your understanding that Melissa  01:34:39

24  Wheaton was getting the information of these plaintiffs  01:34:42

25  from Penny Dreher or doing her own investigation into  01:34:47
```

170

Brian Barr                                                              May 6, 2021

```
 1   them?                                                01:34:49

 2       A.   I think Melissa read them.  I think Melissa  01:34:49

 3   read them.                                           01:34:52

 4       Q.   Okay.  And your basis for that, I guess, would  01:34:53

 5   be that Melissa told you that?                       01:34:53

 6       A.   Through the -- through the conversation and --  01:34:55

 7   and, you know, as the conversation was ongoing.      01:34:57

 8       Q.   Okay.  So at least -- without knowing exactly  01:34:59

 9   what she did, at least can you testify that it is your  01:35:03

10   understanding that you believe that Melissa Wheaton read  01:35:06

11   each of the transcripts and reviewed the exhibits for  01:35:09

12   each of the plaintiffs?                              01:35:11

13       A.   Yes.                                         01:35:13

14       Q.   And I believe you said earlier, she -- she was  01:35:15

15   Penny Dreher's boss?                                 01:35:20

16       A.   Yeah.  The way I recall the structure at that  01:35:21

17   time, Penny was the field admin at that time.  It was in  01:35:23

18   2000 at this time frame in July, it was her role, right?  01:35:25

19   And I know that -- I am almost sure that is what Penny's  01:35:30

20   role was at this particular date, and Melissa Wheaton  01:35:35

21   was the head of field administration at that time.   01:35:38

22   Right around this time, Penny had two roles.  She went  01:35:43

23   there and she went to Labor Relations.  I think at this  01:35:44

24   time, she was a field admin.  Shortly after the summer,  01:35:47

25   she made a lateral role to Labor Relations.          01:35:49
```

                                                              171

Brian Barr                                                                    May 6, 2021

```
 1        Q.   Okay.  I am sorry.  I thought field          01:35:53

 2   administration was within Labor Relations?             01:35:55

 3        A.   It is, but it's like, you know, a specialty. 01:35:57

 4   You know what I mean?  Like, there is different roles  01:36:00

 5   within Labor Relations organization.                   01:36:03

 6        Q.   Okay.                                         01:36:04

 7        A.   So you have Labor Relations that deals with the 01:36:04

 8   union agreement.  You have Labor Relations that deals  01:36:07

 9   with field administration.  You have Labor Relations   01:36:10

10   that deals with different departments, so there is     01:36:12

11   different jobs within the Labor Relations umbrella.    01:36:15

12        Q.   Okay.  And it is your understanding that Penny 01:36:19

13   Dreher switched positions sometime in 2017?            01:36:24

14        A.   You know like, '17 or '18 she -- she switched 01:36:27

15   positions, yes.                                         01:36:29

16        Q.   Okay.                                         01:36:30

17        A.   At this -- at this point in time though, I   01:36:30

18   think she was over the LR or over the -- you know, she 01:36:34

19   was working with field admin at this point in time.    01:36:37

20   Penny was her -- and Melissa was her supervisor.       01:36:40

21        Q.   Okay.  Now, I know earlier I asked you       01:36:43

22   questions about any communications with the medical    01:36:46

23   department, but I don't recall if I asked you whether  01:36:48

24   you had any communications regarding any of the        01:36:51

25   plaintiffs in your department with the -- Jolanda      01:36:53
```

172

```
 1    Johnson or anyone in the FMLA Department?          01:36:57

 2        A.   I did not.                                01:36:59

 3             MR. PAUL:  Okay.  All right.  Let me just take  01:37:00

 4    a short break.  I think I am almost done.  Let me just  01:37:07

 5    check a couple things.                             01:37:10

 6             THE VIDEOGRAPHER:  Counsel, this exhibit you  01:37:12

 7    have up, is that part of Exhibit 3 or is that a new one?  01:37:13

 8             MR. PAUL:  That is a new one.  I am sorry.  01:37:17

 9    Yeah, let's mark that as Exhibit 4.  If it wasn't for  01:37:19

10    you, I wouldn't have any exhibits in this deposition.  01:37:22

11             (Exhibit 4 was marked for identification.)  01:37:25

12             MR. PAUL:  All right.  We good for five    01:37:27

13    minutes?  Does anybody need longer?                01:37:29

14             THE VIDEOGRAPHER:  We are going off the record.  01:37:32

15    The time is 1:37.                                  01:37:33

16             (Off the record.)                         01:37:35

17             THE VIDEOGRAPHER:  We are back on the record.  01:44:14

18    The time is 1:44.                                  01:44:36

19        BY MR. PAUL:                                   01:44:39

20        Q.   All right, Mr. Barr, we are back on the record  01:44:39

21    after a short break.  Do you know who Macon Jones is?  01:44:41

22        A.   I do.  Macon Jones is a CSX attorney that is in  01:44:46

23    the LR -- I mean, probably the HR department.  But he is  01:44:51

24    a lawyer.  He goes over discipline and we work with him  01:44:57

25    on reading statements and compliance.              01:45:00
```

173

Brian Barr                                                                May 6, 2021

```
 1        Q.   Did you have any communications with Macon    01:45:02

 2   about the plaintiffs in this case?                      01:45:05

 3        A.   Not that I recall.                            01:45:07

 4        Q.   And do you know if -- is Melissa Wheaton still 01:45:08

 5   employed?                                               01:45:14

 6        A.   She is not, but I -- I don't know where she    01:45:14

 7   went to.                                                01:45:17

 8        Q.   Okay.  And do you know when she left, roughly? 01:45:17

 9        A.   I mean, it is something -- I can look it up and 01:45:22

10   see if I can find it.  It looks like May of 2018.       01:45:28

11        Q.   And you don't know where she is now you said?  01:45:51

12        A.   She was -- I just looked on LinkedIn on my cell 01:45:54

13   phone.  She was like, senior director Labor Relations at 01:45:57

14   U.S. -- oh wait.  Founder and principal attorney now at  01:46:00

15   TEPS Law, LLC.                                          01:46:07

16        Q.   And I apologize if I asked you this at the     01:46:09

17   beginning of the deposition but I forget at this time,   01:46:16

18   other than speaking with an attorney, did you consult    01:46:18

19   with any -- anybody in preparation for today's           01:46:21

20   deposition?                                             01:46:25

21        A.   I did not.                                   01:46:25

22        Q.   Okay.  And who gave you the authority to       01:46:26

23   testify today on behalf of the company?                 01:46:30

24        A.   David Weisblatt, CSX attorney.                01:46:32

25        Q.   I take it Mr. Weisblatt is in the law          01:46:37
```

174

```
1    department?                                          01:46:39

2        A.   He is.  He works for -- under Nathan Goldman  01:46:40

3    umbrella.                                            01:46:47

4        Q.   Okay.  Who is that?                          01:46:47

5        A.   Executive Vice President of Law for CSX.     01:46:47

6        Q.   Got it.  Okay.                               01:46:53

7        A.   He's also Executive Vice President of --     01:46:53

8            MS. BIRD:  For corp.                          01:46:56

9            THE DEPONENT:  For corp and legal.            01:46:58

10           MR. PAUL:  All right.  I don't have any other  01:47:09

11   questions for you today.  Thank you.                 01:47:10

12           MS. BIRD:  I don't have any questions either,  01:47:11

13   and we will read and sign.  We will order a transcript.  01:47:13

14   We'll also order the video, but I do not need it -- that  01:47:17

15   it be synced.  I think I hit all the -- all the dots  01:47:21

16   there.                                               01:47:26

17           THE VIDEOGRAPHER:  Yeah, you did.  Okay.  I   01:47:26

18   will read us off then.  We are going off the record and  01:47:28

19   this concludes today's deposition, and the time is 1:47.  01:47:33

20           (Proceedings concluded at 1:47 p.m.)

21

22

23

24

25
```

175

USCA4   2554

1         IN THE UNITED STATES DISTRICT COURT FOR THE

2             SOUTHERN DISTRICT OF WEST VIRGINIA

3                      AT HUNTINGTON

4

5    - - - - - - - - - - - - - x

6    JUSTIN ADKINS, et al.,      :

7              Plaintiffs,       :   Case No.

8       v.                       :   3:18-CV-00321

9    CSX CORPORATION, et         :

10   al.,                        :

11             Defendants.       :

12   - - - - - - - - - - - - - x

13

14          30(b)(6) Videotaped Deposition of

15                  KELLY CROUCH, R.N.

16            Conducted Remotely via Zoom

17              Thursday, May 13, 2021

18                  8:51 a.m. PST

19

20

21

22

23   Reported By:

24       AMY L. STRYKER, CCR No. 30XI00226900

25    Job No.:  237727

                                                            1

Kelly Crouch, R.N.                                                          May 13, 2021

1              30(b)(6) Videotaped Deposition of KELLY

2       CROUCH, R.N., conducted remotely.

3

4

5              Pursuant to notice, before AMY L.

6       STRYKER, Certified Court Reporter and Notary

7       Public of the State of Maryland.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                                            2

Kelly Crouch, R.N.                                                    May 13, 2021

```
 1              A P P E A R A N C E S
                   (Via Zoom)
 2

 3        For the Plaintiffs:

 4            MORGAN & PAUL, PLLC

 5            BY:  GREGORY G. PAUL, ESQ.

 6            100 First Avenue, Suite 1010

 7            Pittsburgh, Pennsylvania 15222

 8            (844) 374-7200

 9            gregpaul@morganpaul.com

10

11        For the Plaintiffs:

12            UNDERWOOD LAW OFFICE, INC.

13            BY: JOHN PATRICK L. STEPHENS, ESQ.

14            923 Third Avenue

15            Huntington, West Virginia 25701

16            (304) 486-3350

17

18

19

20

21

22

23

24

25
```

3

Kelly Crouch, R.N.                                                                                     May 13, 2021

```
 1        A P P E A R A N C E S   C O N T I N U E D

 2

 3         For the Defendants:

 4             NELSON, MULLINS, RILEY & SCARBOROUGH, LLP

 5             BY: MELISSA FOSTER BIRD, ESQ.

 6             949 Third Avenue, Suite 200

 7             Huntington, West Virginia 25701

 8             (304) 526-3500

 9             melissa.fosterbird@nelsonmullins.com

10

11         Also Present:

12             JASON PATSILIS, VIDEOGRAPHER

13

14

15

16

17

18

19

20

21

22

23

24

25
```

                                                                                                      4

Kelly Crouch, R.N.                                                    May 13, 2021

```
 1                    C O N T E N T S

 2

       EXAMINATION OF KELLY CROUCH, R.N.
 3                                              PAGE

 4         By Mr. Paul                            7

 5

                        E X H I B I T S
 6
                 (Attached to transcript.)
 7

       Exhibit 1   Plaintiffs' Amended Notice    9
 8                 of 30(b)(6) Deposition and
                   Request for Production of
 9                 Documents

10     Exhibit 2   Attending Physician's         28
                   Return to Work Report
11                 (instructions and form)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

5

```
 1              P R O C E E D I N G S

 2          THE VIDEOGRAPHER:  Good morning.  We are

 3    on the record.  Here begins the remote           08:51:03

 4    deposition of Kelly Crouch in the matter of       08:51:07

 5    Adkins versus CSX Corporation.  This is           08:51:12

 6    presiding in the United States District Court     08:51:16

 7    for the Southern District of Western Virginia     08:51:19

 8    at Huntington, Case No. 3:18-CV-00321.  Today's   08:51:23

 9    date is May 13, 2021, and the time is 8:51 a.m.   08:51:33

10    Pacific Standard Time.                            08:51:40

11          The video operator today is Jason           08:51:42

12    Patsilis, representing Network Deposition         08:51:45

13    Services located at 1800 Century Park East,       08:51:49

14    Suite 150, in Los Angeles, California; phone      08:51:52

15    number - (310) 557-3400.  The court reporter      08:51:58

16    this morning is Amy Stryker.  This is a remote    08:52:02

17    deposition through Zoom videoconferencing.        08:52:05

18          Would counsel present please identify       08:52:08

19    yourselves for the record and who you             08:52:09

20    represent.

21          MR. PAUL:  This is Greg Paul on behalf

22    of the plaintiffs.                                08:52:14

23          MS. FOSTER BIRD:  Melissa Foster Bird on    08:52:17

24    behalf of CSX Transportation and the defendants   08:52:19

25    in this case.                                     08:52:21
```

                                                              6

| | | |
|---|---|---|
| 1 | THE VIDEOGRAPHER:  The court reporter | 08:52:23 |
| 2 | will now administer the oath to the witness. | 08:52:25 |
| 3 | KELLY CROUCH, R.N., | |
| 4 | after having been duly sworn, testified as | |
| 5 | follows: | |
| 6 | EXAMINATION | |
| 7 | Y MR. PAUL: | |
| 8 | Q   Hi, Ms. Crouch.  My name is Paul.  We | 08:52:40 |
| 9 | just finished your deposition of -- in your | 08:52:43 |
| 10 | individual capacity, so I guess this is | 08:52:46 |
| 11 | technically your second deposition in your | 08:52:48 |
| 12 | life, right? | 08:52:50 |
| 13 | A   Yes. | 08:52:51 |
| 14 | Q   Okay.  If I were to ask you your | 08:52:51 |
| 15 | biographical and work history and all that | 08:52:55 |
| 16 | information that we just went over earlier | 08:52:59 |
| 17 | today, would it be the same? | 08:53:00 |
| 18 | A   Yes. | 08:53:03 |
| 19 | Q   Okay.  Since then, have you thought of | 08:53:04 |
| 20 | any corrections that needed to be made to | 08:53:06 |
| 21 | anything concerning your work history, chain of | 08:53:07 |
| 22 | command, that type of thing? | 08:53:10 |
| 23 | A   No. | 08:53:11 |
| 24 | Q   Okay.  And if you do, just let me know. | 08:53:14 |
| 25 | Right now we're going to get into some | 08:53:16 |

7

| | | |
|---|---|---|
| 1 | topics that were identified in what's called a | 08:53:19 |
| 2 | 30(b)(6) notice of deposition, and you've been | 08:53:22 |
| 3 | designated along with others in my | 08:53:24 |
| 4 | understanding, Topics 1 through 5. | 08:53:27 |
| 5 | MR. PAUL:  Is that correct, Counsel? | 08:53:28 |
| 6 | MS. FOSTER BIRD:  That's correct. | 08:53:29 |
| 7 | MR. PAUL:  Okay. | 08:53:31 |
| 8 | And we'll make that an exhibit right | 08:53:31 |
| 9 | now. | 08:53:33 |
| 10 | Q   But before we do that, I just want to | 08:53:34 |
| 11 | ask you:  Are you famil- -- is that your | 08:53:36 |
| 12 | understanding, and do you agree that you are | 08:53:39 |
| 13 | presenting testimony here today on behalf of | 08:53:41 |
| 14 | the corporation? | 08:53:43 |
| 15 | A   Yes. | 08:53:44 |
| 16 | Q   And what did you do to prepare for | 08:53:44 |
| 17 | Topics 1 through 5 for today's corporate | 08:53:46 |
| 18 | deposition? | 08:53:49 |
| 19 | A   Discussed with my counsel. | 08:53:49 |
| 20 | Q   Okay.  Other than, you know, | 08:53:53 |
| 21 | conversations with counsel, did you review any | 08:53:55 |
| 22 | documents or talk to anybody else? | 08:53:59 |
| 23 | A   I reviewed the 30(b)(6) document. | 08:54:00 |
| 24 | Q   Okay.  Let's take a look at that right | 08:54:03 |
| 25 | now.  And are you able to see that? | 08:54:05 |

8

Kelly Crouch, R.N.                                                    May 13, 2021

| | | |
|---|---|---|
| 1 | A    Yes. | 08:54:14 |
| 2 | Q    Okay.  I'll scroll through it to get to | 08:54:14 |
| 3 | the topics, if that's okay with you.  But if | 08:54:17 |
| 4 | you need to see any other part, let me know. | 08:54:19 |
| 5 | Does this look familiar, what you | 08:54:24 |
| 6 | reviewed? | 08:54:26 |
| 7 | A    Yes. | 08:54:27 |
| 8 | Q    Okay.  And if we were to focus on these | 08:54:27 |
| 9 | Topics 1 through 5, is that large enough or | 08:54:31 |
| 10 | would you like me to make it larger? | 08:54:33 |
| 11 | A    That should be fine. | 08:54:35 |
| 12 | Q    Okay.  Is that a little better? | 08:54:37 |
| 13 | A    Yes.  Thank you. | 08:54:39 |
| 14 | Q    Yup. | 08:54:40 |
| 15 | THE VIDEOGRAPHER:  Will we be marking | 08:54:42 |
| 16 | this as Exhibit 1, Counsel? | 08:54:44 |
| 17 | MR. PAUL:  Yes, please, we'd like to | 08:54:46 |
| 18 | mark it as Exhibit 1. | 08:54:48 |
| 19 | (Exhibit 1, Plaintiffs' Amended Notice | |
| 20 | of 30(b)(6) Deposition and Request for | |
| 21 | Production of Documents, was marked for | |
| 22 | identification and is attached to the | |
| 23 | transcript.) | 08:54:51 |
| 24 | Q    Okay.  Now, as an initial matter, it | 08:54:51 |
| 25 | looked to me that for Topics 1, 2, 4 and 5 you | 08:55:00 |

9

```
 1    were designated along with Dr. Heligman.  Do
 2    you know that?                                      08:55:12
 3        A   1, 2, 4, and 5?                             08:55:12
 4        Q   Well, you were designated through -- for    08:55:16
 5    Topics 1 through 5, but in particular, Topics       08:55:17
 6    1, 2, 4, and 5, you were designated along with      08:55:19
 7    Dr. Craig Heligman.  Do you know that?              08:55:23
 8        A   Oh.  No.                                    08:55:25
 9        Q   Okay.  That's okay.  I mean, there's        08:55:27
10    bound to be some overlap.  I just wanted to ask     08:55:29
11    you the question if you had any knowledge about     08:55:32
12    why you were designated in addition to              08:55:34
13    Dr. Heligman.                                       08:55:37
14        A   Oh.  No knowledge.                          08:55:38
15        MS. FOSTER BIRD:  Probably an oversight         08:55:40
16    on behalf of the lawyer.                            08:55:41
17        MR. PAUL:  Okay.                                08:55:44
18        Q   I mean, it sounds like if you weren't       08:55:44
19    aware that you were designated with
20    Dr. Heligman, then you don't have any knowledge
21    about that, right?                                  08:55:50
22        A   No.                                         08:55:51
23        Q   Okay.  And just to be clear, with           08:55:51
24    respect to Topic 3, you were designated along       08:55:54
25    with Dr. Craig Heligman and Jolanda Johnson.        08:55:56
```

                                                                   10

Kelly Crouch, R.N.                                                    May 13, 2021

| | | |
|---|---|---|
| 1 | Did you know that? | 08:55:59 |
| 2 | A   No. | 08:56:00 |
| 3 | Q   Okay.  All right. | 08:56:01 |
| 4 | So, starting with Topic 1, I'll just | 08:56:04 |
| 5 | read it and then we can talk about it.  But | 08:56:06 |
| 6 | No. 1 is "Defendant's policies, procedures and | 08:56:08 |
| 7 | practices for providing a medical leave of | 08:56:10 |
| 8 | absence for an employee with medical | 08:56:12 |
| 9 | restrictions following a non-work-related | 08:56:14 |
| 10 | injury."  And maybe to simplify things, if we | 08:56:17 |
| 11 | include in Topic No. 2, "Defendant's policies, | 08:56:22 |
| 12 | procedures and practices for providing a | 08:56:29 |
| 13 | medical leave of absence for an employee with | 08:56:30 |
| 14 | medical restrictions following a work-related | 08:56:31 |
| 15 | injury."  If it's all right with you, I'd like | 08:56:33 |
| 16 | to tackle -- tackle those at the same time | 08:56:36 |
| 17 | because they're basically the same question, | 08:56:37 |
| 18 | obviously, the only variable being | 08:56:39 |
| 19 | "work-related" versus "non-work-related."  Do | 08:56:41 |
| 20 | you agree with that? | 08:56:44 |
| 21 | A   Yes. | 08:56:44 |
| 22 | Q   Okay.  All right.  So first off, when it | 08:56:45 |
| 23 | comes to defendant's policies, is there a | 08:56:47 |
| 24 | written medical leave of absence policy for | 08:56:50 |
| 25 | non-work-related injuries and medical leave? | 08:56:56 |

11

Kelly Crouch, R.N.                                                    May 13, 2021

```
 1      A    No.                                        08:56:59

 2      Q    Okay.  Same question with respect to the   08:57:01

 3   work-related injury:  Are you aware of any         08:57:03

 4   written policy that defendant has for medical      08:57:05

 5   leave for a work-related injury?                   08:57:08

 6      A    No.                                        08:57:11

 7      Q    Okay.  So when it comes to policy --       08:57:11

 8   excuse me, procedures and practices, is it your    08:57:15

 9   understanding that those would be things that      08:57:17

10   are not in writing?                                08:57:19

11      A    Correct.                                   08:57:20

12      Q    Okay.  So can you tell me what CSX's       08:57:21

13   procedures and practices are for providing a       08:57:25

14   medical leave following a non-work-related         08:57:27

15   injury?                                            08:57:30

16      A    What -- is there something specific?       08:57:31

17      Q    Yeah.  What is -- I mean, what is the      08:57:35

18   policy or practice -- excuse me, the practice      08:57:37

19   or procedure for providing a medical leave of      08:57:40

20   absence for an employee with medical              08:57:42

21   restrictions following a non-work-related          08:57:44

22   injury?                                            08:57:46

23      A    Okay.  And I understand the medical        08:57:46

24   restrictions as being employee's requests for      08:57:49

25   absence.  Could -- is there a specific for         08:57:54
```

```
 1   medical restrictions?                              08:57:57

 2       Q    Yeah.  Well, I mean -- no, I think        08:57:58

 3   that's -- that's a fair question.  So in the       08:58:00

 4   context of a medical leave of absence, I think     08:58:02

 5   it would follow that there would be medical        08:58:04

 6   restrictions as opposed to a leave of absence      08:58:06

 7   for a non-medical-related circumstance.            08:58:09

 8       A    So it would be just general time off as   08:58:11

 9   the restriction?                                   08:58:15

10       Q    Correct.                                  08:58:16

11       A    Okay.  I just wanted to make sure I       08:58:17

12   understood correctly.                              08:58:19

13       Q    Yeah.  I mean, I think it's best -- but   08:58:20

14   you can answer it any way you want, but, you       08:58:23

15   know, kind of go through it in a chronological     08:58:24

16   order of what that process is.                     08:58:26

17       A    Okay.  So the employee would be           08:58:28

18   responsible for notifying their direct             08:58:30

19   supervisor --                                      08:58:32

20       Q    Okay.                                     08:58:33

21       A    -- of their request for leave of          08:58:34

22   absence.  And then at that point the employee      08:58:39

23   would need to submit documentation to the          08:58:42

24   medical department in support of that absence,     08:58:46

25   and then continue to submit documentation          08:58:50
```

                                                                    13

Kelly Crouch, R.N.                                                                    May 13, 2021

| | | |
|---|---|---|
| 1 | appropriately throughout the absence until the | 08:58:56 |
| 2 | provider have deemed -- has deemed them | 08:59:00 |
| 3 | eligible to return to work. | 08:59:03 |
| 4 | Q   And how often is that type of | 08:59:04 |
| 5 | documentation required, that is, for the | 08:59:06 |
| 6 | continuation of the leave? | 08:59:08 |
| 7 | A   So it's dependent on the documentation | 08:59:09 |
| 8 | submitted and the determination of what the | 08:59:14 |
| 9 | treating provider noted.  And if no notation is | 08:59:18 |
| 10 | made of an estimated return to work date, then | 08:59:23 |
| 11 | the request is for 45 days. | 08:59:26 |
| 12 | Q   Okay.  So it sounds like unless the | 08:59:29 |
| 13 | doctor's form itself contains an estimated | 08:59:35 |
| 14 | return to work date, the default is 45 days; is | 08:59:38 |
| 15 | that right? | 08:59:40 |
| 16 | A   That's correct. | 08:59:40 |
| 17 | Q   And when we say "45 days," that means | 08:59:41 |
| 18 | for the employee to submit additional | 08:59:43 |
| 19 | information to substantiate the medical leave? | 08:59:46 |
| 20 | A   Correct. | 08:59:48 |
| 21 | Q   Okay.  And is there a limit for how long | 08:59:49 |
| 22 | this type of medical leave can go on for, for, | 08:59:53 |
| 23 | in this case, a non-work-related injury? | 08:59:56 |
| 24 | A   No. | 08:59:58 |
| 25 | Q   So it can be indefinite? | 08:59:58 |

14

USCA4    2568

Kelly Crouch, R.N.                                          May 13, 2021

```
 1     A    Yes.                                    09:00:01

 2     Q    Okay.  And is that true also with       09:00:02

 3  respect to Topic 2 for a work-related injury?    09:00:04

 4     A    Yes.                                    09:00:07

 5     Q    Okay.  And I take it from your testimony  09:00:07

 6  so far, the next step in that process would be   09:00:12

 7  the employee or the employee's provider to       09:00:17

 8  provide a return to work slip?                   09:00:20

 9     A    Yes, that's correct.                    09:00:22

10     Q    Okay.  And is there a specific form to   09:00:23

11  be used for that?                                09:00:25

12     A    Yes.  There is a CSX form called         09:00:25

13  Attending Physician's Return to Work form with   09:00:31

14  the acronym of MD-3.                             09:00:31

15     Q    Okay.  Now, you initially mentioned that 09:00:34

16  it was the employee's responsibility to notify   09:00:46

17  his or her supervisor for a medical leave of     09:00:49

18  absence; is that correct?                        09:00:51

19     A    Yes, that's correct.                    09:00:51

20     Q    Are there other ways that an employee    09:00:52

21  can notify the company of the need for a         09:00:54

22  medical leave of absence other than the          09:00:57

23  supervisor?                                      09:00:58

24     A    For certain crafts they can contact crew 09:00:59

25  management or transportation.                    09:01:07
```

                                                           15

```
 1      Q    Okay.  Can you tell me more about that,        09:01:11

 2   for what crafts -- starting -- starting with           09:01:13

 3   what crafts?                                           09:01:15

 4      A    So it would be for transportation;             09:01:16

 5   conductors and engineers.                              09:01:19

 6      Q    Okay.  So they have the option of either       09:01:22

 7   notifying a supervisor or crew management; is          09:01:24

 8   that correct?                                          09:01:27

 9      A    Yes, that's correct.                           09:01:27

10      Q    Okay.  Any other ways that an employee         09:01:31

11   can notify of the need for a medical leave of          09:01:33

12   absence other than through crew management,            09:01:36

13   depending on the craft, and his or her                 09:01:38

14   supervisor?                                            09:01:40

15      A    No.                                            09:01:40

16      Q    Okay.  Can the employee or the                 09:01:43

17   employee's health care provider contact the            09:01:45

18   medical department and CSX directly for that           09:01:47

19   purpose?                                               09:01:50

20      A    Yes, they could.                               09:01:50

21      Q    So that would be another way?                  09:01:53

22      A    Yes, that could be another way.                09:01:54

23      Q    Okay.  Is there anything wrong with            09:01:56

24   that?  I mean, is that an acceptable way?              09:01:58

25      A    That would be acceptable if the employee       09:02:00
```

16

Kelly Crouch, R.N.                                                    May 13, 2021

```
 1    is unable to contact themselves due to the type        09:02:02

 2    of situation they're in.  That would be                09:02:04

 3    acceptable.                                            09:02:05

 4       Q   You mean as if they were unconscious or         09:02:06

 5    something?                                             09:02:09

 6       A   Correct.                                        09:02:09

 7       Q   Okay.  But assuming that they're not            09:02:09

 8    unconscious, just in the regular course of             09:02:12

 9    things, is it an acceptable method under CSX           09:02:13

10    procedures and practices to notify the company         09:02:17

11    of the need for a medical leave to contact             09:02:21

12    either his or her supervisor, the crew                 09:02:22

13    management, depending on the craft, or the             09:02:26

14    medical department directly?                           09:02:28

15       A   Yes.                                            09:02:29

16       Q   Okay.  Is there any other way that CSX          09:02:29

17    would allow the notification of a need for a           09:02:35

18    medical leave?                                         09:02:40

19       A   No.                                             09:02:41

20       Q   Okay.  What about the FMLA department,          09:02:42

21    could an employee contact the FMLA department          09:02:45

22    directly to advise of the need for a medical           09:02:48

23    leave?                                                 09:02:53

24       A   They could.                                     09:02:53

25       Q   And that would be an acceptable method          09:02:55
```

