**CASE NO. 21-2051**

―――――――――――――

## IN THE UNITED STATES COURT OF APPEALS
### FOR THE FOURTH CIRCUIT

―――――――――――――

**JUSTIN ADKINS; JUSTIN BLAKE; EDWIN GLOWACKI; ERIC
JORDAN; KEVIN PALMER; DENNIS SARGENT; TRAVIS
THORNSBERRY; MICHAEL WILLIAMS; JOHN BAKER; JAMES
BLAIN; DEVERY BROWN; JAMES DEAL; JONATHAN JEFFERS;
ROBERT MOSTELLER; MICHAEL L. POTTER; MICHAEL D. POTTER;
JESSEE WALLACE; TIMOTHY WITT; JOHN BILLS; MICHAEL
CLARK; RANDALL CRAYCRAFT; JOHN FRASURE; SAMMY MADDIX;
JAMES STINNETT; TODD THAYER; MICHAEL CAMPBELL; TONY
ABDON; THE ESTATE OF CHAD LITTLE; BRANDON ADKINS;
JACQUELINE MARSHALL; HOMER MAYNARD; SCOTT MORRISON;
JEREMY NAPIER; SHAWN PATTERSON; MATTHEW WOODS; JOHN
CARPENTER; QUINCY CHRISTIAN; GREGORY HAMM;
ETHAN MULLINS; MICHAEL OWENS; JONATHAN ROWE; DANNY
STEWART; LLOYD WILLIAMS; DAVID MANIS; JOSHUA FERGUSON;
ERIC SPEAKS; DONALD STEPHENS; JASON BARKER; CHAD
DOWDY; JERRY FLOCKER; GROVER KELLEY; CHRISTOPHER
CLAY STILTNER; DENNIS HUTCHINSON; JOSHUA HALL; ZACH
POTTER; DEANNA LANHAM; SAMUEL PRESTON; BOBBY AKERS;
GERALD BARBER,**

Plaintiffs – Appellants

v.

**CSX TRANSPORTATION, INCORPORATED; CRAIG S. HELIGMAN,
M.D.; GUS THOELE; CURT SHOGREN; MILTON STORM; DELANDO
JONES; TOM DEANGELO; SHAWN LUSK; ELIZABETH CREEDON;
KENNETH RAY EMERSON**

Defendants – Appellees

―――――――――――――

**Appeal from the United States District Court
for the Southern District of West Virginia**

———————————

**BRIEF OF APPELLANTS**

———————————

Jeff R. Dingwall
EIGHT & SAND
750 West Fir Street, Suite 602
San Diego, CA 92101
Tel: (619) 796-3464
Fax: (619) 717-8762
jeff@eightandsandlaw.com

Gregory G. Paul
PAUL LAW OFFICES
100 First Avenue, Suite 1010
Pittsburgh, PA 15222
Tel: (412) 417-5862
Fax: (888) 822-9421
gregpaul@morgan-paul.com

## DISCLOSURE STATEMENT

Pursuant to Local Rule 26.1, Appellants make the following disclosures:

1.      Is party a publicly-held corporation or other publicly-held entity?  No.

2.      Does party have any corporate parents?  No.

3.      Is 10% or more of the stock of party owned by a publicly-held corporation or other publicly-held entity?  No.

4.      Is there any other publicly-held corporation or other publicly-held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(a)(2)(B))?  No.

5.      Is party a trade association?  No.

6.      Does this case arise out of a bankruptcy proceeding?  No.

# TABLE OF CONTENTS

| | | |
|---|---|---|
| Table of Authorities | | iii |
| Statement of Subject Matter Jurisdiction and Appellate Jurisdiction | | 1 |
| Statement of Issues Presented for Review | | 2 |
| Statement of the Case | | 3 |
| Summary of Argument | | 10 |
| Argument | | 11 |
| I. | THE DISTRICT COURT ERRED IN DISMISSING THE CSX EMPLOYEES' FMLA INTERFERENCE CLAIMS FOR MULTIPLE REASONS INCLUDING THAT CSX DID NOT MOVE FOR SUMMARY JUDGMENT ON THESE CLAIMS AND INTERFERENCE CLAIMS DO NOT REQUIRE A SHOWING OF INTENT. | 11 |
| | A. CSX Did Not Move For Summary Judgment On The FMLA Interference Claims And Was Not Entitled To Judgment. | 11 |
| | B. CSX Failed To Process An Application For FMLA For Any Of The Fired Employees And Violated The Interference Provisions Of The FMLA. | 13 |
| | 1. Definition of a Serious Medical Condition under the FMLA. | 14 |
| | 2. The FMLA Provides for Up to 12 Weeks of Unpaid Leave. | 15 |
| | 3. Prescriptive Rights Versus Proscriptive Rights under the FMLA. | 15 |
| | C. The CSX Employees' Medical Conditions On CSX's Certificate Of Ongoing Illness and Injury (COII) Form Are Serious Medical Conditions As Defined By The FMLA. | 17 |
| | 1. Each of the Plaintiffs Through the Completion and Submission of the COII form by themselves and through their Healthcare Provider Provided Notice to the CSX Medical Department. | 21 |
| II. | THE DISTRICT COURT ERRED IN DISMISSING THE DISCRIMINATION AND RETALIATION CLAIMS UNDER THE FMLA, ERISA, WVHRA AND REHABILITATION ACT BECAUSE FACTUAL ISSUES REMAIN WITHIN THE PROVINCE OF A JURY REGARDING PRETEXT. | 25 |
| | A. Dr. Heligman's Deposition Testimony Establishes That He Provided The Only Evidence Of The Alleged Fraud And Thus There Are Issues Of Material Fact That Must Be Decided By A Jury. | 29 |

| | | |
|---|---|---|
| | 1. Dr. Heligman's Testimony Establishes that the Termination Decisions were Pre-determined. | 29 |
| | 2. Dr. Heligman Admitted that the Course of Treatment Prescribed by Drs. Carey and Johnson was Reasonable. | 31 |
| | 3. Dr. Heligman gave Contradicting Accounts of the Alleged Motives for Treatment by the Employees. | 31 |
| | 4. CSX No Longer Accepts Leave of Absence Forms from Dr. Carey and Dr. Johnson. | 33 |
| | 5. Dr. Heligman had no Evidence that Plaintiffs' Sought to Extend their Health Benefits due to a Layoff/Furlough. | 33 |
| | 6. Dr. Heligman's Allegations of Fraud were "Pure Speculation. | 34 |
| III. | THE HONEST BELIEF EXCUSE HAS NOT BEEN RECOGNIZED BY THE FOURTH CIRCUIT AND DOES NOT APPLY TO THE FACTS OF THIS CASE. IN THE ALTERNATIVE, A JURY QUESTION REMAINS IF THE HONEST BELIEF IS A DEFENSE. | 38 |
| Conclusion and Request for Relief | | 42 |

# TABLE OF AUTHORITIES

## CASES

*Ainsworth v. Loudon Cty. Sch. Bd.*,
   851 F. Supp. 2d 963 (E.D. Va. 2012)................................................................. 17

*Bosse v. Baltimore Cnty.*,
   692 F.Supp.2d 574 (D.Md.2010) ........................................................................ 17

*Brushwood v. Wachovia Bank, N.A.*
   520 F. App'x 154 (4th Cir. 2013) ................................................................ 21, 22

*Bragdon v. Abbott,*
   524 U.S. 624, 118 S. Ct. 2196, 2210, 141 L. Ed. 2d 540 (1998) ...................... 28

*Callison v. City of Philadelphia*,
   128 Fed.Appx. 897 (3rd Cir. 2005) .................................................................... 17

*Cheetham v CSX Transp. Inc.*,
   2011 U.S. Dist. LEXIS 171739, *4-5 (M.D. Fla Jul. 6, 2011) .......................... 41

*Diaz v. Fort Wayne Foundry Corp,*
131 F.3d 711 (7th Cir. 1997) .............................................................................. 24

*Dotson v. Pfizer, Inc.*,
   558 F.3d 284 (4th Cir. 2009)............................................................................... 22

*EEOC v. Sears Roebuck and Co*.,
   243 F.3d 846 (4th Cir. 2001)............................................................................... 26

*Fuentes v. Perskie,*
   32 F.3d 759, 764 (3d Cir. 1994) ......................................................................... 27

*Furnco Const. Corp. v. Waters*,
   438 U.S. 567, 577 (1978)..................................................................................... 27

*Hannah P. v. Coats*,
   916 F.3d 327, 345–46 (4th Cir. 2019)........................................................... 22, 23

*Hodgens v. Gen. Dynamics Corp.,*
   144 F.3d 151, 159 (1st Cir.1998) ................................................................. 15, 16

