**No. 21-2051**

In the

# United States Court of Appeals
## For the Fourth Circuit

———————————

JUSTIN ADKINS; JUSTIN BLAKE; EDWIN GLOWACKI; ERIC JORDAN; KEVIN PALMER; DENNIS SARGENT; TRAVIS THORNSBERRY; MICHAEL WILLIAMS; JOHN BAKER; JAMES BLAIN; DEVERY BROWN; JAMES DEAL; JONATHAN JEFFERS; ROBERT MOSTELLER; MICHAEL L. POTTER; MICHAEL D. POTTER; JESSEE WALLACE; TIMOTHY WITT; JOHN BILLS; MICHAEL CLARK; RANDALL CRAYCRAFT; JOHN FRASURE; SAMMY MADDIX; JAMES STINNETT; TODD THAYER; MICHAEL CAMPBELL; TONY ABDON; THE ESTATE OF CHAD LITTLE; BRANDON ADKINS; JACQUELINE MARSHALL; HOMER MAYNARD; SCOTT MORRISON; JEREMY NAPIER; SHAWN PATTERSON; MATTHEW WOODS; JOHN CARPENTER; QUINCY CHRISTIAN; GREGORY HAMM; ETHAN MULLINS; MICHAEL OWENS; JONATHAN ROWE; DANNY STEWART; LLOYD WILLIAMS; DAVID MANIS; JOSHUA FERGUSON; ERIC SPEAKS; DONALD STEPHENS; JASON BARKER; CHAD DOWDY; JERRY FLOCKER; GROVER KELLEY; CHRISTOPHER CLAY STILTNER; DENNIS HUTCHINSON; JOSHUA HALL; ZACH POTTER; DEANNA LANHAM; SAMUEL PRESTON; BOBBY AKERS; GERALD BARBER,

*Plaintiffs-Appellants,*

v.

CSX TRANSPORTATION, INC.; CRAIG S. HELIGMAN, M.D.; GUS THOELE; CURT SHOGREN; MILTON STORM; DELANDO JONES; TOM DEANGELO; SHAWN LUSK; ELIZABETH CREEDON; KENNETH RAY EMERSON,

*Defendants-Appellees.*

and

CSX CORPORATION; DILLON DOUG JONES,

*Defendants.*

———————————

On Appeal from the United States District Court
for the Southern District of West Virginia at Huntington
Case No. 3:18-cv-0321
The Honorable Robert C. Chambers

_____

**BRIEF OF APPELLEES**

_____

Melissa Foster Bird
NELSON MULLINS RILEY &
SCARBOROUGH LLP
949 Third Avenue
Suite 200
Huntington, WV 25701


Samuel L. Tarry, Jr.
MCGUIREWOODS LLP
1750 Tysons Boulevard
Suite 1800
Tysons, VA 22102

Brian D. Schmalzbach
Davis M. Walsh
Kathryn M. Barber
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
bschmalzbach@mcguirewoods.com

*Counsel for Defendants-Appellees*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _21-2051_      Caption: _Justin Adkins, et al. v. CSX Transportation, Inc., et al._

Pursuant to FRAP 26.1 and Local Rule 26.1,

_CSX Transportation, Inc._
(name of party/amicus)

_____

who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.    Does party/amicus have any parent corporations?                      ☑YES ☐NO
      If yes, identify all parent corporations, including all generations of parent corporations:

       CSX Corporation

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                           ☑YES ☐NO
      If yes, identify all such owners:

       CSX Corporation

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:


5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected
substantially by the outcome of the proceeding or whose claims the trade association is
pursuing in a representative capacity, or state that there is no such member:


6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
corporation that owns 10% or more of the stock of the debtor.


7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational
victim of the criminal activity and (2) if an organizational victim is a corporation, the
parent corporation and any publicly held corporation that owns 10% or more of the stock
of victim, to the extent that information can be obtained through due diligence.


Signature: /s/ Brian D. Schmalzbach          Date:    November 7, 2022

Counsel for: Appellee

ii

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. _21-2051_          Caption: _Justin Adkins, et al. v. CSX Transportation, Inc., et al._

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Craig S. Heligman, M.D.; Gus Thoele; Curt Shogren; Milton Storm; Delando Jones; Tom DeAngelo;_
(name of party/amicus)

_Shawn Lusk; Elizabeth Creedon; Kenneth Ray Emerson_

 who is _____Appellees_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity?     ☐ YES ☑ NO


2.     Does party/amicus have any parent corporations?     ☐ YES ☑ NO
        If yes, identify all parent corporations, including all generations of parent corporations:




3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?     ☐ YES ☑ NO
        If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Brian D. Schmalzbach          Date: November 7, 2022

Counsel for: Appellees

**TABLE OF CONTENTS**

Page

INTRODUCTION ..................................................................................1

STATEMENT OF ISSUES ....................................................................4

STATEMENT OF THE CASE.................................................................4

I.    Factual Background.......................................................................4

      A.   CSXT's Chief Medical Officer received a "very, very
           unusual" influx of "identical" Certificate of Ongoing
           Illness and Injury forms.........................................................4

      B.   CSXT's Labor Relations team undertook the formal
           charging and investigative process required by Plaintiffs'
           bargained-for CBA. ...............................................................9

      C.   The Public Law Board evaluated the extensive record of
           each investigation and refused to overturn the
           terminations...........................................................................12

II.   Procedural History. ....................................................................14

STANDARD OF REVIEW ...................................................................18

SUMMARY OF ARGUMENT ..............................................................18

ARGUMENT.......................................................................................23

I.    The District Court correctly granted summary judgment on the
      discrimination and retaliation claims. .......................................23

      A.   CSXT's belief that Plaintiffs violated workplace rules was
           genuine, so it does not matter if it was accurate........................24

      B.   Plaintiffs identified no genuine dispute over the
           legitimacy of CSXT's consistent, well-supported reason
           for termination. ....................................................................27

           1.   Dr. Heligman consistently testified that he observed
                a suspicious pattern he was obligated to report...............28

           2.   Plaintiffs' mere disagreement with CSXT's
                termination decisions does not establish pretext. ............32

II.   The District Court correctly granted summary judgment on the
       FMLA interference claim. ..........................................................35

       A.   There was no unlawful interference because CSXT
            honestly believed Plaintiffs sought leave for an improper
            purpose. .........................................................................36

            1.   The honest belief rule applies to FMLA interference
                 claims. ...................................................................37

            2.   CSXT honestly believed that Plaintiffs improperly
                 sought leave. ..........................................................42

       B.   Plaintiffs also lack a viable interference claim because
            they were not prejudiced. ...............................................45

       C.   CSXT properly presented the interference claim on
            summary judgment. .......................................................48

CONCLUSION ..........................................................................51

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adams v. Anne Arundel Cnty. Pub. Schs.,*
    789 F.3d 422 (4th Cir. 2015)........................................................35, 36

*Bosse v. Baltimore Cnty.,*
    2011 WL 13362483 (D. Md. Apr. 6, 2011)......................................41

*Bragdon v. Abbott,*
    524 U.S. 624 (1998)..........................................................................26

*Brinkley v. Harbour Recreation Club,*
    180 F.3d 598 (4th Cir. 1999), *overruled on other grounds by*
    *Desert Palace, Inc. v. Costa,* 539 U.S. 90 (2003) ..............................51

*Conkwright v. Westinghouse Elec. Corp.,*
    933 F.2d 238 (4th Cir. 1991)...........................................................24

*Crouch v. Whirlpool Corp.,*
    447 F.3d 984 (7th Cir. 2006)......................................................39, 40

*Deane v. Pocono Med. Ctr.,*
    142 F.3d 138 (3d Cir. 1998) ............................................................26

*DeJarnette v. Corning Inc.,*
    133 F.3d 293 (4th Cir. 1998)...........................................................25

*EEOC v. Sears Roebuck & Co.,*
    243 F.3d 846 (4th Cir. 2001)...........................................................26

*Grayson O Co. v. Agadir Int'l LLC,*
    856 F.3d 307 (4th Cir. 2017)...........................................................49

*Hannah P. v. Coats,*
    916 F.3d 327 (4th Cir. 2019)................................................24, 25, 47

*Hawkins v. PepsiCo, Inc.,*
    203 F.3d 274 (4th Cir. 2000)...............................................15, 25, 32

*Kariotis v. Navistar Int'l Transp. Corp.*,
131 F.3d 672 (7th Cir. 1997) ............................................ 22, 37, 38, 39, 42, 49

*Laing v. Fed. Exp. Corp.*,
703 F.3d 713 (4th Cir. 2013) ........................................................21, 25, 33

*Lawson v. Union Cnty. Clerk of Ct.*,
828 F.3d 239 (4th Cir. 2016), *as amended* (July 8, 2016) ..............................45

*Mayflower Vehicle Sys., Inc. v. Cheeks*,
629 S.E.2d 762 (W.Va. 2006) ....................................................................24