17

```
 1   as well?                                        09:02:58

 2       A   Yes.                                    09:02:59

 3       Q   Okay.  So, so far we've talked about    09:03:00

 4   five ways that an employee can notify the       09:03:02

 5   company of the need for the leave, and those    09:03:05

 6   are all legitimate and accepted?               09:03:08

 7       A   Yes.                                    09:03:10

 8       Q   Okay.  And is that true both with       09:03:10

 9   respect to Topics 1 and 2 concerning work-      09:03:14

10   related or non-work-related injuries?          09:03:16

11       A   Yes.                                    09:03:19

12       Q   Okay.  I know you mentioned the MD-3    09:03:19

13   form which is a return to work form.  Is       09:03:29

14   there -- are there any other forms that are     09:03:31

15   used for the purpose of substantiating the need 09:03:33

16   for a medical leave of absence for either       09:03:37

17   Topics 1 or 2?                                  09:03:39

18       A   No; not from CSX.                        09:03:41

19       Q   Okay.  Have you heard of the Certificate 09:03:44

20   of Ongoing Illness and Injury [sic] form?       09:03:48

21       A   Yes.                                    09:03:48

22       Q   Okay.  What is that?                     09:03:50

23       A   So, the Certification of Ongoing Illness 09:03:51

24   and [sic] Injury Form is used for -- their      09:03:53

25   provider can fill out the form to notify CSX of 09:03:58
```

18

Kelly Crouch, R.N.                                                    May 13, 2021

```
 1    their absence.

 2         (Whereupon, the court reporter was

 3    dropped from the Zoom call and transcribed the

 4    following portion.)                              09:09:18

 5    Q    Is an employee or the employee's medical   09:09:18

 6    provider required to use the Certificate of     09:50:46

 7    Ongoing Illness form from CSX?                   09:50:50

 8    A    That's the preferred method.                09:50:53

 9    Q    Okay.  What are some other methods that     09:50:56

10    are accepted but not preferred?                  09:50:59

11    A    They can submit medical records, work       09:51:01

12    excuses, or other disability forms that          09:51:07

13    identify the same information that's completed   09:51:12

14    by the treating provider.                        09:51:15

15    Q    Okay.  And is -- when that happens, when    09:51:17

16    other types of information is provided in a      09:52:26

17    format other than the COII, is that, depending  09:52:30

18    on the individual circumstances, sufficient     09:52:41

19    documentation in and of itself, or does it      09:52:49

20    trigger a COII form being sent to then be       09:52:54

21    completed?  Does that make sense?               09:52:59

22    A    We would send correspondence, depending,   09:53:01

23    you know, on the documentation sent to advise   09:53:05

24    that the information was received, and then we  09:53:08

25    would include a letter that had the -- a blank  09:53:14
```

                                                                   19

Kelly Crouch, R.N.                                                    May 13, 2021

```
 1   COII and MD-3 form included in it and requested     09:53:21

 2   that they submit the COII at the next due date.     09:53:51

 3      Q   Okay.  So it sounds like when a COII         09:53:56

 4   form is not submitted in the first instance,        09:54:01

 5   that documentation, again, depending on the         09:54:05

 6   specifics, would be accepted in and of itself,      09:54:09

 7   and a COII form would be sent to them along         09:54:13

 8   with the MD-3 for future use?                       09:54:18

 9      A   Correct.                                      09:54:22

10      Q   Okay.  All right.  And what -- like, in      09:54:23

11   this -- what we're talking about right now, the     09:54:35

12   information that's requested on the COII form       09:54:37

13   compared to other documentation that you            09:54:41

14   submitted --                                        09:54:44

15         THE REPORTER:  Did anybody know I was         09:57:44

16   gone?                                               09:57:45

17         MR. PAUL:  Oh.  No.                            09:57:47

18         THE REPORTER:  I was kicked off.              09:57:51

19         MR. PAUL:  Okay.                               09:57:54

20         MS. FOSTER BIRD:  Yeah, the screen            09:57:56

21   sharing makes it hard to see who's there.           09:57:57

22   That's where I'm struggling.                        09:57:59

23         THE REPORTER:  I figured Jason would          09:58:01

24   notice.                                             09:58:04

25         THE VIDEOGRAPHER:  No.                         09:58:05
```

                                                                    20

| | | |
|---|---|---|
| 1 | Let's -- can we off record, Counsel, | 09:58:06 |
| 2 | or... | 09:58:08 |
| 3 | MR. PAUL:  Yeah, sure. | 09:58:09 |
| 4 | THE VIDEOGRAPHER:  Okay.  Okay.  We're | 09:58:11 |
| 5 | going off the record.  The time is 9:05. | 09:58:12 |
| 6 | (Discussion held off the record.) | 09:09:59 |
| 7 | THE VIDEOGRAPHER:  We're back on the | 09:09:59 |
| 8 | record.  The time is 9:09. | 09:10:09 |
| 9 | MS. FOSTER BIRD:  Greg, why don't we put | 09:10:13 |
| 10 | our agreement on the record, and then we can | 09:10:13 |
| 11 | edit that out if we need to later. | 09:10:16 |
| 12 | MR. PAUL:  Yeah.  Yeah.  We're on the | 09:10:18 |
| 13 | record now. | 09:10:20 |
| 14 | We're on the record -- back on the | |
| 15 | record after a short break.  We lost the court | 09:10:20 |
| 16 | reporter for what looks to be maybe somewhere | 09:10:22 |
| 17 | five minutes or less.  And so we'd like to put | 09:10:25 |
| 18 | on the record that counsel agreed to have the | 09:10:28 |
| 19 | court reporter transcribe that portion of the | 09:10:31 |
| 20 | testimony from the video. | 09:10:34 |
| 21 | Is that accurate? | 09:10:38 |
| 22 | MS. FOSTER BIRD:  That's accurate. | 09:10:38 |
| 23 | MR. PAUL:  Okay.  All right.  Shall we | 09:10:40 |
| 24 | continue? | 09:10:43 |
| 25 | MS. FOSTER BIRD:  Sure. | |

21

```
 1              THE REPORTER:  I'm ready.

 2              MR. PAUL:  Okay.  Everybody ready?  All

 3     right.  Naturally, I have no idea what my last      09:10:54

 4     question was, so...                                 09:10:56

 5              MS. FOSTER BIRD:  I was going to say       09:10:58

 6     that, but...                                        09:10:59

 7              MR. PAUL:  Yeah.                            09:11:00

 8     BY MR. PAUL:

 9       Q    So at the risk of being, perhaps, a         09:11:00

10     little repetitive, we talked about different       09:11:02

11     ways that -- well, we're on Topics 1 and 2.        09:11:05

12     Okay?  So I think I'm still screen sharing.        09:11:09

13     Yup.  And there's -- we've identified at least     09:11:12

14     five different ways that an employee can notify    09:11:14

15     of the need for a medical leave of absence; is     09:11:17

16     that correct?

17       A    Correct.                                    09:11:20

18       Q    Okay.  Moving on from that initial          09:11:20

19     notification, it sounds like a letter goes out     09:11:27

20     providing the MD-3 and a Certificate of Ongoing    09:11:30

21     Illness form; is that correct?                     09:11:34

22       A    Yes, that's correct.                        09:11:35

23       Q    Okay.  And so I think my next question      09:11:37

24     was going to be:  If you were to compare the       09:11:39

25     Certificate of Ongoing Illness form to those       09:11:41
```

                                                                22

Kelly Crouch, R.N.                                                    May 13, 2021

| | | |
|---|---|---|
| 1 | circumstances where an employee or the | 09:11:44 |
| 2 | employee's doctor is not provided on a | 09:11:47 |
| 3 | Certificate of Ongoing Illness, what is the | 09:11:50 |
| 4 | minimum threshold of information that's | 09:11:53 |
| 5 | required in order to substantiate a medical | 09:11:55 |
| 6 | leave of absence for a non-work-related or | 09:12:00 |
| 7 | work-related injury? | 09:12:02 |
| 8 | A   So we would need information of the | 09:12:03 |
| 9 | provider; so what provider was being seen. | 09:12:07 |
| 10 | Ideally, the information would need to come on | 09:12:10 |
| 11 | some sort of letterhead, include the employee's | 09:12:12 |
| 12 | name.  ID number is preferable, but, if not, we | 09:12:18 |
| 13 | can use the date of birth as a secondary | 09:12:22 |
| 14 | identifiable factor.  Along with the start date | 09:12:24 |
| 15 | of the absence, and the preferred is some sort | 09:12:31 |
| 16 | of diagnosis, but not necessarily; it doesn't | 09:12:35 |
| 17 | have to have it. | 09:12:39 |
| 18 | Q   Anything else? | 09:12:40 |
| 19 | A   Estimated return to work date would be | 09:12:42 |
| 20 | preferred as well, but if not, that's okay as | 09:12:45 |
| 21 | well. | 09:12:48 |
| 22 | Q   Okay.  So in terms of what's the minimum | 09:12:48 |
| 23 | required -- not preferred but required, would | 09:12:51 |
| 24 | be the name of the provider, that is, the | 09:12:54 |
| 25 | medical provider, the employee's name with the | 09:12:55 |

23

```
 1   date of birth or ID number, and the start date        09:12:58

 2   of the medical absence?                                09:13:03

 3       A   And a statement indicating that the            09:13:04

 4   employee's off work.                                   09:13:07

 5       Q   Okay.  That the state- -- and a                09:13:09

 6   statement that the employee is, I'm sorry, did         09:13:11

 7   you say unable to work or out of work?                 09:13:13

 8       A   I said out of work, but unable to work         09:13:15

 9   is fine.                                               09:13:18

10       Q   Okay.  So those are really the four            09:13:18

11   required pieces of information to initiate the         09:13:21

12   leave?                                                 09:13:23

13       A   Correct.                                       09:13:23

14       Q   Okay.  And just to be clear, that's the        09:13:24

15   same procedure or practice for work-related and       09:13:30

16   non-work-related?                                      09:13:32

17       A   Yes.                                           09:13:38

18       Q   Okay.  And I take it that medical leave        09:13:38

19   is unpaid; is that correct?                            09:13:40

20       A   Medical leave is unpaid, but there is          09:13:41

21   disability benefits available through the              09:13:50

22   Railroad Retirement Board.                             09:13:53

23       Q   Can you tell me what you know about             09:13:54

24   that.                                                  09:13:55

25       A   I know that the employee would need to         09:13:56
```

24

Kelly Crouch, R.N.                                                    May 13, 2021

| | | |
|---|---|---|
| 1 | contact the Railroad Retirement Board in order | 09:13:58 |
| 2 | to initiate his benefits -- | 09:14:00 |
| 3 | Q   Is that some -- I'm sorry, go ahead. | 09:14:03 |
| 4 | A   I was just correcting and saying his or | 09:14:04 |
| 5 | her benefits. | 09:14:07 |
| 6 | Q   Okay.  And do you understand that to be | 09:14:08 |
| 7 | called railroad retirement, like, sickness and | 09:14:11 |
| 8 | accident benefits? | 09:14:13 |
| 9 | A   Typically, we say sickness benefits. | 09:14:14 |
| 10 | Q   Okay.  And do you have any involvement | 09:14:20 |
| 11 | in -- is that -- let me ask it a better way. | 09:14:24 |
| 12 | As the corporate representative talking | 09:14:27 |
| 13 | about this topic, is that process to get those | 09:14:28 |
| 14 | type of benefits with the employee and the | 09:14:31 |
| 15 | Railroad Retirement Board or is someone at CSX | 09:14:35 |
| 16 | involved in that process? | 09:14:37 |
| 17 | A   No one at CSX is involved in that | 09:14:39 |
| 18 | process. | 09:14:41 |
| 19 | Q   And are sickness benefits different than | 09:14:41 |
| 20 | disability benefits through the RRB, if you | 09:14:48 |
| 21 | know? | 09:14:51 |
| 22 | A   Yes.  If you -- for clarification | 09:14:51 |
| 23 | purposes, do you mean permanent or occupational | 09:14:54 |
| 24 | disability? | 09:14:57 |
| 25 | Q   Either. | 09:14:58 |

25

USCA4    2579

```
 1        A    Then yes, that would be different.        09:15:00

 2        Q    Okay.  I just want to make -- I guess I   09:15:02

 3   want to make sure, when you're talking about --     09:15:04

 4   when you answered my question about it being        09:15:06

 5   unpaid versus paid, it sounds like it's not         09:15:08

 6   paid through CSX; is that correct?                  09:15:12

 7        A    That's correct.                           09:15:14

 8        Q    Okay.  It's paid through the Railroad     09:15:15

 9   Retirement Board, it could be either sickness       09:15:17

10   benefits or something of a longer nature that       09:15:18

11   would be called either occupational or total        09:15:21

12   and permanent disability benefits; is that          09:15:25

13   right?                                              09:15:27

14        A    Yes, that's correct.                      09:15:27

15        Q    Okay.  Are there any other paid sickness  09:15:30

16   or disability benefits that you're aware of?        09:15:32

17             MS. FOSTER BIRD:  At this point I'm       09:15:35

18   going to object because these aren't the topics     09:15:36

19   for which she's been asked to testify about.        09:15:39

20   If you look at 1, 2, 3, 4, and 5, it does not       09:15:41

21   specifically reference the different kinds of       09:15:44

22   benefits that would be available, and that's a      09:15:46

23   different topic.  She's answering based upon        09:15:48

24   her knowledge, but she's not been designated to     09:15:51

25   talk about the different types of benefits that     09:15:53
```

26

Kelly Crouch, R.N.                                                    May 13, 2021

```
 1   each employee would be able to get.              09:15:55

 2         MR. PAUL:  Well, I didn't expect it         09:15:58

 3   would be today, but today's the first day that    09:15:59

 4   I agree with your objection.                      09:16:01

 5         MS. FOSTER BIRD:  Wow.  Okay.               09:16:02

 6   BY MR. PAUL:

 7    Q   That will sometimes happen.  We get so      09:16:07

 8   excited we get off topic a little bit.  But       09:16:08

 9   that's correct.  I think it's fair to say that    09:16:11

10   you're talking about what type of medical         09:16:13

11   leaves are available and not paid or unpaid.      09:16:15

12         So let me just ask this to conclude that    09:16:18

13   topic:  Regardless of whether there's a paid or   09:16:20

14   unpaid disability or sickness benefit, the        09:16:22

15   processes and procedures that you've described    09:16:26

16   are the same; is that right?                      09:16:28

17    A   Yes, that's correct.                         09:16:29

18    Q   Okay.  All right.  Let's look at No. 3,      09:16:33

19   "Defendant's policies, procedures and practices   09:16:35

20   for returning an employee to work following       09:16:36

21   sickness and accident, short-term or long-term    09:16:38

22   disability benefits."                             09:16:41

23         Do you see where I read that?               09:16:42

24    A   Yes.                                         09:16:43

25    Q   Okay.  So, so far from your testimony        09:16:44
```

27

Kelly Crouch, R.N.                                                                                        May 13, 2021

```
 1    we -- we've talked a little bit about that          09:16:47

 2    topic, I think, but I want to ask you:  Is the      09:16:49

 3    MD-3 the return to work form that would be          09:16:51

 4    responsive to Topic No. 3?                          09:16:55

 5       A   Yes.                                         09:16:56

 6       Q   Okay.  And what type of information --       09:16:57

 7    well, let me back that up.                          09:17:00

 8           Is the actual MD-3 form required or the      09:17:02

 9    information that's in it?                           09:17:05

10       A   The information that's in it.                09:17:06

11       Q   Okay.  Are you able to see this             09:17:11

12    document?  Let me back it off a little bit, a       09:17:19

13    little slower.  Do you see my screen?               09:17:23

14       A   Yes.                                         09:17:25

15       Q   Okay.                                        09:17:26

16           MR. PAUL:  This is a five-page document.     09:17:27

17    We'll mark it as Exhibit 2.                         09:17:29

18           (Exhibit 2, Attending Physician's Return

19    to Work Report (instructions and form), was

20    marked for identification and is attached to

21    the transcript.)

22       Q   You may or may not recognize this first      09:17:30

23    page form, but I'll ask you:  Do you recognize      09:17:32

24    this first page?                                    09:17:34

25       A   No.                                          09:17:38
```

28

Kelly Crouch, R.N.                                                      May 13, 2021

| | | |
|---|---|---|
| 1 | Q    Okay.  Turning to page 2, which | 09:17:40 |
| 2 | sometimes will -- I guess these aren't Bates | 09:17:51 |
| 3 | numbered because they are from the deposition | 09:17:55 |
| 4 | the other day.  But let's go through these | 09:17:56 |
| 5 | pages.  Do you recognize this page -- and I'll | 09:17:59 |
| 6 | show you the others -- as the MD-3 form? | 09:18:01 |
| 7 | A    Yes. | 09:18:05 |
| 8 | Q    All right.  And is this -- page 3 of 5, | 09:18:05 |
| 9 | is this also a part of the MD-3 form Attending | 09:18:11 |
| 10 | Physician's Return to Work Report? | 09:18:15 |
| 11 | A    Yes.  It would not normally have the | 09:18:17 |
| 12 | typed information in it. | 09:18:21 |
| 13 | Q    Correct.  Yeah, and I'll represent to | 09:18:22 |
| 14 | you that this was used in Ms. Shumway's | 09:18:24 |
| 15 | deposition who, at the time in question, was a | 09:18:27 |
| 16 | chief clerk.  So she made -- I think I can | 09:18:29 |
| 17 | fairly represent she prepopulated some of these | 09:18:32 |
| 18 | fields.  But without that -- with that removed, | 09:18:35 |
| 19 | is this still all part of the MD-3 form? | 09:18:37 |
| 20 | A    Yes. | 09:18:40 |
| 21 | Q    Okay.  So on this section, History | 09:18:40 |
| 22 | Physical Findings, Diagnosis, et cetera, these | 09:18:43 |
| 23 | are all things that a doctor would fill out? | 09:18:46 |
| 24 | A    Yes, correct; a treating provider. | 09:18:48 |
| 25 | Q    A treating provider is more accurate. | 09:18:52 |

29

Kelly Crouch, R.N.                                                    May 13, 2021

```
 1   It does not have to be a doctor; is that          09:18:54

 2   correct?                                          09:18:56

 3       A   Yes, that's correct.                      09:18:56

 4       Q   Okay.  I just want to go through the      09:18:58

 5   rest of the form.  This the final page 5.  So     09:18:59

 6   all of this is part of the MD-3 form?             09:19:02

 7       A   Yes, that's correct.                      09:19:04

 8       Q   And then back to my question:  Is this    09:19:06

 9   MD-3 form actually required itself or just the    09:19:09

10   information that's in it for a return to work?    09:19:12

11       A   So the preference is the return to work   09:19:14

12   form because it has the required information.     09:19:17

13       Q   Okay.                                     09:19:20

14       A   Will we accept additional information?    09:19:21

15   Yes.                                              09:19:23

16       Q   Okay.  And the same question that we      09:19:24

17   covered earlier, what are the minimum --          09:19:27

18   minimum topics of information to be provided to   09:19:31

19   be sufficient for return to work?                 09:19:34

20       A   Can you scroll down?                       09:19:37

21       Q   Yeah.  You want me to keep going?         09:19:38

22       A   Yes.  Next page, please.  So we would     09:19:44

23   still require information regarding the           09:19:54

24   history, physical findings, diagnosis,           09:19:54

25   treatments, duration of care, estimated return   09:19:57
```

30

Kelly Crouch, R.N.                                                    May 13, 2021

```
1    to work -- not estimated, excuse me -- return      09:20:02

2    to work date, and whether or not it's with or      09:20:05

3    without restrictions, and identifying what         09:20:06

4    restrictions.                                      09:20:08

5        Q    Okay.  When --                            09:20:09

6        A    And medications.  Sorry, I didn't say     09:20:11

7    that.                                              09:20:14

8        Q    No, I'm sorry.  I didn't mean to          09:20:14

9    interrupt.                                         09:20:16

10       A    I just said and the medications that      09:20:16

11   would -- I did not mention that.                   09:20:18

12       Q    Okay.  So all of those areas are          09:20:19

13   required?                                          09:20:22

14       A    Yes.                                       09:20:22

15       Q    Okay.  And any others?                    09:20:22

16       A    There are additional information --       09:20:25

17   there is additional information required for       09:20:29

18   certain diagnosises [sic].  You can reference      09:20:31

19   page 4 of this form.                               09:20:34

20       Q    Down here?                                09:20:36

21       A    Yes.                                       09:20:37

22       Q    Okay.  So depending on certain diagnoses  09:20:38

23   or conditions, additional information may be       09:20:45

24   required as outlined here?                         09:20:48

25       A    Yes.                                       09:20:49
```

31

Kelly Crouch, R.N.                                                    May 13, 2021

```
 1      Q   And that's page 5 of 5; is that right?      09:20:50

 2      A   Of this, yes.                                09:20:52

 3      Q   Yeah, right.  Oh, right, I see.  So it's     09:20:54

 4   normally page 4 in your experience because it       09:20:57

 5   doesn't have that cover sheet.                       09:20:59

 6      A   Correct.                                      09:21:01

 7      Q   Got it.  Okay.                                09:21:02

 8          What is the policy or practice when it        09:21:05

 9   comes to either an employee or an employee's         09:21:06

10   health care provider not providing those             09:21:09

11   required information?                                09:21:12

12      A   You would typically request that the          09:21:13

13   information be complete or -- or request             09:21:18

14   additional medical records.                          09:21:22

15      Q   Okay.  So is it accurate to say that the      09:21:24

16   procedure or practice is not to immediately          09:21:27

17   deny the leave, but to allow the employee or         09:21:28

18   health care provider to provide additional           09:21:32

19   information?                                          09:21:34

20      A   Correct.                                      09:21:34

21      Q   Okay.  And is there a time period that's      09:21:35

22   allowed for that submission of additional            09:21:37

23   information?                                          09:21:40

24      A   Yes; until they submit it.                    09:21:40

25      Q   Okay.  There's no calendar deadline or        09:21:42
```

                                                                        32

| | | |
|---|---|---|
| 1 | anything like that? | 09:21:44 |
| 2 | A    No. | 09:21:45 |
| 3 | MS. FOSTER BIRD:  You may have just | 09:21:48 |
| 4 | misspoke.  I think you said to provide the | 09:21:49 |
| 5 | leave and this is about return to work. | 09:21:53 |
| 6 | THE WITNESS:  I thought he said for -- | 09:21:54 |
| 7 | MS. FOSTER BIRD:  Did he say -- I'm | 09:21:56 |
| 8 | sorry.  I thought he said with regard to leave. | 09:21:58 |
| 9 | But I'm sorry if I misunderstood. | 09:22:00 |
| 10 | THE WITNESS:  Oh, maybe I misunderstood. | 09:22:02 |
| 11 | Q    Okay.  Well, if you did -- and I don't | 09:22:03 |
| 12 | think you did.  But if you did, it's -- what | 09:22:04 |
| 13 | we're looking at in Exhibit due has to -- 2 has | 09:22:05 |
| 14 | to do with return to work. | 09:22:07 |
| 15 | A    Yes. | 09:22:09 |
| 16 | Q    Okay.  So let me just ask my question a | 09:22:09 |
| 17 | different way.  If -- if an employee or | 09:22:15 |
| 18 | employee's health care provider does not | 09:22:18 |
| 19 | provide sufficient information in the first | 09:22:19 |
| 20 | instance, is there any time period that they | 09:22:22 |
| 21 | have to supplement with additional information | 09:22:27 |
| 22 | before the leave will be denied? | 09:22:30 |
| 23 | MS. FOSTER BIRD:  Objection.  That's -- | 09:22:33 |
| 24 | that's the problem.  We're not talking about | 09:22:34 |
| 25 | leave; we're talking about return to work. | 09:22:36 |

33

Kelly Crouch, R.N.                                                    May 13, 2021

```
 1            MR. PAUL:  Okay.  I see what you're        09:22:42

 2    saying.                                            09:22:43

 3    BY MR. PAUL:

 4       Q   So I guess with respect to the return to   09:22:49

 5    work, if there's any delay -- well, let me         09:22:51

 6    ask -- it sounds like your testimony was           09:22:53

 7    there's no time frame for the employee or          09:22:55

 8    health care provider to submit return to work,    09:22:58

 9    it's just the employee will remain off work.       09:23:00

10       A   Correct.                                    09:23:02

11       Q   Is that -- okay, I'm sorry, I didn't        09:23:03

12    hear you.                                          09:23:05

13       A   Correct.                                    09:23:05

14       Q   Okay, great.  All right, perfect.          09:23:06

15            And the MD-3, is that the form that's      09:23:08

16    used for all of these topics, returning to work   09:23:21

17    from sickness, accident, short-term or            09:23:23

18    long-term disability benefits?                     09:23:25

19       A   Yes.                                        09:23:27

20       Q   And is the MD-3 used regardless of         09:23:27

21    whether it's a work-related or non-work-related   09:23:29

22    injury?                                            09:23:32

23       A   Yes.                                        09:23:33

24       Q   Okay.  All right.  Next is "Defendant's    09:23:33

25    policies, procedures and practices for            09:23:38
```

                                                                           34

```
 1    returning an employee to work for an employee         09:23:39

 2    who is not eligible for leave under the FMLA."        09:23:42

 3        Do you see where I read that?                     09:23:44

 4    A    Yes.                                             09:23:45

 5    Q    Okay.  So, first, is -- to your                 09:23:46

 6    knowledge, is there any difference in the             09:23:51

 7    policies, procedures, and practices for               09:23:55

 8    returning to work in Topics 4 and 5, whether          09:23:57

 9    it's -- whether an employee is eligible or not        09:24:00

10    eligible for FMLA?                                    09:24:04

11    A    No.                                              09:24:06

12    Q    Okay.  Now, we just covered Topic 3,            09:24:06

13    which is the return to work and the MD-3,             09:24:16

14    right?                                                09:24:18

15    A    Yes.                                             09:24:18

16    Q    Okay.  So to simplify this:  Is the             09:24:19

17    return to work for an employee who's either on        09:24:22

18    FMLA or not FMLA the same as you described in         09:24:24

19    Topic 3?                                              09:24:28

20    A    Yes.                                             09:24:29

21    Q    I mean, is it identical?                         09:24:29

22    A    Yes.                                             09:24:32

23    Q    Okay.  So there's no reason for me to           09:24:32

24    ask you to say all that again.  Your answers to       09:24:34

25    Topic 4 and 5 will be the same as your answers        09:24:37
```

35

| | | |
|---|---|---|
| 1 | to Topic 3 with respect to returning to work. | 09:24:39 |
| 2 | A    Yes. | 09:24:42 |
| 3 | Q    Okay. | 09:24:43 |
| 4 | MR. PAUL:  All right.  Well, I don't | 09:25:11 |
| 5 | have any other questions for you, then.  Thank | 09:25:12 |
| 6 | you. | 09:25:15 |
| 7 | MS. FOSTER BIRD:  I don't have any | 09:25:15 |
| 8 | questions. | 09:25:15 |
| 9 | MR. PAUL:  Off the record. | 09:25:20 |
| 10 | THE VIDEOGRAPHER:  Okay.  Madam Court | 09:25:21 |
| 11 | Reporter -- | |
| 12 | MR. PAUL:  Do you want to read or sign? | 09:25:23 |
| 13 | Do you want to address that? | |
| 14 | MS. FOSTER BIRD:  Yeah, I'd like to | 09:25:26 |
| 15 | read and -- I'd like to have her read and sign | |
| 16 | simply for the -- | 09:25:28 |
| 17 | MR. PAUL:  Snafu. | 09:25:31 |
| 18 | MS. FOSTER BIRD:  -- snafu.  I didn't | 09:25:32 |
| 19 | want to say.  I could come up with a different | 09:25:33 |
| 20 | word, but it sounded judgmental. | 09:25:35 |
| 21 | I'd like to have her read and sign to | 09:25:37 |
| 22 | make sure we got it as correct as possible. | 09:25:39 |
| 23 | THE REPORTER:  Sure. | 09:25:44 |
| 24 | MR. PAUL:  No offense intended.  Sorry. | 09:25:45 |
| 25 | MS. FOSTER BIRD:  I did not mean it to | 09:25:47 |