*Johnson v. Reichhold, Inc.*,
   2010 U.S. Dist. LEXIS 86753 (N.D. Ill. Aug. 23, 2010).................................. 39

*Kariotis v. Navistar Int'l Transp. Corp.*,
   131 F.3d 672 (7th Cir. 1997)............................................................................... 39

*King v. Preferred Technical Group,*
   166 F.3d 887 (7th Cir.1999)................................................................................ 25

*Kline v. TVA*, 128 F.3d 337 (6th Cir. 1997)........................................................... 28

*McDonnell Douglas Corp. v. Green,*
   411 U.S. 792 (1973) ...................................................................................... 24, 38

*Mercer v Arc of Prince Georges Cnty, Inc.*,
   532 F. Appx. 392 (4th Cir. 2013)................................................................... 38-39

*Moore v. Equitrans, L.P.*,
  27 F.4th (4th Cir. 2022)......................................................................... 11
*Nelson v. Oshkosh Truck Corp.*,
  No. 07 C 509, 2008 U.S. Dist. LEXIS 72375, at *6 (E.D. Wis. 2008)......... 40-41
*O'Connor v. PCA Family Health Plan, Inc.*,
  200 F.3d 1349 (11th Cir.2000)........................................................ 24, 25
*Reed v. Buckeye Fire Equip.*,
  241 F. App'x 917 (4th Cir. 2007) .......................................................... 15
*Reeves v. Sanderson Plumbing Prod., Inc.*,
  530 U.S. 133 (2000) ..........................................................................27-28
*Rhoads v. FDIC*,
  257 F.3d 373 (4th Cir. 2001)................................................................. 21
*Rice v. Sunrise Express, Inc.*,
  209 F.3d 1008 (7th Cir.2000)................................................................ 16
*Sharif v United Airlines, Inc.*,
  841 F.3 199 (4th Cir. 2016)............................................................. 12, 38
*St. Mary's Honor Center v. Hicks*,
  509 U.S. 503 (1993) ............................................................................ 27
*Strickland v. Water Works and Sewer Bd. Of City of Birmingham.*,
  239 F.3d 1199 (11th Cir. 2001)............................................................. 24
*Texas Dept. of Comm. Affairs v. Burdine*,
  450 U.S. 248 (1981) ............................................................................ 27
*Yashenko v. Harrah's NC Casino Co., LLC*,
  446 F.3d 541 (4th Cir. 2006)................................................................ 16

**STATUTES**

28 U.S.C. § 1291 .................................................................................... 1
28 U.S.C. § 1331 .................................................................................... 1
28 U.S.C. § 1367 .................................................................................... 1
29 U.S.C. § 1001, et seq ......................................................................... 1
29 U.S.C. § 1132 .................................................................................... 1
29 U.S.C. § 2601 ............................................................................... 1, 14
29 U.S.C. § 2611(11).............................................................................. 14
29 U.S.C. § 2612(a)(1)(D ...............................................................14-17, 21
29 U.S.C. § 2613(a) ............................................................................... 23
29 U.S.C. § 2613(d(4)(B) ........................................................................ 23
29 U.S.C. § 2614(a)(1) ........................................................................... 15
29 U.S.C. § 2615 .......................................................................... 13, 15-17
29 U.S.C. § 794 et seq ...................................................................... 1, 26

49 U.S.C. § 20109 ............................................................................. 1

**REGULATIONS**

29 C.F.R. § 825.302.............................................................21-22
29 C.F.R. § 825.305............................................................. 23
29 C.F.R. § 825.310............................................................. 23
29 C.F.R. § 825.302(c).........................................................21-22
29 C.F.R. § 825.303(b).........................................................21-22
29 C.F.R. § 825.301(b)(1)..................................................... 23
29 C.F.R. § 825.302(f)......................................................... 23
29 C.F.R. § 825.114(e).........................................................17-18
29 C.F.R. § 825.117............................................................17-18
29 C.F.R. § 825.114(e).........................................................17-18

## STATEMENT OF SUBJECT MATTER JURISDICTION AND APPELLATE JURISDICTION

The United States District Court for the Southern District of West Virginia had jurisdiction over this action pursuant to 28 U.S.C. § 1331, 29 U.S.C. § 1132, 28 U.S.C § 1331, 28 U.S.C. § 1343(a)(4), and 28 U.S.C § 1367. The action was brought pursuant to section 510 of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001, *et seq*., under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § *794 et seq*., the West Virginia Human Relations Act, Title 5-11-1 *et seq*., under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq*., under the Federal Railroad Safety Act, 49 U.S.C. § 20109, and state law causes of action. The District Court had jurisdiction without respect to the amount in controversy or the citizenship of the parties of the federal causes of action and supplemental jurisdiction over the state law causes of action.

This Court has jurisdiction under 28 U.S.C. § 1291, in that the decisions appealed constitute the final appealable judgments and other orders of a district court, which adjudicated and disposed of all claims before it. Appellants timely filed their Notice of Appeal on September 21, 2021, within 30 days of the district court's Order entering summary judgment in favor of the Defendants-Appellees.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Whether the district court erred in granting summary judgment to Defendants on Plaintiffs' claim of interference under the FMLA where the claim was not before the court and the court did not give Plaintiffs' notice and the opportunity to present all material evidence.

2. Whether the district court erred in granting summary judgment to Defendants on Plaintiffs' claim of interference under the FMLA by relying on Defendants' "honest belief" excuse where there is no intent element in an interference claim.

3. Whether the district court erred in making credibility determinations and resolving issues of material fact in favor of Defendants as the moving party in granting their motion for summary judgment as to all of Plaintiffs' claims.

4. Whether the district court erred in granting summary judgment to Defendants based on their "honest belief" excuse which has not been recognized in the Fourth Circuit and, if it were to apply to the facts here, requires a factual determination by a jury.

## STATEMENT OF THE CASE

Appellants John Baker, Randall Craycraft, Chad Dowdy, Sammy Maddix, Danny Stewart, and James Stinnett[1] were among more than 50 workers fired by CSX in the summer of 2017 due to their treatment for various musculoskeletal conditions with two local chiropractors, Dr. Daniel Carey, II, and Dr. Shannon Johnson. JA 1035 at 87:15-25; JA 2696-2697. CSX employees in the tri-state area of West Virginia, Ohio, and Kentucky had long treated with Drs. Carey and Johnson due to the doctors' proximity to CSX facilities, their excellent professional reputations, and their ability to treat musculoskeletal injuries without reliance on prescription drugs which would render the workers incapable of performing their duties. JA 1021 at 64:3-16.

Appellants worked in various jobs and locations for CSX and had varied medical conditions and treatment histories. Upon treating with Dr. Carey or Dr. Johnson, the chiropractors submitted to CSX a Certificate of Ongoing Illness or Injury (COII) form on behalf of the Appellants, setting forth a diagnosis and course of treatment, as well as an expected timeframe that the employee would need to be off work. JA 2696-2697. The COII is a form created and used by CSX's medical department for the employee and healthcare provider to substantiate a medical leave

---

[1] All other Plaintiffs-Appellants have resolved their cases and have been dismissed. *See* ECF No. 471, Agreed Order of Dismissal (S.D. W.Va. July 11, 2022).

of absence over seven days. JA 982 at 34:12 – 36:11. Each of the Appellants submitted a COII form to the CSX Medical Department during the timeframe of May 2017 through August 2017. JA 2696-2697.

John Baker was a welder in the mechanical department in Huntington, West Virginia, was born in 1978 and hired on with CSX in 2014. ECF No. 356-10 at 12:13-14 and 13:9-13. He injured his left shoulder while riding a four-wheeler with his son. *Id*. at 44:8-13. Dr. Johnson evaluated and treated Baker's left shoulder, and submitted a COII to CSX stating that Baker was unable to work from 6/19/17 and estimated a return to work date of 8/19/17. JA 163; ECF 369 at *7, Ex. 1; ECF No. 356 at *26. Baker's primary care doctor, Dr. Jennifer Adkins, provided a second opinion and agreed with Dr. Johnson. ECF No. 356-10 at 48: 9-21. Dr. Adkins' COII form was faxed to CSX's medical department in Jacksonville, Florida on August 31, 2017. JA 163; ECF No. 356-10 at 48:20-23 and 117:2-18.

Randall Craycraft was a carman in the mechanical department in Columbus, Ohio, was born in 1959, and hired on with CSX in 1978. ECF No. 356-21 at 11:5-6 and 24:11-12. He was treated by Dr. Carey for a lumbar sprain/strain sustained when he tripped at home while carrying a can of gas. ECF No. 356-21 at 99:18-24. . Dr. Carey submitted a COII to CSX for Craycraft, stating that he was unable to work from 6/7/16 to an estimated return date of 8/21/17. JA 246; ECF No. 369 at *7, Ex.