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973).............................................................................15, 24

*Medley v. Polk Co.*,
260 F.3d 1202 (10th Cir. 2001) ...........................................................22, 40

*Mercer v. Arc of Prince Georges Cnty., Inc.*,
532 F. App'x 392 (4th Cir. 2013) ...........................................17, 22, 36, 39, 49

*Moore v. Equitrans, L.P.*,
27 F.4th 211 (4th Cir. 2022)...................................................................50

*Parker v. Verizon Pennsylvania, Inc.*,
309 F. App'x 551 (3d Cir. 2009) ..............................................22, 38, 39, 40, 43

*Pennington v. Fluor Corp.*,
19 F.4th 589 (4th Cir. 2021)...................................................................18

*Ragsdale v. Wolverine World Wide, Inc.*,
535 U.S. 81 (2002)...........................................................................23, 45

*Scruggs v. Carrier Corp.*,
688 F.3d 821 (7th Cir. 2012)............................................................40, 41, 42

*Sharif v. United Airlines, Inc.*,
841 F.3d 199 (4th Cir. 2016).........................................................24, 27, 33, 41

*Spears v. Water & Sewage Auth. of Cabarrus Cnty.*,
2017 WL 2275011 (M.D.N.C. May 24, 2017) .................................................41

*Strickland v. Water Works & Sewer Bd. of City of Birmingham*,
    239 F.3d 1199 (11th Cir. 2001) ........................................................42

*Vail v. Raybestos Prods. Co.*,
    533 F.3d 904 (7th Cir. 2008) ..........................................................37

*Vannoy v. Fed. Rsrv. Bank of Richmond*,
    827 F.3d 296 (4th Cir. 2016) ....................................................22, 45

*Villa v. CavaMezze Grill, LLC*,
    858 F.3d 896 (4th Cir. 2017) ..........................................................25

*Walker v. Prince George's Cnty.*,
    575 F.3d 426 (4th Cir. 2009) ..........................................................27

*Yashenko v. Harrah's NC Casino Co.*,
    446 F.3d 541 (4th Cir. 2006) ....................................................21, 43

**Statutes**

29 U.S.C. §§ 794 *et seq.* ...................................................................14

29 U.S.C. §§ 1001 *et seq.* .................................................................14

29 U.S.C. §§ 2601 *et seq.* .................................................................14

29 U.S.C. § 2614(a)(3)(B) .................................................................37

29 U.S.C. § 2615(a)(1) .......................................................................35

W. Va. Code 5–11–9(1) ....................................................................14

**Regulations**

29 C.F.R. § 825.216(a) .................................................................37, 43

29 C.F.R. § 825.216(d) .......................................................................38

29 C.F.R. § 825.301(e) .................................................................47, 48

29 C.F.R. § 825.302(f) .......................................................................46

## INTRODUCTION

The apparent large-scale employee misconduct that led to this appeal was too suspicious to ignore. When nearly six dozen employees filed cookie-cutter requests for prolonged medical leave amid rumors of force reductions, CSX Transportation, Inc. (CSXT) initiated an investigation and the collectively bargained process to ensure those employees had the agreed opportunity to address the charges against them. At each stage of that process, reviewing officials agreed that the employees were subject to termination for violating CSXT's honesty policy.

Yet Plaintiffs claim that various federal and state disability and employment statutes forbade CSXT from terminating them, even though their violations were confirmed by each decisionmaker at each step of the collectively bargained process. Plaintiffs are wrong. CSXT's belief that these employees violated workplace ethics rules—a belief repeatedly confirmed in the collectively bargained process—amply justified their termination. And no statute provides immunity from termination for employees found to have deceived their employer—as to medical leave or any other issue—in the process bargained for by their own representatives.

This action arose from almost 70 CSXT employees' mass submission of near-identical medical leave forms. Like dozens of other employees at CSXT's Huntington, West Virginia facility, Plaintiffs John Baker, Randall Craycraft, Chad Dowdy, Sammy Maddix, Danny Stewart, and James Stinnett had one of two chiropractors submit a Certificate of Ongoing Illness and Injury (COII) to CSXT representing that they had suffered a minor musculoskeletal injury that warranted two months off work. That astronomically unlikely confluence of claimed off-work injuries—on the heels of furlough notice postings and rumored force reductions—led CSXT's Chief Medical Officer, Dr. Craig S. Heligman, to call for investigation.

CSXT did investigate, amid the disciplinary process required by Plaintiffs' Collective Bargaining Agreement (CBA). As the CBA required, CSXT held formal investigation hearings at which union representatives advocated for Plaintiffs and Plaintiffs could (through that representation) present evidence defending against the charges. After assessing the evidence and testimony adduced during those hearings, a CSXT decisionmaker (not Dr. Heligman) fired Plaintiffs for violating CSXT rules against dishonesty. Then Plaintiffs received even more process, as their bargained-for CBA provides: their union representation pursued on-

property appeals and then arbitral appeals to the Public Law Board. That body, after thorough review and analysis of the extensive investigation records, confirmed that substantial evidence showed Plaintiffs' violations of CSXT's honesty policy.

Plaintiffs now complain that—contrary to the findings throughout the collectively bargained process—they were not dishonest and so CSXT violated various antidiscrimination and antiretaliation statutes by terminating them. But what matters is that CSXT's belief that Plaintiffs violated workplace rules was *genuine*, not whether CSXT, Dr. Heligman, or the ultimate CSXT decisionmaker (who was not Dr. Heligman) were *right*. No evidence suggests that CSXT's termination decisions in the wake of the collectively bargained process were a mere pretext for some other concern besides employee misconduct. The District Court correctly held that Plaintiffs created no genuine dispute over pretext.

The same failing also defeats Plaintiffs' claim for interference under the Family and Medical Leave Act of 1993 (FMLA). CSXT's honest belief that Plaintiffs dishonestly sought FMLA leave means Plaintiffs have no claim for FMLA interference. And in any event, Plaintiffs offer no evidence that they were prejudiced by purported interference with benefits to which

they were not entitled.  This Court should affirm the District Court's grant of summary judgment.

## STATEMENT OF ISSUES

I.     Did the district court correctly grant summary judgment to CSXT on Plaintiffs' discrimination and retaliation claims when Plaintiffs provided no evidence showing that CSXT's legitimate, nondiscriminatory basis for termination was pretextual?

II.     Did the district court correctly grant summary judgment to CSXT on Plaintiffs' FMLA interference claim when CSXT had a legitimate, honestly held reason for terminating Plaintiffs and Plaintiffs suffered no prejudice?

## STATEMENT OF THE CASE

**I.     Factual Background.**

**A.     CSXT's Chief Medical Officer received a "very, very unusual" influx of "identical" Certificate of Ongoing Illness and Injury forms.**

In 2017, Dr. Heligman served as CSXT's Chief Medical Director, part of a decades-long career spent working in similar roles for railroads.  JA 2034:21-2036:2.  Beginning in June, Dr. Heligman encountered "an extremely unique" and "highly unusual" situation—something he had never seen in

4

over 20 years of service.  *Id.* at 1896:25-1897:1, 1876:7.  Over several weeks, close to 70 employees at CSXT's Huntington, West Virginia mechanical facility submitted "very similar, and at times identical" COIIs prepared by one of two chiropractors, Drs. Johnson and Carey.   *Id.* at 617, 1504:8-10, 2157:25-2158:8.

These forms, used under the employees' CBA to notify CSXT of ongoing illness requiring an extended absence from work, "did not provide individualized assessments of the employees."  JA 608; *see also id.* at 1504:8-10 ("The information on each and every one of those forms was very similar.").  Instead, for each employee, the form identified a "minor musculoskeletal condition" sustained outside of work and certified that the employee would need roughly two months off work to recover—"much longer than is medically appropriate" for such conditions.  *Id.* at 1582:4-19.

Plaintiffs' COIIs were part of this deluge of near-identical forms seeking excessive leave for purported sprains and muscle spasms.  Dr. Johnson submitted a COII for John Baker on June 19 estimating that, due to such a condition, Baker would be unable to work from June 19 to August 19.  *See* JA 163; Pls.' Br. 4.  For Chad Dowdy, Dr. Johnson again estimated (in a COII submitted the same day) that Dowdy would be unable to work from

June 19 to August 19 due to a similar condition.  JA 429-30; Pls.' Br. 5.  And Dr. Johnson submitted a COII for Sammy Maddix certifying that Maddix, too, would need off work from June 19 to August 19.  JA 264; Pls.' Br. 5.

Dr. Johnson sent in COIIs for Danny Stewart and James Stinnett as well, diagnosing similar musculoskeletal conditions for both and certifying that each would need roughly two months off work—from July 10 to September 12 for Stewart and June 22 to August 22 for Stinnett.  JA 276, 389-90; Pls.' Br. at 6.  Randall Craycraft's COII, submitted by Dr. Carey, mirrored Dr. Johnson's submissions: Dr. Carey diagnosed Craycraft with a musculoskeletal condition like the other Plaintiffs' and certified an over two-month absence through August 21.  JA 246; Pls.' Br. 4.