36

```
 1    sound bad.  I just couldn't come up with a

 2    different word.

 3         THE REPORTER:  Listen, I feel awful.      09:25:50

 4         MR. PAUL:  All right.  No problem.  All   09:25:52

 5    right, are we all off the record?             09:25:54

 6         THE VIDEOGRAPHER:  Anything to add,       09:25:55

 7    Madam Court Reporter, before I read us off?   09:25:56

 8         THE REPORTER:  Would anybody like to      09:25:59

 9    order?                                        09:26:01

10         MS. FOSTER BIRD:  Yes.  This is Melissa.  09:26:01

11    I'd like to order the transcript of both      09:26:03

12    depositions, and the video of both depositions, 09:26:06

13    but not synced.                               09:26:08

14         THE REPORTER:  Okay.                      09:26:12

15         THE VIDEOGRAPHER:  Okay.  This concludes  09:26:12

16    today's deposition.  The time is 9:25 and we're 09:26:13

17    now off the record.                           09:26:16

18         (Off the record at 9:25 a.m.)

19

20

21

22

23

24

25
```

                                                                          37

Jolanda Johnson                                                          May 5, 2021

```
 1     IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN

 2                  DISTRICT OF WEST VIRGINIA

 3                        AT HUNTINGTON

 4

 5   JUSTIN ADKINS, et al.,    )
                               )
 6        Plaintiffs,          )
                               )
 7   vs.                       )Civil Action No. 3:18-cv-00321
                               )
 8   CSX CORPORATION, et al., )
                               )
 9        Defendants.          )
     _____)

10

11

12

13

14

15

16

17

18

19

20

21

22        REMOTE VIDEOTAPED DEPOSITION OF CSX CORPORATION'S

23   30(b)(6) DESIGNEE, JOLANDA JOHNSON, commencing at

24   10:38 a.m. PST, Wednesday, May 5, 2021, before

25   Elizabeth A. Willis-Lewis, RPR, CSR No. 12155.
```

2

Jolanda Johnson                                                    May 5, 2021

```
 1    APPEARANCES (VIA ZOOM):

 2

 3        FOR THE PLAINTIFFS:

 4        MORGAN & PAUL, PLLC
          BY:  GREGORY G. PAUL, ESQ.
 5        100 First Avenue, Suite 1010
          Pittsburgh, Pennsylvania 15222
 6        844.374.7200
          gregpaul@paullaw.com
 7

 8
          FOR THE DEFENDANTS:
 9
          NELSON MULLINS
10        BY:  MELISSA FOSTER BIRD, ESQ.
          949 Third Avenue, Suite 200
11        Huntington, West Virginia 25701
          681.888.5282
12        melissa.fosterbird@nelsonmullins.com

13

14        ALSO PRESENT:  PATRICK HUGHES, ESQ.

15

16

17

18

19

20

21

22

23

24

25
```

                                                                           3

Jolanda Johnson                                                    May 5, 2021

```
 1                          INDEX

 2

 3   WITNESS:  JOLANDA JOHNSON

 4

 5   EXAMINATION                              PAGE

 6   By Mr. Paul                                 7

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Jolanda Johnson                                                                    May 5, 2021

```
 1                    INDEX TO EXHIBITS

 2      NUMBER                                    MARKED

 3      Exhibit 1     Plaintiffs' Amended Notice of
                      30(b)(6) Deposition and Request
 4                    for Production of Documents.         8

 5      Exhibit 2     13-page e-mail string with
                      attachments including an e-mail
 6                    from Jolanda Johnson to Craig
                      Heligman dated Wednesday, July 19,
 7                    2017, 12:41 PM, Bates stamped
                      CSXT(Adkins)022260-CSXT(Adkins)022272.  14
 8
        Exhibit 3     14-page document including a
 9                    document titled, "Frequently Asked
                      Questions About FMLA," Bates stamped
10                    CSXT(Adkins)022198-CSXT(Adkins)022211.  42

11      Exhibit 4     15-page document titled, "CSX
                      Intermodal Terminals, Inc. -
12                    Medical Leaves of Absence Policy,"
                      Bates stamped
13                    CSXT(Adkins)022066-CSXT(Adkins)022080.  65

14

15

16

17

18

19

20

21

22

23

24

25
```

5

USCA4   2595

Jolanda Johnson                                                    May 5, 2021

```
 1              WEDNESDAY, MAY 5, 2021, 10:38 A.M. PST

 2

 3              THE VIDEOGRAPHER:  Hello.  We are on the        10:38:21

 4      record.  Here begins the remote deposition of Jolanda  10:38:26

 5      Johnson in the matter of Adkins versus CSX Corporation. 10:38:30

 6      This is presiding in the United States District Court of 10:38:36

 7      the Southern District of Virginia at Huntington.  Case  10:38:40

 8      number 3:18-cv-00321.                                   10:38:44

 9              Today's date is May 5th, 2021, and the time is  10:38:52

10      10:38 a.m. Pacific Standard Time.  The video operator   10:38:55

11      today is Jason Patsalis representing Network Deposition  10:39:01

12      Services located at 1800 Century Park East, Suite 150,   10:39:05

13      in Los Angeles, California.  Phone number 310-557-3400.  10:39:11

14      The court reporter today is Elizabeth Willis.  This is a 10:39:18

15      remote deposition through Zoom videoconferencing.        10:39:24

16              Would counsel present please identify            10:39:27

17      yourselves for the record and who you represent?         10:39:28

18              MR. PAUL:  This is Greg Paul on behalf of the    10:39:31

19      plaintiffs.                                              10:39:34

20              MR. HUGHES:  Patrick Hughes for the plaintiffs   10:39:38

21      as well.                                                 10:39:40

22              MS. BIRD:  Melissa Foster Bird.  I'm here on     10:39:41

23      behalf of CSX Transportation, the other defendants in   10:39:44

24      this case, and Ms. Johnson, the witness.                10:39:46

25              THE DEPONENT:  Jolanda Johnson, CSX.            10:39:49
```

6

| | | |
|---|---|---|
| 1 | administer the oath to the witness. | 10:39:54 |
| 2 | | |
| 3 | JOLANDA JOHNSON, | 10:40:10 |
| 4 | having been first duly sworn, testified as | 10:40:10 |
| 5 | follows: | 10:40:10 |
| 6 | | |
| 7 | COURT REPORTER:  Thank you. | 10:40:10 |
| 8 | | |
| 9 | EXAMINATION BY MR. PAUL: | 10:40:11 |
| 10 | Q.   Good afternoon, Ms. Johnson.  My name is Greg | 10:40:11 |
| 11 | Paul.  We've been introduced before.  How are you doing | 10:40:14 |
| 12 | today? | 10:40:17 |
| 13 | A.   Fine. | 10:40:17 |
| 14 | Q.   Great.  We're here today in this deposition | 10:40:18 |
| 15 | you've been designated as a 30(b)(6) deponent under the | 10:40:22 |
| 16 | Federal Rules of Civil Procedure.  Are you familiar with | 10:40:28 |
| 17 | that? | 10:40:30 |
| 18 | A.   Yes. | 10:40:30 |
| 19 | Q.   Okay.  And what is -- what is your | 10:40:30 |
| 20 | understanding of being designated as a 30(b)(6) deponent | 10:40:31 |
| 21 | today? | 10:40:36 |
| 22 | A.   Just to represent the company.  To speak on | 10:40:36 |
| 23 | behalf of the company on certain matters. | 10:40:39 |
| 24 | Q.   Okay.  And those matters are certain topics, is | 10:40:45 |
| 25 | | |

7

7

```
 1    that your understanding, that were outlined in the       10:40:49

 2    Notice of Deposition?                                    10:40:51

 3        A.   Yes.                                            10:40:52

 4        Q.   Okay.  I'd like to mark that as Exhibit 1 and   10:40:52

 5    share my screen.                                         10:40:58

 6             (Exhibit 1 was marked for identification.)      10:40:59

 7    BY MR. PAUL:                                             10:41:04

 8        Q.   Are you able to see what looks like a           10:41:04

 9    deposition?  It says, "In the United States District     10:41:07

10    Court for the Southern District of West Virginia"?       10:41:08

11        A.   Yes.  But could you zoom, make it larger,       10:41:12

12    please?                                                  10:41:15

13        Q.   Yeah.  Absolutely.  Is that big enough?         10:41:16

14        A.   Yes.                                            10:41:21

15        Q.   Okay.  This is a nine-page document that starts 10:41:22

16    out with the names of a number of plaintiffs, and then   10:41:28

17    it gets to a number of topics.  And prior to going on    10:41:31

18    the record today, counsel have confirmed but I want to   10:41:34

19    put on the record, is it your understanding that you've  10:41:40

20    been designated to testify today on behalf of the        10:41:43

21    following topics -- and then we'll read them together -- 10:41:46

22    topic 3, topic 6, topic 7, and topic 18?                 10:41:49

23        A.   Yes.                                            10:42:00

24        Q.   Okay.  So let's get topic 3 into the record.    10:42:00

25    "Defendant's policies, procedures, and practices for     10:42:06
```

Jolanda Johnson                                                    May 5, 2021

```
 1   returning an employee to work following sickness and      10:42:08

 2   accident, short-term and/or long-term disability          10:42:11

 3   benefits."                                                10:42:15

 4         Do you see where I read that?                       10:42:16

 5   A.   Yes.                                                 10:42:17

 6   Q.   Okay.  Then topic 6, "Defendant's disability         10:42:17

 7   leave of absence policies, procedures, and practices      10:42:26

 8   with effective dates and amendments for all such          10:42:29

 9   policies."                                                10:42:31

10         Do you see where I read that?                       10:42:32

11   A.   Yes.                                                 10:42:33

12   Q.   No. 7, "Identify and produce the person or           10:42:34

13   persons most knowledgeable regarding KEPRO's policies     10:42:38

14   and practices for processing requests and approval for    10:42:42

15   FMLA in general and specific to any of the plaintiffs."   10:42:46

16         Do you see where I read that?                       10:42:49

17   A.   Yes.                                                 10:42:51

18   Q.   And then jumping to topic 18, "E-mails between       10:42:54

19   Dr. Heligman and Jolanda Johnson during the period of     10:43:02

20   time 2016 to the present."                                10:43:04

21         Do you see where I read that?                       10:43:05

22   A.   Yes.                                                 10:43:07

23   Q.   Sorry.  With you I'm going to go in reverse          10:43:13

24   order.  Tell me what your knowledge is of any e-mails     10:43:16

25   between you and Dr. Heligman during the period of 2016    10:43:19
```

9

```
 1    to the present.                                    10:43:23

 2          MS. BIRD:  We're going to object to that topic,  10:43:26

 3    as we've previously stated, with regard to the breadth  10:43:27

 4    and the over -- overbreadth of it.  We are going to    10:43:32

 5    permit her to answer as to the plaintiffs or this -- the  10:43:36

 6    subject matter in this case, but not as to all possible  10:43:41

 7    e-mails between her and Dr. Heligman which would       10:43:45

 8    encompass, first of all, too long a period of time.   10:43:48

 9    Also, a period of time after all of the [technical    10:43:52

10    interference] in this case to her, and it would be    10:43:55

11    invasion of privacy, possibly, for medical information  10:44:00

12    for other employees that are not plaintiffs in this   10:44:02

13    case.  Previously noted objection and you may continue  10:44:06

14    with that objection.                                  10:44:10

15          BY MR. PAUL:                                     10:44:11

16          Q.   Okay.  Notwithstanding that objection, let me  10:44:11

17    ask you this:  Do you regularly, in the course of your  10:44:14

18    job duties at CSX, e-mail Dr. Heligman?               10:44:17

19          A.   No.                                         10:44:21

20          Q.   Is it fair to characterize that it's rare that  10:44:23

21    you would exchange e-mails with Dr. Heligman?         10:44:31

22          A.   Yes.                                        10:44:36

23          Q.   Outside of the plaintiffs in this case, do you  10:44:41

24    have a recollection of ever e-mailing Dr. Heligman    10:44:44

25    concerning any employee other than the plaintiffs?    10:44:47
```

                                                                    10

Jolanda Johnson                                                    May 5, 2021

```
 1        A.   Yes.                                          10:44:50

 2        Q.   And broadly, without identifying the specific 10:44:53

 3   person, to the extent you recall, what are the topics or 10:44:57

 4   what are the reasons that you've communicated by e-mail  10:45:00

 5   with Dr. Heligman other than related to the plaintiffs   10:45:03

 6   in this case?                                            10:45:05

 7        A.   Going back to 2016?                            10:45:13

 8        Q.   Yes.                                           10:45:15

 9        A.   As it pertains to revocation of short-term     10:45:27

10   disability.                                              10:45:30

11        Q.   Okay.  So short-term disability questions in   10:45:31

12   general or specific to employees?                        10:45:34

13        A.   Specific to an employee, more related to since 10:45:36

14   the employee was in a safety-sensitive job, based on     10:45:43

15   what our vendor had at the time as far as the medical    10:45:48

16   condition.  Working with Dr. Heligman, as well as the    10:45:52

17   employee's supervisor, to get an understanding as far as 10:45:59

18   his job duties to determine if the employee would be     10:46:03

19   medically qualified to be returned to work.              10:46:09

20        Q.   Okay.  And we'll -- I know that's one of the   10:46:12

21   topics, but as a general matter, do you know if any of   10:46:14

22   the plaintiffs in this case were eligible for short-term 10:46:17

23   disability benefits?                                     10:46:20

24        A.   It's possible that a few may have been eligible 10:46:22

25   for supplemental sickness or short-term disability       10:46:34
```

11

Jolanda Johnson                                                    May 5, 2021

```
 1    benefits, but I would like to state on record that those   10:46:37

 2    benefits for this group or the ones that may have been     10:46:42

 3    eligible are not managed by benefits.                      10:46:47

 4         Q.   Okay.  Are you aware of any short-term           10:46:52

 5    disability benefits that are provided by CSX to any of     10:46:56

 6    the plaintiffs in this case?                               10:47:00

 7         A.   I wouldn't say provided by CSX, because going    10:47:02

 8    back to their benefits are negotiated, but the -- there    10:47:05

 9    is, like, a supplemental sickness benefit that's          10:47:11

10    administered by CoreSource for certain training, and       10:47:15

11    then there is a short-term disability benefit for --       10:47:18

12    that's administered by Sun Life, and that's for BLET       10:47:25

13    union employees.                                           10:47:31

14         Q.   And BLET stands for the Brotherhood of           10:47:32

15    Locomotive Engineer and Trainmen?                          10:47:35

16         A.   Yes.                                             10:47:38

17         Q.   So those are the conductors and engineers?       10:47:39

18         A.   Yes.                                             10:47:41

19         Q.   And are those short-term disability benefits     10:47:41

20    for the BLET members -- are those premiums paid for by     10:47:44

21    the company or are they voluntary?                         10:47:48

22         A.   I'm not sure, because it goes back to our        10:47:51

23    department does not administer those benefits.  I'm        10:47:54

24    aware of it, of those benefits.  But just to the extent    10:47:57

25    of, you know, it being supplemental sickness benefits or   10:48:01
```

                                                              12

```
 1    short-term disability and the vendor.              10:48:05

 2         Q.   Okay.  Different question.  Do you recall,  10:48:10

 3    either by preparing for this deposition or by your own  10:48:15

 4    memory, whether you had any e-mail correspondence with  10:48:17

 5    Dr. Heligman concerning the plaintiffs in this case  10:48:24

 6    during the period of time 2016 to the present?     10:48:26

 7         A.   Yes.                                      10:48:31

 8         Q.   Okay.  And other than the e-mail that we can  10:48:32

 9    take a look at here now in July of 2017, were there any  10:48:35

10    other e-mails that you had with Dr. -- to or from  10:48:40

11    Dr. Heligman concerning the plaintiffs?            10:48:43

12         A.   No.                                       10:48:45

13         MR. PAUL:  Okay.  Can we mark that Notice of  10:48:53

14    Deposition as Exhibit 1 if we already didn't do that?  10:48:54

15         And I'd like to mark this as Exhibit 2, which  10:48:57

16    is an e-mail dated July 19th, 2017.                10:49:01

17    BY MR. PAUL:                                        10:49:05

18         Q.   Are you able to see that?                10:49:05

19         A.   Yes.                                      10:49:06

20         Q.   Okay.  Is this the e-mail you're referring to?  10:49:08

21         A.   Yes.                                      10:49:09

22         Q.   So is it accurate to say this e-mail chain --  10:49:11

23    and if you need more time to take a look at it, let me  10:49:19

24    know -- is the only e-mail correspondence that you had  10:49:23

25    with Dr. Heligman concerning the plaintiffs?       10:49:25
```

13

Jolanda Johnson                                                    May 5, 2021

```
 1      A.   Yes.                                          10:49:29

 2           MR. PAUL:  I'd like to mark that as Exhibit 2,  10:49:37

 3      please.                                            10:49:39

 4           (Exhibit 2 was marked for identification.)   10:49:50

 5      BY MR. PAUL:                                       10:49:51

 6      Q.   During the time of that e-mail of July of 2017,  10:49:51

 7      what was your position at CSX?                     10:49:55

 8      A.   July 2017, manager of benefits, FMLA.        10:49:57

 9      Q.   Okay.  And if you need to take a look at that  10:50:07

10      e-mail again, let me know; I'll pull it back up.  But  10:50:09

11      what was your understanding of your role as manager of  10:50:13

12      FMLA in that correspondence with Dr. Heligman?    10:50:17

13      A.   To review the employee's FMLA record to provide  10:50:21

14      information about their leaves, if any.            10:50:32

15      Q.   And it looks like from the times of the       10:50:40

16      e-mail -- let me pull that back up.  It appears that you  10:50:44

17      responded to Dr. Heligman by e-mail at 12:41 p.m. on  10:50:54

18      July 19th, 2017.  Do you see that?                 10:50:58

19      A.   Yes.                                          10:51:00

20      Q.   And it looks like, but I want to ask you, the  10:51:01

21      e-mail chain right below that, did you receive an e-mail  10:51:05

22      from Penny Dreher at 11:18 a.m. on July 19, 2017?  10:51:08

23      A.   Yes.                                          10:51:15

24      Q.   So did you perform the work that you were     10:51:16

25      requested by Penny Dreher and submit it to Dr. Heligman  10:51:18
```

                                                                    14

May 5, 2021

1      in between 11:18 a.m. and 12:41 p.m. on July 19?          10:51:22

2          A.   Yes.                                            10:51:27

3          Q.   And did you ever do anything before or after   10:51:28

4      that period of time on July 19 with respect to any of    10:51:31

5      the plaintiffs in this case?                             10:51:35

6          A.   No.                                             10:51:44

7          Q.   Were you asked by Dr. Heligman, anyone in the   10:51:44

8      medical department, or Penny Dreher to review the        10:51:50

9      eligibility for current or future FMLA coverage for any  10:51:53

10     of the plaintiffs in this case based upon the            10:51:57

11     information that was in the attachment chart that we're  10:51:59

12     looking at right now that starts at Bates No. 22262 all  10:52:03

13     the way through the end of that attachment 22272?        10:52:08

14         A.   No.                                             10:52:13

15         Q.   Being that you weren't asked to consider        10:52:13

16     current or future existing FMLA coverage, did it occur   10:52:20

17     to you to investigate that on your own initiative?       10:52:24

18         A.   No.                                             10:52:27

19         Q.   And why not?                                    10:52:28

20         A.   Because due to the possible fraud,              10:52:31

21     investigation had been launched, and so I provided the   10:52:38

22     information as part of the investigation process.        10:52:45

23         Q.   Is there any reason other than the alleged      10:52:49

24     suspicion of fraud that you did not consider processing  10:52:53

25     FMLA applications for the plaintiffs in this case in the 10:52:56

                                                                    15

Jolanda Johnson                                                    May 5, 2021

```
 1    summer of 2017?                                    10:52:59

 2        A.   No.                                       10:53:01

 3        Q.   Okay.  That will take us off of topic 18. 10:53:02

 4             So if we move to topic 7, are you able to see  10:53:11

 5    that topic?                                        10:53:20

 6        A.   Yes.                                       10:53:20

 7        Q.   Okay.  So if you could, tell us for the record  10:53:21

 8    what KEPRO is, and then we'll get to the policies and  10:53:26

 9    practices for processing requests and approval for FMLA  10:53:30

10    in general and specific.                           10:53:33

11             So first, who or what is KEPRO?           10:53:34

12        A.   KEPRO is a third-party vendor that specializes  10:53:38

13    in the administration of FMLA.  They are responsible for  10:53:43

14    handling calls as it relates to FMLA, ranging from  10:53:55

15    answering questions about the FMLA benefits to     10:54:01

16    initiating an FMLA leave request.  Also, they are  10:54:06

17    clinicians or nurses that are responsible for reviewing  10:54:13

18    the medical certification forms and making a decision  10:54:15

19    and pursuant to the FMLA guidelines whether if their  10:54:19

20    leave -- the leave will be approved, denied, or returned  10:54:24

21    to the employee for a cure.  Also, the nurses are  10:54:28

22    responsible for reviewing the employee's FMLA      10:54:33

23    utilization and determining if the employee should be  10:54:38

24    required to recertify.                             10:54:43

25        Q.   And for how long has KEPRO been involved in any  10:54:45
```

16

| | | |
|---|---|---|
| 1 | aspect of CSX's FMLA administration? | 10:54:49 |
| 2 | A.    Since January 2013. | 10:54:53 |
| 3 | Q.    Okay.  And if you consider the period of time | 10:54:55 |
| 4 | of 2013 to the present, would you describe KEPRO's | 10:54:57 |
| 5 | involvement in the administration of CSX's FMLA as a | 10:55:02 |
| 6 | full handoff or a partial handoff? | 10:55:06 |
| 7 | A.    I would say a partial handoff. | 10:55:08 |
| 8 | Q.    Okay.  And throughout that period of time, 2013 | 10:55:15 |
| 9 | to the present, have those -- has that partial handoff | 10:55:19 |
| 10 | changed in any significant manner such that we need to | 10:55:24 |
| 11 | break it down further? | 10:55:27 |
| 12 | A.    So KEPRO is definitely -- when it comes to just | 10:55:29 |
| 13 | the day-to-day administration, they are totally -- have | 10:55:32 |
| 14 | taken ownership of that.  But as far as the designation | 10:55:36 |
| 15 | process, at one point CSX was responsible -- benefits | 10:55:41 |
| 16 | was responsible for designating leave of FMLA.  In about | 10:55:47 |
| 17 | 2019 KEPRO took on ownership of part of that process, | 10:55:53 |
| 18 | specifically as it relates to employee -- management | 10:55:59 |
| 19 | employees, dispatchers, or -- you know, that are | 10:56:04 |
| 20 | approved for short-term disability.  So they manage that | 10:56:09 |
| 21 | process. | 10:56:12 |
| 22 | Also, as far as -- | 10:56:19 |
| 23 | COURT REPORTER:  Ma'am, I'm sorry.  I have my | 10:56:19 |
| 24 | children's school calling me.  Could I go off the record | 10:56:23 |
| 25 | for just a moment? | 11:00:13 |

17

Jolanda Johnson                                                     May 5, 2021

```
 1              MR. PAUL:  Yeah, that's fine.              11:00:13

 2              THE VIDEOGRAPHER:  We're going off the     11:00:13

 3   record --                                            11:00:13

 4              COURT REPORTER:  Thank you.  I'm sorry.    11:00:13

 5              THE VIDEOGRAPHER:  We're going off the record.  11:00:13

 6   The time is 10:56.                                   11:00:13

 7              (Off the record.)                         11:00:13

 8              THE VIDEOGRAPHER:  We're back on the record.  11:00:58

 9   The time is 11:01.                                   11:01:18

10              MR. PAUL:  All right.  Great.             11:01:21

11         BY MR. PAUL:                                    11:01:21

12         Q.  Ms. Johnson, we're back on the record after a  11:01:21

13   short break.  We were talking about KEPRO and its role  11:01:25

14   in the administration of CSX's FMLA process, and I    11:01:29

15   believe you had said that over the course of 2013 to the  11:01:35

16   present, one of the primary things that changed with  11:01:38

17   respect to KEPRO and CSX's FMLA process was the      11:01:41

18   designation process; is that correct?               11:01:46

19         A.  Yes, the designation and I failed to mention  11:01:47

20   the recertification process.                         11:01:50

21         Q.  Okay.  Let's talk about the designation process  11:01:52

22   first.  What does that mean, if you can explain that for  11:01:54

23   the record?                                          11:01:57

24         A.  So if an employee -- and this is specifically  11:01:57

25   employees that the benefits department manages their  11:02:01
```

18

Jolanda Johnson                                                        May 5, 2021

```
 1    short-term disability, so that will be active management    11:02:07

 2    employees, dispatchers.  So once their short-term           11:02:14

 3    disability is approved, then KEPRO will designate their     11:02:16

 4    time as FMLA.                                               11:02:23

 5        Q.   Okay.  So is it accurate to say that the           11:02:24

 6    designation process is the official recognition of an       11:02:27

 7    employee's leave as qualifying for FMLA leave?              11:02:31

 8        A.   Yes, based on short-term disability approval.      11:02:37

 9        Q.   Okay.  Can you explain the relationship between    11:02:41

10    that, the short-term disability process and the FMLA's      11:02:45

11    designation process?                                        11:02:49

12        A.   Yes.  So the short-term disability is              11:02:50

13    administered by New York Life Benefits Solutions,           11:02:54

14    formerly Cigna.  So they, you know, receive medical         11:03:00

15    information from the employee's doctor.  They complete      11:03:04

16    the review of that medical documentation, and they make     11:03:07

17    a decision to either approve or deny the request.           11:03:10

18          With the short-term disability process, the          11:03:16

19    medical information that is obtained is over and beyond     11:03:21

20    what is permitted under the FMLA regulations.  So           11:03:25

21    instead of having the employees get two forms completed,    11:03:30

22    we've taken the position that we'll accept the approval     11:03:34

23    of their short-term disability as a means to designate      11:03:39

24    their FMLA or the continuous leave as FMLA.                 11:03:43

25        Q.   So does that mean for that category of             11:03:48
```

19

USCA4    2609

Jolanda Johnson                                                              May 5, 2021

| | | |
|---|---|---|
| 1 | employees, they do not have to complete an FMLA | 11:03:50 |
| 2 | certification form because the paperwork involved in the | 11:03:53 |
| 3 | application for short-term disability suffices? | 11:03:57 |
| 4 | A.   Yes. | 11:04:01 |
| 5 | Q.   Okay.  And for what class of employees is that | 11:04:01 |
| 6 | process in place for? | 11:04:05 |
| 7 | A.   Active management employees, and I believe the | 11:04:07 |
| 8 | dispatchers as well. | 11:04:11 |
| 9 | Q.   Okay.  Do -- | 11:04:13 |
| 10 | (Simultaneous colloquy.) | 11:04:13 |
| 11 | A.   -- active management. | 11:04:13 |
| 12 | Q.   Okay.  And to your knowledge, does that process | 11:04:15 |
| 13 | that we've just talked about, the short-term disability | 11:04:18 |
| 14 | through Cigna or New York Life, apply to any of the | 11:04:20 |
| 15 | plaintiffs in this case? | 11:04:23 |
| 16 | A.   No.  They're not eligible for benefits with New | 11:04:24 |
| 17 | York Life. | 11:04:29 |
| 18 | Q.   Okay.  And in the testimony today, when you | 11:04:29 |
| 19 | referred to that designation process, you know, in | 11:04:32 |
| 20 | between KEPRO and CSX, does that designation process | 11:04:36 |
| 21 | apply to anyone other than that class of employees that | 11:04:42 |
| 22 | we just talked about, either the dispatchers or the | 11:04:46 |
| 23 | management folks? | 11:04:48 |
| 24 | A.   Well, the process, generally speaking, it can | 11:04:50 |
| 25 | apply to any employee except union employees. | 11:04:54 |

20

Jolanda Johnson                                                    May 5, 2021