1; ECF No. 356 at *37. Craycraft was released to return to work on 7/25/17. ECF No. 356-21 at 100:11-16.

Chad Dowdy was a utility worker for CSX in the mechanical department in Russell, Kentucky, was born in 1987 and hired on with CSX in 2014. ECF No. 356-23 at 12:16-17 and 32:18-22. JA 430-431. Dr. Johnson treated Dowdy for a strain of cervical and muscle spasms that Dowdy sustained while at home changing lug nuts and tires. ECF No. 356-23 at 44:4-13. Dr. Johnson submitted a COII to CSX for Dowdy and stated he was unable to work from 6/19/17 through an estimated return to work on 8/19/17. JA 430-431; ECF No. 356 at *39. Dowdy testified that he was healed up from this injury by the time of his disciplinary investigation on 8/7/17. ECF No. 356-23 at 74:7-10 and 125:2-8.

Sammy Maddix was a painter for CSX in Huntington, West Virginia, was born in 1972, and hired on with CSX in 2012. ECF No. 356-34 at 12:10-11 and 31:6-10.  Dr. Johnson treated Maddix for a sprain of his lumbar and pelvis sustained when he fell into an "old grubbing hole" at home. ECF No. 356-34 at 43:13-22. Dr. Johnson submitted a COII to CSX for Maddix, stating that he was unable to work from 6/19/17 with an estimated return to work date of 8/19/17. JA 264; ECF 369 at *7, Ex. 1; ECF No. 356 at *50. In addition to Dr. Johnson, Maddix also treated with Dr. Bailey at St. Claire Medical Center for these same injuries. ECF No. 356-34 at 46: 2-7.

Danny Stewart was a machinist for CSX in Russell, Kentucky, was born in 1968 and hired on with CSX in 2004. ECF No. 356-52 at 10: 11-12 and 23:20-21. Dr. Johnson treated Stewart for a sprain of the lumbar/pelvis sustained when he fell in his backyard on 7/6/17. ECF No. 356-52 at 32:2-9. Dr. Johnson submitted a COII to CSX for Stewart and stated he was unable to work from 7/10/17 with an estimated return to work date of 9/12/17. JA 389-390; ECF 369 at *7, Ex. 1; ECF No. 356 at *68. In addition to Dr. Johnson, Stewart was treated for these injuries by Dr. Jarrod Smith. ECF No. 356-52 at 45:3-10.

James Stinnett worked as a painter for CSX in the mechanical department at Huntington, West Virginia, and was born in 1958. ECF No. 356-54 at 8:18-19. Dr. Johnson treated Stinnett for a sprain of the cervical and muscle spasms sustained when he fell at home while attempting to install a window air conditioning unit. ECF No. 356-54 at 26:6-25. Dr. Johnson submitted a COII to CSX for Stinnett and stated he was unable to work from 6/22/17 with an estimated return to work date of 8/22/17. JA 275-276; ECF 369 at *7, Ex. 1; ECF No. 356 at *70.

Instead of processing the COIIs of these employees and granting the medical leaves of absence, as was standard practice, CSX and the head of its Medical Department, Dr. Craig Heligman, decided to charge the Appellants, and dozens of their co-workers, with identical fraud and ethics violations. JA 985 at 37:20 – 41:14. Company disciplinary investigations were held for each of the charged employees,

6

per applicable collective bargaining agreements, which were conducted and overseen by Appellees Gus Thoele, Curt Shogren, Milton Storm, Delando Jones, Tom Deangelo, Shawn Lusk, Elizabeth Creedon, and Kenneth Ray Emerson, and featured Dr. Heligman as the only witness for CSX. JA 2696-2698. Based solely on the bald-faced and completely unsupported claims of fraud by Dr. Heligman, the Appellants and dozens of their co-workers were fired. JA 867-922.

In the process of charging and firing the Appellants and their co-workers, Dr. Heligman sent three different letters to the United States Railroad Retirement Board[2] (RRB), accusing the Appellants of engaging in a conspiracy to defraud the RRB. JA 1010 at 62:14 – 64:2. Dr. Heligman similarly sent letters to other benefits providers, including Aetna, Inc., Highmark Blue Cross Blue Shield, and United Healthcare, and sent letters to the Ohio and Kentucky state chiropractic boards claiming misconduct by Drs. Carey and Johnson in their treatment of the Appellants. JA 1020 at 72:4-10.

At no time did Dr. Heligman or anyone from CSX: (1) examine the Appellants or their co-workers; (2) speak with Dr. Carey or Dr. Johnson; (3) speak with Appellants; or (4) otherwise seek evidence that these employees had done anything

---

[2] Railroad workers such as the Appellants do not receive Social Security benefits. Instead, their retirement, unemployment, and sickness benefits come through the Railroad Retirement and Railroad Unemployment and Insurance Acts. The RRB administers these programs. *See* https://rrb.gov/OurAgency/AgencyOverview (last visited July 9, 2022).

other than seek and receive treatment for legitimate medical conditions. JA 1013 at 65:19 – 66:18; JA 1028 at 80:14-23; JA 1048-1049 at 100:23 – 101:1. In fact, Dr. Heligman testified in his April 29, 2021 deposition that he had "zero evidence" that Drs. Carey and Johnson had done anything improper in treating the Appellants and submitting COII forms for time off, that he did not in 2017, know the motivations of the Plaintiffs with regard to their medical treatment, and that he is not aware of any independent entity or organization that found any wrongdoing on behalf of the Plaintiffs or the chiropractors. JA 2255 at 439:4 – 440:5; JA 2256 at 445:5-19; JA 1021 at 73:14 – 74:12.

As for the assertions by Dr. Heligman and CSX that the Appellants had somehow conspired with the doctors to commit fraud, Dr. Heligman confirmed that it was "pure speculation." JA 2254 at 438:4-25. Nevertheless, with "zero evidence" and based on "pure speculation," CSX fired the Appellants and dozens of their co-workers, destroying their careers, harming their reputations, and causing severe economic and non-economic damage to them. Moreover, Dr. Heligman lacked any qualification to assess the medical conditions claimed by the workers here, and the propriety of the treatment they received from Drs. Carey and Johnson. Dr. Heligman is not a chiropractor, he is not an orthopedist, he's not a neurologist, he's not licensed to practice medicine in any of the three states where the workers were treated, and he has not personally examined a patient since 2012. JA 1046 at 98:4 – 99:3.

In attempting to justify their unjustifiable termination of more than 50 employees, CSX also tried to link the medical treatment of these employees to a furlough/layoff in the area by claiming the workers were only getting treatment as a means of extending their benefits in some way. However, the Appellants were either not subject to the furlough/layoff or were not aware of any pending furlough/layoff at the time they sought treatment. *See* ECF 360 at 66:6-8; ECF 360 at 47: 5-7; ECF 360 at 70:12-19; ECF 360 at 59: 9-13; ECF 360 at 48:7-9; ECF 360 at 33:15-23.

Appellants were among 58 individuals fired in this fashion to bring suit in the Southern District of West Virginia, alleging violations of: Section 510 of the Employee Retirement Income Security Act (ERISA); Section 504 of the Rehabilitation Act of 1973 (Rehab Act); the West Virginia Human Relations Act (WVHRA); the Family and Medical Leave Act (FMLA); the Federal Railroad Safety Act; and state law causes of action of defamation, invasion of privacy, tortious interference, intentional infliction of emotional distress, and wrongful discharge. JA 106.

In a series of rulings over several weeks, the district court granted the motions for summary judgment brought by Defendants-Appellees as to each cause of action and denied the motion for partial summary judgment brought by Plaintiffs-Appellants. JA 1696, 1705, 1710, 1718, 1726, 1807, 2696. Having resolved all

claims in favor of the Defendants, the district court entered judgment in their favor and dismissed the case. JA 2696, 2705.

## SUMMARY OF ARGUMENT

There is an informal fallacy known as the Texas Sharpshooter Fallacy.[3] It derives its name from the idea of a cowboy shooting at a barn. After the barn is riddled with bullet holes, the cowboy paints targets over the holes to make it appear he has hit bullseyes and then proclaims himself a sharpshooter. In essence, this fallacy stands for ignoring the differences while focusing on the similarities, thus coming to an inaccurate conclusion. That, in a nutshell, is exactly what CSX did to the Appellants, and ultimately what the district court did in disposing of their cases.

The district court failed to consider the unique facts of the individual plaintiffs, failed to consider the complete lack of evidence to support CSX's accusations of fraud, and failed to meaningfully analyze the individual claims based on the unique facts of the individual plaintiffs. The district court further invaded the province of a jury in resolving issues of material fact in favor of the Defendants as the moving party on summary judgment, and in making critical credibility determinations of key witnesses.