As an experienced CSXT official explained, "there is usually a variation in what time" injured employees need off work—there is "not usually a consistent broad spectrum that everybody has that same amount of time off."  JA 2504:1-11.  And in Dr. Heligman's experienced view, "none of the[se] alleged conditions should have involved recovery periods of more than a few days to a week or so."  *Id.* at 620.  Yet Drs. Johnson and Carey "had authorized a consistent period of absence from work of two months for each employee."  *Id.*

The similarities between these COIIs certifying extensive absences, combined with the fact that just two practitioners submitted forms for so many CSXT employees in a small geographical area and over a short period, made for a "[v]ery, very unusual set of circumstances." JA 1505:21-1506:2. Dr. Heligman "had never come across" this scenario before, nor had anyone on his team—indeed, a nurse on his team first brought the strange influx to Dr. Heligman's attention. *Id.* at 1448:24-25; 1860:25-1861:8. As Dr. Heligman explained, although he reviewed many COIIs daily, for him "to actually be aware and come to recognize the name of any treating provider [was] pretty rare." *Id.* at 1895:4-14. To have two practitioners submit so many markedly similar COIIs over a short period had "just never happened." *Id.* at 1895:22.

Put differently, there was normally "no pattern" to the COIIs Dr. Heligman reviewed. JA 1895:18-19. But these 2017 submissions presented an obvious pattern—one that raised concerns that the employees were potentially misusing benefits. *Id.* at 1858:11-14. The COII submissions coincided with CSXT posting furlough notices at the Huntington facility and rumors that other force reductions were to come. *Id.* at 608. In fact, the furlough list was posted at the mechanical facility on June 16—the Friday before Baker, Dowdy, Maddix, and over a dozen other employees visited Dr.

7

Johnson (many of them for the first time) and received COIIs from him. *Id.* at 620, 676, 811. An employee on medical leave while furloughed would receive benefits for up to two years, but if furloughed while not on leave would receive just four months of continued benefits. *Id.* at 2163:5-2164:22; *see also id.* at 631. In Dr. Heligman's view, these happenings thus "had the potential to explain" the unprecedented influx of near-identical COIIs he had received. *Id.* at 1905:25-1906:1. They contributed to the picture that was developing of an "extremely unique" and potentially suspicious scenario. *Id.* at 1897:1.

As Chief Medical Officer, the COII submissions were an "abnormalit[y]" Dr. Heligman had a responsibility to "present . . . to the organization." JA 1961:2-6. Dr. Heligman thus "identified [the] pattern" to CSXT's Law Department and then the Labor Relations team as "a possible issue that should be addressed." *Id.* at 1857:6-9. Once Dr. Heligman presented those teams with the "collection of COII documents," the investigation and discipline process bargained for and required under Plaintiffs' CBA kicked in. *Id.* at 963:2-17; *see also id.* at 1478:17-1479:25 (describing the "front-end discipline process").

## B.    CSXT's Labor Relations team undertook the formal charging and investigative process required by Plaintiffs' bargained-for CBA.

Members of CSXT's Labor Relations team assessed the situation—dozens of employees seeking the same amount of leave at the same time through the same chiropractors—and decided to pursue charges of dishonesty and fraud against the employees involved. JA 2424. Consistent with the CBA-required discipline process, CSXT issued charge letters to each Plaintiff directing them to "[a]rrange to attend a formal investigation" intended:

> to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017, from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances relating thereto.

*Id.* at 537, 548, 550, 561, 579, 581; *see also id.* at 1479:4-5. As the charge letters informed Plaintiffs, the CBA entitled them to have union representation present at the investigation. *Id.* They were also entitled "to have present witnesses who [had] knowledge of the matter under investigation." *Id.*

Each Plaintiff, like all the charged employees, attended a formal investigation run by a hearing officer. JA 2436:1-2. Gus Thoele ran Plaintiffs'

investigative hearings. *Id.* Another CSXT official, Curt Shogren, served as the charging officer at those hearings who presented CSXT's evidence and testimony, including Dr. Heligman's, against each Plaintiff. *Id.* at 2433:7-2434:25.

Plaintiffs' union representatives actively advocated for Plaintiffs and their fellow charged employees throughout the investigations. These representatives "subjected [CSXT's witnesses] to able and rigorous questioning."[1] JA 678. Plaintiffs could also submit their own testimony and evidence through their union representatives. One employee, for example, "submitted documentary evidence" corroborating his claimed injury, including evidence that he had seen another doctor aside from Dr. Johnson. *Id.* at 646.

The evidence and testimony set forth during each investigation were transcribed to generate a record later verified by the hearing officer. JA 1479:6-14; *see also id.* at 2432:5-15, 2439:16-2440:17. Reflecting the quantity of

---

[1] Union representatives were absent for part of Dowdy's investigation hearing, but the Public Law Board confirmed that Dowdy's representation subjected CSXT's witnesses to such questioning on the first day of the hearing and "nothing was developed to clear or exonerate [Dowdy] or the other employees under investigation." JA 678.

evidence and testimony presented during each investigation, the records were "voluminous." *Id.* at 724 (referring to Maddix's record of investigation). Baker's investigation record, for example, "consist[ed] of 306 pages of testimony transcript and exhibits." *Id.* at 620.

The Labor Relations team reviewed each investigation record "page-for-page" and made a recommendation to Brian Barr, then Vice President of CSXT's mechanical department, on whether they believed the evidence supported the charges. JA 2432:15; *id.* at 2371-74. Barr bore ultimate responsibility for deciding what discipline to impose on Plaintiffs. *Id.* at 2448:25-2449:16. After discussion with the Labor Relations team, Barr decided to terminate Plaintiffs. *Id.* at 2449. Barr issued termination letters to Plaintiffs informing them that CSXT had determined from "the testimony and other evidence presented during the investigation" that Plaintiffs violated CSX Operating Rule 104.2a's provision that employees may not be dishonest and CSXT's Code of Ethics Policy. *Id.* at 871, 882, 884, 895, 913, 915. They were thus dismissed. *Id.*

11

**C.    The Public Law Board evaluated the extensive record of each investigation and refused to overturn the terminations.**

The process afforded Plaintiffs did not end with their termination notices.  Instead, as the CBA allowed, each pursued on-property appeals through their union representation.  JA 1480:1-22, 2404:5-18.  Those appeals were denied.  *See, e.g.*, *id.* at 681.  Plaintiffs then sought further review by appealing to the Public Law Board, an arbitral tribunal composed of one union representative, one CSXT representative, and one neutral member.  *Id.* at 1480:17-22; *see also id.* at 679 (reflecting signatures of three Board members).

For each Plaintiff and other employee who appealed, the three-member Board "thoroughly reviewed" the extensive investigation record as well as "all of the contentions raised" during the on-property appeals.  JA 620.  The Board carefully assessed the evidence individual to each dismissed employee, including any evidence the employee submitted to rebut the charges.  For example, based on additional corroborating evidence one employee submitted, the Board reinstated the employee.  *Id.* at 647.  As to another employee, the Board found that CSXT had "sustained its burden of proving [his] guilt," but, based on "somewhat mitigating" circumstances

12

specific to him, ordered him reinstated.  *Id.* at 695-97.  And for Stewart, the Board found that the record supported the charges, but pointed to "unique" circumstances, including that he was treated by another physician, that warranted a different penalty.  *Id.* at 824-25.  The Board therefore ordered him reinstated and his dismissal modified to an unpaid suspension.  *Id.* at 825.

In the Board's view, however, almost all the investigation records (including Stewart's) were "replete with evidence of suspicious activity" by Plaintiffs and their fellow employees and "provided substantial evidence to support [CSXT]'s determination" that the charged dishonesty and fraud had occurred.  JA 677; *see also id.* at 824 ("[T]he record contains . . . a strong circumstantial case against [Stewart]" and "negates the Organization's claim that the Charges against [Stewart] were based only on speculation or assumptions.").  Indeed, the Board noted in many of its decisions its view that the employees were "involved in a concerted effort to defraud [CSXT]." *See, e.g., id.* at 860.  The Board thus found no basis for overturning the

13

termination decisions for Baker, Craycraft, Dowdy, and Maddix.[2]  *Id.* at 621, 674, 678, 724.

## II.    Procedural History.

Plaintiffs and 52 other dismissed employees filed suit alleging violations of federal and state disability and employment statutes as well as state law torts.[3]  JA 106.  As relevant here, Plaintiffs alleged that CSXT and the individual Appellees (collectively, CSXT) violated the antiretaliation and interference provisions of the Family and Medical Leave Act of 1993 (FMLA), 29 U.S.C. §§ 2601 *et seq.*; the antiretaliation provision of the Employment Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 *et seq.*; § 504 of the Rehabilitation Act, 29 U.S.C. §§ 794 *et seq.*, and its prohibition on discrimination based on disability; and the West Virginia Human Rights Act (WVHRA), W. Va. Code 5–11–9(1), which similarly prohibits discrimination on the basis of disability.  JA 460-63.