```
 1        Q.   So in 2017, who was responsible for the       11:05:00

 2   designation of the union crafts that include the        11:05:04

 3   plaintiffs?                                              11:05:09

 4        A.   Benefits.                                      11:05:09

 5        Q.   Okay.  So the -- it was -- was it KEPRO or was 11:05:10

 6   it someone in benefits at CSX who was responsible for   11:05:16

 7   designating that leave for the plaintiffs?              11:05:18

 8        A.   Well, I'm just speaking in general.  In 2017, 11:05:21

 9   benefits was -- had ownership of the designation        11:05:25

10   process.                                                11:05:28

11        Q.   Okay.  And at some point in time, did that    11:05:29

12   designation for the union employees change to KEPRO?    11:05:31

13        A.   Just to the extent of what I've shared as far 11:05:36

14   as short-term disability.                               11:05:41

15        Q.   Okay.  But including -- I guess let me ask it 11:05:42

16   this way:  Was there ever a shift in the designation    11:05:45

17   process from CSX to KEPRO with respect to all           11:05:49

18   employees --                                            11:05:55

19        A.   No.                                           11:05:56

20        Q.   -- on the designation topic?                  11:05:56

21        A.   No.                                           11:05:58

22        Q.   Okay.  So today, is CSX still responsible for 11:05:58

23   the designation process for all employees?             11:06:05

24        A.   Yes.                                           11:06:07

25        Q.   I think we've established this but not in this 11:06:07
```

                                                                    21

Jolanda Johnson                                                      May 5, 2021

```
1    deposition.  Are you aware -- I'm on topic 7 and the     11:06:25

2    last part that says, "Specific to any of the            11:06:29

3    plaintiffs."  I want to ask you, do you have any         11:06:31

4    knowledge about whether any of the plaintiffs in this    11:06:33

5    case were considered by CSX or KEPRO for FMLA leave      11:06:36

6    starting in June of 2017 moving forward?                 11:06:42

7         A.   No.                                            11:06:45

8         Q.   So in general -- now I'm on topic 7 in general. 11:06:48

9    Can you just walk through the process of how -- what the  11:07:00

10   policies and practices are for processing requests and   11:07:05

11   approval for FMLA?                                        11:07:08

12        And let's right now start with union employees.     11:07:11

13   To the extent it may be different, we can talk about     11:07:13

14   that later.                                              11:07:16

15        A.   If a union employee has a need for FMLA leave,  11:07:18

16   they would -- or should contact KEPRO -- it's known as   11:07:23

17   the CSX FMLA Center -- to initiate leave.  A customer    11:07:31

18   service rep will ask the employee a series of questions  11:07:39

19   such as their CSX ID number, the reason for leave and    11:07:44

20   the type of leave.  They would then run the eligibility  11:07:48

21   just to confirm that the employee meets the eligibility  11:07:55

22   requirements, at least 12 months of service with the     11:07:59

23   company and have worked at least 1,250 hours within a    11:08:03

24   12-month period from the start date of leave.            11:08:07

25        Q.   Okay.  Can I stop you there for one moment?     11:08:10
```

22

Jolanda Johnson                                                    May 5, 2021

| | | |
|---|---|---|
| 1 | What is the CSX FMLA Center? | 11:08:13 |
| 2 | A.   KEPRO. | 11:08:17 |
| 3 | Q.   Okay.  They are one and the same? | 11:08:18 |
| 4 | A.   Yes. | 11:08:20 |
| 5 | Q.   And for how long has that term been in use, the | 11:08:20 |
| 6 | CSX FMLA Center, referring to KEPRO? | 11:08:24 |
| 7 | A.   Since 2013. | 11:08:26 |
| 8 | Q.   Okay.  And to your knowledge, have any of the | 11:08:27 |
| 9 | union employees, including the plaintiffs in this case, | 11:08:34 |
| 10 | ever been provided any training on the FMLA at CSX? | 11:08:36 |
| 11 | A.   No. | 11:08:40 |
| 12 | Q.   To your knowledge, have any of the supervisors, | 11:08:45 |
| 13 | say, in the Huntington, Kentucky or Ohio area ever been | 11:08:48 |
| 14 | provided any training under the FMLA at CSX? | 11:08:53 |
| 15 | A.   Okay.  So let me step back on the union | 11:08:53 |
| 16 | employees.  So to the extent of -- there was a training | 11:08:56 |
| 17 | I believe in 2018, '19.  There was a segment of FMLA | 11:09:01 |
| 18 | information that was provided.  There was other content | 11:09:07 |
| 19 | that was covered in the training, but there was -- I was | 11:09:11 |
| 20 | responsible for providing content in regards to the | 11:09:17 |
| 21 | FMLA. | 11:09:20 |
| 22 | Q.   Okay.  How about prior to 2018 or '19?  Is your | 11:09:21 |
| 23 | answer the same that there was no training? | 11:09:28 |
| 24 | A.   Yes.  No training. | 11:09:30 |
| 25 | Q.   And that was no training to both union | 11:09:31 |

23

USCA4   2613

1    employees and supervisors?                              11:09:33

2        A.    No to union employees.  Yes to supervisors.  11:09:35

3        Q.    Okay.  What training are you aware of that was  11:09:40

4    provided to supervisors prior to 2018 and '19?         11:09:43

5        A.    In 2 -- so in general with managers, if they  11:09:46

6    have direct reports, I would provide training on an ad  11:09:51

7    hoc basis or as requested.  But in 2016, we actually   11:09:57

8    held training.  And it was not just FMLA, but it       11:10:06

9    included medical.  It included labor relations.  It    11:10:10

10   included, you know, payroll.  And so it was a training  11:10:16

11   session for all people leaders or people that had direct  11:10:24

12   reports who were able to attend in person.             11:10:29

13       Q.    Other than by an employee contacting the CSX  11:10:37

14   FMLA Center, that is KEPRO, what other means can the   11:10:46

15   company process an application for FMLA coverage?      11:10:50

16       A.    An employee, if they mark off FMLA, meaning   11:10:55

17   either mark off FMLA by calling per management or mark  11:11:03

18   off FMLA with a time keeper or their manager, once their  11:11:07

19   work history has been updated with an FMLA absence, that  11:11:13

20   information is transmitted on a file from CSX to QCERA.  11:11:18

21   That information, those absences, are then uploaded into  11:11:27

22   LeaveSource which is the system that is used to         11:11:34

23   administer FMLA.                                        11:11:37

24       Q.    And just --                                   11:11:42

25       A.    And --                                        11:11:42

                                                              24

Jolanda Johnson                                                    May 5, 2021

```
 1        Q.   I'm sorry, go ahead.                      11:11:42

 2        A.    Those absences will auto adjudicate if there is  11:11:42

 3   an existing leave and the absence is for the FMLA   11:11:47

 4   reason, meaning the FMLA mark-off code is for family 11:11:55

 5   member or self.  Then if they're -- for example, let's 11:12:03

 6   say the employee marks off for self, and there is an 11:12:05

 7   FMLA leave for the employee's own serious health     11:12:09

 8   condition, if that absence falls within that approval 11:12:13

 9   period, then it would auto adjudicate or automatically 11:12:16

10   be assigned to that leave.  Whereas, if the employee 11:12:21

11   marked off for self and there's not an existing leave, 11:12:24

12   or there's a leave maybe for a family member's serious 11:12:28

13   health condition, or the mark-off falls outside of the 11:12:35

14   approval period, then it will go to what's called    11:12:38

15   inbound list.  And KEPRO, or the CSX FMLA Center, is  11:12:43

16   responsible for processing those exceptions.          11:12:48

17        So similar to, like, a phone call, they would    11:12:53

18   go through that same process.  Okay, this mark-off is 11:12:56

19   for the employee's serious health condition so we'll -- 11:13:00

20   they'll initiate a leave for the employee's serious   11:13:05

21   health condition, run the eligibility to establish if 11:13:09

22   they qualify, and then make a decision either to place 11:13:11

23   the employee in a conditional pending status or deny it 11:13:15

24   if they don't meet the eligibility requirements.      11:13:21

25        Q.   Okay.  So it sounds like on this second     11:13:24
```

                                                              25

1    topic -- the first topic being that an employee can call    11:13:27

2    the FMLA center; the second being that an employee can       11:13:31

3    notify crew management of either an existing FMLA            11:13:35

4    coverage or a new potentially qualifying FMLA                11:13:39

5    coverage that goes on the inbound list.  Did I get that      11:13:44

6    right?                                                       11:13:47

7        A.    Yeah.  So it's crew management, now, because       11:13:47

8    not all employees call into crew management.  But crew       11:13:50

9    management, they can mark off -- like, train and engine      11:13:53

10   employees can mark off through Crew Life, which is an        11:13:56

11   application.  Then other union employees, since you were     11:13:59

12   talking about just union employees in general, they may      11:14:05

13   have a time keeper that they call in, you know, to mark      11:14:07

14   off with or a manager.  So there's various ways,             11:14:12

15   depending on the group or where they're located, that        11:14:16

16   will determine their mark-off process.                       11:14:22

17       Q.    Okay.  Is it accurate to say that the second       11:14:25

18   way that an employee can mark off either for existing or     11:14:29

19   a new FMLA is to contact whoever that person is that's       11:14:32

20   responsible for attendance based on their craft and          11:14:37

21   department?                                                  11:14:40

22       A.    Correct.                                           11:14:41

23       Q.    Okay.                                              11:14:41

24       A.    And it will either be a person, and as I've        11:14:41

25   stated, for T & E employees, they actually have an app       11:14:45

26

Jolanda Johnson                                                          May 5, 2021

```
 1   where, you know -- you know, it's an application that    11:14:49

 2   they can use to mark off versus a person.                11:14:56

 3        Q.   Okay.  Are there any other apps that you can   11:14:59

 4   think of, just so we, you know, complete this topic?     11:15:03

 5        A.   No.                                            11:15:07

 6        Q.   Do employees like craft employees, like the   11:15:08

 7   plaintiffs in this case, do they have access to          11:15:12

 8   LeaveSource?                                             11:15:14

 9        A.   Yes.                                           11:15:15

10        Q.   Is there any opportunity for an employee to log 11:15:16

11   into LeaveSource and trigger FMLA leave, either existing 11:15:23

12   or new?                                                  11:15:29

13        A.   No.                                            11:15:30

14        Q.   So we've talked about the FMLA center.  We've  11:15:31

15   talked about crew management or apps or other people who 11:15:35

16   are responsible for attendance.  Are there any other     11:15:41

17   ways that an employee can initiate an FMLA application   11:15:46

18   at CSX?                                                  11:15:49

19        A.   I mean, if they send an e-mail to our mailbox, 11:15:57

20   which is leaveadmin@csx.com, or to a member of the       11:16:04

21   benefits team, two things can happen.  We will go ahead  11:16:13

22   and initiate the leave on the employee's behalf, or we   11:16:18

23   may redirect the employee to reach out to the CSX FMLA   11:16:21

24   Center to initiate FMLA.                                 11:16:27

25        Q.   And how long has that mailbox,                 11:16:33
```

27

Jolanda Johnson                                                        May 5, 2021

```
 1   leaveadmin@csx.com, been in place?                    11:16:35

 2        A.   It was put in place in 2017 or 2018, but at the   11:16:39

 3   time that it was put in place, it -- only certain    11:16:48

 4   departments or persons had access to it.  So the craft   11:16:55

 5   employees or management employees did not have access to  11:17:01

 6   send e-mails to that mailbox.  It was opened up to allow  11:17:03

 7   anyone to send an e-mail to that mailbox I believe   11:17:10

 8   in 2019.                                              11:17:13

 9        Q.   Okay.  And is it also correct that an employee  11:17:15

10   could initiate an FMLA application process through his  11:17:22

11   or her supervisor?                                    11:17:26

12        A.   Yes.                                        11:17:27

13        Q.   Is it also correct to say that an employee  11:17:27

14   could initiate FMLA or potentially FMLA qualifying    11:17:32

15   absences through the medical department?             11:17:36

16        A.   So to clarify, let me step back to the manager.  11:17:38

17   So in the event that an employee lets their manager   11:17:44

18   know, "Hey, I need FMLA," two things could happen.  The  11:17:48

19   manager could let them know that, "Hey, you need to   11:17:51

20   contact the CSX FMLA Center," or the manager may send an  11:17:54

21   e-mail to the benefits department, and then we will   11:17:58

22   start that process.  And on occasion, which it doesn't  11:18:01

23   happen very often, but the manager too can call in to  11:18:05

24   the CSX FMLA Center and initiate the FMLA on the      11:18:10

25   employee's behalf.                                    11:18:15
```

                                                                        28

Jolanda Johnson                                                    May 5, 2021

1        Q.    Okay.  And is that also correct with respect to    11:18:16

2    the employee initiating FMLA to the medical department?    11:18:20

3        A.    So when you say, "initiate FMLA," I would say    11:18:23

4    no simply because the medical department's role is    11:18:38

5    dealing with just being off medical in general, so to    11:18:40

6    that extent.  But to say -- to call in to initiate the    11:18:43

7    FMLA, that the medical department would refer them to    11:18:49

8    the CSX FMLA Center.    11:18:54

9        Q.    Okay.  Let me ask a more specific question.    11:18:57

10    Are you aware of any communications in general, by    11:18:59

11    e-mail or otherwise, where the medical department has    11:19:03

12    informed the FMLA department at CSX of an employee's    11:19:06

13    need for FMLA or potentially FMLA qualifying absence?    11:19:11

14        A.    Yes.    11:19:16

15        Q.    Okay.  What do you know about that?    11:19:19

16        A.    So the medical department will -- you know, we    11:19:20

17    would receive notification that someone is off -- off    11:19:25

18    due to a medical reason, and so they would provide us    11:19:30

19    notice of that absence.    11:19:35

20        Q.    Okay.  And for how long has the medical    11:19:38

21    department notified you or your department at CSX    11:19:40

22    concerning employees' potential FMLA qualifying    11:19:45

23    absences?    11:19:47

24        A.    How long?    11:19:48

25        Q.    For how long?    11:19:52

                                                              29

Jolanda Johnson                                                    May 5, 2021

```
 1        A.   I mean --                                  11:19:57

 2        Q.   As long as you remember?                   11:19:57

 3        A.   Yes.                                        11:19:57

 4        Q.   Okay.                                       11:19:58

 5        A.   Yes.                                        11:19:58

 6        Q.   Have you -- and I know -- I know you've been 11:19:59

 7   with CSX since 1999, but for how long have you been  11:20:02

 8   involved in CSX's FMLA policies and practices?        11:20:05

 9        A.   Since 2005.                                 11:20:08

10        Q.   Okay.  So is -- can we say that it's true that 11:20:10

11   at least since 2005 that the medical department has  11:20:14

12   communicated with the FMLA department at CSX concerning 11:20:18

13   an employee's potential FMLA qualifying event?       11:20:21

14        A.   Yes.  But I would like to state this:  It  11:20:24

15   wasn't, keep in mind -- well, not keep in mind.  But  11:20:31

16   even though I'm saying I've been in this space since  11:20:35

17   2005, it's not like in 2005 to the present that we were 11:20:38

18   made aware of every single employee that has gone out 11:20:44

19   due to a medical reason.  I know that medical had worked 11:20:47

20   to put a system -- a report that they generated for us 11:20:51

21   to identify those employees that were off medical, but 11:20:58

22   there was an issue with the report so we weren't getting 11:21:06

23   the report.  So not sure when it was actually put in  11:21:09

24   place and when it was -- we started experiencing issues 11:21:15

25   with that report, but the intent was to -- for        11:21:18
```

30

| | | |
|---|---|---|
| 1 | visibility so we'll be able to be notified, you know, | 11:21:25 |
| 2 | when employees go out due to a medical reason. | 11:21:28 |
| 3 | Q.   I understand you don't remember or recall the | 11:21:30 |
| 4 | exact time period, so we can come back to that in a | 11:21:34 |
| 5 | minute.  But for whatever period of time that this was | 11:21:36 |
| 6 | in place, did you receive weekly reports from the | 11:21:39 |
| 7 | medical department about employees' potential FMLA | 11:21:42 |
| 8 | qualifying absences? | 11:21:46 |
| 9 | A.   Based off -- from what I can recall, yes. | 11:21:47 |
| 10 | Q.   Okay.  And do you -- just to be specific to | 11:21:50 |
| 11 | calendar year 2017, do you know if that process was in | 11:21:55 |
| 12 | place that we're talking about? | 11:21:59 |
| 13 | A.   I don't recall, simply because it goes back | 11:22:03 |
| 14 | to -- I don't recall when it was put in place, but I | 11:22:08 |
| 15 | also don't recall at what point there was an issue with | 11:22:12 |
| 16 | the reporting. | 11:22:17 |
| 17 | Q.   Is it working today? | 11:22:18 |
| 18 | A.   I don't know, simply because I came out of that | 11:22:20 |
| 19 | space for a couple of years.  And so we have a | 11:22:26 |
| 20 | centralized mailbox where all the reports and any | 11:22:30 |
| 21 | inquiries that are -- it's being sent to, and I'm not | 11:22:33 |
| 22 | involved with the day-to-day aspect of the FMLA. | 11:22:38 |
| 23 | Q.   Okay.  Were you involved in the day-to-day | 11:22:41 |
| 24 | aspect before January of 2019? | 11:22:44 |
| 25 | A.   Yes. | 11:22:47 |

31

```
1        Q.   Okay.  So to the best of your memory -- I've    11:22:47

2   already asked you about 2017, but to the best of your     11:22:52

3   memory, was this process where the medical department     11:22:54

4   would send a report to the FMLA department in existence   11:22:57

5   in 2018 or '19?                                           11:23:00

6        A.   I don't recall.                                 11:23:03

7        Q.   And you may have touched on this, but what was  11:23:10

8   the purpose of having that system in place where the      11:23:13

9   medical department would communicate with the FMLA       11:23:16

10  department concerning employees' potential eligibility    11:23:18

11  for FMLA leave?                                           11:23:22

12       A.   Well, not a system, a report that we would      11:23:23

13  receive, but just, once again, for us to have visibility  11:23:27

14  as far as the employees who are off on FMLA.  And then    11:23:31

15  at that point, we would conduct a review to determine if  11:23:34

16  the absence would be designated as FMLA.                  11:23:38

17       Q.   Okay.  That was going to be my next question,   11:23:43

18  is what did you do upon receipt of those reports.  And    11:23:45

19  did you or someone in your department make that           11:23:49

20  eligibility assessment, or did that get shifted over to   11:23:51

21  KEPRO?                                                    11:23:54

22       A.   Benefits.                                       11:23:54

23       Q.   Okay.  And then what would happen -- what's the 11:23:56

24  next step after that determination of eligibility?        11:23:59

25       A.   Verify if they -- if the employee had any       11:24:04
```

                                                                       32

Jolanda Johnson                                                      May 5, 2021

```
 1    entitlements available.                          11:24:07

 2        Q.   Okay.  Can you explain what you mean by  11:24:08

 3    "entitlements"?                                   11:24:11

 4        A.   Under the FMLA, the employees are allowed up  11:24:12

 5    to 12 work weeks of unpaid job protected leave.  So  11:24:15

 6    looking at in sum the employee's FMLA balance.    11:24:20

 7        Q.   Got it.  And then what would be the next step  11:24:27

 8    in the FMLA process after the eligibility and     11:24:29

 9    entitlement were checked?                         11:24:32

10        A.   The issue of designation.                11:24:34

11        Q.   And what is that, please?                11:24:36

12        A.   It's a letter that's sent to the employee  11:24:38

13    advising them that we received information that they're  11:24:41

14    unable to work due to a personal illness or injury, and  11:24:47

15    that pursuant with the FMLA regulations, their    11:24:51

16    continuous time has been designated as FMLA, reminding  11:24:57

17    the employee as far as how much time is allowed under  11:25:00

18    the FMLA.  And then a copy of the CSX FMLA policy is  11:25:06

19    included.                                         11:25:16

20        Q.   Okay.  And at this point in the process that  11:25:16

21    we're discussing right now, did the medical       11:25:20

22    certification form happen or not happen yet?      11:25:22

23        A.   Did not.                                 11:25:25

24        Q.   Okay.  What's the next step after what you just  11:25:27

25    described?                                        11:25:31
```

                                                                          33

```
 1        A.    End of the process.                          11:25:32

 2        Q.    I'm sorry?                                   11:25:34

 3        A.    It's end of the designation process.         11:25:35

 4        Q.    Okay.  So what happens next?  Does it go to  11:25:38

 5   KEPRO, or do you do something in-house?                 11:25:46

 6        A.    No, it's all in-house.  So the letter of     11:25:48

 7   designation is generated from LeaveSource.  So KEPRO is 11:25:50

 8   not involved in the process.                            11:25:55

 9        Q.    Okay.  When does the medical certification form 11:25:57

10   come into play that an employee or the employee's health 11:26:01

11   care provider has to complete?                          11:26:04

12        A.    There's no -- we don't request a medical     11:26:06

13   certification form.                                     11:26:08

14        Q.    Okay.  For how long has that been the practice? 11:26:09

15        A.    It's always been our practice.               11:26:12

16        Q.    So it's your testimony that CSX has never    11:26:15

17   requested a medical certification form from an employee 11:26:19

18   or his or her health care provider?                     11:26:22

19        A.    No, you said -- you were asking about the    11:26:24

20   designation process.                                    11:26:28

21        Q.    Okay.  I think we're done with designation,  11:26:28

22   aren't we?                                              11:26:32

23        A.    Yeah, I thought you said what's next.  Like  11:26:32

24   after it's designated, you said what's next?            11:26:35

25        Q.    Okay.  No, that's all right.  Well, just --  11:26:37
```

34

```
 1              (Simultaneous colloquy.)              11:26:37

 2       A.    -- process.  So then you said, "Well, what   11:26:37

 3  happens?  There's KEPRO.  Do you send out a medical   11:26:40

 4  certification form?"  So.                           11:26:43

 5       Q.    Okay.  We're just kind of looking at an   11:26:44

 6  overview of the FMLA process as it relates to CSX's, you   11:26:48

 7  know, policies and procedures.                      11:26:52

 8       A.    Okay.                                    11:26:54

 9       Q.    So after this designation process -- well,   11:26:54

10  first, have we talked about everything in the       11:26:57

11  designation process so far?                         11:26:59

12       A.    Yes.                                     11:27:00

13       Q.    Okay.  So what happens next in terms of an   11:27:01

14  overview of the FMLA process, you know, concerning CSX's   11:27:05

15  policies and practices?                             11:27:10

16       A.    Could you clarify?  Because you keep saying,   11:27:12

17  "What happens next?"  And to me, we just wrapped up our   11:27:15

18  discussion about designation.  So what's next, what am I   11:27:20

19  expanding on?                                       11:27:26

20       Q.    Sure.  Okay.  So let me take, like, two or   11:27:27

21  three steps back.  I'm just trying to get kind of a   11:27:30

22  longitudinal picture of when an employee is in need of   11:27:33

23  FMLA leave and what CSX does from that point all the way   11:27:38

24  until the end.                                      11:27:43

25       A.    Okay.  So in the event that an employee   11:27:45
```

35

Jolanda Johnson                                                    May 5, 2021

```
 1    initiates leave, then KEPRO will run the eligibility,    11:27:50

 2    verify that the employee has entitlements available.  If  11:27:58

 3    the employee qualifies, then they're placed in what's     11:28:03

 4    called a conditional approval status.  The employee is    11:28:06

 5    mailed an employer response packet.  In the employer      11:28:12

 6    response packet is a letter of acknowledgment as far as   11:28:19

 7    the leave that was initiated.  It provides information    11:28:21

 8    about the type of leave, meaning if it's for self or a    11:28:24

 9    covered family member; the leave type, if it's            11:28:29

10    intermittent or continuous.                               11:28:33

11         Then there's other information that is provided     11:28:35

12    to the employee as far as expectations, as far as the     11:28:37

13    due date that they're required to provide a medical       11:28:42

14    certification form, the due date of when the medical      11:28:45

15    certification form was to be received, what will happen   11:28:49

16    if the employee fails to provide the certification        11:28:54

17    within the allotted time period.                          11:28:59

18         There's also language in the letter about the       11:29:01

19    purpose of FMLA and what is considered to be FMLA         11:29:10

20    misuse.  A copy of the CSX FMLA leave policy is           11:29:16

21    included, and then also a medical certification form to   11:29:23

22    be completed by the employee.  There's a section to be    11:29:26

23    completed by the employee, and then a section to be       11:29:30

24    completed by the health care physician.                   11:29:33

25    Q.   In calendar year 2017, was KEPRO or CSX              11:29:35
```

                                                                         36

Jolanda Johnson                                                    May 5, 2021

```
 1   responsible for mailing out that packet that included      11:29:41

 2   the medical certification form for an employee and/or      11:29:44

 3   his or her health care provider to complete?               11:29:49

 4       A.   The packet is initiated by KEPRO, but the         11:29:52

 5   packet is mailed out by CSX document processing            11:29:58

 6   department.                                                11:30:04

 7       Q.   And where is that department located?            11:30:04

 8       A.   Jacksonville, Florida.                           11:30:07

 9       Q.   Okay.  So there -- is there some kind of          11:30:10

10   communication between KEPRO and that department in         11:30:12

11   Jacksonville that you just mentioned on this topic of      11:30:15

12   sending out the packet that includes the medical           11:30:18

13   certification form?                                        11:30:20

14       A.   No.                                              11:30:22

15       Q.   Okay.  How does that -- what's the connection     11:30:23

16   between KEPRO and this packet being sent out of            11:30:27

17   Jacksonville?                                              11:30:30

18       A.   So LeaveSource is the system that we use to       11:30:31

19   administer the FMLA.  So the FMLA leave requests are       11:30:35

20   initiated in the system.  So if a person qualifies, then   11:30:40

21   the ERP is generated or the employer response packet.      11:30:45

22   If the employee is not eligible, then the request is       11:30:49

23   denied.  So the declination letter will include, you       11:30:52

24   know, the reason for leave and the reason why the leave    11:30:58

25   is denied.  So whatever is generated today will be         11:31:00
```

37

Jolanda Johnson                                                    May 5, 2021

1    queued up or those documents will be placed in a queue        11:31:11

2    the following business day.  And then document services       11:31:16

3    or processing will go into the system and retrieve all        11:31:22

4    of the correspondence that are in the queue and then          11:31:26

5    mail those letters.                                           11:31:32

6        Q.   Okay.  And you mentioned ERP.  That stands for       11:31:33

7    employer response packet?                                     11:31:37

8        A.   Yes.                                                 11:31:39

9        Q.   Okay.  And maybe -- I know you've described          11:31:39

10   some things that have gone out, but just to be clear,         11:31:42

11   what documents are included in the employer response          11:31:45

12   packet?                                                       11:31:47

13       A.   The letter.  And I described all the -- what's       11:31:48

14   covered in the letter.  Copy of --                           11:31:53

15       Q.   The designation letter?  I'm sorry.  Is that         11:31:55

16   the designation letter or something else?                     11:31:59

17       A.   No, it's not a designation letter.  It's a          11:32:01

18   letter that provides information about a leave request.       11:32:04

19   The type of leave, if it's, like, for an employee's own       11:32:06

20   serious health condition; if it's an intermittent versus      11:32:11

21   a continuous leave; when the medical certification is         11:32:14

22   due.  It provides information about the purpose of FMLA        11:32:19

23   and what is considered to be misuse under the FMLA, a         11:32:28

24   copy of the CSX FMLA leave policy, and the medical            11:32:32

25   certification form.                                           11:32:35

                                                                    38

Jolanda Johnson                                                          May 5, 2021

1      Q.    Okay.  And it sounds like that letter that you     11:32:37

2    described that's part of the employer response packet --   11:32:47

3    it sounds like that was specific to an employee as         11:32:51

4    opposed to a form letter; is that correct?                 11:32:55

5      A.    Partial.  So, yes, part of it is specific to       11:32:57

6    the employee.  Their name, their ID, the address, the      11:33:05

7    reason for leave.  But the majority of the letter, it is   11:33:08

8    standard language.                                         11:33:13

9      Q.    Okay.  Based on your training and experience at    11:33:16

10   CSX, you know, with FMLA, are you familiar with the        11:33:22

11   topics "General and Specific Notification" as it relates   11:33:25

12   to the FMLA?                                               11:33:29

13     A.    Yes.                                               11:33:31

14     Q.    Okay.  What do those terms mean to you starting    11:33:32

15   with the -- you know, general?                             11:33:35

16     A.    Yeah, so there's -- pursuant with the              11:33:38

17   regulations, there are certain notices that we are         11:33:42

18   required to provide employees.                             11:33:45

19     Q.    And that falls under general or specific?          11:33:52

20     A.    I mean, it depends on what notices we're           11:33:56

21   talking about.  So the -- so, like, for example, the       11:34:09

22   declination.  I mean, we're required to -- if the leave    11:34:17

23   is going to be denied, we're required to provide notice    11:34:20

24   to the employee.  And it has to be -- we just can't        11:34:23

25   say -- send a general, you know, letter saying, "Hey,      11:34:27

                                                                        39