The result was that the district court dismissed the cases of Appellants with the broad stroke of a dubious presumption that federal courts are unable to inquire,

---

[3] *See* https://tinyurl.com/mwxhspjm (last visited July 9, 2022).

let alone rule, as to whether the reasons an employer fired more than 50 people in one fell swoop were lawful. Under the theory of the district court, employers cannot be subject to civil liability for firing people so long as they can come up with *any* reason, and federal courts are powerless to even test that reason. Of course, state and federal legislatures, and the judiciary at large, say otherwise. Here, the judgment of the district court must be vacated, and the cases of the Appellants remanded with instructions consistent with the unique individual facts and the applicable law.

## ARGUMENT

I.    **THE DISTRICT COURT ERRED IN DISMISSING THE CSX EMPLOYEES' FMLA INTERFERENCE CLAIMS FOR MULTIPLE REASONS INCLUDING THAT CSX DID NOT MOVE FOR SUMMARY JUDGMENT ON THESE CLAIMS AND INTERFERENCE CLAIMS DO NOT REQUIRE A SHOWING OF INTENT.**

A.    CSX Did Not Move For Summary Judgment On The FMLA Interference Claims And Was Not Entitled To Judgment.

The district court granted summary judgment to Defendants on Plaintiffs' claim for FMLA interference, (JA 2696), even though Defendants never moved for summary judgment on that claim.

Under Fed. R. Civ. P. 56, a district court *may* enter summary judgment *sua sponte*, but *must* provide sufficient notice to the losing party "with an adequate opportunity to demonstrate a genuine issue of material fact." *Moore v. Equitrans*, L.P., 27 F.4th 211, 224 (4th Cir. 2022). Furthermore, the district court "must, in view

of the procedural, legal, and factual complexities of the case, allow the party a reasonable opportunity to present all material pertinent to the claims under consideration. These requirements ensure a litigant has a "full and fair opportunity to present its case." *Id*. (internal citations and quotations omitted). Failure to do so constitutes error and necessitates remand. *Id*. Here, the FMLA interference claim was never raised by Defendants thus Plaintiffs had no notice and no opportunity to present its case.

A district court's decision to grant summary judgment is reviewed *de novo*, "applying the same legal standards as the district court and viewing all facts and reasonable inferences in the light most favorable to the nonmoving party." *Ballengee v. CBS Broad., Inc*., 968 F.3d 344, 349 (4th Cir. 2020).

On May 13, 2021, CSX filed "Defendants' Memorandum of Law in Support of their Motion for Summary Judgment as to Plaintiffs' claim under the FMLA". ECF No. 363. There is a passing reference to interference in the motion itself, but nothing of substance in the brief other than the retaliation claim.

Defendants' opening brief only argues the elements of an FMLA retaliation claim. ECF No. 363 at *6. Specifically, Defendants argue about "protected activity", "causal connection" and "pretext"- none of which are elements of an interference claim. And Defendants extensively cite to *Sharif v United Airlines, Inc*., 841 F.3 199, 203-204 (4th Cir. 2016), which is only a retaliation case ("Shariff argues that

United Airlines threatened to terminate his employment in retaliation for taking FMLA leave, a violation of the proscriptive provisions in 29 U.S.C. 2615(a)(2)"). There is simply no argument made by CSX regarding the elements of an interference claim which do not require a showing of intent.

To prevail on an FMLA interference claim, the plaintiff must show that: (1) he was an eligible employee under the FMLA; (2) the defendant was an eligible employer; (3) he was eligible for leave; (4) he gave notice of his intent to take leave; and (5) the defendant denied him benefits. The district court, in granting summary judgment to Defendants held that "an employer does not interfere with the exercise of FMLA rights where it terminates an employee's employment based on the honest belief that the employee is not taking FMLA for an approved purpose." JA 2703 (*quoting Mercer v. Arc of Prince Georges Cnty, Inc*., 532 F. App'x 392, 396 (4th Cir. 2013)).

It follows that because intent is not an element of an interference claim, then evidence of pretext and the *McDonnell Douglas* framework has no place in an FMLA interference claim. Accordingly, the district court erred in dismissing the FMLA interference claims based upon lack of pretext or the honest belief excuse.

B.    <u>CSX Failed To Process An Application For FMLA For Any Of The Fired Employees And Violated The Interference Provisions Of The FMLA.</u>

13

Congress enacted the FMLA "to balance the demands of the workplace with the needs of families" and "to entitle employees to take reasonable leave for medical reasons." 29 U.S.C. § 2601(b)(1), (2). The FMLA seeks to achieve these purposes "in a manner that accommodates the legitimate interests of employers." 29 U.S.C. § 2601(b)(3). In so doing, an employee is eligible for FMLA leave if he (1) has been employed by the employer for at least one year and (2) has worked at least 1,250 hours in the twelve-month period immediately preceding the leave. 29 U.S.C. § 2611(2).

### 1. Definition of a Serious Medical Condition under the FMLA.

If these requirements are met, then a covered employee may take leave if he "suffers from a serious medical condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). As defined in the FMLA, "serious health condition" means "an illness, injury, impairment, or physical or mental condition that involves inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). Pertinent FMLA regulations further address this issue as follows: (a) For purposes of FMLA, "serious health condition" entitling an employee to FMLA leave means an illness, injury, impairment, or physical or mental condition that involves: (2) Continuing treatment by a health care provider. A serious health condition is:

(i)     A period of incapacity (i.e., inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery there from) of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:

(A)     Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or

(B)     Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

## 2. The FMLA Provides for Up to 12 Weeks of Unpaid Leave.

The FMLA gives employees with qualifying medical conditions the right to take up to 12 weeks of leave during a 12-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions" of his job. 29 U.S.C. § 2612(a)(1)(D. "The employee has an accompanying right to return to the same or an equivalent position at the conclusion of the leave period." *Reed v. Buckeye Fire Equip.*, 241 F. App'x 917, 923 (4th Cir. 2007) (citing 29 U.S.C. § 2614(a)(1)).

## 3. Prescriptive Rights Versus Proscriptive Rights under the FMLA.

Under the FMLA, substantive rights, and their accompanying protections, *see id.* § 2615(a)(1), are *prescriptive,* "set[ting] substantive floors for conduct by employers, and creating entitlements for employees." *Hodgens v. Gen.*

15

*Dynamics Corp.,* 144 F.3d 151, 159 (1st Cir.1998) (quoting *Diaz v. Fort Wayne Foundry Corp.,* 131 F.3d 711, 712–13 (7th Cir.1997))(internal quotation marks omitted) (amendment in original). *See also Rice v. Sunrise Express, Inc.,* 209 F.3d 1008, 1016 (7th Cir.2000) (explaining that "in §§ 2612–2615, the Act contains prescriptive protections for employees that are expressed as substantive statutory rights"). Claims of alleged violations of these prescriptive rights—known as "interference" or "entitlement" claims—arise under 29 U.S.C.A. § 2615(a)(1), which states that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 546 (4th Cir. 2006).

Separately, the FMLA also contains *proscriptive* provisions that protect employees from discrimination or retaliation for exercising their substantive rights under the FMLA. *See Hodgens,* 144 F.3d at 159–60; *Rice,* 209 F.3d at 1017. Known as "retaliation" or "discrimination" claims, causes of action alleging violations of these proscriptive rights arise under 29 U.S.C.A. § 2615(a)(2), which states that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." *Yashenko v. Harrah's NC Casino Co., LLC,* 446 F.3d 541, 546 (4th Cir. 2006).

"A retaliation claim under the FMLA differs from an interference claim under the FMLA in that the interference claim merely requires proof that the employer denied the employee his entitlements under the FMLA, while the retaliation claim requires proof of retaliatory intent." *Ainsworth v. Loudon Cty. Sch. Bd.*, 851 F. Supp. 2d 963, 977 (E.D. Va. 2012), citing *Bosse v. Baltimore Cnty.,* 692 F.Supp.2d 574, 588 (D.Md.2010).

Under the FMLA, it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). In this case, defendant improperly interfered with the Plaintiffs' rights to take medical leave. "An interference action is not about discrimination; it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA." *Callison v. City of Philadelphia*, 128 Fed.Appx. 897, 899 (3rd Cir. 2005) (*citing* 29 U.S.C. §§ 2612(a), 2614(a)).

C.    The CSX Employees' Medical Conditions On CSX's Certificate Of Ongoing Illness And Injury (COII) Form Are Serious Medical Conditions As Defined By The FMLA.