The District Court rejected Plaintiffs' claims on summary judgment. The court dealt with the antiretaliation and antidiscrimination provisions of

---

[2] Stinnett withdrew his claim before the Board decided it.

[3] The other 52 plaintiffs that instituted this suit have dismissed their claims with prejudice.  *See* Dkt. 471.

the FMLA, ERISA, Rehabilitation Act, and WVHRA together, as all those claims are subject to the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  JA 2699.  The court held that, even assuming Plaintiffs met their initial burden of establishing a prima facie case of discrimination or retaliation under each statute, Plaintiffs could not succeed on their claims.  In the District Court's view, CSXT had provided a "consistent legitimate, nondiscriminatory reason" for terminating Plaintiffs—one that Plaintiffs could not show was a pretext for discrimination.  *Id.* at 2700 (citations omitted).  Specifically, "CSXT believed the Plaintiffs were seeking time off work on an illegitimate basis" and were thus "violating CSXT workplace rules."  *Id.*

Nothing Plaintiffs pointed to showed that this reason was pretextual, and Plaintiffs therefore failed to create the genuine issue of material fact required "to survive summary judgment."  JA 2700.  The District Court emphasized that it did not matter whether CSXT correctly concluded Plaintiffs had violated its Operating Rules and Code of Ethics, so long as that conclusion was truly the reason for their terminations.  *Id.* (citing *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) ("[W]hen an employer gives a legitimate, nondiscriminatory reason for discharging the plaintiff, it is not

15

our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.")). Thus, Plaintiffs' mere disagreement with CSXT's conclusion did not show pretext. *Id.*

The District Court held that nothing in Dr. Heligman's testimony suggested any pretext. Rather, Dr. Heligman clearly "believed that the circumstances indicated fraudulent acts." JA 2701. Moreover, Dr. Heligman was neither the final decisionmaker as to Plaintiffs' terminations, "nor was he the only person who testified during the disciplinary hearings." *Id.* As a result, the ultimate decisionmaker (Brian Barr, not Dr. Heligman) heard evidence beyond just Dr. Heligman's opinions elicited throughout the hearing process. *Id.* And, the District Court noted, because "a predetermination is not the same thing as pretext," even if Dr. Heligman or the other Defendants had been "convinced from the beginning that Plaintiffs were acting fraudulently," that showing "would actually strengthen [CSXT's] argument" that it terminated Plaintiffs "for that reason." *Id.* at 2701 n.3.

Plaintiffs' assertion that they were not all subject to furlough also did not persuade the court, as CSXT still "had sufficient reason to believe that

16

the Plaintiffs were improperly seeking leave" even if not all Plaintiffs were covered by the furlough notices. JA 2701-02. Plaintiffs thus "failed to produce any evidence" suggesting CSXT had terminated them for any reason other than its belief that Plaintiffs acted dishonestly. *Id.* at 2702. Because Plaintiffs had not carried their burden of showing pretext, the District Court granted CSXT summary judgment on Plaintiffs' FMLA retaliation, ERISA, WVHRA, and Rehabilitation Act claims. *Id.*

The District Court reached the same conclusion about Plaintiffs' FMLA interference claim. In the District Court's view, although this Court "has not . . . formally adopted" the "honest belief" rule for such claims, it has "alluded to the rule's validity," and the rule applied here. JA 2703 (citing *Mercer v. Arc of Prince Georges Cnty., Inc.*, 532 F. App'x 392, 396 (4th Cir. 2013) (unpublished)). Because CSXT "honestly believed Plaintiffs sought leave for an improper purpose," that genuinely held belief (whether accurate or not) defeated Plaintiffs' FMLA interference claim. *Id.*

The District Court thus granted CSXT's motion for summary judgment and denied Plaintiffs' motion for partial summary judgment as to the FMLA, ERISA, Rehabilitation Act, and WVHRA claims. JA 2703. In separate orders,

17

the court granted summary judgment for CSXT (and denied it for Plaintiffs) as to all other claims.[4]  Dkts. 439, 440, 441, 442, 443, 445.

## STANDARD OF REVIEW

This Court reviews a district court's order granting summary judgment de novo and affirms "where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Pennington v. Fluor Corp.*, 19 F.4th 589, 595 (4th Cir. 2021).

## SUMMARY OF ARGUMENT

Plaintiffs underwent an extensive disciplinary process, one that included forceful union representation and the ability to present evidence on their own behalf, before CSXT terminated them for dishonesty.  That outcome was then upheld at multiple levels of review.  Plaintiffs do not—and cannot—dispute that their disciplinary decisions emerged from this bargained-for procedure conducted in accordance with their CBA.  And they

---

[4] Among these also-rejected claims, Plaintiffs asserted defamation claims based on Dr. Heligman's letter to the Railroad Retirement Board and other stakeholders alerting them to "highly suspicious" injury claims and calling on them "to fully investigate."  JA 1697-98.  The District Court found these statements to be opinion protected by the First Amendment and calls for investigation protected by the qualified privilege.  *Id.* at 1699-1704.  Plaintiffs did not appeal—and have waived any appeal—as to the grant of summary judgment on their defamation claims.

presented no evidence that during the investigation that resulted in their termination, they received lesser benefits than they would have received had they been on valid FMLA leave.

Yet Plaintiffs continue to pursue claims for discrimination, retaliation, and FMLA interference based on their unsupported view that the process they received was somehow "predetermined" by one actor, Dr. Heligman—who was not even the decisionmaker on their terminations. As the District Court correctly held, Plaintiffs created no genuine dispute that CSXT dismissed Plaintiffs for any reason other than CSXT's genuine and honestly held belief that Plaintiffs were dishonest when they, along with some 60 other CSXT employees from the same facility, submitted near-identical COIIs. Nor were Plaintiffs prejudiced by any purported interference with any of their rights under the FMLA.

I. The District Court correctly held that Plaintiffs' retaliation and discrimination claims under the FMLA, ERISA, Rehabilitation Act, and WVHRA all failed at summary judgment because Plaintiffs did not raise any triable issue about pretext. CSXT consistently offered the same legitimate, nondiscriminatory reason for dismissing Plaintiffs: CSXT genuinely believed Plaintiffs were dishonest and thus violated workplace rules.

19

Plaintiffs did not point to any evidence below or here that rendered that reason pretextual. Instead, Plaintiffs simply sought, and seek again here, to undercut Dr. Heligman's coherent and consistent testimony, while ignoring the broader picture.

The full context of this case reflects that both Dr. Heligman's initial decision to report Plaintiffs' COIIs as a potential pattern of misconduct and CSXT's ultimate decision to dismiss Plaintiffs were genuine. Dr. Heligman, serving as CSXT's Chief Medical Officer after decades spent working in similar roles for railroads, witnessed something unprecedented in his long career. He received close to 70 almost identical COIIs from just two chiropractors over just a few weeks. This remarkable occurrence was something he had to report to CSXT management, and he did. CSXT viewed this scenario as equally suspicious, but it did not terminate Plaintiffs right away based solely on suspicion. Instead, CSXT launched the thorough process Plaintiffs' CBA required, including a disciplinary hearing at which Plaintiffs had union representation and could present their own evidence. Only after that process did a decisionmaker at CSXT, Brian Barr, terminate Plaintiffs.

Because there is no genuine dispute that CSXT's belief that Plaintiffs violated workplace rules was "the real reason for [their] termination," District Court's summary judgment ruling on the retaliation and discrimination claims should be affirmed. *Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 722 (4th Cir. 2013).

II. The District Court's ruling dismissing Plaintiffs' FMLA interference claim should also be affirmed—for essentially the same reasons. *See Yashenko v. Harrah's NC Casino Co.*, 446 F.3d 541, 551 (4th Cir. 2006) (rejecting FMLA retaliation and interference claims based on same evidence showing that legitimate reason for termination was not pretextual). Plaintiffs cannot carry their burden on that claim because they were neither eligible employees with whose benefits CSXT unlawfully interfered, nor did they suffer any prejudice because of any supposed interference.

The District Court properly applied the "honest-belief rule" in deciding that CSXT's honest belief that Plaintiffs acted dishonestly defeated Plaintiffs' interference claim. As the Third, Seventh, and Tenth Circuits have held, and a panel of this Court has cited with approval, an employer's honest belief that an employee is dishonestly seeking or using FMLA leave defeats an interference claim. Such an employee is no longer an eligible employee

entitled to any benefits with which the employer could interfere. *See Mercer*, 532 F. App'x at 396 (citing *Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 681 (7th Cir. 1997)); *see also Medley v. Polk Co.*, 260 F.3d 1202, 1207 (10th Cir. 2001); *Parker v. Verizon Pennsylvania, Inc.*, 309 F. App'x 551, 563 (3d Cir. 2009) (unpublished). Plaintiffs provide no basis for this Court not to apply this rule here, especially because not applying it would give employees who acted dishonestly in claiming FMLA leave "greater rights" than employees who were dishonest in some other respect—and "the statute . . . rule[s] out that inequity." *Kariotis*, 131 F.3d at 681.