```
 1    it's denied."  We have to identify why the leave is        11:34:30

 2    denied.                                                     11:34:35

 3        Q.   Okay.  But is it correct to say that CSX has an    11:34:35

 4    obligation to provide specific notification to an          11:34:39

 5    employee of their eligibility for FMLA once they're on     11:34:42

 6    notice of a potentially FMLA qualifying absence?           11:34:46

 7        A.   Repeat that again.                                 11:34:52

 8        Q.   Sure.  Let me -- let me back up a minute.  Let     11:34:56

 9    me show you.  Am I still screen sharing?  Yeah, looks      11:35:01

10    like it.                                                    11:35:05

11        A.   Yes.                                               11:35:06

12        Q.   Okay.  Is it correct to say -- and we can look     11:35:06

13    at these -- that CSX has written policies and, in this     11:35:09

14    case, frequently-asked questions about the FMLA?  Do you   11:35:14

15    see that?                                                   11:35:18

16        A.   Yes.                                               11:35:18

17        Q.   And without getting into the specifics,           11:35:18

18    although you're welcome to read all of these if you        11:35:23

19    want, this first document appears to be what's called      11:35:26

20    "Frequently-asked questions about FMLA."  Do you see       11:35:28

21    that?                                                       11:35:31

22        A.   Yes.                                               11:35:32

23        Q.   And then the next page -- well, three pages --     11:35:32

24    the third page, rather, is what looks to be a "Family      11:35:37

25    and Medical Leave Act, FMLA, Policy, Effective Date        11:35:41
```

                                                                    40

Jolanda Johnson                                                              May 5, 2021

```
 1   January 16th of 2009, Revised March 9th of 2017."  Do      11:35:44

 2   you see where I read that?                                  11:35:49

 3       A.  Yes.                                                11:35:50

 4       Q.  Okay.  And is that what this is, CSX's policy       11:35:50

 5   on FMLA?                                                    11:35:54

 6       A.  Yeah.  It's not just only our policy, but the      11:35:56

 7   DOL have what's called rights and responsibilities, and    11:36:02

 8   so we incorporated a lot of language that we needed to     11:36:05

 9   cover or make sure that the employee was aware of into     11:36:12

10   our policy.  So instead of having a policy as well --      11:36:17

11   along with the rights and responsibilities, we've          11:36:19

12   incorporated all of that into our policy.                  11:36:21

13       Q.  Okay.  Got it.  So is that saying that, yes,        11:36:25

14   this is CSX's policy on FMLA, but it also incorporates     11:36:30

15   some of the Department of Labor regulations on the FMLA?   11:36:38

16       A.  Yes.                                                11:36:39

17       Q.  All right.  And now, this next document -- and     11:36:40

18   let me know if I need to blow this up.  It's also called   11:36:49

19   "Family and Medical Leave Act, Effective January 16th of   11:36:53

20   2009"; is that correct?                                     11:36:57

21       A.  Yes.                                                11:36:58

22       Q.  So does that date, January 16th of 2009 -- and     11:36:58

23   that's at Bates No. 22205.  Is that the original policy    11:37:04

24   that is referenced in this seemingly newer policy that     11:37:10

25   starts at Bates No. 22201 -- I'm sorry.  That's the        11:37:15
```

41

Jolanda Johnson                                                    May 5, 2021

```
 1        A.    Scroll back to the other document that you    11:37:24

 2   referenced, please.                                      11:37:33

 3        Q.    This one?  Um-hum.                            11:37:37

 4        A.    Yeah.                                         11:37:37

 5              THE VIDEOGRAPHER:  Counsel, really quickly,   11:37:37

 6   which exhibit is this?                                   11:37:39

 7              MR. PAUL:  I don't think we've marked this yet. 11:37:40

 8   I think it will be Exhibit 3.                            11:37:42

 9              (Exhibit 3 was marked for identification.)    11:37:45

10              THE DEPONENT:  Could you -- it's --           11:37:52

11   BY MR. PAUL:                                             11:37:52

12        Q.    You want me to go down?                       11:37:52

13        A.    -- showing additional pages.  Yes, let -- I   11:37:54

14   prefer to look at the document in entirety.              11:37:55

15              MS. BIRD:  Whoa, whoa, whoa, whoa, whoa, whoa. 11:37:59

16   You went too far.  Yeah.                                 11:38:00

17              MR. PAUL:  Go down?                            11:38:27

18              THE DEPONENT:  Go ahead.                       11:38:27

19              MS. BIRD:  I tried to scroll down myself, and  11:38:27

20   it doesn't work that way.                                11:38:28

21              MR. PAUL:  You need -- you need eDepoze for    11:38:32

22   that.                                                    11:38:34

23              MS. BIRD:  That's right.                       11:38:36

24              THE DEPONENT:  Go ahead.  You can keep going.  11:38:40

25                                                            42
```

                                                                      42

```
1        BY MR. PAUL:                                 11:38:46

2        Q.   Still more?                             11:38:46

3        A.   So yes.  Yeah.  This is -- yes, this is the    11:38:47

4    policy at that time.                             11:38:51

5        Q.   Okay.  So looks like the -- this initial policy    11:38:52

6    is dated -- effective date January 16th of 2009.  That    11:39:01

7    starts at Bates No. 22205 and goes all the way to Bates    11:39:06

8    No. 22208; is that correct?                      11:39:12

9        A.   Yes.                                    11:39:14

10       Q.   Okay.  And I think my question was, the policy    11:39:15

11   before that, seems like more of a -- more than a    11:39:19

12   coincidence that it also references a January 16th,    11:39:24

13   2009, date at the very beginning, which is Bates    11:39:28

14   No. 22200.  Do you see that?  Let me blow that up a    11:39:35

15   little bit.                                      11:39:38

16       A.   Yes.  But it also -- also referenced a revised    11:39:39

17   date March 9th, 2017.                            11:39:44

18       Q.   Correct.  Right.  So far these two documents    11:39:46

19   that we've looked at, to your knowledge, are those CSX's    11:39:50

20   FMLA written policies?                           11:39:54

21       A.   Yes.                                    11:39:56

22       Q.   Okay.  Are there any others that you're aware    11:39:57

23   of?                                             11:40:00

24       A.   No.                                     11:40:01

25       Q.   Okay.  So we've got this frequently-asked    11:40:04
```

                                                             43

```
 1    question form.  It says, "Revised August 12, 2016."  Do    11:40:10

 2    you see where I read that?                                  11:40:14

 3         A.   Yes.                                              11:40:15

 4         Q.   And we've got these two policies that we've       11:40:16

 5    talked about.  And then there's one more document at the    11:40:20

 6    end, this document that is Bates 22209.  And do you know    11:40:26

 7    what that is?                                               11:40:34

 8         A.   Yes.  That's the Department of Labor document.    11:40:35

 9         Q.   Okay.  So this is something that -- how is this   11:40:43

10    used at CSX if you know?                                    11:40:48

11         A.   Prior to the revision of our policy, we had our   11:40:51

12    policy and then we also posted the rights and              11:40:57

13    responsibilities.  But then eventually, we just took --     11:41:00

14    kind of combed through the Department of Labor's rights     11:41:06

15    and responsibilities, and incorporated a lot of the        11:41:10

16    language or points that had to be covered and just         11:41:14

17    included it in our policy.                                  11:41:18

18         Q.   I'm sorry, can you clarify what you mean when     11:41:24

19    you say the "rights and responsibilities"?  Is that a       11:41:26

20    letter or a document or a reference to some regulation,     11:41:28

21    or all of the above?                                        11:41:31

22         A.   It's the actual FMLA document that you just --    11:41:33

23    you referenced the very last document.  So that --          11:41:38

24         Q.   Yes?                                              11:41:42

25         A.   -- "Employee Rights and Responsibilities," yes.   11:41:42
```

                                                                              44

Jolanda Johnson                                                    May 5, 2021

1      Q.   Okay.  This is what you're referring to as the        11:41:45

2    rights --                                                      11:41:47

3      A.   Right.  So that's a Department of Labor              11:41:47

4    document.  And so what we did was -- you know, a lot of      11:41:50

5    it we had already covered in our policy, but just kind       11:41:56

6    of combed through the rights and responsibilities and        11:41:59

7    made sure that it was addressed in the CSX policy.           11:42:02

8      Q.   Does the -- I'm sorry, go ahead.                      11:42:07

9      A.   I was about to say, so instead of them having        11:42:11

10   to read the policy and then the Department of Labor's        11:42:13

11   rights -- Employee's Rights and Responsibilities, now       11:42:16

12   they -- it's all centralized into one document.             11:42:20

13     Q.   Okay.  Does this document we're looking at           11:42:22

14   right here, 22209, okay, where it says, "Employee Rights    11:42:25

15   and Responsibilities," is that connected with this next     11:42:32

16   document that's Bates numbered 22210 or are they            11:42:34

17   separate?                                                    11:42:38

18     A.   It's two separate documents.  Both are the          11:42:38

19   Department of Labor's documents.                            11:42:41

20     Q.   Okay.  But when you say "rights and                  11:42:43

21   responsibilities," you're referring to this specific --     11:42:45

22   where it says, "Employee Rights and Responsibilities,"      11:42:47

23   Bates No. 22209?                                             11:42:49

24     A.   Yes.                                                  11:42:52

25     Q.   Okay.  And you're saying information in this         11:42:55

45

Jolanda Johnson                                                                    May 5, 2021

```
 1    document was incorporated into the policy right here      11:42:57

 2    that starts at 22200?                                     11:43:02

 3         A.   Yes.                                            11:43:04

 4         Q.   Okay.  So either based upon this policy or      11:43:04

 5    CSX's practices, what is CSX required to do once they     11:43:16

 6    are in receipt of information that an employee could      11:43:20

 7    be -- potentially have a qualifying event for FMLA        11:43:23

 8    coverage?                                                 11:43:29

 9         A.   Notify the employee about their eligibility if  11:43:29

10    they qualify.                                             11:43:34

11         Q.   Is that the employer response packet, or is     11:43:35

12    that something else?                                      11:43:40

13         A.   Yes.  That would be the employer response       11:43:40

14    packet.                                                   11:43:43

15         Q.   Okay.  And to your knowledge, has --            11:43:43

16         A.   Either that -- let me clarify.  Either that or  11:43:46

17    a declination because just because an employee has a      11:43:49

18    qualifying reason doesn't necessarily mean that they are  11:43:53

19    eligible.  They may not meet the eligibility             11:43:56

20    requirements.  They may have already exhausted their      11:44:02

21    FMLA leave entitlements.                                  11:44:06

22         Q.   Got it.                                         11:44:06

23         A.   So if the leave is declined, then we're         11:44:07

24    required to provide notice to the employee.               11:44:10

25         Q.   And that's a function of checking the 1,250     11:44:12
```

46

Jolanda Johnson                                                    May 5, 2021

1    hours or having worked for the company for 12 months?    11:44:19

2       A.   That's one piece of it.  But you can ask    11:44:21

3    someone, what if they were off -- went out for surgery    11:44:24

4    in December and was off a total of 12 weeks?  They may    11:44:28

5    meet the eligibility requirements, but they've already    11:44:33

6    exhausted their FMLA benefits.  So they would receive a    11:44:35

7    declination letter letting them know, "Hey, you've    11:44:39

8    exhausted your FMLA.  You're only entitled to 12 weeks    11:44:43

9    under the FMLA."    11:44:47

10           So they -- you know, so regardless of why the    11:44:49

11   leave is declined, the employee -- we're required by law    11:44:54

12   to advise the employee of the reason for the    11:44:57

13   declination.    11:45:00

14      Q.   Okay.  So is that another way of saying that    11:45:01

15   the employee [sic] response packet is only sent out if    11:45:04

16   somebody determines both eligibility and entitlement as    11:45:08

17   you've described them today?    11:45:12

18      A.   Yeah.  Yes, and is a covered reason.    11:45:13

19      Q.   Okay.  So a decision is made that early whether    11:45:17

20   it's a covered reason?    11:45:20

21      A.   Well, when I say "covered reason," so if    11:45:21

22   someone calls in for a cousin, well, a cousin is not a    11:45:24

23   covered -- you know, not considered to be a covered    11:45:28

24   family member.    11:45:31

25      Q.   Okay.  Is it -- but is it accurate to say with    11:45:31

47

Jolanda Johnson                                                        May 5, 2021

1    respect to determining eligibility and entitlements and    11:45:34

2    coverage -- that's the third category -- those are --       11:45:37

3    that's data that's being checked for eligibility and        11:45:42

4    entitlement and coverage, and not a specific medical       11:45:46

5    condition; is that correct?                                 11:45:49

6        A.   Correct.                                           11:45:51

7        Q.   Okay.  So to, like, put it in another way, if     11:45:51

8    somebody submitted an interest in FMLA leave and you       11:45:57

9    determined that they hadn't worked for the company for a   11:46:01

10   year, or hadn't previously been employed for 12 months,    11:46:04

11   or they had already used 12 weeks of FMLA coverage, that   11:46:08

12   would be enough information to say, "Hey, we're not        11:46:11

13   going to send an employer response packet because          11:46:14

14   there's no way that you could be covered for this under    11:46:16

15   the FMLA"?                                                  11:46:19

16       A.   Right.  Instead we will send a declination.       11:46:19

17       Q.   Got it.  Okay.  And based on your training and    11:46:24

18   the policies and practices here under the FMLA, is it      11:46:38

19   correct to say that an employee does not have to use the   11:46:42

20   magic words "FMLA" or "Family Medical Leave Act" to        11:46:45

21   trigger protection and potential coverage under the        11:46:48

22   FMLA?                                                       11:46:51

23       A.   Correct.  However, they need to give us enough    11:46:52

24   information to determine that there may be a need for      11:46:58

25   FMLA.                                                       11:47:01

                                                                48

Jolanda Johnson                                                    May 5, 2021

1      Q.   Okay.  And how do you define that?  I mean,       11:47:01

2   based on your training and experience at CSX, what is     11:47:03

3   enough information for you or the FMLA department to       11:47:06

4   determine whether a condition is potentially FMLA         11:47:09

5   qualifying?                                                11:47:13

6      A.   I wouldn't say condition, but reason.  So, for    11:47:14

7   example, if someone says, "Hey, you know, I need to be    11:47:19

8   off the next 30 days because I'm having surgery," so      11:47:22

9   even though the employee did not assert their rights      11:47:26

10  under FMLA, it's enough information to -- you know, to    11:47:29

11  put the company on notice that there is a need for FMLA.  11:47:34

12     Q.   And is that based upon, in your example, the      11:47:38

13  date range of one month as being potentially FMLA         11:47:41

14  qualifying?                                                11:47:45

15     A.   Yes.                                               11:47:46

16     Q.   And to -- to take it one step --                   11:47:47

17          (Simultaneous colloquy.)                           11:47:50

18     Q.   I'm sorry, go ahead.                               11:47:51

19     A.   I was about to say the duration.  You're going    11:47:52

20  to be off more than three consecutive days due to a       11:47:54

21  medical reason that's going to prevent them from          11:47:57

22  performing, you know, their job.                           11:47:59

23     Q.   Okay.  That's -- all right.  That's exactly       11:48:03

24  what I wanted to ask you about.                            11:48:05

25          So is it accurate to say that if somebody said,   11:48:06

                                                                      49

```
 1    you know -- to use your time frame of one month -- "I      11:48:10

 2    need to be off work for one month for vacation," that's    11:48:12

 3    not going to trigger an FMLA event, potentially FMLA       11:48:16

 4    qualifying absence, correct?                               11:48:20

 5        A.   Correct.                                          11:48:22

 6        Q.   But in the example I think you used, if an        11:48:22

 7    employee links up that one-month period of time with a     11:48:25

 8    medical condition, either for himself, herself, or a       11:48:27

 9    family member, that that would put the company on notice   11:48:30

10    of a potential FMLA qualifying absence?                    11:48:33

11        A.   Correct.                                          11:48:36

12        Q.   And then I think you mentioned the third part,    11:48:36

13    that -- in response to the question what -- where that     11:48:40

14    threshold is, you've got a time frame, for example, a      11:48:45

15    month; you've got a medical condition; and then I think    11:48:48

16    you said something along the lines of, "and the            11:48:51

17    inability to work."  Did I understand that correctly?      11:48:53

18        A.   Yes.                                              11:48:56

19        Q.   Okay.  So is it accurate to say that when an      11:48:57

20    employee provides an estimated time away from work,        11:49:01

21    linked with a medical condition, coupled with the          11:49:04

22    inability to perform their work, that that would provide   11:49:07

23    the company sufficient notice to send out the employee     11:49:10

24    [sic] response packet assuming they're eligible for        11:49:16

25    leave?                                                     11:49:19
```

50

| | | |
|---|---|---|
| 1 | A.   Yes.  I'm not sure what's going on, but | 11:49:19 |
| 2 | everything has gotten smaller. | 11:49:34 |
| 3 | Q.   In terms of the screen sharing or you mean the | 11:49:35 |
| 4 | video? | 11:49:38 |
| 5 | A.   Yes, the screen sharing. | 11:49:39 |
| 6 | MS. BIRD:  It's partially the font on the | 11:49:41 |
| 7 | document, I think. | 11:49:44 |
| 8 | THE DEPONENT:  Is that what happened?  Okay. | 11:49:45 |
| 9 | BY MR. PAUL: | 11:49:55 |
| 10 | Q.   I mean, if I blow it up, is that better? | 11:49:55 |
| 11 | A.   Yes. | 11:49:55 |
| 12 | Q.   All right.  Other than these documents that | 11:49:55 |
| 13 | we've looked at here in Exhibit 3, are you aware of any | 11:49:57 |
| 14 | other written policies for CSX concerning the FMLA? | 11:50:00 |
| 15 | A.   No. | 11:50:05 |
| 16 | MS. BIRD:  Hey, Greg, can you qualify -- can | 11:50:07 |
| 17 | you tell us the date -- the Bates stamp range for | 11:50:09 |
| 18 | Exhibit 3?  It looks like there was something after the | 11:50:12 |
| 19 | exhibit you showed her, and I just wanted -- | 11:50:15 |
| 20 | MR. PAUL:  Sure. | 11:50:17 |
| 21 | MS. BIRD:  -- to make sure that document is | 11:50:17 |
| 22 | attached to exhibit. | 11:50:19 |
| 23 | MR. PAUL:  I believe they're consecutive, but | 11:50:20 |
| 24 | let's go through it.  It starts at 22198. | 11:50:21 |
| 25 | THE VIDEOGRAPHER:  And, Counsel, this is still | 11:50:27 |

51

Jolanda Johnson                                                    May 5, 2021

| | | |
|---|---|---|
| 1 | Exhibit 3, correct? | 11:50:29 |
| 2 | MR. PAUL: Correct. Yeah, this exhibit goes | 11:50:31 |
| 3 | through 22211. And -- | 11:50:48 |
| 4 | MS. BIRD: Can you make that one bigger? | 11:50:53 |
| 5 | Because that was one -- | 11:50:55 |
| 6 | BY MR. PAUL: | 11:50:56 |
| 7 | Q. Yeah, I didn't ask you about this one yet, but | 11:50:56 |
| 8 | let's blow it up and take a look. I believe it's tucked | 11:50:58 |
| 9 | in here by mistake. | 11:51:01 |
| 10 | This appears -- this is a document Bates | 11:51:07 |
| 11 | numbered 22211 that -- it has a couple different titles, | 11:51:09 |
| 12 | but the one I see most prominently is "Protection | 11:51:16 |
| 13 | Against Retaliation for Railroad Workers." And I don't | 11:51:19 |
| 14 | believe this has any direct bearing on the FMLA. | 11:51:22 |
| 15 | MS. BIRD: So is that going to be part of | 11:51:28 |
| 16 | Exhibit 3 or not? | 11:51:29 |
| 17 | MR. PAUL: Well, it is just because it is, but | 11:51:30 |
| 18 | it shouldn't be. So -- but I think the fact that we've | 11:51:33 |
| 19 | referenced it, I'll leave it in. | 11:51:38 |
| 20 | MS. BIRD: Okay. We're getting close to | 11:51:41 |
| 21 | needing a break, Greg. Is this a good time to take five | 11:51:51 |
| 22 | minutes? | 11:51:55 |
| 23 | MR. PAUL: Yeah, absolutely. | 11:51:55 |
| 24 | MS. BIRD: Okay. | 11:51:56 |
| 25 | MR. PAUL: We'll go off the record. | 11:51:56 |

52

Jolanda Johnson                                                    May 5, 2021

```
 1              THE VIDEOGRAPHER:  We're going off the record.   11:51:57

 2    The time is 11:51.                                          11:51:59

 3              (Off the record.)                                 11:52:01

 4              THE VIDEOGRAPHER:  We are back on the record.     11:57:37

 5    The time is 11:58.                                          11:58:08

 6        BY MR. PAUL:                                            11:58:11

 7        Q.   All right.  We're back on the record,              11:58:11

 8    Ms. Johnson, after a short break.  We were talking about    11:58:12

 9    topic No. 7.  Let's get that back up on the screen.         11:58:15

10              Are you able to see that okay?                    11:58:21

11        A.   Yeah.                                              11:58:23

12        Q.   Is there any more information, obviously, that     11:58:24

13    we haven't talked about, concerning KEPRO's policies and    11:58:29

14    practices for processing requests and approval for FMLA     11:58:34

15    in general and specific to any of the plaintiffs?           11:58:37

16        A.   No.                                                11:58:41

17        Q.   Okay.  Just for the sake of being complete,        11:58:41

18    we've talked about, I think so far, in the picture of       11:58:51

19    applying for FMLA, and the paperwork and the packets.       11:58:56

20    Is there also a procedure for recertification after an      11:59:00

21    application is initially approved?                          11:59:05

22        A.   Yes.                                               11:59:07

23        Q.   Okay.  Can you tell me what you know about that    11:59:07

24    recertification process?                                    11:59:10

25        A.   Okay.  So in the event -- once the employee is     11:59:12
```

                                                                        53

Jolanda Johnson                                                    May 5, 2021

```
 1    approved, if the employee -- so let me back up.        11:59:18

 2            So the medical certification, the doctor will   11:59:24

 3    provide in most cases an estimate as far as if the     11:59:30

 4    patient will experience episodes or periods of         11:59:34

 5    incapacity.  That estimate is based on the doctor's    11:59:37

 6    knowledge of the condition and/or the patient's medical 11:59:43

 7    history.  So in the event that the employee consistently 11:59:46

 8    exceeds what the medical certification support gives,   11:59:53

 9    the employee may be asked to recertify.                11:59:59

10        Q.    And is that something that an employer can do, 12:00:04

11    what, every six months or upon information that casts  12:00:10

12    doubt on the validity of the certification?            12:00:13

13        A.    Yes, every six months.  Sooner if they, you  12:00:15

14    know, receive information that casts doubt, yes.       12:00:19

15        Q.    Okay.                                          12:00:22

16        A.    In a situation such as this, if it appears that 12:00:22

17    something has changed.  A good example would be they're 12:00:24

18    approved for intermittent leave for episodes and office 12:00:30

19    visits, and now the employee is off for blocks of period 12:00:33

20    of time, you know, off now on a continuous leave.      12:00:36

21        Q.    Okay.  Going back a little bit, so we're not  12:00:40

22    talking about certification anymore.  Once the company 12:00:44

23    gets the medical information such as that on a medical 12:00:47

24    certification form, and it's incomplete, what are the  12:00:53

25    steps -- what are the next steps for that?             12:00:56
```

54

Jolanda Johnson                                                    May 5, 2021

1    A.   If it's incomplete?                          12:01:00

2    Q.   Yeah, incomplete, like the --                12:01:01

3    A.   So the medical certification -- the clinician  12:01:04

4    or nurse will highlight the areas that are incomplete,  12:01:08

5    and the employee will be given the opportunity to    12:01:14

6    provide a cure.  And so the employee will receive a   12:01:17

7    properly -- will receive the original med cert along  12:01:25

8    with the incomplete letter.  And as stated in the    12:01:28

9    incomplete letter, the doctor is required to initial and  12:01:33

10   date any changes made to the certification, and the   12:01:37

11   employee has 21 days to provide a response.           12:01:41

12   Q.   And does the doctor or the employee -- are they  12:01:45

13   required to use the Department of Labor medical       12:01:50

14   certification form?                                   12:01:53

15   A.   No.                                             12:01:56

16   Q.   Are they required to use CSX's medical          12:01:58

17   certification form?                                   12:02:02

18   A.   Yes.  But I will state that the medical         12:02:03

19   certification form that we have does not ask any      12:02:06

20   questions, anything more than we're allowed to ask.   12:02:09

21   Q.   Okay.  You're -- are you referring to the       12:02:16

22   medical certification form that's part of the employer  12:02:19

23   response packet?                                      12:02:22

24   A.   Yes.                                            12:02:22

25   Q.   Okay.  So you just -- I mean, that wasn't my    12:02:23

                                                              55

May 5, 2021

1    question, but you're just offering up that your -- it's    12:02:26

2    your opinion that what's being requested in that medical    12:02:29

3    certification form is compliant with the Department of    12:02:32

4    Labor form?    12:02:35

5        A.   Yes.    12:02:36

6        Q.   Okay.  And in terms of your job duties and    12:02:36

7    knowledge about this topic, I mean, what is required to    12:02:41

8    be completed on a medical certification form in order to    12:02:45

9    be deemed complete?    12:02:49

10       A.   I mean, technically, as you know, I mean, the    12:02:52

11   company doesn't have to require a medical certification    12:02:56

12   form.  But, you know, in the event that an employee    12:03:00

13   is -- there is a need, then we do require a medical    12:03:05

14   certification form to be completed.  And so completion    12:03:09

15   would include, you know, if the employee is being seen,    12:03:15

16   at least for a chronic condition, once or twice a year,    12:03:19

17   medical facts, if they're seeking leave for episodes    12:03:24

18   or -- you know, we need to at least know to get an idea    12:03:30

19   as far as an estimate.  If it's for a family member, the    12:03:34

20   type of care that is going to be provided.  And then    12:03:38

21   also for the doctor to sign off on the med cert and    12:03:44

22   provide information like telephone number, address,    12:03:50

23   things of that nature.    12:03:53

24       Q.   Okay.  So in the example we used where a    12:03:54

25   medical certification form was incomplete, you've talked    12:03:57

56

1    about what the company can do.  What if the company          12:04:00

2    looks at the medical certification form, says it's           12:04:06

3    complete but has some additional questions in order to       12:04:09

4    determine whether it's FMLA qualifying, what are the         12:04:12

5    next steps there?                                            12:04:14

6        A.   I mean, if clarification is needed, then the        12:04:16

7    clinician will -- may reach out to the doctor to obtain      12:04:28

8    clarification.  But once again, you know, it's just for      12:04:33

9    the main -- sole purpose for clarification.  If they're      12:04:38

10   not able to make contact, then a letter will be sent to     12:04:42

11   the employee.                                                12:04:46

12       Q.   In order to seek that clarification?               12:04:47

13       A.   Correct.                                            12:04:50

14       Q.   Okay.  And is it also an option -- or let me        12:04:50

15   ask you, what are the options that CSX has with respect      12:04:54

16   to obtaining a second opinion in order to determine FMLA    12:04:57

17   qualification?                                               12:05:03

18       A.   I mean, we have the right to obtain a second        12:05:04

19   opinion if we doubt the validity of the med cert, and       12:05:08

20   this will be on a -- the initial med cert.                   12:05:13

21       Q.   Okay.  Right.  As opposed to a recertification?    12:05:17

22       A.   Yes.                                                12:05:23

23       Q.   Okay.  Got it.  All right.  I'd like to move        12:05:24

24   over to topic 6, "Defendant's disability leave of           12:05:27

25   absence policies, procedures, and practices, with          12:05:29

57

Jolanda Johnson                                                    May 5, 2021