The FMLA defines serious health condition including incapacity for more than three calendar days and continuing treatment and for chronic health conditions. The rules for chronic health conditions are different. Absences due to a chronic health condition so long as they are medically necessary, qualify for FMLA leave even if the employee does not receive treatment during the absence. 29 C.F.R. §§

17

825.117, 825.114(c). Moreover, there are no durational requirements; an absence due to a chronic health need not last more than three days and may in fact be less than an hour. 29 C.F.R. §§ 825.114(e), 825.203(c), (d).

On the face of each COII form, every Plaintiff meets the definition of serious health condition because the period of incapacity is more than three calendar days. The majority of the COII forms state that the Plaintiffs were unable to work for approximately two months. ECF No. 369 at *7-8.

For example, Jolanda Johnson's FMLA chart provides a "date seen" and "RTW" dates in columns for each CSX employee. Except for Bobby Akers, Jolanda Johnson's FMLA chart provides for potentially FMLA qualifying leave under twelve weeks. ECF No. 369 at *7-8; ECF No. 378, Exs. A and B. Accordingly, each of the CSX employees would have been eligible for FMLA leave. A review of the actual COII forms for John Baker provides an estimated return to work date of 8/19/17 from 6/19/17. *Id*. Ms. Johnson's FMLA chart for Randall Craycraft states a RTW date of 8/21/17 from 6/20/17. *Id.* Ms. Johnson's FMLA chart identifies Chad Dowdy's return to work date as 8/19/17 from 6/19/17. *Id.* Ms. Johnson's FMLA chart identifies Sammy Maddix's return to work date as 8/19/17 from 6/19/17. *Id.* Ms. Johnson's FMLA chart identifies Danny Stewart's return to work date as 9/12/17 from 7/10/17. *Id.* Ms. Johnson's FMLA chart identifies James Stinnett's return to work date as 8/22/17 from 6/22/17. *Id.*

18

Jolanda Johnson, Manager of FMLA for CSX, admitted in her deposition testimony that her review of the COII forms and the summary of the same that she submitted to Dr. Heligman put CSX on notice of a potentially FMLA qualifying absence. More specifically, Ms. Johnson testified that the both the COII forms and her summary chart identified the medical condition and duration of the medical absence. However, CSX did not process any application for protected FMLA leave for any of the Plaintiffs. COII Forms and Johnson FMLA Chart: ECF No. 369 at *7-8; ECF No. 378, Exs. A and B.

The deposition transcript of Jolanda Johnson, Manager of FMLA for CSX during the relevant period of time.  Ms. Johnson testified as follows:

> Q. Okay. Are you familiar with the concept that an employee, to trigger a potentially FMLA qualifying event, does not have to use magic words like "the FMLA" or "Family Medical Leave Act"?
>
> A. Yes. The employee doesn't have to explicitly assert their rights under the FMLA.
> ECF 382-4 at 92:5-10.
>
> Q. Prior to 2018 or '19, are you aware of any FMLA training that was provided to union employees?
> A. No.
> *Id*. at 74:12-14.
>
> Q. Did you ever have any conversations with anyone at CSX about whether any of the Plaintiffs were eligible or potentially eligible for FMLA based on the certificate of ongoing illnesses submitted in June or July or August of 2017?
> A. No.
> *Id*. at 97:17-22.

19

Q. Got it. Okay. So the- is it correct to say that the -when it comes to the Certificate of Ongoing Illness, the combination of identifying a diagnosis and the concurrent condition, coupled with the duration of the period of time of being unable to work, would provide the information to evaluate whether an employee has potentially FMLA qualifying absences?
A. Yes.
*Id*. at 100:16-23.

Q. Did those columns for each of the plaintiffs in this case put you on notice of potentially FMLA qualifying event because the date ranges were less than 12 weeks?
A. Yes, to an extent.
*Id*. at 115:12-16.

Q. Okay. So if the answer to the question is yes, that this date range did put you on notice of a potentially FMLA qualifying event, is the reason that you did not initiate an FMLA application process because they were suspected of fraud in this investigation?
A. Yes.
*Id*. at 116:2-7.

Q. …I'm asking were you ever made aware of the conclusions of that investigation in your job at CSX?
A. No.
Q. Looking back, do you believe in your role administering the FMLA that you should have processed an application for FMLA for the plaintiffs in this case based upon the information you received on July 19th of 2017?
A. No.
*Id*. at 117: 22-25 and J.A. 1102 at 118:1-2.

Q. Did you form an opinion on July 19th of 2017 that the plaintiffs in this case were guilty of fraud?
A. No.
Q. Have you formed an opinion since July of 2017 to the present whether any of the plaintiffs have engaged in fraud?
A. No.
*Id*. at 118: 1-2 and 9-11.

Moreover, Dr. Heligmann testified that the "new case landing screen" in a case management program called Medgate provided an FMLA box to be checked or unchecked regarding whether the absence was a potential FMLA qualifying absence. JA 1156 at 208:13-19. This case management software was in place since at least 2014 generating a report that is sent from the medical department to the FMLA department. JA 1149 at 201:19-25 and 1150:1-21. In fact, Dr. Heligman testified that the FMLA box is checked by default because the COII form is required every 45 days. JA 1151 at 203:13-21. In preparation for his deposition, Dr. Heligman reviewed "the new case landing screen" with a random sampling of the Plaintiffs in this case and found that the FMLA box was checked. JA 1152 at 204:2-23. This evidence establishes that the Plaintiffs were potentially eligible for FMLA leave, but the FMLA department and Jolanda Johnson specifically failed to process FMLA paperwork because the Plaintiffs were suspected of fraud.

1. Each of the Plaintiffs Through the Completion and Submission of the COII form by themselves and through their Healthcare Provider Provided Notice to the CSX Medical Department.

Although an employee may have a right to take leave under the FMLA, the employee must give his employer notice of his intention to take leave to be entitled to it. *See* 29 U.S.C. § 2612(e)(l). "An employee is mandated to provide notice to her employer when she requires FMLA leave." *Brushwood v. Wachovia Bank, N.A.*, 520

21

F. 'pp'x 154, 157 (4th Cir. 2013) (quoting *Rhoads v. FDIC*, 257 F.3d 373, 382 (4th Cir. 2001)).

That said, an employee need not specifically invoke the FMLA to benefit from its protections. *See Dotson v. Pfizer, Inc*., 558 F.3d 284, 295 (4th Cir. 2009). Verbal notice can be sufficient. 29 C.F.R. §§ 825.302(c), 825.303(b). There are no "magic words" and "[t]he employee need not expressly assert rights under the FMLA or even mention the FMLA...." 29 C.F.R. §§ 825.302(c), 825.303(b). *Id*.

Proper notice merely "makes the employer aware" that the employee needs potentially FMLA-qualifying leave. *Brushwood* at 157. And once the employer is on notice of the employee's need to take potentially FMLA-qualifying leave, "the responsibility falls on the employer to inquire further about whether the employee is seeking FMLA leave." *Dotson*, 558 F.3d at 295; *see Hannah P. v. Coats*, 916 F.3d 327, 345–46 (4th Cir. 2019), *cert. denied sub nom. Hannah v. Maguire*, 140 S. Ct. 1294, 206 L. Ed. 2d 375 (2020).

Additionally, an employer's failure to provide notice of the availability of FMLA leave will prejudice an employee because if he or she had been aware of the availability of FMLA leave, he or she could have structured her leave differently. "Prejudice may be gleaned from evidence that had the plaintiff received the required (but omitted) information regarding his FMLA rights, he would have structured his

leave differently." *Id. Hannah P. v. Coats*, 916 F.3d 327, 346–47 (4th Cir. 2019), *cert. denied sub nom. Hannah v. Maguire*, 140 S. Ct. 1294, 206 L. Ed. 2d 375 (2020).

Upon such notice, The Family and Medical Leave Act requires an employer to furnish a certification of a serious health condition provided by the employee's health care provider.   29 U.S.C. § 2613(a); 29 C.F.R. § 825.305, 825.310.   In requiring a medical certification, an employer may require the following: "(1) the approximate date the condition began; (2) the probable duration of the present incapacity; (3) which part of the definition of 'serious health condition,' if any, applies to the patient's condition, and the appropriate medical facts that support the definition of serious health condition; and (4) a statement that the employee is unable to perform work of any kind, is unable to perform any one or more of the essential functions of the employee's position (and, if so, which function or functions the employee is unable to perform), or must be absent from work for treatment." 29 U.S.C. § 2613(d(4)(B).

Once an employee gives notice to an employer that FMLA is requested, the employer is charged with the duty to provide the employee with written notice detailing the specific expectations and obligations of the employee and explaining any consequences of a failure to meet these obligations. 29 CFR 825.301(b)(1)"

A failure of the employer to provide this written notice precludes any adverse action as stated in 29 CFR 825.302(f). (If the employer fails to provide notice in

accordance with the provisions of this section, the employer may not take action against the employee for failure to comply with any provision required to be set forth in the notice).