This Court also has an independent basis to affirm the District Court's ruling: Plaintiffs identify no prejudice they suffered because of any failure to issue eligibility notices or process paperwork. Plaintiffs' interference claim thus fails on this basis as well. *See Vannoy v. Fed. Rsrv. Bank of Richmond*, 827 F.3d 296, 302 (4th Cir. 2016) (The FMLA "'provides no relief unless the employee has been prejudiced by [a purported] violation.'" (quoting *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)). This Court should affirm the District Court's decision on both sets of claims.

## ARGUMENT

## I. The District Court correctly granted summary judgment on the discrimination and retaliation claims.

The District Court correctly held that there was no genuine dispute that CSXT's nondiscriminatory reason for terminating Plaintiffs—their violations of workplace rules as confirmed by the collectively bargained process—was genuine. Nothing in Plaintiffs' cherry-picked characterization of the record and reliance on inapt authority overcomes that conclusion. Their argument depends on ignoring both their role in the unprecedented, en masse submission of near-identical COIIs as well as the extensive process they were afforded under their CBA—one involving multiple players and layers of review. Plaintiffs instead try to paint an (inaccurate) picture of a baseless vendetta pursued solely by Dr. Heligman and seek to undercut Dr. Heligman's consistent explanation of why he brought the COIIs to management's attention. The record and applicable law refute Plaintiffs' portrayal of the case and confirm that the District Court correctly held Plaintiffs had not created a genuine dispute of material fact as to pretext.

## A. CSXT's belief that Plaintiffs violated workplace rules was genuine, so it does not matter if it was accurate.

What matters here is that CSXT in fact believed Plaintiffs violated company rules, not whether CSXT (or Dr. Heligman) was right about that belief. Because Plaintiffs concede that "there is not direct evidence of discriminatory intent under any of [the relevant] statutory schemes," JA 1779, Plaintiffs' antiretaliation and antidiscrimination claims all operate under the *McDonnell Douglas* framework.[5] Under this framework, once an employer rebuts a prima facie case by showing it had a legitimate, nondiscriminatory reason for terminating the plaintiff, the plaintiff must persuade the factfinder that this proffered reason was a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 802, 804. To show pretext, the plaintiff must prove that the employer's proffered reason was false—and

---

[5] *See Sharif v. United Airlines, Inc.*, 841 F.3d 199, 203 (4th Cir. 2016) (FMLA retaliation); *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 238, 239 (4th Cir. 1991) (ERISA); *Hannah P. v. Coats*, 916 F.3d 327, 342 (4th Cir. 2019) (Rehabilitation Act); *Mayflower Vehicle Sys., Inc. v. Cheeks*, 629 S.E.2d 762, 772 (W.Va. 2006) (WVHRA).

the real reason for her termination was discrimination or retaliation. *Laing*, 703 F.3d at 722.

Contrary to Plaintiffs' view, the employer's reason need not be "wise, fair, or even correct . . . so long as it truly was the reason for the . . . termination." *Hawkins*, 203 F.3d at 279. Courts do not "sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998). Indeed, even if an employee "was fired for misconduct she did not actually engage in, that is unfortunate, but a good-faith factual mistake" does not show retaliatory or discriminatory intent. *Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 903 (4th Cir. 2017); *see also Hannah P.*, 916 F.3d at 345 ("It is not the job of this court to decide whether Appellee made the right choice . . . [r]ather, our job is simply to decide whether Appellee made an illegal choice.").

Plaintiffs try to muddy this clear standard by arguing that "goofs, or mistaken beliefs" can defeat a legitimate, nondiscriminatory reason for termination. Pls.' Br. 28. Nothing Plaintiffs cite supports this assertion. Instead, Plaintiffs rely on cases addressing whether a plaintiff was "regarded as" disabled for purposes of an Americans with Disabilities Act claim, *id.* at

28-29 (citing *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 144 (3d Cir. 1998)), or threatened health and safety for purposes of the ADA's public accommodations provision, *id.* at 28 (citing *Bragdon v. Abbott*, 524 U.S. 624, 649-50 (1998)).  These decisions did not address and have nothing to say about the *McDonnell Douglas* pretext determination.

Plaintiffs also mischaracterize this Court's decision in *EEOC v. Sears Roebuck & Co.*, 243 F.3d 846 (4th Cir. 2001).  That decision did not allow employees to prove pretext by pointing to "mistakes of fact."  *Contra* Pls.' Br. 26.  Rather, the evidence there showed the employer had *not* made an honest mistake.  *Sears Roebuck*, 243 F.3d at 853.  *Sears Roebuck* thus reflects that "a mistaken belief," if "honestly held," *is* a legitimate, non-pretextual reason. *Id.*

Because they misconstrue the relevant standard, Plaintiffs waste much of their brief on irrelevant (and unpersuasive) assertions that Dr. Heligman was somehow wrong to think the Plaintiffs engaged in dishonesty.  But whether Dr. Heligman was wrong—and there is nothing to suggest he was—says nothing about whether he genuinely believed Plaintiffs were dishonest.  And whether Dr. Heligman genuinely believed Plaintiffs were dishonest also says nothing about the ultimate question of whether CSXT—

and specifically Barr, the ultimate decisionmaker as to termination for the employees in the mechanical department—"had ample reason to believe it had been lied to" when it decided to terminate Plaintiffs. *Sharif*, 841 F.3d at 206. Because the record shows that it did, the District Court correctly granted CSXT summary judgment.[6]

## B. Plaintiffs identified no genuine dispute over the legitimacy of CSXT's consistent, well-supported reason for termination.

CSXT has consistently maintained the same legitimate, nondiscriminatory reason for terminating Plaintiffs: CSXT believed Plaintiffs acted dishonestly and thus violated CSXT policy. The District

---

[6] Plaintiffs did not name the ultimate decisionmaker Brian Barr as a defendant. For the other individuals named as defendants (other than Dr. Heligman), Plaintiffs' brief identifies no evidence of their liability other than the conclusory assertion that "[c]ompany disciplinary investigations . . . were conducted and overseen" by those otherwise ignored defendants. Pls.' Br. 6-7. Plaintiffs thus provide no basis at all for disturbing summary judgment as to those individuals. *See Walker v. Prince George's Cnty.*, 575 F.3d 426, 429 n.* (4th Cir. 2009) ("Judges are not like pigs, hunting for truffles buried in briefs.").

Court correctly held that Plaintiffs failed to create a triable issue of pretext, and none of Plaintiffs' rehashed arguments here change that conclusion.

### 1. Dr. Heligman consistently testified that he observed a suspicious pattern he was obligated to report.

Plaintiffs assert that Dr. Heligman provided the only evidence of their wrongdoing and that purported inconsistencies in his testimony therefore created a jury question on pretext. Pls.' Br. 29, 36. But the initial evidence of Plaintiffs' dishonesty spoke for itself in the form of almost 70 markedly similar COIIs submitted by two chiropractors over several weeks. Dr. Heligman identified this evidence and brought it to the attention of CSXT officials who could investigate further and make the ultimate discipline decisions. *See* JA 1961:2-6; *id.* at 1503:17-20 ("[I]t was the responsibility, following the process and procedures of the investigation and hearing, for others to make the determination as to the guilt or innocence."). Although Dr. Heligman did not play the all-powerful role Plaintiffs cast him in, he never wavered in his explanation about what he observed and why it

suggested Plaintiffs' dishonesty.  Thus, as the District Court correctly held, Dr. Heligman's testimony did not create any genuine factual dispute.

Plaintiffs try to impeach Dr. Heligman with excised deposition snippets that, in context, confirm Dr. Heligman's consistent explanation.  For one, by responding in the affirmative to Plaintiffs' counsel's assertions that he engaged in "pure speculation" and had "zero information" about what CSXT employees discussed with Drs. Johnson and Carey, JA 2254:23-2255:8, Dr. Heligman was simply adhering to the same explanation he gave throughout his depositions.  Dr. Heligman never claimed insight into each Plaintiff's mind or interactions with their provider—how could he?  What he knew was that dozens of employees had suddenly submitted remarkably similar COIIs—something he had never witnessed in his decades of work for railroads.  *See supra* at 7.  As Dr. Heligman repeatedly testified, the overarching and unprecedented pattern he observed was his concern, "not necessarily what was on . . . any one document" or in any one employee's mind.  JA 1504:16-19; *see also id.* at 1856-59.