```
 1    effective dates and amendments for all such policies."    12:05:32

 2            Before I show you that exhibit, or at least       12:05:35

 3    what I believe is a responsive exhibit, just as an        12:05:37

 4    overview, if an employee is not eligible for family       12:05:40

 5    medical leave or FMLA, what are other medical             12:05:45

 6    leave-of-absence options for a craft employee -- let's    12:05:52

 7    start there -- or a union employee?                       12:05:56

 8        A.   Let me see the best approach.  Okay.  So for     12:05:58

 9    dispatchers -- okay.  Could you restate your question?    12:06:04

10        Q.   Yeah.  So this is just sort of an overview.      12:06:11

11    We're going to get into some more specifics, but my       12:06:16

12    question was, if an employee is not eligible for FMLA     12:06:19

13    for one reason or the other, perhaps they've already      12:06:23

14    used it or haven't worked there long enough, what are     12:06:27

15    other options to secure a medical leave of absence for a  12:06:30

16    union employee?                                           12:06:32

17        A.   Okay.  So for a union employee -- so for         12:06:33

18    dispatchers, they can -- they can always file for short-  12:06:41

19    term disability with New York Life Benefits Solution.     12:06:45

20            For, I will say, certain train and engine         12:06:50

21    employees, they can file for supplemental sickness        12:06:56

22    benefits with CoreSource or short-term disability with    12:06:59

23    Sun Life.                                                 12:07:05

24            Union employees can always seek for a             12:07:07

25    medical -- a leave of absence.  They can reach out to     12:07:11
```

58

```
 1    their union representative to kind of initiate that      12:07:14

 2    process.                                                 12:07:19

 3        Q.   Okay.  No, that was helpful.  I think the first 12:07:19

 4    two you mentioned were with respect to New York Life or  12:07:25

 5    formerly Cigna, and I think you said supplemental        12:07:28

 6    sickness.  Those are -- that's money, right?  Those are  12:07:32

 7    payments?                                                12:07:35

 8        A.   Yes.  For their pay, yes.                        12:07:35

 9        Q.   Okay.  And so that wasn't quite my question,     12:07:37

10    but I appreciate that.  And maybe they're related.  But  12:07:40

11    my question really went more to that last answer, which  12:07:43

12    is that an employee could contact their union about a    12:07:46

13    medical leave of absence.  Did I understand your         12:07:50

14    testimony to that correctly?                             12:07:54

15        A.   Yes.                                             12:07:56

16        Q.   And the FMLA is unpaid itself, right?            12:07:56

17        A.   Yes.                                             12:07:58

18        Q.   Okay.  So trying to just -- for me to ask a      12:08:00

19    more specific question.  Other than the FMLA and job     12:08:04

20    protections, it sounds like there's the FMLA and that a  12:08:08

21    union employee can ask their union rep; is that right?   12:08:13

22        A.   Yeah, they can go through that process.  And I   12:08:16

23    really -- can't really speak to their type of process.   12:08:19

24    I can speak to what I know.  So, like, for the T & E     12:08:22

25    employees, or train and engine employees, if they were   12:08:28
```

59

Jolanda Johnson                                                    May 5, 2021

```
 1   to call in to crew management, or even through crew life   12:08:32

 2   mark off sick, then they will be coded as sick.  And       12:08:36

 3   then after seven -- being off seven consecutive days,      12:08:42

 4   they're placed in a -- at off medical status.  And I       12:08:47

 5   know that the availability team has a process that after   12:08:54

 6   so many days, they'll conduct outreach to the employee     12:08:59

 7   advising them to either provide medical information to     12:09:03

 8   the medical department, return to work, or resign.         12:09:08

 9   But -- so but in general, the employees, if they're not    12:09:15

10   eligible for FMLA and there's a need to be off, they can   12:09:18

11   certainly request a leave of absence.  They could go       12:09:22

12   through their union, and possibly even submitting          12:09:27

13   information to the medical department in regards to the    12:09:32

14   need to be off medical.                                    12:09:38

15       Q.   Are you familiar -- based upon your job duties    12:09:40

16   or training at CSX, or as a corporate representative,      12:09:43

17   are you familiar with the terminology that a medical       12:09:47

18   leave of absence can be a reasonable accommodation under   12:09:51

19   the Americans with Disabilities Act or similar            12:09:54

20   disability discrimination laws?                            12:09:59

21       A.   I mean, yes.                                      12:10:01

22       Q.   Okay.  And have you heard of that concept as --   12:10:07

23   medical leave of absence as a reasonable accommodation     12:10:10

24   under disability discrimination laws as part of your job   12:10:14

25   duties training, or as a corporate representative today    12:10:15
```

60

Jolanda Johnson                                                    May 5, 2021

```
 1   for this deposition, or all of the above?        12:10:18

 2        A.   Okay.  Repeat your question.           12:10:22

 3        Q.   Sure.  You said that you're familiar with the  12:10:26

 4   concept of a medical leave of absence as a reasonable  12:10:28

 5   accommodation, correct?                          12:10:30

 6        A.   Yes.                                    12:10:31

 7        Q.   And that's a reasonable accommodation under  12:10:33

 8   disability discrimination laws like the Americans with  12:10:35

 9   Disabilities Act or Rehabilitation Act; is that correct?  12:10:38

10        A.   I responded to the question simply because I've  12:10:41

11   had a case where an employee was not eligible for FMLA.  12:10:46

12   I did work with a medical team and the law department,  12:10:50

13   and I know that there was, I guess you could say, an  12:10:54

14   accommodation for the employee for that period of time.  12:10:59

15   But that's the only case I can think of where I was  12:11:06

16   involved in a situation where the -- there was a medical  12:11:09

17   reason why the employee needs to be off.          12:11:13

18        Q.   Okay.  And roughly how long ago was that?  12:11:19

19        A.   It's been a few years ago.  Maybe -- I believe  12:11:27

20   it was before 2017.  So maybe '15, '16, around that time  12:11:32

21   frame.                                           12:11:36

22        Q.   Before that incident where you went to the  12:11:37

23   medical department that you just described, had you ever  12:11:41

24   heard of that concept before at that time, a medical  12:11:43

25   leave of absence as a reasonable accommodation?   12:11:46
```

                                                          61

```
 1        A.   No.                                       12:11:48

 2        Q.   Okay.  So --                              12:11:49

 3             MS. BIRD:  Greg, let me just -- since we are on   12:11:51

 4   the 30(b)(6) part of her deposition, we're not talking   12:11:53

 5   about her personal knowledge, and we're not talking   12:11:57

 6   about a topic for which she's been disclosed with regard   12:11:59

 7   to anything having to do with disability discrimination   12:12:03

 8   policies or anything else.  I'll allow you to question   12:12:06

 9   her about this, but she is not here to speak on behalf   12:12:10

10   of the company about medical disability discrimination   12:12:12

11   as you've defined it, as you're asking her.   12:12:18

12             MR. PAUL:  Well, I think she is.  I mean, topic   12:12:21

13   No. 6, which I've read, is "Defendant's disability leave   12:12:24

14   of absence policies, procedures, and practices," which   12:12:25

15   is exactly that.                                   12:12:28

16             MS. BIRD:  I disagree.                    12:12:30

17        BY MR. PAUL:                                   12:12:32

18        Q.   Okay.  In your corporate role -- corporate   12:12:32

19   representative role today on topic 6, "Defendant's   12:12:41

20   disability leave of policies, practices, and           12:12:41

21   procedures," what do you understand that to mean?   12:12:43

22        A.   Our medical leaves of absence policy, which   12:12:47

23   covers a short-term disability and long-term disability.   12:12:54

24        Q.   Do you believe that CSX's disability leave of   12:12:58

25   absence policies, practices, or procedures encompass   12:13:00
```

                                                                        62

Jolanda Johnson                                                    May 5, 2021

```
 1    requests for accommodation in the form of medical leave    12:13:04
 2    of absence?                                                12:13:07
 3        A.    I've never taken it as accommodation.  I take    12:13:10
 4    it as this is a benefit that's provided to employees.      12:13:15
 5    In the event that they're unable to perform their job      12:13:17
 6    due to a personal illness or injury, they have this time   12:13:21
 7    off and depending on their tenure with the company will    12:13:25
 8    determine their salary continuance.                        12:13:32
 9        Q.    Okay.  Leaving aside the salary continuance      12:13:32
10    piece, what is your understanding of CSX's disability      12:13:35
11    leave of absence policies, practices, and procedures       12:13:39
12    outside of the FMLA which we've already talked about?      12:13:42
13        A.    To what extent?                                  12:13:45
14        Q.    Well, what's the process for an employee who's   12:13:49
15    not eligible for FMLA to be considered for a disability    12:13:54
16    leave of absence?                                          12:13:57
17        A.    So with -- under the MLA or the medical leaves   12:13:59
18    of absence policy, it has no bearing if they're eligible   12:14:02
19    for FMLA or not.  So if the employee -- management         12:14:08
20    employee, because that's who's it's for, if they're        12:14:14
21    going to be off work to -- you know, off seven             12:14:17
22    consecutive working days due to a personal illness or      12:14:21
23    injury, then they are to initiate a claim.  And so with    12:14:25
24    that process, once they approve -- or if they are          12:14:32
25    approved for STD, then the STD is designated as FMLA, if   12:14:37
```

63

Jolanda Johnson                                                                        May 5, 2021

```
1    they're eligible, so it runs concurrent with the FMLA.      12:14:46

2         Q.   Are there any disability leave of absence          12:14:50

3    policies, practices, or procedures for union employees?      12:14:53

4         A.   There's no policies, no.                           12:14:56

5         Q.   Okay.  The example that you mentioned that was     12:15:01

6    a couple of years ago where you went to medical, was         12:15:05

7    that for a union employee or a non-union employee?           12:15:08

8         A.   It was for a union employee.                       12:15:10

9         Q.   And so was that example that you mentioned, was    12:15:12

10   that considered part of a reasonable accommodation           12:15:18

11   process?                                                     12:15:21

12        A.   I mean, I -- you know, the employee was            12:15:22

13   concerned about his job.  He had been diagnosed with a       12:15:31

14   condition, had been off for an extended period of time.      12:15:35

15   And so when he returned, he was not eligible for FMLA,       12:15:38

16   and so he kept calling the CSX FMLA Center.  He was          12:15:43

17   instructed to contact his union rep.  But he just            12:15:49

18   continued to call so it was escalated to me, and then        12:15:53

19   that's when I engaged our medical and law department to      12:15:57

20   see if -- what could be done.  And so from that point,       12:16:00

21   the employee actually dealt directly with medical at         12:16:05

22   that point, because it was out of our hands because he       12:16:08

23   didn't qualify for FMLA.                                     12:16:11

24        Q.   And in that circumstance, was his disability       12:16:12

25   leave of absence approved?                                   12:16:16
```

                                                                              64

May 5, 2021

```
 1        A.   I'm not sure.  I mean, I can't -- because, like   12:16:17

 2   I said, I connected with medical and law, explained to      12:16:22

 3   them what occurred.  And then from that point, medical      12:16:27

 4   took over his case.  So the outcome of it, I don't know.    12:16:31

 5        Q.   Okay.  I'd like to show you what we'll mark as     12:16:35

 6   Exhibit 4, which consists of 15 pages, and I'd like to      12:16:40

 7   just scroll through them first and then ask you some        12:16:44

 8   questions.  But I'd like to just identify the documents     12:16:46

 9   first.  But if you need more time for any reason, let me    12:16:50

10   know.                                                        12:16:53

11        This first document is entitled "Medical Leaves        12:16:53

12   of Absence Policy."  Do you see that?                       12:16:57

13        A.   Yes.                                               12:16:59

14        (Exhibit 4 was marked for identification.)             12:16:59

15   BY MR. PAUL:                                                 12:16:59

16        Q.   And this one appears to be -- the most recent     12:16:59

17   effective date appears to be January 1st, 2016.  Do you    12:17:06

18   agree with that?                                            12:17:10

19        A.   Yes.                                               12:17:11

20        Q.   Okay.  And again, we'll come back to these some   12:17:12

21   more in particular, but just in -- you're familiar with    12:17:16

22   this policy I guess?                                        12:17:19

23        A.   I am.                                              12:17:20

24        Q.   Okay.  Just in summary fashion, what is it?      12:17:21

25        A.   So this is -- I've referenced the medical        12:17:23
```

                                                                        65

Jolanda Johnson                                                    May 5, 2021

```
 1    leaves of absence policy.  This is the short-term      12:17:29

 2    disability, and long-term disability falls under this  12:17:33

 3    policy.  The benefits are for non-contract or non-union 12:17:38

 4    employees only.  So it's basically if the employee is  12:17:45

 5    unable to work due to a personal illness or injury, then 12:17:51

 6    they should apply for short-term disability.            12:17:58

 7        Q.   Okay.  And this is -- this includes the New    12:18:06

 8    York Life or the Cigna long-term disability that you    12:18:07

 9    discussed earlier?                                      12:18:09

10        A.   Yes.                                           12:18:10

11        Q.   So --                                          12:18:10

12        A.   So the --                                      12:18:11

13        Q.   -- none of the -- I'm sorry.                   12:18:11

14        A.   Short-term disability is for 26 weeks.  And if 12:18:12

15    the employee is unable to return to work, then they are 12:18:15

16    considered for long-term disability.                    12:18:19

17        Q.   Okay.  And in that example, is the specific job 12:18:22

18    held for that person pending that six-month period of   12:18:27

19    time?  Or 26 weeks rather, I think you said.            12:18:30

20        A.   It depends.                                    12:18:35

21        Q.   What does it depend on?                        12:18:37

22        A.   If there is a business need for the job to be  12:18:40

23    filled prior to the exhaustion of the STD period, then  12:18:44

24    it is possible for the employee to be taken off that    12:18:53

25    position.                                               12:18:55
```

Jolanda Johnson                                                          May 5, 2021

1        Q.   I'm sorry.  Did you say at the expiration of        12:18:56

2    the short-term or during the short-term disability?          12:18:59

3        A.   Expiration.  So typically, in general, if           12:19:01

4    there's not a business need for the job to be filled, if     12:19:03

5    the employee returns to work within that six-month           12:19:06

6    period, then they return to their job.  However, if the      12:19:10

7    employee is unable to return after six months, then they     12:19:14

8    are removed from that position and they are considered       12:19:19

9    for long-term disability.                                    12:19:21

10       Q.   Okay.  And does anything like that exist for        12:19:24

11   the union employees, what you just described?                12:19:29

12       A.   No.                                                 12:19:32

13       Q.   Are you familiar with this?  This is entitled       12:19:33

14   "Vocational Rehabilitation Program Reasonable                12:19:49

15   Accommodations."  Are you familiar with this policy?         12:19:51

16       A.   I'm aware of the policy.  I know it exists.         12:19:54

17       Q.   Okay.                                               12:20:00

18       A.   And I am familiar with the process to the          12:20:00

19   extent with FMLA, if we receive a request, and if the        12:20:04

20   FMLA request there is some sort of accommodation             12:20:11

21   required, like an employee is only able to work X amount     12:20:14

22   of hours per week or they require -- you know, they          12:20:21

23   can't operate machinery, whatever the case may be, we        12:20:26

24   will send them actually the form you just scrolled past,     12:20:31

25   but the accommodation form to the employee for them to       12:20:37

                                                                        67

USCA4    2657

Jolanda Johnson                                                    May 5, 2021

```
 1    complete.  But the form is returned to medical, so we're   12:20:42

 2    only involved to the extent of -- if the medical -- the    12:20:48

 3    FMLA medical certification gives some sort of indication    12:20:52

 4    that there's a need for an accommodation.                   12:20:56

 5        Q.   I'm -- I'm --                                      12:21:00

 6             (Simultaneous colloquy.)                           12:21:04

 7        A.   Instead of sending the FMLA form to medical,       12:21:04

 8    we'll just go ahead and send them a letter of              12:21:07

 9    accommodation.  And then it's the employee's               12:21:09

10    responsibility to have the form completed and then         12:21:12

11    returned to medical.                                       12:21:14

12        Q.   Okay.  Let me just back up a minute.  So you're   12:21:15

13    saying the FMLA department will send out this reasonable   12:21:18

14    accommodation form that's Bates numbered 22076 when        12:21:23

15    there's something on the medical certification form that   12:21:27

16    indicates the need for an accommodation?                   12:21:30

17        A.   Yes.  The FMLA medical certification form, yes.   12:21:32

18        Q.   Okay.  Could there be any other documentation     12:21:35

19    that the FMLA department would receive that would put      12:21:40

20    the company at -- that would trigger an accommodation      12:21:43

21    request other than a medical certification form?           12:21:46

22        A.   I mean, is it possible?  Yes.  If we were to      12:21:49

23    receive something -- and I know it has happened.  Like,    12:21:53

24    for example, the MD-3 form where the employee -- better    12:21:56

25    yet, not the MD-3 form but the sickness form from the      12:22:01
```

68

1    RRB.  The employees will submit it to KEPRO.  KEPRO, in        12:22:05

2    turn, will send it to us, the benefits department, and        12:22:11

3    then we, in turn, will forward it on to the RRB.              12:22:15

4        Q.    Have you ever seen this accommodation form that     12:22:20

5    CSX used to request a medical leave of absence or a           12:22:26

6    disability leave of absence?                                  12:22:31

7        A.    I have not.                                         12:22:33

8        Q.    Okay.  And other than that one example for the      12:22:34

9    union employee that you've already described, do you          12:22:37

10   have any knowledge about any other disability leave of        12:22:40

11   absences that are longer than the FMLA for union             12:22:44

12   employees?                                                    12:22:53

13       A.    No.                                                 12:22:53

14       Q.    After that example you gave of if the MLA           12:22:54

15   department receives a certification form or other             12:23:14

16   information that indicates the need for an                    12:23:17

17   accommodation, does the FMLA department have any              12:23:17

18   other -- do they take any other actions other than           12:23:22

19   sending it to the medical department?                         12:23:25

20       A.    You said if there's any indication on the FMLA      12:23:26

21   form?                                                         12:23:34

22       Q.    Well, I mean I'll broaden it, but if I -- you       12:23:34

23   know, tell me if you don't understand the question.  But      12:23:37

24   in the example that you gave of where the FMLA                12:23:40

25   department receives information such as on a medical          12:23:44

| | | |
|---|---|---|
| 1 | certification form that indicates the need for an | 12:23:48 |
| 2 | accommodation, I believe your testimony was that you | 12:23:51 |
| 3 | would send that to the medical department? | 12:23:53 |
| 4 |     A.   No.  We would initiate -- we'll send the | 12:23:55 |
| 5 | accommodation form to the employee.  The employee would | 12:24:00 |
| 6 | then be responsible to have the form completed and | 12:24:05 |
| 7 | returned to medical for further review and handling. | 12:24:08 |
| 8 |     Q.   Got it.  Okay.  So I skipped a step, I guess. | 12:24:13 |
| 9 | So the -- there would be a letter and a form that would | 12:24:16 |
| 10 | go out to the employee, and then it's up to the employee | 12:24:20 |
| 11 | to submit that to the medical department or not? | 12:24:22 |
| 12 |     A.   Correct. | 12:24:24 |
| 13 |     Q.   Okay.  After that step of sending the employee | 12:24:25 |
| 14 | the accommodation form, does the FMLA department have | 12:24:32 |
| 15 | any other involvement in that request for accommodation? | 12:24:36 |
| 16 |     A.   No. | 12:24:38 |
| 17 |     Q.   Okay. | 12:24:39 |
| 18 |     A.   Well, let me back up.  To the extent, if it's | 12:24:41 |
| 19 | related to hours worked, some sort of hours worked | 12:24:46 |
| 20 | restriction, yes. | 12:24:50 |
| 21 |     Q.   Okay.  Can you explain what you mean, please? | 12:24:51 |
| 22 |     A.   So like, for example -- and this is more for | 12:24:55 |
| 23 | non-train and engine employees, but if they -- they're | 12:25:01 |
| 24 | not -- they can't work overtime, for example.  So once | 12:25:05 |
| 25 | medical receives that information, they will notify | 12:25:11 |

70

```
 1    KEPRO in regards to the outcome of the accommodation    12:25:16

 2    request.                                                12:25:21

 3        Q.   Okay.                                          12:25:23

 4             MS. BIRD:  Greg, on that last exhibit, did you  12:25:26

 5    mark that last thing as an exhibit?  Because there was a  12:25:29

 6    bunch of stuff in that same...                          12:25:31

 7             MR. PAUL:  I just marked the whole thing as     12:25:35

 8    Exhibit 4.                                              12:25:37

 9             MS. BIRD:  Okay.  There's a bunch --            12:25:40

10             MR. PAUL:  But it looks --                      12:25:41

11             MS. BIRD:  -- of stuff in there, but that's     12:25:41

12    fine.                                                   12:25:43

13             MR. PAUL:  I'm sorry?  Yeah.                    12:25:43

14             MS. BIRD:  There's a bunch of different topics  12:25:44

15    and things in there.  I just wanted to make sure we got  12:25:46

16    the Bates numbers for that whole exhibit.               12:25:47

17             MR. PAUL:  Yeah.  Starts at 22066.  Should be   12:25:49

18    consecutive through 22080.  See if this is the same.    12:25:57

19        BY MR. PAUL:                                        12:26:37

20        Q.   Okay.  Let me ask you about this last one,      12:26:37

21    which is Bates numbered 22080.  This one is entitled     12:26:40

22    "Short and Long-Term Disability, FMLA, and Leaves of     12:26:45

23    Absence."  Do you see that?                             12:26:49

24        A.   Could you enlarge that?                        12:26:50

25        Q.   You bet.  Take a look at that and let me know   12:26:55
```

                                                                      71

Jolanda Johnson                                                    May 5, 2021

1    when you're ready.                                    12:26:59

2         A.   Okay.                                       12:27:38

3         Q.   All good?                                   12:27:40

4         A.   Yes.                                        12:27:41

5         Q.   Let me make sure there's nothing at the bottom   12:27:41

6    there.  Yeah, that's the end of it.                   12:27:44

7              Are you familiar with this policy?          12:27:45

8         A.   This is not a policy.                       12:27:47

9         Q.   Okay.  What is it?                          12:27:48

10        A.   It's just -- I would consider just an overview   12:27:50

11   of ways an employee can be off.                       12:27:56

12        Q.   Okay.  And is this both union and non-union   12:28:02

13   employees?                                            12:28:06

14        A.   Combination.                                12:28:06

15        Q.   What does that mean?  Both?  Or what do you   12:28:10

16   mean?                                                 12:28:13

17        A.   Yeah, both.                                 12:28:13

18        Q.   Okay.  So, in other words, this document we're   12:28:14

19   looking at, Bates No. 022080, applies to both union and   12:28:16

20   non-union employees at CSX?                           12:28:23

21        A.   Yes.                                        12:28:25

22        Q.   With respect to this first category of medical   12:28:26

23   leaves of absence, what is the process for a union    12:28:36

24   employee to apply for and be considered for a medical   12:28:40

25   leave of absence?                                     12:28:44

                                                                72

USCA4    2662

Jolanda Johnson                                                                May 5, 2021

```
 1        A.   Medical leaves of absence, this is -- this is    12:28:45

 2   the actual medical leaves of absence policy, the MLOA.     12:28:56

 3   So that's going back to the policy we just looked at.      12:29:03

 4   I'm not sure if you noticed, but in the upper left-hand    12:29:07

 5   corner, it says "Intermodal."  So there is a policy for,   12:29:10

 6   like, Intermodal Transportation Corp. and Technology,      12:29:17

 7   but once again, regardless of the company, the MLOA or     12:29:21

 8   the medical leaves of absence policy, it's the same as     12:29:27

 9   far as who's eligible, which is only -- it's              12:29:30

10   non-contracted, non-union employees.                       12:29:34

11        Q.   Okay.  Are you aware of any medical leave of     12:29:41

12   absence policy like the one in Exhibit 4 that exists at    12:29:43

13   CSX for union employees?                                   12:29:48

14        A.   No.                                              12:29:49

15        Q.   And to your knowledge, is there none?  In other  12:29:50

16   words, is it a true statement CSX does not have a          12:29:56

17   medical leave of absence policy for its union employees?   12:29:59

18        A.   No.                                              12:30:02

19        Q.   That's incorrect or correct?                     12:30:03

20        A.   No, there's not a medical leaves of absence      12:30:05

21   policy for union employees.                                12:30:08

22        Q.   Okay.  Is there a procedure or practice -- I'm   12:30:10

23   looking at topic No. 7 -- with respect to a disability     12:30:23

24   or medical leave of absence policy for union employees?    12:30:25

25        A.   Not that I'm aware of.                           12:30:29
```

```
 1        Q.   All right.                              12:30:36

 2             MR. PAUL:  Thank you.  I don't have any other   12:30:38

 3   questions.                                         12:30:39

 4             THE DEPONENT:  Okay.  So I didn't know --   12:30:40

 5             MR. PAUL:  Do you want to go off the record   12:30:44

 6   or --                                              12:30:45

 7             THE DEPONENT:  No, because you was asking me   12:30:45

 8   about the leaves, like the medical leaves of absence,   12:30:47

 9   maternity, FMLA, and military.  You was wondering -- I   12:30:50

10   thought you was going down the path you wanted me to   12:30:55

11   identify which ones were for union or management or   12:30:58

12   both.                                              12:31:02

13             MR. PAUL:  Well, sure.                   12:31:04

14             THE DEPONENT:  I thought that's -- I'm sorry.   12:31:05

15             MS. BIRD:  See, you can't instruct some of   12:31:09

16   them.  You can't --                                12:31:13

17             (Simultaneous colloquy.)                 12:31:13

18             MS. BIRD:  That's okay.  Tell him everything   12:31:15

19   you know, Jolanda.                                 12:31:17

20      BY MR. PAUL:                                     12:31:18

21        Q.   So we're going back -- is this the document you   12:31:18

22   want me to go back to, No. 22080?                  12:31:20

23        A.   Yeah, so the medical leaves of absence is for   12:31:22

24   active management employees.  The maternity leave that   12:31:25

25   it's referencing is only for active management     12:31:30
```

74

Jolanda Johnson                                                    May 5, 2021