To establish an interference claim, "an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied." As established above, Defendant failed to process any of the Plaintiffs' requests for medical leave.

In *Diaz v. Fort Wayne Foundry Corp*., the Seventh Circuit held that the *McDonnell Douglas Corp. v Green* burden-shifting framework does not apply to a case involving statutory entitlements. 131 F.3d 711, 4 WH Cases 2d 417 (7th Cir. 1997). Likewise, in *O'Connor v. PCA Family Health Plan, Inc*., the Eleventh Circuit "[found] no fault with the Seventh Circuit's interpretation of the FMLA." 200 F.3d 1349 (11th Cir. 2000). As a result, claims involving the denial of FMLA entitlements involve the straightforward determination of whether the plaintiff can establish by a preponderance of the evidence that he or she is entitled to the benefit claimed. *Diaz*, 131 F.3d at 713. To state a claim of interference with a substantive right, an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied. *Strickland v. Water Works and Sewer Bd. Of City of Birmingham*., 239 F.3d 1199, 1207, 6 WH Cases2d 1185 (11th Cir. 2001) (ci'ing *O'Connor v. PCA Family Health Plan, Inc.,* 200 F.3d 1349, 1353-[54] (11th Cir.2000);

*King v. Preferred Technical Group,* 166 F.3d 887, [89]1 (7th Cir.1999)). The employee need not demonstrate that the employer "intended to deny the benefit ---- the employer's motives are irrelevant." *Id*.

Because the district court required a showing of intent for the FMLA interference claims, the decision granting summary judgment was in error and should be reversed.

## II. THE DISTRICT COURT ERRED IN DISMISSING THE DISCRIMINATION AND RETALIATION CLAIMS UNDER THE FMLA, ERISA, WVHRA AND REHABILITATION ACT BECAUSE FACTUAL ISSUES REMAIN WITHIN THE PROVINCE OF A JURY REGARDING PRETEXT.

In granting summary judgment to Defendants on Plaintiffs' discrimination and retaliation claims under the FMLA, ERISA, WVHRA and Rehabilitation Acts, the district court "assumed, without deciding, that Plaintiffs have carried their initial burden of producing evidence of a *prima facie* case under each of the pertinent acts...". JA 2700. CSX did not argue either in its motion for summary judgment.

As set forth above, the CSX Employees' submission of the Certificate of Ongoing Illness forms (COII) established "notice" of the need for leave under the FMLA because the form set forth medical conditions and a requested period for time for the medical leave. The submission of the COII forms also invoke the protections of the Rehabilitation Act, the West Virginia Human Rights Act (WVHRA) and the

25

Employee Retirement Income Security Act (ERISA) because one type of a reasonable accommodation is a medical leave of absence:

> For purposes of the ADA, "reasonable accommodations" may comprise "job restructuring, part-time or modified work schedules," 42 U.S.C. § 12111(9)(B), and "permitting the use of accrued paid leave or providing additional unpaid leave for necessary treatment . . . ." 29 C.F.R. § 1630.2(o) (Appendix) (2011).

*Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 344-345 (4th Cir. 2013); 29 U.S.C. 794(d)(ADA and Rehabilitation Acts are analyzed under the same standards).

For purposes of the FMLA and the Rehabilitation Act, the period of medical leave is generally unpaid. However, CSX's denial of the medical leave and any accompanying employee benefits invokes the protections of ERISA.

The district court analyzed the above statutes together referring to them as the "pertinent acts" and concluded that "Defendants have provided a consistent legitimate, nondiscriminatory reason for terminating the Plaintiffs". (ECF Doc. No. 455, Page 5).

The Fourth Circuit has established that a plaintiff may show that an employer's proffered non-discriminatory reasons for the termination are inconsistent over time, false, or based on mistakes of fact. *EEOC v. Sears Roebuck and Co*., 243 F.3d 846, 852-53 (4th Cir. 2001).

It is black letter law that evidence which would allow a jury to find that the employer's proffered reason for its decision is false is enough to prove

discrimination. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000); *St' Mary's Honor Center v. Hicks*, 509 U.S. 503, 511 (1993); *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). All that is needed for a plaintiff to avoid summary judgment is to point to "some" evidence, from which the fact finder could reasonably conclude that the defendant's proffered reasons were inaccurate. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). "'[R]ejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination.'" *Reeves*, 530 U.S. at 147 (quoting *St' Mary's Honor Center*, 509 U.S. at 511).

Once the plaintiff has pointed to evidence sufficient to discredit the defendant's proffered reasons, that is, to prove that they are "unworthy of credence," there is no requirement that the plaintiff come forward with additional independent evidence of discrimination (such as direct evidence about the decisionmaker's subjective beliefs). *Id.* at 148-149. From that point on, the jury is entitled to infer that discrimination played a part in his termination. *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577 (1978).

A *prima facie case*, "combined with sufficient evidence for a reasonable factfinder to reject the employer's nondiscriminatory explanation for its decision, is adequate to sustain a finding of liability for intentional discrimination." *Reeves*, 530 U.S. at 140. In other words, a *prima facie* case, combined with a factual issue on

pretext, *always* means a motion for summary judgment must be denied and the case goes to the jury. *Id.*; *see also Kline v. TVA*, 128 F.3d [33]7 (6th Cir. 1997). Summary judgment rules strictly forbid the Court from making any credibility determinations. This is particularly true with respect to interested witnesses (like an employer's managers), whose testimony the jury is always free to disbelieve. *Reeves*, 530 U.S. at 151.

The Supreme Court has rejected the concept "that an individual physician's state of mind could excuse discrimination without regard to the objective reasonableness of his actions." *Bragdon v. Abbott*, 524 U.S. 624, 118 S. Ct. 2196, 2210, 141 L. Ed. 2d 540 (1998) (holding that an individual doctor's unsupported belief that a patient's HIV status rendered her a health risk was not dispositive under the ADA).

In the same manner, CSX cannot excuse Dr. Heligman's predetermined dismissal of the medical conditions and requested leave of absence in the respective CSX Employees' COII forms, the district court erred in accepting Dr. Heligman's unsupported, or even honest belief, with "objective reasonableness."

The ADA statute and regulations make clear that even innocent mistakes, goofs, or mistaken beliefs will subject employers to potential liability:

> Although the legislative history indicates that Congress was concerned about eliminating society's myths, fears, stereotypes, and prejudices with respect to the disabled, the EEOC's Regulations and Interpretive Guidance make clear that even an innocent misperception based on

28

nothing more than a simple mistake of fact as to the severity, or even the very existence, of an individual's impairment can be sufficient to satisfy the statutory definition of a perceived disability. *See* 29 C.F.R. pt. 1630, app. § 1630.2(l)

*Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 144 (3rd Cir 1998).

A. <u>Dr. Heligman's Deposition Testimony Establishes That He Provided The Only Evidence Of The Alleged Fraud And Thus There Are Issues Of Material Fact That Must Be Decided By A Jury</u>.

Dr. Heligman, Chief Medical Officer for CSX, testified that he was the only witness on behalf of the company that testified at any of the plaintiffs' disciplinary investigations.  JA 2145 at 329:1-6.  The written statement that Dr. Heligman read into the record at each hearing was provided to him by either the law department or labor relations department.  JA 2149 at 333:1-12.  Dr. Heligman testified that he was not aware of any surveillance that CSX conducted on any of the plaintiffs in this matter. JA 2232 at 416: 16-20.

1. <u>Dr. Heligman's Testimony Establishes that the Termination Decisions were Pre-determined</u>.

While attending the investigative hearing, Dr. Heligman contrived a pre-determined result. Mr. DeAngelo was a hearing officer who asked Dr. Heligman the following question:  "so based on your total investigation here, what did you – what did you conclude from this – from this incident and with this group in particular?" JA 2174 at 358:1-10. Dr. Heligman testified in his deposition and read his response from the investigation hearing: "I found that these employees' actions to be

concerted fraud - effort to defraud CSXT, the Railroad Retirement Board, and insurance providers of extended benefits."  JA 2174 at 358: 11-20.

When asked by Mr. Thoele at an investigation hearing Dr. Heligman was asked the question "what rules did the employees violate?"  JA 2205 at 389:5-23. Dr. Heligman read his answer from the hearing and stated "the employees violated Rule 104.2 when they were dishonest. 104.2 is … employee behavior must be respectful and courteous.  Employers must not be any of the following:  a. dishonest, or b. insubordinate, or c. disloyal, or d. quarrelsome."  JA 2205 at 389:5-23.  Dr. Heligman testified at his deposition that he stands behind that testimony today.