Dr. Heligman also knew from his experience and training that some employees might seek out providers they know are willing to accept their representations of injury or certify excessive work absences, without either

side explicitly discussing their intentions.  JA 2217:21-2221:22; *id.* at 2220:23-25 ("I understand the dynamics that take place between a practitioner and their patient."); *id.* at 1455:6-11 ("[I]t's clear [from the medical literature] that health care professionals will misrepresent information to various agencies to assist their patients to receive benefits.").  It is this conduct that he described as a potential "subconscious[]" effort to defraud.  *Id.* at 2219:18-23.  But again, Dr. Heligman never claimed to witness such interactions.  What he witnessed was a mass submission of near-identical COIIs that did not provide individualized assessments of employees.  *Id.* at 608.  Because that event raised the "possibility" of wrongdoing, he notified CSXT management of the "potential" misconduct so that an "investigation and hearing process [could] determine what the facts were in the case."  *Id.* at 1503:8-12.

Plaintiffs' argument that Dr. Heligman was somehow inconsistent in disclaiming an intent to interfere with the doctor-patient relationship, Pls.' Br. 31, 36, also ignores that it was the overall pattern of similar COIIs that made Dr. Heligman suspect potential wrongdoing.  As Dr. Heligman explained, looking at any one COII in isolation, he did not have reason to believe that a single form in isolation was false.  It was the almost 70 near-identical COIIs *together* that raised his suspicions.  JA 2299; *id.* at 1900 ("The

30

issue was of the pattern . . . The issue wasn't the medical information on the documents, per se.").   Nor was it the diagnosis on any one form that he doubted.  Instead, it was (among other similarities) the uniform certification of two months off for "a nonspecific soft tissue, musculoskeletal-type complaint."  *Id.* at 1860:5-7.  By reporting this pattern for investigation, Dr. Heligman was not deciding that each employee's diagnosis was fraudulent. He was instead notifying CSXT of a problematic pattern so that CSXT could investigate it.

For the same reasons, Plaintiffs' contention that they were not all subject to furlough does not bear on whether dishonesty was the true reason for their termination.   Dr. Heligman did not know whether any one employee who submitted a COII was subject to the furlough notices.  *See* JA 2213:11-2214:4.  He simply knew that furlough notices and information about force reductions were out there for the same facility where all these employees worked.  *Id.* at 1033:15-1034:18.  That knowledge, layered on top of the already notable influx of similar COIIs, confirmed even more that Dr. Heligman must report what he saw.  *See id.* at 1034:25-1035:7 ("It had the potential to explain some of the behavior.").   As of the hearings, Dr. Heligman knew that not all the Plaintiffs were subject to the furlough

notices, *id.* at 2213:24-2214:4 — but at that point each employee had the chance to present their individual case and refute (as one ultimately did) the charges. *Supra* at 10, 12. And because Plaintiffs underwent that established, bargained-for investigatory process, there is no genuine dispute about pretext. *See infra* at 32-35.

Viewed in context, Dr. Heligman's testimony shows that he reported Plaintiffs because he genuinely believed they were potentially engaged in fraud or dishonesty. Plaintiffs identify no evidence suggesting Dr. Heligman had any other reason for taking that course.

### 2. Plaintiffs' mere disagreement with CSXT's termination decisions does not establish pretext.

Not only do Plaintiffs fail to identify anything in Dr. Heligman's testimony creating an issue of triable fact, but their exclusive focus on Dr. Heligman means they ignore the key question: whether CSXT's decision to fire Plaintiffs for violating workplace rules was "dishonest or not the real reason for [their] termination." *Hawkins*, 203 F.3d at 280. "[T]he unexceptional fact that [Plaintiffs] disagree[] with the outcome of [CSXT's]

investigation" does not carry Plaintiffs' burden of showing pretext—and that disagreement is all that Plaintiffs have. *Laing*, 703 F.3d at 722.

Plaintiffs' contention that Dr. Heligman launched a "predetermined" hearing process lacks any basis in the record. Pls.' Br. 36-37. The evidence shows that CSXT followed its usual procedures—those bargained for and required by Plaintiffs' CBA—to investigate and, if the charges were proven, ultimately discipline Plaintiffs. *Cf. Sharif*, 841 F.3d at 206 ("[F]ailure to comply with established investigatory procedures might . . . be evidence of improper motive" but "is not per se sufficient to create a genuine dispute as to pretext."). As the District Court observed, "Plaintiffs have no evidence that the hearing process was somehow pretextual." JA 2701. Instead, it followed the usual investigative process: Gus Thoele oversaw the hearings, Dr. Heligman and Curt Shogren served as CSXT's witnesses and presented the evidence against Plaintiffs, and Plaintiffs had union representation that "ably" questioned CSXT's witnesses and advocated on Plaintiffs' behalf. *See* JA 608-10. Plaintiffs were then able to present their own evidence and witnesses. So thorough were these hearings that they produced hundreds of pages in testimony and exhibits—pages that were "replete with evidence

of suspicious activity" and "provided substantial evidence" of dishonesty and fraud. JA 620, 677, 674, 724.

CSXT's Labor Relations Team (of which Dr. Heligman was not a part) reviewed these extensive records "page-for-page." JA 2432:15; *id.* at 2371-74. CSXT's Brian Barr (not Dr. Heligman) decided that the record supported the charges and that Plaintiffs' dismissal was warranted. *Id.* at 2448:25-2449:16. And the process did not end there—Plaintiffs had the benefit of union representation to pursue on-property and arbitral appeals. *Supra* at 12. That process only confirmed the dishonesty first suspected.

Even if the initial hearings were somehow "predetermined," and no evidence reflects that they were, the District Court rightly observed that predetermination does not equal pretext. JA 2701. If Dr. Heligman believed so strongly that Plaintiffs were dishonest that he somehow engineered the hearings to guarantee dismissals (and no evidence suggests he could have

or did),[7] that would merely confirm that he genuinely believed Plaintiffs were dishonest. It would not show that he or anyone had CSXT acted with animus.

Plaintiffs thus identified no genuine dispute on pretext. The District Court correctly held that there was no triable issue that CSXT's legitimate, nondiscriminatory reason for terminating Plaintiffs was the true reason for termination. This Court should affirm that decision.

## II. The District Court correctly granted summary judgment on the FMLA interference claim.

This Court should also affirm the District Court's correct conclusion that Plaintiffs lacked a viable claim for FMLA interference. An employee claiming FMLA interference under 29 U.S.C. § 2615(a)(1) must "demonstrate that (1) he is entitled to an FMLA benefit; (2) his employer interfered with the provision of that benefit; and (3) that interference caused harm." *Adams*

---

[7] The letters Dr. Heligman sent the Railroad Retirement Board and health insurance companies do not show the hearings were "predetermined from the beginning." *Contra* Pls.' Br. 36-37. Those letters mirrored Dr. Heligman's report to CSXT—they simply provided notice of a potential problem that it would be in the recipients' interest to investigate. *See* JA 1697-98; *see also id.* at 1020:14-16 ("It was my intent that all of these parties should investigate and make determinations for themselves as to what to do with the information.").

*v. Anne Arundel Cnty. Pub. Schs.*, 789 F.3d 422, 427 (4th Cir. 2015). Plaintiffs could not establish any of these three elements. Because CSXT had a legitimate reason for terminating Plaintiffs rather than giving them FMLA leave—its honest belief they were dishonest in seeking FMLA leave—Plaintiffs cannot show they were entitled to any FMLA benefits with which CSXT wrongfully interfered. And Plaintiffs omit any showing or argument that they were prejudiced by any supposed interference. The District Court thus correctly granted CSXT summary judgment on this claim.

### A. There was no unlawful interference because CSXT honestly believed Plaintiffs sought leave for an improper purpose.

The District Court correctly dismissed the interference claim because "'an employer does not interfere with the exercise of FMLA rights where it terminates an employee's employment based on the employer's honest belief that the employee is not taking FMLA for an approved purpose.'" JA 2703 (quoting *Mercer*, 532 F. App'x at 396). That "honest belief" rule correctly states the law of FMLA interference. And Plaintiffs offered no evidence that CSXT lacked an honest belief that Plaintiffs dishonestly sought FMLA leave.

### 1.   The honest belief rule applies to FMLA interference claims.

An employer who honestly believes that an employee dishonestly requested FMLA leave does not interfere with FMLA rights by not "processing" that leave request or by ultimately terminating that employee. If an employee acts dishonestly in requesting FMLA leave, she is not an "eligible employee" entitled to any benefits under the FMLA. *Vail v. Raybestos Prods. Co.*, 533 F.3d 904, 909 (7th Cir. 2008). As "the FMLA's regulations plainly state," an employee taking FMLA leave "has 'no greater right to [any] benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period.'" *Kariotis*, 131 F.3d at 681 (quoting 29 C.F.R. § 825.216(a)); *see also* 29 U.S.C. § 2614(a)(3)(B) (no employee taking FMLA leave is entitled to "any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave"). "In other words, because [an employer] lawfully could have terminated [an employee] after suspecting she committed fraud while on duty, the company can discharge her after suspecting she committed fraud while on leave"—or, as here, in requesting leave. *Kariotis*, 131 F.3d at 681;

37

*see also* 29 C.F.R. § 825.216(d) ("An employee who fraudulently obtains FMLA leave from an employer is not protected by FMLA's job restoration or maintenance of health benefits provisions.")