```
1   employees.  The disability coverage, if you'll notice,   12:31:34

2   it referenced short-term and long-term disability.       12:31:40

3   That's going back to the medical leaves of absence.  So, 12:31:44

4   again, only active management employees.  FMLA would be  12:31:49

5   for management and union.  And then military leave is    12:31:53

6   for management and union.                                12:31:56

7       Q.   Okay.  Great.  Well, thank you for that         12:31:58

8   clarification.                                           12:32:01

9           MR. PAUL:  I don't have any other questions.     12:32:03

10          MS. BIRD:  I don't have any questions either.    12:32:05

11          THE VIDEOGRAPHER:  Madam Court Reporter,          12:32:09

12  anything to add before I read us off the record?         12:32:11

13          This concludes the --                            12:32:17

14          COURT REPORTER:  Can I get copy orders on the     12:32:17

15  record, Counsel?                                         12:32:20

16          MS. BIRD:  I don't know what you said.            12:32:26

17          COURT REPORTER:  I'm sorry.  Could I get copy     12:32:27

18  orders on the record, please?                            12:32:27

19          MS. BIRD:  Yes.  I'd like to have a copy of the   12:32:27

20  transcript.  I'd also like to have a copy of the video   12:32:29

21  but not synced.                                          12:32:32

22          MR. PAUL:  I don't know about the video, so      12:32:35

23  I'll have to get back to you on that, but -- unless you  12:32:38

24  know what Jeff has ordered in other -- I'm asking the    12:32:40

25  court reporter -- what Jeff has ordered in other cases.  12:32:43
```

                                                                    75

Jolanda Johnson                                                                    May 5, 2021

1    But we would definitely want a transcript.            12:32:45

2            THE VIDEOGRAPHER:   This concludes today's    12:32:51

3    deposition.   The time is 12:32, and we're now off the    12:32:52

4    record.                                                12:32:56

5            (Deposition concluded at 12:32 p.m.)

6                            * * *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

76

## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

JUSTIN ADKINS, et al.,

                Plaintiffs,

v.                             CIVIL ACTION NO.  3:18-0321

CSX TRANSPORTATION, INC., et al.,

                Defendants.

### <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is Plaintiffs' Motion for Leave to File Supplemental Briefing on Summary Judgment Motions. ECF No. 446. The Motion asks the Court to permit supplemental briefing on the pending motions for summary judgment through October 11, 2021. For the reasons that follow, the Court **DENIES** the Motion.

### I.  BACKGROUND

Pursuant to the Amended Scheduling Order dated September 29, 2020, dispositive motions in this case were to be filed by May 13, 2021. ECF No. 281. Consistent with that deadline, on May 13, 2021, Defendants filed a Motion for Summary Judgment, which moved to dismiss all ten counts of the Third Amended Complaint. ECF No. 360. Additionally, on the same day, Plaintiffs filed a Motion for Patrial Summary Judgment as to their FMLA and Defamation claims. ECF No. 368. Briefing on the motions was completed on June 24, 2021.

Between July 30, 2021, and August 2, 2021, the Court entered numerous orders granting, in part, Defendants' Motion for Summary Judgment and dismissing Plaintiffs' defamation,

wrongful discharge, invasion of privacy, intentional infliction of emotional distress, and tortious interference claims. ECF Nos. 439–43.

On August 5, 2021, the Court held a motion hearing and allowed the Parties to argue the viability of the remaining claims. ECF No. 444. Outstanding discovery was not raised as an issue at the hearing. At the end of the hearing, the Court continued the trial in this case generally, noting that the current trial dates were not feasible given the estimated length of this trial and the status of criminal trials in this district. The Court stated that it would reset the trial after it made final decision on summary judgment, which it hoped to do shortly.

On August 10, 2021, the Court entered an order dismissing Plaintiffs' Federal Railroad Safety Act claim. ECF No. 445. Accordingly, the only remaining claims at this time are those under FMLA, ERISA, the West Virginia Human Rights Act, and the Rehabilitation Act. Two hours after the Court's last order, the Plaintiffs filed the instant Motion. ECF No. 446.

## II.  APPLICABLE LAW

Pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, "[i]f a nonmovant shows by affidavit or declaration that, for a specified reasons, it cannot present facts essential to justify its opposition" a court may defer ruling on a motion for summary judgment, allow additional time for the parties to obtain discovery, or issue other appropriate orders. This Circuit has held that Rule 56 "mandates that summary judgment be [postponed] when the nonmovant 'has not had the opportunity to discover information that is essential to his opposition.'" *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014) (quoting *Ingle ex rel. Est. of Ingle v. Yelton*, 439 F.3d 191, 195 (4th Cir. 2006)). However, a court is not required to grant a motion under Rule 56(d) "when the information sought would not by itself create a genuine issue of material fact sufficient for the nonmovant to survive summary judgment." *Id.*

### III. ANALYSIS

Plaintiffs' Motion argues that supplemental briefing on summary judgment is proper because they have not been able to take the Rule 30(b)(6) deposition Dr. Craig Heligman, and they "anticipate that Dr. Heligman's testimony as a CSXT corporate representative will reveal critical facts relevant to the claims and defenses at issue in this litigation." *Mot.* 4; *Garella Aff.* ¶ 6. Additionally, they submit that they took a number of material depositions after the dispositive motion deadline, and therefore they "were not able to present facts essential to its opposition to the Court." *Mot.* 4, *Garella Aff.* ¶ 5.[1] Finally, they argue that there is a pending motion to compel Defendants' privilege log, which they believe contains documents with critical facts that are not appropriately protected by privilege. *Mot.* 6, *Garella Aff.* ¶ 7.

Upon careful review of the parties briefing, the Court denies Plaintiffs' Motion for three separate reasons. First, Plaintiffs' Motion is not timely. The parties completed briefing on the pending motions for summary judgment on June 24, 2021. Plaintiffs waited to file this motion until nearly seven weeks had passed, oral arguments had been held, and the Court had issued orders dismissing six out of the Plaintiffs' ten claims. If the Plaintiffs truly believed this discovery to be "essential," surely they would have raised that issue with the Court before now. Instead, they waited until the Court pointed out the flaws in their claims. While the Court informed the parties that it was continuing the trial in this case generally, it specified that it was doing so to consider a final ruling on summary judgment. Plaintiff cannot now, on the eve of such ruling, ask for continued supplementation and briefing. Their request is untimely and therefore must be denied. *See, e.g.*, *CBRE Realty Fin. TRS, LLC v. McCormick*, 414 F. App'x 547, 551 (4th Cir. 2011) (noting that the protections of Rule 56 are "not designed to protect those who slumber upon

---

[1] Plaintiffs argue that at these depositions Defendants Thoele, Creedon, and DeAngelo testified that they were instructed not to complete "Notices of Findings" for the Plaintiffs' disciplinary hearings. *Mot.* at 4–5.

perceptible rights") (internal quotation marks omitted);[2] *Firewalker-Fields v. Lee*, No. 7:17-CV-00400, 2019 WL 4783112, at *10 (W.D. Va. Sept. 30, 2019) (finding a motion under 56(d) was untimely when it was "filed after the time for responding to the summary judgment motion had passed").

Second, even if the Motion was timely, the Court does not believe the facts the Plaintiffs seek were truly unavailable until this point. Defendants Thoele, Creedon, and DeAngelo were deposed June 15, 16, and 17 of 2021. While Plaintiffs had already filed their Responses to Defendants' motion for summary judgment, the depositions were noticed on June 8, 2021, two days before Plaintiffs submitted their Responses. *See* ECF Nos. 383–85. Moreover, the depositions were conducted before Defendants filed their Replies. Nevertheless, Plaintiffs did not ask the Court to extend the deadline for their Responses to allow for completion of the depositions first, nor did they seek to file a Surreply after the depositions were completed. Similarly, they did not raise the facts learned at the depositions during the motions hearing before the Court.

Additionally, while Plaintiffs have not conducted a Rule 30(b)(6) deposition of Dr. Heligman, they have already deposed him at length, and they have failed to describe how they were prevented from asking him questions at his first deposition that they now need to survive summary judgment. Accordingly, the Court is unable to find that Plaintiffs were denied access to this essential discovery.

Third, Plaintiffs' affidavit fails to "identify any specific information that would create a genuine dispute of material fact." *Hodgin v. UTC Fire & Sec. Americas Corp. Inc.*, 885 F. 3d 243, 250 (4th Cir. 2018). While Plaintiffs' Motion and supporting affidavit identify several pieces of

---

[2] While *CBRE Realty* specifically addressed slumbering upon the rights provided by Rule 56(f), Defendants aptly note that "Rule 56 was amended effective December 1, 2010; the amendments moved (without making material change) the substance of subsection (f) to subsection (d)." *Defs.' Resp.* 5 n.5 (quoting *Radi v. Sebelius*, 434 F. App'x 177, 179 n.* (4th Cir. 2011)).

discovery, they fail to demonstrate how this discovery would create a material question of fact or would otherwise prevent a grant of summary judgment. For example, Kiel Garella's affidavit simply states that it anticipates Dr. Heligman's second depositions "will reveal critical facts relevant to the claim and defense at issue in this litigation." *Garella Aff.* ¶ 6. Similarly, the affidavit states that Plaintiffs "believe at least some of the more than 300 documents identified in CSXT's privilege logs . . . contain critical facts relevant to the claims and defenses at issue in this litigation . . .." These vague statements "do not identify any specific evidence that Plaintiffs might discover . . . or explain how that evidence would create a triable issue" of fact on any of Plaintiffs' claims. *Hodgin*, 885 F.3d at 250. As such, the Court finds that supplementation under Rule 56(h) is not required.

Finally, the Court notes that the Plaintiffs argue in their Motion and Reply that no defense motion for summary judgment is pending against Plaintiffs' FMLA Interference claim. The Court finds that this argument is irrelevant to Plaintiffs' request for supplemental briefing under the Federal Rules of Civil Procedure and therefore declines to address it at this time.

## IV. CONCLUSION

The Court **DENIES** Plaintiffs' Motion. ECF No. 446. The Court will not allow supplemental briefing on summary judgment. The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER:        August 18, 2021

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE

# Courtroom Minute Entry

**Room:** Huntington                    **Case No.:** 3:18-cv-00321                    **Type:** Civil
**Caption:** Adkins et al v. CSX Transportation, Inc et al                    **Judge:** Cheryl A. Eifert

**Started:**  8/19/2021 9:29:29 AM
**Ends:**      8/19/2021 9:56:48 AM          **Length: 00:27:20**

Judge: Cheryl A. Eifert
Courtroom Deputy: Heidi L. Guerra
Judicial Assistant: Laura Tatman
Plaintiffs' Counsel: Charles Kiel Garella; Jeffrey Dingwall; John Patrick L. Stephens
Defense Counsel: Melissa Foster Bird; Davis Michael Walsh

| | |
|---|---|
| **9:29:36 AM** | **TELEPHONIC HEARING** |
| **9:30:15 AM** | Judicial Assistant: Laura Tatman |
| **9:30:16 AM** | Called case, noted appearances of counsel, defendant present in courtroom |
| **9:32:00 AM** | Judge: Cheryl A. Eifert |
| **9:32:13 AM** | In Camera Review |
| **9:35:51 AM** | Parties discussed 30B6 Depositions |
| **9:49:21 AM** | Parties discussed scope of discovery |
| **9:56:39 AM** | Hearing Adjourned |

IN THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF WEST VIRGINIA, HUNTINGTON DIVISION

BEFORE THE HONORABLE CHERYL A. EIFERT, MAGISTRATE JUDGE

---o0o---

JUSTIN ADKINS, et al.,

                Plaintiffs,

vs.                                        No. 3:18-CV-00321

CSX TRANSPORTATION, INC.,
et al.,

                Defendants.
_____/


---o0o---

TRANSCRIPT FROM AN ELECTRONIC RECORDING

TELEPHONIC DISCOVERY STATUS CONFERENCE

THURSDAY, AUGUST 19, 2021, 9:30 A.M.

---o0o---


APPEARANCES:
(All telephonically)

For the Plaintiffs:    GARELLA LAW
                      409 East Boulevard
                      Charlotte, North Carolina  28303
                      BY:  CHARLES KIEL GARELLA

                      UNDERWOOD & PROCTOR LAW OFFICES
                      923 Third Avenue
                      Huntington, West Virginia  25701
                      BY:  JOHN PATRICK L. STEPHENS


Transcribed by:      KATHY L. SWINHART, CSR
                      Court-approved Transcriber
                      (304) 528-2244

Proceedings recorded by electronic sound recording,
transcript produced by computer-aided transcription.

```
 1                     APPEARANCES (Continued)

 2
      For the Plaintiffs (Cont'd):
 3
                  EIGHT & SAND
 4                110 West C Street, Suite 1903
                  San Diego, California  92101
 5                BY:  JEFFREY R. DINGWALL

 6
      For the Defendants:
 7
                  NELSON MULLINS RILEY & SCARBOROUGH
 8                Post Office Box 1856
                  Huntington, West Virginia  25719-1856
 9                BY:  MELISSA FOSTER BIRD

10                MCGUIRE WOODS
                  800 East Canal Street
11                Richmond, Virginia  23219
                  BY:  DAVIS MICHAEL WALSH
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

```
 1              HUNTINGTON, WEST VIRGINIA
 2         THURSDAY, AUGUST 19, 2021, 9:29 A.M.
 3                   ---o0o---
 4         THE JUDICIAL ASSISTANT:  Good morning, everyone.
 5    This is Laura, Judge Eifert's judicial assistant.  We are
 6    here today in the matter of Adkins versus CSX, case No.
 7    3:18-CV-321, and we're here for a telephone conference
 8    regarding discovery issues.
 9         May I have plaintiffs' counsel, please?
10         MR. GARELLA:  This is Kiel Garella on behalf of the
11    plaintiffs.  I'm not sure if there is other folks on here as
12    well.
13         THE JUDICIAL ASSISTANT:  I'm sorry.  I didn't catch
14    the last part.
15         MR. GARELLA:  It's Kiel Garella.
16         THE JUDICIAL ASSISTANT:  Yes.
17         MR. GARELLA:  And I'm not sure -- there should be
18    other counsel joining.  I'm not sure if they're on or not.
19         THE JUDICIAL ASSISTANT:  Oh, I see.  Is there anyone
20    else on the line yet for plaintiff?
21         MR. DINGWALL:  Jeff Dingwall for the plaintiffs.
22         THE JUDICIAL ASSISTANT:  Thank you.
23         MR. STEPHENS:  Patrick Stephens for the plaintiffs
24    as well.
25         THE JUDICIAL ASSISTANT:  All right.  Thank you.
```

2

1       All right.  If that's everyone for plaintiffs'

2   counsel, may I have counsel for defendants, please?

3       MS. BIRD:  Hi, this is Melissa Foster Bird.  I'm

4   here for the defendants.  Also on the phone is Davis Walsh

5   from McGuire Woods, also for the defendants.

6       THE JUDICIAL ASSISTANT:  All right.  Thank you very

7   much.

8       So I'll just remind everyone to identify yourself

9   when speaking.  And if you'll please hold one moment for

10  Judge Eifert.

11      (Brief pause in proceedings.)

12      THE COURT:  Good morning.

13      MR. GARELLA:  Good morning.

14      MS. BIRD:  Good morning.

15      THE COURT:  Well, I appreciate you all making time

16  this morning for this telephone call.  What I wanted to do

17  was just tell you a little bit about what I've been doing

18  and then talk in more depth about the Rule 30(b)(6)

19  deposition.

20      So let me start first with the documents that I did

21  the in camera review on.  I did go over those documents, and

22  I did read some of the cases that were provided to me by

23  counsel, and I really didn't have any problems with what the

24  defendants did as far as what they claimed was privileged.

25  There were just two instances where there were attachments

3

1   that I wouldn't have considered to be privileged, and they

2   happened to be transcripts from two separate hearings during

3   the, I guess, investigative part of this whole thing.

4         The reason that the defendants had attached those as

5   privileged is because apparently there was notations made by

6   counsel throughout these -- these transcripts.  I would be

7   of the impression that you could redact those.  I didn't see

8   a lot of comments, at least I didn't appreciate that there

9   were a lot of comments on these transcripts.  However, I'm

10   not sure that it's necessary for the defendants to produce

11   them because I would have assumed that you already --

12   plaintiffs have these transcripts.

13         One of them -- and I'm talking specifically about

14   document No. 96 -- it had as an attachment a hearing

15   involving Mr. Little that took place on August 4, 2017.  And

16   then the other one was document 234 -- or 343, I'm sorry,

17   and it had a transcript of a hearing that involved several

18   boilermakers.  I couldn't find a date for that hearing

19   anywhere on the record, but those are the two transcripts.

20         So let me ask somebody to tell me, do the plaintiffs

21   already have verified transcripts that don't have these

22   attorney notes on them?

23         MR. GARELLA:  This is Kiel Garella, Your Honor.

24         I believe we do.  I know I've -- I know we have a

25   transcript for Mr. Little, and I believe we've got one for

USCA4  2676

4

1    the boilermakers as well.

2         THE COURT:  So based on that, I'm not going to

3    require the defendants to redact and produce these

4    transcripts because really you wouldn't be entitled to the

5    attorneys' impressions or notes anyway.  And if you already

6    have the transcript, then it would just be cumulative to

7    make me have them provide that to you.

8         So bottom line is I really did not have any problems

9    with what they marked as privileged or work product.  Even

10   though some of these e-mails, it appeared they came from

11   Ms. Dreyer, who is not an attorney, it appeared that what

12   she was doing was conveying communications or decisions or

13   judgments or assessments made by attorneys, so I don't

14   really see a problem there.  And based on that, I don't

15   really think anything further needs to be done as far as the

16   privileged documents.

17        So do you have anything to say about that,

18   plaintiffs' counsel?

19        MR. GARELLA:  Your Honor, this is Kiel Garella

20   again.

21        No.  I mean, obviously, you know, you've reviewed

22   them.  We have no idea what's in the documents.  I don't

23   think we've got anything further to say on that matter.

24        THE COURT:  Okay.  You know, I mean, it isn't

25   anything that you would be entitled to, I really don't think

5

1    you would be, and I don't see any of it as being

2    earth-shattering if that makes you feel any better.  So on

3    that point, then, I'm not going to require the defendants to

4    do anything further.

5         Now I want to talk a little bit about the Rule

6    30(b)(6) deposition.  And I know that the plaintiffs had

7    cited to that Ford Motor Company case I had, and it was a

8    big problem in that case all throughout the litigation to

9    try to get documents produced.  And obviously there were a

10   lot of documents on a lot of subjects, but there were

11   real -- there were real questions in my mind as to whether

12   the defendant in that case was actually conducting

13   reasonable searches for information, and that's why I

14   entered that order telling them that they had to make

15   somebody available from the corporation who could explain

16   how they went about doing their searches and who they

17   actually asked to conduct searches and those sorts of

18   things.

19        And what happened after I ordered them to do that is

20   that Ford, the defendant, produced a very detailed letter to

21   the plaintiffs' counsel stating about how they had gone

22   about doing the searches, who had done the searches, what

23   kind of searches they had done, et cetera, et cetera.

24   Because some of these documents -- what had happened was

25   they were producing documents before we actually -- I could

6

1    get them to agree on any search terms to run on their

2    electronic information.  And so some searches had been done

3    before that, so there wasn't really any consistency to the

4    searches.  And we didn't know what topics they had actually

5    been asked to look for, these witnesses.

6         But then Ford did this very detailed letter about

7    what had happened, and I still did -- I still was going to

8    have them go forward with that deposition.  But then Judge

9    Chambers decided that they really didn't need to do that for

10   several reasons.  One was that most of these searches were

11   overseen by counsel, and they were conducted at the request

12   of counsel, and they involved quite a bit of involvement of

13   counsel.  So that was one thing.  And he felt that if

14   counsel then explained what had happened, that should be

15   enough for the Court.

16        Secondly, there were so many employees that

17   conducted the searches -- there were over a hundred

18   employees who had searched their documents -- that he was of

19   the opinion that it would be very difficult for a corporate

20   representative to testify about what each one of these

21   people had done.  And I don't disagree with that, I knew it

22   was going to be difficult, although at the time I entered my

23   order I didn't know how many employees because Ford really

24   hadn't produced any facts to me to understand what had been

25   done.

7

1          And then lastly, he felt as though it would be

2     burdensome to have -- to have to have all these employees

3     kind of go back years later and try to reconstruct what they

4     did and try to then communicate that to some Rule 30(b)(6)

5     witness.  So that being the case, he did not make them

6     produce a person ultimately to testify.

7          And, you know, that's -- having had that history, it

8     makes me wonder, first of all, whether it's similar in this

9     case, and whether we could follow a similar path where there

10    could be information provided to plaintiffs' counsel by

11    defendants' counsel as to kind of how these searches were

12    conducted and what kinds of types of -- what searches did

13    they do, did they do paper searches, electronic searches,

14    that sort of thing.  And maybe if there was more detailed

15    information provided to the plaintiffs by counsel for the

16    defendants, that that would ease some of their concern about

17    perhaps documents not being produced or searches not being

18    reasonable.

19         But I don't really have any idea what the underlying

20    facts are here, how many employees we're talking about and

21    that kind of thing, so I'd like to get a little more

22    information about that.

23         Then there is also in my mind kind of two areas of

24    the 30(b)(6) deposition.  One is just some sort of

25    understanding of what the document retention policies are of

8

1    the defendants.  And another is what kind of searches and

2    what sort of steps did you take to respond to the document

3    production requests.

4         It sounded to me as though CSX had already agreed to

5    provide a Rule 30(b)(6) witness to talk about document

6    retention policies of the corporation, and that the real

7    problem maybe had to do with discovery being done on how the

8    discovery was responded to.

9         So is that correct?  Let me start there.

10        MS. BIRD:  I think --

11        MR. DINGWALL:  Your Honor, this is Jeff -- go ahead,

12   Melissa.

13        MS. BIRD:  No, go ahead.

14        MR. DINGWALL:  Your Honor, this is Jeff Dingwall.

15        I think that is generally correct.  I think through

16   discovery and through the depositions, we continued to see

17   and hear about documents that -- e-mails and things of that

18   nature that existed at some point that were not produced.

19   And so then the issue -- and we were interested in getting,

20   you know, kind of a discovery document retention deposition

21   anyway.  But as we continued to take more depositions and

22   conduct more discovery, things kept coming up over and over

23   again, which, you know, continued to highlight the

24   importance of the need to do that sort of discovery.

25        THE COURT:  So, Ms. Bird, has CSX agreed to produce

9

1    someone to talk about the document retention policies?

2    Because it appeared that you had done that, had agreed to

3    that.

4         MS. BIRD:  We talked about whether or not we would

5    agree to produce the retention policies themselves, which we

6    did produce.  And then said if there were questions about,

7    ah, what was done or how they were retained, if they had

8    something they could point to specifically, then we would be

9    able to have someone available if that was needed.  But

10   there was never anything about document retention policies

11   or document retention and production that needed to be

12   explored because there was never anything that could be

13   pointed to as something that was missing.

14        That, with our supplemental productions and other

15   documents that were produced here, there was really never

16   anything that the plaintiffs could say was missing.  It

17   seemed like something that was a fishing expedition about

18   something that wasn't -- that hadn't happened.

19        So we agreed to produce the document retention

20   policies, which we did.  And then said if there needed to be

21   follow-up because there was a -- you know, something that

22   needed to be explored, that we could then revisit that, but

23   we never did revisit that.

24        THE COURT:  Okay.

25        MS. BIRD:  There was always some amorphous, changing

10

1    something that was missing that no one could ever point to

2    what that thing was.  And without that, there is really no

3    basis to do any sort of investigation into retention

4    policies and specifically not our searches, which I believe

5    are privileged.  There is nothing -- there's no reason to do

6    those things without good cause for something that is

7    unrelated to the facts or the issues that are in this case.

8            THE COURT:  So on that fundamental point, I do

9    disagree with you.  I know there is a split as to whether or

10   not there has to be some evidence of something missing

11   before discovery can be done on retention policies and

12   whatnot, but there is a whole set of case law that disagrees

13   with that.  And I am more in line with that latter group of

14   cases, and I'll tell you why.

15           I think because of electronic information and

16   electronic discovery, it's almost expected now that up front

17   the parties have some discussion about how their documents

18   are maintained, how they are retained, when they are

19   destroyed, what systems they have documents on, where their

20   documents are located, whether they're paper, whether

21   they're on a server.  So that sort of thing is just becoming

22   pretty standard in discovery now because of the fact that so

23   much is electronically stored.

24           So I don't think that the plaintiff has to show that

25   something is missing before they can ask you about your

11

1   document retention policies and procedures, so I don't agree

2   on that.

3        And I think that what kind of throws me a little bit

4   in this case is that normally that sort of exchange of

5   information -- and it doesn't always require a deposition.

6   I mean, typically the lawyers will sit down and hash this

7   out so they know where to look and where to focus their

8   requests on.  But that is typically done at the beginning of

9   the case.  You know, it's usually not done at the end of the

10  case.  And I think that kind of threw me, that this subject

11  is even coming up at this point.

12       And I understand that the plaintiffs say they became

13  increasingly more concerned because this insurance policy

14  suddenly popped up, and they'd asked for that, you know,

15  years ago and had no idea that it existed.  But, you know,

16  even so, that to me doesn't have anything to do with

17  document retention policies, and that's -- that's just

18  whether something wasn't produced that should have been

19  produced.  I feel like parties ought to be able to do some

20  discovery on the other side's document retention and

21  destruction policy.

22       Now the policies in this case, CSX's policies have

23  been produced.  And I'm looking at page 4 of the plaintiffs'

24  brief, and they say that:  Ms. Foster e-mailed plaintiffs'

25  counsel that the parties agree to produce the document

12

1    retention and destruction policy and someone to testify

2    about the policy in general.

3            So if that was already something that you were going

4    to do, then I think you ought to go ahead and do that.  I

5    don't disagree with Ms. Bird, though, that there should be a

6    little focus to this.  It shouldn't just be having them

7    explain every line of the policy to the plaintiffs.  There

8    ought to be some focus to it and some purpose behind it.

9            So if that exists, then I think you ought to be able

10   to question a corporate representative about the policy that

11   you received and how that was implemented and whether it was

12   implemented during the time frames that are relevant in this

13   case.  So I think you should go ahead and do that.

14           I don't know, I've seen where there is maybe only

15   four counts that are left in this case; is that right?  Four

16   causes of action --

17           MS. BIRD:  Yes.

18           THE COURT:  -- four claims?

19           So I don't know if -- I don't even know how

20   important that subject is to these four remaining claims,

21   and there is no way for me to know that since I'm not

22   working on the case.

23           But what I would suggest on that is that, Ms. Bird,

24   you and the plaintiffs' counsel get together, and if in fact

25   there is still some issue about document retention that is

USCA4   2685

13

1    relevant to these four remaining claims, then go ahead and

2    allow them to do a 30(b)(6) deposition on the policy.

3          Now, the second issue is wanting to know how they

4    conducted their searches.  And, you know, again, I don't

5    fundamentally believe that there has to be something missing

6    before that can happen because, you know, a lot of times the

7    plaintiff won't know what is missing and won't know that

8    there is a gap.  So it kind of seems a little crazy to me

9    that they have to prove that something is missing in order

10   to figure out what searches were done because the defendant

11   is obligated to do a reasonable search.

12          However, you know, I would like to know what are we

13   talking about as far as employees and documents and how big

14   would this be.  Because I agree with Judge Chambers, it's

15   very unwieldy to try to have a corporate representative

16   figure out what each individual did when there's a lot of

17   individuals who did something.

18          I also would like to know how involved counsel was

19   in the searches because, you know, then I think it makes

20   more sense to just have counsel set out what kind of in

21   general was done, not disclosing any privileged

22   communications, but just indicating, you know, this is kind

23   of the steps that were followed.

24          So, Ms. Bird, what can you tell me about the number

25   of employees that had to search and how long it took, how

14

1    many documents were produced, that sort of thing?  I don't

2    have any idea how large of a pool of documents we're talking

3    about.

4            MS. BIRD:  Yeah, Your Honor, I am going to claim a

5    little bit of maybe not being prepared to address this

6    question today.

7            What I can tell you is that this started with a

8    group of plaintiffs, 59 plaintiffs.  The total class of

9    employees that were terminated from CSX over the issue that

10   is involved here was more than 60, in the 67 to 68 range.

11           THE COURT:  Okay.

12           MS. BIRD:  I can also tell you that, as you've seen

13   some of the documents, labor relations was involved as well

14   as the law department.  On some -- in some instances, there

15   was the management department, multiple layers of people

16   through the mechanical department, the transportation

17   department, the maintenance department, all of the crafts

18   that some of the plaintiffs and the other terminated

19   employees were involved in or, you know, crafts that they

20   were a part of.

21           Because of the extensive number of claims, there

22   were more than ten causes of action in the complaint.  There

23   were not only -- when we started this, both CSX

24   Transportation and CSX Corporation remained as well as nine

25   individual defendants -- or eight individual defendants who

15

1    have been named.  The number of people involved here

2    including any sort of union representatives or witnesses

3    that were involved in the labor relations or collective

4    bargaining agreement process, there was an extensive number

5    of people that were subject to a legal hold that was

6    inadvertently by me disclosed in one of these cases because

7    I was -- I believed that that was privileged, but we -- I

8    did that, accidentally provided that, so they have that.

9    They know the list of -- I can't even name the number of

10   employees that were subject to legal holds in just that one

11   case.

12          So the number is vast.  I cannot tell you as I'm

13   sitting here now how many.  I'm not even sure that many of

14   those people ever had any documents that pertained to the

15   case or, you know, was subject to the legal hold.  I know

16   that we have produced in this case upwards of -- gosh, has

17   to be 25,000 or more documents in this matter.