Prior to any decision to terminate any of the plaintiffs, Dr. Heligman testified that "I found that the providers' actions and the employees' actions to be a concerted effort to defraud CSXT, the Railroad Retirement Board, and the insurance providers of the extended benefits" and he confirmed in this case that his testimony was "accurately reflected in all of the investigations."  Dr. Heligman testified in a hearing "the concern was this is that the providers – provider were not acting appropriately from a medical perspective".  JA 2296 at 480: 11-24. Dr. Heligman testified that on the one hand as the medical director he was not supposed to interfere with the treatment between a patient of Dr. Carey and Dr. Johnson; however, on the other hand Dr. Heligman was calling into question the medical treatment of Dr. Carey and Dr. Johnson with respect to the plaintiffs.  JA 2298 at 482: 1-13.

30

2.  Dr. Heligman Admitted that the Course of Treatment Prescribed by
    Drs. Carey and Johnson was Reasonable.

In response to the question "but with respect to the reasonableness of the care

and the course of treatment, would you agree that it is not the position of the medical

director of CSX to interfere with that – those decisions?" Dr. Heligman testified

"that's correct.  It is not my position to interfere with the doctor/patient relationship

with any of our employees".  JA 2202 at 386:15-22.

When Dr. Heligman was asked the question "going back to the summer of

2017 'till today, I mean, is it correct to say that you don't have any reason to believe

that all of the plaintiffs' medical illnesses were legitimate?"  Dr. Heligman testified

"well, again, I wasn't – wasn't using the COIIs to be particularly critical of anyone's

medical care". JA 2230 at 414: 7-14. Dr. Heligman further clarified that it would be

a correct statement to say that for all of the plaintiffs in this case, that he did not have

any reason to believe that their illnesses were not legitimate as reported in the COII

forms.  JA 2231 at 415:18-25.  Furthermore, Dr. Heligman testified for these

plaintiffs, the COIIs do not appear to be fraudulent.  JA 2299 at 483:16-23.

3.  Dr. Heligman gave Contradicting Accounts of the Alleged Motives
    for Treatment by the Employees.

Dr. Heligman testified that the employees "selected this practitioner or one of

these two practitioners, and the practitioners elected to continue to endorse disability

where it probably didn't truly exist for an extended period of time for the purpose of

31

extending benefits". JA 2181 at 365: 1-9. However, Dr. Heligman contradicted himself by saying that he did not think there was an outright statement by either the provider or the employee to extend the benefits. JA 2181 at 365:10-17. Dr. Heligman testified that he didn't think that type of conversation took place. JA 2181 at 365:17.

When asked the question "if there a fly on the wall in Dr. Johnson or Dr. Carey's office, you do not believe that any of the plaintiffs in this case had a conversation with Dr. Carey or Dr. Johnson that would – that would be a conspiracy to defraud anybody?" JA 2183 at 367:8-16. Dr. Heligman testified "again, I don't know what took place in that office". JA 2183 at 367:15-16.

Dr. Heligman testified that 67 employees and counting from CSX in the greater Huntington area all went to two practitioners "with the sole intent of obtaining medical documentation for the purpose of seeking benefits inappropriately. That's the fraud". JA 2284 at 468: 15-25 and 469:1-4. Dr. Heligman contradicted himself by saying "I'm not saying they didn't have an issue that could be treated by chiropractic professional. I'm saying they selected these particular chiropractic professionals knowing in advance that if they wanted to have a form completed to their advantage, that they would receive that from these two practitioners." JA 2285 at 469: 15-22. When asked the question "and it's your testimony, then and today, that each of the plaintiffs in this case, it was their sole

intent to obtain benefits inappropriately, and that's the fraud; is that correct?", Dr.

Heligman testified in the affirmative.  JA 2286 at 470:17-21.

> 4. CSX No Longer Accepts Leave of Absence Forms from Dr. Carey and Dr. Johnson.

Dr. Heligman testified as follows:

> When we advised both Dr. Johnson and Dr. Carey that we would no longer accept forms that they submitted on behalf of our employees, that really closed out any issues that we may have had with either practitioner.

JA 2159 at 343:3-7.

Dr. Heligman testified that they sent a separate letter to the employees concurrent with sending the letters to Dr. Johnson and Dr. Carey. JA 2160 at 344:10-13. Although Dr. Heligman was instructed by his attorney to not answer the question, Dr. Heligman testified that he did not consult with anyone other than the legal department at CSX concerning the decision to no longer accept medical documentation from Dr. Carey and Dr. Johnson. JA 2316 at 500:19-23. Dr. Heligman testified not to the best of his recollection. Furthermore, Dr. Heligman testified that he believed that the decision to no longer accept medical documentation from Dr. Carey and Dr. Johnson was permanent in nature.  JA 2316 at 500: 6-11.

> 5. Dr. Heligman had no Evidence that Plaintiffs' Sought to Extend their Health Benefits due to a Layoff/Furlough.

In response to the question: "with respect to any of the plaintiffs, you did not look at their age or availability for furlough or retirement?" Dr. Heligman testified

"No, I did not look at that at all". Furthermore, Dr. Heligman testified he was not aware of anyone else who looked at those factors for the plaintiffs. JA 2193 at 377:12-21.

In direct contradiction to his prior testimony, Dr. Heligman testified that once he did become aware of the furloughs that was a significant factor in his investigation. JA 2213 at 397:2-10. Dr. Heligman testified that he did not become aware that many of the plaintiffs in this case were not subject to furlough until later. JA 2213 at 397:11-14. Dr. Heligman testified "the answer is yes, I was aware that all of the COIIs for the employees in this group, not all of them were on a furlough list". JA 2213 at 397:11-17.

Importantly, Dr. Heligman became aware of the fact that many of the employees and plaintiffs in this case were not subject to furlough before he sent the letter to the Railroad Retirement Board Inspector General and prior to any of the investigative hearings in this case. JA 2213 at 397: 24-25 and 398: 1-4.

6.  Dr. Heligman's Allegations of Fraud were "Pure Speculation.

In his deposition on April 29, 2021, Dr. Heligman testified that he had "zero evidence, and it was pure speculation that any of the plaintiffs in this case endorsed an enabling environment that he claimed Dr. Carey and Dr. Johnson fostered for time away from work. JA 2255 at 439:24-25 and 440:1-9. Dr. Heligman also testified it was "pure speculation" and that he had "zero information" that any employee

34

spoke with each other for the purpose of treating with Dr. Carey or Dr. Johnson or that any of the plaintiffs knew the practice patterns of Dr. Johnson or Dr. Carey. JA 2254 at 438:23-25 and 439:1-9. In a hearing in 2017, Dr. Heligman testified that the plaintiffs "unconsciously" defrauded the United States Railroad Retirement Board, CSX and insurance companies. JA 2218 at 402:18-25 and 403:12-23. In his deposition, Dr. Heligman testified that a better term would be "subconscious" rather than "unconscious" concerning the plaintiffs efforts to defraud. JA 2218 at 402:24-25 through 404:1-16.

In response to the question: "even as of today, you have no actual knowledge of any fraudulent submissions by any of the plaintiffs to CSX, the Railroad Retirement Board, or the insurance companies?", Dr. Heligman testified "no, all I know is the results of the decisions to terminate various individuals …." JA 2243 at 427:11-20. Dr. Heligman testified that he had "no idea" what the intentions were of the plaintiffs with respect to the submission of any alleged fraudulent claims. JA 2243 at 427:21-25 and 428:1-4.

With respect to Dr. Heligman's letter to the Railroad Retirement Board Inspector General, chiropractic boards and health insurance companies, Dr. Heligman never received a response that substantiated his claims of fraud. JA 2302 at 486:23-25 and 487:1-24.

In support of its evidence to establish that it was pretext for each of the plaintiffs, plaintiffs submit that there are several.  First, the pre-determined procedure employed by Dr. Heligman to charge more than 50 employees with different medical conditions and different statuses of employment over the summer of 2017 for the purpose of extending medical benefits is false because no human being is capable of "subconsciously" engaging in fraud that by definition requires intent. Second, Dr. Heligman sent his letters to the Railroad Retirement Board and health insurance companies prior to when the investigations were held.  When Dr. Heligman testified at the hearings, he had already concluded that the Plaintiffs engaged in fraud and were guilty. Third, Dr. Heligman claims to not interfere with the doctor-patient relationship, then promptly questions the motives for treatment without any basis and leads the unprecedented decision to not accept paperwork from Dr. Carey and Dr. Johnson.