Thus, "[t]he FMLA does not shield an employee from termination simply because the alleged misconduct concerns use of FMLA leave." *Parker*, 309 F. App'x at 563. "Just as suspected fraud or violation of company policy would be a sufficient basis to discharge an employee not on FMLA leave, it is a sufficient basis to discharge one who misuses FMLA leave" — and it is enough to discharge one who dishonestly requests FMLA leave. *Id.* Requiring an employer to prove more than that honest suspicion before terminating an employee for falsely claiming FMLA leave would make FMLA fraudsters "better off (and enjoy 'greater rights') than similarly situated employees (suspected of fraud) who are not on leave." *Kariotis*, 131 F.3d at 681. "The statute and the regulations rule out that inequity." *Id.*

Sister circuits have thus applied the honest belief rule to former employees (like Plaintiffs) suspected of misusing FMLA leave. The seminal *Kariotis* case, for example, affirmed summary judgment against an employee "suspected of dishonestly extending her disability leave," even though the company's "investigation hardly look[ed] world-class." *Id.* at 677. It was

38

sufficient for summary judgment that the company "demonstrated that it honestly believed she was not on a legitimate FMLA leave." *Id.* at 680-81. A panel of this Court cited *Kariotis* with approval. *Mercer*, 532 F. App'x at 396--97. In *Mercer*, the panel relied on *Kariotis* for the proposition "that an employer does not interfere with the exercise of FMLA rights where it terminates an employee's employment based on the employer's honest belief that the employee is not taking FMLA for an approved purpose." *Id.*

Plaintiffs try to distinguish this case from *Kariotis* and *Mercer* because Plaintiffs "were terminated before even being processed for medical leave under the FMLA." Pls.' Br. 39. But that timing is irrelevant. A violation of a company's honesty policy warrants termination no matter when it is detected. *See Kariotis,* 131 F.3d at 681; *Parker*, 309 F. App'x at 563. And the dishonesty apparent in the initial requests for FMLA leave equally warrants termination (at which point no further processing of leave is required).

The Seventh Circuit affirmed summary judgment against an FMLA interference claim on facts like those here in *Crouch v. Whirlpool Corp.*, 447 F.3d 984 (7th Cir. 2006). That plaintiff submitted "Accident & Sickness Claim Forms" that suspiciously coincided with periods for which his vacation requests had been denied. *Id.* at 985. The employer suspected the employee

had violated a company rule against falsifying personnel forms, and ultimately terminated the employee. *Id.* at 986. That termination for falsifying forms defeated the plaintiff's interference claim because "even an employer's honest suspicion that the employee was not using his medical leave for its intended purpose is enough to defeat the employee's substantive rights FMLA claim." *Id.*[8]

Plaintiffs offer no persuasive reason *not* to adopt the honest-belief rule in this Circuit. Nor do they identify any court in this Circuit or elsewhere that has rejected the rule. Aside from insisting that this Court has not yet joined the Third, Seventh, and Tenth Circuits (as well as district courts from

---

[8] *Accord Scruggs v. Carrier Corp.*, 688 F.3d 821, 826 (7th Cir. 2012) (the employer "did not violate [the employee's] FMLA rights" when it terminated him for violating a company rule against falsifying documents "because it honestly believed [he] was not using his leave for its intended purpose"); *Medley*, 260 F.3d at 1207 (termination based on an employer's honest belief that leave was not for a proper FMLA purpose "would not be in violation of FMLA, even if its conclusion is mistaken"); *Parker*, 309 F. App'x at 563 (affirming summary judgment on FMLA interference claim because the employer's "honest suspicion that [the employee] misused his leave prevent[ed] it from being found liable for violating the FMLA").

this circuit) in applying the rule,[9] Pls.' Br. 38, Plaintiffs' only argument

against it is that "there is no intent element in an interference claim."  *Id.* at

2.  But the honest-belief rule does not make the employer's intent an *element*

of the claim such that the employee must prove the employer meant to

discriminate or retaliate against her.  In situations of suspected FMLA abuse,

the rule acknowledges that the employer's mindset is *relevant* if the employer

honestly believed the employee was misusing FMLA leave and was

therefore not an eligible employee entitled to any benefits.  *See Scruggs*, 688

F.3d at 825-26 (although "[a]n interference claim does not require an

employee to prove discriminatory intent . . . an employer can defeat an

interference claim . . . based on an honest suspicion that [the employee] was

abusing her leave.").

Plaintiffs cite no precedent—and CSXT is aware of none—forbidding

courts to consider the employer's honest belief under these circumstances.

---

[9] *See Spears v. Water & Sewage Auth. of Cabarrus Cnty.*, 2017 WL 2275011, at *8 n.3 (M.D.N.C. May 24, 2017); *Bosse v. Baltimore Cnty.*, 2011 WL 13362483, at *1, *5 (D. Md. Apr. 6, 2011).  Plaintiffs suggest in passing that *Sharif v. United Airlines* "rejected" the honest-belief rule.  Pls.' Br. 38.  But *Sharif* did not address FMLA interference; it simply stated that the rule was an unnecessary addition to the *McDonnell Douglas* framework when assessing an FMLA *retaliation* claim.  841 F.3d at 207 n.2.

Plaintiffs quote Eleventh Circuit authority stating that "'the employer's motives are irrelevant,'" Pls.' Br. 25 (quoting *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1208 (11th Cir. 2001)), but ignore that the same decision then acknowledges that if the employer "would have discharged the employee had he not been on FMLA leave," there would be no interference claim. *Strickland*, 239 F.3d at 1208; *see also Scruggs*, 688 F.3d at 825-26 ("An interference claim does not require an employee to prove discriminatory intent," but an employer may still "defeat an interference claim . . . based on an honest suspicion that [the employee] was abusing her leave."). This rule is the only logical one: forbidding consideration of the employer's honest suspicion of dishonesty would impermissibly endow FMLA fraudsters with "'greater right[s]'" than other dishonest employees. *Kariotis*, 131 F.3d at 681 (quoting 29 C.F.R. § 825.216(a)).

### 2.    CSXT honestly believed that Plaintiffs improperly sought leave.

The District Court correctly held that the honest-belief rule disposes of Plaintiffs' FMLA interference claim here. JA 2703. Summary judgment was correct because Plaintiffs "failed to produce any evidence or persuasive

argument suggesting [CSXT] did not honestly believe leave was sought for an improper purpose." *Id.*

Plaintiffs' burden on the interference claim resembles their burden for the retaliation claims: they must show sufficient evidence for a reasonable jury to find that CSX did *not* harbor an honest suspicion of dishonesty. *See Parker*, 309 F. App'x at 563 (rejecting FMLA interference claim "[f]or the [same] reasons" that the "pretext claim" failed); JA 1779 ("[I]t does seem to me that ultimately the interference claim rests really under the same analysis that the retaliation claims rest on."). In other words, Plaintiffs had to introduce evidence "sufficient to have a jury decide that this may have been pretextual on the part of CSX[T]." JA 1779; *see also Yashenko*, 446 F.3d at 551 ("Yashenko's retaliation claim fails because he has not proffered evidence demonstrating that Harrah's asserted legitimate non-discriminatory reason for eliminating his position was pretextual. As discussed above in reference to Yashenko's interference claim, Harrah's offered a great deal of evidence explaining its reasons for eliminating Yashenko's position, none of which relate to his FMLA leave.").

Plaintiffs thus fail to meet their burden under the honest-belief rule for the same reasons that they failed to meet their burden for the retaliation

claims.  There is no evidence of pretext in CSXT's reason for not processing Plaintiffs' paperwork and ultimately terminating them.  Dr. Heligman received a remarkable deluge of matching COIIs, the likes of which he had never seen, and the Labor Relations Team agreed with him that these "extremely unique" circumstances were worth investigating.  JA 1896:25-1897:1.  CSXT followed the thorough course of investigation and discipline required by Plaintiffs' CBA, a process that elicited substantial evidence and testimony (including whatever Plaintiffs presented on their behalf).  *Supra* at 10-11.  A decisionmaker other than Dr. Heligman reviewed this evidence and decided the evidence supported dismissal for dishonesty.  *Id.* at 11.  And Plaintiffs then received more review and appeal rights during which these determinations were thoroughly assessed and confirmed.  *Id.* at 12-13.  Plaintiffs have identified no evidence suggesting CSXT did not consistently, reasonably, and honestly believe Plaintiffs violated workplace ethics rules.