18          I just am not sure of the scope.  I mean, I'd

19   certainly be willing to address that with the Court and with

20   plaintiffs' counsel in the type of letter you're referring

21   to in the Ford case, if that is helpful.  But I just -- as

22   I'm sitting here today, I really am not sure I could answer

23   that question adequately or accurately.

24          THE COURT:  Well, and you know what I might suggest

25   is if you go into the Ford case -- and I think you can

USCA4 2688

16

1  probably access this through PACER.  But if for some reason

2  you can't do that, let me know, and what I'll do is have

3  Laura get this document and just e-mail it to you.  But the

4  case number was 3:13-CV-6529.  And specifically what I'm

5  referring to is document 577 where Ford asked for a

6  reconsideration of my order requiring them to produce the

7  Rule 30(b)(6) deposition.

8        And they explain about, you know, what steps they

9  have done since I entered that order to make it more

10 transparent as to how they conducted their searches.  And

11 they've attached to this brief a copy of the correspondence

12 that they provided to plaintiffs' counsel.

13       Now I'm not suggesting that you, CSX, would have to

14 do something exactly the same as far as the letter goes.

15 Their letter is extremely detailed, and I don't know that it

16 would be -- because the facts of that case are so different,

17 I don't know that it would really -- yours would be quite as

18 detailed as this.  Because that had to do with an -- or

19 instances of acceleration that were unintended, and it

20 covered a ten-year period of vehicles and a lot of different

21 vehicles and different systems.  So I doubt that yours would

22 be quite that detailed, but that will give you an example of

23 what Judge Chambers felt was an acceptable way to approach

24 this issue without requiring a 30(b)(6) witness.

25       MS. BIRD:  I think that probably at this point

17

1    speaking with plaintiffs' counsel and then attempting to do

2    something like that -- and I'll pull that; I did not look at

3    that, but I will pull that and look at that -- is probably a

4    better way than me trying to talk to you about this off the

5    top of my head without really being able to be completely

6    accurate in what I'm saying.

7         THE COURT:  No, I understand.

8         You know, I think that would be right now the way to

9    go about it.  I understand that maybe your trial date has

10   been delayed, and you don't perhaps have a new trial date

11   yet, so there is a little bit of time to do this.

12        I would ask you to go back -- both sides, go and

13   look at this document 577 from that case, and that will give

14   you some idea of how this issue was addressed, and that

15   method of addressing it was acceptable to Judge Chambers.

16   He felt that that was sufficient to satisfy any obligation

17   that the defendant would have to prove that reasonable

18   searches were conducted.

19        So I'd like you to do that.  And then, you know,

20   maybe you two can get together on that and, you know, you

21   can agree to do some sort of outline like that, Ms. Bird,

22   just to give them an idea of how the document search was

23   approached.  And then if there is further concerns, you can

24   contact my office, and we'll just set up another telephone

25   conference or an in-person hearing, and we can address it in

18

1    more detail.

2         MS. BIRD:  We will do that, Your Honor.

3         THE COURT:  All right.  So what I'm going to do

4    right now, what I'm going to do is I'm going to enter an

5    order that says that I did not find problems with the

6    privilege claim made by the defendants and, therefore, there

7    is nothing further to be done on that issue at this time.

8         And in regard to the 30(b)(6) deposition, someone

9    from CSX or from the defendant should be made available for

10   the plaintiffs to question about the document and

11   destruction policies that were produced.

12        And on the other point of the reasonableness of the

13   searches and thoroughness of the searches, that the parties

14   will further meet and confer about whether information can

15   just be exchanged without a Rule 30(b)(6) deposition.

16        Okay?

17        MS. BIRD:  Thank you, Your Honor.

18        THE COURT:  Anything else that you all need today?

19        MR. GARELLA:  I don't believe so, Your Honor.

20        THE COURT:  All right.  Thank you.  This matter is

21   in recess.

22        MR. GARELLA:  Thank you, Judge.

23            (Proceedings were adjourned at 9:56 a.m.)

24                      ---o0o---

25

USCA4  2691

1    CERTIFICATION:

2        I, Kathy L. Swinhart, CSR, court-approved transcriber,

3    certify that the foregoing is a correct transcription from the

4    official electronic sound recording of the proceedings in the

5    above-entitled matter on August 19, 2021.

6

7

8    October 21, 2021_____
     DATE

9

10   /s/ Kathy L. Swinhart_____
     KATHY L. SWINHART, CSR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

KATHY L. SWINHART, Official Court Reporter (304) 528-2244

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## HUNTINGTON DIVISION

**JUSTIN ADKINS, et al.,**

      **Plaintiffs,**

**v.**                                                  **Case No.: 3:18-cv-00321**

**CSX TRANSPORTATION, INC., et al.,**

      **Defendants.**

## <u>ORDER</u>

On August 19, 2021, the parties appeared, by counsel, for a discovery status conference. After reviewing materials provided by counsel and discussing the outstanding issues, the Court found that the concerns related to Defendants' privilege log and associated unproduced documents are resolved. Defendants agreed to produce DOC 00001802, DOC 00001935, DOC 00002707, and DOC 00002766. If those documents have not yet been produced to Plaintiffs, the Court **ORDERS** Defendants to do so within **three (3) business days**.

As to the Rule 30(b)(6) deposition, Defendants are **ORDERED** to produce a corporate designee to answer questions related to the document retention and destruction policies already produced. This deposition shall occur promptly and at a time and place agreed upon by the parties. The production of a Rule 30(b)(6) designee to testify regarding the individual document searches performed by Defendants and their employees is not required at this time. Instead, counsel for Defendants shall provide Plaintiffs' counsel with an overview of the methodology used to conduct the searches, thus

allowing Plaintiff to determine if the searches were conducted in a reasonable manner. The parties shall then meet and confer in an effort to resolve any remaining issues. If the parties decide that another discovery status conference would be helpful, they shall contact the Court to arrange the conference.

The Clerk is directed to provide a copy of this Order to counsel of record.

**ENTERED:** August 19, 2021

Cheryl A. Eifert
United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

JUSTIN ADKINS, et al.,

          Plaintiffs,

v.                                    CIVIL ACTION NO.  3:18-0321

CSX TRANSPORTATION, INC., et al.,

          Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court are Defendants' Motion for Summary Judgment, ECF No. 360, and Plaintiffs' Motion for Partial Summary Judgment, ECF No. 368.[1] For the reasons that follow, the Court **GRANTS** Defendants' Motion, **in part**, and **DENIES** Plaintiffs' Motion, **in part**. Plaintiffs' remaining claims are **DISMISSED**.

## I.  BACKGROUND

The facts of this case have been restated ad nauseam. Plaintiffs in this case were employees of CSX Transportation ("CSXT"). In a two-month period in mid-2017, each of the Plaintiffs

---

[1] Multiple memoranda submitted by the parties are relevant to the remaining claims including *Defendants' Memorandum of Law in Support of their Motion for Summary Judgment as to Plaintiffs' Claim Under FMLA* ("*Defs.' FMLA Mem.*"), ECF No. 363; *Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment as to Plaintiffs' Claim Under the FMLA* ("*Pls.' FMLA Resp.*"), ECF No. 398; *Defendants' Reply Memorandum in Support of Their Motion for Summary Judgment as to Plaintiffs' Claims Under the FMLA* ("*Defs.' FMLA Reply*"), ECF No. 413; *Plaintiffs' Brief in Support of Plaintiffs' Motion for Partial Summary Judgment* ("*Pls.' Br.*"), ECF No. 369; *Defendant's Response in Opposition to Plaintiffs' Motion for Partial Summary Judgment* ("*Defs.' Resp. in Opp.*"), ECF No. 382; *Plaintiffs' Reply Memorandum in Support of Motion for Partial Summary Judgment* ("*Pls.' Reply in Supp.*"), ECF No. 410; *Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment on Plaintiffs' Claim for Wrongful Discharge and Plaintiffs' Claims Under ERISA, the Rehabilitation Act and the West Virginia Human Rights Act* ("*Defs.' ERISA Mem.*"), ECF No. 362; *Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment on Plaintiffs' Claim for Wrongful Discharge and Plaintiffs' Claims Under ERISA, the Rehabilitation Act and the West Virginia Human Rights Act* ("*Pls.' ERISA Resp.*"), ECF No. 397; and *Defendants' Reply Memorandum in Support of Their Motion for Summary Judgment as to Plaintiffs' Claim for Wrongful Discharge and Plaintiffs' Claims Under ERISA, the Rehabilitation Act and the West Virginia Human Rights Act* ("*Defs.' ERISA Reply*"), ECF No. 415.

visited one of two chiropractors in this region, Shannon M. Johnson, D.C. ("Dr. Johnson"), or Daniel J. Carey, II, D.C. ("Dr. Carey"). CSXT's Certificate of Illness and Injury ("COII") was completed for each of the Plaintiffs by their respective chiropractor. The COII for each Plaintiff listed a soft-tissue injury and recommended that each Plaintiff remain off work for eight or more weeks.

Dr. Craig Heligman is the Chief Medical Officer for CSXT. Dr. Heligman "noticed the high number of COIIs submitted within weeks of each other from the same two providers, and their close similarity." *Defs.' FMLA Mem.* 2. He became concerned that they were improperly submitted. *Id.* at 2–3. "As a result of his opinion that these employees may be attempting to fraudulently obtain extended benefits, Dr. Heligman notified the Railroad Retirement Board ("RRB") Office of Inspector General by letter and requested an investigation because 'the timing of these alleged injuries . . . is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers.'" *Id.* at 3; *July 14, 2017 Letter*, ECF No. 370-2.[2] That letter was also sent to Plaintiffs' medical benefits providers and the chiropractic board of Ohio and Kentucky. *July 14, 2017 Letter.*

Soon after Dr. Heligman wrote his letter to the RRB, Plaintiffs received "charge letters" informing them that they were "being held out of service" pending a formal investigation into their conduct. *Charge Letters*, ECF No. 360-1. Plaintiffs were informed that formal investigative hearings would be held at which they could be represented by a union representative in accordance with their collective bargaining agreements and that they could present witnesses in their defense. *Id.*

---

[2] While it is not discussed at length in the parties' briefing, the Court has been informed that around the time the COIIs were submitted, CSXT had announced furloughs in the area. *See, e.g.*, *Heligman Dep.* 85, ECF No. 382-1. At the motions hearing, Plaintiffs submitted that approximately half of the Plaintiffs were not subject to the announced reduction in force/furlough.

Each of the Plaintiffs in this case had a full investigative hearing, which included testimony by the employee and Dr. Heligman, and the benefit of union representation. *Hearing Trs.*, ECF No. 370-61–116. Defendants ultimately concluded that Plaintiffs had violated CSXT's Operating Rules and Code of Ethics, and they were all terminated from their employment with CSXT. *Termination Letters*, ECF No. 360-7.

On February 2, 2018, Plaintiffs filed a lawsuit alleging that the Defendants were liable for violating federal and state laws and for committing multiple torts. *See* ECF No. 1. The Third Amended Complaint included the following counts: (1) the Employment Retirement Income Security Act of 1974, (2) the Rehabilitation Act, (3) the West Virginia Human Relations Act, (4) the Family and Medical Leave Act of 1993, (5) defamation, (6) invasion of privacy (public disclosure of private facts), (7) tortious interference, (8) intentional infliction of emotional distress, (9) wrongful discharge, and (10) the Federal Railroad Safety Act.

The Court has entered numerous orders pertaining to summary judgment, *see* ECF Nos. 439, 440, 441, 442, 443, 445. To date, the following claims have been dismissed: defamation, invasion of privacy, tortious interference, intentional infliction of emotional distress, wrongful discharge, and the Federal Railroad Safety Act.

On August 5, 2021, the Court held a motions hearing at which the parties had the opportunity to present their arguments on the remaining causes of action. This Order addresses Plaintiffs' claims under the Employment Retirement Income Security Act of 1974 ("ERISA"), the Rehabilitation Act of 1973, the West Virginia Human Relations Act ("WVHRA"), and the Family and Medical Leave Act of 1993 ("FMLA").

## II.  LEGAL STANDARD

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.

Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

The nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

### III. ANALYSIS

#### A. FMLA Retaliation, ERISA, WVHRA, Rehabilitation Act

While the antiretaliation and antidiscrimination provisions of the FMLA, ERISA, WVHRA, and the Rehabilitation Act all provide different protections to employees, claims under these statutory provisions are all analyzed using the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800–06 (1973). *See Sharif v. United Airlines, Inc.*, 841 F.3d 199, 203 (4th Cir. 2016) (applying *McDonnell Douglas* to FMLA retaliation claim); *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 238, 239 (4th Cir. 1991) (applying *McDonnell Douglas* to claims under § 510 of ERISA); *Mayflower Vehicle Sys., Inc. v. Cheeks*, 629 S.E.2d 762, 772 (W. Va. 2006) (applying *McDonnell Douglas* to WVHRA claims); *Hannah P. v. Coats*, 916 F.3d 327, 342 (4th Cir. 2019) (applying *McDonnel Douglas* to Rehabilitation Act claims).

Under this framework, a plaintiff has the burden of producing evidence of a *prima facie* case of discrimination or retaliation under the relevant statute. *See McDonnell Douglas*, 411 U.S. at 802. If that burden is met, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Id.* Thereafter, the plaintiff has "the burden of persuading the factfinder that the employer's proffered explanation is merely a pretext for discrimination." *Id.* at 804.

Assuming, without deciding, that Plaintiffs have carried their initial burden of producing evidence of a *prima facie* case under each of the pertinent acts, Defendants have provided a consistent "legitimate, nondiscriminatory reason" for terminating the Plaintiffs: CSXT believed the Plaintiffs were seeking time off work on an illegitimate basis, and therefore, that the Plaintiffs were violating CSXT workplace rules. *See Defs.' FMLA Mem.* 7; *Defs.' ERISA Mem.* 7–8. The ultimate burden of persuasion, then, lies with the Plaintiffs. They must at least create a genuine issue of material fact on the issue of pretext to survive summary judgment. *See McDonnell Douglas*, 411 U.S. at 804.

In the end, it does not matter if CSXT was correct when it concluded that the Plaintiffs had violated its Operating Rules and Code of Ethics. *See Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) ("[W]hen an employer gives a legitimate, nondiscriminatory reason for discharging the plaintiff, it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination."). Accordingly, Plaintiffs must do more than submit "the unexceptional fact" that they disagree with CSXT's final determinations. *Id.; Conkwright*, 933 F.2d at 239 ("[A] plaintiff must adduce facts, which if taken as true, could enable a jury to identify unlawful intent from the other various reasons why an employer might have terminated plaintiff, and to conclude that the employer harbored the requisite

unlawful intent."); *Hannah P.*, 916 F.3d at 345 (reiterating that plaintiff must demonstrate that purposed basis for adverse action was pretext for discrimination under Rehabilitation Act); *Powers v. Covestro LLC*, No. 2:16-CV-05253, 2017 WL 1952230, at *6 (S.D.W. Va. May 10, 2017) ("The plaintiff may not satisfy his burden by merely stating that the defendants' stated reason is pretext and vaguely hinting that sufficient evidence exists to refute the defendants' stated reason.")

Plaintiffs argue that the investigative process was "pre-determined," because by the time Dr. Heligman testified at the hearings, he had already concluded that the Plaintiffs had engaged in fraud. *See Pls.' FMLA Resp.* 15. Additionally, they argue that Dr. Heligman's deposition testimony that the Plaintiffs engaged in "subconscious" fraud, is further indication that he came to his conclusions about the Plaintiffs' guilt without evidence. *Id.* Finally, they argued that not all of the Plaintiffs were subject to furlough, and therefore the Defendants had no reason to believe the conduct of those Plaintiffs was suspicious.

As stated at the hearing, none of these purported facts suggest that CSXT's ultimate reason for firing the Plaintiffs was pretextual. First, Dr. Heligman was not the final decisionmaker in the Plaintiffs' terminations, nor was he the only person who testified during the disciplinary hearings.[3] Accordingly, the final decisionmaker heard more than just Dr. Heligman's opinions, and Plaintiffs have no evidence that the hearing process was somehow pretextual. Second, the Court has been directed to nothing in Dr. Heligman's deposition testimony that suggests the actual reasons for firing the Plaintiffs were pretextual. As the Court stated at the motions hearing, while Dr. Heligman was careful not to literally accuse the Plaintiffs of committing fraud or crimes, it is clear that he believed that the circumstances indicated fraudulent acts. Finally, the Court does not believe

---

[3] Additionally, as Defendants argued at the hearing, a predetermination is not the same thing as pretext. In fact, a finding that the Defendants were convinced from the beginning that Plaintiffs were acting fraudulently would actually strengthen Defendants' argument that they terminated Plaintiffs for that reason.

Plaintiffs' argument that not all the Plaintiffs were subject to furlough is evidence of pretext. Even without the furlough notice, the Defendants had sufficient reason to believe that the Plaintiffs were improperly seeking leave.

In sum, Plaintiffs have failed to produce any evidence to suggest that Defendants terminated the Plaintiffs for any purpose other than the Defendants' stated legitimate reason. Therefore, Plaintiffs are unable to carry their burden of showing they were terminated for pre-textual reasons under any of the relevant statutory provisions. As such, the Defendants are entitled to summary judgment on Plaintiffs' FMLA Retaliation, ERISA, West Virginia Human Rights Act, and Rehabilitation Act claims.

## B.  FMLA Interference[4]

In addition to prohibiting retaliation for the exercise of FMLA rights, the FMLA prohibits employers from interfering with the same. "Claims of alleged violations of these prescriptive rights—known as 'interference' or 'entitlement' claims—arise under 29 U.S.C.A. § 2615(a)(1), which states that '[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.'" *Yashenko v. Harrah's NC Casino Co.*, LLC, 446 F.3d 541, 546 (4th Cir. 2006).

To prevail on an interference claim, an employee must show "(1) that he is entitled to an FMLA benefit; (2) his employer interfered with the provision of that benefit, and (3) that

---

[4] Plaintiffs argue that Defendants did not move for summary judgment on this claim. *Pls.' FMLA Resp.* 2. Defendants plainly noted in their Motion that summary judgment was proper on Plaintiffs claims of "denial of benefits and interference under the Family Medical Leave Act of 1993." *Mot.* 1–2. Additionally, Defendants' supporting memorandum expressly, albeit briefly, addresses interference and cites FMLA interference caselaw to support its argument that it did not interfere with Plaintiffs' FMLA rights. *See Defs.' FMLA Mem.* 10. Finally, when the parties appeared before the Court to argue the motions, FMLA interference was addressed at length. At no time did Plaintiffs argue that interference was improperly before the Court. As such, the Court rejects Plaintiffs' submission that the interference claim is not at issue on summary judgment.

interference caused harm." *Adams v. Anne Arundel Cnty. Pub. Sch.*, 789 F.3d 422, 427 (4th Cir. 2015).

Plaintiffs argue that Defendants interfered with their FMLA rights by failing to process their requests for leave as FMLA leave. *Pls.' Br.* 3, 7–8, 13. Defendants argue that they did not interfere with Plaintiffs' FMLA rights because they honestly believed Plaintiffs sought leave for an improper purpose. *Defs.' FMLA Mem.* 11–12 (citing *Kariotis v. Navisotar Int'l Transp. Corp.*, 131 F.3d 672, 680–81 (7th Cir. 1997)).

Here, the Court finds that application of the "honest belief" rule is appropriate. While the rule has not been formally adopted by the Fourth Circuit, the Court has alluded to the rule's validity. *See Mercer v. Arc of Prince Georges Cnty, Inc.*, 532 F. App'x 392, 396 (4th Cir. 2013). In *Mercer*, the Fourth Circuit cited *Kariotis* for the proposition that "an employer does not interfere with the exercise of FMLA rights where it terminates an employee's employment based on the employer's honest belief that the employee is not taking FMLA for an approved purpose." *Id.* That is the exact scenario before this Court. Defendants have demonstrated to the Court that they believed the Plaintiffs submitted the COII improperly. That belief need not have been accurate, so long as it was genuine. *See Kariotis*, 131 F.3d at 681. Plaintiffs have failed to produce any evidence or persuasive argument suggesting the Defendants did not honestly believe leave was sought for an improper purpose. As such, the Court finds that Plaintiffs cannot maintain a claim for FMLA interference.

## IV. CONCLUSION

In light of the foregoing, the Court **GRANTS, in part,** Defendant's Motion for Summary Judgment. Accordingly, Plaintiff's Motion for Partial Summary Judgment is **DENIED**, **in part**.

The Court dismisses Plaintiffs' FMLA, ERISA, West Virginia Human Rights Act, and Rehabilitation Act claims.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTERED:    August 23, 2021

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

JUSTIN ADKINS, et al.,

               Plaintiffs,

v.                                   CIVIL ACTION NO.   3:18-0321

CSX TRANSPORTATION, INC., et al.,

               Defendants.

**JUDGMENT ORDER**

With entry of the accompanying Memorandum Opinion and Order, the Court awards summary judgment in favor of Defendants on the remaining claims. As all claims now have been resolved in favor of Defendants, the Court **ORDERS** that judgment be issued in their favor and that this case be dismissed and stricken from the docket of this Court.

The Court **DIRECTS** the Clerk to send a certified copy of this Order to all counsel of record, and any unrepresented parties.

                        ENTER:         August 23, 2021

                        ROBERT C. CHAMBERS
                        UNITED STATES DISTRICT JUDGE

Shelby Cardoza <shelby@eightandsandlaw.com>

**Eight & Sand**
LAW OFFICE OF JEFF R. DINGWALL

---

## Activity in Case 3:18-cv-00321 Adkins et al v. CSX Transportation, Inc. et al Transmitted Certified Copy

1 message

---

**wvsd_ecf@wvsd.uscourts.gov** <wvsd_ecf@wvsd.uscourts.gov>         Mon, Aug 23, 2021 at 10:35 AM
To: Courtmail@wvsd.uscourts.gov

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**United States District Court**

**Southern District of West Virginia**

### Notice of Electronic Filing

The following transaction was entered on 8/23/2021 at 1:35 PM EDT and filed on 8/23/2021
**Case Name:**       Adkins et al v. CSX Transportation, Inc. et al
**Case Number:**   3:18-cv-00321
**Filer:**
**WARNING: CASE CLOSED on 08/23/2021**
**Document Number:** 457

**Docket Text:**
**TRANSMITTED CERTIFIED COPY of [456] Judgment Order to counsel of record and any unrepresented parties. (hkl)**

**3:18-cv-00321 Notice has been electronically mailed to:**

Charles Kiel Garella     kiel@gljustice.com, ecf@gljustice.com

Davis Michael Walsh     dwalsh@mcguirewoods.com

Gregory G. Paul     gregpaul@paullaw.com, bferris@morgan-paul.com, jen@morgan-paul.com, nina@morgan-paul.com

Jeffrey R. Dingwall     jeff@eightandsandlaw.com, shelby@eightandsandlaw.com

John Patrick L. Stephens     pstephens@underwoodlawoffices.com, nhall@underwoodlawoffices.com

Mark F. Underwood     munderwood@underwoodlawoffices.com, cmorales@underwoodlawoffices.com, cunderwood@underwoodlawoffices.com, nhall@underwoodlawoffices.com

Megan Basham Davis     megan.davis@nelsonmullins.com, kendra.huff@nelsonmullins.com, leeann.lemon@nelsonmullins.com

Melissa Foster Bird     melissa.fosterbird@nelsonmullins.com, meg.thrasher@nelsonmullins.com, natalie.taylor@nelsonmullins.com, rebecca.mitchell@nelsonmullins.com

Nathan R. Hamons     nathan.hamons@nelsonmullins.com

Samuel Lewis Tarry , Jr     starry@mcguirewoods.com

**3:18-cv-00321 Notice has been delivered by other means to:**

Kenneth R. Reed

USCA4    2706

241 Elm Street
Ludlow, KY 41016

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1060112543 [Date=8/23/2021] [FileNumber=10067168-0] [4cbcdb56d6998ce7069558924c4dcca5ce4ca4f4459c8fd2c97d8f6d6fa9ac17eb1af01a86e9177ff4e4d561575898f2e066ecef097d94698e3063894e1d0721]]

# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA AT HUNTINGTON

| | |
|---|---|
| JUSTIN ADKINS et al., | ) |
| | ) |
| Plaintiffs, | ) Civil Action No. 3:18-CV-00321 |
| | ) |
| vs. | ) HON. ROBERT C. CHAMBERS |
| | ) |
| CSX TRANSPORTATION, INC. et al., | ) MAGISTRATE JUDGE EIFERT |
| | ) |
| | ) |
| Defendants. | ) |

## PLAINTIFFS' NOTICE OF APPEAL

NOTICE IS HEREBY GIVEN that **All Plaintiffs,** hereby appeal to the United States Court of Appeals for the Fourth Circuit from the following orders and judgments of the United States District Court for the Southern District of West Virginia:

1. ECF No. 166: Order entered June 11, 2020 granting CSX Corporation's Motion to Dismiss for Lack of Personal Jurisdiction;

2. ECF No. 427: Order entered July 15, 2021 granting in part and denying in part Defendants' Motion to Strike;

3. ECF No. 430: Order entered July 20, 2021 granting in part and denying in part Plaintiffs' Motion to Compel Discovery Responses;

4.      ECF No. 439: Order entered July 30, 2021 granting summary judgment in favor of Defendants' on Plaintiffs' Defamation claim;

5.      ECF No. 440: Order entered July 30, 2021 granting summary judgment in favor of Defendants' on Plaintiffs' Wrongful Discharge claim;

6.      ECF No. 441: Order entered August 2, 2021 granting summary judgment in favor of Defendants' on Plaintiffs' Invasion of Privacy claim;

7.      ECF No. 442: Order entered August 2, 2021 granting summary judgment in favor of Defendants' on Plaintiffs' Intentional Infliction of Emotional Distress claim;

8.      ECF No. 443: Order entered August 2, 2021 granting summary judgment in favor of Defendants' on Plaintiffs' Tortious Interference claim;

9.      ECF No. 445: Order entered August 10, 2021 granting summary judgment in favor of Defendants' on Plaintiffs' Federal Railroad Safety Act claim;

10.     ECF No. 452: Order entered August 18, 2021 denying Plaintiffs' Motion for Leave to File Supplemental Briefing on Summary Judgment Motions;

11.     ECF No. 454: Order entered August 19, 2021 regarding Defendants' privilege log and production of a Fed. R. Civ. P. 30(b)(6) deponent;

12.     ECF No. 455: Order entered August 23, 2021 granting summary judgment in favor of Defendants on Plaintiffs' FMLA, ERISA, West Virginia Human Rights Act, and Rehabilitation Act claims;

13.     ECF No. 456: Judgment Order entered August 23, 2021 granting summary judgment in favor of Defendants;

14.     ECF No. 457: Certified Judgment Order entered August 23, 2021.

Respectfully submitted this 21st day of September, 2021.

/s/C. Kiel Garella
C. Kiel Garella
Garella Law, P.C.
409 East Boulevard
Charlotte, NC 28303
Tel:  (980) 321-7934
kiel@gljustice.com
Pro Hac Vice

Gregory G. Paul
WV Bar #8129
Morgan & Paul, PLLC
100 First Avenue, Suite 1010
Pittsburgh, PA 15222
Tel: (844) 374-7200
gregpaul@morganpaul.com

J. Patrick L. Stephens
Underwood Law Offices
WV Bar #10262
923 Third Avenue
Huntington, WV 25701
Tel: (304) 522-0508
pstephens@underwoodlawoffices.com

Jeff R. Dingwall
Eight & Sand
550 West B Street, Fourth Floor
San Diego, CA 92101
Tel: (619) 796-3464
jeff@eightandsandlaw.com
Pro Hac Vice

Kenneth R. Reed
Kenneth R. Reed, Attorney PSC
241 Elm Street
Ludlow, KY 41016
Tel: (859) 331-4443
kenreedatty@gmail.com
Applicant for Pro Hac Vice

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on September 21, 2021, the foregoing was served with the Clerk of the Court via CM/ECF which will provide service to all parties.

<u>/s/C. Kiel Garella</u>
C. Kiel Garella
Attorney for Plaintiffs