For example, most of the plaintiffs began submitting certificate of ongoing illnesses on or about June 20, 2017 through July 14, 2017. Investigative hearings were held beginning on August 4, 2017, August 7, 2017, August 8, 2017, August 9, 2017, August 10, 2017, August 15, 2017, August 22, 2017, August 23, 2017, August 24, 2017, and October 5, 2017.  However, Dr. Heligman's initial letter to the Railroad Retirement Board and health insurance companies was dated July 14, 2017. A reasonable jury could conclude that the results were predetermined from the

beginning. That is, Dr. Heligman's letter to the Railroad Retirement Board and other fraud units of the health insurance companies, if at all, should have only occurred after the investigative hearings. The fact that Dr. Heligman chose to send the letter to the Railroad Retirement Board Inspector General prior to the hearings suggests a pre-determined result. Additionally, Dr. Heligman was not the sole actor. The evidence supports that both the legal department and the labor relations department as CSX approved Dr. Heligman's letter before it was sent. A reasonable jury could conclude the only conspiracy was to terminate numerous employees to interfere with employee benefits including health insurance.

Accordingly, the letters to the Railroad Retirement Board were intentional both with respect to the content and timing. Additionally, more than half of the plaintiffs in this case were not subject to furlough at all. This constitutes a shifting explanation that further supports evidence of pretext. In other words, if Dr. Heligman and the CSX motivations to both the charge and ultimate termination were made by the plaintiffs to avoid layoff, it is highly relevant that the majority of the plaintiffs were not subject to layoff at all.

The district court imposed its view about the layoffs as follows: "Finally, the Court does not believe Plaintiffs' argument that not all the Plaintiffs were subject to furlough is evidence of pretext". JA 2696, 2702. Because CSX charged and terminated the CSX employees based on submitting COII forms to seek leave in

order to be paid money and extended medical coverage, a jury could find it relevant

whether a specific employee was even subject to being laid off.

### III. THE HONEST BELIEF EXCUSE HAS NOT BEEN RECOGNIZED BY THE FOURTH CIRCUIT AND DOES NOT APPLY TO THE FACTS OF THIS CASE. IN THE ALTERNATIVE, A JURY QUESTION REMAINS IF THE HONEST BELIEF IS A DEFENSE.

In *Sharif v. United Airlines, Inc.*, 841 F.3d 199 (2016), the Fourth Circuit

Court of Appeals rejected the employer's insertion of the "honest belief" excuse.  In

footnote 2 the Opinion states the following:  the district court discussed, and the

parties argued extensively, the application of the so called "honest belief rule" that

would require plaintiffs to show that their employer's non-discriminatory motivation

was not sincerely held. … we think the issues in this case are most profitably

addressed through the well-established proof scheme of *McDonnell Douglas* and its

progeny.  Accordingly, we see no reason to address the "honest belief rule".

Accordingly, there is no Fourth Circuit precedent applying the honest belief rule in

addition to the *McDonnell Douglas* framework.

The district court acknowledged that the Fourth Circuit has not "formally"

adopted the "honest belief" doctrine, but applied it anyway based upon the

unpublished decision in *Mercer v Arc of Prince Georges Cnty, Inc*., 532 F. Appx.

392, 396 (4th Cir. 2013). In *Mercer*, an employee was terminated for not processing

benefit applications before she went on FMLA leave because of an automobile

accident. The court in *Mercer* stated that "[a]n employer has discretion to discipline

or terminate the employment of an at-will employee for poor performance regardless of whether the employer's reason for terminating the employment was discovered while the employee is taking FMLA leave". *Mercer* at 396. The facts in that case are not at comparable to the facts in the present appeal. Even more curious, the district cited referred to the *Mercer* court citing *Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 680-681 (7th Cir. 1997). In *Kariotis*, the employee was on a disability leave following a knee replacement. Based upon video surveillance while off-duty, the employer terminated her. That case concerned whether the employer had to reinstate the employee while on a medical leave. The video showed physical activity inconsistent with the ability to perform her position as an executive assistant.

Both *Mercer* and *Kariotis* concerned employees who were on a medical leave and suspected of either poor performance before the leave or physical activity while on medical leave. The facts are distinguishable to the present appeal where the CSX employees were terminated before even being processed for medical leave under the FMLA. The CSX employees were charged and terminated for requesting medical leave through the submission of the COII forms.

Within the Seventh Circuit, some courts have found the application of the honest belief excuse to be a fact question for the jury. In *Johnson v. Reichhold, Inc.*, 2010 U.S. Dist. LEXIS 86753 (N.D. Ill. Aug. 23, 2010), the Court denied a motion for summary judgment on an FMLA interference claim, despite the employer's

position that they held an honest belief that the plaintiff was misusing his FMLA leave. In *Johnson*, the Court denied summary judgment where the employer determined that the employee was abusing his FMLA leave because he went on a fishing trip. *Id*. at 21-25. The Court found that "[t]he problem, however, is that according to Johnson, and in some part Zeigler, the job duties that Johnson regularly performed during his twelve-hour shift were substantially more strenuous than the activities that Colwell observed on an edited version of the surveillance video." *Id*. Thus, the Court found that, "depending on which witness a jury believes, it may find that Colwell's suspicion that Johnson was abusing his leave was not just poorly founded, but arguably baseless. Put another way, based on the evidence, a reasonable jury could find that Colwell's suspicion was, in fact, dishonest." *Id*.

In *Nelson v. Oshkosh Truck Corp*., No. 07 C 509, 2008 U.S. Dist. LEXIS 72375, at \*6 (E.D. Wis. 2008), the Court denied summary judgment as to an FMLA interference claim, despite the employer's honest suspicion that the employee misused FMLA leave. In *Oshkosh*, the employer suspected Nelson of misusing her FMLA leave because an investigator witnessed her performing activities suggesting that she would have been able to work. *Id*. at \*12-13. Nelson's doctor provided clarification that the symptoms she was experiencing on those days actually did prevent her from performing her job. *Id*. at \*13. "Even after receiving her physician's clarifying information, Oshkosh contends, it 'still honestly believed that she was not

40

using her leave for its intended p–pose--to work through the side effects of her medical condition at home.' Unpersuaded by anything Nelson was able to say on her behalf, Oshkosh decided to terminate her." *Id*. In denying the Motion, the Court stated," it may be true that a jury will ultimately conclude that the decision to terminate Nelson's employment was based on an honest suspicion that she was abusing her leave. But the evidence bearing on the issue is not so one-sided as to warrant summary judgment." *Id*. at *13.

In *Cheetham v CSX Transp. Inc*., 2011 U.S. Dist. LEXIS 171739, *4-5 (M.D. Fl.), the district court upheld the jury's determination of the honest belief defense:

> In Jury Instruction 10, the Court instructed the jury as fol"ows: "If you find by a preponderance of the evidence that Defendant honestly believed that it was discharging Plaintiff for misusing the FMLA, even if Defendant was mistaken as to whether Plaintiff was misusing the FMLA, then Defendant is not liable and your verdict must be for Defe"dant." (Final Jury Instr. at 12 (Docket No. 252).) The Special Verdict Form asked the "ury, "Do you find by a preponderance of the evidence . . . [t]hat CSX honestly believed that Plaintiff was misusing FMLA leave to avoid working and possible disciplinary a"tion?" (Special Verdict Form at 2 (Docket No. 260).) The jury ans"er"d "No" to this question. (Id.) Thus, in the eyes of the jury, CSX did not carry its burden on the honest-belief defense.

Appellants submit that the honest belief excuse does not apply under precedent in the Fourth Circuit. In those jurisdictions that have accepted it, more recent cases submit the honest belief as a defense to the jury. Further, it was not pled as an affirmative defense and cannot serve as a basis for granting summary judgment.

## CONCLUSION AND REQUEST FOR RELIEF

For the foregoing reasons, Appellants request that the Court find that the district court erred in entering judgment against them as to each of the causes of action addressed. Accordingly, Appellants request that the Court vacate the judgment of the district court, and that the case be remanded for further proceedings.

Submitted this 12th day of July 2022.

s/*Jeff R. Dingwall*
Jeff R. Dingwall
EIGHT & SAND
750 West Fir Street, Suite 602
San Diego, CA 92101
Tel: (619) 796-3464
Fax: (619) 717-8762
jeff@eightandsandlaw.com

s/*Gregory G. Paul*
Gregory G. Paul
PAUL LAW OFFICES
100 First Avenue, Suite 1010
Pittsburgh, PA 15222
Tel: (412) 417-5862
Fax: (888) 822-9421
gregpaul@morgan-paul.com

Counsel for Appellants

## REQUEST FOR ORAL ARGUMENT

Appellants hereby request oral argument of 20 minutes per side.

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. PROC. 32(a)(7)(B)

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 10,322 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

Dated: July 30, 2022.

*s/Jeff R. Dingwall*
Counsel for Appellants

## CERTIFICATE OF SERVICE

I certify that on July 30, 2022, I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Fourth Circuit Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*s/ Jeff R. Dingwall*
Counsel for Appellants