Nor do Plaintiffs offer any authority suggesting summary judgment was improper on these facts.  Plaintiffs contend that "some courts have found the application of the honest belief excuse to be a fact question for the jury."  Pls.' Br. 39.  But Plaintiffs do not even contend that the facts of those cases resemble the facts here.  *See id.* at 39-41.  In particular, none of those

cases involved plaintiffs who were terminated only after they (1) claimed leave in an astronomically unlikely mass, (2) had union representation and an opportunity to present their own medical testimony, and yet (3) were found to have been dishonest in a collectively bargained tribunal.

## B.  Plaintiffs also lack a viable interference claim because they were not prejudiced.

This Court can also affirm summary judgment on the independent ground that Plaintiffs offered no evidence of prejudice.  *See Lawson v. Union Cnty. Clerk of Ct.*, 828 F.3d 239, 247 (4th Cir. 2016), *as amended* (July 8, 2016) ("Our review is not limited to the grounds the district court relied upon, and we may affirm on any basis fairly supported by the record.").  The FMLA "'provides no relief unless the employee has been prejudiced by [a purported] violation.'"  *Vannoy*, 827 F.3d at 302 (quoting *Ragsdale*, 535 U.S. at 89).

Plaintiffs complain that CSXT committed FMLA interference by "fail[ing] to process any of the Plaintiffs' requests for medical leave" or to issue eligibility notices to Plaintiffs when they submitted their COIIs.  Pls.' Br. 24.  But Plaintiffs identify no prejudice from those alleged failures. Plaintiffs apparently assert that the mere lack of paperwork or eligibility

notice prejudiced them because they could have structured their leave differently had they known FMLA leave was available.[10]  *Id.* at 22-23. Plaintiffs do not explain, however, exactly how the paperwork processing should have been different—instead, they merely speculate that it could have been.  And, even more fundamentally, they do not explain how they would have approached their leave any differently if CSXT had issued eligibility notices.

In fact, Plaintiffs *were* placed on leave pending the results of the investigation incited by their submission of the COII forms.  And Plaintiffs presented no evidence that while on leave, they became ineligible for Railroad Retirement Board benefits or health insurance coverage.  In other words, there is no evidence that they were harmed compared to what would have happened had they been on FMLA leave or received the eligibility

---

[10] Plaintiffs also assert that "[o]nce an employee gives notice to an employer that FMLA leave is requested," the employer must provide "written notice detailing the specific expectations and obligations of the employee," and that "[a] failure of the employer to provide this written notice precludes any adverse action [against the employee] as stated in 29 CFR 825.302(f)."  Pls.' Br. 23.  It is unclear what regulation Plaintiffs are quoting—29 C.F.R. § 825.302(f) says nothing on this point—but even if Plaintiffs identified such a regulation, it would be irrelevant.  Plaintiffs were terminated because they violated CSXT's honesty policy, not because of some procedural foot-fault with their paperwork.

notice of the same. *See* JA 1772:6-1773:8; *see also* Defs.' Ex. 26, Dkt. 370-20 at 67:15-20; Defs.' Ex. 57, Dkt. 370-51 at 127:23-128:12; Defs.' Ex. 59, Dkt. 370-53 at 59:10-15. Plaintiffs offer no evidence of any other entitlement had their leave been designated as FMLA leave. Nor do they identify what they might have done differently had they received an eligibility notice or other paperwork.

The lack of evidence of harm contrasts with what this Court has viewed as sufficient to create a jury question on prejudice. In *Hannah P. v. Coats*, the plaintiff took off work using a combination of sick leave and annual time. 916 F.3d at 347. But she would only have taken sick leave had she known FMLA protected her position. *Id.* Had she not used that annual leave, she would have been paid out for it to the tune of at least $20,000. *Id.* This evidence of harm, this Court held, created a triable issue as to prejudice. *Id.*

The FMLA's implementing regulations similarly explain that an employee who takes leave that should be designated as FMLA leave but is not, while planning to use her FMLA leave for another purpose, might show prejudice from her employer's failure to properly designate her initial leave. 29 C.F.R. § 825.301(e). But an employee who did not receive proper

47

designation of leave yet remained out of work because of his health condition regardless of the designation likely could not show the required prejudice. *Id.* Plaintiffs plainly fall in the latter bucket. Thus, summary judgment would be independently required because Plaintiffs suffered no prejudice from any FMLA interference.

### C. CSXT properly presented the interference claim on summary judgment.

Plaintiffs also try to ward off summary judgment on FMLA interference by insisting that CSXT "never moved for summary judgment on that claim." Pls.' Br. 11. That argument fails for three reasons. First, Plaintiffs waived it. Second, CSXT did move for summary judgment on this claim. Third, even if CSXT had not so moved, summary judgment was still proper because Plaintiffs had ample opportunity to oppose.

First, the District Court correctly concluded that Plaintiffs failed to preserve an argument that CSXT did not move for summary judgment on FMLA interference. Plaintiffs addressed FMLA interference "at length" at the summary judgment hearing, yet "[a]t no time did Plaintiffs argue that interference was improperly before the Court." JA 2702 n.4. The District Court correctly held that Plaintiffs' abandoning this argument at that

48

hearing was reason enough to "reject[] Plaintiffs' submission that the interference claim is not at issue on summary judgment." *Id.* And Plaintiffs' opening brief here does not even mention—let alone rebut—that holding. Plaintiffs thus waived any challenge to that aspect of the District Court's decision. *See Grayson O Co. v. Agadir Int'l LLC,* 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief[.]").

Second, CSXT *did* move for summary judgment on Plaintiffs' FMLA interference claim. As the District Court observed, CSXT "plainly noted in [its] Motion that summary judgment was proper on Plaintiffs' claims of 'denial of benefits and interference under the Family Medical Leave Act of 1993.'" JA 2702 n.4 (quoting Dkt. 363 at 1-2). And CSXT argued below, as it does here, that "an employer does not interfere with the exercise of FMLA rights where it terminates an employee based upon the employer's honest belief that the employee is not taking leave for an approved purpose." Dkt. 363 at 10-12 (citing *Mercer*, 532 F. App'x at 396, 399*; Kariotis*, 131 F.3d at 681); *see also* JA 2702 n.4 (noting that CSXT's supporting brief "cites FMLA interference caselaw to support its argument that it did not interfere with Plaintiffs' FMLA rights").

Third, even if CSXT had not moved for summary judgment on that claim, the District Court correctly granted summary judgment. Plaintiffs acknowledge that Federal Rule of Civil Procedure 56(f) allows courts to grant summary judgment sua sponte if parties have "a reasonable opportunity to present all material pertinent to the claims under consideration." Pls.' Br. 11-12 (quoting *Moore v. Equitrans, L.P.*, 27 F.4th 211, 224 (4th Cir. 2022)). As the District Court noted (and Plaintiffs do not contest on appeal), "FMLA interference was addressed at length" at the summary judgment hearing. JA 2702 n.4. And Plaintiffs identify no other evidence or arguments that they would have used to oppose summary judgment. To the contrary, their brief on appeal simply reiterates the same arguments they

raised below—arguments the District Court correctly rejected in granting

summary judgment.[11]

## CONCLUSION

For these reasons, this Court should affirm the District Court's

judgment.

Dated: November 7, 2022          Respectfully submitted,

                                 */s/ Brian D. Schmalzbach*
                                 Brian D. Schmalzbach
                                 Davis M. Walsh
                                 Kathryn M. Barber
                                 McGuireWoods LLP
                                 Gateway Plaza
                                 800 East Canal Street
                                 Richmond, VA 23219
                                 (804) 775-4746
                                 bschmalzbach@mcguirewoods.com
                                 dwalsh@mcguirewoods.com
                                 kbarber@mcguirewoods.com

---

[11] One exception is Plaintiffs' cursory assertion that the honest-belief rule "was not pled as an affirmative defense" and so "cannot serve as a basis for granting summary judgment." Pls.' Br. 41. That argument was not raised below and so is waived. Even if the honest-belief rule were an affirmative defense, Plaintiffs have long known of CSXT's contention that their "claim pursuant to the Family Medical Leave Act is barred . . . because Plaintiffs violated Defendant CSX Transportation, Inc.'s Operating Rules and Code of Conduct." *See, e.g.*, Dkt. 50 at 299. And in any event, Plaintiffs identify no "unfair surprise or prejudice" warranting waiver of a defense. *See Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 612 (4th Cir. 1999), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003).

Samuel L. Tarry, Jr.
MCGUIREWOODS LLP
1750 Tysons Boulevard, Suite 1800
Tysons, VA 22102
(703) 712-5425
starry@mcguirewoods.com

Melissa Foster Bird
NELSON MULLINS RILEY &
SCARBOROUGH LLP
949 Third Avenue, Suite 200
Huntington, WV 25701
(304) 526-3503
melissa.fosterbird@nelsonmullins.com

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 9,983 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced, 14-point Book Antiqua font using Microsoft Word.

*/s/ Brian D. Schmalzbach*
Brian D. Schmalzbach

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 7, 2022, the foregoing was filed with the Clerk of the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system, which will also serve counsel of record.

*/s/ Brian D. Schmalzbach*
Brian D. Schmalzbach